IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) ) | |
| | ) | Civ. No. 04- 1339-SLR |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AVIE ARENSON, SELK, LLC, LAUREL EQUITY GROUP, LLC, J12ALH ASSOCIATES, A. ARENSON HOLDINGS, LTD. AND D.A. GARDENS, LTD., | ) ) ) ) ) | |
| Defendants. | | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs Shamrock Holdings of California, Inc. ("Shamrock"), its affiliate, Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein"), by and through their attorneys, allege upon knowledge with respect to themselves and their own actions and upon information and belief with respect to other matters as follows:

## NATURE OF THE ACTION

1.    This action seeks declaratory relief, pursuant to 10 Del. C. §§ 6501 et seq. and 28 U.S.C. §§ 2201-02, with respect to certain rights and obligations of the parties hereto.

2.     Defendants, directly and indirectly, invested in the equity of ALH Holdings, LLC. ("ALH"), a limited liability company organized under Delaware law in June 1998 to engage in the home-building business. Shamrock invested millions of dollars more in the equity of ALH than did any of the defendants. Due to no wrongdoing by plaintiffs, ALH was ultimately unsuccessful, with the result that both Shamrock and defendants have lost most of what they invested in ALH. Defendants are now threatening to sue Shamrock, Krieger, Buchler and Stein, even though there is no basis for holding these plaintiffs liable for ALH's disappointing performance.

3.     The plaintiffs' and defendants' financial interests in ALH have at all times been fully aligned. Under the agreement creating ALH, the economic rights of the Class A and Class B investors are *pari passu*. The Class A investors have no financial priority or preference over the Class B investors. The only difference is that Shamrock's share of ALH's losses is necessarily larger than that of defendants, because Shamrock's investment in ALH is larger. No setback experienced by ALH could hurt defendants without hurting Shamrock more. As the single largest investor in ALH, Shamrock always sought to maximize value for all investors. All of plaintiffs' actions in connection with ALH were taken in good faith, in the reasonable exercise of plaintiffs' business judgment.

4.     At most, defendants are claiming that they would have made certain business decisions differently than plaintiffs. In particular, defendants assert that they were opposed to the sale of ALH's operations and that the sale process should have been handled differently. Defendants object vehemently to ALH's separate sales of its regional operations, even though months of searching yielded no buyer for the company

as a whole, and the company could not meet its liquidity and capital needs without selling at least some of its operations. In fact, through their Representative on ALH's Supervisory Board, defendants consented to the sale of ALH and approved the selection, retention and compensation of the financial and investment banking professionals who conducted the auction of ALH's operations.

5.     Defendants seem to believe, in hindsight, that they should have taken some other approach to ALH, e.g., by asserting themselves more strongly in the management of ALH or by presenting concrete alternative plans for meeting ALH's financial obligations and needs, as plaintiffs repeatedly invited defendants to do. Such a hindsight belief cannot support any legal claim against plaintiffs — let alone a claim for bad faith or gross negligence that would override the exculpation clause in § 6.2(f) of ALH's Operating Agreement.

6.     This action presents a case or controversy suitable for declaratory judgment because, among other things, defendants persist in asserting that plaintiffs breached their fiduciary duties, acted in self-interest and engaged in other wrongful conduct. Defendants have repeatedly stated their intention to sue plaintiffs for millions of dollars, insisting that plaintiffs must "make them whole" by paying them the entire amount they claim to have invested in the equity of ALH, plus additional damages. Thus, plaintiffs face a real and substantial probability of being sued by defendants, and are entitled to judicial relief from the injury caused by these spurious accusations.

## THE PARTIES AND THEIR CONNECTIONS WITH DELAWARE

*The Plaintiffs*

7.      Plaintiff Shamrock has invested more than $9.1 million in the equity of ALH, constituting approximately 38% of ALH's total equity.  Shamrock is a Class A Member of ALH, holding approximately 62% of the Class A Membership Interest in ALH.  Shamrock and the other Class A Members of ALH invested a total of approximately $ 14.5 million in ALH (approximately 62% of ALH's total equity).

8.      Plaintiffs Krieger, Buchler and Stein are employees of Shamrock who serve as Representatives on ALH's Supervisory Board.  Krieger, Buchler and Stein all perform substantial services for plaintiff SCA.

*Arenson and the Arenson Entities*

9.      Defendant Avie Arenson ("Arenson") is the founder and controlling shareholder of Israel's largest private real estate contractor.  Over more than four decades, Arenson's companies, which have approximately 1200 employees, have successfully completed numerous major construction projects in Israel and other countries.   Arenson has substantial expertise in the real estate, contracting and construction businesses.

10.      Since the inception of ALH in 1998, Arenson has served on ALH's Supervisory Board as the Representative of ALH's Class B Members (the "Class B Representative").

11.      Since the inception of ALH in 1998, Arenson has owned, controlled and acted as agent for A. Arenson Holdings, Ltd. ("Arenson Holdings") and D.A. Gardens, Ltd. ("D.A. Gardens") (collectively the "Arenson Entities").  The Arenson

Entities claim to have invested $1.4 million in the equity of ALH, which would constitute approximately 6% of ALH's total equity. Each of the Arenson Entities is a Class B Member of ALH; together they claim to hold approximately 17% of the Class B Membership Interest in ALH.

  12. In acting as Class B Representative, Arenson has represented all of ALH's Class B Members, including the Arenson Entities.

  13. As Class B Representative, Arenson has acted in what he perceived and/or claimed to be the best interests of both the Arenson Entities and the other Class B Members.

  14. In all matters relating to the Arenson Entities' initial investment in and subsequent dealings with ALH, Arenson was the controlling person of, and sole agent, spokesperson and signatory for, the Arenson Entities.

  15. Since the inception of ALH in 1998, Arenson has participated materially in the management of ALH. Among other things, Arenson has participated in decisions and actions concerning (a) the corporate structure and governance of ALH and its subsidiaries, (b) the funding of ALH's operations, including assessment of financial needs, arrangements for debt and equity financing and obtaining extensions and waivers in connection with debt financing arrangements, (c) the engagement and payment of consultants and financial/investment banking advisors, (d) the acquisition and disposition of operations, (e) the restructuring of ALH's relationship with affiliates providing management services, (f) the handling and resolution of litigation, and (g) the appointment, compensation and termination of officers of ALH and its subsidiaries.

16.    From time to time, Arenson visited ALH's home-building operations in Florida, Tennessee and North Carolina, talked to local management and made suggestions for improving the operations.

17.    Beginning in or around July 2001, Arenson was one of the three members of ALH's Audit Committee.

18.    Arenson has expressly acknowledged his material participation in the management of ALH, e.g., his statement in April 2002 that he and Shamrock had been allowed by the other Members of ALH to "do what we thought best in the company."

*The June 1998 ALH Transaction*

19.    In and around June 1998, the investors in ALH, including the Arenson Entities and the other Class B Members, negotiated the terms of their investment in a limited liability company to be organized under Delaware law for the purpose of engaging in the home-building business.    That limited liability company, ALH, was formed on June 3, 1998 by the filing of a Certificate of Limited Liability Company with the Office of the Secretary of State of the State of Delaware.

20.    On or around June 12, 1998, the Class B Members, including the Arenson Entities, funded their investments in ALH.    At that time, ALH's operations began.

21.    As a result of the June 1998 closing of the transaction that formed and funded ALH (the "ALH Transaction"), ALH became the sole direct or indirect stockholder of American Landmark Homes Corporation ("ALH Corp.") and Atlantic Builders, Inc. ("ABI"), Delaware corporations with home-building operations in Florida.

The stock of ALH Corp. was contributed to ALH by (a) Landmark Equity Investors LLC, a Delaware limited liability company which thereby became the Class C Member of ALH, and (b) Lion ALH Capital LLC ("Lion LLC"), a Delaware limited liability company which thereby became the Class D Member of ALH.

*The ALH Operating Agreement*

22.    ALH's Operating Agreement was initially signed by ALH's Members as of June 12, 1998 and was amended as of March 15, 1999.  (Except as otherwise indicated, the term "Operating Agreement" as used herein refers to ALH's June 12, 1998 Operating Agreement as amended.)

