IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 04- 1339-SLR |
| v. | ) ) ) | |
| AVIE ARENSON, SELK, LLC, LAUREL EQUITY GROUP, LLC, J12ALH ASSOCIATES, A. ARENSON HOLDINGS, LTD. AND D.A. GARDENS, LTD., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

MORRIS, NICHOLS, ARSHT & TUNNEL

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200

OF COUNSEL:

Gregory P. Joseph Law Offices LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
New York, New York 10022
212-407-1200

Attorneys for Plaintiffs Shamrock Holdings
of California, Inc., Shamrock Capital
Advisors, Inc., Eugene I. Krieger,
George J. Buchler, and Bruce J. Stein

DATED: August 8, 2005

**TABLE OF CONTENTS**

TABLE OF CITATIONS ................................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 3

SUMMARY OF ARGUMENT......................................................................................... 3

    I.  This Court Has Personal Jurisdiction Over Arenson, the Arenson Entities and J12 ....... 3

    II.  SELK and Laurel's Rule 19 Motion Should be Denied .................................................. 4

STATEMENT OF FACTS................................................................................................. 4

ARGUMENT .................................................................................................................. 18

    I.  This Court Has Personal Jurisdiction over Arenson, the Arenson Entities and J12 ......... 18

        A.  Jurisdiction over Arenson under 6 <u>Del.</u> <u>C.</u> § 18-109 ................................................ 18

        B.  Long-Arm Jurisdiction over Arenson, the Arenson Entities and J12 ....................... 23

        C.  Jurisdiction over J12 Through Service in Delaware on Jays LLC............................ 31

    II.  SELK and Laurel's Rule 19 Motion Should Be Denied .................................................. 34

        A.  The Rule 19 Motion Is Premature ........................................................................... 34

        B.  The Arenson Entities and J12 Are Not Necessary Parties ........................................ 35

        C.  In Equity and Good Conscience, this Action Should Proceed................................... 38

CONCLUSION ............................................................................................................... 40

i

TABLE OF CITATIONS

**Cases**                                                                                                     **Page**

*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428 (Del. 2005) ............................24, 27

*Angst v. Royal MacCabees Life Ins. Co.*, 77 F.3d 701 (3d Cir. 1996) ..................................................35, 37

*Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974 (Del. Ch. 2000) ......................................................21

*Blue Ball Props., Inc. v. McClain*, 658 F. Supp. 1310 (D. Del. 1987) ........................................................30

*Brown v. Sagamore Hotel*, 590 N.Y.S. 2d 934 (3d Dep't 1992) ..................................................................31

*Burger King Corp. v. Rudewicz*, 471 U.S. 462 (1985) ...............................................................................25

*Burnham v. Superior Court,* 495 U.S. 604 (1990) .....................................................................................32

*Cairns v. Gelmon,* No. 16062, 1998 Del. Ch. LEXIS 79
    (Del. Ch. May 21, 1998).......................................................................................................26

*Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963 (Del. Ch. 2000)..................................................30

*Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb,*
    No. Civ. A. 03-278-KAJ, 2004 WL 2980736 (D. Del. Dec. 21, 2004)..........................................36

*Cornerstone Tech., LLC v. Conrad,* C.A. No. 19712-NC,
    2003 Del. Ch. LEXIS 34 (Del. Ch. March 31, 2003)...................................................................22

*Delpro Co. v. Nat'l Mediation Board of the U.S.*, 509 F. Supp. 468 (D. Del. 1981) .................................39

*Extra Equipamentos e Exportacao Ltda. v. Case Corp.*, 361 F.3d 359 (7th Cir. 2004).............................39

*First Am. Corp. v. Price Waterhouse LLP,* 154 F.3d 16 (2d Cir. 1998)................................................32, 34

*First Union Nat'l Bank v. Harman*, C.A. No. 95L-12-012, 1996 WL 769343
    (Del. Ch. Dec. 31, 1996) ......................................................................................................31

*Foster Wheeler Energy Corp. v. Metallgesellschaft AG*, Civ. A. No. 91-214-SLR
    1993 WL 669447 (D. Del. Jan. 4, 1993) ....................................................................................2

*Friedman v. Alcatel Alsthom*, 752 A.2d 544 (Del. Ch. 1999) .............................................................27, 28

*Hibou, Inc. Ramsing*, 324 A.2d 777 (Del. Super. 1974) ............................................................................32

*HMG/Courtland Props., Inc. v. Gray,* 729 A.2d 300 (Del. Ch. 1999)...........................................19, 33, 34

*International Shoe Co. v. Washington,*  326 U.S. 310 (1945) .....................................................................24

*Kafka v. Bellevue Corp.*, No. 90 Civ. 6709, 1991 WL 159828 (N.D. Ill. Aug. 8, 1991) .....................37, 39

ii

*Larroca v. Royal Associates, L.L.C.*, 735 N.Y.S. 2d 191 (3d Dep't 2001) ...................................32

*Macklowe v. Planet Hollywood, Inc.*, Civ. A. No. 13689, 1994 WL 586838
(Del. Ch. Oct. 13, 1994) ........................................................................................27

*Marketing Prods. Mgmt., LLC v. HealthandBeautyDirect.com, Inc.*, No. 02C-04-256
CLS, 2004 WL 249581 (Del. Super. Ct. Jan 28, 2004)..................................................30

*Marriott Corp. v. Host Corp.*, Civ. A. No. 12863, 1993 Del Ch. LEXIS
(Del. Ch. July 14, 1993) ........................................................................................31

*Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.*,
685 A.2d 724 (Del. Super. Ct. 1996)........................................................................31

*Palmer v. Moffat*, C.A. No. 01C-03-114-JEB, 2001 Del. Super. LEXIS 386
(Del. Super. Ct. Oct. 10, 2001)...............................................................................20

*Papendick v. Robert Bosch GmbH*, 410 A.2d 148 (Del. 1979) ......................................... 23-26

*Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497 (D. Del. 2003)...................................31

*Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*,
Civ. A. No. 12036, 1991 WL 129174 (Del. Ch. July 10, 1991)........................................31

*Solar Cells, Inc. v. True North Partners, LLC*, No. Civ. A. 19477, 2002 WL 749163
(Del. Ch. April 25, 2002) .......................................................................................23

*State v. Snavely*, 514 A. 2d. 1148 (Del. Super. Ct. 1986).................................................31

*Suburban Trust and Sav. Bank v. Univ. of Delaware*, 910 F. Supp. 1009 (D. Del. 1995) .........19

*Tell v. Trustees of Dartmouth College*, 145 F.3d 417 (1st Cir. 1999) ...............................37

*Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*, 882 F. Supp. 359 (D. Del. 1994)..........................34

*United States Aircraft Ins. Group v. Dwiggins, LLC*, No. Civ. 03-173-SLR,
2004 WL 51269 (D. Del. Jan. 5, 2004) ...............................................................34, 35

*Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch 2003)....................................22, 23

## Statutes and Rules

Fed. R. Civ. P. 12 ...............................................................................................1, 35

Feb. R. Civ. P. 19 ...............................................................................................1, 38

6 <u>Del.</u> <u>C.</u> § 18-109 .........................................................................................*passim*

10 <u>Del.</u> <u>C.</u> § 3114...........................................................................................22, 33

10 <u>Del.</u> <u>C.</u> § 3104(c)(1) ................................................................................3, 23, 27

6 Del. C. § 18-1002 ............................................................................................................................36

**Other Authorities**

HON. JACK B. WEINSTEIN, HAROLD L. KORN & ARTHUR R. MILLER, 3 NEW YORK CIVIL PRACTICE § 310.01 AT 3-353 (2D ED. 2005)................................................................................................................32

MOORE'S FEDERAL PRACTICE § 19.02[3][C] ...........................................................................................38

573762

## PRELIMINARY STATEMENT

Plaintiffs Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein") respectfully submit this brief in opposition to Defendants' Motion to Dismiss the First Amended Complaint for Declaratory Relief (D.I. 43 & 44). In this motion, Defendants Avie Arenson ("Arenson"), A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12"), SELK, LLC ("SELK") and Laurel Equity Group, LLC ("Laurel") seek the following relief:

(1) Arenson — who owns and controls Arenson Holdings and D.A. Gardens (the "Arenson Entities") and is Defendants' representative (the "Class B Representative") on the Supervisory Board of ALH, Holdings, LLC ("ALH") — moves to dismiss this action under FED. R. CIV. P. 12(b)(2) for lack of personal jurisdiction.

(2) The Arenson Entities and J12, who are Class B Members of ALH, move to dismiss this action under FED. R. CIV. P. 12(b)(2) for lack of personal jurisdiction.

(3) SELK and Laurel move to dismiss this action under FED. R. CIV. P. 12(b)(7)for failure to join the Arenson Entities and J12 as indispensable parties pursuant to FED. R. CIV. P. 19 (the "Rule 19 Motion").

Plaintiffs' First Amended Complaint (the "Amended Complaint") (D.I. 37) alleges detailed facts supporting personal jurisdiction.[1]  Defendants' brief purports to deny all such allegations, but these conclusory denials are devoid of factual substantiation. For example, the assertion that Arenson "did not participate materially in the management of ALH" (D.I. 44 at 4, 23) is unaccompanied by any record citation. Arenson's declaration in support of his motion to dismiss (D.I. 44 Ex. 1) does not deny the specific allegations of material participation in the Amended Complaint. There can be only one explanation for this: Arenson does not state under oath that he did not materially participate in the management of ALH because he cannot truthfully so state.

---

[1]    Extensive additional support for Plaintiffs' position on jurisdiction and other issues raised by Defendants' various motions is contained in the accompanying Declarations of Pamela Jarvis ("Jarvis Dec.") and George J. Buchler ("Buchler Dec.") in Opposition to Defendants' Motions to Dismiss or Stay.

Similarly, the declarations of the Arenson Entities (*id.* Exs. 2-3) and J12 (*id.* Ex. 4) make no attempt to refute the specific allegations in the Amended Complaint concerning their contacts with Delaware. Instead, they baldly assert that they "ha[ve] not . . . transacted any business . . . in Delaware." *Id.* Clearly, <u>the Arenson Entities and J12 are also unable to state under oath that they did not take any of the specific jurisdictional actions alleged</u>.

Since there has been no discovery or evidentiary hearing on personal jurisdiction, Plaintiffs need only make a prima face case with the record viewed in the light most favorable to them. *See, e.g., Foster Wheeler Energy Corp. v. Metallgesellschaft AG*, Civ. A. No. 91-214-SLR, 1993 WL 669447 (D. Del. Jan. 4, 1993); D.I. 44 at 8 ("the court must view all factual disputes in a light most favorable to plaintiff"). Plaintiffs believe they have more than carried this burden, but in the event that the Court is not satisfied of this, Plaintiffs respectfully request that the Court order discovery and an evidentiary hearing on personal jurisdiction.

The Rule 19 Motion is defective on its face because the Arenson Entities and J12 are currently defendants in this action, so all of ALH's Class B Members are before this Court. SELK and Laurel's <u>hope</u> that these Class B Members will in the future be dismissed for lack of personal jurisdiction does not alter the fact that they <u>are not now and may never be absent from this action</u>. Moreover, even if the Arenson Entities and J12 were dismissed from this case, the Rule 19 Motion would be meritless because, in simplest terms, there is no requirement that a suit by or against some investors in a company include all investors in the company. Assuming, *arguendo*, that the Arenson Entities and J12 were to succeed in their motions to dismiss, their choice not to participate in this action does not prevent this Court, in equity and good conscience, from proceeding without them.[2]

---

[2]    On June 2, 2005, more than eight months after Plaintiffs commenced this action, all Defendants except Arenson (*i.e.*, all Class B Members of ALH) sued Plaintiffs in federal court in North Carolina (the "NC Action") asserting claims that mirror the claims in this action (*see* D.I. 41 Ex. I). Plaintiffs currently intend, *inter alia*, to move to transfer the NC Action to this Court on the grounds that this action was first-filed. If that motion is granted, the Rule 19 Motion will be moot because all Class B Members of ALH will be before this Court.

