# EXHIBIT N

# LOAN AGREEMENT

### Dated as of April 6 2000

### Between

### ALH II, INC.
### a Delaware corporation

### the "Borrower"

### and

### The Parties Described on Exhibit A,

### the "Lender"

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Loan Agreement") is made as of Aar·l 6 , 2000 by and between ALH II, INC., a Delaware corporation ("ALH") ("Borrower") and the Parties listed on Exhibit A hereto (collectively the "Lender").

### R E C I T A L S:

A.      The Borrower has requested a loan in the principal amount of Two Million Dollars ($2,000,000) as set forth herein (the "Loan") to finance certain operations of the Borrower.

B.      The Lender is willing to make the requested loan upon and subject to the terms and conditions set forth in this Agreement.

### A G R E E M E N T:

NOW, THEREFORE, in consideration of the covenants and conditions herein contained, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1.    Certain Defined Terms.    As used herein (including any Exhibits attached hereto), the following terms shall have the meanings set forth below (unless expressly stated to the contrary):

"ALH-Acquisition" shall mean ALH Acquisition Corporation, a Delaware corporation.

"ALH" shall mean ALH II, Inc., a Delaware corporation.

"ALH-Tennessee" shall mean ALH Tennessee Acquisition, Inc., a Delaware corporation.

"Atlantic Builders" shall mean Atlantic Builders, Inc., a Florida corporation.

"Borrower" shall mean ALH

"Bowden" shall mean Bowden Building Corporation, a Tennessee corporation,

"Business Day" shall mean any day except Saturday, Sunday or other day on which commercial banks are required or permitted by law to close in New York, New York.

"Event of Default" shall mean the occurrence, after any applicable grace period, of any of the events listed as Events of Defsault.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession prevalent in the United States of America.

"Guarantors" shall mean the following entities: ALH Acquisition Corporation, a Delaware corporation ("ALH-Acquisition"), ALH Tennessee Acquisition Corporation, a Delaware corporation ("ALH-Tennessee"), Atlantic Builders Inc., a Delaware corporation ("Atlantic Builders"), Bowden Building Corporation, a Tennessee corporation ("Bowden"); Mulvaney Homes, Inc, a North Carolina corporation ("Mulvaney").

"Lender" shall mean the parties set forth on Exhibit A hereto and their successors and assigns.

"Material Adverse Change" shall mean any material and adverse change in, or a change which has a material adverse effect upon, any of:

      (a)     the legal ability of the Borrower to perform its obligations under the Loan and to avoid any Event of Default; or

      (b)     the legality, validity, binding effect or enforceability against the Borrower of the Loan Agreement.

"Maturity Date" shall mean December 31, 2000.

"Mulvaney" shall mean Mulvaney Homes, Inc., a North Carolina corporation

"Note" shall mean those certain Promissory Notes dated of even date herewith and executed by the Borrower, as maker, and made payable to the order of a Lender, as holder, in the aggregate amount of Two Million Dollars ($2,000,000) and maturing on the Maturity Date, to evidence the Loan, as such Promissory Notes may be amended or otherwise modified from time to time.

"Prepayment Price" shall mean an amount equal to (i) the principal amount of the Loan to be prepaid with no premium thereon, plus (ii) all accrued interest to the date of prepayment on the principal amount prepaid

## ARTICLE II
## THE LOAN

Section 2.1.    <u>Agreement to Lend and Borrow; Evidence of Indebtedness and Maturity</u>.

      (a)     The Lender agrees, on the terms and conditions hereinafter set forth, to make the Loan to the Borrower for the purpose of providing financing for its operations. Each of the parties making up the Lender shall make a loan to Borrower only up to the amounts listed next to their name on Exhibit A.

      (b)     Concurrent with the execution and delivery of this Loan Agreement, the Borrower shall execute and deliver to the Lender the Note, evidencing the indebtedness incurred by the Borrower pursuant to the terms of this Loan Agreement.

      (c)     The outstanding principal balance of the Loan, together with accrued and unpaid interest thereon and all other amounts payable by the Borrower under the terms of the Loan Agreement, shall be due and payable on the Maturity Date.

Section 2.2.    <u>Repayment of Principal</u>. Principal of the Loan shall be due and payable on the Maturity Date

Section 2.3.    Interest.

(a)    The Loan shall bear interest from the date of disbursement hereunder on the unpaid principal at the per annum rate of fifteen (15%) percent. Throughout the term of the Loan, interest shall be calculated on the basis of a 360-day year consisting of twelve (12) thirty (30) day months.

(b)    On or before the fifth business day after the end of each calendar quarter, commencing with June 30, 2000, the Borrower shall pay the interest due for the previous quarter.

Section 2.4.    Prepayment of the Loan.  The Borrower shall have the right to prepay the Loan at any time, in full or in part at a price equal to the Prepayment Price.

Section 2.5.    Payments  All computations of interest under the Loan Documents shall be made by the Lender on the basis of a year of 360 days, comprised of twelve (12) thirty (30) day months.  If any payment of interest or principal to be made by the Borrower shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest with respect to such payment.

Section 2.6.    Applications of Payments; Late Charges

(a)    Payments received by the Lender pursuant to the terms hereof shall be applied in the following manner:

      (1)    first, to any costs or expenses incurred by Lender in regard to the Loan.

      (2)    second, to the payment of all interest accrued to the date of such payment; and

      (3)    three, to the payment of principal.

(b)    If any installment of interest and/or the payment of principal is not received by the Lender within five (5) Business Days after the due date thereof, then the Lender may elect to assess a late charge of four percent (4%) of the amount of the installment due and unpaid, which such late charge will be added to the delinquent amount to compensate the Lender for the expense of handling the delinquency. The Borrower and the Lender agree that such late charge represents a good faith and fair and reasonable estimate of the probable cost to the Lender of such delinquency.  Acceptance of such late charge shall not constitute a waiver of the default with respect to the overdue installment, and shall not prevent the Lender from exercising any of the other rights and remedies available hereunder.

Section 2.7.    Interest Rate Limitation  The provisions of this Loan Agreement and the other Loan Documents are hereby expressly limited so that in no contingency or event whatsoever shall the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the sums evidenced by this Loan Agreement exceed the maximum amount permissible under applicable law.  If from any circumstance whatever the performance or fulfillment of any provision of this Loan Agreement or of any other Loan Document should involve or purport to require any payment in excess of the limit prescribed by law, then the obligation to be performed or fulfilled is hereby reduced to the limit of such validity, and if, from any circumstance whatever, the Lender should ever receive as interest an amount which would exceed the highest lawful rate under applicable law, then the amount which would be excessive interest shall be applied as an optional reduction of principal in accordance with the terms of Section 2.4 of this Loan Agreement (or, at the Lender's option, be paid over to the Borrower), and shall not be counted as interest.

Section 2.8    Guaranty.  Each of the Guarantors hereby expressly and unconditionally

3

guaranties the full and timely performance by the Borrower of its obligations hereunder. This guarantee shall remain in full force and effect until all of the Borrower's obligations hereunder have been fully and indefeasibly paid and satisfied. The guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment of all of Borrower's obligations hereunder without regard to any defense (other than the defense of payment), set-off or counterclaim which may at any time be available to or be asserted by the Guarantors against the Lenders. The Guarantors waive notice of or proof of reliance by the Lenders upon this guarantee or acceptance of this guarantee. All of Borrower's obligations hereunder, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this guarantee, and all dealings between Borrower or the Guarantors and the Lenders shall likewise be conclusively presumed to have been had or consummated in reliance upon this guarantee. The Guarantors unconditionally waive, to the extent permitted by applicable law, any and all rights the Guarantors may have or that at any time hereafter may be conferred upon them, by statute, regulation or otherwise, to terminate or cancel this guarantee.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1. <u>Consideration</u>. As an inducement to the Lender to execute this Loan Agreement, make the Loan and disburse the proceeds of the Loan, the Borrower represents and warrants to the Lender the truth and accuracy of the matters set forth in this <u>Article III</u>

Section 3.2. <u>Organization</u>. The Borrower and each Guarantor is duly organized, validly existing and in good standing as a corporation under the laws of the State of its respective incorporation, is duly qualified to do business and is in good standing in every jurisdiction where its business or properties require such qualification and has all requisite power and authority to own and operate its properties and to carry on its business as now conducted or proposed to be conducted.

Section 3.3. <u>Governmental Consents</u>. No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by any of the entities constituting the Borrower of the Loan Documents or any other document executed pursuant thereto or in connection therewith.

Section 3.4. <u>Validity</u>. The Loan Documents have been duly executed and delivered by and constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their respective terms.

## ARTICLE IV
## COVENANTS OF BORROWER

Section 4.1. <u>Consideration</u>. As an inducement to the Lender to execute this Loan Agreement, make the Loan and make each disbursement of the Loan, the Borrower hereby covenants as set forth in this <u>Article IV</u>.

Section 4.2. <u>Affirmative Covenants</u> So long as any amount payable hereunder or under any other Loan Document shall remain unpaid or the Lender shall have any commitment to disburse the Loan hereunder, the Borrower shall, unless the Lender shall otherwise consent in writing:

    (a) <u>Reporting Requirements</u>. Furnish or cause to be furnished to the Lender the following notices and reports:

        (1) *Quarterly Financial Reports*. As soon as possible and in any event within forty five (45) days after the end of each fiscal quarter of the Borrower (other than the last quarter of any fiscal year), the unaudited financial statements of the

Borrower on a fully consolidated and consolidating basis, which financial statements shall include (A) a balance sheet as at the end of such fiscal quarter and (B) statements of income and cash flow for the period from the beginning of the then current fiscal year to the end of such fiscal quarter and setting forth in comparative form figures for the corresponding budget for such fiscal year, including income and expense statements for each division; all in reasonable detail and in accordance with GAAP consistently applied and certified by the Chief Financial Officer of ALH to fairly present the financial condition of the Borrower on a fully consolidated and consolidating basis as at the end of such fiscal quarter and the results of the operations of the Borrower on a fully consolidated and consolidating basis for the period ending on such date;

(2)    *Annual Financial Statements.* As soon as possible after the end of each fiscal year of the Borrower, audited financial statements of the Borrower on a fully consolidated and consolidating basis, which financial statements shall include a balance sheet of the Borrower as at the end of such fiscal year, statements of income, shareholders' equity and cash flow of the Borrower for such fiscal year, and setting forth in each case in comparative form figures for the preceding fiscal year, all in reasonable detail and in accordance with GAAP consistently applied accompanied by an opinion issued by an independent certified public accountant acceptable to the Lender.

