# EXHIBIT Z



**PERSONAL AND CONFIDENTIAL**

March 20, 2002

ALH Holdings LLC
ALH II, Inc.
489 Fifth Avenue
28th Floor
New York, NY 10017
Attention: Mr. Shalom Lamm

Re:    ALH Engagement with Jolson Merchant Partners

Dear Shalom:

We are pleased to confirm the arrangements under which Jolson Merchant Partners ("we," "us" or "JMP") is engaged by ALH Holdings LLC and ALH II, Inc. (collectively, "you" or the "Company") as a financial advisor to the Company in connection with the Transaction described below, subject to the terms and conditions of this letter agreement (the "Agreement").

1.0    **Engagement**

1.1    **Scope of Engagement**

You have engaged us to advise you concerning a sale of the Company and matters related thereto. For purposes of this Agreement, a sale of the Company includes any transaction or related series of transactions whereby, directly or indirectly, control of the Company or of all or substantially all of the assets of the Company is acquired by a third party (but specifically excluding any current holder of equity interests in the Company or any affiliate of such holder) in a sale or exchange of stock, merger or consolidation, sale of assets or other similar transaction ("Transaction"). For purposes of this Agreement, "control" means the ownership of 50% or more of the equity interests in the Company.

We will render to you such financial advisory and investment banking services as are necessary or appropriate in connection with the Transaction or any potential Transaction. When and as necessary or appropriate we will (i) conduct an investigation and analysis with respect to the business and operations of the Company and its subsidiaries and of the industry and markets which it serves, (ii) perform an analysis of the various strategic alternatives available to the Company and

*One Embarcadero Center, Suite 2100    San Francisco, California 94111    T. (415) 835-8900    F. (415) 263-1337*



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 2

review such analysis with the management of the Company, (iii) develop (and update from time to time) and review with you on an on-going basis a list of parties which might have a specific interest in acquiring the Company with the understanding that we will contact only parties you approve, (iv) market the Company to potential buyers expressly approved by the Company, (v) assist you in preparing a descriptive memorandum concerning the Company that describes the operations and financial condition of the Company and its subsidiaries and provides other appropriate information furnished by the Company (the "Offering Memorandum"), (vi) advise and consult with you with respect to the financial aspects of any transaction as described in the agreements effecting any Transaction or potential Transaction, (vii) participate in meetings of the board of directors of the Company at which such potential Transaction is to be considered, (viii) structure a sale transaction process, including developing and administering a highly confidential "bidding" process, (ix) counsel the Company as to strategy and tactics for negotiations in connection with any Transaction or potential Transaction, (x) participate with the Company and its counsel in negotiations related to the Transaction or any potential Transaction, (xi) assist the Company in the administration of the closing of the Transaction or another form of transaction that may aid the Company in achieving its strategic objectives, (xii) if requested by the Company, render an opinion (such opinion will be in writing if requested by the Company) as to the fairness, from a financial point of view, to the Company's equity holders of the consideration to be received by such equity holders or of the exchange ratio, as the case may be, in any potential Transaction or advise the board of directors of the Company that we are unable to render such an opinion and (xiii) render such other financial advisory and investment and/or merchant banking services as may be agreed upon from time to time by us and the Company. We will promptly notify the Company of any communication concerning a potential Transaction.

In connection with performing our services we will use publicly available information and information which you provide to us, including information concerning the business, assets, operations or financial condition of the Company ("Company Information"). We may rely upon the accuracy and completeness in all material respects of such Company Information without independent verification. JMP shall provide Company Information, Confidential Information (as defined in Section 3.3 below) or the Offering Memorandum only to those potential buyers approved by the Company, unless otherwise approved in writing by the Company.

We will provide our financial advice, written or oral, exclusively for the information of your board of directors and senior management, who, in their sole discretion, will make all decisions regarding whether and how to pursue any opportunity or transaction. Your board of directors and senior management may base their decisions on our advice as well as on the advice of their legal, tax and other business advisors and other factors which they consider appropriate. Accordingly, as an independent contractor, we will not assume the responsibilities of a fiduciary to you or your shareholders in connection with the performance of our services in good faith on the terms set forth herein. Notwithstanding anything to the contrary contained herein, the Company shall have no obligation to consummate or pursue any potential Transaction, Qualified Equity Placement or opportunity or other transaction proposed or identified by JMP or by any other person or entity.



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 3

This Agreement shall not give rise to any commitment by JMP to act as a principal in the Transaction, and JMP shall have no authority to bind the Company. With the prior written consent of the Company, JMP may retain other advisors or consultants to act on its behalf in connection with the Transaction in accordance with the terms of this Agreement (it being understood and agreed that, unless otherwise expressly agreed by the Company in writing, JMP hereby assumes all liability and agrees to be solely responsible for the actions and inactions of such other advisors and consultants).

### 1.2 Term of Engagement

The term of our engagement will begin on the date hereof and continue for one year or until earlier terminated by the final closing of the Transaction or our mutual written agreement. The Company may terminate this Agreement for any reason whatsoever upon 30 days prior written notice. Without limiting the foregoing, in the event that Tony Avila shall cease providing services under this Agreement, cease working for JMP or acting as lead investment banker, or being primarily responsible, for the services under this Agreement (an "Assurance Default"), JMP agrees to provide the Company written notice of any Assurance Default within 5 days of its occurrence and the Company (regardless of whether or not JMP shall have provided the foregoing notice with respect to such Assurance Default) may terminate this Agreement at any time after the occurrence of any Assurance Default immediately upon written notice to JMP. Subject to Section 2.1 below, any early termination of our engagement will not affect your obligation to pay our fees or reimburse our expenses owing hereunder to the extent that such fees are due and payable, and expenses have been incurred, prior to the date of such termination and JMP requests the payment of such properly documented fees and expenses within 60 days after the date of such termination; provided, however, that in the event that this Agreement is terminated because of an Assurance Default which Assurance Default has not been disclosed to the Company within 5 days of its occurrence, the Company shall not have any obligation to pay any of our fees or reimburse our expenses to the extent that such fees are due and payable, or expenses were incurred, from and after the date of such Assurance Default.

