# EXHIBIT CC

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON**
350 South Grand Avenue, 32nd Floor
Los Angeles, CA 90071

Direct Phone: 213-473-2005
Fax:            213-473-2222

August 16, 2001

Avie Arenson
A. Arenson Holdings, Ltd.
5 Hashita Street
P.O. Box 3566
Caesera, Israel

Re:    ALH Holdings LLC Unanimous Written Consent

Dear Mr. Arenson:

        At the request of George Buchler and in our capacity as attorneys for ALH
Holdings LLC ("ALH"), we are writing to you in your capacity as the Class B
Representative[1] of the Supervisory Board of ALH.  As you were advised at the last
meeting of the Supervisory Board, the Class A Representatives, on behalf of ALH,
have been involved in discussions with Shalom Lamm and other members of his
management team (the "Management Persons") regarding certain issues that have
arisen in connection with their management of ALH.  As a result of these discussions, a
draft agreement regarding these matters has been agreed to subject to the approval of
the Supervisory Board.

        Because those involved are eager to put these matters behind them and in light
of your inability to attend the August 15th Supervisory Board meeting, the
Representatives would like to proceed by having the Supervisory Board act by
unanimous written consent.  Attached is the unanimous written consent.  If after
reviewing this letter and the attached documents, you are in agreement with the
resolutions contained in the unanimous written consent and the transactions being
authorized thereunder, please sign and return a copy of the unanimous written consent
to Fried, Frank, Harris, Shriver & Jacobson ("Fried, Frank") by telecopy (213-473-
2222) and by air courier, as soon as possible.

        To assist you in your consideration, we have summarized some of the more
significant issues addressed in the agreement with the Management Persons.  This is

---

[1]     Unless otherwise indicated, all capitalized terms used and not otherwise defined herein shall have the
        meanings ascribed to them in the Operating Agreement of ALH (the "Operating Agreement"), dated as of
        June 12, 1998, as amended.

Avie Arenson                         page 2                    August 16, 2001

only a summary, and we urge you to carefully review each of the attached documents
and contact us, George Buchler or Gene Krieger for further details and explanation.

1.  Release Agreement

      Pursuant to the agreement (the "Agreement"), ALH will release the
Management Persons from any and all liability stemming from certain actions
(specified in Section 2.0 of the Agreement) taken or omitted to be taken by the
Management Persons in connection with their management of ALH.  ALH will grant
the release subject to a total payment of $1.9 million to ALH by the Management
Persons.  The Management Persons are jointly and severally liable to pay the full $1.9
million, and the release will not become effective until the Management Persons have
paid the full $1.9 million.

      The $1.9 million to be paid by the Management Persons will be comprised of
(i) a cancellation by Lion Capital of a loan in the principal amount of approximately
$200,000 (plus approximately $36,000 in interest) made by Lion Capital to ALH II,
Inc., (ii) the transfer to ALH of approximately $264,000 previously deposited by Lion
Capital in an escrow account held by Fried, Frank, and (iii) payments totaling $1.4
million, plus accrued interest, pursuant to the terms of a Promissory Note (the
"Promissory Note").

      Pursuant to the Promissory Note, principal outstanding will bear interest at the
rate of 15% per annum, and the Management Persons will be obligated to make
payments of $500,000, plus accrued interest on the principal balance being repaid, on
February 28, 2002 and March 15, 2002 and $400,000, plus accrued interest on the
principal balance being repaid, on November 15, 2002.  However, if on or prior to
December 31, 2001, ALH enters into a binding agreement to effect the sale or
disposition of all of its equity or assets and such sale or disposition is consummated
prior to March 31, 2002, then in lieu of being obligated to make the March 15 and
November 15, 2002 payments, the Management Persons will be allowed to make a
final payment of $900,000, plus accrued interest on the principal balance being repaid,
on December 31, 2002.

      The Agreement also contains covenants (specified in Section 1 of the
Agreement) with respect to the Management Persons, which are in addition to the
rights of ALH as set forth in the Operating Agreement.  The Management Persons will
be obligated in good faith to use their commercially reasonable efforts to satisfy the
Arbor Debt and obtain the release of (i) certain outstanding indebtedness of American
Landmark Homes of Florida, Inc. ("ALH Florida") incurred in connection with the
operations and sale of ALH Florida's business in Tampa, Florida and (ii) guarantees
entered into by ALH II, Inc. and Bowden Building Corporation ("BBC").  The
Agreement also provides that the Management Persons must obtain prior approval

Avie Arenson                          page 3                    August 16, 2001

from the Supervisory Board of ALH before permitting ALH or any of its Subsidiaries
to incur indebtedness or grant security interests in ALH or any of its Subsidiaries other
than in the ordinary course of business.

2.  Remedies

        In the event that the Management Persons breach any of the terms of the
Agreement or the ancillary documents entered into in connection therewith, ALH may
declare the Promissory Note immediately due and payable.  Cousy, LLC, an Affiliate
of the Management Persons, has agreed to guarantee the Promissory Note and will
pledge 90% of its equity interests in QACC LLC, the owner of an office complex
named Queens Atrium Corporate Center, located in New York, New York.  Cousy,
LLC has also agreed to use 90% of any dividends or distributions received by it from
QACC LLC to prepay the Promissory Note.  If the Management Persons fail to make
payments under the Promissory Note or the $1.9 million amount is otherwise not paid
in full (by Cousy or otherwise), ALH also may file an Affidavit of Confession of
Judgment with the Supreme Court of the State of New York 60 days after seeking
payment under the guarantee and pledge agreements.  The Affidavit of Confession of
Judgment is a court acknowledgement by the Management Persons of their liability to
pay ALH an aggregate of $1.9 million and should facilitate ALH's ability to collect the
full $1.9 million.

        In addition to the remedies set forth above, the Agreement provides for an
indemnity for losses incurred by ALH in connection with any covenant breaches under
the Agreement or any of the ancillary documents entered into in connection therewith.

3.  Governance Matters

        The documents contemplate that Jonathan Zich will resign from the
Supervisory Board of ALH and be replaced by Bruce Stein of Shamrock Holdings of
California, Inc. ("SHOC") and that the Class A Members (acting by Class A Vote) will
appoint George Buchler to each ALH Subsidiary Board.

        In addition, the unanimous written consent establishes an audit committee of
the Supervisory Board, which audit committee will be composed of the two Class A
Representatives and the Class B Representative.

4.  Consulting Agreements

        The Agreement also formally terminates the consulting agreement with Shalom
Lamm, and the unanimous written consent authorizes ALH to enter into a new
consulting agreement (the "Lion Capital Consulting Agreement") with Lion Capital,
the parent entity of the Manager, pursuant to which Lion Capital will provide
consulting services to ALH.

Avie Arenson                            page 4                    August 16, 2001

Lion Capital will be required to devote such of its business time, attention, skill and reasonable best efforts as are reasonably required or reasonably requested of it for the diligent performance of its duties under this consulting agreement. In addition, the Lion Capital Consulting Agreement provides that Lion Capital will cause Shalom Lamm to be actively involved in advising ALH on behalf of Lion Capital and to devote not less than a majority of his business time and his highest attention and skill to provide such advice.

The Lion Capital Consulting Agreement provides for payments to Lion Capital of $36,000 in each of July, August and September of this year, of $30,000 in each of October and November of this year and for payments of $25,000 each month thereafter until its termination on December 31, 2002. However, the Lion Capital Consulting Agreement may be terminated earlier upon the consummation of a sale of the outstanding equity interests or assets of ALH or upon the breach by any Management Person of the Operating Agreement or the Agreement or any of the ancillary documents entered into in connection therewith. The July payment of $36,000 has already been advanced to Lion Capital; however, the August payment will not be made until the Agreement and the ancillary documents have been executed. Should the Agreement and the ancillary documents not be executed, to offset the July advance payment to Lion Capital, $36,000 of the $264,000 held in escrow by Fried, Frank will be withheld upon the return of such funds to Lion Capital.

The unanimous written consent also authorizes ALH to execute an agreement with Shamrock Capital Advisors ("SCA") pursuant to which SCA will provide consulting services on a nonexclusive basis to ALH. This agreement provides a fee of $50,000 to be paid to SCA every six months in advance ($100,000 annually, with the first payment occurring upon execution of this agreement) and expires December 31, 2002.

5. Miscellaneous Matters

In connection with the transactions contemplated under the Agreement, BBC and L&L Arlington, L.P., an Affiliate of the Management Persons, will waive certain claims it may have against BBC and amend the take down schedule under the rolling option agreement that governs the purchase by BBC of certain unfinished lots in Memphis, Tennessee. Attached is a draft copy of the revised takedown schedule.

Because the Manager is a party to the Agreement and the documents to be executed in connection therewith, the unanimous written consent authorizes George Buchler, instead of the Manager, to sign such documents on behalf of ALH.

The Agreement provides that the Management Persons shall bear their own expenses in connection with this matter and that the out of pocket expenses and costs

Avie Arenson                          page 5                          August 16, 2001

of ALH, SHOC, SCA and the Class A Representatives shall be borne by ALH.  In
addition, any enforcement costs related to this transaction shall be borne by the
Management Persons.

      Enclosed with this document are draft copies of the Agreement; the Promissory
Note; the Cousy, LLC guarantee and pledge agreements; the Lion Capital Consulting
Agreement; the SCA Consulting Agreement; two letter agreements; a form of an
Affidavit of Confession of Judgment; an Acknowledgement and Release; a form of
legal opinion from Zukerman, Gore & Brandeis; and the amendment to the rolling
option agreement.

      If you have any questions or comments, please contact me directly at 213-473-
2005 or call George Buchler at 818-973-4222 or Gene Krieger at 818-973-4295.  If you
are in agreement with the resolutions contained in the unanimous written consent and
the transactions being authorized thereunder, please sign and return a copy of the
unanimous written consent to Fried, Frank, by telecopy (213-473-2222) and by air
courier, as soon as possible.

