# EXHIBIT HH

CONSOLIDATED FINANCIAL STATEMENTS
AND OTHER FINANCIAL INFORMATION

ALH II, Inc. and Subsidiaries

*Years ended December 31, 2003 and 2002*
*with Report of Independent Certified Public Accountants*

0401-0499575

ALH II, Inc. and Subsidiaries

Consolidated Financial Statements
and Other Financial Information

Years ended December 31, 2003 and 2002

## Contents

Report of Independent Certified Public Accountants ...................................................................1

Consolidated Financial Statements

Consolidated Balance Sheets ........................................................................................................3
Consolidated Statements of Operations .......................................................................................4
Consolidated Statements of Stockholder's Deficit ......................................................................5
Consolidated Statements of Cash Flows ......................................................................................6
Notes to Consolidated Financial Statements ...............................................................................7

Other Financial Information

Consolidating Balance Sheet ......................................................................................................25
Consolidating Statement of Operations ......................................................................................27

Report of Independent Certified Public Accountants

To the Shareholder of
ALH II, Inc.

We have audited the accompanying consolidated balance sheets of ALH II, Inc. and Subsidiaries (the Company) as of December 31, 2003 and 2002, and the related consolidated statements of operations, statements of stockholder's (deficit) equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of ALH II, Inc. and Subsidiaries at December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As more fully described in Note 1, the Company has incurred recurring operating losses and requires additional capital to continue operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The Other Financial Information consisting of the consolidating balance sheet and the consolidating statement of operations as of December 31, 2003 and for the year then ended is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has been subjected to the auditing procedures applied in our audits of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated financial statements taken as whole.

*Ernst & Young LLP*

March 26, 2004

0401-0499575

ALH II, Inc. and Subsidiaries

Consolidated Balance Sheets

| | December 31 | |
| | 2003 | 2002 |
|---|---|---|
| | *(Dollars in Thousands)* | |
| **Assets** | | |
| Cash and cash equivalents | $ 5,259 | $ 7,089 |
| Restricted cash and cash equivalents | 3,689 | 2,008 |
| Accounts and notes receivable | 1,529 | 266 |
| Inventory | 48,065 | 43,587 |
| Receivable from note payable assumed by related party | 1,752 | 1,752 |
| Property and equipment, net | 855 | 766 |
| Goodwill, net | 1,592 | 13,648 |
| Other assets | 3,489 | 3,637 |
| Assets held for sale | – | 30,394 |
| Total assets | $ 66,230 | $ 103,147 |
| | | |
| **Liabilities and stockholder's deficit** | | |
| Liabilities: | | |
| Accounts payable and accrued liabilities | $ 5,308 | $ 7,916 |
| Customer deposits | 335 | 434 |
| Accrued home buyers' warranty costs | 768 | 609 |
| Notes payable and lines of credit | 62,632 | 66,165 |
| Notes payable relating to predecessors | 5,240 | 4,622 |
| Notes payable to related parties | – | 5,563 |
| Liabilities related to assets held for sale | – | 18,466 |
| | 74,283 | 103,775 |
| | | |
| Stockholder's deficit: | | |
| Common stock, no par value; authorized 1,500 shares, issued and outstanding 100 shares | – | – |
| Paid-in capital | 30,871 | 30,871 |
| Accumulated deficit | (38,815) | (31,507) |
| Accumulated other comprehensive (loss) income | (109) | 8 |
| Total stockholder's deficit | (8,053) | (628) |
| Total liabilities and stockholder's deficit | $ 66,230 | $ 103,147 |

*See accompanying notes.*

0401-0489575

3

ALH II, Inc. and Subsidiaries

Consolidated Statements of Operations

| | Year ended December 31 | |
| | 2003 | 2002 |
| | *(Dollars in Thousands)* | |
| **Revenue** | | |
| Home sales | $ **142,419** | $  124,077 |
| | | |
| **Operating expenses** | | |
| Cost of home sales | **113,491** | 98,516 |
| Selling, general and administrative expenses | **23,280** | 20,770 |
| Amortization and depreciation | **280** | 430 |
| Restructuring expenses | **862** | 2,849 |
| | **137,913** | 122,565 |
| Income from operations | **4,506** | 1,512 |
| | | |
| **Other income (expense)** | | |
| Interest expense, net of interest income of $106 and $167 in 2003 and 2002, respectively | **(4,706)** | (5,258) |
| Goodwill impairment | **(12,057)** | (14,700) |
| Uncollectible receivable expense | **–** | (1,564) |
| Litigation and contingency expense | **(200)** | (1,823) |
| Other, net | **96** | 135 |
| Loss from continuing operations before income taxes | **(12,361)** | (21,698) |
| Income tax benefit | **1,955** | 1,630 |
| Loss from continuing operations | **(10,406)** | (20,068) |
| | | |
| **Discontinued operations** | | |
| Income from discontinued operations, net of income taxes | **1,830** | 2,696 |
| Gain on sale of discontinued operations, net of income taxes | **1,268** | – |
| Net loss | $ **(7,308)** | $  (17,372) |

*See accompanying notes.*

# ALH II, Inc. and Subsidiaries

## Consolidated Statements of Stockholder's (Deficit) Equity

*(Dollars in Thousands)*

| | Shares of Common Stock | Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive (Loss) Income | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2001 | 100 | $  30,871 | $  (14,135) | $  (753) | $  15,983 |
| Net loss | – | – | (17,372) | – | (17,372) |
| Unrealized gain on interest rate swaps | – | – | – | 761 | 761 |
| Balance, December 31, 2002 | 100 | 30,871 | (31,507) | 8 | (628) |
| Net loss | – | – | **(7,308)** | – | **(7,308)** |
| Unrealized loss on interest rate swaps | – | – | – | (117) | (117) |
| Balance, December 31, 2003 | **100** | **$  30,871** | **$  (38,815)** | **$  (109)** | **$  (8,053)** |

*See accompanying notes.*

## ALH II, Inc. and Subsidiaries

## Consolidated Statements of Cash Flows

| | Year ended December 31 | |
|---|---|---|
| | 2003 | 2002 |
| | *(Dollars in Thousands)* | |
| **Operating activities** | | |
| Net loss | $ (7,308) | $ (17,372) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 280 | 430 |
| Goodwill impairment | 12,057 | 14,700 |
| Uncollectible receivable expense | – | 1,564 |
| Litigation and contingency expense | 200 | 1,823 |
| Changes in operating assets and liabilities: | | |
| Restricted cash and equivalents | (1,681) | (167) |
| Accounts and notes receivable | (1,263) | 656 |
| Inventory | (4,478) | (4,308) |
| Other assets | 148 | (249) |
| Accounts payable and accrued liabilities | (2,925) | (1,604) |
| Customer deposits | (99) | 24 |
| Accrued home buyers' warranty costs | 159 | 114 |
| Accrued interest on notes payable relating to predecessor | 618 | 510 |
| Net cash used in operating activities | (4,292) | (3,879) |
| | | |
| **Investing activities** | | |
| Purchase of property and equipment | (369) | (351) |
| Net cash used in investing activities | (369) | (351) |
| | | |
| **Financing activities** | | |
| Proceeds from notes payable | 145,342 | 144,677 |
| Principal payments on notes payable | (148,875) | (137,802) |
| Principal payments on notes payable to related parties | (5,563) | – |
| Proceeds from notes payable from related parties | – | 4,376 |
| Net cash (used in) provided by financing activities | (9,096) | 11,251 |
| | | |
| Net cash (used in) provided by continuing operations | (13,757) | 7,021 |
| Net cash provided by (used in) discontinued operations | 11,927 | (3,216) |
| Net (decrease) increase in cash | (1,830) | 3,805 |
| Cash and cash equivalents at beginning of year | 7,089 | 3,284 |
| Cash and cash equivalents at end of year | $ 5,259 | $ 7,089 |
| | | |
| **Supplemental cash flow information** | | |
| Cash paid for interest–net of amounts capitalized | $ 3,213 | $ 2,362 |
| | | |
| **Non-cash financing activity** | | |
| Unrealized (loss) gain on interest rate swaps | $ (117) | $ 761 |

*See accompanying notes.*

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements

December 31, 2003

*(Dollars in thousands)*

## 1. Organization and Description of Business

**Organization**

ALH II, Inc. (the "Company") was established on December 9, 1998 as a wholly owned subsidiary of ALH Holdings, LLC (the "Parent"). The Company's wholly owned subsidiary, ALH Acquisition Corp., acquired all common stock of Atlantic Builders, Inc. ("Atlantic") in 1998. In 1999, ALH Tennessee Acquisition Corp., a wholly owned subsidiary, acquired all common stock of Bowden Building Corporation ("Bowden"). Mulvaney Homes, Inc. ("Mulvaney") is a wholly owned subsidiary formed to acquire assets of an unrelated entity in 2000. Since its formation, the Company has also owned all of the common stock of ALH Corporation and Subsidiaries (the "Predecessor Companies").

**Description of Business**

Through its subsidiaries, the Company operates as a geographically diversified builder of single-family and attached homes for use as primary residences. The Company's homebuilding operations are in Northeast Florida (Atlantic), Memphis, Tennessee (Bowden) and North Carolina (Mulvaney). In July 2003, the Company sold the assets of Atlantic Builders, Inc. (See Note 14 for further discussion).

