# EXHIBIT 2

**UNREPORTED CASES**

- Cairns v. Gelmon, 1998 WL 276226 (D.Del. May 21, 1998).
- Solar Cells, Inc. v. True North Partners, LLC, 2002 WL 749163 (D.Del. April 25, 2002).

Westlaw.
Not Reported in A.2d
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

Page 1

▷

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Leon G. CAIRNS, Gerald A. Cairns and Stanley K. Mabbott, Plaintiffs,
v.
Michael J. GELMON, Lewis Gelmon, Cory H. Gelmon, Alvin D. Gelmon and Instant Vision, Inc. Defendants.
No. CIV.A. 16062.

May 21, 1998.

Andre G. Bouchard and Joel Friedlander, Esquires, of Bouchard, Friedlander & Maloneyhuss, Wilmington, Delaware; and Dale C. Lysak, Esquire of The Dzivi Law Firm, San Francisco, California; Attorneys for Plaintiffs

Peter L. Tracey, Esquire, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware; and Debra A. Harrison, Esquire of Katten, Muchin & Zavis, Washington, DC; Attorneys for Defendants

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1 On November 26, 1997, Leon G. Cairns, Gerald A. Cairns, and Stanley K. Mabbott (the "plaintiffs" or the "Cairns Group") filed this action against Michael J. Gelmon, Lewis Gelmon, Cory Gelmon, and Alvin D. Gelmon (the "Individual defendants" or the "Gelmon Group"). The plaintiffs claim that the Gelmon Group wrongfully caused the Cairns Group to lose their equity in the corporate defendant Instant Vision, Inc. ("Instant Vision"), a Delaware corporation formed by the Gelmon Group.

The Complaint alleges five Counts: (i) breach of contract; (ii) unjust enrichment; (iii) breach of fiduciary duties; (iv) fraud; and (v) violation of 8 Del. C. § 242. [FN1] The Gelmon Group has moved to dismiss the Complaint on the grounds of lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. Defendant Cory Gelmon has moved separately for a dismissal as to himself on the ground of ineffective service of process, and Instant Vision has moved to dismiss as to it for failure to state a claim upon which relief can be granted. This is the Opinion of the Court on those motions, which are denied except with respect to Cory Gelmon.

FN1. Section 242 is the section of the Delaware General Corporation Law that governs amendments to a certificate of incorporation.

I. FACTS

The Cairns Group obtained from Morrison International, Inc. ("Morrison") an exclusive license to develop in Canada a product known as "Instant Eyeglasses." Morrison then invited the Cairns Group to bid for the right to license the Instant Eyeglasses technology in the United States. To raise the necessary capital, the Cairns Group formed a joint venture with the Gelmon Group and introduced the Gelmon Group to Morrison. The Cairns Group and the Gelmon Group then entered into two letter agreements, the essential elements of which were that (i) the parties would form a corporation as a vehicle to acquire the United States license from Morrison, (ii) the parties would share equally in the equity of that corporation, and (iii) each group would have one director on the corporation's board of directors.

On January 28, 1997, the Gelmon Group incorporated Instant Vision. It is claimed that contrary to their agreements, the Gelmon Group issued all of the shares to themselves and placed four of its members--but only one member of the Cairns Group--on Instant Vision's board of directors. On June 25, 1997, the Gelmon Group announced that it exclusively would handle the license transaction with Morrison, and also declared unilaterally its entitlement to a 10% finder's fee. The Gelmon Group also caused Instant Vision to amend its Certificate of Incorporation to increase its authorized common stock from 3000 to 10,000,000 shares, even though Leon Cairns, the director who represented the Cairns Group, was never informed of the charter amendment in advance of its approval. This action followed.

After commencing this action, the plaintiffs served each member of the Gelmon Group under 10 Del. C. § 3104, Delaware's long-arm statute, and 10 Del. C. § 3114, Delaware's d irector-consent-to-service statute. The record reflects that no member of the Gelmon Group has ever been physically present, or

Not Reported in A.2d    Page 2
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
**(Cite as: 1998 WL 276226 (Del.Ch.))**

ever conducted any business or performed any work relevant to the plaintiffs' claims in Delaware.

## II. THE PARTIES' CONTENTIONS

*2 The defendants advance several grounds for dismissal. First, they contend that this Court lacks personal jurisdiction over all members of the Gelmon Group under § 3104, because (i) none of those defendants had the requisite minimum contacts with Delaware, (ii) § 3114 does not support personal jurisdiction over the Gelmon Group, and (iii) service of process was never validly effected upon Cory Gelmon. The defendants also urge that the Complaint should be dismissed as to Instant Vision, because no relief is sought against it and because the Complaint does not allege that any conduct of Instant Vision caused harm to the plaintiffs. Finally, the defendants argue that because the plaintiffs are not shareholders of Instant Vision, they have no standing to challenge the certificate amendment that increased the number of Instant Vision's authorized shares.

In response, the plaintiffs contend that Cory Gelmon was properly served and that the act of incorporating Instant Vision in Delaware is a sufficient statutory and constitutional basis to support *in personam* jurisdiction over the Gelmon Group. The plaintiffs further claim that the Gelmon Group has waived its right to argue that Counts I through V fail to state a claim upon which relief can be granted, because the Gelmon Group's opening brief does not specify in what respect those Counts fail to state a claim. The plaintiffs contend that Instant Vision is a proper defendant, because its presence is necessary to afford the plaintiffs a full and complete remedy. Finally, the plaintiffs urge that they have standing to challenge the amendment to the certificate of incorporation because they are equitable (as opposed to record) shareholders, and because Mr. Cairns was harmed as a result of being denied full and equal access to the certificate amendment-related information that had been furnished to Instant Vision's remaining directors.

