# EXHIBIT 1

**UNREPORTED CASES**

- Cairns v. Gelmon, 1998 WL 276226 (D.Del. May 21, 1998).
- Carlton Inv. v. TLC Beatrice Int'l Holdings, Inc., 1995 WL 694397 (Del. Ch. Nov. 21, 1995).
- Little Switzerland, Inc. v. Destination Retail Holdings Corp., 1999 WL 223496 (D. Del. March 31, 1999).
- Mobilificio San Giacomo S.P.A. v. Stoffi, 1996 WL 924508 (D.Del. Oct. 29, 1996).
- Palmer v. Moffat, 2001 WL 1221749 (Del. Oct. 10, 2001).
- Solar Cells, Inc. v. True North Partners LLC, 2002 WL 749163 (Del. Ch. April 25, 2002).

Westlaw.

Not Reported in A.2d                                                                                         Page 1
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
**(Cite as: 1998 WL 276226 (Del.Ch.))**

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Court of Chancery of Delaware.
Leon G. CAIRNS, Gerald A. Cairns and Stanley K.
Mabbott, Plaintiffs,
v.
Michael J. GELMON, Lewis Gelmon, Cory H.
Gelmon, Alvin D. Gelmon and Instant
Vision, Inc. Defendants.
**No. CIV.A. 16062.**

May 21, 1998.

Andre G. Bouchard and Joel Friedlander, Esquires,
of Bouchard, Friedlander & Maloneyhuss,
Wilmington, Delaware; and Dale C. Lysak, Esquire
of The Dzivi Law Firm, San Francisco, California;
Attorneys for Plaintiffs


Peter L. Tracey, Esquire, of Potter, Anderson &
Corroon, LLP, Wilmington, Delaware; and Debra A.
Harrison, Esquire of Katten, Muchin & Zavis,
Washington, DC; Attorneys for Defendants

### MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1 On November 26, 1997, Leon G. Cairns, Gerald
A. Cairns, and Stanley K. Mabbott (the "plaintiffs" or
the "Cairns Group") filed this action against Michael
J. Gelmon, Lewis Gelmon, Cory Gelmon, and Alvin
D. Gelmon (the "Individual defendants" or the
"Gelmon Group"). The plaintiffs claim that the
Gelmon Group wrongfully caused the Cairns Group
to lose their equity in the corporate defendant Instant
Vision, Inc. ("Instant Vision"), a Delaware
corporation formed by the Gelmon Group.

The Complaint alleges five Counts: (i) breach of
contract; (ii) unjust enrichment; (iii) breach of
fiduciary duties; (iv) fraud; and (v) violation of 8 Del.
C. § 242. [FN1] The Gelmon Group has moved to
dismiss the Complaint on the grounds of lack of
personal jurisdiction and for failure to state a claim
upon which relief can be granted. Defendant Cory
Gelmon has moved separately for a dismissal as to
himself on the ground of ineffective service of
process, and Instant Vision has moved to dismiss as

to it for failure to state a claim upon which relief can
be granted. This is the Opinion of the Court on those
motions, which are denied except with respect to
Cory Gelmon.

> FN1. Section 242 is the section of the
> Delaware General Corporation Law that
> governs amendments to a certificate of
> incorporation.

### I. FACTS
The Cairns Group obtained from Morrison
International, Inc. ("Morrison") an exclusive license
to develop in Canada a product known as "Instant
Eyeglasses." Morrison then invited the Cairns Group
to bid for the right to license the Instant Eyeglasses
technology in the United States. To raise the
necessary capital, the Cairns Group formed a joint
venture with the Gelmon Group and introduced the
Gelmon Group to Morrison. The Cairns Group and
the Gelmon Group then entered into two letter
agreements, the essential elements of which were that
(i) the parties would form a corporation as a vehicle
to acquire the United States license from Morrison,
(ii) the parties would share equally in the equity of
that corporation, and (iii) each group would have one
director on the corporation's board of directors.

On January 28, 1997, the Gelmon Group
incorporated Instant Vision. It is claimed that
contrary to their agreements, the Gelmon Group
issued all of the shares to themselves and placed four
of its members--but only one member of the Cairns
Group--on Instant Vision's board of directors. On
June 25, 1997, the Gelmon Group announced that it
exclusively would handle the license transaction with
Morrison, and also declared unilaterally its
entitlement to a 10% finder's fee. The Gelmon Group
also caused Instant Vision to amend its Certificate of
Incorporation to increase its authorized common
stock from 3000 to 10,000,000 shares, even though
Leon Cairns, the director who represented the Cairns
Group, was never informed of the charter amendment
in advance of its approval. This action followed.

After commencing this action, the plaintiffs served
each member of the Gelmon Group under 10 Del. C.
§ 3104, Delaware's long-arm statute, and 10 Del. C.
§ 3114, Delaware's d irector-consent-to-service
statute. The record reflects that no member of the
Gelmon Group has ever been physically present, or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

ever conducted any business or performed any work relevant to the plaintiffs' claims in Delaware.

## II. THE PARTIES' CONTENTIONS

**\*2** The defendants advance several grounds for dismissal. First, they contend that this Court lacks personal jurisdiction over all members of the Gelmon Group under § 3104, because (i) none of those defendants had the requisite minimum contacts with Delaware, (ii) § 3114 does not support personal jurisdiction over the Gelmon Group, and (iii) service of process was never validly effected upon Cory Gelmon. The defendants also urge that the Complaint should be dismissed as to Instant Vision, because no relief is sought against it and because the Complaint does not allege that any conduct of Instant Vision caused harm to the plaintiffs. Finally, the defendants argue that because the plaintiffs are not shareholders of Instant Vision, they have no standing to challenge the certificate amendment that increased the number of Instant Vision's authorized shares.

In response, the plaintiffs contend that Cory Gelmon was properly served and that the act of incorporating Instant Vision in Delaware is a sufficient statutory and constitutional basis to support *in personam* jurisdiction over the Gelmon Group. The plaintiffs further claim that the Gelmon Group has waived its right to argue that Counts I through V fail to state a claim upon which relief can be granted, because the Gelmon Group's opening brief does not specify in what respect those Counts fail to state a claim. The plaintiffs contend that Instant Vision is a proper defendant, because its presence is necessary to afford the plaintiffs a full and complete remedy. Finally, the plaintiffs urge that they have standing to challenge the amendment to the certificate of incorporation because they are equitable (as opposed to record) shareholders, and because Mr. Cairns was harmed as a result of being denied full and equal access to the certificate amendment-related information that had been furnished to Instant Vision's remaining directors.

## III. ANALYSIS

On these motions, the Court must decide five issues. Two of those issues are jurisdictional, namely, (i) whether the Gelmon Group's sole act of incorporating Instant Vision in Delaware, without more, is enough to sustain *in personam* jurisdiction over the Gelmon Group in Delaware, and (ii) whether Cory Gelmon was properly served. The remaining three issues relate to the legal sufficiency of the various Counts in the Complaint: specifically, (i) whether the Gelmon Group has waived its right to assert the defense that

Counts I through V fail to state a claim upon which relief can be granted; (ii) whether Instant Vision is a proper defendant; and (iii) whether the plaintiffs have standing to challenge the amendment to the certificate of incorporation.

### A. *The Personal Jurisdictional Issues*
1. Personal Jurisdiction Over the Gelmon Group

In determining whether it has personal jurisdiction over the Gelmon Group, this Court must employ a two-step inquiry: (i) whether personal jurisdiction has been established under the Long-Arm Statute, and (ii) if so, whether the assertion of personal jurisdiction in this specific instance would violate traditional notions of Due Process. [FN2] On a motion to dismiss for lack of personal jurisdiction, the plaintiffs have the burden to demonstrate that jurisdiction exists. [FN3]

> FN2. *LaNouva D & B S.p.A. v. Bowe Co.*, Del.Supr., 513 A.2d 764, 768 (1986).

> FN3. *Hart Holding Co. v. Drexel Burnham Lambert Inc.*, Del. Ch., 593 A.2d 535, 539 (1991).

**\*3** The plaintiffs rely on *Papendick v. Bosch* [FN4] as on-point authority for their position that a single act of incorporation in Delaware, if done as part of a wrongful scheme, will suffice to confer *in personam* jurisdiction over the nonresident defendants responsible for the scheme. [FN5] In *Papendick*, the plaintiff sued the defendant for breach of a finder's fee agreement. The only contact between the nonresident defendant and the Delaware forum was that the defendant had formed a Delaware subsidiary to acquire stock in a third company. The Delaware Supreme Court determined that the defendants' purposeful availment "of the benefits and protections of the State of Delaware for financial gain" through the act of incorporating the Delaware subsidiary satisfied the "minimum contacts" requirement of *International Shoe Co. v. Washington*. [FN6]

> FN4. Del.Supr., 410 A.2d 148 (1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980).

> FN5. *See Newspan, Inc. v. Hearthstone Funding Corp.*, Del. Ch., C . A. No. 13304, Allen, C. (May 10, 1994) ("It is well accepted that the incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

this jurisdiction sufficient to satisfy the requirements of the Due Process Clause, particularly where the creation of the corporation is an integral part of the actions giving rise to the suit.").

FN6. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The plaintiffs claim that here, as in *Papendick,* the act of incorporating Instant Vision in Delaware was an integral part of a fraudulent scheme, and is therefore sufficient to sustain personal jurisdiction under § 3114(c)(1). [FN7] Indeed, plaintiffs argue, the present facts are even more compelling than *Papendick,* because here the very act of incorporation is claimed to have caused the plaintiffs' injury.

FN7. Sub-section (c)(1) provides: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in this State." It is claimed that the incorporation of Instant Vision falls within the scope of this provision.

The defendants contend that *Papendick* is not controlling because in that case, service of process was accomplished by writ of foreign attachment under 10 *Del. C.* § 3507, whereas in this case, service was accomplished under § 3104. The defendants fail to explain why this distinction is significant; moreover, their assertion that the plaintiffs have failed to make an adequate evidentiary showing to satisfy the requirements of § 3104 and the Due Process clause is at best conclusory. The defendants rely upon the identical recital(s), in affidavits filed by each member of the Gelmon Group, denying that "they have... transacted business or performed any work or services from which plaintiffs' alleged causes of action against me arises in the State of Delaware, either in my individual capacity, or as a Director or officer of Instant Vision, Inc." The defendants argue that because the plaintiffs have failed to rebut that affidavit testimony, they have failed to carry their burden of proof.

I cannot agree. Given the defendants' failure to distinguish *Papendick,* and because the incorporation of Instant Vision in Delaware is central to their claims of wrongdoing, I conclude that in these

specific circumstances that single act suffices to constitute the "transaction of business" in Delaware under 10 *Del. C.* § 3104(c)(1) and to satisfy the requirements of Due Process. [FN8] The defendant's contrary affidavits recite legal conclusions that are legally incorrect. The Court therefore rejects the Gelmon Group's motion to dismiss for lack of personal jurisdiction.

FN8. *Red Sail Easter Limited Partnership, L.P. v. Radio City Hall Productions, Inc.,* Del. Ch., C.A. No. 12036, Allen, C. (July 10, 1991).

2. Sufficiency of Process on Cory Gelmon

The defendants next argue that service of process was never validly effected on Cory Gelmon. The plaintiffs respond that process was sent by registered mail to Cory Gelmon's mailing address as set forth on the original certificate of incorporation, [FN9] and that such process was returned as undelivered on February 3, 1998. Accordingly, the plaintiffs conclude, service of process on Cory Gelmon was effective under § 3104(d) and (g).

FN9. Cory Gelmon was one of the Incorporators of Instant Vision.

*4 The defendants respond that although the plaintiffs filed proof of nonreceipt, § 3104(d) then required that they send Cory Gelmon a second registered notice by certified mail. Because the plaintiffs have not offered proof that they did this, defendants continue to argue that service of process on Cory Gelmon was ineffective.

The Court finds that the plaintiffs have not carried their burden on this issue, as they have not established that they sent a second registered notice to Cory Gelmon. Our Supreme Court has held that noncompliance with that statutory requirement (that a second notice be sent no later than seven days after the filing of the first notice) invalidates service of process under § 3104. [FN10] Because the plaintiffs have not established that they satisfied this requirement, the Complaint must be dismissed as against Cory Gelmon, unless the plaintiffs are able to show (by way of a supplemental affidavit) that a timely second registered notice was sent.

FN10. *See Greenly v. Davis,* Del.Supr., 486 A.2d 669, 671 (1984).

B. *The Rule 12(b)(6) Issues*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

The defendants also contend that all Counts of the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. The legal standard on a Rule 12(b)(6) motion to dismiss is that "[t]he complaint may not be dismissed unless it appears to a reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim." [FN11]

> FN11. *Weinberger v. UOP, Inc.*, Del. Ch., 409 A.2d 1262, 1263-64 (1979).

### 1. The Waiver Argument

The plaintiffs respond that the defendants have waived their right to argue that those Counts should be dismissed under Rule 12(b)(6), because their opening brief contains no argument as to how Counts I-IV inclusive fail to state a claim.

The plaintiffs are mistaken. Court of Chancery Rule 12(h)(2) states that "A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." Because Rule 12(h)(2) entitles the Gelmon Group to advance Rule 12(b)(6) arguments up to and including the trial, they have not waived their right to raise a 12(b)(6) defense as to Counts I through IV, inclusive.

### 2. The Claims Against Instant Vision

The defendants argue that Instant Vision should be dismissed: (i) as to Count I (breach of contract) because Instant Vision was not a party to the alleged contract(s) between the plaintiffs and the Gelmon Group; (ii) as to Count II (unjust enrichment) because the Complaint does not allege that Instant Vision was unjustly enriched; (iii) as to Count III (breach of fiduciary duty) because the Complaint does not allege that Instant Vision owed any fiduciary duties to the plaintiffs; (iv) as to Count IV (fraud) because the Complaint does not allege that Instant Vision misrepresented or failed to disclose any material fact to the plaintiffs; and (v) as to Count V (violation of § 242) because the Complaint fails to allege any action or inaction by Instant Vision that resulted in harm to the plaintiffs.

**\*5** The plaintiffs respond that Instant Vision was properly joined as a defendant solely in order to ensure that full and complete relief can be granted. The relief that plaintiffs seek here is to recover 50% of Instant Vision's shares, dividends, and profits now held by the Gelmon Group. That being the case, the plaintiffs contend, Instant Vision must be made a defendant if only because they claim that certain stock, dividends, and profits were distributed to one member of the Gelmon Group, and were then returned to Instant Vision. To recover those monies from Instant Vision, plaintiffs argue, that entity must be joined as a party.

The plaintiffs also argue that Instant Vision is a proper defendant with respect to their claim that the defendants incorporated Instant Vision, and then wrongfully took control of its board of directors and caused to be issued to themselves all of its stock. The plaintiffs contend that because it may be impossible to distinguish the acts of Instant Vision from those of the Gelmon Group which controlled the corporation, any relief against the Individual defendants may have to run against Instant Vision as well.

The defendants respond that Instant Vision need not be made a party to afford the plaintiffs the specific relief they seek because the Complaint only seeks 50% of the stock held by the Gelmon Group. That argument incorrectly assumes that the only form of relief sought is a constructive trust. It ignores the fact that the Complaint also requests such other form of relief that the Court deems appropriate. At the oral argument on the pending motions, the defendants' counsel conceded that under at least one scenario relief against the corporation might be justified, *viz.*, if the Court were to direct Instant Vision to recognize the plaintiffs as record owners of 50% of its stock. Because the Court finds that Instant Vision is a proper party, the defendants' motion to dismiss the Complaint as to it is denied.

### 3. The Standing Argument

The defendants argue that the Court must dismiss Count V because the plaintiffs are not record shareholders of Instant Vision, and therefore lack standing under 8 *Del. C.* § 242 to challenge the amendment to Instant Vision's corporate charter that increased its authorized stock from 3000 to 10,000,000 shares.

The plaintiffs counter that they have standing to challenge the charter amendment, because Mr. Cairns was a director of Instant Vision at the time the amendment was adopted, yet was not given advance notice of the proposed amendment, or any opportunity to vote on it. Plaintiffs also argue that they have standing by virtue of the Cairns Group's claimed equitable interest in the disputed shares of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179
(Cite as: 1998 WL 276226 (Del.Ch.))

Instant Vision. For that reason, the plaintiffs argue, they should have the same standing as would any record holder of the corporation's shares, because had the Gelmon Group honored their agreement, the plaintiffs would be the record owners of one half of Instant Vision's equity. [FN12]

> FN12. *See Shaev v. Wyly,* Del. Ch., C.A. No. 15559, Steele, V.C. (Jan. 6, 1998)(former shareholder of parent has standing to bring derivative action on behalf of subsidiary after spin-off); *International Equity Capital Growth Fund, L.P. v. Clegg,* Del. Ch ., C.A. No. 14995, Allen, C. (Apr. 21, 1997)(discussing exception to standing requirement for plaintiffs with a "substantial and continuing equity investment.").

*6 Defendants contend that Mr. Cairns does not have standing, even as a director, because the plaintiffs have not alleged how (if at all) he was harmed. Moreover, the defendants argue, if the plaintiffs have an equitable claim to shares held by the Gelmon Group, that claim is derivative yet Count V of the Complaint is not brought derivatively. Therefore, the defendants urge that Count V of the Complaint must be dismissed for failure to state a claim upon which relief can be granted.

I conclude that Count V states a claim upon which relief can be granted. First, there is no merit to the argument that the plaintiffs' claim as equitable owners of stock is derivative, because the alleged harm runs to the plaintiffs directly, not to the corporation. Second, Count V claims that Mr. Cairns was a director of Instant Vision at the time the amendment to the corporate charter was considered and voted upon, yet he was intentionally not given notice that this issue would be considered, and was deprived of the opportunity to join in the board's deliberations. These allegations are sufficient to state a cognizable claim for relief. In *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* [FN13] this Court held that except where certain board governance procedures are established, a director has a right of access to whatever corporate information was given to its other directors during the director's tenure. Because Mr. Cairns is claimed to have been denied such access, Count V may be viewed as a claim to enforce that right, by invalidating a charter amendment that was the result of a defective board process. That claim, if meritorious, would afford the plaintiffs a basis for relief. [FN14] Accordingly, the motion to dismiss this Count must be denied.

> FN13. Del. Ch., C.A. Nos. 13911 & 14595, Jacobs, V.C. (June 4, 1996), *appeal denied,* 682 A.2d 625 (1996).

> FN14. *See, e.g., Schroder v. Scotten, Dillon Company,* Del. Ch., 299 A.2d 431, 435 (1972)("A special meeting held without notice to all directors as required by the by-laws is not lawful and all such acts done at such a meeting are void.").

## IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motions to dismiss, except that the claims against Cory Gelmon will be dismissed unless the plaintiffs are able to demonstrate, by the filing of appropriate proof within ten days of the date of this Opinion, that Mr. Gelmon was properly served in accordance with 10 Del. C. § 3104. IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 276226 (Del.Ch.), 24 Del. J. Corp. L. 179

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
CARLTON INVESTMENTS, derivatively on behalf
of TLC Beatrice International
Holdings, Inc., Plaintiff,
v.
TLC BEATRICE INTERNATIONAL HOLDINGS,
INC., Loida Nicolas Lewis, as Executrix of
the Estate of Reginald F. Lewis, Leslie N. Lewis,
Individually and as Executrix
of the Estate of Reginald F. Lewis, TLC Group, L.P.,
TLC Holdings Corp., TLC
General Corp., TLC Transport, Inc., McCall Pattern
Holdings, Inc., and Lee A.
Archer, Jr., Robert C. deJongh, James E. Obi,
Ricardo J. Olivarez, Samuel P.
Peabody, Jean S. Fugett, Jr., Anthony S. Fugett,
Marilda G. Alfonso, Sanford
Cloud, Jr., William S. Mowry, Jr., and Dumas M.
Simeus, Defendants.
**Civ. A. No. 13950.**

Submitted: Aug. 29, 1995.
Decided: Nov. 21, 1995.
Rodman Ward, Jr., Cathy L. Reese and Herbert W.
Mondros of Skadden, Arps, Slate, Meagher & Flom,
Wilmington, for plaintiff Carlton Investments.

Michael D. Goldman and Stephen C. Norman of
Potter Anderson & Corroon, Wilmington, Gregory V.
Varallo, and Matthew E. Fisher, of Richards, Layton
& Finger, Wilmington, Henry E. Gallagher, Jr., of
Connolly, Bove, Lodge & Hutz, Wilmington, David
J. Margules of Wolf, Block, Schorr and Solis-Cohen,
Wilmington, David C. McBride, and William D.
Johnston, of Young, Conaway, Stargatt & Taylor,
Wilmington, William M. McErlean, Richard S.
Huszagh, and John F. Verhey, of Rudnick & Wolfe,
Chicago, Illinois; of counsel: Thomas P. Puccio,
New York City, for Defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 Carlton Investments L.P., has brought this action
as a derivative suit on behalf of TLC Beatrice
International Holdings, Inc., a publicly held Delaware
Corporation, seeking recovery of amounts allegedly
paid by TLC Beatrice to or on behalf of the late
Reginald Lewis, who is alleged to have been a
controlling shareholder of TLC Beatrice. Presently
pending is a motion by various defendants to dismiss
or stay this action. The motion has sub-parts:
> First, it seeks to dismiss or stay the action on the
> basis of a prior pending New York suit and on the
> grounds of *forum non conveniens.*
> Second, it asserts the inadequacy of Carlton
> Investments as a representative of TLC Beatrice in
> this suit. Defendants claim that Carlton's attempt
> to procure a judgment against TLC Beatrice in the
> New York litigation places Carlton's interests
> inherently at odds with those of the company and
> its public shareholders.
> Third, defendants claim that this court lacks
> personal jurisdiction over named defendants the
> Lewis Estate, TLC Group, L.P., and Jean S. Fugett,
> Jr.
> Fourth, defendants claim that Delaware statutes of
> limitations bars the claims asserted against the
> Lewis Estate, Marilda Alfonso, Sanford Cloud, and
> William Mowry.
> Fifth, defendants move to dismiss Anthony Fugett,
> TLC Holdings, and TLC Transport as defendants
> for failure to allege facts stating a claim against
> them.

