# *EXHIBIT A*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHAMROCK HOLDINGS OF CALIFORNIA,        )
INC., SHAMROCK   CAPITAL ADVISORS,      )
INC., EUGENE I. KRIEGER, GEORGE J.      )
BUCHLER and BRUCE J. STEIN              )
                                        )
    Plaintiffs,                         )
                                        )
    v.                                  )        Civil Action No.  04-1339-SLR
                                        )
AVIE ARENSON, SELK, LLC, LAUREL         )
EQUITY GROUP, LLC, J12ALH ASSOCIATES,   )
A. ARENSON HOLDINGS, LTD., and          )
D.A. GARDENS, LTD.                      )  )
                                        )
    Defendants.                         )
---------------------------------------------------------------⌐     )
SELK, LLC, LAUREL EQUITY GROUP, LLC        )
J12ALH ASSOCIATES, A. ARENSON             )
HOLDINGS, LTD., and D.A. GARDENS, LTD.    )
                                          )
    Defendants/Counterclaim Plaintiffs/    )
    Third-Party Plaintiffs,             )
                                          )
    v.                                     )
                                          )
SHAMROCK HOLDINGS OF CALIFORNIA,          )
INC., SHAMROCK   CAPITAL ADVISORS,        )
INC., EUGENE I. KRIEGER, GEORGE J.        )
BUCHLER and BRUCE J. STEIN                )
                                          )
    Plaintiffs/Counterclaim Defendants,    )
                                          )
    and                                    )
                                          )
ALH HOLDINGS LLC,                         )
                                          )
    Third-Party Defendant.              )

## AMENDED ANSWER TO AMENDED COMPLAINT, AMENDED COUNTERCLAIMS AND AMENDED THIRD-PARTY COMPLAINT

    Defendants, Abraham (Avie) Arenson ("Arenson"), A. Arenson Holdings, Ltd. ("Arenson

Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12ALH"), SELK, LLC

("Selk"), and Laurel Equity Group, LLC ("Laurel") (collectively "Defendants"), by and through their undersigned counsel, hereby respond to the allegations in the Amended Complaint, and Arenson Holdings, Ltd., D.A. Gardens, Ltd., J12ALH Associates, SELK, LLC, and Laurel Equity Group, LLC, hereby counterclaim against Plaintiffs, Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler"), and Bruce J. Stein ("Stein") (collectively "Plaintiffs") as follows:

## NATURE OF THE ACTION

1.      Admit the allegations in paragraph 1.

2.      Admit the allegations in sentence 1 of paragraph 2. Admit the allegations in sentence 2 of paragraph 2. Deny the allegations in sentence 3 of paragraph 2. Deny the allegations in sentence 4 of paragraph 2 except admit that Defendants threatened to sue Plaintiffs.

3.      Deny the allegations in sentence 1 of paragraph 3. Admit the allegations in sentences 2, 3, 4 and 5 of paragraph 3. Deny the allegations in sentences 6 and 7 of paragraph 3.

4.      Deny the allegations in sentence 1 of paragraph 4. Admit the allegations in sentence 2 of paragraph 4 but deny that the sentence accurately states all Defendants' claims. Deny the allegations in sentence 3 of paragraph 4 except admit that Defendants objected vehemently to ALH's separate sales of its regional operations. Deny the allegations in sentence 4 of paragraph 4.

5.      Deny the allegations in paragraph 5.

6.      Sentence 1 of paragraph 6 states a legal conclusion to which no response is required. Admit the allegations in sentence 2 of paragraph 6. Sentence 3 of paragraph 6 states a legal conclusion to which no response is required.

## THE PARTIES AND THEIR CONNECTIONS WITH DELAWARE

2

7.    Admit the allegations in sentence 1 of paragraph 7.  Admit the allegations in sentence 2 of paragraph 7.  Admit on information and belief the allegations in sentence 3 of paragraph 7.

8.    Admit the allegations in paragraph 8.

9.    Admit the allegations in paragraph 9.

10.    Admit the allegations paragraph 10.

11.    Admit the allegations of paragraph 11.

12.    Admit the allegations in paragraph 12.

13.    Admit the allegations in paragraph 13.

14.    Admit the allegations in paragraph 14 except deny that Arenson was the sole agent for D. A. Gardens and Arenson Holdings.

15.    Deny the allegations in paragraph 15 except admit that Arenson has acted in an advisory role regarding the allegations in sentence 2 of paragraph 15.

16.    Admit the allegations in paragraph 16.

17.    Admit the allegations in paragraph 17.

18.    Deny the allegations in paragraph 18 but answering further admit that the quoted statements were made but that they were taken out of context.

19.    Admit the allegations in sentence 1 of paragraph 18.  Admit on information and belief the allegations in sentence 2 of paragraph 19.

20.    Admit the allegations in paragraph 20.

21.    Admit on information and belief the allegations in paragraph 21.

22.    Admit the allegations in paragraph 22.

23.    Admit the allegations in paragraph 23.

3

24.    Deny the allegations in paragraph 24 except admit that D. A. Gardens and Arenson Holdings entered into the ALH transaction and that Arenson signed the ALH Operating Agreement on behalf of D.A. Gardens and Arenson Holdings.

25.    Admit on information and belief the allegations in paragraph 25.

26.    Admit on information and belief the allegations in paragraph 26.

27.    Admit on information and belief the allegations in paragraph 27.

28.    Admit on information and belief the allegations in sentences 1, 2 and 3 of paragraph 28. Admit the allegations in sentence 4 of paragraph 28.

29.    Deny the allegations in sentence 1 of paragraph 29 except admit that D.A. Gardens and Arenson Holdings entered into the March 15, 1999 Amendment to ALH's Operating Agreement. Deny the allegations in sentence 2 of paragraph 29 except admit that D.A. Gardens and Arenson Holdings made a capital contribution of $468,750 to ALH. Admit the allegations in sentence 3 of paragraph 29.

30.    Admit the allegations in paragraph 30.

31.    Admit the allegations in paragraph 31.

32.    Admit the allegations in paragraph 32.

33.    Admit the allegations in paragraph 33.

34.    Admit the allegations in sentence 1 of paragraph 34. Deny the allegations in sentence 2 of paragraph 34 except admit that Arenson Holdings entered into the 2000 Loan Agreement.

35.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

36.    Admit the allegations in paragraph 36.

4

37.    Deny the allegations in paragraph 37 regarding the Class B Members of ALH. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 relating to the Class A Members of ALH.

38.    Admit the allegations in paragraph 38.

39.    Admit the allegations in paragraph 39.

40.    Admit the allegations in paragraph 40.

41.    Admit the allegations in paragraph 41.

42.    Deny the allegation in paragraph 42 except admit that Arenson, as the Class B Representative, decided in 2001, that it would be in ALH's best interests to sell ALH in its entirety as a going concern.

43.    Deny the allegations in paragraph 43 except admit that Isaac Neuberger who represented some or all of the Class B Members was involved in identifying a possible buyer for ALH.

44.    Deny the allegations in sentence 1 of paragraph 44 to the extent that JMP was engaged to provide services in connection with the sale of only some of ALH's operations. Admit the allegations in sentence 2 of paragraph 44.

45.    Deny the allegations in sentence 1 of paragraph 45 except admit that Arenson believed ALH needed additional funding. Deny the allegations in sentence 2 of paragraph 45.

46.    Admit the allegations in paragraph 46 but deny that the sole purpose was to provide working capital.

47.    Admit the allegations in sentence 1 of paragraph 47. Deny the allegations in sentence 2 of paragraph 47 except admit that D.A. Gardens entered into the 2002 Loan Agreement and that Arenson signed on behalf of D.A. Gardens. Admit the allegations in sentence 3 of paragraph 47.

5

48.     Deny the allegations in paragraph 48 except admit that all class representatives, including Arenson, consented to the loan repayments.

49.     Deny the allegations in paragraph 49 except admit that the Class B Members expressed an interest in purchasing the Class A Membership interest in ALH since it was clear that Plaintiffs would rid themselves of their management responsibilities at ALH regardless of the consequences to ALH and its members.

50.     Deny the allegations in paragraph 50 except admit that through Arenson and Neuberger, the Class B Members contended that the price offered for BBC was too low. They also contended that any sale of less than all of ALH's operations was imprudent and would serve only Plaintiffs' interests.

51.     Deny the allegations in sentence 1 of paragraph 51. Deny the allegations in sentence 2 of paragraph 51 except admit that no formal written proposal to the Class A Membership Interest was made although the Class B Members made several proposals verbally and through email. Deny the allegations in sentence 3 of paragraph 51.

52.     Admit the allegations in paragraph 52.

53.     Admit the allegations in paragraph 53 except deny that Selk is a Lamm affiliate as a matter of law or as defined in the SAMR.

54.     Admit the allegations in sentence 1 of paragraph 54.  Deny the allegations in sentence 2 of paragraph 54.

55.     Admit the allegations in sentence 1 of paragraph 55.  The remaining sentences in paragraph 55 state a legal conclusion to which no response is required.

56.     Deny the allegations in paragraph 56 except deny knowledge or information sufficient to form a belief as to Plaintiffs' beliefs.

57.     Admit the allegations in paragraph 57.

6

58.    Admit the allegations in paragraph 58.

59.    Admit the allegations in paragraph 59.

60.    Admit the allegations in paragraph 60.

61.    Admit the allegations in sentence 1 of paragraph 61.  Deny the remaining allegations in paragraph 61.

62.    Admit the allegations in paragraph 62.

63.    Admit the allegations in paragraph 63.

64.    Deny the allegations in paragraph 64.

65.    Deny the allegations in paragraph 65.

66.    Deny the allegations in paragraph 67.

67.    Deny the allegations in paragraph 68.

68.    Deny the allegations in sentence 1 of paragraph 68.

Deny the allegations in sentence 2(a) of paragraph 68 except admit that D.A. Gardens and Arenson Holdings agreed to form and fund the Delaware limited liability company that became ALH.

Deny the allegations in sentence 2(b) of paragraph 68 except admit that D.A. Gardens and Arenson Holdings entered into the ALH Operating Agreement.

Deny the allegations in sentence 2(c) of paragraph 68 except admit that D.A. Gardens and Arenson Holdings agreed that their rights and obligations in connection with ALH would be governed by Delaware law.

Admit the allegations in sentence 2(d) of paragraph 68 except deny knowledge or information sufficient to form a belief as to what Plaintiffs maintain.

Admit the allegations in sentence 2(e) of paragraph 68.

7

Admit the allegations in sentence 2(f) of paragraph 68 except deny that D.A. Gardens and Arenson Holdings have asserted that Shamrock should not have received its corresponding repayment for participating in the very same loans.

