IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 04-1339-SLR |
| AVIE ARENSON, SELK, LLC, LAUREL EQUITY GROUP, LLC, J12ALH ASSOCIATES, A. ARENSON HOLDINGS, LTD AND D.A. GARDENS, LTD, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ——————————————————— | ) | |
| A. ARENSON HOLDINGS, LTD., D.A. GARDENS, LTD., J12ALH ASSOCIATES, SELK, LLC, LAUREL EQUITY GROUP, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-62-SLR |
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF MOTION FOR
JUDGMENT ON THE PLEADINGS
AND DISMISSAL OF THE COUNTERCLAIMS**

OF COUNSEL:

Gregory P. Joseph Law Offices LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200

February 28, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200
    *Attorneys for Plaintiffs and Counterclaim
    Defendants and Third-Party Defendant*

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................... 4

SUMMARY OF ARGUMENT........................................................................................................ 7

STATEMENT OF FACTS............................................................................................................... 8

ARGUMENT ..................................................................................................................................29

    I.    THIS COURT HAS PERSONAL
          JURISDICTION OVER ALL CLASS B PARTIES....................................................29

    II.   THE CLASS B PARTIES' ALLEGATIONS AND ADMISSIONS
          DEFEAT THE BREACH OF FIDUCIARY DUTY CLAIMS ...................................30

    III.  THE COUNTERCLAIMS STATE NO BREACH OF CONTRACT CLAIM ..........37

    IV.  THE COUNTERCLAIMS STATE NO
          AIDING AND ABETTING CLAIM AGAINST SCA.................................................37

    V.   THE DAMAGES PLED IN THE
          COUNTERCLAIMS ARE WHOLLY SPECULATIVE ...........................................38

    VI.  THE COURT LACKS SUBJECT MATTER
          JURISDICTION OVER THE "DIRECT" CLAIMS....................................................39

CONCLUSION ..............................................................................................................................41

## TABLE OF CITATIONS

CASES                                                                    PAGE

*Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004) .......................................................................40

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
    C.A. No. 762-N, 2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005).........30 n.26, 32, 34

*Alessi v. Beracha*, 849 A.2d 939 (Del. Ch. 2004) .......................................................................40

*Baranof Fisheries Ltd. P'ship v. Elsey*,
    No. 95-1476-FR, 1996 U.S. Dist. LEXIS 11838 (D. Or. Aug. 15, 1996).................29 n.25

*Bay Newfoundland Co. v. Wilson & Co.*, 37 A.2d 59 (Del. 1944) .........................................36 n.31

*Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del. 1987)....................................................30 n.27

*Chamison v. HealthTrust, Inc. - The Hospital Co.*,
    735 A.2d 912 (Del. Ch. 1999)
    *aff'd*, 748 A.2d 407 (Del. 2000) ....................................................................................37

*Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*,
    385 F. Supp. 2d 449 (D. Del. 2004) .................................................................. 35-36, 39

*Dean v. Dick*, No. 16566, 1999 Del. Ch. LEXIS 121 (Del. Ch. June 10, 1999) .....................33, 34

*Grupke v. Linda Lori Sportswear, Inc.*, 174 F.R.D. 15 (E.D.N.Y. 1997) ......................................29

*In re Encore Computer Corp. S'holders Litig.*,
    Consol. C.A. No. 16044, 2000 Del. Ch. LEXIS 93 (Del. Ch. June 16, 2000) ....34, 35 n.29

*In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59 (Del. 1995) ........................................37

*Independent Ass'n of Continental Pilots v. Continental Airlines*,
    No. 96-389-SLR, 1997 U.S. Dist. LEXIS 8034 (D. Del. April 29, 1997)....................4 n.3

*IT Litig. Trust. v. D'Aniello*, C.A. No. 04-1268-KAJ,
    2005 U.S. Dist. LEXIS 27869 (D. Del. Nov 15, 2005)................................. 35, 35-36 n.30

*Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1991)........................................36, n.31

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group*,
    Civ. No. 00-840-SLR, 2005 U.S. Dist. LEXIS 14386 (D. Del. July 19, 2005)...........31, 32

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)........................................................................37

*Manzo v. Rite Aid Corp.*,
    No. 18451-NC, 2002 Del. Ch. LEXIS 147 (Del. Ch. Dec. 19, 2002) ...............................39

*McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004) ...............................................35 n.29, 36 n.31

*Miller v. American Real Estate Partners, L.P.,*
    C.A. No. 16778, 2001 Del. Ch. LEXIS 116 (Del. Ch. Sept. 6, 2001)..........................34, 35

*Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,*
    No. 13911, 1995 Del. Ch. LEXIS 134 (Del. Ch. Nov. 2, 1995)........................................37

*Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del. 1971) ...........................................................32, 33

*Southmark Prime Plus, L.P. v. Falzone,* 776 F.Supp. 888 (D. Del. 1991) .................................4 n.3

*Stanziale v. Nachtomi,* 416 F.3d 229 (3d Cir. 2005) ......................................................................31

*TCW/Camil Holding L.L.C. v. Fox, Haron & Camerini, L.L.P.,*
    No. 03-1154-SLR, 2004 U.S. Dist. LEXIS 9659 (D. Del. May 12, 2004)....................4 n.3

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del. 2004) ...................................39

*Trounstine v. Remington Brand, Inc.* 194 A. 95 (Del. Ch. 1937)...........................................36 n.31

*Tse v. Ventana Med. Sys.,* 297 F.3d 210 (3d Cir. 2002) ..................................................................39

*Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116 (Del. Ch. 1986)........................................37

STATUTES                                                                                                                      PAGE

6 Del. C. § 18-109 ....................................................................................................................29-30

10 Del. C. § 3104(c)(1) ................................................................................................................29

10 Del. C. § 8106 ....................................................................................................... 15 n.9 & n.10

## PRELIMINARY STATEMENT

Plaintiffs and Counterclaim Defendants Shamrock Holdings of California, Inc. ("Shamrock"),

Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler")

and Bruce J. Stein ("Stein") (collectively the "Shamrock Parties") respectfully submit this opening brief

in support of their motion for:

- Judgment on the pleadings under Fed. R. Civ. P. 12(c) against Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs Avie Arenson ("Arenson"), A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12"), SELK, LLC ("SELK") and Laurel Equity Group, LLC ("Laurel") (collectively, the Class B Parties); or

- Dismissal of the Counterclaims filed by Arenson Holdings, D.A. Gardens, J12, SELK and Laurel (collectively the "Class B Members," *i.e.*, all Class B Parties except Arenson) under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim on which relief may be granted.

This brief is also submitted on behalf of Third-Party Defendant ALH, Holdings, LLC ("ALH"), which, as

a nominal defendant, joins in the motion to dismiss the claims purportedly asserted against it.

This case arises from the formation, funding and management of ALH, a Delaware limited

liability company ("LLC").  Shamrock invested in the Class A equity of ALH and the Class B Members

invested in the Class B equity.  The dispute concerns a difference of opinion between these investors

about how — not whether — ALH should be sold.  It is at most a matter of business judgment that does

not give rise to any cognizable claim on the part of the Class B Members, as shown by the Counterclaims

themselves and by the Class B Parties' Answer to the Shamrock Parties' Complaint.[1]

The Counterclaims are premised on the wholly unsupported and insupportable notion that

Shamrock conceived and carried out a "scheme" to sell ALH's operations separately at "depressed" "fire

sale" prices — even though the Class B Members admit that Shamrock invested millions of dollars more

in ALH than any of them did and that selling below value would harm Shamrock most:

> [T]he economic rights of the Class A and Class B investors are *pari passu*.  The Class A investors have <u>no financial priority or preference</u> over the Class B investors.  <u>The only difference is that Shamrock's share of ALH's losses is necessarily larger than that of [the</u>

---

[1]    The Class B Parties' Answer and the Class B Members' Counterclaims are both part of D.I. 67. The Answer will be cited as "D.I. 67[A]" and the Counterclaims as "D.I. 67[C]."

1

<u>Class B Parties], because Shamrock's investment in ALH is larger.   No setback experienced by ALH could hurt [the Class B Parties] without hurting Shamrock more</u>.

(D.I. 37 & D.I. 67[A] ¶¶ 2-3; emphasis added.)

In addition, the Answer admits and the Counterclaims allege numerous other facts that contradict and defeat the breach of fiduciary duty claims, including but not limited to the following:

- *Approval of Sale of ALH*.  The Answer admits that "Arenson, as the Class B Representative, decided in 2001, that it would be in ALH's best interests to sell ALH in its entirety as a going concern." (D.I. 37 & D.I. 67[A] ¶ 42.)[2]  The decision to seek a buyer for ALH was unanimously approved by the Supervisory Board. (*Id.* ¶ 141.)

- *Approval of Engagement of Investment Banker*.  The Answer admits that in March 2002, Arenson, as Class B Representative, approved the retention of Jolson Merchant Partners ("JMP") in connection with the effort to sell all of ALH's operations. (*Id.* ¶¶ 44, 82-83.)

- *Extension of JMP's Engagement After Unsuccessful Efforts to Sell ALH as a Whole*.  The Answer admits that "[w]ith the knowledge and consent of ALH's Supervisory Board, including Arenson, JMP spent more than six months seeking a buyer for the Company or substantially all of its assets." (*Id.* ¶¶ 85, 141.)  "After these efforts to sell the Company in its entirety proved unsuccessful, JMP began seeking potential buyers" for ALH's Atlantic Builders, Inc. ("ABI") operation. (*Id.* ¶ 85.)  Thereafter, in March 2003, the engagement of JMP was extended with the approval of all Class Representatives, including Arenson. (*Id.*)

- *Approval of Litigation Settlement Necessitating Sale of ABI*.  The Answer admits that in June 2003, Arenson, as Class B Representative, approved a $5-plus million litigation settlement that he knew could not be funded without selling ABI. (*Id.* ¶¶ 95-96.)

- *Approval of Bonus to Shamrock for Sale of ABI*.  The Answer admits that Arenson, as Class B Representative, approved a $200,000 bonus payment to Shamrock for services in connection with the sale of ABI. (*Id.* ¶¶ 68(i), 75, 111.)  The Counterclaims affirmatively plead this $200,000 fee and do not challenge it. (D.I. 67[C] ¶ 86.)

- *Shamrock Not on Both Sides of Transactions*.  The Answer admits and the Counterclaims concede that ALH's operations were sold to third parties, so Shamrock was not on both sides of the sales. (D.I. 37 & 67[A] ¶¶ 100, 105, 113, 122, 125, 129; D.I. 67[C] ¶¶ 76, 89-90, 102, 113.)

- *No Disproportionate Benefit to Shamrock from Proceeds of Sales*.  A portion of the proceeds of ABI were used to repay, in full, loans made by the Class B Members as well as Shamrock. (D.I. 37 & 67[A] ¶¶ 108, 137 D.I. 67[C] ¶¶ 80, 87.)  Thus, the Answer admits and the Counterclaims concede that Shamrock did not receive any disproportionate benefit from the sale proceeds.

- *Approval of Loan Repayments*.  The Counterclaims allege that the sales of ALH's operations were motivated by Shamrock's self-interest in securing repayment of its loans. (D.I. 67[C] ¶¶ 54, 67, 74, 77, 84, 95, 112, 115, 129, 173-74, 180, 229-30.)  Even if this were true (which it is not),

---

[2]      Arenson, who owns and controls Class B Members Arenson Holdings and D.A. Gardens, has at all times been the Class B Members' Class Representative on ALH's Supervisory Board. (*Id.* ¶ 10.)

the Answer admits that all the repayments (including to the Class B Members) were approved by Arenson as Class B Representative. (D.I. 37 & D.I. 67[A]¶ 48.)

- _Purpose of Sales to Keep ALH Viable and Out of Bankruptcy_. The Counterclaims allege that the sale of ALH's operations was motivated by Shamrock's desire to "keep ALH viable" and "avoid bankruptcy," so that the loan repayments would not be voided as preferences. (D.I. 67[C] ¶¶ 95, 112, 115, 129, 180.) Regardless of the loan repayments, keeping ALH viable and out of bankruptcy are rational and legitimate business purposes. By affirmatively pleading this, the Counterclaims defeat the breach of fiduciary duty claims.

- _No Need to Sell Operations to End Management Responsibilities_. The Counterclaims allege that the Shamrock Parties sought to "exit their investment in ALH" because "their management responsibilities were too time consuming." (D.I. 67[C] ¶ 50; _see id._ ¶¶ 54, 65, 69.) The Counterclaims infer from this that the sale prices for ALH's operations were low because Shamrock needed to sell the operations in order to end their management activities. (_Id._ ¶¶ 2, 54, 67, 74, 84, 95, 101, 112, 173-74, 229-230.) However, nothing in ALH's Operating Agreement required Shamrock to serve as management. (_See_ D.I. 20 Ex. B, D.I. 54 Ex. B.) SCA had the right to terminate its consulting agreement with ALH at any time. (D.I. 37 & 67[A] ¶ 76.) Thus, the pleadings specifically disprove this inferred self-interested motive to sell ALH's operations.

