IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ALH HOLDINGS LLC | ) ) ) | Consol. C.A. No. 04-1339-SLR |

**COUNTERCLAIM PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
COUNTERCLAIM DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
AND DISMISSAL OF THE COUNTERCLAIMS**

COZEN O'CONNOR
Sean J. Bellew (#4072)
David A. Felice (#4090)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 295-2000
(302) 295-2013 (Fax)

THOMAS M. WOOD, IV
Neuberger, Quinn, Gielen, Rubin
 & Gibber, P.A.
One South Street, 27th Floor
Baltimore, Maryland 21202-3201
(410) 332-8523 (Direct)
(410) 332-8564 (Fax)

Attorneys for Defendants Abraham Arenson, A.
Arenson Holdings, Ltd., D.A. Gardens, Ltd.,
J12ALH Associates, SELK, LLC and Laurel
Equity Group, LLC

DATED: April 7, 2006

**Table of Contents**

PRELIMINARY STATEMENT.................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS...........................................................2

SUMMARY OF ARGUMENT..............................................................................................3

STATEMENT OF FACTS ....................................................................................................5

ARGUMENT.........................................................................................................................10

I.     Counterclaim Defendants' Motion for Judgment on the Pleadings Should Be
       Denied.......................................................................................................................10

II.    Standards of Review for Motion to Dismiss.........................................................14

III.   The Counterclaim States Claims for Breach of Fiduciary Duty ............................16

       A.     The Counterclaim States Claims for Breach of the Fiduciary Duty
              of Loyalty Against Krieger, Buchler and Stein...........................................17

              1.     The Counterclaim Alleges That Krieger, Buchler and Stein
                     Breached Their Fiduciary Duty of Loyalty Because They
                     Lacked Independence in Approving the Sales of the
                     Operating Units.......................................................................................17

              2.     In the Alternative, the Counterclaim Alleges That Krieger,
                     Buchler and Stein Breached Their Fiduciary Duty of
                     Loyalty by Failing to Maximize Value for the Members of
                     ALH in the Sales of the Operating Units .......................................19

       B.     The Counterclaim States Claims for Breach of the Fiduciary Duty
              of Loyalty Against Shamrock .....................................................................21

       C.     The Counterclaim States a Claim for Breach of the Fiduciary
              Duty of Care Against Shamrock, Krieger, Buchler and Stein
              For Their Gross Negligence in the Sales of the Operating Units................24

       D.     Counterclaim Defendants Have Failed to Meet Their Burden of
              Showing that the Counterclaim Does Not State Claims for
              Breach of the Fiduciary Duties of Loyalty and Due Care...........................28

IV.    The Counterclaim States Claims for Breach of the Operating Agreement
       and the Consulting Agreement................................................................................34

V.     The Counterclaim States a Claim for Aiding and Abetting Against SCA ...............35

VI.    The Amount of Damages Are Not At Issue At This Stage of the
       Litigation.................................................................................................................37

VII.   The Counterclaim States Direct Claims Against Counterclaim Defendants............38

CONCLUSION.....................................................................................................................41

**Table of Citations**

*Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004).......................................................... 39

*Albert v. Alex. Brown Mgmt. Servs., Inc.*, Civ. A. 762-N, 2005 WL 2130607
 (Del. Ch. Aug. 26, 2005) ...................................................................... 25

*Alston v. Parker*, 363 F.3d 229 (3d Cir.2004).................................................................. 15

*Aronson v. Lewis*, 473 A.2d 805 (Del.1984)..................................................................... 18, 22

*Belcom, Inc. v. Robb*, Civ. A. 14663, 1998 WL 229527 (Del. Ch. 1998) ....................... 17

*Blackmore Partners, L.P. v. Link Energy LLC*, 864 A.2d 80 (Del. Ch. 2004) ................ 20, 21

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .................................................................... 25

*Burton v. Exxon Corp.*, 583 F. Supp. 405 (D.C.N.Y. 1984) ............................................ 22

*Cagin v. McFarland Clinic, P.C.*, 317 F.Supp.2d 964 (S.D. Iowa 2004)........................ 37

*Cantor v. Perelman*, 414 F.3d 430 (3d Cir. 2005) ........................................................... 21

*Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center*,
 536 F. Supp. 1065 (D.C. Pa. 1982)....................................................................... 11

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del.1993) ............................................ 18

*Coan v. Bell Atlantic Systems Leasing Int.'l, Inc.*, 813 F. Supp. (D. Conn. 1990) .......... 37

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................................ 14

*Dean v. Dick*, C.A. No. 16566, 1999 WL 413500 (Del. Ch. June 10, 1999)................... 29

*Everco Indus., Inc. v. O.E.M. Products Co.*, 63 F.R.D. 662 (N.D. Ill. 1974)................. 37, 38

*Fischer v. Fischer*, C.A. No. 16864, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999).......... 39, 40

*Gould Electronics Inc. v. United States*, 220 F.3d 169 (3d Cir. 2000) ............................ 4, 14, 28

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)......................................................... 17

*In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996) ................... 25

*In re Cencom Cable Income Partners*, C.A. No. 14634, 2000 WL 130629
 (Del. Ch. Jan. 27, 2000)..................................................................... 39, 40, 41

*In re Encore Computer Corp. Shareholders Litigation*, No. 16044,
 2000 WL 823373 (Del. Ch. June 16, 2000)........................................................ 29

*In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71 (Del. Ch. 1999) .............. 40

*In re General Motors (Hughes) Shareholder Litigation*, Civ. A. 20269,
2005 WL 1089021 (Del. Ch. May 4, 2005) ...................................................................... 36

*In re Hechinger Inv. Co. of Del.*, 327 B.R. 537 (D. Del. 2005) ........................................ 18, 28

*In re IT Group Inc.*, Civ. A. 04-1268, 2005 WL 3050611
(D. Del. Nov. 15, 2005) ............................................................... 15, 16, 17, 19, 24, 37

*In re Walt Disney Co. Derivative Litigation*, 731 A.2d 342 (Del.Ch. 1998) ................... 35

*Ins. Co. of North America v. Waterhouse*, 424 A.2d 675 (Del. 1980) ............................ 35

*Institute for Scientific Information, Inc. v. Gordon & Breach, Sci. Publishers, Inc.*,
931 F.2d 1002 (3d Cir.1991) ............................................................................................ 10

*Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334 (Del. 1987) .......................... 21

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir.1994) .................. 14

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) .......................................................... 36

*McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004) ....................................................... 29

*McIver v. Russell*, 264 F. Supp. 22 (D. Md. 1967) .......................................................... 37

*McMullin v. Beran*, 765 A.2d 910 (Del. 2000) ............................................................... 25

*Miller v. American Real Estate Partners, L.P.*, Civ. No. 16788,
2001 WL 1045643 (Del. Ch. Aug. 6, 2001) .................................................................... 29

*Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975 (D. Del. 1976) .............. 14, 16, 31

*Murphy v. Bancroft Const. Co.*, Civ. A. 02-453, 2002 WL 31641641
(D. Del. Nov. 15, 2002) ................................................................................................... 11

*Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v.
Elkins*, Civ.A. 20228, 2004 WL 1949290, *9 (Del. Ch. Aug. 24, 2004) ....................... 17

*Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) ....................................................... 18

*Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972) ............................ 36

*Pierce Associates, Inc. v. Nemours Foundation*, 865 F.2d 530, 535 (3rd Cir. 1988) ...... 34

*Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) ......................................................... 18

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986) ......... 19

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ................................................................. 14

*Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 269 (Del.Ch., 1989) ........... 25

*Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005) ................................. 13

*Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 719-20 (Del. 1971) ..................................... 21, 29, 30

*Smith v. Van Gorkom*, 488 A.2d 858, 882-83 (Del. 1985) ................................................ 25

*Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888 (D. Del. 1991) ...................... 11

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229
(3d Cir.2005) ............................................................................... 13, 15, 16, 26, 29, 37

*Strum v. Clark*, 835 F.2d 1009 (3d Cir. 1987) .................................................................. 14

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ......................................................... 14

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) ...................... 39

*Tse v. Ventana Medical Systems, Inc.*, 297 F.3d 210 (3rd Cir. 2002) ............................... 37, 38

*Walker v. Resource Dev., L.L.C.*, 791 A.2d 799 (Del. Ch. 2000) ..................................... 35

**Secondary Sources**

*Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389, 407-08 (2005) ............... 39

Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 3d § 1370 ................... 13

## PRELIMINARY STATEMENT

Defendants and Counterclaim Plaintiffs, A. Arenson Holdings, Ltd. ("**Arenson Holdings**"), D.A. Gardens, Ltd. ("**D.A. Gardens**"), J12ALH Associates ("**J12ALH**"), Selk, LLC ("**Selk**") and Laurel Equity Group LLC ("**Laurel**")(collectively "**Counterclaim Plaintiffs**") and Defendant Abraham Arenson ("**Arenson**"), by their undersigned counsel, file this Opposition to the Motion for Judgment on the Pleadings and Dismissal of the Counterclaims (the "**Motion**"),[1] filed by Plaintiffs and Counterclaim Defendants, Shamrock Holdings of California, Inc. ("**Shamrock**"), Shamrock Capital Advisors, Inc. ("**SCA**"), Eugene I. Krieger ("**Krieger**"), George J. Buchler ("**Buchler**"), and Bruce J. Stein ("**Stein**") and Third-Party Defendant ALH Holdings LLC ("**ALH**")(hereinafter collectively "**Counterclaim Defendants**").

Counterclaim Plaintiffs are the Class B members of ALH and Arenson is the Class B representative on ALH's Supervisory Board (the "**Board**"). Counterclaim Defendants control ALH through Shamrock's majority control of the Class A members, their majority representation on the Board through Krieger, Buchler and Stein and their control of ALH's consultant, SCA. Counterclaim Plaintiffs filed Counterclaims, alleging direct and derivative claims for breach of fiduciary duties, breach of the operating agreement, breach of the consulting agreement and aiding and abetting in breach of their fiduciary duties (hereinafter the "**Counterclaim**"). These claims are based on Counterclaim Defendants' liquidation of ALH by the piecemeal sale of ALH's subsidiaries: Atlantic Builders, Inc. ("**ABI**"), Bowden Building Corporation ("**BBC**") and Mulvaney Homes, Inc. ("**MHI**")(hereinafter collective the "**operating units**"), at fire sale prices that resulted in a total loss of equity to ALH's members.

Shamrock's purpose in dismantling ALH was to benefit itself by eliminating its costly, time-consuming management responsibilities, obtaining repayment of its loans to ALH and ensuring that ALH avoided bankruptcy during the preference period so that the loan repayments would not be treated as preferences. In selling the operating units of ALH, Counterclaim Defendants acted with deliberate disregard for all the members of ALH. In an effort to save their

---

[1] Counterclaim Defendants' Opening Brief in Support of Motion for Judgment on the Pleadings and Dismissal of the Counterclaims is docket item 72 and hereinafter shall be cited as "**D.I. 72**".

equity interest in ALH, Counterclaim Plaintiffs offered to purchase the Class A's interests in ALH but Counterclaim Defendants demanded an unreasonable price and, rather than hand over control to Counterclaim Plaintiffs and allow them to strengthen ALH, Counterclaim Defendants chose to further Shamrock's own self interest at the expense of the remaining members of ALH. As a result, Counterclaim Plaintiffs have lost their entire investment in ALH.

In their Motion, Counterclaim Defendants seek dismissal of Counts I through VII of the Counterclaim under Rule 12(b)(1) and dismissal of Counts VIII through XIV of the Counterclaim under Rule 12(b)(6) and seek judgment on the pleadings for Counts I, II, III and VIII of their Amended Complaint under Rule 12(c). For the reasons set forth below, Counterclaim Defendants' motions should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

On September 13, 2004, Shamrock, SCA, Krieger, Buchler and Stein (collectively referred to in this section as "**Shamrock**") filed a declaratory judgment action in the Delaware Court of Chancery against Arenson, Selk and Laurel. (D.I. 20, Ex. A). Defendants Arenson, Selk and Laurel appropriately removed the action to this Court and moved to dismiss the claims against them. (D.I. 1, 3 and 4). Shamrock moved to remand the case to the Court of Chancery. On March 22, 2005, the Court denied Shamrock's motion to remand. (D.I. 33). On April 22, 2005, Shamrock amended the Complaint and joined Arenson Holdings, D.A. Gardens and J12ALH as defendants. (D.I. 37). Thereafter, Defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(1), (2) and (6). (D.I. 40, 43, 46).

