IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ALH HOLDINGS, LLC | ) |
| | )    Consol. C.A. No. 04-1339-SLR |
| | ) |

**REPLY BRIEF IN SUPPORT OF PLAINTIFF AND COUNTERCLAIM
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
AND DISMISAL OF THE COUNTERCLAIMS**

OF COUNSEL:

Gregory P. Joseph Law Offices LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200

April 28, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200
   *Attorneys for Plaintiffs and Counterclaim
   Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ......................................................................................... 3

    I.    The Class B Parties Are Bound By Their Admissions in the
        Answer ............................................................................... 3

    II.   The Class B Members Cannot Side-Step the Business Judgment
        Rule ................................................................................... 4

    III.  There is No Self-Dealing Claim Against Krieger, Buchler and Stein .. 6

        A.  The Class B Parties Admit That Their Interests Were
            Aligned With Shamrock's ............................................... 6

        B.  *Revlon* Does Not Apply .................................................. 7

    IV.  There is No Self-Dealing Claim Against Shamrock ............................ 9

    V.   The Class B Parties' Pleadings Foreclose Any Claim That the
        Shamrock Parties Breached a Duty of Due Care .................................. 12

    VI.  The Class B Members Have No Claim For Breach of Contract ........... 16

    VII.  The Class B Members Have No Claim for Aiding and Abetting ......... 17

    VIII.  The Class B Members Have No Viable Damages Claim ..................... 17

    IX.  The Counterclaims Do Not State Direct Claims ................................... 17

    X.   Leave to Re-Plead Should Be Denied .................................................. 19

CONCLUSION ......................................................................................... 19

TABLE OF CITATIONS

**CASE**                                                                    **PAGE(S)**

*Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004) ................................................. 18

*ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855 (3d Cir. 1994) ............................................ 4

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, C.A. No. 12883,
    1993 Del. Ch. LEXIS 275 (Del. Ch. Dec. 15, 1993),
    *aff'd in relevant part, rev'd in part on other grounds*, 650 A.2d 1270 (Del. 1994) ..................... 8

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523 (2d Cir. 1985) ..................... 3

*Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del. 1987) .................................... 8

*Blackmore Partners, L. P. v. Link Energy LLC*, 864 A.2d 80 (Del. Ch. 2004) ............... 9 n.9

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .................................................... 15

*Cede & Co. v. Technicolor*, 634 A.2d 345 (Del. 1993) ........................................ 7 n.8

*Davis v. Correctional Med. Sys.*, Civ. No. 04-209 (SLR),
    2005 U.S. Dist. LEXIS 6947 (D. Del. April 25, 2005) ..................................... 19

*Davis v. Grusemeyer*, 996 F.2d 617 (3d Cir. 1993) ........................................... 4-5

*Fischer v. Fischer*, No. CA 16864, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999) ............... 18 n.13

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................... 19

*Fusion, Inc. v. Nebraska Aluminum Castings*, 934 F. Supp. 1270 (D. Kan. 1996) ............. 4 n.5

*Grabowski v. J.J. White, Inc.*, C.A. No. 02-1668 (SLR),
    2003 U.S. Dist. LEXIS 7596 (D. Del. May 2, 2003) ...................................... 19

*Hartman v. Pathmark Stores, Inc.*, Civ. No. 05-403,
    2006 U.S. Dist. LEXIS 9349 (D. Del. Mar. 8, 2006) ..................................... 9

*In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71 (Del. Ch. 1999) ............... 18 n.13

*In re General Motors (Hughes) S'holder Litig.*, No. Civ. A. 20269,
    2005 WL 1089021 (Del. Ch. March 4, 2005),
    *aff'd*, 2006 WL 722198 (Del. March 20, 2006) ......................................... 17

*In re Santa Fe Pacific Corp. S'holder Litig.*, C.A. No. 13587,
    1995 WL 334258 (Del. Ch. May 31, 1995),
    *aff'd in relevant part and rev'd in part on other grounds*, 669 A.2d 59 (Del. 1995) .................. 8-9

*Indeck Power Equip. Co. v. Ring Power Co.*, No. 03 cv 7494,
    2004 U.S. Dist. LEXIS 1272 (N.D. Ill. Jan. 30, 2004) .................................... 4 n.5

*Johnson v. Carolina Cas. Ins. Co.*, No. Civ. A. 98-101 (GMS),
 1999 WL 33220032 (D. Del. Nov. 10, 1999) ............................................................. 19

*Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955 (Del. Ch. 2004) ................... 12 n.12

*Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group
 (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537 (D. Del. 2005) ............................. 7 n.8

*McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004),
 *aff'd*, 873 A.2d 1099 (Del. 2005) ................................................................... 15, 15-16

*Mendel v. Carroll*, 651 A.2d 297 (Del. Ch. 1994) ................................................................. 8

*Milton Roy Co. v. Bausch & Lomb, Inc.*, 418 F. Supp. 975 (D. Del. 1976) .............................. 3

*Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 763 F. Supp. 28 (S.D.N.Y. 1991),
 *modified in part on other grounds*, 768 F. Supp. 115 (S.D.N.Y. 1991) ........................ 3, 3-4

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002) ............................................................... 7 n.8

*Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. 1994) ............................ 8

*Pierce Assoc., Inc. v. Nemours Found.*, 865 F.2d 530 (3d Cir. 1988) .................................. 16

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986) ................... 8, 9

*Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971) ...................................................... 10

*SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686 (E.D. Pa. 2004) ........... 12 n.12

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229 (3d Cir. 2005) ................... 4, 5, 11

*Sudicky v. Allied Tube & Conduit*, No. 99 cv 4113,
 1999 U.S. Dist. LEXIS 16794 (N.D. Ill. Oct. 22, 1999) ............................................. 4 n.5

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) ........................ 17-18

*Wells Fargo & Co. v. First Interstate Bancorp*, C.A. Nos. 14696 & 14623,
 1996 Del. Ch. LEXIS 3 (Del. Ch. Jan. 18, 1996) ........................................................ 9

