# Exhibit B



## WILCOX & FETZER LTD.

In The Matter Of:

# ALH Holdings LLC

C.A. # 04-1339-SLR

Transcript of :

# Shalom E. Lamm

Volume # I

January 17, 2007

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 14

1  Q. Can you give me an approximate time that you
2  first met Mr. Neuberger?
3  A. (No response.)
4  Q. Let me go at this a little bit differently.
5  A. It's one of those people that you've known for
6  quite some time. I really have no idea when I first
7  met him.
8  Q. Did you know Mr. Neuberger prior to your
9  involvement in any way with ALH?
10 A. I believe we may have met somewhere beforehand,
11 but not -- not in a intimate basis. I'm not sure I
12 like that choice of words. That I would like to
13 strike.
14 Q. I was going to ask.
15 A. That I would like to strike.
16 Q. Let's put it this way: Any meeting that you
17 had with Mr. Neuberger prior to the time of the ALH
18 project and your involvement was, at best, casual?
19 A. Well said.
20 Q. Do you have a recollection of how you met
21 Mr. Neuberger?
22 A. Originally?
23 Q. Yes.
24 A. Not at all.

Page 15

1  Q. Has Mr. Neuberger or his firm ever represented
2  you personally?
3  A. Yes.
4  Q. Can you tell me each of the instances in which
5  Mr. Neuberger or his firm have represented you,
6  personally?
7  A. In this deposition.
8  Q. Any other time?
9  A. I am unclear about the technical meaning of the
10 word "represented."
11 Q. Let's go back.
12 A. I sought his advice perhaps once or twice in
13 the past.
14 Q. Can you tell me first those instances in which
15 you sought his advice, what the subject matter was? I
16 don't want the content of the advice, but I would like
17 to know the subject matter of the advice that you
18 sought from him.
19 A. It was with respect to structuring an
20 investment in a piece of real property.
21 Q. Was that real property unrelated in any way to
22 ALH?
23 A. No.
24 Q. It was not related --

Page 16

1  A. It was not related in any way to ALH.
2  Q. Was that before, during, or after your
3  involvement with ALH?
4  A. It may have been very early on.
5  Q. Now, you said you had sought his advice once or
6  twice. Was each time that you sought his advice
7  relating to the structuring of the investment and that
8  particular piece of real property, or was there some
9  other subject matter about which you sought his advice
10 as an attorney?
11 A. No. That was it.
12 Q. Now, has --
13 A. Can I ask you to define "you" when you say
14 "you"?
15 Q. That's fair. I'm asking about you, personally,
16 right now.
17 A. Fine. We're good.
18 Q. Good. Then the next question is going to be,
19 and let me finish off that line. I asked all those
20 questions in the terms of Mr. Neuberger or his firm.
21    Were there any circumstances in which the
22 firm with which Mr. Neuberger is presently associated
23 rendered you advice through someone other than
24 Mr. Neuberger other than in connection with this

Page 17

1  deposition?
2  A. What?
3  Q. I had asked the question whether Mr. --
4  A. Sorry.
5  Q. Sure. Let me go back. This is simpler than it
6  sounds.
7     I had asked all of the questions that I
8  previously asked in the context of Mr. Neuberger or
9  his firm.
10 A. Yes, sir.
11 Q. And all I'm seeking to ascertain now is in the
12 instances where advice was sought concerning a piece
13 of real property, that was advice you got from
14 Mr. Neuberger himself, not advice from Mr. Neuberger's
15 firm at some point in time when Mr. Neuberger wasn't
16 with the firm?
17 A. That is correct.
18 Q. Now I'm going to shift and ask: Has
19 Mr. Neuberger ever rendered advice to any company or
20 business venture with which you were associated in his
21 capacity as an attorney, as you understood it?
22 A. No. You mean me, personally? You're still
23 in --
24 Q. No, no.

Page 18

1  A. Let's go back. Then I misunderstood the
2  question.
3  Q. You have been a principal in various companies;
4  correct?
5  A. Yes, sir.
6  Q. And my question to you is: In your capacity as
7  a principal in various companies, did Mr. Neuberger
8  ever enter into an attorney/client relationship with
9  either you or that company and render advice to you or
10 that company?
11 A. I appreciate the clarification.
12 Q. Okay.
13 A. Using the word "principal" in a very, very
14 broad sense, yes.
15 Q. Can you tell me in each instance in which, by
16 subject matter, Mr. Neuberger did so, again, without
17 disclosing to me the substance of any advice that he
18 might have rendered.
19 A. With respect to SELK, S-E-L-K.
20 Q. Okay. Anything else?
21 A. Not to the best of my recollection.
22 Q. Now, SELK is an LLC; correct?
23 A. Yes, sir.
24 Q. Were you the managing member of SELK?

Page 19

1  A. Yes.
2  Q. Are you still the managing member of SELK?
3  A. To the best of my knowledge.
4  Q. To further hone in on the nature of the
5  representation, at some point in time you must have
6  negotiated with someone else the terms of your
7  relationship with SELK and its other investors;
8  correct?
9  A. Yes, sir.
10 Q. Did Mr. Neuberger represent you, personally, in
11 terms of your relationships, and defining your
12 relationships vis-a-vis other investors in SELK?
13 A. Did he represent me in SELK?
14 Q. Yes.
15 A. No.
16 Q. So in terms of your personal interest and your
17 relationship with the other investors in SELK, either
18 someone else represented you or you were unrepresented
19 in terms of that relationship?
20 A. Correct.
21 Q. Or those relationships.
22    So his only advice was rendered to you in
23 your capacity as managing member of SELK? Is that
24 fair to say?

