# Exhibit C



**WILCOX & FETZER LTD.**

In The Matter Of:

# ALH Holdings LLC

C.A. # 04-1339-SLR

## Avie Arenson
Volume 1

November 16, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 18

1  A. Unless you had some papers that I could look
2  at. Some of the e-mails that -- the early e-mails
3  that I sent were actually drawn up by Shalom, and if I
4  saw them, I can recognize his style as opposed to
5  mine.
6  Q. So some of the early e-mails that you were
7  sending regarding ALH were actually drafted by Shalom
8  Lamm; is that correct?
9  A. By Shalom and by Isaac Neuberger. I'm sorry.
10  Did you ask about Shalom Lamm?
11      MR. WOOD: You said Shalom.
12  Q. You had indicated Shalom.
13  A. My mistake.
14  Q. So some of the early e-mails you sent were
15  actually drafted by Isaac Neuberger and not by --
16  A. Yes, yes, yes.
17  Q. Did that change at some point?
18  A. No, not really, not every letter. If I thought
19  it was important, I asked him to draft it. This is a
20  standard practice for me in almost every important
21  letter, I ask my lawyers to draft them for me and they
22  do. Because I'm an engineer.
23  Q. Now, did you retain Mr. Neuberger and his firm
24  to represent you in your capacity as the Class B

Page 19

1  representative on the ALH supervisory board?
2  A. No.
3  Q. So he was representing just your investment
4  vehicles; is that correct?
5  A. As far as I was concerned, yes. But I knew he
6  was representing some of the other class -- the
7  shareholders of the Class B group.
8  Q. Did you know which of the other Class B
9  investors he was representing?
10  A. Actually, I think we all met in London, in
11  Heathrow, at which point we all more or less, I think,
12  confirmed that he was representing us. I think he was
13  representing us before this, but this was actually the
14  first time I met some of these people. And we
15  confirmed that he was representing us.
16  Q. And the London Heathrow meeting you are
17  referring to, that was July of 2002; is that right?
18  A. I don't remember. Could be.
19  Q. You indicated that was the first time you had
20  met some of these people. Which people had you met
21  for the first time at the London Heathrow meeting?
22  A. Except for maybe Michel, whom I met in Israel,
23  I think all of them, this was the first time.
24  Q. So you had met Michel -- is that Konig?

Page 20

1  A. Yes. I believe I met him in Israel.
2  Q. When did you first --
3  A. In fact, that may have been where I met Isaac,
4  too, previous to London. I'm not sure. But this was
5  the first time I met some of the others.
6  Q. We'll probably come back and talk about the
7  London meeting in a little more detail, but I wanted
8  to just follow up with when you first met Mr. Konig.
9  You believe that may have been in Israel?
10  A. It may have been before that and it may have
11  been at that meeting.
12  Q. You are just not sure?
13  A. I'm not sure.
14  Q. But you are sure that the other people that
15  attended the Heathrow meeting, that that was the first
16  time you had met them?
17  A. Yes. In fact, a lot of them it's the only time
18  I met them. I haven't met them since.
19  Q. Which group of people is that?
20  A. The two brothers.
21  Q. Would that be the Frankels?
22  A. The Frankels, yes.
23  Q. What's your relationship with Shalom Lamm?
24  A. At this point we have no -- we're not in

Page 21

1  contact.
2  Q. When did you first meet him?
3  A. I think in the middle '90s.
4  Q. What were the circumstances under which you
5  first met Shalom Lamm?
6  A. There was a group of Israelis investing in some
7  of his projects, his real estate projects in real
8  estate, in rental, rental properties.
9  Q. You indicated rental properties. What type of
10  rental properties?
11  A. Apartments, shopping centers, offices.
12  Q. Where were these rental properties located?
13  A. I think in the southeast.
14  Q. What were the names of the businesses that you
15  were investing in?
16  A. I don't remember.
17  Q. Who participated in the group of Israelis that
18  you mentioned?
19  A. Other names of Israelis?
20  Q. Yes. In addition to yourself.
21  A. David Zwibel was an American-Israeli.
22      MR. WOOD: You need to spell last names.
23  Q. We'll need the spelling for the court reporter.
24  A. I don't really know how he spells his last

