# Exhibit H

| | |
|---|---|
| **From:** | Isaac M. Neuberger |
| **Sent:** | Thursday, August 01, 2002 4:56 PM |
| **To:** | Michel Konig (E-mail); Avie Arenson (E-mail); Mark Frankel (E-mail); Michael G. Jesselson (E-mail) |
| **Cc:** | Shalom E. Lamm (E-mail) |
| **Subject:** | RE: ALH |

www.ohiosavings.com

for your information and reading pleasure
************************************

CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege.  If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
************************************

1

CLASSB01421

erry Meyers

| From: | Shalom Lamm |
|---|---|
| Sent: | Sunday, December 29, 2002 10:49 PM |
| To: | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| Subject: | Surety Bonds |

Gentlemen:

Jonathan Zich forwarded the following article appearing in US Banker Magazine which you may find interesting as it relates to claims under surety binds.

-Shalom


COURT BATTLE
Trying Not To Pay


Insurance companies are trying to wiggle out of paying Morgan Chase $1.1 billion, underscoring the dangers of using new financial instruments, or old ones in new ways. The likelihood is that the bank will win.
By Roger Furman

J.P. Morgan Chase & Co.¹s lawsuit against six insurance companies to collect on 11 surety bonds covering almost $1.1 billion in Enron-related obligations could test the legal viability of a new use for an old financial instrument..
Being inventive could turn out to be very expensive for Morgan Chase, and already has been highly embarrassing.

The surety bonds guaranteed Enron¹s obligations to repay money advanced to it by Morgan Chase. Under a series of ³forward sale contracts,² Morgan Chase subsidiaries had paid large amounts to Enron subsidiaries at the outset, in return for the Enron subs¹ promise to deliver oil and gas to the Morgan Chase subs in the future. On Dec. 7, five days after Enron first filed for bankruptcy, Morgan Chase asked the insurers to pay under the surety bonds.

But the insurers balked. They are claiming that the contracts were for delivery of oil and gas, and that Morgan Chase never had any intention of actually accepting oil or gas. In reality, the insurers argue, Morgan Chase had made loans to Enron, and the surety bonds were not designed to insure loans.

Interesting argument. Using surety bonds was an unusual way of insuring the ever mounting amounts of funding Enron needed. The deals were made between two Morgan Chase subsidiaries‹Mahonia Ltd. and Mahonia Natural Gas Ltd.‹and two Enron subsidiaries, Enron Natural Gas Marketing Corp. and Enron North America Corp. The Mahonia subsidiaries originally were set up to help Enron avoid taxes by shifting gains and losses between Enron and Mahonia. They were not specifically meant to be vehicles to finance Enron. But as Enron¹s losses mounted, and its thirst for cash from Morgan Chase intensified, it came up with the idea of the surety bonds to hedge Morgan Chase¹s risk. It is unclear whether other options were open to it.

Lawyers for none of the parties directly involved would speak about the issue. But a careful reading of legal papers filed by the bank and the insurers indicate that Morgan Chase has a strong case.

St. Paul Fire and Marine Insurance Co., for example, on the hook for $134 million, claims that because Enron never entered into any contracts with oil and gas suppliers to provide the product it would be compelled to deliver to Enron in the future, ³Enron did not actually intend to deliver the subject crude oil and natural gas,² according to its formal response to Morgan Chase¹s complaint. St. Paul similarly argues that because Mahonia, also a trading company, never entered into any contracts with oil and gas users to sell the product Mahonia was to receive from Enron, Mahonia never actually intended to take

1

CLASSB01507

| | |
|---|---|
| **From:** | Shalom Lamm |
| **Sent:** | Sunday, December 29, 2002 10:49 PM |
| **To:** | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| **Subject:** | Surety Bonds |

Gentlemen:

Jonathan Zich forwarded the following article appearing in US Banker Magazine which you may find interesting as it relates to claims under surety binds.

-Shalom


COURT BATTLE
Trying Not To Pay


Insurance companies are trying to wiggle out of paying Morgan Chase $1.1 billion, underscoring the dangers of using new financial instruments, or old ones in new ways. The likelihood is that the bank will win.
By Roger Furman

J.P. Morgan Chase & Co.¹s lawsuit against six insurance companies to collect on 11 surety bonds covering almost $1.1 billion in Enron-related obligations could test the legal viability of a new use for an old financial instrument..
Being inventive could turn out to be very expensive for Morgan Chase, and already has been highly embarrassing.

The surety bonds guaranteed Enron¹s obligations to repay money advanced to it by Morgan Chase. Under a series of ³forward sale contracts,² Morgan Chase subsidiaries had paid large amounts to Enron subsidiaries at the outset, in return for the Enron subs¹ promise to deliver oil and gas to the Morgan Chase subs in the future. On Dec. 7, five days after Enron first filed for bankruptcy, Morgan Chase asked the insurers to pay under the surety bonds.

But the insurers balked. They are claiming that the contracts were for delivery of oil and gas, and that Morgan Chase never had any intention of actually accepting oil or gas. In reality, the insurers argue, Morgan Chase had made loans to Enron, and the surety bonds were not designed to insure loans.

Interesting argument. Using surety bonds was an unusual way of insuring the ever mounting amounts of funding Enron needed. The deals were made between two Morgan Chase subsidiaries‹Mahonia Ltd. and Mahonia Natural Gas Ltd.‹and two Enron subsidiaries, Enron Natural Gas Marketing Corp. and Enron North America Corp. The Mahonia subsidiaries originally were set up to help Enron avoid taxes by shifting gains and losses between Enron and Mahonia. They were not specifically meant to be vehicles to finance Enron. But as Enron¹s losses mounted, and its thirst for cash from Morgan Chase intensified, it came up with the idea of the surety bonds to hedge Morgan Chase¹s risk. It is unclear whether other options were open to it.

Lawyers for none of the parties directly involved would speak about the issue. But a careful reading of legal papers filed by the bank and the insurers indicate that Morgan Chase has a strong case.

St. Paul Fire and Marine Insurance Co., for example, on the hook for $134 million, claims that because Enron never entered into any contracts with oil and gas suppliers to provide the product it would be compelled to deliver to Enron in the future, ³Enron did not actually intend to deliver the subject crude oil and natural gas,² according to its formal response to Morgan Chase¹s complaint. St. Paul similarly argues that because Mahonia, also a trading company, never entered into any contracts with oil and gas users to sell the product Mahonia was to receive from Enron, Mahonia never actually intended to take delivery of the oil and gas that Enron was to provide it.

1

CLASSB01634

**Kathy Schumann**

---

| | |
|---|---|
| **From:** | MGJ [mgj@attglobal.net] |
| **Sent:** | Sunday, May 30, 2004 10:37 AM |
| **To:** | Isaac M. Neuberger; konig@skynet.be; avie@arenson.co.il |
| **Cc:** | bjj@jesselson.com |
| **Subject:** | please read......regards |


JUNE 7, 2004

FINANCE

Look Out Below, Lenders

The end of the mortgage boom is nigh -- and it could get ugly for banks and thrifts

In most markets -- be it stocks, bonds, or commodities -- most participants never realize the market has topped until it's too late. But for banks and the rest of the nation's mortgage lenders, the signals are as clear as can be. It's becoming painfully evident that the current surge in housing activity probably represents the blow-off to a four-year party.

The latest evidence: The Commerce Dept.'s May 26 report that sales of new single-family homes fell 11.8% -- the biggest monthly drop in a decade. Mortgage demand could decline even more sharply in coming months. Already, refinancing activity is down more than half from 2003's record pace. And overall mortgage originations could tumble 36.5% in 2004, to $2.4 trillion, and an additional 28% in 2005 as demand for housing cools and refis dry up, says Doug Duncan, chief economist for the Mortgage Bankers Assn. (MBA).

Tally it all up, and it may not be a pretty sight for the financial sector. Richard X. Bove, bank analyst for Hoefer & Arnett Inc., a San Francisco brokerage, expects bank and thrift profits to grow by as little as 6% this year and a mere 5% in 2005, after years of 20%-plus growth. Two new forces are likely to play havoc with bank profits: a margin squeeze as the Federal Reserve raises short-term funding costs and the rise in mortgage delinquencies and defaults among borrowers -- many of them with weak credit -- who have opted for adjustable-rate mortgages. Says Bove: "At the risk of a little hyperbole, 2005 is going to be a bloodbath."

Just how much pain will an industry contraction cause? Plenty, for the simple reason that the nation's banks and thrifts have increasingly staked their loan portfolios on the mortgage and home-equity businesses. Over the past year, banks have raised their holdings of residential mortgages by some $125 billion, to $1.35 trillion, or about 18% of their assets. At the same time, home-equity loans have soared by 36% over the past year, to a record $324 billion. To handle these loan volumes, lenders have built up huge infrastructures. According to the MBA, total mortgage-related employment has risen by 120,000 since 2001.

