# Exhibit K

Date: August 2, 2002

To: Isaac Neuberger
Fax #: 410-332-8511

From: Shalom E. Lamm

Re: ALH

Note:

R' Isaac:

Attached is a UWC I just received from George Buchler. FYI.

Kol tuv, and Shabbat Shalom

-SEL

L13012

Gentlemen:

In an e-mail dated March 17, George Buchler asked me to execute an extension agreement with JMP for the purpose of continuing the sale process of ABI and then to move again to sell Bowden. I think it is safe to assume that he was speaking on behalf of all of the Shamrock Board members as they were all copied on the communication. On the 18th I received an e-mail from Avie Arenson voicing his concurrance with the Shamrock wish that I execute the extension to continue the sale process. As that makes the Board decision unanimous (not including my own vote on the matter) I will execute the agreement as proposed. However, I do want to give voice to my own view which is a respectful, but dissenting one. I don't belive the strategy of breaking up the company onto componets for sale is the right strategy for this time.

Allow me please to give voice to my view of ALH and how to maximize shareholder value. In short, I think we ought to give time for the company to produce the results it has had as its potential during its tortuous maturation.

Going through all of the details would be book-length, so I will hit the highlights.

The Company:
Company-wide, the ALH group is in its finest shape ever going into 2003 from an operational perspective (that is, excluding balance sheet impairments which are the ongoing challenge of the company - more on this later).

Specifically, the backlog at ABI and BBC are powerful, being 206 and 171 respectively. MHI, as expected is weaker at about 100, but as MHI is beginning its turnaround, we can expect stronger performance from it throughout the year. I believe MHI will fall far short of FY03 business plan. I do belive, however, having recently spent time there, that it is merely a matter of time before it becomes a strong and profitabloe member division. My guess is that it will take all of FY03 to turn it around, and it will see a strong FY04.

From a management perspective, both senior and middle management is as strong as we have ever experienced. We have solid division leaders and, except for BBC, we have depth of management as well in the second tier leadership positions.

The Triad is showing good performance and very good potential. It will do about twice as many closings as last year, and has potential thereafter of growing into a division the size of Jacksonville, which would allow it in the future to contribute perhaps $4MM to EBITDA in a number of years.

From a cash perspective the company finds itself, for the first time, completely current with all of its vendors in every market, able to get prompt payment discounts. ALHII had at EOY '02 about $5MM cash on hand (with almost that much of liabilities, but there is no shortfall now or anticipated in the future - and this, after paying down Wachovia $1MM on the Swiss Re extension). It is difficult to overstate the importance of this positive development.

Further, there are major land takedowns in the offing, including two major ones in Jacksonville. Whereas contemplating these a year ago, we needed to scramble for alternative financing, today, the outlays will likely be handled out of cash flow in the normal course of business.

The land positions in BBC and ABI remain first rate, with the Jacksonville acquisitions being particularly noteworthy in terms of size and quality. At MHI, the land positions remain largely good, with two or three notable exceptions. Management wisely has taken the Balance sheet hit on these in FY '02 including the write-down of the Citiside project. During FY03 it may want to consider one additional write-down.

L13048

All in all, we have created a very solid and large platform on which to operate in the future.

CONCLUSION
The company has achieved stability unprecedented in its history.  It is a strong platform that is getting stronger every month.  Management is solid, cash is not a crisis, and sufficient financing is in place. EBITDA yields across all divisions should be near or exceed 10%.

What the company lacks is any plan going forward.  It lacks a strategic vision, or game plan, if you will

The company, to achieve large shareholder value must accomplish two things:
EBITDA growth and balance sheet improvement.

Improvement to the balance sheet will, over time, lower the overall cost if financing, which will in turn increase EBITDA and cash flow.  The cycle feeds itself and is critical to increasing the stability of operations.  There are a number of ways of improving the balance sheet, which must be managed just as assuredly the operations must.  First, good will must be reduced through a write-off process that is acceptable to our lenders  and does not result in violation of any of our loan covenants.  Second, cash generated from operations must be used to aggressively reduce debt.  As our debt levels are reduced from internally generated cash flow, our debt to equity levels will allow our pricing of debt to be reduced and further cash flow will be forthcoming.  Also, the universe of lenders will increase as we become more fiscally attractive.

Swiss Re, which looms in the comoing months once again should be given a choice.
Take the company or accept a 50% loss.  I believe they will take the 50% loss.
We would gain about $12MM dollars of reduced debt on our balance sheet as a result.  The source of those funds could be a combination of internally generated cash flow, investor infusion, outside  debt from any number of our lenders, or an outside investor with some priority capital.

I would like to see the company slow down its land acquisition process for a time.  It ought to reduce inventory to increase avaiolbale cash.  This is a managed process, so that we ought to have enough inventory to be on the low end of what companies our size keep on their menu.

EBITDA growth can be accomplished a number of ways.  Some, we should exclude for the moment.  I think we should not seek any acquisitions of new divisions for now or in the foreseeable future.  Rather, EBITDA growth should be accomplished by relentless concentration on reduction of direct and indirect costs to insure a 10%+ maintenance of EBITDA margins in all divisions.  Second, land positions should be further increased  only insofar as each division operates at its peak closing efficiency.  By this, I mean that no division should grow for market-share  sake.  Rather, each should achieve a maximum efficiency for its market that maintains margins without overhead growth.  This organic growth (as opposed to acquisition growth) can and should naturally form our game plan.

Let me be specific:  We need to target over the next few years a "sweet spot" stability of 10% EBITDA at a volume of 500 units at ABI, about 700 units in Charlotte, 400 units at the Triad, and 500 units at BBC (this is all readily achievable with Charloote being slowest to come on board).  With an average price of $150K/home, this will yield gross sales of $330MM with an EBITDA of $33MM.  If, over a four year period, we have been relentless in paying down debt with cash flow (over that period Bill and I have estimated we could pay down something on the order of $30MM of debt from after-tax cash flow) we would indeed have a very healthy and valuable company from a cash flow perspective, a balance sheet perspective and a land inventory perspective.  That is the goal.
All this can be achieved without the risk of acquisitions.

It is my recommendation that this can be achieved with present operational management in place and that we do not need to seek new management with its risks in order to achieve the above results.

I think we ought to proceed with this game plan as the least risky, and most productive in terms of taking advantage of the platform we have created and creating real shareholder value.

What is required is a strategic plan that I have outlined, the discipline to carry out that plan and time to implement it.

L13051

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@cannondev.com] |
| **Sent:** | Tuesday, December 14, 2004 6:42 AM |
| **To:** | Jon Zich |
| **Subject:** | FW: ALH II, Inc. Board Meeting - Updated DraftResolutions/Exhibits |
| **Importance:** | High |
| **Attachments:** | Black lined Settlement Agreement (12_13_04).DOC; Draft Stock Purchase Agreement (12_11_04 Version).DOC |

L13133

EXHIBIT "A"

## ~~DRAFT~~SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement"), is entered into as of December ___, 2004 by and amongst Swiss Reinsurance America Corporation ("Swiss Re"), a New York corporation, ALH Holdings, LLC ("ALH"), a Delaware limited liability company, ALH II, Inc., ("ALH II"), a Delaware corporation, and Mulvaney Homes, Inc. (the "Company"), a North Carolina corporation.

WHEREAS, ALH II entered into a Commitment Letter with Wachovia Bank, N.A. ("Wachovia") on January 13, 2000 (the "Commitment Letter") pursuant to which it executed two Promissory Notes, each dated January 13, 2000 and amended from time to time thereafter, (collectively, the "Notes") in favor of Wachovia in the principal amounts of $13,000,000 and $14,500,000;

WHEREAS, the proceeds of the loans evidenced by the Notes were used by ALH II to acquire assets of The Mulvaney Group, Ltd. through the Company;

WHEREAS, the Notes are secured by one or more Security Instruments (collectively, the "Security Instruments"), which Security Instruments include a Bank Collateral Assignment of Deposit Agreement, dated January 13, 2000, pursuant to which ALH II pledged to Wachovia a certificate of deposit issued by Wachovia, number 10314465, as renewed from time to time, (the "Certificate of Deposit");

WHEREAS, ALH II and Wachovia entered into that certain ISDA Master Agreement dated January 13, 2000, (the "Swap Agreement");

WHEREAS, ALH, ALH II and Wachovia entered into that certain Note Purchase Agreement, dated January 13, 2000, and amended from time to time thereafter, (the "Note Purchase Agreement") pursuant to which Wachovia was given the option to require ALH to purchase, for the price provided therein, the Notes, Security Instruments, Commitment Letter, Swap Agreement and any other documents held by Wachovia which evidence or secure the amounts owing under the foregoing documents (collectively, the "Loan Documents"), together with all collateral securing such amounts or arrangement under the Swap Agreement then held by Wachovia (together with the Loan Documents, the "Assets");

WHEREAS, as security for the Note Purchase Agreement, Swiss Re and Amwest Surety Insurance Company ("Amwest") jointly and severally issued Bond No. 125002282, as amended by Riders "A" and "B" thereto dated, respectively, February 4, 2002 and January 27, 2003, in the original penal sum of $13,194,000 and Bond No. 125002284, as amended by Rider "A" thereto dated January 27, 2003, in the original penal sum of $14,806,000 (collectively, the "Surety Bonds");

WHEREAS, Amwest is in the process of being liquidated and dissolved and is no longer a co-surety on the Bonds and Swiss Re is the sole surety obligated on the Surety Bonds;

WHEREAS, ALH II is in default under the Notes and ALH is or will be in default under the Note Purchase Agreement;

WHEREAS, ALH II, ALH, Swiss Re and Wachovia have entered into that certain Forbearance Agreement and Amendment, dated as of September 10, 2004, (the "Forbearance Agreement") pursuant to which Wachovia has agreed to forbear exercising its rights in the event of a default under the Loan Documents until the earlier of December 31, 2004 or the sale by ALH II of all the stock or assets of the Company;

WHEREAS, ALH II has entered into a Stock Purchase Agreement, dated ————December——, 2004 (the "Stock Purchase Agreement") with Mattamy Homes Corp. and/or its affiliate(s) ("Mattamy"), attached hereto as Exhibit "A", pursuant to which Mattamy will acquire all of the issued and outstanding stock of the Company in consideration of the payment to ALH II of $6,500,000 (the "Purchase Price");

WHEREAS, the parties hereto acknowledge that ALH II is insolvent (i.e. its liabilities exceed the fair market value of its assets) by an amount greater than the outstanding principal balance of the Notes, after the assignments ~~against the Notes~~ identified in Section 2 below, accrued and unpaid interest thereon, and any other amounts now owed or which may be owed in the future by it to Wachovia under the Loan Documents: (collectively, the "Indebtedness"), and the parties further acknowledge that ALH has insufficient assets to pay to Wachovia the amount of the Indebtedness which amount is or will be equal to the purchase price for the Assets due under the Note Purchase Agreement; and

WHEREAS, the parties hereto desire pursuant to this Agreement to conclusively resolve their respective rights and obligations with respect to the Indebtedness ~~on~~ as of the Closing Date, as defined in the Stock Purchase Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

SECTION 1.    SATISFACTION OF INDEBTEDNESS

1.1    Payment by ALH II at Closing.  At the Closing of the Stock Purchase Agreement, ALH II shall pay to Wachovia the sum of $950,000 to be applied against the Indebtedness and ALH II shall release at the Closing any and all of its interest in the Certificate of Deposit which shall be assigned in its entirety to Wachovia to be applied against the Indebtedness.

1.2    Payment by Swiss Re at Closing.  Subject to the conditions set forth herein, Swiss Re agrees to pay at the Closing to Wachovia $14,600,000 which amount represents the full amount of the Indebtedness ~~then~~ due and owing on the date of the Closing (the "Closing Date") after crediting to the Indebtedness the amounts set forth in Sections 1.1 and 2.1 (the "Swiss Re Payment"). Notwithstanding anything to the contrary set forth herein, Swiss Re shall not be obligated to pay to Wachovia any amount in excess of the original aggregate penal sum of the Surety Bonds.  Upon the payment by Swiss Re to Wachovia of the ~~full amount of the Indebtedness.~~ "Swiss Re Payment," Swiss Re, pursuant to ~~the Surety Bonds~~ an assignment from Wachovia, will have ~~a right of subrogation~~ rights against ALH II ~~on~~ as to the Indebtedness and ~~a claim~~ against ALH under the Note Purchase Agreement.  The parties agree that these obligations of ALH II and ALH will be forgiven by Swiss Re in accordance with the terms and conditions of this Agreement.