23.    The Operating Agreement provides that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

24.    Arenson caused the Arenson Entities to enter into the ALH Transaction and signed ALH's original June 12, 1998 Operating Agreement on behalf of the Arenson Entities.

*The Creation of ALH II*

25.    On or around December 9, 1998, the members of ALH's Supervisory Board (the "Class Representatives"), including Arenson, decided that it would be in ALH's best interests to form a Delaware corporate subsidiary which would be the parent company of all of ALH's operating subsidiaries.  That corporate subsidiary, ALH II, Inc. ("ALH II"), was organized on December 9, 1998 by the filing of a

Certificate of Incorporation with the Office of the Secretary of State of Delaware. All Class Representatives, including Arenson, approved the creation of ALH II.

26.     ALH II was created in part for tax planning purposes, in order to, *inter alia*, capture the consolidated tax liability of ALH, while taxable income would flow directly to ALH's Members. ALH II was used as the vehicle for obtaining debt financing for ALH's operations and acquisitions. The financial statements of ALH II were presented to lenders in connection with the initial arrangement and subsequent modification of such loans. As of June 30, 2001, ALH II was the borrower or guarantor on over $40 million in loans for the benefit of ALH and its operations.

27.     Both ALH and ALH II were exposed to potential liability for the debts of ALH II and its subsidiaries. For example, in or around January 2000, ALH II obtained a $27.5 million loan from Wachovia Bank, N.A. ("Wachovia"). The Wachovia loan was secured by surety bonds from Swiss Reinsurance America Corporation ("Swiss Re") and Amwest Surety Insurance Corporation ("Amwest") (subsequently, Swiss Re assumed the Amwest surety bond). The proceeds of this loan were used for, *inter alia*, the acquisition of home-building operations in Charlotte, North Carolina that operated under the name Mulvaney Homes, Inc. ("MHI").

28.     In connection with the Wachovia loan, ALH II pledged its interest in a $500,000 Certificate of Deposit and ALH pledged all of its stock in ALH II. In addition, ALH agreed that, if ALH II defaulted on the loan, Wachovia could require ALH to purchase ALH II's loan obligation to Wachovia for a price equal to ALH's obligation to Wachovia. Thus, in effect, ALH became the guarantor of ALH II's obligations to

Wachovia. All Class Representatives, including Arenson, approved the acquisition of MHI, the Wachovia loan and the related arrangements.

*The March 1999 Operating Agreement Amendment and Related Capital Contributions*

29. Arenson caused the Arenson Entities to enter into the March 15, 1999 Amendment to ALH's Operating Agreement and signed the Amendment on their behalf. In connection with the March 15, 1999 Amendment to the Operating Agreement, Arenson caused the Arenson Entities to make a capital contribution of approximately $469,000 to ALH. The March 19, 1999 Amendment to the Operating Agreement shows this amount as having been contributed jointly by the Arenson Entities; it does not differentiate between Arenson Holdings and D.A. Gardens.

30. The purpose of the capital contributions made by ALH's Class A and Class B Members in connection with the March 15, 1999 Amendment of the Operating Agreement was to provide funds for ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a Delaware corporation and direct wholly-owned subsidiary of ALH II, to acquire Bowden Building Corporation ("BBC"), a home-building company based in Memphis, Tennessee.

31. In connection with the March 15, 1999 Amendment to the Operating Agreement, defendants SELK, LLC ("SELK") guaranteed to ALH that Shalom Lamm ("Lamm"), as Class E Member of ALH, would fulfill his outstanding obligation to contribute capital to ALH (the "Class E Capital Contribution") in the amount of approximately $4.7 million, by paying cash or satisfying certain indebtedness of ALH Corporation (the "SELK Guarantee"). The March 15, 1999 Amendment to the Operating Agreement provides that, if Lamm fails to make the full Class E Capital

9

Contribution, SELK must make up the shortfall by performing under the SELK Guarantee, and to the extent SELK fails to do so, its equity interest in ALH shall be reduced dollar-for-dollar by the amount of the shortfall.

*The 2000 Loans*

32.    Pursuant to a loan agreement dated April 6, 2000 (the "2000 Loan Agreement"), certain ALH investors loaned $2 million to ALH II to "finance certain operations" of ALH II.   Approximately $1.63 million of this amount was loaned by Shamrock.  According to the 2000 Loan Agreement, $166,666 was loaned by an "A. Arenson Holdings, Inc."  The 2000 Loan Agreement does not state what the relationship is between "A. Arenson Holdings, Inc.," on the one hand, and Arenson and the Arenson Entities, on the other hand.

33.    ALH II's obligations under the 2000 Loan Agreement were guaranteed by various ALH II subsidiaries, including three Delaware corporations: Atlantic Builders, Inc. ("ABI"), ALH Acquisition Corp. (the parent company of ABI) and ALH-Tennessee (the parent company of BBC).

34.    All Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2000 Loan Agreement.  Arenson caused "A. Arenson Holdings, Inc." to enter into the 2000 Loan Agreement and agreed to it on behalf of "A. Arenson Holdings, Inc."

35.    By the end of 2000, ALH II was in default under the 2000 Loan Agreement and under agreements with its third-party lenders.  The auditor's report on ALH II's financial statements for fiscal year 2000 stated that ALH II's defaults on certain

loan covenants raised substantial doubt about the ability of ALH II and its subsidiaries to continue as a going concern.

*The Lion LLC Settlement*

36.     Pursuant to § 6.1(a) of the Operating Agreement, Lion LLC was appointed the Initial Manager of ALH.  Lion LLC was controlled by Lamm.

37.     By early 2001, the Class A and Class B Members of ALH were extremely dissatisfied with Lion LLC's performance as Manager of ALH.  The Class A and Class B Members of ALH believed that Lion LLC, Lamm and certain of their associates owed ALH millions of dollars in misappropriated and/or misused funds and unauthorized expenditures.

38.     In or around July 2001, ALH reached a settlement with Lion LLC, Lamm and certain of their associates (the "Lion LLC Settlement").  Pursuant to the Lion LLC Settlement, Lion LLC, Lamm and certain of their associates agreed to pay approximately $2 million dollars to ALH.

39.     The Lion LLC Settlement substantially decreased the influence of Lion LLC, Lamm and their associates over ALH by, *inter alia*: (a) allowing the Class A Members to designate one of the two Class D Representatives on the Supervisory Board, (b) providing that SCA would render consulting services to ALH, (c) making Buchler a member of the board of directors of each ALH II subsidiary, and (d) establishing an Audit Committee, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B Representative (Arenson).

40.     As part of the Lion LLC Settlement, the subsidiaries of ALH II which guaranteed the 2000 Loan Agreement reaffirmed their guarantees to Shamrock and "A. Arenson Holdings, Inc."

41.     All Class Representatives, including Arenson, approved the Lion LLC Settlement.

*The Possible Sale of ALH*

42.     Because of, *inter alia*, ALH's ongoing financial problems and disappointing performance, the Class Representatives, including Arenson, decided during the course of 2001 that it would be in ALH's best interests to consider selling ALH's operations.

43.     In or around December 2001, Isaac M. Neuberger ("Neuberger"), who then represented some or all of the Class B Members in connection with ALH, was involved in identifying a possible buyer for ALH, for which he sought a substantial finder's fee. Because the transaction was not consummated, Neuberger did not receive this payment.

44.     In March 2002, ALH and ALH II engaged Jolson Merchant Partners ("JMP") to provide financial advisory and investment banking services in connection with the possible sale of some or all of ALH's operations. All Class Representatives, including Arenson, approved this engagement of JMP.

*The 2002 Loans*

45.     Regardless of whether there would or would not be a sale of some or all of ALH's operations, the Class Representatives, including Arenson, decided that ALH needed additional funding. After considering and exploring various alternatives,

the Class Representatives, including Arenson, concluded that it would not be feasible to raise additional equity from ALH's existing Members or obtain additional equity or loans from outside parties.

46.    Pursuant to a loan agreement dated May 7, 2002 (the "2002 Loan Agreement"), certain ALH investors loaned approximately $4.4 million to ALH II. The purpose of the 2002 Loan Agreement was to "provide working capital" to ALH II and its subsidiaries. All Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2002 Loan Agreement.