## NATURE AND STAGE OF THE PROCEEDINGS

So as not to burden the Court with unnecessary repetition, Plaintiffs incorporate by reference herein the recitation of the Nature and Stage of the Proceedings in their simultaneously filed brief in opposition to Defendants' Motion to Dismiss, or in the Alternative, for Stay of Proceedings (the "Forum Motion," D.I. 40 & 41).

## SUMMARY OF ARGUMENT

I.    *This Court Has Personal Jurisdiction Over Arenson, the Arenson Entities and J12.*

A.    This Court has personal jurisdiction over Arenson under 6 Del. C. § 18-109, which encompasses any person who, although not formally named as a manager in the operating agreement or similar instrument of a limited liability company ("LLC"), "participates materially in the management of the [LLC]." In addition, by entering a general appearance in this action without any reservation of rights as to personal jurisdiction, Arenson waived any right to seek dismissal for lack of personal jurisdiction. *See infra* Point IA.

B.    This Court has long-arm jurisdiction over Arenson, the Arenson Entities and J12 under 10 Del. C. § 3104(c)(1) because, among other things, they intentionally (a) caused the formation of ALH, a Delaware LLC, and ALH II, Inc. ("ALH II"), a Delaware corporation, from which the claims in this action arise; (b) caused and participated in (directly and through their agent, Arenson, in his capacity as Class B Representative) acts by Delaware entities (ALH and ALH II) that they now claim were taken unlawfully and in derogation of their rights — claims that give rise to this action for declaratory relief; (c) made loans to a Delaware entity (ALH II) and received repayment from that Delaware entity, and now claim that Plaintiffs wrongfully caused such repayment — one of the claims from which this action for declaratory relief arises; (d) sought to acquire a Delaware entity (ALH), in connection with which they threatened Plaintiffs with breach of fiduciary duty claims under Delaware law; (e) have interfered with the indemnification rights of, *inter alia*, the officers and directors of a Delaware corporation (ALH II) and the ability of ALH to honor those indemnification rights in accordance with Delaware law;

and (f) have asserted claims against Plaintiffs that can only be brought derivatively on behalf of a

Delaware entity (ALH) to seek recovery for that entity, not Defendants individually (in effect,

Defendants seek to recover through a Delaware entity (ALH) the capital contributions they chose

to make to that entity); and (g) agreed in ALH's Operating Agreement that all claims relating to

ALH would be governed by Delaware law. *See infra* Point IB.

      C.    This Court has personal jurisdiction over J12, a New York general partnership,

because (a) the Amended Complaint was <u>served on J12 in Delaware</u> through one of its general

partners, which is a Delaware LLC, and (b) J12 was formed for the express purpose of acquiring,

owning, managing, investing in or disposing of an interest in ALH. *See infra* Point IC.

II.    *SELK and Laurel's Rule 19 Motion Should Be Denied.*

      The Rule 19 Motion is at best premature because the Arenson Entities and J12 are

currently defendants in this action. Even if the Arenson Entities and J12 were in the future

dismissed for lack of personal jurisdiction, their absence would not warrant dismissal because

(a) this Court would be able to accord complete relief among the other parties, and (b) their self-

chosen absence would not impair or impede <u>their</u> ability to protect <u>their</u> interests — by itself,

their decision to sue Plaintiffs on the same issues in the NC Action demonstrates this. The

Arenson Entities and J12 have, of their own volition, moved to dismiss; <u>if</u> these motions succeed,

this Court could certainly, in equity and good conscience, proceed without them. *See infra* Point

II.

## STATEMENT OF FACTS

*Background Concerning the Movants and Their Investments in ALH*

      This action arises from the formation, funding and management of ALH, a Delaware

limited liability company ("LLC"). D.I. 37 at ¶ 2; D.I. 20 Ex. B; Jarvis Dec. Ex. A. The Arenson

Entities, J12, SELK and Laurel are the five Class B equity investors in ALH (the "Class B

Members"). D.I. 20 Ex. B at Ex. B. They and Arenson are the Defendants herein (D.I. 37 at

¶¶ 9-18, 52, 57-59). Plaintiff Shamrock, as a holder of Class A equity in ALH ("Class A

4

Member"), is the single largest investor in ALH, having invested over $9 million — millions of dollars more than any of the Class B Members. *See* D.I. 37 at ¶¶ 2, 7; D.I. 20 at Ex. A ¶¶ 2,7; Jarvis Dec. Ex. B at 2. The Class A Members have no financial priority or preference over the Class B Members. *See* D.I. 37 at ¶ 3; D.I. 20 Ex. B at §§ 4.1(b), 8.3(a); Jarvis Dec. Ex. C-1 at 3 (Arenson statement that the "A and B [Members] have basically the same risks and benefits with regard [to] getting back equity or moneys lent"). The only difference is that Shamrock's share of ALH's losses is necessarily larger than that of any Class B Member, because Shamrock's investment in ALH is larger (*see* D.I. 37 at ¶ 3). No setback experienced by ALH could hurt the Class B Members without hurting Shamrock more (*id.*).

Arenson is the founder and controlling shareholder of Israel's largest private real estate contractor. Jarvis Dec. Ex. O. Over more than four decades, Arenson's companies, which have approximately 1200 employees, have successfully completed numerous major construction projects in Israel and other countries. *Id.* Because of Arenson's substantial expertise in the real estate, contracting and construction businesses, from time to time he visited ALH's regional home-building operations, talked to local management and made suggestions for improving the operations. Buchler Dec. at ¶ 2; *see also* Jarvis Dec. Ex. C-6 at 1 (Arenson's plan to visit ALH's Tennessee and North Carolina operations before October 2002 Board meeting in Florida) and Ex. C-19 (Arenson's plan to visit operations before February 2003 Board meeting) .

Arenson owns, controls and acts on behalf of the Arenson Entities. *See, e.g.,* D.I. 44 at Exs. 1-3. Together, the Arenson Entities invested approximately $1.4 million in the equity of ALH (approximately 6% of ALH's total equity); they hold approximately 17% of ALH's Class B equity. *See* D.I. 37 at ¶ 11. In connection with ALH, Arenson has been the sole spokesperson and signatory for the Arenson Entities. Buchler Dec. ¶ 5.

Since the inception of ALH in 1998, Arenson has served as the Class B Representative on ALH's Supervisory Board. Buchler Dec. ¶ 3.[3]  As Class B Representative, Arenson acts on behalf of all Class B Members. D.I. 20 Ex. B at § 6.2(b). Except for the fact that the Class B Members did not all invest the same amount in ALH, their economic rights and interests as Class B Members are identical (*id.* at § 4.1(b), 8.3(a)).  SELK and Laurel each claim to hold approximately 33% of ALH's Class B equity; the Arenson Entities (together) and J12 each hold approximately 17% (D.I. 37 at ¶¶ 57-58).[4]  Even if the Arenson Entities and J12 were to prevail in their motions to dismiss, the holders of 66% of the Class B equity would be before this Court.

J12 invested approximately $1.47 million in the equity of ALH (approximately 6% of ALH's total equity); thus, J12 holds approximately 17% of the Class B equity. *See* D.I. 37 at ¶ 58. J12 is a general partnership organized under the laws of New York State. Jarvis Dec. Ex. D.  On or around June 2, 1998, J12 was formed for the purpose of acquiring, owning, managing, investing in or disposing of an interest in ALH. *Id.* at 1.  One of J12's three general partners, Jays Twelve LLC ("Jays LLC"), was formed under Delaware law on January 12, 1998. Jarvis Dec. Ex. F.  According to its Certificate of Formation, Jays LLC has a registered office and a registered agent for the service of process in Delaware. *Id.* On April 25, 2005, J12 was served

---

[3]    The Class B Members are required to elect a Class Representative and may remove him at any time, with or without cause. D.I. 20 Ex. B at §§ 6.2(a) & 6.2(b)(ii). Not less than 67% of the Class B equity must vote to elect the Class B Representative. Operating Agreement (D.I. 20 Ex. B. at §§ 1.1 & 6.2(b)(ii). Therefore, counting the Arenson Entities as one Member, at least three of the four Class B Members must support the election of the Class B Representative. A Class Representative (such as Arenson) must have a financial interest in a Member of the Class he represents or be a fiduciary for such a Member. *Id.* at § 6.2(a).

[4]    The parties dispute whether and, if so, to what extent, SELK currently has any equity interest in ALH, and also whether SELK has released any claims it may have against Plaintiffs. D.I. 37 at ¶¶ 52-56; Jarvis Dec. Exs. G, H.  This is one of a number of reasons why the declaratory relief sought in this case would affect the parties' present and future actions.

with the Amended Complaint by means of service on Jays LLC through its registered agent. D.I. 38.[5]

*The June 1998 ALH Transaction*

All of ALH's investors, including the Class B Members, negotiated the terms of their investments in ALH, an LLC to be organized under Delaware law to engage in the home-building business. Buchler Dec. ¶ 4(a); D.I. 20 Ex. B at § 10.2. ALH was created on June 3, 1998. Jarvis Dec. Ex. A. On or around June 12, 1998, all of ALH's investors, including the Class B Members, signed the Operating Agreement and funded their investments in ALH. Buchler Dec. ¶ 4(b); D.I. 20 Ex. B. (Unless otherwise indicated, all references to the Operating Agreement are to such agreement as amended.) As a result of the June 1998 formation and funding of ALH (the "ALH Transaction"), ALH became the sole direct or indirect stockholder of American Landmark Homes Corporation ("ALH Corp."). D.I. 20 Ex. B.[6]

Arenson caused the Arenson Entities to enter into the ALH Transaction and signed ALH's original June 12, 1998 Operating Agreement on behalf of the Arenson Entities. *See* D.I. 44 Exs. 1-3; D.I. 20 Ex. B. The Operating Agreement, signed by all of ALH's investors, provides that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware." D.I. 20 Ex. B at § 10.2.

---

[5]     Under the June 2, 1998 J12 Partnership Agreement, Jays LLC was required to contribute $100,000 of the partnership's total $1 million capital. Jarvis Dec. Ex. D. Although Jays LLC was required to contribute only 10% of J12's capital, the partnership agreement entitles Jays LLC to 90% of the partnership's cash flow from the ALH investment, after return of the $888,889 capital contributed by the partnership's Class A partner. *Id.* at 4. The Class A partner, who is a citizen of New York State, had only a 10% interest in such cash flow, despite the much larger percentage of her capital contribution to the partnership. *Id.* at 2.

[6]     The stock of ALH Corp. was contributed to ALH by (a) Landmark Equity Investors LLC, a Delaware limited liability company which thereby became the Class C Member of ALH, and (b) Lion ALH Capital LLC ("Lion LLC"), a Delaware limited liability company which thereby became the Class D Member of ALH. D.I. 20 Ex. B.

*The Creation of ALH II*

On or around December 9, 1998, the Class Representatives on ALH's Supervisory Board, including Arenson, decided it would be in ALH's best interests to form a Delaware corporate subsidiary to be the parent company of all of ALH's operating subsidiaries. Buchler Dec. ¶ 7. That entity, ALH II, was organized on December 9, 1998. Jarvis Dec. Ex. I. All Class Representatives, including Arenson, approved the creation of ALH II. *Id.* ALH II was created in part for tax planning purposes, in order to, *inter alia*, capture the consolidated tax liability of ALH, while taxable income would flow directly to ALH's Members. *Id.* ALH II was used as the vehicle for obtaining debt financing for ALH's operations and acquisitions. *See* Jarvis Dec. Ex. J. The financial statements of ALH II were presented to lenders in connection with the initial arrangement and subsequent modification of such loans. Buchler Dec. ¶ 7. As of June 30, 2001, ALH II was the borrower or guarantor on over $40 million in loans for the benefit of ALH and its operations. *Id.*

Both ALH and ALH II were exposed to potential liability for the debts of ALH II and its subsidiaries. For example, in or around January 2000, ALH II obtained a $27.5 million loan from Wachovia Bank, N.A. ("Wachovia"). Jarvis Dec. Ex. K. The Wachovia loan was secured by surety bonds from Swiss Reinsurance America Corporation ("Swiss Re") and Amwest Surety Insurance Corporation (subsequently, Swiss Re assumed the Amwest surety bond). Jarvis Dec. Ex. L. ALH was, in effect, the guarantor of ALH II's obligations to Wachovia. Jarvis Dec. Ex. M. All the Class Representatives, including Arenson, approved the Wachovia loan and the related arrangements. Buchler Dec. ¶ 8.