(b)    <u>Compliance with Laws, Etc.</u>  Comply in all material respects, with all applicable laws, rules, regulations and orders of any governmental authority, the noncompliance with which might result in a Material Adverse Change.

(c)    <u>Maintenance of Existence</u>.  Maintain and preserve its existence and all rights, privileges, qualifications, permits, licenses, franchises and other rights material to its business.

(d)    <u>Senior or Pari Pasu Debt</u>.  Not enter into any new debt facility or other debt that would be senior or of equal priority with the Loan.

(e)    <u>Further Assurances.</u>  Execute and deliver at any time and from time to time any and all instruments, agreements and documents, and shall take such other action as the Lender reasonably requires.

## ARTICLE V
## EVENTS OF DEFAULT AND REMEDIES

Section 5.1.    <u>Events of Default</u>.  The occurrence and continuance of any of the following events shall constitute an "Event of Default" hereunder:

5

(a)    The Borrower shall fail to pay any installment of principal on the Loan when due, whether at stated maturity, as a result of a mandatory prepayment requirement, upon acceleration or otherwise, or pay when due any interest, fees or other amounts payable hereunder or under the other Loan Documents; or

(b)    The Borrower or any Guarantor shall assert the invalidity or unenforceability of the Loan Agreement or Note and the same be adjudicated to be invalid or unenforceable in any material respect; or

(c)    the dissolution or winding up of the Borrower; or

(d)    The Borrower defaults under the terms of any senior debt; or

(e)    Borrower has materially breached any representation or covenant contained herein.

Section 5.2.    Notices of Default.  The Borrower, immediately upon becoming aware of any circumstance that is or would result in an Event of Default, shall so notify the Lender specifying the circumstances of such default.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1.    Successors and Assigns; No Assignment by Borrower.  The provisions of this Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that the Borrower may not assign or transfer any of its rights or obligations under this Loan Agreement or without the prior written consent of the Lender.

Section 6.2.    Notices.  All notices, requests and demands to be made hereunder to the parties hereto shall be in writing (at the addresses set forth below) and shall be given by any of the following means:

(a)    personal delivery;

(b)    reputable overnight courier service;

(c)    electronic communication, whether by telex, telegram or telecopying (if confirmed in writing sent by registered or certified, first class mail, return receipt requested); or

(d)    registered or certified, first class mail, return receipt requested.

Any notice, demand or request sent pursuant to the terms of this Loan Agreement shall be deemed received (i) if sent pursuant to subsection (a), upon such personal delivery, (ii) if sent pursuant to subsection (b), on the next Business Day following delivery to the courier service, (iii) if sent pursuant to subsection (c), upon dispatch if such dispatch occurs between the hours of 9:00 a.m. and 5:00 p.m. (recipient's time zone) on a Business Day, and if such dispatch occurs other than during such hours, on the next Business Day following dispatch and (iv) if sent pursuant to subsection (d), upon receipt.

The addresses for notices are as follows:

6

| To Lender: | c/o Shamrock Capital Advisors<br>4444 West Lakeside Drive<br>Burbank, California 91505<br>Attn: George J. Buchler<br>Telephone No.: (818) 845-4444<br>Telecopier No.: (818) 845-4675 |
|---|---|
| With a copy to: | Fried Frank Harris Shriver & Jacobson<br>350 South Grand Avenue<br>32nd Floor<br>Los Angeles, California 90071<br>Telephone No.: (213) 473-2000<br>Telecopier No.: (213) 473-2222 |
| To the Borrower: | ALH II, Inc.<br>c/o Atlantic Builders<br>7800 Belfort Parkway<br>Suite 200<br>Jacksonville, Florida 32256<br>Attention:      John LaGuardia, President<br>Telephone No.: (904) 384-1900<br>Telecopier No.: (904) 384-2599 |
| With a copy to: | Jonathan Zich<br>General Counsel<br>c/o Lion & Lamm Capital, LLC<br>489 Fifth Avenue<br>New York, NY 10017<br>Telephone No.: (212) 867-6363<br>Telecopier No.: (212) 867-6303 |

Such addresses may be changed by notice to the other parties given in the same manner as provided above.

Section 6.3.    Changes, Waivers, Discharge and Modifications in Writing.  No provision of this Loan Agreement may be changed, waived, discharged or modified except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or modification is sought.

Section 6.4.    Indemnification.  The Borrower agrees to protect, indemnify, defend and hold harmless the Lender from and against any and all claims, damages, losses, liabilities, obligations, penalties, actions, judgments, suits, costs, disbursements and expenses (including, without limitation, reasonable fees and expenses of counsel and consultants and allocated costs of internal counsel) that may be incurred by or asserted against the Lender, in each case arising out of or in connection with or related to any of the following:

(a)    the Loan, this Loan Agreement;

(b)    the use of funds advanced under the Loan Documents;

Section 6.5.    Governing Law.  This Loan Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7

Section 6.6.  Titles and Headings.  The titles and headings of sections of this Loan Agreement are intended for convenience only and shall not in any way affect the meaning or construction of any provision of this Loan Agreement.

Section 6.7.    Counterparts.    This Loan Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page.

Section 6.8.    Lender's Rights With Respect to the Loan.    Notwithstanding any provision to the contrary contained in this Loan Agreement, the Lender may at any time sell, assign, grant or transfer to any person all or a portion of its interest in or rights with respect to the Loan.

Section 6.9.    Time is of the Essence.    Time is of the essence of this Loan Agreement.

Section 6.10.    No Third Parties Benefited    This Loan Agreement is made and entered into for the sole protection and legal benefit of the Borrower and the Lender and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with this Loan Agreement. The Lender shall not have any obligation to any Person not a party to this Loan Agreement.

Section 6.11.    Severability.    The illegality or unenforceability of any provision of this Loan Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Loan Agreement or any instrument or agreement required hereunder.

Section 6.12.    Jurisdiction.    Any legal action or proceeding with respect to this Loan Agreement or may be brought in the courts of the State of New York or of the United States for the Southern District of New York and by execution and delivery of this Loan Agreement, each of the Borrower, the Guarantors and the Lender consents to the jurisdiction of those courts. Each of the Borrower, the Guarantors and the Lender irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect to this Loan Agreement or any document related hereto. The Borrower, the Guarantors and the Lender each waive any personal service of any summons, complaint or other process, which may be made by any other means permitted by New York law.

Section 6.13.    Waiver of Jury Trial.    THE BORROWER, THE GUARANTORS AND THE LENDER WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OR ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS LOAN AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE BORROWER, THE GUARANTORS AND THE LENDER AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS LOAN.   THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LOAN AGREEMENT.

Section 6.13.    Interpretation    This Loan Agreement shall not be construed against the Lender merely because of the Lender's involvement in the preparation of such documents and agreements.

9

Section 6.14.  Entire Agreement.  This Loan Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the Borrower and the Lender and supersedes all prior or contemporaneous agreements and understandings of such persons, verbal or written, relating to the subject matter hereof and thereof except for any prior arrangements made with respect to the payment by the Borrower of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of the Lender.

IN WITNESS WHEREOF, the Lender, the Borrower and the Guarantors have caused this Loan Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

ALH II, INC., a Delaware corporation

By: _____

Printed Name: Jonathan Z. Ich
Title: Pres.

GUARANTORS:

ALH ACQUISITION CORPORATION, a Delaware corporation

By: _____

Printed Name: John D. Honrahan
Title: V.P.

ALH TENNESSEE ACQUISITION CORPORATION, a Delaware corporation

By: _____

Printed Name: Jonathan Z. Ich
Title: V P

10

ATLANTIC BUILDERS INC., a Delaware
corporation

By: _____

Printed Name: _____
Title: _____

BOWDEN BUILDING CORPORATION, a
Tennessee corporation

By: _____

Printed Name: _____
Title: _____

MULVANEY HOMES, INC: a North
Carolina corporation

By: _____

Printed Name: _____
Title: _____

LENDER:

SHAMROCK HOLDINGS OF CALIFORNIA, INC.

By: _____

Printed Name: _George Erchler_____

LION & LAMM CAPITAL, LLC

By: _____

Printed Name: _Jonathan Zu_____

A. ARENSON HOLDINGS, INC.

By: _____

Printed Name: _____

11

## EXHIBIT A

| Name | Amount |
|------|--------|
| Shamrock Holdings of California, Inc. | $1,633,334.00 |
| A. Arenson Holdings, Inc. | $166,666.00 |
| Lion & Lamm Capital, LLC | $200,000.00 |

# PROMISSORY NOTE

$1,633,334

April 6, 2000
Jacksonville, Florida

FOR VALUE RECEIVED, the undersigned, ALH II, INC. a Delaware corporation having an office at 7800 Belfort Parkway, Suite 200, Jacksonville, Florida 32256 ("**Borrower**"), hereby promises to pay to the order of SHAMROCK HOLDINGS OF CALIFORNIA, INC., having its offices at 4444 West Lakeside Drive, Burbank, California 91510-7774 ("**SHC**"), and/or its successors and assigns ("**Lender**"), at SHC's office at 4444 West Lakeside Drive, Burbank, California 91510-7774, or such other addresses as Lender may from time to time designate in a written notice to Borrower, on the Maturity Date (as defined below) the principal sum of ONE MILLION SIX HUNDRED THIRTY THREE THOUSAND THREE HUNDRED THIRTY FOUR DOLLARS or so much thereof as may be outstanding hereunder, together with interest thereon as hereinafter set forth, such payment to be made in lawful money of the United States of America in immediately available funds.

    1.    **Definitions**.  The following terms used in this Note shall have the following meanings:

| | |
|---|---|
| "Business Day" | Any day except a Saturday, Sunday or other day on which commercial banks are required or permitted by law to close in New York, New York. |
| "Default Rate" | Shall have the meaning ascribed to such term in Section 3 hereof. |
| "Event of Default" | Shall mean any default beyond applicable grace and notice periods in the performance of the obligations under this Note |
| "Lender" | Shall have the meaning ascribed to such term in the introductory paragraph hereof. |
| "Interest Rate" | Shall have the meaning ascribed to such term in Section 2 hereof. |
| "Loan" | The loan made by Lender to Borrower on the date hereof which is evidenced by this Note. |

1

| | |
|---|---|
| "Loan Documents" | Shall mean this Note and any and all other documents, evidencing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note. |
| "Borrower" | Shall have the meaning ascribed to such term in the initial paragraph hereof. The term "Borrower" shall include the respective successors and assigns of Borrower. |
| "Maturity Date" | December 31, 2000. |
| "Note" | This Promissory Note, together with all extensions, renewals, modifications, amendments and supplements hereof or hereto. |
| "Payment Date" | July 5, 2000, and the first day of each calendar quarter thereafter during the term of this Note. |

2.    Interest and Principal Payments.

(a)    Subject to the further provisions of this Note, including Section 3 below, the principal amount outstanding hereunder shall bear interest at a rate per annum (the "Interest Rate") equal to fifteen (15%) percent based on a 360 day period.