### 1.3 Compliance with Securities Laws.

JMP and the Company agree to conduct its respective activities in connection with the Transaction in a manner permitted by all applicable Federal and state securities laws.

### 2.0 Compensation, Expenses and Retainer

#### 2.1 Retainer

As compensation for our services, you will pay us a cash retainer fee of $150,000, which shall be deemed earned upon execution of this Agreement. The retainer fee shall be payable in three installments of $50,000 each, the first of which shall be due upon the execution of this Agreement, the second of which shall be due upon the date which is 60 days after the execution of this Agreement, and the third of which shall be due upon the date which is 120 days after the execution of this Agreement (or, in each case, if such installment date is not a business day, on the next succeeding



ALH Holding LLC
ALH II, Inc.
March 20, 2002
Page 4

business day). The retainer fee, to the extent of payments made thereon pursuant to the preceding
sentence, will be credited against any fees (except the fairness opinion fee) due to us under this
Agreement when and as such fees are payable until such retainer fee has been applied in its entirety
against all such fees. The retainer fee, to the extent of payments made thereon by the Company, will
be credited against any success fee (including without limitation any Transaction Fee or incentive fee),
any Break-Up Fee (as defined below) or any Equity Placement Fee (as defined below) paid pursuant to
Subsection 2.2. Except as set forth in the immediately succeeding sentence, the retainer is non-
refundable such that if the Transaction fails to close, the retainer shall be retained in full by JMP as a
fee for services rendered, and shall be in addition to the expense reimbursement payable by the
Company under Subsection 2.3. Notwithstanding the foregoing sentence, upon the occurrence of an
Assistance Default, JMP agrees to immediately refund one-half of the retainer fee paid by the
Company.

### 2.2 Fees

If a Transaction is consummated with a JMP Prospect (as defined below) during the
term of this engagement or at any time prior to nine months following the expiration or earlier
termination of this Agreement (or, in the event that this Agreement is terminated pursuant to any
Assistance Default, at any time prior to the date which is 60 days after such termination), you will pay
us a fee equal to 0.85% of the consideration (as defined below) paid to the Company or the Company's
equity holders in such Transaction (the "Transaction Fee"), which Transaction Fee, less the retainer
fee (to the extent of any payments made thereon by the Company) described in Section 2.1 above and
less the fairness opinion fee, if paid, described in Section 2.5 below and less the Equity Placement Fee,
if any, previously paid (such deductions referred to collectively as the "Offsets"), will be due and
payable when and as any consideration is paid to the Company or its equity holders in connection
with such Transaction and to the extent not prohibited by law, such Transaction Fee shall be in the
form of such consideration received by the Company and its equity holders, as applicable, or, to the
extent that payment of such Transaction Fee in the form of such consideration is prohibited by law,
such Transaction Fee shall be paid in cash when the Company or its equity holders realize cash in
connection with the sale or transfer of such consideration; provided, however, that upon the
consummation of such Transaction (or if the Transaction results from a series of sub-transactions,
upon the consummation of the final sub-transaction related to the Transaction), the Transaction Fee
payable at such time, prior to giving effect to any and all Offsets, shall not be less than $700,000 in
cash (the "Minimum Payment") (it being understood and agreed that, to the extent to which the
Minimum Payment exceeds the Transaction Fee which would be otherwise due and payable at the
consummation of the Transaction then the amount of such excess shall be applied against future
payments of the Transaction Fee in the order that such future amounts become payable).
Additionally, if a Transaction is consummated with a JMP Prospect during the term of this
engagement or at any time prior to nine months following the expiration or earlier termination of this
Agreement (or, in the event that this Agreement is terminated pursuant to any Assistance Default, at
any time prior to the date which is 60 days after such termination), you will pay us an incentive fee of
one and one half percent (1.50%) of any consideration in excess of $120 million paid to the Company
or the Company's equity holders in such Transaction. The incentive fee shall also be due and payable
when and as any consideration is paid to the Company or its equity holders in connection with such



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 5

Transaction and to the extent not prohibited by law, such fee shall be in the form of such consideration received by the Company and its equity holders, as applicable, or, to the extent that payment of such fee in the form of such consideration is prohibited by law, such fee shall be paid in cash when the Company or its equity holders realize such consideration in connection with the sale or transfer of such consideration. For purposes of this Agreement, "JMP Prospect" shall mean any prospective third party purchaser identified by JMP and with whom JMP or the Company has substantive discussions regarding a Transaction prior to the earlier of the date of termination of this Agreement.

Our fee will not be reduced by any obligation that you may have to any other broker or finder. In addition, if a Transaction for which we would have been entitled to a fee is not consummated, you will pay us a fee equal to (x) the difference between the amount of any "termination," "break-up," "topping" or other cash fee that you receive as a result of the failure to consummate such Transaction less the amount of any and all costs, fees and expenses of any kind whatsoever paid or incurred by the Company pursuant to such Transaction, any other Transaction or potential Transaction or otherwise pursuant to or in connection with this Agreement (other than fees payable under this paragraph) *multiplied by* (y).25 (the "Break-Up Fee"), less the amount of any Offsets; provided, however, that the Break-Up Fee shall not exceed the amount of the Transaction Fee and any incentive fee which would have been payable to JMP upon the consummation of such Transaction.