Best regards,


/s/ David K. Robbins

David K. Robbins
Fried, Frank, Harris, Shriver & Jacobson


cc:    George Buchler (without enclosures)
       Eugene Krieger (without enclosures)

## LIST OF ENCLOSURES

1.  Unanimous Written Consent
2.  Draft Agreement and Schedules
3.  Draft Promissory Note
4.  Draft Cousy, LLC Guarantee Agreement
5.  Draft Cousy, LLC Pledge Agreement
6.  Draft Lion Capital Consulting Agreement
7.  Draft SCA Consulting Agreement
8.  Draft Payment in Full Letter Agreement
9.  Draft Governance Letter Agreement
10. Draft Form of Affidavit of Confession of Judgment
11. Draft Acknowledgement and Release
12. Draft Form of Legal Opinion of Zukerman, Gore & Brandeis
13. Draft Amendment to Rolling Option Agreement

73282

**Dragicevich, Vera**

| | |
|---|---|
| **From:** | Bates, Ryan T. [BatesRy@ffhsj.com] |
| **Sent:** | Thursday, August 16, 2001 5:07 PM |
| **To:** | Avie Arenson (E-mail) |
| **Cc:** | Eugene I. Krieger (E-mail); George J. Buchler (E-mail); Robbins, David K. |
| **Subject:** | ALH Holdings LLC - Unanimous Written Consent |
| **Importance:** | High |



FFHSJ Letter.doc



Enclosure List.doc



Unanimous Written Consent.doc



Draft Agreement.doc



Draft Promissory Note.doc



Draft Guarantee Agreement.doc



Draft Pledge Agreement.doc



Draft Lion Capital Consulting ...



Draft SCA Consulting Agreement...



Draft Payment in Full Letter A...



Draft Goverance Letter Agreeme...



Draft Form of Affidavit of Con...



Draft Acknowlegement and Relea...

Draft Form of Legal Opinion.do...



Draft Rolling Option Amendment...

*Mr. Arenson,*

    *In connection with ALH Holdings LLC, attached please find the following documents.*

**1.**    *Letter from Fried, Frank, Harris, Shriver & Jacobson to ALH Holdings LLC Class B Representative, Avie Arenson.*

  **<<FFHSJ Letter.doc>>**

**2.**    **List of Enclosures**

  **<<Enclosure List.doc>>**

**3.**    **Unanimous Written Consent**

  **<<Unanimous Written Consent.doc>>**

1

Fried, Frank, Harris, Shriver & Jacobson
350 South Grand Avenue
Thirty-Second Floor
Los Angeles, CA 90071-3406
Tel: 213.473.2000
Fax: 213.473.2222
www.ffhsj.com

# F A X   C O V E R   S H E E T

| | | |
|---|---|---|
| **Date:** | August 17, 2001 | |
| **From:** | Ryan T. Bates | |
| **Sender's Phone:** | 213.473.2038 | |
| **Sender's Fax:** | 213.473.2222 | |
| **Sender's Email:** | batesry@ffhsj.com | |
| **Number of Pages** (including cover sheet): | *136* | |

**FRIED**
**FRANK**
**HARRIS**
**SHRIVER &**
**JACOBSON**

| Recipient | Company | Fax | Phone |
|---|---|---|---|
| Arie Arenson | | 011-972-4-6230230 | |

**Comments:**    This is also being sent by air courier and has been sent by e-mail.

If you have any problems receiving this transmission, please contact us at 213.473.2035

**Confidentiality Notice:**
The information contained in this facsimile message may be legally privileged and confidential. It is intended only for the use of the addressee named above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this telecopy is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. We will reimburse any costs you incur in notifying us and returning the message to us. Thank you.

A Partnership
Including
Professional
Corporations

# EXHIBIT DD

## Pamela Jarvis

| | |
|---|---|
| **From:** | Isaac M. Neuberger [IMN@NQGRG.com] |
| **Sent:** | Monday, August 09, 2004 7:06 PM |
| **To:** | Pamela Jarvis |
| **Cc:** | Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com |

**Subject:** RE:

Thanks for the notices on the e-mails, my IT guys are trying to figure it out.

Please see responses in context:

---

**From:** Pamela Jarvis [mailto:pjarvis@josephnyc.com]
**Sent:** Monday, August 09, 2004 2:19 PM
**To:** Isaac M. Neuberger
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:** RE:

Dear Isaac:

I will forward to you separately the "returned mail" messages I received Friday evening. Perhaps they will help your tech people identify where the glitch was so that it won't recur.

The attachments to your August 8, 2004 email are by no means "the extent of" Mr. Arenson's communications with ALH regarding MHI. There have been many communications, both orally and in writing, over many months. It is my understanding that Mr. Arenson has been kept up-to-date, but as always, if he desires additional information, he need only ask.

***IMN- YOUR UNDERSTANDING IS IN ERROR. WE HAVE CAREFULLY MONITORED ALL OF THE COMMUNICATIONS FROM SHAMROCK.HE HAS GONE ON RECORD OPPOSING ALL THAT WE ARE COMPLAINING ABOUT....IF THIS IS SHAMROCK'S DEFENSE,IT IS VERY WEAK.SINCE SHAMROCK HAS MADE IT CLEAR TO MR. ARENSON THAT SHAMROCK HAD ITS OWN AGENDA, AND WE WARNED THEM OF THE OUTCOME , WHAT MORE COULD ANYONE HAVE EXPECTED OF HIM?***

Your comment that "none of the other Bs" knew certain information known to Mr. Arenson suggests that there may be a communication gap of some kind between your clients, but if that is so, it is hardly something that can be laid at Shamrock's door.

***IMN- THAT RELATED ONLY TO THE ORIGINAL LAMM/ZICH /HOURIHAN AGREEMENTS.THEY ARE IRRELEVANT TO OUR COMPLAINTS.PLEASE DO NOT TAKE THAT OUT OF CONTEXT.***

Mr. Buchler is available to speak with Mr. Arenson this coming week. (My offer to "coordinate" means nothing more than acting as conduit for scheduling purposes, so that a mutually convenient time can be arranged -- I trust that you see nothing sinister in that.)

***IMN- THE EXCHANGE WE HAVE HAD IS VERY SINISTER. ALH IS BURNING AND BUCHLER IS VACATIONING. UNBELIEVABLE. I TRUST THAT YOU HAVE TOLD THESE ALH "CONTROL" DIRECTORS THAT THEY INDEPENDENT EXPOSURE, ASIDE FROM THEIR ROLES IN SHAMROCK?***

As previously stated, Shamrock and I are also available for a conference call at noon (U.S. east coast time) on August 25, which is a date and time that you suggested. If your clients do not wish to communicate with Shamrock, that is their choice, but in that event I think it ill-becomes them to complain that Shamrock has been incommunicative.

***IMN- IMAGINE THAT. WE WRITE A LETTER ON JULY 14, OFFER TO MEET AND ALL SHAMROCK CAN MUSTER IS A CALL ON AUGUST 25, AT A TIME WHEN MHI IS SO VERY CRITICAL. SOME OBJECTIVE FINDER OF THE FACTS WILL DETERMINE WHETHER OR NOT SHAMROCK HAS BEEN "INCOMMUNICATIVE"***

As I have repeatedly explained to you, I do not think the currently planned conference call is a constructive time to discuss what you refer to as "Shamrock's overall culpability."

***IMN- WHY NOT? MY CLIENTS HAVE INVESTED THEIR OWN MONEY, NOT "OPM", WHY ARE GOLD, KRIEGER HIDING? WE KNOW THAT BUCHLER IS VACATIONING, ARE THE OTHERS VACATIONING AS WELL?***

However, if you would like to have a lawyer-to-lawyer discussion of this subject, please contact me to set a time for a call this week.

***IMN- I WOULD BE HAPPY TO DO SO, IF YOU HAD SOME AUTHORITY TO DEAL WITH THE $7.5 MM+/- THAT MY CLIENTS HAVE INVESTED. DO YOU?***

As near as I can tell, the crux of your clients' "grievances" (to use your word) is that certain decisions with respect to ALH were made without their "consent." Under ALH's Operating Agreement, the Class B Members have never had more than one of the five representatives on ALH's board, and board action by ALH has never required a unanimous vote. Your clients knowingly chose to invest in ALH on these terms , i.e., on terms that expressly gave ALH the right to act without the Class Bs' "consent."

***IMN- YOU CONVENIENTLY SEEK TO IGNORE THAT SHAMROCK'S REASON FOR THESE DECISIONS HAVE NOTHING TO DO WITH THE AFFAIRS OF ALH, BUT THAT SHAMROCK WAS SPENDING TOO MUCH MANAGEMENT TIME......IS THAT WHAT YOU FEEL THAT THE B's BOUGHT INTO?***
***DID THE B's EVER EXPECT SHAMROCK TO TAKE OPERATING CONTROL?***
***DID THE B's EVER EXPECT SHAMROCK TO SELL OFF PROFITABLE DIVISIONS AND DESTROY THE ENTIRE BUSINESS PLAN THAT THEY HAD BOUGHT INTO?***
***JUST REMEMBER, THAT IN THE PERIOD IN QUESTION, HOMEBUILDING WAS A REAL WINNER, NOT AT ALH.***

Much of what you complain of was in fact consented to by Mr. Arenson as Class B representative, but even if that were not  so, I am unable to see that your clients have any

basis whatsoever for a legal claim based on absence of their "consent."

*IMN- IF YOU REALLY BELIEVE THIS THEORY, THEN WHAT ON EARTH COULD WE POSSIBLY TALK ABOUT.?*
*A JUDGE WILL HAVE TO AGREE WITH YOU,BEFORE WE GO AWAY.*

*I THINK THAT TO THE CONTRARY, THIS IS A VERY STRONG CASE AND SO LONG AS YOU SEEK TO MINIMIZE IT, NO QUIET PROGRESS WILL BE MADE.*

Moreover, it is undisputed that ALH originally sought a buyer for the entire company, but after many months of effort by the company's investment bankers, Jolson Merchant Partners (whose selection was approved by Mr. Arenson), no such buyer was found.