**Basis of Presentation**

The Company has experienced recurring operating losses, is not generating sufficient cash flows from its operations to fund its activities, and therefore is dependent on additional financing from external sources. These conditions among others raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result should the Company be unable to continue as a going concern. The Company is actively working to obtain extensions on its existing financing and, if successful, management believes that the Company will have adequate resources to continue to meet its current obligations. There is no assurance that such extensions, or other additional financing, will be obtained and the inability to obtain such extensions would have a material adverse effect on the Company.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies**

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated.

**Cash and Cash Equivalents**

Cash and cash equivalents include all short-term, highly liquid investments with a maturity date at acquisition of three months or less.

**Restricted Cash**

Restricted cash consists of cash held in collateral accounts and certificates of deposit as required by state law and contractual requirements. These amounts are not available for general operating purposes.

**Inventory**

Inventory consists of unimproved lots, work-in-process toward the construction of single-family homes, and completed model homes. Amounts are stated at the lower of accumulated cost or fair value less costs to sell. Construction costs are accumulated in work-in-process accounts based on specific identification. Interest costs incurred during construction activities related to inventory and certain indirect project costs are capitalized and subsequently charged to cost of home sales as the units associated with such costs are closed.

**Impairment of Long-Lived Assets and Goodwill**

Management reviews long-lived assets, including identifiable intangibles, inventory and goodwill, for impairment whenever events or changes in circumstances indicate that carrying amount of an asset may not be recoverable. The Company uses the undiscounted cash flows to determine if the assets are impaired. Recoverability is determined based on future net cash flows from the use and ultimate disposition of the asset. Impairment loss is calculated as the difference between the carrying amount of the asset and its fair value. Fair value is based on estimated future cash flows to be generated by the assets, discounted at a market rate of interest.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

The Company follows the Financial Accounting Standards Board Statement of Financial Accounting Standards ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS 144"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets and supersedes SFAS No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of*, and the accounting and reporting provisions of Accounting Principles Board ("APB") Opinion No. 30, *Reporting the Results of Operations – Reporting the Effects of a Disposal of a Segment of a Business*.

The Company follows SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"), effective January 1, 2002. According to SFAS 142, goodwill and indefinite lived intangible assets are no longer amortized but are reviewed annually for impairment. Separable intangible assets that are not deemed to have an indefinite life will continue to be amortized over their useful lives.

**Revenue Recognition**

The Company's primary source of revenues is the sale of single-family homes to homebuyers. Revenue is recognized on the sale of single-family homes at closing upon the transfer of title to the homeowners.

**Derivatives**

The Company follows SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"), amended by SFAS No. 149, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS 133 requires that all derivative instruments be recorded on the balance sheets at fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether the derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Advertising Costs**

The Company expenses advertising costs as incurred. Advertising costs were $1,898 and $1,585 for the years ended December 31, 2003 and 2002, respectively, and are included in the selling, general and administrative expenses in the accompanying Consolidated Statements of Operations.

**Income Taxes**

For income tax purposes, the Company files a consolidated federal income tax return. Income taxes are calculated on a consolidated return basis. The provision or benefit for income taxes provided in the accompanying Consolidating Statement of Operations included in Other Financial Information is calculated on a separate return basis, whereby the Company and its subsidiaries have agreed that the subsidiaries will pay to the Company the subsidiaries' share of the consolidated group's income tax liability and will receive from the Company the benefit of any losses of the subsidiary utilized in the Company's consolidated income tax calculation.

**Property and Equipment**

Property and equipment are stated at cost. Depreciation is provided using the straight-line and accelerated methods over the estimated useful lives of the assets. Estimated useful lives range from 3 to 39 years. Estimated useful lives for leasehold improvements range from 5 to 39 years and do not exceed the term of any lease.

**Comprehensive Income (Loss)**

Comprehensive income is reflected in the Consolidated Statements of Stockholder's Deficit. Accumulated other comprehensive income (loss) is comprised of unrealized gains or losses on derivative financial instruments.

**Deferred Financing Costs**

Included in other assets in the accompanying Consolidated Balance Sheets are deferred financing costs incurred in connection with the Company's debt agreements. Deferred financing costs are charged to interest expense over the life of the debt using the straight-line method, which approximates the effective interest method. Net deferred financing costs approximated $319 and $302 at December 31, 2003 and 2002, respectively.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Warranty Costs**

Home purchasers are provided with one-year warranties against certain building defects. Estimated warranty costs are provided for in the period in which the revenue is recorded.

**Concentration of Credit Risk**

Concentration of credit risk associated with cash and cash equivalents and restricted cash is considered low due to the credit quality of the issuers of the financial instruments held by the Company and due to their short duration to maturity.

The Company is also exposed to credit risk related to its accounts and notes receivable. Credit is extended based on the evaluation of the counter party's financial condition, and collateral is generally required. The Company maintains an allowance for doubtful accounts at a level which management believes is sufficient to cover potential losses. At December 31, 2003 and 2002, the allowance for doubtful accounts was $0.

**Reclassifications**
The Company has reclassified certain prior year amounts to conform to the current year presentation. These reclassifications did not affect net loss for the years presented.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates that affect the amounts reported in the financial statements and the accompanying notes. Actual results could differ from those estimates.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Recent Accounting Pronouncements**

In April 2002, the Financial Accounting Standards Board ("FASB") issued SFAS No. 145 *Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No.13 and Technical Corrections* ("SFAS 145"). Among other things, SFAS 145 rescinds Statement 4, which required all gains and losses from extinguishment of debt to be aggregated and, if material, classified as an extraordinary item, net of related income tax effect. SFAS NO. 145 is effective for the company's 2003 fiscal year. Management does not believe that the implementation of SFAS NO. 145 will have a material impact on the company's financial condition or results of operation. The Company adopted the disclosure provisions of this interpretation for the year ended December 31, 2003.

In November 2002, the FASB issued FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*, an interpretation of FASB Statements No. 5, 57, and 107 and rescission of FASB Interpretation No. 34. This interpretation elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2003 and the adoption did not have a material effect on the Company's consolidated results of operations, financial position or cash flows. The Company adopted the disclosure provisions of this interpretation for the year ended December 31, 2003.

In January 2003, the FASB issued FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*. Until this interpretation, a company generally included another entity in its consolidated financial statements only if it controlled the entity through voting interests. The interpretation requires a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns. We have not completed our evaluation as to the potential impact on our consolidated financial statements. However, based on preliminary review, management does not believe that the adoption of Interpretation No. 46 will have a significant effect on our consolidated financial statements.

0401-0499575

12

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 3. Inventory

At December 31, 2003 and 2002, inventory consists of the following:

|  | December 31 | |
|---|---|---|
|  | 2003 | 2002 |
| Work-in-process | $ 30,867 | $ 28,824 |
| Lots held for construction | 15,179 | 12,562 |
| Completed model homes | 2,019 | 2,201 |
|  | $ 48,065 | $ 43,587 |

## 4. Property and Equipment, Net

At December 31, 2003 and 2002, property and equipment, net consists of the following:

|  | December 31 | |
|---|---|---|
|  | 2003 | 2002 |
| Model home furniture and equipment | $ 951 | $ 910 |
| Office furniture and equipment | 357 | 361 |
| Other property and equipment | 2,126 | 1,817 |
|  | 3,434 | 3,088 |
| Less accumulated depreciation | (2,579) | (2,322) |
|  | $ 855 | $ 766 |

## 5. Accrued Home Buyers' Warranty Costs

During the years ended December 31, changes in our warranty accrual consisted of the following:

|  | December 31 | |
|---|---|---|
|  | 2003 | 2002 |
| Accrued warranty costs at January 1 | $ 609 | $ 650 |
| Estimated liability recorded | 849 | 623 |
| Settlements made | (690) | (664) |
| Accrued warranty costs at December 31 | $ 768 | $ 609 |

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**6. Notes Payable and Line of Credit**

At December 31, 2003 and 2002, notes payable and line of credit consists of the following:

|  | December 31 | |
|---|---|---|
|  | 2003 | 2002 |
| Inventory notes payable; interest is due monthly at various interest rates (ranging from 4.25% to 7.0% at December 31, 2003). | $ 36,132 | $ 36,415 |
| Acquisition loans payable to bank; principal of $13,500 and $13,000 plus applicable accrued interest are due June 30, 2006. Interest accrues at LIBOR plus 0.5% or the Prime Rate, as defined, or the Federal Funds Rate plus 0.5% (1.1195%, 4.0% and 1% at December 31, 2003, respectively); secured by certificate of deposit ($516 and $509, respectively at December 31, 2003 and 2002, which is included in restricted cash in the accompanying Consolidated Balance Sheets) and by a surety bond. | 26,500 | 27,500 |
| Subordinated note payable to former shareholder of Bowden. Interest is due quarterly at 8%; matured on March 19, 2003. *(See Note 13)* | – | 2,250 |
| Notes payable and lines of credit | 62,632 | 66,165 |
| Note payable relating to predecessor only assumed by related party, in default. Interest is due monthly at LIBOR plus 6%, matured on January 31, 2001, guaranteed by related parties. *(See Note 9)* | 1,752 | 1,752 |
| Note payable relating to predecessor only, in default. Interest is due quarterly at 20%, matured on December 11, 2001. | 3,488 | 2,870 |
| Notes payable relating to predecessors | $ 5,240 | $ 4,622 |

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**6. Notes Payable and Line of Credit (continued)**

| | | |
|---|---|---|
| Note payable to related parties. Interest is due quarterly at 15%, maturing on June 30, 2004. *(See Note 10)* | – | 1,188 |
| Note payable to related parties principal $4,375 plus applicable accrued interest at 18% are due June 30, 2004. *(See Note 10)* | – | 4,375 |
| Total notes payable and lines of credit | $ 67,872 | $ 76,350 |

Inventory notes payable are collateralized by real estate inventory and require release payments when title to secured inventory is transferred to homebuyers.