## III. ANALYSIS

On these motions, the Court must decide five issues. Two of those issues are jurisdictional, namely, (i) whether the Gelmon Group's sole act of incorporating Instant Vision in Delaware, without more, is enough to sustain *in personam* jurisdiction over the Gelmon Group in Delaware, and (ii) whether Cory Gelmon was properly served. The remaining three issues relate to the legal sufficiency of the various Counts in the Complaint: specifically, (i) whether the Gelmon Group has waived its right to assert the defense that Counts I through V fail to state a claim upon which relief can be granted; (ii) whether Instant Vision is a proper defendant; and (iii) whether the plaintiffs have standing to challenge the amendment to the certificate of incorporation.

### A. *The Personal Jurisdictional Issues*
1. Personal Jurisdiction Over the Gelmon Group

In determining whether it has personal jurisdiction over the Gelmon Group, this Court must employ a two-step inquiry: (i) whether personal jurisdiction has been established under the Long-Arm Statute, and (ii) if so, whether the assertion of personal jurisdiction in this specific instance would violate traditional notions of Due Process. [FN2] On a motion to dismiss for lack of personal jurisdiction, the plaintiffs have the burden to demonstrate that jurisdiction exists. [FN3]

> FN2. *LaNouva D & B S.p.A. v. Bowe Co.,* Del.Supr., 513 A.2d 764, 768 (1986).

> FN3. *Hart Holding Co. v. Drexel Burnham Lambert Inc.,* Del. Ch., 593 A.2d 535, 539 (1991).

*3 The plaintiffs rely on *Papendick v. Bosch* [FN4] as on-point authority for their position that a single act of incorporation in Delaware, if done as part of a wrongful scheme, will suffice to confer *in personam* jurisdiction over the nonresident defendants responsible for the scheme. [FN5] In *Papendick,* the plaintiff sued the defendant for breach of a finder's fee agreement. The only contact between the nonresident defendant and the Delaware forum was that the defendant had formed a Delaware subsidiary to acquire stock in a third company. The Delaware Supreme Court determined that the defendants' purposeful availment "of the benefits and protections of the State of Delaware for financial gain" through the act of incorporating the Delaware subsidiary satisfied the "minimum contacts" requirement of *International Shoe Co. v. Washington.* [FN6]

> FN4. Del.Supr., 410 A.2d 148 (1979), *cert. denied,* 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980).

> FN5. *See Newspan, Inc. v. Hearthstone Funding Corp.,* Del. Ch., C . A. No. 13304, Allen, C. (May 10, 1994) ("It is well accepted that the incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01339-SLR   Document 55-3   Filed 09/12/2005   Page 4 of 14

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

this jurisdiction sufficient to satisfy the requirements of the Due Process Clause, particularly where the creation of the corporation is an integral part of the actions giving rise to the suit.").

> FN6. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The plaintiffs claim that here, as in *Papendick,* the act of incorporating Instant Vision in Delaware was an integral part of a fraudulent scheme, and is therefore sufficient to sustain personal jurisdiction under § 3114(c)(1). [FN7] Indeed, plaintiffs argue, the present facts are even more compelling than *Papendick,* because here the very act of incorporation is claimed to have caused the plaintiffs' injury.

> FN7. Sub-section (c)(1) provides: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in this State." It is claimed that the incorporation of Instant Vision falls within the scope of this provision.

The defendants contend that *Papendick* is not controlling because in that case, service of process was accomplished by writ of foreign attachment under 10 Del. C. § 3507, whereas in this case, service was accomplished under § 3104. The defendants fail to explain why this distinction is significant; moreover, their assertion that the plaintiffs have failed to make an adequate evidentiary showing to satisfy the requirements of § 3104 and the Due Process clause is at best conclusory. The defendants rely upon the identical recital(s), in affidavits filed by each member of the Gelmon Group, denying that "they have... transacted business or performed any work or services from which plaintiffs' alleged causes of action against me arises in the State of Delaware, either in my individual capacity, or as a Director or officer of Instant Vision, Inc." The defendants argue that because the plaintiffs have failed to rebut that affidavit testimony, they have failed to carry their burden of proof.

I cannot agree. Given the defendants' failure to distinguish *Papendick,* and because the incorporation of Instant Vision in Delaware is central to their claims of wrongdoing, I conclude that in these specific circumstances that single act suffices to constitute the "transaction of business" in Delaware under 10 Del. C. § 3104(c)(1) and to satisfy the requirements of Due Process. [FN8] The defendant's contrary affidavits recite legal conclusions that are legally incorrect. The Court therefore rejects the Gelmon Group's motion to dismiss for lack of personal jurisdiction.

> FN8. *Red Sail Easter Limited Partnership, L.P. v. Radio City Hall Productions, Inc.,* Del. Ch., C.A. No. 12036, Allen, C. (July 10, 1991).

2. Sufficiency of Process on Cory Gelmon

The defendants next argue that service of process was never validly effected on Cory Gelmon. The plaintiffs respond that process was sent by registered mail to Cory Gelmon's mailing address as set forth on the original certificate of incorporation, [FN9] and that such process was returned as undelivered on February 3, 1998. Accordingly, the plaintiffs conclude, service of process on Cory Gelmon was effective under § 3104(d) and (g).

> FN9. Cory Gelmon was one of the Incorporators of Instant Vision.

*4 The defendants respond that although the plaintiffs filed proof of nonreceipt, § 3104(d) then required that they send Cory Gelmon a second registered notice by certified mail. Because the plaintiffs have not offered proof that they did this, defendants continue to argue that service of process on Cory Gelmon was ineffective.