For the reasons set forth below, these motions will
be denied, except that the motion to dismiss TLC
Group L.P. for lack of *in personam* jurisdiction will
be granted to the extent claims other than those
directly relating to the alleged wrongful payment of
some $2,000 of franchise fee payments to the
Delaware Department of Corporations are alleged.

I. Factual and Procedural Background

On January 4, 1995, Carlton Investments
("Carlton"), a California Limited Partnership that
owns approximately 22% of the stock of TLC
Beatrice, filed a derivative complaint purporting to
allege breaches of fiduciary duties and waste of
corporate assets. Named as defendants were (1) the
Estate of Reginald Lewis, which is being
administered in New York, the domicile of the late
Mr. Lewis; (2) various individuals who serve or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

Page 2

served as directors of TLC Beatrice; (3) TLC Transport, a wholly owned subsidiary of TLC Beatrice; (4) several companies separately owned by Lewis but alleged to have participated in or benefitted from the misappropriation and waste; and (5) TLC Beatrice, as a nominal defendant.

The complaint particularly alleges that the various defendants have engaged in waste and misappropriation of assets, breach of fiduciary duties of care and loyalty, aiding and abetting, conversion, and civil conspiracy. Plaintiff contends that these wrongs led to a severe depletion of TLC Beatrice's cash and negatively impacted its overall financial condition.

This suit follows Carlton's filing of an individual (non-derivative) action in the state of New York against TLC Beatrice and the Lewis Estate. In that suit, Carlton seeks recovery of approximately $11 million for alleged breaches of a stockholder agreement by Mr. Lewis, Carlton, and the Company. Carlton alleges that between 1987 and 1992, TLC Beatrice made certain payments to Reginald Lewis, its founder, former Chairman and CEO in contravention of provisions in the stockholder's agreement strictly limiting transactions between the Company and its affiliates including Mr. Lewis. Carlton particularly challenges the propriety of a $22.1 million compensation package paid to Lewis in 1992. Roughly speaking, as I understand it, the theory of the New York case is that under the stockholders' agreement which Lewis, Carlton and TLC Beatrice signed, the payments to Lewis trigger a right to proportionate payments to Carlton.

*2 The theory of the present derivative action is that the payments in question were a breach of fiduciary duty and should be rescinded. Thus, the complaint in the present action similarly focuses on the allegedly improper payments to Mr. Lewis. A central element of this claim is the compensation package challenged in the separate New York suit. In addition, the complaint here alleges that TLC Beatrice improperly reimbursed Lewis for $2,147,932 in "living expenses" and $600,000 in other, unidentified expenses.

The complaint further catalogues a number of allegedly improper transactions between TLC Beatrice and Lewis or his affiliates: payment of salaries, bonuses, and severances for employees of TLC Group L.P (an entity separately owned and controlled by Lewis); reimbursement of TLC Group for paying taxes and governmental levies for other Lewis-owned entities; payments to a trust for the benefit of Mr. Lewis' daughters; payments to affiliated law firms on matters for which TLC Beatrice had no liability; payments to McCall Pattern Holdings (an entity owned by Mr. Lewis but otherwise unaffiliated with TLC Beatrice); reimbursement of $2.5 million in legal fees incurred by Lewis in an action unrelated to TLC Beatrice; payment of rent for office facilities for Lewis' affiliates; the lease, purchase and maintenance of a corporate jet for the personal use of Lewis; and excessive employment and severance agreements with certain directors.

II. Motion to Stay or Dismiss: Prior Pending Action

Coordination of related litigation pending in several states, is of course a cost of our federal system. Generally the grant or denial of motions of this type falls within the sound discretion of each trial court. That discretion is, however, not uninformed by legal principles. On the contrary settled principles govern its exercise. *See Chrysler First Business Credit Corporation v. 1500 Locust Limited Partnership,* Del.Supr., --- A.2d ---- (1995).

Ordinarily a stay of action will be granted where there is a prior action between the same parties, arising out of the same subject matter, pending before a court capable of doing prompt and complete justice. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co., Del.Supr., 263 A.2d 281, 283 (1970).* Unless there is present an unusual circumstance (such as may be present in an action under Section 225 of our corporation law) the presence of these factors will indicate that the fair and efficient result is for the second-filed law suit to be stayed, so long as the first filed suit is proceeding reasonably promptly to an adjudication of claims that will eliminate or substantially reduce the need to pursue the second litigation.

In my opinion, however, this principle of comity has no application to the facts of this case as it is presently pleaded. The present case is fundamentally different from the pending New York litigation because this is a suit brought in the name of TLC Beatrice itself and seeks the recovery of substantial amounts paid-out by the company. The New York suit seeks recovery from Beatrice and Lewis for breach of the shareholders' agreement that allegedly limited the right of signatories to accept disproportionate distributions from Beatrice. But even if Carlton were to win that suit, I do not understand that the New York court would have had

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

to adjudicate the question whether the payments to Lewis, etc., that would have been held to violate the agreement were necessarily a breach of fiduciary duty to the corporation itself and all of its stockholders. Similarly were Carlton to lose that suit I don't understand that a necessary intermediate step in such a determination would be a binding adjudication that the payments that would have been held not to breach the shareholders agreement also did not constitute a waste or breach of fiduciary duty.

*3 That is, the New York litigation is structured to adjudicate the rights of the corporation as a contracting party--a signatory to the stockholders agreement--but not in the legal capacity that this suit is designed to address: as the primary beneficiary of the fiduciary duty of the directors and controlling persons who authorized certain self-interested payments. Thus final judgment in the New York action would not preclude this derivative adjudication of TLC Beatrice's rights, nor is it clear that as a practical matter the doctrine of collateral estoppel would render it highly efficient for this court to pause in its process to allow the earlier suit to reach judgment. Thus, even though the principal parties to the New York litigation are also parties to this litigation the different status that they hold in this suit renders the *McWane* principle inapplicable in my opinion.

Defendants also seek a dismissal on *forum non conveniens* ground. The legal standard is well established. *E.g., Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Supr., 559 A.2d 1301 (1988); *Parvin v. Dorfman,* Del.Supr., 236 A.2d 425, 427 (1967). The grant of such a motion is a rarity which may properly occur only where genuine hardship is present. *Chrysler First Business Credit Corp. v. 1500 Locust LP, supra; St. Joe Mineral Corp. v. Horsehead Industries, Inc.,* Del.Ch., C.A. No. 10522, Allen, C. (Apr. 7, 1989). Having considered the record as it presently appears, I conclude that this case, with its witnesses and documents largely in New York, does not present even a colorably correct application of that doctrine. No hardship whatsoever would be occasioned by the litigation of this case in this jurisdiction.

III. Carlton's Standing As A Representative Plaintiff

Defendants assert that Carlton is an inappropriate person to sue them in this derivative action; it might not be a faithful agent of the TLC Beatrice shareholders whom it purports to represent in this derivative suit. The claim is that Carlton's interest in

its New York suit *against* TLC Beatrice and the Lewis Estate compromises its pursuit of this derivative suit *on behalf of* the company. Moreover, it is said that the concurrent adjudication of the two suits create a situation rife with opportunities for procedural gamesmanship.

I have considered this argument carefully. For the reasons set forth below I conclude that in light of all the circumstances, including the mechanisms that permit judicial supervision of representative litigation under Rule 23.1, that Carlton is an appropriate shareholder to represent the interests of the corporation and its stockholders in the adjudication of these claims.

Obviously there are grounds for courts' to view with a certain suspicion motions by defendants grounded on the claim that the plaintiff who has forced them into litigation is an inappropriate representative of a plaintiff class. The same characteristics that might make a faithful champion energetic would incline a defendant to like to see that representative replaced. There is reason to believe, for example, that Carlton, as a 22% shareholder of TLC Beatrice has a better incentive structure than any other shareholder energetically to pursue the claims of waste etc., here put forward. [FN1] This observation is not intended as a final answer to defendants' motion because it is nevertheless possible for the defendants to raise legitimate issues concerning the identity of a representative plaintiff. The observation simply provides a certain initial orientation. In all events the qualification of a party to represent others is a question addressed to the informed judgment of the court, which in deciding it should consider all of the relevant circumstances, including the presence or absence of alternative parties to carry the suit forward.

> FN1. *See* Robert C. Clark, CORPORATE LAW § 9.5 (1986) (theory of shareholders' collective action problems in public corporations).

*4 Certainly the presence of a substantial conflict of interest would supply a most salient consideration in reaching such a judgment. If "the plaintiff cannot be expected to act in the interest of [the] other [shareholders] because doing so would harm his other interests," it is unlikely that a court would permit the interests of others to be adjudicated by that person. *Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376, 381 (1983).

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

Page 4

In *Youngman,* this court made a listing, not intending it to be exhaustive, of factors that may be relevant to a determination of the adequacy of a derivative plaintiff to represent the interests of the corporation. That list included:

economic antagonism between representatives and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiffs and the defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Youngman,* 457 A.2d at 379-80.

Defendants focus on two of these elements in attempting to argue that Carlton is unfit to represent the other shareholders: (1) economic antagonism between representative and class, and (2) vindictiveness toward the defendants. Defendants further argue that Carlton previously acquiesced to the wrongs alleged in this suit and should thus be precluded from presently asserting these rights.

A. Economic Antagonism and Vindictiveness

Defendants argue that the present action is an attempt to gain leverage in the New York litigation. That is, that this suit "raises the ante" in New York and could in effect be traded for consideration to Carlton in the settlement of the New York case. In addition, defendants assert that the New York suit against TLC Beatrice would provide relief inconsistent with that sought in this derivative suit, by which Carlton, as a shareholder and on behalf of the Company itself, seeks the return of allegedly wasted and misappropriated funds to the corporate treasury. Neither of these points appear to have sufficient weight to warrant disabling this large shareholder from suing on behalf of the corporation.

Defendants hope to construct a conflict of interest argument out of the difference in Carlton's positions in the respective litigations, (*i.e.,* seeking judgment against TLC Beatrice in New York, but seeking a judgment in favor of TLC Beatrice in Delaware) has been effectively thwarted by Carlton's offer voluntarily to stay the New York case, if all relevant parties will consent to the jurisdiction of this court, or in the alternative, to hold any recovery awarded in New York in escrow pending this court's adjudication of the rights of the corporation and all of its public shareholders.

*5 Moreover, even assuming that neither of these steps could be taken, I am not impressed that litigation of this claim by Carlton in this jurisdiction would sufficiently involve threats to the interests of other shareholders as to warrant disabling this plaintiff from carrying on this suit. Certainly the court's powers are substantial in such a case to assure that active good faith prosecution of the suit occurs. Primarily this means that the court can assure that any consideration paid for release of the claims is distributed to the corporation (and its shareholders *pro rata* ); because the court has *in personam* jurisdiction over the representative plaintiff, the court has the means to assure that Carlton acts only as directed with respect to any settlement that might be reached in the New York litigation. Thus the opportunity for Carlton to "sell out" the other shareholders in exchange for consideration paid through the New York action is quite limited, if it exists. [FN2]

> FN2. Defendants alternatively and additionally argue that Carlton's vindictiveness should disqualify it as an adequate shareholder representative. Defendants allege that this derivative suit serves only as another action in a larger pattern of harassment that includes allegedly unjustified demands that TLC Beatrice seek registration of its stock and the initiation of contempt proceeding against TLC Beatrice for asserting affirmative defenses in the New York suit purportedly in violation of a previous court order. However, the record falls far short of establishing facts that would disqualify Carlton as a representative of the shareholder class based on its alleged "vindictiveness" or any other such motive.

B. Acquiescence

Defendants assert that Carlton is an inappropriate plaintiff because it acquiesced in the acts of which it now complains, since (it is claimed) it had a representative on the TLC Beatrice board at all relevant times. This aspect of the matter raises fact issues that preclude a legal judgment at this time.

Critical to this acquiescence claim is proof that Carlton had knowledge of the acts to which it purportedly acquiesced. 3 SPENCER W. SYMONS,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

POMEROY'S EQUITY JURISPRUDENCE, § 817 at 246 (5th ed. 1941). [FN3] Defendants assert that Carlton had knowledge of the various instances of waste and misappropriation of which it now complains because it had appointed a representative to serve on the TLC Beatrice board prior to these acts. Specifically, defendants argue that Carlton had effectively appointed Dean Kehler as its representative to the Board by virtue of the right of the institutional investors--which group is said to include Carlton--to elect a director representative. The second affidavit of W. Kevin Wright similarly indicates that Dean Kehler "was appointed by Carlton as its director on TLC Beatrice's Board of Directors and served as a director from 1988 through late 1990,...." Wright 2d Aff. ¶ 14.

> FN3. "[A]cquiescence must be with knowledge of the wrongful acts themselves, and of their injurious consequences; it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal, or moral necessity, and it must last for an unreasonable length of time, so that it will be inequitable even to the wrong-doer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested, and his conduct apparently acquiesced in." 3 SPENCER W. SYMONS, POMEROY'S EQUITY JURISPRUDENCE, § 817 at 246 (5th ed. 1941).

Plaintiff points to contrary language in a Form 10-K and an S-1 Registration statement: "Mr. Dean C. Kehler is the director designated by the stockholder *other than Carlton Investments* and Mr. Lewis and his affiliates. *No director has been designated by Carlton Investments.*" Form 10-K, TLC Beatrice International Holdings, Inc. December 31, 1989; Form S-1 Registration Statement, January 19, 1990 (emphasis added).

As the claim that Kehler served as Carlton's representative on the TLC Beatrice board is presently subject to dispute, I cannot now conclude that Carlton is subject to a special defense that would somehow disable it from effectively representing the interests of the corporation in this litigation.

IV. Personal Jurisdiction Over The Lewis Estate, TLC Group L.P., And Anthony Fugett

*6 I turn next to the motion of various defendants for dismissal predicated upon a lack of personal jurisdiction over them. Those defendants are the Lewis Estate, TLC Group, L.P. (a New York limited partnership), and Anthony Fugett.

When a motion to dismiss on grounds of lack of personal jurisdiction is decided without an evidentiary hearing, plaintiff has the burden to adduce from the record (*i.e.*, depositions, affidavits, admissions etc.) sufficient evidence to support a *prima facie* determination as to the existence of jurisdictional facts. *Hart Holding Company v. Drexel Burnham Lambert, Inc.*, Del.Ch., 593 A.2d 535, 539 (1991).

The assertion that there is no *in personam* jurisdiction over the listed defendants raises two major sub-issues. The first relates to the constitutionality of the exercise of *in personam* jurisdiction over each of the defendants. This sub-issue involves the factual and legal question whether there exists such contacts between each defendant, the disputes to be adjudicated, and the forum jurisdiction as to render it fundamentally fair for this court to insist that those defendants answer and defend these claims in this jurisdiction. This is the constitutional inquiry dictated first by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). The second sub-issue required to be answered is whether under the statutes of Delaware the processes of this court have been duly issued and served so that the court is authorized by the law of Delaware to adjudicate claims against these defendants. *See LaNuova D & B S.p.A. v. Bowe Co., Inc.*, Del.Supr., 513 A.2d 764, 768 (1986). I address these issues separately with respect to each of the defendants below.

A. Personal Jurisdiction Over the Lewis Estate

The Lewis Estate is being administered in and under the laws of the State of New York; no Delaware ancillary administrator has been appointed. Furthermore, so far as the record shows, the Lewis Estate itself has not undertaken any action subjecting it directly to the jurisdiction of this court under 10 *Del.C.* § 3104 (Personal jurisdiction by acts of nonresidents) or 12 *Del.C.* § 1569 (Jurisdiction by act of foreign personal representative). Obtaining jurisdiction over the Lewis Estate therefore turns on whether the decedent would have been amenable to suit in this jurisdiction on the claims now asserted. 12 *Del.C.* § 1570 (1987).

Whether a person is subject to the jurisdiction of this court turns on the dual inquiry: whether Delaware

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

law provides a means effectively to serve the defendant with legal process and, secondly, whether the exercise of such coercive power does, in the circumstances, satisfy the constitutional requirement of due process of law.

1. Lewis Estate: Statutory Service of Process
The parties have focused their arguments concerning the amenability of Mr. Lewis, and therefore the Lewis estate, to service of process on the scope and applicability of the Delaware long-arm statute, 10 Del.C. § 3104(c) (Supp.1994). Reliance on section 3104, however, forces the parties into a metaphysical assessment of whether various acts outside of this jurisdiction, of Mr. Lewis or persons acting for one of a large number of legal entities formed under Delaware law, qualify as "contacts" with this state and if they do, whose contacts are they.

*7 Plaintiff's brief lists the alleged contacts between Lewis and Delaware upon which it seeks to premise jurisdiction over the Lewis Estate: (1) diverting TLC Beatrice funds (held elsewhere) through Group L.P. to make at least 20 franchise tax payments (about $2,000 worth) to the Delaware Secretary of State (in Delaware) on behalf of companies unrelated to TLC Beatrice but in which Lewis held some interest; (2) incorporating at least 21 Delaware entities; (3) causing or directing a series of transactions involving the rental, delivery, later purchase, and subsequent sale of a corporate jet in Delaware (including the alleged incorporation of TLC Transport, Inc. and TLC Transport International, Inc. to facilitate the rental and purchase of the jet); and (4) selecting TLC General Corp., a Delaware Corporation, as the sole general partner of TLC Group L.P.

All of these acts appear to have been the acts of several distinct legal actors. But even if all of these acts were attributable to a single non-resident, there is room to doubt whether those contacts with Delaware would provide either a statutory or a constitutionally sufficient basis to require that person to adjudicate these claims in this jurisdiction. One is entitled to doubt it. See World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1980).

Plaintiff's reliance on Section 3104 for authority to serve process on the Lewis Estate eschews the seemingly logical alternative of basing jurisdiction on Mr. Lewis' status as a director of a Delaware corporation. Under the director consent statute, 10 Del.C. § 3114 (Supp.1994) [FN4] this court may exercise jurisdiction over a director or former director of a Delaware corporation for claims of breach of

directors' duties, based upon her implied consent to substituted service of process.

> FN4. "Every nonresident of this State who after September 1, 1977 accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of this State or who after June 30, 1978, serves in such capacity and every resident of this State who so accepts election or appointment or serves in such capacity and thereafter removes his residence from this State shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation (or, if there is none, the Secretary of State) as his agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member for violation of his duty in such capacity, whether or not he continues to serve as such director, trustee or member at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as if served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable." 10 Del.C. § 3114(a).

Plaintiff has doubtless invoked Section 3104 and not Section 3114 because the holding in Tabas v. Crosby, Del.Ch., 444 A.2d 250 (1982) may be thought to preclude application of Section 3114 to the instant case. See id. at 252-53. Tabas noted that, although the implied consent provisions of Section 3114 plainly do subject a director to substituted service of process in suits premised upon breach of a legal or equitable duty as a director, even if she no longer serves as a director at the time suit is commenced, Section 3114 does not itself provide a means to effectuate substituted process upon the personal representative of a deceased director. Id. In Tabas this court interpreted the absence of any language in Section 3114 providing for substituted service upon the personal representative of a deceased director as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

requiring the conclusion that this section could not be applied to nonresident directors who die before suit or service of process is commenced. *Id.*

In *Tabas* the parties apparently did not argue, or in all events the court did not consider the effect 12 *Del.C.* § 1570 and 12 *Del.C.* § 1571, which provides as follows:

*8 § 1570 Jurisdiction by act of decedent. In addition to jurisdiction conferred by § 1569 of this title, a foreign personal representative is subject to the jurisdiction of the courts of this State to the same extent that his decedent was subject to jurisdiction immediately prior to death. (59 Del.Laws, c. 384, § 1.)

§ 1571 Service on foreign personal representative. (a) Service of process may be made upon the foreign personal representative by certified mail, addressed to his last reasonably ascertainable address, requesting a return receipt signed by the addressee only. Notice by ordinary first-class mail is sufficient if certified mail service to the addressee is unavailable. Service may be made upon a foreign personal representative in the manner in which service could have been made under other laws of this State on either the foreign personal representative or his decedent immediately prior to death.

In my opinion because Mr. Lewis was at the time of his death "subject to the jurisdiction of the courts of this state" with respect to claims asserting a breach of his fiduciary duty as a director (Section 3114), this court is authorized by Section 1570 to exercise jurisdiction over Mr. Lewis' estate and Section 1571 authorizes service of process for that purpose. I believe that the substances of Section 1571 was complied with in this instance.

The record contains sufficient evidence to satisfy the court for the limited jurisdictional purposes of this motion, that Mr. Lewis violated his duties as a director of TLC Beatrice so as to subject him to substituted service under Section 3114. [FN5] Mr. Lewis served as a director from the acquisition of TLC Beatrice through his death in 1992. Plaintiff has alleged that Lewis authorized or acquiesced in waste, misappropriation, and conversion of TLC Beatrice assets, and that he has breached his directorial duties to TLC Beatrice and its stockholders. These claims all arise from actions by him as a director of a Delaware corporation and fundamentally relate to internal affairs and corporate governance issues of particular concern to the state in which TLC Beatrice has been formed. The

allegations and record clearly would place Mr. Lewis himself within the jurisdiction of this court under the provisions of Section 3114.

> FN5. That is to say sufficient allegations have been made and the record is sufficient to allow Section 3114 to be invoked. I mean to suggest no more with respect to the merits.

Since Section 1571 permits service of process on a foreign personal representative "in the manner in which service could have been made under other laws of this State on ... his decedent immediately prior to death," 12 *Del.C.* § 1571 (1987), plaintiff may properly serve the Lewis Estate under Section 1571 *via* the Section 3114 provisions that would have permitted substituted service of process on Lewis himself prior to his death. Thus, 12 *Del.C.* § 1571 cures the service of process defect that this court recognized in *Tabas,* so that under it an estate of a director may be served with process as effectively as the director himself during his life.

2. Lewis Estate: Constitutional Requirements
*9 It is of course elementary that for any court to exercise coercive jurisdiction over a nonresident defendant, it is necessary that some minimum level of contacts exist between the defendant and this jurisdiction, such that the exercise of personal jurisdiction over that defendant comports with traditional notions of fair play and substantial justice. *See World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292 (1980). The touchstone of this fundamental fairness requirement is foreseeability: whether a person should have reasonably anticipated that her actions might result in the forum state asserting personal jurisdiction over her to adjudicate disputes arising from these actions. *Id.* at 297.