Deny the allegations in sentence 2(g) of paragraph 68 except admit that Arenson as the Class B Representative voted in favor of the Lion Settlement, which resulted in the Class A Members having the right to designate three out of five Representatives on ALH's Supervisory Board.

Deny the allegations in sentence 2(h) of paragraph 69 but admit that Arenson supported the engagement of JMP to provide services in connection with the possible sale of all of ALH's operations.

Deny the allegations in sentence 2(i) of paragraph 68 except admit that Arenson approved a $200,000 bonus for Shamrock.

Deny the allegations in sentence 2(j) of paragraph 68 except admit that efforts were made to acquire the Class A Membership Interest.

Deny the allegations in sentence 2(k) of paragraph 68.

Deny the allegations in sentence 2(l) of paragraph 68.

Deny the allegations in sentence 2(m) of paragraph 68.

69.    Admit the allegations in paragraph 69 except deny that Major Decisions concerning ALH are made only by the Members of ALH, acting through ALH's Supervisory Board since all Major Decisions are made only by the adoption of a resolution by the Class A Representatives.

70.    Admit the allegations in paragraph 70.

71.    Admit the allegations in sentences 1, 2, 3 and 4 of paragraph 71. Deny the allegations in sentences 5, 6 and 7 of paragraph 71.

72.    Admit the allegations in paragraph 72.

8

73.    Deny the allegations in sentence 1 of paragraph 73.  Admit the allegations in sentence 2 of paragraph 73.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 3 of paragraph 73.  Deny the remaining allegations in paragraph 73 except admit that the statements attributed to Arenson were made but have been taken out of context.

74.    Admit the allegations in paragraph 74.

75.    Admit the allegations in sentences 1 and 2 of paragraph 75 except deny that they are found in Section 2 of the Consulting Agreement.  Deny the allegations in sentence 4 of paragraph 75 except admit that Arenson approved a $200,000 fee for Shamrock.

76.    Admit the allegations in paragraph 76.

77.    Admit the allegations in sentence 1 of paragraph 77.  Admit the allegations in sentence 2 of paragraph 77 except deny that ALH is obligated to indemnify SCA for legal fees and expenses in connection with this litigation since the action does not relate to any alleged liability for which indemnity may be sought against ALH.  Admit the allegations in sentence 3 of paragraph 77.

78.    Admit the allegations in paragraph 78.

79.    Admit the allegations in paragraph 79.

80.    Admit the allegations in paragraph 80.

81.    Admit the allegations in paragraph 81.

82.    Deny the allegations in paragraph 82 except admit that JMP was engaged to provide services in connection with the sale of the entire company.

83.    Admit the allegations in paragraph 83 except admit that JMP was engaged to provide services in connection with the sale of the entire company.

84.    Admit the allegations in paragraph 84.

85.    Admit the allegations in paragraph 85 except deny that Arenson approved any decision for JMP to seek buyers for ABI.

9

86.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in sentences 1 and 2 of paragraph 86. Deny the allegations in sentence 3 of paragraph 86 as it states a legal conclusion.

87.    Admit that the allegations in sentences 1 and 2 of paragraph 87 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting. Deny the allegations in sentence 3 of paragraph 87.

88.    Admit that the allegations in paragraph 88 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

89.    Admit that the allegations in paragraph 89 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

90.    Deny the allegations in sentence 1 of paragraph 90 since the judge in the Bowden litigation rescheduled the trial for February 2, 2004. Admit that the remaining allegations in paragraph 90 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

91.    Admit that the allegations in paragraph 91 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

92.    Admit that the allegations in paragraph 92 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

10

93.    Admit that the allegations in sentence 1 of paragraph 93 are consistent with the minutes from the May 14, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.    The remaining allegations in paragraph 93 state a legal conclusion to which no response is required.

94.    Deny the allegations in paragraph 94.

95.    Admit that the allegations in paragraph 95 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

96.    Admit that the allegations in paragraph 96 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

97.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in sentences 1 and 2 of paragraph 97. The remaining allegations in paragraph 97 state a legal conclusion to which no response is required.

98.    Admit that the allegations in sentences 1, 2 and 4 of paragraph 98 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting. Deny that the allegations in sentence 3 of paragraph 98 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting.

99.    Admit that the allegations in paragraph 99 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

100.    Admit that the allegations in paragraph 100 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no

purport to be a complete summary of all statements made at that meeting.          101.

Admit that the allegations in paragraph 101 are consistent with the minutes from the June 26, 2003

Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete

summary of all statements made at that meeting.          102.    Admit     that     the

allegations in paragraph 102 are consistent with the minutes from the June 26, 2003 Supervisory Board

Meeting and answering further state that the minutes do no purport to be a complete summary of all

statements made at that meeting.          103.    Admit that the allegations in paragraph

103 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering

further state that the minutes do no purport to be a complete summary of all statements made at that

meeting.          104.    Admit that the allegations in paragraph 104 are consistent with

the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the

minutes do no purport to be a complete summary of all statements made at that meeting.

105.    Admit that the allegations in paragraph 105 are consistent with the minutes from

the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no

purport to be a complete summary of all statements made at that meeting.          106.

Deny the allegations in sentence 1 of paragraph 106 and admit that the remaining allegations in

paragraph 106 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and

answering further state that the minutes do no purport to be a complete summary of all statements made

at that meeting.

107.    Admit that the allegations in paragraph 107 are consistent with the minutes from

the June 26, 2003 Supervisory Board Meeting except deny that it was Arenson who originally

suggested that the proceeds from the sale of ABI be used to repay the 2000 and 2002 Loans.

108.    Admit the allegations in paragraph 108 except deny that it was based on

Arenson's suggestion.

109.    Admit that the allegations in paragraph 109 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.                    110. Admit that the allegations in paragraph 110 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.                    111.    Admit    that    the allegations in sentences 1 and 2 of paragraph 111 are consistent with the minutes from the June 26, 2003 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.  Deny the allegations in sentence 3 of paragraph 111 except admit that Arenson and Lamm indicated that Shamrock was entitled to some payment. Admit the allegations in sentence 4 and 5 of paragraph 111.

112.    Admit that the allegations in paragraph 112 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

113.    Admit that the allegations in paragraph 113 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

114.    Admit that the allegations in paragraph 114 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

115.    Admit that the allegations in paragraph 115 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

13

116.    Admit that the allegations in paragraph 116 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

117.    Admit that the allegations in paragraph 112 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

118.    Admit that the allegations in paragraph 112 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting except deny that Arenson did not identify any proposal since he had previously suggested additional capital contributions and the Class B Members had presented proposals to buyout the Class A Membership interest.

119.    Admit that the allegations in paragraph 119 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting.

120.    Deny the allegations in paragraph 120.

121.    Admit the allegations in paragraph 121.

122.    Admit the allegations in sentences 1 and 2 of paragraph 122. Admit that the allegations in sentence 3 of paragraph 112 are consistent with the minutes from the May 24, 2004 Supervisory Board Meeting and answering further state that the minutes do no purport to be a complete summary of all statements made at that meeting. Deny the allegations in sentence 4 of paragraph 122 except admit that Arenson and Lamm decided against paying Shamrock a bonus.

123.    Admit the allegations in sentence 1 of paragraph 123. Deny the allegations in sentences 2, 3 and 4 of paragraph 123.

124.    Admit the allegations in paragraph 124.

14

125.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 except admit that Levitt did not proceed with the acquisition of MHI and that Mattamy made an offer, which Swiss Re approved.

126.    Admit the allegations in paragraph 126.

127.    Admit the allegations in sentences 1, 2 and 3 of paragraph 127. Admit that the quoted statements in sentence 4 were made but that they were taken out of context. Deny the allegations in sentences 5 and 6 of paragraph 127.

128.    Admit the allegations in sentence 1 of paragraph 128. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in sentences 2, 3 and 4 of paragraph 128.

129.    Admit the allegations in paragraph 129 except deny that Lamm voted in favor of the sale of MHI.

130.    Admit the allegations in sentence 1 of paragraph 130. Deny the allegations in sentences 2 and 3 of paragraph 130.

131.    Admit the allegations in paragraph 131.

132.    Admit the allegations in sentences 1 and 2 of paragraph 132. Deny the remaining allegations in paragraph 132 except admit that Plaintiffs were unilaterally selling off ALH because it was taking up too much management time and they wanted to get their loans repaid and that ALH's Supervisory Board unanimously decided to sell ALH as a whole not to sell off its operating units in a piecemeal fashion.

133.    Deny the allegations in sentence 1 of paragraph 133. Admit the allegations in sentence 2 of paragraph 133.

134.    Admit the allegations in sentence 1 of paragraph 134 except deny that Shamrock had the right to unilaterally use its control to destroy ALH's equity by selling off ALH in a

15

piecemeal fashion regardless of the best interests of ALH or its members. Deny the allegations in sentences 2, 3 and 4 of paragraph 134.

135.    Deny the allegations in paragraph 135.

136.    Deny the allegations in paragraph 136 except admit that although several proposals were made to buy Class A Membership Interests, no written proposal was made.

137.    Deny the allegations in paragraph 137 except admit that all lenders were repaid in full.

138.    Deny the allegations in paragraph 138.

139.    Deny the allegations in sentence 1 of paragraph 139. Admit the allegations in sentence 2 of paragraph 139.

140.    Deny the allegations in sentence 1 of paragraph 140. Admit the allegations in sentences 2, 3 and 4 of paragraph 140. The allegations in sentence 5 of paragraph 140 state a legal conclusion to which no response is required.

141.    Admit the allegations in paragraph 141.

142.    Admit the allegations in sentence 1 of paragraph 142. Deny the remaining allegations in paragraph 142.

143.    Admit the allegations in paragraph 143.

144.    The allegations in paragraph 144 state legal conclusions to which no response is required.

145.    The allegations in paragraph 145 state legal conclusions to which no response is required.

146.    The allegations in paragraph 146 state legal conclusions to which no response is required.

147.    Admit the allegations in paragraph 147.

16

148.    Deny the allegations in paragraph 148.

149.    Deny the allegations in paragraph 149.

150.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150.

151.    The allegations in paragraph 151 set forth conclusions of law and, therefore, are neither admitted nor denied.

152.    Deny the allegations in paragraph 152.

<u>**Count I**</u>

**(Declaratory Judgment: No Breach of Fiduciary Duty)**

153.    The responses to the allegations in paragraphs 1 through 152 are incorporated herein by reference.

154.    Deny the allegations in paragraph 154.

155.    Deny the allegations in paragraph 155.

156.    Admit the allegations in paragraph 156 except deny that Plaintiffs have not breached any fiduciary duties to defendants.