- _Absence of Funding Alternatives_. The Counterclaims do not (and cannot) assert that the Class B Members provided any funding after the 2002 loans. The Answer admits that no one was obligated to provide the funding ALH needed at the time ABI was sold. (_See, e.g.,_ D.I. 37 & 67[A] ¶¶ 130-31.) The assertions that Arenson "suggested" that ALH's existing Members "might consider" investing more capital and "recommended" that existing members finance confirm the nonexistence of any actual funding alternative. (D.I. 37 & 67[A] ¶¶ 103; D.I. 67[C] ¶¶ 82.)

Thus, the Class B Members have specifically refuted their own conclusory allegations of self-interest based on the loan repayments, because all Members of ALH were repaid in full, Shamrock was not favored in any way, and the Class B Members approved and acquiesced in the repayments. Similarly, the Class B Members' "management responsibilities" theory is factually negated by the Counterclaims. The bad faith and gross negligence claims cannot survive where, as here, the Answer and Counterclaims admit the existence of rational and legitimate business purposes and processes, regardless of the how the Class B Members may feel about the results. As non-movants, the Class B Members are entitled to all reasonable inferences from their well-pleaded allegations, but such inferences cannot breathe life into these moribund claims.

3

## NATURE AND STAGE OF THE PROCEEDINGS[3]

On September 13, 2004, the Shamrock Parties commenced this action by filing a complaint for declaratory judgment (D.I. 20 Ex. A) in the Court of Chancery of the State of Delaware ("Chancery Court"). Shamrock, as a holder of Class A equity in ALH ("Class A Member"), is the single largest equity investor in ALH, having invested over $9 million. (D.I. 37 & 67[A] ¶¶ 2, 7.) Arenson Holdings, D.A. Gardens, J12, SELK and Laurel are the five Class B investors in ALH. (*Id.* ¶¶ 9-18, 52, 57-59.)

ALH was organized under Delaware law in June 1998 to engage in the home-building business (*Id.* ¶ 2.) Shamrock invested millions of dollars more in the equity of ALH than did any of the Class B Parties. (*Id.*). ALH was ultimately unsuccessful, with the result that both Shamrock and the Class B Parties lost most of what they invested in ALH. (*Id.*). Under the June 12, 1998 Operating Agreement creating ALH, as amended (the "Operating Agreement") (D.I. 20 Ex. B), the economic rights of the Class A and Class B Members are *pari passu*. (D.I. 37 & 67[A] ¶ 3; *see* D.I. 20 Ex. B §§ 4.1(b), 8.3(a)(iii).) The Class A Members have no financial priority or preference over the Class B Members. (*Id.*). The only difference is that Shamrock's share of ALH's losses is necessarily larger than that of Defendants, because Shamrock's investment in ALH is larger (D.I. 37 & 67[A] ¶ 3). No setback experienced by ALH could hurt Defendants without hurting Shamrock more. (*Id.*)

The Complaint seeks a declaratory judgment that: (1) the Shamrock Parties did not breach any fiduciary duty in connection with ALH, particularly ALH's sale of its home-building operations and its repayment of loans from certain ALH investors (Count I); (2) the Shamrock Parties have no liability under ALH's Operating Agreement (Count II); (3) the Shamrock Parties have no liability under the July

---

[3]    On this motion, the Shamrock Parties rely on the Class B Members' Answer, Counterclaims and certain documents relied on in the Counterclaims, most of which are already in the record, *e.g.*, ALH's Operating Agreement, the Consulting Agreement (*see* below) and the Lion LLC Settlement (*see* below). Some of these documents are annexed to the accompanying Declaration of Pamela Jarvis. Such documents may be considered without converting this motion into a summary judgment motion. *See, e.g., In Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 892 (D. Del. 1991); *Independent Ass'n of Continental Pilots v. Continental Airlines*, No. 96-389-SLR, 1997 U.S. Dist. LEXIS 8034 (D. Del. April 29, 1997); *TCW/Camil Holding L.L.C. v. Fox, Haron & Camerini, L.L.P.*, No. 03-1154-SLR, 2004 U.S. Dist. LEXIS 9659 (D. Del. May 12, 2004) (judgment on pleadings appropriate where no material issue of fact remains to be resolved and movant is entitled to judgment as matter of law).

1, 2001 consulting agreement between ALH and SCA (the "Consulting Agreement") (Count III); (4) the Shamrock Parties relied in good faith on the advice of ALH's outside legal counsel and financial/investment banking advisors (Count IV); (5) the Shamrock Parties are entitled to indemnification and advancement of expenses (Count V); (6) SELK has released its claims against the Shamrock Parties (Count VI); (7) SELK's equity interest in ALH should be reduced or eliminated to the extent of any shortfall in the capital contribution of ALH's Class E Member (Count VII); and (8) the Shamrock Parties have not violated Arenson's rights as Class B Representative on ALH's Supervisory Board (Count VIII). (D.I. 37 ¶¶ 153-84.)

On or around October 5, 2004, the original defendants, including Arenson, entered a general appearance in the Chancery Court, without any reservation of rights as to personal jurisdiction. On October 6, 2004, the original defendants (SELK, Laurel and Arenson) removed the complaint to this Court. (D.I. 1.)[4] On October 14, 2004, the original defendants moved to dismiss this action. (D.I. 3, 4.)

On April 22, 2005, the Shamrock Parties amended their original compliant. (D.I. 37.) Among other things, the amended complaint added Arenson Holdings, D.A. Gardens and J12 as defendants. (D.I. 37 ¶¶ 11, 58-62.) On June 2, 2005, over eight months after the Shamrock Parties commenced this action, all of the Class B Parties except Arenson (*i.e.*, all the Class B Members of ALH) sued the Shamrock Parties in federal court in North Carolina (the "NC Action") (D.I. 41 Ex. I). The NC Action was essentially a mirror image of this action (except that Arenson was not a party to the NC Action and the NC Action did not address the claims for such relief as indemnification and advancement of expenses).

On June 3, 2005, the Class B Parties made the following motions in this action: (1) the Class B Members moved to dismiss or stay in favor of the NC Action (the "Forum Motion") (D.I. 40); (2) Arenson, the Arenson Entities and J12 moved to dismiss for lack of personal jurisdiction (D.I. 43); (3)

---

[4]    On November 5, 2004, the Shamrock Parties moved to remand on the grounds that the original defendants had failed to carry their burden of establishing diversity jurisdiction. (D.I. 15.) On January 27, 2005, this Court issued a Memorandum Order (D.I. 29 at 9-12) in which, *inter alia*, the Court (1) found that the evidence provided by SELK and Laurel with regard to principal place of business was "negligible" and (2) gave SELK and Laurel permission to make a supplemental submission on that issue. On March 22, 2005, this Court denied the motion to remand. (D.I. 33.)

SELK and Laurel moved to dismiss for failure to join the Arenson Entities and J12 as indispensable parties (the "Rule 19 Motion") (D.I. 43); and (4) Arenson moved to dismiss for failure to state a claim on which relief may be granted (D.I. 46). The Shamrock Parties believe that the Class B Parties' motions are all moot because of the November 2005 transfer of the NC Action to this Court, but the Class B Parties characterize their motions to dismiss as "still pending." (D.I. 67[A] at 21 n.1.)

On September 2, 2005, the Shamrock Parties moved to dismiss the NC Action on the grounds of improper venue under Fed. R. Civ. P. 12(b)(3) or, in the alternative, to transfer the NC Action to this Court under 28 U.S.C. § 1404 and/or §1406, on the grounds, *inter alia*, that the Shamrock Parties' choice of a Delaware forum was protected by the "first-filed" rule. The Shamrock Parties also moved to dismiss the entire complaint in the NC Action (the "NC Complaint") in whole or in part for lack of subject matter jurisdiction and failure to state a claim on which relief may be granted. (*Id.*) These motions were fully briefed in the NC Action, so the Class B Members have already had an opportunity to correct the defects in their claims against the Shamrock Parties.

On November 22, 2005, the federal court in North Carolina transferred the NC Action to this Court, "in the interest of judicial economy and comity between the federal courts." (D.I. 60 at 1.) On November 29, 2005, in this Court, the Shamrock Parties amended their November 10, 2005 answer to the NC Complaint. (D.I. 61.) This amended answer includes as counterclaims the same claims in the Shamrock Parties' Complaint. On December 14, 2005, this Court entered a Scheduling Order under which, *inter alia*, this case is set for a bench trial starting February 20, 2007. (D.I. 64.)

The Class B Parties filed their original answer, counterclaims and third-party complaint on January 20, 2006 (D.I. 66) and amended them on January 23, 2006 (D.I. 67). Pursuant to the December 13, 2005 scheduling conference with the Court, the Shamrock Parties are seeking by stipulation to consolidate the NC Action with this action. The Shamrock Parties and ALH are filing their reply and answer to the Counterclaims and Third-Party Complaint, thus closing the pleadings. This motion seeks declaratory judgment on Counts I, II, III and VIII of the Shamrock Parties' Complaint, which would moot Counts VI and VII and render Count V (indemnification) ready for summary disposition.

## SUMMARY OF ARGUMENT

I.    *This Court Has Personal Jurisdiction Over All Class B Parties*.   Because of the transfer of the NC Action, the three Class B Members who contested the personal jurisdiction (Arenson, Arenson Holdings, D.A. Gardens and J12) are now fully before this Court.   In addition, the three of them and Arenson, who also contested personal jurisdiction, have admitted virtually all of the jurisdictional facts alleged by Shamrock.  *See* Point I, *infra*.

II.    *The Class B Parties' Allegations and Admissions Defeat The Breach of Fiduciary Duty Claims*. In their Answer and Counterclaims, the Class B Parties admit facts that contradict and preclude their breach of fiduciary duty claims.  The Counterclaims assert two supposedly self-interested motives for the sale of ALH's operations, contending that the Shamrock Parties sought to secure repayment of their loans to ALH and to end their management responsibilities with respect to ALH.  Both are specifically refuted by the Class B Parties' own pleadings, which state, *inter alia*, that the Shamrock Parties were not on both sides of the transactions in which ALH's operations were sold and that the sale of ALH's operations did not affect the Class B Members' equity in ALH any differently from Shamrock's equity in ALH.  Also, the Answer admits that Arenson, as Class B Representative, approved and acquiesced in many of the actions that the Counterclaims now challenge.

   Furthermore, the allegations of bad faith and gross negligence cannot overcome the protective presumption of the business judgment rule, because the Class B Parties' pleadings admit the existence of rational and legitimate reasons and processes in connection with the sales of ALH's operations, *e.g.*, the desire to keep ALH viable and out of bankruptcy and the resolution of litigation exposure, which are classic matters of business judgment.  *See* Point II, *infra*.

III.    *The Counterclaims State No Breach of Contract Claim*.   Counts III, V, X and XII of the Counterclaims fail because the Counterclaims do not identify any actual or implied provision of the Operating Agreement or the Consulting Agreement that the Shamrock Parties supposedly breached.  In addition, the Class B Parties are not parties to the Consulting Agreement and have no standing to assert its breach.  *See* Point III, *infra*.

IV.     *The Counterclaims State No Aiding and Abetting Claim Against SCA*.  Counts IV and XI of the Counterclaims fail because the breach of fiduciary duty claims fail and also because they do not allege knowing participation by SCA in the alleged breaches.  *See* Point IV, *infra*.

V.      *The Damages Pled in the Counterclaims Are Wholly Speculative*.  The damages claim asserted in the Counterclaims fails because it is causally unrelated to the alleged breaches and would require the Court assume a series of events that did not occur and are not susceptible of proof.  *See* Point V, *infra*.

VI.     *The Court Lacks Subject Matter Jurisdiction Over the "Direct" Counterclaims*.  Because the Counterclaims plead injury to the Class B Members solely as a by-product of alleged injury to ALH, the Class B Members lack standing to bring the "direct" claims in Counts I through VII.  *See* Point VI, *infra*.

## STATEMENT OF FACTS

*Background Concerning Arenson, the Arenson Entities and J12*

Since the inception of ALH in 1998, Arenson has owned, controlled and acted as agent for the Arenson Entities.  (D.I. 37 & 67[A] ¶ 11.)[5]  Together, the Arenson Entities claim to have invested approximately $1.4 million in the equity of ALH (approximately 6% of ALH's total equity); they claim to hold approximately 17% of ALH's Class B equity.  (*Id.*)  In all matters relating to the Arenson Entities' initial investment in and subsequent dealings with ALH, Arenson has been the controlling person of, and agent, spokesperson and signatory for, the Arenson Entities.  (*Id.* ¶ 14.)  From the inception of ALH in 1998, Arenson has served as the Class B Representative on ALH's Supervisory Board.  (*Id.* ¶ 10.)  In that capacity, Arenson represents all Class B Members, including the Arenson Entities.  (*Id.* ¶ 12.)  As Class B Representative, Arenson has acted in what he perceived and/or claimed to be the best interests of both the Arenson Entities and the other Class B Members.  (*Id.* ¶ 14.)