On June 2, 2005, Selk, Laurel, Arenson Holdings, D.A. Gardens and J12ALH filed a complaint in the United States District Court for the Western District of North Carolina, Civil Action No. 3:05-CV-256-H (the "**NC Action**"). (D.I. 41, Exh. I). On September 2, 2005, Shamrock moved, on various grounds, to dismiss the NC Action or, in the alternative, to transfer the action to Delaware. On November 10, 2005, Shamrock filed an answer to the North Carolina complaint. On November 22, 2005, without addressing the issues raised in Shamrock's motion to dismiss, the federal court in North Carolina granted Shamrock's motion to transfer finding that "[a]s the

2

Delaware action was the earlier action instituted, all Plaintiff's claims should be properly resolved in the Delaware court." (D.I. 60 at 2).[2]

On December 13, 2005, a scheduling teleconference was held with this Court and Defendants agreed to assert the claims from the NC Action with their answer and compulsory counterclaims in this action. On January 20, 2006, Defendants filed an answer, counterclaims and third-party complaint, which was amended on January 23, 2006.[3] (D.I. 66, 67). On February 28, 2006, Shamrock filed a Motion for Judgment on the Pleadings and Dismissal of the Counterclaims. (D.I. 71). On March 14, 2006, this Court denied Defendants' motions to dismiss. (D.I. 77).

## SUMMARY OF ARGUMENT

I.   Counterclaim Defendants' Motion for Judgment on the Pleadings should be denied as Counterclaim Defendants have failed to meet their burden under Federal Rule of Civil Procedure 12(c). *See infra* § I.

II.  The Counterclaim states claims for breach of the fiduciary duty of loyalty against Krieger, Buchler and Stein because in voting to sell off the operating units, Krieger, Buchler and Stein lacked independence because they did not base their decision on the corporate merits of the sales but were so beholden to Shamrock that they acted in furtherance of its agenda to the detriment of ALH and its members. *See infra* § III.A(1). In the alternative, even if the court finds that Krieger, Buchler and Stein were independent, the Counterclaim states a claim for breach of the duty of loyalty because they breached their *Revlon* duties in the sales of the operating units of ALH by failing to maximize value for the benefit of ALH's members. *See infra* § III.A(2).

III. The Counterclaim states claims for breach of the fiduciary duty of loyalty against Shamrock because Shamrock used its control over ALH and the Board in connection with the sale of the operating units to further its own self-interest—namely eliminating its costly, time-consuming management responsibilities of ALH, obtaining repayment of approximately $3,598,000 in

---

[2] The NC Action was transferred to this Court on January 31, 2006 (the "**transferred action**"). *See* Civil Action No. 06-62. On March 9, 2006, the Court ordered that the transferred action be consolidated with this action. (D.I. 76).

[3] Defendant Arenson is not a party to the counterclaims or the third-party complaint.

3

outstanding loans to ALH and ensuring that its loan repayments were not treated as preferences. *See infra* § III.B.

IV.  The Counterclaim states a claim for breach of the fiduciary duty of care against Counterclaim Defendants for their gross negligence in the sales of ALH's operating units because they rubber stamped the sales of the operating units and engaged in an irrational decision making process with reckless indifference to material information available to protect the financial interests of ALH's members. Their primary consideration in deciding on the sales of the operating units was whether the sales furthered Shamrock's interests, and not whether they would benefit ALH and its members. *See infra* § III.C.

V.  Counterclaim Defendants have failed to meet their burden of showing that the Counterclaim does not state claims for breach of the fiduciary duties of loyalty and due care. *See Gould Electronics Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000). Counterclaim Defendants assert various arguments in support of their motion to dismiss the breach of fiduciary duty claims but they all relate to the same affirmative defense—the business judgment rule. Counterclaim Defendants rely on precedent that arises in a different procedural context, is based on a different standard of review and contains no allegations of self-dealing or lack of independence. *See infra* § III.D.

VI.  The Counterclaim states a claim for breach of the Operating Agreement and the Consulting Agreement because it states claims for the breach of fiduciary duties of loyalty and care against Shamrock, Krieger, Buchler and Stein and aiding and abetting against SCA. *See infra* § IV.

VII.  The Counterclaim states a claim for aiding and abetting against SCA because it alleges that Shamrock, Krieger, Buchler and Stein breached their fiduciary duties and SCA knowingly participated in those breaches. *See infra* § IV.

VIII.  The amount of damages are not at issue because under Federal Rule of Civil Procedure 8(a) damages do not need to be pleaded with any particularity at this stage. *See infra* § V.

IX.  The Counterclaim states direct claims against Counterclaim Defendants because the unjust enrichment exception applies. *See infra* § VI.

4

## STATEMENT OF FACTS

ALH, a Delaware limited liability company, and ALH II, Inc. ("**ALH II**"), a Delaware corporation and wholly-owned subsidiary of ALH, are both Delaware entities. ALH was in the homebuilding business in North Carolina, Florida and Tennessee and ALH II was formed as a vehicle to obtain debt financing for ALH's operations and acquisitions. (D.I. 67[C] ¶¶ 17-19). Shortly after its formation, ALH acquired ABI, a home-building operation in Jacksonville, Florida (*Id.* ¶ 17). In 1999, ALH acquired BBC, a home-building operation in Memphis, Tennessee (*Id.* ¶ 18). In 2000, ALH acquired MHI, a home-building operation in Charlotte, North Carolina (*Id.* ¶ 19).

As provided in the ALH Operating Agreement (the "**Operating Agreement**"), the overall business, operations and affairs of ALH are controlled by a designated manager (*Id.* ¶ 20). Lion LLC ("**Lion**") was originally designated as the manager (*Id.* ¶ 21). The Operating Agreement also created a Supervisory Board comprised of five members—2 Class A representatives, 1 Class B representative and 2 Class D representatives. (*Id.* ¶ 22). At all relevant times, Krieger and Buchler, employees of Shamrock and SCA, were the Class A Representatives and Arenson was the Class B representative. (*Id.* ¶ 23). Until July 2001, Shalom Lamm and Jonathan Zich were the Class D Representatives, but in July 2001, when Lion was stripped of its authority, the Class A members replaced Zich with Stein as the Class D representative. (*Id.* ¶ 25).

In addition to obtaining financing from outside lenders, several members and other non-members of ALH loaned funds to the company with the approval of the Board. (*Id.* ¶ 30). On April 6, 2000, ALH II obtained a $ 2 million loan to finance certain operations of ALH II, much of which was provided by the members of ALH (the "**2000 Loans**"). (*Id.*). Pursuant to the 2000 Loan Agreement, Shamrock loaned $1,633,334.00; Arenson Holdings loaned $166,666.00 and Lion & Lamm Capital, LLC loaned $200,000. (*Id.*). In May 2002, it became apparent that ALH needed additional funding. (*Id.*¶ 32). After considering various alternatives, the Board approved a second loan from certain members of ALH and non-members totaling $4.4 million to provide working capital (the "**2002 Loans**"). (D.I. 67[C].¶ 33). Pursuant to the 2002 Loan Agreement, Shamrock

loaned $1,964,800.00; D.A. Gardens loaned $312,500.00, The Erica Jesselson 1994 CLAT loaned $312,500 and SELK loaned $625,000. (*Id.*).

In 2001, as a result of a dispute regarding Lion's performance, ALH entered into an agreement with Lion wherein its authority was limited by, *inter alia*, requiring the consent of the Board—then controlled by Counterclaim Defendants—before Lion could make certain decisions. (*Id.* ¶ 34). Further entrenching Counterclaim Defendants' control of ALH, SCA, an affiliate of Shamrock, entered into a consulting agreement with ALH to take over much of the management responsibilities previously performed by Lion (the "**Consulting Agreement**"). (*Id.* ¶ 39). Thereafter, ALH was effectively controlled solely by Counterclaim Defendants because they controlled three of the five representatives on the Board; they had the power to remove the nominal manager, Lion; they controlled the consultant; and they had the sole power under the Agreement to make major decisions for ALH. (*Id.* ¶ 37).

In 2001, after Counterclaim Defendants expressed a desire to exit their investment in ALH because their management responsibilities were too time consuming, the Board decided it was a good time to sell the entire company. (*Id.* ¶ 50). In connection with the sale, Shamrock hired its own attorneys, the law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP ("**Fried Frank**"), as the attorneys for ALH to provide legal counsel and Jolson Merchant Partners, a broker with whom it had a prior relationship, to provide brokerage services. (*Id.* ¶¶ 39, 51). At the direction of Counterclaim Defendants, the sale of ALH as a going concern was mishandled from the start because Counterclaim Defendants insisted on selling ALH's balance sheet which contained an enormous amount of goodwill rather than selling ALH as a multiple of cash flow and land option inventory. (*Id.* ¶ 52). As a result of the mishandling of the sale process, Counterclaim Defendants were unable to sell the entire company and claimed that such a sale was not possible. (*Id.* ¶ 53).

Rather than continue to look for a buyer for the entire company or stop the sale process and focus on strengthening the company, Counterclaim Defendants unilaterally decided to market the operating units individually. (*Id.* ¶ 56). Despite repeated warnings by Arenson that the piecemeal sale of each operating unit would result in a substantial loss of equity to ALH's members by, *inter*

*alia*, demonstrating that the estimates of net proceeds from the sales less existing debts would result in a loss of equity and that the sale of ABI would result in the forced sale of the remaining divisions at a total loss of equity because the remaining divisions did not generate sufficient cash flow to support the ALH operations, Counterclaim Defendants forged ahead with liquidation. (D.I. 67[C] ¶¶ 70, 77).

On July 30, 2002, Arenson informed Counterclaim Defendants that the Class B members had met and unanimously agreed that the sale of BBC was ill advised and would weaken ALH and make the sale of the remaining operating units more difficult. (*Id.* ¶ 58). Further, Arenson advised that while the Class B members would like to continue to operate ALH with Counterclaim Defendants, if they were unwilling to continue, then the Class B members would consider buying out the Class A's interests in ALH. (*Id.* ¶ 59). Discussions between the parties regarding the Class B members buy-out of the Class A equity ensued, but an agreement was not reached. (*Id.* ¶ 61). Counterclaim Defendants demanded $12 million for their interest and the Class B members offered $3 million. (*Id.*). On December 18, 2002, Arenson sent an email to Counterclaim Defendants stating, in relevant part:

> [The Class B members] remain gravely concerned that the sale of [BBC] will seriously impair the viability of ALH, as while it might serve some short term end and may fund the Bowden litigation settlement, which we feel is not a "priority", it will hinder and cripple ALH going forward. The "auction" process is busted and it has made ALH look even weaker. The Bs are prepared to fund needed working capital. We appreciate that the As have made a decision to exit and are NOT prepared to invest additional amounts. Since we fear that we have been placed in a liquidation mode, the Bs, in an effort to save their investment and seize an opportunity (that the As either do not believe is there or that they choose not to pursue) have been willing to offer the As a limited sum to exit and it is that amount that we need to agree upon. What the Bs simply can not accept is to allow the As to liquidate ALH in a piecemeal fashion. That said, we need to conclude a buy-out of the As on mutually acceptable terms or recommit ourselves to running ALH in a positive and forward looking manner and abandon, for the time being, the notion of a sale.

(*Id.* ¶ 62). Counterclaim Defendants rejected Counterclaim Plaintiffs' buy-out offer, continued pursuing buyers for the separate operating units and disregarded the reasoned advice to focus on strengthening ALH and stop trying to sell. (*Id.* ¶ 63). Counterclaim Defendants' goal was clear—sell off ALH regardless of the consequences. *Id.*

In April 2003, Counterclaim Defendants entered into a letter of intent with Mattamy Homes ("**Mattamy**") for the sale of ABI. As justification for the decision, Buchler told Arenson that the funds from the sale of ABI were "sorely needed by ALH" because, *inter alia*, it would "allow repayment of shareholder loans". (D.I. 67[C] ¶ 76). At a Board meeting held on May 14, 2003, Counterclaim Defendants pushed their agenda by arguing there was no alternative other than to sell ABI to Mattamy because ALH needed the funds available to pay for the Bowden litigation. (*Id.* ¶ 79).