OTHER CITATIONS                   PAGE(S)

*Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389 (2005) ............................... 18 n.13

## PRELIMINARY STATEMENT

The Class B Parties'[1] theory of this case is that that the Shamrock Parties[2] forced "piecemeal" sales of ALH's assets at "fire sale" prices for two "self-interested" reasons: (1) to rid themselves of management responsibilities for ALH and (2) to obtain repayment of loans to ALH and then keep ALH viable and out of bankruptcy, so that the repayment would not be deemed a preference under the bankruptcy laws. (*See* Class B Parties' Opposition Brief ("Opposition") (D.I. 82 at 1-2).) But nothing in the Opposition can alter the dispositive effect of the Class B Parties' admissions that:

- <u>Shamrock was free to end its management activities at any time, just like any other ALH Member</u> (*see, e.g.*, D.I. 82 at 23). This admission eviscerates the Class B Parties' inference that Shamrock's alleged self-interest in ending such activities motivated the asset sales. Even if the Court were to credit this unfounded and illogical inference, there is still no basis for the Class B Parties' further inference — equally unfounded and illogical — that the desire to end management activities would motivate asset sales at lower prices when higher ones were available.

- <u>All loans to ALH by the Class B Members[3] were, like Shamrock's loans, repaid in full from the proceeds of the first of the three challenged asset sales, and the Class B Parties consented to these repayments</u> (*see, e.g.*, D.I. 37 & 67[A] ¶¶48, 107, 137). The even-handed repayment of valid debts according to pre-existing terms is not actionable self-dealing. To the extent that the second

---

[1]    The "Class B Parties" are Defendants Avie Arenson ("Arenson"), A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12"), SELK LLC ("SELK"), and Laurel Equity Group, LLC ("Laurel").

[2]    The "Shamrock Parties" are Plaintiffs and Counterclaim Defendants Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein"). Third-Party Defendant ALH Holdings, LLC ("ALH"), as nominal defendant, joins in the motion to dismiss the claims purportedly asserted against it.

[3]    The "Class B Members" are all of the investors in ALH's class B equity. They are the Counterclaim Plaintiffs and Third-Party Plaintiffs in this action. All of the Class B members are also Class B Parties, except for Arenson, who owns and controls two Class B Members (Arenson Holdings and D.A. Gardens, sometimes referred to as the "Arenson Entities") and is the Class B Representative on ALH's Supervisory Board. (D.I. 37 & 67[A] ¶10.)

and third asset sales kept ALH viable and out of bankruptcy, that is not actionable self-dealing either, because it served the interests of the company and all its investors.

- While the Shamrock Parties' loans were larger than the Class B Members' loans, so too were the Shamrock Parties' investments in ALH — which was nearly three times the size of the loans — and their share of the loss if ALH were sold for less than the Members' total equity investment (*see, e.g.*, D.I. 37 & 67[A] ¶¶2-3). The Opposition hypothesizes a dichotomy between Shamrock's financial interests and those of the Class B Members, but the Class B Parties' pleadings admit there is none.

- The Shamrock Parties were not on both sides of any of the challenged sales of ALH's operations (*see, e.g.*, D.I. 82 at 12). Together with the admitted absence of any disproportionate treatment in the repayment of the loans, this leaves the Class B members bereft of any grounds for a self-dealing claim.

- None of ALH's Members (including Shamrock and the Class B Parties) were obligated to invest additional capital to meet ALH's funding needs and none of them in fact did so.[4] The Shamrock Parties cannot have wrongfully rejected or overlooked a financial alternative that did not exist.

In light of these admitted facts, only one reasonable inference can be drawn: that the Shamrock Parties had no motivation but to maximize the value of ALH, because they would reap most of the benefit and they risked the greatest loss of equity. The Class B Parties are not entitled to burden the Shamrock Parties and this Court with discovery and trial of claims as to which, by virtue of the Class B Parties' own pleadings, there are no material facts in dispute.

---

[4]    (*See, e.g.,* D.I. 37 & 67[A] ¶¶130-31; D.I. 82 at 12 ("no additional funding was provided").) The Counterclaims allege that in December 2002, the Class B Members told Shamrock that they were "prepared to fund needed working capital." (D.I. 67[C] ¶62.) This presupposed that Shamrock and the Class B Members would agree on terms for a buy-out of Shamrock's equity, which never happened. The Counterclaims do not allege that the Class B Members ever offered to fund ALH independently of Shamrock. Since at least December 2002, the Class B Members knew that Shamrock was "NOT prepared to invest additional amounts." (D.I. 67[C] ¶62; emphasis in original.)

**ARGUMENT**

I.      **The Class B Parties Are Bound By Their Admissions in the Answer**

The Class B Parties argue that "[i]n deciding the Motion to Dismiss the Counterclaim, this Court's review is limited to the allegations in the Counterclaim." However, the sole case they cite for this proposition says nothing of the sort. (D.I. 82 at 16 n.9.) *Milton Roy Co. v. Bausch & Lomb, Inc.*, 418 F. Supp. 975, 977-79 (D. Del. 1976), merely states the unremarkable propositions that "[t]he standards for determining a motion to dismiss a counter-claim are the same as for determining a motion to dismiss a complaint" and that "[a]ll the relevant statements of fact contained in the counterclaim must be accepted as true, and the benefit of reasonable inferences given to the complainant." Nowhere does *Milton Roy* limit the Court's consideration to the allegations of the Counterclaims. It certainly does not preclude the Court from holding a party to its judicial admissions — especially where, as here, the Answer containing the admissions is part of the same pleading as the Counterclaims.

Courts will not assume the truth of counterclaim allegations that are belied by admissions in the party's answer. For example, in *Morse/Diesel, Inc. v. Fid. & Deposit Co.*, 763 F. Supp. 28, 32 (S.D.N.Y. 1991), *modified in part on other grounds*, 768 F. Supp. 115 (S.D.N.Y. 1991), the court dismissed a fraud counterclaim where defendant's answer admitted the truth of plaintiff's allegedly fraudulent statement. The court explained that:

> It is axiomatic that "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. <u>Under federal law, . . . admissions in the pleadings are generally binding on the parties and the Court.</u> Having agreed on a set of facts, the parties . . . and this Court , must be bound by them; <u>we are not free to pick and choose at will.</u>"

*Id.* (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)) (emphasis added).