Page 20

1  A. Yes.
2  Q. Have we now covered the universe, to your
3  recollection, of any time that Mr. Neuberger acted as
4  an attorney for you or any of your companies in any
5  capacity?
6  A. Yes, I believe that's it.
7  Q. Now, have you had nonattorney-type
8  communications, I'll call it, with Mr. Neuberger in
9  some other capacity such as a business capacity?
10    MR. WOOD: I'll object to the form.
11    But you can answer.
12 A. I have no doubt that I have called him over the
13 last few years. I don't remember specific instances,
14 but he's a very, very nice guy and I admire him and
15 I'm sure I've spoken to him.
16 Q. Has Mr. Neuberger invested in any of the
17 companies in which you are a principal or which you
18 promoted?
19 A. No.
20 Q. Have you had any financial dealings with
21 Mr. Neuberger other than the payment of fees to
22 Mr. Neuberger for work that he did for SELK?
23 A. No.
24 Q. All right. Let's get to the more exciting part

Page 21

1  of the deposition and start to work our way through
2  these cartons of documents.
3     While we were waiting to start, I, at
4  least, got a head start and had the court reporter
5  mark the first three or four documents, so we'll go a
6  little faster here at the beginning.
7     I'm handing you a document that's been
8  marked by the court reporter as Lamm Exhibit 1.
9     By the way, have you had your deposition
10 taken before?
11 A. Yes.
12 Q. So you're familiar with this concept that we
13 put little stickers on these things and we call them
14 from here on forward it will be Lamm 1 instead of
15 whatever it once was?
16 A. No problem.
17 Q. Are you also familiar with the fact that
18 lawyers, when they produce documents, put little
19 numbers in the lower right-hand corner of the
20 document?
21 A. Yes, sir.
22 Q. And we call them Bates numbers. I guess there
23 was some guy named Bates who invented a machine once
24 that each time you stamped it, it put a higher number

Page 22

1  on it.
2  A. I think he may have been the attorney general,
3  I think.
4  Q. Whatever he was, and in this case, and Sam,
5  correct me if I'm wrong about this, but I think if
6  it's L before it, it means it came from Mr. Lamm's
7  files?
8       MR. SPARKS: Is that accurate?
9       MR. WOOD: Right. Correct.
10 BY MR. SPARKS:
11 Q. So I don't want to be tricking you or anything.
12 As you see a document, if you see an L, you can
13 assume, unless Mr. Wood has some contrary information,
14 certainly we are assuming that that came from your
15 files.
16 A. Good enough.
17 Q. All right?
18      So I've placed before you the document that
19 we've marked as Lamm 1, which appears to be an e-mail
20 from you to Mr. Neuberger dated November 15, 2002.
21      Could you just take a minute and look at
22 that document? I'm going to ask you just a couple
23 questions about it. Let me know when you're done.
24 A. (The witness reviews the document.) Done.

Page 23

1  Q. Now, there is reference in that document to
2  saying you can use an update regarding Dublin, Ohio,
3  and that you're anxious to get the bank off your back
4  and concentrate on leasing the building up.
5       Is that the other project --
6  A. Yes, it is.
7  Q. -- that you mentioned to me?
8  A. Yes, it is.
9  Q. Completed unrelated to ALH; correct?
10 A. Completely unrelated.
11 Q. And it has no common investors with ALH other
12 than, perhaps, yourself or one of your entities; is
13 that correct?
14 A. No. I stand corrected.
15 Q. Can you tell me in what sense you stand
16 corrected?
17 A. The investor in the Dublin, Ohio, transaction.
18 Q. Who is or who are the investors in the Dublin
19 transaction who are in some way related to the ALH
20 project?
21 A. That would be Michel Konig.
22 Q. Is Mr. Konig also an investor in SELK?
23 A. I don't know.
24 Q. How is Mr. Konig related, as you understand it,

Page 24

1  to the ALH project?
2  A. He was a person I spoke with in the arrangement
3  of the line of credit for SELK, which was its funds.
4  Q. Is there anyone who you have ever spoken with
5  in connection with your association with SELK other
6  than Mr. Konig? In other words, were there other
7  principals in SELK that you're aware of other than --
8  A. I actually don't know if Mr. Konig is a
9  principal in SELK.
10 Q. Is he a lawyer?
11 A. I don't think so.
12 Q. Is he a business advisor for other people who
13 have an interest in SELK as you understand it?
14 A. I don't know.
15 Q. In Dublin is he an actual investor himself?
16 A. I don't remember the entity through which --
17 who was the actual investor. I'm not trying to be
18 evasive. I just don't remember. It's been a couple
19 of years. We don't have it anymore.
20 Q. Is the Dublin operation still ongoing?
21 A. No.
22 Q. Did it ever get off the ground?
23 A. It got off the ground, but we don't own it
24 anymore.