Page 74

1 right?
2  A. Yes.
3  Q. And that Shamrock didn't want to bring more
4 money.
5  A. Yes.
6  Q. And I'm asking: Is it your understanding that
7 Shamrock was obligated to invest more money itself?
8  A. Obligated? No, I don't think so.
9  Q. What do you mean, then, by Shamrock wanted to
10 bring more money?
11  A. We all saw that we needed more money in the
12 company. I felt, and apparently others felt, as well,
13 that there was no outside source that we could get
14 this money from. The individual investors should
15 bring more money to the company. None of us had to.
16  Q. Did you?
17  A. Not by myself, no.
18  Q. Why not?
19  A. Shamrock by this time decided that they wanted
20 to sell the company. We offered to bring more money.
21 We offered to buy old Shamrock. But just to lend more
22 money and let Shamrock keep on was not -- was not an
23 option.
24  Q. Did you ever discuss making a greater equity

Page 75

1 investment and taking over control yourself?
2  A. Myself, personally? No.
3  Q. How about the B's as a group?
4  A. Yes.
5      MR. WOOD: Can we take a five-minute break?
6      MR. HURD: Yes. Why don't we take a break?
7      MR. WOOD: We are almost two hours.
8      (A recess was taken at this time.)
9 BY MR. HURD:
10  Q. Mr. Arenson, I wanted to follow up on a couple
11 things that occurred to me while we were on break.
12      You indicated before that you had not
13 retained Mr. Neuberger to represent you in your
14 capacity as the Class B representative on a
15 supervisory board.
16      Do you have a lawyer that represents you in
17 that capacity?
18  A. There's something wrong with that question.
19 Can you --
20  Q. Sure.
21      I believe you had indicated before that
22 Mr. Neuberger and his firm represented you before the
23 litigation was filed --
24  A. Yeah.

Page 76

1  Q. -- and represented your two investment
2 companies that were the Class B investors.
3  A. Yes.
4  Q. I believe you also indicated that he wasn't
5 representing you in your capacity as the Class B
6 representative?
7  A. No.
8  Q. No?
9  A. No.
10  Q. That's not correct?
11  A. No, he wasn't representing me. I'm sorry.
12 Your statement is correct.
13  Q. Okay. Thank you.
14      MR. WOOD: Yes, you are correct.
15  A. Yes, you are correct. I'm sorry.
16  Q. Thank you.
17      Did you have a lawyer that was representing
18 you in that capacity?
19  A. No.
20  Q. Did you ever get any financial or business
21 advice from Mr. Neuberger?
22  A. Not really.
23  Q. No?
24  A. No.

Page 77

1  Q. You indicated "not really."
2      Were there times when you had discussions
3 about financial matters with Mr. Neuberger?
4  A. In his legal capacity, obviously we did.
5  Q. Can you distinguish for me between when you
6 were seeking legal advice versus when you were seeking
7 business advice?
8  A. I could give you an example, but I don't think
9 I can distinguish --
10  Q. An example might even be helpful.
11  A. If I wanted to know whether I should have
12 bought one of these companies or not, that would be
13 business advice. If I wanted to know whether the
14 company was properly registered as part of his due
15 diligence in the legal part of it was okay, that would
16 be legal advice.
17  Q. If you were communicating about, for example,
18 the way JMP was managing the sales process, in what
19 category would you put that?
20      MR. WOOD: Objection.
21      You can answer that. Go ahead.
22  A. Well, I think that was legal because our
23 question about JMP was not -- was not really -- I
24 didn't ask them -- I didn't ask Neuberger whether JMP

20 (Pages 74 to 77)