Now it looks likely that banks and thrifts will have to drastically pare back on those extra workers. Indeed, the Seattle thrift, Washington Mutual Inc. (WM ), laid off 2,900 in the first quarter after eliminating 4,500 in the prior four months, with most of the cuts coming in the firm's mortgage lending departments. And the end of the

CLASSB01769

mortgage boom is likely to trigger a deeper shakeout within the industry. "There are a lot of regional banks, brokers and mortgage banks that built their operations on refinancings," notes Joe Anderson, a senior managing director at Countrywide Financial Corp. (CFC ). "When that business goes away and the margins drop, they don't have other options."

The consolidation is already beginning: In mid-May, Citigroup (C ) acquired Principal Residential Mortgage, a Des Moines-based mortgage servicer, while Regions Financial (RF ) and Union Planters (UPC ) agreed in April to combine their mortgage operations. And on May 21, Washington Mutual's shares climbed nearly 9% on speculation that it might sell out to HSBC Holdings (HBC ). A Washington Mutual spokesman declined comment.

For the moment, though, most mortgage lenders are straining to keep the music playing as long as possible. GMAC Mortgage Corp. has slashed its closing fees to as little as $900 and is allowing borrowers to lock in for as long as 60 days before closing, vs. the 45-day window that most lenders provide. "You have to look at your margins and see what you can give the consumer," says Ralph Hall, chief operating officer for GMAC Mortgage (GM ).

But some mortgage brokers and credit counselors contend that lenders are loosening their credit standards to qualify as many new borrowers as possible. And they claim that they're pushing borrowers toward adjustable-rate mortgages that sport initial rates as low as 1.6% -- but that could surge to upwards of 8% if rates climb sharply. "There is a much greater willingness on the lenders' part to make the loan than in the past," surmises Steve Bucci, president of Consumer Credit Counseling Service of Southern New England.

**SCARY STUFF**
Certainly, lenders are writing more loans to so-called subprime borrowers with poor credit histories: The volume of such loans surged 70% in the first quarter of 2004, to $105.6 billion. They now account for 18% of all mortgage activity, vs. 7% in the first quarter of 2003, according to *Inside Mortgage Finance*, a mortgage trade publication. If rates rise fast enough and high enough, analysts believe banks and thrifts could be facing "some scary defaults in the mortgage business," predicts George R. Yacik, a vice-president at SMR Research Corp., a Hackettstown, N.J., mortgage research firm. "There could be some real pain for lenders here."

Lenders maintain that they remain prudent. For one, they say sophisticated risk modeling with computer programs allows them to better predict the likelihood of defaults and charge more to cover greater losses on riskier loans. Many lenders maintain that they're not basing their lending criteria on the initial level of the ARMs deals they're now offering, but on worse-case scenarios in which rates rise much higher. "The industry has had the benefit of hindsight. We saw the big players -- the West Coast thrifts -- go out of business the last time," explains Anthony T. Meola, an executive vice-president at Washington Mutual.

No doubt about it, the 1980s housing boom had an ugly ending. Will lenders emerge in better shape this time? The amounts involved are much higher today, so let's hope so. Either way, there's a bumpy ride ahead.

CLASSB01770

By Dean Foust in Atlanta, with Christopher Palmeri in Los Angeles, David Welch in Detroit, and bureau reports

http://yahoo.businessweek.com:/print/magazine/content/04_23/b3886127.htm?mz

CLASSB01771

**Terry Meyers**

| | |
|---|---|
| **From:** | MGJ |
| **Sent:** | Sunday, May 30, 2004 10:37 AM |
| **To:** | Isaac M. Neuberger; konig@skynet.be; avie@arenson.co.il |
| **Cc:** | bjj@jesselson.com |
| **Subject:** | please read......regards |

JUNE 7, 2004

FINANCE

Look Out Below, Lenders

The end of the mortgage boom is nigh -- and it could get ugly for banks and thrifts

In most markets -- be it stocks, bonds, or commodities -- most participants never realize the market has topped until it's too late. But for banks and the rest of the nation's mortgage lenders, the signals are as clear as can be. It's becoming painfully evident that the current surge in housing activity probably represents the blow-off to a four-year party.

The latest evidence: The Commerce Dept.'s May 26 report that sales of new single-family homes fell 11.8% -- the biggest monthly drop in a decade. Mortgage demand could decline even more sharply in coming months. Already, refinancing activity is down more than half from 2003's record pace. And overall mortgage originations could tumble 36.5% in 2004, to $2.4 trillion, and an additional 28% in 2005 as demand for housing cools and refis dry up, says Doug Duncan, chief economist for the Mortgage Bankers Assn. (MBA).

Tally it all up, and it may not be a pretty sight for the financial sector. Richard X. Bove, bank analyst for Hoefer & Arnett Inc., a San Francisco brokerage, expects bank and thrift profits to grow by as little as 6% this year and a mere 5% in 2005, after years of 20%-plus growth. Two new forces are likely to play havoc with bank profits: a margin squeeze as the Federal Reserve raises short-term funding costs and the rise in mortgage delinquencies and defaults among borrowers -- many of them with weak credit -- who have opted for adjustable-rate mortgages. Says Bove: "At the risk of a little hyperbole, 2005 is going to be a bloodbath."

Just how much pain will an industry contraction cause? Plenty, for the simple reason that the nation's banks and thrifts have increasingly staked their loan portfolios on the mortgage and home-equity businesses. Over the past year, banks have raised their holdings of residential mortgages by some $125 billion, to $1.35 trillion, or about 18% of their assets. At the same time, home-equity loans have soared by 36% over the past year, to a record $324 billion. To handle these loan volumes, lenders have built up huge infrastructures. According to the MBA, total mortgage-related employment has risen by 120,000 since 2001.

Now it looks likely that banks and thrifts will have to drastically pare back on those extra workers. Indeed, the Seattle thrift, Washington Mutual Inc. (WM ), laid off 2,900 in the first quarter after eliminating 4,500 in the prior four months, with most of the cuts coming in the firm's mortgage lending departments. And the end of the

CLASSB01454

mortgage boom is likely to trigger a deeper shakeout within the industry. "There are a lot of regional banks, brokers and mortgage banks that built their operations on refinancings," notes Joe Anderson, a senior managing director at Countrywide Financial Corp. (CFC ). "When that business goes away and the margins drop, they don't have other options."

The consolidation is already beginning: In mid-May, Citigroup (C ) acquired Principal Residential Mortgage, a Des Moines-based mortgage servicer, while Regions Financial (RF ) and Union Planters (UPC ) agreed in April to combine their mortgage operations. And on May 21, Washington Mutual's shares climbed nearly 9% on speculation that it might sell out to HSBC Holdings (HBC ). A Washington Mutual spokesman declined comment.

For the moment, though, most mortgage lenders are straining to keep the music playing as long as possible. GMAC Mortgage Corp. has slashed its closing fees to as little as $900 and is allowing borrowers to lock in for as long as 60 days before closing, vs. the 45-day window that most lenders provide. "You have to look at your margins and see what you can give the consumer," says Ralph Hall, chief operating officer for GMAC Mortgage (GM ).

But some mortgage brokers and credit counselors contend that lenders are loosening their credit standards to qualify as many new borrowers as possible. And they claim that they're pushing borrowers toward adjustable-rate mortgages that sport initial rates as low as 1.6% -- but that could surge to upwards of 8% if rates climb sharply. "There is a much greater willingness on the lenders' part to make the loan than in the past," surmises Steve Bucci, president of Consumer Credit Counseling Service of Southern New England.

**SCARY STUFF**
Certainly, lenders are writing more loans to so-called subprime borrowers with poor credit histories: The volume of such loans surged 70% in the first quarter of 2004, to $105.6 billion. They now account for 18% of all mortgage activity, vs. 7% in the first quarter of 2003, according to *Inside Mortgage Finance*, a mortgage trade publication. If rates rise fast enough and high enough, analysts believe banks and thrifts could be facing "some scary defaults in the mortgage business," predicts George R. Yacik, a vice-president at SMR Research Corp., a Hackettstown, N.J., mortgage research firm. "There could be some real pain for lenders here."

Lenders maintain that they remain prudent. For one, they say sophisticated risk modeling with computer programs allows them to better predict the likelihood of defaults and charge more to cover greater losses on riskier loans. Many lenders maintain that they're not basing their lending criteria on the initial level of the ARMs deals they're now offering, but on worse-case scenarios in which rates rise much higher. "The industry has had the benefit of hindsight. We saw the big players -- the West Coast thrifts -- go out of business the last time," explains Anthony T. Meola, an executive vice-president at Washington Mutual.