L13135

SECTION 3.    PORTION OF PURCHASE PRICE TO ALH II

3.1    Payable at Closing.  At the Closing, ALH II shall cause Mattamy to pay to ALH II or its assignee(s), by wire transfer, a portion of the Purchase Price equal to the sum of $1,000,000 (the "ALH II Portion").

3.2    Free of Holdback or Other Claims.  The payment of the ALH II Portion shall be made without set off or deduction of any kind, or liability for same, including, but not limited to, any hold back or indemnity obligations secured by the Purchase Price pursuant to the terms of the Stock Purchase Agreement. [Subject to tax review.]

SECTION 4.    RELEASES

4.1    Acknowledgment by Parties.  The parties acknowledge and agree that the undertakings set forth herein constitute a settlement of disputed matters and, by entering into this Agreement, no party hereto shall be deemed to have admitted any liability to any other party hereto.

4.2    Release by Swiss Re.  Swiss Re on its own behalf and on behalf of its present and former assigns, predecessors, successors, owners, agents, employees, attorneys, officers, directors, shareholders and subsidiaries, hereby forever releases and discharges each of ALH, ALH II and the Company and each of their present and former assigns, predecessors, successors, owners, officers, employees, shareholders, subsidiaries, members, directors, agents and attorneys, from any and all claims, debts, liabilities, obligations, contracts, promises, agreements, losses, damages, suits, costs, expenses and causes of action of whatever kind or nature, whether known or unknown, which they may have had, may now have, or may hereafter have for or by reason of any and all obligations and liabilities under, related to or arising out of, the Loan Documents, the Note Purchase Agreement, the Surety Bonds and the Forbearance Agreement, or the transactions described therein, or any other past transactions between them. Other than as set forth in Section 2, Swiss Re will not receive any monetary consideration from ALH, ALH II or the Company (other than the assignment as set forth in Section 2) in exchange for this release.  The parties hereto each acknowledge that this release and discharge represents, among other things, a cancellation by Swiss Re of the outstanding obligations of ALH II and ALH which are or may be owed to Swiss Re with regard to the Indebtedness and the Note Purchase Agreement.

4.3    Release by ALH, ALH II and the Company.  ALH, ALH II and the Company on their own behalf and on behalf of their present and former assigns, predecessors, successors, owners, agents, employees, officers, directors, shareholders, members, attorneys and subsidiaries, hereby forever release and discharge Swiss Re, and its present and former assigns, predecessors, successors, owners, officers, employees, shareholders, subsidiaries, directors, agents and attorneys, from any and all claims, debts, liabilities, obligations, contracts, promises, agreements, losses, damages, suits, costs, expenses and causes of action of whatever kind or nature, whether known or unknown, which they may have had, may now have, or may hereafter have for or by reason of any and all obligations and liabilities under, related to or arising out of the Loan Documents, the Note Purchase Agreement, the Surety Bonds and the Forbearance Agreement, or the transactions described therein, or any other past transactions between them.

L13137

Except for the payment received by ALH II or its assignee from Mattamy as provided in Section 3.1 herein, ALH, ALH II and the Company will not receive any monetary consideration from Swiss Re in exchange for this release and discharge.

4.4     Acknowledgement.  The parties hereto each acknowledge that they are aware that they or their attorneys may hereafter discover facts different from or in addition to the facts which they now know or believe to be true, or may hereafter analyze any applicable law differently from the analysis undertaken prior to entering into this Agreement with respect to the claims and disputes among them.  The parties further acknowledge that, in entering into this Agreement, each party has relied only on the advice of its own attorney and not on the advice of any party or its attorney.  Notwithstanding these acknowledgements, it is the intention of the parties that the releases as provided in Sections 4.2 and 4.3 herein shall be and remain full and complete releases as to the claims released notwithstanding the discovery of any such different or additional facts or analysis of law.  In that regard, each party hereto acknowledges that it is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING A RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Notwithstanding this Section, each of the parties hereto does hereby expressly waive and relinquish all rights and benefits it has or may have under said Section 1542, as well as any similar federal or state statute or principle of law, with respect to the claims mentioned in Sections 4.2 and 4.3 herein.

4.5     No Discharge.  Nothing contained in this Agreement shall operate to release or discharge any of the parties or their successors or assigns from any express undertakings of the parties in this Agreement, or from any claims, rights, or causes of action arising out of, relating to or connected with said undertakings, or from breach of any of the obligations of the parties contained in this Agreement.

SECTION 5.  MISCELLANEOUS

5.1     Successors and Assigns.  The rights and obligations created by this Agreement may not be assigned by any party hereto to any other person or entity without the prior written consent of the remaining parties hereto.  This Agreement, and the covenants and conditions contained herein, shall apply to and bind the parties, their successors, subrogees and permitted assigns.

5.2     Costs.  Except otherwise expressly provided herein, all parties agree to bear their own costs and attorney's fees in connection with this Agreement and the transactions referred to herein.

L13138

5.3    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties to the Agreement with respect to the subject matter of this Agreement, and supercedes all prior agreements and understandings, written or oral, between the parties hereto or any of them<s>.</s> <u>with respect to such subject matter.</u>

5.4    <u>Counterparts</u>.  This Agreement may be executed in any number of <s>counter-parts</s><u>counterparts</u>, each of which shall be deemed an original, but all of which, when taken together, shall constitute a fully executed document.

5.5    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to rules or principles respecting conflicts of laws and any action brought to enforce, or for breach of, any provision of this Agreement shall be filed in a court of competent jurisdiction in the County of Los Angeles, State of California, unless otherwise mutually agreed upon by all of the parties hereto who are parties to any such suit.

5.6    <u>Interpretation</u>.  This Agreement is deemed to have been prepared by the parties hereto, and any uncertainty or ambiguity contained herein shall not be interpreted against any particular party, but rather, if such uncertainty or ambiguity exists, shall be interpreted according to the application of all of the rules of interpretation of contracts<s>.</s> <u>as if all parties participated equally in the drafting.</u>

5.7    <u>Notices</u>.  Unless expressly provided otherwise in this Agreement or documents executed in connection with this Agreement, all notices shall be in writing and delivered personally or sent by registered or certified mail postage prepaid or by facsimile transmission to <s>the parties</s><u>a party</u> at the <s>addresses</s><u>address</u> set forth below <u>which may be changed at any time by such party upon notice to the other parties</u>:

If to Swiss Re:

Michael Gillies
SWISS REINSURANCE AMERICA CORPORATION
c/o Marilyn Klinger
Peter Cofield
SEDGWICK, DETERT, MORAN & ARNOLD, LLP
801 S. Figueroa St., Suite 1800
Los Angeles, CA 90017
<u>Fax: (213) 426-6921</u>

If to ALH:

ALH Holdings, LLC
4444 Lakeside Drive
Second Floor
Burbank, CA  91505
Telephone: (818) 973-4253
Fax: (818) 556-6995
Attn: George J. Buchler

L13139

If to ALH II:

ALH II, Inc.
4444 Lakeside Drive
Second Floor
Burbank, CA  91505
Telephone: (818) 973-4253
Fax: (818) 556-6995
Attn: George J. Buchler


If to the Company:

Mulvaney Homes, Inc.
7800 Belfort Parkway
Suite 200
Jacksonville, FL 32256
Telephone: (904) 219-8460
Fax: (904) 279-9556
Attn: William R. Lanius


5.8    Additional Actions.  The parties agree to execute and deliver any additional documents which may be reasonably required or convenient to accomplish any of the purposes set forth in this Agreement.

5.9    Attorneys' Fees.  If any party hereto employs an attorney, or incurs attorneys' or paralegal fees or costs in order to enforce or defend its rights under this Agreement due to any failure by another party or parties to perform any of the duties provided in this Agreement and prevails in such enforcement or defense, the non-prevailing party or parties against whom such enforcement is sought, in addition to their other duties herein, shall pay the prevailing party's or parties' reasonable attorneys' and paralegal fees, costs, and necessary disbursements, associated with such successful enforcement with this Agreement or defense.

5.10    Severability of Provisions.  The invalidity or unenforceability of any provisions of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement.  Any such provision found to be invalid is severable from the remaining provisions of this Agreement.

5.11    Waiver and Amendments.  No breach of any provision hereof can be waived unless in writing.  Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision hereof.  No delay or omission by a Party party in the exercise of any of its rights or remedies constitutes a waiver of (or otherwise impairs) such right or remedy.  A consent to or approval of an act does not waive or render unnecessary the consent to or approval of any other subsequent act.  This Agreement may be amended only be a written agreement executed by the Parties parties affected thereby at the time of the amendment.

L13140

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective and duly authorized representatives as of the day and year first above written.

SWISS REINSURANCE AMERICA CORPORATION

By: _____
    Michael Gillies
    Dated:_____

ALH HOLDINGS, LLC

By: _____
    (type name)
    Dated:_____

ALH II, INC.

By: _____
    (type name)
    Dated:_____

MULVANEY HOMES, INC.

By: _____
    (type name)
    Dated:_____

APPROVED AS TO FORM AND CONTENT:

Sedgwick, Detert, Moran & Arnold, LLP

By_____
    Marilyn Klinger
    Peter M. Cofield
Attorneys for Swiss Reinsurance America Corporation
Dated: _____

8

L13141

Holland & Knight LLP


By_____
     Francis W. Costello
Attorneys for ALH Holdings LLC ~~and,~~
ALH II~~, Inc. and Mulvaney Homes~~, Inc.
Dated: _____


~~[Attorneys for Mulvaney]~~


~~By_____~~

~~Attorneys for MULVANEY HOMES, INC.~~
~~Dated: _____~~


~~# 2464079 v1~~


# 2464079 v1

9

L13142

Document comparison done by DeltaView on Monday, December 13, 2004 6:33:40 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://laxdms/Active/2438102/1 |
| Document 2 | iManageDeskSite://laxdms/Active/2460175/1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| | |
| | |
| Style change | |
| Format change | |
| | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 41 |
| Deletions | 37 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 80 |

L13143

EXHIBIT "B"
DRAFT - 12/11/04

Deleted: 08

STOCK PURCHASE AGREEMENT

AMONG

MATTAMY (US) ACQUISITION CORPORATION,

MULVANEY HOMES, INC.

AND

ALH II, INC.