47.    Pursuant to the 2002 Loan Agreement, D.A. Gardens loaned $312,500 to ALH II. Arenson caused D.A. Gardens to enter into the 2002 Loan Agreement and signed the Agreement on behalf of D.A. Gardens. Shamrock loaned approximately $1,964,000 to ALH II pursuant to the 2002 Loan Agreement, and other ALH Members (except Laurel) also made loans to ALH II.

48.    At the June 26, 2003 meeting of ALH'S Supervisory Board, Arenson suggested that the loans to ALH II pursuant to the 2000 Loan Agreement and 2002 Loan Agreement — including the loans made by the Arenson Entities, the other Class B Members and Shamrock — should be repaid from the proceeds of the sale of ABI. All Class Representatives, including Arenson, consented to these loan repayments.

*The Class B Members' Efforts to Acquire the Class A Membership Interest*

49.    Beginning in or around July 2002, ALH's Class B Members embarked on a plan to acquire the Class A Membership Interest in ALH.

50.    At that time, ALH was in the midst of an effort to sell BBC, to raise cash that was essential to ALH's survival. Through Arenson and Neuberger, the

13

Class B Members contended that the sale of BBC — or any sale of less than all of ALH's operations — was imprudent and would serve only Shamrock's interests. Yet the Class B Members knew that an acceptable buyer for all of ALH could not be found, both because of JMP's unsuccessful efforts and because of the Class B Members' own fruitless efforts to find a partner to join them in a buy-out offer.

51.    At the same time, the Class B Members refused to provide any additional funding for ALH. Despite repeated invitations by Shamrock, the Class B Members never once made a written proposal to acquire the Class A Membership Interest. Apparently, the Class B Members hoped that the ALH situation would deteriorate to the point where Shamrock would succumb to their threats and pressure tactics and sell out on the cheap.

*SELK*

52.    Defendant SELK claims to have invested approximately $2.9 million in the equity of ALH, which would constitute approximately 12% of ALH's total equity. SELK is a Class B Member of ALH, claiming to hold approximately 33% of the Class B Membership Interest in ALH. SELK is a limited liability company organized under Delaware law.

53.    Pursuant to a Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR"), Lamm, on behalf of himself and, *inter alia*, his affiliates (collectively the "Lamm Affiliates"), has released ALH, ALH II, MHI and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors and assigns (collectively the "ALH Affiliates"), from "any and all claims, demands, debts, duties, bonds, damages, liabilities,

actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises" (collectively "Claims") of Lamm or the Lamm Affiliates that "relate[] to or aris[e] out of [any] past transactions between or amongst them."

54.    In the course of opposing plaintiffs' motion to remand this action, SELK filed a declaration in which Lamm attests that he (1) is "the managing member" of SELK, (2) holds a 30% membership interest in SELK, and (3) on behalf of SELK, authorized the removal of this action,  Consequently, it appears that SELK is a Lamm Affiliate which has released any Claims it may have against the ALH Affiliates, including but not limited to the threatened claims which are referenced in this action.

55.    SELK has denied that it is a Lamm Affiliate under the SAMR and that any claim it may have against the ALH Affiliates was released by the SAMR.  If that were correct, then SELK was not released by the ALH Affiliates pursuant to the SAMR. Therefore, SELK would have continuing exposure under the SELK Guarantee and the March 15, 1999 Amendment to the Operating Agreement.

56.    Lamm has not made the Class E Capital Contribution in full and SELK has not paid ALH the amount of the shortfall in the Class E Capital Contribution. Plaintiffs do not know the precise amount of the shortfall, but they believe that it reduces or eliminates SELK's equity interest in ALH and, therefore, any amount recoverable by SELK under its threatened litigation against plaintiffs.

*Laurel*

57.    Defendant Laurel Equity Group ("Laurel") claims to have invested approximately $2.9 in the equity of ALH, which would constitute approximately 12% of ALH's total equity.  Laurel supposedly made $1.75 million of its capital contribution to

ALH by releasing a promissory note, issued by ALH Corp. and signed by Lamm, in favor of one of the members of Laurel. Laurel is a Class B Member of ALH, claiming to hold approximately 33% of the Class B Membership Interest in ALH. Laurel is a limited liability company organized under Delaware law.

*J12*

58.    J12ALH Associates ("J12") claims to have invested approximately $1.47 million in the equity of ALH, which would constitute approximately 6% of ALH's total equity. J12 is a Class B Member of ALH, claiming to hold approximately 17% of the Class B Membership Interest in ALH.

59.    J12 is a general partnership organized under the laws of New York State. On or around June 2, 1998, J12 was formed for the purpose of acquiring, owning, managing, investing in or disposing of an interest in ALH.

60.    One of J12's three general partners, Jays Twelve LLC ("Jays LLC"), is a Delaware limited liability company. Jays LLC was formed on January 12, 1998 by the filing of a Certificate of Formation with the Office of the Secretary of State of the State of Delaware. According to its Certificate of Formation, Jays LLC has a registered office and a registered agent for the service of process in Wilmington, Delaware.

61.    Under the J12 partnership agreement, Jays LLC was required to contribute $100,000 of the partnership's total $1 million capital. For tax reasons, although Jays LLC was required to contribute only 10% of J12's capital, the partnership agreement entitled Jays LLC to 90% of the partnership's cash flow from the ALH investment, after return of the $888,889 capital contributed by the partnership's Class A

partner. The Class A partner, who is a citizen of New York State, had only a 10% interest in such cash flow, despite the much larger percentage of her capital contribution to the partnership.

62.     Together, Arenson Holdings, D.A. Gardens, SELK, Laurel and J12 claim to hold 100% of the Class B Membership Interest in ALH.

## JURISDICTION

63.     This action was originally commenced in the Court of Chancery of the State of Delaware. The action was removed to this Court on grounds of diversity jurisdiction under 28 U.S.C. § 1332, and plaintiffs' motion for remand was denied.

64.     This Court has personal jurisdiction over the defendants pursuant to 6 Del. C. § 18-105, 6 Del. C. § 18-109, 10 Del. C. § 3104(c)(1), § 310(a) of the New York State Civil Practice Law and Rules ("NY CPLR"), and principles of common law.

65.     J12, a New York general partnership, is subject to personal jurisdiction in Delaware through service of process of Jays LLC, one of its general partners. Jay LLC, a Delaware limited liability company, is subject to service of process in Delaware. J12 is also subject to personal jurisdiction in Delaware because it transacted business in Delaware from which the present causes of action arise and intentionally availed itself of the benefits and protections of Delaware law.

66.     On or around October 5, 2004, defendants Arenson, SELK and Laurel entered a general appearance in the Chancery Court, without any reservation of rights with respect to personal jurisdiction. Thus, Arenson, SELK and Laurel have waived any objection based on lack of personal jurisdiction.

67.    Arenson is subject to personal jurisdiction in Delaware under 6 Del. C. § 18-109, which provides in pertinent part that (a) a manager of a limited liability company may be served with process in all civil actions "involving or relating to the business of the limited liability company, and (b) the term "manager" refers to any person who, although not formally named as a manager in the limited liability company agreement or similar instrument, "participates materially in the management of the limited liability company."

68.    Arenson and the Arenson Entities are subject to personal jurisdiction in Delaware under 10 Del. C. § 3104(c)(1), in that they transacted business in Delaware from which the present causes of action arise and intentionally availed themselves of the benefits and protections of Delaware law, including Delaware's advanced body of law on alternative entities such as limited liability companies. Among other things, the Arenson Entities and Arenson himself (as Class B Representative and as agent for the Arenson Entities):

(a) Entered into the ALH Transaction, i.e., agreed to form and fund the Delaware limited liability company that became ALH, from which all of their claims against plaintiffs arise — claims as to which plaintiffs now seek declaratory relief.

(b) Entered into the Operating Agreement, which created the ALH governance structure that they now attack as the vehicle for plaintiffs' alleged breaches of fiduciary duty.

(c) Agreed that their rights and obligations in connection with ALH should be governed by Delaware law, as expressly provided in the Operating Agreement,

while plaintiffs base their right to exculpation on that very same Operating Agreement as construed in accordance with Delaware law.

(d) Supported the creation of ALH II, a Delaware corporation, which was used as the vehicle for ALH to obtain debt financing for its newly acquired operations. While plaintiffs maintain that the resulting financial burdens necessitated the sale of those operations in the interest of ALH as a whole, Arenson and the Arenson Entities allege that these sales were solely in the interest of Shamrock.