*The March 1999 Operating Agreement Amendment and Related Capital Contributions*

On or around March 15, 1999, all of ALH Members agreed to amend the Operating Agreement (the "Amendment") and make additional capital contributions to ALH. Jarvis Dec. Ex. B. The purpose of these capital contributions was to provide funds for ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a Delaware corporation and a direct wholly-owned

8

subsidiary of ALH II, to acquire Bowden Building Corporation ("BBC"), a home-building company based in Memphis, Tennessee. *Id.* Arenson caused the Arenson Entities to enter into the Amendment and signed the Amendment on their behalf. D.I. 44 Exs. 1-3; Jarvis Dec. Ex. B. The Arenson Entities (together) and J12 each made a capital contribution of approximately $469,000 to ALH. *Id.* The Amendment reflects that the Arenson Entities made their capital contribution jointly, without differentiation between the two entities. *Id.*

*The 2000 Loans*

Pursuant to a loan agreement dated April 6, 2000 (the "2000 Loan Agreement"), some of ALH's investors loaned $2 million to ALH II to "finance certain operations" of ALH II. Jarvis Dec. Ex. N at 1. All the Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2000 Loan Agreement. Buchler Dec. ¶ 9. Approximately $1.63 million of the $2 million loaned to ALH II came from Shamrock. Jarvis Dec. Ex. N at Ex. A. According to the 2000 Loan Agreement, $166,666 was loaned by "A. Arenson Holdings, Inc." *Id.* Arenson caused "A. Arenson Holdings, Inc." to enter into the 2000 Loan Agreement. D.I. 44 Exs. 1-3; Jarvis Dec. Ex. N.

ALH II's obligations under the 2000 Loan Agreement were guaranteed by various ALH II subsidiaries, including two Delaware corporations: ALH Acquisition Corp. (the parent company of ABI) and ALH-Tennessee (the parent company of BBC). Jarvis Dec. Ex. P. By the end of 2000, ALH II was in default under the 2000 Loan Agreement and under agreements with its third-party lenders. Jarvis Dec. Ex. Q at 12. The auditor's report on ALH II's financial statements for fiscal year 2000 stated that ALH II's defaults on certain loan covenants raised substantial doubt about the ability of ALH II and its subsidiaries to continue as a going concern. *Id.* at 1.

*The Lion LLC Settlement*

The Operating Agreement appointed Lion LLC as the Initial Manager of ALH. D.I. 20 Ex. B at § 6.1(a). Lion LLC was controlled by Shalom Lamm ("Lamm"). Jarvis Dec. Ex. R. By

early 2001, both the Class A and Class B Members of ALH were extremely dissatisfied with Lion LLC's performance as Manager of ALH.  Buchler Dec. ¶ 10; *see also* D.I. 44 at 23 n. 5.  The Class A and Class B Members of ALH believed that Lion LLC, Lamm and certain of their associates owed ALH millions of dollars in misappropriated and/or misused funds and unauthorized expenditures.  *Id.*  In or around July 2001, ALH reached a settlement with Lion LLC, Lamm and certain of their associates (the "Lion LLC Settlement").  Jarvis Dec. Ex. S.  All the Class Representatives, including Arenson, approved the Lion LLC Settlement.  *Id.*[7]

Pursuant to the Lion LLC Settlement, Lion LLC, Lamm and certain of their associates agreed to pay approximately $2 million dollars to ALH.  Jarvis Dec. Ex. R.  The Lion LLC Settlement substantially decreased the influence of Lion LLC, Lamm and their associates over ALH by, *inter alia*: (1) allowing the Class A Members to designate one of the two Class D Representatives on the Supervisory Board (Jarvis Dec. Exs. T, U), (2) providing that SCA would render consulting services to ALH (Jarvis Dec. Exs. V, W), (3) making Buchler a member of the board of directors of each ALH II subsidiary (Jarvis Dec. Ex. W), and (4) establishing an Audit Committee, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B Representative (Arenson) (*id.*; *see* Ex. C-12 at 1 (scheduling Audit Committee meeting)).  As part of the Lion LLC Settlement, the subsidiaries of ALH II that guaranteed the 2000 Loan Agreement, including three Delaware corporations, reaffirmed their guarantees to Shamrock and "A. Arenson Holdings, Inc."  Jarvis Dec. Ex. P.

---

[7]     All the documentation of the Lion LLC Settlement was sent to Arenson for his review; he signed the documents approving and implementing the settlement.  Jarvis Dec. Ex. CC. Nonetheless, Defendants claim that Plaintiffs caused ALH to enter into the Lion LLC Settlement without Arenson's approval.  *See, e.g.*, D.I. 41 at ¶¶ 33-35; Jarvis Dec. Ex. DD at 4 (asserting with respect to Lion LLC Settlement that Arenson "APPROVED NOTHING") (capitalization in original).  The Lion LLC Settlement was a Major Decision requiring Supervisory Board approval. D.I. 20 Ex. B at §§ 6.2(a) & 6.2(c).  This is an example of the issues in this action concerning the rights and obligations of the members and managers of a Delaware LLC under Delaware law.  It is also an example of the controversy between the parties concerning whether Arenson's rights as Class B Representative were violated.

In connection with the Lion LLC Settlement, ALH entered into a July 1, 2001 Consulting Agreement with SCA (the "Consulting Agreement").  Jarvis Dec. Ex. V.  All the Class Representatives, including Arenson, approved the Consulting Agreement.  Jarvis Dec. Ex. X at 4.[8]  ALH could have terminated the Consulting Agreement at any time, with or without cause, after December 31, 2002.  Jarvis Dec. Ex. V.  Neither Arenson, as Class B Representative, nor the Class B Members have ever requested that the Consulting Agreement be terminated.  Buchler Dec. ¶ 11.

Substantial services were provided under the Consulting Agreement.  Krieger, Buchler and Stein spent thousands of hours on ALH matters, including but not limited to the negotiation and renegotiation of loans and other financial arrangements with Wachovia, Swiss Re and Ohio Savings Bank.  Buchler Dec. ¶ 12; *see* Jarvis Dec Ex. C-30 at 2 (Krieger, Buchler and Stein spend time every day dealing with pressing ALH issues on behalf of all investors).  Arenson expressly acknowledged the value of these services: even though he opposed ALH's sale of ABI, he approved a $200,000 bonus payment for the services provided in connection with that sale, as an expression of thanks on behalf of all the Class B Members.  Jarvis. Dec. Ex. Y; Ex. C-26.

*The Possible Sale of ALH*

Because of, *inter alia*, ALH's ongoing financial problems and disappointing performance, the Class Representatives, including Arenson, decided during the course of 2001 that it would be in ALH's best interests to consider selling ALH's operations.  Buchler Dec. ¶ 13. In March 2002, ALH and ALH II engaged Jolson Merchant Partners ("JMP") to provide financial advisory and investment banking services in connection with the possible sale of some or all of

---

[8]     Even though Arenson, as Class B Representative, approved the Consulting Agreement on behalf of the Class B Members, Defendants claim that the Consulting Agreement was entered into "without any consent" of the Class B Members.  *See, e.g.*, D.I. 41 Ex. I at ¶ 4.  The Consulting Agreement was a Major Decision requiring Supervisory Board approval.  D.I. 20 Ex. 3 at §§ 6.2(a) & 6.2(c).  This is another example of the issues in this action concerning the rights and obligations of the members and managers of a Delaware LLC under Delaware law.  It is also an example of the controversy between the parties concerning the whether Arenson's rights as Class B Representative were violated.

ALH's operations. Jarvis Dec. Ex. Z. The March 20, 2002 engagement letter between the Company and JMP (the "JMP Engagement Letter") contemplated JMP's provision of a broad range of services. *Id.* at 1-2. All the Class Representatives, including Arenson, approved this engagement of JMP. *Id.*

With the knowledge and consent of ALH's Supervisory Board, including Arenson, JMP spent more than six months seeking a buyer for the Company or substantially all of its assets. Buchler Dec. ¶ 14; Jarvis Dec. Ex. AA. After these efforts to sell the Company in its entirety proved unsuccessful, JMP began seeking potential buyers of ALH's separate operations. Buchler Dec. ¶ 14; Jarvis Dec. Ex. AA at 1. In March 2003, with the approval of all Class Representatives, including Arenson, the engagement of JMP was extended. Jarvis Dec. C-23.

*The 2002 Loans*

Regardless of whether there would or would not be a sale of some or all of ALH's operations, the Class Representatives, including Arenson, decided that ALH needed additional funding. Buchler Dec. ¶ 15. After considering and exploring various alternatives, the Class Representatives, including Arenson, concluded that it would not be feasible to raise additional equity from ALH's existing Members or obtain additional equity or loans from outside parties. *Id.* Pursuant to a loan agreement dated May 7, 2002 (the "2002 Loan Agreement"), some of ALH's investors loaned approximately $4.4 million to ALH II. Jarvis Dec. Ex. BB at 1. The purpose of the 2002 Loan Agreement was to "provide working capital" to ALH II and its subsidiaries. *Id.* All the Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2002 Loan Agreement. Buchler Dec. ¶ 16.

D.A. Gardens loaned $312,500 to ALH II. Jarvis Dec. Ex. BB at Ex. A. Arenson caused D.A. Gardens to enter into the 2002 Loan Agreement. D.I. 44 Exs. 1-3; Jarvis Dec. Ex. BB. Shamrock loaned approximately $1,964,000 to ALH II pursuant to the 2002 Loan Agreement; other ALH Members (except Laurel) also made loans to ALH II. Jarvis Dec. Ex. BB at Ex. A. At the June 26, 2003 meeting of ALH'S Supervisory Board, Arenson suggested that the loans to

12

ALH II pursuant to the 2000 Loan Agreement and 2002 Loan Agreement — including the loans made by the Arenson Entities, J12, the other Class B Members and Shamrock — should be repaid from the proceeds of the sale of ABI.  Jarvis Dec. Ex. EE at 10.  All Class Representatives, including Arenson, approved these loan repayments.  Buchler Dec. ¶ 17.

*Participation in the Management of ALH*

The Operating Agreement provides that Major Decisions concerning ALH are to be made only by the Members of ALH, <u>acting through ALH's Supervisory Board</u>.  D.I. 20 Ex. B at §6.2(a).  Under the broad definition of Major Decision, Arenson, as Class B Representative, had a role in many aspects of the operation of ALH.[9]  Arenson (and through him, the Arenson Entities and J12) participated in a broad range of Major Decisions, including but not limited to ALH's acquisitions, the Wachovia loan and Swiss Re surety, the 2000 and 2002 Loan Agreements, the Lion LLC Settlement, and the $200,000 fee to Shamrock, as described above.