(b)    Prior to the Maturity Date (or the date on which the unpaid principal balance of this Note otherwise becomes due, whether by acceleration or otherwise), interest on the outstanding principal balance of this Note, calculated at the Interest Rate, shall be payable quarterly, in arrears, on each Payment Date, with respect to the preceding period. The entire unpaid principal balance of this Note, together with all accrued and unpaid interest and all other sums payable hereunder and under the other Loan Documents, if not sooner paid, shall be due and payable in full on the Maturity Date.

(c)    All sums payable to Lender hereunder shall be payable, without setoff, deduction or counterclaim, in immediately available funds. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, when any payment is due hereunder or under any of the other Loan Documents on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day.

3.    Default Interest. If any installment of interest or principal payable hereunder is not paid within five (5) days from the date when the same shall become due and payable or if all principal, interest and other amounts due hereunder and under the

2

other Loan Documents is not paid on the Maturity Date (or such earlier date as the same may become due, whether by acceleration or otherwise), or if any other sum payable hereunder or under any of the other Loan Documents is not paid when due, after applicable grace and/or notice periods, if any, then a late charge of four (4%) percent of the installment due may, at the sole option of the Lender, be assessed.

4.    Event of Default.  The entire outstanding principal balance of this Note, together with all accrued and unpaid interest thereon and all other sums due hereunder and/or under the Loan Agreement, shall become immediately due and payable, at the option of Lender, upon the occurrence or during the continuance of any Event of Default as described in the Loan Agreement, whereupon the same shall forthwith become immediately due and payable without presentment, demand, protest or other notice of any kind and Lender may proceed to exercise any rights and remedies available to Lender hereunder and under the Loan Agreement or which Lender may have at law, in equity or otherwise.

5.    Expenses.    Borrower hereby agrees to pay to Lender on demand any and costs and expenses incurred by Lender (including, without limitation, attorneys' fees and disbursements) in connection with the enforcement and collection of this Note, whether or not any suit is brought on this Note or any foreclosure or other proceeding is brought. The provisions of this Section 5 are not intended to limit in any manner Borrower's obligations to pay any other costs and expenses of Lender as may be elsewhere provided herein or in any of the other Loan Documents.

6.    Maximum Lawful Rate.  Notwithstanding any provision to the contrary contained in this Note or in the Loan Agreement, under no circumstances shall Borrower be charged more than the highest rate of interest which lawfully may be charged by the Lender hereof and paid by Borrower on all or any portion of the indebtedness evidenced by this Note. It is, therefore, agreed that if at any time interest on any portion of the indebtedness evidenced by this Note would otherwise exceed the highest lawful rate:

(a)    Borrower shall only be obligated to pay interest on the indebtedness evidenced by this Note at such highest lawful rate, the Interest Rate or any other applicable interest rate or rates shall be deemed to be reduced to such maximum lawful rate and this Note and the Loan Agreement shall be deemed to have been, and shall be, reformed and modified to reflect such reduction;

(b)    any amount paid by Borrower in excess of such highest lawful amount shall, at the option of Lender, be (i) applied as a credit against the then outstanding principal balance due under this Note or against any other sums then due and payable by Borrower hereunder or under the Loan Agreement, or both, (ii) refunded to Borrower or (iii) any combination of the foregoing; and

(c)    neither Borrower nor any of the other persons required to pay any amounts with respect to the Loan shall have any action or remedy against Lender for any damages whatsoever or any defense to enforcement of this Note or the Loan Agreement

3

arising out of the payment or collection of any interest which is in excess of such maximum lawful rate.

7.     Waiver.  Borrower expressly waives presentment for payment, demand, notice of demand and of dishonor and nonpayment of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party.

8.     Governing Law.  THIS NOTE SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

9.     Modification.  This Note can be extended, modified or amended only in writing by an instrument executed by Lender and Borrower and none of the rights or benefits of Lender hereunder can be waived except in a written document executed by Lender.

10.     Binding Effect  This Note shall be binding upon and inure to the benefit of Lender, Borrower and their respective successors and assigns.

11.     Interpretation.  The headings of sections and paragraphs in this Note are for convenience only and shall not be construed in any way to limit or define the content, scope, or intent of the provisions hereof. As used in this Note, the singular shall include the plural, and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires. The parties hereto intend and believe that each provision in this Note comports with all applicable law. However, if any provision in this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of all parties to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of Borrower and Lender under the remainder of this Note shall continue in full force and effect, provided, however, that if any provision of this Note is found to be in violation of any applicable law concerning the imposition of interest hereunder, the rights, obligations and interests of Borrower and Lender with respect to the imposition of interest hereunder shall be governed and controlled by the provisions of Section 8 hereof. Time is of the essence in respect of each and every obligation of Borrower set forth in this Note.

12.     Waiver of Jury Trial.  BY THE EXECUTION HEREOF, BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREES THAT NEITHER BORROWER NOR ANY ASSIGNEE, SUCCESSOR, HEIR OR LEGAL REPRESENTATIVE OF BORROWER SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE ARISING FROM OR BASED UPON ANY LOAN DOCUMENT EVIDENCING, SECURING OR RELATING TO THE OBLIGATIONS EVIDENCED HEREBY OR TO THE DEALINGS OR RELATIONSHIP BETWEEN OR AMONG

4

THE PARTIES THERETO. NEITHER BORROWER NOR LENDER WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED.

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of the day and year first above written.

BORROWER

ALH II. INC.

By: _____

5

# EXHIBIT O

Source: News & Business > Company & Financial > Company Profiles & Directories > By Country & Region > Middle East & Africa > International Company Intelligence Reports - Middle East and Africa Reports 🔲
Terms: **arenson** (Edit Search)

*CI Int'l, 7/1/2005, A Arenson Ltd.*

Copyright 2005 Graham & Whiteside Limited
IAC (SM) Company Intelligence (R) -- International

## A **Arenson** Ltd.

5 Hashita St. PO Box 3566, Caesa
Caesarea 38900
Israel

July 1, 2005

**IAC-ACC-NO:** 0000474014

**PUB-TYPE:** Company Profile

**EMPLOYEES:** 1,000 [Verification Letter]

**COMPANY-TYPE:** International and Multinational Private company

NAICS:
237990 Other Heavy and Civil Engineering Construction
236210 Industrial Building Construction
236220 Commercial and Institutional Building Construction
237310 Highway, Street, and Bridge Construction
PRIMARY SIC CODE:
1629 Heavy Construction, Not Elsewhere Classified
SECONDARY SIC CODE:
1542 Genl Contractors-nonresidential Bldgs
1622 Bridge Tunnel Elevated Hwy Construct
1541 Genl Contractors Industrial Buildings

**DESCRIPTION:** Construction: Civil engineering company specialising in industrial and commercial building including power plants, bridges, chemical complexes, shopping centres and hotels

REVENUES: $ 768,900,000
REVENUE-TYPE: SALES
REVENUE-SOURCE: Estimate
FISCAL YEAR END: December 31, 2002

EXECUTIVES:
Chief Financial Officer:
Shilo Vardizer, Director of Finance
Head of Marketing, Sales:
Amnon Glick, Director of Marketing

E-MAIL: arenson1@**arenson**.co.il

**BUSINESS-ADDRESS:** PO Box 3566, Industrial Park, Caesarea, 38900

**LOAD-DATE:** July 2, 2005

Source: News & Business > Company & Financial > Company Profiles & Directories > By Country & Region > Middle
East & Africa > **International Company Intelligence Reports - Middle East and Africa Reports** 🔅
Terms: **arenson** (Edit Search)
View: Full
Date/Time: Friday, July 29, 2005 - 3:28 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News, All (English, Full Text) 
Terms: **(avi or avie) w/1 arenson** (Edit Search)

✔Select for FOCUS™ or Delivery

*The Jerusalem Post, November 19, 2004*

Copyright 2004 The Jerusalem Post
The Jerusalem Post

November 19, 2004, Friday

**SECTION:** FEATURES; Pg. 22

**LENGTH:** 3228 words

**HEADLINE:** Don't they look familiar?

**BYLINE:** Yehezkel Laing, Douglas Davis Contributed

**HIGHLIGHT:**
The who's who of Israel's richest English-speaking immigrants

**BODY:**
As the old joke goes: "Want to know how to make a small fortune in Israel? Come with a big one." But what was once the butt of a joke has some laughing all the way to the bank.

According to US investment bank Merrill Lynch, the number of Israeli millionaires grew by 20 percent in 2003 and now exceeds 6,000. Among those, there is a fair representation of wealthy Anglo olim. In fact, two of the country's five wealthiest citizens, including its wealthiest, are English-speaking immigrants.

In order to keep track of who has the most toys, The Jerusalem Post has compiled its own list of the wealthiest Anglo olim.

A word about the methodology: The names were compiled by culling information from The Jerusalem Post archives and lists assembled by Maariv, The Marker, Forbes Magazine, Canadian Business and Australia's Business Review Weekly. The wealth attributed to each person is only an estimate and the actual figures may be far from the ones presented. Two people were included on the list whose wealth could not be ascertained, but it is certainly is considerable. Our definition of "Anglo" is anyone born in a Western English- speaking country or anyone who spent most of their formative years there and subsequently made aliya.

Almost half of the people on the list have made their fortunes here. But the other half of the well-heeled olim came to Israel wealthy and have used their wealth to invest heavily in the country. The list includes three billionaires, four worth hundreds of millions and the rest worth dozens.

Shari Arison, $ 4.6b.

Arison, 47, originally from Miami, is not only the wealthiest olah in Israel, she's its wealthiest citizen. According to Forbes Magazine, Arison is the 94th richest person in world. The majority of her wealth comes from the 80 million shares she inherited from her father, Ted Arison, in Carnival Cruise Lines - the largest cruise line company in the world. Her shares are worth some $ 3.6b.

Shari's father, Israeli-born Ted Arison, moved to Miami in the 1960s and started Carnival Cruise Lines in 1972 utilizing a refurbished former transatlantic liner. A pioneer of the modern-day cruise industry, he eventually built up a fleet of 15 ships. Towards the end of his life he returned to Israel and became active in business ventures here.