Subject to the immediately succeeding paragraph, in the event of a Transaction or Qualified Equity Placement (as defined below), "consideration" means, without duplication, the sum of (i) the cash paid to the Company or its equity holders or any entity affiliated with the Company or its equity holders in connection with such Transaction or Qualified Equity Placement, (ii) the marketable equity securities or equity interests transferred, the unmarketable equity securities or equity interests transferred, and the debt instruments and convertible debt instruments or obligations issued (including any amounts paid into escrow) to the Company or its shareholders or any entity affiliated with the Company or its shareholders in connection with such Transaction or Qualified Equity Placement (or, upon the election of the Company, in its sole discretion, the fair market value of each of the foregoing as may be mutually agreed upon by the parties), (iii) the outstanding amount of indebtedness for borrowed money (excluding trade payables, short-term financing facilities secured by mortgage loans or mortgage loan derivatives and indebtedness payable pursuant to securitizations) of the Company assumed directly or indirectly by an acquiring party or any entity affiliated with an acquiring party in connection with such Transaction or Qualified Equity Placement, and (iv) the cash received from contingent future payment obligations (e.g., earn-outs) arising in connection with such Transaction or Qualified Equity Placement when and as such cash is received by the Company and its equity holders.

Notwithstanding anything to the contrary contained in this Agreement, (i) consideration shall be determined at the time the Transaction or Qualified Equity Placement is consummated, unless the sale of the Company occurs as the result of a combination or series of sub-transactions, in which case the total consideration shall be an amount equal to the sum of the aggregate consideration paid on the closing date of each applicable sub-transaction, with the value of consideration for any sub-transaction to be determined as of the closing date such sub-transaction, and



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 6

(ii) in the event that any Transaction (including without limitation, any Transaction resulting from a series of sub-transactions described in clause (i) above) will result in the disposition of less than all of the equity interests, business or assets of the Company, the "consideration" for such Transaction shall be an amount equal to the consideration otherwise payable for such Transaction in connection with the immediately preceding paragraph (and, as applicable, clause (i) above) *multiplied* by the percentage of the Company acquired by any third party (but specifically excluding any current holder of equity interests in the Company or any affiliate of such holder).

If the sale by the Company to a JMP Prospect of equity interests in the Company in an amount equal to at least 20% (but less than 50%) of such interests then outstanding is consummated during this engagement or at any time prior to nine months following the expiration or earlier termination of this engagement (or, in the event that this Agreement is terminated pursuant to any Assistance Default, at any time prior to the date which is 60 days after the occurrence of such Assistance Default) and such sale does not constitute a sub-transaction of any Transaction or is not otherwise made in connection with any Transaction (a "Qualified Equity Placement"), you will pay us a cash fee of 3.0% of the consideration received for such sale (the "Equity Placement Fee"), less the amount of any Offsets, subject to a maximum fee which shall be no greater than the amount of the Transaction Fee and any incentive fee which would be payable at the valuation of the Company applied in connection with such Qualified Equity Placement. Such Equity Placement Fee, less the amount of any Offsets, will be due and payable when, as and in the form of any consideration paid to the Company or its equity holders.

### 2.3 Expenses

Whether or not there is a closing of the Transaction, the Company will pay its own and its agents' expenses in connection with the Transaction and will reimburse JMP for its reasonable out-of-pocket expenses incurred in connection with the Transaction, including, without limitation, the reasonable fees and expenses of outside legal counsel, reasonable out-of-pocket costs related to preparing, printing and disseminating the Offering Memorandum and reasonable travel expenses; provided that such expenses shall not exceed $30,000 in the aggregate without the prior written consent of the Company. JMP agrees not to hire any third-parties for which the Company would be responsible for any fees and/or expenses without the prior written consent of the Company. The Company will reimburse JMP's reimbursable out-of-pocket expenses and such other expenses within thirty (30) days after receipt by the Company of an invoice submitted by JMP for the payment of such expenses and appropriate supporting documentation. JMP will deliver such an invoice from time to time.

### 2.4 Payment of Compensation, Fees and Expenses

All amounts under this section 2.0 shall be denominated in United States Dollars and payable by check or wire transfer of immediately available funds to JMP.



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 7

### 2.5  Rendering of Fairness Opinion

If requested by the Company, upon JMP rendering a written fairness opinion to the Company, a one-time fairness opinion fee of $100,000 shall be due and payable. In the event that the Company shall request any additional fairness opinions in connection with this Agreement, no fee shall be due or payable in connection with any such additional fairness opinions. Further, such fairness opinion fee shall be fully credited against any Transaction Fee, Incentive fee, Break-Up Fee, or Equity Placement Fee due hereunder in the order that such other fees become payable, and to the extent that the fairness opinion fee shall exceed the aggregate amount of the foregoing credits, the amount of such excess shall be credited against any amounts that the Company may in the future owe to JMP, whether pursuant to this Agreement or otherwise.

### 3.0  Miscellaneous

#### 3.1  Reasonable Efforts

JMP shall commit such time and other resources as are necessary or appropriate to seek timely success of the Transaction and the Company shall commit such time and resources as are reasonably necessary to seek timely success of the Transaction.

#### 3.2  Company Material

From and after the date of this Agreement, the Company shall provide to JMP such information as JMP shall reasonably request in connection with any Transaction or potential Transaction and shall promptly inform JMP of any events which, to the knowledge of the senior officers of the Company, would materially and adversely affect a Transaction or potential Transaction. To the knowledge of the senior officers of the Company, the written materials, taken as a whole, provided to JMP by the Company shall not contain an untrue statement of a material fact or omit to state a material fact necessary to make any such statements, in light of the circumstances under which they were made, not misleading.