*IMN- HERE AGAIN YOU ARE WRONG. MDC, ONE OF THE NATIONS LARGEST BUILDERS, WALKED AWAY, AS THEY COULD NOT DEAL WITH SHAMROCK. I THINK, WE WILL FIND THAT LENNAR HAD A SIMILAR VIEW.*

You have contended that the sale process should have been handled differently, but as you know, this is a most matter of business judgment that likewise cannot form the basis of a legal claim against Shamrock.

*IMN- FOR ALL OF THE REASON THAT I HAVE GIVEN YOU, THIS IS NOT A BUSINESS JUDGMENT CASE.*

For these and other reasons, I believe that your "grievances" are wholly without merit.

*IMN- THEN WHY SHOULD WE CONFER?*

In any context, I think it would be a waste of both parties' time and resources to discuss -- let alone litigate -- these issues, but I am willing discuss them with you (and your litigator, Mr. Wood) if you wish.

*IMN- TOWARDS WHAT END?*

Perhaps we might also discuss whether the "course[s] of action" your clients are considering could expose them to liability for breach of fiduciary duty, e.g., if they disrupt a transaction beneficial to ALH and its various constituencies.

*IMN- IS THAT A THREAT? ANOTHER PREDICATE ACT?*

The fact that Shamrock does not want to waste its own or your clients' time and resources on these meritless "grievances" in no way supports your accusations that "ALH has been left adrift," or that "vacation schedules . . . take precedence over the affairs of ALH."

*IMN- SIMPLY STATED...BALONEY. SHAMROCK, ONLY WANTED TO RECOVER ITS LOANS, IT HAD WRITTEN OFF THE EQUITY AND INTENDED TO DRAG ALONG THE Bs.*

*YOU SEEM TO HAVE CAUGHT UP VERY WELL IN THIS REVISIONIST APPROACH TO WHAT HAPPENED...HOW IN THE WORLD CAN THEY EXPLAIN MEMPHIS?*

Nothing of the kind has occurred or is occurring. ALH's current and future needs are being attended to on an ongoing basis (with no help from your clients, as near as I can tell).

*IMN- GREAT---WE ARE INSOLVENT AND HAVE BEEN...IS THAT THE ATTENTION THAT THE Bs BOUGHT INTO?*

Your repeated attempts to conflate the present business situation with your desire to find fault with past events are pointless and will not succeed.

*IMN- THIS IS ABOUT THE 5TH TIME IN THIS E-MAIL THAT YOU HAVE DISMISSED OUR POSITION? WHAT COULD WE POSSIBLY TALK ABOUT? IF THIS CASE IS BROUGHT IN DELAWARE,NORTH CAROLINA OR ELSEWHERE OTHER THAN NYC, WILL YOU PARTICIPATE?*

You seem to be suggesting that what I "refer to [as] confessions of judgment" are in fact something else. As you will see from the July 2001 settlement documents, they include what are, on their face, confessions of judgment . Mr. Arenson was both fully informed of and consented to the terms of the settlement, which are set forth in great detail in the documents he approved.

*IMN- HE APPROVED NOTHING. THIS ENTIRE MESS WILL BE A MAJOR ISSUE DEALING WITH FRIED FRANK*

Do you believe that ALH does not have a responsibility to  seek to  collect the amounts owed, and if so, what is the basis of this belief?

*IMN- LAMM AND ZICH ARE WELL REPRESENTED. THEY WILL DEAL WITH THIS ON THEIR OWN. THE ONLY RELATIONSHIP WE HAVE IS THAT THEIR INTERESTS IN ALH HAVE BEEN SIMILARLY DESTROYED.*

Finally, I believe you are mistaken in your assertion that Mr. Zich obtained the most recent extension from Swiss Re; as far as I know, that extension was obtained by Mr. Buchler, Mr. Krieger and Mr. Lanius.

*IMN- WRONG, AGAIN*

Sincerely,

Pamela Jarvis

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Sunday, August 08, 2004 11:43 AM
**To:** Pamela Jarvis
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:**

I am unable to explain the difficulties you experienced on Friday evening.

Your fax/e-mail seeks to limit the agenda of the proposed phone call. You have suggested that Mr. Arenson is fully conversant with MHI and ALH. The attached e-mails are the extent of his communication.

Shamrock's unwillingness to address the the Bs' grievances or due to various vacation schedules to defer even a phone call is much akin to a game of russian roulette and I daresay that the gun being used has live ammunition.

ALH has been left adrift, with a part time consultant-CFO who tries his best to deal with the Banks, who I expect will prove to be  a key and material witness in proving the Bs' allegations. While it is very generous of Mr. Buchler to "make time" for a call and that it be without lawyers, other than you will "coordinate" is just another "nail", when in my view, through prompt and current discussions, a great deal of aggravation could be avoided.

In light of the Lanius reports, there is great urgency to the issues and I assure that the Bs, if they even agree to proceed with a call, when Shamrock deigns one should occur, will not be able to separate the MHI issues from Shamrock's overall culpability.If your statement that Shamrock does "not intend to spend time" on what you refer to as "historical gripes", then personally I see no purpose in waiting for a call and just doing what must be done.Over the next three weeks, while Shamrock vacations, the Bs will decide their course of action and there may or may not be a conference call.

The Lamm and Zich issues are very much tied to ALH; the factual background that led to what you refer to "confessions of judgment" are of further concern to the Bs; while Mr. Arenson knew whatever it was that Shamrock told him happened, at that time, none of the other Bs, knew about it and to the contrary, it was Zich that initiated the relationship with Swiss Re and it was Zich that obtained the last extension. So long as the vacation schedules loom so large and take precedence over the affairs of ALH, the worst the situation is.

**********************************
CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************


**********************************
CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

# EXHIBIT EE

**Minutes of a Meeting of the**
**Supervisory Board of ALH Holdings LLC**
**Held on June 26, 2003**

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH
Holdings LLC, a Delaware limited liability company (the "Company"), was held on June
26, 2003, pursuant to Section 6.2 of the Operating Agreement of the Company. In
attendance were the following members of the Board:

Avie Arenson                        Shalom E. Lamm
George Buchler                      Bruce Stein
Eugene Krieger

John Laguardia, President and Chief Executive Officer of the Company, William Lanius,
Treasurer and Chief Financial Officer of the Company, and David K. Robbins and Lino
Lauro of Fried, Frank, Harris, Shriver & Jacobson, counsel to the Company, also attended
the meeting at the invitation of the Board. The meeting was called to order at 9:00 AM
PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to address two issues:

>    (1)    Board approval of the proposed settlement of the lawsuit brought by
>           Helen E. Bowden, Donald L. Bowden, Sr., Donald L. Bowden, Jr., and
>           Jere W. Bowden, as Plaintiffs (the "Bowden Plaintiffs"), against ALH II,
>           Inc., a Delaware corporation and wholly-owned subsidiary of the
>           Company ("ALH II"), ALH Tennessee Acquisition, Inc., a Delaware
>           corporation and an indirect, wholly-owned subsidiary of the Company
>           ("Tennessee Acquisition"), Bowden Building Corporation, a Tennessee
>           corporation and an indirect, wholly-owned subsidiary of the Company
>           ("BBC" and together with ALH II and Tennessee Acquisition, the "BBC
>           Entities"), Shalom Lamm, an individual, and Jon Zich, an individual, as
>           Defendants, in that certain matter No. Ct. 003524-01 filed in the Circuit
>           Court of Tennessee for the Thirtieth Judicial District at Memphis (the
>           "Bowden Family Litigation"); and

>    (2)    Board approval of the proposed sale of substantially all of the assets of
>           Atlantic Builders, Inc., a Florida corporation and an indirect, wholly-
>           owned subsidiary of the Company ("ABI"), to an affiliate of Mattamy
>           Homes, Ltd., an Ontario corporation ("Mattamy").

**THE BOWDEN FAMILY LITIGATION**

Stephen Alexander of Fried, Frank, Harris, Shriver & Jacobson joined the meeting at the
invitation of the Board. Mr. Alexander explained the terms of the proposed settlement of
the Bowden Family Litigation, as described in the letter from Allen S. Blair to Stephen
Alexander and John S. Golwen, dated June 25, 2003, and previously provided to the Board

1

84981

(the "Settlement"). Under the terms of the Settlement, the BBC Entities would be required to pay the Bowden Plaintiffs $5 million (the "Settlement Cost") and reimburse them for $210,000 for their attorneys' fees. The Settlement Cost would be payable as follows: $1 million would be due immediately upon the execution of the settlement agreement; and an additional $4 million (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would be payable upon the earlier to occur of August 31, 2003 or the consummation of the sale of ABI. In addition, the Settlement provides the BBC Entities the option to extend the final payment date for an additional 90 days for a fee of $250,000.

Mr. Alexander indicated that the sum of the Settlement Cost and the $210,000 for the attorneys' fees of the Bowden Plaintiffs is approximately $500,000 to $750,000 more than the aggregate amount that the BBC Entities would be obligated to pay under the terms of the promissory note owing to the Bowden Plaintiffs and under the earn-out provision contained in the Stock Purchase Agreement, dated as of January 20, 1999, as amended, with the Bowden Plaintiffs. He stated that, while the outcome of the Bowden Family Litigation cannot be predicted, the BBC Entities could easily be required to pay an amount in excess of the Settlement Cost if there were a judgment in favor of the Bowden Plaintiffs. Given that the court could (and likely would) rule against the BBC Entities in the pending action for partial summary judgment on the promissory note, Mr. Alexander stated that, in his view, if this settlement was rejected, the likelihood of a settlement later on terms as favorable as those of the Settlement was remote. Mr. Alexander stated that, given the potential alternatives, the proposed terms of the Settlement, including the Settlement Cost, were favorable to the Company and the BBC Entities.

Mr. Laguardia informed the Board that ALH II had already accrued a $5 million liability for the Bowden Family Litigation on its balance sheet, and payment of the Settlement Cost (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would result in only a $210,000 impact on ALH II's financial statements.

Mr. Lanius stated that ALH II could pay the first installment (of $1 million) of the Settlement Cost with funds currently held by its subsidiaries. Mr. Lanius commented that reaching a settlement was difficult and that he thought that the terms of the Settlement were favorable to the Company and the BBC Entities. Messrs. Arenson and Lamm commented that they also thought that the proposed terms of the Settlement were favorable to the Company and the BBC Entities.