The loan agreements for inventory notes payable contain certain affirmative and negative covenants. At December 31, 2003, the Company did not comply with the debt to worth ratio covenant for one loan, which had an outstanding balance of $3,000 at December 31, 2003. The Company expects to repay this loan as the properties secured by the loan are sold to third parties in the normal course of operations. Also, at December 31, 2003, the Company did not comply with the minimum equity covenant for one loan, which had an outstanding balance of $10,000 at December 31, 2003. The Company expects to renew this loan agreement and modify the covenant accordingly.

Maturities of notes payable and lines of credit for each of the years subsequent to December 31, 2003 are: 2004 – $40,132, 2005 – $1,000, 2006 – $21,500 thereafter – $0.

The Company capitalized interest of approximately $1,315 and $1,925, respectively during the years ended December 31, 2003 and 2002, relating to its construction activities. Of the amount capitalized, approximately $479 and $946, respectively, remain in inventory at December 31, 2003 and 2002. Total interest incurred during the year ended December 31, 2003 and 2002, was approximately $6,207 and $8,427, respectively.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**7. Derivative Financial Instruments**

Effective January 1, 2001, the Company adopted SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended* ("SFAS 133") amended by SFAS No. 149, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS 133 establishes accounting and reporting standards for derivative instruments and for hedging activities by requiring that all derivatives be recognized in the balance sheets and measured at fair value. Gains or losses resulting from changes in the fair value of derivatives are recognized in earnings or recorded in other comprehensive income and recognized in the statement of earnings when the hedged item affects earnings, depending on the purpose of the derivatives and whether they qualify for hedge accounting treatment.

The Company's policy is to designate at a derivative's inception the specific assets, liabilities, or future commitments being hedged and monitor the derivative to determine if it remains an effective hedge. The effectiveness of a derivative as a hedge is based on high correlation between changes in its value and changes in the value of the underlying item associated with the hedge. The Company does not enter into or hold derivatives for trading or speculative purposes.

The Company has two-interest rate swap agreements that effectively convert variable interest rates to fixed interest rates on approximately $26.5 million of outstanding debt. The swap agreements have been designated as cash flow hedges and, accordingly, are reflected at their fair value in the consolidated balance sheets at December 31, 2003 and 2002. The related gain (loss) is deferred in stockholder's deficit as accumulated other comprehensive income (loss). The swap agreements expire in June 2004; however, the swap agreements were renewed in March 2004 *(See·Note 16)*. The Company accounts for its interest rate swaps using the shortcut method, as described in SFAS No. 133. Amounts to be received or paid as a result of the swap agreements are recognized as adjustments to interest incurred on the related debt instruments. The Company believes that there will be no ineffectiveness related to the interest rate swaps and therefore no portion of the accumulated other comprehensive income (loss) will be reclassified into future earnings. The net effect on the Company's operating results is that interest on the variable rate debt being hedged is recorded based on fixed interest rates.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 8. Income Taxes

For the years ended December 31, 2003 and 2002, the components of income tax benefit are as follows:

| | Year ended December 31 | |
| | 2003 | 2002 |
| --- | --- | --- |
| Current | $ 1,955 | $1,630 |
| Deferred | – | – |
| Income tax benefit | $ 1,955 | $1,630 |

As of December 31, 2003 and 2002, the significant components of the Company's deferred income taxes are as follows:

| | Year ended December 31 | |
| | 2003 | 2002 |
| --- | --- | --- |
| Deferred tax assets: | | |
| Current: | | |
| Accrued expenses and reserves | $ 494 | $ 90 |
| Inventory | 140 | 82 |
| Goodwill | 10,217 | 5,635 |
| Net operating loss carryforwards | 646 | 1,805 |
| Settlement and accrued litigation | – | 613 |
| Other | 52 | 27 |
| Deferred tax assets | 11,549 | 8,252 |
| Valuation allowance | (10,114) | (7,271) |
| Net deferred tax assets | 1,435 | 981 |
| | | |
| Deferred tax liabilities: | | |
| Property and equipment | (1,435) | (981) |
| Net deferred tax liabilities | (1,435) | (981) |
| Total net deferred taxes | $ – | $ – |

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**8. Income Taxes (continued)**

SFAS 109 requires a valuation allowance to reduce the deferred tax assets reported if, based on the weight of the evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. After consideration of all the evidence, both positive and negative, management has determined that a valuation allowance of $10,114 is necessary as of December 31, 2003, an increase of $2,843 from December 31, 2002.

At December 31, 2003, the Company had available net operating loss carryforwards of approximately $241 that expire beginning in 2020 for U.S. federal income tax purposes. Additionally, the Company has net operating loss carryforwards of approximately $1,458 for state income tax purposes.

**9. Sale of ALH Corporation**

On January 1, 2000, the Company sold the net assets of ALH Corporation and Subsidiaries (Predecessor Companies) to a third party. The Company has not been released from certain debt in connection with the Predecessor Companies in accordance with SFAS No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* and has, therefore, included the outstanding debt in notes payable relating to predecessor in the accompanying Consolidated Balance Sheets and a corresponding receivable from note payable assumed by related party in the accompanying Consolidated Balance Sheets.

**10. Related Party Transactions**

**Receivable From Note Payable Assumed by Related Party**

An investor of the Parent assumed a note payable of a Predecessor Company for its investment in the Parent. The Company has not been released from its debt obligation in connection with this note payable in accordance with Statement of Financial Accounting Standard No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* and has, therefore, included the receivable from the investor and the outstanding debt in receivable relating to notes payable assumed by related party and notes payable and lines of credit, in default, respectively, in the accompanying Consolidated Balance Sheets.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**10. Related Party Transactions (continued)**

**Notes Payable to Related Parties**

Notes payable to related parties consists of amounts borrowed from related party entities under formalized notes. In July 2003, all outstanding notes payable to related parties were paid in full with applicable accrued interest.

**Guarantees**

The Company guarantees the debt of a limited partnership that is affiliated through common management. The debt is secured by developed lots that the Company acquires from the limited partnership at market rates. At December 31, 2003 and 2002, the Company had outstanding guarantees of $0 and $503, respectively.

**Management Compensation Agreements**

At December 31, 2003, the Company was obligated to pay certain amounts to executives upon either the first occurring, maturity of contract or termination of employment. Management has adequately accrued for such payments and is reflected in the consolidated balance sheet at December 31, 2003.

**11. Fair Value of Financial Instruments**

Statement of Financial Standards No. 107, *Disclosures about Fair Value of Financial Instruments*, requires information about financial instruments, whether or not recognized in the statement of financial condition, for which it is practical to estimate that value. In cases where quoted market prices are not available, fair values are based on estimates using present value or other valuation techniques. These techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, could not be realized in immediate settlement of the instrument.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 11. Fair Value of Financial Instruments (continued)

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

*Cash and Cash Equivalents and Restricted Cash and Cash Equivalents*—The carrying amounts reported in the Consolidated Balance Sheets for these assets approximate their fair values.

*Accounts and Notes Receivable*—The fair values are estimated using discounted cash flow calculations that consider the difference between current interest rates and stated note rates adjusted for risk and historical prepayment experiences.

*Notes Payable and Lines of Credit*—The carrying amounts of the notes payable and lines of credit approximate their fair value as they are primarily tied to a market rate of interest.

## 12. Commitments

The Company has entered into option arrangements to purchase certain lots in various subdivisions. Option deposits related to these arrangements approximate $2,436 and $2,829 at December 31, 2003 and 2002, respectively, and are included in other assets in the accompanying Consolidated Balance Sheets. In addition, the company has provided standby letters of credit from various financial institutions, in lieu of cash, for option deposits. The letters of credit related to these arrangements approximate $969 and $2,179 at December 31, 2003 and 2002, respectively. The Company can cancel the land purchase options by forfeiture of the deposit.

The Company leases certain office and warehouse space. The leases expire in 2004 through 2008, with minimum rental commitments of 2004 – $596; 2005 – $108; 2006 – $28; 2007 – $28 and 2008 – $10.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**13. Contingencies**

At December 31, 2002, the Company was involved in litigation with the former shareholders of a subsidiary company. On July 1, 2003 a Settlement Agreement was reached between the parties, the Company agreed to pay the former shareholders certain amounts, which was included in Note Payable at December 31, 2002 designated as subordinate note payable to former shareholder.

The Company is subject to other claims and legal matters, which are being defended and handled in the ordinary course of business. Management believes that any liability that may ultimately arise from the resolution of these matters will not have a material adverse effect on the financial condition or results of operations of the Company.