The Court finds that the plaintiffs have not carried their burden on this issue, as they have not established that they sent a second registered notice to Cory Gelmon. Our Supreme Court has held that noncompliance with that statutory requirement (that a second notice be sent no later than seven days after the filing of the first notice) invalidates service of process under § 3104. [FN10] Because the plaintiffs have not established that they satisfied this requirement, the Complaint must be dismissed as against Cory Gelmon, unless the plaintiffs are able to show (by way of a supplemental affidavit) that a timely second registered notice was sent.

> FN10. See *Greenly v. Davis,* Del.Supr., 486 A.2d 669, 671 (1984).

B. *The Rule 12(b)(6) Issues*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 4
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
**(Cite as: 1998 WL 276226 (Del.Ch.))**

The defendants also contend that all Counts of the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. The legal standard on a Rule 12(b)(6) motion to dismiss is that "[t]he complaint may not be dismissed unless it appears to a reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim." [FN11]

> FN11. *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1263-64 (1979).

1. The Waiver Argument

The plaintiffs respond that the defendants have waived their right to argue that those Counts should be dismissed under Rule 12(b)(6), because their opening brief contains no argument as to how Counts I-IV inclusive fail to state a claim.

The plaintiffs are mistaken. Court of Chancery Rule 12(h)(2) states that "A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." Because Rule 12(h)(2) entitles the Gelmon Group to advance Rule 12(b)(6) arguments up to and including the trial, they have not waived their right to raise a 12(b)(6) defense as to Counts I through IV, inclusive.

2. The Claims Against Instant Vision

The defendants argue that Instant Vision should be dismissed: (i) as to Count I (breach of contract) because Instant Vision was not a party to the alleged contract(s) between the plaintiffs and the Gelmon Group; (ii) as to Count II (unjust enrichment) because the Complaint does not allege that Instant Vision was unjustly enriched; (iii) as to Count III (breach of fiduciary duty) because the Complaint does not allege that Instant Vision owed any fiduciary duties to the plaintiffs; (iv) as to Count IV (fraud) because the Complaint does not allege that Instant Vision misrepresented or failed to disclose any material fact to the plaintiffs; and (v) as to Count V (violation of § 242) because the Complaint fails to allege any action or inaction by Instant Vision that resulted in harm to the plaintiffs.

*5 The plaintiffs respond that Instant Vision was properly joined as a defendant solely in order to ensure that full and complete relief can be granted. The relief that plaintiffs seek here is to recover 50% of Instant Vision's shares, dividends, and profits now held by the Gelmon Group. That being the case, the plaintiffs contend, Instant Vision must be made a defendant if only because they claim that certain stock, dividends, and profits were distributed to one member of the Gelmon Group, and were then returned to Instant Vision. To recover those monies from Instant Vision, plaintiffs argue, that entity must be joined as a party.

The plaintiffs also argue that Instant Vision is a proper defendant with respect to their claim that the defendants incorporated Instant Vision, and then wrongfully took control of its board of directors and caused to be issued to themselves all of its stock. The plaintiffs contend that because it may be impossible to distinguish the acts of Instant Vision from those of the Gelmon Group which controlled the corporation, any relief against the Individual defendants may have to run against Instant Vision as well.

The defendants respond that Instant Vision need not be made a party to afford the plaintiffs the specific relief they seek because the Complaint only seeks 50% of the stock held by the Gelmon Group. That argument incorrectly assumes that the only form of relief sought is a constructive trust. It ignores the fact that the Complaint also requests such other form of relief that the Court deems appropriate. At the oral argument on the pending motions, the defendants' counsel conceded that under at least one scenario relief against the corporation might be justified, *viz.,* if the Court were to direct Instant Vision to recognize the plaintiffs as record owners of 50% of its stock. Because the Court finds that Instant Vision is a proper party, the defendants' motion to dismiss the Complaint as to it is denied.

3. The Standing Argument

The defendants argue that the Court must dismiss Count V because the plaintiffs are not record shareholders of Instant Vision, and therefore lack standing under 8 Del. C. § 242 to challenge the amendment to Instant Vision's corporate charter that increased its authorized stock from 3000 to 10,000,000 shares.

The plaintiffs counter that they have standing to challenge the charter amendment, because Mr. Cairns was a director of Instant Vision at the time the amendment was adopted, yet was not given advance notice of the proposed amendment, or any opportunity to vote on it. Plaintiffs also argue that they have standing by virtue of the Cairns Group's claimed equitable interest in the disputed shares of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01339-SLR   Document 55-3   Filed 09/12/2005   Page 6 of 14

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

Instant Vision. For that reason, the plaintiffs argue, they should have the same standing as would any record holder of the corporation's shares, because had the Gelmon Group honored their agreement, the plaintiffs would be the record owners of one half of Instant Vision's equity. [FN12]

> FN12. *See Shaev v. Wyly,* Del. Ch., C.A. No. 15559, Steele, V.C. (Jan. 6, 1998)(former shareholder of parent has standing to bring derivative action on behalf of subsidiary after spin-off); *International Equity Capital Growth Fund, L.P. v. Clegg,* Del. Ch., C.A. No. 14995, Allen, C. (Apr. 21, 1997)(discussing exception to standing requirement for plaintiffs with a "substantial and continuing equity investment.").

*6 Defendants contend that Mr. Cairns does not have standing, even as a director, because the plaintiffs have not alleged how (if at all) he was harmed. Moreover, the defendants argue, if the plaintiffs have an equitable claim to shares held by the Gelmon Group, that claim is derivative yet Count V of the Complaint is not brought derivatively. Therefore, the defendants urge that Count V of the Complaint must be dismissed for failure to state a claim upon which relief can be granted.