By accepting appointment or election to the board of TLC Beatrice, Reginald Lewis impliedly consented to jurisdiction for cases in which he is a necessary or proper party, or actions for breach of directoral duties. Since plaintiff's claims all relate to alleged breaches in fiduciary duties, they fall squarely within Lewis' implied consent to jurisdiction. Thus, Mr. Lewis could clearly have expected to be hailed into Delaware courts to answer the type of claims asserted by plaintiff against him. Lewis' implied consent to service of process under the terms of Section 3114 would relieve any constitutional concerns over unfairness or injustice in requiring him to defend suit in Delaware.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

Page 8

The constitutionality of exercising jurisdiction over the Lewis Estate similarly follows from Lewis' implied consent to jurisdiction. Plaintiff here sues the co-executrices of the Lewis Estate--Loida Nicolas Lewis and Leslie N. Lewis--not personally but as the personal representatives of Lewis [FN6] for claims relating to Lewis' acts as a director. Sued in this capacity, the Lewis Estate is fairly bound by Lewis' consent to jurisdiction and the exercise of personal jurisdiction over the Lewis Estate passes constitutional scrutiny. It can hardly fail to satisfy fundamental fairness to require an estate to answer charges of delect or breach of duty of the decedent in a forum to which the decedent consented to such adjudication.

> FN6. Plaintiff also sues defendant Leslie N. Lewis in her individual capacity as a director of TLC Beatrice.

B. Personal Jurisdiction Over TLC Group L.P.

Defendant TLC Group L.P. ("Group") is a New York limited partnership with a Delaware corporation--TLC General Corp.--serving as its general partner. While the general partner can be personally served in this State, plaintiff relied on the general long-arm statute, 10 *Del.C.* § 3104 to serve Group. Group has now moved to be dismissed on the ground that it is not amenable to suit on the claims asserted in this jurisdiction.

As with the Lewis Estate, in order to justify the employment of Section 3104, plaintiff attributes various contacts to Group that in the first instance are acts of others. The only direct contacts between Group and Delaware that are alleged are (1) the payment of franchise taxes to the Delaware Secretary of State, and (2) the selection of a Delaware corporation as its general partner (which of course is not an act of limited partnership's both of its partners). In addition, plaintiff argues that this court should attribute to Group the contacts of its alleged co-conspirators.

1. Group: Jurisdiction Under 10 *Del.C.* § 3104(c)
   **\*10** Three subsections of the Delaware long-arm statute, (§ 3104(c)) are relied upon. It is contended that TLC Group (1) transacted business in Delaware [§ 3104(c)(1) ]; (2) caused tortious injury in Delaware by an act or omission in Delaware [§ 3104(c)(3) ]; and (3) caused tortious injury inside or outside of Delaware by an act or omission outside of Delaware and was

doing business in Delaware [§ 3104(c)(4) ]. [FN7] I conclude that none of the provisions have been shown, *prima facie,* to be applicable.

FN7. "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident or his personal representative, who in person or through an agent:
> (1) Transacts any business or performs any character of work or service in the State;

> * * *

> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he *regularly does or solicits business,* engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

> * * *

10 *Del.C.* § 3104(c).

* * *

Section 3104 is, in most of its aspects, a "single act" statute that establishes jurisdiction over nonresidents on the basis of a single act or transaction engaged in by the nonresident within the state. *Eudaily v. Harmon,* Del.Supr., 420 A.2d 1175, 1180 (1980); *Tabas v. Crosby,* Del.Ch., 444 A.2d 250, 254 (1982). Thus, this section permits the exercise of *specific* personal jurisdiction over the claims arising from the jurisdictional contacts listed in the relevant subsections. Subsection (c)(4) contemplates a general affiliating circumstance and thus permits the exercise of *general* personal jurisdiction over parties that qualify under its terms. *See, e.g., LaNuova D & B, S.p.A. v. Bowe Co., Inc.,* Del.Supr., 513 A.2d 764, 768 (1986); *Colonial Mtg. Serv. Co. v. Aerenson,* 603 F.Supp. 323, 327 (D.Del.1981).

*Subsection (c)(4).*

To prevail on plaintiff's assertion that Group's contacts with this State are such as to warrant the exercise of jurisdiction under subsection (c)(4), plaintiff must present evidence that Group "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

First, the service of a Delaware corporation as a general partner does itself constitute "doing business" or "a persistent course of conduct" in the state. Plainly the law of its incorporation is an important body of law for the general partner, but the fact of Delaware incorporation alone surely does not establish that the foreign limited partnership is "doing business" in this jurisdiction.

Second, plaintiff asserts that Group was a link in a practice that violated TLC Beatrice's rights and had a Delaware connection in the following way. It allegedly made payments (and was reimbursed by TLC Beatrice) to the Delaware Secretary of State for annual franchise fee obligations of various Reginald Lewis-affiliated enterprises. Together these payments amount to about $2,000. While these payments do, in my opinion, afford a basis for the exercise of specific jurisdiction over Group (addressed below) they do not meet the statutory test for general jurisdiction of subsection (c)(4). The contact itself--the repeated delivery of a $50 fee--is too insignificant to serve as a predicate for "presence" or "doing business." Moreover, to construe the statute as conferring generally affiliated status on Group on these facts would give rise to a constitutional problem. [FN8] The exercise of judicial power must satisfy "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The franchise tax payments fail, in my opinion, to satisfy the constitutional standards. See *Afros S.p.A. v. Kraus-Maffei Corp.,* 624 F.Supp. 464, 468 (D.Del.1985).

FN8. "[A] limited partnership that is accorded the right to sue or be sued in its own name, is a 'person' under the due process clause of the Fourteenth Amendment for the purpose of determining whether it possesses a constitutional privilege against suit in the forum jurisdiction." *Hart Holding Company Incorp. v. Drexel Burnham Lambert Incorp.,* Del.Ch., C.A. No. 11514, Allen, C. (May 28, 1992), Mem.Op. at 10. As previously noted, Group L.P. is a New York limited partnership and, under New York law, a limited partnership may be sued in its own name. See *N.Y.Civ.Prac.L. & R. § 1025 (McKinney 1976)* ("Two or more persons conducting a business as a partnership may sue or be sued in the partnership name, and actions may be brought by or against the president or treasurer of an unincorporated

association on behalf of the association in accordance with the provisions of the general associations law." *Id.).*

*Subsection (c)(1) and (c)(3).*

**11** These subsections authorize this court to exercise jurisdiction over a nonresident, or his personal representative, who directly or through an agent "transacts any business or performs any character of work or service in the State[,]" or "causes tortious injury in the State by an act or omission in this State[.]"

As noted the franchise fee payments do represent contacts sufficient to confer specific jurisdiction over the waste, misappropriation, and breach of fiduciary duty claims against Lewis arising from those payments. So limited jurisdiction here of such a claim would in my opinion be consistent with the constitutional test of minimum contacts.

Specific personal jurisdiction over one claim, however, does not confer specific jurisdiction over plaintiff's other claims. See *Sears, Roebuck & Co. v. Sears plc,* 774 F.Supp. 1297, 1302 (D.Del.1990); CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1588 (1969). "Indeed, where general jurisdiction over a defendant is lacking, the constitutional analysis distinguishing between general and specific jurisdiction would become meaningless if the finding of specific jurisdiction over one claim provided the basis for extending jurisdiction over all other alleged claims." *Sears, Roebuck,* 774 F.Supp. at 1302.

\* \* \*

**2. Group: Section 17-911 of Limited Partnership Statute**

Plaintiff also claims that this court has jurisdiction over Group because (1) a Delaware corporation, serves as Group's sole general partner and (2) Section 17-911, of our Limited Partnership Act, [FN9] provides for such jurisdiction. Plaintiff relies on *Macklowe v. Planet Hollywood, Inc.,* Del.Ch., C.A. No. 13689, Steele, V.C. (Oct. 4, 1994), contending it holds generally that a Delaware court may always exercise jurisdiction over an unregistered foreign limited partnership if a Delaware corporation serves as its general partner. I cannot read that precedent so broadly. Whether the "presence" of a "general partner" in the forum jurisdiction will, without more, subject the limited partnership to *in personam* jurisdiction is a question that turns on the further question whether the law of the creation of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

Page 10

limited partnership treats it as a jural entity. New York law, which forms and creates Group, does treat Group as a legal entity, *i.e.*, having a distinct legal existence from its general or limited partners. (*see* fn. 8) Therefore, like a corporation or other legal entity, the simple presence in this jurisdiction of a person with management authority with respect to the entity will not itself subject the entity to jurisdiction, unless that presence is in connection with the affairs of the entity.

> FN9. *6 Del.C. § 17-911* states:
> Any foreign limited partnership which shall do business in the State without having registered under § 17-902 of this title shall be deemed to have thereby appointed and constituted the Secretary of State of the State as its agent for the acceptance of legal process in any civil action, suit or proceeding against it in any state or federal court in the State arising or growing out of any business done by it within the State. *Id.*

3. Group: Conspiracy Theory of Jurisdiction

Plaintiff also attempts to attribute other contacts to Group (*i.e.*, transactions relating to the purchase of a corporate jet and the incorporation of Delaware subsidiaries), but fails to present evidence that Group itself performed these acts or even that it "caused" or "directed" these actions. Instead, plaintiff alleges broadly that this court may exercise jurisdiction over Group based upon an *agency* among its alleged co-conspirators. By casting Group as a member of a conspiracy to defraud TLC Beatrice, plaintiff hopes to attribute the jurisdictional contacts of the alleged co-conspirators to Group.

**\*12** If the plaintiff can show *prima facie* the existence of a conspiracy in which Group participated, "a basis will have been shown to employ the Delaware long-arm Statute [*10 Del.C. § 3104(c)* ] on the view that one member of a conspiracy acts as the agent of others with respect to the aim of the conspiracy." *Hart Holding, 593 A.2d at 542; see also Hercules Inc. v. Leu Trust and Banking, Del.Supr., 611 A.2d 476, 481 (1992).* This court could then exercise personal jurisdiction over the nonresident based on the forum contacts of the co-conspirators. See *Mobile Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc., 833 F.Supp. 437, 446 (D.Del.1993).*

The Supreme Court has defined the conspiracy theory of jurisdiction in *Istituto Bancario Italiano v. Hunter Eng. Co., Del.Supr., 449 A.2d 210, 225 (1982).* Under the conspiracy theory:

> [a] conspirator who is absent from the forum state is subject to the jurisdiction of the court, ..., if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Id.* This court has narrowly construed the conspiracy theory of jurisdiction, seeing in it an easy technique to evade the thrust of the *International Shoe* holding. Proper invocation of this basis of jurisdiction requires factual proof of each enumerated element. *See Newspan, Inc. v. Hearthstone Funding Corp.,* Del.Ch., C.A. No. 13304, Allen, C. (May 10, 1994), Mem.Op. at 18-19 ("all of [the five elements of a conspiracy] must be satisfied before a Delaware court may exercise personal jurisdiction." *Id.*). *Istituto Bancario, 449 A.2d at 225* (requiring that plaintiff make a "factual showing" of required elements).

Lewis' dominant ownership position in the limited partnership and his complete ownership and control over the corporate general partner of Group indicates a strong solidarity between Lewis and Group. However, even assuming elements (1) and (2) of conspiracy enumerated in *Istituto Bancario,* are satisfied, plaintiff must offer evidence that the contacts of the conspiratorial agents would themselves satisfy the Delaware long-arm statute elements (3 & 4) such that, if they were attributed to Group, this court could exercise jurisdiction over Group based on those contacts (element 5). *See Mobile Oil, 833 F.Supp. at 446.*

First, as to whose acts are considered as acts of Group for *in personam* jurisdiction, it is plaintiff's burden to show *prima facie* evidence that a conspiracy with another person existed and that the others act touching upon Delaware was in furtherance. In my view, the record does sufficiently establish an agreement between Lewis and Group with respect to franchise payments made through Group for the benefit of Lewis and Lewis affiliates. There is no evidence linking those payments by Group to the more substantial contact established by the receipt of an airplane in this State.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)                                        Page 11
**(Cite as: 1995 WL 694397 (Del.Ch.))**

**\*13** Similarly, the incorporation of various Delaware entities, particularly the entities involved in the rental, purchase, delivery, and sale of the jet, have not been shown to fall within a "conspiracy" between Lewis and Group.

Plaintiff's attempt to define a broad plan "to defraud TLC Beatrice" fails because of its absence of specificity and evidence. Plaintiff neglects to trace the enumerated elements of conspiracy with respect to other alleged co-conspirators. Thus, left unanswered are questions such as (1) who the members of the conspiracy were and whether, in fact, the members of the alleged conspiracy "voluntarily participated in [the] conspiracy with knowledge of its acts in or effects on the forum state ..." *Istituto Bancario*, 449 A.2d at 225; and (2) are any acts on effects in Delaware a part of a conspiracy and what is the scope of it.

I conclude that the conspiracy theory of jurisdiction is not sufficiently proven to require Group to appear and defend the panoply of claims asserted in this suit.

C. Personal Jurisdiction Over Anthony Fugett

1. Fugett: Statutory Basis: 10 Del.C. § 3114
Plaintiff asserts jurisdiction over Anthony Fugett ("Fugett") under 10 Del.C. § 3114, the directors consent statute.

Carlton argues that Fugett's actions as a director to approve, ratify, and adopt resolutions previously considered by the TLC Beatrice board render him subject to the court's jurisdiction for adjudication of claims allegedly arising from those acts. These resolutions included (1) a $22.1 million payment to Lewis, (2) the award of stock appreciation rights to each director, and (3) a generous compensation agreement for his brother, Jean Fugett.

Mr. Fugett contends that ratification was not necessary for the resolutions to take effect. Therefore, he says, his action in ratifying them cannot form the basis of jurisdiction under Section 3114. He asserts that the holding in *Istituto Bancario*, 449 A.2d at 227-28, supports this position. There the Delaware Supreme Court held that a director's approval of the ministerial act of exchanging old share certificates for newly issued certificates, after the other parties to the conspiracy had already acted to issue and distribute the new shares, did not by itself constitute a wrongful action so as to subject the director to the personal

jurisdiction under Section 3114. The Court specifically noted that this share exchange occurred after "all acts pursuant to, and necessary for completion of the conspiracy had been completed." The court additionally noted that, as regarding the share exchange, "board approval was not necessary and ... in fact, no action was taken." *Id.* at 228.

The *Bancario* holding is not dispositive on these facts since it is not clear that all acts to complete the wrong had been accomplished by the time of the ratification. More basically this point involves the distinction between jurisdiction to consider a claim and the validity of the claim itself. The ability of a shareholder to invoke Section 3114 cannot turn upon whether the facts allege constitute a valid claim. If they do not, the director may have the case dismissed on its merits under Rule 12(b)(6), not under 12(b)(2) or (4). Although the efficacy or necessity of Mr. Fugett's ratification is not certain, his potential liability for effecting such ratification, supported by evidence sufficient to create a *prima facie* case of jurisdictional status, suffices to permit this court to take personal jurisdiction over him. "Jurisdiction, ..., is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.... Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood, 327 U.S. 678, 682 (1946).*

V. Statute Of Limitations

A. Limitations: The Lewis Estate

**\*14** Defendants claim that this suit is barred against the Lewis Estate because the applicable statute of limitations has run. Mr. Lewis died in 1993; this suit was not instituted until 1995. The Lewis Estate argues that, under 10 Del.C. § 8121 (the "borrowing statute"), [FN10] an eight month limitations period of 12 Del.C. § 2102 applies to the instant case and bars the present claim.

> FN10. Section 8121 holds in relevant part: "Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of *whichever is shorter,* the time limited by the law of this State, *or* the time limited by the law of the state or country where the cause of action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
(Cite as: 1995 WL 694397 (Del.Ch.))

arose, for bringing an action upon such cause of action."
10 Del.C. § 8121 (1975) (emphasis added).

Section 2102, however, has no bearing on the amenability of a suit in Delaware for breach of fiduciary duties against an estate administered in New York. If indeed Chapter 21 and its purpose fail to illustrate this principle, the language of Section 2102 with reference to Section 2104 should. Chapter 21 is part of the comprehensive regulation of the administration of Delaware estates. It does not apply to claims against foreign estates.

Under Section 2104 the presentation of claims requires mailing the proper documents to the personal representative or filing such claim with the Register of Wills. A foreign estate has no personal representative in Delaware and must open an ancillary proceeding in Delaware to establish a personal representative in Delaware. Furthermore, filing with the Register of Wills has no application to estates established and administered in foreign jurisdictions.

Consistent with this analysis, this court stated in *Wimpfheimer v. Goldsmith*, Del.Ch., 298 A.2d 778 (1972), that, "under well-established law, ... the domiciliary state, has the right to determine the validity and the timeliness of claims against the estate." *Id.* at 780. Because Lewis was a domiciliary of New York and his estate is being administered in New York, this general rule dictates that New York law, and not Delaware law, defines the period in which claims against the estate must be asserted. Insofar as this court is concerned in this suit claiming breach of fiduciary duty, the appropriate concept is *laches* not limitations. *Kahn v. Seaboard Corp.*, Del.Ch., 625 A.2d 209 (1993).

B. Limitations: Alfonso, Cloud, and Mowry

Defendants Alfonso, Cloud and Mowry contend that they should be dismissed as defendants since, they say, an applicable statute of limitations had expired with respect to any claims against them. In asserting this statute of limitations bar, defendants rely on 10 Del.C. § 8106, which, if it applies, bars claims seeking damages or other legal relief after three years. Alfonso, Cloud, and Mowry all left the TLC Beatrice board in 1989, almost five years before plaintiff brought this action.

Plaintiff responds that where a complaint alleges self-dealing by corporate fiduciaries, the three-year limitations period will not be employed by the Court of Chancery, until a reasonably diligent shareholder knew or had reason to know the facts giving rise to the alleged wrong. *See Kahn v. Seaboard Corp.*, Del.Ch., 625 A.2d 269, 276 (1993).

Plaintiff has the burden of pleading facts that will qualify the case for the tolling principle. *See Litman v. Prudential-Bache Properties, Inc.*, Del.Ch., C.A. No. 12137, Chandler, V.C. (Jan. 14, 1994), Mem.Op. at 8. Certainly proof of some affirmative act of concealment by the directors would entitle the court to not invoke statute of limitations. *Id.* at 5. Likewise, under the doctrine of equitable tolling, plaintiff may also qualify for tolling even absent an affirmative act of concealment, if it alleges (1) that defendants had a fiduciary relation with plaintiff, (2) self-dealing by the defendants, and (3) that plaintiff did not know or have reason to know of the facts giving rise to the alleged wrong. *E.g., Kahn*, 625 A.2d at 276. This principle of justifiable reliance by the beneficiary of a fiduciary duty on the integrity of the holder of the power subject to the duty, that plaintiff relies upon here.

*15 Defendants attempt to dispose of the tolling claim by asserting that plaintiff had a representative on the board and thereby knew, or should have known the facts now claimed to constitute a breach of fiduciary duty.

The critical fact--whether Carlton knew relevant facts in circumstances in which it could not reasonably rely any longer on the board's integrity-- are subject to dispute in the record and not resolvable on this motion. Carlton asserts that it did not have a representative on the board. Carlton also claims that Lewis, in fact, failed to disclose information regarding the self-dealing transactions to the board of TLC Beatrice. Thus, even if Carlton had a representative on the board, that representative would not have had information sufficient to precipitate suit.

Does this fact question concerning what Carlton knew or should have known extend to the time at which defendants Alfonso, Cloud and Mowry served on the Beatrice board? If plaintiff was blamelessly unaware in 1989 of the facts and circumstances that it claimed when constituted a wrong when it filed this suit, then I believe that the directors must answer the claim, whether or not they as individuals concealed any action or misled anyone. When the issue is a time-bar in an action against a fiduciary. The emphasis in equity is upon the protection of the beneficiary of a fiduciary duty, so long as she is

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

reasonably attentive to her interests, albeit trusting. *See Kahn v. Seaboard, supra.*

Thus, the unresolved state of the record leads me to decline to grant this motion at this time.

VI. Dismissal Of Conversion And Aiding And Abetting/Conspiracy Claims

Defendants have moved to dismiss the conversion and aiding and abetting/civil conspiracy claims for failure to state valid claims for relief. In a motion to dismiss for failure to state a claim, the court will consider all well pleaded allegations as true, *see Del. State Troopers Lodge No. 6 v. O'Rourke, Del.Ch., 403 A.2d 1109, 1110 (1979),* and will construe the complaint and all inferences contained therein in the light most favorable to the plaintiff. *See id.* The moving party has the burden to show that the plaintiff could not prevail under any state of facts which could be proven to support his claim. *See Summers v. Beneficial Corp., Del.Ch., C.A. No. 8788, Hartnett, V.C. (March 9, 1988).*

A. Civil Conspiracy/Aiding and Abetting

To establish this civil conspiracy or aiding and abetting claim, plaintiff must plead facts tending to show (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in the breach by the non-fiduciary defendant. *Weinberger v. Rio Grande Industries, Inc., Del.Ch., 519 A.2d 116, 131 (1986); Gilbert v. El Paso Co., Del.Ch., 490 A.2d 1050, 1057 (1984).* Such causes largely come down to what constitutes "knowing participation." [FN11]

> FN11. In some occasions this court has dilated upon the "knowing participation" element by employing the following test of a civil conspiracy (1) the participation of two or more persons, (2) some object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more overt acts, and (5) damages as a proximate result thereof. *See Tuckeran v. AeroSonic Corp., Del.Ch., C.A. No. 8094, Hartnett, V.C. (June 29, 1981), Mem.Op. at 2; Weinberger v. UOP, Inc., Del.Ch., 426 A.2d 1333, 1348 (1981), rev'd on other grounds, Del.Supr., 457 A.2d 701 (1983).* For the purposes of the instant case, however, analysis under the civil conspiracy test mirrors the analysis under the civil conspiracy/aiding and abetting standard.

Both primarily focus on the understanding of the parties with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.