<u>**Count II**</u>

**(Declaratory Judgment: No Breach of Operating Agreement)**

157.    The responses to the allegations in paragraphs 1 through 156 are incorporated herein by reference.

158.    Deny the allegations in paragraph 158.

159.    Deny the allegations in paragraph 159.

160.    Admit the allegations in paragraph 160 except deny that Plaintiffs have not breached any obligations to defendants, or violated any rights of Defendants, under the Operating Agreement.

17

## Count III

### (Declaratory Judgment: No Liability Under Consulting Agreement)

161.    The responses to the allegations in paragraphs 1 through 161 are incorporated herein by reference.

162.    Deny the allegations in paragraph 162.

163.    Deny the allegations in paragraph 163.

164.    Admit the allegations in paragraph 164 except deny that Plaintiffs in rendering services pursuant to the Consulting Agreement did not commit bad faith, gross negligence or willful misconduct and deny that Plaintiffs are protected from liability to Defendants by the Consulting Agreement.

## Count IV

### (Declaratory Judgment: Good Faith Reliance on Professionals and Experts)

165.    The responses to the allegations in paragraphs 1 through 164 are incorporated herein by reference.

166.    Deny the allegations in paragraph 166.

167.    Deny the allegations in paragraph 167.

168.    Admit the allegations in paragraph 168 except deny that Plaintiffs relied in good faith on JMP and on ALH's outside counsel.

## Count V

### (Declaratory Judgment: Indemnification)

169.    The responses to the allegations in paragraphs 1 through 168 are incorporated herein by reference.

170.    Deny the allegations in paragraph 170 because Plaintiffs have never sought Board approval for indemnification.

18

171.    Deny the allegations in paragraph 171.

172.    Admit the allegations in paragraph 172 except deny that Plaintiffs are entitled to indemnification, including advancement of legal fees and other expenses.

## Count VI

### (Declaratory Judgment: Release of Selk Claims Under SAMR)

173.    The responses to the allegations in paragraphs 1 through 172 are incorporated herein by reference.

174.    Deny the allegations in paragraph 174.

175.    Deny the allegations in paragraph 175.

176.    Admit the allegations in paragraph 176 except deny that Selk's claims against Plaintiffs have been released in the SAMR.

## Count VII

### (Declaratory Judgment: Class E Shortfall and SELK Equity Interest)

177.    The responses to the allegations in paragraphs 1 through 176 are incorporated herein by reference.

178.    Deny the allegations in paragraph 178.

179.    Deny the allegations in paragraph 179.

180.    Admit the allegations in paragraph 180 except deny that Selk's equity interest in ALH is reduced or eliminated due to a shortfall in the Class E Capital Contribution.

## Count VIII

### (Declaratory Judgment: Arenson as Class B Representative)

19

181.    The responses to the allegations in paragraphs 1 through 180 are incorporated herein by reference.

182.    Deny the allegations in paragraph 182.

183.    Deny the allegations in paragraph 183.

184.    Admit the allegations in paragraph 184.


### AFFIRMATIVE DEFENSES

A.    The Complaint should be dismissed for lack of subject matter jurisdiction.[1]

B.    The Complaint should be dismissed for lack of personal jurisdiction over Defendants Arenson, Arenson Holdings, D.A. Gardens and J12ALH.[1]

C.    The Complaint should be dismissed for failure to join the following necessary parties: Arenson Holdings, D.A. Gardens and J12ALH.[1]

D.    The Complaint should be dismissed because it fails to state a claim upon which relief can be granted.[1]

E.    The claims in the Complaint are barred by the doctrine of unclean hands.

WHEREFORE, it is requested that the Amended Complaint be dismissed, and that Defendants be awarded attorneys' fees and costs.

---

[1] The affirmative defenses—lack of subject matter jurisdiction, lack of personal jurisdiction, failure to join necessary parties and failure to state a claim—are not waived because they were raised in motions to dismiss filed by ~~Counterclaim Plaintiffs~~Defendants on June 3, 2005, (D.I. 40, 43 and 46), which are still pending before this Court.

20

**AMENDED COUNTERCLAIMS AND AMENDED THIRD-PARTY COMPLAINT[2]**

Counterclaim Plaintiffs and Third-Party Plaintiffs, A. Arenson Holdings, Ltd., D.A. Gardens, Ltd., J12ALH Associates, SELK, LLC, and Laurel Equity Group, LLC (collectively "Counterclaim Plaintiffs"), by and through their undersigned counsel, hereby file ~~this~~these compulsory ~~counterclaim~~counterclaims against Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler, and Bruce J. Stein (collectively "Counterclaim Defendants") and third-party Defendant ALH Holdings, LLC, as follows:

### BACKGROUND

1.      Counterclaim Plaintiffs are the Class B Members of ALH Holdings, LLC ("ALH"), a Delaware limited liability company.   Counterclaim Defendants control ALH through Shamrock's majority control of the Class A Members and its majority representation on ALH's Supervisory Board by Krieger, Buchler and Stein.

2.      This action seeks redress for the wrongful and inequitable conduct of the Counterclaim Defendants, including Shamrock, the controlling member of ALH.  This dispute arises out of Counterclaim Defendants' decision to sell the operating units of ALH in a piecemeal fashion at depressed prices over the well-reasoned objections of Counterclaim Plaintiffs and others.  Counterclaim Defendants took control of ALH, its management and the Supervisory Board but then complained that the control and management of ALH was too time consuming and unilaterally decided to sell off the Company's operating units at fire sale prices resulting in a total loss of equity to Counterclaim Plaintiffs. Counterclaim Defendants' scheme to liquidate ALH has not been in the best interests of ALH or Counterclaim Plaintiffs and amounts to intentional breaches of their fiduciary duties owed to

---

[2] The allegations raised in the complaint filed in the United States District Court for North Carolina, Civil Action No. 3:05-CV-256-H (the "North Carolina Action"), have been revised and consolidated in ~~this Counterclaim~~these Counterclaims and Third-Party Complaint. On November 22, 2005, the North Carolina Action was transferred to this Court for consolidation with this action. Pursuant to a conference call held with this Court on December 13, 2005, it was agreed that Counterclaim Plaintiffs would include the allegations in the North Carolina Complaint in a counterclaim in this action. Accordingly, the allegations in the North Carolina Action have been redrafted and amended and included with the other allegations in ~~this Counterclaim~~these Counterclaims and Third-Party Complaint.

21

Counterclaim Plaintiffs and ALH, gross negligence, bad faith and self-dealing. As a result of Counterclaim Defendants' grossly negligent conduct as set forth herein, Counterclaim Plaintiffs' interests in ALH are worthless, Counterclaim Plaintiffs have lost millions of dollars invested in ALH and ALH is now insolvent.

3.    Counts 1 through 7 are direct action against Counterclaim Defendants. In the alternative, Counts 8 through 14 are derivative actions on behalf of and for the benefit of ~~Counterclaim~~Third-Party Defendant ALH, which are filed in the alternative.

## **PARTIES**

4.    Counterclaim Plaintiff, A. Arenson Holdings, Ltd. ("Arenson Holdings") is an Israeli Corporation and a Class B member of ALH. Arenson Holdings invested $1,168,750 in ALH and owns approximately 8% of the Class B membership interest in ALH. Its principal place of business is in Israel. Arenson Holdings has not conducted any business in Delaware.

5    Counterclaim Plaintiff, D.A. Gardens, Ltd. ("D.A. Gardens"), is a Panamanian Corporation and a Class B member of ALH. D.A. Gardens invested approximately $534,375 in ALH and owns approximately 8.77% of the Class B membership interest in ALH. Its principal place of business is in Panama. D.A. Gardens has not conducted any business in Delaware.

6.    Counterclaim Plaintiff, J12ALH Associates ("J12ALH"), is a New York general partnership and a Class B member of ALH. J12ALH invested approximately $1,468,750 in ALH and owns approximately 16.7% of the Class B membership interest in ALH. The partners are Erica Jesselson, a citizen of New York, and Jays Twelve, LLC, a Delaware limited liability company. The members of Jays Twelve, LLC are twelve New York trusts. The trustees are all New York citizens. J12ALH has not conducted any business in Delaware.

7.    Counterclaim Plaintiff, SELK, LLC ("SELK"), is a Delaware limited liability company and a Class B member of ALH. SELK invested approximately $2,937,500 in ALH and

22

owns approximately 33.3% of the Class B membership interest in ALH. SELK's members are Shalom Lamm and NACA Holdings Inc. Shalom Lamm is a citizen of New York and NACA Holdings Inc. ("NACA") was incorporated in the British Virgin Islands. It does not have one principal place of business. It engages in business activities throughout Europe and Israel and occasionally the United States. All day to day activities, including investment decisions, as well as corporate decisions, are made in Europe, Israel and occasionally in New York by the Trust that owns NACA. No business is conducted in Delaware.

8.    Counterclaim Plaintiff, Laurel Equity Group, LLC ("Laurel"), is a Delaware limited liability company and a Class B member of ALH. Laurel invested approximately $2,937,500 in ALH and owns approximately 33.3% of the Class B membership interest in ALH. Laurel's members are Mark Frankel, Chesky Frankel and Sallervale Company. Mark Frankel and Chesky Frankel are New Jersey and New York citizens, respectively. Sallervale Company is a Bahamian corporation. Sallervale's principal place of business is in Geneva, Switzerland, where all corporate business decisions are made. No business is conducted in Delaware.

9.    Third-Party Defendant, ALH, is a Delaware limited liability company that has never conducted business activities in Delaware. ALH conducts no business of its own, but is a holding company whose wholly-owned subsidiaries were in the home-building business and at one time, had operations in Florida, Tennessee and North Carolina.

10.    Counterclaim Defendant, Shamrock Holdings of California, Inc., ("Shamrock"), is a California corporation engaged in business as a diversified investment company wholly-owned by the Roy E. Disney Family with its principal place of business at 4444 Lakeside Drive, Burbank, California. Shamrock holds approximately 62% of the Class A membership interest in ALH.

11.    Counterclaim Defendant, Shamrock Capital Advisors, Inc. ("SCA") is a Delaware corporation engaged in business as a merchant bank with its principal place of business

located at 4444 Lakeside Drive, Burbank, California. SCA is wholly owned by Shamrock and is also the investment adviser affiliate of Shamrock. SCA has no membership interest in ALH. In July 2001, at Shamrock's insistence, SCA entered into a consulting agreement with ALH to take over the consulting services previously provided by Lion LLC ("Lion").