From time to time, Arenson visited ALH's regional home-building operations, talked to local management and made suggestions for improving the operations.  (*Id.* ¶ 16.)  Beginning in or around July

---

[5]     Arenson is the founder and controlling shareholder of Israel's largest private real estate contractor.  (*Id.* ¶ 9.)  Over more than four decades, Arenson's companies, which have approximately 1200 employees, have successfully completed numerous major construction projects in Israel and other countries.  (*Id.*)   Arenson has substantial expertise in the real estate, contracting and construction businesses.  (*Id.*)

2001, Arenson was one of the three members of ALH's Audit Committee. (*Id.* ¶ 17.)  Since 1998, Arenson has acted in an advisory role with respect to (a) the corporate structure and governance of ALH and its subsidiaries, (b) the funding of ALH's operations, including assessment of financial needs, arrangements for debt and equity financing and obtaining extensions and waivers in connection with debt financing arrangements, (c) the engagement and payment of consultants and financial/investment banking advisors, (d) the acquisition and disposition of operations, (e) the restructuring of ALH's relationship with affiliates providing management services, (f) the handling and resolution of litigation, and (g) the appointment, compensation and termination of officers of ALH and its subsidiaries.  (*Id.* ¶ 15.)

J12 claims to have invested approximately $1.47 million in the equity of ALH (approximately 6% of ALH's total equity); thus, J12 holds approximately 17% of the Class B equity.  (*Id.* ¶ 58.)  J12 is a general partnership organized under the laws of New York State.  (*Id.* ¶ 59.)  On or around June 2, 1998, J12 was formed for the purpose of acquiring, owning, managing, investing in or disposing of an interest in ALH.  (*Id.*)  One of J12's three general partners, Jays Twelve LLC ("Jays LLC"), was formed under Delaware law on January 12, 1998.  (*Id.* ¶ 60.)  According to its Certificate of Formation, Jays LLC has a registered office and a registered agent for the service of process in Delaware.  (*Id.*)

*The June 1998 ALH Transaction and, ALH's Acquisition of its Operations*

All of ALH's investors, including the Arenson Entities and J12, negotiated the terms of their investments in ALH, an LLC to be organized under Delaware law to engage in the home-building business.  (*Id.* ¶ 19.)  ALH was created in June 1998.  (*Id.*)  At that time, all of ALH's investors, including the Class B Members, signed the Operating Agreement and funded their investments in ALH.  (*Id.* ¶¶ 20, 68(b).)  Arenson caused the Arenson Entities to enter into the ALH transaction and signed the Operating Agreement on behalf of the Arenson Entities.  (*Id.* ¶¶ 24, 68(a)-(c).)  In 1998, when ALH was formed, it became the sole indirect stockholder of ABI.  (*Id.* ¶ 21.)[6]  Subsequently, on behalf of all the Class B

---

[6]    American Landmark Homes Corporation ("ALH Corp.") owned ABI.  The stock of ALH Corp. was contributed to ALH by (a) Landmark Equity Investors LLC, a Delaware limited liability company which thereby became the Class C Member of ALH, and (b) Lion ALH Capital LLC ("Lion LLC"), a Delaware limited liability company which thereby became the Class D Member of ALH.  (*Id.* ¶ 21.)

Members, Arenson approved ALH's acquisition of its other two operating units, BBC and Mulvaney Homes, Inc. ("MHI"). (*Id.* ¶¶ 80-81.)

*The Operating Agreement*

By entering into the Operating Agreement, the Class B Members agreed that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware." (*Id.* ¶¶ 23, 68(c), 143.) They also agreed that "[n]either the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence." (*Id.* ¶ 147.)

The Operating Agreement states that Major Decisions concerning ALH are to be made only by the Members of ALH, acting through the Supervisory Board. (D.I. 20 Ex. B §6.2(a).) Under the broad definition of Major Decision (*id.* § 6.2(c)), all of the Class Representatives were given a role in many aspects of the operation of ALH. Arenson (and through him, all of the Class B Members, including the Arenson Entities and J12) participated in a broad range of Major Decisions described herein, including but not limited to ALH's acquisitions of BBC and MHI, the Wachovia loan and Swiss Re surety, the 2000 and 2002 Loan Agreements and the repayment of such loans, the Lion LLC Settlement, the Consulting Agreement, the decision that it would be in ALH's best interest to be sold, the settlement of the Bowden Litigation (defined below), and the $200,000 bonus to Shamrock. (*See id.* §§ 6.2(a) & 6.2(c).)

*The Creation and Purpose of ALH II*

In December 1998, the Class Representatives on ALH's Supervisory Board, including Arenson, decided it would be in ALH's best interests to form a Delaware corporate subsidiary to be the parent company of all of ALH's operating subsidiaries. (D.I. 37 & 67[A] ¶ 25.) That entity, ALH II, was organized on December 9, 1998. (*Id.*) All Class Representatives, including Arenson, approved the

creation of ALH II.  (*Id.* ¶¶ 25, 68(d).)  ALH II was created in part for tax planning purposes, in order to, *inter alia*, capture the consolidated tax liability of ALH, while taxable income would flow directly to ALH's Members.  (*Id.* ¶ 26.)  ALH II was used as the vehicle for obtaining debt financing for ALH's operations and acquisitions.  (*Id.*; D.I. 67[C] ¶ 16.)  The financial statements of ALH II were presented to lenders in connection with arranging and modifying such loans.  (D.I. 37 & 67[A] ¶ 26.)  As of June 30, 2001, ALH II was the borrower or guarantor on over $40 million in loans for the benefit of ALH.  (*Id.*)

Both ALH and ALH II were exposed to potential liability for the debts of ALH II and its subsidiaries.  (*Id.* ¶ 27.)  For example, in or around January 2000, ALH II obtained a $27.5 million loan from Wachovia Bank, N.A. ("Wachovia").  (*Id.*)  The Wachovia loan was secured by surety bonds from Swiss Reinsurance America Corporation ("Swiss Re") and Amwest Surety Insurance Corporation (subsequently, Swiss Re assumed the Amwest surety bond).  (*Id.*)  ALH was, in effect, the guarantor of ALH II's obligations to Wachovia.  (*Id.* ¶ 28.)  All the Class Representatives, including Arenson, approved the Wachovia loan and the related arrangements.  (*Id.*)

*The March 1999 Operating Agreement Amendment and Related Capital Contributions*

In March 1999, all of ALH's Members agreed to amend the Operating Agreement (the "Amendment") and make additional capital contributions to ALH.  (D.I. 37 & 67[A] ¶ 29; D.I. 54 Ex. B.)  The purpose of these capital contributions was to provide funds for ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a Delaware corporation and a direct wholly-owned subsidiary of ALH II, to acquire BBC, a home-building company based in Memphis, Tennessee.  (D.I. 37 & 67[A] ¶ 30, 68(e); D.I. 54 Ex. B at 2.)  The Arenson Entities (jointly) and J12 each made a capital contribution of approximately $469,000 to ALH.  (D.I. 37 & 67[A] ¶ 29; D.I. 54 Ex. B at 46.)

*The 2000 Loans*

Pursuant to a loan agreement dated April 6, 2000 (the "2000 Loan Agreement"), some of ALH's investors loaned $2 million to ALH II to "finance certain operations" of ALH II.  (D.I. 37 & 67[A] ¶ 32.)  Arenson and Arenson Holdings participated in the 2000 loans and the repayment thereof.  (*Id.* ¶¶ 34, 68(f).  All the Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to

the 2000 Loan Agreement. (*Id.* ¶ 34.) Approximately $1.63 million of the $2 million loaned to ALH II came from Shamrock. (*Id.* ¶ 32.) ALH II's obligations under the 2000 Loan Agreement were guaranteed by various ALH II subsidiaries, including two Delaware corporations: ALH Acquisition Corp. (the parent company of ABI) and ALH-Tennessee (the parent company of BBC). (*Id.* ¶ 33.)

*The Lion LLC Settlement*

Pursuant to the Operating Agreement, Lion LLC was appointed the Initial Manager of ALH. (D.I. 37 & 67[A] ¶ 36; D.I. 20 Ex. B § 6.1(a).) Lion LLC was controlled by Shalom Lamm ("Lamm"), who is also the managing member of SELK. (*Id.*; D.I. 25 Ex. H ¶ 2.) A dispute arose regarding Lion LLC's performance as manager of ALH. (D.I. 67[C] ¶ 34.) In or around July 2001, ALH reached a settlement with Lion LLC, Lamm and certain of their associates (the "Lion LLC Settlement"). (D.I. 37 & 67[A] ¶ 38.)[7] All of the Class Representatives, including Arenson, approved the Lion LLC Settlement. (*Id.* ¶ 41.) The Lion LLC Settlement includes a Unanimous Written Consent of ALH's Supervisory Board stating that the Lion LLC Settlement is in ALH's best interests. (D.I. 67[C] ¶ 34; D.I. 54 Ex. W.)

Pursuant to the Lion LLC Settlement, Lion LLC, Lamm and their associates agreed to pay approximately $2 million dollars to ALH. (D.I. 37 & 67[A] ¶ 38.) The Lion LLC Settlement substantially decreased the influence of Lion LLC, Lamm and their associates over ALH by, *inter alia*: (1) allowing the Class A Members to designate one of the two Class D Representatives on the Supervisory Board, (2) providing that SCA would render consulting services to ALH, (3) making Buchler a member of the board of directors of each ALH II subsidiary, and (4) establishing an Audit Committee, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B

---

[7]    The documents comprising the Lion LLC Settlement are D.I. 54 Exs. P, R, S, T, U, V, W & X. The Counterclaims characterize the Lion LLC Settlement as a "Management Agreement," as if to suggest that it gave the Shamrock Parties management responsibility for ALH. The Lion LLC Settlement regulates the conduct of Lion LLC, Lamm and their its associates (the "Management Persons") in connection with ALH. It requires, *inter alia*, that the Management Persons: (1) ensure ALH's right to corporate opportunities; (2) obtain approval from ALH's Supervisory Board before causing or permitting ALH to enter into certain kinds of transactions, including related-party transactions; (3) acknowledge the receipt of certain payments from ALH; and (4) make certain payments to ALH and sign confessions of judgment in favor of ALH in the aggregate amount of $1.9 million. (D.I. 54 Ex. 5 §§ 1(d), 1(e), 1(h), 2.0, 3.0; D.I. 54 Ex. R.)

Representative (Arenson).  (*Id.* ¶ 39.)  As part of the Lion LLC Settlement, the subsidiaries of ALH II that guaranteed the 2000 Loan Agreement, including three Delaware corporations, reaffirmed their guarantees to Shamrock and "A. Arenson Holdings, Inc."  (*Id.* ¶ 40.)

*The SCA Consulting Agreement*

In or around July 2001, in connection with Lion LLC Settlement, ALH entered into the Consulting Agreement with SCA, under which SCA would provide consulting services to ALH for a fee of $100,000 per year.  (*Id.* ¶ 74.)  All of the Class Representatives, including Arenson, approved the Consulting Agreement.  (*Id.* ¶ 78.)  The Consulting Agreement provides, *inter alia,* that SCA shall have no liability to ALH or any other person in connection with the services rendered pursuant to the Consulting Agreement, except to the extent that it is finally judicially determined that such liability results primarily from SCA's bad faith, gross negligence or willful misconduct.  (*Id.* ¶ 77.)

The Counterclaims allege that ALH entered into the Consulting Agreement "at Shamrock's insistence," but even if this were true, it would not contradict the admission that Arenson, as Class B Representative, approved the Consulting Agreement.  (D.I. 67[C] ¶¶ 11, 39.)  Pursuant to the Consulting Agreement, substantial services were provided and Krieger, Buchler and Stein spent thousands of hours on ALH matters.  (D.I. 37 & 67[A] ¶¶ 75, 133.)  Section 6 of the Consulting Agreement provides that SCA may terminate the agreement at any time, with or without cause.  (*Id.* ¶ 76.)  Neither the Class B Representative on ALH's Supervisory Board nor the Class B Members have ever requested that the Consulting Agreement be terminated.  (*Id.*)

*The July 2001 Change in the Composition of ALH's Supervisory Board*

When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by the Class A Members, one designated by the Class B Members and two designated by the Class D Member (Lion LLC, which was under Lamm's control).  (*Id.* ¶¶ 36, 70.)  From the outset, Buchler was a Class A Representative and Arenson was the Class B Representative.  (*Id.*)  In late 1999/early 2000, Krieger became a Class A Representative, replacing another Shamrock employee.  (*Id.*)  The Class D Representatives were Lamm and Jonathan Zich ("Zich"), who worked for Lamm.  (*Id.*)

ALH's Supervisory Board has always had five members. (*Id.* ¶ 71.) The Class B Members have never had more than one Representative on the Board. (*Id.* ¶¶ 71, 140.) Nothing in the Operating Agreement requires the consent of the Class B Representative for any action or decision by the Board. (*Id.*) Nothing in the Operating Agreement requires the consent of the Class B Members for actions or decisions by ALH (except that Members must unanimously consent to amendments of the Operating Agreement that modify their limited liability, alter their interest in the profits, losses or distributions of ALH, or alter the number or voting rights of the Representatives). (*Id.* ¶ 71) The Class B members knowingly chose to invest in ALH on terms that expressly gave ALH the right to act without the Class B members' consent. (*Id.* ¶ 140.) Thus, <u>the Class B Members accepted from the outset that they might not be in agreement with the business judgments directing ALH</u>.