After insufficient notice and little time to review the proposal, Counterclaim Defendants called a Board meeting on June 26, 2003, to vote on the proposed sale of ABI to Mattamy. (*Id.* ¶ 81). Buchler explained that the sale was necessary because of pressing liquidity needs and the need to settle pending litigation. (*Id.* ¶ 83). Since Counterclaim Defendants controlled ALH, Arenson could not stop them from selling ABI but he recommended that it would be better for ALH if the members financed another infusion of capital to assist ALH as was previously done with success in 2000 and 2002. (*Id.* ¶ 82). Just three days after notifying Arenson and Lamm of the proposed sale and less than twenty-four hours after providing Arenson and Lamm with the documentation regarding the sale of ABI, Counterclaim Defendants called for a vote on the sale of ABI to Mattamy. (*Id.* ¶ 81). Counterclaim Defendants denied Lamm's request for an adjournment to allow for additional time to review the documents to better understand the terms and conditions of the sale. (*Id.* ¶ 85). With Counterclaim Defendants firmly in control of the Board, Counterclaim Defendants voted in favor of the sale of ABI. (*Id.*). Arenson voted against the sale and Lamm abstained. (*Id.*). It was apparent to Arenson that Counterclaim Defendants intended to act in their own self-interest to liquidate ALH regardless of the consequences to others. (*Id.*)

Shortly after the sale of ABI, Counterclaim Plaintiffs learned that Counterclaim Defendants were proceeding with the liquidation of ALH by marketing BBC to several potential buyers including John LaGuardia ("**LaGuardia**"), the president and chief operating officer of ALH II, and Jeff Sweeney ("**Sweeney**"), the president of BBC. (*Id.* ¶¶ 90-91). Before any steps were taken to address the potential conflict of interest, LaGuardia and Sweeney began assisting Levitt

Corporation ("**Levitt**") with the purchase of BBC. Thereafter, LaGuardia sent a formal letter requesting permission to assist Levitt in evaluating BBC. (*Id.* ¶ 92). Buchler had Fried Frank draft a response granting LaGuardia and Sweeney permission subject to certain disclosure conditions. (*Id.*)

On March 24, 2004, a Board meeting was held and Counterclaim Defendants presented a proposal for the sale of 100% of the stock of BBC to Levitt. [4] (*Id.* ¶ 96). Arenson again expressed concern that the sale was not in the best interests of ALH and that ALH might obtain a better offer if BBC continued to operate. (D.I. 67[C] ¶ 97). Further, Arenson challenged the conflict of interest of Fried Frank, counsel for ALH, SCA and Shamrock (*Id.* ¶ 98). Fried Frank claimed that ALH had waived any potential conflict. (*Id.*). Despite Arenson's reasoned objections, Counterclaim Defendants voted in favor of the sale of BBC (*Id.* ¶ 99).

After the sales of ABI and BBC, ALH was left with only one operating unit, MHI. (*Id.* ¶100). In his capacity as consultant for ALH, Lanius was responsible for advising Counterclaim Defendants on the management and financial aspects of ALH, for negotiating with potential buyers and for negotiating with ALH's lenders, Wachovia and Swiss Re, in connection with the sales of BBC and MHI. [5] (*Id.* ¶¶ 102-03). Levitt, the purchaser of BBC, expressed an interest in MHI. [6] In connection with the sale of MHI to Levitt, Lanius evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH members would receive a payment of $1 million if the Levitt transaction closed. (*Id.* ¶ 105). For reasons that remain unclear, on October 6, 2004, Levitt informed ALH that it was no longer interested in purchasing MHI. (*Id.* ¶ 107).

---

[4] LaGuardia used his insider knowledge about Defendants' mismanagement of ALH and their lack of commitment to ALH to leverage an advantageous deal for the purchase of BBC by Levitt to the disadvantage of ALH. *Id.*

[5] At the time of the sale of ABI in 2003, Lanius was the CFO for ALH II. After the sale of ABI in 2003, Lanius became the President of ABI's acquirer, Mattamy. Despite his new position, he was hired by Counterclaim Defendants as a consultant to advise them on the management and financial aspects of ALH and assist in the further sales of ALH's operating units BBC and MHI. (*Id.* ¶ 102).

[6] After the sale of BBC to Levitt, LaGuardia, the former President of ALH II, became the President of Levitt.

9

In an email to Arenson and Lamm dated October 6, 2004, Buchler conveyed Levitt's intent to withdraw, and also indicated that Lanius, as President of Mattamy, was interested in purchasing MHI. (*Id.* ¶ 108). On October 22, 2004, Mattamy submitted a proposal through Lanius, offering to purchase MHI on terms even less favorable than the Levitt deal. (*Id.* ¶ 109). Mattamy's depressed offer was not surprising since Lanius was intimately familiar with the financial condition of ALH and knew that Counterclaim Defendants' conduct caused the severely depressed financial condition of ALH and MHI. (D.I. 67[C] ¶ 111).

Counterclaim Defendants made no efforts to solicit other buyers to purchase MHI or to shop MHI on the open market but, instead, entered into discussions with its own consultant, Lanius, who was intimately familiar with the financial weaknesses of ALH and Shamrock's desire to liquidate ALH at any cost. (*Id.* ¶ 110). In December 2004, Counterclaim Defendants approved the sale of MHI to Mattamy. (*Id.* ¶ 113).

Counterclaim Defendants achieved their goal of liquidating ALH's operating units piecemeal. As Arenson forewarned, Counterclaim Defendants' piecemeal sale of ALH resulted in a total loss of equity to ALH's members. Although it still exists, ALH no longer has any operations and is winding up its affairs. (*Id.* ¶ 117). At the expense of its equity and the remaining members' equity in ALH, Shamrock, with the help of Krieger, Buchler, Stein and SCA, was able to recoup $3,598,000 in loans, avoid having to disgorge the repayments as preferences and eliminate their costly and time-consuming management responsibilities at ALH.

## ARGUMENT

**I.    Counterclaim Defendants' Motion for Judgment on the Pleadings Should Be Denied.**

Counterclaim Defendants' Motion for Judgment on the Pleadings as to Counts I, II, III and VIII[7] of the Amended Complaint should be denied as Counterclaim Defendants have failed to meet their burden under Federal Rule of Civil Procedure 12(c). The burden of establishing that

---

[7] Counts I, II, III and VIII in the Amended Complaint are: Count I—Declaratory Judgment: No Breach of Fiduciary Duty; Count II—Declaratory Judgment: No Breach of Operating Agreement; Count III—Declaratory Judgment: No Liability Under Consulting Agreement; and Count VIII—Declaratory Judgment: Arenson as Class B Representative.

judgment on the pleadings is appropriate rests on the moving party. *Institute for Scientific Information, Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir.1991). "Since Rule 12(c) provides for the summary disposition of a party's claims on the merits before discovery, such motions are disfavored." *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 891 (D. Del. 1991).

"In evaluating a Rule 12(c) motion, 'the court must view the pleadings in the light most favorable to, and draw all inferences in favor of, the nonmoving party.'" *Murphy v. Bancroft Const. Co.*, Civ. A. 02-453, 2002 WL 31641641, *1 (D. Del. Nov. 15, 2002)(internal citations omitted). "The motion can be granted 'only if no relief could be granted under any set of facts that could be proved.'" *Falzone*, 776 F. Supp. at 891 (citation omitted). "If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied." *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center*, 536 F. Supp. 1065, 1072 (D.C. Pa. 1982). Here, Counterclaim Defendants, as the moving party, have not and could not establish that they are entitled to judgment on the pleadings. [8] Other than the conclusory argument in the preliminary statement of their brief, Counterclaim Defendants have provided no argument or analysis in support of their claim that they are entitled to judgment on the pleadings.

Counterclaim Defendants contend that the Answer and Counterclaim allege facts that contradict and defeat the breach of fiduciary duty claims. (D.I. 71 at 3). Specifically, Counterclaim Defendants contend that (1) Counterclaim Plaintiffs "have specifically refuted their own conclusory allegations of self-interest based on the loan repayments because all members were repaid in full, Shamrock was not favored in any way and [Counterclaim Plaintiffs] approved and acquiesced in the repayments[;]" (2) the "management responsibilities" theory—that Counterclaim Defendants liquidated ALH to rid themselves of their costly, time-consuming management

---

[8] Even if the Court were to find that Counterclaim Plaintiffs had failed to state a claim in the Counterclaim, amendment would be appropriate under Fed. Rules of Civ. Proc. 15. Rule 15(a) states that leave to amend "shall be freely given when justice so requires[.]" "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.'" *Symbol Technologies, Inc. v. Proxim Inc.*, No. 01-801, 2003 WL 1905637, *1 (D. Del. April 17, 2003)(quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

11

responsibilities—is factually negated by the Counterclaim; and (3) the Answer and Counterclaim admit the existence of rational legitimate business purposes and processes, therefore the bad faith and gross negligence claims cannot survive. (*Id.*). In support of their contentions, Counterclaim Defendants set forth a bulleted list of eleven factual admissions (the "**factual admissions**") that they assert "contradict and defeat the breach of fiduciary duty claims." (D.I. 71 at 2-3).

The "factual admissions" are either legally insignificant, factually inaccurate or present material facts in dispute thereby precluding judgment on the pleadings. The following factual admissions are legally insignificant since they have no relevance to Counterclaim Plaintiffs' breach of fiduciary duty claims in connection with the sales of the operating units:

- Arenson's approvals of the sale of ALH as a whole, the engagement of JMP to sell ALH as a whole, the extension of JMP's engagement and the bonus to Shamrock are immaterial to the breach of fiduciary duty claims regarding the piecemeal sale of the operating units of ALH.
- Arenson's approval of both the Bowden settlement and the loan repayments have no relevance to the breach of fiduciary duty claims because Arenson did not approve either until after Counterclaim Defendants breached their fiduciary duties by approving the sales of ABI and BBC and because the Answer and Counterclaim specifically refute that the sales of ABI and BBC were necessary to settle the Bowden litigation or to repay the 2000 and 2002 Loans. *See* discussion *infra* § III.D. at 33.
- The admission that Shamrock was not on both sides of the transaction is irrelevant to Counterclaim Plaintiffs' claim of self-interest against Shamrock.

Further, the following list of "factual admissions" are mischaracterizations:

- Although Arenson approved the extension of JMP's contract, there are no admissions that Arenson approved JMP seeking buyers for ABI. To the contrary, the Answer denied "that Arenson approved any decision for JMP to seek buyers for ABI." (D.I. 37 & 67[A] ¶ 85); *see also* discussion *infra* § III.D. at 33.
- Although Arenson approved settlement of the Bowden litigation, the Answer does not admit that Arenson admitted that the settlement necessitated the sale. To the contrary, the Counterclaim asserts that settlement of the Bowden litigation did not warrant the sale of ABI. (D.I. 67[C] ¶ 83); *see also* discussion *infra* § III.D. at 32-33.
- Although no additional funding was provided, the Answer denies that it was because the Class B members refused to provide it and the Counterclaim alleges that the Class B members were prepared to fund needed capital. (D.I. 37 & 67[A] ¶130); (D.I. 67[C] ¶ 62).

Finally, the following list of "factual admissions" are material facts in dispute that have been mischaracterized as admissions:

- The Answer and Counterclaim do **not** admit that Shamrock did not receive a disproportionate benefit from the proceeds of the sales. To the contrary, the Counterclaim is replete with allegations that Shamrock was able to eliminate their costly, time-consuming management responsibilities and obtain repayment of their $3,598,000 in loans, both of which were not received by all members of ALH since only Shamrock had

management responsibilities and only some members loaned money to ALH, and of those that did the largest amount was $625,000. *See* discussion *infra* § III.B. at 23.

- It is disingenuous and a mischaracterization for Counterclaim Defendants to characterize the allegation in the Counterclaim as stating that the purpose of the sales was to keep ALH viable and out of bankruptcy.    The Counterclaim alleges that after Counterclaim Defendants sold off ABI to obtain repayment of their loans, they then sold off BBC to use the proceeds to keep ALH viable until the expiration of the preference period.  The only reasonable inference that can be drawn from the allegations in the Counterclaim is that Counterclaim Defendants were trying to infuse just enough cash into ALH—by selling off the operating units at fire sale prices—to keep it viable until the expiration of the preference period in order to protect their loan repayments from disgorgement. (D.I. 67[C] ¶ 95); *see also* discussion *infra* § III.D. at 31-32.

- The Answer and Counterclaim do **not** "infer" that Shamrock needed to sell the operating units of ALH to end their management responsibilities.  To the contrary, the Counterclaim alleges that Counterclaim Defendants' self-interested motive for selling the operating units was because they chose to end their management responsibilities.  *See* discussion *infra* § III.B. at 23.

In accordance with the standard of review on a 12(c) motion—that "a party moving for a judgment on the pleadings impliedly admits the truth of its adversary's allegations and the falsity of its own assertions that have been denied by that adversary," and that "[j]udgment will not be granted unless the movant clearly establishes there are no material issues of fact, and he is entitled to judgment as a matter of law"—Counterclaim Defendants' arguments and supporting "factual admissions" do not establish that they are entitled to judgment on the Amended Complaint.  *See* Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 3d § 1370; *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).  The "factual admissions" demonstrate that there are material facts in dispute regarding, *inter alia*, Shamrock's self-dealing with respect to the loan repayments and the elimination of their management responsibilities.  There are not, however, any "factual admissions" purporting to refute that Krieger, Buchler and Stein lacked independence, that they engaged in an irrational decision making process with reckless indifference to material information available to protect the financial interests of ALH and its members or that they fulfilled their *Revlon* duties by maximizing value in the sales of the operating units for ALH's members.  Moreover, Counterclaim Defendants continue to assert that Counterclaim Plaintiffs have not pled sufficient facts to overcome the business judgment rule, a standard expressly rejected by the Third Circuit in *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229 (3d Cir.2005).  However,

although not required to do so, the Counterclaim contains sufficient allegations to overcome the business judgment rule. *See* discussion *infra* § III.

In light of the federal notice pleading standards and the standard of review under Rule 12(c), Counterclaim Plaintiffs' Answer and Counterclaim do not support Counterclaim Defendants' conclusion that they are entitled to judgment on the Amended Complaint as to Counts I, II and III. As for judgment on Count VIII—declaratory judgment as to Arenson as Class B Representative— the Court has already concluded that "Any harm caused by depriving the Class B representative of his rights to participate in the Board will be suffered by the class B members, not by defendant Arenson as the Class B representative." (D.I. 77).