The court further held that Fed. R. Civ. P. 8, which permits a party to set forth two or more statements of a claim or defense alternatively or hypothetically, "does not excuse a party from being <u>bound by its own explicit admissions of fact.</u>" *Id.* at 32-33 (emphasis added). This is so even where the result is to preclude an affirmative claim: "F&D <u>chose to make an admission and is now bound by it, even</u>

though that admission has the effect of negating an essential element of F&D's fraud counterclaim." *Id.* at 33 (emphasis added).[5]

Here, the Class B Parties have admitted facts that foreclose their counterclaims. They cannot legitimately demand that those admissions be disregarded and the issues tried.

## II.    The Class B Members Cannot Side-Step the Business Judgment Rule

The Opposition argues that the Class B Members "are not required to plead around the business judgment rule to survive a motion to dismiss" because they "do not make any allegations about the business judgment rule," as did the plaintiff in *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). (D.I. 82 at 15.) This misconstrues *Stanziale* and the cases on which *Stanziale* relies.

In *Stanziale*, the Third Circuit held that "[a] complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face." *Stanziale*, 416 F.3d at 238. Nothing limits that holding to complaints that explicitly name the legal rule underlying the incipient defense. In fact, the authority cited in *Stanziale*, and that authority's antecedents, involved such defenses as the statute of frauds and statute of limitations, which were implicit in the complaint but were not preemptively controverted on the face of the complaint. *See, e.g., ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859-61 (3d Cir. 1994) (letter attached to complaint was sufficient to raise statute of frauds defense, although not conclusive on that issue); *Davis v. Grusemeyer*, 996 F.2d 617, 624-25 (3d Cir. 1993) (affirming dismissal of complaint that raised statute of limitations defense because the contents of a letter described in the

---

[5]    Other courts have likewise rejected attempts by litigants to whipsaw their adversaries and the judicial system with self-contradictory pleadings. *See, e.g., Indeck Power Equip. Co. v. Ring Power Co.*, No. 03 cv 7494, 2004 U.S. Dist. LEXIS 1272, at *6 (N.D. Ill. Jan. 30, 2004) (where defendant's answer admitted the existence of a purchase and sale contract between the parties, the result was that defendant "pled itself out of court on its unjust enrichment [counter]claim"); *Sudicky v. Allied Tube & Conduit*, No. 99 cv 4113, 1999 U.S. Dist. LEXIS 16794, at *1-4 (N.D. Ill. Oct. 22, 1999) (defendant "effectively pled itself out of court when it admitted [conflicting] facts in its answer and (amended) counterclaim"); *Fusion, Inc. v. Nebraska Aluminum Castings*, 934 F. Supp. 1270, 1274-75 (D. Kan. 1996) (defendant's *quasi contract* counterclaim was dismissed because defendant's answer admitted the existence of a contract with plaintiff, although certain terms of the contract were in dispute).

4

complaint demonstrated that plaintiff had sufficient knowledge of defendants' activities to make plaintiff chargeable as of the letter's date with discovery of the elements of his RICO claims).

The Class B Parties' pleadings unquestionably raise the business judgment rule. The Class B Parties deny that "[a]ll of [the Shamrock Parties'] actions in connection with ALH were taken in good faith, in the reasonable exercise of [the Shamrock Parties'] business judgment." (D.I. 37 & 67[A] ¶3.) Moreover, in the Counterclaims, the Class B Members affirmatively plead that Shamrock Parties' decisions were taken in disregard of "reasoned" advice, objections, and recommendations. (*See, e.g.*, D.I. 67[C] ¶¶2, 56, 63, 71, 78, 85.)

Although *Stanziale* differentiates between the level of detail required in state versus federal court pleadings, the Third Circuit recognized the business judgment rule as a substantive rule of law, and did not give *carte blanche* for pleadings to ignore the business judgment rule's presumption that "directors and officers acted in good faith and on an informed basis."[6] 416 F.3d at 238. This is a "near-Herculean task" which, *inter alia*, requires a plaintiff to "demonstrate that no reasonable business person could possibly authorize the action in good faith, ... [that] the decision [goes] so far beyond the bounds of reasonable business judgment that its only explanation is bad faith ... [or] that a decision was the product of an irrational process ...." *Id.* at 238-39 (internal citations omitted). The Counterclaims do not rise to this task.

The Class B Parties concede that "a complaint is self-defeating when it states an ostensibly legitimate business purpose for an allegedly egregious decision," *Stanziale* at 239, but contend that this proposition is "inapplicable" where there are allegations of self-dealing or lack of independence. (D.I. 82 at 29.) Nothing in *Stanziale* supports this supposed distinction. The plaintiff in *Stanziale* alleged bad faith as well as gross negligence, partly on the grounds that the airline added a route because the CEO's daughter "expressed a personal interest in having the airline do so." 416 F.3d at 233. The Counterclaims

---

[6]    The Opposition also acknowledges that the business judgment rule is a distinctive presumption that decisions were made on an informed basis, in good faith and in the best interests of the corporation "unless the plaintiff shows that the presumption does not apply." (D.I. 82 at 17.)

here likewise allege bad faith and gross negligence. [7]  There is no reason to suppose that the Third

Circuit's explicit discussion of the requirements for a claim of bad faith were confined as the Opposition

suggests.  Moreover, contrary to the Class B Parties' unfounded contentions, courts need not and do not

draw only the nefarious inferences urged by a plaintiff when the pleadings allow legitimate, non-

actionable inferences to be drawn.  (*See* Shamrock Opening Memorandum (D.I. 72) at 32-36.)