Page 25

1  Q. Did you sell Dublin to any entity or person
2  that is in any way involved in ALH?
3  A. No.
4  Q. There is a reference in this e-mail to
5  "Interesting business going on at YU." Do you see
6  that?
7  A. Yes, I do.
8  Q. I'm assuming that's a reference to Yeshiva
9  University?
10 A. Yes, it is.
11 Q. Was Mr. Neuberger also a graduate or had an
12 interest in Yeshiva that you two were discussing?
13 A. No.
14 Q. It looks like, I just finished chairing a
15 search committee for the university in this state. It
16 looks to me like that might have something to do with
17 selecting a new president for Yeshiva?
18 A. That was a fantastic guess. Kudos to you.
19 Q. And that was simply some topic that you and he
20 had discussed at some point in the past and you were
21 just sort of making a comment to follow up on an
22 earlier comment?
23 A. It is fondly known as Jewish geography.
24 Q. Is there anything else you can tell me about

7 (Pages 22 to 25)

Page 278

1   A. Yes.
2   Q. Now, at this point is it fair to say you're
3   getting desperate? This date is coming?
4   A. Yes.
5   Q. You don't have the money to pay and you are
6   being pressed for payment?
7   A. Yes.
8   Q. Is that fair to say?
9   A. Yes.
10  Q. I don't think, unless there's something more to
11  it than you've just told me, I'm assuming the
12  ruthlessness is covered in the answer that you just
13  gave?
14  A. I think your timing is brilliant.
15  Q. Is that fair to say?
16  A. Yes.
17  Q. It's not completely accidental that these
18  things happen in some order.
19      And then you say: "At this point, I would
20  like to find a very, very smart strategist/litigater
21  who, if need be, could really cause SCA to lose lots
22  of sleep."
23      Why did you want to cause SCA to lose a lot
24  of sleep?

Page 279

1   A. Because I had approached the post-July,
2   whatever it is, agreement with a sense of -- with
3   their encouragement that I was going to lead this
4   thing home, and it became further and further apparent
5   to me that they never had an intention of doing that.
6   Q. Why did you go to Mr. Neuberger for help on
7   this?
8   A. Mr. Neuberger is a person who has the largest
9   Rolodex I've ever seen in my life. I believe the man
10  actually does know just about everybody. It's an
11  amazing thing. He's exceedingly well respected. I
12  believe the man is brilliant and I asked his advice.
13  Q. But as a friend, not as your lawyer; is that
14  correct?
15  A. In this instance, yes.
16  Q. Then you go on and add: "They are mean,
17  heartless people. I now see how they could slit your
18  throat if they could earn another $10. ...and you
19  thought Mickey Mouse was cute."
20      You wrote that; correct?
21  A. I did, sure.
22  Q. And that all relates to the fact that they're
23  pushing you for payment of this debt?
24  A. Knowing full well that I can't eat, yes.

Page 280

1   Q. Do I also take it from that e-mail that at some
2   prior point in time, looking at the first paragraph,
3   that Mr. Neuberger had suggested that you ought to get
4   a lawyer?
5   A. Yes.
6   Q. Do you recall when he made that suggestion and
7   in what context?
8   A. It was in the context of -- I don't recall
9   date-wise when he made the suggestion, but it was in
10  the context of I tried to my core to be cooperative,
11  be the good guy, take the moral high ground in every
12  sense after that agreement. And it just kept
13  occurring. I kept saying to myself, I'm being an
14  idiot. These guys are going to take advantage of me
15  and I didn't want to believe it. I just didn't want
16  to believe it. But then it became obvious.
17      MR. SPARKS: I would like to mark this as
18  the next exhibit.
19      (Lamm Exhibit 47 was marked for
20  identification.)
21  BY MR. SPARKS:
22  Q. This appears to be a response dated Wednesday,
23  February 20, from Mr. Neuberger to you with respect to
24  the e-mail we just reviewed. Do you agree with that?

Page 281

1   A. Yes, sir.
2   Q. He gives you the name of somebody called Jay
3   Lobell. I'm assuming that's a lawyer?
4   A. Yes, sir.
5   Q. Then he writes: "I will be happy to
6   participate."
7       What did you understand by Mr. Neuberger
8   saying "I will be happy to participate"?
9   A. That he would give context to some of the
10  background.
11  Q. In other words, you read that to mean he would
12  be happy to participate in briefing Mr. Lobell about
13  the background?
14  A. Yes, sir.
15  Q. That's what you thought he meant?
16  A. Yes, sir. Yes.
17  Q. You did not understand him to mean that he
18  would be happy to participate in whatever campaign you
19  were forging against?
20  A. No, that's not what happened. Not at all. No.
21  He just gave background information to Lobell. Not at
22  all.
23  Q. Okay.
24      MR. SPARKS: Let's mark this as the next

Page 290

1  What did he need Michel's permission to do?
2  A. He was Michel's attorney. It's not my
3  attorney. I don't know.
4  Q. Then you say: "I have no clue what he is
5  talking about." Do you see that?
6  A. Correct. He would not disclose anything to me.
7  Q. Did he ever disclose what his plan was?
8  A. Must not have because none of this rings a
9  bell, to be honest with you. So either it wasn't a
10 very good plan or it never happened because I don't
11 remember it.
12 Q. Did you end up meeting with him as you
13 suggested in this e-mail?
14 A. I don't believe so.
15 Q. Did you end up meeting with Mr. Lobell at or
16 about this time?
17 A. I met with Mr. Lobell numerous times, so at or
18 about this time, I would have to venture a guess yes,
19 but I have no specific recollection.
20 Q. Mr. Lobell you did retain as an attorney; is
21 that correct?
22 A. I retained as an attorney, yes, I did.
23     MR. SPARKS: Let's mark this as the next
24 Lamm exhibit, 50.