Page 238

1 personal interest anymore. He may have or he may not
2 have. But in any case, he had no obligation to help
3 us, but he did.
4   Q. In Mr. Lamm's response on the -- or it may not
5 have been the response, it may have been in Mr. Lamm's
6 e-mail to you on the first page of Exhibit Number 26,
7 he indicates, "last item: We have been working with
8 our attorney for a long time to try to resolve the
9 Bowden litigation - which we will ultimately lose."
10       Did you agree with Mr. Lamm's assessment
11 that ALH would ultimately lose the Bowden litigation?
12   A. I didn't have any personal knowledge of the
13 details.
14   Q. I think we talked about before that
15 Mr. McWhirter, who is referenced in that paragraph,
16 had advised the ALH supervisory board to try to settle
17 the Bowden litigation; is that right?
18   A. I believe so.
19       MR. HURD: Mark that as the next exhibit,
20 please.
21       (Arenson Exhibit 27 was marked for
22 identification.)
23   A. (The witness reviews the document.)
24

Page 239

1 BY MR. HURD:
2   Q. Have you had a chance to review Exhibit
3 Number 27?
4   A. Just one more minute, please.
5   Q. Okay.
6   A. (The witness reviews the document.) Yes. What
7 was the question?
8   Q. The first line of this e-mail from you to
9 George Buchler and Gene Krieger indicates: "As I told
10 you last week, the Class B investors met together in
11 London." I think we talked about that meeting?
12   A. Yes.
13   Q. Did you have a telephone call before sending
14 this e-mail with both Mr. Krieger and Mr. Buchler?
15   A. I have no idea. I don't remember.
16   Q. Do you remember that you definitely spoke with
17 one of them?
18   A. No.
19   Q. The second paragraph indicates that it's "The
20 unanimous view of the Class B's that a sale of Bowden
21 is ill-advised at this time...."
22       Why was that?
23   A. I've described this many times. The reasons
24 that we discussed. Bowden -- the Bowden -- this was

Page 240

1 the first sale. We hadn't sold Jacksonville at this
2 time, yet, had we?
3   Q. That's right, Mr. Arenson.
4   A. This was the first aborted sale.
5   Q. The efforts by JMP to sell the company as a
6 whole had already ceased and they were now focusing
7 and trying to sell Bowden?
8   A. I'd forgotten that we tried to sell Bowden and
9 didn't, and then we went on to Jacksonville. I think,
10 in general, I was opposed to selling the components
11 and Bowden -- the word, I had forgotten. Now I recall
12 that we had actually tried unsuccessfully to sell
13 Bowden first and then we went on to Jacksonville.
14   Q. Okay.
15   A. But the reasons for Jacksonville or, for that
16 matter -- although Bowden a year previously or
17 sometime other than that was in bad shape. But in the
18 meantime Jeff Sweeney had done a really good job on it
19 and it was a very dynamic buoyant company.
20   Q. At the point of this e-mail, Bowden was
21 performing well?
22   A. Very well.
23   Q. So the reasons that you believe that a sale of
24 Bowden is ill-advised at this time are really just the

Page 241

1 same reasons that you believe a sale of ABI by itself
2 would be ill-advised; is that right?
3   A. Yes, yes.
4   Q. Does reviewing this e-mail refresh your
5 recollection about anything else that was discussed
6 during the course of the Heathrow meeting in London?
7   A. Not that I haven't already mentioned.
8   Q. Why did you copy Mr. Neuberger?
9   A. I think at this point I copied him on
10 everything. He was there in London. As a rule, I
11 tend not to have hidden copies. The cc. is open.
12   Q. Your e-mail also indicates "As I told you," and
13 I guess we're not sure if that was one of Gene or
14 George or both of them?
15   A. Yes.
16   Q. "The time frame for a Shamrock buy out is one
17 of weeks and not months."
18   A. Yeah.
19   Q. Why were you thinking that it was one of weeks
20 and not months?
21   A. I had forgotten that the 30th of July was a few
22 weeks before the high holidays, the Jewish high
23 holidays, and I thought we could accomplish it in
24 weeks, which is why. But the 30th of July was