No doubt about it, the 1980s housing boom had an ugly ending. Will lenders emerge in better shape this time? The amounts involved are much higher today, so let's hope so. Either way, there's a bumpy ride ahead.

CLASSB01455

By Dean Foust in Atlanta, with Christopher Palmeri in Los Angeles, David Welch in Detroit, and bureau reports

http://yahoo.businessweek.com:/print/magazine/content/04_23/b3886127.htm?mz

CLASSB01456

**From:**         Isaac M. Neuberger
**Sent:**         Sunday, October 27, 2002 3:45 PM
**To:**           Arenson Avie; Michael Jesselson; Michel Konig
**Cc:**           Shalom Lamm; Menashe Frankel; Hesky Frankel
**Subject:**      RE: ALH


This will confirm that Avie, Michel, Michael and I are meeting  (G-d willing) at the
Heathrow Terminal 4 Hilton at or about Noon on Thursday October 31.

Avie's flight arrives from Israel around 11;15 AM. I arrive from Washington at 7;30 AM. I
assume that Michael and Michel will coordinate accordingly and  provide their schedules.

Avie and I are both booked on a flight to Israel at 10 PM, that evening, leaving certainly
enough time.

I have spoken to Shalom and Menashe and advised them of the meeting and have told them
that the primary purpose of the meeting is to decide whether and on what basis to proceed
with a buy-out of Shamrock, if at all. Once decided, if relevant, that the three of you
will also reach a consensus on what opportunity the Frankel investors will have to
participate.

I have asked Sholom to be available by phone for any questions that may arise.

regards
**********************************
CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn, Gielen, Rubin &
Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient
and may constitute a communication protected by the attorney-client privilege.  If you are
not the intended recipient or a person responsible for delivering it to the intended
recipient, you are hereby notified that any use, distribution, or copying of this
communication or its contents is strictly prohibited.  If you have received this
communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

CLASSB01674

**Terry Meyers**

| | |
|---|---|
| **From:** | Isaac M. Neuberger |
| **Sent:** | Wednesday, November 13, 2002 7:30 PM |
| **To:** | Michel Konig (E-mail); Avie Arenson (E-mail); Michael G. Jesselson (E-mail) |
| **Subject:** | ALH |

where do I start.....

Today, we had the conference call to discuss next steps. For whatever reason, Michael was unable to get on the conference line. I was told that his office called complaining about the fact that he held on and that none of us showed. Well 3 of us made it into a conference cell. I apologize to Michael for the inconvenience. I can not explain why.

What we discussed was setting up a meeting Charlotte this coming Monday November 18. Avi has spoken with LaGuardia and Lanius about preparing a presentation. This meeting was scheduled for 11AM, since LaGuardia had to leave by 2PM. When I hung up with Avi and Michel, all that had to be done was  get Shamrock's OK to the meeting.

Avi is in the "air" on his way to Miami and I can NOT reach him.

Michel called back to say that he can NOT be in USA this coming week, but could be there next week during the week of the Nov. 25.

I have tried to reach Michael J and we have not yet caught up to each other.

Sometime tomorrow we need to hook up and decide .......
***********************************
CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege.  If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
***********************************

CLASSB01486

**From:**        Isaac M. Neuberger
**Sent:**        Wednesday, November 13, 2002 7:30 PM
**To:**          Michel Konig (E-mail); Avie Arenson (E-mail); Michael G. Jesselson (E-mail)
**Subject:**     ALH


where do I start.....

Today, we had the conference call to discuss next steps. For whatever reason, Michael was
unable to get on the conference line. I was told that his office called complaining about
the fact that he held on and that none of us showed. Well 3 of us made it into a
conference cell. I apologize to Michael for the inconvenience. I can not explain why.

What we discussed was setting up a meeting Charlotte this coming Monday November 18.
Avi has spoken with LaGuardia and Lanius about preparing a presentation. This meeting was
scheduled for 11AM, since LaGuardia had to leave by 2PM. When I hung up with Avi and
Michel, all that had to be done was  get Shamrock's OK to the meeting.

Avi is in the "air" on his way to Miami and I can NOT reach him.

Michel called back to say that he can NOT be in USA this coming week, but could be there
next week during the week of the Nov. 25.

I have tried to reach Michael J and we have not yet caught up to each other.

Sometime tomorrow we need to hook up and decide .......
***********************************

CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn, Gielen, Rubin &
Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient
and may constitute a communication protected by the attorney-client privilege.  If you are
not the intended recipient or a person responsible for delivering it to the intended
recipient, you are hereby notified that any use, distribution, or copying of this
communication or its contents is strictly prohibited.  If you have received this
communication in error, please notify us immediately by telephone at (410) 332-8550.
***********************************

CLASSB01662

**Kathy Schumann**

| | |
|---|---|
| **From:** | MGJ [mgj@attglobal.net] |
| **Sent:** | Sunday, November 09, 2003 10:09 PM |
| **To:** | Isaac M. Neuberger; Arenson Avie |
| **Cc:** | Michael G. Jesselson (E-mail); Shalom Lamm; Michel Konig (E-mail); Benjamin J. Jesselson |
| **Subject:** | Re: |

Tues 7 AM works for me
Isaac...try to meet my brother benjamin. We spoke about filling him in etc Portable 054 424 444
Regards Michael -----Original Message-----

REDACTED

From: "Isaac M. Neuberger" <IMN@NOGRC.com>

CLASSB01781

and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

Sent via BlackBerry from T-Mobile.

CLASSB01782

**Kathy Schumann**

| | |
|---|---|
| **From:** | MGJ [mgj@attglobal.net] |
| **Sent:** | Sunday, November 09, 2003 10:09 PM |
| **To:** | Isaac M. Neuberger; Arenson Avie |
| **Cc:** | Michael G. Jesselson (E-mail); Shalom Lamm; Michel Konig (E-mail); Benjamin J. Jesselson |
| **Subject:** | Re: |

Tues 7 AM works for me
Isaac...try to meet my brother benjamin. We spoke about filling him in etc Portable 054 424 444
Regards Michael -----Original Message-----                     REDACTED

CLASSB01783

**From:** MGJ
**Sent:** Sunday, November 09, 2003 10:09 PM
**To:** Isaac M. Neuberger; Arenson Avie
**Cc:** Michael G. Jesselson (E-mail); Shalom Lamm; Michel Konig (E-mail); Benjamin J. Jesselson
**Subject:** Re:

Tues 7 AM works for me
Isaac...try to meet my brother benjamin. We spoke about filling him in etc Portable 054
424 444 Regards Michael -----Original Message----- REDACTED

-----Original Message-----

CLASSB01575

**Kathy Schumann**

| | |
|---|---|
| **From:** | MGJ [mgj@attglobal.net] |
| **Sent:** | Sunday, March 14, 2004 3:31 PM |
| **To:** | Isaac M. Neuberger |
| **Subject:** | Re: Sale of BBC |

Can I call u
Number?
-----Original Message-----
From: "Isaac M. Neuberger" <IMN@NQGRG.com>
Date: Sun, 14 Mar 2004 15:15:14
To:"Arenson Avie" <avie@arenson.co.il>, "Shalom Lamm" <slamm@cannondev.com>
Cc:"Konig, Michel" <konig@skynet.be>,      "Jesselson, Michael G.  Jesselson Capital Corp."
<mgj@attglobal.net>
Subject: RE: Sale of BBC

Can we have a conf. Call some time on Monday.?

Avie: what is the latest that you are available Israel time?
I will check with Michel and Michael in the AM. I will out of the office, but can do so, at your collective
convenience.


Shalom- your availability?

Everyone- any objection, if I invite the Frankel's ?

REDACTED

----- Original Message -----

CLASSB01755

REDACTI

CLASSB01756

**Terry Meyers**

| | |
|---|---|
| **From:** | Arenson Avie |
| **Sent:** | Thursday, November 14, 2002 3:49 PM |
| **To:** | Isaac M. Neuberger |
| **Subject:** | ALHII MEETING |

Dear Isaac:

Gene and George (Shamrock) finally came on line.  They are concerned as to the identity of the B shareholders which has never been clearly set out.  I told them that Michel and  Michael both represented their own money but could not tell them what the names of the corporate bodies were who held the shares and what percentage they held. They wanted things to be straightforward and clear  before they agree to this meeting with Bill Lanius and John LaGuardia .  I told them that I thought you could help me get the identities cleared up.  They will also have a confidentiality agreement drawn up for us as well.  What have you succeeded in doing with Michel?