Dated as of December 17, 2004

Deleted: HOMES

L13144

## TABLE OF CONTENTS

Page

SECTION 1. ACQUISITION OF SHARES .................................................................1

    1.1    Sale and Purchase of Shares ...............................................1

SECTION 2. PURCHASE PRICE AND PAYMENT .................................................1

    2.1    Purchase Price .....................................................................1
    2.2    Allocation of the Purchase Price .........................................1

SECTION 3. REPRESENTATIONS AND WARRANTIES REGARDING SELLER ................1

    3.1    Power and Authorization .....................................................2
    3.2    No Conflicts.........................................................................2
    3.3    Ownership of the Shares ......................................................3
    3.4    Brokers ................................................................................3
    3.5    Indebtedness.........................................................................3

SECTION 4. REPRESENTATIONS AND WARRANTIES REGARDING COMPANY ...........3

    4.1    Organization and Good Standing..........................................3
    4.2    Power and Authorization .....................................................3
    4.3    No Conflicts.........................................................................4
    4.4    Capitalization ......................................................................5
    4.5    Investments and Subsidiaries ...............................................5
    4.6    Compliance with Laws.........................................................5
    4.7    Litigation.............................................................................5
    4.8    Financial Statements............................................................6
    4.9    Inventory .............................................................................6
    4.10   Warranties...........................................................................6
    4.11   Real Property ......................................................................7
    4.12   Personal Property ................................................................9
    4.13   List of Properties, Contracts, Etc ........................................9
    4.14   Contracts ...........................................................................11
    4.15   Insurance ...........................................................................11
    4.16   Previously Constructed Homes ..........................................11
    4.17   Suppliers ...........................................................................12
    4.18   Taxes .................................................................................12
    4.19   Employee Benefits.............................................................15
    4.20   Labor Matters....................................................................17
    4.21   Directors, Officers and Employees ....................................17
    4.22   Affiliate Agreements .........................................................17
    4.23   Environmental Matters.......................................................18
    4.24   Absence of Certain Changes and Events............................20
    4.25   Books and Records. ...........................................................21
    4.26   Brokers..............................................................................22

L13145

4.27   Accounts Receivable.................................................................22
4.28   Additional Capital Contributions..............................................22
4.29   Disclosure...............................................................................22

SECTION 5. REPRESENTATIONS AND WARRANTIES OF BUYER......................22
5.1   Organization and Good Standing...............................................22
5.2   Power and Authorization...........................................................22
5.3   No Conflicts.............................................................................23
5.4   Funds......................................................................................23
5.5   Disclosure...............................................................................23
5.6   Brokers...................................................................................23

SECTION 6. OBLIGATIONS OF THE PARTIES.....................................................23
6.1   Conduct of Business Pending Closing.........................................23
6.2   Negative Covenants .................................................................24
6.3   Access to Information; Confidentiality........................................25
6.4   Commercially Reasonable Efforts...............................................26
6.5   Consents.................................................................................26
6.6   Financial Information................................................................26
6.7   Noncompetition, Trade Secrets, Etc. .........................................27

SECTION 7. CERTAIN CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS ...........28
7.1   Representations and Warranties.................................................28
7.2   Performance of Covenants........................................................28
7.3   Approvals................................................................................28
7.4   Legal Matters..........................................................................29
7.5   Resignation of Directors and Officers ........................................29
7.6   Opinion of Counsel..................................................................29
7.7   No Material Adverse Change......................................................29
7.8   Indebtedness...........................................................................29
7.9   Tax Affidavits..........................................................................29
7.10   Estoppel Letters .....................................................................29
7.11   Intercompany Loan .................................................................29
7.12   Insolvency Exemption. .............................................................29

SECTION 8. CERTAIN CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS ...........29
8.1   Representations and Warranties.................................................30
8.2   Performance of Covenants........................................................30
8.3   Legal Matters..........................................................................30
8.4   Settlement and Release Agreement. ...........................................30

SECTION 9. CLOSING ...................................................................................30
9.1   Time and Place of Closing.........................................................30
9.2   Deliveries at the Closing...........................................................30
9.3   Default by Seller at the Closing .................................................32

ii

L13146

9.4    Accounts Receivable From Employees of Company ............................................32
9.5    Remittance of Payments ...................................................................................32

SECTION 10.  INTENTIONALLY OMITTED .......................................................................33

SECTION 11.  INDEMNIFICATION .......................................................................................33
11.1    Indemnification by Seller ...............................................................................33
11.2    Indemnification by Buyer ...............................................................................33
11.3    Third Party Claims ..........................................................................................33
11.4    Tax Indemnification and Other Matters ..........................................................34
11.5    Tax Treatment of Indemnity Payments ...........................................................37
11.6    Interest .............................................................................................................37
11.7    Warranty Indemnity .........................................................................................37
11.8    Right of Set-Off ...............................................................................................37
11.9    Sole Remedy; Exclusion of Certain Damages; Mitigation ..............................37
11.10   Time Limitations .............................................................................................38

SECTION 12.  DEFINITIONS ..................................................................................................38

SECTION 13.  MISCELLANEOUS ..........................................................................................41
13.1    Further Assurances ..........................................................................................41
13.2    Costs and Expenses .........................................................................................41
13.3    Notices .............................................................................................................42
13.4    Assignment and Benefit ...................................................................................42
13.5    Amendment, Modification and Waiver ............................................................43
13.6    Governing Law, Venue and Attorneys' Fees and Costs ...................................43
13.7    Section Headings and Defined Terms ..............................................................43
13.8    Severability ......................................................................................................43
13.9    Counterparts .....................................................................................................44
13.10   Entire Agreement .............................................................................................44

Deleted: 36

Deleted: 41

Deleted: 43

iii

L13147

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is entered into as of December 17, 2004 by and among Mattamy (US) Acquisition Corporation, a Delaware corporation ("Buyer"), Mulvaney Homes, Inc., a North Carolina corporation ("Company"), and ALH II, Inc., a Delaware corporation ("Seller").

> Deleted: Homes

    A.    Buyer desires to acquire Company.

    B.    Seller owns all of the issued and outstanding shares of common stock of the Company.

    C.    The Seller desires to sell, and Buyer desires to purchase, all of the issued and outstanding shares of common stock of the Company at the price and upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

### SECTION 1.  ACQUISITION OF SHARES

    1.1    Sale and Purchase of Shares. Subject to the terms and conditions of this Agreement, at the Closing (as herein defined), Seller shall sell, transfer and deliver to Buyer 1,000 shares of the common stock of the Company, constituting all of the outstanding shares of the capital stock of Company (collectively, the "Shares"), and Buyer shall purchase the Shares for the consideration set forth in Section 2.

### SECTION 2.  PURCHASE PRICE AND PAYMENT

    2.1    Purchase Price. The aggregate purchase price for the Shares shall be Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Purchase Price"). The Purchase Price shall be paid to Seller or Seller's assignee on the Closing Date by wire transfer of immediately available funds pursuant to instructions previously given by Seller to Buyer for that purpose.

    2.2    Allocation of the Purchase Price. An allocation of the Purchase Price is attached hereto as Schedule 2.2. The parties hereto shall make consistent use of the allocation for all Tax (as defined in Section 4.18) purposes and in all filings, declarations and reports filed with the Internal Revenue Service in respect thereof.

### SECTION 3.  REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller hereby represents and warrants to Buyer as of the date of this Agreement and as of the Closing Date as follows:

L13148

3.1    Power and Authorization. Seller has full capacity, legal right, power and authority to enter into and perform its obligations under this Agreement and under the other documents required to be delivered by Seller prior to or at the Closing (the "Seller Transaction Documents"). This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, laws restricting the enforceability of noncompete and nonsolicitation provisions and other specific restraints of trade and principles of equity (whether considered and applied in a proceeding in equity or at law). When executed and delivered as contemplated herein, each of the Seller Transaction Documents shall constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

3.2    No Conflicts.

(a)    The execution, delivery and performance of this Agreement and the Seller Transaction Documents by Seller do not and will not (with or without the passage of time or the giving of notice):

(i)    violate or conflict with the certificate or articles of incorporation or bylaws (or other organizational documents) of Seller;

(ii)    violate or conflict with any law (including, without limitation, principles of common law), statute, regulation, permit, license, certificate, judgment, order, award or other decision or requirement of any arbitrator, court, government or governmental agency or instrumentality (domestic or foreign) (collectively, "Laws") which are binding upon the Seller and which, in the event of such violation or conflict, would have a material adverse effect on Seller, the Company or the performance by them of this Agreement; or

| Deleted: , |
| --- |

(iii)    result in, require or permit the creation or imposition of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any nature upon or with respect to the Shares.

(b)    Each consent or approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person required to be given or made by Seller in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein has been obtained or made or will be obtained or made prior to the Closing without payment of premium or penalty by, or loss of benefit to, Company.

(c)    There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Seller, threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby which, if adversely determined, could reasonably be expected to have a material adverse effect upon the ability of Seller to enter into or

| Deleted: or |
| --- |

2

L13149

perform its obligations under this Agreement or any such other agreements or instruments. Seller has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.

3.3    Ownership of the Shares. Seller owns the Shares beneficially and of record, free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any kind, and there has been no event or action taken (or failure to take action) by or against Seller which might result in the creation of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any kind on any Shares. There are no shareholder or other agreements affecting the right of Seller to convey the Shares to Buyer or any other right of Seller with respect to the Shares, all of which agreements shall be terminated prior to Closing, and Seller has the absolute right, authority, power and capacity to sell, assign and transfer the Shares free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance. Upon delivery to Buyer of the certificates for the Shares at the Closing, Buyer will acquire good, valid and marketable title to the Shares, free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance.

3.4    Brokers. No person acting on behalf of Seller or any affiliate of Seller or under the authority of any of the foregoing is or will be entitled to any brokers' or finders' fee or any other commission or similar fee, directly or indirectly, from any of such parties in connection with any of the transactions contemplated by this Agreement.

3.5    Indebtedness. Except as set forth in Schedule 3.5, there are no notes, advances or other unpaid indebtedness or obligations, whether written or oral, of the Company in favor of Seller or a Related Party (as defined in Section 4.22) of Seller.

**SECTION 4.   REPRESENTATIONS AND WARRANTIES REGARDING COMPANY**

Seller and Company hereby represent and warrant to Buyer as of the date of this Agreement and as of the Closing Date as follows:

4.1    Organization and Good Standing. Company is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina and has all necessary corporate power and authority to carry on its business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it is bound. Except as set forth in Schedule 4.1, the Company is not required to be qualified to do business as a foreign corporation in any State.

4.2    Power and Authorization. Company has full legal right, power and authority to enter into and perform its obligations under this Agreement and under the other agreements and documents (the "Company Transaction Documents") required to be delivered by it prior to or at the Closing. The execution, delivery and performance by Company of this Agreement and the Company Transaction Documents have been duly authorized by all necessary corporate action by the Company. This Agreement has been duly and validly executed and delivered by Company and constitutes its legal, valid and binding obligation, enforceable against

3

L13150

it in accordance with its terms. When executed and delivered as contemplated herein, each of the Company Transaction Documents shall constitute the legal, valid and binding obligation of Company, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

    4.3    <u>No Conflicts</u>.

    (a)    The execution, delivery and performance by the Company of this Agreement and the Company Transaction Documents do not and will not (with or without the passage of time or the giving of notice):

    (i)    violate or conflict with the certificate or articles of incorporation or bylaws (or other organizational documents) of Company or any Law which is binding upon Company and which, in the event of such violation or conflict, would have a material adverse effect on Seller, the Company or the performance by them of this Agreement;

    (ii)    violate or conflict with, result in a breach of, or constitute a default or otherwise cause any loss of benefit under any agreement or other obligation to which Company is a party or by which it or its assets are bound, or give to others any rights (including rights of termination, foreclosure, cancellation or acceleration), in or with respect to Company or any of their assets; or

    (iii)    result in, require or permit the creation or imposition of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance upon or with respect to the Shares, Company or any of <u>its</u> assets.

                                            | Deleted: their |

    (b)    Except as set forth on <u>Schedule 4.3</u>, no approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person is required to be given or made by Company in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein.  No such consents, approvals, registrations, notifications, filings or declarations are required to be obtained or made or will be required to be obtained or made involving payment of premium or penalty by, or loss of benefit to, Company. Upon consummation of the transactions contemplated by this Agreement, Company will be entitled to continue to use all of the assets and properties now used by it immediately prior to such consummation.

    (c)    There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Company (as hereinafter defined), threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby or which, if adversely determined, could reasonably be expected to have a material adverse effect upon Company's ability to enter into or perform its obligations under this Agreement or any of the other agreements or instruments contemplated hereby.  Company has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.  The phrase "to the knowledge of Company" as used in this Agreement

4

shall mean that Gary Shamp, Julie Walker, James Eastridge, George Buchler or Bruce Stein is actually aware of a particular fact or matter or, after reasonable inquiry, would reasonably be expected to have discovered or otherwise become aware of a particular fact or matter.

4.4    Capitalization.  The Company's authorized, issued and outstanding capital stock or other securities are fully and accurately set forth in Schedule 4.4 attached hereto.  No person has any preemptive or other similar rights with respect to any such equity interests or other securities and there are no offers, options, warrants, rights, agreements or commitments of any kind (contingent or otherwise) relating to the issuance, conversion, registration, voting, sale or transfer of any equity interests or other securities of Company (including, without limitation, the Shares) or obligating Company or any other person to purchase or redeem any such equity interests or other securities. The Shares constitute all of the issued and outstanding shares of capital stock of Company, have been duly authorized and are validly issued and outstanding, fully paid and non-assessable, and such issuance was not in violation of applicable securities laws.