(e) Made additional capital contributions to ALH for the express purpose of acquiring BBC, which they now claim was imprudently and improperly sold by plaintiffs.

(f) Participated in loans to ALH II and the repayment of those loans by ALH II, but now assert that Shamrock should not have received its corresponding repayment for participating in the very same loans.

(g) Supported the Lion Settlement, which resulted in the Class A Members having the right to designate three out of five Representatives on ALH's Supervisory Board, but claim now that this wrongfully deprived them of a meaningful role in the Board's decision-making process.

(h) Supported the engagement of JMP to provide financial advisory and investment banking services in connection with the possible sale of some or all of ALH's operations, but now claim that the auction process was mishandled.

(i) Approved a $200,000 bonus for Shamrock, in recognition of its valuable services resulting in the sale of ABI, but now assert that plaintiffs' support of this sale was a breach of fiduciary duty.

(j) Made efforts over a period of many months to acquire the Class A Membership Interest in ALH for a low-ball price, and now contend that plaintiffs wrongfully declined to sell it to them and the other Class B Members. In aid of these efforts, Arenson and the Arenson Entities threatened plaintiffs with litigation under Delaware law. The fact that these efforts were ultimately unsuccessful does not detract from their relevance for jurisdictional purposes, because plaintiffs are alleged to have wrongfully thwarted these efforts.

(k) In connection with their efforts to acquire the Class A Membership Interest in ALH, supported a proposal to transfer the assets of BBC so as to shield them from creditors, and now assert that plaintiffs did a disservice to ALH by declining to engage in such a transfer.

(l) Seek to interfere with the indemnification rights of officers and directors of Delaware corporations (SCA and ALH), under the SCA Consulting Agreement and the By-Laws of ALH II, including the right to advancement of legal expenses.

(m) Threatened repeatedly to bring claims against the plaintiffs for mismanagement of ALH and waste of its assets –- claims that are derivative in nature and could only be brought on behalf of ALH to seek recovery for ALH, not defendants individually. Most of the issues on which plaintiffs seek declaratory relief are issues on which Arenson and the Arenson Entities have threatened to sue, through a Delaware entity, for the capital contributions they chose to make to that entity.

## FACTS

### *ALH's Supervisory Board*

69.     Section 6.2(a) of the Operating Agreement provides that Major Decisions concerning ALH are to be made only by the Members of ALH, acting through ALH's Supervisory Board.  Section 6.2(c) of the Operating Agreement defines Major Decisions as including, among other things: the sale, disposition or other transfer of substantially all the assets, or any securities, of ALH or any subsidiary of which ALH holds more than 40% of the voting power (a "Subsidiary"); the acquisition by ALH or a Subsidiary of all or substantially all of the assets or ownership interests of any other person; any modification of the Operating Agreement; engaging in any business other than home building or land development; making loans to, or guaranteeing obligations of, any person (except for guarantees required under the existing credit facilities of ALH or any Subsidiary); the sale to any person of any interest in ALH, any Subsidiary, or any of their properties or businesses; any distribution by ALH or any Subsidiary other than in accordance with the Operating Agreement; establishing, amending or modifying any rules for the operation of the Supervisory Board or similar governing body of any Subsidiary, including levels of authority for officers of ALH or any Subsidiary; any borrowing from any person (except under the existing credit facilities of ALH or any Subsidiary); any litigation settlement in excess of $500,000; the commencement of any litigation; approval of the annual budget or any amendment thereto by ALH or any Subsidiary; capital expenditures in excess of $50,000 outside the ordinary course of business; removal of any of the five most highly compensated employees; the execution of any agreement with any affiliate or Member of ALH; the execution of any agreement

requiring aggregate payments in excess of $100,000; the execution of any agreement extending beyond June 12, 1999; and the taking of any action that is other than in the ordinary course of business or not in compliance with ALH's budget (except for immaterial deviations and certain capital expenditures otherwise permitted by the Operating Agreement).

70.    When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by ALH's Class A Members, one designated by ALH's Class B Members and two designated by ALH's Class D Members. From the outset, Buchler was a Class A Representative and Arenson was the Class B Representative. In or around late 1999/early 2000, Krieger became a Class A Representative, replacing the Shamrock employee who previously held that position. The Representatives of the Class D Members were Lamm and Jonathan Zich ("Zich"), who worked for Lamm.

71.    ALH's Supervisory Board has always had five members. The Class B Members have never had more than one Representative on the Supervisory Board. Nothing in the Operating Agreement requires the consent of the Class B Representative for any action or decision by the Supervisory Board. Nothing in the Operating Agreement requires the consent of the Class B Members for actions or decisions by ALH (except that Members must unanimously consent to amendments of the Operating Agreement that modify their limited liability, alter their interest in the profits, losses or distributions of ALH, or alter the number or voting rights of the Representatives). Actions and decisions by ALH are generally effective by majority vote of the five Representatives on the Supervisory Board. All Major Decisions require the

consent of the Class A Representatives on the Supervisory Board. However, the Operating Agreement does not authorize the two Class A Representatives, acting alone, to make Major Decisions or other decisions requiring Supervisory Board approval.

72. Pursuant to the July 2001 Lion LLC Settlement, Zich resigned from ALH's Supervisory Board and was replaced by Stein. The Lion LLC Settlement gave ALH's Class A Members the right to designate one of the two Class D Representatives on the Supervisory Board. Since July 2001, three of the five members of the Supervisory Board have been Shamrock employees. All Class Representatives, including Arenson, approved this change in the composition of ALH's Supervisory Board.

73. This change in the composition of ALH's Supervisory Board did not in any way preclude Arenson, as Class B Representative, from having a meaningful voice in ALH's decision-making. Arenson continued to attend Board meetings, express his opinions and vote as he saw fit, whether with or against the majority. Shamrock consistently solicited and paid attention to Arenson's thoughts on a broad range of matters relating to the management of ALH. Arenson himself recognized that, in situations where he held the minority view, his appropriate role was to act as advocate. For example, in July of 2003, after the Board meeting at which the decision to sell BBC was made, Arenson stated that "I could have been firmer. I should have been more persuasive." In fact, Arenson conceded that he had not even persuaded all of the Class B Members to agree with him: "I did not convince . . . all the 'B's."

### *The SCA Consulting Agreement*

74. In or around July 2001, in connection with Lion LLC Settlement, ALH entered into an agreement (the "Consulting Agreement") for SCA to provide consulting services to ALH for a fee of $100,000 per year.

75. Section 2 of the Consulting Agreement provides that ALH has no obligation to follow any of SCA's advice, and that SCA has no duty to provide any oversight or review of ALH's activities or plans. Section 2 further provides that (1) SCA shall devote such time as it deems necessary to perform the services to be rendered by it under the Consulting Agreement, and (2) SCA is not required to devote any minimum amount of time to the performance of such services. In fact, substantial services were provided, and Krieger, Buchler and Stein spent thousands of hours on ALH matters. For example, even Arenson, who voted against the sale of BBC, recognized the value of the services provided in connection with that transaction; he approved a $200,000 bonus payment, as an expression of thanks on behalf of all the Class B Members.

76. Section 6 of the Consulting Agreement provides that SCA may terminate the agreement at any time, with or without cause. Under § 6 of the Consulting Agreement, ALH could have terminated the agreement at any time, with or without cause, after December 31, 2002. Neither the Class B Representative on ALH's Supervisory Board nor the Class B Members have ever requested that the Consulting Agreement be terminated.

77. Exhibit A to the Consulting Agreement requires ALH to indemnify and hold harmless SCA, its affiliates, and the partners, officers, directors, employees and agents of the foregoing against all liabilities arising from or relating to the Consulting

Agreement, except to the extent that it is finally judicially determined that such liabilities result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct. In Exhibit A, ALH agrees to reimburse the indemnified persons for legal fees and other expenses "as they are incurred." Exhibit A further provides that SCA shall have no liability to ALH or any other person in connection with the services rendered pursuant to the Consulting Agreement, except to the extent that it is finally judicially determined that such liability results primarily from SCA's bad faith, gross negligence or willful misconduct.