The Operating Agreement provides that consent of the two Class A Representatives is necessary but not sufficient for Major Decisions.  D.I 20 Ex. B at § 6.2.  Until July 2001, when

---

[9]    Section 6.2(c) of the Operating Agreement (D.I. 20 Ex. B) defines Major Decisions as including, among other things: the sale, disposition or other transfer of substantially all the assets, or any securities, of ALH or any subsidiary of which ALH holds more than 40% of the voting power (a "Subsidiary"); the acquisition by ALH or a Subsidiary of all or substantially all of the assets or ownership interests of any other person; any modification of the Operating Agreement; engaging in any business other than home building or land development; making loans to, or guaranteeing obligations of, any person (except for guarantees required under the existing credit facilities of ALH or any Subsidiary); the sale to any person of any interest in ALH, any Subsidiary, or any of their properties or businesses; any distribution by ALH or any Subsidiary other than in accordance with the Operating Agreement; establishing, amending or modifying any rules for the operation of the Supervisory Board or similar governing body of any Subsidiary, including levels of authority for officers of ALH or any Subsidiary; any borrowing from any person (except under the existing credit facilities of ALH or any Subsidiary); any litigation settlement in excess of $500,000; the commencement of any litigation; approval of the annual budget or any amendment thereto by ALH or any Subsidiary; capital expenditures in excess of $50,000 outside the ordinary course of business; removal of any of the five most highly compensated employees; the execution of any agreement with any affiliate or Member of ALH; the execution of any agreement requiring aggregate payments in excess of $100,000; the execution of any agreement extending beyond June 12, 1999; and the taking of any action that is other than in the ordinary course of business or not in compliance with ALH's budget (except for immaterial deviations and certain capital expenditures otherwise permitted by the Operating Agreement).

the Lion LLC Settlement (approved by Arenson) enabled the Class A Members to designate one

of the two Class D Representatives, the Class A Members could only designate two of the five

Class Representatives. *Id*. at 6.2(b)(i). Defendants' brief (D.I. 44 at 23) suggests that Major

Decisions could be approved by the two Class A Members acting unilaterally, but in fact, a

majority vote of the Supervisory Board was required. D.I. 20 Ex. B at § 6.2(e). Until July 2001,

the Class D Members (like the Class A Members) could designate two Class Representatives (*id*.

at § 6.2(b)(iii)), which gave Arenson a potential swing vote.[10]

Since the July 2001 Lion LLC Settlement, the Class A Members have designated a

majority of the Class Representatives, who have been Shamrock employees. D.I. 37 at ¶ 72.

However, this did not preclude Arenson from participating materially in ALH's management.

Arenson continued to attend Board meetings and stay up-to-date on ALH's affairs.[11]  He

participated in discussions, asked questions, made suggestions, expressed his opinions and voted

as he saw fit.  For example, at the June 26, 2003 Board meeting, Arenson opined that the

proposed terms of the Bowden Litigation Settlement were favorable, asked how the settlement

would be funded if ABI were not sold, and voted to approve the settlement.  Jarvis Dec. Ex. EE at

2-3.  (The Bowden Litigation Settlement was a Major Decision; *see* D.I. 20 Ex. B at § 6.2(c).)

Arenson questioned whether it would be better for ALH to raise additional equity rather

than sell ABI and suggested that ALH's existing Members might consider investing more capital

---

[10]    Until Arenson voted against the sale of ABI in June 2003, all Supervisory Board
decisions had been unanimous. Buchler Dec. ¶ 18; Jarvis Dec. Ex. EE at 9.

[11]    Arenson received detailed presentations and updates from ALH's financial/investment
banking advisors concerning, *inter alia*, efforts to sell ALH as a whole and proposals for the
purchase of separate operations.  *See, e.g.*, Jarvis Dec. Ex. AA at 1-4; Ex. EE at 4-5; Ex. FF at 4.
He received reports from senior ALH II officers such as President and Chief Operating Officer
John Laguardia ("Laguardia") and Executive Vice President and Chief Financial Officer William
R. Lanius ("Lanius"), on business and financial matters, including ALH's performance, profit
margins, liquidity issues, markets and competitive environment.  Jarvis Dec. Ex. AA at 2-4;
Ex. EE at 2, 5-6, 8.  He also received presentations from ALH's outside legal advisors concerning
the proposed sale of ABI and BBC and the $5 million settlement of litigation arising from ALH's
original purchase of BBC (the "Bowden Litigation Settlement").  Jarvis Dec. Ex. EE at 1-2, 6-8;
Ex. FF at 2-4.  Drafts of the proposed transaction documents were provided to him for review
before the meetings.  Jarvis Dec. Ex. EE at 4; Ex. FF at 2; Ex. C-35; Ex. C-36.

14

in ABI. Jarvis Dec. Ex. EE at 8. After further discussion, a majority of the Board approved the sale, with Arenson voting against it and Lamm abstaining. *Id*. at 8-9. Nonetheless, Arenson approved a fee of up to $300,000 for JMP's services in connection with the sale. *Id*. at 10. Arenson also agreed to form a special committee (consisting of himself and Lamm) to consider whether Shamrock should be paid a special bonus for its work on the sale (*id*. at 12-13). Thereafter, he approved a special bonus of $200,000. Jarvis Dec. Ex. Y; Ex. C-26 (stating that "Shamrock is entitled to the bonus [and there are] no objections from the other [Class B Members], so please consider it a thank you of sorts from all of us").

Arenson suggested that the net proceeds of the ABI sale be used to repay the loans made by certain of ALH's Members (including the Arenson Entities, J12 and other Class B Members) under the 2000 Loan Agreement and the 2002 Loan Agreement. Jarvis Dec. Ex. EE at 10.[12] He also participated in the Board's discussion and approval of exit bonuses for Lanius and ABI President William Holt on the consummation of the ABI sale. *Id*. *See also* Jarvis Dec. Ex. FF at 6 (Arenson approved changes in executive appointments at ALH's operating subsidiaries).

At the March 24, 2004 Board meeting, Arenson stated that he opposed the sale of BBC for the same reasons he had opposed the sale of ABI. *Id*. at 5. He expressed a concern that the sale was not in the best interest of all of ALH's Members and that better value might be obtained by continuing to operate BBC. *Id*. After further discussion, a majority of the Board voted in favor of the sale and Arenson and Lamm both voted against it. *Id.* Arenson also raised and discussed with the Board "a concern about a possible conflict of interest on the part of the Company's counsel." *Id.*

Not until late 2004, <u>after the commencement of this litigation</u>, did Arenson refuse to attend a Board meeting. The Board meeting to consider the proposed sale of ALH's last remaining operating subsidiary, Mulvaney Homes, Inc. ("MHI"), was scheduled for

---

[12]    Defendants now attack the validity of these loan repayments as a breach of fiduciary duty by Plaintiffs. D.I. 37 ¶ 137-38; D.I. 41 Ex. I ¶¶ 9-11. However, they have not offered to return to ALH the loan repayments they received. Buchler Dec. ¶ 17.

December 15, 2004. Jarvis Dec. Ex. GG at 2. Arenson initially confirmed that he would attend the meeting. *Id.* However, the night before the meeting, Arenson advised Shamrock that he would not attend, stating that "[b]arring some unforeseen discussion during the meeting, I would probably vote against anyway." *Id.* Arenson later added that "any further participation would be a waste of my time." *Id.* Ex. 1.[13]

In addition to his participation in the management of ALH through formal Board meetings, Arenson participated in numerous ways that were less formal but no less significant. Arenson was informed about ALH's financial and operational condition through internal reports, financial statements, business plans and emails from Plaintiffs. *See, e.g.*, Jarvis Dec. Ex. C-31 at 2 (bi-weekly "WARs," *i.e.*, Weekly Activity Reports for each operation); Exs. Q, HH, II (audited and unaudited financial statements); Ex. C-28 (2004 forecast with Lanius comments); Ex. C-8, (summary of management meeting on operations); Ex. C-11 (update re BBC sale process and projections); Ex. C-22 (email re: impact of Wachovia loan extension); Ex. C-24 (response to Arenson's concerns re: proposals for ABI).

Arenson had unrestricted access to ALH management, including at the operating level. Buchler Dec. ¶ 19. After receiving information such as that described above, he would, as he saw fit, contact Lanius or other ALH management to ask follow-up questions or make comments. *Id.*; *see, e.g.*, Jarvis Dec. Ex. C-20 (request for updated 2003 business plans and draft of 2002 financial report). Plaintiffs never denied Arenson access to any information he requested and

---

[13]    Even though ALH has no remaining operations, it still exists and will eventually have to wind up its affairs. Buchler Dec. ¶ 22. Decisions with respect to, *e.g.*, the distribution of any remaining assets will have to be made by the Supervisory Board. *Id.* Consequently, the validity of ALH's governance structure, which is disputed by Defendants, will affect the parties' conduct going forward. Moreover, the indemnification claims asserted by Plaintiffs (D.I. 37 at ¶¶ 149-52, 169-72) will need to be resolved. Jarvis Dec. Ex. JJ.

they are unaware of anyone else at ALH having done so.  Buchler Dec. at ¶ 6.[14]  As noted above, from time to time Arenson visited ALH's operating subsidiaries and made suggestions to local management for improvements.  *Id.* at ¶ 2; Jarvis Dec. Ex. C-6; Ex. C-19.

Arenson was extensively involved in ALH's debt financing from Members and outside financial institutions. See, e.g., Jarvis Dec. Exs. C-1, C-9, C-13, C-16, C-17, C-18 (at 1), C-29, C-31 (at 3-4), C-32, C-33, C-34, C-40, C-41, C-42.  He participated in various personnel matters, such as terminations, employment agreement modifications and pay raises.  *See, e.g.,* Jarvis Dec. at Exs. C-2, C-4, C-15, C-27, C-33.  In 2002, despite his minority position, Arenson shared his analysis of the possible sale of ABI and BBC.  *See, e.g.,* Jarvis Dec. at Exs C-5, C-7.  Plaintiffs solicited Arenson's views on a broad range of matters relating to the management of ALH.  *See, e.g.* Jarvis Dec. Ex. C-31 at 1 (October 2003 conference call to discuss list of financial and operational issues and any other topics Arenson would like to include); Ex. C-39 (June 2004 conference call to discuss list of financial and operational issues and "[a]nything else [Arenson] would like to know about"); Exs.C-7 at 1-3, C-10 at 1-2 & C-38 (Lamm default under Lion LLC Settlement); Ex. C-11 (Bowden sale process in relation to negotiations for Swiss Re extension); Ex. C-23 (extension of JMP engagement to September 30, 2003); Ex. C-37 (settlement of Caruso litigation).

Arenson himself expressly acknowledged his significant role in the management of ALH. For example, in April 2002, Arenson observed that he and Shamrock had been allowed by the other Members of ALH to "do what we thought best in the company."  Jarvis Dec. Ex. C-1 at 3. Thus, notwithstanding Arenson's minority position on the Board, he saw himself as a guiding force in ALH.  Arenson also recognized that, in situations where he and the Class A Members did

---

[14]     Nonetheless, Defendants claim that Plaintiffs restricted Arenson's access to information concerning ALH.  Jarvis Dec. Ex. KK at 2 (asserting that the Class B Members "only know what little information is occasionally dribbled out by Shamrock").  This is another example of the controversy concerning whether Arenson's rights as Class B Representative were violated.  *See* D.I. 20 Ex. B at § 9.2 (Members have full access to ALH's books and records); Jarvis Dec. Ex. C-13 at 1 (no problem to provide financial information to Class B Members in connection with possible buy-out, so long as confidentiality maintained).

not agree, he could and should participate in management by advocating his position. In July of 2003, after the Board meeting at which the sale of BBC was approved, Arenson stated that "I could have been firmer. I should have been more persuasive." Jarvis Dec. Ex. C-25. Arenson also acknowledged that the parties' difference of opinion concerning the sale of BBC was nothing more than that: "This difference of opinion does not affect my regard for you, [Krieger] and the ALH management. It was and is of the highest." *Id.*

*The Class B Members' Efforts to Acquire the Class A Equity*

Beginning in or around July 2002, Defendants embarked on a plan to acquire ALH's Class A equity. Jarvis Dec. Ex. C-3. At the outset, they stated that "the time frame for a Shamrock buy-out is one of weeks and not months" (*id.*), but months passed without any offer being made. Jarvis Dec. Ex. C-14 at 1. Through Arenson and Class B counsel, the Class B Members contended that the sale of BBC — or any sale of less than all of ALH's operations — was imprudent and would serve only Shamrock's interests. *See, e.g.,* Jarvis Dec. Ex. C-43 at 1-2. Yet the Class B Members knew that an acceptable buyer for all of ALH could not be found, both because of JMP's unsuccessful efforts and because of the Class B Members' own fruitless efforts to find a partner to join them in a buy-out offer. *See* Jarvis Dec. Ex. LL. The Class B Members would not provide any additional funding for ALH. *See* Jarvis Dec. Ex. EE at 8 (no funding proposals from Class B Members). Despite repeated invitations by Shamrock, the Class B Members never made a written proposal to acquire the Class A equity. Buchler Dec. ¶ 20.