Ted Arison died in 1999 at the age of 75. Carnival, which posted a net profit of $ 1.2b. last year, is currently managed by Ted's son, Micky.

Shari currently holds 35 percent of the shares in Arison Holdings which owns 20.7% of Bank Hapoalim, 35% of Housing and Construction (Shikun Ubinui) and 49% of Eurocom - Israel's largest privately-owned communications group. She also holds a significant number of shares in Partner Communications and Internet Zahav.

Shari, who served in the IDF, officially made aliya in 1967 but has been back and forth between the US and Israel many times over the years. She left Israel in September last year following withering media attacks but returned in June saying that she loves Israel and that her heart is here.

Arison is heavily involved in the Arison Foundation which has distributed $ 150m. in Israel, including $ 30m. to the Sourasky Medical Center, $ 10m. to the Weizmann Institute and $ 6m. to the Tel Aviv School for the Arts. On average, the foundation distributes $ 20m. a year to Israeli causes.

Morris Kahn, $ 1.75b.

South African-born Kahn, 74, made his fortune through software giant Amdocs which he co-founded in 1982. Amdocs went public on the New York stock exchange in 1998. It is estimated that half the phone calls made in North America today rely on Amdocs software. In 2000, Kahn began selling off his Amdocs shares, netting him the majority of his $ 1.75b. fortune.

Kahn, who has a house in Beit Yanai, has managed to guard his wealth by spending more than six months of the year on his personal yacht outside the territorial waters of Israel. He thereby avoids holding Israeli citizenship and pays lower taxes. Insiders estimate the highest level of income tax he has ever paid is 10%.

Kahn currently controls the Aurec Group, a private equity firm with cable and telecom investments. He has also been involved in bio-technology start-ups in the Negev. Kahn's philanthropic activities includes establishing the Coral World Eilat Marine Park and the Red Sea Underwater Observatory that was first opened in 1975.

Pincus Green, $ 1.1b.

Commodities trader Green, 69, is rated No. 514 on Forbes' 2004 Wealthiest Americans list.

In the Sixties and Seventies, Green and partner Marc Rich amassed a fortune dealing in oil, precious metals and other commodities. But in the Seventies, the two were indicted on charges of manipulating the US oil system, trading with Iran during the hostage crisis, and evading taxes. In spite of paying about $ 150 million in fines, criminal charges remained outstanding against the two and they moved their base to a town south of Zurich. Rich and Green eventually both became citizens of Spain and Israel, countries where the tax charges aren't grounds for extradition. Despite receiving pardons from president Bill Clinton in 2001, the partners have been reluctant to return to the US.

While Rich's lavish lifestyle and campaign contributions to Clinton made headlines, soft-spoken Green was considered an appendage. But Swiss bankers say that Green was the

brains behind the commodity trades, exploiting price differentials due to delays and other glitches in transporting nickel, aluminum, oil and other commodities.

Green, a high-school dropout, is married with four children, several of whom live in Israel. He and his wife, Libby, purchased a penthouse apartment on Jerusalem's Rehov Brenner several years ago, almost back-to-back with the prime minister's residence. He has been described as a modest man, and extremely liberal with his philanthropy.

Benzion (Benny) Landa, $ 500m.

Known as the father of digital offset color printing, Landa, 56, is the former chairman and founder of Indigo, which he established in 1977. In 2002, Landa sold Indigo to Hewlett-Packard for $ 830m.

Landa was born in Poland to post-World War II refugee parents but grew up in what he described as a "poor but loving home" in Canada. His interest in printing goes back to the time he worked as a child in his father's photo shop. "As a young man, I dreamed about two things: machines and Israel," he said. His dream of moving to Israel he fulfilled in the mid-Seventies. Since then he has been active in developing his graphic technologies. Over the course of his career Landa has been awarded several hundred patents including more than 150 in the US, many of which made up Indigo's core strategy.

In September of 2001, Landa sold Indigo in which he held 44% to HP for $ 629m. in common stock and an estimated $ 200m. in cash. He is believed to have made $ 500m. on the deal. He now serves on HP's Strategic Technology Advisory Board.

Landa has created a philanthropic foundation that supports Ben-Gurion University's efforts to develop the Negev as well as help students prepare for university through a program called Atidim. In 2003 he made a NIS 7.5m. donation towards the establishment of the Landa Center for Equal Opportunity Through Education at Haifa University.

Leon Koffler, $ 444m.

Canadian-born Koffler, 56, is CEO of the Israeli drugstore chain Super-Pharm.

The story begins with his father, Morry, who founded Shopper's Drug Mart in Toronto in the 1960s. Over time it blossomed into a chain of more than 1,000 stores across Canada and today has annual revenues of almost $ 5b.

In the early Seventies, at the invitation of then finance minister Pinhas Sapir, Morry came to Israel with other Jewish businessmen. After a chat with a local pharmacist, Koffler senior quickly realized the potential here and decided to try his luck. In 1978 he sent his son, Leon, to manage the business in Israel and Leon opened the first Super-Pharm in Neveh Avivim in the same year.

The pharmacy chain took on the mom-and-pop pharmacies and profited from the deregulation of the industry in 1993. The chain now numbers 108 stores. Annual revenues top NIS 2b. with growth of almost 10% a year. Koffler hopes to open 50 more stores in the next two years. He is also rumored to be interested in opening up to 5,000 Super-Pharm stores in China.

Koffler's success parallels the "Americanization" of Israel and the introduction of American retail chain's into the country. Following Super-Pharm's success, Koffler acquired the Israeli franchise rights for Toys R Us, Blockbuster Video and Office Depot. He is heavily involved in a number of philanthropic pursuits in Israel, including establishing shelters for battered women.

Benjamin Jesselson, $ 350m

American-born Jesselson, 51, along with his two brothers, Michael and Daniel, inherited their father Ludwig's fortune. Ludwig founded Phillip Barders, a commodities trading company which dealt in oil and metals. He later merged it with investment giant Solomon Smyth Barney and the Jesselsons became the largest shareholders in the firm. Brother Michael currently manages the family's holdings in the US while Benjamin does the same in Israel.

Jesselson made aliya in the late Seventies and is a Jerusalem resident. He runs Promedico, a former Teva subsidiary which imports drugs from multinational companies such as giant Pfizer. Promedico has annual sales of some $ 400m. Jesselson also formerly owned a stake in Mirabilis, the designer of the famous ICQ program, and has a 1.5% stake in Elite Food Industries.

He has had a couple of run-ins with the law. Last year he was acquitted on charges of helping businessman Shlomo Eisenberg deceive shareholders and manipulate a vote in the Arad investment company. In 1998, he was acquitted of mismanagement with intent to deceive in tax fraud charges brought against Teva CEO Eli Hurvitz and senior managers of Promedico. He was, however, charged with tax evasion, and acquitted in 2000.

Jesselson is a major supporter of the Shaare Zedek Hospital and helped establish the hospital's Heart Center which bears the family name.

Erwin Eisenberg, $ 300m.

London-born Eisenberg, 54, inherited his fortune from his father, Shoul, who built up a $ 1b. empire, which included real estate and industrial holdings such as Israel Corp. Israel Corp. was originally set up to privatize state-owned Zim and oil refineries. In an infamous move, Shoul Eisenberg took control of the company from three shareholders using a law specially enacted to give it and its shareholders a privileged tax status.

In 1997, Eisenberg junior inherited 55% of his father's wealth. The family was subsequently involved in several legal battles over distribution of the inheritance money. In 1999 he sold off his stake in Israel Corp. to the Ofer brothers for $ 300m.

Since selling Israel Corp., Eisenberg has spent most of his time in New York and London, though he owns several homes in Israel's upscale Savyon. His mother, Leah, who is believed to be worth about $ 170m., also owns a home in Savyon.

Currently Eisenberg is involved in infrastructure business deals in the Far East. He has served for many years as the head of the Council for the Promotion of Israel-China Relations (CPICR).

Shirley Porter, $ 125m.

Tesco supermarket heiress Dame Shirley Porter, 73, is believed to be worth at least pounds 69m. according to the Sunday Times's 2001 rich list. Unfortunately for her, she is wanted by British authorities for a 1994 conviction in the "homes-for-votes" affair. In the Eighties, Porter was believed to be active in trying to boost votes in a London borough by offering heavily discounted council housing to potential voters, and she relocated to Tel Aviv.

Earlier this year, Porter paid London's Westminster Council some pounds 12.3 million as a settlement of their claim for pounds 42 million. Porter's latest difficulties, which may be grounds for extradition, center on an affidavit she signed during the affair in which she claimed she was worth just pounds 300,000.

British police have been asked to investigate whether Porter committed perjury when she signed the affidavit.

- Douglas Davis contributed

Isi Leibler, $ 60m.

Born in Belgium, Leibler, 70, grew up in Melbourne, where he made his money in the travel industry. Leibler is the son of a diamond merchant who wisely moved his family to Australia prior to World War II.

After working in his family's jewelry business, Leibler got involved in the travel industry in 1964, creating a travel company called Jetset which eventually was valued at $ 100m. He netted $ 20m. when he sold his share in the company to Air New Zealand in 1997. Since then he has been involved in real estate deals.

A former head of the Australian Jewish community, Leibler has also served as the co-chairman of the World Jewish Congress governing board and is currently vice president of the WJC. Leibler made aliya in 1998.

Barry Shaked, $ 55m

South-African-born Shaked, 47, made aliya with his family in 1960 at the tender age of three, but that still officially qualifies him as an oleh. Shaked is founder, chairman and CEO of Retalix.

While still studying for his BA in computer science at Bar-Ilan University, he established Retalix under the name Point of Sale in 1982. The company produces in-store systems for food retailers. Back in the company's early years, Shaked and his staff would work 36 hours straight when attempting to figure out how to connect a personal computer to a cash register.

Retalix trades on the TASE and NASDAQ and is valued at $ 253m. Shaked holds 13% of Retalix shares worth some $ 33m.

"I've always been an entrepreneur," Shaked has said of himself. "I organized golf teams, the school shows. I knew that I wanted to work for myself."

**Avi Arenson,** $ 30m.

Winnipeg-born Arenson, 64, is the founder and majority shareholder of private company A. Arenson Construction, one of Israel's largest infrastructure firms. Arenson made aliya in 1961 and eight years later founded the construction company which carries his name. Arenson Construction currently boasts some 1,200 employees. Amongst other projects, it built the new Foreign Ministry building in Jerusalem on an area totaling 40,000 sq.m. The deal was worth some $ 20m. The company also took part in building Terminal 3 at Ben-Gurion Airport. Recently it was awarded the tender to add a third lane to the Ayalon Highway. Arenson resides in Caesarea.