#### 3.3  Confidentiality of Company Material

JMP will keep confidential and not disclose to any third-party any confidential, proprietary or non-public information of the Company, whether oral, written, graphic, machine-readable or otherwise ("Confidential Information"), made available to JMP by the Company or the directors, officers, managers, members, affiliates, representatives, agents (including without limitation, its advisors, consultants, accountants and attorneys) or employees (collectively, "Representatives") of the Company, and will use the Confidential Information only in connection with the engagement hereunder; provided, however, such Confidential Information shall not include any information already in the possession of JMP prior to the date of its disclosure to JMP by the Company or its Representatives, any information generally available to the public (other than as a result of any disclosure by JMP or its Representatives), or any information which becomes available to JMP on a non-confidential basis from a third-party who is not bound by a confidentiality obligation; and provided, further, that such Confidential Information may be disclosed (i) to JMP's officers, members,



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 8

employees, agents, advisors and representatives who need such Confidential Information in connection with JMP's engagement hereunder and who shall be informed of the confidential nature of the information, that such information is subject to a confidentiality agreement and of the terms of this confidentiality provision; (ii) to any person with the prior written consent of the Company, including to any prospective investors; or (iii) if, upon the advice of counsel, and only to the extent that, JMP is compelled to disclose any Confidential Information pursuant to any order or requirement of a court, administrative agency or other governmental body (it being agreed that JMP shall provide prompt notice of such court order or requirement to the Company to enable the Company, at its own expense, to seek a protective order or otherwise prevent or restrict such disclosure and JMP shall reasonably cooperate with the Company with respect to the foregoing).

### 3.4 Indemnification

JMP and the Company hereby agree to the terms set forth in Exhibit A hereto.

### 3.5 Notices

All notices or communications hereunder will be in writing and will be mailed or delivered as follows: If to the Company, at the name and address set forth on the first page of this Agreement, facsimile number (212) 867-6303 with a copy to George Buchler, Shamrock Capital Advisors, Inc., 4444 Lakeside Drive, Burbank, CA 91505, facsimile number (818) 556-6995, and if to JMP, at One Embarcadero Center, Suite 2100, San Francisco, CA 94111, facsimile number (415) 263-1337.

### 3.6 Survival; Governing Law; Entire Agreement; Successors and Assigns

The provisions of Subsection 1.3, Section 2.0, Subsections 3.2, 3.5 and 3.6 hereof shall survive any termination of this Agreement. The provisions of Subsection 3.3 hereof (Confidentiality) and Subsection 3.4 and Exhibit A hereof (Indemnity) shall survive the closing of the Transaction and any termination of this Agreement for a period of two (2) years, and no longer, following the final closing or the termination of this Agreement, as applicable.

This Agreement, including Exhibit A hereto, shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any principles of conflicts of law. Each of JMP and the Company (on its own behalf and, to the extent permitted by law, on behalf of its shareholders) waives any right to trial by jury in any action, claim, suit or proceeding with respect to this Agreement.

This Agreement, together with Exhibit A hereto, contains the entire agreement between the Company and JMP concerning the Transaction and supersedes any prior understanding or agreement whether written or oral with respect to the subject matter hereof. Any amendment hereto or waiver of any right or obligation hereunder must be in writing signed by the party to be charged. The rights and obligations you have or may have to us or any of our affiliates under any other agreement are separate from your rights and obligations under this engagement agreement and will not be affected by our performance or failure to perform hereunder.



**ALH Holdings LLC**
**ALH II, Inc.**
March 20, 2002
Page 9

JMP may not assign its obligations hereunder. The benefits of this Agreement and the attached indemnity provisions shall inure to the respective successors and permitted assigns of the parties hereto and of the indemnified parties hereunder and their successors and permitted assigns, and the obligations and liabilities assumed in this Agreement and the attached indemnity provisions shall be binding upon their respective successors and assigns.

This Agreement is effective as of the date first set forth above. Please confirm that the foregoing correctly and completely sets forth our understanding, by signing and returning to us the enclosed duplicate of this Agreement. We thank you for the opportunity to share in your business endeavors and are looking forward to a successful and mutually beneficial relationship.

Very truly yours,

JOLSON MERCHANT PARTNERS

By: _____
Carter Mack
Managing Director

Agreed and accepted as of the date first written above:

**ALH HOLDINGS LLC**

By: _____
Shalom Lamm
Its Duly Authorized Signatory

**ALH II, INC.**

By: _____
Shalom Lamm
Its Duly Authorized Signatory



# EXHIBIT A

## INDEMNITY AGREEMENT

In connection with the engagement of Jolson Merchant Partners ("JMP") to advise and assist the undersigned (referred to herein as "we," "our," "us" or the "Company") with the matters set forth in the Agreement dated March 20, 2002 between us and JMP (the "Agreement"), we hereby agree to indemnify and hold harmless JMP, its affiliated companies, and each of JMP's and such affiliated companies' respective members, officers, directors, agents, employees and controlling persons (within the meaning of each of Section 20 of the Securities Exchange Act of 1934 and Section 15 of the Securities Act of 1933) (each of the foregoing, including JMP, being hereinafter referred to as an "Indemnified Person") to the fullest extent permitted by law from and against any and all losses, claims, damages, expenses (including reasonable fees, disbursements and other charges of counsel), actions (including actions brought by us or our equity holders or derivative actions brought by any person claiming through us or in our name), proceedings, arbitrations or investigations (whether formal or informal), or threats thereof (all of the foregoing being hereinafter referred to as "Liabilities"), based upon, relating to or arising out of such engagement or any Indemnified Person's role therein; provided, however, that we shall not be liable under this paragraph: (a) for any amount paid in settlement of claims without our consent, unless our consent is unreasonably withheld, or (b) to the extent that it is finally judicially determined, or expressly stated in an arbitration award, that such Liabilities resulted primarily from the willful misconduct or gross negligence of, breach of the Agreement by, or any violation of law by, the Indemnified Person seeking indemnification. We hereby also agree that neither JMP nor any other Indemnified Person shall have any liability to us (or anyone claiming through us or in our name) in connection with JMP's engagement by us except to the extent that such Indemnified Person has engaged in willful misconduct, or been grossly negligent or has otherwise materially violated the Agreement.