Mr. Arenson asked the Board how the second installment (of $4,000,000) of the Settlement Cost (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would be addressed if the proposed sale of ABI were not consummated. Mr. Buchler stated that, under such circumstances, the BBC Entities would need to exercise their option to extend the final payment date and seek other purchasers for ABI.

A full discussion ensued, after which Mr. Buchler asked if there were any other questions for Mr. Alexander pertaining to the Bowden Family Litigation or the Settlement. There were none, and Mr. Alexander left the call at this time.

84981

2

Upon motion duly made and seconded and unanimously approved, the Board adopted the following resolutions:

APPROVAL OF SETTLEMENT

WHEREAS, the Supervisory Board of the Company believes it is in the best interests of the BBC Entities to enter into the Settlement with the Bowden Plaintiffs substantially on the terms previously reviewed by the Board and attached hereto as Exhibit A; and

WHEREAS, the Supervisory Board of the Company has been advised by management and counsel as to the claims, risks and costs of the Bowden Family Litigation and the proposed terms of the Settlement and has determined it to be in the best interests of the Company for the Company and the BBC Entities to enter into a settlement agreement and settle the Bowden Family Litigation, on the terms and subject to the conditions set forth in the Settlement.

NOW, THEREFORE, BE IT RESOLVED, that the Settlement, substantially on the terms reviewed by the Supervisory Board of the Company and attached hereto as Exhibit A, be, and it hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of, and counsel to, the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the settlement agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the BBC Entities in connection with the Settlement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the BBC Entities that are its direct and indirect subsidiaries to, enter into the Settlement on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84981

## SALES EFFORTS

Tony Avila with Jolson Merchant Partners ("JMP") was invited to join the meeting. Mr. Avila gave an overview of JMP's efforts to find purchasers for the sale of the Company's various subsidiaries and/or assets.

### Status of Potential Bowden Building Sale

At the request of Mr. Arenson, Mr. Avila described the status of efforts to find purchasers for BBC. Mr. Avila stated that Walter Industries, which expressed interest in purchasing BBC's assets last year, might have renewed interest in pursuing the transaction after the settlement of the Bowden Family Litigation. In his view, it is an excellent time to sell BBC because of its strong performance in the first half of 2003.

Mr. Laguardia pointed out that BBC would achieve approximately $2.2 million in EBITDA for the first half of 2003 and appears able to maintain comparable EBITDA throughout the second half of 2003. Mr. Avila said that the Company might obtain a purchase price representing a multiple of five times its EBITDA for 2003 from a potential buyer and that, with EBITDA of $4.4 million, the purchase price for BBC could exceed $20 million.

### Status of Potential Mulvaney Homes Sale

Mr. Avila stated that, in his view, it was not yet the best time to sell Mulvaney Homes, Inc., a North Carolina corporation and an indirect, wholly-owned subsidiary of the Company ("Mulvaney"). He recommended that the Company continue its efforts to expand Mulvaney's business before pursuing sales opportunities. In his view, Mulvaney needs increased EBITDA to obtain a target sales price of $65 million. Presently, entry-level competition from other builders, combined with decreased demand for homes in the Charlotte real estate market (and significant, recent lay-offs by the employers of potential homebuyers in the area), may limit EBITDA in the short term. Mr. Avila recommended that the Board reconsider its opportunities with respect to the sale of Mulvaney in the second half of 2003.

## PROPOSED SALE OF ABI

The Board considered the proposed sale of substantially all of the assets of ABI to Mattamy (Jacksonville) Partnership, a Florida general partnership and an affiliate of Mattamy ("Buyer") on the terms described in the draft of the proposed Asset Purchase Agreement (the "Purchase Agreement"), among ABI, ALH Acquisition Corp., a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("Acquisition Corp." and, together with ABI, the "Seller Entities") and Buyer, a draft of which had previously been circulated to the Board.

84981

### Evaluation by JMP

Mr. Buchler asked Mr. Avila to assess the terms of the proposed sale of ABI. Mr. Avila stated that he thought the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. Mr. Avila indicated that in making this determination he had performed a review of comparable sales transactions. He also reviewed the proposed Purchase Agreement and compared it to documents for similar transactions. He stated that the proposed Purchase Agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in such comparable sales agreements.

Mr. Avila pointed out that the bid from Mattamy was the highest bid (by approximately $1.5 million to $2.0 million) that the Company had received for ABI. He explained that the combination of (i) the approximately $17 million purchase price (subject to adjustments described in the Purchase Agreement), (ii) ABI's ability to retain certain receivables with approximately $2.5 million in value and (iii) Buyer's assumption of substantially all of ABI's outstanding debt, results in a deal which yields an aggregate purchase price of approximately $40 million.

Mr. Avila explained that ABI's projected EBITDA for 2003 is approximately $8 million, and that the aggregate purchase price approximates a multiple of five times this projected EBITDA. Mr. Avila stated that the aggregate purchase price is based, therefore, upon an EBITDA multiple that is well above the average for previous sales of homebuilders and is at least as high as any recent transaction with which he is familiar. The aggregate purchase price also compares favorably to sales prices that are derived from a multiple of a company's book value or earnings.

Mr. Avila stated that, based upon his analysis and review, he believed that the proposed transaction for the sale of ABI on the terms described in the proposed Purchase Agreement was fair to the Company from a financial point of view.

Mr. Buchler asked if there were any other questions for Mr. Avila pertaining to the proposed sale of ABI or JMP's pursuit of possible transactions regarding Mulvaney or BBC. There were none, and Mr. Avila left the call at this time.

### Evaluation by the Company's Senior Officers

Mr. Buchler then asked Messrs. Laguardia and Lanius to provide their views regarding the proposed sale of ABI. Mr. Laguardia stated that he thought Mattamy had made its offer for the ABI business at the peak of the Jacksonville, Florida homebuilding market. Mr. Laguardia stated that other homebuilders, such as Lennar and Standard Pacific, were considering entry into the Jacksonville real estate market and that additional competition from large participants would make it more difficult for ABI to maintain its current profit levels. Mr. Laguardia stated that, based on these factors, he believed that the Company would be selling ABI at the peak of the market. In addition, Mr. Laguardia noted that the proceeds of the proposed ABI sale could be used to pay for the settlement of the Bowden Family Litigation, which would enhance the Company's ability to sell BBC.

5

84981

Mr. Lanius concurred with Mr. Laguardia's evaluation of the Jacksonville real estate market. In addition, Mr. Lanius stated that ABI needs substantially better capitalization in order to continue competing in the Jacksonville market. He explained that ABI's upcoming lot purchase obligations under its existing contracts (such as those regarding the Oakleaf Plantation and Bartram Springs developments) will require ABI to purchase large numbers of lots and will place considerable strain on the Company's liquidity resources. He also indicated that, to compete successfully in Jacksonville in the future, ABI must begin purchasing large numbers of lots in single transactions, a requirement that ABI does not have sufficient financial resources to meet. Mr. Lanius concluded that, from a financing and liquidity perspective, it is the most opportune time to sell ABI.

*Counsel's Presentation regarding the Purchase Agreement*

Mr. Buchler requested Mr. Robbins to provide a brief overview of the draft of the Purchase Agreement that had been circulated to the Board. Mr. Robbins stated that he would address some of the more significant provisions contained in the latest draft of the Purchase Agreement circulated by Mattamy's counsel, and he indicated that several issues remained open to further negotiation. Mr. Robbins explained that the draft circulated by Mattamy's counsel provides as follows:

Transaction Structure and Liabilities: The proposed transaction would be structured as an asset sale with ABI retaining certain liabilities, including all liabilities of ABI prior to closing (unless a reserve for such liabilities had been established on ABI's balance sheet as of December 31, 2002). ABI's retained liabilities would include, therefore, all environmental liabilities, whether or not caused by ABI, in existence prior to the closing, as well as claims with respect to pre-closing employment matters. In addition, he indicated that ABI would remain liable for warranties on homes built prior to closing, but that the draft Purchase Agreement provides for a "basket" of approximately $413,000 for these warranty claims, which must be exhausted before Mattamy is entitled to seek indemnification for warranty claims from ABI.

Retained Assets: ABI would retain an account receivable related to the Towers' litigation and pre-paid expenses related to insurance and indebtedness. Mr. Buchler informed the Board that these items are currently valued on ABI's balance sheet at approximately $437,000, $46,000 and $19,000, respectively.

Escrow Amount: At closing, Buyer will place $2,000,000 of the purchase price in escrow. $1,000,000 of this escrow amount, less the amount of any claims made pursuant to the indemnification provisions of the Purchase Agreement, shall be released to ABI on the first anniversary of the closing. The remaining portion of the escrow amount, less the amount of any claims made pursuant to the indemnification provisions of the Purchase Agreement, shall be released to ABI on the second anniversary of the closing.

Representations and Warranties: The representations and warranties that Buyer is requesting from the Seller Entities are highly detailed and the "knowledge" qualifier provided by the Buyer with respect to these representations and warranties requires the Seller Entities to make "due inquiry" into the veracity of many representations. Therefore,

6

84981

the schedules to the Purchase Agreement must be carefully prepared by the Seller Entities, and the Seller Entities must interview employees and carefully review their books and records to ensure the Seller Entities' compliance with these representations and warranties.

Interim Period Covenants: The covenants with respect to the operation of ABI during the period between signing and closing are typical for deals of this size and nature.