**14. Discontinued Operations**

In July 2003, the Company sold the assets of Atlantic Builders, Inc. for approximately $17.0 million and recorded a gain of $1.3 million, net of income taxes of $1.3 million. In addition, the Company was required to place $2.0 million in cash in an escrow account, which has been classified as restricted cash in the Company's balance sheet. The $2.0 million in escrow will be received in $1 million installments in July 2004 and July 2005, assuming there are no claims made by the seller against the funds held in escrow as outlined in the asset purchase agreement. The Company believes it will receive the entire $2.0 million amount held in escrow.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**14. Discontinued Operations and the Impairment of Long-Lived Assets (continued)**

In accordance with FAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, the Company classified the operating results of Atlantic as discontinued operations in the Company's consolidated statements of operations ($ in thousands):

|  | Year ended December 31 | |
|  | 2003 | 2002 |
| --- | --- | --- |
| Home sales | $ 36,388 | $ 58,411 |
| Cost of home sales | 30,540 | 46,968 |
| Selling, general and administrative expenses | 1,566 | 6,293 |
| Amortization and depreciation | 88 | 225 |
| Income from operations | 4,194 | 4,925 |
| Interest expense | (510) | (892) |
| Other, Net | 131 | 315 |
| Income from discontinued operations | 3,815 | 4,348 |
| Income tax provision | (1,985) | (1,652) |
| Income from discontinued operations | 1,830 | 2,696 |
| Gain on sale of discontinued operations, net of income taxes | 1,268 | – |
| Total discontinued operations | $ 3,098 | $ 2,696 |

**15. Impairment of Goodwill**

In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"), goodwill and indefinite lived intangible assets are no longer amortized but are reviewed annually for impairment. For the year ended December 31,2003, the Company recognized an impairment loss $12,057 to reduce the carrying value of goodwill at Mulvaney and Bowden. The impairment for Mulvaney reflects competitive conditions in North Carolina and a restructuring of the Company's operations in the market. The impairment charge for Bowden reflects the current value based on an expected sale of the company *(See Note 16)*.

ALH II, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**16. Subsequent Events (unaudited)**

**Sale of Subsidiary**

In April 2004, the Company sold the stock of Bowden for approximately $7 million. The Company did not classify Bowden as held for sale since the Company's Board of Directors approved the sale in March 2004. In accordance with FAS 144, the operations of Bowden have been classified as held for use as of December 31, 2003.

**Renewal of Loan Agreement**

In March 2004, the Company entered into a renewal with a bank for the Note payable classified as Acquisition loans (*See Note 6*) providing a new maturity date of June 2006. With this renewal comes the renewal of the Interest Rate Swap agreements to hedge the risk in variable interest rates till June 2006.

In March 2004, the Company renewed its two-interest rate swap agreements. The new interest rate swap agreements convert variable interest rates to fixed interest rates through June 2006 on approximately $26.5 million of outstanding debt.

0401-0499575

23

# Other Financial Information

0401-0499575

## ALH II, Inc. and Subsidiaries

## Consolidating Balance Sheet

December 31, 2003
*(Dollars in Thousands)*

| | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 908 | $ 3,353 | $ 998 | $ — | $ 5,259 |
| Restricted cash and cash equivalents | 1,173 | — | 2,516 | — | 3,689 |
| Accounts and notes receivable | 1,151 | 65 | 313 | — | 1,529 |
| Inventory | 17,173 | 30,892 | — | — | 48,065 |
| Due from (to) related parties | (5,412) | 2,520 | 2,892 | — | — |
| Receivable relating to note payable assumed by related party | — | — | 1,752 | — | 1,752 |
| Investment in subsidiaries | — | — | 45,854 | (45,854) | — |
| Property and equipment, net | 326 | 529 | — | — | 855 |
| Goodwill, net | 1,592 | — | — | — | 1,592 |
| Deferred income tax asset | — | — | — | — | — |
| Other assets | 1,482 | 1,973 | 34 | — | 3,489 |
| Total assets | $ 18,393 | $ 39,332 | $ 54,359 | $ (45,854) | $ 66,230 |

25

0401-049975

## ALH II, Inc. and Subsidiaries

## Consolidating Balance Sheet (continued)

December 31, 2003
*(Dollars in Thousands)*

| | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Liabilities and stockholder's (deficit) equity** | | | | | |
| Liabilities: | | | | | |
| Accounts payable and accrued liabilities | $ 1,867 | $ 1,824 | $ 1,617 | $ — | $ 5,308 |
| Customer deposits | 190 | 145 | — | — | 335 |
| Accrued home buyers' warranty costs | 214 | 554 | — | — | 768 |
| Notes payable and lines of credit | 15,161 | 20,971 | 26,500 | — | 62,632 |
| Notes payable Relating to Predecessor | — | — | 5,240 | — | 5,240 |
| Notes payable to related parties | — | 27,059 | — | (27,059) | — |
| | 17,432 | 50,553 | 33,357 | (27,059) | 74,283 |
| Stockholder's (deficit) equity: | | | | | |
| Common stock | 1 | — | 2 | (3) | — |
| Paid-in capital | 8,097 | — | 41,566 | (18,792) | 30,871 |
| Accumulated deficit | (7,136) | (11,221) | (20,458) | — | (38,815) |
| Accumulated other comprehensive loss | — | — | (109) | — | (109) |
| Total stockholder's (deficit) equity | 962 | (11,221) | 21,001 | (18,795) | (8,053) |
| Total liabilities and stockholder's (deficit) equity | $ 18,394 | $ 39,332 | $ 54,358 | $ (45,854) | $ 66,230 |

0401-049975

ALH II, Inc. and Subsidiaries

Consolidating Statement of Operations

Year ended December 31, 2003
*(Dollars in thousands)*

| | Bowden Building Corporation | Mulvaney Homes, Inc. | ALH II, Inc. and Other | Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Home sales | $ 62,407 | $ 80,012 | $ – | $ – | $ 142,419 |
| Costs and expenses: | | | | | |
| Cost of home sales | 50,580 | 62,911 | – | | 113,491 |
| Selling, general and administrative expenses | 8,193 | 11,543 | 3,544 | | 23,280 |
| Amortization and depreciation | 149 | 131 | – | | 280 |
| Restructuring expenses | – | 862 | – | | 862 |
| | 58,922 | 75,447 | 3,544 | | 137,913 |
| Income (loss) from operations | 3,485 | 4,565 | (3,544) | | 4,506 |
| Other income (expense): | | | | | |
| Interest (expense) income, net | (1,026) | (3,696) | 16 | | (4,706) |
| Goodwill impairment | (6,274) | (5,783) | – | | (12,057) |
| Litigation and contingency expense | – | – | (200) | | (200) |
| Other, net | 127 | (133) | 102 | | 96 |
| Loss from continuing operations before income taxes | (3,688) | (5,047) | (3,626) | | (12,361) |
| Income tax benefit (provision) | (1,051) | 609 | 2,397 | | 1,955 |
| Loss from continuing operations | (4,739) | (4,438) | (1,229) | | (10,406) |
| Discontinued operations: | | | | | |
| Income from discontinued operations, net of income taxes | – | – | 1,830 | | 1,830 |
| Gain on sale of discontinued operations, net of income taxes | – | – | 1,268 | | 1,268 |
| Net (loss) income | $ (4,739) | $ (4,438) | $ 1,869 | $ – | $ (7,308) |

27

0401-049975

# EXHIBIT II

# ALH II, Inc.

(and Subsidiaries)

# Financial Reporting

For the Six Months
Ended June 30, 2004

■ Bowden Building (Memphis, TN)          ■ Mulvaney Homes (Charlotte/Triad, NC)

7/19/04

7/19/2004
8:46 AM
ALH II FS 040630
BS Consolidating

**ALH II, Inc.**
**Consolidating Balance Sheet (Unaudited)**
**as of 6/30/04**

| | MHI - Charlotte / Triad | Parent Company | Consolidating Entries | Consolidated Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash & Cash Equivalents | $2,056,521 | $864,834 | - | $2,921,355 |
| Restricted Cash & Escrow Accounts | - | 3,518,775 | - | 3,518,775 |
| Accounts and Notes Receivable | 30,980 | 253,399 | - | 284,379 |
| Receivable from N/P Assumed by Related Party | - | 1,752,415 | - | 1,752,415 |
| Due from (to) Consolidated Affiliates | 1,606,796 | (1,606,796) | - | - |
| Prepaid Expenses | 293,262 | 86,912 | - | 380,174 |
| Investment in Subsidiaries | - | 44,490,714 | (44,490,714) | - |
| Real Estate Inventory | 32,713,340 | - | - | 32,713,340 |
| Real Estate Deposits | 1,512,625 | - | - | 1,512,625 |
| Miscellaneous Assets | 12,917 | 398 | - | 13,315 |
| Property & Equipment, Net | 551,040 | - | - | 551,040 |
| Goodwill & Organization Costs, Net | - | - | - | - |
| Total Assets | $38,777,481 | $49,360,651 | ($44,490,714) | $43,647,418 |
| **Liabilities** | | | | |
| Accounts Payable and Accrued Liabilities | 2,225,659 | 360,244 | - | 2,585,903 |
| Customer Deposits | 224,216 | - | - | 224,216 |
| Warranty Reserve | 556,295 | - | - | 556,295 |
| Secured Notes Payable | 19,514,214 | - | - | 19,514,214 |
| Notes Payable Relating to Predecessor | - | 5,597,289 | - | 5,597,289 |
| Other Notes Payable | - | 22,500,000 | - | 22,500,000 |
| Total Liabilities | 22,520,384 | 28,457,533 | - | 50,977,917 |
| **Equity & Subordinated Debt** | | | | |
| Subordinated Debt | 27,059,349 | - | (27,059,349) | - |
| Common Stock | - | 1,801 | (1,801) | - |
| Additional Paid-in Capital | - | 41,565,315 | (10,694,184) | 30,871,131 |
| Retained Earnings | (10,802,252) | (20,663,998) | (6,735,380) | (38,201,630) |
| Total Equity & Subordinated Debt | 16,257,097 | 20,903,118 | (44,490,714) | (7,330,499) |
| Total Liabilities & Stockholders' Equity | $38,777,481 | $49,360,651 | ($44,490,714) | $43,647,418 |