I conclude that Count V states a claim upon which relief can be granted. First, there is no merit to the argument that the plaintiffs' claim as equitable owners of stock is derivative, because the alleged harm runs to the plaintiffs directly, not to the corporation. Second, Count V claims that Mr. Cairns was a director of Instant Vision at the time the amendment to the corporate charter was considered and voted upon, yet he was intentionally not given notice that this issue would be considered, and was deprived of the opportunity to join in the board's deliberations. These allegations are sufficient to state a cognizable claim for relief. In *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* [FN13] this Court held that except where certain board governance procedures are established, a director has a right of access to whatever corporate information was given to its other directors during the director's tenure. Because Mr. Cairns is claimed to have been denied such access, Count V may be viewed as a claim to enforce that right, by invalidating a charter amendment that was the result of a defective board process. That claim, if meritorious, would afford the plaintiffs a basis for relief. [FN14] Accordingly, the motion to dismiss this Count must be denied.

> FN13. Del. Ch., C.A. Nos. 13911 & 14595, Jacobs, V.C. (June 4, 1996), *appeal denied,* 682 A.2d 625 (1996).

> FN14. *See, e.g., Schroder v. Scotten, Dillon Company,* Del. Ch., 299 A.2d 431, 435 (1972)("A special meeting held without notice to all directors as required by the by-laws is not lawful and all such acts done at such a meeting are void.").

### IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motions to dismiss, except that the claims against Cory Gelmon will be dismissed unless the plaintiffs are able to demonstrate, by the filing of appropriate proof within ten days of the date of this Opinion, that Mr. Gelmon was properly served in accordance with 10 Del. C. § 3104. IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 1
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
SOLAR CELLS, INC., Plaintiff,
v.
TRUE NORTH PARTNERS, LLC, First Solar, LLC, Michael J. Ahearn, Michael L. Pierce, and Michael Gallagher, Defendants.
**No. Civ.A. 19477.**

Submitted April 17, 2002.
Decided April 25, 2002.

Kenneth J. Nachbar, Jon E. Abramczyk, S. Mark Hurd, and Brian J. McTear, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Barry W. Fissel and M. Charles Collins, of Eastman & Smith Ltd., Toledo, Ohio, for Plaintiff, of counsel.

Allen M. Terrell, Jr., Thad J. Bracegirdle and Andrea K. Short, of Richards, Layton & Finger, Wilmington, Delaware; Timothy P. Ryan and Daniel B. McLane, of Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 This action concerns the proposed merger of defendant First Solar, LLC ("First Solar" or the "Company") with and into First Solar Operating, LLC ("FSO"), the wholly-owned operating subsidiary of First Solar Ventures, LLC ("FSV"). The plaintiff, Solar Cells, Inc. ("Solar Cells"), alleges that the individual defendant managers of First Solar, [FN1] acting at the direction of defendant True North Partners, LLC ("True North" and, collectively, "the defendants"), acted in bad faith in approving the proposed merger and that the defendants will be unable to prove the entire fairness of that merger.

> FN1. The individual defendants are First Solar Managers elected by True North: Michael J. Ahearn ("Ahearn"), Michael L. Pierce ("Pierce"), and Michael Gallagher ("Gallagher").

On March 13, 2002, Solar Cells filed a motion for a temporary restraining order requesting that this Court enjoin the proposed merger, which was scheduled to close two days later. The defendants agreed to postpone consummation of the merger in order to permit the parties to conduct the limited discovery necessary to present their positions at a preliminary injunction hearing. Solar Cells' motion for a preliminary injunction was fully briefed and then argued on April 17, 2002. Because I find that Solar Cells has met its burden of establishing a reasonable likelihood that it will be successful on the merits of its claim of a breach of fiduciary duty and that it is threatened by irreparable harm if the merger is consummated, I will enter an Order preliminarily enjoining the merger. [FN2]

> FN2. Solar Cells also contends that True North improperly converted loans it made to First Solar into First Solar membership units, that the defendants breached their duty of care in approving the proposed merger, and that the defendants improperly are attempting to deny Solar Cells its Class B Units merger approval rights. Because a preliminary injunction will issue if a plaintiff carries his burden on at least one of his claims, my determination that Solar Cells has made an adequate showing as to this first claim obviates the need to discuss these additional claims.

**I. BACKGROUND FACTS**
Solar Cells, an Ohio corporation, was founded in 1987 by Harold A. McMaster ("McMaster") to develop, design, and manufacture products and processes for photovoltaic electricity generation-technology commonly referred to as "solar power." McMaster designed technologies and processes for manufacturing photovoltaic cells making use of heretofore-unknown techniques that were predicted to revolutionize the solar power industry. [FN3] These inventions purportedly would permit cost-effective manufacture of photovoltaic cells that produce energy at rates competitive with, or even less than, the present cost of electrical generation using fossil fuels. In order to exploit the potential of these inventions, True North, an Arizona limited liability company, was brought in to provide needed financing. Solar Cells and True North formed First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Solar as a Delaware limited liability company in February 1999 to commercialize McMaster's solar technology.

> FN3. McMaster or his companies were awarded at least 13 patents for these processes and technologies.

First Solar is managed pursuant to the Operating Agreement of First Solar, LLC ("Operating Agreement"). The Operating Agreement required Solar Cells to contribute patented and proprietary technology-valued in the Operating Agreement at $35 million-to First Solar. True North was to contribute $35 million in capital to First Solar and, also pursuant to the Operating Agreement, was required to, and did, loan First Solar an additional $8 million. In return for their contributions, Solar Cells and First Solar each received 4,500 of First Solar's Class A membership units. Solar Cells also received 100% of First Solar's Class B membership units. [FN4] The business and affairs of First Solar is conducted by five Managers. The Operating Agreement permits True North to elect three of those Managers (the "True North Managers") and Solar Cells to elect the remaining two Managers (the "Solar Cells Managers"). It is undisputed that, since its inception, First Solar has been managed by True North.