The actions of Group and its general partner TLC Group Corp., as set forth in the complaint, clearly reveal a knowing participation in the alleged acts that are said to constitute breaches of fiduciary duties. The complaint sets forth a melange of payments made by Group to Lewis, his friends and family, his companies, and its own employees which were later reimbursed by TLC Beatrice. This participation as middleman for and beneficiary of improper disbursements by TLC Group L.P. and TLC Group Corp. with the defendant directors in this action for breach of fiduciary duties.

*16 As for the remaining entities, plaintiff has alleged sufficient facts to indicate their participation in a range of acts claimed to constitute waste and misappropriation. Specifically, they "participated" in receiving an improper benefit, directly or indirectly, from Beatrice: TLC Holdings allegedly obtained office space free of rent, and McCall Pattern Holdings allegedly had its legal expenses paid. Regardless of the possibly *de minimus* nature of the benefit conferred, the receipt of improper benefits suffices to prove their participation in the alleged breaches of fiduciary duties. Furthermore if one accepts the pleadings, TLC Transport participated in the breach of fiduciary duties in facilitating the lease of the corporate jet for TLC Beatrice and Lewis. For the purpose of assessing this motion to dismiss, this court infers their "knowing" participation from the factual allegations in the complaint as to the overarching control of Lewis over these entities. Any claims that the defendant companies unknowingly participated in the alleged breaches of fiduciary duties might be proven to be true later but for these purposes I conclude enough is alleged to state a claim.

B. Conversion

Defendants have moved to dismiss the conversion claim, arguing that conversion applies only to tangible property and not to the wrongful taking of money. ("The rule therefore is that an action for conversion of money will lie only where there is an obligation to return the *identical* money delivered by the plaintiff to the defendant." This is a traditional limitation of this ancient form of recovery. Plaintiff concedes that defendants could not have converted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)
**(Cite as: 1995 WL 694397 (Del.Ch.))**

Page 14

TLC Beatrice funds, but it argues that the "wrongful exercise of dominion over" (1) the services of the corporate jet, and (2) the leased office space, support its conversion claim.

Conversion is the "wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it." _Drug, Inc. v. Hunt_, Del.Supr., 168 A. 87, 93 (1933). An action for conversion has traditionally applied to the wrongful exercise of dominion over tangible goods. _See_ RESTATEMENT (SECOND) OF TORTS § 222A, cmt. a. Following a modern trend, Delaware courts have tentatively expanded the doctrine to encompass some intangible goods where the intangible property relations are merged into a document. _See Drug. Inc. v. Hunt_, Del.Supr., 168 A. 87, 93 (1933) (specific stock certificates); _see generally_, _Mastellone v. Argo Oil Corp._, 82 A.2d 379, 382-83 (1951) (stock certificates). Plaintiff here argues for an expansion of conversion to encompass wrongful taking of the right to occupy space and the right to the services of the jet plane. We do not, however, have a shortage of available legal theories of recovery should plaintiff prove the factual elements of this case. There is no need to attempt to craft new theories of recovery of this type. Therefore I conclude that conversion is not an available theory of recovery to plaintiff insofar as it complains of the payment of money by TLC Beatrice or the intangibles not represented in an instrument.

VII. Motion To Dismiss Claims Against Anthony Fugett, TLC Holdings And TLC Transport

**\*17** Defendants have moved to dismiss Anthony Fugett, TLC Holdings, and TLC Transport, claiming that the complaint fails to allege any wrongdoing on their part. In this context, the moving party must show that plaintiff could not prevail under any state of facts which could be proven to support her claim. _Rabkin v. Philip A. Hunt Chemical Corp._, Del.Supr., 498 A.2d 1099, 1004 (1985). Here, defendants contend that Fugett should be dismissed because the complaint fails to allege that he did anything wrong and because all the payments challenged by Carlton were authorized prior to his becoming a director. I addressed this above; questions remain as to whether Fugett's _post hoc_ ratification of certain resolutions regarding the challenged payments had any legal significance. The potential liability of Fugett remains an unsettled question of fact and law.

Defendants similarly move to dismiss TLC Holdings Corp. The complaint alleges that TLC Holdings

Corp. occupied space in TLC Beatrice offices and had its taxes and other governmental levies paid by TLC Beatrice. As discussed above, this receipt of benefits from TLC Beatrice may subject it to liability under the aiding and abetting/civil conspiracy claim alleged by plaintiff.

\* \* \*

Plaintiffs shall submit a form or order on notice.

Not Reported in A.2d, 1995 WL 694397 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
LITTLE SWITZERLAND, INC., Plaintiff,
v.
DESTINATION RETAIL HOLDINGS
CORPORATION; Young Caribbean Jewellery
Company
Limited; Alliance International Limited; CEI
Distributors Inc.; and Stephen
G.E. Crane, Defendants.
**No. CIV. A. 98-315-SLR.**

March 31, 1999.

Alan J. Stone, Esquire, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware, attorneys for
plaintiff. Of Counsel: R. Todd Cronan, Esquire and
Jeremy M. Sternberg, Esquire, of Goodwin, Procter
& Hoar LLP, Boston, Massachusetts.

Gregory P. Williams, Esquire, Raymond J.
DiCamillo, Esquire, and John S. Mills, Esquire, of
Richards, Layton & Finger, Wilmington, Delaware,
attorneys for defendants. Of Counsel: William J.
McSherry, Jr., Esquire, of Battle Fowler, New York,
New York.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

*1 Plaintiff Little Switzerland, Inc. ("LSI") filed suit
in this court seeking damages related to a failed
merger transaction with defendants Destination Retail
Holdings Corporation ("DRHC"), Young Caribbean
Jewellery Company Limited ("Young Caribbean"),
Alliance International Holdings Limited ("Alliance"),
CEI Distributors, Inc. ("CEI"), and Stephen G.E.
Crane ("Crane") (collectively "defendants"). More
specifically, plaintiff LSI contends that the corporate
defendants (allegedly controlled by defendant Crane)
breached a merger agreement by failing to secure the
financing necessary to close the merger, despite the
lack of a financing contingency in the merger

agreement. Plaintiff asserts this court's subject matter
jurisdiction based solely upon diversity of citizenship
pursuant to 28 U.S.C. § 1332.

Defendants have moved to dismiss the complaint
pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject
matter jurisdiction and pursuant to Fed.R.Civ.P.
12(b)(7) for failure to join a party under Rule 19. In
addition, defendant Crane has moved to dismiss the
complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack
of personal jurisdiction and pursuant to Fed.R.Civ.P.
12(b)(6) for failure to state a claim for "aiding and
abetting."

For the reasons that follow, defendants' motion to
dismiss is denied.

II. FACTS

On or about February 4, 1998, a merger agreement
("the Agreement") was entered into by plaintiff LSI
and defendants DRHC, Young Caribbean, Alliance
and CEI. Plaintiff LSI is a Delaware corporation with
its principal place of business in St. Thomas in the
United States Virgin Islands. Defendant DRHC is an
Island of Nevis corporation with its principal place of
business located in Freeport in the Bahamas.
Defendant Young Caribbean is a Cayman Islands
corporation which is a subsidiary of DRHC.
Defendant Alliance is a Bahamian corporation which
is a wholly owned subsidiary of DRHC. Defendant
CEI is a British Virgin Islands corporation which is a
wholly owned subsidiary of DRHC. Defendant
Crane, a resident of Freeport in the Bahamas,
executed the Agreement as a corporate officer of
DRHC and Young Caribbean (D.I.34, Ex. B)

Another signatory to the Agreement was LSI
Acquisition Corp. ("LSI Acquisition"). LSI
Acquisition is a Delaware corporation and a wholly
owned subsidiary of DRHC established as a vehicle
for accomplishing the merger at issue. Under the
terms of the Agreement, the corporate defendants and
LSI Acquisition agreed to acquire all of the
outstanding stock of LSI for a price of $8.10 per
share. The all-cash merger was structured so that LSI
would merge with either LSI Acquisition or with
another entity specified by DRHC, with LSI
surviving as a wholly owned subsidiary of DRHC
(unless DRHC elected to have another entity survive
the merger). (D.I.34, Ex. B)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
**(Cite as: 1999 WL 223496 (D.Del.))**

Page 2

Plaintiff asserts that the Agreement was the culmination of a concerted effort on the part of defendant Crane to acquire control of LSI. (D.I.34, Ex. A) In connection with his plan to pursue a business combination with LSI, defendant Crane undertook the following steps. Crane directed that LSI Acquisition be incorporated in Delaware, with Crane described as President, director, and controlling stockholder. (D.I. 34, Ex. A; D.I. 55 ¶ 3) Crane directed that a series of offer letters be sent to LSI in 1997 and 1998. (D.I.34, Ex. G) When these offers were rejected by LSI, Crane initiated a proxy contest to take control of LSI's board of directors. As part of the proxy contest, Crane caused a lawsuit to be filed in the Court of Chancery for the State of Delaware whereby he was authorized to nominate his slate of "dissident directors" and secured LSI's shareholder list. [FN1] (D.I.34, Exs.A, H) On or about January 15, 1998, defendant Crane sent to LSI shareholders (some of whom allegedly reside in Delaware [FN2]) his proxy statement and accompanying letter describing the transaction at issue as an "all-cash, fully-financed offer." (D.I. 34, Ex. F at 20) On or about January 29, 1998, defendant Crane sent another letter to LSI shareholders urging support of DRHC's slate of board nominees "in order to maintain pressure on the Little Switzerland Board" to consummate a transaction with DRHC. (D.I.34, Ex. J) Crane once again described the transaction as an "all-cash, fully-financed offer...." in the January 29, 1998 missive. (D.I.34, Ex. J) Crane caused his attorneys to issue a series of press releases in support of his acquisition plan. (D.I.34, Ex. A)

**\*2** On or about February 4, 1998, plaintiff LSI and the corporate defendants executed the Agreement. Crane personally negotiated the terms of the Agreement with LSI and executed the Agreement on behalf of DRHC, Young Caribbean, and LSI Acquisition. (D.I.34, Ex. B) The Agreement included various representations and warranties. Of especial relevance to the dispute at bar are the representations by defendants that they had: (1) "a combined net worth in excess of $48 million ...;" and (2) "financing commitments in place which, together with cash presently on hand, [would] provide sufficient funds to purchase and pay for the shares pursuant to the Merger in accordance with the terms of this Agreement and to consummate the transactions contemplated hereby...." (D.I. 34, Ex. B at 24, 26) The Agreement also provided that it "shall be governed and construed in accordance with the laws of the State of Delaware" and that the parties "irrevocably and unconditionally consent to the

jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware...." (D.I. 34, Ex. B at 58)

On or about May 8, 1998, LSI shareholders voted in favor of the merger. Despite their representations to the contrary, defendants were unable to meet their obligation to tender the $8.10 per share consideration to LSI shareholders. LSI then commenced this action for breach of the Agreement.

## III. ANALYSIS

### A. Subject Matter Jurisdiction

Plaintiff at bar asserts jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. [FN3] It is well settled that, in order to sustain diversity jurisdiction, all of the parties on one side of the controversy must be citizens of different states than all of the parties on the other side. *See Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir.1995); *see also Transamerica Corp. v. Reliance Ins. Co.*, 884 F.Supp. 133, 137 (D.Del.1995). For purposes of determining diversity jurisdiction, a corporation has "dual citizenship" and is considered a citizen of the state of its incorporation and the state where its principal place of business is located. *See* 28 U.S.C. § 1332(c)(1); *Mid-Atlantic*, 48 F.3d at 696; *Transamerica Corp.*, 884 F.Supp. at 137. If LSI Acquisition were made a party to this action, the requirement of complete diversity would not be met because both LSI and LSI Acquisition are Delaware corporations. *See Johnson & Johnson v. CooperVision, Inc.*, 720 F.Supp. 1116, 1120 (D.Del.1989).

Where jurisdiction is based upon a diversity of citizenship, a plaintiff cannot confer jurisdiction upon the federal court by its own determination as to who are the proper parties to an action. A federal court must ascertain the " 'principal purpose of the suit' ... and the 'primary and controlling matter in dispute'...," *Indianapolis v. Chase National Bank*, 314 U.S. 63, 69-70 (1941) (citations omitted), and "must disregard nominal or formal parties to the action [in order to] determine jurisdiction based only upon the citizenship of the real parties to the controversy." *Rose v. Giamatti*, 721 F.Supp. 914 (S.D.Ohio 1989) (citing *Navarro Savings Ass'n v. Lee*, 446 U.S. 458 (1980)). A real party in interest has been characterized as "one who, by the substantive law, has the duty sought to be enforced or enjoined." *Rose*, 721 F.Supp. at 914.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

*3 In examining whether the alignment of the parties is consistent with the invocation of federal jurisdiction, the court must undertake a two-step analysis. First, the court must identify "necessary" parties under Fed.R.Civ.P. 19(a). As explained by the Third Circuit in *Angst v. Royal MacCabees Life Ins. Co.*, 77 F.3d 701 (3d Cir.1996),

> Rule 19(a) requires the joinder of a party who is subject to service of process and within the court's subject matter jurisdiction when:
> (1) in the person's absence complete relief cannot be accorded among those already parties, or
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
> (i) as a practical matter impair or impede that person's ability to protect that interest or
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

*Id.* at 705. Under Rule 19(a), the court need only find that a party's absence "results in any of the problems identified in the rule." *Id.* at 706.

If the court concludes that a party is "necessary" at the time the complaint is filed, the party should be joined if feasible. If joinder is not feasible, [FN4] then the court proceeds to the second step of the analysis, that is, whether "in equity and good conscience the action should proceed among the parties before it, or [alternatively, whether the action] should be dismissed." Fed.R.Civ.P. 19(b). Rule 19(b) lists four factors to be considered by the court, in light of the facts of a given case:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
> Fed.R.Civ.P. 19(b).

Defendants assert that LSI Acquisition is both a necessary and indispensable party. In support of their assertion, defendants compare the allegations of the complaint with the provisions of the Agreement and conclude that LSI Acquisition's obligations under those provisions of the Agreement cited in the complaint [FN5] are joint with (and not severable

from) those of the other corporate defendants. Although the court agrees that the Agreement says what it says, other facts of record require consideration before a conclusion as to joinder can be drawn.

Section 1.01 of the Agreement provides that LSI Acquisition, the identified "Sub," was essentially a fungible actor in the transaction:

> At the election of Parent, any direct or indirect wholly owned subsidiary of Parent may be substituted for Sub as a constituent corporation in the Merger. In the event such a subsidiary is substituted for Sub, Parent will cause such subsidiary to become a party to this Agreement and to assume and perform the obligations of Sub hereunder. Notwithstanding the foregoing, Parent may elect ... that instead of merging Sub into the Company as hereinabove provided, to merge the Company into Sub or another direct or indirect wholly owned subsidiary of Parent ....

*4 (D.I. 34, Ex. B at 2) As stipulated to by the parties:

> LSI Acquisition Corp. ("LSI Acquisition") was established as a vehicle for accomplishing a triangular merger through which Little Switzerland Inc. ("Little Switzerland") would be merged into a corporate entity owned in its entirety by Destination Retail Holdings Corporation ("DRHC").
> LSI Acquisition was to be the merger subsidiary pursuant to the Agreement and Plan of Merger dated February 4, 1998 (the "Merger Agreement"), but this purpose was never accomplished because the merger did not close.
> Incorporating LSI Acquisition was purely a ministerial act accomplished by a paralegal at a law firm representing DRHC.
> LSI Acquisition has conducted no business to date other than the execution of the Merger Agreement, thereby, among other things, agreeing to serve as an entity which could potentially merge with Little Switzerland under the Merger Agreement.
> LSI Acquisition currently has no assets and no liabilities other than those it would obtain if the merger closed.
> (D.I.35) [FN6]

In applying Rule 19(a) to the facts of this case, the court must determine whether "complete relief" can be accorded among those who are already parties in LSI Acquisition's absence. The specific question framed by the record is whether the court "can grant complete relief in a breach of contract action to the parties before it when only [four] of [five] co-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

Page 4

obligors [have] been joined as [defendants]." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 405 (3d Cir.1993) (footnote omitted). The Third Circuit in *Janney Montgomery Scott* recognized "a strong trend in favor of a principle that co-signors or co-obligors on a contract are jointly and severally liable for its performance." *Id.* The Third Circuit concluded that if an agreement "can be construed or interpreted as a contract imposing joint and several liability on its co-obligors, ... complete relief may be granted in a suit against only one of them." *Id.* at 406. Cf. *Bank of Am. Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs.,* 844 F.2d 1050, 1054 (3d Cir.1988) (noting that "Professor Moore instructs that 'all joint obligors should be joined in order that there may be a complete determination of the controversy, provided ... their joinder would not destroy federal jurisdiction.' ... However, if such joinder would destroy diversity, 'the court can proceed without the joinder of all joint obligors." ') (citation omitted).

Defendants argue that "[b]ecause the obligations of DRHC, Young Caribbean, Alliance, CEI, and LSI Acquisition under the Merger Agreement are not severable, LSI Acquisition's absence would leave the named defendants subject to a substantial risk of incurring 'double or inconsistent obligations." ' (D.I. 19 at 12) The specific risk identified is that LSI could sue LSI Acquisition in a separate proceeding, thus "expos[ing] DRHC to multiple or inconsistent judgments." (*Id.*) [FN7]

*5 Although defendants argue that the obligations of the corporate defendants are not severable, they cite to no portion of the record or to any case law in support of their assertion. (D.I. 19 at 12) Indeed, if anything, various provisions of the Agreement indicate an intention that there be joint and several liability among the co-obligors. [FN8] Because the Agreement can be construed to impose joint and several liability, LSI Acquisition is not a necessary party under Rule 19(a)(1).

Turning to the concerns raised in Rule 19(a)(2), the court finds that defendants have failed to adequately identify LSI Acquisition's "interest relating to the subject of the action," save for its interest in avoiding litigation. In that respect, the court further concludes that the risk of subsequent litigation being pursued against LSI Acquisition (thus exposing DRHC to the risk of multiple or inconsistent obligations) [FN9] is simply too remote and speculative to constitute a "substantial risk."

Having determined that LSI Acquisition is not a necessary party pursuant to Fed.R.Civ.P. 19(a), the court need not "navigate the path of equity and good conscience" in order to determine whether to dismiss the action pursuant to Rule 19(b). Given the court's findings above and the overlapping concerns of Rule 19(a) and (b), suffice it to say that it is unlikely, in the absence of additional evidence, that LSI Acquisition would be deemed indispensable, thus requiring dismissal of the action.

B. Personal Jurisdiction

Defendant Crane contends that this court lacks personal jurisdiction over him and accordingly moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(2). To defeat a Rule 12(b)(2) motion to dismiss, plaintiff bears the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Patterson v. FBI,* 893 F.2d 595, 603-04 (3d Cir.1990). Bare pleadings and allegations are insufficient to withstand a Rule 12(b)(2) motion; rather, a plaintiff "must sustain its burden of proof ... through sworn affidavits or other competent evidence." *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 67 n. 9 (3d Cir.1984). Once a plaintiff has made out a *prima facie* case, the burden shifts to defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 483 (3d Cir.1993) (internal quotations and citation omitted). In reaching its determination, the court must accept as true all well-pled facts and draw all reasonable inferences from the facts in favor of LSI, the nonmoving party. *Shushan,* 954 F.2d at 142 n. 1.

This court may assert personal jurisdiction to the extent permitted under the Delaware long arm statute, 10 Del. C. § 3104, *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.1985), and the due process clause of the Fourteenth Amendment. *Jeffreys v. Exten,* 784 F.Supp. 146, 152-53 (D.Del.1992). In determining whether jurisdiction lies the court must apply a two-step analysis: "First, [the] court must determine whether the alleged conduct of a defendant comes within one of the provisions of the long-arm statute.... [T]hen the court must proceed to consider whether the exercise of jurisdiction over a particular defendant violates due process interests." *Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1315 (D.Del.1987).

1. Delaware Long Arm Statute

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

Page 5

**\*6** Plaintiff alleges that personal jurisdiction over defendant Crane is proper under 10 Del. C. § 3104(c). This section provides in pertinent part that "a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; ... [or] (3) Causes tortious injury in the State by an act or omission in this State." 10 Del. C. § 3104(c)(1) and (3). As this court has held, this section is to be construed liberally, favoring the exercise of jurisdiction. *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies*, 833 F.Supp. 437, 444 (D.Del.1993). *Accord Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 863 F.Supp. 186, 188 (D.Del.1993) ("The long arm statute 'is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.' ") (citation omitted).

a. Transacting Business in Delaware

In support of its contention that defendant Crane transacted business in Delaware, plaintiff LSI argues "that the single act of incorporating a business in Delaware, even in the absence of other contacts with the forum state Delaware, may be sufficient to confer jurisdiction" under 10 Del. C. § 3104(c)(1). (D.I. 33 at 22) The Supreme Court of the State of Delaware held in *Papendick v. Bosch*, 410 A.2d 148 (Del.1979), that a single act of incorporation in Delaware will suffice to confer personal jurisdiction over a nonresident defendant responsible for the transaction, if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates. *See Cairns v. Gelmon*, No. Civ. A. 16062, 1998 WL 276226 (Del. Ch. May 21, 1998) at \*3; *Arnold v. Society for Savings Bancorp, Inc.*, Civ. A. No. 12883, 1993 WL 526781 (Del. Ch. Dec. 17, 1993) at \*3, reversed on other grounds, 650 A.2d 1270 (Del.1994). The question, then, is whether the relationship between defendant Crane, the incorporation of LSI Acquisition under Delaware law, and plaintiff's cause of action is sufficient to subject Crane to this court's personal jurisdiction.

The court finds the relationship to be insufficient. LSI Acquisition, although incorporated in Delaware, was a fungible corporate entity in terms of the proposed merger transaction. Not only could another corporation have been substituted for LSI Acquisition but, more significantly (and unlike the facts in both *Cairns* and *Arnold* ), the transaction was never consummated, leaving LSI Acquisition a shell

company with no business activities, no assets, and no actual role in the transaction. The court concludes, therefore, that under the factual record presented, the act of incorporating LSI Acquisition in Delaware is insufficient to confer personal jurisdiction over defendant Crane. [FN10]

b. Tortious Acts in Delaware

Jurisdiction under § 3104(c)(3) requires that the tortious act itself, and not merely the resulting harm, occur in Delaware. *See Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1468 (D.Del.1991). This interpretation is necessary to distinguish § 3104(c)(3) from § 3104(c)(4), which provides for jurisdiction over one who

> **\*7** [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from services, or things used or consumed in the State
> ....