12.    Counterclaim Defendant, Eugene I. Krieger ("Krieger") is Vice-Chairman and Chief Operating Officer of Shamrock. Krieger also performs substantial services for SCA. Krieger also serves as a representative on ALH's Supervisory Board. Krieger is a citizen of the state of California. On information and belief, Krieger has served as a director of ALH's subsidiaries.

13.    Counterclaim Defendant, George J. Buchler ("Buchler"), is President and Chief Executive of the Shamrock Real Estate Division and was also Vice President and Chief Financial Officer of Shamrock. Buchler performs substantial services for SCA. At all relevant times, Buchler has served as a representative on ALH's Supervisory Board. Buchler is a citizen of the state of California. On information and belief, Buchler has served as a director of ALH's subsidiaries.

14.    Counterclaim Defendant, Bruce J. Stein ("Stein"), is the Director of Real Estate for Shamrock. Stein performs substantial services for SCA. Stein also serves as a representative on ALH's Supervisory Board. Stein is a citizen of the state of California. On information and belief, Stein has served as a director of ALH's subsidiaries.

## JURISDICTION

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states and foreign countries. In addition, this Court has supplemental jurisdiction over Counts 8 through 14 under 28 U.S.C. § 1367 because the ~~counterclaims~~claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

## FACTUAL ALLEGATIONS

24

## A.    The Business of ALH

16.    In June 1998, ALH was formed to acquire homebuilding businesses in the southeastern United States. In December 1998, ALH II, Inc. ("ALH II") was formed to act as the parent company for ALH's operating subsidiaries and to provide a vehicle for obtaining debt financing for ALH's operations and acquisitions.

17.    Shortly after its formation in 1998, ALH acquired home-building operations in Jacksonville, Florida, that operated under the name Atlantic Builders, Inc. ("ABI").

18.    In 1999, ALH acquired home-building operations in Memphis, Tennessee that operated under the name Bowden Building Corporation ("BBC").

19.    In 2000, ALH acquired home-building operations in Charlotte, North Carolina, that operated under the name Mulvaney Homes, Inc. ("MHI"). MHI expanded into western North Carolina and operated in the Charlotte, Greensboro and Winston-Salem metropolitan areas.

## B.    The Management of ALH

20.    As provided in the ALH Operating Agreement (the "Operating Agreement"), the overall business, operations and affairs of ALH are controlled by a designated manager. (D.I. 25, Ex. B).

21.    Lion LLC ("Lion") was originally designated as the manager of ALH.

22.    The Operating Agreement also created a Supervisory Board (the "Supervisory Board"), comprised of five members—2 Class A representatives, 1 Class B representative and 2 Class D representatives.

23.    From the outset, Buchler was one of two Class A Representatives and Abraham (Avie) Arenson ("Arenson") was the Class B Representative. The Representatives of the Class D members were Shalom E. Lamm ("Lamm") and Jonathan Zich ("Zich").

25

24.     In or around late 1999/early 2000, Krieger became a Class A Representative, replacing another Shamrock employee who previously held that position.

25.     In the summer of 2001, Stein, an employee of Shamrock, replaced Zich as the Class D representative.

26.     The Operating Agreement provides that each Representative on the Supervisory Board "shall have one vote on all matters presented to the Supervisory Board for approval, and **except with respect to a Major Decision**, the vote of a majority of the Representatives at a meeting which is properly called and at which a quorum is present shall be binding on the Supervisory Board." (D.I. 25, Ex. B § 6.2(e) (emphasis added).

27.     With respect to Major Decisions, the Operating Agreement provides that a Major Decision "may be decided only upon (and the Company or any Subsidiary, and the Manager and the officers of the Company or such Subsidiary on its behalf, shall not take any action relating to such matters without) the adoption of a resolution by (y) the Class A Representatives or their Deputy Representatives present in person or by proxy at a meeting of the Supervisory Board or (z) the unanimous written consent of the Class A Representatives or their Deputy Representatives for action taken without a meeting[.]" (D.I. 25, Ex. B § 6.2(c)).

28.     Therefore, Shamrock through the Class A Representatives controls all Major Decisions of the Supervisory Board and as of July 2001, controlled a majority of the Supervisory Board thereby controlling all decisions of the Supervisory Board.

C.     **Loans Made to ALH**

29.     In 2000, ALH and its subsidiaries needed funds to finance certain operations of its subsidiaries.

30.     On April 6, 2000, certain members of ALH entered into a loan agreement with ALH II (the "2000 Loan Agreement"). (D.I. 54, Ex. 5 at 1). Pursuant to the 2000 Loan Agreement,

Shamrock loaned $1,633,334.00; Arenson Holdings loaned $166,666.00 and Lion & Lamm Capital, LLC loaned $200,000 (the "2000 Loans").

31.     The 2000 Loans were guaranteed by various ALH II subsidiaries including ABI, BBC and MHI.

32.     In 2002, ALH and its subsidiaries needed additional working capital.

33.     On May 7, 2002, certain Class A and Class B members of ALH entered into a loan agreement with ALH II for a total loan of $4,375,000.00 (the "2002 Loan Agreement"). (D.I. 54, Ex. 10 at 4). Pursuant to the 2002 Loan Agreement, Shamrock loaned $1,964,800.00; D.A. Gardens loaned $312,500.00, The Erica Jesselson 1994 CLAT loaned $312,500 and SELK loaned $625,000 (the "2002 Loans").

**D.**    **Change in Control of ALH**

34.    In 2001, in a move designed to further entrench the power of Shamrock, purportedly as a result of a dispute regarding Lion's performance, Counterclaim Defendants forced Lion to enter into a Management Agreement wherein Lion was relieved of its authority (the "Management Agreement"). (D.I. 54, Ex. 8 at 1).    For example, Lion was required to obtain the consent of the Supervisory Board—then controlled by Counterclaim Defendants—before Lion could make certain decisions.

35.    The Management Agreement relieved one of the two seats from the Class D members on the Supervisory Board and gave the Class A members the right to designate the person to fill the Class D seat on the Supervisory Board.

36.    The Class A members placed Stein on the Supervisory Board.

37.    Thereafter, ALH was effectively controlled solely by Counterclaim Defendant Shamrock because it controlled three of the five representatives on the Supervisory Board; it had the power to remove the nominal manager, Lion; and it had the sole power under the Operating Agreement to make Major Decisions for ALH.

**E.**    **Hiring Decisions by Counterclaim Defendants**

### *Shamrock hires SCA*

38.    Counterclaim Defendants have continually made hiring decisions that ensured their unfettered control of ALH and that were not in the best interests of the Class B members or ALH as a whole but were solely in the best interests of Shamrock.

39.    At Shamrock's insistence, ALH hired a Shamrock-subsidiary, SCA, as a "consultant" when Shamrock embarked on its course to dismantle ALH.    Shamrock also hired its own attorneys, the law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank"), as the

attorneys for ALH in connection with the sales of its assets and operating units. Finally, Shamrock retained a broker with whom it had a prior relationship to justify the sales of the operating units.

40.    In July 2001, ALH entered into an agreement with SCA to provide consulting services to ALH for $100,000 per year (the "Consulting Agreement"). The Consulting Agreement: (1) does not require SCA to provide any minimum amount of time in order to receive its yearly payoff; (2) allows SCA to determine how much time, if any, it will allocate to its duties; (3) allows SCA to terminate the agreement at will; (4) includes indemnification clauses to protect SCA from its mistakes; and (5) attempts to shield SCA from all liability to ALH for the mistakes it makes.

41.    Upon information and belief, Fried Frank represented Shamrock, SCA and ALH in the Consulting Agreement.

42.    SCA assisted, aided and abetted Shamrock in its goal to sell off the operating units of ALH at a loss.

43.    Krieger, Buchler, and Stein, the Representatives on the Supervisory Board, have all done substantial work for SCA. The three Representatives are highly placed officers in Shamrock, which wholly-owns SCA. The three representatives owe conflicting fiduciary duties to Counterclaim Plaintiffs, ALH, Shamrock and SCA.

### Shamrock hires a Broker

44.    On March 20, 2002, ALH entered into an engagement letter with Jolson Merchant Partners ("JMP") to provide brokerage services in connection with the sale of the entire company. (D.I. 54, Ex. 9 at 1). JMP was paid a non-refundable retainer of $150,000. To ensure their ability to control the sale process, Counterclaim Defendants selected JMP, a San Francisco based firm, with whom they had a long-standing business relationship and over whom they had substantial influence. JMP mishandled the sale of ALH.

### Shamrock hires conflicted counsel

29

45.    The law firm of Fried, Frank represents Shamrock and SCA. Fried Frank was selected by Shamrock to represent ALH in the sale of its various operating units.

46.    The Class B members raised concerns with Fried Frank, Shamrock, ALH, and the Supervisory Board regarding this clear conflict of interest but, nevertheless, Fried Frank continued to represent ALH in the sales with the exception of the sale of MHI, even though its duty of loyalty was to its longtime client Shamrock.

47.    Fried Frank's recognition of its conflict is evidenced by a conflict letter it insisted that ALH sign despite the fact that the conflict could not be waived. Fried Frank has assisted Shamrock in the destruction of the Class B members' equity and the dismantling of ALH.

48.    Fried Frank continued to attend the Supervisory Board meetings on behalf of ALH and Shamrock and continued throughout the sale of ABI and BBC to represent both ALH and Shamrock despite the unwaivable conflict. Any attempt by the Class B members to bring their own counsel to the Supervisory Board meetings was blocked by Shamrock without explanation.

49.    Upon information and belief, Counterclaim Defendants replaced Fried Frank as counsel for ALH in connection with the sale of the last operating unit, MHI, only after it was apparent that litigation between Counterclaim Plaintiffs and Counterclaim Defendants was imminent.

**F.    Proposed Sale of Entire Company**

50.    In 2001, the Supervisory Board decided it was a good time to consider selling the entire company since Counterclaim Defendants had begun expressing a desire to exit their investment in ALH as their management responsibilities were too time consuming.

51.    In March 2002, at the insistence of Counterclaim Defendants, ALH retained JMP to provide brokerage services in connection with the sale of the entire company.

52.    Counterclaim Defendants attempted to sell ALH as a going concern but the sale was mishandled from the start because Counterclaim Defendants insisted on selling ALH's balance

30

sheet which contained an enormous amount of goodwill rather than selling ALH as a multiple of cash flow and land option inventory.

53.    As a result of the mishandling of the sale process, Counterclaim Defendants were unable to sell the entire company and claimed that such a sale was not possible.