Pursuant to the July 2001 Lion LLC Settlement, Zich resigned from ALH's Supervisory Board and was replaced by Stein. (*Id.* ¶ 72.) Since then, three of the five members of the Board have been Shamrock employees. All of the Class Representatives, including Arenson, approved this change in the composition of the Board. (*Id.* ¶¶ 72, 139, 68(g) ("Arenson as the Class B Representative voted in favor of the Lion [LLC] Settlement, which resulted in the Class A members having the right to designate three out of five Representatives on ALH's Supervisory Board").)

The Counterclaims use pejorative language to imply that this change in the composition of the Board was somehow improper. For example, they allege that Shamrock "took control" of ALH, [8] "entrench[ed]" itself and "forced" Lion LLC to enter into the Lion LLC Settlement. (D.I. 67[C] ¶¶ 2, 34, 69.) However, as set forth above, the Class B Members, through Arenson, approved the Lion LLC Settlement and, concomitantly, Shamrock's ability to designate three of the five Class Representatives.

---

[8]    Curiously, while alleging that Shamrock took control of ALH in July 2001, the Class B Members also allege that, from the inception of ALH in 1998, Shamrock had "sole power under the Operating Agreement to make Major Decisions for ALH." (D.I. 67[C] ¶ 37.) This is refuted by the plain language of the Operating Agreement, which provides that consent of the two Class A Representatives is necessary but not sufficient for Major Decisions, which must be approved by a majority vote of the Supervisory Board. (D.I 20 Ex. B § 6.2.) Until July 2001, the Class D Members (like the Class A Members) could designate two Class Representatives, which gave the Class B Representative a potential swing vote. (*Id.* § 6.2(b)(iii).).

14

(D.I. 37 & 67[A] ¶ 72.)  <u>Shamrock did not have the right to designate a majority of the Board until the Class B Parties agreed that it should have such right</u>.  (*See, e.g.*, D.I. 67[C] ¶ 28.)

Moreover, in the Answer, the Class B Parties deny accusing the Shamrock Parties of (a) wrongfully seizing control of ALH, or (b) wrongfully causing ALH to make decisions concerning, *inter alia*, the sale of ALH, without the Class B Parties' consent.  (D.I. 37 & 67[A] ¶¶ 139-40; *see id* ¶ 68(g) (Arenson and Arenson Entities deny claiming that the third Class A Board seat wrongfully deprived them of a meaningful role in the Board's decision-making process).)  Notwithstanding the change in the configuration of the Board, Arenson continued to attend Board meetings, express his opinions and vote as he saw fit, whether with or against the majority.  (*Id.* ¶ 73.) [9]

*The Decision to Sell ALH, the Engagement of JMP and the Extension of JMP's Engagement*

In 2001, Arenson, as the Class B Representative, decided that it would be in ALH's best interests to sell ALH in its entirety as a going concern.  (*Id.* ¶ 42.)  In March 2002, ALH and ALH II engaged JMP to provide financial advisory and investment banking services in connection with the sale of ALH.  (*Id.* ¶¶ 44, 82.) [10]  All the Class Representatives, including Arenson, approved this engagement of JMP.  (*Id.* ¶¶ 44, 83, 68(h), 141.)  The Counterclaims allege that ALH engaged JMP "at the insistence" of the

---

[9]    The Counterclaims do not purport to assert that the change in the composition of the Board was itself a breach of fiduciary duty or that it violated the Operating Agreement.  In any event, such a claim would be time-barred because the Lion LLC Settlement occurred in July 2001, nearly four years before the filing of the NC Action on June 2, 2005.  *See* 10 <u>Del</u>. <u>C</u>. § 8106 (three-year statute of limitations).

[10]    The Class B Members allege that in addition to retaining JMP, ALH retained Fried, Frank, Harris Shriver & Jacobson ("Fried Frank").  (D.I. 67[C] ¶ 45.)  They contend that because Fried Frank also represented Shamrock, there was an unwaivable conflict of interest.  (*Id.* ¶¶ 39, 45, 48, 68, 98.) Paradoxically, they attempt to support this contention by pointing to the conflict waiver letter signed by Lamm (not the Shamrock Parties) on behalf of ALH, without stating why this waiver would not be effective.  (*Id.* ¶¶ 47; Jarvis Dec. Ex. A.)  According to the Counterclaims, Arenson asserted that Fried Frank's supposed conflict "was likely to be detrimental to the Class B members," but the Counterclaims do not identify any actual detriment or even any effect of the retention of Fried Frank.  The Counterclaims allege that the Shamrock Parties' "hiring and directions to" Fried Frank were "grossly negligent," but do not identify any directions given to Fried Frank or anything about the hiring process that could support a gross negligence claim.  (*Id.* ¶¶ 161, 216.)  In any event, such claims would be time-barred because the waiver letter shows that Fried Frank was retained in 2001, more that three years before June 2, 2005, when the Class B Members filed the NC Action.  *See* 10 <u>Del</u>. <u>C</u>. § 8106 (three-year statute of limitations).

Shamrock Parties, but even if this were true, it would not contradict the express admission that Arenson, as Class B Representative, approved the engagement of JMP. (D.I. 67[C] ¶ 51.)

The March 20, 2002 engagement letter with JMP (the "JMP Engagement Letter") contemplated JMP's provision of a broad range of services, including analysis of strategic alternatives; development, updating and ongoing review of a list of parties that might have a specific interest in acquiring the company; marketing the company to potential buyers; structuring a sale transaction process, including developing and administering a confidential bidding process; and rendering opinions as to the fairness of a transaction, from a financial point of view, to the company's equity holders or advising the Supervisory Board that JMP is unable to render such an opinion. (D.I. 37 & 67[A] ¶ 84.)

With the knowledge and consent of ALH's Supervisory Board, including Arenson, JMP spent more than six months seeking a buyer for the Company or substantially all of its assets. (*Id.* ¶¶ 85, 141 (JMP spent "many months" seeking buyer for ALH).) Even the Class B Members' counsel was involved in identifying a possible buyer for ALH. (*Id.* ¶ 43.) After JMP's efforts to sell the Company in its entirety proved unsuccessful, JMP began seeking potential buyers of ABI. (*Id.* ¶ 85.)

In March 2003, with the approval of all Class Representatives, including Arenson, the engagement of JMP was extended. (*Id.*) The Answer admits this but "den[ies] that Arenson approved any decision for JMP to seek buyers for ABI." (D.I. 67[A] ¶ 85.) However, the Answer does not deny that Arenson and the Class B Members knew that JMP was seeking potential buyers for ABI when Arenson, as Class B Representative, approved the extension of JMP's engagement in March 2003. The Answer and Counterclaims do not assert that JMP was still looking for buyers of ALH as a whole at that time. They do not assert that Arenson or the Class B Members believed JMP was doing anything other than seeking potential buyers for ABI when the extension was approved. Nor do the Answer and Counterclaims allege that the Class B Members ever changed their opinion that it was in ALH's best interest to be sold. Thus, the Answer and Counterclaims concede that the Class B Parties at least implicitly approved ALH's pursuit of buyers of its individual operations.

16

*The 2002 Loans*

The Counterclaims allege that in 2002, ALH and its subsidiaries needed additional working capital. (D.I. 67[C] ¶ 32.) In particular, Arenson believed that ALH needed additional funding. (D.I. 37 & 67[A] ¶ 45.) Pursuant to a May 7, 2002 loan agreement (the "2002 Loan Agreement"), certain ALH investors loaned approximately $4.4 million to ALH II. (*Id.* ¶ 46.) One purpose of the 2002 Loan Agreement was to "provide working capital" to ALH II and its subsidiaries. (*Id.*) All of the Class Representatives, including Arenson, approved the borrowings by ALH II under the 2002 Loan Agreement. (*Id.*) D.A. Gardens loaned $312,500 to ALH II. (*Id.* ¶ 47.) Arenson signed the 2002 Loan Agreement on behalf of D.A. Gardens. (*Id.*) Shamrock loaned approximately $1,964,000 to ALH II; other ALH Members (except Laurel) also made loans to ALH II. (*Id.*)

*The Repayment of the 2000 and 2002 Loans*

At the June 26, 2003 meeting of ALH'S Supervisory Board, Buchler explained that approximately $8.8 million of the net proceeds from the sale of ABI would be left after payment of various transaction costs and the settlement of the Bowden Litigation (described below). (*Id.* ¶ 106.) Arenson suggested that the remaining $8.8 million be used to repay (to the extent permitted under ALH's other credit agreements) the loans made by certain of ALH's Members under the 2000 Loan Agreement and the 2002 Loan Agreement. (*Id.* ¶ 107.) The Answer denies that it was Arenson who "originally" suggested this use of the ABI proceeds, but it does not deny that he suggested it. (*Id.*) The repayments would be made to the Arenson Entities, SELK and another Class B Member, as well as to Shamrock and other Class A Members. (*Id.*) Arenson suggested that any monies remaining after the repayment of the Member loans could be used for ALH's working capital needs or to repay ALH's bank debt. (*Id.*)[11]

---

[11]    In an attempt to convey the impression that repayment of the loans was the sole reason for the sale of ABI, ¶ 76 of the Counterclaims quotes a phrase concerning loan repayment from an email from Buchler to Arenson and Lamm, dated April 15, 2003. (Jarvis Dec. Ex. B.) The entire sentence shows that the sale had multiple purposes: "The transaction will allow repayment of the shareholder loans, give us the ability to resolve the Bowden litigation and have some additional capital to help us either improve the profitability of MHI and Bowden or be held in reserve for the Swiss Re obligation." (*Id.*)

The loans made by ALH's Members under the 2000 Loan Agreement and the 2002 Loan Agreement were repaid in full from the proceeds of the sale of ABI. (*Id.* ¶¶ 107, 137.) All Class Representatives, including Arenson, consented to these loan repayments. (*Id.* ¶ 48.) The Counterclaims allege that various Members made loans to ALH and that the loans were repaid. (D.I. 67[C] ¶¶ 30, 33, 87.) However, the Counterclaims do not allege that (a) any Member who wanted to lend to ALH was prevented from doing so, (b) the loans were repaid on terms that favored Shamrock over the other Member-lenders (including the Class B Members), (c) the Class B Members ever offered to return their repayments to ALH or asked Shamrock to do so, or (d) had the loans not been repaid, ALH would have had sufficient funds to continue in business without selling any operations.

Given that Shamrock and the Class B Members received and retained their loan repayments on exactly the same terms and conditions (apart from size of the loans), the Class B Members do not claim that such repayments (including their own) are wrongful as such. (*See* D.I. 67[A] ¶ 68(f) (Arenson Entities deny asserting that Shamrock's loans should not have been repaid).) Rather, they contend that loan repayment was the motive for the sale of ALH's operations. Even if this were the motive, it would not conflict with Shamrock Parties' interest in maximizing value or negate the existence of other business reasons for the sales of ALH's operations. For example, as noted above, the Counterclaims allege that the sale of ALH's operations was motivated by Shamrock's desire to "keep ALH viable" and "avoid bankruptcy," so as to prevent the loan repayments from being voided as preferences. (D.I. 67[C] ¶¶ 95, 112, 115, 129, 180.) Keeping ALH viable and out of bankruptcy is a perfectly rational and legitimate business objective, whether or not it had anything to do with the repayment of the loans.

*The Class A Parties' Efforts to Acquire the Class A Membership Interest*

During the latter half of 2002, the Class B Members expressed an interest in purchasing Shamrock's interest in ALH, as well as that of the other Class A Members. (D.I. 37 & 67[A] ¶¶ 49, 51, 136; D.I. 67[C] ¶¶ 59-64, 66.) However, no agreement was reached. (D.I. 67[C] ¶ 61.) The Class B Members claim to have offered $3 million for Shamrock's interest, although they concede that they never made a formal written offer. (D.I. 67[C] ¶ 61; D.I. 37 & 67[A] ¶¶ 51, 136.) As noted above, Shamrock

had outstanding loans to ALH in the principal amounts of approximately $1.63 million and $1.96 million, totaling over $3.5 million (without interest). (D.I. 37 & 67[A] ¶¶ 32, 47.) Therefore, the alleged $3 million offer for Shamrock's interest in ALH valued Shamrock's equity in ALH at a negative number. The Counterclaims allege that Shamrock "refused to negotiate a reasonable price." (D.I. 67[C] ¶ 66.) However, according to the Answer, Arenson and the Arenson Entities do not contend that Shamrock wrongfully declined to sell its interest to them and the other Class B Members. (D.I. 37 & 67[A] ¶ 68(j).)

*ALH's Sale of ABI and Settlement of the Bowden Litigation*

At the meeting of ALH's Supervisory Board on May 14, 2003, JMP gave an overview of the efforts to sell ALH in its entirety and the subsequent efforts to sell ABI. (D.I. 37 & 67[A] ¶ 87.)[12] JMP initially spoke to 20 builders who were potential buyers of ABI and then narrowed this list to six viable candidates. (*Id.*)[13] The most favorable proposal came from Mattamy Homes, Ltd. ("Mattamy"), which offered approximately $20 million for substantially all of the assets of ABI. (*Id.*) JMP advised the Board that the Mattamy proposal represented the best available transaction for the sale of ABI. (*Id.* ¶ 88.)