## II. Standards of Review for Motion to Dismiss

The purpose of a motion to dismiss under 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Strum v. Clark*, 835 F.2d 1009, 1011 (3d Cir. 1987). A motion to dismiss a counterclaim is decided by the same standard as a motion to dismiss a complaint. *See Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975, 978 (D. Del. 1976). In deciding a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Strum*, 835 F.2d at 1011. A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). The issue in resolving a motion to dismiss is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Furthermore, the moving party bears the burden of showing no claim has been stated and Counterclaim Defendants have failed to meet that burden. *See Gould Electronics Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). Counterclaim Plantiffs have alleged sufficient facts in the Counterclaim to establish that they are entitled to offer evidence to

support their claims. At best, Counterclaim Defendants have raised issues of fact not relevant at this stage.

The federal pleading requirements in the context of a motion to dismiss under Rule 12(b)(6) were addressed in a recent decision by the Court of Appeals for the Third Circuit in *Stanziale*, 416 F.3d 229, and applied by this Court in *In re IT Group Inc.*, Civ. A. 04-1268, 2005 WL 3050611, *7 (D. Del. Nov. 15, 2005). The Third Circuit held that "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts" because to "say that a plaintiff's claim appears factually weak is not to say that he states no claim." *Stanziale*, 416 F.3d at 237-38. A party "'need only make out a claim upon which relief can be granted. If more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules.'" *Id.* at 237 (quoting *Alston v. Parker*, 363 F.3d 229, 233 n. 6 (3d Cir.2004)). The *Stanziale* court reiterated that "supporting facts should be alleged, but only those necessary to provide the defendant **fair notice of the plaintiff's claim** and the 'grounds upon which it rests.'" *Id.* at 237 (emphasis added). Further, the court stated that "to hold otherwise would be effectively to transform Rule 12(b)(6) motions into multi-purpose summary judgment vehicles. That we will not do." *Id.* at 238.

Moreover, contrary to Counterclaim Defendants' assertions, Counterclaim Plaintiffs are not required to plead around the business judgment rule to survive a motion to dismiss under Rule 12(b)(6). The *Stanziale* court explained that generally, it would "not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)" unless "an unanswered affirmative defense appears on its face[.]" *Stanziale*, 416 F.3d at 238. Since Stanziale's complaint expressly pled that the business judgment rule did not vitiate any of his claims, the court held that he was required to plead facts that defeated the presumption of the business judgment rule. *Id.* In contrast, Counterclaim Plaintiffs do not make any allegations about the business judgment rule and therefore, applying *Stanziale*, they are not required to plead around the business judgment rule and Counterclaim Defendants may not rely on the affirmative defense of the business judgment rule to trigger dismissal under Rule 12(b)(6).

### III. The Counterclaim States Claims for Breach of Fiduciary Duty.

Counterclaim Plaintiffs have alleged the following claims, both direct and derivative, for

breach of the fiduciary duties of loyalty and care:

> Breach of Fiduciary Duty against Krieger, Buchler and Stein, for breach of the fiduciary duty of loyalty for their lack of independence in voting to sell off the operating units of ALH to further Shamrock's agenda. (D.I. 67[C] ¶¶ 135-139; 186-191; 216-223).
>
> Breach of Fiduciary Duty against Shamrock, as the controlling member of ALH, for breach of the duty of loyalty for selling off the operating units of ALH to further its own self-interest to eliminate costly, time-consuming management responsibilities, to secure repayment of its loans from ALH and to ensure that the loan repayments would not be treated as preferences. (D.I. 67[C] ¶¶ 127-133; 178-184).
>
> Breach of Fiduciary Duty—Gross Negligence against Shamrock, Krieger, Buchler and Stein, for breach of the duty of care for for their gross negligence in the sales of ALH's operating units because they rubber stamped the sales of the operating units and engaged in an irrational decision making process with reckless indifference to material information available to protect the financial interests of ALH's members. (D.I. 67[C] ¶¶ 161-167; 186-191).

To survive a motion to dismiss the breach of fiduciary duty claims, Counterclaim Plaintiffs

must allege supporting facts necessary to provide the Counterclaim Defendants fair notice of the

claims against them and the grounds upon which they rest. *See Stanziale*, 416 F.3d 237; *In re IT

Group Inc.*, 2005 WL 3050611, *8. Counterclaim Plaintiffs have met this standard.

In support of their Motion, Counterclaim Defendants contend that Counterclaim Plaintiffs'

Answer and Counterclaim admits facts that contradict and preclude breach of fiduciary duty

claims.[9] (D.I. 71 at 7). Specifically, Counterclaim Defendants contend that the allegations of self-

interested motives—to secure repayment of their loans and to end their management

responsibilities—are specifically refuted by the pleadings. *Id.* Moreover, Counterclaim Defendants

contend that the allegations of bad faith and gross negligence cannot overcome the presumption of

the business judgment rule because the pleadings admit the existence of rational and legitimate

reasons and processes in connection with the sales of the operating units. *Id.*

---

[9] Counterclaim Defendants' reliance on the Answer or any pleading other than the Counterclaim is inappropriate because Counterclaim Defendants have moved for dismissal of the Counterclaim under Rule 12(b)(6). In deciding the Motion to Dismiss the Counterclaim, this Court's review is limited to the allegations in the Counterclaim. *See Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975, 978 (D. Del. 1976).

Counterclaim Defendants' contentions are without merit as they are based on distortions of the factual allegations in the Counterclaim and an improper standard of review—that Counterclaim Plaintiffs are require to plead around the business judgment rule. However, even if Counterclaim Plaintiffs were required to plead around the business judgment rule—which they are not—the Counterclaim contains sufficient allegations to put Counterclaim Defendants on notice of the claims against them—lack of independence by Krieger, Buchler and Stein, self-dealing by Shamrock and gross negligence by Shamrock, Krieger, Buchler and Stein in the sale of the operating units, and therefore, to defeat the business judgment rule.

## A. The Counterclaim States Claims for Breach of the Fiduciary Duty of Loyalty Against Krieger, Buchler and Stein.

### 1. The Counterclaim Alleges That Krieger, Buchler and Stein Breached Their Fiduciary Duty of Loyalty Because They Lacked Independence in Approving the Sales of the Operating Units.

Counterclaim Plaintiffs have stated claims for breach of the fiduciary duty of loyalty against Krieger, Buchler and Stein because they lacked independence in approving the sales of the operating units and acted in bad faith to protect and advance the interests of Shamrock, the controlling member of ALH. "Under Delaware law, a director's duty of loyalty 'imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation.'" *In re IT Group Inc.*, 2005 WL 3050611, *7 (quoting *Belcom, Inc. v. Robb*, Civ. A. 14663, 1998 WL 229527, at *3 (Del. Ch. 1998)). "A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, Civ.A. 20228, 2004 WL 1949290, *9 (Del. Ch. Aug. 24, 2004)(quoting *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003)). "One cannot act in conformity with her duty of loyalty to a company if she acts in bad faith." *Id.* "While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply." *In re IT Group Inc.*, 2004 WL 1949290, *9 (quoting

17

*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). If the challenging party rebuts the presumption,

"the burden shifts to the defendant directors 'to prove to the trier of fact the 'entire fairness' of the

transaction,' that is, 'that the transaction was the product of both fair dealing and fair price.'" *In re*

*Hechinger Inv. Co. of Del.*, 327 B.R. 537, 549 (D. Del. 2005) (quoting *Cede & Co. v. Technicolor,*

*Inc.*, 634 A.2d 345, 361 (Del.1993)).

A plaintiff can avoid the presumption for a particular transaction by showing "that a

majority of a board that approved the transaction in dispute was interested and/or lacked

independence." *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch. 2002). A director lacks independence

when the "'directors are 'beholden' to [the controlling person] or so under their influence that their

discretion would be sterilized.'" *Orman,* 794 A.2d at 24 (quoting *Rales v. Blasband,* 634 A.2d 927,

936 (Del. 1993)). "Independence means that a director's decision is based on the corporate merits

of the subject . . . rather than extraneous considerations or influences." *Aronson,* 473 A.2d at 816.

Counterclaim Plaintiffs state a claim for breach of the duty of loyalty against Krieger,

Buchler and Stein and have alleged sufficient facts to put them on notice of the claims against

them—that in voting to sell off the operating units, Krieger, Buchler and Stein lacked

independence because they did not base their decision on the corporate merits of the sales but were

so beholden to Shamrock that they acted in furtherance of its agenda to the detriment of ALH and

its members. Specifically, the Counterclaim allege the following facts:

- Krieger, Buchler and Stein are representatives on the Board as well as officers and employees of Shamrock and they owe conflicting duties of loyalty to both Shamrock and ALH.[10] (D.I. 67[C] ¶¶ 12-14, 23-25). Krieger, Buchler and Stein are beholden to Shamrock and act at the direction of Shamrock. (*Id.* ¶ 43). *Id.*
- Krieger, Buchler and Stein used their majority position on the Board to approve the sales of ABI, BBC and MHI over the objections of Counterclaim Plaintiffs and Arenson. (*Id.* ¶¶ 84-85, 99, 114).
- Arenson, on behalf of the Class B members, tried on numerous occasions to demonstrate to Krieger, Buchler and Stein that their plan to sell off the operating units was not in the best interests of ALH or its members. (*Id.* ¶¶ 55, 58, 62, 67 )
- For example, in an email dated August 1, 2002, Arenson summarized the estimates of net proceeds from the sale of each operating unit less existing debts and demonstrated to Counterclaim Defendants that the piecemeal sale of the operating units would result in increased transactional costs and a substantial loss of equity to ALH's members. (*Id.* ¶ 70).

---

[10] Krieger is vice-chairman and chief operating officer of Shamrock. (*Id.* ¶ 12). Buchler is vice president and chief financial officer of Shamrock. (*Id.* ¶ 13). Stein is director of real estate for Shamrock. (*Id.* ¶ 14).

- With total disregard for the best interests of ALH and its members, Krieger, Buchler and Stein ignored the warnings and vigorously pursued the piecemeal liquidation of ALH. (*Id.* ¶ 67). Their goal was clear—utilize their majority position and control to liquidate ALH regardless of the consequences to ALH or its members to further Shamrock's self-interested agenda—to eliminate its costly, time-consuming management responsibilities, to obtain repayment of its $3,598,000 loans to ALH and to ensure that ALH remain viable until the expiration of the preference period so the loan repayments would not have to be disgorged. (D.I. 67[C] ¶¶ 30, 33, 50, 54, 56, 65, 66, 67, 69, 74, 84, 95, 112, 115, 129 and 180).

Accordingly, the Counterclaim states a claim for breach of the fiduciary duty of loyalty against Krieger, Buchler and Stein and contains sufficient facts to put them on notice of the claims against them. Specifically, the allegations in the Counterclaim of Shamrock's control over ALH and Krieger, Buchler and Stein, if proven, support the conclusion that they lacked independence in the sales of ALH's operating units, and therefore, Counterclaim Plaintiffs' breach of fiduciary duty claims should not be dismissed. *See In re IT Group Inc.*, 2005 WL 3050611, *8 (holding that allegations of actual control over the corporation by majority shareholders, if proved, would support a conclusion that some or all of the directors lacked independence concerning the challenged transactions).

### 2. In the Alternative, the Counterclaim Alleges That Krieger, Buchler and Stein Breached Their Fiduciary Duty of Loyalty by Failing to Maximize Value for the Members of ALH in the Sales of the Operating Units.

Even if the court finds that the directors were independent and did not act in their own self-interest, Counterclaim Plaintiffs have alleged sufficient facts to state a claim for breach of the duty of loyalty against Krieger, Buchler and Stein because they breached their *Revlon* duties in the sale of the operating units of ALH by failing to maximize value for the benefit of ALH's members. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). In *Revlon,* the court held that when the board of directors authorizes a sale of the company, the duty of the board changes from preservation of the company as a corporate entity to the maximization of the company's value at a sale of the company for the stockholders' benefit. *Id.* at 182. "The directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.*

In *Blackmore Partners, L.P. v. Link Energy LLC*, 864 A.2d 80 (Del. Ch. 2004), the Delaware Court of Chancery held that "a complaint that does not contain specific allegations that a majority of the directors were either interested in the transaction or lacked independence may nevertheless survive a motion to dismiss on the basis of a permissible inference that the action of the directors amounted to a breach of the duty of loyalty." *Id.* at 81. The court held that the former equity unit holders alleged sufficient facts in the complaint to support a claim for disloyal conduct, which was enough to survive the motion to dismiss. The complaint alleged that the directors approved a transaction that disadvantaged the equity unit holders at a time when the LLC was neither insolvent nor on the verge of re-entering bankruptcy, "[y]et as a result of the transaction at issue, those units were rendered valueless." *Id.* at 85-86. In reaching its decision, the court explained:

> Once a board of directors determines to sell the corporation in a change of control transaction, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders. This obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its duties. Rather, the board's actions must be evaluated in light of the relevant circumstances to determine whether they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.