In the end, the Class B Parties are reduced to arguing that business judgment rule is not operative

unless the disputed action was "necessary" to achieve a legitimate purpose.  This has absolutely no basis

in the law and simply underscores the fact that the Class B Members are complaining that legitimate

activities were "unnecessary" — the epitome of a business judgment dispute.

## III.    There Is No Self-Dealing Claim Against Krieger, Buchler and Stein

### A.    The Class B Parties Admit That Their Interests Were Aligned With Shamrock's

It is no secret that Krieger, Buchler and Stein are employees of Shamrock who have been

designated by the Class A Members, including Shamrock, to ALH's Supervisory Board (D.I. 37 & 67[A]

¶¶7-8) — just as Arenson, in his capacity as Class B Representative, has been designated to the

Supervisory Board by the Arenson Entities and the other Class B Members.  (D.I. 37 & 67[A] ¶¶10-14).

The Class B Parties admit that in 2001 they approved the reconfiguration of the Supervisory Board so as

to allow Shamrock to appoint a majority of the Board.  (*See, e.g.*, D.I. 67[C] ¶28.)  From the inception of

ALH in 1998, the Class B Members invested with the express understanding that nothing in the Operating

Agreement required ALH to have the consent of the Class B Members for ALH's actions or decisions.

(D.I. 37 & 67[A] ¶¶ 68(g), 71, 139-40; *see* D.I. 72 at 12-15.)

Thus, it is puzzling that so much of the Opposition is devoted to the fundamentally

uncontroversial notion that the Krieger, Buchler and Stein viewed ALH's best interests in the same way

as Shamrock and the other Class A Members.  (*See, e.g.,* D.I. 82 at 18-19.)  The Class B Parties seem to

contend that the relationship between Shamrock, Krieger, Buchler and Stein, in and of itself, taints any

---

[7]    ALH's Operating Agreement precludes liability absent bad faith or gross negligence."  (*See* D.I. 37 & 67[A] ¶ 147.)

business judgment of these three Class Representatives. But this makes no more sense than arguing that Arenson's business judgments are *per se* tainted by his relationship to the Arenson Entities and the other Class B Members. Assuming *arguendo* that Krieger, Buchler and Stein "lacked independence" from Shamrock (*see, e.g.*, D.I. 82 at 3, 13, 17, 18, 19 & 35), it is still necessary to plead and prove that Shamrock is liable for bad faith or gross negligence. The Class B Parties' ostensible attack on the "independence" of Krieger, Buchler and Stein (*see, e.g.*, D.I. 82 at 17-19) is a red herring, intended to divert attention from the underlying reality that there is no viable claim against Shamrock, which is a necessary predicate to their attack.

What is missing from the Class B Parties' argument is any well-pled allegation — *i.e.*, an allegation not contradicted by their admissions — that the interests of the Class A Members and Class B Members were not aligned. This is a defect that cannot be corrected by a further amendment of the Counterclaims, because the Class B Parties have already admitted that Shamrock did not stand on both sides of the sales of ALH's operations and have confirmed that admission in their Opposition. (D.I. 37 & 67[A] ¶¶100, 105, 113, 122, 125, 129; D.I. 67[C] ¶¶76, 89-90, 102, 113; D.I. 82 at 12.)[8]

**B.    *Revlon* Does Not Apply**

Alternatively, the Opposition argues that Krieger, Buchler and Stein breached "their *Revlon* duties in the sale of the operating units of ALH by failing to maximize value for the benefit of ALH's

---

[8]    It is therefore pointless for the Class B Parties to rely on cases involving defendants alleged to have been on both sides. *See, e.g., Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002) ("the practical implications of the automatic requirement of an entire fairness review has led our Supreme Court to limit such automatic requirement to the narrow class of cases in which there is a controlling shareholder on both sides of a challenged merger"); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 549 (D. Del. 2005) ("breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director 'derived any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally'"); *Cede & Co. v. Technicolor*, 634 A.2d 345, 363 (Del. 1993) (shareholder plaintiff must establish that director either was on both sides of transaction or derived personal financial benefit, as distinct from benefit to corporation or all to stockholders generally).

members." (D.I. 82 at 19.) The Class B Parties have never purported to plead a *Revlon* claim and their pleadings foreclose such a claim.

Under settled Delaware law, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), is inapplicable here. The Delaware Supreme Court has explained that *Revlon* comes into play only when the transfer of a majority of voting shares from the public to one person or entity results in the public shareholders losing the right to vote to implement fundamental corporate changes, and thus losing the corresponding control premium. *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42-43 (Del. 1994). In such a case, "an asset belonging to public stockholders (a control premium) is being sold and may never be available again." *Id.* at 45. Where, as here, the entity already has a controlling shareholder, that rationale is absent. *See, e.g., Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 842, 844-45 (Del. 1987) (rejecting contention that "*Revlon* requires a majority shareholder to sell its stock . . . to the highest bidder" and holding that directors had no duty to seek to maximize shareholder value in circumstances where there was a majority shareholder); *Mendel v. Carroll,* 651 A.2d 297, 306 (Del. Ch. 1994) (presence of controlling shareholder changes the duty to maximize current value of minority shares). Because the Class B Parties had no control premium and no corresponding opportunity to lose, *Revlon* duties do not apply to this case.