Page 291

1     (Lamm Exhibit 50 was marked for
2  identification.)
3  BY MR. SPARKS:
4  Q. There is an e-mail from Zich at the bottom
5  which I really don't have anything to ask about.
6     Then at the top on January 25, 2002, you
7  say in the second sentence: "We should probably start
8  building an anti-SCA file." What did you mean by
9  that?
10 A. I meant that I thought that SCA, that Shamrock
11 was acting in an inappropriate manner and that I
12 thought that this may end up in litigation and that we
13 should probably start getting things like the Fried
14 Frank waiver, which was bogus, and I thought we should
15 start accumulating these things. No such file ever
16 happened, but it was certainly a thought that never
17 happened.
18 Q. This idea of the first thing that would go into
19 that file was a waiver of conflicts letter; is that
20 right?
21 A. Yes.
22 Q. Where had you gotten an idea that somehow the
23 subject of conflicts would be an appropriate part of
24 an anti-SCA file?

Page 292

1     MR. WOOD: Objection.
2     Make sure it didn't come from one of your
3  attorneys.
4     MR. SPARKS: There's only one that I heard
5  of in this capacity, and that is Mr. Lobell. So if it
6  came --
7     MR. WOOD: Mr. Zich was an attorney, too.
8     MR. SPARKS: You're not claiming
9  attorney/client privilege here with respect to
10 Mr. Zich, are you?
11    MR. WOOD: Not at this time I'm not, but
12 previous times I am. I don't know when this
13 conversation took place.
14    So why don't you answer --
15 BY MR. SPARKS:
16 Q. Let me ask: Did you discuss with someone the
17 concept of the subject of waiver of conflicts being
18 ammunition in some way or form against SCA?
19 A. Not ammunition, as such. I thought that Fried
20 Frank was horribly and unalterably conflicted
21 throughout this whole transaction and that it became
22 more egregious as time went on.
23 Q. Did you discuss with anybody the subject matter
24 of Fried Frank's conflicts as they related to your

Page 293

1  anti-SCA posture?
2     MR. WOOD: When? On this date?
3     MR. SPARKS: Well, obviously before this
4  date is what I'm asking.
5  BY MR. SPARKS:
6  Q. At some point prior to the date of this e-mail
7  or the time of this e-mail, did you have that
8  discussion with anybody? I'm not asking you for the
9  substance of the discussion. I'm simply asking if you
10 had such a discussion.
11 A. Yes.
12 Q. Now I'm going to ask you who you had the
13 discussion with, but I am not going to ask you for the
14 substance of the discussion.
15    MR. WOOD: Go ahead.
16 A. I had it with Isaac Neuberger and Avie Arenson.
17 Q. All right. I'd like you to discuss with me
18 everything that you spoke about with Mr. Neuberger
19 having to do with the propriety or impropriety of the
20 waiver of conflicts relating to Fried Frank and
21 Shamrock.
22    MR. WOOD: Okay. I'll instruct you not to
23 answer.
24 Q. You've previously told me that the only time

74 (Pages 290 to 293)

Page 294

1  Mr. Neuberger represented you, I believe, apart from
2  the Dublin transaction, was in your capacity as the
3  managing member of SELK; correct?
4    A.  Correct.
5    Q.  Your anti-SCA posture, as I understand it at
6  this point in time, relates to either your
7  disappointment with the back-end treatment that you
8  were negotiating for or the continued pursuit by
9  Shamrock on behalf of ALH of your debt obligations
10 under the July 1, 2001, agreement; isn't that correct?
11   A.  No.
12   Q.  Tell me in what respect that's incorrect.
13   A.  Because those relate to a third point, which is
14 I believed at that point that my having to exit ALH at
15 that point would be highly detrimental as a B member
16 to the value of the investors. So my conversations
17 here with Mr. Neuberger were as the manager of SELK.
18   Q.  I'm correct, am I not, that at this point in
19 time you had no real economic interest in SELK
20 anymore; right?
21   A.  I had responsibility as the managing member to
22 protect SELK to the best of my ability.
23   Q.  So you were conferring with Mr. Neuberger on
24 behalf of SELK on the subject matter of how to get

Page 295

1  Shamrock to be more forthcoming to you, personally,
2  and to Lion & Lamm with respect to the back end and
3  your debt obligation? Is that a fair summary?
4        MR. WOOD: That's not the question. The
5  question is when you talked about waiver. That's the
6  question, the waiver letter.
7    A.  Right. I think there's a tremendous confusion
8  here. This is about Fried Frank's inappropriate
9  conduct here, and I thought it was detrimental to the
10 health and wealth of the company.
11   Q.  Let's go back for a minute to your
12 conversations with Mr. Arenson about this subject.
13   A.  Yes, sir.
14   Q.  What did you tell Mr. Arenson about this
15 subject, and when, prior to this letter?
16   A.  That I was alarmed by what appeared to me to be
17 Fried Frank representing both Shamrock and ALH, but
18 clearly not knowing who they were representing. I
19 specifically asked a Fried Frank attorney: "I cannot
20 figure out who you're representing." And he laughed
21 and said, "I can't figure it out, either."
22   Q.  We'll come back to that.
23        Did you tell Mr. Arenson anything
24 Mr. Neuberger had told you about the subject of waiver