61 (Pages 238 to 241)

Page 254

1  MR. HURD: Can you mark that as the next
2  exhibit?
3  (Arenson Exhibit 30 was marked for
4  identification.)
5  A. (The witness reviews the document.) Yes.
6  BY MR. HURD:
7  Q. First of all, do you recognize this document?
8  A. Yes.
9  Q. It's an e-mail letter from Mr. Krieger to you?
10 A. Yes.
11 Q. The last paragraph of his letter says: "It has
12 now been over two weeks since you indicated that the
13 B's were seriously interested in a buyout of the A's
14 interest in ALH, and you said the process would be one
15 of weeks not months. I haven't heard anything further
16 from you on this issue. Please let me know if the
17 prospects of a transaction are real and the likely
18 timetable."
19 Did you get back to Mr. Krieger with the
20 request?
21 A. Yes.
22 Q. What did you say?
23 A. I think shortly after that, or not necessarily
24 shortly, but after the holidays, which was, I believe,

Page 255

1  the end of September, the first week in October, but I
2  couldn't wrong, we started talking about prices.
3  Q. So you responded --
4  A. About the purchasing. About Shalom, I'm not
5  sure if I did respond.
6  Q. So you don't believe you responded to
7  Mr. Krieger's August 14th request for a timetable
8  until sometime in late September or early October?
9  A. He didn't ask for a timetable. I'm sorry. He
10 did. No, I didn't respond with a likely timetable
11 because it hadn't changed. It hadn't changed. What I
12 did was in the next conversation we started talking
13 about qualities of money.
14 Q. And that next conversation was late September
15 or early October?
16 A. I believe so, but as we move ahead, I think
17 we'll reach that one.
18 Q. Slowly but surely.
19 A. Yes.
20 Q. Did you discuss what you mentioned, the Shalom
21 Lamm defaults at all with Mr. Krieger?
22 A. Yes.
23 Q. What did you discuss?
24 A. I agreed with him that he was in default and

Page 256

1  that something should be done about it.
2  Q. Did you suggest to Mr. Krieger what should be
3  done?
4  A. No.
5  Q. Did you volunteer to do anything about
6  Mr. Lamm's defaults?
7  A. No.
8  MR. HURD: Mark that as 31, please.
9  (Arenson Exhibit 31 was marked for
10 identification.)
11 A. (The witness reviews the document.)
12 BY MR. HURD:
13 Q. I actually won't even ask you questions,
14 Mr. Arenson, about the second page. I want to focus
15 you on the first, your e-mail, which is at the top of
16 the page.
17 MR. WOOD: I'm going to object. I think
18 this was inadvertently produced. Go ahead. I will
19 recall this document.
20 MR. HURD: You are recalling this document?
21 MR. WOOD: Yes. I think it was
22 inadvertently produced and it's privileged.
23 MR. HURD: Okay.
24 MR. WOOD: I'm sure it's privileged. If

Page 257

1  you disagree, we can take it up later.
2  MR. HURD: If you are going to recall it,
3  we'll do that and we'll reserve our rights to take
4  that up later.
5  MR. WOOD: Yes. I think this is definitely
6  privileged. However, if you want to ask the document
7  itself -- why don't you ask your question and let me
8  see if I have a problem?
9  MR. HURD: I have a series of questions I'm
10 going to ask him about this.
11 MR. WOOD: I think this document is
12 definitely privileged and it shouldn't have been
13 produced.
14 MR. HURD: Primarily what he meant by a
15 variety of things he said in the communication.
16 MR. WOOD: Yes, I will recall this
17 document.
18 MR. HURD: Okay. I guess we'll need to
19 un -- I don't know how you want to handle this.
20 MR. WOOD: Why don't we unmark it?
21 MR. HURD: We will not make it an exhibit.
22 MR. WOOD: Why don't you unmark it? And
23 then I would ask that it be destroyed. You don't have
24 to do it right now.

65 (Pages 254 to 257)