Avie

**CLASSB01488**

**Terry Meyers**                          REDACTED



-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Thursday, November 14, 2002 3:49 PM
**To:** Isaac M. Neuberger
**Subject:** ALHII MEETING

Dear Isaac:

Gene and George (Shamrock) finally came on line.  They are concerned as to the identity of the B
shareholders which has never been clearly set out.  I told them that Michel and  Michael both represented
their own money but could not tell them what the names of the corporate bodies were who held the shares
and what percentage they held. They wanted things to be straightforward and clear  before they agree to
this meeting with Bill Lanius and John LaGuardia .  I told them that I thought you could help me get the
identities cleared up.  They will also have a confidentiality agreement drawn up for us as well.  What have
you succeeded in doing with Michel?

Avie

*********************************
CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber,
P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may
constitute a communication protected by the attorney-client privilege. If you are not the intended
recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that
any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have
received this communication in error, please notify us immediately by telephone at (410) 332-8550.
*********************************

**CLASSB01489**

11/15/2004

## Terry Meyers

**From:**     Arenson Avie
**Sent:**     Thursday, November 14, 2002 3:49 PM
**To:**       Isaac M. Neuberger
**Subject:** ALHII MEETING

Dear Isaac:

Gene and George (Shamrock) finally came on line. They are concerned as to the identity of the B shareholders which has never been clearly set out. I told them that Michel and Michael both represented their own money but could not tell them what the names of the corporate bodies were who held the shares and what percentage they held. They wanted things to be straightforward and clear before they agree to this meeting with Bill Lanius and John LaGuardia . I told them that I thought you could help me get the identities cleared up. They will also have a confidentiality agreement drawn up for us as well. What have you succeeded in doing with Michel?

Avie

CLASSB01660

12/1/2005

Date:  November 12, 2002

To:  Isaac Neuberger
Fax #:  410-332-8511

From:  Shalom E. Lamm

Re:  ALH/Walter Industries

REDACTED

Note:



CLASSB01666

TELECOPIER TRANSMITTAL COVER SHEET     SEE CONFIDENTIALITY NOTICE BELOW



## Walter Industries, Inc.

Post Office Box 31601
4211 W. Boy Scout Blvd.
Tampa, Florida 33631-3601

FAX (813) 871-4491

DATE: November 8, 2002

PLEASE DELIVER __4__ PAGE(S) (Including Cover Sheet) TO THE FOLLOWING:

| NAME(S) | FACSIMILE NUMBER(S) |
|---|---|
| Shalom Lamm | 516/565-1819 |
| George Buchler | 818/556-6995 |

THIS TELECOPY IS BEING SENT BY:   Catherine C. McGurk

Phone Number:   (813) 871-4057

---

### COMMENTS/SPECIAL INSTRUCTIONS

---

TO REACH OPERATOR DURING TRANSMISSION, CALL: (813) 871-4763
OPERATOR: Jean

---

### CONFIDENTIALITY NOTICE

The information contained in this FAX is confidential and/or privileged. This FAX is intended to be reviewed initially by only the individual named above. If the reader of this TRANSMITTAL PAGE is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this FAX or the information contained herein is prohibited. If you have received this FAX in error, please immediately notify the sender by telephone and return this FAX to the sender at the above address. Thank you.

CLASSB01667



*Jim Walter* HOMES

Post Office Box 31601, Tampa, FL  33631-3601
4211 W. Boy Scout Blvd., Tampa, FL  33607

November 8, 2002

ALH Holdings, LLC                          **VIA FAX AND OVERNIGHT COURIER**
ALH II, Inc.
ALH Tennessee Acquisition, Inc.
Bowden Building Corporation
489 Fifth Avenue
28th Floor
New York, NY 10017
Attention: Mr. Shalom Lamm

Shamrock Holdings of California, Inc.
4444 Lakeside Drive
Burbank, CA 91505
Attention: Mr. George Buchler

     Re:    Bowden Building Corporation

Dear Mr. Lamm and Mr. Buchler:

     As you are aware, pursuant to discussions between Jim Walter Homes, Inc.("Jim Walter") and the addressees listed above, including, without limitation, Bowden Building Corporation (the "Company") and ALH Tennessee Acquisition, Inc. ("Shareholder"), Jim Walter has submitted a draft Stock Purchase Agreement to Shareholder with respect to the possible acquisition of all of the shares of capital stock of the Company (the "Possible Transaction").

     This letter is written to reflect the agreement of the parties, in light of the expenses that Jim Walter has incurred and that it expects to incur in performing due diligence with respect to the Company and the Possible Transaction, that Jim Walter is granted exclusivity until and including December 31, 2002 (the "Exclusivity Period") for the consummation of the Possible Transaction"; provided, however, that the Exclusivity Period shall automatically terminate earlier if (i) Jim Walter notifies representatives of the Company or Shareholder that Jim Walter will discontinue its due diligence investigation of the Company or the Possible Transaction, or (ii) negotiations between Shareholder or any of the other addressees listed above and Jim Walter as

CLASSB01668

ALH Holdings, LLC
November 8, 2002
Page 2

to the Possible Transaction are terminated by Jim Walter. Jim Walter shall provide Shareholder with notice promptly upon a determination by Jim Walter to discontinue negotiations with Shareholder or any of the other addressees listed above or otherwise not to proceed with the Possible Transaction.

During the Exclusivity Period, none of the addressees named above, Shamrock Holdings of California, Inc. ("Shamrock"), JMP Securities LLC ("JMP"), all other affiliates of these companies as well as any companies working on their behalf, or any of their representatives (all of the foregoing being collectively called the "ALH Persons") will solicit or entertain offers from, discuss, distribute information, or in any way have contact with, other potential acquirers of the Company, whether by an acquisition of all or any substantial portion of the Company's assets, a sale or transfer of any of the shares of stock of the Company, the issuance of any securities of the Company, merger, consolidation or any other transaction. Notwithstanding the preceding portions of this paragraph, nothing in this letter shall, or shall be deemed to, prohibit the ALH Persons from discussing, distributing information with respect to, or otherwise having contact with, other potential acquirers of all or any portion of the equity interests or assets of any other direct or indirect subsidiary of ALH II, Inc.("ALH")(other than the Company) that does not contain any assets of the Company used or held by such other direct or indirect subsidiary for use in the Company's business.

Nothing in this letter or any course of conduct between the parties shall give rise to or serve as a basis for any obligation or other liability on the parties to negotiate or enter into an agreement with respect to the Possible Transaction. Nor shall the parties have any obligation with respect to the Possible Transaction or any other transaction with respect to the Company unless and until a definitive written agreement has been duly executed by Jim Walter and any or all of such addressees.

Very truly yours,

Joseph J. Troy, Executive Vice President

The terms of the letter above are hereby accepted by the undersigned, each of which has executed this letter by a duly authorized officer.

CLASSB01669

ALH Holdings, LLC
November 8, 2002
Page 3


**ALH HOLDINGS, LLC,** a _____
limited liability company

By: _____
     Name: _____
     Title: _____


**ALH II, INC.,** a Delaware corporation

By: _____
     Name: _____
     Title: _____


**ALH TENNESSEE ACQUISITION, INC.,**
a Delaware corporation

By: _____
     Name: _____
     Title: _____

**BOWDEN BUILDING CORPORATION,**
a Tennessee corporation

By: _____
     Name: _____
     Title: _____

**SHAMROCK HOLDINGS OF CALIFORNIA, INC.,**
a _____corporation

By: _____
     Name: _____
     Title: _____

CLASSB01670

**From:**       Isaac M. Neuberger
**Sent:**       Thursday, December 05, 2002 9:27 PM
**To:**         Avie Arenson (E-mail); Michel Konig (E-mail); Michael G. Jesselson (E-mail)
**Subject:**    f.y.i./

**Attachments:**       FW: Swiss Re; Swiss Re; Re: Swiss Re



FW: Swiss Re        Swiss Re        Re: Swiss Re

                                            <<FW: Swiss Re>>   <<Swiss Re>>   <<Re: Swiss Re>>

**************************************
CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn, Gielen, Rubin &
Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient
and may constitute a communication protected by the attorney-client privilege.  If you are
not the intended recipient or a person responsible for delivering it to the intended
recipient, you are hereby notified that any use, distribution, or copying of this
communication or its contents is strictly prohibited.  If you have received this
communication in error, please notify us immediately by telephone at (410) 332-8550.
**************************************

CLASSB01652

LAW OFFICES

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

27th FLOOR
ONE SOUTH STREET
BALTIMORE, MARYLAND 21202-3282
www.nqgrg.com
(410) 332-8550

ISAAC M. NEUBERGER
(410) 332-8510

FAX NO.
(410) 332-8511
E-MAIL ADDRESS:
IMN@NQGRG.COM

December 2, 2005

**VIA E-MAIL:** robbida@friedfrank.com
**AND FEDERAL EXPRESS**

David K. Robbins, Esquire
Fried, Frank, Harris, Shriver & Jacobson, LLP
Thirty-Second Floor
350 South Grand Avenue
Los Angeles, California 90071

**VIA E-MAIL:** alexast@friedfrank.com
**AND FEDERAL EXPRESS**

Stephen D. Alexander, Esquire
Fried, Frank, Harris, Shriver & Jacobson, LLP
Thirty-Second Floor
350 South Grand Avenue
Los Angeles, California 90071

Dear Mr. Robbins and Mr. Alexander:

This firm represents the Class B investors ("the Class B Investors") in ALH Holdings, LLC (ALH) who together with the Class A investors, led by Shamrock Holdings ("Shamrock") owned and operated American Landmark Homes. Fried Frank has represented both ALH and Shamrock.