4.5    Investments and Subsidiaries.  Except as disclosed in Schedule 4.5, the Company's business is and has been conducted solely by and through the Company and no other person, and Company does not directly or indirectly own, control or have any investment or other interest in any corporation, partnership, joint venture, business trust or other entity and Company has not agreed, contingently or otherwise, to share any profits, losses, costs or liabilities, or to indemnify any person or entity or to guaranty the obligations of any person or entity.

4.6    Compliance with Laws.

(a)    The Company is in compliance in all material respects with all Laws applicable to the Company the violation of which would have a material adverse effect on the Company and the Company has not received any written notice from a governmental authority of an alleged or actual violation of or failure to comply with any Law.  Company has complied with all material provisions of applicable building codes for all homes constructed by the Company the violation of which would have a material adverse effect on the Company.

(b)    To the knowledge of Company, all federal, foreign, state, local and other governmental consents, licenses, permits, franchises, grants and authorizations (collectively, "Authorizations") required for the operation of the business of Company as currently conducted and as conducted during the last five years are in full force and effect, and, to the knowledge of Company, the Company has not received any written notice of any claim or charge that Company is in violation of or in default under any such Authorization. No proceeding is pending or, to the knowledge of Company, threatened by any person to revoke or deny the renewal of any Authorization of Company.

4.7    Litigation.  Except as disclosed on Schedule 4.7, there are no pending actions, suits, proceedings (arbitration or otherwise) or, to the knowledge of Company, investigations to which Company, or its directors, officers or shareholders in their capacities as such, is a party before or by any court or governmental agency or instrumentality, or before an arbitrator of any kind. To the knowledge of Company, no such action, suit, proceeding or

| Formatted: Underline |
| Deleted: T |

5

L13152

investigation is presently threatened.  There are no unsatisfied judgments, penalties or awards against Company.

    4.8    Financial Statements.

    (a)    Exhibit 4.8 attached hereto includes the balance sheet of Company as of December 31, 2003 (including the notes thereto, the "Balance Sheet"), and the related statements of income and stockholders' equity for such period, together with the audit report thereon from Ernst & Young, LLP, independent accountants (the "Audited Financial Statements"), including all notes thereto and other financial information schedules detailing the balance sheet and operating statement of the Company.  Such financial statements accurately and fairly present, in all material respects, the financial condition and results of operations of Company as at December 31, 2003 and for the periods therein referred to, all in accordance with GAAP consistently applied (except as described in the notes).

    (b)    Exhibit 4.8 attached hereto includes the interim balance sheet of the Company as of September 30, 2004 and for the nine month period then ended (the "Interim Balance Sheet") and the related statements of income and stockholders' equity for such period.  Such financial statements accurately and fairly present, in all material respects, the financial condition and results of operations of the Company as at September 30, 2004 and for the periods therein referred to, all in accordance with past practices of the Company consistently applied.  The Interim Balance Sheet reflects, in all material respects, all liabilities of Company, whether absolute, accrued or contingent, as of the date thereof.  Company does not have any material liabilities that are not reflected in the Interim Balance Sheet (or the notes thereto).

    4.9    Inventory.

    (a)    Except as disclosed on Schedule 4.9(a), all inventory of Company is valued on Company's consolidated books and records at the lower of cost or fair market value thereof, and is usable or saleable in the ordinary course of business consistent with past practice.  A true and complete listing of all inventory of Company as of a recent date has been delivered to Buyer.

    (b)    There are no present material design, construction, manufacturing or other defects with respect to homes currently in inventory or, to the knowledge of Company, defects presently existing with respect to such homes as a result of soil conditions. No homes have been sold by Company under an understanding that such homes would be returnable.

    4.10    Warranties. Except for the standard warranty and the warranty issued by Bonded Builders Home Warranty Association (the "Warranty Company"), copies of which have been provided to Buyer, (a) Company has not made any express warranties to third parties with respect to any homes manufactured, constructed or sold by Company; and (b) there are no express warranties outstanding with respect to any such homes. The Company has not modified or expanded its warranty obligations beyond those set forth in the standard warranty.

Deleted: ,

Deleted: or services

6

L13153

4.11    Real Property.

(a)    Except as set forth in Schedule 4.11(a), the Owned Real Property (as defined below), and, to the knowledge of Company, the Land Contract Real Property (as defined below) and the Option Real Property (as defined below) (collectively, the "Real Property"): (i) have (or will have as a matter of right by contract or otherwise) all necessary access to and from public highways, streets, and roads, and no pending or, to the knowledge of Company, threatened proceeding exists that would reasonably be expected to limit or result in the termination of such access; (ii) to the knowledge of Company, are (or may as a matter of right be) connected to and serviced by public electric, public gas, public sewage, septic tanks (if applicable), permitted wells (if applicable), public storm drains, public telephone and public water facilities, subject to such installation and connection charges with respect thereto which, in the ordinary course of business are payable upon issuance of building permits or certificates of occupancy, as applicable, which have not yet been procured; and (iii) to the knowledge of Company, meet the conditions for the issuance of a building permit for the construction and sale of residential dwellings as proposed by Company in Exhibit 4.11(a). The Real Property constitutes all of the Real Property that Company owns or has a right to acquire.

(b)    Schedule 4.11(b) attached hereto lists all of the real property that Company owns, and Company is the sole owner of good, valid, marketable and insurable (at standard rates) fee simple title to all such real property, including, without limitation, all buildings, structures, fixtures and improvements thereon (the "Owned Real Property"), in each case free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest, or other lien or encumbrance, except Permitted Encumbrances set forth on Exhibit 4.11(b) or as disclosed in title reports and surveys made available to Buyer and listed on Exhibit 4.11(b). "Permitted Encumbrances" means (i) liens for current state and local property taxes or assessments not yet due or delinquent or which are being contested in good faith; (ii) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Company; (iii) exceptions shown on the surveys or other title records made available to Buyer on or before the date hereof and which do not materially affect the Company's proposed use of such Real Property as disclosed in Exhibit 4.11(a); (iv) mortgages on the landlord's interest in property leased to the Company; (v) liens and encumbrances reflected in the Balance Sheet (or notes thereto or the Interim Balance Sheet); (vii) such other Liens, imperfections in title, charges, rights of way, land use ordinances and zoning plans which do not materially interfere with Company's proposed use of such Real Property as disclosed in Exhibit 4.11(a).

(c)    Schedule 4.11(c) attached hereto describes each lease pursuant to which Company is the lessee with respect to any real property (the "Leased Real Property"). Company has all right, title and interest in all material leasehold estates and other material rights purported to be granted to it by the agreements, arrangements, contracts, commitments and leases listed and set forth in Schedule 4.11(c).

(d)    Schedule 4.11(d) attached hereto lists all written and oral agreements, arrangements, contracts and commitments to which Company is a party pursuant to which Company is obligated to purchase any developed or undeveloped real property, whether or not subject to conditions precedent (the "Land Contract Real Property") or possesses an option or

7

other rights to acquire any developed or undeveloped real property, whether or not subject to conditions precedent (the "Option Real Property").

(e)    Except as set forth in Schedule 4.11(e), with respect to any agreements, arrangements, contracts, covenants, conditions, deeds of trust, rights-of-way, easements, mortgages, restrictions, surveys, title insurance policies, and other documents granting Company title to or an interest in or a right or an option to acquire real property, no breach or event has occurred that, with or without the giving of notice or the passage of time, would constitute a breach or event of default, by Company, or, to the knowledge of Company, any other party thereto.

(f)    No Owned Real Property and, to the knowledge of Company, no Land Contract Real Property or Option Real Property is the subject of any condemnation, eminent domain, or similar proceedings and, to the knowledge of Company, no condemnation, eminent domain, or similar proceeding is threatened with respect to the Real Property.

(g)    The buildings and other improvements on the Owned Real Property, and, to the knowledge of Company, the Land Contract Real Property and the Option Real Property, do not violate in any material respect (i) any applicable Law, including without limitation, any building, set-back, or zoning Law, or (ii) any restrictive covenant affecting any such real property and conform in all material respect to the appropriate governmental authority's subdivision standards, except to the extent that any violation of, or nonconformance with an applicable Law would not inhibit Company's ability to construct and sell residential homes.

(h)    To the knowledge of Company, there are no parties in possession of any portion of the Owned Real Property, the Land Contract Real Property or the Option Real Property, as lessees, tenants at sufferance, or trespassers.

(i)    Except as set forth in Schedule 4.11(i), there are no unpaid charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use, or operation of the Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property. Except as set forth in Exhibit 4.11(i), no Owned Real Property or, to the knowledge of Company, no Land Contract Real Property and no Option Real Property is subject to any condition or obligation to any governmental entity or other person requiring Company or any transferee thereof to donate land, money or other property or to make on-site or off-site public improvements.

(j)    The Company has no obligation, without rights of recourse against a developer or other third party, to pay any developer related charges or any charges or assessments for public improvements made to Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property, including without limitation, any charges or assessments for construction of sewer lines, water lines, storm drainage systems, electric lines, natural gas lines, roads and curbs. The Company has no obligation, without rights of recourse against a developer or other third party, to pay any developer related charges or any charges or assessments for public improvements made to previously sold homes, including without limitation, any charges or assessments for construction

8

L13155

of sewer lines, water lines, storm drainage systems, electric lines, natural gas lines, roads and curbs, except as reflected or reserved for on the Balance Sheet.

    (k)  There is no published moratorium applicable to any of the Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property on (i) the issuances of building permits for the construction of houses or certificates of occupancy therefor, or (ii) the purchase of sewer or water taps.

    (l)  To the knowledge of Company, the Owned Real Property, and, to the knowledge of Company, the Land Contract Real Property and the Option Real Property (i) are not located within a "critical," "preservation," "conservation" or similarly designated area and (ii) the buildable area of the property does not contain wetlands.

    (m)  To the knowledge of Company, none of the Owned Real Property, the Former Real Property, the Land Contract Real Property or the Option Real Property is reclaimed marsh or swampland or has been used as a grave site, land fill or for any industrial purpose whatsoever.

    4.12 <u>Personal Property</u>. Company owns all of the personal property reflected in the Interim Balance Sheet as owned by it and all personal property acquired after the end of the period covered by the Interim Balance Sheet, except personal property which has been sold or disposed of in the ordinary course of business since such date, free and clear of any mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance.

    4.13 <u>List of Properties, Contracts, Etc</u>. <u>Schedule 4.13</u> attached hereto lists or describes the following:

    (a)  Each vehicle, item of machinery, equipment and other tangible asset (other than real property) carried as an asset on the records of or leased by Company with cost or tax basis in excess of $25,000 in respect of any item;

    (b)  Each material Authorization;

    (c)  Each (i) fictitious business name, domain name registration, tradename, registered and unregistered trademark, service mark, patents, copyrights and related application (together with the name Mulvaney Homes, the "Intellectual Property"), and (ii) license and permit issued or granted by any person relating to any of the foregoing; in each case owned, leased, used or held by, granted to or licensed by Company as either licensor or licensee, together with all other interests therein granted by Company to any other person, all agreements with respect to any of the foregoing to which Company is a party and any lien, encumbrance, adverse claim, opposition or claim of infringement with respect to any of the foregoing;

    (d)  Each outstanding loan or advance (excluding certain advances to employees for ordinary and necessary business expenses made in the ordinary course of business) by Company to any person (including Seller and any officer, director of employee of Company);

9

L13156

(e)     Each contract, agreement, lease, purchase order or other commitment, withdrawal, involving the performance of services or delivery of goods or materials by or to Company (excluding contracts for the sale of homes, but including listing agreements) involving payments of more than $25,000 over its remaining term and which is not terminable by Company on 90 days' notice, without premium or penalty (each, a "Material Contract");

(f)     Each capital project currently undertaken or which has been approved by Company involving an estimated expenditure of more than $25,000 and all agreements, contracts, purchase orders or commitments with respect thereto;

(g)     Each contract, agreement, lease or commitment, withdrawal, to which Company is a party or is otherwise bound providing for payments (contingent or otherwise) to or by any person or entity based on sales, purchases or profits, other than direct payments for goods and salesperson's commission and override arrangements set forth in the Schedule 4.13;

(h)     Each form of contract, agreement, lease or commitment currently used by Company as a standard form in the ordinary course of business;

(i)     Each policy and binder of insurance (including without limitation, property, casualty, liability, life, health, accident, workers' compensation and disability insurance and bonding arrangements) owned by, or maintained for the benefit of, or respecting which any premiums are paid directly or indirectly by Company;

(j)     Each outstanding power-of-attorney or similar power granted by Company for any purpose whatsoever;

(k)     Each evidence of indebtedness, note, advance, guaranty or letter of credit entered into, issued or to be issued by Company, and all loan and other agreements relating thereto;

(l)     Each evidence of indebtedness, note, advance, guaranty or letter of credit entered into, issued or to be issued to the Company, and all loan and other agreements relating thereto;

(m)     Each deed of trust, pledge, lien, security interest or other charge, claim and encumbrance of any nature relating to the Owned Real Property or material personal property of Company; and

(n)     Each bank or other financial institution in which Company has a deposit account, line of credit or safe deposit box, the relevant account or other identifying number, and the names of all persons authorized to act or deal in connection therewith.