78.     All Class Representatives, including Arenson, approved the Consulting Agreement.

### ALH's Acquisitions of ABI, BBC and MHI

79.     In 1998, as part of the closing of the ALH Transaction, ALH acquired the ABI home-building operations based in Jacksonville, Florida.

80.     In 1999, ALH acquired the BBC home-building operations based in Memphis, Tennessee. All the Class Representatives, including Arenson, approved this acquisition and the related financing, including ALH II's agreement to guarantee a $2.25 million promissory note for a portion of the purchase price.

81.     In 2000, ALH acquired the MHI home-building operations based in Charlotte, North Carolina. All Class Representatives, including Arenson, approved this acquisition And the related financing, including agreements by ALH and ALH II to guarantee and secure the Wachovia loan as set forth above.

*ALH's Engagement of Jolson Merchant Partners*

82.    In March 2002, ALH and its wholly-owned subsidiary ALH II (collectively the "Company") engaged JMP to provide financial advisory and investment banking services in connection with the possible sale of the Company.  ALH selected JMP, a firm with substantial qualifications and experience in the home-building industry, after seriously considering and interviewing four candidates for this engagement.

83.    All Class Representatives, including Arenson, approved the engagement of JMP by ALH and ALH II.

84.    The March 20, 2002 engagement letter between the Company and JMP (the "JMP Engagement Letter") contemplated JMP's provision of a broad range of services, including: investigation and analysis with respect to the business and operations of the Company and of the industry and markets it serves; analysis of the various strategic alternatives available to the Company; development, updating and ongoing review of a list of parties that might have a specific interest in acquiring the Company; marketing the Company to potential buyers; advising on the financial aspects of proposed transactions; participating in meetings of the Supervisory Board to consider potential transactions; structuring a sale transaction process, including developing and administering a confidential bidding process; counseling the Company with respect to strategy and tactics for negotiation of a transaction; participating with the Company and its counsel in the negotiation of a transaction; and rendering opinions as to the fairness of a transaction, from a financial point of view, to the Company's equity holders or advising the Supervisory Board that JMP is unable to render such an opinion.

85.    With the knowledge and consent of ALH's Supervisory Board, including Arenson, JMP spent more than six months seeking a buyer for the Company or substantially all of its assets.    After these efforts to sell the Company in its entirety proved unsuccessful, JMP began seeking potential buyers of ABI (the Jacksonville, Florida operation).    In March 2003, with the approval of all Class Representatives, including Arenson, the engagement of JMP was extended.

86.    JMP was selected with reasonable care by or on behalf ALH to perform the services contemplated by the JMP Engagement Letter.    Shamrock, Krieger, Buchler and Stein reasonably believed, based on JMP's substantial experience in the industry, that such services were within JMP's professional and expert competence, and they relied in good faith on JMP's advice.    Therefore, as to all matters relating to the sale of the Company, Shamrock, Krieger, Buchler and Stein are fully protected by 6 Del. C. § 18-406.

### ALH's Sale of ABI

*May 14, 2003 Meeting of ALH's Supervisory Board*

87.    At the meeting of ALH's Supervisory Board on May 14, 2003, JMP gave an overview of the efforts to sell ALH in its entirety and the subsequent efforts to sell ABI.    JMP initially spoke to 20 builders who were potential buyers of ABI and then narrowed this list to six viable candidates.    From these six, JMP obtained four written proposals and one verbal proposal.    The most favorable proposal came from Mattamy Homes, Ltd. ("Mattamy"), which offered approximately $20 million for substantially all of the assets of ABI.

27

88.     JMP advised the Board that the Mattamy proposal represented the best available transaction for the sale of ABI.  John Laguardia ("Laguardia"), who was then the President and Chief Operating Officer of ALH II, presented his views of the home-building market in Jacksonville, Florida, and stated that the sale of ABI to Mattamy would be at the peak of the market.

89.     William R. Lanius ("Lanius"), who was then Executive Vice President and Chief Financial Officer of ALH II, stated that ABI faced various liquidity issues with respect to the capital needed to honor its existing land contracts.  Lanius explained that ABI did not have either the cash or credit available with existing lenders to finance upcoming purchases pursuant to the existing contracts.  Buchler noted that ALH as a whole had serious liquidity issues resulting from, among other things, poor results at MHI, which were causing ALH's auditors to write down a minimum of $15 million in goodwill.  Lanius pointed out that ALH did not have sufficient cash on hand to finance its anticipated settlement of certain litigation in connection ALH's acquisition of BBC from the Bowden family (the "Bowden Litigation").

90.     At the time of the May 14, 2003 meeting, the Bowden Litigation was scheduled to go to trial the following month.  In the Bowden Litigation, the Bowden family sought payment under a promissory note (the "Bowden Note") issued by ALH Tennessee in connection with the purchase of BBC.  The principal amount of the Bowden Note was $2.25 million and the accrued interest was approximately $600,000.  In addition, there was an earn-out provision with an estimated value of approximately $675,000, and the judge could require payment of attorneys' fees in the range of $200,000 to $600,000.

91.    Based on the foregoing, if the Bowden family were to prevail on its then-pending motion for partial summary judgment, the liability to the Bowden family could be approximately $4 million. In fact, a year earlier, ALH's Tennessee counsel in the Bowden Litigation had advised ALH II's auditors that "in all likelihood," plaintiffs in the Bowden Litigation would prevail and get a judgment in the $3-4 million range. In addition, the Bowden Litigation sought tens of millions of dollars in consequential and punitive damages on the grounds that, among other things, non-payment of the Bowden Note had caused the failure of three new businesses started by the Bowden family after they sold BBC to ALH.

92.    At a mediation held shortly before the May 14, 2003 meeting, ALH Tennessee had offered $5 million to settle the Bowden Litigation: $1 million to be paid up front and the balance to be paid later from the proceeds of the sale of ABI. The Bowden family had countered at $8 million, but it appeared that they might accept $5-6 million if payment were made promptly.

93.    The Bowden Note was guaranteed by ALH II, and ALH II was a named defendant in the Bowden Litigation. Consequently, the Bowden Note and related claims asserted in the Bowden Litigation could have been enforced against any or all of ALH's subsidiaries and their assets.

94.    In or around February 2002, it was proposed on behalf of the Class B Members that the assets of BBC be transferred so as to shield them from the plaintiffs in the Bowden Litigation. Shamrock would not go along with this proposal. In addition to its dubious legality, such a transfer would not have addressed the direct exposure of

ALH II in the Bowden Litigation. Nonetheless, defendants have continued to assert that plaintiffs did ALH a disservice by declining to engage in such a transfer.

*June 26, 2003 Meeting of ALH's Supervisory Board*

95.    At the next meeting of ALH's Supervisory Board, held on June 26, 2003, ALH's outside counsel described a proposed settlement of the Bowden Litigation under which the Bowden family would be paid $5 million plus $210,000 in attorneys' fees (the "Settlement"). The first $1 million would be due immediately upon execution of the settlement agreement and the balance would be payable on the earlier of August 31, 2003 or the consummation of the sale of ABI. The proposed Settlement included an option to extend the final payment date for an additional 90 days, for a fee of $250,000. ALH's outside counsel advised the Supervisory Board that the proposed Settlement was favorable to ALH, ALH II and other ALH subsidiaries.

96.    At the June 26, 2003 meeting, there was a full discussion of the proposed Settlement. Arenson, Lamm and Lanius commented that the proposed Settlement was favorable. Arenson asked how the final payment would be addressed if the proposed sale of ABI were not consummated. Buchler stated that, under such circumstances, it would be necessary to exercise the option to extend the final payment date and seek other purchasers for ABI. Following this discussion, ALH's Supervisory Board, including Arenson, unanimously approved the Settlement.

97.    ALH's outside counsel in the Bowden Litigation were selected with reasonable care by or on behalf ALH to perform such legal services. Shamrock, Krieger, Buchler and Stein reasonably believed, based on counsel's substantial litigation experience, that these services were within such counsel's professional and expert

competence, and they relied in good faith on counsel's advice. Accordingly, as to all matters relating to the Bowden Litigation, Shamrock, Krieger, Buchler and Stein are fully protected by 6 Del. C. § 18-406.