## ARGUMENT

## I. This Court Has Personal Jurisdiction over Arenson, the Arenson Entities and J12.

### A.     Jurisdiction over Arenson under 6 <u>Del.</u> <u>C.</u> § 18-109

Arenson is subject to personal jurisdiction in this action under 6 <u>Del.</u> <u>C.</u> § 18-109, which provides that (a) a manager of an LLC may be served with process in all civil actions "involving or relating to the business of the [LLC]," and (b) the term "manager" refers to any person who,

although not formally named as a manager in the LLC agreement or similar instrument, "participates materially in the management of the limited liability company."

As is set forth in detail in the Statement of Facts above, since the inception of ALH in 1998, Arenson has participated materially in the management of ALH. Arenson does not and cannot deny the specific allegations in the Amended Complaint concerning his material participation. *See* D.I. 44 Ex. 1. Arenson's sole argument against jurisdiction under 6 Del. C. § 18-109 is that, because the Class B Members do not have the right to elect a majority of ALH's Supervisory Board, Arenson is necessarily precluded from participating materially in the management of ALH. According to Arenson, "the only members of the supervisory board that participate materially in the management of [ALH] are the Class A representatives." D.I. 44 at 24. [15]

If the Delaware General Assembly had intended to define "manager" for purposes of 6 Del. C. § 18-109 as someone with majority control over the governing body of the LLC, it could easily have done so, but it did not. *See, e.g., HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 306 (Del. Ch. 1999) (which is relied on by J12 (D.I. 44 at 25-26): "This court should be chary about reading words into a statute that the General Assembly could have easily added itself."). The phrase "participates materially" is, on its face, far broader than "controls." As this Court stated in *Suburban Trust and Sav. Bank v. Univ. of Delaware*, 910 F. Supp. 1009, 1016 (D. Del. 1995) (internal citation omitted):

> In construing Delaware statutes, Delaware courts have consistently followed the "plain meaning rule" of construction. In its most recent articulation of this rule, the Supreme Court of Delaware has stated: "In the absence of any ambiguity, the

---

[15]     Arenson misleadingly suggests that the two Class A Representatives under § 6.2(b)(i) of the Operating Agreement (D.I. 20 at Ex. B) can make Major Decisions unilaterally. Arenson states that "[t]here are twenty-two 'major decisions' that may only be decided by the unanimous approval of the Class A representatives." D.I. 44 at 23 (emphasis added). Arenson reinforces this misimpression by omitting the last sentence of ¶ 71 of the Amended Complaint (D.I. 37), which states: "However, the Operating Agreement does not authorize the two Class A Representatives, acting alone, to make Major Decisions or other decisions requiring Supervisory Board approval" (see D.I. 44 at 24).

language of the statute must be regarded as conclusive of the General Assembly's intent. The judicial role is then limited to an application of the literal meaning of the words."

In *Palmer v. Moffat*, C.A. No. 01C-03-114-JEB, 2001 Del. Super. LEXIS 386 (Del. Super. Oct. 10, 2001), plaintiff sued three members of a Delaware LLC and a former member of the LLC's Management Committee, asserting jurisdiction under 6 Del. C. § 18-109. The LLC's operating agreement provided as follows:

> The Members shall have full, exclusive and complete discretion, power and authority, subject in all cases to the provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the company for the purposes herein stated, to make all decisions affecting such business and affairs, and to adopt such accounting rules and procedures as they deem appropriate in the conduct of the business and affairs of the Company.

*Id.* at *6-7.

On this basis, plaintiff argued that all three LLC members were managers under 6 Del. C. § 18-109 — i.e., that all members are managers. The court rejected this argument because the operating agreement vested actual authority in the Management Committee:

> The operations of the Company shall be conducted by the Management Committee. Except as otherwise provided in this Agreement, all Company decisions shall require the affirmative vote of the majority of the members of the Management [Committee].

*Id.* at *7.

In *Palmer*, the former member of the Management Committee (Kranjac), who had been outside counsel to the LLC, argued that he was neither a member nor a manager at the time of the events alleged in the complaint. In holding that Kranjac was subject to jurisdiction, the court did not discuss the nature or extent of Kranjac's actual activities as a member of the Management Committee. Instead, the court relied on his status as a committee member, stating that "[s]ince Kranjac concedes that he was a member of the Management Committee, the only question is one of timing," *i.e.*, whether Kranjac was on the committee when the alleged events occurred. *Id.* at 10. The court also found that it was reasonable for someone who had agreed to serve as a

manager of a Delaware LLC to expect to be subject to suit in Delaware courts in proceedings relating to his "rights, duties and obligations" as a manager. *Id.* at 12 (citation omitted).

Other personal jurisdiction cases support a broad reading of 6 <u>Del. C.</u> § 18-109. *Assist Stock Mgmt. L.L.C. v. Rosheim*, 753 A.2d 974 (Del. Ch. 2000), was an action for declaratory judgment relating to ownership interests and management rights in a Delaware LLC. Defendant Rosheim was one of two members of the LLC's governing body. Certain transactions could be approved only by unanimous consent of the board, such as material transactions with a member or manager, significant acquisitions, or issuance of interests to new members.[16] The other board member allegedly had the power to control the LLC on all matters not covered in the unanimous consent provision. One aspect of the dispute was whether the other board member had diluted Rosheim's 50% equity interest in the LLC to less than 1%.

The court had to decide whether the proceeding before it was one "involving or relating to the business of the limited liability company" within the meaning of 6 <u>Del. C.</u> § 18-109. If, as Arenson contends, participating materially in the management of an LLC requires unilateral control, Rosheim would not seem to fall within 6 <u>Del. C.</u> § 18-109. However, without discussing this aspect of 6 <u>Del. C.</u> § 18-109, the court decided that it did have jurisdiction over Rosheim. In considering whether the exercise of jurisdiction was consistent with due process, the court focused on the fact "[t]he two managers of [the LLC] cannot agree on an interpretation of their respective rights and obligations." *Assist*, 753 A.2d. at 981. The court explained that:

> [T]he <u>failure of co-managers to agree as to the scope of their respective rights and obligations</u> in their capacity as managers (or their <u>exercise or performance</u> of those rights and obligations) is . . . a matter of <u>substantial interest to this state</u>. The controlling [LLC] agreement <u>relies on Delaware law</u> to delineate those rights and obligations, and the state has a <u>compelling interest</u> in the resolution of disagreements about them.

---

[16]    Such a unanimous consent arrangement would give each of the two board members the ability to block any action proposed by the other, but it would not give either of them unilateral control. Each may try to persuade the other to agree, but neither can compel agreement. *Assist* does not suggest that such a governance arrangement — in which the ability of the LLC to make decisions may depend on persuasion — would preclude board members from being deemed managers under 6 <u>Del. C.</u> § 18-109.

*Id.* (emphasis added).

The court concluded that it could properly exercise personal jurisdiction over Rosheim because:

> (1) the allegations against Rosheim <u>focus centrally on his "rights, duties and obligations" as a manager of a Delaware LLC;</u> (2) the resolution of this matter is "inextricably bound up in Delaware law;" and (3) Delaware has a <u>strong interest in providing a forum</u> for disputes relating to the ability of managers of an LLC formed under its law to <u>properly discharge their respective managerial functions</u>. When he became a manager of a Delaware limited liability company, Rosheim <u>impliedly consented</u> to being sued in a Delaware court to adjudicate disputes <u>so inherently intertwined with that fiduciary position</u>.

*Id.* (emphasis added). *See also Cornerstone Tech., LLC v. Conrad*, C.A. No. 19712-NC, 2003 Del. Ch. LEXIS 34, at *38 (Del. Ch. March 31, 2003), where the court ruled that the issue of who owns what part of an LLC was "'related in some respect'" to the management issues underlying the case, and thus related to the business of the LLC for purposes of 6 <u>Del. C.</u> § 18-109. *Id.* at * 38. In reaching this conclusion, the court took note of the Delaware General Assembly's decision to write 6 <u>Del. C.</u> § 18-109 more broadly than 10 <u>Del. C.</u> § 3114, which provides for jurisdiction over corporate directors only in connection with suits against them for acts performed in their directorial capacities.

Defendants cite no case law — and we know of none— interpreting 6 <u>Del. C.</u> § 18-109 as limited to persons with majority control. The sole case cited by Arenson, *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch 2003), concerns jurisdiction over members of the advisory board of a limited partnership. 6 <u>Del. C.</u> § 18-109, which is part of Delaware's Limited Liability Company Act (the "LLC Act") would not have applied and was not mentioned by the court. In *Werner*, the advisory board members were <u>expressly prohibited</u> by the limited partnership's governing documents from taking any part in the "'control, management, direction or operation of the affairs'" of the partnership. *Id.* at 328. If *Werner* had involved an LLC with such language in its governing documents, the advisory board members could not have participated materially in

22

management — indeed, they could not have participated in its management at all.  Thus, *Werner* sheds no light on the meaning of "participates materially."

Arenson's fundamental fallacy is highlighted by *Solar Cells, Inc. v. True North Partners, LLC*, No. Civ. A. 19477, 2002 WL 749163 (Del. Ch. April 25, 2002), involving a merger that would have eliminated plaintiff's right to elect two of the five managers of a Delaware LLC. Defendants argued that since Solar Cells never had the right to elect a majority of the managers, it suffered no harm by losing its right to appoint managers.  The court disagreed emphatically:

> That argument carries no weight whatsoever.  To accept that assertion would be to believe that <u>every time the ability to elect a manager or director of a corporation is negotiated, there is no benefit derived therefrom if there is not a right to elect a majority</u> of the managers or directors.  Such a notion would certainly come as a surprise to all those who have given valuable consideration in negotiating such valueless rights.  <u>The right to participate in a management group is a valuable right whether or not that participation includes control of the group.</u>  In this case, it is undisputed that Solar Cells will lose that right if the proposed merger closes, thereby suffering an irreparable harm.

*Id*. at *7 (emphasis added).   Thus, *Solar Cells* debunks Arenson's claim that material participation in management is only possible in the context of majority control.

### B.   Long-Arm Jurisdiction over Arenson, the Arenson Entities and J12

Arenson, the Arenson Entities and J12 are subject to personal jurisdiction in Delaware under 10 <u>Del. C.</u> § 3104(c)(1), in that they (1) transacted business in Delaware from which the present causes of action arise, and (2) intentionally availed themselves of the benefits and protections of Delaware law, including Delaware's advanced body of law on alternative entities such as LLCs.  The crux of their opposition to jurisdiction is that they themselves did not physically enter into Delaware in connection with ALH.  However, it is well-established that personal jurisdiction can properly be exercised over a defendant who has not set foot within the borders of the state.

For example, in the leading case of *Papendick v. Robert Bosch GmbH*, 410 A.2d 148, (Del. 1979), a German company (RB) entered into a finder's fee agreement with an individual residing outside of Delaware (Papendick).  Papendick was to be compensated if RB acquired

stock of B-W. RB incorporated a Delaware subsidiary (RBNA) to act as a vehicle for the

acquisition of the stock.