Jonathan Kolber, $ 25m

Canadian-born Kolber is vice-chairman and CEO of Koor Industries. Kolber graduated from Harvard in 1983 with a BA in Near Eastern Languages and civilization and later studied at the American University of Cairo. He moved to Israel in 1988 to take charge of the Israeli branch of Claridge, an investment company he controls together with the Bronfman family. By 1997

he was vice-chairman of Claridge Israel and a few months later its CEO.

Kolber first got involved in Koor when Claridge Israel bought 24% of the firm for $ 423m. Based on the company's current market capitalization of approximately $ 645m., Claridge has lost approximately 60% of its investment in Koor. Koor moved back to profitability for the first time in three years earning $ 10.6 million in 2003. The holding company had lost some $ 175m. in 2002 and $ 570m. in 2001.

Shlomo Ben-Zvi, $ 20m.

Businessman Ben-Zvi, 39, grew up in Golders Green, London, where he was known as Michael Goldblum. He moved to Israel in 1978 at the age of 13. He learned at Hesder Yeshiva Kerem B'Yavne and Mercaz Harav Kook before studying philosophy and math at the Hebrew University. He also holds a graduate degree in international relations.

Following his studies, Ben-Zvi went into the family business - commercial real-estate development - in Tel Aviv and Europe. He also started investing in hi-tech companies in Israel and Europe, including Israeli company Ness Technologies.

Most recently Ben-Zvi has been involved in building a media empire aimed at taking on Israel's powerful media establishment. Along with American-Jewish billionaire Ronald Lauder he formed the Techelet Group which established Techelet, Israel's first Jewish-content television channel. The two later bought the Makor Rishon weekly newspaper. Several months ago the group also acquired a 49% stake in the floundering Channel 10, saving it from collapse.

Marc Belzberg

Vancouver-bred Belzberg, 49, made aliya in 1992 and is chairman and CEO of e-Sims, a simulation software company, formerly known as Emultek. He is also CEO of ODF Electronics and was CEO of the now defunct Versaware, which converted books into electronic versions on the Internet and CDs. Before coming to Israel, Belzberg managed Mergers & Acquisitions and LBOs for Salomon Brothers and Oppenheimer & Co. and served as the first president of First City Capital Corp. from 1983 to 1990. He received his undergraduate degree from Yeshiva University and an MBA from New York University.

Marc is the son of Samuel, one of the famous Belzberg brothers of Canada. The sons of Polish immigrants, Sam, William and Hyman Belzberg made a fortune in real estate, oil and gas investments and were said at one point to be worth $ 8 billion.

Marc Belzberg is heavily involved in philanthropic work and amongst other activities serves as the worldwide chairman of the Bnei Akiva youth movement, chairman of the Foundation of Jewish Renaissance and chairman of the One Family Fund, which supports Israeli victims of Arab terror.

Edward Reichmann

Edward, 79, is the oldest of the five famous Reichmann brothers. The brothers, who fled Austria to Canada with their parents during World War II, built a real-estate development empire estimated at $ 18 billion. Olympia & York, the firm founded by the brothers eventually became the world's biggest owners of office space. But after risking $ 6 billion in the 24-building Canary Wharf project in London, the company crashed and today the brothers are believed to hold less than $ 1b.

Despite disappointments, Edward's life has been tinged with good luck. In early 1938, the Reichmanns were planning his bar mitzva in Vienna. But two weeks before the scheduled

date, his grandfather, David, suffered a stroke in Hungary and the family decided to shift the ceremony there. The day of the bar mitzva thousands of Nazi brown- shirts poured into Vienna and rampaged through the city's Jewish district.

Considered the black sheep of the family, Edward was eventually bought out by his brothers before the company crashed, which actually saved his fortune.

Edward made aliya in 1986 and resides in Jerusalem were he has pursued development projects. In 1987 he bought a one dunam site for $ 2 million in the center of Jerusalem and built on it the Bell Center Mall. But his most ambitious local project was certainly Jerusalem's Kikar Safra, which cost $ 130m.

A generous giver, Reichmann has been a major donor to the Shaare Zedek Hospital as well as to many other medical institutions, synagogues and schools in Israel. He also acted as the Reichmann family's representative here during the yeshiva crisis of 1987, helping to bail-out the yeshivot by distributing $ 100m.

**GRAPHIC:** 13 photos: Arison. Heart in the Holy Land. Landa. Equal opportunity through education. Koffler. Importing American chains. Leibler. Made money by the book. Shaked. Opening Wall Street. Ben-Zvi. Saving Channel 10. Reichmann with the Bell Center Mall. (Credit: Jonathan Bloom Courtesy Of 'Yediot Aharonot'; Ariel Jerozolimski; Israel Hadari)

**LOAD-DATE:** December 2, 2004

Source: News & Business > News > **News, All (English, Full Text)** [i]
Terms: **(avi or avie) w/1 arenson** (Edit Search)
View: Full
Date/Time: Monday, April 18, 2005 - 9:07 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News, All (English, Full Text)
Terms: (avi or avie) w/1 arenson (Edit Search)

➥Select for FOCUS™ or Delivery

*Globes [online] - Israel's Business Arena November 23, 2003 Sunday*

Copyright 2003 Globes Publisher Itonut (1983) Ltd.
All Rights Reserved
Globes [online] - Israel's Business Arena

November 23, 2003 Sunday

**LENGTH:** 387 words

**HEADLINE:** Real estate slump persists ;
"Globes" ask top contractors: Is the recession over?

**BYLINE:** Elazar Levin

**BODY:**
Last week, "Globes" asked Israel's leading contractors the same question: Is the recession over? The answers were as follows:

Association of Contractors and Builders in Israel president Samuel Olpiner: "Conditions in the industry are very hard. There are no signs of a recovery. The shortage of foreign workers is a severe handicap for contractors and developers. The government has banned the import of foreign workers, causing projects to grind to a halt."

Solel Boneh Building and Infrastructure (TASE:SOLB) CEO Shimon Hiblum: Everything is stuck. The situation is serious. Housing and Construction Holding Co. (Shikun u'Binui) (TASE:HUCN) has been forced to lay off 430 employees, 20% of its workforce, which says all that is necessary about the industry's condition."

**Avie Arenson,** Israel's largest private contractor: "I don't think that the recession is over, and I don't know the source of Minister of Finance Benjamin Netanyahu's optimism. The industry is heading for collapse. Large companies are being battered from every side, on the matter of workers and other issues. Personally, I'm running away from projects. I won't enter new projects in Israel, only overseas."

Ashdar general manager Shraga Waseman: "We felt some recovery in recent months, and our company's sales rose 50% in August-November, but optimism would be premature."

Dirom Construction Company CEO Yossi Granot: "The recession isn't over. The industry's condition is very difficult. Developers, including Dirom, are forced to go abroad to survive."

Ezra Khakshouri, a private contractor in Tel Aviv and Netanya: "The recession isn't over. I don't see any signs of a recovery. The market and industry situation continues to be very bad."

Aviv-Ocif Investments and Development (TASE:OCIF) CEO Doron Aviv: "There are no indications that we're pulling out of the recession, although the mood is cautiously optimistic."

Africa-Israel Investments (TASE:AFIL) CEO Pinchas Cohen: "It is still difficult to identify signs of a significant turnaround in the real estate industry.

Re/MAX Israel regional director Bernard Raskin: "July was a record month for apartment sales by our company. Apartment sales have subsequently fallen 20%."

Published by Globes [online]- www.globes.co.il - on November 23, 2003

www.globes.co.il

**LOAD-DATE:** November 30, 2003

Source: News & Business > News > **News, All (English, Full Text)**
Terms: **(avi or avie) w/1 arenson**  (Edit Search)
View: Full
Date/Time: Monday, April 18, 2005 - 9:11 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT P

ACTION TAKEN BY
UNANIMOUS WRITTEN CONSENT
OF THE BOARD OF DIRECTORS OF
ALH TENNESSEE ACQUISITION, INC.
(a Delaware corporation)

July 1, 2001

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the

undersigned, being all of the directors (the "Board of Directors") of ALH Tennessee Acquisition,

Inc., a Delaware corporation (the "Corporation"), hereby take the following action by unanimous

written consent in lieu of a meeting:

APPROVAL OF REAFFIRMATION OF GUARANTORS

WHEREAS, the Corporation is a guarantor pursuant to that certain Loan
Agreement (the "Loan Agreement"), dated as of April 6, 2000, between ALH II,
Inc., a Delaware corporation ("ALH II"), as Borrower, and Lion & Lamm Capital,
LLC ("Lion Capital"), Shamrock Holdings of California, Inc. ("SHOC"), and A.
Arenson Holdings, Inc. ("AAH"), as Lenders; and

WHEREAS, pursuant to the terms of the Acknowledgment and Release,
dated as of July 1, 2001, Lion Capital is releasing ALH II from any and all
indebtedness obligations owing to Lion Capital under the Loan Agreement; and

WHEREAS, the Board of Directors of the Corporation has determined it
to be in the best interests of the Corporation to affirm the Corporation's
obligations as a guarantor under the Loan Agreement and to execute and deliver a
Reaffirmation of Guarantors (the "Reaffirmation") to SHOC and AAH,
substantially in the form previously circulated to the Board of Directors of the
Corporation, on the terms and conditions contained in the Reaffirmation.

NOW, THEREFORE, BE IT RESOLVED, that the Reaffirmation,
substantially in the form previously circulated to the Board of Directors of the
Corporation, be, and hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Corporation be, and each of them
hereby is, authorized and empowered for and on behalf of the Corporation, to
negotiate the final form, terms and provisions of, and to execute and deliver, the
Reaffirmation with such changes, modifications, and/or additions thereto as such
officers shall deem advisable, necessary or desirable, and to negotiate, execute and
deliver such other certificates, documents, agreements or instruments required or

73203

desired to be delivered by the Corporation pursuant to the Reaffirmation, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization by the Corporation.

GENERAL RESOLUTIONS

　　　　RESOLVED, that each of the officers of the Corporation be, and each of them hereby is, authorized and directed and empowered on behalf of the Corporation and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Corporation to carry out the obligations of the Corporation under, and to effect the transactions contemplated by, the forgoing resolutions, or to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such documents, agreements and instruments or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Corporation.

　　　　RESOLVED, that any and all actions heretofore taken by any officer of the Corporation in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

2

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon

due notice.