Promptly after JMP receives notice of the commencement of any action or other proceeding in respect of which indemnification or reimbursement may be sought hereunder, JMP will notify us thereof; but the omission so to notify us shall not relieve us from any obligation hereunder unless, and only to the extent that, such omission results in our forfeiture of substantive rights or defenses. If any such action or other proceeding shall be brought against any Indemnified Person, we shall, upon written notice given reasonably promptly following your notice to us of such action or proceeding, be entitled to assume the defense thereof at our expense with counsel chosen by us and reasonably satisfactory to such Indemnified Person; provided, however, that any Indemnified Person may at its own expense retain separate counsel to participate in such defense. Notwithstanding the foregoing, such Indemnified Person shall have the right to employ separate counsel at our expense and to control its own defense of such action or proceeding if, in the reasonable opinion of counsel to such Indemnified Person, (i) there are or may be legal defenses available to such Indemnified Person or to other Indemnified Persons that are different from or additional to those available to us, or (ii) a difference of position or potential difference of position exists between us and such Indemnified Person that would make such separate representation advisable; provided, however, that in no event shall we be required to pay fees and expenses under this indemnity for more than one firm of attorneys (in addition to local counsel) in any jurisdiction in any one legal action or group of related legal actions. We agree that we will not, without the prior written consent of JMP, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding relating to the matters

A-1

contemplated by JMP's engagement (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise or consent includes an unconditional release of JMP and each other Indemnified Person from all liability arising or that may arise out of such claim, action or proceeding.

If the indemnification of an Indemnified Person provided for hereunder is finally judicially determined by a court of competent jurisdiction to be unenforceable, then we agree, in lieu of indemnifying such Indemnified Person, to contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by us on the one hand and by JMP on the other from the transactions in connection with which JMP has been engaged. If the allocation provided in the preceding sentence is not permitted by applicable law, then we agree to contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities in such proportion as is appropriate to reflect not only the relative benefits referred to in such preceding sentence but also the relative fault of us and of such Indemnified Person. Notwithstanding the foregoing, in no event shall the aggregate amount required to be contributed by all Indemnified Persons taking into account our contributions as described above exceed the amount of fees actually received by JMP pursuant to such engagement. The relative benefits received or sought to be received by us on the one hand and by JMP on the other shall be deemed to be in the same proportion as (a) the total value of the transactions with respect to which JMP has been engaged bears to (b) the fees paid or payable to JMP with respect to such engagement.

The rights accorded to Indemnified Persons hereunder shall be in addition to any rights that any Indemnified Person may have at common law, by separate agreement or otherwise.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE. WE HEREBY CONSENT, SOLELY FOR THE PURPOSE OF ALLOWING AN INDEMNIFIED PERSON TO ENFORCE ITS RIGHTS HEREUNDER, TO PERSONAL JURISDICTION AND SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM FOR WHICH INDEMNIFICATION MAY BE SOUGHT HEREUNDER IS BROUGHT AGAINST JMP OR ANY OTHER INDEMNIFIED PERSON. We and JMP also hereby irrevocably waive any right we and JMP may have to a trial by jury in respect of any claim based upon or arising out of this agreement. This agreement may not be amended or otherwise modified except by an instrument signed by both JMP and us. If any provision hereof shall be determined to be invalid or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this agreement, which shall remain in full force and effect. If there is more than one indemnitor hereunder, each indemnifying person agrees that its liabilities hereunder shall be joint and several. Each Indemnified Person is an intended beneficiary hereunder.

The officer signing below is duly authorized to execute this indemnification agreement on behalf of the Company and, upon his execution thereof, this indemnification agreement shall be binding against the Company and in full force and effect.

A-2



The foregoing indemnification agreement shall remain in effect indefinitely, notwithstanding any termination of JMP's engagement.

Very truly yours,

ALH HOLDINGS LLC

By: _____
    Shalom Lamm
    Its Duly Authorized Signatory

ALH II, INC.

By: _____
    Shalom Lamm
    Its Duly Authorized Signatory

Agreed and accepted as of the date first written above:

JOLSON MERCHANT PARTNERS

By: _____
    Carter Mack
    Managing Director

A-3

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon due

notice.

_____
Shalom E. Lamm

_____
Eugene Krieger

_____
Georga Buchler

76383

IN WITNESS WHEREOF, the undersigned have executed this

Unanimous Written Consent as of the date set forth above.

_____
Shalom E. Lamm

_____
Bruce Stein

_____
Avie Arenson

_____
Eugene Krieger

_____
George Buchler

76882

MAR-20-2002  14:45        904*394*2599 :                          10179   P.02

# UNANIMOUS WRITTEN CONSENT
## OF THE SUPERVISORY BOARD
## OF
## ALH HOLDINGS LLC
### (a Delaware limited liability company)

### March 15, 2002

Pursuant to the provisions contained in Title 6, Sections 18-106 and 18-302(d) of the Delaware Limited Liability Company Act (the "DLLCA") and the Operating Agreement (the "Operating Agreement") of ALH Holdings LLC, a Delaware limited liability company (the "Company"), dated as of June 12, 1998, as amended, the undersigned, being all of the Representatives designated to serve on the Supervisory Board of the Company hereby take the following action by unanimous written consent:

## APPROVAL OF ENGAGEMENT AGREEMENT

WHEREAS, the Supervisory Board has determined that it is in the best interests of the Company to enter into an Engagement Agreement (the "Engagement Agreement") among Jolson Merchant Partners ("JMP"), ALH II, Inc., a Delaware corporation and wholly owned subsidiary of the Company ("ALH II"), and the Company, substantially in the form previously circulated to and reviewed by the Supervisory Board, pursuant to the terms of which the Company and ALH II will engage JMP to act as a financial advisor to the Company and ALH II;

NOW, THEREFORE, BE IT RESOLVED, that the Engagement Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be and hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered for and on behalf of the Company, to negotiate the final terms and provisions of the Engagement Agreement, to execute and deliver the Engagement Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other documents, agreements or instruments required or desired to be delivered in connection with the Engagement

76882

MAR-20-2002  14:45        904*394*2599 :                    10179   P.03

Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such documents, agreements and instruments to be conclusive evidence of such due authorization by the Company.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of them hereby is, authorized and directed and empowered on behalf of the Company and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents, or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by, the foregoing resolutions, or to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such documents, agreements and instruments, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that any and all actions heretofore taken by any officer or the Class A Representatives of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.