Closing Conditions: Buyer's obligation to purchase ABI's assets is subject to the Seller Entities' satisfaction of the following conditions, among others:

- The representations and warranties of the Seller Entities must be true and correct, except where such failure would not, individually or in the aggregate, be reasonably expected to cause a material adverse change in the assets or operations of ABI.
- Messrs. Lanius and Holt must enter into employment agreements with Mattamy.
- Buyer must hire at least 32 out of 39 of ABI's employees.
- ABI's net income for the period beginning January 1, 2003 until the closing must exceed $1.4 million. Mr. Buchler informed the Board that ABI is currently projecting to generate $2.134 million in net income for the first six months of 2003. The Purchase Agreement provides that the purchase price may be increased by ABI's net income over $1.5 million, and, based upon these projections, the purchase price would be increased by $634,000.
- ABI must obtain consents with respect to certain of its lot purchase and option contracts, including consents with respect to ABI's agreements with Bartram Springs ("Bartram"). Because the purchase of ABI is structured as an asset deal, it may be difficult to avoid obtaining a consent from Bartram, but Baker & Hostetler has proposed a structure which would not require Bartram's consent. This proposal is not without risk, and Bartram might challenge the proposed structure. Of course, ABI must first get the Buyer to cooperate with it to pursue such a structure, and ABI is attempting to do so.

Termination: The current draft of the Purchase Agreement allows either party to terminate the proposed transaction on or after July 25, 2003, and limits the damages that may be recovered from the terminating party to $300,000. Mr. Robbins noted that ABI has been trying to establish an earlier termination date but that, in light of ABI's difficulties in obtaining Bartram's consent, this might not be possible.

Indemnification: The indemnification procedures of the Purchase Agreement limit the Seller Entities' liability to $10,000,000 (for claims that do not arise from fraudulent, willful or intentional misrepresentations or claims arising from breaches of representations and warranties that ABI had knowledge of). This indemnification amount is subject to a "basket" of $200,000, and individual claims under $2,500 are not counted towards this indemnity basket. Similarly, Buyer's indemnification obligations are capped at $10,000,000. The indemnification period for many claims expires on the second anniversary of the closing, although claims for breaches of certain representations and warranties may be made until the fifth anniversary of the closing.

7

84981

Guaranty:  Contemporaneously with the signing of the Purchase Agreement, Mattamy will execute a Guaranty with respect to Buyer's obligations to pay the purchase price and repay or assume ABI's existing indebtedness at closing.

Non-Compete:  The Purchase Agreement provides that neither the Company nor any of its direct or indirect subsidiaries will (A) compete with Buyer in the Jacksonville area homebuilding market during the seven-year period following the closing or (B) solicit or hire any of Buyer's employees, contractors, customers or suppliers during the five-year period following the closing.  Baker & Hostetler has advised ABI that the length of the non-compete provision may not be enforceable under Florida law, and ABI is attempting to clarify this issue with the Buyer.

Contractor's License.  Buyer has not yet obtained a contractor's license with the Florida Construction Industry Licensing Board and must apply for one.  ABI has been informed that the application process could take up to six weeks.  Buyer has requested that ABI, for no more than three months following the closing, maintain its existing contractor's license for the benefit of Buyer until Buyer obtains a new license.  ABI has requested that Buyer indemnify ABI with respect to these obligations, reimburse ABI for all of its fees and costs associated with its maintenance of this license and cause ABI to be named as an additional insured on Buyer's insurance policies.

Mr. Buchler noted that Buyer has also agreed to obtain title insurance with respect to the Owned Real Property at its sole cost and expense, resulting in ABI's saving approximately $200,000 in title expenses.  Mr. Buchler then asked if there were any other questions for Mr. Robbins regarding the Purchase Agreement.  There were none.  Mr. Buchler then read resolutions (set forth below) with respect to the Purchase Agreement for consideration by the Board.

A discussion ensued.  Mr. Arenson questioned whether it would be better for the Company to raise additional equity rather than sell the assets of ABI.  Instead, Mr. Arenson suggested that the shareholders might consider investing more capital in ABI.  Mr. Buchler noted that (i) ABI has pressing liquidity needs that it will not be able to meet in the near future, (ii) the Settlement with the Bowden Plaintiffs can be brought to a conclusion upon the consummation of the sale of ABI and (iii) no other proposals for funding or acquiring ABI, including proposals of the Class B Members or Mr. Arenson, have been proposed to the Company's Board for its consideration.  Mr. Laguardia stated that Jacksonville is not an attractive market and that he would not recommend that the Company invest more money in the Jacksonville market because it had reached its peak and, with many new and powerful builders entering into this market, he anticipated that the business opportunities of ABI would deteriorate in the future.

Mr. Lamm then requested that the Board reconsider the proposed sale later in the day.  Mr. Lamm stated that he had insufficient time to review the text of the proposed resolutions.  In response to Mr. Lamm's request, the Board requested that Mr. Robbins discuss in greater detail the substance of the proposed resolutions with the Board.  After such review and consideration of the merits of Mr. Lamm's proposal and the text of the proposed

8

84981

resolutions, the Board ultimately elected to proceed with a vote regarding the proposed sale of the assets of ABI.

After further discussion, upon motion duly made and seconded, the following resolutions were adopted by the Board, with Messrs. Buchler, Krieger and Stein voting in favor, Mr. Arenson voting against and Mr. Lamm abstaining:

## APPROVAL OF ASSET PURCHASE AGREEMENT

WHEREAS, the Company desires to cause the Seller Entities to enter into the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, pursuant to which the Seller Entities will agree to sell substantially all of the assets of ABI and its subsidiaries to Buyer for a purchase price of approximately $17,000,000, subject to adjustment as provided in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company for the Seller Entities to enter into the Purchase Agreement and sell substantially all of the assets of ABI and its subsidiaries, on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Seller Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the Seller Entities to, enter into the Purchase Agreement and to consummate the transactions contemplated thereby on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84981

9

*Use of Proceeds*

Mr. Buchler requested that Messrs. Laguardia and Lanius leave the call.

At the request of Mr. Arenson, Mr. Buchler discussed the application of the net proceeds from the proposed sale of ABI. He stated that the proposed sale would provide the Company with proceeds of approximately $14 million (after taking into consideration the $2 million to be placed in escrow and deducting expenses and other amounts payable in connection with the Purchase Agreement). Upon subtracting the Settlement Cost (as well as $210,000 for the attorneys' fees of the Bowden Plaintiffs) for the Bowden Family Litigation, approximately $8.8 million would remain. Mr. Arenson suggested that the remaining $8.8 million could be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the Loan Agreement, dated April 6, 2000, of ALH II with certain of the Company's members and under the Loan Agreement, dated May 7, 2002, of ALH II with certain of the Company's members. He suggested that any remaining monies could then be used for the working capital needs of the Company or to repay amounts owing under the Note Purchase Agreement, dated January 13, 2000, between the Company and Wachovia Bank, N.A., as amended to date.

## OTHER MATTERS

*JMP Fee*

The Board next discussed a fee to be paid to JMP in connection with the ABI sale. Under the terms of the Engagement Letter, dated as of March 21, 2002, among JMP, the Company and ALH II, JMP was only entitled to a fee upon the sale of the whole Company. Mr. Avila and the Company had later agreed to negotiate a fee with JMP in good faith to be paid upon the sale of ABI within a certain timeframe. Pursuant to the terms of the Engagement Letter, JMP would have been entitled to a minimum fee of .85 basis points upon a sale of the whole Company. Mr. Avila had calculated the pro-rated fee for the ABI sale to be approximately $300,000. Upon motion duly made and seconded, the Board unanimously authorized Messrs. Buchler and Krieger on behalf of the Company to negotiate the fee for the ABI sale with JMP up to a maximum amount of $300,000.

*Exit Bonuses for Messrs. Holt and Lanius*

The Board next discussed the possibility of paying exit bonuses to Messrs. Lanius and Holt upon the consummation of the ABI sale and the termination of their employment. The Board agreed that Messrs. Lanius and Holt should both be treated fairly and generously and that Messrs. Buchler and Krieger could negotiate appropriate exit bonuses for each of them. Upon motion duly made and seconded and approved, the Board unanimously authorized Messrs. Buchler and Krieger to negotiate, approve and authorize appropriate exit bonuses for Messrs. Lanius and Holt.

*Adoption of Prior Meeting's Minutes*

84981

10

Mr. Buchler stated that the next order of business was the approval of minutes of the meeting of the Board held on May 14, 2003. Upon motion duly made and seconded, the Board unanimously approved minutes of the meeting of the Supervisory Board of the Company held on May 14, 2003.

*Corporate Record-Keeping*

Mr. Buchler informed the Board that he had been advised by counsel that the corporate minute books and other records of many of the Company's subsidiaries would need to be updated before signing the Purchase Agreement or entering into the Settlement. He asked Mr. Lauro to provide a brief overview of the types of modifications that needed to be made. Mr. Lauro explained that some ministerial actions, such as adopting name changes, should be reflected in the books and records of the Company's subsidiaries and that, under the terms of the Company's Operating Agreement, the Board must authorize its subsidiaries to undertake many such actions.

Upon motion duly made and seconded and unanimously approved, the following resolutions were adopted by the Board:

RATIFICATION AND ADOPTION OF COMPANY ACTIONS

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company to cause the Company and its direct and indirect, wholly-owned subsidiaries (the "Subsidiaries") to take certain ministerial actions and measures as its counsel may advise ("Company Actions") and to adopt such resolutions as may be necessary or desirable to duly ratify, adopt or document the Company Actions of the Subsidiaries.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt, or document the Company Actions as such officers, upon the advice of counsel to the Company and the Subsidiaries, shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Subsidiaries on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt or document the Company Actions of the Subsidiaries.

*SHOC Fee*

11

84981

The Board next discussed the payment of a fee to Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC"), in connection with its efforts to facilitate the ABI sale. The Representatives who are affiliated with SHOC indicated that it would not be appropriate for them to participate in this decision, and Messrs. Buchler, Krieger and Stein agreed to abstain from any participation in these discussions. Messrs. Arenson and Lamm indicated that some payment to SHOC would be appropriate in consideration of SHOC's special services to the Company in connection with the Purchase Agreement, but Mr. Arenson suggested that he would like to consider this matter further. The Board decided that the payment of a fee to SHOC (if any), and the amount of any such fee, would be left to Messrs. Arenson and Lamm, and the Board agreed to form a Special Compensation Committee consisting of Messrs. Arenson and Lamm to make such determination.