1

# ALH II, Inc.
## Consolidating Operating Statement (Unaudited)
### Six Months Ended 6/30/04

7/19/2004
8:46 AM
ALH II FS 040630
OS Yr Consolidating

| | MHI - Charlotte / Triad | Parent Company | Consolidated Total |
|---|---:|---:|---:|
| Units Closed | 253 | 0 | 253 |
| | | | |
| Total Homebuilding Revenues | $31,951,625 | $0 | $31,951,625 |
| *Average Sales Price* | *$126,291* | *$0* | *$126,291* |
| | | | |
| Cost of Sales | | | |
| Lot Costs | 6,139,481 | 0 | 6,139,481 |
| Construction Costs | 17,207,558 | 0 | 17,207,558 |
| Indirect Costs | 1,453,793 | 0 | 1,453,793 |
| Warranty Costs | 207,651 | 0 | 207,651 |
| Total Cost of Sales | 25,008,483 | 0 | 25,008,483 |
| | | | |
| Gross Profit Margin | 6,943,142 | 0 | 6,943,142 |
| *Gross Profit Margin %* | *21.7%* | *0.0%* | *21.7%* |
| | | | |
| Variable Selling Expenses | | | |
| Commissions - Company | 967,859 | 0 | 967,859 |
| Commissions - Broker | 556,555 | 0 | 556,555 |
| Closing Costs | 1,046,894 | 0 | 1,046,894 |
| Total Variable Selling Expenses | 2,571,308 | 0 | 2,571,308 |
| | | | |
| Contribution Margin | 4,371,834 | 0 | 4,371,834 |
| *Contribution Margin %* | *13.7%* | *0.0%* | *13.7%* |
| | | | |
| Overhead | | | |
| Sales & Marketing | 1,080,022 | 0 | 1,080,022 |
| General & Administrative | 1,096,509 | 0 | 1,096,509 |
| Corporate Expenses | 0 | 544,273 | 544,273 |
| Total Overhead | 2,176,531 | 544,273 | 2,720,804 |
| | | | |
| Operating Income | 2,195,303 | (544,273) | 1,651,030 |
| *Operating Income %* | *6.9%* | *0.0%* | *5.2%* |
| | | | |
| Other Income (Expense) | | | |
| Miscellaneous | 8,605 | 1,097,843 | 1,106,448 |
| Total Other Income | 8,605 | 1,097,843 | 1,106,448 |
| | | | |
| EBITDA | 2,203,908 | 553,570 | 2,757,478 |
| *EBITDA %* | *6.9%* | *0.0%* | *8.6%* |
| | | | |
| Depreciation & Amortization | 86,414 | 0 | 86,414 |
| | | | |
| EBIT | 2,117,494 | 553,570 | 2,671,064 |
| Finance Costs | 1,397,481 | 348,472 | 1,745,953 |
| | | | |
| Pretax Earnings | $720,013 | $205,098 | $925,111 |
| *Pretax Earnings %* | *2.3%* | *0.0%* | *2.9%* |
| | | | |
| Pre-Tax Earnings (excl. Interco. Int.) | $1,080,013 | ($154,902) | $925,111 |
| *Pre-Tax Earnings (excl. Interco. Int.) %* | *3.4%* | *0.0%* | *2.9%* |

**ALH II, Inc.**
**Consolidating Operating Statement (Unaudited)**
**Fiscal Quarter Ended 6/30/04**

7/19/2004
8:46 AM
ALH II FS 040630
OS Qtr Consolidating

| | MHI -<br>Charlotte /<br>Triad | Parent<br>Company | Consolidated<br>Total |
|---|---|---|---|
| Units Closed | 130 | 0 | 130 |
| | | | |
| Total Homebuilding Revenues | $16,454,724 | $0 | $16,454,724 |
| *Average Sales Price* | *$126,575* | *$0* | *$126,575* |
| | | | |
| Cost of Sales | | | |
| Lot Costs | 3,130,639 | 0 | 3,130,639 |
| Construction Costs | 8,864,030 | 0 | 8,864,030 |
| Indirect Costs | 748,838 | 0 | 748,838 |
| Warranty Costs | 106,977 | 0 | 106,977 |
| Total Cost of Sales | 12,850,485 | 0 | 12,850,485 |
| | | | |
| Gross Profit Margin | 3,604,239 | 0 | 3,604,239 |
| *Gross Profit Margin %* | *21.9%* | *0.0%* | *21.9%* |
| | | | |
| Variable Selling Expenses | | | |
| Commissions - Company | 520,747 | 0 | 520,747 |
| Commissions - Broker | 301,416 | 0 | 301,416 |
| Closing Costs | 534,096 | 0 | 534,096 |
| Total Variable Selling Expenses | 1,356,259 | 0 | 1,356,259 |
| | | | |
| Contribution Margin | 2,247,980 | 0 | 2,247,980 |
| *Contribution Margin %* | *13.7%* | *0.0%* | *13.7%* |
| | | | |
| Overhead | | | |
| Sales & Marketing | 642,665 | 0 | 642,665 |
| General & Administrative | 553,952 | 0 | 553,952 |
| Corporate Expenses | 0 | 167,705 | 167,705 |
| Total Overhead | 1,196,617 | 167,705 | 1,364,322 |
| | | | |
| Operating Income | 1,051,363 | (167,705) | 883,658 |
| *Operating Income %* | *6.4%* | *0.0%* | *5.4%* |
| | | | |
| Other Income (Expense) | | | |
| Miscellaneous | 3,105 | 390,956 | 394,061 |
| Total Other Income | 3,105 | 390,956 | 394,061 |
| | | | |
| EBITDA | 1,054,468 | 223,251 | 1,277,719 |
| *EBITDA %* | *6.4%* | *0.0%* | *7.8%* |
| | | | |
| Depreciation & Amortization | 43,552 | 0 | 43,552 |
| | | | |
| EBIT | 1,010,916 | 223,251 | 1,234,167 |
| Finance Costs | 619,574 | 180,276 | 799,850 |
| | | | |
| Pretax Earnings | $391,342 | $42,975 | $434,317 |
| *Pretax Earnings %* | *2.4%* | *0.0%* | *2.6%* |
| | | | |
| Pre-Tax Earnings (excl. Interco. Int.) | $571,342 | ($137,025) | $434,317 |
| *Pre-Tax Earnings (excl. Interco. Int.) %* | *3.5%* | *0.0%* | *2.6%* |

3

# EXHIBIT JJ

GREGORY P. JOSEPH LAW OFFICES LLC

805 THIRD AVENUE
NEW YORK, NEW YORK 10022
(212) 407-1200
WWW.JOSEPHNYC.COM

PAMELA JARVIS
DIRECT DIAL: (212) 407-1250
DIRECT FAX: (212) 407-1278
EMAIL: pjarvis@josephnyc.com

FACSIMILE
(212) 407-1299

January 14, 2005

ALH Holdings, LLC (by First Class Mail)
4444 Lakeside Drive
Second Floor
Burbank CA 91505

Supervisory Board of ALH Holdings, LLC (by Email): Mr. Avie Arenson
(avie@arenson.co.il); Mr. George J. Buchler (gbuchler@shamrock.com); Mr. Eugene I.
Krieger (gkrieger@shamrock.com); Mr. Shalom E. Lamm (slamm@cannondev.com);
Mr. Bruce J. Stein (bstein@shamrock.com)

ALH II, Inc. (by First Class Mail)
4444 Lakeside Drive
Second Floor
Burbank CA 91505

Board of Directors of ALH II, Inc. (by Email): Mr. George J. Buchler
(gbuchler@shamrock.com); Mr. Eugene I. Krieger (gkrieger@shamrock.com); Mr.
Shalom E. Lamm (slamm@cannondev.com)

Re: Indemnification of Shamrock Holdings of California, Inc., Shamrock Capital
    Advisors, Inc., Eugene I. Krieger, George J. Buchler and Bruce J. Stein

Gentlemen:

My law firm and the law firm of Morris, Nichols, Arsht & Tunnell are counsel to
Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I.
Krieger, George J. Buchler and Bruce J. Stein (collectively the "Indemnitees") in
connection with certain claims threatened and/or asserted by the Class B Members of
ALH Holdings, LLC (the "Class B Members"), as reflected in, among other things, the
declaratory judgment action (the "Delaware Action") commenced in the Court of
Chancery of the State of Delaware under the caption *Shamrock Holdings of California,
Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler and Bruce J.
Stein v. Avie Arenson, SELK, LLC and Laurel Equity Group, LLC*, Civil Action No. 692-
N, and subsequently removed to the United States District Court for the District of

GREGORY P. JOSEPH LAW OFFICES LLC
January 14, 2005
Page 2


Delaware, where it is now under Civil Action No. 04-1339-SLR, subject to a pending motion to remand.

The purpose of this letter is to notify ALH Holdings, LLC ("ALH LLC") and its wholly-owned subsidiary ALH II, Inc. ("ALH II") that the Indemnitees are invoking their rights to indemnification in connection with the Delaware Action and all past, present and future claims threatened and/or asserted by the Class B Members (including but not limited to the Indemnitees' rights to seek reimbursement and advancement of legal fees and other expenses) based on the July 1, 2001 letter agreement between Shamrock Capital Advisors, Inc. and ALH LLC, Section 7.4 of the By-Laws of ALH II, and any and all other common law, statutory and contractual grounds for indemnification that may exist in favor of the Indemnitees.

If you have any questions regarding the foregoing, please do not hesitate to contact me.