> FN4. According to the Operating Agreement, Class A Units had voting rights, and Class B Units had no voting rights.

*2 First Solar's continuing development and manufacturing expenditures, as well as its inability to produce a marketable product, eventually depleted the Company's initial funding. By early 2001 it became apparent that continued operations would require additional funding. To this end, in March 2001, First Solar retained investment banker Adams, Harkness & Hill, Inc. ("AHH") to find a strategic investor for the Company. In order for the Company to continue operating while AHH searched for a strategic investor, True North agreed to make an additional $15 million loan to First Solar.

The Loan Agreement between First Solar and True North bundled True North's original $8 million loan and the new $15 million loan and represented a funding commitment by True North of up to a total of $23 million through December 31, 2001. Upon either the receipt of outside investment or at the end of its funding commitment, the Loan Agreement gave True North the option of converting some or all of the loan amount into Class A Units of First Solar [FN5] or to retain the investment as a loan with liquidation preferences. For reasons disputed by the parties (but not relevant to this motion), no outside investors were brought into First Solar.

> FN5. The loan was convertible either at the same value as AHH proposed to outside investors or at a "conversion ratio" specified in the Loan Agreement.

From December 2001 through March 2002, the parties engaged in unsuccessful negotiations regarding different alternatives for financing and restructuring First Solar. On March 5, 2002, True North purported to convert $250,000 of its outstanding loans to First Solar into Class A Units at a conversion ratio based on a January 8, 2002 AHH valuation of First Solar at $32,000,000. On March 7, 2002, the True North Managers executed a written consent approving the challenged merger of First Solar into FSO, a Delaware limited liability company wholly owned by True North. On March 11, 2002, Solar Cells received notice of the proposed merger, which was scheduled to close on March 15, 2002, and the terms of that merger. In connection with the merger, True North would convert its remaining outstanding loans into equity at the same ratio as the March 5, 2002 conversion. The merger would occur based on a total valuation of First Solar at $32 million with First Solar ownership units being exchanged for ownership units of the surviving company. The end result of the merger-related transactions would be that Solar Cells would go from owning 50% of the Class A Units of First Solar to owning 5% of the membership units of the surviving company. On March 13, 2002, Solar Cells filed a complaint and request for temporary restraining order enjoining consummation of the proposed merger. True North agreed not to cause its Managers to close the merger before this Court's decision on Solar Cells' motion for a preliminary injunction filed in response to that agreement.

II. PRELIMINARY INJUNCTION STANDARD
The standard on a motion for preliminary injunction is well-settled. In order to prevail, a plaintiff must establish: (1) a reasonable likelihood of success on the merits of at least one claim; (2) that irreparable harm will be suffered by the plaintiff if the injunction is denied; and (3) that the harm that the plaintiff will suffer if the injunction is not granted outweighs the harm that the defendant will suffer if the injunction is granted. [FN6]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN6. See *In re Aquila Inc. Shareholders Litig.*, 2002 WL 27815 at * 5 (Del. Ch.).

### III. CONTENTIONS

*3 Solar Cells argues that the manner in which the proposed merger was approved demonstrates that the True North Managers acted in bad faith and breached their fiduciary duties to Solar Cells as a member of First Solar. Because of the defendants' bad faith, Solar Cells contends that the defendants will be required to prove that the proposed merger is entirely fair. Solar Cells argues that it is likely to be successful on the merits because the defendants will be unable to demonstrate that the proposed merger was the result of fair dealing and based on a fair price.

Solar Cells lists three effects of the proposed merger that will irreparably harm it should the merger close. First, because of the purportedly improper conversion ratio used by True North to convert its outstanding First Solar loans to equity, Solar Cells' 50% voting and equity interest in First Solar will be diluted to only a 5% interest in the surviving company. Second, Solar Cells bargained for the right to elect two Managers when negotiating with True North over the creation of First Solar. As a result of the proposed merger, it will lose this bargained-for right. Instead, True North will-through its control of 95% of the voting units of the surviving company-elect all three of the Managers of the surviving LLC. Third, and finally, it is contemplated that outside investors will be brought into the surviving company. Should that happen and this Court later determines that use of an improper conversion caused the equity positions of the parties to be incorrectly established, the interests of third parties would make the resolution of that problem extremely difficult. [FN7] Solar Cells argues the harm is incalculable and far outweigh any harm that might be suffered by First Solar as a result of enjoining an unfair transaction.

> FN7. The plaintiff also makes lengthy arguments over which one of several valuations was appropriate to use under the terms of the Loan Agreement in determining the conversion ratio for True North debt. Plaintiff also, as a separate matter, argues that AHH's January 8, 2002 valuation of First Solar at $32,000,000 was, nonetheless, inaccurate and could not serve as the basis for conversion under any circumstances. It is not necessary for my decision on this motion to make determinations with regard to those arguments. That value was used for both the purported conversion of True North loans and served as the valuation of First Solar for purpose of the merger. I need only determine whether the values used in those transactions is likely to cause irreparable harm to Solar Cells.

The defendants counter that, as evidenced by the Operating Agreement, the parties unambiguously agreed that the True North Members could control decisions regarding the business and affairs of First Solar. Action by written consent is permitted by the Operating Agreement. A merger need only be approved by a majority of the Managers and True North has veto power over any mergers it does not agree with. The merger was approved by the three True North Managers in the good faith belief that, in light of failed restructuring negotiations between the parties, this was the only option available to save First Solar from a forced sale or liquidation when it runs out of operating money at the end of April 2002. Furthermore, the Operating Agreement acknowledges that there will be conflicts of interest between the True North Managers (two of which are True North principals) and eliminates liability for any conflict of interest transactions that they may engage in. The only requirement is that the True North Managers act in the good faith belief that their actions are in the best interest of First Solar. Because every action taken by the True North Managers with regard to the proposed merger was authorized by the Operating Agreement and made in the good faith belief that it was in the best interest of First Solar, True North insists that this Court should deny Solar Cells' motion.