This latter section, known as a grant of "general jurisdiction," clearly does not require a nexus between the cause of action and a defendant's activities in the State, but does require a higher level of regular contacts in the State than do the other "specific jurisdiction" subsections. To give this subsection any meaning, the court must read § 3104(c)(3) as requiring a connection between the alleged tortious activity and defendant Crane's "presence" in Delaware.

It is undisputed that defendant Crane has not had any physical presence in the State of Delaware. Plaintiff contends, however, that Crane "was directly and personally responsible for a series of actions--all taken in Delaware--with the objective of acquiring control of Little Switzerland, a Delaware corporation." (D.I. 33 at 23) As a basis for this conclusion, plaintiff relies on *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc.*, 833 F.Supp. 437 (D.Del.1993). In *Mobil Oil*, the court exercised jurisdiction over an individual defendant who had authorized, in his official capacity, the corporate act that was the subject of plaintiff's suit.

The crux of LSI's complaint against defendants is that they misrepresented to LSI and its shareholders that they were capable of consummating an all-cash merger transaction; in fact, defendants were not able to consummate such a deal and, therefore, breached the Agreement. The representations made in the materials of record, therefore, are related to the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

Page 6

causes of action as "necessary precursors to the execution of the Merger Agreement ...." (D.I. 33 at 25) These representations as published in the proxy statement and the January 16 and 29, 1998 letters were signed by defendant Crane and were directed to be circulated by defendant Crane.

In order to find jurisdiction under 10 Del. C. § 3104(c)(3), a defendant must have caused a tortious injury in Delaware by its acts or omissions in Delaware. Plaintiff's invocation of subsection (c)(3) fails on the second of these requirements. Although defendant Crane arguably caused tortious injury in Delaware by mailing to Delaware residents materials containing misrepresentations, this court has held that

[t]he "act" of mailing, for purposes of subsection (c)(3), is complete when the material is mailed. Any other interpretation of the statute would mean that anytime tortious injury was felt in Delaware, the alleged tortfeasor could be deemed to have committed an "act" in Delaware. [Plaintiff's] construction of the statute would "eviscerate the distinction between subsections (c)(3) and (c)(4) ...." ... Simply put, in order for a defendant to commit an act in Delaware and be subject to subsection (c)(3), the defendant, or an agent of the defendant, must be present in Delaware when the deed is done.... There was no such presence with regard to the mailing of the billing statements, the mailing of the promotional material, or the placement of the advertisements....

*8 Sears, Roebuck & Co. v. Sears plc, 744 F.Supp. 1289, 1294 (D.Del.1990) (citations omitted). See also Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1468. The court does not understand the materials to have been mailed from Delaware but to Delaware. Therefore, defendant Crane has not committed an "act" in Delaware for purposes of conferring jurisdiction under 10 Del. C. § 3104(c)(3).

c. Agency Theory

Plaintiff LSI contends that defendant Crane is subject to this court's personal jurisdiction because his "agents" had the requisite contacts with the forum. "It is true that a person who is controlled by a principal may be deemed an agent," Wesley-Jessen Corp., 863 F.Supp. at 188, and that actions taken by an agent in the forum state are imputed to the principal for purposes of jurisdiction, Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 481 (Del.1992).

The "agents" identified by plaintiff at bar are the

attorneys (and their staff) who incorporated LSI Acquisition in Delaware and instituted the lawsuit in Delaware relating to the proxy contest. Plaintiff argues that, because these "acts" took place in Delaware and "were necessary precursors to the execution of the Merger Agreement," there is a sufficient nexus between the conduct in the state and the tortious injury alleged in plaintiff's lawsuit to satisfy the jurisdictional prerequisites of section 3104(c)(3). (DI 33 at 25)

The court finds, however, that the "acts" performed by the "agents" in Delaware, while arguably of historical relevance, are too far removed from the causes of action asserted by plaintiff to justify the imposition of personal jurisdiction on the principal, defendant Crane.

d. Conspiracy Theory

Under Delaware law, the actions of a conspirator may be attributed to a co-conspirator for the purposes of asserting personal jurisdiction. [FN11] Hercules, 611 A.2d at 481-82. To assert jurisdiction under this theory, a plaintiff must establish that:

(1) a conspiracy ... existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

Id. at 482. Accord Wesley-Jessen Corp., 863 F.Supp. at 189.

Plaintiff LSI alleges that defendant Crane "was part of a conspiracy to breach the Merger Agreement, make misrepresentations regarding the Merger Agreement and otherwise unlawfully harm [LSI's] business." (D.I. 33 at 32; D.I. 1, ¶ 46) Plaintiff further alleges that one of Crane's co-conspirators was Robert Cordes, the President of Alliance, CEI and Aspen (Aspen being the corporate entity which instituted the Chancery Court action). (D.I.34, Exs.B, H) Harking back to the proxy contest and the related lawsuit, plaintiff asserts that "Crane and Cordes were co-conspirators and the acts of one can be attributed to the other both for jurisdictional and liability purposes." (D.I. 33 at 32)

*9 A conspiracy is defined as "[a]n agreement manifesting itself in words or deeds and made by two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

or more persons confederating to do an unlawful act or use unlawful means to do an act which is lawful." *Webster's New International Dictionary* 485 (1993). There is evidence of record that the defendants engaged in a concerted effort to take control of plaintiff LSI. Plaintiff has asserted that defendants engaged in unlawful conduct (*e.g.*, fraud) to effectuate their business plan. Reviewing the facts and inferences to be drawn from the pleadings in the light most favorable to the nonmoving party, the court finds the first two prongs of the conspiracy test satisfied.

The next inquiry is whether the acts identified by plaintiff constitute "substantial acts" which occurred in Delaware or, alternatively, whether "substantial effects" in furtherance of the conspiracy occurred in Delaware. Defining the scope of the term "substantial act" commensurate with the requirements of 10 Del. C. § 3104(c), the court finds that the acts performed in the State of Delaware are not "substantial" enough (i.e., do not have a sufficient nexus to the controversy at issue) to confer personal jurisdiction over defendant Crane. The court finds, however, that the defendant's personal conduct outside the State of Delaware had a "substantial effect in furtherance of the conspiracy in the forum state." More specifically, the materials containing the representations at issue were mailed into Delaware at Crane's direction. Such communications with LSI shareholders (including Delaware shareholders) had the effect of forcing LSI's directors to agree to the merger. LSI executed the Agreement based on those same representations as recited in the Agreement. The court further finds that defendant Crane knew or had reason to know that the acts outside the forum state would have an effect in the forum state and that the effect was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

e. Controlling Person Theory

Plaintiff asserts as yet another jurisdictional basis a theory that defendant Crane's control over the transaction and the corporate defendants fairly subject him to the jurisdiction of this court. More specifically, the argument is that, because the corporate defendants are subject to personal jurisdiction in Delaware by virtue of Section 8.06 of the Agreement, so too is defendant Crane, as "the controlling person responsible for the actions taken by the corporate defendants in their efforts to acquire" LSI. (D.I. 33 at 29)

Under Delaware law, "merely contracting with" a

Delaware corporation does not provide the necessary connections between the contract and the forum to support a finding of jurisdiction. *Abajian v. Kennedy*, Civ. A. No. 11425, 1992 WL 8794 (Del. Ch. Jan. 17, 1992) at *10. Therefore, merely executing the Agreement on behalf of the corporate signatories does not confer individual responsibilities on or personal jurisdiction over defendant Crane. Plaintiff cites to *Soviet Pan Am Travel Effort v. Travel Committee Inc.*, 756 F.Supp. 126 (S.D.N.Y.1991), for the broad proposition that an out-of-state corporation and its shareholder are subject to personal jurisdiction in New York (under New York law) "based not on their own actions but instead on the actions" of an affiliated corporation in New York over which they exerted "some control in the matter." *Id.* at 130.

*10 Of course, New York law and its interpretation are not controlling in the case at bar. The court finds no evidence that plaintiff's "controlling person" theory has found acceptance in Delaware as an alternate basis for asserting personal jurisdiction over a nonresident. Therefore, although the record indicates that defendant Crane was the moving force behind the transaction in dispute and that he controlled some, if not all, of the corporate defendants and directed some, if not all, of their activities relating to the transaction in dispute, nevertheless, the court finds that these facts add nothing to the traditional analyses under 10 Del.C. § 3104(c).

f. Alter Ego Theory

Plaintiff asserts that defendant Crane is subject to personal jurisdiction "upon a showing that the corporate defendants are his alter egos under Delaware law." (D.I. 33 at 26) Assuming for purposes of argument that plaintiff has demonstrated that the corporate defendants' activities satisfy the requirements of 10 Del. C. § 3104(c), plaintiff has not sufficiently "show[n] fraud, injustice or inequity in the use of the corporate form" "distinct from the tort alleged in the complaint." *Sears plc*, 744 F.Supp. at 1304-05.

D. Due Process

Having concluded that jurisdiction over defendant Crane exists under Delaware law, the court must also determine whether the requirements of the due process clause of the Constitution would prevent this court from asserting jurisdiction. The Supreme Court of the United States set forth the relevant due process requirements in *International Shoe Co. v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
(Cite as: 1999 WL 223496 (D.Del.))

Page 8

*Washington,* 326 U.S. 310, 316 (1945):

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer,* 311 U.S. 457 ....

In *Hanson v. Denckla,* 357 U.S. 235, 253 (1958), the Supreme Court noted further:

> [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

In addition, the "defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

> By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," ... the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit ...."

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (citations omitted). In a case such as the present,

> **\*11** [w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, th[e] "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, ... and the litigation results from alleged injuries that "arise out of or relate to those activities ...."

*Id.* at 472-73 (citations and footnotes omitted).

As noted above, the court has found that defendant Crane "controlled" the transaction at issue, including negotiating the final terms of the Agreement with plaintiff LSI. As admitted by defendants, Crane is a "controlling person" of at least DRHC and Young Caribbean and executed the Agreement on their behalf. (D.I. 19 at 18; D.I. 33 at 25; D.I. 34, Ex. B) The Agreement, of course, specifically provides for a Delaware forum. Under these circumstances, where the court has found contacts sufficient to uphold personal jurisdiction, the court further finds that defendant Crane should reasonably have anticipated being haled into court in Delaware, thus satisfying "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316.

## E. Aiding and Abetting Claim

Defendants urge the court to dismiss LSI's aiding and abetting claim against Crane, arguing that "LSI has not cited any Delaware authority recognizing a cause of action for aiding and abetting a breach of contract or misrepresentation." (D.I. 41 at 19). Defendants acknowledge that Section 876 of the Restatement (Second) of Torts recognizes the tort of "aiding and abetting," but contend that Section 876 "does not apply to allegations of wrongdoing premised on agency principles." (*Id.*)

It would appear that Delaware recognizes a cause of action for aiding and abetting. *See In re Santa Fe Pac. Corp. Shareholder Litig.,* 669 A.2d 59, 72 ((Del.1995). While it may be true that one cannot be both an "aider and abetter" and a principal to an agent, inconsistent legal theories at this stage of the proceedings are not cause for dismissal.

## IV. CONCLUSION

For the reasons stated, defendants' motions to dismiss and to stay discovery are denied. An order shall issue.

> FN1. The suit was filed by Aspen Investments, Inc., another corporation allegedly controlled by defendant Crane. Aspen is a corporation organized and existing under the laws of the Republic of Panama, with a business address of Freeport in the Bahamas. (D.I. 34, Ex. F at 1; Ex. H at 1)

> FN2. Plaintiff has submitted the affidavit of William Carey who avers, *inter alia,* that Delaware residents are included among LSI's shareholder list. (D.I.37, ¶ ¶ 5, 6) There is no evidence of record to the contrary.

> FN3. Although "[t]he burden of proving diverse citizenship falls on the party invoking federal jurisdiction," *Rashid v. Kite,* 957 F.Supp. 70, 72 (E.D.Pa.1997), generally when reviewing a motion to dismiss under Fed.R.Civ.P. 12, all well-pled facts are taken as true and all inferences therefrom viewed in a light most favorable to the nonmoving party. *Carteret Savings Bank FA v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir.1992).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)
**(Cite as: 1999 WL 223496 (D.Del.))**

Page 9

FN4. For instance, joinder in this case would destroy the diversity among the parties, thus depriving the court of subject matter jurisdiction.

FN5. Sections 1.01, 4.01, 4.04, 5.05, and 6.03. (D.I.34, Ex. B)

FN6. Although counsel for defendants asserted at oral argument that one could not assume that LSI Acquisition would "always be what it is today" (D.I. 55 at 10), the court's charge is to determine a party's role at the time the complaint was filed and not engage in speculation about its future role. *See Angst, 77 F.3d at 706.*

FN7. At oral argument, counsel also argued that if LSI Acquisition remains exposed to separate legal proceedings, "certainly, Little Switzerland or its stockholders could then try to go up the ladder to other corporations or persons." (D.I. 55 at 10) LSI has stipulated that it will not sue LSI Acquisition, "except to the extent that LSI Acquisition is the recipient of funds transferred fraudulently from any of the defendants" at bar. (D.I.44) A derivative suit has been filed in this court; LSI Acquisition is not a named defendant. (Civil Action No. 99-176, D.I. 1)

FN8. The preface to Article IV of the Agreement provides that: "Parent, Sub and the Parent Related Entities, jointly and severally represent and warrant to the Company as follows: ..." (Emphasis added) Section 4.02 of the Agreement provides that the Agreement "constitutes a valid and binding agreement of each of Parent, Sub and the Parent Related Entities, enforceable against each of Parent, Sub and the Parent Related Entities...." (emphasis added) Section 8.10 of the Agreement provides in relevant part that: "Parent shall cause Sub to perform its obligations hereunder and shall be fully liable, severally and jointly, for any failure of Sub to perform such obligations." (emphasis added)

FN9. The fact that a derivative suit has been instituted against DRHC supports the notion that LSI Acquisition, a non-operating, no-asset corporate entity, is not a real party in interest.

FN10. This conclusion is not inconsistent with the finding that LSI Acquisition is not a necessary party to the litigation.

FN11. Defendants assert that, "as a matter of law, a corporation cannot conspire with its officers and agents." (D.I. 41 at 16) Assuming that to be the case, *see Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.,* Civ. A. No. 12036, 1991 WL 129174 (Del. Ch. July 10, 1991) at *4, the court finds that defendants cannot assert both that defendant Crane does not control all of the corporate defendants (for purposes of avoiding personal jurisdiction under the agency and controlling person theories) and that he does control all of the corporate defendants (for purposes of avoiding personal jurisdiction under a conspiracy theory). At this juncture, on a motion to dismiss, the court declines to adopt defendants' varying versions of the facts and will analyze LSI's conspiracy theory as though defendant Crane were neither a principal nor a controlling person of all of the corporate entities.

Not Reported in F.Supp.2d, 1999 WL 223496 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

•           1:98cv00315           (Docket)
(Jun. 10, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
**(Cite as: 1996 WL 924508 (D.Del.))**

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
MOBILIFICIO SAN GIACOMO S.P.A, Plaintiff,
v.
Carlo Bargagli STOFFI, et al. Defendants.
**No. 96-415-LON.**

Oct. 29, 1996.

Lawrence C. Ashby, Esquire, Randall E. Robbins,
Esquire, Regina A. Iorii, Esquire, and Christopher S.
Sontchi, Esquire of Ashby & Geddes, Wilmington,
Delaware; Of Counsel: Avv. Francesco Camilotti,
Esquire and Dott. Proc. Allessandra Gioi Rolandi,
Esquire of Studio Legale Camilotti-Ceccon-Polettini;
Attorneys for Plaintiff.

F.L. Peter Stone, Esquire of Connolly, Bove, Lodge
& Hutz, Wilmington, Delaware;  Of Counsel:
Melvin Goldstein, Esquire and William L. Miller,
Esquire  Washington,  D.C.;      Attorneys  for
Defendants.

OPINION

LONGOBARDI, District J.

I.

*1 Plaintiff Mobilificio San Giacomo S.p.A.
("Mobilificio"), an Italian joint stock company,
brought a five count complaint arising out of an
alleged joint venture agreement between it and
defendant Carlo Bargagli Stoffi ("Bargagli").
Presently before the Court is defendant Bargagli's
motion to dismiss for lack of personal jurisdiction
and insufficient service of process pursuant to
Fed.R.Civ.P. 12(b).

Plaintiff and its affiliates manufacture, design and
sell furniture.    From 1982 to 1989, plaintiff
attempted to establish itself as a supplier of Italian
furniture in the United States market.  In furtherance
of that goal, plaintiff and Bargagli reached an
agreement in principle in 1988 for the formation of a
U.S. subsidiary of plaintiff to act as plaintiff's
exclusive distributor of its "San Giacomo" line of

furniture in North America.   The agreement provided
that Bargagli would manage the subsidiary and gave
him the right to acquire up to 25% of the equity in the
subsidiary.

Pursuant to this agreement, Melvin Goldstein, an
attorney acting on behalf of plaintiff and Bargagli,
incorporated defendant San Giacomo N.A., Ltd.
("SGNA") in Delaware on December 5, 1995.  In a
letter written to plaintiff's counsel in Italy, Goldstein
outlined the proposed joint venture arrangements and
enclosed corporate resolutions putting a corporate
structure in place pending a decision as to the
permanent organization of the San Giacomo
enterprise.  Under this corporate structure, Bargagli
was named as one of SGNA's directors, and soon
thereafter was elected Chairman and President of
SGNA.  Thus, according to the complaint, Bargagli
took control of SGNA from its inception,
notwithstanding the agreement that SGNA would be
controlled by plaintiff.

With this structure in place, Bargagli attempted to
renegotiate the joint venture arrangement previously
contemplated by the parties.  In the meanwhile,
SGNA had commenced business, and plaintiff was
supplying furniture on credit.  On May 9, 1989, the
parties finally reduced their agreement to writing in a
series of documents:  a Joint Venture Agreement
between plaintiff and Bargagli;   a Management
Agreement between SGNA and Bargagli;  and a
Distribution Agreement between plaintiff and SGNA.

Plaintiff asserts that Bargagli never intended to
fulfill the contractual obligations he assumed under
the agreements or the fiduciary duties he incurred as
a joint venturer with plaintiff and as director and
officer of SGNA. Plaintiff contends that Bargagli
instead used SGNA to violate the agreements by
continually delaying plaintiff's right to provide any
supervision of SGNA. Specifically, plaintiff was not
given control of the board of directors, nor was it
issued any stock in SGNA. The only stock issuance
occurred in March 1991, when SGNA's Board of
Directors issued Bargagli 925 shares of stock, the
only outstanding stock in the company.

In May 1993, Bargagli sent plaintiff a letter
terminating the Distribution Agreement effective
December 21, 1993.   In response to this letter, the
parties   ultimately   entered   into   a   Settlement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
(Cite as: 1996 WL 924508 (D.Del.))

Agreement that was intended to govern their future commercial relationship and define the terms regarding the discharge of the credit extended by plaintiff to SGNA. The Settlement Agreement also provided that the parties would enter into a new Distribution Agreement ("1993 Distribution Agreement"). Plaintiff contends that, notwithstanding the fact that it continued to supply SGNA in compliance with the Settlement Agreement, Bargagli violated this agreement by refusing to sign the 1993 Distribution Agreement and attempted to usurp plaintiff's "San Giacomo" trademark. Plaintiff also alleged that, from the inception of the parties' relationship, Bargagli and SGNA have defrauded it by creating fictitious charge-backs for defective goods and debits to its accounts for late deliveries. In approximately July 1996, plaintiff sent written notice to SGNA terminating the 1993 Distribution Agreement effective six months therefrom.

*2 Plaintiff filed a five count complaint against Bargagli and SGNA. Count I is a claim for common law fraud/fraudulent inducement. Plaintiff asserts that defendants made numerous misrepresentations for the purpose of inducing it to enter into the various agreements described above, defrauding it of money to which it was owed, and usurping its "San Giacomo" trademark. In Count II, plaintiff asserts that Bargagli breached his fiduciary obligations that arose as a result of his position as a joint venturer and his position as officer, director, and person in actual control of SGNA. In Count III, plaintiff asserts that defendants breached the various agreements described above. Count IV states a claim for restitution/constructive trust and pertains to the alleged misappropriation of money by defendants through false invoices and false accounting. Count V states a claim for civil conspiracy against defendants.

II.

Bargagli is a resident of New Jersey. SGNA is a Delaware corporation with its principle place of business in New Jersey. With the exception of the incorporation of SGNA, none of the aforementioned events occurred within the State of Delaware. Plaintiff asserts this Court has personal jurisdiction over Bargagli pursuant to 10 Del.Code Ann. § § 3104(c)(1) and 3114. Bargagli contests this allegation.

A.

Plaintiff has the burden of proof to establish the existence of personal jurisdiction. Sears, Roebuck & Co. v. Sears PLC, 744 F.Supp. 1289, 1301 (D.Del.1990). The Court has the discretion to delay decision on a motion to dismiss for lack of personal jurisdiction until the completion of discovery, Van De Walle v. L.F. Rothschild Holdings, Inc., Civ. A. No. 9894, 1994 WL 469150, at *1 (D.Del. Aug. 2, 1994). However, when defendant raises a jurisdictional challenge prior to discovery, plaintiff must make a prima facie showing from the allegations of the complaint that jurisdiction over defendant is appropriate. Sears, 744 F.Supp. at 1301. [FN1]

> FN1. Plaintiff requests that the Court grant it the opportunity to take discovery in order to develop a factual record on the jurisdictional issue if the Court concludes that it has not made a prima facie showing of personal jurisdiction. In light of the facts asserted in the complaint and the Court's disposition of this issue, the Court concludes that further discovery would be unproductive. Accordingly, it is unnecessary to grant plaintiff's request and to postpone resolution of the jurisdictional issue pending the completion of discovery.