54.    In the summer of 2002, after the sale of ALH as a going concern was unsuccessful, Counterclaim Defendants concluded that ALH required too much of Shamrock's time. In order to rid themselves of their management responsibilities and to secure repayment of the 2000 and 2002 Loans, Counterclaim Defendants began to investigate selling off the operating units of ALH in a piecemeal fashion which they knew or should have known would result in depressed values for each of the units.

55.    Counterclaim Plaintiffs objected to the sale of anything less than the entire company and explained that selling the operating units in a piecemeal fashion would result in depressed values for each of the units and greater transactional costs.

56.    Rather than continue to look for a buyer for the entire company or stop the sale process and focus on strengthening the company, Counterclaim Defendants began to market the operating units, ignoring the well-reasoned advice of ALH's officers and Counterclaim Plaintiffs and proceeded in bad faith to use their majority position to force a sale under any circumstances without regard for the best interests of ALH or its members.

## G.    Class B Members Offer to Buy Class A Members' Interest

57.    In the summer of 2002, Counterclaim Defendants began negotiating with a potential buyer for the sale of BBC, the homebuilding business in Memphis, Tennessee.

31

58.    On July 30, 2002, Arenson informed Counterclaim Defendants that the Class B members had met and unanimously agreed that the sale of BBC was ill advised and would weaken ALH and make the sale of the remaining operating units more difficult and result in a loss of equity to all members.

59.    Further, Arenson advised that while the Class B members would like to continue to operate ALH with Counterclaim Defendants, if Counterclaim Defendants were unwilling to continue then the Class B members would consider buying out the Class A's interests in ALH.

60.    Counterclaim Defendants expressed an interest in selling their interests to the Class B members but still continued to pursue a buyer for BBC and ABI.

61.    Discussions between the parties regarding the Class B members buy-out of the Class A equity ensued, but an agreement was not reached. Counterclaim Defendants demanded $12 million for their interest and the Class B members offered $3 million.

62.    On December 18, 2002, Arenson sent an email to Defendants stating that the Class B members:

> remain gravely concerned that the sale of [BBC] will seriously impair the viability of ALH, as while it might serve some short term end and may fund the Bowden litigation settlement, which we feel is not a "priority", it will hinder and cripple ALH going forward. The "auction" process is busted and it has made ALH look even weaker. The Bs are prepared to fund needed working capital. We appreciate that the As have made a decision to exit and are NOT prepared to invest additional amounts. Since we fear that we have been placed in a liquidation mode, the Bs, in an effort to save their investment and seize an opportunity (that the As either do not believe is there or that they choose not to pursue) have been willing to offer the As a limited sum to exit and it is that amount that we need to agree upon. What the Bs simply can not accept is to allow the As to liquidate ALH in a piecemeal fashion.  That said, we need to conclude a buy-out of the As on mutually acceptable terms or recommit ourselves to running ALH in a positive and forward looking manner and abandon, for the time being, the notion of a sale."

63.    Counterclaim Defendants rejected Counterclaim Plaintiffs' buy-out offer, continued pursuing buyers for ALH's operating units and disregarded the reasoned advice of

Counterclaim Plaintiffs and ALH's officers. to focus on strengthening ALH for the time being and stop trying to liquidate it.

64.    In February 2003, the parties agreed to meet in Charlotte, North Carolina at the ALH Supervisory Board meeting to discuss ALH's then current problems, the future problems that would arise if a change of course was not effected and a possible buy-out by the Class B members of the Class A's interests in ALH.

65.    At the meeting, Counterclaim Defendants indicated that ALH was consuming too much management time and that they wanted to rid themselves of the time consuming demands of dealing with ALH.

66.    Counterclaim Defendants refused to negotiate a reasonable price for the sale of the Class A's interests in ALH.  Instead, Counterclaim Defendants acted in their own self-interest and continued to market the operating units of ALH in furtherance of their efforts to liquidate ALH. Counterclaim Plaintiffs warned Counterclaim Defendants that such action would adversely affect ALH and its members by, *inter alia*, impairing ALH's ability to obtain necessary financing and destroying the equity interest of all members.

67.    With total disregard for the best interests of ALH and its members, Counterclaim Defendants ignored the warnings and vigorously pursued the piecemeal liquidation of ALH.  Counterclaim Defendants' goal was clear—utilize their majority position and control to liquidate ALH regardless of the consequences to ALH or its members to relieve themselves of any further management responsibilities and to have their 2000 and 2002 Loans repaid.

## H.    The Dismantling of ALH

68.    Defendants hired Fried Frank to represent ALH in the sale of its various operating units.  Fried Frank has a longstanding relationship with Shamrock and also represents SCA.

33

Arenson raised the issue that this was a clear conflict of interest and likely to be detrimental to the Class B members. Despite the non-waivable conflict, Fried Frank continued to attend the Supervisory Board meetings on behalf of ALH and Shamrock throughout the sale of ABI and BBC, maintaining that any potential conflict had been waived by ALH in a signed conflict letter.

69.     After taking control of the management of ALH in July 2001, Counterclaim Defendants complained the management was taking up too much time and when the sale of the entire company did not happen, they proceeded to separately market the operating units of ALH and entered into negotiations with a potential buyer for BBC.

70.     In an email dated August 1, 2002, Arenson summarized the estimates of net proceeds from the sale of each operating unit less existing debts and demonstrated to Counterclaim Defendants that the piecemeal sale of the operating units would result in a substantial loss of equity to ALH's members.

71.     Counterclaim Defendants rejected Arenson's estimates and proceeded in their effort to sell BBC. Over the reasoned objections of Arenson, Counterclaim Defendants made it clear that they were in control and entered into an exclusivity agreement with the potential buyer of BBC.

72.     Counterclaim Defendants were unable to reach an agreement with the potential buyer because of litigation that was pending with the Bowden family relating to the purchase of BBC in 1999 ("the Bowden Litigation").

73.     Several officers and senior management of ALH began to complain that the protracted sale process was hurting ALH and preventing management from forming and executing a plan for ALH's long-term stability and growth.

74.     Rather than heed these concerns, Counterclaim Defendants pushed forward with their efforts to liquidate ALH in furtherance of their effort to rid themselves of the management responsibilities of ALH and to secure repayment of their 2000 and 2002 Loans.

75.    In an email dated April 9, 2002, Counterclaim Defendants attempted to justify their decision to sell ABI by claiming that ABI was being sold to provide liquidity because ALH "has a severe liquidity crisis"; yet, at the Supervisory Board meeting held less than two months earlier on February 21, 2002, there was no mention of any severe liquidity crisis.

### Shamrock sells off ABI

76.    In April 2003, Counterclaim Defendants entered into a letter of intent with Mattamy Homes ("Mattamy") for the sale of ABI.  As justification for the decision, Buchler told Arenson that the funds from the sale of ABI were "sorely needed by ALH" because, *inter alia*, it would "allow repayment of shareholder loans".  Buchler also advised that in addition to purchasing ABI, Mattamy wanted to employ two key ALH executives—Bill Holt and William Lanius ("Lanius").

77.    Counsel for the Class B members responded to Counterclaim Defendants as follows:

> I write to you again on behalf of the Class B Investors. They feel very strongly that the proposed sale of Jacksonville is NOT in the best interests of ALH for a number of reasons. They fear that the remaining divisions in N.C. and Memphis do not generate sufficient cash flow to support the ALH operations and that as a consequence, a forced sale of NC and/or Memphis today will result in a complete write-off of the equity in ALH. This is all the more troubling, since it appears that the motivation, in seeking a sale NOW is being driven solely by Shamrock's stated intention to exit this investment and to be able to be repaid the advances that it ( and we)  have made, regardless of the long term impact that this strategy may have on ALH.

> We also understand that the auditors are considering a "going concern" caveat to their opinion, which will cast a further cloud on ALH's continued viability. The Jacksonville operation is such a key contributor to ALH's bottom line that we urge you to carefully consider this approach.

> We all understand that Shamrock controls. With this control goes certain fiduciary obligations. We appreciate the desire and interest to "salvage" your loans, but we also feel that by doing what we understand you propose to do NOW, that while your loans (and ours) may be repaid, that it will  threaten ALH's continued survival and will jeopardize our investment.

> We think that recommendation that we hear from Messrs. LaGuardia and Lanius that "stay the course" is imperative and that Shamrock's desire to exit notwithstanding, that we do what Management has advised.

35

As we have repeated many times, we think that we need to continue the operations as is and that we need to withdraw ALH and its component entities from the "block", as a continuation of what is clearly a "busted auction" is only hurting the Company.

78.    Counterclaim Defendants ignored the advice of Counterclaim Plaintiffs and the officers and senior management of ALH and called a Supervisory Board meeting on May 14, 2003, to discuss the sale of ABI and the Bowden Litigation ("May 2003 Meeting").

79.    At the May 2003 meeting, Counterclaim Defendants pushed their agenda that there was no alternative other than to sell ABI to Mattamy because ALH needed the funds available to pay for the Bowden litigation.

80.    Counterclaim Defendant Buchler discussed the application of the net proceeds from the proposed sale of ABI, which were approximately $16 million.  Buchler indicated that $5 million was needed to settle the Bowden litigation and that the remaining $11 million would be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the 2000 and 2002 Loan Agreements.  Any remaining amounts would be used to pay down other ALH debts.

81.    On June 23, 2003, Counterclaim Defendants called a Supervisory Board meeting to vote on the sale of ABI and settlement of the Bowden litigation ("June 2003 Meeting"). Counterclaim Defendants did not give the required five days notice before the Supervisory Board meeting and as a result sought a waiver from Arenson and Lamm to hold the meeting on June 26, 2003, just three days after notifying Arenson and Lamm and less than twenty-four hours after providing Arenson and Lamm with the proposed resolution for the sale of ABI.

82.    At the June 2003 Meeting, an overview was presented regarding ALH's efforts to find purchasers for its various operating units and assets. Fried Frank (counsel to ALH, Shamrock, and SCA) then presented the terms of a proposed sale of ABI to the Supervisory Board. During the discussion that followed, Arenson recommended that existing members finance another infusion of

36

capital to assist ALH to compete more effectively in the home buying market as had been done in 2000 and 2002, rather than selling off the assets piecemeal.

83.     Buchler argued in bad faith, despite Arenson's previous proposal, that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of the pending Bowden litigation, and (3) no other proposals for funding or acquiring ABI had been made. Buchler failed to mention that the trial in the Bowden litigation originally scheduled for July 2003 had been postponed until February 2004, thereby eliminating the urgent need for funds to settle the Bowden litigation.

84.     Since Counterclaim Defendants controlled ALH, Counterclaim Plaintiffs could not stop them from selling ABI. Upon information and belief, Counterclaim Defendants Buchler, Krieger and Stein did not address the impact the sale would have on ALH or its ability to strengthen its remaining operating units. In promoting the sale of ABI, their only concerns were to obtain repayment of Shamrock's loans and to relieve themselves of their management responsibilities.