John Laguardia ("Laguardia"), who was then the President and Chief Operating Officer of ALH II, presented his views of the home-building market in Jacksonville, Florida, and stated that the sale of ABI to Mattamy would be at the peak of the market. (*Id.*) William R. Lanius ("Lanius"), who was then Executive Vice President and Chief Financial Officer of ALH II, stated that ABI faced various liquidity issues with respect to the capital needed to honor its existing land contracts, explaining that ABI did not have either the cash or credit to finance upcoming purchases pursuant to the existing contracts. (*Id.* ¶ 89.)

---

[12]    The Answer admits many allegations concerning what transpired at the Board meetings. As to these allegations, the Answer states that they are "consistent with the minutes" of the meeting. (*See, e.g., id.* ¶¶ 87-93.) The Answer's assertion that the minutes "do no[t] purport to be a complete summary of all statements made at [the] meeting" is not a denial of these allegations. (*Id.*)

[13]    This is one of several Class B admissions that specifically refute the conclusory allegation that the Shamrock Parties "fail[ed] to actively solicit offers for ALH." (D.I. 67[C] ¶¶ 136, 187.) *See, e.g.,* D.I. 37 & 67[A] ¶ 113 (JMP contacted approximately 20 prospective buyers for BBC, including all active or potentially active participants in the relevant market) and ¶ 85 (JMP spent more than six months seeking a buyer for ALH). Similarly, ¶ 76 of the Counterclaims relies on an April 15, 2003 email from Buchler stating that "[a]fter weeks of intensive negotiations and consideration of all proposals to acquire ABI, Mattamy's bid proved to be the strongest" versus losing bidders MDC and Toll. (Jarvis Dec. Ex. B.)

Buchler noted that ALH as a whole had serious liquidity issues resulting from, among other things, poor results at MHI, which were causing ALH's auditors to write down a minimum of $15 million in goodwill. (Id.)[14]  Lanius noted that ALH did not have sufficient cash for its anticipated settlement of litigation arising from ALH's acquisition of BBC from the Bowden family (the "Bowden Litigation"). (Id.)[15]

At a mediation held shortly before the May 14, 2003 Supervisory Board meeting, ALH Tennessee had offered $5 million to settle the Bowden Litigation: $1 million to be paid up front and the balance to be paid later from the proceeds of the sale of ABI. (D.I. 37 & 67[A] ¶ 92.)  The Bowden family had countered at $8 million, but it appeared that they might accept $5-6 million if payment were made promptly. (Id.)  At the next Board meeting, held on June 26, 2003, ALH's outside counsel described a proposed settlement of the Bowden Litigation under which the Bowden family would be paid $5 million plus $210,000 in attorneys' fees (the "Settlement").[16]  (Id. ¶ 95.)  The first $1 million would be due immediately upon execution of the settlement agreement and the balance would be payable on the earlier of August 31, 2003 or the consummation of the sale of ABI. (Id.)  The proposed Settlement included an option to extend the final payment date for an additional 90 days, for a fee of $250,000.  ALH's outside counsel advised the Supervisory Board that the proposed Settlement was favorable to ALH. (Id.)

---

[14]     By May 2003, if not earlier, the Class B Parties also knew that ALH's auditors were "considering a 'going concern' caveat to their opinion. (D.I. 67[C] ¶ 77: Jarvis Dec. Ex. C.)

[15]     The Bowden family sought payment under a promissory note issued by ALH Tennessee in connection with the purchase of BBC. (Id. ¶ 90.) The principal amount of the note was $2.25 million and the accrued interest was approximately $600,000. (Id.)  There was an earn-out provision with an estimated value of approximately $675,000, and in addition, ALH could be required to pay attorneys' fees in the range of $200,000 to $600,000. (Id.)  Consequently, if the Bowden family were to prevail on its then-pending motion for partial summary judgment, the liability to the Bowden family could be approximately $4 million. (Id. ¶ 91.)  A year earlier, ALH's Tennessee counsel in the Bowden Litigation had advised ALH II's auditors that "in all likelihood," plaintiffs in the Bowden Litigation would prevail and get a judgment in the $3-4 million range. (Id.)  The Bowden Litigation also sought tens of millions of dollars in consequential and punitive damages. (Id.)

[16]     The Counterclaims allege that the Shamrock Parties "did not give the required five days notice" of this meeting and therefore sought waivers of notice from Arenson and Lamm. (D.I. 67[C] ¶ 81.)  The Counterclaims do not allege that notice was not waived.  By itself, the attendance of Arenson and Lamm at the meeting would waived notice anyway. (D.I. 20 Ex. B § 6.2(e).)  It is not clear what purpose this notice allegation is intended to serve, since presumably the Class B Members are not arguing that Arenson and Lamm would have voted in favor of the sale of ABI if they had been given additional notice.

At the June 26, 2003 Board meeting, there was a full discussion of the proposed Settlement. Arenson, Lamm and Lanius commented that the proposed Settlement was favorable. (*Id.* ¶ 96.) Arenson asked how the final payment would be addressed if the proposed sale of ABI were not consummated. (*Id.*) Buchler stated that, under such circumstances, it would be necessary to exercise the option to extend the final payment date and seek other purchasers for ABI. (*Id.*) Following this discussion, ALH's Supervisory Board, including Arenson, unanimously approved the Settlement. (*Id.*)[17]

Also at the June 26, 2003 Board meeting, JMP gave an overview of its efforts to find purchasers for ALH's various subsidiaries and assets. (*Id.* ¶ 98.) Buchler asked JMP to give its assessment of the proposed Purchase Agreement for the sale of ABI to Mattamy. (*Id.* ¶ 100.) JMP stated that based on, among other things, its review of comparable transactions, the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. (*Id.*) In light of ABI's projected EBITDA of approximately $8 million for 2003, the proposed purchase price represented an EBITDA multiple that was well above the average for previous sales of homebuilders. (*Id.*) This price also compared favorably to comparable sale prices derived from multiples of book value or earnings. (*Id.*) JMP concluded by stating that, based on its analysis and review, the proposed sale of ABI on the terms described in the Purchase Agreement was fair to ALH from a financial point of view. (*Id.*) Neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of ABI. (*Id.* ¶ 101.)

Buchler asked Laguardia and Lanius for their views on the proposed sale of ABI. (*Id.* ¶ 102.) Laguardia stated that ALH would be selling ABI at the peak of the Jacksonville, Florida homebuilding

---

[17]     The Counterclaims allege that, at the June 23, 2003 Supervisory Board meeting, "Buchler failed to mention that the trial in the Bowden litigation originally scheduled for July 2003 had been postponed until February 2004, thereby eliminating the urgent need for funds to settle the Bowden litigation." (D.I. 67[C] ¶ 83.) However, the Counterclaims do not allege that Arenson or Lamm did not know about the postponement of the trial or that they would have voted against the settlement if the alleged postponement had been "mention[ed]." Moreover, as noted above, the Answer admits that the potential in June 2003 for the Bowden family to lower their settlement demand from $8 million to $5-6 million depended on payment being made "promptly." (D.I. 37 & 67[A] ¶ 92.) The Counterclaims allege that the Class B Members felt that settling the Bowden Litigation was "not a 'priority'" (D.I. 67[C] ¶ 62), but such a divergence of opinion is hardly sufficient to support a breach of fiduciary duty claim. The Counterclaims incorporate by reference an August 1, 2002 email in which Arenson estimated the liability in the Bowden Litigation at $4 million. (D.I. 67[C] ¶ 70; Jarvis Dec. Ex. D.)

21

market. (*Id.*) Lanius concurred in this, noting that the proceeds of the sale of ABI could be used to pay for the settlement of the Bowden Litigation, which would enhance ALH's ability to sell BBC. (*Id.*) Lanius explained that, to continue competing in its market, ABI would need substantially better capitalization, and that ABI did not have financial resources for the land purchases it would need to make in order to compete successfully. (*Id.*) Lanius also stated that ABI's existing contracts to purchase building lots would place considerable strain on ALH's liquidity resources. (*Id.*) Lanius concluded that, from a financing and liquidity perspective, it was the most opportune time to sell ABI. (*Id.*)

Following a presentation by ALH's outside counsel concerning the terms of the proposed Purchase Agreement, there was a discussion among the Class Representatives. (*Id.* ¶ 103.) Arenson questioned whether it would be better for ALH to raise additional equity rather than sell ABI. (*Id.*) The Answer states that Arenson "suggested" that ALH's existing Members "might consider" investing more capital in ABI. (*Id.*) The Counterclaims describe this slightly differently, alleging that "Arenson recommended that existing members finance another infusion of capital to assist ALH to compete more effectively in the home buying *[sic]* market as had been done in 2000 and 2002, rather than selling off the assets piecemeal." (D.I. 67[C] ¶ 82.) The difference in language is immaterial, because the Counterclaims do not allege that any of the existing Members were willing to contribute or lend more capital or that any of them did so.[18] Moreover, the Answer admits that none of ALH's Members were under any obligation to invest any additional capital, and that § 3.3 of the Operating Agreement expressly provides that no Member shall have any personal liability to ALH, to any other Member of ALH, or to any other person for deciding not to make a further investment in ALH. (D.I. 37 & 67[A] ¶ 131.)

Buchler pointed out that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) consummation of the sale of ABI would permit the settlement of the Bowden Litigation to

---

[18]   In fact, the Counterclaims concede that, no later than December 2002, the Class B Members were aware that Shamrock and the other Class A Members were not interested in investing additional amounts in ALH. (D.I. 67[C] ¶ 62.) The Counterclaims allege that, in December 2002, the Class B Members stated that they were "prepared to fund needed working capital" (*id.*), but this apparently presupposed that Shamrock and the Class B Members would agree on terms for a buy-out of Shamrock's equity, which never happened. The Counterclaims do not allege that the Class B Members ever offered to fund ALH independently of Shamrock.

be concluded, and (3) no other proposals for funding or acquiring ABI, including proposals from the Class B Members or Arenson himself, had been made. Although the Counterclaims allege that Buchler's statements were made "in bad faith," they do not allege that the statements were untrue. (D.I. 67[C] ¶ 83.) The Class B Members do not (and cannot) aver that ABI did not have pressing liquidity needs or that funds to settle the Bowden Litigation were not needed. The Counterclaims suggest that Buchler's statements were in bad faith because Arenson had made a "proposal" that would address ABI's liquidity needs, but the Counterclaims do not actually allege that any proposal was made — they only allege that Arenson "recommended" a capital infusion. (Id. ¶ 82.)

Buchler further stated that he would not recommend that ALH invest more money in the Jacksonville, Florida market because that market had reached its peak and, due to the entry of many new and powerful builders, he anticipated that ABI's business opportunities would deteriorate in the future. (D.I. 37 & 67[A] ¶ 104.) Lanius also stated that Jacksonville, Florida was not an attractive market. (*Id.*) After further review and discussion, a majority of ALH's Board voted in favor of the sale of ABI. Arenson voted against the sale and Lamm abstained. (*Id.* ¶ 105.)

At the time of the ABI sale, Arenson expressly acknowledged ALH's need for additional capital. (*Id.* ¶ 130.) The Counterclaims allege that "there was no mention of any severe liquidity crisis" at the Board's February 21, 2002 meeting. (D.I. 67[C] ¶ 75.) Even if this were true, it was well before the sale of ABI was approved. It would also be irrelevant in light of ALH's recognized financial needs, which were discussed extensively at, *inter alia*, the May and June 2003 meetings. Buchler's April 9, 2003 email to Arenson, from which ¶ 75 of the Counterclaims selectively quotes, points out that ALH's liquidity crisis was the result of a number of the factors that were discussed at the May and June 2003 Board meetings, including but not limited to the Bowden Litigation and the "inability to take down huge land positions in Florida." (Jarvis Dec. Ex. E.) The April 9, 2003 email goes on to explain that "[t]o provide some liquidity, ABI is being sold. <u>If you or any of the other "B" investors can propose an alternative</u>

solution, as always, we're ready to listen. As we were unsuccessful in selling the company intact, selling it piecemeal appears to be the only other alternative to meet ALH's obligations." (*Id.*; emphasis added.)[19]

At the June 26, 2003 meeting, the Board discussed the fee to be paid to JMP for its work on the ABI sale. (D.I. 37 & 67[A] ¶ 109.) Under the JMP Engagement Letter, JMP was only entitled to a fee upon the sale of the whole Company. (*Id.*) However, in light of JMP's efforts over the preceding 14 months, the Board unanimously authorized a fee to JMP for the sale of ABI alone and unanimously authorized Buchler and Krieger to negotiate the fee with JMP. (*Id.*)[20] The Board also discussed the payment of an exit bonus to Lanius upon the consummation of the ABI sale and his anticipated resignation as an employee of ALH. (*Id.* ¶ 110.) The Board agreed that Lanius should be treated fairly and generously. (*Id.*) The Board unanimously authorized Buchler and Krieger to negotiate an appropriate exit bonus for Lanius. (*Id.*)

The Board also discussed the payment of a fee to Shamrock in connection with its efforts to facilitate the ABI sale. (*Id.* ¶ 111.) Krieger, Buchler and Stein declined to participate in any discussion of such a fee, because of their relationship with Shamrock. (*Id.*) Arenson and Lamm indicated that Shamrock was entitled to some payment. (*Id.*) Arenson and Lamm were appointed as the sole members of a special committee to evaluate the services performed by Shamrock and to determine the appropriateness and amount, if any, of a fee to Shamrock for its services in facilitating the sale of

---

[19]    Documents relied on in the Counterclaims refute any claim that the Class B Members were unaware of ALH's financial circumstances. In an email dated August 1, 2002, relied on in ¶ 70 of the Counterclaims, Arenson estimated that after selling ABI and BBC, what ALH would have left would be the MHI operations and approximately $60 million of debt, including $20 million owed to Swiss Re. (Jarvis Dec. Ex. D.) In Buchler's August 2, 2002 response, which is part of the same document, Buchler discusses, *inter alia*, the "ongoing liquidity issues at ALH" and encourages the Class B Members to proceed with their proposal to buy out the Class A Members. (*Id.*) Moreover, the Counterclaims allege that by June 2003, when the loans were repaid, ALH was insolvent. (D.I. 67[C] ¶ 95.)