*Blackmore Partners*, 864 A.2d at 85 (internal citations omitted). The court held that the approval of "a sale of substantially all of [the LLC's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct." *Id.* at 86.

Similarly, in the present case, Counterclaim Plaintiffs have alleged that under *Revlon*, Counterclaim Defendants violated their fiduciary duty of loyalty by failing to seek the transaction that offered the best value reasonably available to the members of ALH. After the Board decided to pursue the sale of ALH, Counterclaim Defendants' fiduciary duty changed to maximizing ALH's value at a sale for the benefit of the members. Even after it was apparent that a sale of the entire company was not imminent, Counterclaim Defendants' duty remained unchanged because

20

they unilaterally decided to sell ALH by liquidating its operating units. Counterclaim Defendants'
duty was to maximize value to ALH's members, which they failed to do.

Here, the Counterclaim alleges that after the sale of all the assets of ALH, namely ABI,
BBC and MHI, the resultant distribution of proceeds went exclusively to the company's creditors,
including Shamrock and other members of ALH. The liquidation of ALH resulted in a total loss of
equity to the members of ALH and no distributions were made. (D.I. 67[C] ¶¶ 2, 116). Therefore,
this conduct "raises a reasonable inference of disloyalty or intentional misconduct" and under
federal notice pleading standards, Counterclaim Plaintiffs have alleged sufficient facts to establish
a claim for disloyalty or intentional misconduct. *See Blackmore Partners*, 864 A.2d at 86.
Accordingly, the Counterclaim states a claim for breach of the duty of loyalty against Krieger,
Buchler and Stein.

## B. The Counterclaim States Claims for Breach of the Fiduciary Duty of Loyalty Against Shamrock.

Counterclaim Plaintiffs have stated a claim for breach of the fiduciary duty of loyalty
against Shamrock because Shamrock used its control over ALH and the Board in connection with
the sale of the operating units to engage in self-dealing. Specifically, Shamrock used its control to
obtain benefits not received by ALH's members generally,—i.e. elimination of its costly, time-
consuming management responsibilities of ALH, repayment of approximately \$3,598,000 in
outstanding loans to ALH and assurance that its loan repayments were not treated as preferences.

"Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority
interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v.
Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987). To establish a breach of fiduciary duty by
a controlling shareholder, the plaintiff must prove that the controlling shareholder used its control
over the corporation's board of directors to engage in self-dealing. *Sinclair Oil Corp. v. Levien*,
280 A.2d 717, 719-20 (Del. 1971). "Self-dealing occurs when the majority shareholders cause the
dominated corporation to act in such a way that the majority shareholders receive something from
the corporation not received by the minority shareholders. *Id.* at 720; *see also Cantor v. Perelman*,
414 F.3d 430, 435-36 (3d Cir. 2005)(applying Delaware law)(holding that "[a] corporate fiduciary

receiving a 'personal benefit not received by shareholders generally' is a 'classic' example of breach of the duty of loyalty" without regard to whether the fiduciary caused the beneficiary to act to its detriment); *Aronson,* 473 A.2d at 812.

Counterclaim Plaintiffs have stated a claim for breach of the fiduciary duty of loyalty against Shamrock and have alleged sufficient facts to put it on notice of the claim against it—that Shamrock, as the controlling member of ALH, engaged in self-dealing when it used its control over the Board to cause ALH to sell off its operating units at fire sale prices to obtain benefits for itself to the detriment of ALH and the minority members of ALH. Specifically, the Counterclaim alleges the following facts:

- Shamrock owes a fiduciary duty of loyalty to the minority members of ALH because it exercises control over the business affairs of ALH based in part on its approximately 62% ownership of the Class A membership interest and approximately 38% ownership of ALH's total equity. (D.I. 67[C] ¶ 10).
- From the inception of ALH, Shamrock, through the Class A representatives, controlled all "Major Decisions" of ALH. (*Id.* ¶¶ 26-28).
- In July 2001, in a move designed to further entrench its control over ALH, Shamrock forced Lion, ALH's manager, to enter into a Management Agreement wherein Lion was relieved of its authority and Shamrock was given the right to designate the person to fill one of the Class D seats on the Board. (*Id.* ¶¶ 34-35).
- Also in July 2001, Shamrock caused ALH to enter into a Consulting Agreement with SCA, a wholly owned subsidiary of Shamrock, to take over much of the management responsibilities of ALH. (*Id.* ¶¶39-40).These management responsibilities were performed by Krieger, Buchler and Stein. (*Id.* ¶¶11-13).
- Shamrock placed Krieger, Buchler and Stein on the Board. (*Id.* ¶¶ 23-25).
- Thereafter, and at all relevant times, ALH was effectively controlled solely by Shamrock because it controlled three of the five representatives on the Board; it had the power to remove the nominal manager, Lion; it controlled SCA, the new management consultant; and it had the sole power under the Operating Agreement to make Major Decisions for ALH. (*Id.* ¶ 37).

Thus, by reason of Shamrock's status and domination, it is clear that Shamrock owed Counterclaim Plaintiffs a fiduciary duty. As part of this fiduciary duty, Shamrock was required to be fair in its dealings insofar as those dealings affected the interests of the minority members of ALH. *See Burton v. Exxon Corp.,* 583 F. Supp. 405, 414 (D.C.N.Y. 1984)(applying Delaware law)(holding that as part of their fiduciary duty, Exxon, the majority shareholder, and the board of directors "were required to be fair in their dealings insofar as those dealings affected the interests of the minority stockholders."). Shamrock breached its fiduciary duty by using its control of the Board to sell off the operating units of ALH to further its own self-interest—namely eliminating its

costly, time-consuming management responsibilities, obtaining repayment of approximately $3,598,000 in outstanding loans to ALH and ensuring that its loan repayments were not treated as preferences. (D.I. 67[C] ¶¶ 30, 33, 50, 54, 56, 65, 66, 67, 69, 74, 84, 95, 112, 115, 129 and 180). Shamrock's actions amounted to self-interest because Shamrock received a benefit from the piecemeal sales of the operating units not received by all members of ALH.

Counterclaim Defendants assert that Shamrock did not need to sell the operating units to end its management responsibilities because it was not required to serve as management under the Operating Agreement and the Consulting Agreement with SCA was terminable at any time. (D.I. 72 at 3). The reality, however, is that Shamrock did not relinquish management of ALH. Regardless of whether Shamrock was *obligated* to manage ALH, it was clear from Shamrock's action that unless the Class B members paid $12 million for the Class A's interest in ALH, Shamrock intended to retain control only as long as necessary to liquidate ALH and secure repayment of its loans. The Counterclaim alleges the following facts regarding Shamrock's management responsibilities:

- Prior to the sale of any of the operating units, Arenson on behalf of the Class B members, informed Counterclaim Defendants that the Class B members had met and unanimously agreed that the sale of BBC was ill advised and would weaken ALH and make the sale of the remaining operating units more difficult and result in a loss of equity to all members. (D.I. 67[C] ¶ 58).
- Further, Arenson advised that while the Class B members would like to continue to operate ALH with Counterclaim Defendants, if they were unwilling to continue, then the Class B members would consider buying out the Class A's interests in ALH. (*Id.* ¶ 59).
- Counterclaim Defendants expressed an interest in selling their interests to the Class B members but still continued to pursue a buyer for ABI and BBC. (*Id.* ¶ 60). Negotiations ensued but an agreement was not reached since Counterclaim Defendants demanded $12 million for their interest and the Class B members offered $3 million. (*Id.* ¶ 61).
- When it was apparent that Counterclaim Defendants would not sell their interests to Counterclaim Plaintiffs, Arenson asked Counterclaim Defendants to recommit to running ALH in a positive and forward looking manner and to abandon a sale. (*Id.* ¶ 62).

Counterclaim Defendants refused to recommit to running ALH and rather than give up the costly and time-consuming management of ALH, Shamrock used its control to liquidate ALH's operating units thereby accomplishing its goals. Accordingly, the elimination of the costly, time-consuming management responsibilities was a benefit received by Shamrock that was not received by all members.

Moreover, Shamrock received $3,598,000 in loan repayments, a benefit not received by all members. Counterclaim Defendants argue that the loan repayments to Shamrock were a benefit received by all Counterclaim Plaintiffs. This misstates the facts. Not all of the Counterclaim Plaintiffs loaned money to ALH,[11] and of those that did,[12] the largest amount was $625,000, not enough to warrant running ALH into the ground to preserve these repayments. In contrast, Shamrock's outstanding loans to ALH were approximately $3,598,000, an amount that apparently Shamrock deemed significant enough to justify its decision to keep ALH running until expiration of the preference period even at the expense of its equity in ALH. Therefore, Shamrock clearly received a benefit from the sale of ALH's operating units that was not received by all members of ALH and that was significantly greater than the benefits received by other members.

Accordingly, the allegations in the Counterclaim of Shamrock's control and self-interest put Shamrock on notice of Counterclaim Plaintiffs' claims against it, and therefore, Counterclaim Plaintiffs' claim for breach of the fiduciary duty of loyalty against Shamrock should not be dismissed. *See In re IT Group Inc.*, 2005 WL 3050611, *10 (holding that allegations of control and self-interest by controlling defendant shareholders put them on notice of the claims against them and satisfied the federal pleading standards).

### C. The Counterclaim States Claims for Breach of the Fiduciary Duty of Care Against Shamrock, Krieger, Buchler and Stein for Their Gross Negligence in the Sales of the Operating Units.

Counterclaim Plaintiffs have stated claims for breach of the fiduciary duty of care against Shamrock, Krieger, Buchler and Stein (hereinafter in this section "Counterclaim Defendants"), for their gross negligence in connection with the sales of the operating units of ALH. Counterclaim Defendants "rubber stamped" the sale of the operating units and engaged in an irrational decision making process with reckless indifference to material information available to protect the financial interests of ALH and its members.

---

[11] J12ALH and Laurel did not loan money to ALH.

[12] Shamrock received repayment of its 2000 Loan of $1,633,334 and its 2002 Loan of $1,964,800.00. (D.I. 67[C] ¶ 30, 33). Arenson Holdings received repayment of its 2000 Loan of $166,666.00. *Id.* ¶ 30. D.A. Gardens received repayment of its 2002 Loan of $312,500.00. *Id.* ¶ 33. SELK received repayment of its 2002 Loan of $625,000.

24

Under Delaware's fiduciary duty of care, directors must act in good faith, with the care of an ordinarily prudent person, and in the best interests of the corporation. *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967-69 (Del. Ch. 1996). The duty of care measures directors' decision-making processes, requiring that directors be informed in order to discharge this duty. *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). Only actions that are grossly negligent will give rise to liability for a breach of the duty of care. *Smith v. Van Gorkom*, 488 A.2d 858, 882-83 (Del. 1985). Gross negligence in the duty of care context is "a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Civ. A. 762-N, 2005 WL 2130607, *4 (Del. Ch. Aug. 26, 2005). "[T]he protections of the business judgment rule will not be afforded to directors who fail 'to inform themselves, prior to making a business decision, of all material information reasonably available to them.' Directors have "an affirmative duty" to protect the financial interests of the stockholders and must "proceed with a critical eye" in acting on their behalf." *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 269 (Del.Ch. 1989)(internal citations omitted).

In *McMullin v. Beran*, 765 A.2d 910 (Del. 2000), the Supreme Court of Delaware held that the plaintiff alleged sufficient facts to state a claim for breach of the duty of care. The amended complaint alleged, *inter alia*, that the board authorized ARCO, the majority shareholder, to negotiate the merger agreement with Lyondell, a third-party; that the board met only once to consider the transaction negotiated by ARCO with Lyondell; and that the board approved the transaction with Lyondell at that meeting on the basis of disclosures made by the majority shareholder's financial advisor. The court noted that "[t]he imposition of time constraints on a board's decision-making process may compromise the integrity of its deliberative process. History has demonstrated boards 'that have failed to exercise due care are frequently boards that have been rushed.'" *Id.* at 922 (internal citations omitted). In reversing the Chancery Court's dismissal of plaintiff's breach of the duty of care claims, the court held that "[t]he specific allegations contained in McMullin's Amended Complaint, if true, suggest that the directors of Chemical breached their duty of care by approving the merger with Lyondell without adequately informing themselves

25

about the transaction and without determining whether the merger consideration equaled or exceeded Chemical's appraisal value as a going concern." *Id.* at 922.

Moreover, in *Stanziale*, the Third Circuit reversed the district court's dismissal of the plaintiff's duty of care claims for inattention and for gross negligence and mismanagement. The court held that the plaintiff had alleged enough to survive a motion to dismiss the inattention claim where the complaint alleged that the directors "rubber stamped" major capital expenditures. *Stanziale*, 416 F.3d at 240. In reaching its decision, the court reasoned that "a 'good faith effort to be informed and exercise judgment' is the core duty of care inquiry." *Id.* The court noted that the claim for gross negligence and mismanagement, appeared to be synonymous with the irrational decision-making process allegations in the inattention claim. Nevertheless, the court held that "Stanziale deserved the opportunity to refine his theories of liability on remand with the aid of discovery. It is still early in this litigation. It may be that the adversarial process in its later stages elicits refinements in the concepts of gross negligence in Delaware that the parties have not yet uncovered, focused as they have been on pleading standards." *Id.* at 244.