The Class B Parties further argue that Shamrock's supposed *Revlon* duties were "unchanged" even "after it was apparent that a sale of the entire company was not imminent." (D.I. 82 at 20.) They cite no authority for this proposition, which is not surprising since Delaware law is to the contrary. For example, in *Arnold v. Soc'y for Sav. Bancorp, Inc.*, C.A. No. 12883, 1993 Del. Ch. LEXIS 275, at *31 (Del. Ch. Dec. 15, 1993), *aff'd in relevant part, rev'd in part on other grounds,* 650 A.2d 1270 (Del. 1994), the Court of Chancery observed that *Revlon* likely had been implicated when the Bancorp board had considered a change in control, but when the board chose to pursue Bancorp's long-term business options, that decision removed the board "from the *Revlon* realm of fiduciary duty." *See also In re Santa Fe Pacific Corp. S'holder Litig.*, C.A. No. 13587, 1995 WL 334258 (Del. Ch. May 31, 1995), *aff'd in relevant part and rev'd in part on other grounds*, 669 A.2d 59, 71 (Del. 1995) (*Revlon* did not apply

8

because plaintiffs did not allege "that the board at any point decided to pursue a transaction which would result in a sale of control"); *Wells Fargo & Co. v. First Interstate Bancorp*, C.A. Nos. 14696 & 14623, 1996 Del. Ch. LEXIS 3, at *14 (Del. Ch. Jan. 18, 1996) (fact that board initially "talked to a number of other possible transaction-partners" did not implicate *Revlon* duties).[9]

Quite recently, in *Hartman v. Pathmark Stores, Inc.*, Civ. No. 05-403, 2006 U.S. Dist. LEXIS 9349, at *11-12 (D. Del. Mar. 8, 2006), this Court dismissed a purported *Revlon* claim for failing to allege, *inter alia*, that (1) the directors' decision-making process was inadequate and (2) their action was unreasonable. Under *Hartman*, even if *Revlon* were otherwise applicable, the Class B Parties have precluded such a claim by admitting the specifics of ALH's decision-making process in connection with the asset sales and the existence of legitimate business objectives for the actions taken. (*See* D.I. 72 at 15-28 and Point V *infra*.)

**IV.    There Is No Self-Dealing Claim Against Shamrock**

The Class B Parties argue that they have stated a breach of fiduciary duty claim against Shamrock "because Shamrock used its control over ALH and the Board in connection with the sale of the operating units to engage in self-dealing." (D.I. 82 at 21.) In support of this argument, they point exclusively to allegations that (1) concern Shamrock's "status and domination" (*Id.* at 22) or (2) claim that Shamrock made business judgments that the Class B Parties considered "ill advised" (*Id.* at 23). These allegations

---

[9]    The Class B Parties rely solely on *Blackmore Partners, L. P. v. Link Energy LLC*, 864 A.2d 80 (Del. Ch. 2004), which they mischaracterize, and which is inapposite here. In *Blackmore*, the directors approved a transaction in which 100% of the proceeds of the sale of the company's assets were distributed to noteholders. The equity units were left valueless, while the <u>distribution to noteholders included $25 million more than was due under the notes</u>. In addition, the equity holders alleged that an <u>alternative transaction had been available</u>. Here, in contrast, the Class B Parties admit that some (but not all) of the proceeds of the first of the three asset sales (*i.e.*, the sale of ABI) were used even-handedly to repay loans in accordance with their terms. (D.I. 37 & 67[A] ¶¶106, 107.) The Class B Parties have never alleged the existence of a specific alternative transaction. To the contrary, the speculative language in their pleadings demonstrates the absence of any such alternative, *e.g.*, Arenson "suggested" that that ALH's existing Members "might consider" investing more capital in ABI. (*Id.* ¶103.)

demonstrate nothing more than the undisputed facts that Shamrock was a controlling equityholder in ALH[10] and that the Class B Parties disagreed with Shamrock's business judgments.

The Class B Parties do not and cannot point to any allegations in their Counterclaims that demonstrate a breach of fiduciary duty, as distinct from the supposed existence of a fiduciary duty. Nor can they salvage the material elements of claims that are foreclosed by their admissions:

- They confirm their "admission that Shamrock was not on both sides of the transaction," arguing that it is "irrelevant" to their claim of self-interest. (D.I. 82 at 12.) They use the terms "self-interest" and "self-dealing" interchangeably, as if to suggest that any action by an investor that is alleged to benefit the investor in some way necessarily gives rise to a breach of fiduciary duty claim — regardless of whether the investor is on both sides of the transaction or whether the investor benefited disproportionately from the transaction. This is not the law. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971) and other cases discussed in D.I. 72 at 32-36.

- They admit that although Shamrock obtained loan repayments of $3,598,000 (compared to an equity investment of over $9 million), those who made Class B "member loans" received repayments of their $1,616,666 on equal terms. (D.I. 67[C] ¶¶29-33, 68(f).)

- The Class B Parties argue that, because of the loan repayments, Shamrock "received a benefit from the sale of ALH's operating units … that was significantly greater than the benefits received by other members." (D.I. 82 at 24.) But the difference in absolute dollar amounts is irrelevant so long as the payments were consistent with pre-existing terms and proportional to the relative size of the Members' loans. (*See* D.I. 72 at 32-33.) Moreover, the Class B Parties do not even attempt to address their admission that Shamrock stood to lose — and did lose — a $9.1 million equity investment in ALH, whereas the most any Class B Member had at risk was less than $3 million. (D.I. 67[C] ¶¶4-8.) As the Class B Parties have admitted, "Shamrock's share of ALH's

---

[10]    Although Shamrock could be considered a controlling shareholder, it was not a majority shareholder. Shamrock owned approximately 62% of the Class A Membership Interest, which amounted to only 38% of ALH's total equity. (D.I. 67[C] ¶10; D.I. 82 at 22.)

losses is necessarily larger than that of [the Class B Members] because Shamrock's investment in ALH is larger. No setback experienced by ALH could hurt [the Class B Parties] without hurting Shamrock more." (D.I. 37 ¶3, D.I. 67[A] ¶3.)[11]

In the face of these admissions, the Class B Parties argue that "[t]he reality … is that Shamrock did not relinquish management of ALH," and that "[r]egardless of whether Shamrock was obligated to manage ALH, it was clear from Shamrock's action that unless the Class B members paid $12 million for the Class A's interest in ALH, Shamrock intended to retain control only as long as necessary to liquidate ALH and secure repayment of its loans." (D.I. 82 at 23 (emphasis added).)