Page 296

1  of conflicts?
2    A.  I cannot remember with specificity.
3    Q.  Do you know whether you did or whether you
4  didn't?
5    A.  Right. I don't remember.
6    Q.  Did you originally conceive of the idea that
7  the anti-SCA file that you were interested in starting
8  to build was going to be maintained on your behalf by
9  Mr. Neuberger?
10   A.  No. It never happened. These are e-mails that
11 people send. It's called flaming out. Send out a
12 thought that you have.
13   Q.  One of your thoughts was building an anti-SCA
14 file; correct?
15   A.  That's correct.
16   Q.  Then your next thought was to start that file,
17 I'll send a copy of the waiver of conflicts letter
18 from Fried Frank to Mr. Neuberger; is that correct?
19   A.  That is correct. I was alarmed by their
20 behavior. That remains true.
21   Q.  Did you send it to Mr. Neuberger?
22   A.  I don't remember sending it. It's possible. I
23 don't recall.
24   Q.  Did you send it to Mr. Neuberger with a

Page 297

1  direction to start an anti-SCA file?
2    A.  Absolutely not.
3        MR. SPARKS: All right. It is 6:00. This
4  is as good a stopping point as any. We'll just start
5  up here again at 9:00 tomorrow.
6        MR. WOOD: Fine.
7        MR. SPARKS: We will be breaking for lunch,
8  with your permission, at about 11:55 for 45 minutes.
9  I have a telephonic board meeting I need to jump on
10 from noon to 12:30. Other than that, we'll just blast
11 on.
12       Thank you for your cooperation. I
13 appreciate it.
14       (The deposition was then adjourned at
15 6:00 p.m.)
16       - - - - -
17
18       INDEX TO TESTIMONY
19
20 SHALOM E. LAMM                         PAGE
21
   Examination by Mr. Sparks                2
22
23
       - - - - -
24



**WILCOX & FETZER LTD.**

In The Matter Of:

# ALH Holdings LLC

C.A. # 04-1339-SLR

Transcript of :

## Shalom E. Lamm
Volume # 2

January 18, 2007

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 410

1  BY MR. SPARKS:
2  Q. I have now marked a letter dated October 3,
3  2001, from Mr. Hourihan to Union Planters Bank. Have
4  you ever seen this letter before?
5  A. Not to the best of my knowledge.
6  Q. Were you aware that Mr. Hourihan was going to
7  communicate to Union Planters Bank that Lion ALH
8  Capital, LLC, was prepared to make an additional
9  capital contribution to support the operations of
10 Bowden Building Corporation?
11 A. No.
12 Q. He did that on his own?
13 A. I believe he did.
14 Q. Had Lion made any determination that it was
15 willing to make an additional cash contribution to
16 support the operations of Bowden Building Corporation?
17 A. No.
18 Q. So this is Mr. Hourihan on a lark of his own?
19 A. This is a -- yes.
20      MR. SPARKS: Let's mark this as the next
21 exhibit.
22      (Lamm Exhibit 79 was marked for
23 identification.)
24

Page 411

1  BY MR. SPARKS:
2  Q. This is an e-mail dated December 28, 2001, from
3  you to Michael Konig copied --
4  A. Michel.
5  Q. I'm sorry. Michel Konig. I make that mistake
6  every time. Michel Konig copied to Mr. Neuberger.
7      Is this a report by you to Mr. Konig
8  concerning a particular sale of the whole company that
9  was being considered at the time?
10 A. Yes.
11 Q. Which sale was it that fell through that you
12 are referring to?
13 A. I don't recall, but given the chance to consult
14 documents, I would say that it was MDC, but I don't
15 recall.
16 Q. We can look at that.
17      At any rate, this is 12/28/2001, so we may
18 be able to match this up with other stuff as we did
19 before.
20 A. Right.
21 Q. Fine.
22      Now, at this point was there unanimity as
23 you knew it among all of the investors at ALH that ALH
24 should be sold?

Page 412

1  A. To the best of my knowledge, yes.
2  Q. That included you?
3  A. Yes.
4  Q. Now, there is a reference here to "The
5  about-face of the seller came as a complete surprise
6  to me (and to Isaac, incidentally)."
7      Does that suggest to you that this was one
8  of the sales that Isaac Neuberger was seeking to
9  broker, if you will?
10 A. That was the clue to me that it would be MDC.
11 Q. Now, you say you can't change the mind of the
12 buyer, so you are putting plan B into effect. I'm
13 always intrigued by plans. What was plan B?
14 A. To go to an investment banker and make a formal
15 beauty contest of companies.
16 Q. Then the next paragraph refers to engaging
17 Ernst & Young to audit the books of the company, and
18 at that point your expectation was that the audit
19 would be done by the first week in April; correct?
20 A. Correct.
21 Q. We've looked at other e-mails that indicate we
22 were into the summer and that audit hadn't occurred
23 yet because of some of the problems that we had
24 discussed; correct?