Serious issues and differences have arisen between the Class B Investors and Shamrock in regard to the manner in which Shamrock directly and through a number of Shamrock designees, who acted as directors and possibly officers of ALH, have conducted themselves and have operated ALH.

Shamrock has used its controlling position to sell off divisions of ALH and has used the proceeds to repay itself certain loans, all in the name of extricating itself from ALH without regard to the interests of the shareholders of ALH, where it now appears that ALH's viability is in serious doubt. Some time ago, in an effort to avoid the situation that ALH now finds itself in, the undersigned met with Shamrock (Messrs. Krieger and Buchler) together with one of the Class B investors, who too was a director of ALH, warning Shamrock that its conduct was inappropriate and would, if not then stopped, result in the situation that ALH and its shareholders now face. Shamrock's justification was that ALH was consuming too much management time, which is hardly an excuse or justification for breaching their fiduciary duties to the shareholders of ALH. Shamrock embarked on a series of "acts" designed to allow it to withdraw loans that it made to ALH, and avoid these repayments as "avoidable preferences".

CLASSB01474

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

David K. Robbins, Esquire
Stephen D. Alexander, Esquire
December 2, 2005
Page 2

In addition, we believe that the facts will show a concerted and deliberate effort to deprive the shareholders of their equity in ALH, in that Shamrock, for its own purposes, had written off the equity in ALH some time ago and engaged in this pattern of behavior to effect an impermissible purpose.

The Class B Investors have asked us to contact Shamrock, which we have done today.

The Class B Investors believe that Fried Frank, in representing both ALH and Shamrock had an unwaiveable conflict of interest and, depending on whether Fried Frank knew the extent of the differences between Shamrock and the Class B Investors, may too have contributed to the loss that the Class B Investors now face. The Class B Investors, acting on our advice, have authorized our Firm to request that, until we have fully investigated the facts and circumstances underlying this situation, that Fried Frank refrain from representing Shamrock in this matter and that Fried Frank not participate with Shamrock in responding to the claims raised by the Class B Investors, for to do so, would, in our view represent a clear breach of the obligations that Fried Frank has to ALH and its shareholders as a group.

We are keenly aware of the long term relationship between Shamrock and Fried Frank. We feel, however, that these circumstances dictate that Fried Frank must not further involve itself in this matter, in any way. If Shamrock's counsel should require information from Fried Frank, we insist that we be provided with copies of that information and that we be parties to any phone or face to face conferences.

We have enjoyed many good relations with Fried Frank, both in NYC and in DC and are very sorry that these circumstances have placed us in this position.

We believe that if an objective view is taken, that even Fried Frank will conclude that Shamrock's conduct in ALH is troubling. We are hopeful of finding a resolution with the least amount of tumult and  publicity. It is so odd that Shamrock, who of late has been the clarion of "proper" governance in the Disney matter has treated the Class B Investors in ALH as they have.

We are sending Shamrock a copy of this letter, so that Shamrock will understand our view of the ground rules in dealing with Fried Frank. It would be a shame, if this effort to mitigate the extent of the "mess" was not taken seriously and that Fried Frank would further involve itself, contrary to the demands made in this letter.

CLASSB01475

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

David K. Robbins, Esquire
Stephen D. Alexander, Esquire
December 2, 2005
Page 3

Very truly yours,

Isaac M. Neuberger

IMN/tem
cc:     DA Gardens, LTD.
        The Erica Jesselson 1984 CLAT
        SELK, LLC

CLASSB01476

206265

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

David K. Robbins, Esquire
Stephen D. Alexander, Esquire
December 2, 2005
Page 4

bcc:    Michel Konig (via e-mail: konig@skynet.be)
        Avie Arenson (via e-mail: avie@arenson.co.il)
        Benjamin J. Jesselson (via e-mail: bjj@jesselson.com)
        Michael G. Jesselson (via e-mail: mgj@attglobal.net)
        Chesky Frankel (via e-mail: starjewelers@aol.com)
        Mark Frankel (via e-mail: mfrankel@iaac.com)

CLASSB01477

206265

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@lionlamm.com] |
| **Sent:** | Thursday, August 08, 2002 6:16 AM |
| **To:** | Isaac M. Neuberger |
| **Cc:** | Arenson Avie; Jon Zich |
| **Subject:** | Swiss Re |

Jon Zich's approach to Swiss Re is simple and direct.  His outline below will require some cooperation from Bill Lanius which, I believe, will be forthcoming. Some of it will have to be conjecture without first knowing for certain who a JV partner might be. Please let me know your thoughts.  Jon is prepared to approach Swiss Re as soon as the information is compiled.

1. **Prior Commitments**
   a. Sale Book
   b. Six Month Performance
   c. Management Update

2. **Request for Extension**
   a. Three Year Pro-Forma
   b. Cash Available to Reduce Wachovia Debt
   c. Management Plan
   d. Description of Ownership Restructuring
   e. Description of New Investors
   f. Land Report

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

1

**CLASSB01702**

**From:**        Shalom Lamm
**Sent:**        Friday, December 06, 2002 1:45 PM
**To:**          Arenson Avie; Isaac Neuberger
**Subject:**     Bowden Litigation

**Attachments:**     021205 Mediation Notes.pdf


021205 Mediation
Notes.pdf (11...

            Avie & Isaac, good afternoon:

Bill Lanius attended mediation in Memphis regarding the Bowden litigation.
Attached is the report I asked him to forward to me following my conversation with him
last evening.

Kind regards,

-Shalom

PS:  A meeting is set with Swiss Re for December 12th at their offices in Stamford,
Connecticut.  In attendance will be Jon Zich, Bill Lanius and George Buchler.

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

CLASSB01651

**Terry Meyers**

| | |
|---|---|
| **From:** | Arenson Avie |
| **Sent:** | Sunday, December 15, 2002 3:39 AM |
| **To:** | Isaac M. Neuberger; M. G. Jesselson (E-mail); Michel Konig (E-mail) (E-mail) |
| **Cc:** | Shalom Lamm (E-mail) |
| **Subject:** | Re: Shalom Lamm called - 917/282-7375 |

Hello All:

Very good news.  Please Isaac, arrange the call for us.
thanks
Avie

REDACTED

```
>  -----Original Message-----
> From: Andri Theo
> Sent: Thursday, December 12, 2002 3:25 PM
> To: Isaac M. Neuberger
> Subject: Shalom Lamm called - 917/282-7375
>
> SwissRe meeting went very well.   The loan was extended to January 2005.
```

1

CLASSB01493

**Terry Meyers**

| | |
|---|---|
| **From:** | Arenson Avie |
| **Sent:** | Monday, December 16, 2002 3:52 AM |
| **To:** | Isaac M. Neuberger |
| **Subject:** | Fw: Shalom Lamm called - 917/282-7375 |

```
----- Original Message -----
From: "Arenson Avie" <avie@arenson.co.il>
To: "Isaac M. Neuberger" <IMN@NQGRG.com>; "M. G. Jesselson (E-mail)"
<mgj@attglobal.net>; "Michel Konig (E-mail) (E-mail)" <konig@skynet.be>
Cc: "Shalom Lamm (E-mail)" <slamm@lionlamm.com>
Sent: Sunday, December 15, 2002 10:39 AM
Subject: Re: Shalom Lamm called - 917/282-7375
```

```
> Hello All:
>
> Very good news.  Please Isaac, arrange the call for us.
> thanks
> Avie
>  ----- Original Message -----                    REDACTED
```



```
>
> >  -----Original Message-----
> > From: Andri Theo
> > Sent: Thursday, December 12, 2002 3:25 PM
> > To: Isaac M. Neuberger
> > Subject: Shalom Lamm called - 917/282-7375
> >
> > SwissRe meeting went very well.   The loan was extended to January 2005.
>
>
>
>
```

CLASSB01494

**Terry Meyers**

| | |
|---|---|
| **From:** | Shalom Lamm |
| **Sent:** | Thursday, December 19, 2002 4:07 PM |
| **To:** | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| **Subject:** | Swiss Re |

Swiss Re signed the extension letter.  The meeting with Wachovia is set for Monday morning.