Seller has caused Company to make available to Buyer true and complete copies of each agreement or other document required to be disclosed on Exhibit 4.13.

L13157

4.14    Contracts. Each Material Contract to which Company is a party was made in the ordinary course of business, is in full force and effect and is valid, binding and enforceable in all material respects against the parties thereto in accordance with its terms. The Company has not received any written notice of cancellation of, or any written notice of a material dispute under, any Material Contract. To the knowledge of Company, no other party is in default in any material respect under any Material Contract, and there has not occurred any event which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute such a default. Except as set forth on Schedule 4.14, Company has performed in all material respects all obligations required to be performed by it under each such contract, agreement and commitment, and to the knowledge of Company, no condition exists or event has occurred which with notice or lapse of time would constitute a material default or a basis for delay or non-performance by Company, or by any other party thereto.

4.15    Insurance.

(a)    Except as set forth on Schedule 4.15, the insurance policies listed in Schedule 4.13 are valid and enforceable policies, no claims have been made against any of such insurance policies, and such insurance policies will not be affected by, terminate or lapse by reason of the transactions contemplated by this Agreement.

(b)    Company has not received any written notice of cancellation or modification of any policy or binder of insurance identified in Schedule 4.13. Company has not, within the last five years, been refused any insurance nor has its coverage been limited.

4.16    Previously Constructed Homes.

(a)    All of the homes previously Constructed by Company were of a quality salable in the ordinary course of business, consistent with the practices and standards of the home building industry and in substantial compliance with all Laws the violation of which would have a materially adverse effect on Company, including without limitation, any building, setback, subdivision or zoning Law, consistent with the practices followed in homebuilding industry in the markets in which the Company operates. As used in this Agreement "Constructed" means homes for which construction has been completed and a certificate of occupancy has been issued.

(b)    Schedule 4.16 attached hereto lists all repairs made after sale of Constructed homes by or on behalf of Company during the 36 month period ended October 31, 2004, which involved (i) an aggregate repair cost in excess of $5,000 per home or (ii) a material recurring problem (the same material problem occurring in more than five (5) homes).

(c)    Schedule 4.16 sets forth (i) the total dollar amount of all warranty claims paid by the Warranty Company or on behalf of Company in each of the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, (ii) the total dollar amount of all deductibles paid by Company in each of the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, and (iii) the total dollar amount and a brief description of all pending warranty claims, other than claims for punchlist and similar items involving in any case less than $5,000 in the aggregate per home. All homes previously Constructed by Company and

14

sold during the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, were enrolled in the Warranty Company's warranty program upon closing of the sale to the homeowner and are currently enrolled in such program.

      (d)    To the knowledge of Company, there are no material design, construction, manufacturing or, to the knowledge of Company, other material defects with respect to homes previously Constructed by Company.

    4.17   <u>Suppliers</u>.  <u>Schedule 4.17</u> attached hereto lists the names of the ten suppliers from whom Company made the most purchases during 2003 and during the nine month period ended November 30, 2004 and the aggregate expenditures attributable to each in each such year.  No supplier that accounted for more than $50,000 of the purchases of Company during the twelve month period ended September 30, 2004, has terminated or materially reduced, or has given notice that it intends to terminate or materially reduce, the amount of business done with Company.

    4.18   <u>Taxes</u>.

      (a)    All federal, state, local and foreign Returns (as defined herein) relating to Taxes (as defined herein), or extensions relating thereto, required to be filed on or before the Closing Date by or with respect to Company (including, without limitation, all federal and state consolidated and combined tax returns and reports for any consolidated group of which Company has been a member (the "Consolidated Group")) have been or will be timely filed and are or will be true and complete in all material respects.  For purposes of this Agreement, "Return" and/or "Returns" shall mean all reports, estimates, information statements and returns of any nature, including amended versions of any of the foregoing, relating to or required to be filed in connection with any Taxes pursuant to the statutes or regulations of any federal, state, local or foreign government taxing authority.  "Tax" or "Taxes" shall mean all federal, state (which includes for this purpose the District of Columbia), local and foreign (which includes for this purpose possessions, territories and protectorates of the United States of America) income, profits, capital, franchise, sales, use, payroll, premium, occupancy, real or personal property, ad valorem, severance, excise, withholding, customs, unemployment, transfer and other taxes, or other kind of tax, assessment, levy, imputation or other governmental change in the nature of a tax (no matter how denominated), including interest, additions to tax and penalties.

      (b)    All Taxes imposed upon the Company due with respect to taxable periods ending on or prior to Closing Date have been fully and timely paid to the appropriate governmental authority or properly deposited as required by law, or, in the case of Taxes not yet due, fully provided for on the books of account of Company; and there are no levies, liens, or other encumbrances relating to Taxes existing, threatened or pending with respect to any asset of Company.

      (c)    No claim of deficiency has been asserted or, to the knowledge of Company, threatened by the Internal Revenue Service ("IRS") or any other taxing authority (or is currently pending), no taxing authority has begun or, to the knowledge of Company, threatened to begin any audit or investigation of any Returns filed by Company referred to above, or requested information with regard thereto or any other Taxes that may be owed by Company and

12

L13159

no waivers of statutes of limitations have been given with respect to any Returns previously filed by Company. In the event Company or Seller become aware of any such asserted or threatened deficiency or assessment, or any investigation or audit, after the date hereof, it will immediately notify Buyer and will diligently defend any such action.

      (d)    Buyer has been furnished complete copies of all Returns filed by Company for the three year period ending on the date of this Agreement. No deficiencies have been asserted in writing or, with respect to deficiencies as to which the Company has received written notice, are currently under examination by the IRS or by other taxing authorities with respect to all federal, state, local and foreign income, franchise and sales and use tax Returns of or with respect to Company. All deficiencies asserted or assessments made as a result of such examinations have been fully paid, and there are no other unpaid deficiencies asserted or assessments made by any taxing authority against Company.

      (e)    Except as set forth in Schedule 4.18(e) attached hereto, Company: has not filed any consent under section 341(f)(1) of the Code or agreed to have the provisions of Code section 341(f)(2) apply to any dispositions of "subsection (f) assets" as such term is defined in Code section 341(f)(4); has not agreed to or is required to make any adjustments under Code section 481(a) by reason of a change in accounting method or otherwise; does not employ the LIFO method of accounting for inventories for federal income tax purposes; has not made a transfer of intangible property on which Code section 367(d) or 482 will require the recognition of additional income for any period after the date hereof; and does not own stock in a "passive foreign investment company" within the meaning of Code section 1297(a). "Code" for purposes of this Agreement shall mean the Internal Revenue Code of 1986, as amended.

      (f)    Company is a member of a consolidated group for federal income tax purposes.

      (g)    Company is a "C" corporation and has analogous status for applicable state income tax purposes.

      (h)    Company is not required to file a foreign Return.

      (i)    Company has not made, and will not become obligated to make, any payments that will be nondeductible under Section 280G of the Code (or any corresponding provision of federal, state, provincial, local or foreign income Tax law). Seller is a United States person as defined in Code §7701(a)(3). Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662. Company is not a party to or bound to any Tax allocation, sharing or similar agreement and has no contractual obligation to indemnify any other Person with respect to Taxes and Company has no liability for Taxes arising as a result of Company at any time being a member of an affiliated group for federal income tax purposes.

      (j)    Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (1) change in method of accounting for a taxable period ending on or prior to the Closing Date; (2) "closing agreement" as described in Code

13

L13160

§7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; (3) intercompany transactions occurring at or prior to the Closing (including, but not limited to, conversion of the Intercompany Loan from debt to equity) or any excess loss account in existence at Closing described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or foreign income Tax law); (4) installment sale or open transaction disposition made on or prior to the Closing Date; or (5) prepaid amount received on or prior to the Closing Date.

(k)      As of the first day of its most recently completed taxable year, Company had adjusted inventories as required by Section 263A of the Code.  Exhibit 4.18 sets forth the amount of each adjustment required under said Section 263A and the regulations thereunder.

(l)     Possible Section 338(h)(10) Election.

(i)     At the election of Buyer, Seller and Company shall file an election under Section 338(h)(10) of the Code and under any comparable provisions of state, local or foreign law with respect to the purchase of the Shares (the "Election").  No later than one hundred fifty (150) days following the Closing, Buyer shall notify Seller whether Buyer will make the Election.  If such election is to be made, Buyer shall also supply to Seller within such one hundred fifty (150) day period Form 8883 prepared by Buyer's regularly employed accountants which shall be attached to Company's federal income tax return (and the forms if any to be attached to Company's state income tax return).  Seller and Company shall take no action which is inconsistent with the Election or its validity under the Code and the applicable Treasury Regulations.

(ii)     On the Closing Date, Seller shall execute and deliver to Buyer five copies of Internal Revenue Service Form 8023-A provided by Buyer and the equivalent forms for state income tax purposes, and shall thereafter provide any additional or similar forms under applicable federal, state, local or foreign law (the "Election Forms") to Buyer as Buyer may reasonably request.

(iii)     Buyer shall be responsible for the preparation and filing of all forms and documents required in connection with the Election.  Buyer shall provide Seller with copies of (a) any necessary corrections, amendment, or supplements to Form 8023(a), (b) all attachments required to be filed therewith pursuant to applicable Treasury Regulations, and (c) any comparable forms and attachments with respect to any applicable state, foreign, or local elections included as part of the Election.  Seller shall execute and deliver to Buyer within five (5) days of receipt by Seller such documents or forms as are required properly to complete the Election.

(iv)     Seller and Company shall cooperate fully with Buyer and make available to Buyer such Tax data and other information as may be reasonably required by Buyer or Company in order for Buyer to timely file the Election and any other required statements or schedules (or any amendments or supplements thereto) and shall, if requested by Buyer, attach to the federal income tax Return filed for the Company for the period ending with the Closing Form 8883 as referred to in Section 4.18(l)(i).

14

L13161

4.19    Employee Benefits.

(a)    Schedule 4.19 attached hereto contains a complete and correct list of all benefit plans, arrangements, commitments and payroll practices (whether or not employee benefit plans ("Employee Benefit Plans") as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), including, without limitation, sick leave, vacation pay, severance pay, salary continuation for disability, consulting or other compensation arrangements, retirement, deferred compensation, bonus, incentive compensation, stock purchase, stock option, health including hospitalization, medical and dental, life insurance and scholarship programs maintained for the benefit of any present or former employees of Company or any ERISA Affiliate (as defined below) or to which Company or any ERISA Affiliate has contributed or is or was within the last three years obligated to make payments. Company has made available to Buyer, with respect to all such plans, arrangements, commitments and practices, true, complete and correct copies of the following: all plan documents, handbooks, manuals, collective bargaining agreements and similar documents governing employment policies, practices and procedures; the most recent summary plan descriptions and any subsequent summaries of material modifications for each Title I plan; Forms series 5500 as filed with the IRS for the three most recent plan years; the most recent report of the enrolled actuary for all defined benefit plans, funded welfare plans or other plans requiring actuarial valuation; all trust agreements with respect to employee benefit plans; plan contracts with service providers or with insurers providing benefits for participants or liability insurance for fiduciaries and other parties in interest or bonding; most recent annual audit and accounting of plan assets for all funded plans; and most recent IRS determination letter for all plans intended to be qualified under Code section 401(a). As used herein, "ERISA Affiliate" shall refer to any trade or business, whether or not incorporated, under common control with the Company within the meaning of Section 414(b), (c), (m) or (o) of the Code.