98.     At the June 26, 2003 meeting, JMP gave an overview of its efforts to find purchasers for ALH's various subsidiaries and assets. During the discussion that followed, JMP stated that it was an excellent time to sell BBC because of its strong performance in the first half of 2003. Lanius pointed out that BBC would achieve approximately $2.2 million in EBITDA (earnings before interest, taxes, depreciation and amortization), and appeared able to maintain comparable EBITDA for the second half of 2003. JMP stated that a purchase price at a multiple of five times EBITDA was possible, so assuming EBITDA of $4.4 million, the price for BBC could exceed $20 million.

99.     With respect to MHI, JMP advised that it was not yet the best time to sell. JMP recommended that ALH continue its efforts to expand MHI's business before pursuing sale opportunities, and that the Supervisory Board reconsider its opportunities for selling MHI in the second half of 2003.

100.     Buchler asked JMP to give its assessment of the proposed Purchase Agreement for the sale of ABI to Mattamy. JMP stated that based on, among other things, its review of comparable transactions, the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. In light of ABI's projected EBITDA of approximately $8 million for 2003, the proposed purchase price represented an EBITDA multiple that was well above the average for previous sales of homebuilders. This price also compared favorably to comparable sale prices derived from multiples of book value or earnings. JMP concluded by stating that, based on its analysis and review,

the proposed sale of ABI on the terms described in the Purchase Agreement was fair to ALH from a financial point of view.

101.    At the June 26, 2003 meeting, neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of ABI.

102.    Buchler asked Laguardia and Lanius for their views on the proposed sale of ABI.  Laguardia stated that ALH would be selling ABI at the peak of the Jacksonville, Florida homebuilding market.  Lanius concurred in this, noting that the proceeds of the sale of ABI could be used to pay for the settlement of the Bowden Litigation, which would enhance ALH's ability to sell BBC.  Lanius explained that, to continue competing in its market, ABI would need substantially better capitalization, and that ABI did not have financial resources for the land purchases it would need to make in order to compete successfully.  Lanius also stated that ABI's existing contracts to purchase building lots would place considerable strain on ALH's liquidity resources.  Lanius concluded that, from a financing and liquidity perspective, it was the most opportune time to sell ABI.

103.    Following a presentation by ALH's outside counsel concerning the terms of the proposed Purchase Agreement, there was a discussion among the Class Representatives.  Arenson questioned whether it would be better for ALH to raise additional equity rather than sell the assets of ABI.  Arenson suggested that ALH's existing Members might consider investing more capital in ABI.

104.    Buchler pointed out that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of the Bowden Litigation to be concluded, and (3) no other

proposals for funding or acquiring ABI, including proposals from the Class B Members or Arenson himself, had been made. Lanius added that Jacksonville, Florida was not an attractive market. He said he would not recommend that ALH invest more money in that market because it had reached its peak and, due to the entry of many new and powerful builders, he anticipated that ABI's business opportunities would deteriorate in the future.

105.    After further review and discussion, a majority of ALH's Supervisory Board voted in favor of the sale of ABI. Arenson voted against the sale and Lamm abstained.

106.    At Arenson's request, Buchler discussed the application of the net proceeds from the sale of ABI. Buchler explained that approximately $8.8 million would be left after payment of various transaction costs and funding the previously approved settlement of the Bowden Litigation.

107.    Arenson then suggested that the remaining $8.8 million be used to repay (to the extent permitted under ALH's other credit agreements) the loans made by certain of ALH's Members under the 2000 Loan Agreement and the 2002 Loan Agreement. The repayments suggested by Arenson would be made to his entities, SELK and another Class B Member, as well as to Shamrock and other Class A Members. Arenson suggested that any monies remaining after the repayment of the Member loans could be used for ALH's working capital needs or to repay ALH's bank debt.

108.    In accordance with Arenson's suggestion, the loans made by ALH's Members under the 2000 Loan Agreement and the 2002 Loan Agreement were repaid from the proceeds of the sale of ABI.

109.    At the June 26, 2003 meeting, the Supervisory Board discussed the fee to be paid to JMP for its work in connection with the ABI sale.  Under the JMP Engagement Letter, JMP was only entitled to a fee upon the sale of the whole Company. However, in light of JMP's efforts over the preceding 14 months, the Board unanimously authorized a fee to JMP for the sale of ABI alone.  The Board unanimously authorized Buchler and Krieger to negotiate the fee with JMP up to a total of $300,000 (the prorated portion of the fee that would have been payable to JMP upon a sale of the whole Company).

110.    The Supervisory Board discussed the payment of an exit bonus to Lanius upon the consummation of the ABI sale and his anticipated resignation as an employee of ALH.  The Board agreed that Lanius should be treated fairly and generously. The Board unanimously authorized Buchler and Krieger to negotiate an appropriate exit bonus for Lanius.

111.    The Supervisory Board also discussed the payment of a fee to Shamrock in connection with its efforts to facilitate the ABI sale.  Krieger, Buchler and Stein declined to participate in any discussion of such a fee, because of their relationship with Shamrock.  Arenson and Lamm indicated that some payment to Shamrock would be appropriate in light of Shamrock's special services to ALH in connection with the sale of ABI.  Arenson and Lamm were appointed as the sole members of a special committee to evaluate the services performed by Shamrock and to determine the appropriateness and amount, if any, of a fee to Shamrock for its services in facilitating the sale of substantially all the assets of ABI and negotiating the terms of the Purchase Agreement. Arenson and Lamm subsequently authorized a fee of $200,000 to Shamrock.

*ALH's Sale of BBC*

*March 24, 2004 Meeting of ALH's Supervisory Board*

112. At a meeting on March 24, 2004, ALH's Supervisory Board considered the proposed sale of 100% of the stock of BBC. Buchler gave an overview of the economic terms of the transaction and ALH's outside counsel made a presentation regarding the terms of the proposed purchase agreement.

113. JMP gave an overview of its efforts to find purchasers for BBC during the preceding two years. JMP had contacted approximately 20 prospective buyers, constituting every entity identified by JMP as a potentially active participant or potential participant in the Memphis, Tennessee homebuilding market. Levitt Corporation ("Levitt") was the only entity that provided a serious bid for BBC. JMP noted that the Memphis area was flat in growth and that the homebuilding market there was not robust.

114. In determining the merits of the BBC sale, JMP had reviewed comparable transactions in the Memphis area. JMP was aware of only two sales in the Memphis area in the preceding two years that were comparable to the BBC sale, and in both cases, the acquired entities performed poorly post-acquisition. JMP explained that Levitt's proposed purchase price for BBC approximated a multiple of five times BBC's 2003 EBITDA, which was well above the average EBITDA multiple for previous sales of homebuilders. The price also compared favorably to comparable sale prices derived from a multiple of book value.

115. JMP stated that Levitt's proposed purchase agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in

comparable sales agreements. JMP concluded that Levitt's proposal represented the best potential transaction for the sale of BBC and a superior opportunity for ALH to realize value on its investment.

116.    At the March 24, 2004 meeting, neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of BBC.

117.    The Board then discussed the merits of the proposed BBC sale. Buchler pointed out that Jeffrey Sweeney ("Sweeney"), BBC's President and Chief Executive Officer, had indicated that he would not continue at BBC absent a sale to Levitt. Buchler stated his belief that Sweeney was integral to BBC's operations and was an important part of BBC's relationship with its lenders. Buchler noted that there was no successor to take over from Sweeney and that it would be difficult to identify and hire an adequate successor in a timely manner. Buchler also noted that the current absence of equity capital greatly impaired BBC's ability to significantly expand its business.

118.    Arenson stated that he opposed the sale of BBC for the same reasons he had opposed the sale of ABI. Arenson expressed a concern that the sale was not in the best interest of all of ALH's Members and that better value might be obtained by continuing to operate BBC. Arenson did not identify any proposal from himself, from any of the Class B Members or from any other source for obtaining additional capital for BBC, for improving BBC's financial or operational condition, for realizing better value by continuing to operate BBC, or for finding a replacement for Sweeney. Buchler stated his belief that the sale of BBC to Levitt was the best option available under the current circumstances.