After the transaction was consummated, when Papendick sued for his finder's fee, RB

argued that its "mere" ownership of stock in RBNA (which did not do business in Delaware and

was not an alter ego of RB) was an insufficient contact on which to base jurisdiction. 410 A.2d at

150. The court rejected this argument, pointing out that

> there were significant contacts between RB, the State of Delaware, and the
> litigation. RB came into the State of Delaware to create, under Delaware
> Corporation Law, a subsidiary corporation <u>for the purpose of implementing its
> contract</u> with B-W and accomplishing its acquisition of B-W stock. RB utilized
> the benefits and advantages of Delaware's Corporation Law for the creation of
> RBNA to be the <u>vehicle for channeling to B-W the purchase money for the B-W
> stock and for becoming the recipient of the B-W stock</u>. It is reasonable to assume
> that RB saw benefits and advantages in purposefully selecting the State of
> Delaware and utilizing its laws, above all others, for the creation of RBNA in the
> execution of its agreement with B-W. We conclude that RB's ownership of
> RBNA stock was the result of RB's purposeful activity in Delaware as an <u>integral
> component of its total transaction</u> with B-W to which the plaintiff's instant cause
> of action relates.

*Id.* at 152 (emphasis added). As in *Papendick*, ALH's Members, including the Class B Members,

agreed to the formation and funding of ALH for <u>the purpose of implementing</u> their mutually

agreed objective of developing a home-building business. ALH's Members, through their Class

Representatives, created ALH II as a <u>vehicle for</u>, *inter alia*, obtaining debt financing to support

and grow ALH's operations and hold the stock in ALH's many subsidiaries.

The court went on to explain that the "minimum contact" due process standards under

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945), were not intended to:

> deprive Delaware courts of jurisdiction by permitting an alien corporation to
> come into this State to create a Delaware corporate subsidiary for the purpose of
> <u>implementing a contract under the protection of and pursuant to powers granted
> by the laws of Delaware</u>, and then be heard to say, in a suit arising from the very
> contract which the subsidiary was created to implement, that the only contact
> between it and Delaware is the 'mere' ownership of stock of the subsidiary.

*Papendick*, 410 A.2d at 152 (emphasis added). *See also AeroGlobal Capital Mgmt., LLC v.*

*Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (rejecting notion that physical presence was

24

required and noting that "parties purposely chose Delaware law to govern" in upholding exercise of personal jurisdiction). The court emphasized that the case before it arose "from the purposeful utilization of the benefits and protections of the Delaware Corporation Law in activities related to the underlying cause of action" and that RB had "purposefully availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action." *Id.*[17] In the case at bar, the parties' intent to implement their objectives through ALH, under the protection of and pursuant to powers granted by the laws of Delaware, is demonstrated by, among other things, the Delaware choice of law provision in the Operating Agreement (D.I. 20 Ex. B §10.2).

There is no suggestion in the court's opinion that the non-payment of Papendick's fee was affected in any way by RB's creation and use of a Delaware subsidiary — as opposed to a subsidiary organized under the laws of some other state — to acquire the B-W stock. Nevertheless, the court held that RB's election to "utilize[] the benefits and advantages of Delaware Corporation law" was jurisdictionally significant.

The creation of a Delaware entity obviously requires that organizational documents be filed with the Office of the Secretary of State. Someone must deliver or arrange for the delivery of these documents. But the person who does so need not be the defendant him/itself. On the other hand, this person must be someone whose actions were, directly or indirectly, set in motion by the defendant. It is clear from *Papendick* that the identity of the person who physically files the papers in Delaware to create the new company is not dispositive. What matters is that the defendant wants the company to be created and directly or indirectly causes it to be created.

---

[17]     Purposeful availment does not require physical presence. *See Burger King Corp. v. Rudewicz*, 471 U.S. 462, 476 (1985): "Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." (Emphasis in original).

Although *Papendick* states that "RB came into the State of Delaware" (*id.*), it is clear that the court's holding did not depend on the fortuity of whether or not RB itself did the footwork.

Nonetheless, Arenson, the Arenson Entities and J12 insist that the existence of sufficient jurisdictional contacts with Delaware depends on who did the footwork. They concede that the formation of ALH and ALH II "actually occurred in Delaware," but argue that Arenson did not file the formational documents with the Secretary of State (D.I. 44 at 13). They also erroneously argue that the formation of ALH and ALH II "were acts by Plaintiffs" (*id.*). *See* Buchler Dec. at ¶ 21. *See also* D.I. 44 Ex. 1 at ¶¶ 14-15, in which Arenson denies filing the ALH and ALH II documents with the Secretary of State, but does not deny — and cannot deny — that the Class B Members wanted and expected these documents to be filed in furtherance of the ALH Transaction to which they had agreed. What Arenson, the Arenson Entities and J12 fail or refuse to understand is that <u>all of ALH's investors caused ALH to be formed and begin operations</u> when, in or around June 1998, they negotiated the terms of the ALH Transaction (which expressly contemplated the creation of ALH), entered into the Subscription Agreements and the original Operating Agreement, and made their capital contributions. *See* D.I. 37 at ¶¶ 19-24; Jarvis Dec. Ex. MM; D.I. 20 Ex. B.

Similarly, when ALH II was formed in December 1998, all five Class Representatives supported its creation (at that time, the Class A Members had a two seat minority on the Board). Buchler Dec. ¶ 7. All of ALH's Members (including the Class B Members), acting through all of the Class Representatives (including Arenson), believed that the formation of ALH II was in their collective interest, so they caused it to happen. *See* D.I. 37 at ¶¶ 25-28; Buchler Dec. ¶ 7.

*Papendick* is by no means alone in its jurisdictional analysis. In *Cairns v. Gelmon*, No. 16062, 1998 Del. Ch. LEXIS 79, at *2-3 (Del. Ch. May 21, 1998), plaintiffs and defendants made a joint venture agreement to form a corporation that would acquire certain license rights. Defendants formed the corporation in Delaware but then allegedly breached their agreement with plaintiffs to share the corporation's equity and governance equally. *Id.* at *3. Because the

formation of the corporation in Delaware was central to plaintiffs' claims of wrongdoing, the court concluded that this "single act suffices to constitute the 'transaction of business' in Delaware under 10 Del. C. § 3104(c)(1) and to satisfy the requirements of Due Process." *Id.* at *10. Here, in the same way, both the formation and operation of ALH, a Delaware LLC, are central to the parties' claims. *See also AeroGlobal*, 871 A.2d at 440.

As in *Cairns*, the parties' formation and operation of ALH and their disputes relating to the ALH Operating Agreement are central to the claims in the case at bar. Had ALH been formed in another jurisdiction, the parties' disputes and claims would presumably be the same, except for being governed by another jurisdiction's law. *See Macklowe v. Planet Hollywood, Inc.*, Civ. A. No. 13689, 1994 WL 586838 at, *7 (Del. Ch. Oct. 13, 1994), where the defendant limited partnership's selection of a Delaware corporation as its general partner allegedly facilitated the wrongful transfer of assets from the corporation to the partnership. The court focused on the interaction between the partnership and the Delaware corporation and its effect on the interests of the corporation, noting that "[i]t matters not whether the interaction actually occurred in Delaware." *Id.* (emphasis added). For purposes of minimum contacts, a "foreign limited partnership's acts may even occur outside of the forum state, so long as the contacts with the forum proximately result from those acts." *Id.* at *6 (emphasis added).

Similarly, in *Friedman v. Alcatel Alsthom*, 752 A.2d 544 (Del. Ch. 1999), defendant Alcatel, a French company, created a Delaware subsidiary to effect a merger with DSC, an American corporation. DSC's shareholders claimed that the merger proxy/prospectus was false and misleading. The court held that Alcatel's single act of creating a Delaware subsidiary was sufficient for jurisdiction: "Alcatel could not have merged with DSC, an American corporation, without creating an American subsidiary into which DSC could merge." *Id.* at 550 (emphasis added). The court's decision does not indicate how or why the state of incorporation of the "American subsidiary" was chosen, or how it affected the shareholders' fraud claims. However, the court did point out that "Alcatel voluntarily chose Delaware" and that all of the parties' claims

27

"spring from the merger effected by that Delaware subsidiary." *Id*. (emphasis added). In the same way, the parties here <u>could not have</u> invested in the home building business <u>without the creation of an entity</u> to serve as the fulcrum between investors and operations, and they <u>voluntarily chose a Delaware entity</u> to serve that purpose.

Arenson, the Arenson Entities and J12 argue that "Plaintiffs' claims do not relate to the formation of ALH or ALH II" (D.I. 44 at 13). In fact, as in *Friedman*, many of Plaintiffs' claims "spring from" the creation of these Delaware entities. Paragraph 68 of the Amended Complaint lists numerous examples of how Arenson and the Class B Members transacted business in Delaware and availed themselves of the benefits and protections of Delaware law. Defendants' brief (D.I. 44 at 12) sets forth a bowdlerized version of the list, which omits by ellipsis the language linking the jurisdictional acts with Plaintiffs' claims. The full language of ¶ 68 list is as follows (the language deleted by Defendants in their brief is reinserted and underscored here):

(a) Entered into the ALH Transaction, i.e., agreed to form and fund the Delaware limited liability company that became ALH,<u> from which all of their claims against plaintiffs arise — claims as to which plaintiffs now seek declaratory relief.</u>

(b) Entered into the Operating Agreement, <u>which created the ALH governance structure that they now attack as the vehicle for plaintiffs' alleged breaches of fiduciary duty.</u>

(c) Agreed that their rights and obligations in connection with ALH should be governed by Delaware law, <u>as expressly provided in the Operating Agreement, while plaintiffs base their right to exculpation on that very same Operating Agreement as construed in accordance with Delaware law.</u>

(d) Supported the creation of ALH II, a Delaware corporation, which was used as the vehicle for ALH to obtain debt financing <u>for its newly acquired operations. While plaintiffs maintain that the resulting financial burdens necessitated the sale of those operations in the interest of ALH as a whole, Arenson and the Arenson Entities allege that these sales were solely in the interest of Shamrock.</u>

(e) Made additional capital contributions to ALH for the express purpose of acquiring BBC, <u>which they now claim was imprudently and improperly sold by plaintiffs.</u>

(f) Participated in loans to ALH II and the repayment of those loans by ALH II, <u>but now assert that Shamrock should not have received its corresponding repayment for participating in the very same loans.</u>

(g) Supported the Lion [LLC] Settlement, <u>which resulted in the Class A Members having the right to designate three out of five Representatives on ALH's Supervisory Board,</u>

28

<u>but claim now that this wrongfully deprived them of a meaningful role in the Board's decision-making process.</u>

(h) Supported the engagement of JMP to provide <u>financial</u> advisory and investment banking services <u>in connection with the possible sale of some or all of ALH's operations, but now claim that the auction process was mishandled.</u>

(i) Approved a $200,000 bonus for Shamrock, <u>in recognition of its valuable services resulting in the sale of ABI, but now assert that plaintiffs' support of this sale was a breach of fiduciary duty.</u>

(j) Made efforts over a period of many months to acquire the Class A Membership Interest in ALH <u>for a low-ball price, and now contend that plaintiffs wrongfully declined to sell it to them and the other Class B Members. In aid of these efforts, Arenson and the Arenson Entities threatened plaintiffs with litigation under Delaware law. The fact that these efforts were ultimately unsuccessful does not detract from their relevance for jurisdictional purposes, because plaintiffs are alleged to have wrongfully thwarted these efforts.</u>

(k) In connection with their efforts to acquire the Class A Membership Interest in ALH, supported a proposal to transfer the assets of BBC so as to shield them from creditors, <u>and now assert that plaintiffs did a disservice to ALH by declining to engage in such a transfer.</u>

(l) Seek to interfere with the indemnification rights of officers and directors of Delaware corporations <u>(SCA and ALH [II]), under the SCA Consulting Agreement and the By-Laws of ALH II, including the right to advancement of legal expenses.</u>

(m) Threatened repeatedly to bring claims against the plaintiffs for mismanagement of ALH and waste of its assets — <u>claims that are derivative in nature and could only be brought on behalf of ALH to seek recovery for ALH, not defendants individually. Most of the issues on which plaintiffs seek declaratory relief are issues on which Arenson and the Arenson Entities have threatened to sue, through a Delaware entity, for the capital contributions they chose to make to that entity.</u>

In addition, as discussed in Section C below, J12, a New York general partnership, has a partner, Jays LLC, which is a Delaware LLC. J12 was formed <u>for the express purpose</u> of acquiring, owning, managing, investing in or disposing of an interest in ALH, and Jays LLC was to receive a disproportionate share of any profits. These are additional factors supporting long-arm jurisdiction over J12.