_____
Shalom E. Lamm

_____
John D. Hourihan

_____
Jonathan Zich

73203

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the same force and effect as if regularly adopted at a meeting of the Board of Directors held upon due notice.

_____

Shalom E. Lamm

_____

John D. Hourihan

_____

Jonathan Zich

73203

ACTION TAKEN BY
UNANIMOUS WRITTEN CONSENT
OF THE BOARD OF DIRECTORS OF
ALH ACQUISITION CORPORATION
(a Delaware corporation)

July 1, 2001

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the directors (the "Board of Directors") of ALH Acquisition Corporation, a Delaware corporation (the "Corporation"), hereby take the following action by unanimous written consent in lieu of a meeting:

APPROVAL OF REAFFIRMATION OF GUARANTORS

WHEREAS, the Corporation is a guarantor pursuant to that certain Loan Agreement (the "Loan Agreement"), dated as of April 6, 2000, between ALH II, Inc., a Delaware corporation ("ALH II"), as Borrower, and Lion & Lamm Capital, LLC ("Lion Capital"), Shamrock Holdings of California, Inc. ("SHOC"), and A. Arenson Holdings, Inc. ("AAH"), as Lenders; and

WHEREAS, pursuant to the terms of the Acknowledgment and Release, dated as of July 1, 2001, Lion Capital is releasing ALH II from any and all indebtedness obligations owing to Lion Capital under the Loan Agreement; and

WHEREAS, the Board of Directors of the Corporation has determined it to be in the best interests of the Corporation to affirm the Corporation's obligations as a guarantor under the Loan Agreement and to execute and deliver a Reaffirmation of Guarantors (the "Reaffirmation") to SHOC and AAH, substantially in the form previously circulated to the Board of Directors of the Corporation, on the terms and conditions contained in the Reaffirmation.

NOW, THEREFORE, BE IT RESOLVED, that the Reaffirmation, substantially in the form previously circulated to the Board of Directors of the Corporation, be, and hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized and empowered for and on behalf of the Corporation, to negotiate the final form, terms and provisions of, and to execute and deliver, the Reaffirmation with such changes, modifications, and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or

73115

desired to be delivered by the Corporation pursuant to the Reaffirmation, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization by the Corporation.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Corporation be, and each of them hereby is, authorized and directed and empowered on behalf of the Corporation and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Corporation to carry out the obligations of the Corporation under, and to effect the transactions contemplated by, the forgoing resolutions, or to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such documents, agreements and instruments or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Corporation.

RESOLVED, that any and all actions heretofore taken by any officer of the Corporation in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

2

73115

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon

due notice.

_____
Shalom E. Lamm

_____
John D. Hourihan

_____
Jonathan Zich

73115

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon

due notice.


_____

Shalom E. Lamm


_____

John D. Hourihan


_____

Jonathan Zich

# EXHIBIT Q

CONSOLIDATED FINANCIAL STATEMENTS
AND OTHER FINANCIAL INFORMATION

**ALH II, Inc. and Subsidiaries**

Year ended December 31, 2000
with Report of Independent Auditors

0107-0203352

ALH II, Inc. and Subsidiaries

Consolidated Financial Statements
and Other Financial Information

Year ended December 31, 2000

## Contents

Report of Independent Auditors ............................................................................................1

Consolidated Financial Statements

Consolidated Balance Sheet.................................................................................................3
Consolidated Statement of Operations ...............................................................................4
Consolidated Statement of Stockholder's Equity ..............................................................5
Consolidated Statement of Cash Flows ..............................................................................6
Notes to Consolidated Financial Statements ......................................................................7

Other Financial Information

Consolidating Balance Sheet .............................................................................................19
Consolidating Statement of Operations ............................................................................21

0107-0203352

 **ERNST & YOUNG LLP**

■ Certified Public Accountants
  Suite 3900
  200 South Biscayne Boulevard
  Miami, Florida 33131-5313

■ Phone: 305 358 4111

## Report of Independent Auditors

To the Shareholder
ALH II, Inc.

We have audited the accompanying consolidated balance sheet of ALH II, Inc. and Subsidiaries (the Company) as of December 31, 2000, and the related consolidated statements of operations, stockholder's equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of ALH II, Inc. and Subsidiaries at December 31, 2000 and the consolidated results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States.

The accompanying consolidated financial statements have been prepared assuming that ALH II, Inc. and Subsidiaries will continue as a going concern. As more fully described in Note 3, the Company is in default on certain covenants relating to notes payable. This condition raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 3. The consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Consolidating Balance Sheet and Statement of Operations are presented for purposes of additional analysis and is not a required part of the financial statements. Such information has been subjected to the auditing procedures applied in our audit of the consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the consolidated financial statements taken as whole. No provision for any adjustments that may result from the outcome of the going concern uncertainty described in the preceding paragraph has been made in the information.

*Ernst & Young LLP*

May 23, 2001, except for Note 3 and Note 14,
   as to which the date is August 7, 2001

# ALH II, Inc. and Subsidiaries

## Consolidated Balance Sheet

### December 31, 2000

*(Dollars in Thousands)*

**Assets**

| | |
|---|---:|
| Cash and cash equivalents | $ 4,108 |
| Restricted cash and cash equivalents | 748 |
| Accounts and notes receivable | 2,909 |
| Lots and homes in process | 50,060 |
| Due from related parties | 2,173 |
| Receivable relating to note payable assumed by related party | 2,526 |
| Investment in joint ventures | 615 |
| Property and equipment, net | 1,350 |
| Goodwill, net | 36,710 |
| Deferred income tax asset, net | 1,651 |
| Other assets | 3,982 |
| Total assets | $106,832 |

**Liabilities and stockholder's equity**

Liabilities:

| | |
|---|---:|
| Accounts payable and accrued liabilities | $ 11,982 |
| Customer deposits | 1,098 |
| Accrued home buyers' warranty costs | 852 |
| Notes payable and lines of credit in default | 33,699 |
| Notes payable and lines of credit | 40,872 |
| Notes payable to related parties | 2,000 |
| | 90,503 |

Commitments and contingencies

Stockholder's equity:

| | |
|---|---:|
| Common stock, no par value; authorized 1,500 shares, issued and outstanding 100 shares | – |
| Paid-in capital | 30,871 |
| Accumulated deficit | (14,542) |
| Total stockholder's equity | 16,329 |
| Total liabilities and stockholder's equity | $106,832 |

*See accompanying notes.*

ALH II, Inc. and Subsidiaries

Consolidated Statement of Operations

Year ended December 31, 2000

*(Dollars in Thousands)*

| | |
|---|---:|
| Revenue: | |
| Home sales | $200,277 |
| | |
| Costs and expenses: | |
| Cost of home sales | 163,244 |
| Impairment loss | 1,470 |
| Operating expenses | 28,211 |
| Amortization and depreciation | 2,617 |
| | 195,542 |
| Income from operations | 4,735 |
| | |
| Other income (expense): | |
| Equity in net income of joint ventures | 687 |
| Loss on contract receivable settlement | (1,760) |
| Interest expense, net of interest income of $263 | (5,698) |
| Other, net | (1,398) |
| Loss before income tax benefit | (3,434) |
| Income tax benefit | 1,082 |
| Net loss | $ (2,352) |

*See accompanying notes.*

0107-0203352

4

## ALH II, Inc. and Subsidiaries

### Consolidated Statement of Stockholder's Equity

*(Dollars in Thousands)*

| | Shares of Common Stock | Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|
| Balance, January 1, 2000 | 100 | $30,871 | $(12,190) | $18,681 |
| Net loss | – | – | (2,352) | (2,352) |
| Balance, December 31, 2000 | 100 | $30,871 | $(14,542) | $16,329 |

*See accompanying notes.*

0107-0203352

5

# ALH II, Inc. and Subsidiaries

## Consolidated Statement of Cash Flows

### Year ended December 31, 2000

#### *(Dollars in Thousands)*

| | |
|---|---:|
| **Operating activities** | |
| Net loss | $ (2,352) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | |
|   Deferred income taxes | (1,515) |
|   Depreciation | 679 |
|   Amortization | 1,938 |
|   Equity in net income of joint ventures | (687) |
|   Impairment loss | 1,470 |
|   Bad debt reserve | 1,709 |
|   Changes in operating assets and liabilities, excluding effects of acquisition: | |
|     Restricted cash | (384) |
|     Accounts receivable | (1,312) |
|     Lots and homes in process | 12,542 |
|     Prepaid expenses | (1,000) |
|     Real estate deposits | 388 |
|     Accounts payable and accrued liabilities | (3,648) |
|     Accrued home buyers' warranty costs | 190 |
|     Customer deposits | (230) |
| Net cash provided by operating activities | 7,788 |
| | |
| **Investing activities** | |
| Acquisition of subsidiary, net of cash acquired | (40,955) |
| Due from related parties | (1,405) |
| Distributions from joint ventures | 1,019 |
| Purchase of property and equipment, net of disposals of $44 | (171) |
| Net cash used in investing activities | (41,512) |
| | |
| **Financing activities** | |
| Proceeds from notes payable to banks | 188,722 |
| Principal payments on notes payable to banks | (156,038) |
| Proceeds from notes payable to related parties | 2,000 |
| Net cash provided by financing activities | 34,684 |
| Net increase in cash | 960 |
| Cash and cash equivalents at beginning of year | 3,148 |
| Cash and cash equivalents at end of year | $ 4,108 |
| | |
| **Supplemental cash flow information** | |
| Cash paid for interest–net of amounts capitalized | $ 3,422 |

*See accompanying notes.*

# ALH II, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements

### December 31, 2000

*(Dollars in Thousands)*

## 1. Organization and Description of Business

### Organization

ALH II, Inc. (the Company) was established on December 9, 1998 for the purpose of holding all of the common stock of ALH Corporation and Subsidiaries (ALH Corp.), ALH Acquisition Corp. and Subsidiaries (ALH Acquisition) and subsequent acquisition of ALH Tennessee Acquisition, Inc. (ALH Tennessee), and Mulvaney Homes, Inc. (Mulvaney). The Company is a wholly owned subsidiary of ALH Holdings, LLC (the Parent).

### Description of Business

The Company is principally engaged in the construction and sale of single-family homes. As of December 31, 2000, the Company's primary operations are in Northeast Florida through ALH Acquisition d/b/a Atlantic Builders, Inc. (ABI), Memphis, Tennessee through ALH Tennessee d/b/a Bowden Building Corporation (Bowden) and Charlotte, North Carolina through Mulvaney Homes, Inc.