- 2 -

21/03  02 10:07 FAX 972 4 6230230    ARENSON                                      ☑005
MAR-20-2002  14:45        904*394*2599 :                          10179    P.04

IN WITNESS WHEREOF, the undersigned have executed this

Unanimous Written Consent as of the date set forth above.

_____
Shalom E. Lamm

_____
Bruce Stein

_____
Avie Arenson

_____
Eugene Krieger

_____
George Buchler

76352

**ACTION TAKEN BY**
**UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**ALH II, INC.**
**(a Delaware corporation)**

March 15, 2002

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the directors (the "Board of Directors") of ALH II, Inc., a Delaware corporation (the "Corporation"), hereby take the following action by unanimous written consent in lieu of a meeting:

## APPROVAL OF ENGAGEMENT AGREEMENT

WHEREAS, the Board of Directors of the Corporation has determined it to be in the best interests of the Corporation to enter into an Engagement Agreement (the "Engagement Agreement"), among Jolson Merchant Partners ("JMP"), ALH Holdings, LLC, a Delaware limited liability company and holder of all outstanding equity interests of the Corporation ("ALH Holdings"), and the Corporation, substantially in the form previously circulated to and reviewed by the Board of Directors, pursuant to the terms of which the Corporation and ALH Holdings will engage JMP to act as a financial advisor to the Corporation and ALH II.

WHEREAS, the Board of Directors has further determined that it is in the best interests of the Corporation to authorize Shalom E. Lamm to execute the Engagement Agreement on behalf of the Corporation.

NOW, THEREFORE, BE IT RESOLVED, that the Engagement Agreement, substantially in the form previously circulated to the Board of Directors of the Corporation, be, and hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers and Shalom E. Lamm of the Corporation be, and each of them hereby is, authorized and empowered for and on behalf of the Corporation, to negotiate the final form, terms and provisions of, and to execute and deliver, the Engagement Agreement with such changes, modifications, and/or additions thereto as such officers and/or Shalom E. Lamm shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other documents, agreements or instruments required or desired to be delivered by the

76683

Corporation pursuant to the Engagement Agreement, on such terms as such officers and/or Shalom E. Lamm may deem advisable, necessary or desirable, the preparation, execution and delivery of such documents, agreements and instruments to be conclusive evidence of such due authorization by the Corporation.

### GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Corporation and Shalom E. Lamm be, and each of them hereby is, authorized and directed and empowered on behalf of the Corporation and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers and/or Shalom E. Lamm may deem necessary or appropriate to enable the Corporation to carry out the obligations of the Corporation under, and to effect the transactions contemplated by, the forgoing resolutions, or to do and to cause to be done any and all other acts and things as such officers and/or Shalom E. Lamm may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such documents, agreements and instruments or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Corporation.

RESOLVED, that any and all actions heretofore taken by any officer or director of the Corporation in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

2

73115

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon due

notice.

_____

Shalom E. Lamm

_____

Eugene Krieger

_____

George Buchler



76883

# EXHIBIT AA

**Minutes of a Meeting of the**
**Supervisory Board of ALH Holdings LLC**
**Held on May 14, 2003**

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH Holdings LLC, a Delaware limited liability company (the "Company"), was held on May 14, 2003, pursuant to Section 6.2 of the Operating Agreement of the Company. In attendance were the following members of the Board:

Avie Arenson                    Shalom E. Lamm
George Buchler                  Bruce Stein
Eugene Krieger

Also in attendance, at the invitation of the Board, were John Laguardia, President and Chief Executive Officer of ALH II, Inc., a wholly-owned subsidiary of the Company ("ALH II"), and William Lanius, Treasurer and Chief Financial Officer of ALH II. The meeting was called to order at 8:00 AM PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to discuss two issues affecting the Company: (1) the potential sale of Atlantic Builders, Inc., an indirect wholly-owned subsidiary of the Company ("ABI"), directly or indirectly to Mattamy Homes ("Mattamy") and (2) a lawsuit brought by the Bowden family with respect to the Note, dated March 19, 1999, in the principal amount of $2,250,000 (the "Bowden Note") issued by ALH Tennessee Acquisition, Inc., an indirect, wholly-owned subsidiary of the Company ("ALH Acquisition"), to Donald L. Bowden, Sr. and Helen E. Bowden.

## The Proposed Sale of ABI

### ABI Sale Status

Tony Avila, with Jolson Merchant Partners, was invited to join the telephonic meeting by the Board. Mr. Avila gave an overview of the efforts to sell the Company in its entirety and the subsequent efforts to sell ABI. He explained that he began his search for potential buyers of ABI after an unsuccessful search for a purchaser of the Company or substantially all of its assets by speaking with twenty builders and then narrowed this list to six viable buyer candidates. From these six candidates, Mr. Avila had obtained four written proposals (one of which was subsequently withdrawn) and one verbal proposal for the purchase of ABI. The purchase prices offered by the bidders that made written proposals were as follows:

| | |
|---|---|
| Mattamy | $20 million (this figure reflects a $17-17.5 million offer plus a "gross-up" of approximately $2.5 million to make it comparable to the other proposals, all of which would require an adjustment downward to account for intercompany receivables of approximately $2.5 million) |
| MDC Holdings | $18.5 million |
| Toll Brothers | $14 million plus a $4 million earn-out |

84417

Because Mattamy's proposal was the most favorable of the proposals received, the Company and Mattamy executed a non-binding term sheet on April 11, 2003. Mr. Avila stated his view that the deal described in the Mattamy term sheet represents the best transaction for the sale of the ABI.