Upon motion duly made and seconded and unanimously approved, the following resolutions were adopted by the Board:

FORMATION OF SPECIAL COMMITTEE

WHEREAS, it has been proposed that the Company create a Special Compensation Committee (the "Special Committee"), comprised of Messrs. Arenson and Lamm, to evaluate the services performed by SHOC and to determine the appropriateness and amount, if any, of the Company's payment of any bonus to SHOC (the "SHOC Bonus") in exchange for its services in facilitating the sale of substantially all of the assets of ABI and negotiating the terms of the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has decided to create the Special Committee to evaluate the services performed by SHOC and to determine the appropriateness and amount, if any, of the Company's payment of the SHOC Bonus.

NOW, THEREFORE, BE IT RESOLVED, that the Supervisory Board of the Company hereby adopts, ratifies and confirms the formation of the Special Committee.

RESOLVED, that the Supervisory Board of the Company hereby confirms that the current membership of the Special Committee, and the Chairmanship thereof, shall be as follows:

Avie Arenson, Chairman
Shalom E. Lamm

RESOLVED that the Supervisory Board of the Company hereby delegates to the Special Committee the power and authority of the Supervisory Board of the Company to evaluate the services performed by SHOC in connection with the sale of substantially all of the assets of ABI pursuant to the Purchase Agreement and to

84981

12

determine the appropriateness and amount, if any, of the Company's payment of the SHOC Bonus.

84981

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

George Buchler
Chairman of the Meeting

84981

PROPOSED RESOLUTIONS FOR A MEETING
OF THE SUPERVISORY BOARD
OF
ALH HOLDINGS LLC
(a Delaware limited liability company)

June 26, 2003

84886

## APPROVAL OF SETTLEMENT

WHEREAS, the Supervisory Board of the Company believes it is the best interest of ALH II, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("ALH II"), ALH Tennessee Acquisition, Inc., an indirect, wholly-owned subsidiary of the Company ("Tennessee Acquisition") and Bowden Building Corporation, a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("BBC" and, collectively, the "ALH Entities"), to enter into a settlement agreement with the Bowdens substantially on the terms set forth in the Letter from Allen S. Blair, dated June 25, 2003, and attached hereto as Exhibit A (the "Settlement"); and

WHEREAS, the Supervisory Board of the Company has been advised by management and counsel as to the claims, risks and costs of the Bowden Litigation and the proposed terms of the Settlement and has determined it to be in the best interests of the Company for the Company and the ALH Entities to enter into a settlement agreement and settle the Bowden Litigation, on the terms and subject to the conditions set forth in the Settlement.

NOW, THEREFORE, BE IT RESOLVED, that the Settlement, substantially on the terms reviewed by the Supervisory Board of the Company and attached hereto as Exhibit A, be, and it hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the settlement agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the ALH Entities in connection with the Settlement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the ALH Entities that are its direct and indirect subsidiaries to, enter into the Settlement on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

APPROVAL OF ASSET PURCHASE AGREEMENT

WHEREAS, the Company desires to cause ALH Acquisition Corp., a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("Acquisition Corp."), and Atlantic Builders, Inc., a Florida corporation and an indirect, wholly-owned subsidiary of the Company ("ABI" and, together with Acquisition Corp., the "Seller Entities"), to enter into an Asset Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company (the "Purchase Agreement"), pursuant to which Seller Entities will agree to sell substantially all of the assets of ABI and its subsidiaries to Mattamy (Jacksonville) Partnership, a Florida general partnership and an affiliate of Mattamy Homes, Ltd., for a purchase price of approximately $17,000,000, subject to adjustment as provided in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company for the Seller Entities to enter into the Purchase Agreement and sell substantially all of the assets of ABI and its subsidiaries, on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Seller Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the Seller Entities to, enter into the Purchase Agreement and to consummate the transactions contemplated thereby on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

## APPROVAL OF MINUTES

WHEREAS, the Supervisory Board of the Company has reviewed the Minutes of the Meeting of the Supervisory Board of the Company held on May 14, 2003, in the form attached hereto as <u>Exhibit B</u>.

NOW, THEREFORE, BE IT RESOLVED, that the Minutes of the Meeting of the Supervisory Board of the Company held on May 14, 2003, in the form attached hereto as <u>Exhibit B,</u> be, and they hereby are, approved, adopted, ratified and confirmed.

## APPOINTMENT OF OFFICERS

WHEREAS, pursuant to the Operating Agreement, the Supervisory Board of the Company desires, and deems it to be in the best interests of the Company, to authorize ALH II and its subsidiaries to take such actions as are necessary or desirable to cause ALH Acquisition Corp., Atlantic Builders, Inc., and Mulvaney Homes, Inc., which are each indirect, wholly-owned subsidiaries of the Company, to appoint certain individuals to positions as officers as set forth below:

## ALH Acquisition Corp.

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of ALH Acquisition Corp, a Delaware corporation, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
| --- | --- |
| John Laguardia | Vice-President and Assistant Secretary |
| Eugene Krieger | Vice-President and Assistant Secretary |
| Bruce Stein | Vice-President and Assistant Secretary |

## Atlantic Builders, Inc.

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of Atlantic Builders, Inc., a Florida corporation, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
| --- | --- |
| John Laguardia | Vice-President and Assistant Secretary |
| Eugene Krieger | Vice-President and Assistant Secretary |
| George Buchler | Vice-President and Assistant Secretary |
| Bruce Stein | Vice-President and Assistant Secretary |

84886

<u>Mulvaney Homes, Inc.</u>

RESOLVED, that the Company hereby accepts the resignation of John Laguardia as President of Mulvaney Homes, Inc., a North Carolina corporation ("Mulvaney").

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of Mulvaney, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
|------|--------|
| Gary Shamp | President |
| John Laguardia | Vice-President |
| Julie Walker | Vice-President |

## RATIFICATION AND ADOPTION OF COMPANY ACTIONS

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company to cause the Company and the Subsidiaries to take certain ministerial actions and measures as its counsel may advise ("Company Actions") and to adopt such resolutions as may be necessary or desirable to duly ratify, adopt or document the Company Actions of the Subsidiaries.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt, or document the Company Actions as such officers, upon the advice of counsel to the Company and the Subsidiaries, shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Subsidiaries on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt or document the Company Actions of the Subsidiaries.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of them hereby is, authorized, directed and empowered on behalf of the Company

84886

and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents, or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such certificates, documents, agreements and instruments, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

# EXHIBIT FF

**Minutes of a Meeting of the
Supervisory Board of ALH Holdings LLC
Held on March 24, 2004**

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH
Holdings LLC, a Delaware limited liability company (the "Company"), was held on March
24, 2004, pursuant to Section 6.2 of the Operating Agreement of the Company. In
attendance were the following members of the Board:

| | |
|---|---|
| Avie Arenson | Shalom E. Lamm |
| George Buchler | Bruce Stein |
| Eugene Krieger | |

David K. Robbins and Laura Long of Fried, Frank, Harris, Shriver & Jacobson, counsel to
the Company, also attended the meeting at the invitation of the Board. The meeting was
called to order at 8:00 AM PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to address Board approval of
the proposed sale of 100% of the issued and outstanding shares of Bowden Building
Corporation, a Tennessee corporation and an indirect, wholly-owned subsidiary of the
Company ("Bowden"), to Levitt Corporation, a Florida corporation traded on the New York
Stock Exchange ("Buyer").

## PROPOSED SALE OF BOWDEN

The Board considered the proposed sale of 100% of the issued and outstanding stock of
Bowden to Buyer on the terms described in the draft of the proposed Stock Purchase
Agreement (the "Purchase Agreement"), among Bowden, ALH II, Inc., a Delaware
corporation and a wholly-owned subsidiary of the Company ("ALH"), ALH Tennessee
Acquisition, Inc., a Delaware corporation and an indirect, wholly-owned subsidiary of the
Company ("ALH Tennessee" and, together with ALH, the "Seller Entities") and Buyer, the
latest draft of which had been circulated to the Board on March 23, 2004.

*Overview of Economic Terms*

Mr. Buchler gave a summary of the economic terms of the sale, stating that the purchase
price was approximately $7.25 million, plus (i) $100,000 per month from September 30,
2003 through Closing, pro rated if the Closing occurs other than at the end of the month,
and (ii) the amount reserved for income taxes on Bowden's income (less $100,000 per
month, prorated for the month in which the Closing occurs) from September 30, 2003
through the Closing. In addition, Buyer will assume or pay off all of Bowden's existing
indebtedness for borrowed money.

Mr. Buchler explained that the Seller Entities will be obligated to pay, from the purchase
price, (i) $1.0 million to John Laguardia in connection with his employment contract, (ii)
$200,000 to Jeffrey Sweeney (who will receive an additional $100,000 directly from
Buyer), (iii) legal fees to Fried Frank and Tennessee co-counsel, (iv) a $135,000 success fee

1

88037

payable to the Company's investment advisor, JMP Securities, LLC ("JMP"), (v) the amount of any success fee to be paid to Class A Member Shamrock Holdings of California, Inc. in connection with its efforts regarding the Bowden Sale, to the extent approved by a special committee of non-interested directors to be established, and (vi) $4.0 million to the Company's lender, Wachovia Bank.

In addition, $650,000 of the purchase price will be placed in escrow at Closing in connection with the Seller Entities' general indemnity obligations under the Purchase Agreement and an additional $350,000 of the purchase price will be placed in escrow at Closing in connection with the Seller Entities' indemnification obligations with respect to litigation pending against Bowden at Closing (the "Pending Litigations"). To the extent that there remains any unresolved Pending Litigation after December 31, 2005, the Seller Entities are required to place an additional $1.15 million in escrow before making any payment to their affiliates.

Further, under the terms of the Purchase Agreement, the Seller Entities are required to pay an aggregate of $50,000 to Buyer in connection with the part-time use of Mr. Laguardia's services during the six-month transition period after Closing.

Mr. Buchler explained that the estimated Closing date was April 15th and that Buyer has required that the Seller Entities sign an exclusivity letter with Buyer that terminates on April 15th.

In response to a question from Mr. Arenson, Mr. Buchler confirmed that the two major changes in the draft of the Purchase Agreement circulated to the Board on March 23, 2004 from the previous most recent draft circulated to the Board were (i) an increase in the escrow by $350,000 and (ii) the requirement that the Seller Entities place $1.15 million in escrow after December 31, 2005 under certain circumstances.