Sincerely,

Pamela Jarvis

cc:    Francis W. Costello, Esq. (francis.costello@hklaw.com)
       Holland & Knight LLP, counsel to ALH Holdings, LLC and ALH II, Inc.
       633 West Fifth Street
       21st Floor
       Los Angeles, CA 90071

       Isaac M. Neuberger, Esq. (IMN@NQGRG.com)
       Thomas M. Wood, IV, Esq. (TMW@NQGRG.com)
       Counsel to the Class B Members of ALH Holdings, LLC
       Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
       One South Street
       27th Floor
       Baltimore, MD 21202-3201


/561862

LAW OFFICES

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

27TH FLOOR
ONE SOUTH STREET
BALTIMORE, MARYLAND 21202-3282
www.nqgrg.com
(410) 332-8550

THOMAS M. WOOD. IV.
(410) 332-8523

FAX NO.
(410) 332-8564
E-MAIL ADDRESS:
TMW@NQGRG.COM

January 19, 2005

VIA FACSIMILE: 212-407-1278
AND REGULAR MAIL

Pamela Jarvis, Esquire
Gregory P. Joseph Law Offices, LLC
805 Third Avenue
New York, New York 10022

> RE:  Indemnification of Shamrock Holdings of California, Inc., Shamrock
> Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler and
> Bruce J. Stein

Dear Ms. Jarvis:

We are in receipt of your letter of January 14, 2005 in which Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler and Bruce J. Stein ("Shamrock") purport to seek indemnification in connection with the Declaratory Judgment action filed by Shamrock (the "Delaware Action") which has been removed to the United States District Court for the District of Delaware. In addition the letter seeks indemnification for "all past, present and future claims threatened or asserted by the Class B Members of ALH Holdings, LLC."

Shamrock's claim of indemnification is based on the July 1, 2001 Letter Agreement between Shamrock Capital Advisors, Inc. and ALH, LLC, Section 7.4 of the ALH II By-Laws, and any and all other common law grounds. Shamrock, however, is not entitled to indemnification under the Letter Agreement, the ALH II By-Laws or common law since its conduct, actions and behavior all constituted breaches of fiduciary duties, were ultra vires and were, by definition, outside the scope of their proper duties and obligations owed to ALH and the Class B Members. As we have previously written, Shamrock pursued a course of conduct that was in bad faith, grossly negligent and constituted willful misconduct.

215409.3/1060.3

NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

Pamela Jarvis, Esquire
January 19, 2005
Page 2 of 2

————————————————————

   The Class B Members oppose any indemnification for Shamrock until a Court should otherwise order since Shamrock can simply "help itself" to ALH assets. If it does so, it will be but another breach of duty to the Class B Members and ALH.

Very truly yours,

Thomas M. Wood, IV

TMW/tem
cc:   Francis W. Costello, Esquire

215409.3/1060.3

# EXHIBIT KK

## Pamela Jarvis

| | |
|---|---|
| **From:** | Pamela Jarvis |
| **Sent:** | Tuesday, August 03, 2004 12:35 PM |
| **To:** | 'Isaac M. Neuberger' |
| **Cc:** | Thomas M. Wood |
| **Subject:** | RE: ALH |

You seem to be intent on mischaracterizing the situation as one in which Shamrock is unwilling to meet with the Class B investors. As my letters have plainly stated, Shamrock is indeed willing to meet. This is why I asked you (*see* August 2, 2004 letter at 4) to let me know when Mr. Arenson will be in the United States. If, as you assert, your clients want to meet with Shamrock, I trust that you will provide this information at your earliest convenience.

I do not comprehend your statement that "MHI is a Shamrock creation." It is my understanding that (1) Shalom Lamm introduced MHI to ALH, (2) ALH acquired MHI in January 2000, at a time when the Class A investors had only two of ALH's five board seats, and (3) ALH's acquisition of MHI was unanimously approved by the board, including by Mr. Arenson.

Your assertion that only a "little information [has been] occasionally dribbled out by Shamrock" is demonstrably untrue. Shamrock and others have routinely kept Mr. Arenson, as Class B representative, up-to-date on material developments concerning ALH. Mr. Arenson has received weekly reports, periodic financial statements and other materials. He has had unrestricted access to the company's management. In addition to board meetings, there have been numerous teleconferences and email exchanges between Shamrock and Mr. Arenson, and Shamrock has consistently made itself available to Mr. Arenson. (*See, e.g.*, June 1, 2004 email to Mr. Arenson, arranging teleconference with George Buchler and Eugene Krieger to update Mr. Arenson concerning, *inter alia*, MHI and "[a]nything else that you would like to know about.") Moreover, your clients have always had full access to information from Shalom Lamm, under Section 9.2 of the Operating Agreement. I am unaware of any instance in which your clients requested information but did not receive it. Whatever they wanted to know has been theirs for the asking -- if they did not ask, that is their responsibility, not Shamrock's.

In particular, with regard to MHI, the current information concerning the Levitt offer is set forth in Mr. Buchler's July 1, 2004 email to Mr. Arenson and the letter of intent that was faxed to Mr. Arenson at that time. MHI's "dire straits" are described in the July 1 email, and have been discussed at length with Mr. Arenson, as reflected in, *inter alia*, paragraph 3 of the email. Your attempt to suggest that your clients do not grasp the "critical" nature of the MHI situation is disingenuous. I am confident that Mr. Arenson, as one of Israel's largest general contractors, fully understands the ramifications of MHI present dependence on short-term extensions of its construction lines of credit, in the absence of which MHI "would have had to shut down operations" (July 1 email paragraph 2). Indeed, Mr. Arenson must be especially sensitive to the inability of MHI's management to function without appropriate capital resources.

The question Shamrock has repeatedly put to the Class B investors with respect to MHI is whether they are interested in making an alternative proposal. The answer to this can only come from the Class B investors -- it cannot come from Shamrock. As discussed above, if the Class B investors wanted any additional information concerning MHI in order to answer this question, they could seek it from Shamrock or other sources, but they have not done so.

I have already addressed your unfounded accusations regarding breach of fiduciary duty, so I will not repeat that discussion here.

I look forward to hearing from you concerning Mr. Arenson's availability to meet.

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Monday, August 02, 2004 1:28 PM
**To:** Pamela Jarvis

**Cc:** Thomas M. Wood
**Subject:** ALH

Your letter of today is acknowledged,it unfortunately is another edition of your prior epistle and seeks to avoid the simple fact that MHI is a Shamrock creation,it is a core issue,it can not be separated in some convenient box.

If after 10 pages of the same redundant dodge, Shamrock is unwilling to meet with the Class B investors, then simply say so. Do not purport to seek a resolution and suggest that we divorce MHI  and that we wait 6 weeks to meet. If MHI is as critical as you have suggested, then maybe Shamrock had better inform the Class Bs directly,meet with them and see if a solution to the overall issue can be found. The Class Bs know only what little information is occasionally dribbled out by Shamrock.

You continue to belittle what Shamrock did. They took control of ALH and then proceeded to liquidate it, against the advice and the desires of the Class Bs, all in the name that Shamrock grew tired of the management time that ALH consumed. That, succinctly stated, is a breach of fiduciary duty to the other shareholders of ALH.

I happen to be in Spain today and will be in Paris tomorrow. Intermittently(between meetings) I do see e-mails, though there is a 6 hour time difference to NYC and 9 hours to LA. I can be reached on my GSM- 1-443-570-5135 or 011-972-54-340-118.

Please let us not waste each others time and try and contain our written words to one page.
We are going to meet or we are not....it will not even need a full page.
**********************************

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

# EXHIBIT LL

## Gene Krieger

| | |
|---|---|
| **From:** | Gene Krieger |
| **Sent:** | Friday, September 06, 2002 4:11 PM |
| **To:** | 'Arenson Avie' |
| **Cc:** | George Buchler |
| **Subject:** | RE: ALH |

Dear Avie:

Best wishes to you and yours for a healthy, happy and safe New Year.  Let's pray that the new year brings new hope for peace in Israel.

I am sorry to hear that progress on the buyout has slowed down.  We understand that a meeting was held a few days ago in Miami with Landstar, so I assume they are the party you expect to respond by September 9th.  Since you indicate that Shalom is important to this process, I am willing to hold off a while longer on addressing ALH's issues with him.   What do you mean that "he is taking advantage of his personal relationship in an unconscionable fashion"?   Do you think his role in helping facilitate a buyout is being used as a shield (or a delaying tactic) from facing the issues he has with ALH?

As you know, we are having a meeting with management in Memphis on the 10th.  I don't think it would be practical to hook you in by phone, but we would be happy to bring you up to date after the meeting.  Shalom will not be able to attend either.   Since it has been so long since we have had any face to face contact with the management, and we don't get much information from Shalom, we wanted to get an informal update on the business operations.  Had we been able to get everybody together for a Board meeting sooner than October 2nd, we wouldn't need this management meeting.

Things are moving ahead with Walter Industries.  They have asked for a lot more information, and they are meeting today in Memphis to cover some of their final due diligence matters.  We expect to hear something more definitive from them at the end of next week.   Indications are that they remain very interested in Bowden, and I hope they will come forward with an acceptable offer.

We expect to hear from prospective buyers next week about their interest in Jacksonville.  Assuming positive responses, we hope to move that process forward as quickly as possible.

Please keep us in the loop.  I want to be respectful of the B's interest - both as a current partner and as a possible buyer of the A's interest, but we need to continue to move forward.

Regards.