*4 Although True North disputes the need to establish entire fairness, it contends that both the process and the price of the merger are entirely fair. The process undertaken was clearly authorized by the Operating Agreement and the price was arrived at from a valuation by AHH based on accurate revenue statements and is further supported by an outside valuation.

True North argues that Solar Cells will not be irreparably harmed by the merger. Any dilution suffered by Solar Cells is the result of a valid conversion of True North loans to equity. Solar Cells will be permitted to make further investments in the surviving company on the same basis as True North. There is a reset provision that will reverse part of Solar Cells' dilution if a strategic investor is found during 2002. Although the defendants acknowledge that Solar Cells will not have the right to elect

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

managers of the surviving company, they contend that True North had the right to elect a majority of First Solar Managers and, therefore, was guaranteed control over the business and affairs of the Company. True North merely continues to have the power to control the business and affairs of the surviving company. Since Solar Cells could not control First Solar, it has not lost any power over the company by not being able to elect managers of the surviving company. Having suffered no irreparable harm, defendants contend that the equities clearly balance in their favor and against the motion. They assert that if the injunction is granted, the Company will run out of money by April 30, 2002. Since True North is unwilling to continue funding the Company, it will have to terminate its employees, shut down, and be sold at a bargain in a forced liquidation.

### IV. ANALYSIS
*A. Likelihood of Success on the Merits*

The defendants argue that all of the actions taken in connection with the proposed merger were clearly authorized by the Operating Agreement. They further argue that the Operating Agreement limited any fiduciary duties owed by True North Managers. Section 4.18(a) of the Operating Agreement provides, in relevant part:

> Solar Cells and [First Solar] acknowledge that the True North Managers have fiduciary obligations to both [First Solar] and to True North, which fiduciary obligations may, because of the ability of the True North Managers to control [First Solar] and its business, create a conflict of interest or a potential conflict of interest for the true North Managers. Both [First Solar] and Solar Cells hereby waive any such conflict of interest or potential conflict of interest and agree that neither True North nor any True North Manager shall have any liability to [First Solar] or to Solar Cells with respect to any such conflict of interest or potential conflict of interest, provided that the True North managers have acted in a manner which they believe in good faith to be in the best interest of [First Solar].

I note that this clause purports to limit *liability* stemming from any conflict of interest. Solar Cells has not requested that this Court impose liability on the individual defendants. It is currently only seeking to *enjoin* the proposed merger. Therefore, exculpation for personal liability has no bearing on the likelihood that Solar Cells would be successful on the merits of its contention that the proposed merger is inequitable and should be enjoined. Even if waiver of liability for engaging in conflicting interest transactions is contracted for, that does not mean that there is a waiver of all fiduciary duties to Solar Cells. Indeed, § 4.18(a) expressly states that the True North Managers must act in "good faith." It is undisputed that First Solar was, and is, in financial distress. Months of unsuccessful negotiations have been ongoing in an attempt to come to an agreement as to how to remedy that situation. On March 6, 2002, the full Board of Managers met and the True North Managers made no mention of the planned merger. The *very next day,* March 7, 2002, the three True North Managers met and by written consent approved the proposed merger. No effort was made to inform the Solar Cells Managers that this action was contemplated, or imminent, when those facts were surely known at the time of the March 6 meeting. [FN8] At the earliest, Solar Cells was given notice of the fact, and terms, of the proposed merger (which were presented as a *fait accompli* ) via facsimile on March 8, 2002-a week before consummation of a merger that will apparently reduce Solar Cells' interest from 50% to 5%. These actions do not appear to be those of fiduciaries acting in good faith. As the Supreme Court and this Court have made clear, it is not an unassailable defense to say that what was done was in technical compliance with the law. [FN9] The facts before me make it likely, in my opinion, that the defendants would be required to show the entire fairness of the proposed merger.

> FN8. The plaintiff contends that documents produced during discovery reveal that the defendants had been planning the proposed merger since at least February 27, 2002.

> FN9. *See Schnell v. Chris-Craft Indus.,* 285 A.2d 437 (Del.1971).

*5 The party with the burden of establishing entire fairness must establish that the challenged transaction was the result of fair dealing and offered a fair price. Fair dealing pertains to the process by which the transaction was approved and looks at the terms, structure, and timing of the transaction. Fair price includes all relevant factors "relat[ing] to the economic and financial considerations of the proposed merger." [FN10]

> FN10. *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983).

The defendants argue that there is nothing inherently unfair about the structure of the merger-a holding company with a wholly-owned operating subsidiary. Solar Cells points out, however, that there was no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

independent bargaining mechanism set up to protect its interests. In fact, there was no negotiation at all. All of the decisions regarding the terms of the merger and its approval were made unilaterally by True North through its representative Managers. No advance notice of this merger was given to Solar Cells. The fact that the Operating Agreement permits action by written consent of a majority of the Managers and permits interested transactions free from personal liability does not give a fiduciary free reign to approve any transaction he sees fit regardless of the impact on those to whom he owes a fiduciary duty.

The defendants contend that the timing of the merger was dictated by the Company's financial emergency, an emergency they say had been exacerbated by Solar Cells' refusal to negotiate, in good faith, a suitable plan for restructuring the Company. Solar Cells counters that the timing was driven by True North's desire to increase its proportionate ownership while simultaneously squeezing out Solar Cells at an unfair price. Solar Cells argues that the effect of the merger is essentially the same as the terms of a restructuring plan Solar Cells had refused to agree to in February 2002. They contend, in the face of Solar Cells' refusal to accept an unfair restructuring offer voluntarily, that the defendants immediately sought to impose similar terms by way of the proposed merger.