When a plaintiff asserts that personal jurisdiction is appropriate under the Delaware Long-arm Statute, 10 Del.Code Ann. § 3104, the resolution of that issue entails an analysis comprised of two parts. The first step is to ascertain whether the forum state's long-arm statute applies to the defendant. Fed.R.Civ.P. 4(e). If the Delaware Long-arm Statute applies, this Court must then determine whether exercising jurisdiction under the circumstances of this case comports with due process. See Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 293 (3d Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); Jeffreys v. Exten, 784 F.Supp. 146, 150 (D.Del.1992); Sears, 744 F.Supp. at 1291.

Under this statute, Delaware courts have consistently held that personal jurisdiction may be asserted over a nonresident defendant on the basis of a "single act" related to Delaware if the resulting claim has its basis in the asserted transaction. Blue Ball Properties, Inc. v. McClain, 658 F.Supp. 1310, 1316 (D.Del.1987). In addition, Delaware courts have construed the statute as conferring jurisdiction to the maximum parameters of the due process clause, Transportes Aereos De Angola v. Ronair, Inc., 544 F.Supp. 858, 864- 65 (D.Del.1982); Wilmington Supply Co. v. Worth Plumbing & Heating, Inc., 505 F.Supp. 777, 780 (D.Del.1980), and will liberally interpret the statute in favor of exercising jurisdiction. See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
**(Cite as: 1996 WL 924508 (D.Del.))**

Page 3

_Waters v. Deutz Corp.,_ 460 A.2d 1332 (Del.Super.Ct.1983).

**\*3** Plaintiff asserts that the act of incorporating SGNA in Delaware constitutes the transaction of business in Delaware and is sufficient to confer jurisdiction over Bargagli under section 3104(c)(1) of the Delaware Long-arm Statute. Section 3104(c)(1) provides: "[a]s to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who in person or through an agent [t]ransacts any business or performs any character of work or service in the State." 10 Del.Code Ann. § 3104; _see Sears,_ 744 F.Supp. at 1302 ("[i]t is clear ... that under Delaware law a corporation that causes the incorporation of a subsidiary in Delaware performs an act within Delaware").

The courts of Delaware have consistently stated that the act of incorporation in this State is sufficient to confer personal jurisdiction over a nonresident defendant for claims "related to that act of incorporation." _Id._ at 1303; _Marriott Corp. V. Host Marriott Corp.,_ C.A. No. 12863, 1993 WL 271442, at \* 2 (Del.Ch. Jul.14, 1993); _see Papendick v. Bosch,_ 410 A.2d 148, 151-52 (Del.1979), _cert. denied,_ 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980). It is clear that at least several of plaintiff's claims have a relationship with the act of incorporating SGNA. Because the Delaware courts have indicated that the Long-arm Statute should be interpreted as conferring jurisdiction to the maximum parameters of due process, the issue before the Court is whether the relationship between plaintiff's claims and the act of incorporating SGNA is significant enough to render jurisdiction over Bargagli permissible under the Due Process Clause.

The Due Process Clause limits the power of a state court to render a valid judgment against a nonresident defendant. _World-Wide Volkswagen Corp. V. Woodson,_ 444 U.S. 286, 291 (1980). The "constitutional touchstone" in a specific jurisdiction case such as the instant one is whether the defendants purposely established minimum contacts with the forum state. _Burger King Corp. v. Rudzewicz,_ 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Minimum contacts may be established when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." _World-Wide Volkswagen Corp.,_ 444 U.S. at 297 (Brennan, J. dissenting). Once it has been established that the

defendant has minimum contacts with the forum state, the Court must then determine whether the exercise of personal jurisdiction would comport with traditional notions of "fair play and substantial justice." _Burger King,_ 471 U.S. at 476. Under this prong of the jurisdictional due process analysis, a Court is to ascertain the reasonableness of the exercise of jurisdiction in each case. _Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County,_ 480 U.S. 102, 113-14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Considerations important to this analysis include the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interests of the several States in furthering substantive social policies. _Id._ at 113 (quoting _World-Wide Volkswagen,_ 444 U.S. at 292).

**\*4** Because plaintiff seeks to premise jurisdiction under section 3104(c)(1) based on a single act in the State of Delaware, it is asking the Court to assert specific jurisdiction over Bargagli. [FN2] The United States Supreme Court has stated that specific jurisdiction over a nonresident defendant exists when the defendant has "purposely directed" his activities at residents of the forum state and the litigation results from alleged injuries that "arise out of" or "relate to" those activities. _Burger King,_ 471 U.S. at 472. While the Supreme Court has repeatedly addressed the issue of how much contact with the forum state is required to render a nonresident defendant amenable to suit in that jurisdiction, the Court has not directly addressed the requisite nexus between a plaintiff's claims and a nonresident defendant's contacts with the forum to sustain specific jurisdiction with respect to those claims. In fact, the Court specifically left this question open in _Helicopteros Nacionales de Columbia, S.A. v. Hall,_ 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ("we decline to reach the questions (1) whether the terms "arising out of" and "related to" describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists").

> FN2. For a State to exercise general jurisdiction over a nonresident defendant, the defendant's contacts with the State must be "continuous and systematic." _See Helicopteros Nacionales De Colombia, S.A. v. Hall,_ 466 U.S. 408, 415-16, 104 S.Ct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
(Cite as: 1996 WL 924508 (D.Del.))

1868, 80 L.Ed.2d 404 (1984).

It is clear that the exercise of specific jurisdiction is constitutional where the claims before the Court "grew directly" out of the defendant's contacts with the forum state. *Burger King*, 471 U.S. at 479. It is equally clear that specific jurisdiction cannot be sustained where the underlying cause of action is unrelated to the defendant's contact with the forum. *Shaffer v. Heitner*, 433 U.S. 186, 213, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). This case falls between these two extremes.

In the absence of guidance from the Supreme Court, the Courts of Appeals have reached variant conclusions on the relatedness issue. The Court of Appeals for the Ninth Circuit applies a "but for" test. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995). The Ninth Circuit adopted this test in *Shute v. Carnival Cruise Lines*, 897 F.2d 377 (9th Cir.1990), *rev'd on other grounds*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). In that case, plaintiff suffered injuries when she slipped and fell on the deck of one of defendant's ship's. *Id.* at 379. Defendant's only contact with the forum was that it advertised in the forum, and plaintiff purchased her ticket from a travel agent in the forum who forwarded the payment to defendant. Applying the "but for" test, the Ninth Circuit concluded that personal jurisdiction existed over defendant, because "[i]t was [defendant's] forum-related activities that put the parties within 'tortious striking distance' of one another." *Id.* at 386.

The court concluded that the "but for" test was appropriate, because "it preserves the essential distinction between general and specific jurisdiction." *Id.* at 385. The Court further opined that a restrictive reading of the relatedness requirement was not necessary, because the factors relevant to the determination of whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice protect a defendant against any unreasonable exercise of personal jurisdiction. *See id.*

*5 The Courts of Appeals for the Sixth and Seventh Circuits both apply a version of the "but for" test. In *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209 (7th Cir.1984), the Seventh Circuit concluded that a claim arises from a defendant's contact with the forum state where the claim "lies in the wake of" defendant's forum state activities. *Id.* at 1215-16. Applying this standard, the Court held that jurisdiction over defendant is established when

discussions that took place in the forum state "led to" the contract that gave rise to the underlying dispute. *Id.* Similarly, the Sixth Circuit concluded that jurisdiction is proper when plaintiff's claim was "made possible by" and lies in the wake of defendant's in-state contacts. *Lanier v. American Bd. Of Endodontics*, 843 F.2d 901, 909 (6th Cir.1986), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). In *Lanier*, plaintiff sought to premise jurisdiction in Michigan for a claim that she was denied board certification because of her sex, on defendant's out-of-state exchange of correspondence and telephone calls regarding the application process with plaintiff, who was located in Michigan. *Id.* at 908. The Court concluded that jurisdiction is appropriate when the decision to discriminate arises from defendant's "assessment of facts it obtained as a result of its contacts with [plaintiff] in Michigan, and but for which Michigan contacts it would not have acted upon her application at all and thus would not have made the discriminatory decision." *Id.* at 909.

In a recent decision, the Court of Appeals for the First Circuit explicitly rejected the "but for" test in favor of a flexible proximate cause standard. *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708 (1st Cir.1996). In *Nowak*, plaintiff brought a wrongful death action on behalf of her husband who drowned in a pool of a hotel owned by defendant in Hong Kong. *Id.* at 711. Plaintiff sought to premise jurisdiction in Massachusetts on plaintiff's advertising and solicitation of business in that state. *Id.* at 716.

In rejecting the "but for" test, the Court commented on the benefits of using the tort concept of proximate cause to determine relatedness:

proximate or legal cause clearly distinguishes between foreseeable and unforeseeable risks of harm. Foreseeability is a critical component of the due process inquiry, particularly in evaluating purposeful availment, and we think it also informs the relatedness prong.... Adherence to a proximate cause standard is likely to enable defendants better to anticipate which conduct might subject them to a state's jurisdiction than a more tenuous link in the chain of causation. Certainly, jurisdiction that is premised on a contact that bears a legal cause of the injury underlying the controversy--i.e., that "form[s] an 'important, or [at least] material element of proof' in the plaintiff's case" is presumably reasonable, assuming, of course, purposeful availment.

*6 *Id.* at 715 (second and third alterations in original) (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
(Cite as: 1996 WL 924508 (D.Del.))

But the court indicated that adherence to the proximate cause standard in all circumstances was "unnecessarily restrictive." *Id.* The Court stated that "[w]e see no reason why ... the absence of proximate cause per se should always render the exercise of specific jurisdiction unconstitutional." *Id,* The court therefore determined that, under this approach, it "intend[ed] to emphasize the importance of proximate causation, but to allow a slight loosening of that standard when circumstances dictate." *Id.* at 716.

Turning to the facts of the case before it, the court found that application of the exception was appropriate. *Id.* The court concluded that, although the nexus between defendant's in-state solicitation and plaintiff's husband's death did not amount to a proximate cause relationship, the rejection of jurisdiction would be "imprudent," because this nexus represented "a meaningful link" between defendant's contact and the harm suffered. *Id.*

This Court joins the First Circuit in its conclusion that the "but for" test is an inappropriate standard to determine relatedness. The United States Supreme Court has emphasized that rigid tests are inappropriate in the personal jurisdiction area. For example, in *Burger King,* the Court opined that it "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests." *Burger King,* 471 U.S. at 478 (citing *International Shoe Co. V. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *accord, Shaffer,* 433 U.S. at 204 ("[m]echanical or quantitative evaluations of the defendant's activities in the forum could not resolve the question of reasonableness: 'Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure' "). In fact, the minimum contacts approach of *International Shoe* and its progeny, rejecting the rigid jurisdictional standard set forth in *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1878), is premised on the need for a flexible standard for jurisdiction over nonresidents in response to technological progress. *World-Wide Volkswagen Corp.,* 44 U.S. at 294 (quoting *Hanson v. Denckla,* 357 U.S. 235, 250-51, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). It is implausible that the Court would repeatedly accentuate the need for flexibility in the "minimum contacts" and "fair play and substantial justice" aspects of the due process analysis, and then unexpectedly abandon this approach in favor of a rigid test when addressing the relatedness issue.

Additionally, the virtually limitless "but for" test insufficiently constricts the realm of contacts that would support specific jurisdiction under the Due Process Clause. The Ninth Circuit indicated that a more stringent test for relatedness was unnecessary, because the "fair play and substantial justice" prong of the jurisdictional analysis would protect defendants against unreasonable assertions of jurisdiction. *Shute,* 897 F.2d at 385. However, the United States Supreme Court has made clear that the "fair play and substantial justice" prong of the analysis was not meant to stand alone in filtering out the situations in which the exercise of jurisdiction would not comport with due process. Instead, it is the interplay between this prong and the minimum contacts prong of the analysis that must be evaluated to determine whether jurisdiction is appropriate. Commenting on the connection between these two prongs, the Court opined that the factors used to determine whether the assertion of jurisdiction comports with "fair play and substantial justice"

   *7 sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

*Burger King,* 471 U.S. 477 (citations omitted).

Further, the Supreme Court has indicated that the concept of minimum contacts performs

   two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

*World-Wide Volkswagen Corp.,* 444 U.S. at 291-92. The "fair play and substantial justice" factors were designed only to address the former of these functions by ensuring that the exercise of jurisdiction is reasonable. *See id.* Thus, given the duality of purpose that the minimum contacts test was designed to serve, the proposition that the "fair play and substantial justice" prong protects defendants from unreasonable assertions of jurisdiction does not support the conclusion that a more stringent test is not required in the relatedness area of the jurisdictional analysis.

Moreover, there is evidence in the Supreme Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
(Cite as: 1996 WL 924508 (D.Del.))

discussion of minimum contacts that a proximate cause standard with its emphasis on foreseeability is the correct gauge of relatedness. The Court stated:

> [w]e have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that *arise proximately* from such activities....

*Burger King*, 471 U.S. at 473-74 (emphasis added) (citations omitted).

However, in its discussion of minimum contacts, the Supreme Court has indicated that the foreseeability of causing injury in another State is not a "sufficient benchmark" for exercising jurisdiction. *Id.* at 474. Instead, the Court has made clear that " 'the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." ' *Id.* (quoting *World-Wide Volkswagen*, 44 U.S. at 297) (alteration in original).

Although the Court's discussion of foreseeability occurred in the context of determining whether a defendant has purposefully established minimum contacts with the forum State, this Court is of the opinion that these principles are equally pertinent to the relatedness inquiry. *See Nowak*, 94 F.3d at 715. Accordingly, this Court will follow the flexible proximate cause standard articulated by the First Circuit to the extent that that standard permits the exercise of jurisdiction when the relationship between a defendant's contacts with the forum State and the claims at issue is such that the defendant can reasonably anticipate being haled into Court in the forum State with respect to those claims. [FN3]

> FN3. This holding is consistent with the Third Circuit, Court of Appeals' opinion in *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539 (3d Cir.1985). In that case, the Third Circuit was not called upon to articulate a standard for determining relatedness, because the claims over which it found jurisdiction appropriate arose directly from defendant's activities in the forum State. *Id.* at 544. However, the Court

commented that when the cause of action arises from the defendant's forum related activities, " 'the defendant's conduct and connection with the forum State ... [must be] such that he should reasonably anticipate being haled into court there." ' *Id.* at 541 (quoting *World-Wide Volkswagen*, 444 U.S. 286 (1980)) (alterations in original).

**\*8** Applying these principles to the present case, the Court concludes that the nexus between incorporating SGNA in Delaware and plaintiff's claims is insufficient to sustain the exercise of jurisdiction over Bargagli. Plaintiff has not alleged that any act of fraud was committed in the State of Delaware. The Joint Venture Agreement, which gave rise to the parties' relationship and from which all of plaintiff's claims arise, was negotiated in Italy and New Jersey. Moreover, there is no allegation in the present case that the act of incorporation in and of itself wrongfully harmed plaintiff in any way. In fact, plaintiff admits that as part of the initial agreement, Bargagli was to form a corporation in the United States.

Plaintiff argues that this Court should follow the Supreme Court of Delaware's decision in *Papendick v. Bosch*, 410 A.2d 148 (Del.1979), which concluded on similar facts that the exercise of jurisdiction would not violate due process. In *Papendick*, plaintiff brought a breach of contract action seeking to recover a finder's fee for the acquisition of certain shares of stock. *Id.* at 148. Defendant Robert Bosch GmbH ("RB"), entered into a contract with the Borg-Warner Corporation ("B-W") in which RB would purchase a specified quantity of stock in B-W. *Id.* at 149. RB incorporated a subsidiary, RBNA, in Delaware and designated it as the assignee of the shares of stock that RB was to receive under the agreement. *Id.* Plaintiff brought suit in Delaware asserting that he was entitled to a finder's fee because he had placed RB in contact with B-W. *Id.* RB's act of incorporating its subsidiary was the only act in the entire transaction that occurred in Delaware. *Id.*

Analyzing RB's motion to dismiss for lack of personal jurisdiction under the Due Process Clause, the Delaware Supreme Court held that personal jurisdiction was appropriate under the minimum contacts test. *Id.* at 150-51. The Court concluded that, by incorporating its subsidiary in Delaware, "RB purposely availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action." *Id.* at 150-51. The Court stated that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 7
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
**(Cite as: 1996 WL 924508 (D.Del.))**

RB came into the State of Delaware to create, under the Delaware Corporation Law, a subsidiary corporation for the purpose of implementing its contract with B-W and accomplishing its acquisition of B-W stock....

....

We do not believe that the International Shoe "minimum contact" due process standards were intended to deprive Delaware courts of jurisdiction by permitting an alien corporation to come into this State to create a Delaware corporate subsidiary for the purpose of implementing a contract under the protection of and pursuant to powers granted by the laws of Delaware, and then be heard to say, in a suit arising from the very contract which the subsidiary was created to implement, that the only contact between it and Delaware is the "mere" ownership of stock of the subsidiary.

*9 *Id.* at 152.

This Court disagrees with the rationale of *Papendick,* whose facts would not even support jurisdiction under the "but for" test. In *Papendick* as in this case, the incorporator's only relationship with Delaware was the filing of papers to incorporate a corporation there. Where the act of incorporation neither in and of itself wrongfully harms the plaintiff nor comprises part of a continuing stream of contacts within the State that proximately injures the plaintiff, it is unlikely that a sufficient nexus can be found between this act and the claims at issue to support the exercise of specific jurisdiction.

Plaintiff has alleged a continuing course of fraudulent conduct on the part of Bargagli spanning the period from 1988 to 1996. None of these fraudulent acts were directed at Delaware residents or committed within the State of Delaware. Based on these facts, it cannot be said that Bargagli should have reasonably anticipated being haled into court in the State of Delaware to defend against these claims as a result of his act of incorporating SGNA. [FN4]

> FN4. Plaintiff asserts in a footnote in its brief that two of the May 1989 Agreements contained choice-of-law provisions providing that Delaware law should govern these agreements. However, the statutory authority for the exercise of jurisdiction requires a transaction of business in Delaware. Since these agreements were not negotiated in Delaware or carried out in Delaware, plaintiff may not premise the exercise of jurisdiction on the Delaware choice-of-law provision.

Moreover, the evaluation of the facts of this case under the reasonableness factors compel the conclusion that the exercise of jurisdiction would not comport with "traditional notions of fair play and substantial justice." Delaware's interest in adjudicating this dispute premised on the act of incorporating SGNA is not substantial. None of the acts giving rise to plaintiff's claims were directed at Delaware residents. None of Bargagli's alleged wrongful activities occurred in Delaware. There is also no allegation that any activity committed by Bargagli in Delaware gave rise to a violation of Delaware law.

Additionally, the interstate judicial system's interest in the most efficient resolution of controversies counsels against the exercise of jurisdiction in this case. At least one of plaintiff's claims, count IV for restitution/constructive trust seeking damages for the misappropriation of money through false invoices and false accounting, is completely unrelated to the act of incorporating SGNA. Because the exercise of specific jurisdiction is claim specific, *see Gehling v. St. George's School of Medicine, Ltd.,* 773 F.2d 539, 543-44 (3d Cir.1985) (exercising specific jurisdiction over plaintiff's claims for fraudulent misrepresentation and intentional infliction of emotional distress, but dismissing claims for negligence and breach of contract for lack of personal jurisdiction); *Sears,* 744 F.Supp. at 1307-08 ("where general jurisdiction over a defendant is lacking, the constitutional analysis distinguishing between general and specific jurisdiction would become meaningless if the finding of specific jurisdiction over one claim provided the basis for extending jurisdiction over all other alleged claims"), it is clear that under *Shaffer* this Court could not exercise jurisdiction over this claim under section 1304(a)(1), even if it exercised jurisdiction over the rest of the case. Because Bargagli is a New Jersey resident, SGNA's principle place of business is in New Jersey, and many of the events giving rise to these claims occurred within that State, an alternative forum exists where the courts of that State can exercise jurisdiction over the entire case. Given the existence of this alternate forum, the interstate judicial system's interest in efficiency would be furthered if this Court were not to exercise jurisdiction over only a portion of plaintiff's case against Bargagli.

*10 Finally, plaintiff's interest in obtaining relief in Delaware is not substantial given the availability of an alternate forum, *see Papendick,* 410 A.2d at 153 (concluding that considerations of fairness rendered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jurisdiction appropriate because Delaware was the only forum in the United States where plaintiff could sue both defendants in the same forum), and the fact that plaintiff is not a Delaware resident, nor is there any evidence that it ever set foot in Delaware prior to commencement of this action. Accordingly, in light of these considerations, the exercise of jurisdiction in Delaware over Bargagli based on the act of incorporating SGNA would be unreasonable and unfair.

Thus, because the facts of this case do not establish that Bargagli, by incorporating SGNA, could reasonably anticipate being haled into court in Delaware for plaintiff's claims, and because the exercise of jurisdiction over Bargagli would not comport with "traditional notions of fair play and substantial justice," this Court holds the exercise of jurisdiction over Bargagli under section 1304(a)(1) of Delaware's Long-arm Statute is precluded by the Due Process Clause.

### B.

Plaintiff also asserts that this Court has personal jurisdiction over Bargagli pursuant to 10 Del.Code Ann. § 3114. Section 3114 is Delaware's director consent statute and authorizes the exercise of jurisdiction "only in actions where directors ... of a Delaware corporation are necessary or proper parties or where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners." *Armstrong v. Pomerance,* 423 A.2d 174, 176 n. 5 (Del.1980). Section 3114 does not confer personal jurisdiction over a nonresident director merely based on his status as a director of a Delaware corporation. *E.g. Van De Holdings Inc.,* Civ. A. No. 9894, 1994 WL 469150, at *3 (Del.Ch. Aug.2, 1994). Rather, the Court of Chancery of Delaware indicated that "it is the rights, duties, and obligations which have to do with service as a director of a Delaware corporation which make a director subject to personal service in Delaware under the terms of 10 Del.C. s 3114 and not simply that he or she may be both a proper party as well as a director." *Hana Ranch, Inc. v. Lent,* 424 A.2d 28, 30 (Del.Ch.1980).