85.     After further discussion, and with Counterclaim Defendants firmly in control of the Supervisory Board, Counterclaim Defendants voted in favor of the sale of ABI despite Arenson's reasoned recommendation to the contrary. Arenson voted against the sale of ABI. Lamm abstained because Counterclaim Defendants denied his request for additional time to review the documents to better understand the terms and conditions of the sale. It was apparent to Arenson that Counterclaim Defendants intended to act in their own self-interest to liquidate ALH regardless of the consequences to the other members.

86.     JMP received a $300,000 commission for the sale of ABI and Shamrock received a fee of $200,000.

87.     In April 2003, Buchler indicated to Arenson that one purpose of the sale of ABI was to allow the repayment of the 2000 and 2002 Loans. At the May 2003 Meeting, Buchler

again indicated that the 2000 and 2002 Loans would be repaid from the net proceeds of the ABI sale. The proceeds from the sale of ABI were used in part to repay those loans.

88.    Counterclaim Defendants have repeatedly misrepresented that the repayment of the 2000 and 2002 loans was Arenson's suggestion when in fact, it was Counterclaim Defendants who control ALH and the Supervisory Board, that indicated that the proceeds from the sale of ABI would be used to repay the 2000 and 2002 loans.

### *Problems at ALH*

89.    After the sale of ABI to Mattamy, Bill Lanius, CFO of ALH II, took a job with Mattamy but he continued to provide consulting services to ALH.

90.    Less than a month after closing on the sale of ABI, Counterclaim Plaintiffs learned that Counterclaim Defendants were proceeding with the liquidation of ALH by marketing BBC to several potential buyers including John LaGuardia ("LaGuardia"), the president and chief operating officer of ALH II, and Jeff Sweeney ("Sweeney"), the president of BBC.

91.    Upon information and belief, LaGuardia and Sweeney were assisting a potential buyer with the purchase of BBC before Counterclaim Defendants were informed of this potential conflict of interest.

92.    Thereafter, Buchler informed Counterclaim Plaintiffs that LaGuardia and Sweeney were potential buyers and LaGuardia sent a formal letter requesting permission to assist Levitt Corporation ("Levitt") in evaluating BBC.  Buchler had Fried Frank draft a response granting LaGuardia and Sweeney permission subject to certain disclosure conditions.

93.    As feared by Counterclaim Plaintiffs, Lamm received a call from a critical lender whose financing of ALH II was up for renewal. The lender expressed serious concerns explaining that he saw ALH as a "ship without a head." With Lanius at Mattamy, the lender did not have a sense that anyone was in charge and was most concerned that no plan had been articulated to him. The lender had

38

several concerns including ALH's game plan with its other lenders, how it was dealing with the management of MHI, and other similar concerns. The lender explained that he could foresee serious banking problems if ALH did not start articulating and acting on a game plan.

94.     Arenson contacted Counterclaim Defendants and expressed concern about the lender's statements and acknowledged that although the Class B members "have limited input and no actual control over your decisions on how ALH is to be run.. We think that the piecemeal sale approach was inappropriate and appears to be leading to ominous results. We again ask you to reconsider what you are doing and to take steps to remedy the matters referred to above."

### Shamrock sells off BBC

95.     In order for the repayment of the 2000 and 2002 Loans not to be treated as preferences, since by this time ALH was insolvent, Counterclaim Defendants realized that they had to keep ALH viable until the preference period elapsed. In order to accomplish their goals of relieving themselves of their management responsibilities and safeguarding the repayment of the loans, Counterclaim Defendants pursued the sale of the remaining operating units of ALH at "fire sale" prices.

96.     Counterclaim Defendants called a Supervisory Board meeting on March 24, 2004, to consider the proposed sale of 100% of the stock of BBC ("March 2004 Meeting"). Buchler gave an overview of the economic terms of the transaction and Fried Frank (counsel to ALH, Shamrock, and SCA) made a presentation regarding the terms of the proposed purchase agreement.

97.     The Supervisory Board then discussed the merits of the proposed BBC sale. Arenson stated that he opposed the sale of BBC for the same reasons he had expressed in connection with the sale of ABI. Arenson expressed a concern that the sale was not in the best interests of ALH or ALH's members and that better value might be obtained by continuing to operate BBC.

39

98.    Arenson expressed concern that there was a conflict of interest on the part of Fried Frank in the BBC transaction because Fried Frank also represented Shamrock (and SCA). Fried Frank explained that it was representing ALH and the Supervisory Board in the transaction and not ALH's members separately. Fried Frank also took the position that, regardless of whether there was a potential conflict, ALH had waived any potential conflict of interest. These conflicts, however, could not be waived.

99.    After further discussion, and with Shamrock in control of the Supervisory Board, it voted in favor of the proposed sale of BBC over the protests of Arenson and Lamm.

### Shamrock sells off MHI

100.    After the sales of ABI and BBC, ALH was left with only one operating home building unit, MHI.

101.    In furtherance of their scheme to rid themselves of any further management responsibilities with respect to ALH, Counterclaim Defendants attempted to sell MHI at a depressed value.

102.    At the time of the sale of ABI in 2003, Lanius was the CFO for ALH II. After the sale of ABI in 2003, Lanius became the President of ABI's acquirer, Mattamy. Despite his new position, he was hired by Counterclaim Defendants as a consultant to advise them on the management and financial aspects of ALH and assist in the further sales of ALH's operating units BBC and MHI.

103.    In his capacity as consultant for ALH, Lanius was responsible for negotiating with potential buyers and negotiating with ALH's lenders, Wachovia and Swiss Re, in connection with the sales of BBC and MHI.

104.    In the summer of 2004, ALH and Levitt entered into a letter of intent for the sale of MHI. At that time, the President of Levitt was LaGuardia, the former President of ALH II. LaGuardia had previously used knowledge gained about the mismanagement of ALH by Counterclaim

40

Defendants, in his former position with ALH to his advantage and to the disadvantage of ALH in the BBC sale. Despite the manner in which LaGuardia used Defendants' mismanagement of ALH (the lack of commitment and weakness of the management team) to leverage the purchase of BBC to the advantage of Levitt and to the disadvantage of ALH, Counterclaim Defendants, nevertheless, attempted to sell MHI to Levitt.

105.    In connection with the sale of MHI to Levitt, Lanius, as the consultant for ALH, evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH members would receive a payment of $1 million if the Levitt transaction closed.

106.    The $1 million payment negotiated by Lanius on behalf of the ALH members was too little too late. Counterclaim Plaintiffs had invested over $8.5 million in ALH and a *pro rata* payment of $1 million was woefully inadequate, although not surprising, considering Counterclaim Defendants' mismanagement.

107.    On October 6, 2004, Levitt informed ALH that it no longer was interested in purchasing MHI. The reasons for Levitt's sudden lack of interest are unclear.

108.    Although Buchler's e-mail conveyed Levitt's intent to withdraw, coincidentally, it indicated that Lanius, as President of Mattamy, was interested in purchasing MHI. Buchler's e-mail makes crystal clear that as of October 6, 2004, Lanius was representing both ALH as a consultant and Mattamy as its President.

109.    On October 22, 2004, Mattamy submitted a proposal through Lanius, offering to purchase MHI on terms even less favorable than the Levitt deal.

110.    Between October 6 and October 22, 2004, Counterclaim Defendants made no efforts to solicit other buyers to purchase MHI. During this time, Counterclaim Defendants made no

41

efforts to shop MHI on the open market but instead, entered into discussions with its own consultant, Lanius, who was intimately familiar with the financial weaknesses of ALH and Shamrock's desire to liquidate ALH at any cost.

111.    Mattamy's depressed offer was not surprising.  In his capacity as consultant, Lanius negotiated on behalf of ALH with the various lenders and was intimately familiar with the financial condition of ALH as well as Counterclaim Defendants' conduct which resulted in the severely depressed financial condition of ALH and MHI.

112.    The Mattamy offer was put together by Lanius and he undoubtedly used the insider information he gained while CFO and consultant to ALH to make such a depressed offer.  ALH found itself in a position of having received the depressed offer from Mattamy as a result of the decisions and breaches of fiduciary duty made by Counterclaim Defendants in order to rid themselves of their management responsibilities and to recoup their loans to ALH without any preference issues.

113.    In December 2004, Mattamy and ALH II entered into a Stock Purchase Agreement to sell MHI to Mattamy.  This new offer still only left ALH with One Million Dollars ($1,000,000).

114.    Because of Counterclaim Defendants' past conduct in dismantling ALH and their bad faith refusal to take additional steps to find a more lucrative buyer, ALH now found itself in a position of having only one buyer who was intimately familiar with all of its weaknesses, was familiar with Counterclaim Defendants' desire to rid themselves of their investment and was able to exploit these weaknesses to the disadvantage of ALH and its members and to the advantage of Mattamy.

115.    It is apparent that Counterclaim Defendants, for their own purposes, wrote off the equity in ALH.  By selling divisions of ALH in a piecemeal fashion, they allowed ALH to avoid bankruptcy and have their loans paid back in a manner that would prevent the payments from being treated as "preferential" payments to "insiders" under 11 U.S.C. § 547 of the Bankruptcy Code.

42

**I.    Liquidation of ALH**

116.    Counterclaim Defendants achieved their goal of liquidating ALH's operating units piecemeal. As Arenson forewarned, Counterclaim Defendants' piecemeal sale of ALH resulted in a total loss of equity to ALH's members.

117.    Although it still exists, ALH no longer has any operations and is winding up its affairs. (D.I. 51 at 34). ALH's business is completed, the liquidation sale is over, and the Class A and Class B members are clearly adversaries.

118.    Further, Counterclaim Plaintiffs' claims challenge the conduct of Counterclaim Defendants in the liquidation of ALH, not Counterclaim Defendants ongoing conduct in running the business of ALH since it is no longer operating.

119.    Accordingly, Counterclaim Plaintiffs claims are direct claims against Counterclaim Defendants.

**J.    Derivative and Demand Futility Allegations**

120.    Counts 8 through 14 are brought pursuant to Federal Rule of Civil Procedure 23.1 as a shareholder derivative action to redress injuries suffered by ALH, as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, as well as aiding and abetting of it, by Counterclaim Defendants. This is not a collusive action brought to confer jurisdiction on this Court that it would not otherwise have.

121.    Counterclaim Plaintiffs will adequately and fairly represent the interests of ALH in enforcing and prosecuting its rights.