[20]    The Counterclaims allege that "JMP mishandled the sale of ALH" but they do not identify a single example of this. (D.I. 67[C] ¶ 44.) They assert that the Shamrock Parties "had a long-standing business relationship" with JMP and "had substantial influence" over JMP, but do not identify any way in which this affected JMP's services, detrimentally or otherwise. (*Id.*) They claim that the Shamrock Parties' "hiring and directions to" JMP were "grossly negligent," but do not identify any directions given to JMP or anything about the hiring process that could support a negligence claim. (*Id.* ¶ 161, 216.)

substantially all the assets of ABI and negotiating the terms of the Purchase Agreement. (*Id.*) Arenson and Lamm subsequently authorized a fee of $200,000 to Shamrock. (*Id.* ¶¶ 111, 68(i).)[21]

*ALH's Sale of BBC*

As noted above, at the June 26, 2003 Supervisory Board meeting, JMP gave an overview of its efforts to find purchasers for ALH's various subsidiaries and assets. (*Id.* ¶ 98.) During the discussion that followed, JMP stated that it was an excellent time to sell BBC because of its strong performance in the first half of 2003. (*Id.*) JMP stated that a purchase price at a multiple of five times EBITDA was possible, so assuming EBITDA of $4.4 million, the price for BBC could exceed $20 million. (*Id.*)

At a meeting on March 24, 2004, ALH's Supervisory Board considered the proposed sale of 100% of the stock of BBC. (*Id.* ¶ 112.) Buchler gave an overview of the economic terms of the transaction and ALH's outside counsel made a presentation regarding the terms of the proposed purchase agreement. (*Id.*) JMP gave an overview of its efforts to find purchasers for BBC during the preceding two years. (*Id.* ¶ 113.) JMP had contacted approximately 20 prospective buyers, constituting every entity identified by JMP as a potentially active participant or potential participant in the Memphis, Tennessee homebuilding market. Levitt Corporation ("Levitt") was the only entity that provided a serious bid for BBC. (*Id.*) JMP noted that the Memphis area was flat in growth and that the homebuilding market there was not robust. (*Id.*)

In determining the merits of the BBC sale, JMP had reviewed comparable transactions in the Memphis area. (*Id.* ¶ 114.) JMP was aware of only two sales in the Memphis area in the preceding two years that were comparable to the BBC sale, and in both cases, the acquired entities performed poorly post-acquisition. (*Id.*) JMP explained that Levitt's proposed purchase price for BBC approximated a multiple of five times BBC's 2003 EBITDA, which was well above the average EBITDA multiple for

---

[21]    The Counterclaims allege "[u]pon information and belief" that, in connection with the sale of ABI, Buchler, Krieger and Stein "did not address the impact the sale would have on ALH or its ability to strengthen its remaining operating units." (D.I. 67[C] ¶ 84.) This allegation is directly and fully refuted by the Class B parties' admissions concerning, *inter alia*, the extensive discussion of the proposed sale of ABI at the May and June 2003 Board meetings, described above.

previous sales of homebuilders. (*Id.*) The price also compared favorably to comparable sale prices derived from a multiple of book value. (*Id.*)

JMP stated that Levitt's proposed purchase agreement was "market" and had terms, conditions, covenants and other provisions consistent with those found in comparable sales agreements. (*Id.* ¶ 115.) JMP concluded that Levitt's proposal represented the best potential transaction for the sale of BBC and a superior opportunity for ALH to realize value on its investment. (*Id.*) At the March 24, 2004 meeting, neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of BBC. (*Id.* ¶ 116.)

The Board then discussed the merits of the proposed BBC sale. (*Id.* ¶ 117.) Buchler pointed out that Jeffrey Sweeney ("Sweeney"), BBC's President and Chief Executive Officer, had indicated that he would not continue at BBC absent a sale to Levitt. (*Id.*) Buchler stated his belief that Sweeney was integral to BBC's operations and was an important part of BBC's relationship with its lenders. (*Id.*) Buchler noted that there was no successor to take over from Sweeney and that it would be difficult to identify and hire an adequate successor in a timely manner. (*Id.*) Buchler also noted that the current absence of equity capital greatly impaired BBC's ability to significantly expand its business. (*Id.*) Buchler stated his belief that the sale of BBC to Levitt was the best option available under the current circumstances. (*Id.* ¶ 118.)

Arenson stated that he opposed the sale of BBC for the same reasons he had opposed the sale of ABI. (*Id.*) Lamm stated that he opposed the sale of BBC for reasons similar to Arenson's. (*Id.* ¶ 121.) Arenson "expressed a concern" that the sale was not in the best interest of all of ALH's Members and that better value "might" be obtained by continuing to operate BBC. (*Id.* ¶ 118.) The Shamrock Parties' Complaint alleges that "Arenson did not identify any proposal from himself, from any of the Class B Members or from any other source for obtaining additional capital for BBC, for improving BBC's financial or operational condition, for realizing better value by continuing to operate BBC, or for finding a replacement for Sweeney." (D.I. 37 ¶ 118.) The Answer admits this except "den[ies] that Arenson did not identify any proposal since he had previously suggested additional capital contributions and the Class B members had presented proposals to buyout *[sic]* the Class A Membership interest." (D.I. 67[A] ¶

26

118.)  In other words, Arenson's supposed alternatives to the sale of BBC were (a) the "suggest[ion]" that ALH's Members make additional capital contributions that Arenson knew they were not willing to make and were under no obligation to make, and (b) alleged buy-out proposals that had admittedly been rejected and that Shamrock and the other Class A Members were under no obligation to accept.

After further discussion, a majority of the Supervisory Board voted in favor of the proposed sale of BBC to Levitt.  (*Id.* ¶ 122.)  Arenson and Lamm both voted against the sale.  (*Id.*)  The Supervisory Board expressly acknowledged the "extraordinary and valuable services" provided by JMP in connection with the sale of BBC, and unanimously authorized a fee of approximately $135,000 for such services. (*Id.*)  Arenson and Lamm decided against any bonus for Shamrock.  (*Id.*)

*ALH's Sale of MHI*

In the late summer and early fall of 2004, ALH was in the process of negotiating a possible sale of MHI (the last of ALH's homebuilding operations) to Levitt, which had purchased BBC.  (*Id.* ¶ 123.)[22] Levitt's offer for MHI had been approved by Swiss Re, which was the surety on the bonds securing the January 2000 $27.5 million Wachovia loan.  (*Id.* ¶ 124.)  Swiss Re's approval was required because Swiss Re would be making up a shortfall of more than $12 million to pay off the outstanding balance on the Wachovia loan.  (*Id.*)  However, Levitt did not proceed with the acquisition of MHI.  (*Id.* ¶ 125.) [23] Instead, Mattamy made an offer for MHI, which Swiss Re's approved.  (*Id.*)  In late October, Shamrock

---

[22]    At the June 26, 2003 Board meeting, JMP had advised that it was not yet the best time to sell MHI.  At that time, JMP recommended that ALH continue its efforts to expand MHI's business before pursuing sale opportunities, and that the Supervisory Board reconsider its opportunities for selling MHI in the second half of 2003.  (*Id.* ¶ 99.)

[23]    As noted above, the Counterclaims allege, in wholly conclusory terms, that the Shamrock Parties "fail[ed] to actively solicit offers for ALH" (D.I. 67[C] ¶¶ 136, 187), but both the Answer and the Counterclaims specifically negate these allegations.  (*See, e.g.*, D.I. 37 & 67[A] ¶ 85, 87, 113; Jarvis Dec. Ex. E.)  The Class B Members' only other allegation regarding solicitation of offers is that, between October 6 and October 22, 2004, after Levitt decided not to proceed with MHI, the Shamrock Parties "made no efforts to solicit other buyers to purchase MHI" and "made no efforts to shop MHI on the open market.  (D.I. 67[C] ¶ 110).  This is based on the Shamrock Parties' answer to the NC Complaint, which states that during this 16-day period, "other buyers for MHI were not solicited because, among other things, all possible buyers had already been explored."  Even without the Shamrock Parties' explanation, the alleged failure to put MHI back on the market for 16 days, when Mattamy was offering terms that would yield the same $1 million to ALH as the Levitt deal and where Shamrock would have benefited from any higher price, cannot conceivably support a breach of fiduciary duty claim.

distributed Mattamy's proposed letter of intent to all Class Representatives, including Arenson, and sought their comments on the transaction. (*Id.* ¶ 126.) In November and December 2004, drafts of the proposed MHI transaction documents and resolutions were circulated for comment to all Class Representatives. (*Id.*)

The Supervisory Board meeting to consider the proposed MHI transaction was held on December 15, 2004. (*Id.* ¶ 127.) Arenson initially confirmed that he would be attending the meeting. (*Id.*) However, the night before the meeting, Arenson advised Shamrock that he would not attend, stating that "[b]arring some unforeseen discussion during the meeting, I would probably vote against anyway." (*Id.*) Arenson later added that "any further participation would be a waste of my time." (*Id.*) The Answer admits that Arenson made these statements, although it asserts that "they were taken out of context." (D.I. 67[A] ¶ 127.) Since the other four Class Representatives were in attendance, there was a quorum and the meeting could proceed. (D.I. 37 & 67[A] ¶ 128.) At least three of the Class Representatives voted to approve the transaction, which has since closed. (*Id.* ¶ 129.)[24] Since ABI, BBC and MHI have all been sold, ALH has no remaining operations. (*Id.*)

*Speculative Allegations Concerning Competitive Bids and Supposed Alternatives*

The Counterclaims repeatedly allege that the separate sales of ALH's operations at "fire sale" prices "resulted in the stifling of competitive bids." (D.I. 67[C] ¶¶ 130, 136, 181, 187.) They never attempt to explain how the allegedly low prices might have discouraged other bidders, and as a matter of common sense, there is no reason why they would have that effect. Nor do the Counterclaims identify a single bid that was "stifled." As noted above, the Counterclaims allege that Arenson stated that better value "might" be obtained by continuing to operate BBC. (*Id.* ¶ 97.) Similarly, the Answer admits that Arenson "suggested" that that ALH's existing Members "might consider" investing more capital in ABI. (D.I. 37 & 67[A] ¶ 103.) However, Arenson had already acknowledged the Class A Members' unwillingness to invest additional amounts (D.I. 67[C] ¶ 62), so this was at most wishful thinking.

---

[24]    The Counterclaims attempt to impugn the sale of MHI by alleging that the buyer, Mattamy, was "intimately familiar with the financial condition of ALH." (D.I. 67[C] ¶ 111; *see id.* ¶¶ 110, 112-114.) They do not (and cannot) assert that it is a breach of fiduciary duty to sell to a knowledgeable buyer.