Similarly, in the present case, Counterclaim Plaintiffs have alleged facts which show that in selling the operating units of ALH, Counterclaim Defendants failed to use the amount of care which an ordinarily careful and prudent person would use in similar circumstances, and failed to consider all material information reasonably available thereby acting with reckless indifference to the minority members of ALH. Specifically, the Counterclaim alleges the following facts:

- After Counterclaim Defendants began expressing a desire to exit their investment in ALH as their management responsibilities were too costly and time-consuming, the Board decided it was a good time to consider selling the entire company. (D.I. 67[C] ¶ 50). In connection with the sale, Shamrock hired its own attorneys, the law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank"), as the attorneys for ALH to provide legal counsel and Jolson Merchant Partners, a broker with whom it had a prior relationship, to provide brokerage services. (*Id.* ¶¶ 39, 51).
- At the direction of Counterclaim Defendants, the sale of ALH as a going concern was mishandled from the start and thus, Counterclaim Defendants were unable to sell the entire company. (*Id.* ¶ 53). Rather than continue to look for a buyer for the entire company or stop the sale process and focus on strengthening the company, Counterclaim Defendants unilaterally decided to market the operating units. (*Id.* ¶ 56). Moreover, Counterclaim Defendants forged ahead with liquidation despite repeated warnings by Arenson. *See infra* at 6-7. Rather than investigate Arenson's concerns and address them at a Board meeting, Counterclaim Defendants forged ahead with liquidation.

26

- In connection with their liquidation efforts, Counterclaim Defendants continued to rely on the advice of Fried Frank despite the non-waivable conflict of interest raised by Arenson. (D.I. 67[C] ¶¶ 46, 68, 98). Fried Frank's recognition of its conflict is evidenced by a conflict letter it insisted that ALH sign despite the fact that the conflict could not be waived. (*Id.* ¶ 47). Fried Frank attended the Board meetings on behalf of ALH and Shamrock and continued throughout the sale of ABI and BBC to represent both ALH and Shamrock despite the unwaivable conflict. (*Id.* ¶ 48). Any attempt by the Class B members to bring their own counsel to the Board meetings was blocked by Shamrock without explanation. (*Id.*).

- On June 26, 2003, just three days after notifying Arenson and Lamm of the proposed sale and less than twenty-four hours after providing them with the documentation regarding the sale of ABI, Counterclaim Defendants called for a vote on the sale of ABI to Mattamy. (*Id.* ¶ 81). Counterclaim Defendants denied Lamm's request for an adjournment to allow for additional time to review the documents to better understand the terms and conditions of the sale. (*Id.* ¶ 85). Counterclaim Defendants parroted their earlier rationale that the sale was necessary because of pressing liquidity needs and settlement of the Bowden litigation and failed to disclose to the Board that the Bowden trial had been postponed from July 2003 to February 2004, thereby alleviating the urgent need to settle. (*Id.* ¶ 83). Moreover, Counterclaim Defendants did not address the impact the sale would have on ALH or its ability to strengthen its remaining operating units. (*Id.* ¶ 84).

- Less than a month after closing on the sale of ABI, Counterclaim Plaintiffs learned that Counterclaim Defendants were proceeding with the liquidation of ALH by marketing BBC to several potential buyers including LaGuardia, the president and chief operating officer of ALH II, and Sweeney, the president of BBC. (*Id.* ¶¶ 90-91). Before any steps were taken to address the potential conflict of interest, LaGuardia and Sweeney were assisting Levitt with the purchase of BBC. Thereafter, in response to a formal request by LaGuardia, Buchler had Fried Frank draft a response granting LaGuardia and Sweeney permission subject to certain disclosure conditions. (*Id.* ¶ 92).

- On March 24, 2004, a Board meeting was called to consider the proposed sale of 100% of the stock of BBC to Levitt. Without discussion of the impact the sale of BBC would have on ALH or whether the sale was in the best interest of the minority members of ALH, Counterclaim Defendants voted to approve the sale. (*Id.* ¶¶ 96-99).

- After the sales of ABI and BBC, ALH was left with only one operating unit, MHI. (*Id.* ¶100). Levitt, now run by LaGuardia, expressed an interest in MHI. Despite the manner in which LaGuardia used Counterclaim Defendants' mismanagement of ALH (the lack of commitment and weakness of the management team) to leverage the purchase of BBC to the advantage of Levitt and to the disadvantage of ALH, Counterclaim Defendants, nevertheless, attempted to sell MHI to Levitt. (*Id.* ¶ 104). In connection with the sale of MHI to Levitt, Lanius, as a consultant for ALH, evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH members would receive a payment of $1 million if the Levitt transaction closed. (*Id.* ¶ 105). For reasons that remain unclear, on October 6, 2004, Levitt informed ALH that it was no longer interested in purchasing MHI. (*Id.* ¶ 107).

- Thereafter, Lanius, as President of Mattamy, indicated that Mattamy was interested in purchasing MHI. (*Id.* ¶ 108). On October 22, 2004, Mattamy submitted a proposal through Lanius, offering to purchase MHI on terms even less favorable than the Levitt deal. (*Id.* ¶ 109). Because of Counterclaim Defendants' past conduct in dismantling ALH and their bad faith refusal to take additional steps to find a more lucrative buyer, ALH found itself in a position of having only one buyer who was intimately familiar with all of its weaknesses including Counterclaim Defendants' desire to rid themselves of their investment and who was able to exploit these weaknesses to the disadvantage of ALH and its members and to the advantage of Mattamy. (*Id.* ¶ 114).

27

- Counterclaim Defendants made no efforts to solicit other buyers to purchase MHI or to shop MHI on the open market but instead, entered into discussions with its own consultant, Lanius. (*Id.* ¶ 110). In December 2004, Counterclaim Defendants approved the sale of MHI to Mattamy. (*Id.* ¶ 113).

These allegations establish that Counterclaim Defendants "rubber stamped" the sale of the operating units by, *inter alia*, failing to obtain advice from disinterested professionals regarding the sales, failing to consult professionals on restructuring ALH when a sale of the entire company did not occur, failing to consider or advise the Board on the impact each sale would have on the overall business of ALH or the equity of the minority members, rushing a vote on the sale of ABI, negotiating with insiders for the sales of BBC and MHI and failing to obtain advice from disinterested professionals regarding those sales. The Counterclaim is replete with allegations regarding actions that indicate an irrational decision making process and a reckless indifference to material information available to protect the financial interests of the members. Under the federal notice pleading standards, the Counterclaim alleges sufficient facts to establish a claim for breach of the duty of care.

### D. Counterclaim Defendants Have Failed to Meet Their Burden of Showing that the Counterclaim Does Not State Claims for Breach of the Fiduciary Duties of Loyalty and Due Care.

On a Motion to Dismiss under Rule 12(b)(6), the moving party bears the burden of showing no claim has been stated and Counterclaim Defendants have failed to establish that no claims have been stated for breach of fiduciary duty. *See Gould Electronics,* 220 F.3d at 178. Counterclaim Defendants contend that Counterclaim Plaintiffs' allegations and admissions defeat the breach of fiduciary duty claims in the Counterclaim. (D.I. 72 at 30). Counterclaim Defendants assert various arguments in support of this contention but they all relate to the same affirmative defense—the business judgment rule. Essentially, Counterclaim Defendants argue that their actions in selling off the operating units are protected by the business judgment rule. (*Id.* at 32). Counterclaim Defendants, however, support this argument with cases that either analyze the breach of fiduciary duty claims in a different procedural context, e.g. summary judgment,[13] or arise in the

---

[13] *See In re Hechinger,* 327 B.R. at, 549 (denying motion for summary judgment filed at the close of discovery because a dispute of fact existed as to whether director defendants breached their duty of loyalty

context of a motion to dismiss but do not contain allegations of self-dealing or lack of

independence by the directors and apply the stricter pleading standards of Chancery Rule 8, a

standard expressly rejected by the Third Circuit in *Stanziale*, 416 F.3d at 237,[14] and applied by this

Court in *In re IT Group Inc.*, 2005 WL 3050611, *7.[15]

Counterclaim Defendants rely on *Stanziale* in support of their contention that dismissal is

warranted when bad faith is not the only possible explanation for the decision. In *Stanziale*, the

lower court dismissed the plantiff's claim for breach of the duty to act in good faith where

defendants replaced the airline's jet engines with new engines rather than repairing them. There

were no allegations that this decision was motivated by self-dealing or that the directors lacked

independence in making the decision. The Third Circuit held that "a complaint is self-defeating

when it states an ostensibly legitimate business purpose for the allegedly egregious decision."

*Stanziale*, 416 F.3d at 239. This holding is inapplicable to the present case where, in contrast to

*Stanziale*, there are numerous allegations that the liquidation of ALH resulted from Shamrock's

self-dealing and Krieger, Buchler and Stein's lack of independence.

___

where directors stood to gain financially from the merger as a result of certain interests that were *in addition to* interests of stockholders generally); *Sinclair Oil Corp.*, 280 A.2d at, 722(reversing Chancery Court's decision ordering defendant parent corporation to account for damages sustained by subsidiary where parent corporation did not receive a benefit not received by the minority shareholders); *McGowan v. Ferro*, 859 A.2d 1012, 1032 (Del. Ch. 2004)(denying plaintiff's motion for summary judgment where plaintiff failed to present record evidence showing that the director defendants had disabling conflicts of interest or approved the extension of the merger agreement in bad faith and the record showed the existence of legitimate business reasons for the director's decision).

[14] Counterclaim Defendants mischaracterize the Third Circuit's holding in *Stanziale* stating that "[t]he stringent requirements for pleading a bad faith breach of fiduciary duty were recently enunciated in *Stanziale*[.]" (D.I. 72 at 31). To the contrary, the Third Circuit held that by requiring the plaintiff "to allege specific facts, the District Court erroneously preempted discovery on certain claims by imposing a heightened pleading standard not required by Federal Rule of Civil Procedure 8." *Id.* at 237. Because under Chancery Rule 8, Delaware courts require specific allegations of fact to support a demand for relief, the court held that "[t]he District Court erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleading cases. They are not." *Stanziale*, 416 F.3d at 237.

[15] *See Dean v. Dick*, C.A. No. 16566, 1999 WL 413500 (Del. Ch. June 10, 1999)(applying Chancery Rule 8, court granted motion to dismiss breach of fiduciary duty claims against a general partner based on the court's finding that the various disputed decisions were within his business judgment and counterclaimants failed to allege any facts to suggest self-dealing); *In re Encore Computer Corp. Shareholders Litigation*, No. 16044, 2000 WL 823373, *5-6 (Del. Ch. June 16, 2000)(applying Chancery Rule 8, court granted motion to dismiss breach of fiduciary duty claims where two directors, appointed by the majority shareholder to the board, recused themselves from voting on the transactions that favored the majority shareholder and the two remaining directors had no disabling interests or loyalties); *Miller v. American Real Estate Partners, L.P.*, Civ. No. 16788, 2001 WL 1045643, *12 (Del. Ch. Aug. 6, 2001)(applying Chancery Rule 8, court granted motion to dismiss breach of fiduciary duty claims because plaintiffs "failed to make non-conclusory allegations of fact that, if true, support an inference that the defendants breached their fiduciary duty of loyalty," but granted leave to amend).

Counterclaim Defendants' reliance on *Sinclair Oil Corp.*, 280 A.2d 717, in support of their contention that any benefit received by Shamrock was received by all members is likewise misplaced. In *Sinclair*, the plaintiff alleged that Sinclair, a parent corporation, caused its subsidiary, Sinven, to issue dividends of $108,000,000 ($38,000,000 in excess of Sinven's earnings) because Sinclair needed the cash. *Id.* at 719. The dividends were issued in compliance with Delaware law and pursuant to a board vote. The plaintiff argued that the intrinsic fairness standard rather than the business judgment rule should be applied because when the board voted for the dividends it was completely dominated by Sinclair. *Id.* at 721. The court held that "a dividend declaration by a dominated board will not inevitably demand the application of the intrinsic fairness standard" unless the dividend amounts to self-dealing. *Id.* at 721. The court found that the lower court erred in applying the intrinsic fairness standard because there was no evidence of self-dealing since a proportionate share of the dividends were received by the minority shareholders of Sinven, thus, Sinclair did not receive a benefit not received by all shareholders.