Insofar as we can parse this argument, it bears little if any resemblance to the allegations in the Counterclaims. The Counterclaims allege that Shamrock sought to be relieved of its supposed management responsibilities — not that Shamrock refused to "relinquish" them. If the Class B Members are now contending that their claims do not depend on the alleged management responsibilities ("[r]egardless of whether Shamrock was obligated to manage ALH"), then the only putative benefit to Shamrock would be the even-handed and Class B-approved repayment of the loans on pre-existing terms, which cannot possibly support a self-dealing claim. The contention that Shamrock "intended to retain control only as long as necessary to liquidate ALH and secure repayment of its loans" is contradicted by the allegations and admissions that Shamrock remained in place long after the expiration of the one-year preference period in [June 2004], a year after the sale of ABI. (D.I. 82 at 23, 24.) And insofar as the Class B Parties are complaining that Shamrock exercised its absolute right not to sell its interest in ALH ("unless the Class B Members paid $12 million"), they have no claim at all. (*See* D.I. 72 at 30 n.27.)

---

[11]    The Opposition bizarrely suggests that Shamrock saw $3.6 million in loans — as against $9.1 million in equity — as justification for "running ALH into the ground." (D.I. 82 at 24.)

**V.      The Class B Parties' Pleadings Foreclose Any Claim That the Shamrock Parties Breached a Duty of Due Care**

The Class B Parties rhetorically characterize the Shamrock Parties as "rubber stamp[ing] the sale of the operating units" (D.I. 82 at 24), which implies that they approved decisions made by others. This makes no sense here, where the people who made and approved the challenged decisions were the same.

More specifically, the Class B Parties argue that "in selling the operating units of ALH," the Shamrock Parties were grossly negligent, which requires proof of an "irrational process." *Stanziale*, 413 F.3d at 238. (D.I. 82 at 26.) This argument is equally infirm, since the Class B Parties have admitted, *inter alia*, that: (1) the process of considering and approving the asset sales transpired over more than three years; (2) this process was supported by JMP, an outside investment banking expert whose initial engagement (and the extension thereof) was approved by the Class B Parties through Arenson and whose detailed analyses and progress reports were provided at Supervisory Board meetings attended by Arenson as Class B Representative; (3) the Class B Parties approved the Bowden litigation settlement, which could not be funded without the sale of ABI; (4) the Shamrock Parties did not shut out the Class B Parties' views — to the contrary, they repeatedly listened to and considered those views, although the parties did not ultimately see eye to eye; and (5) the Class B Parties expressed disagreement with the Shamrock Parties' views but did not provide any viable alternatives for meeting ALH's acknowledged financial needs.[12] (*See* D.I. 72 at 15-28 and pleadings cited therein.)

The Counterclaims do not identify a single piece of information that was not considered either in the initial process of trying to sell ALH as a whole or in the subsequent process of selling ALH's operations, or an actual alternative transaction that was rejected. Instead, in their Opposition, the Class B

---

[12]      The Class B Parties' speculation about what <u>might</u> have happened <u>if</u> they and others had invested more in ALH is no impediment to dismissal of the Counterclaims. *See, e.g., SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 701-02 (E.D. Pa. 2004) (court "may dismiss … allegations that require irrational inferences"); *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 964 (Del. Ch. 2004) (case law calling for reasonable inferences in favor of plaintiff "is not an invitation to irrational, plaintiff-friendly speculation," but "means that the court must draw reasonable inferences in the plaintiffs' favor to the extent such inferences arise from well-pled facts in the complaint").

Parties offer a list of supposedly nefarious "facts" which are contradicted by their own pleadings and are, in any event, immaterial:

- The Class B Parties cite no authority (and we know of none) for the proposition that it is a dereliction of fiduciary duty to retain advisors (Fried Frank and JMP) with whom the fiduciary had a prior relationship. (*See* D.I. 82 at 26, 1st bullet point.)

- For the proposition that Fried Frank had an "unwaivable" conflict, the Class B Parties cite a waiver signed by Shalom Lamm, who is, *inter alia*, the managing member of Class B Member SELK. (*See* D.I. 72 at 12 & 15 n.10.) There is no allegation or even argument that Fried Frank's supposed "conflict" was relevant to or had any effect on any of the challenged transactions. (*See* Opp. at 27, 1st bullet point.)

- The Class B Parties complain that the Shamrock Parties "forged ahead with liquidation despite repeated warnings by Arenson" (*i.e.*, <u>acted after being fully informed of the grounds for the Class B Members' opposition</u>). (*See* D.I. 82 at 26, 2nd bullet point.)

- The Class B Parties insinuate that the sale of ABI was approved at the June 26, 2003 Board meeting without adequate notice or information. They contend that the Shamrock Parties approved the sale "just three days after notifying Arenson and Lamm of the proposed sale and less than twenty-four hours after providing them with the documentation." (*See* D.I. 82 at 27, 2d bullet point.) But the Class B Parties do not allege or argue that Shamrock Parties had insufficient information or time to consider the sale. The Class B Parties admit that just a month earlier, at a May 14, 2003 Board meeting, <u>there was a detailed presentation concerning JMP's contacts with twenty potential buyers and the reasons why Mattamy's offer for ABI was more favorable than the others</u>. (D.I. 37 & 67[A] ¶¶87-89.) The Class B Parties also admit that at the June 26, 2003 Board meeting, JMP presented a second overview of its efforts and further analysis of, *inter alia*, <u>the Mattamy offer in terms of ABI's EBITDA, comparable sale prices derived from multiples of book value or earnings, and JMP's conclusion that the transaction was fair to ALH</u>

from a financial point of view, the CEO and CFO of ALH II provided input on the business climate and ALH's financing and liquidity issues, and outside counsel presented the terms of the proposed Purchase Agreement. (*Id.* ¶¶100-103.)

- The Class B Parties argue that the Shamrock Parties failed to disclose that the Bowden trial had been postponed, supposedly alleviating "the urgent need to settle." (D.I. 82 at 27, 2d bullet point.)  Yet the Class B Parties admit that the potential in June 2003 for the Bowden family to lower their settlement demand from $8 million to $5-6 million depended on the payment being made "promptly." (D.I. 37 & 67[A] ¶92.)