Page 413

1  A. Correct.
2  Q. Then the next paragraph says: "Last month, I
3  interviewed 5 investment banks in Los Angeles with
4  Shamrock (Disney)." Is that true?
5  A. Yes, it is.
6  Q. It says: "We settled on the one we liked best
7  (they are the number one investment banker in the
8  homebuilding industry)." Is that JMP?
9  A. No, it is not.
10 Q. Who was that?
11 A. Bank of America.
12 Q. Was that Bank of America at the time that
13 Mr. Avila was, if you will, the team head of the
14 assignment?
15 A. Yes, it was.
16 Q. Mr. Avila subsequently moved to JMP; correct?
17 A. Correct.
18 Q. When JMP was retained and Mr. Avila was
19 retained through JMP, was it still your view that of
20 those you had talked to, that was the best?
21 A. Yes.
22 Q. Down at the bottom it says: "...we have an
23 agreement amongst all of the investors to sell the
24 company." Do you see that? Next-to-the-last

Page 498

1  a serious risk that needed to be mitigated?
2  A. It was always a serious risk that needed to be
3  mitigated. The only difference was timing, when it
4  needed to be done.
5  Q. Here Mr. McWhirter was anxious to settle the
6  suit quickly; correct?
7  A. Yes.
8  Q. Do you know why he wanted to settle it quickly
9  at this point in May of 2002?
10 A. I don't remember why there was a rush to do it
11 at that point.
12 Q. This appears here that at this point you did
13 not have sufficient cash to do it; is that correct?
14 A. We had better use for cash at this point. I
15 believe at this point we probably could have done it,
16 but we could have had better long-term uses for the
17 company, uses of that cash. So it was a matter of
18 prioritizing.
19      Did this need to be settled right now or it
20 could have been done at a short time later and
21 provided us with our cake and allowing us to eat it,
22 as well.
23 Q. Your position was it should be done as quickly
24 as possible?

Page 499

1  A. Right, within the context of balancing our
2  other interests, yes, I would accept that.
3      MR. SPARKS: Let's mark this June 17
4  e-mail.
5      (Lamm Exhibit 109 was marked for
6  identification.)
7  A. (The witness reviews the document.)
8  BY MR. SPARKS:
9  Q. Let me know when you're done.
10 A. Sir?
11 Q. What is the Justice litigation?
12 A. Justice and Schickner were two senior officers
13 of Bowden. I don't recall why they were suing. I
14 really don't.
15 Q. Why did you have to settle with Justice before
16 you could settle with Bowden?
17 A. I don't remember. I do remember that it was a
18 requirement, that it was important. I don't remember
19 the technical reason why.
20 Q. Did you agree at this point --
21 A. I believe, just to give you clarity, I believe
22 it had something to do, and I apologize for
23 interrupting, I believe it had something to do with he
24 would demand more if he knew that the Bowden

Page 500

1  litigation was settled. But not being settled, it
2  allowed us the position to say we're strapped, we may
3  go under, we may do all sorts of horrible and terrible
4  things to force him to settle for a lower amount.
5  Q. I see. Now, with respect to this, you say with
6  respect to the Bowden litigation "which we will
7  ultimately lose." Do you see that?
8  A. Yes.
9  Q. That was your belief then?
10 A. Yes.
11 Q. And that continued to be your belief forever if
12 you hadn't settled it; correct?
13 A. It did, yes.
14 Q. At this point in time did you have some view as
15 to how much it would take to settle the Bowden
16 litigation?
17 A. I did.
18 Q. You did?
19 A. I did.
20 Q. What did you think it would take?
21 A. I apologize. I don't remember the number.
22     MR. SPARKS: Next mark this as the next
23 document.
24     (Lamm Exhibit 110 was marked for

Page 501

1  identification.)
2  BY MR. SPARKS:
3  Q. This is an e-mail from Mr. Neuberger to you
4  where he says: "It is essential that our counsel in
5  Tennessee stave off this." Do you see that?
6  A. Yes, yes.
7  Q. Do you understand why Mr. Neuberger referred to
8  and Tennessee counsel as "our counsel"?
9  A. Yes. I believe Mr. Neuberger, being the
10 representative of a B member, considered himself part
11 of the company in a real way and referred to
12 Mr. McWhirter as "our," being ALH's, counsel.
13 Q. And then he goes on to say: "The problem is
14 that the counsel from the letter you sent me does not
15 understand that we need time." What's he talking
16 about?
17 A. I believe he is talking about there that the
18 company benefits from not making this payment now, but
19 getting time.
20 Q. Why?
21 A. I don't recall.
22 Q. It goes on and says: "We also need to get ALH
23 to focus on a nonfraudulent transfer of the Bowden
24 assets." Do you know what that's about?



**WILCOX & FETZER LTD.**

In The Matter Of:

# ALH Holdings LLC

C.A. # 04-1339-SLR

Transcript of :

# Shalom E. Lamm

Volume # 3

January 19, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Page 603

1  prospect of gain. So it was a sure loser versus
2  reasonable gain when we were having good, solid
3  operations, when Bill Lanius was finally satisfied, we
4  are paying our vendors well.
5      So the choice was sure loss on one hand or
6  possibility of great gain if it all goes to Hoyle or
7  somewhere in between, if it goes reasonably well.
8  Seemed a simple choice to me.
9  Q. And that was your judgment at this point?
10 A. As opposed to whose?
11 Q. As opposed to some judgment that somebody else
12 might make looking at the same set of facts.
13 A. This, to me, seems simple, clear-cut, and
14 obvious.
15 Q. So obvious that, in your view, no reasonable
16 person could come to a different conclusion?
17 A. There are many things contained in this memo.
18 Reasonable people could disagree with various pieces
19 of this. But as the choice between let's exit under
20 any circumstance, I'm tired of being here, it's taken
21 too much of my time versus, hey, there's a good way to
22 get out of this and actually turn this into the solid
23 platform it is, I think there's no room for that. No,
24 I disagree with you. I think it's clear and,