Bill and I are planning to attend the meeting with Ken Harris from Wachovia in Charlotte.

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

1

CLASSB01496

**From:**        Shalom Lamm
**Sent:**        Thursday, December 19, 2002 4:07 PM
**To:**          Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky
**Subject:**     Swiss Re

Swiss Re signed the extension letter.  The meeting with Wachovia is set for Monday
morning.

Bill and I are planning to attend the meeting with Ken Harris from Wachovia in Charlotte.

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

CLASSB01646

**Terry Meyers**

| | |
|---|---|
| **From:** | Shalom Lamm |
| **Sent:** | Tuesday, December 24, 2002 10:28 PM |
| **To:** | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| **Cc:** | Jon Zich |
| **Subject:** | Wachovia Meeting |

Gentleman:

I traveled to Charlotte, North Carolina yesterday to meet with Wachovia Bank.  The
subject, of course, was an extension of the loan backed by the Swiss Re bond.

As you know the Swiss Re meeting went well and they have signed a letter agreement that
they will extend the bond, at no fee, until the end of 2004.

At the Wachovia meeting were Bill Lanius from ALH, and Ken Harris  a senior officer on the
corporate lending side.  Ken has been involved with Mulvaney/ALH from the very beginning.
I have a particularly warm relationship with Ken.  In addition, there were two senior
people from the credit side of the bank (the non-Wachovia side).

Bill and I made a presentation for about 45 minutes, which was followed by a lengthy
discussion.  We emphasized that the bank had hurt us substantially last year by taking
nearly five months to process the extension.  It was agreed, that if the bank decides to
extend the loan, that the brain damage of last year¹s protracted paperwork would not have
to be repeated.  Still, it is a large and bureaucratic bank, so at best we can hope for
much quicker turnaround but it will not be instantaneous.

Leaving the meeting after an hour and a half, Bill felt very confident that they would
extend the loan.  We both expect that in order to prove they are doing their jobs, they
will ask a number of questions and require file-stuffer documents.

My own feeling is that in the end, they probably will extend the loan  but unlike Bill, I
think there is also a real risk that they will find a reason to say no, and see what
happens.  The First Union Credit women (the most unpleasant of the bunch) took pains to
say that they would never do this deal were it to come up as new business.  She was
clearly taking a dig at the Wachovia side.

I think we will hear from them in a fairly definitive way right after the first of the
year.

Regards,

-Shalom


--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

CLASSB01501

**From:**       Arenson Avie
**Sent:**       Wednesday, December 25, 2002 2:59 AM
**To:**         Shalom Lamm; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky
**Subject:**    Re: Wachovia Meeting

Hello Shalom:

Don't you think it would be a good idea at this point to start thinking about an
alternative bank? While we have at least the appearance of a choice and bargaining power.

Avie
----- Original Message -----
From: "Shalom Lamm" <slamm@lionlamm.com>
To: "Arenson Avie" <avie@arenson.co.il>; "Menashe Frankel"
<mfrankel@iaac.com>; "Michael Jesselson" <mgj@attglobal.net>; "Michel Konig"
<konig@skynet.be>; "Isaac Neuberger" <imn@nqgrg.com>; "Hesky"
<starjewelers@aol.com>
Cc: "Jon Zich" <jzich@burakorganization.com>
Sent: Wednesday, December 25, 2002 5:28 AM
Subject: Wachovia Meeting

Gentleman:

I traveled to Charlotte, North Carolina yesterday to meet with Wachovia Bank.  The
subject, of course, was an extension of the loan backed by the Swiss Re bond.

As you know the Swiss Re meeting went well and they have signed a letter agreement that
they will extend the bond, at no fee, until the end of 2004.

At the Wachovia meeting were Bill Lanius from ALH, and Ken Harris  a senior officer on the
corporate lending side.  Ken has been involved with Mulvaney/ALH from the very beginning.
I have a particularly warm relationship with Ken.  In addition, there were two senior
people from the credit side of the bank (the non-Wachovia side).

Bill and I made a presentation for about 45 minutes, which was followed by a lengthy
discussion.  We emphasized that the bank had hurt us substantially last year by taking
nearly five months to process the extension.  It was agreed, that if the bank decides to
extend the loan, that the brain damage of last year¹s protracted paperwork would not have
to be repeated.  Still, it is a large and bureaucratic bank, so at best we can hope for
much quicker turnaround but it will not be instantaneous.

Leaving the meeting after an hour and a half, Bill felt very confident that they would
extend the loan.  We both expect that in order to prove they are doing their jobs, they
will ask a number of questions and require file-stuffer documents.

My own feeling is that in the end, they probably will extend the loan  but unlike Bill, I
think there is also a real risk that they will find a reason to say no, and see what
happens.  The First Union Credit women (the most unpleasant of the bunch) took pains to
say that they would never do this deal were it to come up as new business.  She was
clearly taking a dig at the Wachovia side.

I think we will hear from them in a fairly definitive way right after the first of the
year.

Regards,

-Shalom


--
Shalom Lamm
Phone: 516-565-0868

1                                              **CLASSB01640**

**Terry Meyers**

| | |
|---|---|
| From: | Arenson Avie |
| Sent: | Wednesday, December 25, 2002 2:59 AM |
| To: | Shalom Lamm; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| Subject: | Re: Wachovia Meeting |

Hello Shalom:

Don't you think it would be a good idea at this point to start thinking about an alternative bank? While we have at least the appearance of  a choice and bargaining power.

Avie
----- Original Message -----
From: "Shalom Lamm" <slamm@lionlamm.com>
To: "Arenson Avie" <avie@arenson.co.il>; "Menashe Frankel"
<mfrankel@iaac.com>; "Michael Jesselson" <mgj@attglobal.net>; "Michel Konig"
<konig@skynet.be>; "Isaac Neuberger" <imn@nqgrg.com>; "Hesky"
<starjewelers@aol.com>
Cc: "Jon Zich" <jzich@burakorganization.com>
Sent: Wednesday, December 25, 2002 5:28 AM
Subject: Wachovia Meeting

Gentleman:

I traveled to Charlotte, North Carolina yesterday to meet with Wachovia Bank.  The subject, of course, was an extension of the loan backed by the Swiss Re bond.

As you know the Swiss Re meeting went well and they have signed a letter agreement that they will extend the bond, at no fee, until the end of 2004.

At the Wachovia meeting were Bill Lanius from ALH, and Ken Harris  a senior officer on the corporate lending side.  Ken has been involved with Mulvaney/ALH from the very beginning. I have a particularly warm relationship with Ken.  In addition, there were two senior people from the credit side of the bank (the non-Wachovia side).

Bill and I made a presentation for about 45 minutes, which was followed by a lengthy discussion.  We emphasized that the bank had hurt us substantially last year by taking nearly five months to process the extension.  It was agreed, that if the bank decides to extend the loan, that the brain damage of last year¹s protracted paperwork would not have to be repeated.  Still, it is a large and bureaucratic bank, so at best we can hope for much quicker turnaround but it will not be instantaneous.

Leaving the meeting after an hour and a half, Bill felt very confident that they would extend the loan.  We both expect that in order to prove they are doing their jobs, they will ask a number of questions and require file-stuffer documents.

My own feeling is that in the end, they probably will extend the loan  but unlike Bill, I think there is also a real risk that they will find a reason to say no, and see what happens.  The First Union Credit women (the most unpleasant of the bunch) took pains to say that they would never do this deal were it to come up as new business.  She was clearly taking a dig at the Wachovia side.

I think we will hear from them in a fairly definitive way right after the first of the year.

Regards,

-Shalom

--
Shalom Lamm

1

CLASSB01502

y Meyers

| | |
|---|---|
| : | Shalom Lamm |
| | Sunday, December 29, 2002 10:42 PM |
| | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky |
| ct: | Re: Wachovia Meeting |

ks and yes.  While an alternative bank wold be attractive to have, there is a real
tion as to whether we would attract one at all in today's environment.

we constructed this financing, it was at a specific time and place where we took
ntage of a crazed insurance company that was charging banking rates for equity
stments.  We took advantage of that situation on behalf of the company.  The climate
tirely different now.

docs are written from Swiss Re specifically for Wachovia, and there is serious
gation going on now to determine the validity of similar instruments. Substituting a
er now might be possible, but the chances are, I think, not too high.

xpect to get a strong indication of which way Wachovia intends to go during the week
anuary 5th.  Perhaps it would be prudent to wait to get a reaction from them.  If it
ars they are going to come into line, then all is well (it is the opinion of Bill
us that this is precisely what is going to happen). Because of the brain-damage we
ained last year from the documentation it will be far easier this year.

nother subject, I am meeting with Bruce Stein of Shamrock early tomorrow morning in
fork City.  He seems very anxious to speak with me, but he declined to give me an
ia.  I'll keep you posted if anything comes of it.