(b)    With respect to each Employee Benefit Plan required to be listed on Schedule 4.19: (i) each Employee Benefit Plan has been administered in substantial compliance with its terms, and is in compliance in all material respects with the applicable provisions of ERISA, the Code and all other applicable Laws (including, without limitation, funding, filing, termination, reporting and disclosure and continuation coverage obligations pursuant to Title V of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA")); (ii) the Company has made or provided for all contributions required under the terms of such Plans; (iii) no "Employee Pension Benefit Plan" (as defined in Section 3(2) of ERISA) has been the subject of a "reportable event" (as defined in Section 4043 of ERISA) and there have been no "prohibited transactions" (as set forth in Section 4975 of the Code or in Part 4 of Subtitle B of Title I of ERISA) with respect to any Employee Benefit Plan; (iv) there are and during the past three years there have been no inquiries, proceedings, claims or suits pending or threatened by any governmental agency or authority or by any participant or beneficiary against any of the Employee Benefit Plans, the assets of any of the trusts under such Plans or the Plan sponsor or the Plan administrator, or against any fiduciary of any of such Employee Benefit Plans with respect to the design or operation of the Employee Benefit Plans; (v) the actuarial present value of accumulated benefits (both vested and unvested) of each of the Employee Pension Benefit Plans which are defined benefit plans, are fully funded in accordance with the actuarial assumptions used by the Pension Benefit Guaranty Corporation ("PBGC") to determine the level of funding required in the event of the termination of such Plan; (vi) each

15

L13162

Employee Pension Benefit Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code is and has from its inception been so qualified, and any trust created pursuant to any such Employee Pension Benefit Plan is exempt from federal income tax under Section 401(a) of the Code and the IRS has issued each such Plan a favorable determination letter which is currently applicable; and (vii) neither Company nor any ERISA Affiliate is aware of any circumstance or event which would jeopardize the tax-qualified status of any such Employee Pension Benefit Plan or the tax-exempt status of any related trust, or which would cause the imposition of any liability, penalty or tax under ERISA or the Code with respect to any Employee Benefit Plan.

          (c)     Neither Company nor any ERISA Affiliate maintains or has ever maintained or been obligated to contribute to a "Multiemployer Plan" (as such term is defined by Section 4001(a)(3) of ERISA).

          (d)     With respect to each Employee Benefit Plan maintained by Company or any ERISA Affiliate: (i) no unsatisfied liabilities to participants, the IRS, the United States Department of Labor ("DOL"), the PBGC or to any other person or entity have been incurred as a result of the termination of any Employee Benefit Plan; (ii) no Employee Pension Benefit Plan, which is subject to the minimum funding requirements of Part 3 of subtitle B of Title I of ERISA or subject to Section 412 of the Code, has incurred any "accumulated funding deficiency" within the meaning of Section 302 of ERISA or Section 412 of the Code and there has been no waived funding deficiency within the meaning of Section 303 of ERISA or Section 412 of the Code; (iii) there has been no event with respect to an Employee Pension Benefit Plan which would require disclosure under Sections 4062(c), 4063(a) or 4041(e) of ERISA.

          (e)     All reports and information required to be filed with the DOL, IRS and PBGC with respect to each Employee Benefit Plan have been filed and all annual reports (including Form 5500 series) of such Plans were certified without qualification by each Plan's accountants and actuaries.

          (f)     Any bonding required under ERISA with respect to any Employee Benefit Plan has been obtained and is in full force and effect and no funds held by or under the control of Company are plan assets.

          (g)     Neither Company nor any ERISA Affiliate maintains any retired life and/or retired health insurance plans which provide for continuing benefits or coverage for any employee or any beneficiary of an employee after such employee's termination of employment.

          (h)     The consummation of the transactions contemplated by this Agreement will not, alone or together with any other event, (i) entitle any person to severance pay, unemployment compensation or any other payment, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee, or (iii) result in any liability under Title IV of ERISA or otherwise.

16

L13163

4.20    Labor Matters.

(a)    (i) No application or petition for certification of a collective bargaining agent is pending and none of the employees of Company are, or during the last five years have been, represented by any union or other bargaining representative; (ii) to the knowledge of Company, during the last five years, no union has attempted to organize any group of the Company's employees and no group of the Company's employees has sought to organize themselves into a union or similar organization for the purpose of collective bargaining; (iii) during the last five years there has not been and there is not currently pending any labor arbitration or proceeding in respect of the grievance of any employee, any application, charge or complaint filed by any employee or union with the National Labor Relations Board or any comparable state or local agency, any strike, slowdown, picketing or work stoppage by any employees at any facility of Company, any lockout of any such employees (iv) no agreement restricts Company from relocating, closing or terminating any of its operations or facilities or any portion thereof, and (v) to the knowledge of Company, no such agreement, action, proceeding or occurrence has been threatened in writing by any person.

(b)    The Company has not been cited for violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. sec. 651 et seq. ("OSHA"), any regulation promulgated pursuant to OSHA or any other Law establishing standards of workplace safety, or paid any fines or penalties with respect to any such citation.

(c)    Schedule 4.20(c) attached hereto contains true and correct copies of each OSHA record keeping injury/illness report, loss and summary completed and maintained by Company at its work establishments for the past three (3) years.

4.21    Directors, Officers and Employees.  Schedule 4.21 attached hereto sets forth the following information for each director, officer and employee of Company and each consultant and independent contractor regularly retained (excluding construction sub-contractors), in each case whose aggregate compensation for the calendar year ended December 31, 2003 exceed $75,000 or whose current aggregate annual rate of compensation exceeds such amount (including each such person on leave or layoff status): employer; employee name and job title; current annual rate of compensation (identifying bonuses separately) and any change in compensation since the date of the Balance Sheet; accrued vacation pay and any automobile leased or owned by Company primarily for use by any of the foregoing persons.  To the knowledge of Company, none of the Company's employees, directors or officers is a party to, or is otherwise bound by, any agreement or arrangement with any person or entity other than Company which limits or adversely affects the performance of his duties, the ability of Company to conduct its businesses, or his freedom to engage in any of the businesses conducted by Company.  Schedule 4.21 lists each employment, severance or change of control agreement to which Company is a party or is otherwise bound.

4.22    Affiliate Agreements.  Except as set forth on Schedule 4.22 attached hereto, and except for that certain loan from Seller to the Company having a balance due of $27,059,349 as of September 30, 2004 (as reflected on the Interim Balance Sheet) (the "Intercompany Loan") there are no, and since January 1, 2000 there have not been any, agreements or transactions between Company on the one hand and the Seller or any present or

17

former director, shareholder or officer of Company or any member of such person's immediate family (a "Related Party") providing for the furnishing of services (other than as an employee) by, rental of any assets from or to, or otherwise requiring payments to any Related Party. Except as set forth on Schedule 4.22 attached hereto, no such Related Party has, or since January 1, 2000 has had, any interest in any material property (real or personal, tangible or intangible) sold to, purchased by or otherwise used in or pertaining to the business of Company, or any direct or indirect interest in any person or entity which has had business dealings or a financial interest in any transaction with Company or which is in competition with any business of Company. Except as set forth on Schedule 4.22 attached hereto, all agreements between Company and all Related Parties are terminable by Company upon 30 days' notice or less, without payment of penalty or premium of any kind.

      4.23   Environmental Matters. Except as disclosed on Schedule 4.23:

      (a)   The businesses and operations of the Company are and always have been operated in compliance in all material respects with all applicable Environmental Laws (as defined below);

      (b)   There are no material conditions on, about, beneath or arising from any currently Owned Real Property ("Current Real Property"), which are reasonably expected, under any applicable Environmental Laws, (A) to give rise to any liability or the imposition of any statutory lien, or (B) to require any "Response," "Removal" or "Remedial Action" (as those terms are defined below);

      (c)   At the time of disposition thereof, there were no material conditions on, about, beneath or arising from any real property which was, but is no longer, owned, used or leased to or by the Company, including without limitation real property that includes homes which were previously constructed and/or sold by Company ("Former Real Property") which resulted from action taken by the Company during its period of ownership, use or lease and are reasonably expected, under any applicable Environmental Laws, (A) to give rise to any liability or the imposition of any statutory lien, or (B) to require any "Response," "Removal" or "Remedial Action" (as defined below) pursuant to applicable Environmental Law;

      (d)   The Company has not received any notification of a "Release" or threat of a "Release of a "Hazardous Substance" (as defined below) with respect to any Current Real Property or Former Real Property);

      (e)   No Hazardous Substances have been generated, processed, treated, stored, released, discharged or disposed of by the Company or, to the knowledge of the Company, by any third party on, about or beneath any Current Real Property except in compliance with applicable Environmental Laws;

      (f)   During the Company's ownership, use or lease of the Former Real Property, no Hazardous Substances were generated, processed, treated, released, discharged or disposed of by the Company or, to the knowledge of the Company, by any third party on, about or beneath any Former Real Property except in compliance with applicable Environmental Laws;

> **Deleted:** ; provided that, with respect to periods prior to the acquisition or lease, or after the disposition, of any Real Property by the Company the foregoing representation and warranty is given. [Please clarify the qualification beginning with "provided that".]

18

(g)    There are, and have been no above or underground storage tanks, asbestos containing materials, or lead-based paint, at levels which can reasonably be expected to cause adverse effects to persons or property, or transformers containing or contaminated with PCB's on, about or beneath the Current Real Property.

(h)    Except as set forth on Schedule 4.23, the Company has not received notice of and has no knowledge of:

(i)    any claim, demand, investigation, enforcement action, Response, Removal, Remedial Action, statutory lien or other governmental or regulatory action instituted or threatened in writing or to the knowledge of Company, threatened in any manner, against the Company or the Current, or Former Real Property pursuant to any of the Environmental Laws;

(ii)    any written or any other claim, demand, notice or suit, made or, to the knowledge of Company, threatened by any person against the Company, the Current Real Property or the Former Real Property claiming (1) damage, loss or injury resulting from, or claimed to result from, any Hazardous Substance on, about, beneath or arising from the Current or Former Real Property or (2) any alleged violation of the Environmental Laws by the Company; or

(iii)    any written or any other communication between the Company and any governmental or regulatory agency arising out of or in connection with Hazardous Substances on, about, beneath, arising from or generated at the Current Real Property or Former Real Property, including without limitation, any notice of violation, citation, complaint, order, directive, request for information or response thereto, notice letter, demand letter or compliance schedule which is likely to involve any liability or expenditure by the Company.

(i)    To the Knowledge of Compay, none of the Current Real Property contains, and none of the Former Real Property contained at the time it was sold by the Company, a level of radon above action levels of the United States Environmental Protection Agency.

Deleted: N

(j)    The Company has not arranged for transportation or disposal of any Hazardous Substances at any site listed or formally proposed for listing on the National Priority List promulgated pursuant to "CERCLA" (as defined below) or to any site listed on any other publicly available and computer accessible federal or state list of sites requiring or recommended for investigation or clean-up. None of the Current Real Property or Former Real Property is listed on the National Priorities List or any other federal or state list of sites requiring or recommended for investigation or clean up.

(k)    None of the Current Real Property, or any portion thereof, is currently being used or has been used to dispose or treat wastes or for any industrial purpose whatsoever, except in a manner that does not materially violate any Environmental Laws.

(l)    None of the homes constructed by the Company on the Current Real Property, or the Former Real Property, contain or contained the presence of mold, fungus or

19

L13166

other microbial matter (hereafter "Mold") at levels, in amounts or in a manner, that could reasonably be expected to cause adverse effects to persons or property or a liability to the Company.