36

119.    Arenson expressed a concern that there might be a possible conflict of interest on the part of ALH's outside counsel in the BBC transaction because this counsel also represented Shamrock.  The outside counsel explained that his firm was representing ALH and the Supervisory Board in the transaction and not ALH's Members separately.  He noted that ALH had waived any potential conflict of interest and that the waiver had been approved by the Board prior to his firm's representation of ALH.  He invited the Board Representatives to call him or his Tennessee co-counsel directly with any concerns or questions.

120.    Arenson did not identify any way in which the services performed by outside counsel for ALH might have been affected by such counsel's representation of Shamrock, or any way in which other Members of ALH might have been disadvantaged by such counsel's representation of Shamrock.  Likewise, defendants have not articulated how the legal services rendered for ALH in the BBC transaction might have been affected by such counsel's representation of Shamrock, or how defendants or other Members of ALH might have been disadvantaged by such counsel's representation of Shamrock.  To the contrary, Shamrock's interests and incentives were and remain fully aligned with those of the defendants.

121.    Lamm stated that he opposed the sale of BBC for reasons similar to Arenson's.

122.    After further discussion, a majority of the Supervisory Board voted in favor of the proposed sale of BBC to Levitt.  Arenson and Lamm both voted against the sale.  The Supervisory Board expressly acknowledged the "extraordinary and valuable services" provided by JMP in connection with the sale of BBC, and

37

unanimously authorized a fee of approximately $135,000 for such services. Arenson and Lamm again formed a special committee to consider whether Shamrock should be paid a bonus for facilitating the BBC sale, but in light of their opposition to the sale itself, they subsequently decided against such a bonus.

### *ALH's Sale of MHI*

123.    In the late summer and early fall of 2004, ALH was in the process of negotiating a possible sale of MHI (the last of ALH's homebuilding operations) to Levitt, which had purchased BBC. MHI had been operating under severe financial constraints. Absent a sale or a substantial infusion of capital, MHI would have been forced to shut down. There was no chance of a substantial infusion of capital, since none of ALH's Members was interested in investing any additional capital in ALH, and no third-party interest in making a capital infusion had been or could be elicited.

124.    Levitt's offer for MHI had been approved by Swiss Re, which was the surety on the bonds securing the January 2000 $27.5 million Wachovia loan. Swiss Re's approval was required because Swiss Re would be making up a shortfall of more than $12 million to pay off the outstanding balance on the Wachovia loan.

125.    In early October 2004, Levitt elected not to proceed with the acquisition of MHI. At around the same time, Mattamy, which had purchased ABI, surfaced as a possible buyer of MHI. Although Mattamy's offer for MHI was somewhat lower than the Levitt offer, Swiss Re's approval of the Mattamy offer was ultimately obtained.

126.    In the meantime, in late October, Shamrock distributed Mattamy's proposed letter of intent to all Class Representatives, including Arenson, and sought their

comments on the transaction. In November and December 2004, drafts of the proposed MHI transaction documents and resolutions were circulated for comment to all Class Representatives.

127.    The Supervisory Board meeting to consider the proposed MHI transaction was held on December 15, 2004. Arenson initially confirmed that he would be attending the meeting. However, the night before the meeting, Arenson advised Shamrock that he would not attend, stating that "[b]arring some unforeseen discussion during the meeting, I would probably vote against anyway." Arenson later added that "any further participation would be a waste of my time." Thus, Arenson had a voice on the Supervisory Board that he chose not to use. For this he has no one but himself to blame, and the Class B Members have no one but Arenson to blame.

128.    Since the other four Class Representatives were in attendance, there was a quorum and the meeting could proceed. There was a discussion of the circumstances leading to the proposed MHI transaction, including the fact that ALH II was currently insolvent and in default with respect to an outstanding principal balance of $21.5 million, plus accrued interest, owed to Wachovia. Outside counsel discussed key aspects of the proposed transaction. In summary terms, the effect of the transaction would be that (a) Swiss Re would fully satisfy all indebtedness to Wachovia, (ii) ALH would have no liability to Swiss Re and (iii) ALH II would receive $1 million in net proceeds from the sale of the MHI stock.

129.    All Class Representatives present at the meeting voted to approve the transaction, which has since closed. Since ABI, BBC and MHI have all been sold, ALH has no remaining operations.

130.    As set forth above, at the time of the ABI sale, Arenson expressly acknowledged ALH's need for additional capital. However, Arenson and the other defendants were unwilling to reach into their own pockets to solve ALH's liquidity and capital issues. The sale of ALH's operations was thus inevitable.

131.    None of ALH's Members was under any obligation to invest any additional capital. Section 3.3 of the Operating Agreement expressly provides that no Member shall have any personal liability to ALH, to any other Member of ALH, or to any other person for deciding not to make a further investment in ALH.

### Defendants' Threats to Sue Plaintiffs

132.    During the months leading up to the commencement of this action, defendants repeatedly threatened to sue plaintiffs — in a derivative action or otherwise — for breach of fiduciary duty. During the briefing on plaintiffs' motion to remand, defendants explicitly reconfirmed their intention to sue. In particular, defendants are accusing plaintiffs of unilaterally deciding to sell ALH because ALH was taking up too much of plaintiffs' time. As set forth above, the decision to sell ALH was not unilaterally made by plaintiffs; it was unanimously made by ALH's Supervisory Board. Plaintiffs have devoted thousands of hours to ALH, in an effort to ameliorate the outcome for all of ALH's Members. In contrast, the defendants have sat at the sidelines, carping but not lifting a finger to help — not even proposing any alternative courses of action.

133.    The crux of defendants' position is that plaintiffs were obligated to expend indefinite amounts of time and energy on ALH, without regard to the likelihood of improving ALH's situation. As set forth above, the Consulting Agreement, which was unanimously approved by the Supervisory Board (including Arenson), expressly provides

that SCA is not required to devote any minimum amount of time to the performance of services for ALH, although in fact, as noted above, thousands of hours of time were spent.

134.    Shamrock has always had the same right as any Member of ALH (including defendants) to make a cost/benefit business judgment with respect to the future of ALH.  Under § 4.1(b) of the Operating Agreement, the Class A and Class B Members of ALH are treated economically *pari passu*.  Therefore, such a judgment by Shamrock cannot benefit or harm one group relative to the other.  To the extent that Shamrock has, at various times, considered how much time and energy to put into ALH, such consideration has not been limited to the potential impact on Shamrock alone.  Rather, it has necessarily encompassed the prospects of ALH as a whole.

135.    If defendants genuinely believed that it were worthwhile to put more effort into ALH, they presumably would have done so themselves.  Instead, they have left the plaintiffs to shoulder the entire burden.  By defendants' own account, their supposed efforts on behalf of ALH have taken two forms: (1) general criticisms of the ALH sale process, unaccompanied by any concrete proposals for alternatives; and (2) Arenson's suggestion, beginning in or around July 2002, that the Class B members might acquire Shamrock's Class A Membership Interest.

136.    The defendants never made a formal written proposal to Shamrock. Instead, an email from Neuberger mentioned a possible price for the entire Class A Membership Interest and outstanding loans owed by ALH to all of the Class A Members: a price that would have yielded Shamrock less than the outstanding amount of its loans to ALH, thus valuing Shamrock's equity at a negative number.  But even if the Class B

Members had made a concrete offer at a reasonable price, Shamrock would have been free to reject it, and such a rejection could not support any sort of legal claim against any of the plaintiffs.

137.    Defendants have accused plaintiffs of benefiting at defendants' expense through ALH's repayment of the loans made by certain of ALH's Members. As set forth above, the repayments of the loans under the 2000 Loan Agreement and 2002 Loan Agreement were made to both Class A and Class B Members, including Arenson. All of these lenders were repaid in full; none benefited at the expense of any other.

138.    It was Arenson himself who suggested that the loans be repaid from the proceeds of the sale of ABI. ALH's financial needs took a back seat to repaying Arenson and other ALH Members — Arenson's idea was that <u>only monies remaining after repayment of the Member loans</u> should be used for ALH's working capital needs or to repay its bank debt.

139.    Defendants have repeatedly accused plaintiffs of wrongfully seizing control of ALH. As set forth above, all the Class Representatives, including Arenson, approved the Lion LLC Settlement, which gave the Class A Members the right to designate three of the five Representatives on ALH's Supervisory Board.