Whether or not Arenson, the Arenson Entities and J12 themselves set foot in Delaware, they unquestionably transacted business in Delaware from which the claims in this case arise. These contacts with Delaware are not "random, fortuitous or attenuated" (D.I. 44 at 15). To the

29

contrary, beginning in 1998, these Defendants deliberately utilized and interacted with Delaware

entities and laws — or proximately caused such utilization and interaction — in pursuit of their

financial self-interest through ALH.   The situation here involves far more than the "mere

ownership of stock" in a Delaware entity (D.I. 44 at 17).   *Cf. Marketing Prods. Mgmt., LLC v.*

*HealthandBeautyDirect.com, Inc.*, No. 02C-04-256 CLS, 2004 WL 249581, at *1-2, (Del. Super.

Ct. Jan. 28, 2004) (D.I. 44 Ex. 6; cited at 17) (Delaware corporation not formed with intent to

defraud because formation predated alleged fraud by nearly two years); *Crescent/Mach I*

*Partners, L.P. v. Turner*, 846 A.2d 963, 975, 978 (Del. Ch. 2000) (cited in D.I. 44 at 17) (no

jurisdiction over two defendants who entered into contract outside Delaware and outside purview

of Delaware law that happened to be contingent on merger of two Delaware corporations; in

contrast, there was jurisdiction over foreign defendant who negotiated price for merger between

two Delaware corporations and agreed to provide financing for combined entity).

        Moreover, Arenson, the Arenson Entities and J12 <u>affirmatively chose to participate</u> in the

ALH-related activities <u>that give rise to the disputes this litigation</u>.   In the cases cited by

Defendants, there is no comparable involvement by the defendants or relationship between the

plaintiffs' claims and the alleged jurisdictional acts.[18]   For example, *Blue Ball Props., Inc. v.*

*McClain*, 658 F. Supp. 1310 (D. Del. 1987) (cited in D.I. 44 at 11), the defendant Maryland

contractor had been solicited by plaintiffs to do work in Maryland.   Defendant's very limited

contacts with Delaware were instigated by plaintiffs, *e.g.*, plaintiffs asked defendant to mail the

contract to Delaware and gave defendant a check drawn on a Delaware bank, and defendant's

telephone calls to plaintiffs were all in response to messages left by plaintiffs.   Although

---

[18]        The case most heavily relied on by Arenson, the Arenson Entities and J12 (*see* D.I. 44 at
20) is *Werner*, 831 A.2d at 318, which is discussed at length in Section A above.   This reliance is
misplaced.   There, the partnership agreement expressly prohibited the limited partner/advisory
board members from taking any part in the control, management, direction or operation of the
affairs of the partnership.   Here, in contrast, "Major Decisions . . . <u>shall be decided</u> upon <u>only by
the Members</u>, acting through [the] Supervisory Board." D.I. 20 Ex. B at § 6.2(a); emphasis added.
In order to ensure the Members' participation in this decision-making process, the Members
"shall be entitled and <u>required</u>" to designate Class Representatives, and <u>may remove and replace
them at any time, with our without cause</u>. *Id*. at § 6.2(a)-(b); emphasis added.

jurisdiction could be based on "a single act <u>related to</u> the state," there was no intentional contact between defendant and Delaware. *Id.* at 1316 (emphasis added).

Similarly, in *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 506 (D. Del. 2003) (cited in D.I. 44 at 11), defendants' creation of two Delaware entities preceded the actions alleged in complaint and had nothing to do with the underlying claims. *See Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724 (Del. Super. 1996) (cited in D.I. 44 at 11) (foreign company not subject to jurisdiction on basis that its parent company incorporated a Delaware subsidiary which, in turn, acquired Delaware corporation; these acts in Delaware were unrelated to foreign company's alleged breach of guarantee involving Canadian power plant); *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, Civ. A. No. 12036, 1991 WL 129174, at *1 (Del. Ch. July 10, 1991) (D.I. 44 Ex. 7, cited at 15-16) (no jurisdiction over New York corporation that, years before, formed and merged several Delaware subsidiaries, because "[n]either the formation nor the merger of any of those corporations constitute any part of the facts alleged in the complaint as a wrong").[19]

**C.    Jurisdiction over J12 Through Service in Delaware on Jays LLC**

As set forth in the Statement of Facts above, J12, a New York general partnership, has three partners, one of which is Jays LLC, a Delaware LLC. Under New York law, it "is clear that a partnership may be served by service . . . upon any one of its general partners." *Brown v.*

---

[19]    As Defendants concede (D.I.44 at 9), the requirement of personal jurisdiction can be waived. Here, over a week before making his October 14, 2004 motion to dismiss for lack of personal jurisdiction (D.I. 4) Arenson entered a general appearance in this action in the Delaware Chancery Court, without any reservation of rights with respect to personal jurisdiction. Jarvis Dec. Ex. NN. *See Marriott Corp. v. Host Corp.*, A. No. 12863, 1993 Del Ch. LEXIS (Del. Ch. July 14, 1993) (defendant who appeared *pro se* to oppose plaintiff's motion for default judgment and entered a general appearance waived any objection based on lack of jurisdiction); *State v. Snavely*, 514 A. 2d. 1148, 1149 (Del. Super. 1986) (where counsel for witnesses made motion to quash on jurisdictional grounds, counsel's appearance by presenting the motion deemed to constitute a general appearance by witnesses). Cases such as *First Union Nat'l Bank v. Harman*, C.A. No. 95L-12-012, 1996 WL 769343 (Del. Ch. Dec. 31, 1996) are not to the contrary. Rather, they hold that the entry of an appearance <u>purporting to reserve jurisdictional defenses</u> — unlike Defendants' general appearance here — will be treated as a motion to dismiss rather than a general appearance. *Id.* at *6.

*Sagamore Hotel*, 590 N.Y.S. 2d 934, 935 (3d Dep't 1992); *Larroca v. Royal Associates, L.L.C.,* 735 N.Y.S. 2d 191, 192 (2d Dep't 2001) ("[s]ervice of the summons and complaint on the partnerships by way of personally serving their individual partners was effective and proper"). "The court obtains [personal] jurisdiction over a partnership when personal service is made on any partner, even if the other individual partners or the partnership as an entity would not otherwise be subject to jurisdiction in New York." 3 JACK B. WEINSTEIN, HAROLD L. KORN & ARTHUR R. MILLER, NEW YORK CIVIL PRACTICE § 310.01 at 3-353 (2d ed. 2005).[20]

In upholding service of a subpoena on the general partner of a foreign general partnership while he was temporarily working in New York, the Second Circuit Court of Appeals explained that the absence of a requirement that the partnership be doing business in New York could be attributed "to the fact that a partnership (unlike a corporation) has no separate existence." *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 19 (2d Cir. 1998). Thus, § 310(a) "telescopes service and personal jurisdiction into a single inquiry," such that service on one partner achieves jurisdiction over the partnership. *Id. See* DAVID D. SIEGEL, NEW YORK PRACTICE § 69 at 100 (3d ed. 1999) ("each general partner, carries the partnership about for jurisdictional purposes"). *See also Burnham v. Superior Court of Cal.,* 495 U.S. 604, 628, 640 (1990) (upholding jurisdiction over New Jersey resident who was served while temporarily in California in connection with activities unrelated to lawsuit).

In light of the foregoing, a New York general partnership such as J12 must reasonably expect that it is subject to suit wherever one of its partners may be served. *See First Am. Corp.,* 154 F.3d at 20-21 (because of New York's "venerable" partner service rule, the partnership knew or should have known that it risked exposure to personal jurisdiction). Here, the New York rule creates exposure to suit in Delaware rather than New York (as was the case in *First Am Corp.*),

---

[20]    *See also Hibou, Inc. v. Ramsing*, 324 A.2d 777, 782 (Del. Super. Ct. 1974) ("service upon a single partner is sufficient to constitute service upon the partnership under the theory of partners being jointly and severally liable for partnership debts," and the fact that a general partner is non-resident and not subject to personal service does not deprive court of jurisdiction to render judgment against partnership).

but the principle is the same: since a New York general partnership is subject to jurisdiction wherever one of its partners can be served and a Delaware LLC can always be served in Delaware, J12 can hardly claim surprise at being exposed to suit in Delaware, especially because, *inter alia*, the status of Jays LLC as a Delaware LLC is not temporary and J12 was formed for the express purpose of engaging in the ALH Transaction.

J12 contends that 6 <u>Del</u>. <u>C</u>. § 18-105 — under which Jays LLC was served (D.I. 38) — is an "implied consent" statute and that Plaintiffs are trying to "imput[e] the statutorily implied consent of Jays LLC to J12" (D.I. 44 at 26). However, by its terms, 6 <u>Del</u>. <u>C</u>. § 18-105 is not an implied consent statute; it simply prescribes the mechanism for service on a domestic entity. The sole case relied on by J12 (*see* D.I. 44 at 25-26) is *HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 302, 304, 309 (Del. Ch. 1999), which involved service under 10 <u>Del</u>. <u>C</u>. § 3114 (an implied consent statute) on a non-resident who was both a director of the plaintiff Delaware corporation and a general partner in a Connecticut partnership. Plaintiff argued that jurisdiction over the director under 10 <u>Del</u>. <u>C</u>. § 3114 would give the court jurisdiction over the partnership, based on the theory that the partnership was the director's alter ego. *Id.* at 303-04

In rejecting plaintiff's argument, the court pointed out that 10 <u>Del</u>. <u>C</u>. § 3114 "provide[s] personal jurisdiction over nonresident directors <u>only in connection with suits directed against them for acts performed in their directorial capacities.</u>" *Id.* at 305 (emphasis added). Furthermore,

> Section 3114 is devoid of any expression of intent by the General Assembly to enable service upon those persons who can be proven to be "alter egos" or "agents" of Delaware directors. This is unsurprising given the compelling importance of § 3114's specific purpose: to put in place in the wake of *Schaffer* [*v. Heitner*, 433 U.S. 186 (1977)] a constitutional mechanism by which to hold defendant directors accountable for breaches of their official duties.

*Id.* at 305-06. Most importantly, the court in *HMG/Courtland* considered Connecticut law in determining the partnership's susceptibility to jurisdiction, noting that, "in such a situation this court has looked to the law of the entity in determining whether the entity's separate existence is

to be disregarded." *Id*. at 309.  Here, in contrast to *HMG/Courtland*, the relevant state law point

is not whether the partnership's "separate existence is to be disregarded."  As demonstrated

above, under New York partnership/jurisdictional law, there is no "separate existence" to

disregard, which is why service on Jays LLC in Delaware achieves jurisdiction over J12 in this

action. *First Am. Corp*., 154 F.3d at 19.

## II.    SELK and Laurel's Rule 19 Motion Should Be Denied

### A.    The Rule 19 Motion Is Premature

SELK and Laurel's motion to dismiss pursuant to Rules 12(b)(7) and 19 for failure to

join indispensable parties is premature.  The Arenson Entities and J12 (the "Putatively Absent

Parties") are currently parties before this Court.  Even if the Putatively Absent Parties were likely

to succeed in their personal jurisdiction motions (which they are not), SELK and Laurel can only

seek relief based on reality as it is now, not as they hope it to be.  *See Tuff Torq Corp. v. Hydro-*

*Gear Ltd. P'ship,* 882 F. Supp. 359, 365 n.3 (D. Del. 1994) (Although it was "quite likely" that

patent owner would be dismissed from first-filed suit, it was still currently a party, so case could

not be characterized as customer suit.).  Therefore, the Rule 19 motion is not a valid motion in

lieu of answer, and SELK and Laurel must forthwith answer the Amended Complaint.[21]

In any event, this motion should be denied.  "The first part of [the Rule 19] test asks

whether the absent party is necessary for adjudication of the issue. The second part of the test is

equitable in nature, and is directed to whether a necessary party is indispensable to a fair

resolution of the issues." *United States Aircraft Ins. Group v. Dwiggins, LLC,* No. Civ. 03-173-

---

[21]     We know of no authority — and Defendants have cited none — for the filing of a
Rule 19 motion at a time when the supposedly absent parties have been joined and are before the
Court.  Defendants' invocation of "judicial economy" (D.I. 44 at 29) is particularly ironic given
that SELK and Laurel filed the duplicative NC Action instead of filing their answer and
compulsory counterclaims in this action.