Effective January 1, 2000, the Company acquired all of the net assets of the homebuilding operations of the Mulvaney Group, LTD (the Mulvaney Acquisition). The total purchase price was approximately $42,758, including acquisition costs of $264. The Mulvaney Acquisition was accounted for under the purchase method of accounting. Under this method, the cost of the acquisition is first allocated to all identifiable assets acquired and to the liabilities assumed, at their estimated fair values at the date of acquisition. The excess of the cost of the acquired net assets over the sum of the amounts assigned to identifiable assets acquired less liabilities assumed is recorded as goodwill.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 1. Organization and Description of Business (continued)

The fair value of assets acquired and liabilities assumed in connection with the Mulvaney Acquisition is as follows:

| | |
|---|---:|
| Cash | $ 1,804 |
| Restricted cash | 365 |
| Lots and homes in process | 22,470 |
| Other assets | 473 |
| Goodwill | 22,758 |
| Total assets | 47,870 |
| Less liabilities assumed: | |
| Notes payable to related parties | 950 |
| Accounts payable and other accrued liabilities | 4,162 |
| Net assets acquired | $42,758 |

The operations of Mulvaney are included in the Consolidated Statement of Operations from the date of acquisition.

### 2. Summary of Significant Accounting Policies

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated.

**Cash and Cash Equivalents and Restricted Cash**

Cash and cash equivalents include all short-term, highly liquid investments with a maturity date at acquisition of three months or less. Restricted cash consists of cash held in collateral accounts and certificates of deposit as required by state law and contractual requirements. These amounts are not available for general operating purposes.

**Investment in Joint Ventures**

The Company, through ABI, has investment interests ranging from 11.25% to 50% in seven separate joint ventures. Because the Company has less than controlling interests and does not have controlling influence over the joint ventures, these investments are reflected in the Company's financial statements using the equity method of accounting. The joint ventures engage in land development activities.

8

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Lots and Homes in Process**

Lots and homes in process consist of unimproved lots, work-in-process toward the construction of single-family homes, and completed model homes. Amounts are stated at the lower of accumulated cost or fair value less costs to sell. Construction costs are accumulated in work-in-process accounts based on specific identification. Interest costs incurred during construction activities related to lots and homes in process and certain indirect project costs are capitalized and subsequently charged to cost of home sales as the units associated with such costs are closed.

In accordance with Financial Accounting Standards Board Statement No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of,* long-lived assets that are expected to be disposed of are carried at the lower of carrying amount or fair value. Fair value is based on estimated future cash flows to be generated by the assets, discounted at a market rate of interest. See Note 4.

**Property and Equipment**

Property and equipment is stated at cost. Depreciation is provided using the straight-line method over the estimated useful lives of the assets. Estimated useful lives range from three to thirty nine years. Estimated useful lives for leasehold improvements range from 5 to 39 years and do not exceed the term of any lease.

**Revenue Recognition**

Revenue is recognized on the sale of single-family homes at closing upon the transfer of title to the homeowners.

**Deferred Financing Costs**

Included in other assets in the accompanying Consolidated Balance Sheet are deferred financing costs incurred in connection with the Company's debt agreements. Deferred financing costs are charged to interest expense over the life of the debt using the straight-line method, which approximates the effective interest method. Net deferred financing costs approximated $1,298 at December 31, 2000.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Goodwill**

Goodwill represents the excess of the purchase price of the Company's acquisitions over the fair value of the net assets acquired. Goodwill is being amortized over twenty years using the straight-line method. Accumulated amortization amounted to approximately $2,933 at December 31, 2000. Included in goodwill at December 31, 2000 is $2,250 of accrued contingent consideration relating to the purchase of Bowden. This liability is included in accounts payable and accrued liabilities in the accompanying Consolidated Balance Sheet.

The net carrying value of goodwill is continually assessed for recoverability by management based on the projected discounted net cash flows of the entities acquired.

**Advertising Costs**

The Company expenses advertising costs as incurred. Advertising costs were $2,299 for the year ended December 31, 2000 and are included in operating expenses in the accompanying Consolidated Statement of Operations.

**Home Buyer's Warranty**

Home purchasers are provided with one-year warranties against certain building defects. Estimated warranty costs are provided for in the period in which the revenue is recorded.

**Income Taxes**

For income tax purposes, the Company files a consolidated federal income tax return. The benefit for income taxes is calculated on a consolidated return basis. The benefit (provision) for income taxes provided in the accompanying Consolidating Statement of Operations included in Other Financial Information is calculated on a separate return basis, whereby the Company and its subsidiaries have agreed that the subsidiaries will pay to the Company the subsidiaries' share of the consolidated group's income tax liability and will receive from the Company the benefit of any losses of the subsidiary utilized in the Company's consolidated income tax calculation.

**Concentration of Credit Risk**

Concentration of credit risk associated with cash and cash equivalents and restricted cash is considered low due to the credit quality of the issuers of the financial instruments held by the Company and due to their short duration to maturity.

# ALH II, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

### 2. Summary of Significant Accounting Policies (continued)

The Company is also exposed to credit risk related to its accounts and notes receivable. Credit is extended based on the evaluation of the counter party's financial condition, and collateral is generally required. The Company maintains an allowance for doubtful accounts at a level which management believes is sufficient to cover potential losses. At December 31, 2000, there is no allowance necessary.

### Interest Rate Swap Agreements

The Company has entered into interest rate swap transactions for the purpose of hedging the interest rate exposure of its variable rate debt and not for speculation. Amounts to be paid or received under interest rate swap agreements are accrued as interest rates change and are recognized over the life of the swap transactions as an adjustment to interest expense.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates that affect the amounts reported in the financial statements and the accompanying notes. Actual results could differ from those estimates.

### Recent Accounting Pronouncements

In June 1998, Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* (SFAS No. 133), as amended, was issued. SFAS No. 133, establishes accounting and reporting standards requiring that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded in the balance sheet as either an asset or liability measured at its fair value. SFAS No. 133 requires that changes in the derivative's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. SFAS No. 133 is effective for the Company for its fiscal year beginning January 1, 2001. Management believes that the impact of adopting this statement will not have a significant effect on its consolidated financial position or results of operations.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 3. Management's Plans

At December 31, 2000, the Company was in default of certain affirmative and negative covenants on its notes payable and lines of credit. In addition, certain debt of the Company in the principal amount of $13,000 becomes due in January 2002. Management of the Company has been in negotiations with its lenders to modify the covenant defaults. Management believes they will be able to obtain additional financing. Should any of the lenders call the loans, the managing member of the Parent is prepared to commit additional capital to support the ongoing operations of the Company. However, there are no assurances that the additional capital would be sufficient to meet all operational and refinancing needs.

### 4. Lots and Homes in Process

Lots and homes in process consist of the following at December 31, 2000:

| | |
|---|---:|
| Work-in-process | $35,534 |
| Lots held for construction | 11,904 |
| Completed model homes | 2,622 |
| | $50,060 |

As of December 31, 2000, the Company determined that certain lots and homes in process at Bowden and ABI were impaired. The Company has recognized a write down of these lots and homes in process of approximately $1,300 and $170, respectively, based on the difference between the carrying value and the estimated cash flows to be generated. This amount is included in impairment loss in the accompanying Consolidated Statement of Operations.

### 5. Property and Equipment, Net

At December 31, 2000, property and equipment, net consists of the following:

| | |
|---|---:|
| Model home furniture and equipment | $1,591 |
| Office furniture and equipment | 624 |
| Other property and equipment | 1,564 |
| | 3,779 |
| Less accumulated depreciation | 2,429 |
| Property and equipment, net | $1,350 |

# ALH II, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

### 6. Notes Payable and Line of Credit

Notes payable and line of credit consists of the following at December 31, 2000:

| | |
|---|---:|
| Construction notes payable, in default, aggregating $82,000 maximum lines of credit. Interest is due monthly at various interest rates (ranging from prime plus 0.125% to prime plus 0.75%), maturing at various dates from January 13, 2001 through October 2003, secured by lots and homes in process | $28,923 |
| Note payable assumed by related party, in default. Interest is due monthly at LIBOR plus 6%, maturing on January 31, 2001, guaranteed by related parties | 2,526 |
| Subordinated note payable to former shareholder of Bowden, in default. Interest is due quarterly at 8%; due March 19, 2003 | 2,250 |
| Notes payable and lines of credit in default | 33,699 |
| Acquisition loans payable to bank. Principal of $13,000 and $14,500 plus applicable accrued interest is due January 13, 2002 and 2003, respectively. Interest accrues at LIBOR plus 0.35% or the Prime Rate, as defined, or the Federal Funds Rate plus 0.5%(5.96%, 9.5% and 5.41% at December 31, 2000, respectively); secured by certificate of deposit ($354,000 at December 31, 2000 and included in restricted cash in the accompanying Consolidated Balance Sheet) and a surety bond; cross collateralized with certain construction notes payable. | 27,500 |
| Construction notes payable, interest is due monthly at various interest rates (ranging from 8.25% to 10% at December 31, 2000), secured by lots and homes in process at Bowden | 12,929 |
| Note payable sold, under $2,250 maximum line of credit. Interest is due monthly at prime plus 0.75%, maturing on demand, secured by property owned by third party. | 443 |
| Notes payable and lines of credit | 40,872 |
| Total notes payable and lines of credit | $74,571 |

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 6. Notes Payable and Line of Credit (continued)

The Company capitalized interest of approximately $4,049 during the year ended December 31, 2000 relating to its construction activities. Of the amount capitalized, approximately $1,200 remains in inventory at December 31, 2000. Total interest incurred during the year ended December 31, 2000 was approximately $9,443.

Maturities of notes payable and lines of credit for each of the three years subsequent to December 31, 2000 are 2001—$47,071; 2002— $13,000; and 2003—$14,500.

### 7. Income Taxes

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial purposes and the amounts used for income tax purposes. The significant components of the Company's deferred income tax assets and liabilities at December 31, 2000 were differences in the timing of deductions for goodwill, impairment losses, loss on contract settlement, accumulated depreciation, prepaid expenses, bad debt reserves and warranty costs for book and tax purposes and net operating loss carryforwards.

Income tax benefit for the year ended December 31, 2000 differed from the amount of income tax benefit that would result from applying federal statutory tax rates to pretax loss primarily due to non deductible amortization of goodwill and state income taxes, net of the federal tax benefit.