Mr. Buchler reviewed the status of the discussions regarding the proposed sale of ABI to Mattamy. He reported that Mattamy finished its accounting due diligence and is close to finishing its legal due diligence. He reported that several issues remain to be resolved by the parties, including the ability of ABI to assign all of its land contracts to Mattamy, Mattamy's proposed assumption of ABI's bank debt, and the potential transfer of an ABI account receivable related to the Towers' litigation. Mr. Lanius mentioned that Don Walker, Mattamy's Chief Financial Officer, had indicated to him that these three issues were the only significant concerns that Mattamy currently had regarding the proposed sale of ABI.

With respect to the ability of ABI to assign its land contracts, Mr. Buchler mentioned that Baker & Hostetler, PC, the Company's Florida counsel, provided a memorandum indicating that ABI should be able to assign its rights under its contract to purchase lots from Oakleaf Plantation, LLC. However, Baker & Hostetler indicated that, with respect to ABI's lot purchase agreement with Bartram Lakes, LLC, the standards for assigning ABI's rights are more restrictive. Mr. Laguardia asked the Board if he should contact the Bartram Springs developer about the potential assignment of the contract. It was decided by the Board that the Company's Florida counsel would prepare a draft assignment of the Bartram Springs contract and that Mr. Buchler would have the authority, on behalf of the Board, to authorize Mr. Laguardia to contact the developer when, and if, Mr. Buchler determined that it would be advisable to do so.

### Market Status

Mr. Buchler then asked Messrs. Laguardia and Lanius to provide their views regarding the proposed sale of ABI. Mr. Laguardia stated that he thought Mattamy had made the strongest offer for the ABI business and that this was the peak of the Jacksonville, Florida real estate market. He noted that ABI was performing exceptionally well at this time and that ABI's margins have improved steadily with EBITDA increasing to 14% in the month of April and to 13% for the period of January through March, 2003. Mr. Laguardia cautioned, however, that he could not estimate how long this environment will continue. He mentioned that the Jacksonville market currently has a shortage of lots. As a result, developers are raising lot prices and asking for larger deposits and requiring takedowns of larger numbers of lots. Thus far, ABI has been able to pass these lot price increases on to its buyers, but he was concerned about ABI's ability to continue doing so. Mr. Laguardia stated that, based on these factors, his view is that the Company would be selling ABI at the peak of the market.

Mr. Avila also suggested that a sale presently would be at the market peak because 10,848 units were sold in the Jacksonville market in 2002, an unusually large number of units. Mr. Laguardia added that this number is significantly higher than the historical average of 7,500 units sold per year. Mssrs. Laguardia and Avila also indicated to the Board that

84417

2

competition in the Jacksonville market is intensifying with many national and regional homebuilders entering the Jacksonville market. For example, D.R. Horton, Inc. is planning to sell 1,000 homes per year in the Jacksonville market and KB Home is buying lots to build 1,000 homes per year in the Jacksonville market. These homes would represent 26.67% of the historical average of units sold each year. Also, they indicated that Toll Brothers, Inc. and Lennar Corporation appear to be looking to enter the Jacksonville market. The entrance of these larger homebuilders/developers into the Jacksonville market would likely have a negative impact on ABI's future performance.

Mr. Lamm stated his view that ABI is considered a real "player" in the Jacksonville homebuilding market again and has a reputation sufficient for dealing with major developers. Mr. Laguardia agreed that ABI is now on the "A" list with some developers, but he questioned ABI's ability to maintain this status in the future because ABI's size and financial resources preclude it from buying land for its own account and developing lots. He added that big developers did not approach ABI when lots were being sold in two recent deals. In one such deal, Rutherford sold 50% of its lots to another large developer, Ryland, and, in another deal, Rutherford sold 50% of its lots to a large homebuilder without contacting ABI.

### Liquidity Concerns

Mr. Lanius then explained that the Company faces various liquidity issues with respect to the capital required for ABI to honor its existing land contracts. He indicated that ABI is ramping up from selling 350 homes per year to 400 homes per year and that it needs more cash and increased credit facilities for its increased inventory. ABI has four major lot purchases upcoming pursuant to existing contracts:

(1)    Oakleaf Plantation – 130 lots at a cost of $4.4 million;
(2)    Bartram Springs – 86 lots at a cost of $4.0 million;
(3)    John's Creek – 80 lots at a cost of $4.2 million; and
(4)    Bentwater – 51 lots at a cost of $2.4 million.

These upcoming purchases of an aggregate of 347 lots at a total cost of $15 million equals the total number of homes that ABI typically can close and sell within any given year. Because these purchases will take place over a compressed period of time, ABI's financial resources are being placed under considerable strain. ABI does not presently have either the cash or credit available with existing lenders to finance these contemplated purchases, and Messrs. Laguardia and Lanius stated that ABI will need to find other financing to fund the required purchases under these contracts. Mr. Lanius stated that he will need to find financing solutions within the next two months.

In addition to ABI's liquidity concerns, Mr. Buchler stated that the Company also has serious liquidity issues. The poor results generated by Mulvaney Homes, Inc. ("Mulvaney") are causing the Company's auditors to write down a minimum of $15 million in goodwill and have impacted the Company's financial statements. Mr. Buchler also mentioned that the Company will need to write down certain other receivables, further negatively impacting its financial statements.

84417

3

Mr. Lanius said that over the next six months, the Company should have approximately $2.4 million in cash flow. In addition to the need to obtain financing for the ABI lot purchases, the Company is near the limit on its lines of credit at Mulvaney required to start an 18-unit development. He also added that the Company also does not have sufficient cash on hand to finance the projected settlement of the Bowden family litigation.

### Bowden Building Sale

Mr. Avila then updated the Board on the sale of Bowden Building Corporation ("Bowden Building"). He said that Walter Industries, Inc. shows continued interest in Bowden Building, but, in his view, purchase price issues will need to be considered in light of Bowden Building's improved performance.

Mr. Buchler asked if there were any other questions pertaining to the sale of ABI or the other two divisions. There were none, and Mr. Avila left the call at this time.