*Counsel's Presentation regarding the Purchase Agreement*

Mr. Buchler requested Mr. Robbins to provide a brief overview of the draft of the Purchase Agreement that had been circulated to the Board. Mr. Robbins stated that he would address some of the more significant provisions contained in the latest draft of the Purchase Agreement as follows:

    <u>Transaction Structure and Purchase Price</u>: The proposed transaction would be structured as a stock sale. The Purchase Price is $7.25 million, adjusted as previously described by Mr. Buchler. In addition, the Purchase Price may be decreased or increased due to adjustments for fees paid by Bowden on behalf of the Seller Entities and fees paid by the Seller Entities on behalf of Bowden, in each case between the date of the December 31, 2003 balance sheet and Closing.

    <u>Escrow Amount</u>: At Closing, Buyer will place $1,000,000 of the purchase price in escrow as follows: (i) $650,000 of this escrow amount will be available for claims arising from the Seller Entities' general indemnification obligations under the Purchase Agreement and will be released, less the amount of any claims made pursuant to the indemnification

2

88037

provisions of the Purchase Agreement, to the Seller Entities on the eighteen month anniversary of the Closing and (ii) $350,000 of this escrow amount will be available solely for claims arising from the Seller Entities' indemnification obligations with respect to Pending Litigations. The Seller Entities must pay for counsel fees, settlements and judgments with respect to the Pending Litigations out of their own funds. When the final Pending Litigation is resolved, the remaining portion of the $350,000, if any, shall be released to the Seller Entities.

In addition, to the extent that there remains any unresolved Pending Litigation after December 31, 2005, the Seller Entities must place an additional $1.15 million in escrow before making any kind of payment to their affiliates. This $1.15 million will be available solely for claims arising from the Pending Litigations. After the $1.15 million has been placed into escrow, the Seller Entities may draw from the escrowed amount to pay for counsel fees, settlements and judgments with respect to the Pending Litigations.

Pending Litigation: There are two breach of contract cases pending against Bowden -- Etheridge and Quality Life. Tennessee litigation counsel is handling both cases and has informed the Seller Entities that they believe that Bowden has a good defense in both cases. However, Mr. Robbins cautioned the Board that litigation can be unpredictable, particularly in the case of Etheridge and Quality of Life, where much depends on the results of deposition testimony which has not yet been taken. In addition to the Etheridge and Quality Life cases, there are a handful of construction defect cases that are in the process of being settled or which have been settled in principle but where the settlement agreement has not yet been executed, and in each case Tennessee counsel has informed the Seller Entities that they believe such cases are covered by insurance and will be settled without material liability to Bowden. Mr. Robbins asked the Board to contact him or Stephen Alexander, a litigation partner at Fried Frank, if the Board has any additional questions with respect to the Pending Litigation.

Representations and Warranties: The representations and warranties that Buyer is requesting from the Seller Entities are highly detailed. In some instances, the representations and warranties are qualified by the "knowledge, after due inquiry" of John Laguardia and Jeffery Sweeney. As a condition to signing the Purchase Agreement, the Seller Entities have asked Messrs. Laguardia and Sweeney to sign letters certifying that the representations and warranties are true and correct. Messrs. Laguardia and Sweeney are currently reviewing the Purchase Agreement and related schedules in anticipation of delivering these certifications. Because of the amount of detail in the representations and warranties, Mr. Robbins advised that the schedules to the Purchase Agreement must be carefully prepared by the Seller Entities, and the Seller Entities must interview employees and carefully review their books and records to ensure the Seller Entities' compliance with these representations and warranties.

Timing: The Purchase Agreement provides for a simultaneous signing and Closing.

Indemnification: The indemnification procedures of the Purchase Agreement limit the Seller Entities' liability for breaches of representations and warranties to $3,625,000 (except for claims that arise from fraudulent or intentional misrepresentations). This

3

88037

indemnification amount is subject to a "basket" of $50,000. Liability for other indemnified matters (such as Pending Litigation) is not subject to a cap or basket. The indemnification period for claims for breaches of most representations and warranties expires on the eighteen month anniversary of the Closing.

Non-Compete: The Purchase Agreement provides that neither the Company nor any of its direct or indirect subsidiaries will (A) compete with Buyer in the Memphis area homebuilding market during the two-year period following the Closing or (B) solicit or hire any employees of Bowden or Buyer during the two-year period following the Closing.

Employment Agreements: Buyer is currently in negotiation with Messrs. Laguardia and Sweeney to enter into employment agreements. Buyer has indicated that execution of satisfactory employment agreements is a condition to Buyer's signing the Purchase Agreement.

Mr. Buchler asked if there were any additional questions for Mr. Robbins, and there were none.

*Evaluation by JMP*

Tony Avila with JMP was invited to join the meeting. Mr. Avila gave an overview of JMP's efforts to find purchasers for Bowden over the last two years, stating that JMP had contacted approximately 20 prospective buyers, constituting every entity JMP identified as a potentially active participant or potential participant in the Memphis homebuilding market. Mr. Avila noted that Buyer was the only entity that provided a serious bid for Bowden. Mr. Avila also noted that the Memphis area was flat in growth and that the homebuilding market in Memphis was not robust.

In determining the merits of the Bowden sale, Mr. Avila stated he had reviewed comparable transactions in the Memphis area. Mr. Avila was aware of only two sales in the Memphis area in the past two years which were comparable to the Bowden sale and, in both cases, the acquired entity performed poorly post-acquisition. Mr. Avila explained that the proposed purchase price for Bowden approximated a multiple of five times Bowden's 2003 EBITDA, which is well above the average EBITDA multiple for previous sales of homebuilders. The purchase price also compared favorably to comparable sales prices that are derived from a multiple of a company's book value.

Mr. Avila stated that the proposed Purchase Agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in comparable sales agreements.

Finally, Mr. Avila stated that he thought the proposed Purchase Agreement represented the best potential transaction for the sale of Bowden and a superior opportunity for the Company to realize value on its investment.

Mr. Buchler asked if there were any other questions for Mr. Avila pertaining to the proposed sale of Bowden. There were none, and Mr. Avila left the call at this time.

4

88037

*Board Discussion of Bowden Sale*

A discussion ensued regarding the merits of the Bowden sale. Mr. Buchler pointed out that Mr. Sweeney's employment contract is set to expire shortly, and Mr. Sweeney has indicated that he will not renew his contract without a sale to Buyer. Mr. Buchler stated that he believes Mr. Sweeney is integral to the operations of Bowden and is an important part of Bowden's relationships with its lenders. Mr. Buchler also noted there is currently no successor to take over Mr. Sweeney's position should Mr. Sweeney leave Bowden and that he believes it will be difficult to identify and hire an adequate successor in a timely manner. Mr. Buchler also noted that the current absence of additional equity capital greatly impaired Bowden's ability to significantly expand its business.

Mr. Arenson stated that he opposed the Bowden sale for the same reasons he opposed the previous sale of the assets of the Company's indirect, wholly-owned subsidiary, Atlantic Builders, Inc. Mr. Arenson expressed a concern that the sale was not in the best interest of all stockholders and that better value might be obtained by continuing to operate Bowden. Mr. Arenson also expressed a concern that there might be a possible conflict of interest on the part of the Company's counsel, Fried Frank, because it also represents one of the Class A Members. Mr. Lamm noted that he, too, opposed the sale for reasons similar to Mr. Arenson's. Mr. Buchler stated that he believed the Bowden sale to Buyer was the best option available under current circumstances. Mr. Robbins explained that Fried Frank was representing the Company and the Supervisory Board in this matter and not the Company's members separately. Mr. Robbins noted that the Company has waived any potential conflicts with Fried Frank representing the Company and that the conflict waiver had been approved by the Board prior to Fried Frank's representation of the Company. Mr. Robbins invited the members of the Board to call him or Tennessee co-counsel directly with any concerns or questions.

*SHOC Fee*

The Board next discussed the payment of a fee to Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC"), in connection with its efforts to facilitate the Bowden sale. The Board representatives who are affiliated with SHOC indicated that it would not be appropriate for them to participate in this decision, and Messrs. Buchler, Krieger and Stein agreed to abstain from any participation in these discussions. The Board decided that any payment of a fee to SHOC, and the amount of any such fee, would be left to Messrs. Arenson and Lamm, and the Board agreed to form a Special Compensation Committee consisting of Messrs. Arenson and Lamm to make such determination. Messrs. Arenson and Lamm expressed concern, given their opposition to the Bowden sale itself, about paying SHOC a fee in connection with the sale and agreed to discuss the matter separately as part of a Special Compensation Committee meeting.

After further discussion, upon motion duly made and seconded, the following resolutions were adopted by the Board, with Messrs. Buchler, Krieger and Stein voting in favor and Messrs. Arenson and Lamm voting against:

88037

5

## APPROVAL OF STOCK PURCHASE AGREEMENT

WHEREAS, the Supervisory Board of ALH Holdings LLC, a Delaware limited liability company (the "Company"), has determined it to be in the best interests of ALH II, Inc., a Delaware corporation and wholly owned subsidiary of the Company ("ALH II"), ALH Tennessee Acquisition, Inc., a Delaware corporation and an indirect, wholly owned subsidiary of the Company ("Tennessee Acquisition"), and Bowden Building Corporation, a Delaware corporation and a wholly owned subsidiary of Tennessee Acquisition ("Bowden" and, collectively, with ALH II and Tennessee Acquisition, the "ALH Entities"), to enter into a Stock Purchase Agreement (the "Purchase Agreement") among the ALH Entities and Levitt Corporation, a Florida corporation ("Levitt"), substantially in the form previously circulated to and reviewed by the Supervisory Board of the Company; and

WHEREAS, pursuant to the Purchase Agreement, Tennessee Acquisition agrees to sell to Levitt, and Levitt agrees to purchase from Tennessee Acquisition, 100% of the issued and outstanding capital stock of Bowden, for a purchase price of approximately $7,250,000 (plus the Interim Tax Amount and plus the Intercompany Differential, as each term is defined in the Purchase Agreement), on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, pursuant to the Purchase Agreement, ALH II agrees to, among other things, indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company and the ALH Entities for the ALH Entities to enter into the Purchase Agreement and for (i) Tennessee Acquisition to sell to Levitt 100% of the issued and outstanding capital stock of Bowden; and (ii) ALH II to agree to indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, each on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously circulated to and reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, including the (i) sale by Tennessee Acquisition to Levitt of 100% of the issued and outstanding capital stock of Bowden; and (ii) the agreement by ALH II to indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, each on the terms and subject to the conditions set

6

88037

forth in the Purchase Agreement, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company and the ALH Entities be and each of them hereby is authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications, certificates, documents, agreements, escrow agreements or instruments required or desired to be delivered by the ALH Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements, escrow agreements or instruments to be conclusive evidence of such due authorization by the Company.