Gene

-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Tuesday, September 03, 2002 3:16 AM
**To:** Gene Krieger
**Subject:** Re: ALH

Dear Gene:

I have delayed answering because the situation continues to be very fluid. We seem to have an acceptable and interested third party to buy you out, but have no definite word from him to go ahead. This after a round with an earlier potential buyer who finally decided he wasn't interested. We expect to know whether he will go ahead or not by 09Sept. We have not eliminated the possibility that the 'B's among themselves take up your shares, but sentiment is definitely in favour of an third party who is from the industry. I am aware of the Walter timetable.

At this point I cannot tell you what Shalom's involvement in the ultimate management set-up would be, if at all. Obviously he is quite important, if not vital, to the sale process, so that this is not a good time for a major distraction.

I think that he is taking advantage of his personal relationship in an unconscionable fashion.

what do to about it and when, is a good question.

I would be happy to take part by speaker phone in your non-board meeting on 9th, if you think it is practical, to exchange thoughts and bring each other up to date, and look forward to the 2-Oct meeting in Jacksonville.

best wishes for the New Year

Avie Arenson


----- Original Message -----
**From:** Gene Krieger
**To:** Avie Arenson (E-mail)
**Cc:** George Buchler
**Sent:** Friday, August 30, 2002 1:21 AM
**Subject:** ALH


Dear Avie:

A month has now passed and we have heard nothing from you on the possible buyout by the Bs, nor have I gotten a response to my note below. While we have heard from Shalom that information regarding ALH has been furnished to parties assisting in this transaction, we have not gotten any meaningful feedback that this transaction is progressing.

The timing of this issue is becoming more important. Walter Industries is making progress on their due diligence of Bowden, and we expect that they will provide us an offer and draft documents in a week or so. We know of no issues that have arisen that might deter them from proceeding.

The "book" on ABI has been furnished to several prospective buyers, and we expect to get expressions of interest and valuation within the next two weeks.

Lastly, if we are to move forward regarding an October resolution of Shalom's obligations to ALH, we need to get back to that issue. As I indicated in my note below, I would like to get you input on this matter.

I hope all is well.

Best regards.

Gene


-----Original Message-----
From: Gene Krieger
Sent: Wednesday, August 14, 2002 6:38 PM
To: Avie Arenson (E-mail)
Cc: George Buchler
Subject:


11/1/2004

Dear Avie:

Since we haven't had an ALH Board meeting for quite some time, and we have been preoccupied with matters related to financings, the sale process and management issues, I haven't had an opportunity to bring you up to date on an important matter that has been dragging on for quite a while.

I think you are aware that Shalom is in default on his obligations to ALH arising out of the settlement agreement reached with him about a year ago. Shalom has not made any payments against the two installments which were due in February and May, and these past due obligations now aggregate approximately $750,000. There is another (final) payment due in November. Shalom has requested that we modify the payment terms to accommodate his current financial condition, and we agreed to entertain such a request. Notwithstanding our offers to discuss this in good faith, Shalom has not put forth a proposal, has delayed this process unreasonably, has failed to meet promises and has created obstacles to our attempts to have meetings and discussions. Most recently, we were trying to arrange a meeting with Shalom for the end of July, when you raised the prospect of the B interests buying the A interests. Because of that development, and not knowing how Shalom fit into your plans, we held off any further attempt to address this issue with Shalom.

I believe it is important to protect ALH's interest, and I don't want this matter to drag on unnecessarily. However, if you tell me that we should hold off on this issue because of Shalom's involvement with you on a possible buyout, I would be willing to consider a further delay. On the other hand, if you do not object to renewing our attempts to reach an arrangement with Shalom, we will try to do that once again. We would do this with a view to bringing the issue to you and the Board by the next meeting. I would appreciate your thoughts on this matter.

It has now been over two weeks since you indicated that the Bs were seriously interested in a buyout of the A's interest in ALH, and you said the process would be one of weeks not months. I haven't heard anything further from you on this issue. Please let me know if the prospects of a transaction are real and the likely timetable.

Best personal regards.

Gene

11/1/2004

# EXHIBIT MM

SUBSCRIPTION AGREEMENT


This SUBSCRIPTION AGREEMENT (this "Agreement") is made as of June 12, 1998 by and between ALH Holdings LLC, a Delaware limited liability company (the "Company") and the Persons identified on Schedule I hereto (individually a "Purchaser" and collectively the "Purchasers").

W I T N E S S E T H:


WHEREAS, each Purchaser desires to make a capital contribution to the Company in an amount set forth opposite such Purchaser's name in Schedule I in exchange for the percentage interest in the Class B Membership Interest of the Company as set forth in Schedule I hereof.

NOW, THEREFORE, for and in consideration of the premises and the mutual representations and covenants hereinafter set forth, the parties hereto hereby agree as follows:


## I. DEFINITIONS

For all purposes of this Agreement the following terms shall have the meanings set forth in this Article I:

Act. The term "Act" shall have the meaning set forth in Section 4.4.

Capital Contribution. The term "Capital Contribution" shall have the meaning set forth in Section 2.1.

Class B Membership Interest. The term "Class B Membership Interest" shall have the meaning set forth in the Operating Agreement.

Closing. The term "Closing" shall have the meaning set forth in Section 2.2.

Closing Date. The term "Closing Date" shall have the meaning set forth in Section 2.2.

Contract. The term "Contract" as used herein means any contract, mortgage, deed of trust, bond, indenture, lease, license, note, certificate, option, warrant, right or other instrument, document or written agreement and any oral obligation, right or agreement, to which a party to this Agreement is a party or by which any party to this Agreement or its assets is bound.

DO NY/128887.6

Governmental Authority. The term "Governmental Authority" shall mean the Federal Government, any state, county, municipal, local or foreign government, court or tribunal and any governmental agency, bureau, department, board, commission, authority or body.

ICA. The term "ICA" shall have the meaning set forth in Section 4.5(d).

Interest. The term "Interest" shall have the meaning set forth in the Operating Agreement.

Judgment. The term "Judgment" shall mean any judgment, writ, order, injunction, award or decree of or by any court, judge, justice or magistrate, including any bankruptcy court or judge, and any order of or by any Governmental Authority.

Law. The term "Law" shall mean applicable common law and any statute, ordinance, code or other law, rules, regulation, order, technical or other standard, permit or permit condition, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority.

Material Adverse Effect. The term "Material Adverse Effect" shall have the meaning set forth in Section 3.2(b).

Operating Agreement. The term "Operating Agreement" shall mean the Operating Agreement, dated as of June 12, 1998, by and among the Company, the Purchasers and certain other persons thereto.

Person. The term "Person" shall mean any natural person, corporation, general or limited partnership, limited liability partnership, limited liability company, joint venture, trust, association, or unincorporated limited partnership, limited liability partnership, limited liability company, joint venture, trust, association, or unincorporated entity of any kind.

Stock Purchase Agreement. The term "Stock Purchase Agreement" shall mean that certain Stock Purchase Agreement date as of March 12, 1998 by and among ALH Acquisition Corp., John B. Towers, William B. Towers, Jr., Atlantic Builders, Inc., Atlantic Development Corporation of Jacksonville and Florida Lifestyle Homes, Inc.

## II. EXCHANGE OF CAPITAL CONTRIBUTION
## FOR THE CLASS B MEMBERSHIP INTEREST; CLOSING

2.1    Exchange of the Class B Membership Interest. Subject to the terms and conditions hereinafter set forth, each Purchaser hereby agrees to make a capital contribution to the Company in an amount (in cash unless otherwise set forth in Schedule I) set forth opposite

such Purchaser's name in Schedule I (each a "Capital Contribution") in exchange for its percentage interest in the Class B Membership Interest as set forth in Schedule I. Each Capital Contribution is payable by the Purchaser making such Capital Contribution at the Closing (as defined in Section 2.2 hereof) by wire transfer of immediately available funds to an account designated by the Company two (2) business day prior to the Closing.

2.2    Closing. The exchange of the Capital Contributions for the Class B Membership Interest (the "Closing") will take place at the offices of Paul, Hastings, Janofsky & Walker LLP, 399 Park Avenue, New York, New York at 10 a.m. New York time on June 12, 1998 (the "Closing Date") or at such other date as may be mutually agreed upon by the Company and the Purchasers.

## III. REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Purchasers as follows:

3.1    Organization and Authority of the Company. The Company is a limited liability company duly organized and validly existing under the laws of the State of Delaware, with all requisite power and authority to conduct its business and operations as presently conducted.

3.2    Legal Capacity: No Breach.

(a)    Legal Capacity. The Company has all requisite power and authority to execute, deliver and perform this Agreement. The Company has duly taken all actions necessary to authorize the execution, delivery and performance of this Agreement. This Agreement has been duly executed and delivered by the Company and (assuming that it is a legal, valid and binding obligation of each Purchaser) is the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws relating to the enforcement of creditors' rights generally.

(b)    No Breach. The execution, delivery and performance of this Agreement does not and will not contravene the certificate of formation or operating agreement of the Company and does not and will not (with the passage of time or the giving of notice or both) conflict with or result in a breach or violation of, or constitute a default by the Company under, any Law, Judgment, Contract, arrangement or understanding to which the Company is a party or by which the Company is subject or bound, except for such defaults, rights and violations which, singly or in the aggregate, would not have a material adverse effect on the

DO NY/128887.6                    -3-

business, financial condition, properties, assets or results of operations (a "Material Adverse Effect") of the Company.