I am unconvinced by defendants' argument that the merger was fair to Solar Cells because Solar Cells retains voting rights in the surviving company. On matters where the unit-holders can vote, Solar Cells is diluted from an equal (50%) voice, to only 5%. Also arguably illusory is the so-called market-reset provision that would raise Solar Cells' initial equity interest in the new entity in the event that the new entity secures third-party financing in 2002. True North has complete control over the managing board and any other decision requiring the vote of unit-holders. Certainly, then, it would be within the power of True North to delay consummation of any proposed third-party investment until after 2002. Such action would seem to be in the self-interest of both True North and any potential third-party investor, as any increase in Solar Cells' equity interest necessarily decreases the equity interest of others. Finally, the ability of Solar Cells to invest new money into the surviving corporation on the same terms as True North hardly remedies the harm suffered by Solar Cells by the initial dilution of its interest as a result of the proposed merger. In my opinion, the facts before me establish a reasonable likelihood that defendants will not be able to establish that the proposed merger was the result of fair dealing.

*6 Application of the entire fairness standard requires a demonstration of both fair dealing and fair price. Having considered the fair dealing component of the standard, I turn now to the fair price analysis.

Solar Cells contends that True North manipulated the valuation of First Solar in order to advantage itself. That is, according to Solar Cells, when True North decided it would become a buyer of First Solar it unilaterally caused AHH to create a fundamentally flawed valuation that is less than one-third of the value calculated by AHH only five months earlier. On the other hand, True North insists that AHH's January 2002 $32 million valuation of First Solar, a calculation that forms the basis of the proposed merger terms, is a more credible calculation of First Solar's value than earlier calculations by AHH. True North contends that the earlier calculations were overly optimistic and were based on outdated financial projections as well as changed market conditions.

For purposes of the present motion only, I am satisfied that there is a reasonable probability that the Court will not find the January 2002 valuation to be entirely fair. First, the author of AHH's January 2002 valuation materials described those materials as a "quick and dirty" analysis of First Solar's value on that date. This contrasts with the earlier valuations in August and November of 2001, valuations that were based on multiple methodologies to arrive at a value for First Solar that ranged from $103 million in August 2001 to $72 million in November 2001, or almost two to three times the January 2002 valuation. Second, AHH's January 2002 valuation employed only a discounted cash flow analysis. Although the lower valuation in January 2002 was the basis upon which True North would acquire a 95% interest in First Solar and Solar Cells would fall to a 5% interest, the significantly lower valuation failed to employ any other method of valuation as a "crosscheck" to the discounted cash flow analysis. Because earlier valuations relied on multiple valuation methodologies, it is a reasonable inference that AHH's "quick and dirty" analysis is less reliable and authoritative. Third, the January 2002 formula used a much lower exit multiple (a 6 .9 x free cash flow terminal year multiple) than did earlier valuation formulas (which used an 11 x free cash flow terminal year multiple), with no apparent rationale for that lower multiple. Fourth, AHH's lower valuation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01339-SLR    Document 55-3    Filed 09/12/2005    Page 12 of 14

Not Reported in A.2d                                                                                                   Page 6
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

resulted from the use of a much higher discount rate (35%) than the valuations it performed only five months earlier (30%), even though the outlook for the solar cell industry was improving in that period and even though interest rates were generally falling. [FN11]

> FN11. Even True North's litigation expert, Mr. Brian DiLucente, arrived at a much higher value for First Solar ($51.9 million). DiLucente was able to reduce his $51.9 million valuation to $31.1 million, but to do so, he was forced to apply a 40% "marketability" discount. The courts of this State, however, have repeatedly rejected the applicability of such discounts. See, e.g., Paskill Corp. v. Alcoma Corp., 747 A.2d 549, 556-57 (Del.2000); Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1145 (Del.1989); Nebel v. Southwest Bancorp., Inc., Del. Ch., C.A. No. 13618, Jacobs, V.C., slip op. at 9 (Mar. 9, 1999). Furthermore, after putting to one side DiLucente's apparent improper application of a marketability discount, his $51.9 million valuation for First Solar likely was improperly depressed by other aspects of his discounted cash flow analysis. For example, DiLucente applied a discount rate as high as 45%, based on his subjective view of First Solar's Company specific risk. But DiLucente admitted in his deposition testimony that he had no expertise in the solar cell industry and limited knowledge of the specific company, First Solar, that his analysis purported to value. This Court has been, understandably in my view, suspicious of expert valuations offered at trial that incorporate subjective measures of company specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion on value. See Onti, Inc. v. Integra Bank, 751 A.2d 904, 919-21 (Del. Ch.1998); Hintmann v. Fred Weber, Inc., Del. Ch., C.A. No. 12839, Steele, V.C. (Feb. 17, 1998).

Judicial determinations of fair price in an entire fairness analysis are difficult even after a full trial on the merits. On the abbreviated record now before the Court in this preliminary injunction context, a fair price analysis is even more problematic. For that reason, I have not found it useful to rely heavily on the deposition and affidavit testimony of the parties' litigation experts. Instead, I conclude that it is reasonably likely this Court will find the January 2002 $32 million valuation of First Solar not to be a fair price because it is irreconcilable with the earlier valuations only a few months before True North decided to go forward with the proposed merger. Because Solar Cells has demonstrated a reasonable likelihood of success on the merits of its entire fairness claim, I turn next to the irreparable harm and balance of the equities component of the preliminary injunction standard.

B. Irreparable Harm

*7 In order to show irreparable harm, the injury must be one for which money damages will not be an adequate remedy. [FN12] Additionally, the threatened harm must be "imminent, unspeculative, and genuine." [FN13]

> FN12. See Kohls v. Duthie, 765 A.2d 1274, 1289 (Del. Ch.2000).