The jurisdictional reach of section 3114 has been held to extend to the situation in which a creditor of the corporation brings a breach of fiduciary duty claim against a director of that corporation. *Kidde Indus., Inc. v. Weaver Corp.,* 593 A.2d 563, 566 (Del.Ch.1991) ("As a creditor to whom a fiduciary duty was owed, [plaintiff] is entitled to sue the defendants in Delaware for breach of that duty

pursuant to 10 Del.C. § 3114"); *Gans v. MDR Liquidating Corp.,* Civ. A. No. 9630, 1990 WL 2851, at *9 (Del.Ch. Jan.10,1990). In the present case, count II of plaintiff's complaint is a claim against Bargagli for breach of fiduciary duty, asserting that a fiduciary duty arose from the debtor/creditor relationship between SGNA and plaintiff. Thus, because plaintiff has alleged that Delaware law imposes a fiduciary obligation on Bargagli by virtue of his status as a director of SGNA, section 3114 provides statutory authority for the exercise of jurisdiction over the breach of fiduciary duty claim against Bargagli.

*11 Moreover, asserting jurisdiction over the breach of fiduciary claim is not precluded by the Due Process Clause. Bargagli purposefully availed himself of Delaware law upon accepting a position as a director of a Delaware corporation. Bargagli's power to act in the capacity of a director arises exclusively under and is governed by the Delaware corporation statutes. *Armstrong,* 423 A.2d at 176. Bargagli's accepted his position as a director with the explicit statutory notice that Delaware law deems his consent to suit in the forum "to answer for alleged breaches of the duties imposed on [him] by the very laws which empowered [him] to act in [his] corporate capacit[y]." *Id.*

Additionally, Delaware has a strong interest, as expressed in section 3114, to regulate the discharge of duties of directors of Delaware corporations and to provide a forum for persons proximately injured by breaches of those duties. *See Kidde Indus.,* 593 A.2d at 566. Although, as discussed previously, the interstate judicial system's interest in efficiency counsels against the exercise of jurisdiction in cases where a court cannot exercise jurisdiction over all claims brought against a particular defendant and an alternate forum exists, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Defendant has not sufficiently demonstrated that the exercise of jurisdiction over the breach of fiduciary duty claim would be unreasonable. Accordingly, this Court has jurisdiction over plaintiff's claim for breach of fiduciary duty against Bargagli pursuant to section 3114. [FN5]

> FN5. Bargagli argues that jurisdiction is not appropriate because a director of a corporation is not in a fiduciary relationship

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 924508 (D.Del.)
**(Cite as: 1996 WL 924508 (D.Del.))**

with a creditor of the corporation. Generally, directors do not owe fiduciary duties to a creditor of the corporation absent special circumstances such as fraud, insolvency or a violation of a statute. *See Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del.Ch.1992).* In the present case, because plaintiff has made allegations pertaining to fraud on the part of Bargagli, for purposes of this motion, the Court will assume these allegations are sufficient to state a claim for breach of fiduciary duty under Delaware law.

Having concluded that jurisdiction over the breach of fiduciary duty claim is proper, it does not follow that this Court has the power to exercise jurisdiction over plaintiff's other claims against Bargagli. Those claims are not asserted against him in his capacity as a director in SGNA, but in his personal capacity. None of the acts giving rise to these claims occurred in Delaware or were directed at Delaware residents. The relationship between plaintiff and Bargagli did not arise by virtue of his status as a director in SGNA. This relationship and these claims arose from agreements made by the parties outside the state of Delaware. Under these circumstances, to exercise jurisdiction over claims unrelated to Bargagli's status as a director would be the type of bootstrapping that is impermissible under the Due Process Clause. *See Sears,* 744 F.Supp. at 1307. Thus, this court cannot constitutionally exercise jurisdiction over counts I, III, IV, and V under section 3114.

### IV.

For the aforementioned reasons, Bargagli motion to dismiss for lack of personal jurisdiction and insufficient service is granted in part, and denied in part. The Court may not constitutionally exercise jurisdiction over Bargagli under 10 Del.Code Ann. § 3104(a)(1). The Court may exercise jurisdiction over count II of the complaint for breach of fiduciary duty under 10 Del.Code Ann. § 3114. Accordingly, Bargagli's motion to dismiss is granted with respect to counts I, III, IV, and V of the complaint.

Not Reported in F.Supp., 1996 WL 924508 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:96cv00415 (Docket)
(Aug. 16, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1221749 (Del.Super.)
**(Cite as: 2001 WL 1221749 (Del.Super.))**

Page 1

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Bradley PALMER, Plaintiff,
v.
Nathaniel MOFFAT, Jay Moffat, Diana Spencer, Kim Spencer, Abby Moffat, Pamela Moffat, Alan Herstrum, James Kee, Thomas Lutes, Mario Kranjac Defendants.
**No. 01C-03-114-JEB.**

Submitted: Sept. 24, 2001.
Decided: Oct. 10, 2001.

Defendants Diane Spencer, Kim Spencer and Pamela Moffat's Motion to Dismiss. Granted. Defendant's Mario Kranjac's Motion to Dismiss. Denied.

Craig B. Smith, Esquire, and Robert J. Katzenstein, Esquire, Wilmington, for Plaintiff.

Richard H. Morse, Esquire, and Ben T. Castle, Esquire, Wilmington, for Defendants Diana Spencer, Kim Spencer, and Pamela Moffat.

Edward M. McNally, Esquire, Wilmington, for Defendants Alan Herstrum, James Kee, Thomas Lutes and Mario Kranjac.

OPINION

BABIARZ, J.

**\*1** This case is a dispute among the members and managers of a Delaware limited liability company. Four of the defendants have moved to dismiss for lack of personal jurisdiction. For the reasons discussed below, the motion is Granted as to Diana Spencer, Kim Spencer and Pamela Moffat, who were members of the company but not managers, and Denied as to Defendant Mario Kranjac, who served as a manager.

FACTS
In March 1997, Plaintiff Bradley Palmer and Defendant Nathaniel Moffat, as well as other investors, formed the Yazoo Power Equipment Group, LLC ("the Company"), pursuant to Delaware's Limited Liability Company Act. [FN1] The Complaint alleges that when the Company's earnings fell to a dangerous low, Moffat withheld capital contributions which he was obligated to make, and that he encouraged other members and managers to do the same. As a result, the Company defaulted on its financing obligations, and was put up for sale at private auction. Moffat bought the Company and subsequently sold one of its major holdings for an alleged sum of approximately $25 million. Palmer, who was no longer a member of the Company received nothing from the proceeds of the sale.

FN1. *See 6 Del. C.* ch. 18.

Palmer subsequently filed suit in Superior Court, alleging that the members and managers of the Company successfully conspired to defraud him of more than $15 million of his equity interest in the Company. Defendants Diana Spencer, Kim Spencer and Pamela Moffat, who, for purposes of this motion only, are referred to as "the Spencer Defendants," have moved to dismiss for lack of personal jurisdiction, pursuant to Super. Ct. Civ. R. 12(b)(2). Defendant Mario Kranjac has filed a separate motion to dismiss for lack of personal jurisdiction.

STANDARD OF REVIEW
On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden to make a prima facie case establishing jurisdiction under the long-arm statute. [FN2] In deciding the motion, the Court is to decide first whether jurisdiction is appropriate under the statute and, if so, whether the exercise of such jurisdiction would offend due process. [FN3] The Court must view all factual disputes in a light most favorable to the plaintiff. [FN4]

FN2. *Greely v. Davis,* Del.Supr., 486 A.2d 669, 670 (1984); *Outokumpu Engineering Enterprises, Inv. v. Kvaerner Enviropower, Inc.,* Del.Super., 685 A.2d 724, 727 (1996).

FN3. *Carlton Investments v. TLC Beatrice Internat'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Oct. 16, 1996); *Mumford v. Mumford,* Del.Super., C.A. No. 93C-06-032, Terry, J. (Feb. 6, 1995).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1221749 (Del.Super.)
**(Cite as: 2001 WL 1221749 (Del.Super.))**

FN4. *Boone v. Oy Partek, AB,* Del.Super.,
724 A.2d 1150, 1155 (1997) (citing
*Outokumpu Engineering Enterprises, Inc. v.
Kvaerner Enviropower, Inc.,* 685 A.2d at
727.)

DISCUSSION

The Spencer Defendants argue that dismissal is
appropriate as to them because *6 Del. C.* § 18-109,
the implied consent statute for service of process in a
Delaware LLC case, applies only to managers and
that they were members but never managers of the
Company. Plaintiff argues that the Spencer
Defendants were managers under the statutory
definition and also under the Operating Agreement.
Defendant Kranjac argues that he was not a manager
at the time the complaint was filed and that he is
therefore not subject to the implied consent statute.
Plaintiff responds that the Complaint refers to events
that occurred during Kranjac's tenure as a manager.

The implied consent statute, § 18-109, provides in
part as follows:

A manager... of a limited liability company may be
served with process... in all civil actions or
proceedings brought in the State of Delaware
involving or relating to the business of the limited
liability company or a violation by the manager...
of duty to the limited liability company, or any
member of the limited liability company.... A
manager's... serving as such constitutes such
person's consent to the appointment of the
registered agent of the limited liability company...
as such person's agent upon whom service of
process may be made.... (Emphasis added.)

**\*2** This statute establishes jurisdiction over a
manager in an action alleging a breach of fiduciary
duty in his managerial capacity. [FN5] It also
provides two definitions of a manager:

FN5. *Assist Stock Mgmt, LLC v. Rosheim,*
Del. Ch., 753 A.2d 974, 978 (2000).

As used in this... section, the term "manager" refers
(i) to a person who is a manager as defined in §
18-101(10) of this title, and (ii) to a person,
whether or not a member of a limited liability
company, who, although not a manager as defined
in § 18-101(10) of this title, participates materially
in the management of the limited liability
company; provided however, that the power to
elect or otherwise select or to participate in the
election or selection of a person to be a manager as

defined in § 18-101(10) of this title shall not, by
itself, constitute participation in the management of
the limited liability company.

Plaintiff concedes that the second definition does not
apply to the Spencer Defendants, that is, that they did
not participate materially in managing the Company.
Plaintiff contends instead that they were managers
under the first definition. Section § 18-101(10)
provides as follows:

"Manager" means a person who is named as a
manager of a limited liability company in, or
designated as a manager of a limited liability
company pursuant to, a limited liability
agreement or similar instrument under which the
limited liability company is formed.

Plaintiff's construction of the Operating Agreement
boils down to an argument that all members are
managers. The pertinent section of the Operating
Agreement provides as follows:

The Members shall have full, exclusive and
complete discretion, power and authority, subject
in all cases to the provisions of this Agreement and
the requirements of applicable law, to manage,
control, administer and operate the business and
affairs of the company for the purposes herein
stated, to make all decisions affecting such
business and affairs, and to adopt such accounting
rules and procedures as they deem appropriate in
the conduct of the business and affairs of the
Company. [FN6]

FN6. Operating Agreement at 18, lines 498-
99, 501-507.

Despite this broad grant of potential operating
authority to members, the Operating Agreement vests
actual authority in the Management Committee:

The operations of the Company shall be conducted
by the Management Committee. Except as
otherwise provided in this Agreement, all
Company decisions shall require the affirmative
vote of the majority of the members of the
Management Committee. [FN7]

FN7. *Id.* at 19, lines 544-47.

This section of the Agreement lists specific duties of
the Management Committee, including hiring
employees and determining their compensation,
borrowing money for Company purposes, pledging or
encumbering the Company's assets, and confessing
judgment for the Company's liabilities. [FN8] Other
duties assigned to the Management Committee

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1221749 (Del.Super.)
(Cite as: 2001 WL 1221749 (Del.Super.))

include appointing a president, [FN9] a chief executive officer, a tax matters partner, [FN10] and other managers, officers or agents. [FN11] To increase capital investment, the Management Committee was authorized to issue new classes of interest units. [FN12] The Management Committee was also responsible for the admission of new members, [FN13] approval of capital items and initiation of bankruptcy proceedings. [FN14]

> FN8. *Id.* at lines 548-60.

> FN9. *Id.* at 20, lines 590, 592-93.

> FN10. *Id.* at lines 616-17.

> FN11. *Id.* at 21, lines 604, 609-13.

> FN12. *Id.* at 9, lines 230-34, et seq.

> FN13. *Id.* at 21, lines 630-33.

> FN14. *Id.* at lines 634-37.

*3 In contrast, members were strictly limited in their rights to sell, assign or transfer their units and could not even resign from the Company without the consent of the Management Committee. [FN15] The members were authorized to appoint or designate a majority of the Management Committee Members. [FN16] However, § 18-109 provides that this power, standing alone, is not sufficient to qualify a member as a manager: "[T]he power to elect or otherwise select or to participate in the election or selection of a person to be a manager as defined in § 18-101(10) of this title shall not, by itself, constitute participation in the management of the limited liability company."

> FN15. *Id.* at 22, § 7.1.1, § 7.1.5.

> FN16. *Id.* at 18-19, § 6.1.2.

Thus the Operating Agreement designates members of the Management Committee as the Company's actual managers. It is uncontested that the Spencer Defendants never served on that Committee. In addition, the Spencer Defendants have filed affidavits averring that they never acted as managers, never attended managerial meetings and had no business connections with Delaware. The Court concludes that Defendants Diana Spencer, Kim Spencer and Pamela Moffat were not managers under either § 18-109 or the Operating Agreement and that they are not subject to service under the implied consent statute. Thus, it is not necessary for the Court to reach the

constitutional question as to these Defendants.

Defendant Kranjak also moves to dismiss, joining in the arguments made by the Spencer Defendants. Kranjac further argues that he was neither a member nor a manager of the Company when the acts alleged in the Complaint took place. Kranjac, who served the Company as outside counsel, avers in his affidavit that he resigned from the Management Committee effective October 7, 1998, and that he did not again become a member of the Management Committee until February 1999, following the foreclosure.

Since Kranjac concedes that he was a member of the Management Committee, the only question is one of timing. Pursuant to § 18-109(a), a manager may be served with process "whether or not the manager or liquidating trustee is a manager or a liquidating trustee at the time suit is commenced." [FN6] He was a member of the Management Committee in 1998 when many of the disputed event occurred. Therefore, Kranjac is subject to the implied consent statute.

> FN6. Title 6 *Del. C.* § 18-109(a).

The second prong of the test for personal jurisdiction is whether the exercise of such jurisdiction would offend due process. The constitutional standard for determining whether a state may exercise judicial power over a person is fairness and substantial justice. [FN7] The critical question in making this determination is whether a reasonable person would have anticipated that his actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions. [FN8]

> FN7. *In re USA Cafes, L.P. Litigation,* Del. Ch., 600 A.2d 43 (1991)(citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980)).

> FN8. *Id.* at 50-51.

In considering this question pursuant to § 18-109, the Court of Chancery stated that "[w]hen nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that under [certain] circumstances... they will be subject to personal jurisdiction in Delaware courts." [FN9] The Court went on to say that a case-by-case analysis would eliminate any risk of an unconstitutionally broad application of the statute. [FN10] In other words, the same principle that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1221749 (Del.Super.)
**(Cite as: 2001 WL 1221749 (Del.Super.))**

governs jurisdiction over corporate directors under <u>10 Del. C.</u> § 3114 applies to 6 <u>Del. C.</u> § 18-109: it is the "rights, duties, and obligations which have to do with service as a director of a Delaware corporation which make a director subject to personal service in Delaware." [FN11]

> FN9. <u>Assist Stock Mgmt., LLC v. Rosheim,</u> Del. Ch., 753 A.2d 974, 975 (2000).

> FN10. <u>Id.</u> at 980.

> FN11. <u>Hana Ranch v. Lent,</u> Del. Ch., 424 A.2d 28, 30-31 (1980).

*4 Unlike 10 <u>Del. C.</u> § 3114, the LLC implied consent statute explicitly incorporates this principle into its provisions. Section 18- 109(a) limits implied consent to service of process to managers and liquidating trustees, and defines managers as those individuals who materially participate in management or those who are designated to serve as managers by the company itself via its operating agreement.

Defendant Kranjac does not dispute that he was a member of the Management Committee or that he served as outside counsel to the Company. The Complaint alleges that Kranjac colluded with other defendants to stall the contribution of new capital in order to facilitate the foreclosure, thereby forcing Plaintiff out of the Company. While this allegation is disputed, it is clear that Kranjac was on the Management Committee throughout the spring, summer and fall of 1998, when the alleged actions took place. In particular, Kranjac was allegedly involved in the unsuccessful negotiations between the parties to reach an agreement that would prevent foreclosure. [FN12] The Court finds that Kranjac could reasonably have anticipated being subject to Delaware jurisdiction under these circumstances to answer for his actions as a manager and that the exercise of such jurisdiction would not offend traditional notions of fair play and substantial justice.

> FN12. Complaint ¶ 40.

## CONCLUSION

For the foregoing reasons, the motion to dismiss filed by Diana Spencer, Kim Spencer and Pamela Moffat is Granted, and the motion to dismiss filed by Mario Kranjac is Denied.

It Is So ORDERED.

Not Reported in A.2d, 2001 WL 1221749

(Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                             Page 1
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
(Cite as: 2002 WL 749163 (Del.Ch.))

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
SOLAR CELLS, INC., Plaintiff,
v.
TRUE NORTH PARTNERS, LLC, First Solar, LLC,
Michael J. Ahearn, Michael L.
Pierce, and Michael Gallagher, Defendants.
No. Civ.A. 19477.

Submitted April 17, 2002.
Decided April 25, 2002.

Kenneth J. Nachbar, Jon E. Abramczyk, S. Mark
Hurd, and Brian J. McTear, of Morris, Nichols, Arsht
& Tunnell, Wilmington, Delaware; Barry W. Fissel
and M. Charles Collins, of Eastman & Smith Ltd.,
Toledo, Ohio, for Plaintiff, of counsel.

Allen M. Terrell, Jr., Thad J. Bracegirdle and Andrea
K. Short, of Richards, Layton & Finger, Wilmington,
Delaware; Timothy P. Ryan and Daniel B. McLane,
of Eckert Seamans Cherin & Mellott, LLC,
Pittsburgh, Pennsylvania, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 This action concerns the proposed merger of
defendant First Solar, LLC ("First Solar" or the
"Company") with and into First Solar Operating,
LLC ("FSO"), the wholly-owned operating subsidiary
of First Solar Ventures, LLC ("FSV"). The plaintiff,
Solar Cells, Inc. ("Solar Cells"), alleges that the
individual defendant managers of First Solar, [FN1]
acting at the direction of defendant True North
Partners, LLC ("True North" and, collectively, "the
defendants"), acted in bad faith in approving the
proposed merger and that the defendants will be
unable to prove the entire fairness of that merger.

> FN1. The individual defendants are First
> Solar Managers elected by True North:
> Michael J. Ahearn ("Ahearn"), Michael L.
> Pierce ("Pierce"), and Michael Gallagher
> ("Gallagher").

On March 13, 2002, Solar Cells filed a motion for a
temporary restraining order requesting that this Court
enjoin the proposed merger, which was scheduled to
close two days later. The defendants agreed to
postpone consummation of the merger in order to
permit the parties to conduct the limited discovery
necessary to present their positions at a preliminary
injunction hearing. Solar Cells' motion for a
preliminary injunction was fully briefed and then
argued on April 17, 2002. Because I find that Solar
Cells has met its burden of establishing a reasonable
likelihood that it will be successful on the merits of
its claim of a breach of fiduciary duty and that it is
threatened by irreparable harm if the merger is
consummated, I will enter an Order preliminarily
enjoining the merger. [FN2]

> FN2. Solar Cells also contends that True
> North improperly converted loans it made to
> First Solar into First Solar membership
> units, that the defendants breached their duty
> of care in approving the proposed merger,
> and that the defendants improperly are
> attempting to deny Solar Cells its Class B
> Units merger approval rights. Because a
> preliminary injunction will issue if a
> plaintiff carries his burden on at least one of
> his claims, my determination that Solar
> Cells has made an adequate showing as to
> this first claim obviates the need to discuss
> these additional claims.

I. BACKGROUND FACTS

Solar Cells, an Ohio corporation, was founded in
1987 by Harold A. McMaster ("McMaster") to
develop, design, and manufacture products and
processes for photovoltaic electricity generation-
technology commonly referred to as "solar power."
McMaster designed technologies and processes for
manufacturing photovoltaic cells making use of
heretofore-unknown techniques that were predicted
to revolutionize the solar power industry. [FN3]
These inventions purportedly would permit cost-
effective manufacture of photovoltaic cells that
produce energy at rates competitive with, or even less
than, the present cost of electrical generation using
fossil fuels. In order to exploit the potential of these
inventions, True North, an Arizona limited liability
company, was brought in to provide needed
financing. Solar Cells and True North formed First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
(Cite as: 2002 WL 749163 (Del.Ch.))

Solar as a Delaware limited liability company in February 1999 to commercialize McMaster's solar technology.

> FN3. McMaster or his companies were awarded at least 13 patents for these processes and technologies.

First Solar is managed pursuant to the Operating Agreement of First Solar, LLC ("Operating Agreement"). The Operating Agreement required Solar Cells to contribute patented and proprietary technology-valued in the Operating Agreement at $35 million-to First Solar. True North was to contribute $35 million in capital to First Solar and, also pursuant to the Operating Agreement, was required to, and did, loan First Solar an additional $8 million. In return for their contributions, Solar Cells and First Solar each received 4,500 of First Solar's Class A membership units. Solar Cells also received 100% of First Solar's Class B membership units. [FN4] The business and affairs of First Solar is conducted by five Managers. The Operating Agreement permits True North to elect three of those Managers (the "True North Managers") and Solar Cells to elect the remaining two Managers (the "Solar Cells Managers"). It is undisputed that, since its inception, First Solar has been managed by True North.

> FN4. According to the Operating Agreement, Class A Units had voting rights, and Class B Units had no voting rights.

**\*2** First Solar's continuing development and manufacturing expenditures, as well as its inability to produce a marketable product, eventually depleted the Company's initial funding. By early 2001 it became apparent that continued operations would require additional funding. To this end, in March 2001, First Solar retained investment banker Adams, Harkness & Hill, Inc. ("AHH") to find a strategic investor for the Company. In order for the Company to continue operating while AHH searched for a strategic investor, True North agreed to make an additional $15 million loan to First Solar.