122.    Counterclaim Plaintiffs are and were owners of an interest in ALH during times relevant to the wrongful conduct alleged here, and remain owners of ALH.

123.    The current Supervisory Board consists of the following five individuals: Counterclaim Defendants Buchler, Krieger and Stein and Arenson and Lamm.

124.    Counterclaim Plaintiffs have not made any demand on the present Supervisory Board to institute this action because such a demand would be futile and useless.

125.    A demand would be futile and is therefore excused because as provided in the Operating Agreement, Counterclaim Defendants make all major decisions. Moreover, Counterclaim Defendants comprise a majority of the Supervisory Board and thus, control all decisions of the Supervisory Board and their interests are so intertwined with the allegations contained in this Counterclaimthese Counterclaims and Third-Party Complaint as to render any such demand futile.

44

## DIRECT CAUSES OF ACTION

### COUNT ONE
### BREACH OF FIDUCIARY DUTY
### (Shamrock)

126.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

127.    At all times material to this action, Shamrock was the majority member of ALH, controlled ALH's Supervisory Board, and exercised domination and control over ALH and its wholly-owned subsidiaries.

128.    As a majority member of ALH, Shamrock owed a fiduciary duty to Counterclaim Plaintiffs, minority members of ALH.

129.    Rather than continue to spend the time required to properly manage ALH, Shamrock schemed to relieve itself of its fiduciary duty to run the company, but at the same time, have its loans repaid without running the risk of having to disgorge the repayment of its loans as preferences.

130.    Shamrock breached its fiduciary duties to Counterclaim Plaintiffs by, *inter alia*, (a) mishandling the sale of ALH as a whole and failing to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory; (b) embarking on a plan to sell the operating units piecemeal at "fire sale" prices that resulted in the stifling of competitive bids; (c) pursuing a sale of the operating units when it was not in the best interests of ALH or its members; and (d) continually failing and refusing to act in the best interests of the Counterclaim Plaintiffs-minority members, as required by law.

131.    As a result of Shamrock's breaches of fiduciary duties, Counterclaim Plaintiffs have been injured and are entitled to recovery from Shamrock.

132.    Shamrock's conduct was in bad faith, grossly negligent and self-dealing. It demonstrated (a) a conscious indifference to the consequences to the Counterclaim Plaintiffs-minority-

45

members; and (b) such a reckless indifference to and wanton disregard of the rights of Counterclaim Plaintiffs-minority-members so as to be equivalent to an intentional violation of those rights.

133.    Thus, as a result of Counterclaim Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY**
**(Krieger, Buchler and Stein)**

134.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

135.    Counterclaim Defendants Krieger, Buchler and Stein owe fiduciary duties to ALH and to Counterclaim Plaintiffs as members of ALH.

136.    Counterclaim Defendants breached such duties by, *inter alia*, (a) mishandling the sale of ALH as a whole and failing to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory; (b) failing to actively solicit offers for ALH and failing to work with Class B members; (c) embarking on a plan to sell the operating units piecemeal at "fire sale" prices that resulted in the stifling of competitive bids; and (d) hiring professionals that owed conflicting loyalties to Shamrock and ALH; and (e) continually failing and refusing to act in the best interests of ALH and Counterclaim Plaintiffs.

137.    Counterclaim Defendants' actions were in bad faith, grossly negligent and unrelated to the pursuit of ALH's best interests.

138.    As a result of Defendants' knowing and willful failure to comply with their fiduciary duties, Counterclaim Plaintiffs have been injured and have lost the value of their investment and their equity is virtually worthless.

46

139.    Thus, as a result of Counterclaim Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT THREE
## BREACH OF OPERATING AGREEMENT
### (Shamrock, Krieger, Buchler and Stein)

140.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth

herein.

141.    Counterclaim Defendants' breaches of fiduciary duties as alleged above are in

violation of the ALH operating agreement.

142.    Section 6.2(f) of the ALH operating agreement states:

> the Manager, Representatives, and Deputy
> Representatives shall be liable, responsible and accountable for their
> own fraud, criminal action, bad faith or gross negligence. Nothing in this
> Section 6.2(f) shall be deemed to make the Manager or any
> Representative or any Deputy Representative liable, responsible or
> accountable to any Person other than the Company or the Members.

143.    Counterclaim Defendants' actions, as described above, were done in bad faith

and in a grossly negligent manner and constitute a violation of the operating agreement.

144.    Counterclaim Defendants' actions, as described above further violate

Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

> (c)    To the extent that, at law or in equity, a member or manager or other person
> has duties (including fiduciary duties) to a limited liability company or to another member
> or manager or another person that is a party to or is otherwise bound by a limited
> liability company agreement, the member's or manager's or other person's duties may
> be expanded or restricted or eliminated by provisions in the limited liability company
> agreement; provided, that the limited liability company agreement **may not eliminate
> the implied contractual covenant of good faith and fair dealing**.

> (e)    A limited liability company agreement may provide for the limitation or
> elimination of any and all liabilities for breach of contract and breach of duties (including
> fiduciary duties) of a member, manager or other person to a limited liability company or
> to another member or manager or to another person that is a party to or is otherwise
> bound by a limited liability company agreement; provided, that a limited liability
> company agreement **may not limit or eliminate liability for any act or omission
> that constitutes a bad faith violation of the implied contractual covenant of good
> faith and fair dealing.**

48

145.    By engaging in the acts described above, Counterclaim Defendants have also violated the implied contractual covenant of good faith and fair dealing.

146.    As a result of Counterclaim Defendants' breaches, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT FOUR
## AIDED AND ABETTED COUNTERCLAIM DEFENDANTS' BREACH OF FIDUCIARY DUTY
## (SCA)

147.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

148.    Counterclaim Defendants Krieger, Buchler and Stein owe a fiduciary duty to ALH and its members.

149.    Counterclaim Defendant Shamrock as the majority member of ALH owes a fiduciary duty to Counterclaim Plaintiffs as minority members.

150.    As previously alleged, Counterclaim Defendants Shamrock, Krieger, Buchler and Stein breached their fiduciary duties to ALH and its members.

151.    SCA knowingly assisted and participated in Counterclaim Defendants breaches of their fiduciary duties.

152.    As a result, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT FIVE
## BREACH OF CONSULTING AGREEMENT
## (SCA)

153.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

154.    SCA's breaches of fiduciary duties as alleged above are in violation of the Consulting Agreement between SCA and ALH.

49

155.    Schedule A of the Consulting Agreement [emphasis added] states:

the Company **[ALH] shall not be responsible** for any claims, liabilities, expenses, losses, and damages to the extent that it is finally judicially determined that they result primarily **from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct.**

156.    SCA's actions, as described above, were done in bad faith, in a grossly negligent manner, and with willful misconduct and constitute a violation of the Consulting Agreement.

157.    SCA's actions, as described above further violate Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

(c)    To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement **may not eliminate the implied contractual covenant of good faith and fair dealing.**

(e)    A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement **may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.**

158.    By engaging in the acts described above, SCA has also violated the implied contractual covenant of good faith and fair dealing.

159.    As a result of SCA's breaches, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT SIX
## BREACH OF FIDUCIARY DUTY-GROSS NEGLIGENCE
### (Shamrock, Krieger, Buchler and Stein)

160.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

50

161.    Counterclaim Defendants' conduct as alleged above and its actions relating to the sale of ALH and the subsequent sale of its operating units amounts to gross negligence. Further its hiring and directions to both Fried Frank, JMP and SCA were grossly negligent.

162.    Counterclaim Defendants' scheme to sell ALH in a piecemeal fashion was for the sole benefit of the Class A members.

163.    Counterclaim Defendants hiring of Fried Frank and forcing ALH to waive any conflicts was grossly negligent and was in bad faith and was for the sole benefit of the Class A members.

164.    Counterclaim Defendants owed a duty to Counterclaim Plaintiffs to act in their best interests and to protect the value of their interests in ALH.

165.    Counterclaim Defendants further owed a duty to Counterclaim Plaintiffs to refrain from breaching the operating agreement.

166.    Counterclaim Defendants have breached their duties as alleged above.

167.    As a result of Counterclaim Defendants' grossly negligent actions, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.


### COUNT SEVEN
### BREACH OF FIDUCIARY DUTY -SELF-DEALING
### (Shamrock, Krieger, Buchler and Stein)

168.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

169.    Counterclaim Defendants Shamrock, Krieger, Buchler and Stein owe fiduciary duties to ALH and to Counterclaim Plaintiffs as members of ALH.

170.    Counterclaim Defendants schemed to sell ALH in a piecemeal fashion.  This plan of action was for the sole benefit of Shamrock.

171.    Counterclaim Defendants, through their control of the Supervisory Board, directed that ABI, BBC, and MHI be sold as separate operating units.

172.    Each time a vote was held to sell an operating entity of ALH, only Counterclaim Defendants Krieger, Buchler and Stein voted to approve the sale. Each time, the three votes were from insiders—all three were employees of Class A member Shamrock and worked for SCA.

173.    Counterclaim Defendants Krieger, Buchler and Stein did not vote in favor of the sale of ABI, BBC and MHI because it was in the best interests of ALH or its members but because the sales furthered Shamrock's plan to rid itself of the time-consuming management of ALH and to secure repayment of its 2000 and 2002 loans.

174.    Shamrock used its control to liquidate ALH not because it was in the best interests of ALH or its members but because the sales furthered Shamrock's plan to rid itself of the time-consuming management of ALH and to secure repayment of its 2000 and 2002 loans.

175.    Counterclaim Defendants' actions were disloyal and in bad faith and amounted to self-dealing.

176.    As a result of Counterclaim Defendants' self-dealing, Counterclaim Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

### DERIVATIVE CAUSES OF ACTION IN THE ALTERNATIVE

### COUNT EIGHT
### BREACH OF FIDUCIARY DUTY
### (Shamrock)

177.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

178.    At all times material to this action, Shamrock was the majority member of ALH, controlled ALH's Supervisory Board, and exercised domination and control over ALH and its wholly-owned subsidiaries.

179.    As a majority member of ALH, Shamrock owed a fiduciary duty to Counterclaim Plaintiffs, minority members of ALH, and to ALH.

180.    Rather than continue to spend the time required to properly manage ALH, Shamrock schemed to relieve itself of its fiduciary duty to run the company, but at the same time, have its loans repaid without running the risk of having to disgorge the repayment of its loans as preferences.

181.    Shamrock breached its fiduciary duties to Counterclaim Plaintiffs by, *inter alia*, (a) mishandling the sale of ALH as a whole and failing to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory; (b) embarking on a plan to sell the operating units piecemeal at "fire sale" prices that resulted in the stifling of competitive bids; (c) pursuing a sale of the operating units when it was not in the best interests of ALH; and (d) continually failing and refusing to act in the best interests of the Counterclaim Plaintiffs-minority members, as required by law.