## ARGUMENT

I.    **THIS COURT HAS PERSONAL JURISDICTION OVER ALL CLASS B PARTIES**

Four of the Class B Parties contested this Court's personal jurisdiction. (The other two, SELK and Laurel, as Delaware LLCs, have admitted jurisdiction; *see* D.I. 67[A], Affirmative Defense B.) Three of the four are Class B Members who were plaintiffs in the NC Action that was transferred here. Thus, they became plaintiffs here and can no longer object to the jurisdiction of this Court. These three Class B Members (the Arenson Entities and J12) could have dismissed the NC Action after it was transferred, but they chose not to do so. Having so chosen, they waived any objection to personal jurisdiction. *See Grupke v. Linda Lori Sportswear, Inc.*, 174 F.R.D. 15 (E.D.N.Y. 1997). In *Grupke*, the plaintiffs originally sued in federal court in Wisconsin, but their case was transferred to federal court in New York. Thereafter, the defendants brought counterclaims against the plaintiffs. Plaintiffs moved to dismiss for lack of personal jurisdiction, arguing that they were in the New York court involuntarily. Because plaintiffs had continued to litigate in New York rather than dismissing their action after transfer, they had submitted to the jurisdiction of the New York court. [25]

In any event, as set forth in the Statement of Facts above, the Answer filed by Arenson, the Arenson Entities and J12 admits ample facts showing that they (1) transacted business in Delaware from which the present causes of action arose, and (2) intentionally availed themselves of the benefits and protections of Delaware law. *See* 10 Del. C. § 3104(c)(1). The Answer also admits that Arenson participated materially in the management of ALH and therefore is subject to personal jurisdiction under

---

[25]    *Cf. Baranof Fisheries Ltd. P'ship v. Elsey*, No. 95-1476-FR, 1996 U.S. Dist. LEXIS 11838 (D. Or. Aug. 15, 1996) (where plaintiff dismissed claims after transfer, plaintiff was not subject to personal jurisdiction of transferee court in connection with defendant's counterclaims). In discussing the duplication and waste of judicial resources resulting from the Class B Members' NC Action, the North Carolina federal court observed that the claims in the NC Action "should have been brought as counterclaims in the [Delaware] action." (D.I. 60 at 2.) We understand that the Class B Members intend to argue on this basis that they have not waived their objection to personal jurisdiction because they were forced to bring their claims against the Shamrock Parties as compulsory counterclaims. This ignores the fact that these claims are pending separately here in the form of the transferred NC Complaint, so the Counterclaims are actually redundant. In any event, the Shamrock Parties' position is based on the Class B Members' decision not to dismiss the NC Action post-transfer, not the fact that they used the Counterclaims as their vehicle instead of proceeding with (or amending) the NC Complaint.

6 Del. C. § 18-109.  The Shamrock Parties' brief in opposition to the Class B Parties' motion to dismiss for lack of personal jurisdiction discusses at length the case law that supports personal jurisdiction over Arenson, the Arenson Entities and J12, regardless of whether they physically entered Delaware in connection with ALH.  (D.I. 52 at 18-33.)  Rather than burdening the Court by reiterating that discussion here, the Shamrock Parties respectfully incorporate it by reference in this brief.[26]

## II.        THE CLASS B PARTIES' ALLEGATIONS AND ADMISSIONS DEFEAT THE BREACH OF FIDUCIARY DUTY CLAIMS

Pejorative rhetoric aside, the Answer and Counterclaims and other pleadings reflect nothing more than a difference in business judgment with respect to how the sale of ALH was handled.  The dominant theme is that the Shamrock Parties allegedly disregarded the Class B Parties' "advice," "reasoned advice," "well-reasoned advice," "reasoned recommendation," "reasoned objections" and "well-reasoned objections."  (D.I. 67[C] ¶¶ 2, 56, 63, 71, 78, 85.)  The Counterclaims assert that the process of selling ALH was "mishandled from the start" because the Shamrock Parties allegedly "insisted on selling ALH's balance sheet which contained an enormous amount of goodwill rather than selling ALH as a multiple of cash flow and land option inventory."  (Id. ¶¶ 52-53, 94; see also id. ¶¶ 130, 136, 181, 187.)[27]

Because of the exculpation provision in the Operating Agreement, the only possible avenue for the Class B Members to offset the disappointing outcome of their investment in ALH is to claim that this outcome resulted from bad faith, self-dealing or gross negligence by the Shamrock Parties. Consequently, the Class B Members attempt to shoehorn their "mishandling" claims into the legal

---

[26]      In addition to the cases cited in our brief in opposition to the Class B Parties' motions to dismiss for lack of personal jurisdiction, we respectfully direct the Court's attention to the Chancery Court's recent decision in Albert v. Alex. Brown Mgmt. Servs., Inc., C.A. No. 762-N, 2005 Del. Ch. LEXIS 133, at *51-61 (Del. Ch. Aug. 26, 2005).  Albert involved two individual Tennessee residents who owned and managed a Tennessee LLC which, in turn, managed two investment funds from which the plaintiffs' claims arose.  The funds had been formed as Delaware limited partnerships and were governed by Delaware law, but otherwise had no apparent connection to Delaware.  The individuals had not physically entered Delaware.  Nevertheless, the court found that it had long-arm jurisdiction over them.

[27]      The Counterclaims also allege that the Shamrock Parties "fail[ed] to work with Class B Members."  (Id. ¶ 187.)  This appears to refer to Shamrock's exercise of its absolute right not to sell its interest in ALH for what the Class B Members claimed was a "reasonable" price.  (Id. ¶ 66.)  See, e.g., Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 845 (Del. 1987) (shareholder has no duty to sell its stock, even if it is majority shareholder and sale would benefit minority).

framework for claims of bad faith, gross negligence (breach of duty of due care) and self-dealing (breach of duty of loyalty).  This attempt fails because, under Delaware law,

> [t]he business judgment rule "posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it <u>cannot be 'attributed to any rational business purpose.</u>'" Therefore, a party challenging a board decision "has the burden at the outset to rebut the rule's presumption."

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group*, Civ. No. 00-840-SLR, 2005 U.S. Dist. LEXIS 14386, at *24 (D. Del. July 19, 2005) (emphasis added; citation omitted).

The stringent requirements for pleading a bad faith breach of fiduciary duty were recently enunciated by the Third Circuit in *Stanziale v. Nachtomi*, 416 F.3d 229 (3d Cir. 2005).  Pointing out that overcoming the business judgment rule is "a near-Herculean task," the Court stated that

> [a] plaintiff may overcome the presumption that directors and officers acted in *good faith* by establishing that a decision was so egregious as to constitute corporate waste.  The burden here is to show irrationality: <u>a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith</u>.  Put positively, the decision must go <u>so far beyond the bounds of reasonable business judgment that its only explanation is bad faith</u>.

416 F.3d at 238 (italics in original; underlining added; citations omitted).  The complaint in *Stanziale* alleged that the directors of a financially troubled airline caused the company to borrow millions of dollars for new engines.  The directors did not discuss the need for new engines, the state of the old engines, or the financial ramifications of acquiring new engines versus repairing the existing ones.  The complaint alleged that the directors caused the airline to incur significant losses and acted in bad faith.

The Third Circuit affirmed this Court's decision to dismiss the bad faith claim, characterizing the challenged decision as "a classic exercise of business judgment" in that "a reasonable business person could have reached that decision in good faith."  *Id.* at 239.  The claim failed as a matter of law because "bad faith [was] not the only possible explanation for the decision."  *Id.*  As the Court explained, a breach of fiduciary duty complaint is "self-defeating" where — as the Counterclaims do here — "it states an ostensibly legitimate business purpose for an allegedly egregious decision."  *Id.*

31

The requirements for pleading a gross negligence claim are equally rigorous.  Even absent an exculpation provision of the kind in the Operating Agreement, "liability for breaching the duty of due care 'is predicated upon concepts of gross negligence.'"  *Albert v. Alex. Brown,* 2005 Del. Ch. LEXIS 133, at *13 (citation omitted) (dismissing claim against fund managers for allowing redemptions that allegedly exacerbated the funds' liquidity problems).  In *Albert v. Alex. Brown,* the court explained that

> [g]ross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a <u>devil-may-care attitude or indifference to duty amounting to recklessness.</u>"  "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."  In order to prevail on a claim of gross negligence, <u>a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."</u>

*Id.* at *14 (emphasis added; citations omitted).  *See Stanziale,* 416 F.3d. at 241 (if challenged action resulted from gross negligence — *i.e.,* irrational decision-making process — it would not also be actionable as bad faith because "by definition, the only explanation for the [action] is not bad faith").[28]

In *Hechinger,* 2005 U.S. Dist. LEXIS 14386, at *26, this Court enunciated the requirements for pleading a breach of the duty of loyalty as follows:

> "A breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director 'derived any personal financial benefit from it in the sense of **self-dealing,** as opposed to a benefit which devolves upon the corporation or all stockholders generally.'"

Emphasis in original; citations omitted) (declining to grant summary judgment for directors who received personal benefits not shared by stockholders generally, *e.g.,* a $6.6 million in change of control payment.)

Applying these principles, the Delaware courts have consistently held that conduct like that alleged against the Shamrock Parties is protected by the business judgment rule.  Most instructive here is the Delaware Supreme Court's decision in *Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del. 1971).

---

[28]     The Answer concedes that the process followed by the Shamrock Parties in connection with the sale of ALH's operations, which included expert advice and extensive discussion at Board meetings, was not "recklessly uninformed" or "outside the bounds of reason," however vehemently the Class B Members may disagree with the ultimate decisions that were made.  Indeed, by asserting numerous instances in which the Shamrock Parties allegedly failed to follow the Class B Parties' advice, the Counterclaims concede that the Shamrock Parties were informed of the Class B Parties' views.  That the Shamrock Parties had differing views is a matter of business judgment, not a matter of fiduciary duty.

Plaintiff, a minority shareholder of Sinclair's 97% owned subsidiary, Sinven, challenged Sinven's payment of dividends that were mostly received by Sinclair. Plaintiff contended that "Sinclair caused Sinven to pay out such excessive dividends that the industrial development of Sinven was effectively prevented, and it became in reality a corporation in dissolution." *Id.* at 720. Plaintiff "attack[ed] these dividends on the ground that they resulted from an improper motive — Sinclair's need for cash." *Id.* at 721. Because Sinclair had caused the dividends to be paid at a time when it needed large amounts of cash, the Chancery Court declined to give Sinclair the benefit of the business judgment rule, instead placing the burden on Sinclair to prove intrinsic fairness.

The Delaware Supreme Court reversed the Chancery Court's ruling that plaintiff had rebutted the presumption of the business judgment rule, explaining that

> [a] parent does indeed owe a fiduciary duty to its subsidiary when there are parent-subsidiary dealings. However, this alone will not evoke the intrinsic fairness standard. This standard will be applied only when the fiduciary duty is accompanied by self-dealing — the situation when a parent is <u>on both sides of a transaction</u> with its subsidiary. <u>Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.</u>

*Id.* at 720. Although the dividends "resulted in great sums of money being transferred from Sinven to Sinclair," this was not self-dealing because "a proportionate share of this money was received by the minority shareholders" and Sinclair "received nothing from Sinven to the exclusion of its minority stockholders." *Id.* at 721-22. Therefore, "the Chancellor erred in applying the intrinsic fairness test as to these dividend payments" — instead, the business judgment rule should have been applied. *Id.* at 722.

In *Dean v. Dick*, No. 16566, 1999 Del. Ch. LEXIS 121, at *12 (Del. Ch. June 10, 1999), the court dismissed breach of loyalty claims brought by a limited partner (Becker) against the partnership's general partner (Dean), arising from the sale of partnership property, where Dean did not stand on both sides of the transaction and the allegedly low sale price would affect Dean "in the same proportion as his

partners." The court also rejected Becker's claim that Dean was "grossly negligent in failing to maintain the value of the property and keep vacancy levels down," observing that

> [t]his seems to me to be a classic case for the protections of the business judgment rule — why should this Court (or any court) second-guess Dean's actions here, when Dean gained nothing by keeping vacancy levels up and in fact was harmed by it to the same degree as Becker?

*Id.* at *14. The court likewise rejected Becker's claim that Dean had been grossly negligent in paying the partnership's real estate tax liability in full, rather than attempting to negotiate a discount:

> While a savvy businessman may have attempted to [negotiate a discount], nothing suggests it is grossly negligent not to have done so. The Partnership had a legal obligation to pay these taxes, and nothing in our law requires a party to shirk its legal responsibilities where possible to avoid paying what it owes.

*Id.* at *15.

Even where a controlling shareholder receives all the proceeds of the sale of the company's assets to third parties, the business judgment rule will apply. *In re Encore Computer Corp. S'holders Litig.*, Consol. C.A. No. 16044, 2000 Del. Ch. LEXIS 93 (Del. Ch. June 16, 2000) (dismissing claim that asset sales served interests of controlling shareholder to the exclusion of others, including contention that company should have continued to own and operate certain assets rather than selling them and using proceeds to discharge debt to controlling shareholder, where complaint showed that sales had rational and legitimate business purposes along with allegedly wrongful ones). *See Albert v. Alex. Brown*, 2005 Del. Ch. LEXIS 133 (court dismissed disloyalty claim against fund managers because permitting redemptions did not benefit them personally, noting that they had financial incentive not to allow redemptions).

Similarly, in *Miller v. American Real Estate Partners, L.P.*, C.A. No. 16778, 2001 Del. Ch. LEXIS 116 (Del. Ch. Sept. 6, 2001), defendant Carl Icahn was accused of causing the limited partnership in which plaintiffs had invested to discontinue distributions and amend the partnership agreement so that he could use partnership funds for his own personal purposes. Acknowledging that Icahn could have been motivated by self-interest, the court nonetheless dismissed the complaint because, *inter alia*, it incorporated by reference a document that "identifies a perfectly legitimate rationale" for the challenged actions. *Id.* at *43. Even in the context of the pro-plaintiff standards of Rule 12(b)(6), the court would

not draw the inferences urged by plaintiffs <u>to the exclusion</u> of all other possible inferences, because the <u>facts</u> pled by plaintiffs evidenced legitimate and rational purposes that contradicted the disloyalty claims.[29]   Consistent with the business judgment rule, the court would not assume that the challenged actions provided no benefit to the partnership and had no legitimate business purpose, concluding that "[a]s pernicious as this alleged conduct sounds in the abstract, the complaint does not plead a cognizable claim." *Id.* at *39.