The *Sinclair* court's decision is an appeal from the Chancery Court's order and is based on a different standard of review than the present case. Moreover, *Sinclair* is factually distinguishable from the present case. Here, the loan repayments were not made to all members and were not made as a result of any member's equity interest in ALH but were made as a result of a valid debt owed by ALH. Further, the Counterclaim contains no allegations regarding dividend payments but asserts sufficient allegations of self-interest. Counterclaim Defendants attempt to analogize dividend payments with loan repayments to refute Counterclaim Plaintiffs' claims of self-dealing. The standard for establishing self-dealing is whether a director or controlling shareholder received a benefit not received by the minority shareholders. *Id.* at 722. Here, ALH did not issue dividends to all members but repaid loans made to ALH by some but not all members of ALH.[16] The loan repayments provided a substantial benefit to Shamrock totaling approximately $3,598,000 whereas it represented no benefit to Laurel or J12ALH and a substantially smaller benefit to the other members, i.e. Arenson Holdings received only $166,666. Moreover, the repayment of the 2000

---

[16] In addition, some of the 2000 and 2002 Loans were made by non-members of ALH, namely Lion & Lamm Capital LLC and The Erica Jesselson 1994 CLAT. (D.I. 67[C] ¶ 33).

and 2002 Loans represented no benefit to the members of ALH generally but was a benefit only to those members and nonmembers that were owed money under the 2000 and 2002 loan agreements. Accordingly, *Sinclair* is inapplicable to the present case.

In further support of their Motion, Counterclaim Defendants argue that the Counterclaim does not state claims for bad faith, self-dealing or gross negligence because it identifies "multiple benefits to ALH as a whole and all its investors, including but not limited to keeping ALH viable and out of bankruptcy, settling litigation, and discharging lawful debts including debts to third-party lenders such as Wachovia (discharged by Swiss Re as part of sale of MHI)." (D.I. 72 at 36). Counterclaim Plaintiffs disagree that these were Counterclaim Defendants' motives in liquidating ALH and that it can reasonably be inferred from the allegations in the Counterclaim that these "benefits" necessitated the liquidation of ALH.[17]

Counterclaim Defendants distort the allegations in the Counterclaim to support their misrepresentation that a benefit to ALH of the sale of the operating units was that it would keep ALH viable and out of bankruptcy. The Counterclaim contains no such allegation. Counterclaim Plaintiffs allege that after Counterclaim Defendants sold off ABI to obtain repayment of their loans, they then sold off BBC to use the proceeds to keep ALH viable until the expiration of the preference period (D.I. 67[C] ¶ 95). It is disingenuous for Counterclaim Defendants to suggest that they were trying to strengthen and restructure ALH so it could remain a viable going concern and stay out of bankruptcy. The allegations establish that it was Counterclaim Defendants' intention to infuse just enough cash into ALH—by selling off the operating units at fire sale prices—to keep it viable until the expiration of the preference period in order to protect their loan repayments from disgorgement. Specifically, Counterclaim Plaintiffs alleged:

> 95.    In order for the repayment of the 2000 and 2002 Loans not to be treated as preferences, since by this time ALH was insolvent, Counterclaim Defendants realized that they had to keep ALH viable until the preference period elapsed.
> 
> *        *        *

---

[17] In deciding Counterclaim Defendants' Motion to Dismiss the Counterclaim, this Court's review is limited to the Counterclaim. *See Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975, 978 (D. Del. 1976)("All the relevant statements of fact contained in the counterclaim must be accepted as true, and the benefit of reasonable inferences given to the complainant."). Therefore, Counterclaim Defendants' reliance on allegations in the Amended Complaint and Counterclaim Plaintiffs' Answer is not appropriate.

115.    . . .    By selling divisions of ALH in a piecemeal fashion, they allowed ALH to avoid bankruptcy and have their loans paid back in a manner that would prevent the payments from being treated as "preferential" payments to "insiders" under 11 U.S.C. § 547 of the Bankruptcy Code.

\*        \*        \*

180.    Rather than continue to spend the time required to properly manage ALH, Shamrock schemed to relieve itself of its fiduciary duty to run the company, but at the same time, have its loans repaid without running the risk of having to disgorge the repayment of its loans as preferences.

(D.I. 67[C] ¶¶ 95, 115& 180).

Further, there are no allegations in the Counterclaim to support Counterclaim Defendants' contention that the sales of the operating units were motivated by the **need** to discharge lawful debts including debts to third-party lenders. The following are allegations in the Counterclaim regarding the repayment of debts:

76.    In April 2003, Counterclaim Defendants entered into a letter of intent with Mattamy Homes ("Mattamy") for the sale of ABI. As justification for the decision, Buchler told Arenson that the funds from the sale of ABI were "sorely needed by ALH" because, inter alia, it would "allow repayment of shareholder loans". . . .

\*        \*        \*

79.    At the May 2003 meeting, Counterclaim Defendants pushed their agenda that there was no alternative other than to sell ABI to Mattamy because ALH needed the funds available to pay for the Bowden litigation.

80.    Counterclaim Defendant Buchler discussed the application of the net proceeds from the proposed sale of ABI, which were approximately $16 million. Buchler indicated that $5 million was needed to settle the Bowden litigation and that the remaining $11 million would be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the 2000 and 2002 Loan Agreements. Any remaining amounts would be used to pay down other ALH debts.

\*        \*        \*

105.    In connection with the sale of MHI to Levitt, Lanius, as the consultant for ALH, evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH members would receive a payment of $1 million if the Levitt transaction closed.

(D.I. 67[C] ¶¶ 76, 79-80, & 105). The only inference that can be drawn from these allegations is that the proceeds from the sales were used to pay off lenders not that the sales were **necessary** to pay off lenders. At best, Counterclaim Defendants have created a factual dispute as to the motivation of the sales of the operating units and whether they amounted to self-dealing.

Counterclaim Plaintiffs, however, have stated claims and are entitled to set forth evidence in support of their claims.

Finally, the Counterclaim does not allege that the sale of ABI was necessary for the settlement of litigation. To the contrary, the Counterclaim alleges:

> 83.    Buchler argued in bad faith, despite Arenson's previous proposal, that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of the pending Bowden litigation, and (3) no other proposals for funding or acquiring ABI had been made.  Buchler failed to mention that the trial in the Bowden litigation originally scheduled for July 2003 had been postponed until February 2004, thereby eliminating the urgent need for funds to settle the Bowden litigation.

Since trial in the case was scheduled for July 2003, Counterclaim Defendants used settlement of the Bowden litigation as a ploy to support their decision to sell ABI.  However, at the June 26, 2003 Board meeting called to discuss the sale of ABI, Counterclaim Defendants failed to inform the Board that the trial had been postponed thereby eliminating the "pressing liquidity needs" to settle the litigation.

Counterclaim Defendants try to confuse the issues by arguing that Arenson voted to approve the Bowden settlement, which he did but **only after** Counterclaim Defendants voted to approve the sale of ABI.  This, however, distorts the issue of whether the sale of ABI was necessary to settle the Bowden litigation not whether settlement of the Bowden litigation was proper.  Arenson made clear that he did not believe settlement of the Bowden litigation warranted the sale of ABI. (D.I. 67[C] ¶ 62).  Counterclaim Plaintiffs' breach of fiduciary duty claims against Counterclaim Defendants are based in part on their approval of the sale of ABI **not** their decision to settle the Bowden litigation.

Finally, Counterclaim Defendants argue that Counterclaim Plaintiffs "cannot escape the effect of their acquiescence in certain challenged actions . . . the repayment of the loans from the proceeds of the sale of ABI; the extension of JMP's engagement, even though JMP had begun seeking buyers for ALH's individual operations; and the settlement of the Bowden litigation which necessitated the sale of ABI." (D.I. 72 at 36). Again, this argument fails because it does not focus

on the challenged transactions—the sales of the operating units—which are the basis of Counterclaim Plaintiffs' breach of fiduciary duty claims.

With respect to the repayment of loans and settlement of the Bowden litigation, the breaches of the duty of loyalty are not the actual repayment of the loans or the Bowden settlement but are Counterclaim Defendants' decision to liquidate two valuable and vital operating units of ALH—ABI and BBC—at fire sale prices, resulting in harm to ALH as a whole, for the sole purpose of repaying their loans and ensuring that the repayments were not disgorged as preferences. Further, Arenson did not approve the loan repayments or the Bowden Settlement until after Counterclaim Defendants used their majority control to approve the sales. With respect to the JMP extension, there are no allegations in the Counterclaim regarding the JMP extension and, even if there were, Arenson approved the extension of the agreement as drafted, which provided for services in connection with the sale of ALH as a whole. Counterclaim Defendants were well aware that the Class B members opposed the sale of the operating units but the Class B members had no way to control what directions Counterclaim Defendants gave to JMP. Accordingly, Counterclaim Defendants' claim that Counterclaim Plaintiffs negated their allegations of self-interest because they acquiesced in various decisions is without merit and, at most, creates an issue of fact.

For the above reasons, Counterclaim Defendants have failed to meet their burden of showing that the Counterclaim states no claims for breach of the fiduciary duties of loyalty and care against Shamrock, Krieger, Buchler and Stein.

## IV.    The Counterclaim States Claims for Breach of the Operating Agreement and the Consulting Agreement.

Counterclaim Plaintiffs state claims for breach of the Operating Agreement and the Consulting Agreement by alleging that Counterclaim Defendants[18] breached their fiduciary duties of loyalty and care and SCA aided and abetted Counterclaim Defendants in breaching their fiduciary duties.[19]    Counterclaim Defendants breached the express terms of the Operating

---

[18] In this section, Shamrock, Krieger, Buchler and Stein are collectively referred to as "Counterclaim Defendants".

[19] Contrary to the assertions of Counterclaim Defendants, Counterclaim Plaintiffs have standing to assert a claim for breach of the Consulting Agreement both as third party beneficiaries and derivatively on behalf of ALH. *See Pierce Associates, Inc. v. Nemours Foundation*, 865 F.2d 530, 535 (3rd Cir. 1988)(quoting *Ins.*

34

Agreement by acting in bad faith in violation of their duty of loyalty and in a grossly negligent manner in violation of their duty of care. "LLC members' rights begin with and typically end with the Operating Agreement[.]" *Walker v. Resource Dev., L.L.C.*, 791 A.2d 799, 813 (Del. Ch. 2000).

Counterclaim Defendants contend that "the Counterlcaims do not identify a single provision of either agreement that was breached." (D.I. 71, at 37). To the contrary, the Counterclaim identifies the specific provisions that were breached: § 6.2 of the Operating Agreement and Schedule A of the Consulting Agreement. (D.I. 67[C] ¶¶ 142, 155, 194 & 209). Section 6.2(f) of the Operating Agreement eliminates Counterclaim Defendants' liability for breach of the duty of care for mere negligence but not for breach of the duty of loyalty or for actions that constitute fraud, criminal acts, bad faith or gross negligence. *See McMillan*, 768 A.2d at 501. Schedule A of the Consulting Agreement provides that SCA is responsible for "actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct." (D.I. 67[C] ¶¶ 154-155). Here, as discussed above, the Counterclaim states claims for breach of the fiduciary duties of loyalty and care because Krieger, Buchler and Stein lacked independence in approving the sales of the operating units and Shamrock acted in its own self-interest and Counterclaim Defendants acted with gross negligence in connection with the sales of the operating units. Moreover, the Counterclaim alleges that SCA breached the Consulting Agreement by aiding and abetting Counterclaim Defendants' breaches of their fiduciary duties. Accordingly, Counterclaim Plaintiffs have alleged sufficient facts to establish a breach of contract claim against Counterclaim Defendants and SCA.

**V.    The Counterclaim States a Claim for Aiding and Abetting Against SCA.**

Counterclaim Plaintiffs state a claim for aiding and abetting a breach of fiduciary duty by SCA because SCA aided and abetted Shamrock, Krieger, Buchler and Stein in their breaches of fiduciary duties relating to the sales of the operating units. To state a claim for aiding and abetting, the counterclaim must allege: "'(1) the existence of a fiduciary relationship, (2) a breach of the

---

*Co. of North America v. Waterhouse*, 424 A.2d 675, 679 (Del. 1980))("'It is well settled in Delaware that third-party may recover on a contract made for his benefit.'"); *In re Walt Disney Co. Derivative Litigation*, 731 A.2d 342, 379 (Del.Ch. 1998)(stating shareholders can bring breach of contract claim "on behalf of" corporation for breach of an employment agreement).

fiduciary's duty, ... (3) knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach.'" *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)(quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)). The Counterclaim alleges (1) the existence of a fiduciary relationship between Shamrock, Krieger, Buchler and Stein and ALH and its members, *see supra* §§ III(A) & (B); (2) a breach of the fiduciary duties of care and loyalty, *see supra* § III(A)-(C); (3) sufficient facts to support a reasonable inference that SCA knowingly participated in these breaches; and (4) damages proximately caused by the breach.