- The Class B Parties argue that two ALH officers explored the possibility of pursuing a leveraged buyout of BBC in partnership with Levitt, which eventually purchased BBC on its own. (*See* D.I 82 at 27, 3d bullet point.)  But they do not identify any impact of this on the terms of the transaction that Levitt eventually proposed or any basis for their irrational inference that the Shamrock and the other Class A Members had less interest in maximizing BBC's price than the Class B Members.

- The Class B Parties argue that the sale of BBC was approved at a March 24, 2004 Board meeting "[w]ithout discussion of the impact the sale of BBC would have on ALH or whether the sale was in the best interest of the minority members of ALH" (*see* D.I 82 at 27, 4th bullet point). However, they admit that, at that meeting, the Supervisory Board (including Arenson as Class B Representative) received presentations (a) from Buchler on the economic terms, (b) from outside counsel on the proposed purchase agreement, and (c) from JMP on its two-year effort to find a buyer for BBC, on its contacts with approximately 20 prospective buyers (including every active or potential participant in the Memphis, Tennessee homebuilding market), on its analysis of comparable transactions, and on BBC's EBITDA and comparable sale prices derived from a multiple of book value. (D.I. 37 & 67 ¶¶113-118.)  The Class B Representatives also admit that, at this meeting, they presented their objections to the sale of BBC, although they did not identify

any alternative except additional capital contributions that no Member was obligated to, offered to, or did make. (D.I. 37 & 67[A] ¶118.)

- The Class B Parties argue that MHI was sold to Mattamy, "who was intimately familiar with all of [MHI's] weaknesses," but they cite no authority (and we know of none) for the proposition that it is a breach of fiduciary duty to sell to a knowledgeable buyer. (*See* D.I. 82 at 27, 6th bullet point.)

- The Class B Parties also argue that the eventual sale of MHI to Mattamy was on terms less favorable than those proposed by an earlier bidder (Levitt) that had withdrawn its proposal, and that during the 16-day period that followed Levitt's withdrawal, the Shamrock Parties "made no efforts to solicit other buyers to purchase MHI." (*See* D.I. 82 at 27, 6th bullet point; *Id.* at 28, 1st bullet point.) But they admit <u>that the terms of the Levitt and Mattamy proposals were equal from ALH's standpoint</u> (*i.e.*, ALH would receive $1 million in either deal), and they do not allege that putting MHI back on the market for a second time would have been a helpful or even minimally rational thing to do. (D.I. 37 & 67[A] ¶¶ 124-25, D.I. 72 at 27 n.23.)

In sum, the Class B Parties' argument that ALH's lengthy sale process was grossly negligent withers in the face of their extensive admissions concerning that process. *See, e.g., Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) ("the standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of every fact," but rather that "[t]he Board is responsible for considering only material facts that are reasonably available, not those that are immaterial or out of the Board's reasonable reach."). In *McGowan v. Ferro*, 859 A.2d 1012, 1033-35 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005), the court found that directors "were sufficiently informed as to the adequacy of the price" when they "active[ly] canvass[ed] the market ... with the help of Merrill Lynch[;] ... [were] aware of the increased EBITDA numbers ... [were] cognizant of the changes in the regulatory environment and ... industry and considered those changes ... [and] sought further advice from their investment banker." 859 A.2d at 1033-34. "[S]eeking only informal advice ...

was not unreasonable, especially in the context of a transaction in which a supermajority of the stockholders of a closely held corporation already had approved the merger and were the same individuals making the decision as members of the board of directors." *Id.* at 1034.

After taking the Class B Parties' admissions into account, all that is left of their Counterclaims is sheer speculation that the largest equity shareholder in a company would deliberately or recklessly fail to seek the highest price for its assets. "Court[s] cannot reasonably infer that directors with very substantial stock holdings would fail to seek the highest value reasonably available in the sale of a company's flagship assets." *Id.* at 1035. Even if the Court has grounds to indulge the Class B Members in such an irrational inference, it would not be sufficient to support a viable claim for relief on the facts alleged here.

## VI.    The Class B Members Have No Claim For Breach of Contract

The Opposition identifies no implied contractual covenant that was supposedly breached by the Shamrock Parties, and thus concedes that there are none. Pressed to identify any express contractual provisions that were breached, the Opposition points only to § 6.2, the exculpatory clause of the Operating Agreement, and a parallel clause in the Consulting Agreement. But it makes no sense to assert that an exculpatory clause has been "breached" by the party invoking its protection. If there is a breach here, it is by the Class B Members, who have brought their Counterclaims in disregard of the exculpatory clause's limits.

There is likewise no merit to the Class B Members' argument that they can sue in their own right under the Consulting Agreement. The Opposition cites no authority under which they would qualify as third-party beneficiaries of that agreement. The Class B Parties cite *Pierce Assoc., Inc. v. Nemours Found.*, 865 F.2d 530, 535 (3d Cir. 1988) for the proposition that "a third-party may recover on a contract made for his benefit," but they omit the remainder of that holding: "in order for there to be a third party beneficiary, the contracting parties must intend to confer the benefit ... [and] [t]he intent to confer a third party beneficiary benefit is to be determined from the language of the contract." The Opposition cites no language in the Consulting Agreement that could be read as intending to confer third party beneficiary status on the Class B Parties. Nor do the Counterclaims contain any allegations that would support a

finding that the Class B Members were specifically intended as beneficiaries of the Consulting Agreement. Under the Class B Members' novel approach, the law would be re-written to make every investor in every company a third-party beneficiary of every company contract.

## VII.    The Class B Members Have No Claim for Aiding and Abetting

Since there has been no primary breach of fiduciary duty by the Shamrock Parties, the Class B Members' aiding and abetting claim fails for that reason alone. The Opposition concedes that "there must be factual allegations in the complaint from which knowing participation can be reasonably inferred," citing *In re General Motors (Hughes) S'holder Litig.*, No. Civ. A. 20269, 2005 WL 1089021, at *24 (Del. Ch. March 4, 2005), *aff'd*, 2006 WL 722198 (Del. March 20, 2006). However, it does not identify any such allegations, but continues to point to only to the general assertion that defendants Krieger, Stein, and Buchler performed services for SCA. This does not suffice.