Page 604

1  indeed --
2  Q. I'm not setting my opinion. You can't disagree
3  with me because I didn't state a view.
4  A. The characterization.
5  Q. But I did ask you the question of did you
6  believe that no reasonable person could come to a
7  different conclusion than you came to in your
8  conclusion that this was the least risky alternative.
9  A. I believe that no reasonable person could come
10 to another conclusion.
11 Q. Okay.
12 A. Unless they had another motive.
13 Q. But if they had another motive, you would be
14 saying that that wasn't their real conclusion? In
15 other words, a reasonable person, in your view,
16 looking at this as a businessman, could not come to a
17 different conclusion than the one you outlined there;
18 is that correct?
19 A. Could not come to another conclusion.
20 Q. All right.
21 A. There would have to be another motive.
22     MR. SPARKS: Let's mark this as the next
23 exhibit, please.
24     (Lamm Exhibit 130 was marked for

Page 605

1  identification.)
2  BY MR. SPARKS:
3  Q. I've marked a July 10, 2003, e-mail from you to
4  Mr. Krieger.
5      Why did you congratulate Shamrock on the
6  sale of ABI given all of the strong feelings that
7  you've expressed to us about this transaction over the
8  past two days?
9  A. My mom always told me to be polite.
10 Q. That's it?
11 A. That's it.
12 Q. You are simply trying to be polite?
13 A. I was.
14 Q. You also authorized a payment to Shamrock for
15 its work in connection with arranging the transaction;
16 correct?
17 A. I did.
18 Q. Why did you do that?
19 A. Mr. Arenson and I discussed it. We recognized
20 that, indeed, Shamrock had worked very hard to make
21 sure this got done. They were relentless about
22 getting this done. And it seems that this was their
23 expectation and not doing so would have, I think, been
24 a tremendous slap in the face and no one needed to

Page 606

1  create that animus.
2  Q. There was already plenty of animus running
3  around in this circumstance, was there not?
4  A. There's different animus. Let's devise animus
5  between two types. One is open, in-your-face animus
6  which I think people try to keep to a minimum, and the
7  other is what people really thought. I refer you to
8  Mr. Krieger's congratulatory letter to Mr. Zich which
9  would be along those same lines. Pure and
10 unadulterated nonsense. But he did write a very nice
11 note even as he was trashing him all over the place
12 behind his back. So I think along the same lines of
13 Mr. Krieger's note to Mr. Zich.
14 Q. That this note by you was pure and
15 unadulterated nonsense?
16 A. Not nonsense. It was politeness.
17     MR. SPARKS: Let me mark this as the next
18 exhibit.
19     (Lamm Exhibit 131 was marked for
20 identification.)
21 BY MR. SPARKS:
22 Q. In the top e-mail here am I correct that you
23 are sending on Mr. Buchler's request for a fee to
24 Mr. Neuberger and asking for his help on how to

Shalom E. Lamm

Page 607

1  respond to this?
2  A. I apologize. I just haven't had chance to read
3  it yet.
4  Q. That's my question. So as you read it, think
5  about the question and I'll ask it again after you've
6  read it.
7  A. (The witness reviews the document.)
8      THE WITNESS: Sam —
9      MR. WOOD: Just —
10  A. Go ahead. The question.
11  BY MR. SPARKS:
12  Q. My question is: What did you need help for
13  from Mr. Neuberger with respect to Mr. Buchler's
14  communication in this e-mail?
15  A. To be honest with you, I was surprised this is
16  here. I was asking for legal advice.
17      MR. WOOD: He's not asking you for legal
18  advice yet. I'm not going to let you answer that.
19      THE WITNESS: Okay.
20  BY MR. SPARKS:
21  Q. You were asking for legal advice from
22  Mr. Neuberger?
23  A. I am.
24  Q. Without asking for what the advice was, that

Page 608

1  was legal advice with respect to the meeting to be
2  held on — I think it's the 26th, the meeting that we
3  went over, the supervisory board meeting?
4  A. Yes.
5  Q. You were asking for that legal advice in your
6  capacity as the managing member —
7  A. SELK.
8  Q. — of SELK?
9  A. Yes.
10  Q. Was SELK asked to do anything with respect to
11  the meeting or at the meeting?
12  A. Without going into the nature of my
13  conversation, I was — it's interesting — asking
14  Mr. Neuberger about —
15      MR. WOOD: Don't answer that. Just leave
16  it where it is.
17  Q. Would you answer my question?
18  A. Which is —
19  Q. And that is: Was SELK called upon to do
20  anything, as you understood it, at or with respect to
21  the meeting?
22  A. I needed clarification about just your
23  question. I had a legal question about that. I just
24  wanted to make sure that I was acting properly.