. I received word on Friday that Gary Sharky (the head of construction at Mulvaney)
esigned.  This is a good thing.  Gary, a talented and disciplined builder, was the
l vestige left over from the old regime.
is a very expensive employee paid wages appropriate to our company when MHI was
ling far more homes.  Luckily, he trained two excellent subordinates who don't seem
.eased that Gary is moving on.  We now have a younger, but experienced team at MHI,
.nted by the past and eager to prove their mettle.  Gary Shamp, the new President of
vill have to cut further to get costs in line for our goals for next year, but Gary's
mation will help him do this.

.nk any strategy on the go-forward should concentrate on building the basics.  Simple
: may sound, I think we need to focus on strengthening our balance sheet.  Aside from
:ash infusion of a potential buy-out and the getting out from under various
:cessor debts and litigations, it is done through a focus on attacking direct and
:ect costs, being sure our overhead costs are in line with our production goals.  We
to do this in conjunction with a hard look at all of our land positions to be sure
under all economic conditions we are lean and mean to take on competitors in each of
narkets.  By concentrating on the fundamentals of our business we should, over time,
:e our debt loads to acceptable industry standards.  With sustainable EBITDA, good
.ng-option land positions, direct and indirect costs well within the industry
meters, and an ever improving balance sheet, our borrowing costs will come down and
flow further improved.  All in all, we will in time, be in a position to be acquired
:come the acquirer.  But we will do it from strength.

. New Year to all.

m Lamm
: 516-565-0868
516-565-1819
 917-282-7375

m: "Arenson Avie" <avie@arenson.co.il>

1

CLASSB01504

**Terry Meyers**

| | |
|---|---|
| **From:** | Arenson Avie |
| **Sent:** | Monday, May 05, 2003 12:23 PM |
| **To:** | Michel Konig (E-mail); Michael G. Jesselson (E-mail); Isaac M. Neuberger |
| **Subject:** | ALHII |

Dear All:

I spoke to Bill Lanius. He is not sure he has even been invited to join the new company, and has not made u
mind what he'll say if he is. The due-diligence is underway in Jacksonville, and he thinks the contract will
be circulated next week, with closing the first week of July.
I received the 1st quarter results from him, and they are very good.  He thinks the 2nd quarter will be even be
I think another conference call might be in order.

Avie

12/1/2005

CLASSB01601

:                    Shalom Lamm
                     Monday, December 22, 2003 4:57 PM
                     Arenson Avie; Isaac Neuberger
ct:                  Lanius - Bowden


s told by  Bill Lanius that Laguardia and company were very unhappy about the Purchase
le document submitted by Shamrock, and refused to use it.

are drafting their own docs.


lom

om E. Lamm
on Development, LLC
Free Phone & Fax: 1-877-869-6465
://www.cannonhq.com/

CLASSB01569

1

n:                Shalom Lamm
::                Wednesday, March 17, 2004 5:12 AM
                  Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky
ject:             Follow Up


:lemen:

lowing today's conversation, I spoke to Bill Lanius at some length on the wide range of
1es.  In brief;

He would be very pleased to work with us in crafting this "business plan."

He thought the strategy had great merit -- recognizing that a number of pieces must
l into place for it o happen,

He will try to estimate how many hours this will take and what fee he might charge for
s work,

He is a consultant to ALH and an employee of Mattamy.  He needs to check his Mattamy
loyment contract to be sure he is allowed to do this work.

He would like us to consider that if the strategy worked on paper, he might very well
interested in taking a lead in execution of it both with Swiss Re and in the ensuing
:ation of MHI.

We discussed at some length the assumptions we would want to work with.

His gut feeling -- and it is only that at this point -- is that given some infusion of
ital into MHI (a company he thinks has substantial upside potential), and a reduction
:he loan obligation resulting from Swiss Re (he thought my $5MM is probably too
ressive and not necessary to achieve the results), and given a proper time frame (24-36
:hs) that a substantial recovery of equity could be achieved, if not more.  However,
s is ONLY a sense.  The numbers must bear this out.

He will get back to me by this coming Monday.

ill follow up as soon as I hear from him.  If the interest is strong on his part and we
 come to some conceptual agreement, I will spend whatever time it takes with him in
<sonville to fashion this proposal to see if it can be used as our guide in fashioning
ine transaction.

alom

lom E. Lamm
10n Development, LLC
l Free Phone & Fax: 1-877-869-6465
):://www.cannonhq.com/

CLASSB01553

**Isaac M. Neuberger**

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@lionlamm.com] |
| **Sent:** | Wednesday, March 17, 2004 5:12 AM |
| **To:** | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac M. Neuberger; Hesky |
| **Subject:** | Follow Up |

Gentlemen:

Following today's conversation, I spoke to Bill Lanius at some length on the wide range of issues.  In brief;

1.  He would be very pleased to work with us in crafting this "business plan."

2.  He thought the strategy had great merit -- recognizing that a number of pieces must fall into place for it o happen,

3.  He will try to estimate how many hours this will take and what fee he might charge for this work,

4.  He is a consultant to ALH and an employee of Mattamy.  He needs to check his Mattamy employment contract to be sure he is allowed to do this work.

5.  He would like us to consider that if the strategy worked on paper, he might very well be interested in taking a lead in execution of it both with Swiss Re and in the ensuing operation of MHI.

6.  We discussed at some length the assumptions we would want to work with.

7.  His gut feeling -- and it is only that at this point -- is that given some infusion of capital into MHI (a company he thinks has substantial upside potential), and a reduction of the loan obligation resulting from Swiss Re (he thought my $5MM is probably too aggressive and not necessary to achieve the results), and given a proper time frame (24-36 months) that a substantial recovery of equity could be achieved, if not more.  However, this is ONLY a sense.  The numbers must bear this out.

8.  He will get back to me by this coming Monday.

I will follow up as soon as I hear from him.  If the interest is strong on his part and we can come to some conceptual agreement, I will spend whatever time it takes with him in Jacksonville to fashion this proposal to see if it can be used as our guide in fashioning a sane transaction.

-Shalom
--
Shalom E. Lamm
Cannon Development, LLC
Toll Free Phone & Fax: 1-877-869-6465
http://www.cannonhq.com/

1

CLASSB01784

Shalom Lamm
Monday, March 22, 2004 11:20 PM
Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky
Lanius

:t:

and I spoke once again at length on Friday.  He is going to provide me with a draft
ng financial plan by week's end that we can vet and work through to see if a workable
can be devised.

s motivation is, I believe, his hope that in devising such a plan, the B's will
der him the tool of implementation.  I think Bill is largely bored in his present
ion and would grab the chance to lead a charge in the attempt to recover the B
tment through the guise of a restructured MHI.

s very disappointed that Shamrock and the B's were not able to come to a deal before
ale of our Jacksonville operations.

NOT wish to imply at this juncture that I see how this can be accomplished.  I merely
:o say, that if we can devise such a restructuring, and if we can execute it vis
ɔck, then ...

:o follow.

ɔm

n E. Lamm
1 Development, LLC
?ree Phone & Fax: 1-877-869-6465
'/www.cannonhq.com/

CLASSB01552

**Terry Meyers**

**From:** Arenson Avie

**Sent:** Friday, May 28, 2004 6:20 AM

**To:** Isaac M. Neuberger; Michel Konig (E-mail); Michael G. Jesselson (E-mail)

Dear All:

George advised me that Wachovia was going to cooperate at Mulvaney. He was approached by Levitt ( John LaGardia)  and separately by the Mulvaney family to purchase. The had over 1.2 million profit for the quarter.

For your info.

Avie

CLASSB01457

## Kathy Schumann

**From:** Arenson Avie [avie@arenson.co.il]
**Sent:** Friday, May 28, 2004 6:20 AM
**To:** Isaac M. Neuberger; Michel Konig (E-mail); Michael G. Jesselson (E-mail)

Dear All:

George advised me that Wachovia was going to cooperate at Mulvaney. He was approached by Levitt ( John LaGardia)  and separately by the Mulvaney family to purchase.  The had over 1.2 million profit for the quarter.

For your info.

Avie

CLASSB01772

## Terry Meyers

**From:**    Arenson Avie
**Sent:**    Tuesday, June 29, 2004 2:52 AM
**To:**    Isaac M. Neuberger
**Subject:** Re: PI's call Shalom Lamm - 917-282-7375

What ever I heard I  passed on to you.