(m)    As used in this Agreement:

(i)    the term "Environmental Laws" means all applicable federal, state and local Laws relating to pollution or contamination of the environment, including but not limited to CERCLA and SARA (as defined in clause (ii) below), or otherwise relating to emissions, discharges, releases or threatened releases of Hazardous Substances or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

(ii)    the terms "Release," "Response," "Removal" and "Remedial Action" shall have the meanings ascribed to them in Sections 101(23)-101(25) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act ("SARA"), 42 U.S.C. §§9601(23)-9601(25).

(iii)    The term "Hazardous Substances" or "Hazardous Substance" shall mean any substance regulated under any of the Environmental Laws including, without limitation, any substance which is: (A) petroleum, asbestos or asbestos-containing material, or polychlorinated biphenyls; (B) defined, designated or listed as a "Hazardous Substance" pursuant to Sections 307 and 311 of the Clean Water Act, 33 U.S.C. ss. 1317, 1321, Section 101(14) of CERCLA, 42 U.S.C. ss. 9601; (C) listed in the United States Department of Transportation Hazardous Material Tables, 49 C.F.R. ss. 172.101; (D) defined, designated or listed as a "Hazardous Waste" under Section 1004(5) of the Resource and Conservation and Recovery Act, 42 U.S.C. 6903(5).

4.24    Absence of Certain Changes and Events.

(a)    Except as set forth on Schedule 4.24 attached hereto, since January 1, 2004, Company has conducted its business only in the usual and ordinary course consistent with past practice and there has not been any:

(i)    declaration or payment of any dividend or other distribution or payment in respect of the shares of capital stock of Company, or any repurchase or redemption of any such shares of capital stock or other securities;

(ii)    payment by Company of any bonus or increase of any compensation payable to any shareholder, director or officer or, except in the ordinary course of business consistent with past practice, employee or entry into (or amendment of) any employment, severance or similar agreement with any shareholder, director, officer or employee;

(iii)    adoption of or change in any Employee Benefit Plan or labor policy;

20

L13167

(iv)    damage, destruction or loss to any material asset or property of Company, whether or not covered by insurance;

(v)    except for this Agreement and agreements for the construction or sale of homes in the ordinary course of business, entry into any agreement involving payments in excess of $25,000;

(vi)    sale (other than sales of inventory in the ordinary course of business), assignment, conveyance, lease, or other disposition of any material asset or property of Company or mortgage, pledge or imposition of any lien, on any material asset or property of Company;

(vii)    discharge or satisfaction of any lien, claim or encumbrance, other than in the ordinary course of business consistent with past practice;

(viii)    write-down or write-off of the value of any asset except for write-downs and write-offs in the ordinary course of business consistent with past practice and at a rate no greater than that during the twelve months ended December 31, 2003, or any cancellation or waiver of any other claim or right with a value in the aggregate in excess of $25,000;

(ix)    material change in the business or operations of Company or in the manner of conducting the same or entry by Company into any transaction (other than this Agreement), other than in the ordinary course of business consistent with past practice; or

(x)    material change in the accounting methods, principles or practices followed by Company, except as required by GAAP, or any change in any of the assumptions underlying, or methods of calculating, any bad debt, contingency or other reserve;

(xi)    agreement, whether or not in writing, to do any of the foregoing by Company.

(b)    Since the date of the Interim Balance Sheet, there has not been any material adverse change in the business, operations, properties, assets, or condition (financial or otherwise) of Company.

4.25    Books and Records.

(a)    The copies of the certificate or articles of incorporation of Company, as certified by the Secretary of State of its jurisdiction of incorporation, and of its bylaws (or of their other comparable organizational documents), as certified by its secretary, which have been made available to Buyer are true, complete and correct in all material respects and are in full force and effect as of the date hereof.

(b)    The stock records of Company fairly and accurately reflect the record ownership of all of its outstanding shares of capital stock. Complete and accurate copies, in all material respects, as of the date hereof, of all minute books and stock records of the Company have been made available to Buyer.

24

L13168

4.26    Brokers. No person acting on behalf of Company, any Related Party or any of their affiliates or under the authority of any of the foregoing is or will be entitled to any brokers' or finders' fee or any other commission or similar fee, directly or indirectly, from any of such parties in connection with any of the transactions contemplated by this Agreement.

4.27    Accounts Receivable. Except as set forth in Schedule 4.27, each of the accounts receivable of Company reflected on the Balance Sheet or arising thereafter constituted at the Balance Sheet date or as of the date they arose, respectively, a valid claim in the full amount thereof against the debtor charged therewith on the books of Company and was acquired in the ordinary course of Company's business. No account debtor has any valid set-off, deduction or defense with respect thereto and, to the knowledge of the Company, no account debtor has asserted any such set-off, deduction or defense.

4.28    Additional Capital Contributions. Neither the Company nor any entity in which the Company has any ownership or other equity interest, has any obligation to make any capital contributions, loans, advances or any other similar payments, to any entity.

4.29    Disclosure. All documents and other papers delivered by or on behalf of Company or Seller in connection with the transactions contemplated by this Agreement are accurate and complete in all material respects and are authentic. None of the representations and warranties of Seller made in this Section 4 or in Section 3 contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

## SECTION 5.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date of this Agreement and of the Closing Date as follows:

5.1    Organization and Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to carry on its business as presently conducted, to own and lease the assets which it owns and leases and to perform all of its obligations under each agreement and instrument by which it is bound.

5.2    Power and Authorization. Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under the other agreements and documents (the "Buyer Transaction Documents") required to be delivered by it prior to or at the Closing. The execution, delivery and performance by Buyer of this Agreement and the Buyer Transaction Documents have been duly authorized by all necessary corporate action. This Agreement has been duly and validly executed and delivered by Buyer and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the Buyer Transaction Documents shall constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

22

L13169

5.3    No Conflicts.

(a)    The execution, delivery and performance of this Agreement and the Buyer Transaction Documents do not and will not (with or without the passage of time or the giving of notice):

(i)    violate or conflict with Buyer's certificate of incorporation or bylaws or any Law binding upon Buyer; or

(ii)    violate or conflict with, result in a breach of, or constitute a default or otherwise cause any loss of benefit under any material agreement or other material obligation to which Buyer is a party.

(b)    Each consent or approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person required to be given or made by Buyer in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein has been obtained or made or will be obtained or made prior to the Closing without payment of premium or penalty by, or loss of benefit to, Buyer.

(c)    There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Buyer, threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby or which, if adversely determined, could reasonably be expected to have a material adverse effect upon the ability of Buyer to enter into or perform its obligations under this Agreement or any of the other agreements or instruments contemplated hereby. Buyer has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.

5.4    Funds.  Buyer will have at the Closing the funds necessary to consummate, on a timely basis, the transactions contemplated by this Agreement.

5.5    Disclosure. All documents and other papers delivered by or on behalf of Buyer in connection with the transactions contemplated by this Agreement are accurate and complete in all material respects and are authentic. None of the representations and warranties of Buyer made in this Section 5 contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

5.6    Brokers.  No person acting on behalf of Buyer or any affiliate of Buyer or under the authority of any of the foregoing is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from any such parties in connection with any of the transactions contemplated by this Agreement.

**SECTION 6.   OBLIGATIONS OF THE PARTIES**

6.1    Conduct of Business Pending Closing. Except as contemplated herein, between the date of the Interim Balance Sheet and the date hereof Seller has caused the

23

L13170

Company to, and between the date hereof and the Closing, without the prior written consent of Buyer, Seller will cause Company to:

          (a)     maintain its corporate existence, to pay and discharge all debts, liabilities and obligations as they become due, operate in the ordinary course in a manner, including marketing and sales activities, consistent with past practice, and the provisions of this Agreement and in compliance with all material respects with all applicable Laws;

          (b)     maintain its facilities and assets in the same state of repair, order and condition as they were on the date hereof, reasonable wear and tear excepted;

          (c)     maintain its books and records in accordance with past practice, and maintain in full force and effect all Authorizations and all insurance policies and binders;

          (d)     use reasonable efforts to preserve intact its present business organization and maintain its relations and goodwill with the suppliers, customers, employees and others having a business relationship with it;

          (e)     promptly advise Buyer of the written threat or commencement against Company or Seller of any action, suit, proceeding, arbitration or investigation known to Seller by, against or affecting Company or any of its operations or assets, or which challenges the validity of this Agreement or any action taken or to be taken in connection with this Agreement or the ability of Company, or Seller to consummate the transactions contemplated herein or therein; and

          (f)     promptly advise Buyer in the event it actually knows that any representation or warranty of Company or Seller set forth in this Agreement is untrue in a material respect.

        6.2   <u>Negative Covenants</u>. Except as expressly provided herein, between the date hereof and the Closing, without the prior written consent of Buyer, Company shall not, and Seller shall not cause or permit Company to:

          (a)     make any change in Company's authorized or issued capital stock; grant any stock option or warrant or other right to purchase shares of Company's capital stock or other securities; issue or make any commitment to issue any security by Company, including any security convertible into capital stock; grant any registration rights; or purchase, redeem, retire or make any other acquisition of any shares of any capital stock or other securities; declare or pay any dividend or other distribution or payment in respect of shares of capital stock of Company;

          (b)     amend the certificate or articles of incorporation or bylaws (or equivalent governing documents) of Company;

          (c)     fail to pay or discharge when due any liability or obligation of Company;

          (d)     enter into any agreement, commitment or transaction other than in the ordinary course of business, consistent with past practice, or which is material to the

L13171

business, operations or financial condition of Company, whether or not in the ordinary course of business;

(e)    enter into any contract, agreement, commitment or arrangement with any party, other than contracts for the sale of homes or services and contracts for the purchase of materials, services and supplies in the ordinary and usual course of its business, and not waive any rights under, amend, modify or terminate any such contract, agreement, commitment or arrangement;

(f)    make any capital expenditure in excess of $10,000 as to any individual obligation or expenditure or any series of related expenditures or obligations, and not exceeding $100,000 in the aggregate;

(g)    increase the current compensation or rate of compensation payable to any employee of the Company or modify any payments or fringe benefits payable to such employees; or

(h)    enter into any contract, agreement, commitment or arrangement with Seller or any Related Party thereof or any officer or director of the Company.

6.3    Access to Information; Confidentiality.

(a)    Prior to the earlier of Closing or termination pursuant to Section 10.1, Company shall, and Seller shall cause Company to, upon reasonable prior notice and during ordinary business hours, give Buyer and its authorized representatives reasonable access to all of its personnel, books, records, plants, offices and other facilities and properties, and permit Buyer to make such inspections thereof as Buyer may reasonably request, and cause its officers and advisors to furnish Buyer with such financial, operating and other information regarding Company's business, agreements, commitments, liabilities, personnel and properties as Buyer may reasonably request.

(b)    Buyer agrees at all times up until the Closing to strictly observe the terms and conditions of that certain Confidentiality Agreement, dated as of October 27, 2004, by and among Seller, Company and Buyer, which is attached hereto as Exhibit 6.3(b) and is incorporated by reference herein.

(c)    Buyer agrees at all times after the Closing, (i) to keep confidential all information provided to it regarding Seller, (ii) not to use such information on its own behalf, except in connection with the transactions contemplated hereby, or on behalf of any other person, firm or entity, and (iii) not to disclose such information to any third party (other than to Buyer's lenders, employees, agents, advisors, counsel, accountants and other consultants in connection with the transactions contemplated hereby) without the advance written authorization of Seller; provided that Buyer shall have no such obligations with respect to confidential information that (A) was lawfully obtained by it not subject to restrictions of confidentiality; (B) is a matter of public knowledge; (C) has been or is hereafter publicly disclosed other than by or through Buyer or by a third party in violation of its obligation to the Company or (D) is required to be disclosed by Buyer pursuant to a subpoena or order issued by a court of competent jurisdiction, regulatory or administrative body that has power to compel the disclosure of information, or pursuant to any

25

L13172

other law, rule or regulation. In the event this Agreement is terminated, Buyer will promptly return to the Company all documents, and other materials furnished to Buyer or any of its representatives and all copies thereof, and will promptly and completely destroy all work papers made or prepared by Buyer or any of its representatives relating to the transactions contemplated hereby, whether obtained before or after the execution of this Agreement. In the event of a breach or threatened breach by Buyer of the provisions of this Section 6.3, Seller shall be entitled to an injunction restraining Buyer from disclosing, in whole or in part, the confidential information.