140.    Defendants have also accused plaintiffs of wrongfully causing ALH to make certain decisions — especially in connection with the sale of ALH — without defendants' consent. As set forth above, the Operating Agreement never gave the Class B Members more than one Representative on the five-member Supervisory Board. Decisions by the Supervisory Board have never required a unanimous vote. The defendants knowingly chose to invest in ALH on these terms, i.e., on terms that expressly

gave ALH the right to act without the Class B Members' consent.    Much of what defendants complain of was in fact consented to by Arenson as Class B Representative, but even if that were not so, defendants would not have a legal claim against plaintiffs based on the absence of defendants' consent.

141.    Defendants' threats to sue plaintiffs are focused primarily on the decision to sell ALH and the process by which the sale was implemented.    It is undisputed that ALH originally sought a buyer for the entire company and that this decision was unanimously approved by the Supervisory Board.    After many months of effort by JMP (whose selection was unanimously approved by the Supervisory Board, including Arenson), no such buyer was found.

142.    Defendants assert that such a buyer could have been found, but for the supposed mishandling of the sale process by plaintiffs.    As set forth above, the sale process was guided by JMP, on whom plaintiffs reasonably relied in good faith.    In any event, defendants' contention that the sale process should have been handled differently is at most matter of business judgment that cannot give rise to a legal claim by defendants against plaintiffs.

### The Exculpation Provisions of the Operating Agreement

143.    Section 10.2 of the Operating Agreement provides as follows: "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

144.    6 Del. C. § 18-1101(c), as amended effective August 1, 2004, provides as follows: "To the extent that, at law or in equity, a member or manager or

other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided that a limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."

145.    6 Del. C. § 18-1101(d), as amended effective August 1, 2004, provides as follows: "Unless otherwise provided in a limited liability company agreement, a member or manager or other person shall not be liable to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement for breach of fiduciary duty for the member's or manager's or other person's good faith reliance on the provisions of the limited liability company agreement."

146.    6 Del. C. § 18-1101(e), as amended effective August 1, 2004, provides as follows: "A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."

147.    In keeping with the foregoing provisions of Delaware law, § 6.2(f) of the Operating Agreement provides as follows: "Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence."

148.    Krieger, Buchler and Stein have at all times acted in good faith within the scope of the authority conferred on them by the Operating Agreement, and have not committed any act of fraud, criminality, bad faith or gross negligence. Therefore, they are exculpated by § 6.2(f) of the Operating Agreement from any liability to defendants.

### *Plaintiffs' Indemnification Rights*

149.    As set forth above, the Consulting Agreement between SCA and ALH entitles plaintiffs to indemnification, including reimbursement and advancement of legal fees and other expenses in connection with this action.

150.    Section 7.4 of the By-Laws of ALH II provides for indemnification of directors and officers to the fullest extent allowed by law, subject to the board of directors' discretion regarding the advancement of legal fees and other expenses and determination that indemnification is proper.

151.    Plaintiffs may also have other indemnification rights on common law, statutory and contractual grounds.

152.    Defendants have adamantly and wrongly opposed any indemnification of plaintiffs unless ordered by a court.

## COUNT I
### (Declaratory Judgment: No Breach of Fiduciary Duty)

153.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 152 as if fully set forth herein.

154.    A controversy has arisen between plaintiffs and defendants with respect to plaintiffs' fiduciary duties to defendants in connection with, among other things, the sale of ALH's operations.

155.    The parties are in need of a declaratory judgment declaring their rights and obligations under the governing Delaware law of fiduciary duty.

156.    Plaintiffs seek a judicial declaration that they have not breached any fiduciary duty to defendants.

## COUNT II
### (Declaratory Judgment: No Breach of Operating Agreement)

157.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 156 as if fully set forth herein.

158.    A controversy has arisen between plaintiffs and defendants with respect to their respective rights and obligations under the Operating Agreement.

159.    The parties are in need of a declaratory judgment declaring their rights and obligations under the Operating Agreement.

160.    Plaintiffs seek a judicial declaration that they have not breached any obligations to defendants, or violated any rights of defendants, under the Operating Agreement.

## COUNT III
**(Declaratory Judgment: No Liability Under Consulting Agreement)**

161.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 160 as if fully set forth herein.

162.    A controversy has arisen between plaintiffs and defendants with respect to services provided by SCA to ALH pursuant to the Consulting Agreement.

163.    The parties are in need of a declaratory judgment declaring their rights and obligations under the Consulting Agreement.

164.    Plaintiffs seek a judicial declaration that (1) in rendering services pursuant to the Consulting Agreement, they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement.

## COUNT IV
**(Declaratory Judgment – Good Faith Reliance on Professionals and Experts)**

165.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 164 as if fully set forth herein.

166.    A controversy has arisen between plaintiffs and defendants with respect to plaintiffs' reliance on JMP and on ALH's outside counsel.

167.    The parties are in need of a declaratory judgment declaring whether plaintiffs relied in good faith on JMP and on ALH's outside counsel.

168.    Plaintiffs seek a judicial declaration that they relied in good faith on JMP and on ALH's outside counsel.

## COUNT V
### (Declaratory Judgment – Indemnification)

169.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 166 as if fully set forth herein.

170.    A controversy has arisen between plaintiffs and defendants with respect to plaintiffs' entitlement to indemnification, including their right to advancement of legal fees and other expenses.

171.    The parties are in need of a declaratory judgment declaring plaintiffs' rights to indemnification and advancement of expenses.

172.    Plaintiffs seek a judicial declaration that they are entitled to indemnification, including advancement of legal fees and other expenses.

## COUNT VI
### (Declaratory Judgment – Release of SELK Claims Under SAMR)

173.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 170 as if fully set forth herein.

174.    A controversy has arisen between plaintiffs and defendants with respect to whether SELK's claims against plaintiffs have been released by the SAMR.

175.    The parties are in need of a declaratory judgment declaring whether SELK's claims against plaintiffs have been released by the SAMR.

176.    Plaintiffs seek a judicial declaration that SELK's claims against them have been released by the SAMR.

## COUNT VII
### (Declaratory Judgment – Class E Shortfall and SELK Equity Interest)

177.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 174 as if fully set forth herein.

178.    A controversy has arisen between plaintiffs and defendants with respect to the extent to which SELK's equity interest in ALH should be reduced or eliminated due to a shortfall in the Class E Capital Contribution.

179.    The parties are in need of a declaratory judgment declaring the extent to which SELK's equity interest in ALH is reduced or eliminated due to a shortfall in the Class E Capital Contribution.

180.    In the event that the Court does not grant a declaration that SELK's claims against plaintiffs have been released by the SAMR, plaintiffs seek a judicial declaration of the extent to which SELK's equity interest in ALH is reduced or eliminated due to a shortfall in the Class E Capital Contribution.

<u>COUNT VIII</u>
**(Declaratory Judgment – Arenson as Class B Representative)**

181.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 180 as if fully set forth herein.

182.    A controversy has arisen between plaintiffs and defendants with respect to whether plaintiffs have violated Arenson's rights as Class B Representative.

183.    The parties are in need of a declaratory judgment declaring whether plaintiffs have violated Arenson's rights as Class B Representative.

184.    Plaintiffs seek a judicial declaration that plaintiffs have not violated Arenson's rights as Class B Representative.

**WHEREFORE,** plaintiffs respectfully request that this Court enter an order:

A.    declaring that they have not breached any fiduciary duty to defendants;

B.    declaring that they have not breached any obligations to defendants, or violated any rights of defendants, under the Operating Agreement;

C.    declaring that (1) in rendering services pursuant to the Consulting Agreement, they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement;

D.    declaring that they relied in good faith on JMP and on ALH's outside counsel;

E.    declaring that they are entitled to indemnification, including advancement of legal fees and other expenses;

F.    declaring that SELK's claims against them have been released by the SAMR, or in the alternative, that SELK's equity interest is reduced or eliminated by the shortfall in the Class E Capital Contribution;

G.    declaring that plaintiffs have not violated Arenson's rights as Class B Representative; and

H.    granting such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL

OF COUNSEL:

Gregory P. Joseph
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200


April 22, 2005

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel, II (#4415)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
    Attorneys for Plaintiffs Shamrock Holdings
    of California, Inc., Shamrock Capital
    Advisors, Inc., Eugene I. Krieger, George J.
    Buchler and Bruce J. Stein

564762

51