SLR, 2004 WL 51269, at *3 (D. Del. Jan. 5, 2004). Neither part of this test can be satisfied here.[22]

## B. The Arenson Entities and J12 Are Not Necessary Parties

To determine if a party is "necessary" under Rule 19(a), courts evaluate whether:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede that person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

FED. R. CIV. P. 12(b)(7); *Angst v. Royal MacCabees Life Ins. Co.,* 77 F.3d 701, 705 (3d Cir. 1996). Each of the Putatively Absent Parties is a proper party, but none is "necessary."

*Complete Relief Among the Parties.* Defendants argue that Plaintiffs' claims involve the rights of all Class B Members, should be tried together as a matter of "judicial economy," and that the Putatively Absent Parties are therefore necessary under Rule 19(a)(1). D.I. 44 at 29. Defendants' failure to cite any supporting authority for this is not surprising. Even if each of the Putatively Absent Parties were in fact absent, their absence would not affect the ability of the Court to afford relief among the remaining parties.

For example, in *United States Aircraft Ins. Group*, 2004 WL 51269, plaintiff USAIG sued defendants Dwiggins and BCI for a declaration that an insurance policy issued to cover a jet was void and unenforceable. Less than three weeks later, passengers on the jet when it crashed (the "Florida Claimants") filed actions in Florida against Dwiggins (which were quickly settled) and against USAIG. *Id.* at *1-2. Dwiggins moved to dismiss USAIG's declaratory judgment action, arguing that the Florida Claimants were indispensable parties under Rule 19. The Court

---

[22]    The defendants named in the original complaint were Arenson, SELK and Laurel (*see* D.I. 20 Ex. A). The Amended Complaint added J12 and the Arenson Entities, based on further information supporting personal jurisdiction, *e.g.*, during the removal/proceedings, Defendants revealed that J12 is New York partnership with a general partner that is a Delaware LLC (D.I. 26 at ¶¶ 2-3; D.I. 20 at ¶ 17). Contrary to Defendants' contention (D.I. 44 at 2, D.I. 47 at 2), Plaintiffs have not "implicitly conceded" that the Arenson Entities and J12 are necessary parties.

held that "the absence of the Florida Claimants does not affect the ability of the court to accord relief between the USAIG, Dwiggins and BCI." *Id.* at *3. Even though the <u>actually absent</u> Florida Claimants had claims against USAIG, that did not affect the ability of the Court to accord relief among USAIG, Dwiggins and BCI. Here, the claims of the Putatively Absent Parties are likewise without impact on the Court's ability to accord relief among the other parties in this action.

Moreover, the claims from which this action arises — *i.e.*, Defendants' claims against Plaintiffs — are largely derivative in nature, so there would in any event be no need for the presence of all Class B Members. In essence, Defendants assert that Plaintiffs mishandled the management and disposition of ALH's operations. *See, e.g.,* D.I. 37 ¶¶ 132, 134, 141-42. This is confirmed by the NC Action. *See, e.g.,* D.I. 41 Ex. I at 2 (Class B Members allege that "[a]s a result [the] improper conduct as set forth herein, the value of [their] interests in ALH are *[sic]* worthless, their investments have been lost, and ALH is now insolvent"); *see also id.* at ¶¶ 36, 75. Such claims for waste or mismanagement are classic derivative claims. *See, e.g., Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, No. Civ. A. 03-278-KAJ, 2004 WL 2980736, at *6 n.4 (D. Del. Dec. 21, 2004) (events affecting all stockholders in same way, such as corporate waste and mismanagement, fall squarely within definition of a derivative action).

Because derivative actions are representative actions, only one stockholder (or member) is necessary to effectively bind the parties. *See* 6 <u>Del</u>. <u>C</u>. § 18-1002 (standing requirements for plaintiffs in LLC derivative actions). Here, SELK and Laurel together claim to hold two-thirds of the Class B equity interests, so the Putatively Absent Parties would be redundant.

*The Putatively Absent Parties, Who Seek Dismissal from this Action, Cannot Claim Prejudice.* Defendants argue that "joinder is necessary under Rule 19(a)(2)(i)" because the Class B Members all have "similar claims" against Plaintiffs, and "any judgment in favor of Plaintiffs

prejudices the [Putatively] Absent Parties." D.I. 44 at 29-30.[23]  Again, the law is to the contrary.

For example, in *Kafka v. Bellevue Corp.*, No. 90 Civ. 6709, 1991 WL 159828 (N.D. Ill. Aug. 8,

1991), plaintiff sued to recover on a loan that he and other investors  made to a real estate

developer, 32% of which was loaned by plaintiff.  *Id.* at *1.  In rejecting defendants' argument

that the other investors were indispensable parties, the court held:

> In terms of Rule 19(a)(2)(i), the investors' respective interests in
> defendants' obligations would not be impaired if Kafka's suit proceeded
> without the other investors.  Kafka's recovery of his 32% interest in the
> alleged notes and guaranties would not prevent the other investors from
> recovering their own undivided interests.  Further, there is no risk that a
> judgment for defendants in this action would preclude the other investors
> from suing defendants for their respective interests.  Thus, the investors
> are not parties to be joined if feasible under Rule 19(a)(2)(i).

*Id.* at *3; *see also Angst,* 77 F.3d at 705 ("The possibility that a successful party to the original

litigation might have to defend against a subsequent suit by [an absent party] does not make the

[absent party] a necessary party to the action.").

Moreover, Defendants seek to justify a finding of "prejudice" based on their own motion

to dismiss.  As this Court observed in *Dwiggins*:

> First, [SELK and Laurel] offer[] no reason why any of the [Putatively
> Absent Parties] could not intervene in the present case.  Even if the court
> does not have personal jurisdiction to compel joinder, that is irrelevant to
> whether the [Putatively Absent Parties] could intervene.   Second,
> regardless of whether the [Putatively Absent Parties] are formally joined
> as parties, all the facts presently before the court suggest that the
> [Putatively Absent Parties] are capable of and are actively protecting
> their interests in this forum as evidenced by the fact that [SELK and
> Laurel are] represented by the same attorney that represents the
> [Putatively Absent Parties] in the [North Carolina] litigation.  Third, the
> close relationship between the [Putatively Absent Parties] and [SELK
> and Laurel] is indisputable.

---

[23]    Defendants' reliance upon *Tell v. Trustees of Dartmouth College*, 145 F.3d 417, 419 (1st
Cir. 1999), is misplaced.  The difference of interests in that case referred to substantive legal
interests — not the relative size of the parties' financial interests, as Defendants seem to suggest.
As set forth in the Statement of Facts above, the interests of the Class B Members are absolutely
identical except as to size .

*Dwiggins*, 2004 WL 51269, at *3 (emphasis added).  The Arenson Entities and J12 are not without means to protect their interests.  This Court need not reach the question of the Putatively Absent Parties' ability to intervene, because they are already before the Court.  Surely the <u>ability to refrain from seeking to exit a case by means of a dismissal motion</u> is even more significant than the ability to enter it by intervening.  Even if the Arenson Entities and J12 were to be dismissed, their interests would be more than adequately protected by SELK and Laurel, as they are all Class B Members with identical interests (except for size of investment), they are all represented by the same counsel (who could not act adversely to any of them) and share a common Class Representative on ALH's Supervisory Board.[24]

### C.    In Equity and Good Conscience, this Action Should Proceed

Defendants argue that, if the Court determines that the Putatively Absent Parties are necessary under Rule 19(a) and their dismissal motions are granted so that joinder is not feasible, the Court should dismiss this action under Rule 19(b).  Under Rule 19(b), the Court considers:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

FED. R. CIV. P. 19(b).  "[C]ourts generally will dismiss only when serious harm may result from nonjoinder . . .."  4-19 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 19.02[3][C] (3d ed. 2005).  No such serious harm (indeed, no harm at all) is threatened here.

The first two Rule 19 factors — prejudice to the absent or remaining parties and the ability to craft an order to lessen any prejudice — do not favor dismissal.  Even if the Arenson Entities and J12 were to be dismissed from this action, neither they nor the remaining Class B Members would suffer any prejudice because Plaintiffs do not seek to impose any monetary

---

[24]    SELK and Laurel do not and cannot argue that they would be subject to incurring double, multiple or inconsistent obligations if the Arenson Entities or J12 were dismissed.

liability or other obligations on them. Moreover, as in *Kafka*, 1991 WL 159828, at *3, "there is no risk that a judgment for [Plaintiffs] in this action would preclude the other investors from suing [Plaintiffs] for their respective interests." (Emphasis added.) In addition, SELK and Laurel, who are represented by the same counsel as the Putatively Absent Parties and own two-thirds of the Class B equity, would adequately protect the other Class B Members' interests. *See, e.g., Extra Equipamentos e Exportacao Ltda. v. Case Corp.*, 361 F.3d 359, 362-64 (7th Cir. 2004) (reversing dismissal under Rule 19 where remaining parties had "identical incentive" to defend the case).

Nor do the third and fourth Rule 19(b) factors favor dismissal. Defendants' argument that a judgment would be inadequate because the Class B Members of ALH "own a different percentage of the Class B membership interest, which may affect the manner in which they litigate the issues" D.I. 44 at 32-33, is nonsensical. Defendants' *ipse dixit* argument fails to address how quantitative differences in Defendants' percentage interests would render the relief requested by Plaintiffs inadequate, especially where the holders of two-thirds of the Class B interests are before the Court and are represented by the same counsel and the same Representative on ALH's Supervisory Board. *See Kafka,* 1991 WL 159828, at *3 ("the investors' respective interests in defendants' obligations would not be impaired if Kafka's suit proceeded without the other investors. Kafka's recovery of his 32% interest in the alleged notes and guaranties would not prevent the other investors from recovering their own undivided interests") (emphasis added).[25]

---

[25]    Defendants, citing *Delpro Co. v. Nat'l Mediation Board of the U.S.*, 509 F. Supp. 468 (D. Del. 1981), argue that the Court should dismiss a declaratory judgment action whenever there is an absent party, whether indispensable or not. D.I. 44 at 34. *Delpro* is inapposite. In that case, a railroad union had initiated a proceeding before the National Mediation Board, after which the employer sued the Mediation Board for a declaratory judgment that it was not subject to the Board's jurisdiction, but without joining the union to the action. Contrary to Defendants' contentions, this Court has applied the Rule 19 analysis to conclude that proper parties are not necessary in resolving a claim for declaratory relief. *See Dwiggins,* 2004 WL 51269, at *3.

In equity and good conscience, this action can and should proceed, with or without the Putatively Absent Parties.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court: (1) deny the motions by Arenson, the Arenson Entities and J12 to dismiss for lack of personal jurisdiction, or alternatively, order discovery and an evidentiary hearing on personal jurisdiction over them, and (2) deny SELK and Laurel's Rule 19 Motion.

MORRIS NICHOLS ARSHT & TUNNELL

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200
   *Attorneys for Plaintiffs Shamrock Holdings of
   California, Inc., Shamrock Capital Advisors, Inc.,
   Eugene I. Krieger, George J. Buchler and Bruce J.
   Stein*

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
(212) 407-1200
New York, NY 10022

DATED: August 8, 2005

40

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day August, 2005, copies of the within document were served on the following attorneys of record as follows:

**BY eFILE:**

Sean J. Bellew, Esquire
David A. Felice, Esquire
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, Delaware  19801


_____
S. Mark Hurd (#3297)