The components of the income tax benefit as of December 31, 2000 are as follows:

| | |
|---|---|
| Current | $   433 |
| Deferred | (1,515) |
| | $(1,082) |

At December 31, 2000, the Company had available net operating loss carryforwards of $2,665 that expire in 2018 through 2020.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 8. Due from Previous Owners

In connection with the purchase of ABI, Atlantic Development Corporation and Florida Lifestyle Homes (ABI and Affiliates) by ALH Acquisition, a purchase price adjustment was made based on the post closing tangible net worth, as defined, of ABI and Affiliates at June 11, 1998. Accordingly, management had determined that an adjustment of approximately $3,700 to the purchase price was due to the Company from the sellers (of which $670 was received during 1999). The Company's determination of the post closing tangible net worth was in dispute with that of the sellers. On February 7, 2001, the parties settled and the remaining amount of $1,500 has been included in accounts receivable in the accompanying Consolidated Balance Sheet. Per the Mediated Settlement Agreement, the sellers agreed to pay $500 by March 1, 2001 and $1,000 in 16 quarterly installments of $63, plus 8% interest beginning June 1, 2001. The Company received $500 from the sellers subsequent to December 31, 2000.

The $1,500 that was deemed uncollectible based on the settlement has been written off and is included in loss on contract receivable settlement in the accompanying Consolidated Statement of Operations.

## 9. Sale of ALH Corporation

On January 1, 2000, the Company sold the net assets of ALH Corporation and Subsidiaries to a third party for one hundred dollars plus assumed liabilities. The Company recognized a loss of $21 on this sale, which is included in other income (loss), net in the Consolidated Statement of Operations. The Company has not been released from its debt obligation in connection with ALH Corporation in accordance with Statement of Financial Accounting Standard No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* and has, therefore, included the outstanding debt in notes payable and lines of credit on the accompanying Consolidated Balance Sheet and the related receivable in accounts and notes receivable in the accompanying Consolidated Balance Sheet.

## 10. Related Party Transactions

### Due from Related Parties

Due from related parties consists of consulting fees overpaid to an investor of the Parent and expenses paid for on behalf of the managing member of the Parent that are expected to be repaid in the future.

## ALH II, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

### 10. Related Party Transactions (continued)

#### Receivable Relating to Note Payable Assumed by Related Party

An investor of the Parent assumed a note payable of the Company for its investment in the Parent. The Company has not been released from its debt obligation in connection with this note payable in accordance with Statement of Financial Accounting Standard No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* and has, therefore, included the receivable from the investor and the outstanding debt in receivable relating to notes payable assumed by related party and notes payable and lines of credit, in default, respectively, on the accompanying Consolidated Balance Sheet.

#### Notes Payable to Related Parties

Notes payable to related parties consists of amounts borrowed from related party entities under formalized notes. The notes bear interest at 15% and were due December 31, 2000. The Company has not repaid or obtained extensions on the notes subsequent to year-end.

#### Transaction Costs

The Company paid $738 to the managing member of the Parent for services rendered in connection with the financing of the Mulvaney Acquisition. These costs are included in other assets in the accompanying Consolidated Balance Sheet.

#### Guarantees

The Company guarantees the debt of certain entities affiliated through common ownership and management. At December 31, 2000, the Company had outstanding guarantees of $2,543.

### 11. Fair Value of Financial Instruments

Statement of Financial Standards No. 107, *Disclosures about Fair Value of Financial Instruments*, requires information about financial instruments, whether or not recognized in the statement of financial condition, for which it is practical to estimate that value. In cases where quoted market prices are not available, fair values are based on estimates using present value or other valuation techniques. These techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, could not be realized in immediate settlement of the instrument.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**11. Fair Value of Financial Instruments (continued)**

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

*Cash and Cash Equivalents and Restricted Cash and Cash Equivalents*—The carrying amounts reported in the Consolidated Balance Sheet for these assets approximate their fair values.

*Accounts and Notes Receivable*—The fair values are estimated using discounted cash flow calculations that consider the difference between current interest rates and stated note rates adjusted for risk and historical prepayment experiences.

*Notes Payable and Lines of Credit*—The carrying amounts of the notes payable and lines of credit approximate their fair value as they are primarily tied to a market rate of interest.

*Swap Agreement*—The fair value of the interest rate swap agreement at December 31, 2000 was based on a dealer quote.

All financial instruments approximate their fair value except for the swap agreement. The fair value of the swap agreement is $611.

**12. Commitments**

The Company has outstanding commitments to purchase certain lots in various subdivisions. Option deposits related to these commitments approximate $1,318 at December 31, 2000 and are included in other assets in the accompanying Consolidated Balance Sheet. Failure to fulfill a commitment may result in the loss of the related option deposit.

The Company leases certain office and warehouse space. The leases expire in 2002 through 2005, with minimum rental commitments of 2001—$604; 2002—$545; 2003—$424; 2004—$172; and 2005—$58.

**13. Contingencies**

The Company is subject to claims and legal matters, which are being defended and handled in the ordinary course of business. Management believes that any liability that may ultimately arise from the resolution of these matters will not have a material adverse effect on the financial condition or results of operations of the Company.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**14. Subsequent Event**

Effective July 1, 2001, the Parent entered into an agreement (the "Agreement") with the managing member of the Parent extending the term of the managing member's authority until December 2002. Pursuant to the Agreement, the managing member agreed to reimburse the Company the amount of $1,900 for certain operating expenses paid by the Company on behalf of the managing member prior to December 31, 2000. This amount is included in due from related parties on the accompanying Consolidated Balance Sheet. As of July 1, 2001, the remaining net balance payable to the Company was $1,137 evidenced by a $1,400 note receivable bearing interest at 15%. The note requires principal payments of $500 on February 28, 2002, $500 on May 15, 2002 and $400 on November 15, 2002. In conjunction with the Agreement, the Company also entered into a consulting agreement with the managing member providing for monthly consulting fees ranging from $25 to $36 through December 31, 2002.

18

# Other Financial Information

0107-0203352

**ALH II, Inc. and Subsidiaries**

**Consolidating Balance Sheet**

December 31, 2000

*(Dollars in Thousands)*

| | Atlantic Builders, Inc. | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | $ 802 | $ 627 | $ 2,271 | $ 408 | $ — | $ 4,108 |
| Restricted cash and cash equivalents | — | 394 | — | 354 | — | 748 |
| Accounts and notes receivable | 2,000 | 94 | 47 | 768 | — | 2,909 |
| Lots and homes in process | 15,318 | 15,828 | 18,916 | (2) | — | 50,060 |
| Due from (to) related parties | (2,366) | (1,145) | 8,418 | (2,734) | — | 2,173 |
| Receivable relating to note payable assumed by related party | — | — | — | 2,526 | — | 2,526 |
| Investment in subsidiaries | — | — | — | 45,853 | (45,853) | — |
| Investment in joint ventures | 615 | — | — | — | — | 615 |
| Property and equipment, net | 448 | 645 | 257 | — | — | 1,350 |
| Goodwill, net | 6,771 | 8,319 | 21,620 | — | — | 36,710 |
| Deferred income tax asset (liability) | 648 | 1,401 | (59) | 1,894 | (2,233) | 1,651 |
| Other assets | 1,546 | 449 | 976 | 1,011 | — | 3,982 |
| Total assets | $25,782 | $26,612 | $52,446 | $50,078 | $(48,086) | $106,832 |

0107-0203352

# ALH II, Inc. and Subsidiaries

## Consolidating Balance Sheet (continued)

### December 31, 2000

*(Dollars in Thousands)*

|  | Atlantic Builders, Inc. | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|---|
| **Liabilities and stockholder's equity** |  |  |  |  |  |  |
| Liabilities: |  |  |  |  |  |  |
| Accounts payable and accrued liabilities | $ 3,068 | $ 4,139 | $ 5,882 | $ 1,126 | $ (2,233) | $ 11,982 |
| Customer deposits | 592 | 167 | 339 | – | – | 1,098 |
| Accrued home buyers' warranty costs | 183 | 158 | 511 | – | – | 852 |
| Notes payable and lines of credit in default | 11,937 | 4,178 | 15,058 | 2,526 | – | 33,699 |
| Notes payable and lines of credit | – | 12,929 | – | 27,943 | – | 40,872 |
| Notes payable to related parties | – | – | 27,059 | 2,000 | (27,059) | 2,000 |
|  | 15,780 | 21,571 | 48,849 | 33,595 | (29,292) | 90,503 |
| **Commitments and contingencies** |  |  |  |  |  |  |
| Stockholder's equity: |  |  |  |  |  |  |
| Common stock | 1 | 1 | – | – | (2) | – |
| Paid-in capital | 10,695 | 8,097 | – | 30,871 | (18,792) | 30,871 |
| (Accumulated deficit) retained earnings | (694) | (3,057) | 3,597 | (14,388) | – | (14,542) |
| Total stockholder's equity | 10,002 | 5,041 | 3,597 | 16,483 | (18,794) | 16,329 |
| Total liabilities and stockholder's equity | $25,782 | $26,612 | $52,446 | $50,078 | $(48,086) | $106,832 |

20

0107-0203352

## ALH II, Inc. and Subsidiaries

## Consolidating Statement of Operations

Year ended December 31, 2000

*(Dollars in thousands)*

| | Atlantic Builders, Inc. | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Home sales | $50,215 | $64,222 | $85,840 | $  — | $  — | $200,277 |
| | | | | | | |
| Costs and expenses: | | | | | | |
| Cost of home sales | 42,389 | 54,898 | 65,957 | — | — | 163,244 |
| Impairment loss | 170 | 1,300 | — | — | — | 1,470 |
| Operating expenses | 7,493 | 9,708 | 10,572 | 438 | — | 28,211 |
| Amortization and depreciation | 730 | 692 | 1,195 | — | — | 2,617 |
| | 50,782 | 66,598 | 77,724 | 438 | — | 195,542 |
| | | | | | | |
| Income (loss) from operations | (567) | (2,376) | 8,116 | (438) | — | 4,735 |
| | | | | | | |
| Other income (expense): | | | | | | |
| Equity in net income of joint ventures | 687 | — | — | — | — | 687 |
| Loss on contract receivable settlement | (1,760) | — | — | — | — | (1,760) |
| Interest (expense) income, net | (1,249) | (1,075) | (2,249) | (1,125) | — | (5,698) |
| Other, net | (890) | (358) | 31 | (181) | — | (1,398) |
| (Loss) income before income tax benefit (provision) | (3,779) | (3,809) | 5,898 | (1,744) | — | (3,434) |
| Income tax benefit (provision) | 1,435 | 1,285 | (2,301) | 663 | — | 1,082 |
| Net (loss) income | $(2,344) | $(2,524) | $ 3,597 | $(1,081) | $  — | $ (2,352) |

21

0107-0203352