### Proceeds

Mr. Buchler next discussed the application of the net proceeds from the proposed sale of ABI. The proposed sale would provide the Company with approximately $17 million in cash (subject to a reduction for amounts required to be placed in escrow under the proposed sale documentation). After deducting expenses and other amounts payable, there would be net proceeds of approximately $16 million available to the Company (subject to the escrow amounts). The estimated cost of settling the litigation with the Bowden family is approximately $5 million. The remaining $11 million would be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the Loan Agreement, dated April 6, 2000, among ALH II and the Company's members who are a party thereto and the Loan Agreement, dated May 7, 2002, among ALH II and the Company's members who are a party thereto. Any remaining monies could then be used to pay down amounts owing under the Note Purchase Agreement, dated January 13, 2000, between the Company and Wachovia Bank, N.A., as amended to date (which is secured by a surety bond posted by Swiss Reinsurance America Corporation and Amwest Surety Insurance Company), and to support operations at the Company's other subsidiaries.

### The Bowden Family Litigation

Mr. Buchler reviewed the status of the litigation with the Bowden family. Steve Alexander, with Fried, Frank, Harris, Shriver & Jacobson, joined in the telephonic meeting at the invitation of the Board.

Mr. Alexander provided the Board with an update regarding the litigation, which is scheduled for trial on June 23, 2003. He explained that ALH Acquisition's local attorney intends to file a motion to postpone the trial, but he indicated that we do not know whether the judge will grant this motion.

84417

4

Mr. Alexander explained that there are two motions currently pending in the Bowden litigation: The first motion was brought by the Bowden family and seeks partial summary judgment with respect to amounts owing by ALH Acquisition under the Bowden Note. The second motion was brought by ALH Acquisition regarding consequential damages (lost profits) and seeks dismissal of those claims due to the speculative nature of the alleged damages.

He explained that the Bowden family's case revolves around two sets of claims. The first set alleges that ALH Acquisition failed to pay interest and other amounts owing on the Bowden Note when and as required in accordance with its terms. The Bowden family's motion for partial summary judgment raises this set of claims. Given the terms of the Bowden Note and ALH Acquisition's failure to pay amounts when due, Mr. Alexander did not think that ALH Acquisition had strong defenses to this claim.

He explained that the amounts potentially owing with respect to Bowden's motion for partial summary judgment for non-payment of the Bowden Note are as follows: The principal amount is $2.25 million, and accrued interest is approximately $600,000. There is also an earn-out provision with a minimum and a maximum calculation. The Company's estimate of the earn-out provision's value is approximately $675,000. In addition, the judge can require payment of attorney's fees that are estimated at between $200,000 and $600,000. Based on these amounts, if the Bowden family were to prevail on its motion, the total judgment could be approximately $4 million. If the Bowden family prevails on its motion and the Company wants to appeal the court's decision, ALH Acquisition would have to post a bond for the full amount of the judgment.

The second set of claims brought by the Bowden family is for consequential and punitive damages. These claims are more tenuous. After selling Bowden Building to ALH Acquisition, the Bowden family apparently started three new businesses. All three companies failed, and the Bowdens each claim losses of over $3 million for each business. Mr. Alexander stated that the failure of ALH Acquisition to make interest and earn-out payments does not appear to have significantly affected these other businesses. He said that, in fact, recently produced documents appear to show that the Bowden family was in severe financial straits prior to ALH Acquisition's failure to make interest and earn-out payments under the Bowden Note. The Bowden family had been asking for tens of millions of dollars under this second claim, and this demand appears to be driven by their need to repay their debt. At the most recent mediation, the Bowdens said they needed $13 million to repay this debt. However, it now appears that the Bowden family's real exposure with banks is for deficiencies valued at approximately $1.3 million. Mr. Alexander then indicated that the second claim has a value ranging from zero to unknown millions.

The court ordered mediation discussions between the parties were held on April 28, 2003. Mssrs. Buchler, Lanius and Alexander attended these discussions on behalf of ALH Acquisition. In these discussions, ALH Acquisition offered $5 million to settle the Bowden family lawsuit: $1 million to be paid upfront and $4 million to be paid later from the proceeds of the sale of ABI. The Bowden family, however, countered at $8 million (with such payment to be deferred for some time, but not subject to the closing of the sale of ABI, and with a guarantee of such payment by the Company) to settle. Mr. Alexander stated that

5

84417

he had told the Bowdens' attorney during these discussions that the most that the Company could offer is $5 million due to financial restrictions that the Company's lenders placed on the Company. While no settlement was reached, the mediator is continuing to work with the parties. Based on these discussions, it appears that Bowdens might accept $5-6 million if the Company had the cash in hand or the amount was guaranteed.

Mr. Buchler asked if there were any other questions pertaining to the Bowden litigation. There were none, and Mr. Alexander left the call at this time.

## Other Matters

Mr. Laguardia proposed to the Board that it accept his resignation as President of Mulvaney and replace him with Gary Shamp. He then proposed that he become a Vice President at Mulvaney and that the Company also promote Julie Walker to the position of Vice President of Mulvaney. After considering this proposal, a vote was taken and unanimously approved by the members of the Board. Mr. Lanius stated that he would draft a Unanimous Written Consent accepting Mr. Laguardia's resignation and authorizing the appointments of Mssrs. Shamp and Laguardia and Ms. Walker.

The Board members agreed that, unless necessary, they would postpone the next scheduled meeting on June 4th in light of Mr. Arenson's conflicting travel plans. The Board members agreed to delay the meeting until some time shortly thereafter so that the contract for the sale of ABI to Mattamy could be reviewed and considered.

Mr. Arenson inquired about Mr. Lanius' continued role at the Company and whether Mr. Lanius intended to work for Mattamy if the proposed ABI sale occurred. Mr. Lanius responded that he was still in discussions with Mattamy's management regarding his future employment status.

84417

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

George Buchler
Chairman of the Meeting

84417