## APPROVAL OF JMP FEE

WHEREAS, the Supervisory Board of the Company recognizes the extraordinary and valuable services JMP Securities, LLC ("JMP") has provided to the Company and the ALH Entities in connection with the sale of Bowden; and

WHEREAS, the Supervisory Board of the Company has determined that fee in the amount of approximately $135,000 should be paid to JMP (the "JMP Fee") for the extraordinary and valuable services rendered in connection with the sale of Bowden pursuant to the Purchase Agreement;

NOW, THEREFORE, BE IT RESOLVED, that the payment of the JMP Fee by the Company to JMP be, and it hereby is, approved, authorized, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered, for and on behalf of the Company, to take such actions as such officers may deem advisable, necessary or desirable to deliver the JMP Fee to JMP and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Company in connection with the payment by the Company of the JMP Fee, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization by the Company.

## FORMATION OF SPECIAL COMMITTEE

7

88037

WHEREAS, it has been proposed that the Company create a Special Compensation Committee (the "Special Committee"), comprised of the disinterested Representatives of the Class B Members of the Company serving on the Supervisory Board of the Company, to evaluate the services performed by Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC") in facilitating the sale of Bowden, and to determine the appropriateness and amount, if any, of the Company's payment of any bonus to SHOC in exchange such services in facilitating such sale.

NOW, THEREFORE, BE IT RESOLVED, that the Supervisory Board of the Company hereby adopts, ratifies and confirms the formation of the Special Committee.

RESOLVED, that the Supervisory Board of the Company hereby confirms that the current membership of the Special Committee, and the Chairmanship thereof, shall be as follows:

Avie Arenson, Chairman
Shalom E. Lamm

RESOLVED, that the Supervisory Board of the Company hereby delegates to the Special Committee the power and authority of the Supervisory Board of the Company to evaluate the services performed by SHOC in connection with the sale of 100% of the issued and outstanding shares of Bowden pursuant to the Purchase Agreement and to determine and the appropriateness and amount, if any, of the Company's payment of a bonus to SHOC in connection therewith and to authorize the payment of any such bonus to SHOC.

## OMNIBUS RESOLUTIONS

WHEREAS, in order to effectuate the transactions as contemplated by the Purchase Agreement, the Supervisory Board of the Company has determined it to be in the best interests of the Company, to authorize the officers of the Company's direct or indirect subsidiaries (the "Subsidiaries") to execute and deliver certain ancillary documents in connection with the Purchase Agreement, such ancillary documents including a (i) noncompetition agreement; and (ii) release (collectively, the "Ancillary Documents").

NOW THEREFORE, BE IT RESOLVED, that the officers of the following Subsidiaries of the Company be and they hereby are authorized and empowered, for and on behalf of each respective Subsidiary listed below, to negotiate the final form, terms and provisions of, and, to execute and deliver, the Ancillary Documents with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications,

8

88037

certificates, documents, agreements or instruments required or desired to be delivered by such Subsidiaries in connection with the Ancillary Documents, on such terms as such officers of each respective Subsidiary may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements or instruments to be conclusive evidence of such due authorization by the Company on behalf of each respective Subsidiary:

Mulvaney Homes, Inc.
Mulvaney Homes/ ALH, Inc.
ALH Acquisition Corp.
American Landmark Homes Corporation
American Landmark Homes of Florida, Inc.
American Landmark Homes, Inc.
ALH/ Jacksonville Builders, Inc.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of them hereby is, authorized, directed and empowered on behalf of the Company and in its name, to prepare, execute, deliver and/or file any applications, certificates, documents, agreements, or any other instruments, including the Ancillary Documents and/or releases or any amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such applications, certificates, documents, agreements or any other instruments, including the Ancillary Documents or any amendments or supplements thereto, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that all actions heretofore taken by any officer of the Company in connection with any of the foregoing be, and each of them hereby is, ratified, confirmed and approved.

Upon motion duly made and seconded and unanimously approved, the Board then agreed to hold its next meeting at 8 a.m. (PST) on Tuesday, April 13, 2004 to review the status of the Bowden sale transaction.

9

88037

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

_____
George Buchler
Chairman of the Meeting

88037

# EXHIBIT GG

**From:**      George Buchler [gbuchler@shamrock.com]
**Sent:**      Thursday, December 16, 2004 1:44 AM
**To:**        'Arenson Avie'
**Subject:** RE: ALH meeting

Avie-

I'm sorry you feel this way.  But let's not confuse the facts-

1.   Yes, we filed suit.  What did we ask for?  Millions of dollars as you and your fellow investors demanded that Shamrock pay you?  No - our filing was for declaratory relief. Ask your lawyer what that means if you don't already know.

2.   Whether you agree or not with the Board, you have obligations and duties as a director which cannot be dismissed merely because you disagree with the other directors.  I'm sure Isaac, whom you copied on your correspondence, can tell you about this as well.

3.   Yes - you are right that you have complained a lot.  Actually, it has been more like whining.  You and your "B" colleagues have not done anything constructive on any ALH issue - operations, finances, strategy, etc.  The only thing you have spent time on is trying to have Shamrock, who has lost about as much money as the entire "B" class, reimburse you for your losses.

4.   Above all, I placed faith in your integrity.  When you informed me in writing a few days ago, that you would attend, I took you at your word that you would indeed intend.  Nothing changed in the next few days, until just hours before the meeting, you capriciously decided not to attend a meeting involving decisions concerning millions of dollars.  The meeting lasted about one hour - was this too much for you to spend on ALH business?

As I said in a previous note to you, I can only again express my extreme disappointment in your integrity and conduct as a director of ALH.  Your treatment of your fellow directors and investors who have done nothing more than work incredibly hard in everyone's best interest is appalling.

George

-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Wednesday, December 15, 2004 10:31 PM
**To:** George Buchler
**Cc:** Isaac M. Neuberger
**Subject:** re: ALH meeting

George:

On reflection,I decided that it would not be appropriate for me to convene in a meeting with people, who, in the course of discussions, filed a suit against me and some of my co-investors. We were engaged in an exchange,albeit through lawyers. The situation at and dismemberment of ALH,of which the sale to MHI is just another element in the Shamrock effort, of which we have complained of and is not something that I want to participate in. You have the votes,you have ignored or disregarded my advice and warnings and quite frankly, any further participation would be a waste of my time.

Avie Arenson

----- Original Message -----
**From:** George Buchler

**Sent:** Wednesday, December 15, 2004 9:50 AM
**Subject:** RE: ALH Holdings Board Meeting - Updated Draft Resolutions/Exhibits

Avie -
    I received your note telling me that you're not attending the telephonic Board meeting at almost midnight, the night before the call. The call is only eight hours away. Barring an extraordinary family emergency, I cannot imagine why you won't participate - especially since you had earlier confirmed your attendance. Not participating in a call involving items of the importance indicated in the papers you have received is far less than I would have anticipated from you.

You are certainly entitled to vote as you see best for ALH - but not participating at all is inappropriate behavior for a director. You state in your note that you would vote against "barring some unforeseen discussion" during the meeting. How can you tell if such a discussion will or won't occur if you're not on the call?

    I hope that you change your mind and participate at 8:00 Los Angeles time. Your participation and input is most welcome.

George Buchler

-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Tuesday, December 14, 2004 11:38 PM
**To:** bridget.mccarthy@hklaw.com; gkrieger@shamrock.com; bstein@shamrock.com; slamm@cannondev.com; George Buchler
**Subject:** Re: ALH Holdings Board Meeting - Updated Draft Resolutions/Exhibits

Dear George et al:

Unfortunately I cannot take part in the meeting.

Barring some unforseen discussion during the meeting , I would probably vote against anyway.

sorry.

Avie Arenson

----- Original Message -----
**From:** bridget.mccarthy@hklaw.com
**To:** gkrieger@shamrock.com ; bstein@shamrock.com ; avie@arenson.co.il ; slamm@cannondev.com
**Cc:** gbuchler@shamrock.com
**Sent:** Tuesday, December 14, 2004 6:15 AM
**Subject:** ALH Holdings Board Meeting - Updated Draft Resolutions/Exhibits

Gentlemen,

On behalf of George Buchler, attached for your review are revised and updated proposed resolutions to be adopted at the meeting of ALH Holdings' Supervisory Board this Wednesday. The proposed resolutions are black lined to show changes made since the first draft of the resolutions was circulated with the meeting notice on December 6.

Also attached are the latest versions of Exhibits A and B to the proposed resolutions (i.e., the Settlement and Release Agreement and Stock Purchase Agreement). While these agreements are still in draft form, they are very close to being finalized.

Please call Mr. Buchler at (818) 973-4222 if you should have any questions on the proposed resolutions or exhibits.

**Bridget McCarthy**

Holland & Knight LLP
Direct 213.896.2486
Fax    213.896.2450
Email  bridget.mccarthy@hklaw.com

<<Blacklined Version of Proposed Resolutions.DOC>> <<Black lined Settlement Agreement
(12_13_04).DOC>> <<Draft Stock Purchase Agreement (12_11_04 Version).DOC>>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber,
P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may
constitute a communication protected by the attorney-client privilege. If you are not the intended
recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that
any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have
received this communication in error, please notify us immediately by telephone at (410) 332-8550.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*