## IV.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Each Purchaser hereby represents and warrants to the Company with respect to itself as follows:

4.1    <u>Organization and Authority of the Purchaser</u>.  The Purchaser (other than any Purchaser which is an individual) is a corporation, partnership, limited liability company or other entity, as applicable,  duly organized and validly existing under the laws of its state of incorporation or formation, with all requisite corporate, partnership or other power and authority to conduct its business and operations as presently conducted.

4.2    <u>Legal Capacity; No Breach</u>

(a)    <u>Legal Capacity</u>.  The Purchaser has all requisite corporate, partnership or other power and authority to execute, deliver and perform this Agreement.  The Purchaser has duly taken all corporate, partnership and other actions necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been duly executed and delivered by the Purchaser and (assuming that it is a legal, valid and binding obligation of the Company) is the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws relating to the enforcement of creditors' rights generally.

(b)    <u>No Breach</u>.  The execution, delivery and performance of this Agreement does not and will not contravene the certificate of incorporation, bylaws, certificate of formation or partnership agreement (or other formation and governing documents) of the Purchaser and does not and will not (with the passage of time or the giving of notice or both) conflict with or result in a breach or violation of, or constitute a default by the Purchaser under, any Law, Judgment, Contract, arrangement or understanding to which the Purchaser is a party or by which the Purchaser is subject or bound, except for such defaults, rights and violations which, singly or in the aggregate, would not have a Material Adverse Effect on the Purchaser.

4.3    <u>Legal and Governmental Proceedings and Judgments</u>.  Except as set forth on Schedule 4.3, there is no legal or governmental action, audit, complaint, proceeding, investigation, dispute, claim or controversy pending or, to the knowledge of the Purchaser, threatened that would delay, restrain, prohibit or otherwise challenge the legality or propriety of the transactions contemplated by this Agreement.

4.4    <u>No Registration</u>. The Purchaser has been advised that the Class B Membership Interest issuable hereunder has not been registered under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Act") and, therefore, cannot be resold unless it is registered under the Act or unless an exemption from registration is available.

4.5    <u>Purchase for Investment, Etc.</u>

(a)    The Purchaser is purchasing its percentage interest in the Class B Membership Interest for its own account, for investment and not with a view to, or for resale in connection with, the distribution thereof or with any present intention or distributing or reselling any thereof in violation of the Act.

(b)    The Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Class B Membership Interest and is aware that it may have to bear the economic risk of such investment for an indefinite period of time or to suffer a complete loss of its investment.

(c)    The Purchaser is an "accredited investor" (as defined in Rule 501 promulgated under the Act).

(d)    The Purchaser is not an investment company as defined in the Investment Company Act of 1940, as amended (the "ICA") nor would it be but for the exception set forth in Section 3(c)(1)(A) of the ICA or Section 3(c)(7) of the ICA. The Purchaser does not presently propose to make a public offering of its securities.

(e)    The Purchaser was not formed for the purpose of acquiring the Class B Membership Interest or its percentage interest therein.

(f)    Neither the Class B Membership Interest or a percentage interest therein was offered to the Purchaser by means of a general solicitation or publicly disseminated advertisement or sales literature, nor is the Purchaser aware of any offers made to other persons by such means.

4.6    <u>Information about the Company</u>. The Purchaser (i) is aware of the Company's business, operations, plans and financial condition, (ii) has had the opportunity to discuss the Company, its business, operations, plans and financial condition with senior executives of the Company, (iii) has received information in response to all inquiries and (iv) has received all such information as it deems necessary and appropriate to enable it to evaluate the Company and the financial risk of the Purchaser's investment in the Class B Membership Interest.

## V. CONDITIONS OF CLOSING

5.1     Each Purchaser's obligation to contribute and deliver the consideration for its percentage interest in the Class B Membership Interest, and the Company's obligation to issue the Class B Membership Interest, at the Closing and each Purchaser's and the Company's obligations to consummate the transactions contemplated by this Agreement are subject to the fulfillment on or prior to the Closing Date of the following conditions:

5.1.1     No Orders. As of the Closing, there shall not be outstanding any Judgment which in any way restrains or prevents the consummation of the transactions contemplated by this Agreement.

5.1.2     Compliance with Law and Governmental Approvals. All authorizations, approvals or permits, if any, of any Governmental Authority that are required in connection with the lawful issuance of the Class B Membership Interest pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Closing.

5.2     Each Purchaser's obligations to contribute and deliver consideration for its percentage interest in the Class B Membership Interest to be issued to it by the Company at the Closing and to consummate the transactions contemplated by this Agreement are subject to the fulfillment on or prior to the Closing Date of the following conditions:

5.2.1     Representations and Warranties. The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the time of the Closing, except to the extent that a representation or warranty of the Company made in this Agreement relates to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date.

5.2.2     Performance. The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing.

5.2.3     Officer's Certificate. The Company shall have delivered to the Purchasers a certificate dated the Closing Date executed by an appropriate officer of the Company certifying (i) the resolutions adopted by the manager of the Company authorizing the transactions contemplated hereby, (ii) the Operating Agreement, and (iii) the satisfaction of the conditions set forth in Sections 5.2.1 and 5.2.2.

5.3     The Company's obligation to issue the Class B Membership Interest to be issued by the Company at the Closing and to consummate the transactions contemplated by this Agreement are subject to the fulfillment on or prior to the Closing Date of the following conditions:

**5.3.1** <u>Capital Contribution</u>. The Company shall have received a Capital Contribution from each respective Purchaser as set forth in Schedule I.

**5.3.2** <u>Representations and Warranties</u>. The representations and warranties of each Purchaser contained in this Agreement shall be true and correct in all material respects as of the time of the Closing, except to the extent that a representation or warranty of each Purchaser made in this Agreement relates to an earlier period, in which case such representation and warranty shall be true and correct as of such earlier date.

**5.3.3** <u>Performance</u>. Each Purchaser shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing.

**5.3.4** <u>Officer's Certificate</u>. Each Purchaser (other than any Purchaser which is an individual) shall have delivered to the Company a certificate dated the Closing Date executed by an appropriate officer of such Purchaser certifying (i) the resolutions adopted by the Board of Directors (or other governing body) of such Purchaser authorizing the transactions contemplated hereby, (ii) the certificate of incorporation and bylaws (or other formation and governing documents) of the Purchaser and (iii) the satisfaction of the conditions set forth in Sections 5.3.2 and 5.3.3 by the Purchaser.

## VI. MISCELLANEOUS PROVISIONS

**6.1** <u>Termination</u>. This Agreement shall terminate (i) upon the mutual agreement of the parties hereto or (ii) if the Closing hereunder has not occurred by June 30, 1998.

**6.2** <u>Governing Law; Amendment</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to principles of conflicts of law. This Agreement cannot be changed orally, and can be changed only by an instrument in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

**6.3** <u>Complete Agreement; Counterparts</u>. This Agreement, together with the Operating Agreement, constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions, agreements and understandings of any and every nature among them. This Agreement may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

**6.4** <u>Assignment</u>. This Agreement is not assignable by the parties hereto except by operation of law.

6.5    Notices.  Any notice or other communication given hereunder shall be deemed sufficient if in writing and sent by registered or certified mail, return receipt requested, or delivered by hand against written receipt therefor, by facsimile transmission or by overnight courier, addressed as follows:

if to the Company:

ALH Holdings LLC
489 Fifth Avenue
New York, NY  10017

Attention:  Jonathan Zich

with a copy to:

Paul, Hastings, Janofsky & Walker LLP
399 Park Avenue
New York, New York  10022

Attention:  Richard Hamlin

if to any Purchaser:

to the address of such Purchaser set forth on Schedule I.

Notices shall be deemed to have been given on the third business day after being so mailed; except notices of change of address and notices not delivered by mail, which shall be deemed to have been given when received.

6.6    Successors.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, legal representatives, successors and assigns.

6.7    Severability.  The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

6.8    Waiver.  It is agreed that a waiver by any party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

DO NY/128887.6                                         -8-

6.9    <u>Further Agreements</u>. The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

6.10    <u>Expenses</u>. Each of the Company and the Purchasers shall pay its own reasonable legal and other out-of-pocket expenses in connection with the negotiation, preparation, execution and delivery of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

ALH HOLDINGS LLC


By: _____
Name:
Title:


ACCEPTED AND AGREED:

PURCHASERS


A. Arenson Holdings, Ltd

By:_____
    Name:
    Title:

D.A. Gardens, Ltd.

By:_____
    Name:
    Title:

J12ALH, Associates, LLC

By:_____
    Name:
    Title:

SELK, LLC

By:_____
    Name:
    Title:

DO NY/128887.6                     -10-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

ALH HOLDINGS LLC

By:_____
   Name:
   Title:


ACCEPTED AND AGREED:

PURCHASERS

A. Arenson Holdings, Ltd

By:_____
   Name:  A. ARENSON
   Title:  GEN MGR

D.A. Gardens, Ltd.

By:_____
   Name:  A. ARENSON
   Title:  C.E.O.

J12ALH, Associates, LLC

By:_____
   Name:
   Title:

SELK, LLC

By:_____
   Name:

DO NY/128887.5                              -10-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

ALH HOLDINGS LLC

By:_____
   Name:
   Title:

ACCEPTED AND AGREED:

PURCHASERS

A. Arenson Holdings, Ltd

By:_____
   Name:
   Title:

D.A. Gardens, Ltd.

By:_____
   Name:
   Title:

J12ALH, Associates, LLC

By:_____
   Name:
   Title:

SELK, LLC

By:_____
   Name:

DO NY/128887.5

-10-

Title:

Laurel Equity Group

By: _yehsbel Fonley_
Name: YEHESKEL FRANKER
Title: V.P