> FN13. H.F. Ahmanson & Co. v. Great W. Fin. Corp., 1997 WL 305824 (Del. Ch.).

Solar Cells argues that it will be harmed irreparably by the dilution of its equity position and voting power as unit-holders. It also alleges that the loss of its bargained-for participation in company management is an irreparable harm. Finally, it contends that it will be irreparably harmed by the fact that, should a third-party investor be brought into the surviving company, those third-party interests will have to be taken into account by the Court. If it is then later determined that the dilution of Solar Cells' interest was improper it will be difficult, if not impossible, to craft an appropriate remedy for the wrong suffered by Solar Cells. Solar Cells is in imminent, unspeculative, and genuine danger of suffering this harm. The defendants do not argue that these results will not follow from the proposed merger, only whether they constitute harm at all, and if they are, whether they are irreparable harm.

The defendants do not dispute that Solar Cells' equity position and voting power as unit-holders will be diluted. They cite Rovner v. Health-Chem Corp. [FN14] for the proposition that dilution alone cannot be viewed as irreparable harm. The plaintiff in Rovner could be compensated for any improper dilution of its shares. The plaintiff stockholder in Rovner, moreover, held less than 3% of the eight million shares issued by a publicly-traded company. [FN15] There was no contention that any dilution

Not Reported in A.2d                                                                 Page 7
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

would have drastically affected voting power or that the value of the purportedly diluted shares of a *public* corporation could not be readily valued. Here, not only is dilution not the sole claim of irreparable harm, but the harm alleged is the power inherent in voting 50% of Class A Units compared to voting only 5%. Moreover, accurately valuing this two-member limited liability company may not be possible, as evidenced by the vastly different valuations the parties ascribe to First Solar. Therefore, these are not the types of harm that can be remedied with money damages. [FN16]

> FN14. 1996 WL 377027 (Del. Ch.).
>
> FN15. *Id.* at *1.
>
> FN16. The Operating Agreement, § 4.18, limits True North's liability for conflicts arising from its fiduciary obligations. This may also cause harm to Solar Cells to be irreparable in nature.

The defendants do not deny that Solar Cells will not have the right to appoint managers of the managing board of the surviving corporation. They argue that since True North had the right to nominate a majority of First Solar's Managers, True North could control the business and affairs of the Company. That reality is unaltered with the surviving company. The defendants reason, therefore, that Solar Cells has suffered no harm by losing its right to appoint managers. That argument carries no weight whatsoever. To accept that assertion would be to believe that every time the ability to elect a manager or director of a corporation is negotiated, there is no benefit derived therefrom if there is not a right to elect a majority of the managers or directors. Such a notion would certainly come as a surprise to all those who have given valuable consideration in negotiating such valueless rights. The right to participate in a management group is a valuable right whether or not that participation includes control of the group. In this case, it is undisputed that Solar Cells will lose that right if the proposed merger closes, thereby suffering an irreparable harm.

*8 Finally, if a third-party investor were brought into the surviving company, the Court would have to consider the interests of that party in formulating relief, if any, later found owing to Solar Cells. The possibility of such investment is not merely speculative, as the defendants claim one of the purposes behind the proposed merger is to make the surviving company more attractive to outside investors. Based on the facts before me, I conclude that Solar Cells is at risk of suffering immediate, irreparable harm if the proposed merger is consummated.

*C. Balance of the Equities*

The harm suffered by Solar Cells is the irreparable harm discussed above. The harm the defendants allege they will suffer if the injunction is granted is that the Company will run out of money in a matter of days and will be forced to close down and terminate its employees and liquidate assets in the undesirable setting of a forced sale. It does not appear to be a certainty, despite defendants' assertions to the contrary, that True North would let the Company close rather than protecting its investment for the short period of time necessary to reach a final judgment in this matter. Actually, Solar Cells has noted that, under the right terms, McMaster would be willing to make financing available to First Solar. A determination of the likelihood that one of the parties will extend additional financing is not necessary to my decision, however. I am required to balance the harm to the plaintiff if I do not grant the injunction with the harm to the defendants if I do grant the injunction. I note that even if the circumstance the defendants present does occur, that is not a harm that would fall solely on the defendants. Such a forced sale would adversely affect Solar Cells as well. In actuality, this predicted result might have an even greater detrimental effect on Solar Cells. As the defendants have pointed out, True North is entitled to priority repayment of its original $35,000,000 capital contribution before Solar Cells would be able to make a claim to any of the proceeds of a liquidation. [FN17] As a result, I find that the balance of the equities favors granting Solar Cells' motion for a preliminary injunction against the proposed merger.

> FN17. *See* Ahearn Aff., at § 10.1.

V. CONCLUSION

For the reasons stated, I grant plaintiff's motion for preliminary injunction. An Order has been entered in accordance with this decision.

A secured bond in the amount of $2500 shall be posted by plaintiff before the injunction becomes effective.

IT IS SO ORDERED.

*ORDER*

For the reasons set forth in this Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 8
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

Memorandum Opinion entered in this case, on this date, it is

ORDERED:

1. Plaintiff's motion for a preliminary injunction is granted;

2. Defendants, their counsel, agents, directors, officers, employees, and all persons acting under, in concert with, or for them are preliminarily enjoined from taking any steps in furtherance of the proposed merger of First Solar, LLC ("First Solar") and First Solar Operating LLC (the "Proposed Merger") and, in particular, from consummating the Proposed Merger or filing with the Delaware Secretary of State any further documents in connection with the Proposed Merger or any other merger to which First Solar is or would be a party.

*9 3. This Order shall become effective upon plaintiff's posting of a secured bond in the sum of $2,500.

Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.