The Loan Agreement between First Solar and True North bundled True North's original $8 million loan and the new $15 million loan and represented a funding commitment by True North of up to a total of $23 million through December 31, 2001. Upon either the receipt of outside investment or at the end of its funding commitment, the Loan Agreement gave True North the option of converting some or all of the loan

amount into Class A Units of First Solar [FN5] or to retain the investment as a loan with liquidation preferences. For reasons disputed by the parties (but not relevant to this motion), no outside investors were brought into First Solar.

> FN5. The loan was convertible either at the same value as AHH proposed to outside investors or at a "conversion ratio" specified in the Loan Agreement.

From December 2001 through March 2002, the parties engaged in unsuccessful negotiations regarding different alternatives for financing and restructuring First Solar. On March 5, 2002, True North purported to convert $250,000 of its outstanding loans to First Solar into Class A Units at a conversion ratio based on a January 8, 2002 AHH valuation of First Solar at $32,000,000. On March 7, 2002, the True North Managers executed a written consent approving the challenged merger of First Solar into FSO, a Delaware limited liability company wholly owned by True North. On March 11, 2002, Solar Cells received notice of the proposed merger, which was scheduled to close on March 15, 2002, and the terms of that merger. In connection with the merger, True North would convert its remaining outstanding loans into equity at the same ratio as the March 5, 2002 conversion. The merger would occur based on a total valuation of First Solar at $32 million with First Solar ownership units being exchanged for ownership units of the surviving company. The end result of the merger-related transactions would be that Solar Cells would go from owning 50% of the Class A Units of First Solar to owning 5% of the membership units of the surviving company. On March 13, 2002, Solar Cells filed a complaint and request for temporary restraining order enjoining consummation of the proposed merger. True North agreed not to cause its Managers to close the merger before this Court's decision on Solar Cells' motion for a preliminary injunction filed in response to that agreement.

## II. PRELIMINARY INJUNCTION STANDARD

The standard on a motion for preliminary injunction is well-settled. In order to prevail, a plaintiff must establish: (1) a reasonable likelihood of success on the merits of at least one claim; (2) that irreparable harm will be suffered by the plaintiff if the injunction is denied; and (3) that the harm that the plaintiff will suffer if the injunction is not granted outweighs the harm that the defendant will suffer if the injunction is granted. [FN6]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
(Cite as: 2002 WL 749163 (Del.Ch.))

FN6. *See* In re Aquila Inc. Shareholders Litig., 2002 WL 27815 at * 5 (Del. Ch.).

## III. CONTENTIONS

*3 Solar Cells argues that the manner in which the proposed merger was approved demonstrates that the True North Managers acted in bad faith and breached their fiduciary duties to Solar Cells as a member of First Solar. Because of the defendants' bad faith, Solar Cells contends that the defendants will be required to prove that the proposed merger is entirely fair. Solar Cells argues that it is likely to be successful on the merits because the defendants will be unable to demonstrate that the proposed merger was the result of fair dealing and based on a fair price.

Solar Cells lists three effects of the proposed merger that will irreparably harm it should the merger close. First, because of the purportedly improper conversion ratio used by True North to convert its outstanding First Solar loans to equity, Solar Cells' 50% voting and equity interest in First Solar will be diluted to only a 5% interest in the surviving company. Second, Solar Cells bargained for the right to elect two Managers when negotiating with True North over the creation of First Solar. As a result of the proposed merger, it will lose this bargained-for right. Instead, True North will-through its control of 95% of the voting units of the surviving company-elect all three of the Managers of the surviving LLC. Third, and finally, it is contemplated that outside investors will be brought into the surviving company. Should that happen and this Court later determines that use of an improper conversion caused the equity positions of the parties to be incorrectly established, the interests of third parties would make the resolution of that problem extremely difficult. [FN7] Solar Cells argues the harm is incalculable and far outweigh any harm that might be suffered by First Solar as a result of enjoining an unfair transaction.

FN7. The plaintiff also makes lengthy arguments over which one of several valuations was appropriate to use under the terms of the Loan Agreement in determining the conversion ratio for True North debt. Plaintiff also, as a separate matter, argues that AHH's January 8, 2002 valuation of First Solar at $32,000,000 was, nonetheless, inaccurate and could not serve as the basis for conversion under any circumstances. It is not necessary for my decision on this motion to make determinations with regard to those arguments. That value was used for both the

purported conversion of True North loans and served as the valuation of First Solar for purpose of the merger. I need only determine whether the values used in those transactions is likely to cause irreparable harm to Solar Cells.

The defendants counter that, as evidenced by the Operating Agreement, the parties unambiguously agreed that the True North Members could control decisions regarding the business and affairs of First Solar. Action by written consent is permitted by the Operating Agreement. A merger need only be approved by a majority of the Managers and True North has veto power over any mergers it does not agree with. The merger was approved by the three True North Managers in the good faith belief that, in light of failed restructuring negotiations between the parties, this was the only option available to save First Solar from a forced sale or liquidation when it runs out of operating money at the end of April 2002. Furthermore, the Operating Agreement acknowledges that there will be conflicts of interest between the True North Managers (two of which are True North principals) and eliminates liability for any conflict of interest transactions that they may engage in. The only requirement is that the True North Managers act in the good faith belief that their actions are in the best interest of First Solar. Because every action taken by the True North Managers with regard to the proposed merger was authorized by the Operating Agreement and made in the good faith belief that it was in the best interest of First Solar, True North insists that this Court should deny Solar Cells' motion.

*4 Although True North disputes the need to establish entire fairness, it contends that both the process and the price of the merger are entirely fair. The process undertaken was clearly authorized by the Operating Agreement and the price was arrived at from a valuation by AHH based on accurate revenue statements and is further supported by an outside valuation.

True North argues that Solar Cells will not be irreparably harmed by the merger. Any dilution suffered by Solar Cells is the result of a valid conversion of True North loans to equity. Solar Cells will be permitted to make further investments in the surviving company on the same basis as True North. There is a reset provision that will reverse part of Solar Cells' dilution if a strategic investor is found during 2002. Although the defendants acknowledge that Solar Cells will not have the right to elect

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
(Cite as: 2002 WL 749163 (Del.Ch.))

managers of the surviving company, they contend that True North had the right to elect a majority of First Solar Managers and, therefore, was guaranteed control over the business and affairs of the Company. True North merely continues to have the power to control the business and affairs of the surviving company. Since Solar Cells could not control First Solar, it has not lost any power over the company by not being able to elect managers of the surviving company. Having suffered no irreparable harm, defendants contend that the equities clearly balance in their favor and against the motion. They assert that if the injunction is granted, the Company will run out of money by April 30, 2002. Since True North is unwilling to continue funding the Company, it will have to terminate its employees, shut down, and be sold at a bargain in a forced liquidation.

## IV. ANALYSIS
### A. Likelihood of Success on the Merits

The defendants argue that all of the actions taken in connection with the proposed merger were clearly authorized by the Operating Agreement. They further argue that the Operating Agreement limited any fiduciary duties owed by True North Managers. Section 4.18(a) of the Operating Agreement provides, in relevant part:

Solar Cells and [First Solar] acknowledge that the True North Managers have fiduciary obligations to both [First Solar] and to True North, which fiduciary obligations may, because of the ability of the True North Managers to control [First Solar] and its business, create a conflict of interest or a potential conflict of interest for the true North Managers. Both [First Solar] and Solar Cells hereby waive any such conflict of interest or potential conflict of interest and agree that neither True North nor any True North Manager shall have any liability to [First Solar] or to Solar Cells with respect to any such conflict of interest or potential conflict of interest, provided that the True North managers have acted in a manner which they believe in good faith to be in the best interest of [First Solar].

I note that this clause purports to limit *liability* stemming from any conflict of interest. Solar Cells has not requested that this Court impose liability on the individual defendants. It is currently only seeking to *enjoin* the proposed merger. Therefore, exculpation for personal liability has no bearing on the likelihood that Solar Cells would be successful on the merits of its contention that the proposed merger is inequitable and should be enjoined. Even if waiver of liability for engaging in conflicting interest

transactions is contracted for, that does not mean that there is a waiver of all fiduciary duties to Solar Cells. Indeed, § 4.18(a) expressly states that the True North Managers must act in "good faith." It is undisputed that First Solar was, and is, in financial distress. Months of unsuccessful negotiations have been ongoing in an attempt to come to an agreement as to how to remedy that situation. On March 6, 2002, the full Board of Managers met and the True North Managers made no mention of the planned merger. The *very next day*, March 7, 2002, the three True North Managers met and by written consent approved the proposed merger. No effort was made to inform the Solar Cells Managers that this action was contemplated, or imminent, when those facts were surely known at the time of the March 6 meeting. [FN8] At the earliest, Solar Cells was given notice of the fact, and terms, of the proposed merger (which were presented as a *fait accompli* ) via facsimile on March 8, 2002-a week before consummation of a merger that will apparently reduce Solar Cells' interest from 50% to 5%. These actions do not appear to be those of fiduciaries acting in good faith. As the Supreme Court and this Court have made clear, it is not an unassailable defense to say that what was done was in technical compliance with the law. [FN9] The facts before me make it likely, in my opinion, that the defendants would be required to show the entire fairness of the proposed merger.

> FN8. The plaintiff contends that documents produced during discovery reveal that the defendants had been planning the proposed merger since at least February 27, 2002.

> FN9. See *Schnell v. Chris-Craft Indus.*, 285 A.2d 437 (Del.1971).

**\*5** The party with the burden of establishing entire fairness must establish that the challenged transaction was the result of fair dealing and offered a fair price. Fair dealing pertains to the process by which the transaction was approved and looks at the terms, structure, and timing of the transaction. Fair price includes all relevant factors "relat[ing] to the economic and financial considerations of the proposed merger." [FN10]

> FN10. See *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983).

The defendants argue that there is nothing inherently unfair about the structure of the merger-a holding company with a wholly-owned operating subsidiary. Solar Cells points out, however, that there was no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
(Cite as: 2002 WL 749163 (Del.Ch.))

Page 5

independent bargaining mechanism set up to protect its interests. In fact, there was no negotiation at all. All of the decisions regarding the terms of the merger and its approval were made unilaterally by True North through its representative Managers. No advance notice of this merger was given to Solar Cells. The fact that the Operating Agreement permits action by written consent of a majority of the Managers and permits interested transactions free from personal liability does not give a fiduciary free reign to approve any transaction he sees fit regardless of the impact on those to whom he owes a fiduciary duty.

The defendants contend that the timing of the merger was dictated by the Company's financial emergency, an emergency they say had been exacerbated by Solar Cells' refusal to negotiate, in good faith, a suitable plan for restructuring the Company. Solar Cells counters that the timing was driven by True North's desire to increase its proportionate ownership while simultaneously squeezing out Solar Cells at an unfair price. Solar Cells argues that the effect of the merger is essentially the same as the terms of a restructuring plan Solar Cells had refused to agree to in February 2002. They contend, in the face of Solar Cells' refusal to accept an unfair restructuring offer voluntarily, that the defendants immediately sought to impose similar terms by way of the proposed merger.

I am unconvinced by defendants' argument that the merger was fair to Solar Cells because Solar Cells retains voting rights in the surviving company. On matters where the unit-holders can vote, Solar Cells is diluted from an equal (50%) voice, to only 5%. Also arguably illusory is the so-called market-reset provision that would raise Solar Cells' initial equity interest in the new entity in the event that the new entity secures third-party financing in 2002. True North has complete control over the managing board and any other decision requiring the vote of unit-holders. Certainly, then, it would be within the power of True North to delay consummation of any proposed third-party investment until after 2002. Such action would seem to be in the self-interest of both True North and any potential third-party investor, as any increase in Solar Cells' equity interest necessarily decreases the equity interest of others. Finally, the ability of Solar Cells to invest new money into the surviving corporation on the same terms as True North hardly remedies the harm suffered by Solar Cells by the initial dilution of its interest as a result of the proposed merger. In my opinion, the facts before me establish a reasonable

likelihood that defendants will not be able to establish that the proposed merger was the result of fair dealing.

*6 Application of the entire fairness standard requires a demonstration of both fair dealing and fair price. Having considered the fair dealing component of the standard, I turn now to the fair price analysis.

Solar Cells contends that True North manipulated the valuation of First Solar in order to advantage itself. That is, according to Solar Cells, when True North decided it would become a buyer of First Solar it unilaterally caused AHH to create a fundamentally flawed valuation that is less than one-third of the value calculated by AHH only five months earlier. On the other hand, True North insists that AHH's January 2002 $32 million valuation of First Solar, a calculation that forms the basis of the proposed merger terms, is a more credible calculation of First Solar's value than earlier calculations by AHH. True North contends that the earlier calculations were overly optimistic and were based on outdated financial projections as well as changed market conditions.

For purposes of the present motion only, I am satisfied that there is a reasonable probability that the Court will not find the January 2002 valuation to be entirely fair. First, the author of AHH's January 2002 valuation materials described those materials as a "quick and dirty" analysis of First Solar's value on that date. This contrasts with the earlier valuations in August and November of 2001, valuations that were based on multiple methodologies to arrive at a value for First Solar that ranged from $103 million in August 2001 to $72 million in November 2001, or almost two to three times the January 2002 valuation. Second, AHH's January 2002 valuation employed only a discounted cash flow analysis. Although the lower valuation in January 2002 was the basis upon which True North would acquire a 95% interest in First Solar and Solar Cells would fall to a 5% interest, the significantly lower valuation failed to employ any other method of valuation as a "crosscheck" to the discounted cash flow analysis. Because earlier valuations relied on multiple valuation methodologies, it is a reasonable inference that AHH's "quick and dirty" analysis is less reliable and authoritative. Third, the January 2002 formula used a much lower exit multiple (a 6 .9 x free cash flow terminal year multiple) than did earlier valuation formulas (which used an 11 x free cash flow terminal year multiple), with no apparent rationale for that lower multiple. Fourth, AHH's lower valuation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

resulted from the use of a much higher discount rate (35%) than the valuations it performed only five months earlier (30%), even though the outlook for the solar cell industry was improving in that period and even though interest rates were generally falling. [FN11]

> FN11. Even True North's litigation expert, Mr. Brian DiLucente, arrived at a much higher value for First Solar ($51.9 million). DiLucente was able to reduce his $51.9 million valuation to $31.1 million, but to do so, he was forced to apply a 40% "marketability" discount. The courts of this State, however, have repeatedly rejected the applicability of such discounts. *See, e.g., Paskill Corp. v. Alcoma Corp., 747 A.2d 549, 556- 57 (Del.2000); Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1145 (Del.1989); Nebel v. Southwest Bancorp., Inc.,* Del. Ch., C.A. No. 13618, Jacobs, V.C., slip op. at 9 (Mar. 9, 1999). Furthermore, after putting to one side DiLucente's apparent improper application of a marketability discount, his $51.9 million valuation for First Solar likely was improperly depressed by other aspects of his discounted cash flow analysis. For example, DiLucente applied a discount rate as high as 45%, based on his subjective view of First Solar's Company specific risk. But DiLucente admitted in his deposition testimony that he had no expertise in the solar cell industry and limited knowledge of the specific company, First Solar, that his analysis purported to value. This Court has been, understandably in my view, suspicious of expert valuations offered at trial that incorporate subjective measures of company specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion on value. *See Onti, Inc. v. Integra Bank, 751 A.2d 904, 919-21 (Del. Ch.1998); Hintmann v. Fred Weber, Inc.,* Del. Ch., C.A. No. 12839, Steele, V.C. (Feb. 17, 1998).

Judicial determinations of fair price in an entire fairness analysis are difficult even after a full trial on the merits. On the abbreviated record now before the Court in this preliminary injunction context, a fair price analysis is even more problematic. For that reason, I have not found it useful to rely heavily on the deposition and affidavit testimony of the parties'

litigation experts. Instead, I conclude that it is reasonably likely this Court will find the January 2002 $32 million valuation of First Solar not to be a fair price because it is irreconcilable with the earlier valuations only a few months before True North decided to go forward with the proposed merger. Because Solar Cells has demonstrated a reasonable likelihood of success on the merits of its entire fairness claim, I turn next to the irreparable harm and balance of the equities component of the preliminary injunction standard.

*B. Irreparable Harm*

*7 In order to show irreparable harm, the injury must be one for which money damages will not be an adequate remedy. [FN12] Additionally, the threatened harm must be "imminent, unspeculative, and genuine." [FN13]

> FN12. *See Kohls v. Duthie, 765 A.2d 1274, 1289 (Del. Ch.2000).*

> FN13. *H.F. Ahmanson & Co. v. Great W. Fin. Corp.,* 1997 WL 305824 (Del. Ch.).

Solar Cells argues that it will be harmed irreparably by the dilution of its equity position and voting power as unit-holders. It also alleges that the loss of its bargained-for participation in company management is an irreparable harm. Finally, it contends that it will be irreparably harmed by the fact that, should a third-party investor be brought into the surviving company, those third-party interests will have to be taken into account by the Court. If it is later determined that the dilution of Solar Cells' interest was improper it will be difficult, if not impossible, to craft an appropriate remedy for the wrong suffered by Solar Cells. Solar Cells is in imminent, unspeculative, and genuine danger of suffering this harm. The defendants do not argue that these results will not follow from the proposed merger, only whether they constitute harm at all, and if they are, whether they are irreparable harm.

The defendants do not dispute that Solar Cells' equity position and voting power as unit-holders will be diluted. They cite *Rovner v. Health-Chem Corp.* [FN14] for the proposition that dilution alone cannot be viewed as irreparable harm. The plaintiff in *Rovner* could be compensated for any improper dilution of its shares. The plaintiff stockholder in *Rovner,* moreover, held less than 3% of the eight million shares issued by a publicly-traded company. [FN15] There was no contention that any dilution

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

would have drastically affected voting power or that the value of the purportedly diluted shares of a *public* corporation could not be readily valued. Here, not only is dilution not the sole claim of irreparable harm, but the harm alleged is the power inherent in voting 50% of Class A Units compared to voting only 5%. Moreover, accurately valuing this two-member limited liability company may not be possible, as evidenced by the vastly different valuations the parties ascribe to First Solar. Therefore, these are not the types of harm that can be remedied with money damages. [FN16]

> FN14. 1996 WL 377027 (Del. Ch.).
>
> FN15. *Id.* at *1.
>
> FN16. The Operating Agreement, § 4.18, limits True North's liability for conflicts arising from its fiduciary obligations. This may also cause harm to Solar Cells to be irreparable in nature.

The defendants do not deny that Solar Cells will not have the right to appoint managers of the managing board of the surviving corporation. They argue that since True North had the right to nominate a majority of First Solar's Managers, True North could control the business and affairs of the Company. That reality is unaltered with the surviving company. The defendants reason, therefore, that Solar Cells has suffered no harm by losing its right to appoint managers. That argument carries no weight whatsoever. To accept that assertion would be to believe that every time the ability to elect a manager or director of a corporation is negotiated, there is no benefit derived therefrom if there is not a right to elect a majority of the managers or directors. Such a notion would certainly come as a surprise to all those who have given valuable consideration in negotiating such valueless rights. The right to participate in a management group is a valuable right whether or not that participation includes control of the group. In this case, it is undisputed that Solar Cells will lose that right if the proposed merger closes, thereby suffering an irreparable harm.

*8 Finally, if a third-party investor were brought into the surviving company, the Court would have to consider the interests of that party in formulating relief, if any, later found owing to Solar Cells. The possibility of such investment is not merely speculative, as the defendants claim one of the purposes behind the proposed merger is to make the surviving company more attractive to outside investors. Based on the facts before me, I conclude that Solar Cells is at risk of suffering immediate, irreparable harm if the proposed merger is consummated.

### C. Balance of the Equities

The harm suffered by Solar Cells is the irreparable harm discussed above. The harm the defendants allege they will suffer if the injunction is granted is that the Company will run out of money in a matter of days and will be forced to close down and terminate its employees and liquidate assets in the undesirable setting of a forced sale. It does not appear to be a certainty, despite defendants' assertions to the contrary, that True North would let the Company close rather than protecting its investment for the short period of time necessary to reach a final judgment in this matter. Actually, Solar Cells has noted that, under the right terms, McMaster would be willing to make financing available to First Solar. A determination of the likelihood that one of the parties will extend additional financing is not necessary to my decision, however. I am required to balance the harm to the plaintiff if I do not grant the injunction with the harm to the defendants if I do grant the injunction. I note that even if the circumstance the defendants present does occur, that is not a harm that would fall solely on the defendants. Such a forced sale would adversely affect Solar Cells as well. In actuality, this predicted result might have an even greater detrimental effect on Solar Cells. As the defendants have pointed out, True North is entitled to priority repayment of its original $35,000,000 capital contribution before Solar Cells would be able to make a claim to any of the proceeds of a liquidation. [FN17] As a result, I find that the balance of the equities favors granting Solar Cells' motion for a preliminary injunction against the proposed merger.

> FN17. *See* Ahearn Aff., at § 10.1.

### V. CONCLUSION

For the reasons stated, I grant plaintiff's motion for preliminary injunction. An Order has been entered in accordance with this decision.

A secured bond in the amount of $2500 shall be posted by plaintiff before the injunction becomes effective.

IT IS SO ORDERED.

### ORDER

For the reasons set forth in this Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)
**(Cite as: 2002 WL 749163 (Del.Ch.))**

Memorandum Opinion entered in this case, on this date, it is

ORDERED:

1. Plaintiff's motion for a preliminary injunction is granted;

2. Defendants, their counsel, agents, directors, officers, employees, and all persons acting under, in concert with, or for them are preliminarily enjoined from taking any steps in furtherance of the proposed merger of First Solar, LLC ("First Solar") and First Solar Operating LLC (the "Proposed Merger") and, in particular, from consummating the Proposed Merger or filing with the Delaware Secretary of State any further documents in connection with the Proposed Merger or any other merger to which First Solar is or would be a party.

*9 3. This Order shall become effective upon plaintiff's posting of a secured bond in the sum of $2,500.

Not Reported in A.2d, 2002 WL 749163 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.