182.    Shamrock's conduct was in bad faith, grossly negligent and self-dealing. It demonstrated (a) a conscious indifference to the consequences to the Counterclaim Plaintiffs-minority-members; and (b) such a reckless indifference to and wanton disregard of the rights of Counterclaim Plaintiffs-minority-members so as to be equivalent to an intentional violation of those rights.

183.    Thus, as a result of Counterclaim Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, ALH has been injured and suffered damages in an amount to be determined at trial.

184.    As a result of its breach of fiduciary duty, Counterclaim Defendant Shamrock is liable to ALH.

**COUNT NINE**

53

## BREACH OF FIDUCIARY DUTY
### (Krieger, Buchler and Stein)

185.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

186.    Counterclaim Defendants Krieger, Buchler and Stein owe fiduciary duties to ALH and to Counterclaim Plaintiffs as members of ALH.

187.    Counterclaim Defendants breached such duties by, *inter alia*, (a) mishandling the sale of ALH as a whole and failing to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory; (b) failing to actively solicit offers for ALH and failing to work with Class B members; (c) embarking on a plan to sell the operating units piecemeal at "fire sale" prices that resulted in the stifling of competitive bids; and (d) hiring professionals that owed conflicting loyalties to Shamrock and ALH; and (e) continually failing and refusing to act in the best interests of ALH and Counterclaim Plaintiffs.

188.    Counterclaim Defendants' actions were in bad faith, grossly negligent and unrelated to the pursuit of ALH's best interests.

189.    As a result of Defendants' knowing and willful failure to comply with their fiduciary duties, Counterclaim Plaintiffs have been injured and have lost the value of their investment and their equity is virtually worthless.

190.    Thus, as a result of Counterclaim Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, ALH has suffered damages in an amount to be determined at trial.

191.    As a result of the misconduct alleged here, Counterclaim Defendants Krieger, Buchler and Stein are liable to ALH.

### COUNT TEN
### BREACH OF OPERATING AGREEMENT
### (Shamrock, Krieger, Buchler and Stein)

54

192.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

193.    Counterclaim Defendants' breaches of fiduciary duties as alleged above are in violation of the ALH operating agreement.

194.    Section 6.2(f) of the ALH operating agreement states:

> the Manager, Representatives, and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence. Nothing in this Section 6.2(f) shall be deemed to make the Manager or any Representative or any Deputy Representative liable, responsible or accountable to any Person other than the Company or the Members.

195.    Counterclaim Defendants' actions, as described above, were done in bad faith and in a grossly negligent manner and constitute a violation of the operating agreement.

196.    Counterclaim Defendants' actions, as described above further violate Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

> (c)    To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement **may not eliminate the implied contractual covenant of good faith and fair dealing**.

> (e)    A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement **may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.**

197.    By engaging in the acts described above, Counterclaim Defendants have also violated the implied contractual covenant of good faith and fair dealing.

55

198.    As a result of Counterclaim Defendants' breaches, ALH suffered injury and damage in an amount to be determined at trial.

199.    As a result of Counterclaim Defendants' breaches, Counterclaim Defendants Shamrock, Krieger, Buchler and Stein are liable to ALH.

### COUNT ELEVEN
### AIDED AND ABETTED COUNTERCLAIM DEFENDANTS' BREACH
### OF FIDUCIARY DUTY
### (SCA)

200.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

201.    Counterclaim Defendants Krieger, Buchler and Stein owe a fiduciary duty to ALH and its members.

202.    Counterclaim Defendant Shamrock as the majority member of ALH owes a fiduciary duty to Counterclaim Plaintiffs as minority members and to ALH.

203.    As previously alleged, Counterclaim Defendants Shamrock, Krieger, Buchler and Stein breached their fiduciary duties to ALH and its members.

204.    Counterclaim Defendant SCA knowingly assisted and participated in Counterclaim Defendants breaches of their fiduciary duties.

205.    As a result of SCA's misconduct, ALH has suffered injury and damage in an amount to be determined at trial.

206.    As a result of SCA's misconduct, SCA is liable to ALH.

### COUNT TWELVE
### BREACH OF CONSULTING AGREEMENT
### (SCA)

207.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

56

208.    SCA's breaches of fiduciary duties as alleged above are in violation of the

consulting agreement between SCA and ALH.

209.    Schedule A of the consulting agreement [emphasis added] states:

the Company **[ALH] shall not be responsible** for any claims,
liabilities, expenses, losses, and damages to the extent that it is finally
judicially determined that they result primarily **from actions taken or
omitted to be taken by SCA in bad faith or due to SCA's gross
negligence or willful misconduct.**

210.    SCA's actions, as described above, were done in bad faith, in a grossly

negligent manner, and with willful misconduct and constitute a violation of the consulting agreement.

211.    SCA's actions, as described above further violate Delaware's Limited Liability

Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

(c)    To the extent that, at law or in equity, a member or manager or other person
has duties (including fiduciary duties) to a limited liability company or to another member
or manager or another person that is a party to or is otherwise bound by a limited
liability company agreement, the member's or manager's or other person's duties may
be expanded or restricted or eliminated by provisions in the limited liability company
agreement; provided, that the limited liability company agreement **may not eliminate
the implied contractual covenant of good faith and fair dealing.**

(e)    A limited liability company agreement may provide for the limitation or
elimination of any and all liabilities for breach of contract and breach of duties (including
fiduciary duties) of a member, manager or other person to a limited liability company or
to another member or manager or to another person that is a party to or is otherwise
bound by a limited liability company agreement; provided, that a limited liability
company agreement **may not limit or eliminate liability for any act or omission
that constitutes a bad faith violation of the implied contractual covenant of good
faith and fair dealing.**

212.    By engaging in the acts described above, SCA has also violated the implied

contractual covenant of good faith and fair dealing.

213.    As a result of SCA's breaches, ALH has suffered injury and damage in an

amount to be determined at trial.

214.    As a result of SCA's breaches, SCA is liable to ALH for damages.

57

## COUNT THIRTEEN
## BREACH OF FIDUCIARY DUTY-GROSS NEGLIGENCE
### (Shamrock, Krieger, Buchler and Stein)

215.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

216.    Counterclaim Defendants' conduct as alleged above and its actions relating to the sale of ALH and the subsequent sale of its operating units amounts to gross negligence. Further its hiring and directions to both Fried Frank, JMP and SCA were grossly negligent.

217.    Counterclaim Defendants scheme to sell ALH in a piecemeal fashion was for the sole benefit of the Class A members.

218.    Counterclaim Defendants hiring of Fried Frank and forcing ALH to waive any conflicts was grossly negligent and was in bad faith and was for the sole benefit of the Class A members.

219.    Counterclaim Defendants owed a duty to Counterclaim Plaintiffs to act in their best interests and to protect the value of their interests in ALH.

220.    Counterclaim Defendants further owed a duty to Counterclaim Plaintiffs to refrain from breaching the operating agreement.

221.    Counterclaim Defendants have breached their duties as alleged above.

222.    As a result of Counterclaim Defendants' grossly negligent actions, ALH has suffered injury and damage in an amount to be determined at trial.

223.    As a result of Counterclaim Defendants' grossly negligent actions, Shamrock, Krieger, Buchler and Stein are liable to ALH.

## COUNT FOURTEEN
## BREACH OF FIDUCIARY DUTY -SELF-DEALING
### (Shamrock, Krieger, Buchler and Stein)

58

224.    Counterclaim Plaintiffs reallege the previous paragraphs as if fully set forth herein.

225.    Counterclaim Defendants Shamrock, Krieger, Buchler and Stein owe fiduciary duties to ALH and to Counterclaim Plaintiffs as members of ALH.

226.    Counterclaim Defendants schemed to sell ALH in a piecemeal fashion. This plan of action was for the sole benefit of Shamrock.

227.    Counterclaim Defendants, through their control of the Supervisory Board, directed that ABI, BBC, and MHI be sold as separate operating units.

228.    Each time a vote was held to sell an operating entity of ALH, only Counterclaim Defendants Krieger, Buchler and Stein voted to approve the sale. Each time, the three votes were from insiders—all three were employees of Class A member Shamrock and worked for SCA.

229.    Counterclaim Defendants Krieger, Buchler and Stein did not vote in favor of the sale of ABI, BBC and MHI because it was in the best interests of ALH or its members but because the sales furthered Shamrock's plan to rid itself of the time-consuming management of ALH and to secure repayment of its 2000 and 2002 loans.

230.    Shamrock used its control to liquidate ALH not because it was in the best interests of ALH or its members but because the sales furthered Shamrock's plan to rid itself of the time-consuming management of ALH and to secure repayment of its 2000 and 2002 loans.

231.    Counterclaim Defendants' actions were disloyal and in bad faith and amounted to self-dealing.

232.    As a result of Counterclaim Defendants' self-dealing, ALH has suffered injury and damage in an amount to be determined at trial.

233.    As a result of Counterclaim Defendants' self-dealing, Shamrock, Krieger, Buchler and Stein are liable to ALH.

Dated: January 20, 2006

                                        SEAN J. BELLEW (#4072)
                                         DAVID A. FELICE (#4090)
                                         Cozen O'Connor
                                         Chase Manhattan Centre
                                         1201 N. Market Street, Suite 1400
                                         Wilmington, DE 19801
                                         Telephone: (302) 295-2000
                                         Facsimile: (302) 295-2013

Of Counsel:
THOMAS M. WOOD, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, MD 21202-3282
(410) 332-8523
tmw@nqgrg.com
       *Attorneys for Defendants/Counterclaim*
*Plaintiffs and Third-Party Plaintiffs*

**VERIFICATION**

MARK FRANKEL states under oath:

1.     I am a member of Laurel Equity Group, LLC, a Counterclaim Plaintiff and Third-Party Plaintiff in this action.

2.     I have read the ~~Counterclaim~~Counterclaims and Third-Party Complaint and, to the best of ~~his~~my knowledge, everything stated therein is true, except that in the case of allegations based upon information and belief, I believe such allegations to be true.

Laurel Equity Group, LLC

By: _____
    Mark Frankel, Member

61

Document comparison done by DeltaView on Monday, January 23, 2006 1:57:24 PM

| | |
|---|---|
| Document 1 | pcdocs://nggrg/228258/7 |
| Document 2 | pcdocs://nggrg/230268/1 |
| Rendering set | Standard |

| | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| | Count |
|---|---|
| Insertions | 20 |
| Deletions | 14 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 34 |