In *IT Litig. Trust. v. D'Aniello*, C.A. No. 04-1268-KAJ, 2005 U.S. Dist. LEXIS 27869 (D. Del. Nov 15, 2005), plaintiff alleged that the company's controlling investors caused the company to pursue an unwise acquisition strategy and take other actions that "caused or deepened" the company's insolvency and "sealed [its] financial doom." *Id.* at *11.  The Court dismissed the claims against the inventors for breach of the duty of due care, explaining that the allegations,

> [r]ead in the light most favorable to Plaintiff, concern poor decision-making . . . and a failure to make informed decisions about the . . . [s]trategy and the accompanying debt. . . .[E]ven at the pleading stage, <u>if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted</u>. . . . While the strategy "did not provide the Company with the desired benefits," <u>the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose</u>. . . . Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule."

Id. at 43-45 (emphasis added; citations omitted).[30]  *See Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449 (D. Del. 2004) (where company faced dire financial circumstances

---

[29]    In declining to draw only the negative inferences argued by plaintiffs, the court pointed out that Icahn, as 90% owner of the partnership, "has a strong interest" in its success. *Id.* at *55.  "Delaware law is clear that substantial stockholdings in a company by directors create powerful incentives to get the best deal in the sale of that company."  *McGowan v. Ferro,* 859 A.2d 1012 (Del. Ch. 2004) (on summary judgment, court rejected claim of wrongdoing in connection with asset sales, where defendants had proportionately larger interest in sale proceeds than plaintiff). *See In re Encore*, 2000 Del. Ch. LEXIS 93 (in concluding that retention payments to director did not give rise to material self-interest, court observed that director's substantial investment in the company gave him significant self-interest in maximizing value, such that his and plaintiffs' financial interests were aligned).  The Counterclaims here contain no factual allegation to support the profoundly illogical notion that Shamrock, as the single largest investor in ALH, would intentionally do anything other than seek to maximize value, if only for its own sake.

[30]    In *IT Group*, the Court declined to dismiss claims relating to the consulting and dividend payments to the controlling investors, including efforts to keep those payments going so that these

and only one financing option was presented, directors did not breach fiduciary duty by taking that option because they did not abdicate their responsibility, even if decision was poor).

Thus, under well-established principles of Delaware law, it is manifest that the well-pleaded allegations of the Counterclaims concerning the sales of ALH's operations do not state a claim of bad faith, self-dealing or gross negligence. As set forth in detail in the Statement of Facts above, the Answer admits the nonexistence of key elements of such claims. No matter how many times the Class B Members incant the phrase "for the sole benefit" of Shamrock, they cannot escape the simple fact that their own pleadings identify multiple benefits to ALH as a whole and all its investors, including but not limited to keeping ALH viable and out of bankruptcy, settling litigation, and discharging lawful debts, including debts to third-party lenders such as Wachovia (discharged by Swiss Re as part of sale of MHI).

Moreover, the Class B Members cannot escape the effect of their acquiescence in certain of the challenged actions.[31] The Answer and Counterclaims admit that, through Arenson, the Class B Members approved, *inter alia:* the repayment of the loans from the proceeds of the sale of ABI; the extension of JMP's engagement, even though JMP had begun seeking buyers for ALH's individual operations; and the settlement of the Bowden litigation, which necessitated the sale of ABI. In particular, by admitting the approval of the loan repayments and their own acceptance thereof, the pleadings negate the Counterclaims' primary allegation of self-interest against the Shamrock Parties.

---

investors — but not equity holders generally — could recoup their investment. *See id.* at *22, 43, 48. These claims survived because the payments to the controlling investors constituted "a personal benefit . . . not received by stockholders generally." *Id.* at *36. As the Court explained, a party can avoid the business judgment rule presumption by showing that the defendant is "interested," *i.e.,* the defendant "appear[s] on both sides of a transaction or . . .deriv[es] a personal benefit from a transaction that is not received by stockholders generally." *Id.* at *23-24. Here, in contrast, the Counterclaims and Answer admit that the Shamrock parties were not on both sides of the challenged sales of ALH's operations and did not receive any personal benefit that was not shared by the Class B Members.

[31]    *See, e.g., McGowan,* 859 A.2d at 1032 (challenge by plaintiff to original merger "would be barred by his acquiescence since [he] voted in favor of the original Merger Agreement."); *Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 177 (Del. 1991) (tendering shares and accepting benefits of transaction constitute acquiescence that may bar relief); *Bay Newfoundland Co. v. Wilson & Co.,* 37 A.2d 59, 63 (Del. 1944) (in light of shareholder's knowledge of recapitalization, failure to vote against it was acquiescence); *Trounstine v. Remington Brand, Inc.* 194 A. 95, 99 (Del. Ch. 1937) (shareholder barred by acquiescence from complaining about conversion of shares after accepting benefits of conversion).

III.    **THE COUNTERCLAIMS STATE NO BREACH OF CONTRACT CLAIM**

Counts III, V, X and XII assert that the Shamrock Parties' alleged breaches of fiduciary duty also breached the Operating and the Consulting Agreements.  Because the Counterclaims state no claim for breach of fiduciary duty, they cannot support this breach of contract claim.  Indeed, the Counterclaims do not identify a single provision of either agreement that was supposedly breached.  Also, the Class B Members are not parties to the Consulting Agreement and therefore lack standing to assert its breach.

The Class B Members' contention that the Shamrock Parties' violated an implied contractual covenant of good faith and fair dealing in both agreements is equally defective.  "To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1995 Del. Ch. LEXIS 134, at *23 (Del. Ch. Nov. 2, 1995) (dismissing implied covenant claim that was inconsistent with contractual language).  *See Chamison v. HealthTrust, Inc. - The Hospital Co.*, 735 A.2d 912, 921 (Del. Ch. 1999) (implied covenant cannot contravene parties' express agreement and cannot expand agreement beyond scope of written contract), *aff'd*, 748 A.2d 407 (Del. 2000).  The Counterclaims do not identify any express provision of the agreements or any specific implied contractual obligation that the Shamrock Parties supposedly violated, so the "implied covenant" claims likewise fail.

IV.    **THE COUNTERCLAIMS STATE NO AIDING AND ABETTING CLAIM AGAINST SCA**

The elements for a claim for aiding and abetting a breach of fiduciary duty are: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in the breach by a defendant who is not a fiduciary; and (iv) damages.  *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995).  Plaintiff must allege specific facts from which knowing participation can "be reasonably inferred." *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986).  Mere conclusory allegations will not suffice. *See, e.g., In re Santa Fe*, 669 A.2d at 72.

The Counterclaims do not state a claim for breach of fiduciary duty, so a key element of the aiding and abetting claim is therefore missing.  Furthermore, Counts IV and XI fail because the

Counterclaims do not identify any participatory act by SCA.  The Counterclaims assert only that "SCA assisted, aided and abetted Shamrock in its goal to sell off the operating units of ALH at a loss."  (D.I. 67[C] ¶ 42; *see id.* ¶¶ 151, 204.)  Although the Counterclaims allege that Krieger, Buchler and Stein performed substantial services for SCA, they do not identify such services or link them in any way to the alleged breaches of fiduciary duty.  (*Id.* ¶¶ 12-14, 43.)  Because the Counterclaims do not sufficiently allege knowing participation, they fail for that reason as well.

## V.    THE DAMAGES PLED IN THE COUNTERCLAIMS ARE WHOLLY SPECULATIVE

The Class B Members seek as damages the entire amount they initially invested in ALH in 1998 and 1999.  (D.I. 67[C] ¶¶ 133, 139, 146, 152, 159, 167, 176.)  Yet, as set forth in the Statement of Facts above, the Class B Members also assert that well before the sale of ABI in June 2003, ALH had deteriorated to the point where its equity had little or no value.  The Class B Members could have claimed damages based on the difference (if any) in the value of ALH's equity immediately before versus after the alleged breaches of fiduciary duty.  However, they did not do so, presumably because they realize that they could recover nothing on such a claim.  Instead, they seek the full amount of their initial 1998-98 investment in ALH, despite the absence of any causal link between the alleged breaches and that amount.

The Class B Parties' pleadings are rife with inherently speculative allegations premised on assumed events that did not occur and are not susceptible of proof, *e.g.*, that ALH's existing Members "might" invest more capital and that ALH "might" obtain better value by continuing its operations.  The pleadings assume that (a) unknown funding sources would have emerged and sustained ALH until some indefinite point in the future, at which point (b) ALH would be performing dramatically better than it had ever had in the past and (c) a buyer would acquire ALH as a whole for a price exceeding ALH's liabilities by at least the amount of the Members' initial investments.  Our research has uncovered no authority for awarding damages on such a speculative basis, in which the Court would have to assume factual developments that did not occur and then further predict the outcome of those developments (as distinct from estimating the future outcome of currently known or ascertainable facts).

In certain circumstances where actual damages cannot be demonstrated, the courts have recognized the concept of "lost opportunity damages," which are the "loss of a possible profit or benefit, [defined as] an addition to the value of one's investment, unless the loss is wholly speculative.'" *Tse v. Ventana Med. Sys.*, 297 F.3d 210, 219 (3d Cir. 2002) (citation omitted). "In general, lost opportunity damages are not 'wholly speculative' if they are based on 'certain, fixed and demonstrable profits thwarted by a defendant's fraud.'" *Id.* at 223 In *Tse*, the Third Circuit rejected a claim for lost opportunity damages premised on an assumed chain of events including, *inter alia*, that plaintiffs not only could but would have negotiated a more favorable deal for their stock. The chain of assumed events underlying the Class B Members' damages claim here is even more attenuated than the one rejected in *Tse*, amounting to "speculation founded upon uncertainty" *See Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 Del. Ch. LEXIS 147, at *19 (Del. Ch. Dec. 19, 2002). In the absence of any viable damages claim, neither the Court nor the Shamrock Parties should be burdened with the Counterclaims.

## VI.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE "DIRECT" CLAIMS

Under Delaware law, the determination of whether a claim is derivative or direct

> must turn <u>solely</u> on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).

In considering these questions, the court

> should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be <u>independent of any alleged injury to the corporation</u>.  The stockholder must demonstrate that the duty breached was owed to the stockholders and that he or she can prevail <u>without showing an injury to the corporation</u>.

*Id.* at 1039 (emphasis added).  *See, e.g., Continuing Creditors' Comm. of Star Telecomms. Inc.*, 385 F. Supp. 2d 449 (events affecting all stockholders in same way, such as corporate waste and mismanagement, fall squarely within definition of derivative action).

Here, in contrast, the Class B Members have only pled injury to themselves as a by-product of injury to ALH. Their central contention — that the Shamrock Parties deliberately caused ALH's operations to be sold at "fire sale" prices — concerns alleged misconduct that would have harmed them only indirectly, as potential recipients of possible distributions by ALH. Thus, the "direct" claims asserted in Counts I –VII of the Counterclaims are not claims that the Class B Members have standing to bring. *See, e.g., Agostino v. Hicks*, 845 A.2d 1110, 1122-23 (Del. Ch. 2004) (where plaintiffs alleged that defendants' breaches of fiduciary duty reduced assets and prevented plaintiffs from recovering on their investments, the claims were dismissed because they were derivative and belonged to corporation). Moreover, as a matter of Delaware law, ALH does not owe fiduciary duties and the putative claims against it should be dismissed for that independent reason. *See Alessi v. Beracha*, 849 A.2d 939, 949 (Del. Ch. 2004) (corporations do not owe fiduciary duties).

## CONCLUSION

For all of the foregoing reasons, the Shamrock Parties respectfully request that the Court grant their motion for judgment on the pleadings as to Counts I, II, III and VIII of their Complaint or, alternatively, dismiss the Counterclaims without leave to replead.

MORRIS NICHOLS ARSHT & TUNNELL LLP

_____
A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200

*Attorneys for Plaintiffs and Counterclaim Defendants Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler and Bruce J. Stein, and Third-Party Defendant ALH Holdings, LLC*

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
(212) 407-1200
New York, NY 10022

DATED: February 28, 2006

CERTIFICATE OF SERVICE

I, S. Mark Hurd, hereby certify that on February 28th, 2006 I electronically filed

the OPENING BRIEF IN SUPPORT OF PLAINTIFF AND COUNTERCLAIM

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND DISMISSAL OF

COUNTERCLAIMS which will send notification of such filing(s) to the following:

> Sean J. Bellew, Esq.
> David A. Felice, Esq.
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE 19801

S. Mark Hurd (#3297)

<u>CERTIFICATE OF SERVICE</u>

I, S. Mark Hurd, hereby certify that on February 28th, 2006 I electronically filed

the OPENING BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

AND DISMISSAL OF COUNTERCLAIMS which will send notification of such filing(s) to the

following:

> Sean J. Bellew, Esq.
> David A. Felice, Esq.
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE 19801

S. Mark Hurd (#3297)