Counterclaim Defendants contend that the Counterclaim does not state a claim for breach of fiduciary duty against Shamrock, Krieger, Buchler and Stein (the "remaining Counterclaim Defendants") and does not sufficiently allege knowing participation.     (D.I. 71 ¶ 37-38). Counterclaim Plaintiffs have stated claims for breach of fiduciary duties against the remaining Counterclaim Defendants, and therefore have satisfied this element. Moreover, the Counterclaim alleges that SCA knowingly participated in the breaches of fiduciary duty. "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede*, 780 A.2d at 1097. "'A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.'" *In re General Motors (Hughes) Shareholder Litigation*, Civ. A. 20269, 2005 WL 1089021, *24 (Del.Ch. May 4, 2005)(internal citation omitted).

Counterclaim Plaintiffs have alleged sufficient facts to reasonably infer knowing participation by SCA in the remaining Counterclaim Defendants' breaches of their fiduciary duties of loyalty and care.   The Counterclaim alleges that Krieger, Buchler, and Stein performed substantial services for SCA. (D.I. 67[C] ¶ 42). In addition, throughout the Counterclaim, there are allegations that Krieger, Buchler, and Stein committed wrongful acts that facilitated their liquidation of ALH, which is the basis for their breaches of fiduciary duties. It is reasonable to infer that these actions were taken, in part, in their capacity as agents for SCA. While at this pre-

36

discovery point in the litigation, Counterclaim Plaintiffs have not alleged precisely what actions were taken by Krieger, Buchler and Stein in their capacity as agents for SCA, under federal notice pleading standards, specific allegations are not required.

The appropriate pleading standard is whether Defendants have "allege[d] supporting facts necessary to provide the [Plaintiffs] fair notice of the [Defendants'] claim and the grounds upon which it rests." *In re IT Group Inc.*, 2005 WL 3050611, *8 (quoting *Stanziale*, 416 F.3d at 237). Here, Counterclaim Plaintiffs' allegations put SCA on notice of the claim against it and the grounds upon which it rests and, therefore, the Counterclaim states a claim for aiding and abetting a breach of fiduciary duty against SCA.

## VI.    The Amount of Damages Are Not At Issue At This Stage of the Litigation.

Counterclaim Defendants contend that "[i]n the absence of any viable damages claim, neither the Court nor [Counterclaim Defendants] should be burdened with the Counterclaims." (D.I. 71 at 39). Contrary to the contentions of Counterclaim Defendants, the amount of, or calculation of, damages are not at issue at this point in the litigation because under Federal Rule of Civil Procedure 8(a), damages do not need to be pled with any particularity.[20]   *See Cagin v. McFarland Clinic, P.C.*, 317 F.Supp.2d 964, 972 (S.D. Iowa 2004)(stating, "At the pleading stage, a plaintiff need not specify an actual amount of damages or the precise basis on which damages should be determined."). All that is required is that the plaintiff or counter-plaintiff "merely state the nature of damages and allow the damage issue to be further delineated by pre-trial discovery." *Id.*   Here, Counterclaim Plaintiffs have sufficiently pled damages in each count of the Counterclaim. (*See* D.I. 67[C] ¶¶ 133, 139, 146, 152, 159, 167, 176, 183, 190, 198, 205, 213, 222, and 232).

Plaintiffs' reliance on *Tse v. Ventana Medical Systems, Inc.*, 297 F.3d 210 (3rd Cir. 2002), is misplaced because the present case does not involve the "lost opportunity" theory of causation or

---

[20]  *See* also *Coan v. Bell Atlantic Systems Leasing Int. 'l, Inc.*, 813 F.Supp. 929, 949 (D. Conn. 1990)(holding, at the "pleadings stage, it is only necessary for [plaintiff] to allege that [plaintiff] *was* damaged," not exactly how the damage was caused.); *Everco Indus., Inc. v. O.E.M. Products Co.*, 63 F.R.D. 662, 665-666 (N.D. Ill. 1974) (stating plaintiff must "merely state the nature of damages and allow the damage issue to be further delineated by pre-trial discovery.").; *McIver v. Russell*, 264 F.Supp. 22, 34 (D. Md. 1967)(stating, "'Where damages are sought a statement of the overall amount demanded suffices'")(internal citation omitted).

speculative damages. In *Tse*, the plaintiffs attempted to use the "lost opportunity" theory to prove causation in a securities fraud case brought under § 10(b) of the Securities Act of 1934 and Rule 10(b)(5), in which an element of the claim is whether the plaintiff experienced an actual loss as a result of the defendants' misstatement or omission. *Tse*, 297 F.3d at 218. The court upheld the dismissal of the plaintiffs' claims because they "did not experience any actual loss from their initial investments" and their loss was "wholly speculative." *Id.* at 221.

In contrast, Counterclaim Plaintiffs have suffered actual loss due to the loss of their entire investment in ALH, therefore an analysis of the lost opportunity doctrine is not relevant. *See Tse*, 297 F.3d at 219.Accordingly, an in depth analysis of the speculative nature of damages is both premature and impossible at this pre-discovery stage in the litigation and even if it were not, the damages here are not speculative. *See Everco Indus., Inc. v. O.E.M. Products Co.*, 63 F.R.D. 662, 666 (N.D. Ill. 1974)(plaintiff must "merely state the nature of damages and allow the damage issue to be further delineated by pre-trial discovery.").

## VII.    The Counterclaim States Direct Claims Against Counterclaim Defendants.

The Counterclaim states direct claims against Counterclaim Defendants.[21]  Counterclaim Defendants' argument that Counterclaim Plaintiffs' claims assert injury to ALH and are therefore derivative is not only wrong but contrary to their position in the Amended Complaint. Counterclaim Defendants commenced this lawsuit directly against Counterclaim Plaintiffs alleging that an actual case or controversy exists because they faced a real and substantial probability of being sued by Counterclaim Plaintiffs. (D.I. 37 ¶ 6). Counterclaim Defendants did not make ALH a party. For Counterclaim Defendants to now claim that Counterclaim Plaintiffs cannot maintain an action against them because the alleged injuries were suffered only by ALH is inconsistent with the stance taken in the Amended Complaint. Nevertheless, this case involves direct actions not

---

[21] Although styled as motion to dismiss under Rule 12(b)(1), Counterclaim Defendants' motion should have been asserted under Rule 12(b)(6) because Counterclaim Defendants argue that the Counterclaim fails to state a direct claim not that Counterclaim Plaintiffs lack constitutional standing. Unlike in *Agostino v. Hicks*, 845 A.2d 1110 (Del. 2004), here, if the Court finds that Counterclaim Plaintiffs have failed to state direct claims, Counterclaim Plaintiffs still have standing, in the alternative, to bring derivative claims because they are current owners, have pled that demand is futile, and have otherwise complied with the requirements of Fed. Rule of Civ. Proc. 23.1. (See D.I. 67[C] ¶¶ 120-125, 177-233). Therefore, the direct versus derivative analysis should be reviewed using a 12(b)(6) standard of review.

derivative claims because the unjust enrichment exception applies. *See Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004)(recognizing the "unjust enrichment exception"); Richard Montgomery Donaldson, *Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389, 407-08 (2005)(discussing the "unjust enrichment" exception).

Counterclaim Plaintiffs do not dispute that the two part test laid down in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), is the appropriate test for determining whether a suit is direct or derivative, however, that test is not determinative here because the unjust enrichment exception survives *Tooley*.[22] Under this exception, "the potential inclusion of culpable parties in the class due relief may affect the distinction between the derivative and direct claims." *In re Cencom Cable Income Partners*, C.A. No. 14634, 2000 WL 130629, *5 (Del. Ch. Jan. 27, 2000). In *Cencom*, the court found that the claims of passive investors against the persons controlling the affairs of an entity were direct, not derivative even though the alleged injury devalued the entities' assets. The court noted that "[m]echanistically applying the corporate common law rules surrounding derivative claims can sometimes defeat efficient resolution of claims." *Cencom*, 2000 WL 130629, *2. Accordingly, the court recognized "the need for flexibility" when applying corporate derivative doctrines to alternative business entities and held that where defendants would recover for injures resulting from their own actions, a derivative action would **not** be appropriate. *Id.* Further, the court reasoned that "it is an elementary principle of equity that defendants found liable for breaches of either fiduciary duties or contractual arrangements should not benefit from any remedy for these breaches. The practical effect of this is to exclude the defendant from the group of those that may potentially recover." *Id.* at *4.

Furthermore, in *Fischer v. Fischer*, C.A. No. 16864, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999), the court looked to the potential recovery of culpable parties in analyzing whether claims should be characterized as direct or derivative. The court held that "[a]s equity will not suffer a wrong without a remedy, I must permit plaintiff's individual claims to proceed." *Fischer*, 1999

---

[22] While *Tooley* overrules the "special injury" concept of determining whether a case is direct or derivative, it does not mention the unjust enrichment exception, therefore *Tooley* has no bearing on the viability of this exception. *See* Richard Montgomery Donaldson, *Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389, 407-08 (2005) (analyzing *Tooley* and discussing the unjust enrichment exception). The cause of action here is direct not because of any special injury, but instead because the unjust enrichment exception applies.

WL 1032768, *4. In reaching its decision, the court reasoned that if the plaintiff's individual claims were dismissed, plaintiff would be "in the awkward position of continuing a purely derivative action with any relevant relief benefiting Fischer Enterprises alone. An eventual victory for plaintiff, therefore, would achieve little since the individual defendants own an overwhelming interest in Fischer Enterprises." *Id.*

Moreover, the Delaware Court of Chancery has applied a similar analysis in determining whether a shareholder case involving defensive tactics should proceed as a direct class action or as a derivative suit. *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71 (Del. Ch. 1999). In analyzing whether the suit was derivative in nature the *Gaylord* court explained: "should the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders? If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not the corporation." *Id.* at 80.

Applying these principles in the present case, Counterclaim Plaintiffs' claims are direct because if this action is derivative then Shamrock, as the majority member of ALH, will unjustly benefit from any recovery. As in *Fischer*, Shamrock owns an overwhelming interest in ALH and equity will not permit it to recover for damages suffered as a result of its own wrongdoing. Further, it would be unjust for Shamrock to benefit in any recovery as a result of the actions of SCA, Krieger, Buchler and Stein because as alleged in the Counterclaim, their wrongdoing was solely at the direction of and for the benefit of Shamrock. Accordingly, Counterclaim Plaintiffs' claims should be characterized as direct actions because Shamrock should not be permitted to benefit from the damages it caused.

Moreover, a derivative suit is not necessary or practical here because Counterclaim Defendants have liquidated ALH and it is not an ongoing entity. *See Cencom*, 2000 WL 130629. ALH is no longer operating and its assets have been liquidated. (*See* D.I. 67[C] ¶ 117). In *Cencom* the court stated that "Once the enterprise is terminated and the fiduciaries have acted to wind up the finances of the enterprise, the demand rule's purposes become irrelevant. To now classify these claims as derivative, purely as a matter of form, and to institute 'demand analysis' only serves to

40

impede efficient and final resolution of the remaining claims against those fiduciaries." *Cencom*,
2000 WL 130629, *5. Similarly, here, Counterclaim Defendants have sold off the assets of ALH
and are planning to liquidate and wind down the entity. Therefore, ALH "is simply an artifice
representing the relationship between two legally juxtaposed parties and is no longer relevant as a
distinct legal creature for the purposes of resolving the final claims between these parties." *Id.* at
*6; (D.I. 67[C] ¶ 117). The Court, therefore, should not classify this case as a derivative action
because "superimposing derivative pleading requirements upon claims needlessly delays ultimate
substantive resolution and serves no useful or meaningful public policy purpose." *Id.* *3.

Accordingly, Counterclaim Plaintiffs should be permitted to proceed with a direct action
as equity will not permit Counterclaim Defendants to profit from their own wrongdoing. Further,
ALH is no longer active and is in the process of winding up, therefore, classifying this action as
derivative would serve no useful purpose since the Court can fashion appropriate relief.[23]
Accordingly, Counterclaim Plaintiffs have stated direct claims against Counterclaim Defendants.

## CONCLUSION

Counterclaim Defendants' Motion for Judgment on Counts I, II, III and VIII of their
Amended Complaint and Motion for Dismissal of the Counterclaims should be denied.

Respectfully submitted,

David A. Felice

SEAN J. BELLEW (#4072)
DAVID A. FELICE (#4090)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 295-2000
(302) 295-2013 (Fax)

THOMAS M. WOOD, IV
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, Maryland 21202-3201
(410) 332-8523 (Direct)
(410) 332-8564 (Fax)

Attorneys for Defendants

---

[23] By filing a direct rather than derivative action in their Amended Complaint, Counterclaim Defendants
concede that appropriate relief can be fashioned among the parties present.

41

## CERTIFICATE OF SERVICE

I, David A. Felice, do hereby certify that on April 7, 2006, I electronically filed the

foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to

the following counsel of record:

> S. Mark Hurd, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
>
> Pamela H. Jarvis, Esquire
> Gregory P. Joseph Law Offices LLC
> 805 Third Avenue, 31st Floor
> New York, NY 10022

> David A. Felice (#4090)
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE 19801
> Telephone: (302) 295-2000
> Facsimile: (302) 295-2013
> E-mail: dfelice@cozen.com