## VIII.    The Class B Members Have No Viable Damages Claim

The Class B Members argue that their damages are neither speculative nor based on a "lost opportunity" theory, because they claim to have lost their entire investment. (D.I. 82 at 37-38.) But they do not even attempt to address the critical point in Shamrock's Opening Memorandum (D.I. 72 at 38-39), which is that according to their own allegations, their investment had lost its value long before any of the acts on which they purport to sue. The issue here is not, as they suggest, whether they must plead damages with "particularity" (D.I. 82 at 37), but whether they have pled a viable damages claim at all (which they have not).

## IX.    The Counterclaims Do Not State Direct Claims

The Opposition argues that "this case involves direct actions not derivative claims because the unjust enrichment exception applies." (D.I. 82 at 38-39.) But the Delaware Supreme Court, in 2004, repudiated the "special injury" analysis from which the so-called "unjust enrichment" exception derives, overruling all of the authority on which the Opposition purports to rely. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), a decision that the Class B Parties seem to accept as controlling, the Delaware Supreme Court ruled that:

> In our view, the concept of "special injury" that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.

845 A.2d at 1035. The authorities relied on in the Opposition all applied this now defunct test.[13]

Moreover, it is far from clear that this test, even before it was overruled, would have permitted the Class B Members to bring their claims as direct claims. The Opposition asserts that *Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004), a pre-*Tooley* case, "recognize[ed] the 'unjust enrichment exception.'" (D.I. 82 at 39.) However, *Agostino* explicitly rejected application of any such exception to allegations substantially identical to those in the Counterclaims here:

> [The] series of events as described would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence.… In my opinion, the nature of this claim is nothing more than a claim of mismanagement that, "if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders." As such, "the wrong alleged is entirely derivative in nature."

845 A.2d at 1123.[14]

In addition, as the Class B Parties recognize, Shamrock is the only Counterclaim Defendant that is a Member of ALH. Krieger, Buchler, Stein and SCA stand to gain nothing from a recovery by ALH.

---

[13]     *See, e.g., Fischer v. Fischer*, No. CA 16864, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999) (D.I. 82 at 39-40) (holding that plaintiff "can bring her claims individually because she alleges she suffered special injury distinct from that suffered by the other shareholders"); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 75 (Del. Ch. 1999) (D.I. 82 at 40) ("To make this decision, I must determine whether the complaint pleads a 'special injury' to the Proposed Class") (internal citations omitted). The Opposition cites Richard Motgomery Donaldson, *Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389 (2005) (D.I. 82 at 39), which further confirms that *Tooley* and *Agostino* "lay to rest the 'special injury' test." *Id.* at 390-91.

[14]     The Opposition (at 38) suggests that the Counterclaims need not include ALH as a party because the Shamrock Parties' declaratory judgment complaint did not do so. This is a *non sequitur*. ALH's presence was not required for the relief the Shamrock Parties sought. Had the Class B Parties believed to the contrary, they presumably would have joined ALH and not removed to this Court (there would not have been diversity because ALH is a citizen of all states of which its Members are citizens). If ALH were required to be a party to the Shamrock Parties' declaratory judgment action, the solution would be remand to the Chancery Court. *See* 28 U.S.C. §1447(c).

As a practical matter, this wholly undercuts the rationale for applying any "unjust enrichment exception" here.

**X.    Leave to Re-Plead Should Be Denied**

Under Fed. R. Civ. P. 15(a), courts may deny leave to amend for "repeated failure to cure deficiencies by amendments previously allowed . . . [or] futility of amendment. . . ." *Grabowski v. J.J. White, Inc.*, C.A. No. 02-1668 (SLR), 2003 U.S. Dist. LEXIS 7596, at *6-7 (D. Del. May 2, 2003) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)); *Davis v. Correctional Med. Sys.*, Civ. No. 04-209 (SLR), 2005 U.S. Dist. LEXIS 6947, at *4 (D. Del. April 25, 2005); *Johnson v. Carolina Cas. Ins. Co.*, No. Civ. A. 98-101 (GMS), 1999 WL 33220032, at *4 (D. Del. Nov. 10, 1999).

The claims in the Amended Counterclaims and Amended Third-Party Complaint were previously raised in United States District Court for North Carolina, Civil Action No. 3:05-CV-256. This occurred as part of the Class B Members' attempt to detour this litigation to that forum by bringing a second, mirror image action there. (D.I. 41 Ex. I.) After complete briefing on the Shamrock Parties' motion to dismiss these claims, the North Carolina action was transferred to this Court and consolidated with this action. Consequently, the Class B Members were fully aware of the deficiencies in their claims when they "revised and consolidated" and "redrafted and amended" them in this Court. (D.I. 37 at 22 n.2.) Since the Class B Members have already had ample opportunity to cure the defects in their claims, there is no purpose to be served by giving them yet another chance. This is especially so because whatever the Class B Members might attempt to alter in their Counterclaims, they cannot alter the admissions in their Answer. Leave to amend would be futile and would simply subject the Shamrock Parties to the burden and expense of additional unnecessary proceedings.

**CONCLUSION**

For all of the foregoing reasons, the Shamrock Parties respectfully request that the Court grant their motion for judgment on the pleadings as to Counts I, II, III, and VIII of their Complaint or, alternatively, dismiss the Counterclaims without leave to replead.

MORRIS NICHOLS ARSHT & TUNNELL LLP

_____

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE  19899
302-658-9200

*Attorneys for Plaintiffs and Counterclaim Defendants Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler and Bruce J. Stein, and Third-Party Defendant ALH Holdings, LLC*

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph
Pamela Jarvis
805 Third Avenue, 31st Floor
(212) 407-1200
New York, NY  10022

DATED: April 28, 2006