Page 609

1  Q. I'm going to press this a bit because I don't
2  understand. I understand why you might seek advice
3  from some lawyer with respect to your conduct as a
4  member of the supervisory board, but you were not a
5  delegate of SELK in that capacity and SELK was not
6  being asked to vote, so as a managing member of SELK,
7  you're not casting a vote.
8      So my question is: Were you seeking advice
9  in some manner concerning your role as managing member
10  of SELK?
11      MR. WOOD: He's already answered that. He
12  said yes.
13  A. Yes.
14  Q. Then I am then asking the question, because I
15  may be missing something: Was some vote or other
16  action of SELK, as you understood it, going to be
17  required at the supervisory board meeting?
18  A. And my answer will get into my conversation
19  with Mr. Neuberger, which I assure you I was —
20  Q. Your answer would be yes or no. I won't get
21  into your conversation, and I'm entitled to an answer
22  to that to at least set up, should I choose to pursue
23  it, a motion to compel an answer to this as being
24  something outside of the scope of your attorney/client

Page 610

1  privilege. I'm not asking for your communication. I
2  am simply asking the question that I've now asked
3  three times.
4      MR. WOOD: You can answer that yes or no.
5  A. We've now gone so many places, I don't know
6  whether it is yes or no, so if you can ask it again.
7      MR. SPARKS: I'm going to ask Kathleen to
8  go back and get my question the last time I iterated
9  it, which probably gets better each time I ask it, and
10  just ask you to answer the question. I only want a
11  yes-or-no answer.
12      THE WITNESS: I accept.
13      (The reporter read the following question
14  from the record as requested:
15      "QUESTION: Then I am then asking the
16  question, because I may be missing something: Was
17  some vote or other action of SELK, as you understood
18  it, going to be required at the supervisory board
19  meeting?")
20  A. No.
21  BY MR. SPARKS:
22  Q. Then I would like you to tell me what you asked
23  Mr. Neuberger and what Mr. Neuberger told you.
24      MR. WOOD: I instruct you not to answer.

6 (Pages 607 to 610)

### Page 639

1  who Mr. Neuberger had introduced to -- to this mix was
2  Mr. Goldberg, and Mr. Goldberg for a short time was
3  contemplating being part of that buyout.
4  Q. So when this says "would enhance his
5  investment," it really means his possible investment
6  in ALH; is that right?
7  A. That's right.
8     (Lamm Exhibit 143 was marked for
9  identification.)
10 BY MR. SPARKS:
11 Q. I've marked a document which is an e-mail from
12 you to Mr. Arenson with a short response from
13 Mr. Arenson. Your e-mail appears to be dated
14 August 2, 2002.
15    MR. WOOD: Read the whole document, please.
16 A. (The witness reviews the document.)
17 Q. My question is really in paragraph 7. You
18 state there: "I emphasized that because of my
19 position as Chairman of Holdings, I could not take an
20 active leadership role with respect to the B potential
21 acquisition of the A's."
22    Do you see that?
23 A. I do.
24 Q. Is that because you saw an active role on your

### Page 640

1  part with respect to the acquisition of the A's as
2  placing you in a conflict position?
3  A. Yes, and I wanted to be clear to Shamrock that
4  I didn't want to be placed in that position.
5     MR. SPARKS: Let's mark this as the next
6  Lamm exhibit.
7     (Lamm Exhibit 144 was marked for
8  identification.)
9  BY MR. SPARKS:
10 Q. I have handed you a document marked Lamm 144
11 which appears to be an e-mail from you to Mr. Arenson,
12 Mr. Frankel, Mr. Jesselson, Mr. Konig, and
13 Mr. Neuberger copied to Mr. Zich memorializing a
14 meeting you had with Mr. Goldberg. Do you see that?
15 A. Yes, sir.
16 Q. In this meeting with Mr. Goldberg you were
17 seeking to help to put together a deal whereby the B's
18 might be able to acquire the interest of the A's;
19 correct?
20 A. Yes.
21 Q. Mr. Goldberg had somebody who he thought might
22 be interested, and that was a Mr. Itchko Ezrati,
23 E-z-r-a-t-i, the first name is I-t-c-h-k-o; correct?
24 A. Yes, sir.

### Page 641

1  Q. Now, was the B's willingness to go ahead and
2  buyout the A's dependent upon them finding some
3  partner?
4  A. No.
5  Q. But they were, nonetheless, searching for a
6  partner as a possible way of doing it?
7  A. It would have been one nice option.
8  Q. Did they ever find a partner?
9  A. I don't know.
10 Q. Do you know what happened to Mr. Itchko and his
11 interest?
12 A. He was not interested.
13 Q. Do you know what happened to the second builder
14 that's referred to in the Goldberg --
15 A. I do not. I don't know that we ever spoke to
16 him. I don't remember.
17    MR. SPARKS: Mark this as the next one.
18    (Lamm Exhibit 145 was marked for
19 identification.)
20 BY MR. SPARKS:
21 Q. Let me know when you are through reading this
22 e-mail exchange of August 6.
23 A. (The witness reviews the document.) Okay.
24 Yes, sir.

### Page 642

1  Q. Who --
2     MR. WOOD: Hold on a second. Let me
3  finish.
4     (Pause.) Okay.
5  BY MR. SPARKS:
6  Q. Who drafted the e-mail from you to Mr. Buchler?
7  Was it drafted initially by you or was it drafted with
8  the assistance of someone?
9  A. It was me.
10 Q. Am I correct that what this was about was that
11 the Shamrock representatives on the supervisory board
12 wanted to execute some exclusivity arrangement with
13 Walter looking toward a possible sale of Bowden?
14 A. That's correct.
15 Q. You didn't think the company ought to be sold
16 in pieces, so you balked for a while at signing the
17 document?
18 A. I was in the position where I felt a
19 responsibility to represent the interest of all of the
20 investors. Shamrock, and here as you see David
21 Robbins acting as counsel to Shamrock, I guess, at
22 this point were taking a position that I had no
23 choice, but I was being directed by them that their
24 will was the only thing that mattered and, therefore,