Avie

----- Original Message -----
**From:** Isaac M. Neuberger
**To:** avie@arenson.co.il ; Konig, Michel ; Michael G. Jesselson (E-mail)
**Sent:** Monday, June 28, 2004 10:47 PM
**Subject:** FW: PI's call Shalom Lamm - 917-282-7375

-----Original Message-----
**From:**  Andri Theo
**Sent:**  Thursday, June 24, 2004 10:34 AM
**To:**    Isaac M. Neuberger
**Subject:**    PI's call Shalom Lamm  - 917-282-7375

Jon Zich has found that ALH/Shamrock filed the Confession of Judgment in May.  Do you know anything about this?

**********************************
CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

11/30/2005

CLASSB01449

**From:** Shalom Lamm
**Sent:** Tuesday, December 24, 2002 10:28 PM
**To:** Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky Jon Zich
**Cc:**
**Subject:** Wachovia Meeting

Gentleman:

I traveled to Charlotte, North Carolina yesterday to meet with Wachovia Bank. The subject, of course, was an extension of the loan backed by the Swiss Re bond.

As you know the Swiss Re meeting went well and they have signed a letter agreement that they will extend the bond, at no fee, until the end of 2004.

At the Wachovia meeting were Bill Lanius from ALH, and Ken Harris a senior officer on the corporate lending side. Ken has been involved with Mulvaney/ALH from the very beginning. I have a particularly warm relationship with Ken. In addition, there were two senior people from the credit side of the bank (the non-Wachovia side).

Bill and I made a presentation for about 45 minutes, which was followed by a lengthy discussion. We emphasized that the bank had hurt us substantially last year by taking nearly five months to process the extension. It was agreed, that if the bank decides to extend the loan, that the brain damage of last year's protracted paperwork would not have to be repeated. Still, it is a large and bureaucratic bank, so at best we can hope for much quicker turnaround but it will not be instantaneous.

Leaving the meeting after an hour and a half, Bill felt very confident that they would extend the loan. We both expect that in order to prove they are doing their jobs, they will ask a number of questions and require file-stuffer documents.

My own feeling is that in the end, they probably will extend the loan but unlike Bill, I think there is also a real risk that they will find a reason to say no, and see what happens. The First Union Credit women (the most unpleasant of the bunch) took pains to say that they would never do this deal were it to come up as new business. She was clearly taking a dig at the Wachovia side.

I think we will hear from them in a fairly definitive way right after the first of the year.

Regards,

-Shalom


--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

1

CLASSB01641

**Terry Meyers**

| | |
|---|---|
| **From:** | Arenson Avie |
| **Sent:** | Sunday, January 19, 2003 2:51 AM |
| **To:** | Isaac M. Neuberger; Michel Konig (E-mail); Michael G. Jesselson (E-mail) |
| **Subject:** | ALH |

Hello Everyone:

At his request I had a long talk with George Buchler last Fri. We are to have a board meeting in Charlotte on 19Feb and he wanted me to know some things in advance.
1. Taylor Woodrow, a British builder, has made a cash offer of 30 million for Jacksonville. The offer was made through Tony, the merchant banker who has been trying to peddle ALH .
2. Walter is still interested in Memphis, subject to a Bowden Settlement.
3. Bowden has a hearing (we knew that) to separate the note default claim from the damages claim.
3. Since the Swiss Re issue has been solved for the time being, and Bill Lanius has developed an independent relationship with them in any case, Shamrock intends to be much firmer in pursuing Shalom, Jon Zick, and Harahan's 2 million dollar, overdue debt to ALH which was in settlement of a much larger sum taken out of ALH by them,(Shamrock believes) to cover their other obligations . I think Shalom has personally guaranteed it.

4.Our 3 million dollar offer and their 12 million dollar counter- offer to buy out the A's are not acceptable, and Shamrock would like to see if there is a possibility to close the gap, previous to a face-to-face meeting.

Why don't we all think about this and have a conference call soon.

Thanks

Avie

**CLASSB01627**

12/1/2005

## Terry Meyers

| | |
|---|---|
| **From:** | Shalom Lamm |
| **Sent:** | Friday, September 19, 2003 12:18 PM |
| **To:** | Isaac Neuberger; Arenson Avie |
| **Subject:** | FW: Swiss Re |

Further to my comments this morning, please see the e-mail below from Jonathan Zich to me.

Regards,

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

----------
**From:** "jon zich" <jzich@burakorganization.com>
**Organization:** The Burak Organization
**Reply-To:** <jzich@burakorganization.com>
**Date:** Thu, 18 Sep 2003 15:39:21 -0400
**To:** "'Shalom Lamm'" <slamm@lionlamm.com>
**Subject:** Swiss Re

Shalom:

I will be sending Michael Beernaert a cancelled and satisfied bond next week and another one the week after. This is in line with what I told him when we last met. The return of the bonds will substantially reduce the open SwissRe liability.

It would  be appropriate to send him, at the same time, some updated financial information on ALH - either the year end 2002 and/or the 6 month 2003.

Please let me know if you want to send the information so that I can hold up on the bonds being returned to SwissRe.

Jon

Jonathan Zich
Principal
The Burak Organization
36 West 44th Street
New York, NY 10036
212-391-7700
212-391-7545 (fax)

CLASSB01579

**Kathy Schumann**

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@cannondev.com] |
| **Sent:** | Monday, December 22, 2003 4:57 PM |
| **To:** | Arenson Avie; Isaac M. Neuberger |
| **Subject:** | Lanius - Bowden |

I was told by Bill Lanius that Laguardia and company were very unhappy about the Purchase & Sale document submitted by Shamrock, and refused to use it.

They are drafting their own docs.

FYI.

-Shalom
--
Shalom E. Lamm
Cannon Development, LLC
Toll Free Phone & Fax: 1-877-869-6465
http://www.cannonhq.com/

1

CLASSB01726

**Kathy Schumann**

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@cannondev.com] |
| **Sent:** | Friday, April 16, 2004 2:20 AM |
| **To:** | Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac M. Neuberger; Hesky |
| **Subject:** | Conversation with Lanius |

Gentlemen:

I had a conversation with Bill Lanius  today that yielded some important issues:

1.  Wachovia -- the prime construction lender at Mulvaney -- does not want to renew the construction line when it is matures at end of year.  This is the largest line and not replaceable.  This would be devastating to Mulvaney.

2.  Ohio Savings Bank (which has been informed of 1 above by Bill), and is very deeply concerned about this.

3.  Swiss Re has been informed of #1 as well.  Understandably super-concerned (that could work strategically well if all else can be solved).

4.  The sale of Bowden has been put off by a week, but will still close.

5.  Bill has been completely overwhelmed by his current responsibilities. He would like to work on the plans we have discussed, but will not be bale to get to it in earnest until the week of April 25th.

-Shalom

--
Shalom E. Lamm
Phone & Fax: 877-869-6465
cell: 917-282-7375

1

CLASSB01766

## Terry Meyers

| | |
|---|---|
| **From:** | Isaac M. Neuberger |
| **Sent:** | Sunday, May 09, 2004 3:22 PM |
| **To:** | konig@skynet.be; avie@arenson.co.il; mgj@attglobal.net |
| **Subject:** | ALH |

I had a very good conversation with Lanius,on Thursday. I apologize that I have been unable to write this report any sooner.

I was able to raise each of the points we discussed. His notion is to seek from Wachovia or Ohio Savings Bank a term loan, which he has proposed at $ 6 MM, though he appreciates that the number is not hard and fast.

The notion would be, if we are able to secure financing, to then begin a negotiation with Swiss Re and get the best possible deal,we can.

He agrees with me that the Swiss Re deal would probably best work as a subordinated debt, junior to any NEW capital that we put in and on some pari-pasu basis with the $7.5 capital that I think that the Bs have invested, thus far. This is obviously and issue for the Bs to determine. I suggest that we ask for Jon Zich's input as well, since he was the "bridge" to Swiss RE.

I did not discuss Shamrock with him at all. I think that if you all agree, we should talk to Ohio, get a read, and if positive to contact Shamrock with a direct and simple approach. Walk away, give up your equity (in 2 tranches, so we keep the NOLs- we would get 49% in 2004 and the balance in 2005,) for a release of claims. Obviously they want to wait until July (one year from their repayment of the loans) which should work for us. Again this is a topic that we did not reach closure on.

He also agreed that his projections were very conservative. As an example, the real property line should be 90%, rather than 65 %. That is good for us, as we will need working capital if we were to do this.

We discussed the use of the NOLs (for tax purposes) the differences between 2003 and 2004 and we are on the same track.

How are you fixed for a conf. call on Tuesday AM @ 8 AM...NYC time?
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**CLASSB01458**

11/30/2005