(d)     Seller agrees at all times, (i) to keep confidential all information provided by or on behalf of Buyer to it, (ii) not to use the confidential information on their own behalf, except in connection with the transactions contemplated hereby, or on behalf of any other person, firm or entity, and (iii) not to disclose the confidential information to any third party (other than to Seller's lenders, counsel, accountants and other consultants in connection with the transactions contemplated hereby) without the advance written authorization of the Buyer; provided that Seller shall have no such obligations with respect to confidential information that (A) was lawfully obtained by it not subject to restrictions of confidentiality; (B) is a matter of public knowledge; or (C) has been or is hereafter publicly disclosed other than by or through Seller or by a third party in violation of its obligation to Buyer.  In the event this Agreement is terminated, Seller will promptly return to Buyer all documents and other materials furnished to Seller or any of its representatives and all copies thereof, and will promptly and completely destroy all work papers made or prepared by Seller or any of its representatives relating to the transactions contemplated hereby, whether obtained before or after the execution of this Agreement. In the event of a breach or threatened breach by Seller of the provisions of this Section 6.3, Buyer shall be entitled to an injunction restraining Seller from disclosing, in whole or in part, the confidential information.

6.4     Commercially Reasonable Efforts.  Prior to the earlier of Closing or termination pursuant to Section 10.1, each party hereto shall use commercially reasonable efforts to cause to occur the transactions contemplated hereby and by the Transaction Documents, and to cause all conditions to the performance of the parties hereto that are within its control to be satisfied. No party shall take any action to cause any such covenant, agreement, transaction or condition not to occur, be satisfied or be performed, as the case may be.

6.5     Consents.  Prior to the Closing, Company and Seller shall, and Seller (insofar as it is able) shall cause Company to, use commercially reasonable good faith efforts to obtain (and cooperate with the other parties hereto in obtaining) all consents, permits, Authorizations, approvals of, and exemptions by, any regulatory authority or third party necessary for the consummation of the transactions contemplated by this Agreement and the Seller Transaction Documents or the Company Transaction Documents.

6.6     Financial Information. Until the earlier of Closing or termination pursuant to Section 10.1, Company and Seller shall provide Buyer, within 20 days after the end of each month, with an unaudited consolidated balance sheet and income statement of Company as of and for the month then ended, prepared on the same basis as the interim financial statements referred to in Section 4.8, and certified as such by the chief financial officer of Company.

26

L13173

6.7    Noncompetition, Trade Secrets, Etc.

(a)    Seller hereby agrees, from and after the Closing Date hereunder, as follows:

(i)    Until the date which is five (5) years after the Closing Date, as such period may be extended as hereinafter set forth (the "Restricted Period"), (i) Seller shall not directly or indirectly engage in (as a principal, shareholder, partner, director, officer, agent, employee, consultant or otherwise) or be financially interested in any business operating within 100 miles of any county in which the Buyer operates (the "Restricted Area"), which is engaged in the construction, sale and/or leasing of single-family or multi-family homes, the acquisition or development of any property for any such purpose, or the provision of mortgage financing or title insurance/settlement services; provided, however, nothing contained in this Section 6.7 shall prevent Seller from holding for investment no more than two percent (2%) of any class of equity securities of a company whose securities are publicly traded on a national securities exchange or in a national market system; (ii) Seller shall not directly or indirectly solicit any employee, customer, independent contractor or supplier of Company to terminate employment or any other relationship with Company; and (iii) Seller shall not directly or indirectly solicit any person who is or was within the preceding year an employee of Company to establish an employment relationship with any other person or entity.

(ii)    Seller shall not disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company other than Company, any Confidential Information. For purposes of the preceding sentence, "Confidential Information" means any information regarding Company's business methods, business policies, procedures, techniques, research or development projects or results; historical or projected financial information, budgets, trade secrets or other knowledge or processes of or developed by Company; any names and addresses of customers or clients or any data on or relating to past, present or prospective Company customers or clients; or any other confidential information relating to or dealing with the business, operations or activities of Company, excepting in each case information otherwise lawfully known generally by, or readily accessible to, the trade or the general public, or as required to be disclosed by law or final, unappealable order of a court of competent jurisdiction or governmental authority. At no time shall Seller, directly or indirectly, remove or cause to be removed from the premises of Company any memorandum, note, list, record, file, document or other paper, equipment or any like item relating to the Company's business (including copies, extracts and summaries thereof); provided, however, that Buyer and Company agree to make available to Seller for inspection and copying at reasonable times during ordinary business hours any such items reasonably necessary for the liquidation of Seller's business, the completion of Seller's financial statements and tax returns or for any other purpose required by Law or by order of a court of competent jurisdiction or governmental authority.

(iii)    Seller acknowledges that the restrictions contained in this Section 6.7, in view of the nature of the business in which the Company is engaged and the purchase to be made by Buyer at Closing hereunder, are reasonable and necessary in order to protect the legitimate interests of the Company, that their enforcement will not impose a hardship on Seller, and that any violation thereof would result in irreparable injuries to the Company. Seller therefore acknowledges that, in the event of Seller's violation of any of these restrictions,

27

L13174

the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief as well as damages, including the Company's legal and other costs of enforcing Seller's compliance with these restrictions, and an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.

(iv)    If the Restricted Period or the Restricted Area specified in Section 6.7(a) above should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such amount or the area shall be reduced by the elimination of such portion or both such reductions shall be made so that such restrictions may be enforced for such time and in such area as is adjudged to be reasonable. If Seller violates any of the restrictions contained in this Section 6.7(a), the Restricted Period shall be extended by a period equal to the length of time from the commencement of any such violation until such time as such violation shall be cured by Seller to the satisfaction of the Company. The Company shall have the right and remedy to require Seller to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Seller as the result of any transactions constituting a breach of this Section 6.7, and Seller shall account for and pay over such amounts to the Company upon the Company's request therefor. Seller hereby expressly consents to the jurisdiction of any court within the Restricted Area to enforce the provisions of this Section 6.7, and agrees to accept service of process by mail relating to any such proceeding. The Company may supply a copy of Section 6.7 of this Agreement to any person to whom Seller has supplied information if the Company determines in good faith that there is a reasonable likelihood that Seller has violated or will violate this Section 6.7.

## SECTION 7.    CERTAIN CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the acquisition of the Shares is subject to the fulfillment by or at the Closing of each of the following conditions:

7.1    <u>Representations and Warranties</u>. Seller's representations and warranties contained in this Agreement shall be deemed to have been made again at and as of the Closing and shall then be true and correct in all material respects, except for representations and warranties qualified by materiality, which shall be true and correct in all respects.

7.2    <u>Performance of Covenants</u>. Company and Seller shall have performed or complied in all respects with all of the agreements in this Agreement to be performed or complied with by them prior to or at the Closing.

7.3    <u>Approvals</u>. The consents or approvals set forth in <u>Schedule 7.3</u> attached hereto shall have been obtained and no such consent or approval: (a) shall have been conditioned upon the modification, cancellation or termination of any material lease, commitment, agreement, easement, right or Authorization of Company; or (b) shall impose on the Buyer or Company any material condition, provision or requirement not presently imposed upon Seller or Company.

28

L13175

7.4    Legal Matters. The Closing shall not violate any order or decree of any court or governmental body of competent jurisdiction and no suit, action, proceeding or investigation, shall be pending or threatened which questions the validity or legality of this Agreement or the transactions contemplated hereby.

7.5    Resignation of Directors and Officers. Buyer shall have received resignations effective as of the Closing Date from such of the officers and directors of Company as it shall have requested in writing no less than five days before the Closing Date.

7.6    Opinion of Counsel. Buyer shall have received opinions reasonably satisfactory to Buyer of Holland & Knight, LLP and Horack, Talley, Pharr & Lowndes, as counsel for Seller and the Company, dated as of the Closing, with respect to the matters set forth on Exhibit B hereto.

7.7    No Material Adverse Change. The shall have been no material adverse change in the business, assets, financial condition or prospects of the Company.

7.8    Indebtedness. Seller shall deliver to Company a release for any indebtedness, obligation or claim for which Seller or a Related Party of Seller may be entitled. Seller and each Related Party of Seller shall pay to the Company all amounts due under any obligations, loans or similar instruments evidencing indebtedness of such persons to the Company.

7.9    Tax Affidavits. Seller shall deliver to the Buyer at the Closing an affidavit in a form provided by Buyer which is consistent with Section 1.1445-2(b)(2) of United States Treasury Regulations, affirming that Seller is not a "foreign person" against whose proceeds the Buyer might otherwise be required to withhold under Section 1445 of the Code.

7.10    Estoppel Letters. Seller shall deliver to Buyer the estoppel letters from each of the Company's lenders in form and substance reasonably satisfactory to Buyer.

7.11    Intercompany Loan. Seller shall cause the Intercompany Loan, and any accrued but unpaid interest thereon, to be converted to equity in the Company effective as of the Closing Date.

7.12    Insolvency Exclusion. Seller shall claim an insolvency exclusion under Section 108(a)(1)(B) of the Code to exclude debt-discharge income from gross income upon the discharge of debt contemplated by the Settlement and Release Agreement (See Section 8.4). As a requirement for claiming this exclusion, Seller shall reduce its tax attributes, pursuant to Section 108(b) of the Code, to the extent of the amount of debt discharged and excluded from gross income.

**SECTION 8.    CERTAIN CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS**

The obligation of Seller to consummate the sale of the Shares is subject to the fulfillment by or at the Closing of each of the following conditions:

29

L13176

8.1    <u>Representations and Warranties</u>. Buyer's representations and warranties contained in this Agreement shall be deemed to have been made again at and as at the Closing and shall then be true and correct in all material respects, except for representations and warranties qualified by materiality, which shall be true and correct in all respects.

8.2    <u>Performance of Covenants</u>. Buyer shall have performed or complied in all material respects with all of the agreements in this Agreement to be performed or complied with by it prior to or at the Closing, except for agreements, covenants and conditions qualified by materiality, which shall be conformed and complied with in all respects.

8.3    <u>Legal Matters</u>. The Closing shall not violate any order or decree of any court or governmental body of competent jurisdiction and no suit, action, investigation, or legal or administrative proceeding shall be pending which questions the validity or legality of this Agreement or the transactions contemplated hereby.

8.4    <u>Settlement and Release Agreement.</u> Seller and Company shall have entered into that certain Settlement and Release Agreement (the "Settlement Agreement") with Swiss Reinsurance American Corporation ("Swiss Re") in the form attached hereto as <u>Exhibit 8.4</u>.

**SECTION 9.  CLOSING**

9.1    <u>Time and Place of Closing</u>. The closing of the purchase and sale of the Shares (the "Closing") pursuant to this Agreement shall take place at the offices of Sack Harris & Martin, P.C., 8270 Greensboro Drive, Suite 810, McLean, VA 22102 commencing at 9:00 A.M., local time, on December 17, 2004 (the "Closing Date") or at such other time and place as the parties may agree in writing.

9.2    <u>Deliveries at the Closing</u>. At the Closing, in addition to the other actions contemplated elsewhere herein:

(a)    Seller shall deliver, or shall cause to be delivered, to Buyer the following:

(i)    certificates representing all of the Shares owned by Seller, duly endorsed for transfer or with stock powers affixed thereto executed in blank in proper form for transfer;

(ii)    a certificate, dated the Closing Date and signed by Seller to the effect set forth in Sections 7.1, 7.2 and 7.3;

(iii)    the signed resignations of all officers and all directors of the Company, dated and effective as of the Closing Date;

(iv)    general releases in favor of Company executed by each shareholder and by each director and officer of the Company in form and substance satisfactory to counsel for Buyer, releasing the Company from all liability to such person;

30

| Deleted: |
| Deleted: 6 |