(v)    an agreement, in form and substance reasonably satisfactory to Buyer, transferring to Buyer for no additional consideration all rights in any names, tradenames, domain names and any other intellectual property used in any aspect of the Company's business which are owned by Seller;

(vi)    such other documents and instruments as Buyer may be reasonably request to effectuate or evidence the transactions contemplated by this Agreement.

(b)    Seller shall cause Company to deliver to Buyer the following:

(i)    a certificate, dated the Closing Date and signed by the President or Vice President of Company, to the effect set forth in Sections 7.1, 7.2 and 7.3;

(ii)    copies of Company's certificates or articles of incorporation and bylaws, or the corresponding charter documents, and all amendments thereof to date, certified as of a recent date by the Secretary of State or corresponding certifying authority of each such entity's respective jurisdiction of organization and by the Secretary or an Assistant Secretary of Company each such entity;

(iii)    certificates of good standing of a recent date for Company and Seller, certified by the Secretaries of State or corresponding certifying authorities of each such entity's respective jurisdiction of organization and of each state in which such entities are qualified to do business;

(iv)    copies of the resolutions of the board of directors or corresponding governing body of Company and Seller authorizing the execution, delivery and performance of this Agreement and the other agreements and instruments referred to herein, certified as of the Closing Date by the Secretary or an Assistant Secretary of Company and Seller, respectively;

(v)    the original corporate seals, minute books and stock transfer and record books of Company as they exist on the Closing Date and such of their files, books and records as Buyer may request;

(vi)    the releases more fully described in Section 7.9; and

(vii)    such other documents and instruments as Buyer may reasonably request to effectuate or evidence the transactions contemplated by this Agreement.

(c)    Buyer shall deliver, or shall cause to be delivered, to Seller or Seller's assignee the items set forth below:

(i)    the Purchase Price;

(ii)    a certificate of Buyer, signed by an officer of Buyer, to the effect set forth in Sections 8.1 and 8.2;

L13178

(iii)     a copy of Buyer's certificate of incorporation and bylaws and all amendments thereof to date, certified as of a recent date by the Secretary of State of Delaware and by the Secretary or an Assistant Secretary of Buyer, and accompanied by a certificate of good standing as of a recent date for Buyer, certified by the Secretary of State of Delaware;

(iv)     a copy of the resolutions of the board of directors of Buyer authorizing the execution, delivery and performance by Buyer of this Agreement and the other agreements and instruments referred to herein, certified as of the Closing by the Secretary or an Assistant Secretary of Buyer;

(v)     such other documents and instruments as Seller may reasonably request to effectuate or evidence the transactions contemplated by this Agreement; and

9.3     Default by Seller at the Closing.  If Seller shall fail or refuse to deliver any of the Shares or to take any other action required by this Agreement to have been taken prior to or at the Closing, such failure or refusal shall not relieve Seller of its obligations under this Agreement and Buyer, at its option and without prejudice to its rights against Seller, may either (i) acquire all the Shares which the Seller has agreed to sell to Buyer hereunder, or (ii) determine to not make such acquisition and terminate all of its obligations hereunder. Seller acknowledges that the Shares are unique and agrees that in addition to any other remedies against Seller, Buyer shall have the right, without limitation, to seek and obtain all available equitable remedies to enforce delivery of the Shares hereunder, including, without limitation, an action or suit for specific performance.

9.4     Accounts Receivable From Employees of Company. With respect to any accounts or notes receivable from employees of the Company to the Company that exist at the close of business on the Closing Date and that remain unpaid and uncollected 180 days following the Closing (collectively, the "Covered Receivables"), Seller shall pay to Buyer, within five business days after receipt of a listing of all such Covered Receivables, the unpaid balance thereof. If the amount of such payment shall be in dispute, Seller shall pay the undisputed portion, if any, and the parties shall attempt in good faith to resolve the dispute.  If the parties are unable to resolve the dispute within 30 days following receipt by Seller of such listing of unpaid Covered Receivables, the dispute shall be resolved by applicable judicial proceedings.  Buyer shall cause any Covered Receivable for which Buyer has been paid under this Section to be assigned to Seller. Any proceeds received thereafter with respect to such assigned receivables shall be the property of Seller, and if received by Buyer or the Company shall be paid to Seller. Prior to such assignment, Buyer shall use reasonable efforts to collect, in accordance with their terms, all Covered Receivables and, upon prior notice, shall provide Seller or its designated representatives during normal business hours with reasonable access to Company's books and records concerning the Covered Receivables.

9.5     Remittance of Payments. From and after the Closing, Seller shall immediately remit to Company, in the form received, any payments which it or any affiliate may receive (such as payments of accounts receivable) which properly belong to Company.

32

L13179

**SECTION 10.   INTENTIONALLY OMITTED**

**SECTION 11.   INDEMNIFICATION**

11.1    <u>Indemnification by Seller</u>. Seller shall indemnify and hold Buyer, Company and their respective officers, directors and shareholders (collectively the "Buyer Indemnitees") harmless against and in respect of any and all losses, costs, expenses, claims, damages, obligations and liabilities, including interest, penalties and reasonable attorneys fees and disbursements ("Damages"), which any of the Buyer Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any breach of any covenant, representation or warranty made by Seller in or pursuant to this Agreement.  No representation or warranty contained herein shall be deemed to have been waived, affected or impaired by any investigation made by or knowledge of Buyer.  Seller shall also indemnify and hold the Buyer Indemnitees harmless against and in respect of any and all Damages which any of the Buyer Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any breach prior to Closing of Sections 1.1, 6.1, 6.2, 6.3(a)(b) and (d), 6.4, 6.5 and 6.6.  Notwithstanding the foregoing, Seller shall not be required to pay any amount with respect to any claim pursuant to this Section 11 unless (i) the amount of damages for a single claim is at least $1,500 and (ii) the aggregate of all Damages exceeds $100,000, in which event Seller shall be liable only for the amount of such Damages which exceed $100,000; provided, however, that the $100,000 "basket" will not apply to (i) any breach of the representations and warranties contained in Section 3, (ii) the breach of any of representations and warranties of Seller or Company of which breach Seller or Company had knowledge (as defined in Section 4.3(c)) on the date on which such representation and warranty is made, (iii) any intentional breach by Seller or Company of any covenant or obligation set forth in this Agreement, or (iv) any indemnification required by Section 11.7.  Seller's liability (for indemnification or otherwise) with respect to claims under this Section 11 shall not exceed $6,500,000, provided that this limitation shall not apply with respect to Seller's obligations under Sections 4.18 or 11.4, or to claims arising from the fraudulent, willful or intentional misrepresentation or omission of Seller.

11.2    ·<u>Indemnification by Buyer</u>. In the event Closing hereunder is consummated, Buyer shall indemnify and hold Seller and its respective officers, directors and shareholders (collectively the "Seller Indemnitees") harmless against and in respect of any and all Damages which any of the Seller Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of: (a) any breach of any representation or warranty of Buyer made in or pursuant to this Agreement; or (b) any breach of any covenant made by Buyer in this Agreement.

11.3    <u>Third Party Claims</u>.

(a)      Each person entitled to indemnity pursuant to this Agreement (an "Indemnified Party") shall promptly notify the person required to indemnify such Indemnified Party (an "Indemnifying Party") of the assertion in writing by any third party of any claim (each an "Indemnity Payment") with respect to which the indemnification set forth in this Section relates. The failure of the Indemnified Party to give such notice shall reduce and limit the Indemnified Party's rights under this Section 11.3(a) only to the extent failure to give prompt

33

L13180

Section 11.4(b) hereof, all taxable periods that include, and end after, the Closing Date (other than, in each case, Taxes for which Seller is responsible pursuant to Section 11.4(a)(ii) hereof); and

(ii)     Taxes for which sufficient current accruals have been made on the Balance Sheet and are specifically shown therein as accruals for unpaid taxes; and

(iii)     any and all adverse tax consequences resulting from the Election (i.e., taxes incurred by Seller or the Company that would not have been incurred if the Election had not been made, including but not limited to taxes paid with respect to any reimbursement pursuant to this Section 11.4(c)(iii)).

(d)     (a)     Seller shall be responsible for preparing all Tax Returns required to be filed by or on behalf of Company and all of its operations and assets on or before the Closing Date (taking into account applicable extensions of time) and shall pay or cause to be paid any Taxes shown to be due thereon.  All such Tax Returns shall be prepared in a manner consistent with past practices and copies of such Tax Returns shall be delivered to Buyer for Buyer's review, comment and approval at least fifteen (15) business days prior to filing; provided, however that such approval shall be limited to confirming that such Tax Returns accurately reflect the transactions contemplated by this Agreement and such approval shall not be unreasonably withheld, conditioned or delayed.  The appropriate officers of Company and, if applicable, Seller and Buyer shall sign and file such Tax Returns.  Buyer shall be responsible for filing or causing to be filed all Tax Returns required to be filed by or on behalf of Company and any of its operations and/or assets after the Closing Date (taking into account applicable extensions of time).

(i)     With respect to any Tax Return required to be filed by Buyer for a taxable period of Company beginning on or before and ending on or after the Closing Date, Buyer shall provide Seller with a statement setting forth the amount of Tax shown on such Return for which Seller is responsible pursuant to Section 11.4(a) hereof or that is allocable to Seller pursuant to Section 11.4(b) hereof (as the case may be) (the "Statement") at least thirty (30) days prior to the due date for filing of such Tax Return (including extensions).  Seller shall have the right to review such Tax Return and the Statement prior to the filing of such Tax Return.  Seller and Buyer agree to consult and resolve in good faith any issues arising as a result of the review of such Tax Return and such Statement and to mutually consent to the filing as promptly as possible of such Tax Return.  If the parties are unable to resolve any disagreement within fifteen business days following Seller's receipt of such Tax Return and Statement, the parties shall jointly request KPMG LLP to resolve any issue in dispute as promptly as possible and shall cooperate with KPMG LLP to resolve such disagreement.  If KPMG LLP is unable to make a determination with respect to any disputed issue prior to the due date (including extensions) for the filing of the Tax Return in question, then Buyer may file such Tax Return on the due date (including extensions) therefor without such determination having been made.  Notwithstanding the filing of such Tax Return, KPMG LLP shall make a determination with respect to any disputed issue, and the amount of Taxes that are allocated to Seller pursuant to this Section 11.4(d)(ii) shall be as determined by KPMG LLP.  The fees and expenses of KPMG LLP shall be paid one-half by Buyer and one-half by Seller.  Not later than five (5) business days before the due date (including extensions) for payment of Taxes with respect to such Tax Return

35

L13182

or in the case of a dispute, not later than five (5) business days after notice to Seller of resolution thereof, Seller shall pay to Company an amount equal to the Taxes shown on the Statement or as shown in such notice, as the case may be, as being the responsibility of Seller pursuant to Section 11.4(a) hereof or allocable to Seller pursuant to Section 11.4(b) hereof (as the case may be). No payment pursuant to this Section 11.4(d)(ii) shall excuse Seller from its indemnification obligations pursuant to Section 11.4(a) hereof should the amount of Taxes as ultimately determined (on audit or otherwise), for the periods covered by such Tax Returns and which are the responsibility of Seller, exceed the amount of Seller's payment under this Section 11.4(d)(ii).

(ii)     Seller may not file any amended Tax Returns or refund claims in respect of any taxable period of Company ending on or prior to the Closing Date without the prior written consent of Buyer.

(iii)     Seller shall cooperate fully with Buyer and make available to Buyer in a timely fashion such Tax data and other information as may be reasonably required for the preparation by Buyer of any Tax Returns required to be prepared and filed by Buyer hereunder. Seller and Buyer shall make available to the other, as reasonably requested, all information, records or documents in their possession relating to Tax liabilities of Company for all taxable periods of Company ending on, prior to or including the Closing Date and shall preserve all such information, records and documents until the expiration of any applicable Tax statute of limitations or extensions thereof; provided, however, that if a proceeding has been instituted for which the information, records or documents is required prior to the expiration of the applicable statue of limitations, such information, records or documents shall be retained until there is a final determination with respect to such proceeding.

(e)     Buyer shall promptly notify Seller in writing upon receipt by Buyer or Company of notice of any Tax audits of or proposed assessments against Company for taxable periods of Company ending on or prior to the Closing Date; provided, however, that the failure of Buyer to give Seller prompt notice as required herein shall not relieve Seller of any of its obligations under this Section 11.4, except to the extent that Seller is actually and materially prejudiced thereby. Buyer shall represent Company's interests in any such Tax audit or administrative or court proceeding and shall employ counsel of its choice. Seller agrees that it will cooperate fully with Buyer and its counsel in the defense against or compromise of any claim in any such audit or proceeding.

(f)     Except as provided in Section 11.4(d)(a)(i), any dispute as to any matter covered hereby shall be resolved by an independent accounting firm chosen by Buyer. The fees and expenses of such accounting firm shall be borne equally by Seller, on one hand, and Buyer on the other.

(g)     The parties hereto agree to furnish or cause to be furnished to each other, at their own expense, such information, access to books and records, and assistance, including making employees available during regular business hours on a mutually convenient basis, as may reasonably be necessary for the preparation and filing of any Tax Return contemplated by this Section 11.4.

36

L13183

11.5    <u>Tax Treatment of Indemnity Payments</u>. Seller and Buyer agree to treat any indemnity payment made pursuant to this Section 11 as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes.

11.6    <u>Interest</u>. In the event any party fails to make full payment with respect to an Indemnity Payment within 30 days after a request for such Indemnity Payment is made by an Indemnified Party, such unpaid Indemnity Payment shall bear interest until paid at a rate of 10% per annum or, if less, the highest rate permitted by applicable law.

11.7    <u>Warranty Indemnity</u>. If the amount of the out of pocket costs incurred by Company during the two (2) year period following the Closing Date for repairs and replacements (including 30 day punchlist items) on homes for which closing of the sale thereof has occurred prior to Closing (which repairs and replacements are required by the Company's warranty on such homes) exceeds in the aggregate the amount of the warranty reserve reflected on the Company's balance sheet as of the Closing Date, Buyer shall be entitled to indemnification for any and all such amounts.

11.8    <u>Right of Set-Off</u>. In the event that Buyer determines in good faith that it is entitled to any Damages or reimbursement from Seller pursuant to this Agreement, Buyer, Buyer's affiliates and Company shall, prior to exercising any other remedy against Seller, set-off the amount of such Damages or reimbursement against the funds being held for the benefit of Mattamy (Jacksonville) Partnership pursuant to that certain Escrow Agreement dated July 10, 2003 by and among Mattamy (Jacksonville) Partnership, Atlantic Builders, Inc. and RBC Centura Bank (the "Escrow Agreement"), as determined by Buyer in good faith (the "Set-Off Amount"), subject to the following provisions of this Section. Prior to the Closing Date, the Escrow Agreement shall be amended to reflect the provisions of this Section 11.8, and the Termination Date (as defined in the Escrow Agreement) shall be extended to a date that is two years after the Closing Date. Upon a final determination of the actual amount of such Damages or reimbursement (the "Actual Amount"), if the Set-Off Amount is in excess of the Actual Amount (upon determination thereof), such excess shall be paid to Seller in accordance with Section 2.2(c) with payment of such amounts to be due within twenty (20) business days of the date on which the Actual Amount is determined.

11.9    <u>Sole Remedy; Exclusion of Certain Damages; Mitigation</u>. The parties understand and agree that, except as otherwise set forth in this Agreement:

(a)    The indemnification obligations provided for in Section 11 shall constitute the sole and exclusive remedy of the parties with respect to any matters or claims arising under this Agreement and the documents, instruments and agreements entered into in connection herewith, and the parties hereby waive, and unconditionally release each other from, any rights and remedies that they may otherwise have against each other. No party shall have any liability (whether for indemnification or otherwise) for any Damages that are punitive, exemplary or special damages of any nature and for indirect or consequential damages, including damages for lost business opportunity or damage to business reputation or lost profits.

(b)    Buyer, on the one hand, and Seller, on the other hand, shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to use commercially

37

L13184

reasonable efforts to mitigate any Damages for which it may be entitled to seek indemnification pursuant to this Agreement. Buyer, on the one hand, and Seller, on the other hand, shall, and shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to use commercially reasonable efforts to obtain all insurance proceeds or other payments from third parties that may be available with respect to any Damages to which it may be entitled to indemnification under this Agreement. If any of the Buyer Indemnitees, on the one hand, or Seller Indemnitees, on the other hand, is indemnified by Seller, or by Buyer, as applicable, for any Damages pursuant to this Agreement with respect to any third party claim, then Seller, on the one hand, and Buyer, on the other hand, shall be subrogated to all rights and remedies of such Buyer Indemnitee or Seller Indemnitee, as applicable, against such third party, and Buyer, on the one hand, and Seller, on the other hand, shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to reasonably cooperate with and assist Seller, on the one hand, and Buyer, on the other hand, as applicable, in asserting all such rights and remedies against such third party. If any of the Buyer Indemnitees, on the one hand, or Seller Indemnitees, on the other hand, after receiving any indemnification payment pursuant to this Agreement with respect to any Damages, subsequently receives any insurance proceeds or other payment with respect to such Damages, Buyer or Seller, as applicable, shall promptly refund and pay to Seller or Buyer, as applicable, an amount equal to such insurance proceeds or payment.

      11.10   Time Limitations.

         (a)     If the Closing occurs, Seller will have liability for indemnification pursuant to this Section 11 with respect to any breach of (i) a covenant or obligation to be performed or complied with prior to the Closing Date or (ii) a representation, warranty, or obligation to be performed after the Closing Date (other than those in Sections 3.4, 4.12, 4.18, 4.19, 4.23, 6.7 and 11.4, as to which a claim may be made within the five (5) year anniversary of the Closing Date), in each case, at any time on or before the two (2) year anniversary of the Closing Date upon notice by Buyer or Seller of a validly asserted claim with respect hereto (and specifying the factual basis of the claim in reasonable detail to the extent then known by Buyer).

         (b)     If the Closing occurs, Buyer will have liability for indemnification pursuant to this Section 11 with respect to any breach of (i) a covenant or obligation, to be performed or complied with prior to the Closing Date or (ii) a representation, warranty or obligation to be performed after the Closing Date (other than that set forth in Section 6.7(a)(ii) and 11.4, as to which a claim may be made within the five (5) year anniversary of the Closing Date), at any time on or before the two (2) year anniversary of the Closing Date upon notice by, Seller or Shareholder to Buyer of a validly asserted claim with respect hereto (and specifying the factual basis of the claim in reasonable detail to the extent then known by Seller.

## SECTION 12.   DEFINITIONS

"Actual Amount" shall have the meaning set forth in Section 11.8.

"Audited Financial Statements shall have the meaning set forth in Section 4.8(a).

"Authorizations" shall have the meaning set forth in Section 4.6(b).

"Balance Sheet" shall have the meaning set forth in Section 4.8(a).

L13185

"Buyer Transaction Documents" shall have the meaning set forth in Section 5.2.

"CERCLA" shall have the meaning set forth in Section 4.23(m)(ii).

"Closing" shall have the meaning set forth in Section 9.1.

"Closing Date" shall have the meaning set forth in Section 9.1.

"COBRA" shall have the meaning set forth in Section 4.19(b).

"Code" shall have the meaning set forth in Section 4.18(e).

"Company Transaction Documents" shall have the meaning set forth in Section 4.2.

"Confidential Information" shall have the meaning set forth in Section 6.7(a)(ii).

"Consolidated Group" shall have the meaning set forth in Section 4.18(a).

"Constructed" shall have the meaning set forth in Section 4.16(a).

"Covered Receivables" shall have the meaning set forth in Section 9.4.

"Current Real Property" shall have the meaning set forth in Section 4.23(b).

"Damages" shall have the meaning set forth in Section 11.1.

"DOL" shall have the meaning set forth in Section 4.19(d).

"Election" shall have the meaning set forth in Section 4.18(l)(i).

"Election Forms" shall have the meaning set forth in Section 4.18(l)(ii).

"Employee Benefit Plans" shall have the meaning set forth in Section 4.19(a).

"Employee Pension Benefit Plan" shall have the meaning set forth in Section 4.19(b).

"Environmental Laws" shall have the meaning set forth in Section 4.23(m)(i).

"ERISA" shall have the meaning set forth in Section 4.19(a).

"ERISA Affiliate" shall have the meaning set forth in Section 4.19(a).

"Escrow Agreement" shall have the meaning set forth in Section 11.8.

"Former Real Property" shall have the meaning set forth in Section 4.23(c).

"Hazardous Substances" shall have the meaning set forth in Section 4.23(m)(iii).

"Hazardous Waste" shall have the meaning set forth in Section 4.23(m)(iii).

39

L13186

"Indemnified Party" shall have the meaning set forth in Section 11.3(a).

"Indemnifying Party" shall have the meaning set forth in Section 11.3(a).

"Indemnity Payment" shall have the meaning set forth in Section 11.3(a).

"Intellectual Property" shall have the meaning set forth in Section 4.13(c).

"Inter Company Loan" shall have the meaning set forth in Section 4.22.

"Interim Balance Sheet" shall have the meaning set forth in Section 4.8(a).

"IRS" shall have the meaning set forth in Section 4.18(c).

"Land Contract Real Property" shall have the meaning set forth in Section 4.11(d).

"Laws" shall have the meaning set forth in Section 3.2(a)(ii).

"Leased Real Property" shall have the meaning set forth in Section 4.11(c).

"Material Contract" shall have the meaning set forth in Section 4.13(e).

"Minimum Value" shall have the meaning set forth in Section 7.5.

"Mold" shall have the meaning set forth in Section 4.23(l).

"Multiemployer Plan" shall have the meaning set forth in Section 4.19(c).

"OSHA" shall have the meaning set forth in Section 4.20(b).

"Option Real Property" shall have the meaning set forth in Section 4.11(d).

"Owned Real Property" shall have the meaning set forth in Section 4.11(b).

"PBCG" shall have the meaning set forth in Section 4.19(b).

"Permitted Encumbrances" shall have the meaning set forth in Section 4.11(b).

"Purchase Price" shall have the meaning set forth in Section 2.1.

"Real Property" shall have the meaning set forth in Section 4.11(a).

"Related Party" shall have the meaning set forth in Section 4.22.

"Release" shall have the meaning set forth in Section 4.23(m)(ii).

"Remedial Action" shall have the meaning set forth in Section 4.23(m)(ii).

"Removal" shall have the meaning set forth in Section 4.23(m)(ii).

40

L13187

"Response" shall have the meaning set forth in Section 4.23(m)(ii).

"Restricted Area" shall have the meaning set forth in Section 6.7(a)(i).

"Restricted Period" shall have the meaning set forth in Section 6.7(a)(i).

"Return" shall have the meaning set forth in Section 4.18(a).

"SARA" shall have the meaning set forth in Section 4.23(m)(ii).

"Seller Indemnitees" shall have the meaning set forth in Section 11.2.

"Seller Transaction Documents" shall have the meaning set forth in Section 3.1.

"Set-Off Amount" shall have the meaning set forth in Section 11.8.

"Shares" shall have the meaning set forth in Section 1.1.

"Statement" shall have the meaning set forth in Section 11.4(d)(a)(i).

"Taxes" shall have the meaning set forth in Section 4.18(a).

"Warranty Company" shall have the meaning set forth in Section 4.10.

## SECTION 13.  MISCELLANEOUS

13.1    Further Assurances. Each party hereto shall use commercially reasonable good faith efforts to comply with all requirements imposed hereby on such party and to cause the transactions contemplated hereby to be consummated as contemplated hereby and shall, from time to time and without further consideration, either before or after the Closing, execute such further instruments and take such other actions as any other party hereto shall reasonably request in order to fulfill its obligations under this Agreement and to effectuate the purposes of this Agreement and to provide for the orderly and efficient transition of the ownership of Company to Buyer. Seller shall, for five years after the Closing, retain its various books and records relating to Company and shall, upon prior notice, provide Buyer and its authorized representatives reasonable access thereto. Each party shall promptly notify the other parties of any event or circumstance known to such party that could prevent or delay the consummation of the transactions contemplated hereby or which would indicate a breach or non-compliance with any of the terms, conditions, representations, warranties or agreements of any of the parties to this Agreement.

13.2    Costs and Expenses. Except as otherwise expressly provided herein, each party shall bear its own expenses in connection herewith. Any and all transfer, sales, use, documentary and similar taxes and recording and filing fees incurred in connection with the transactions contemplated herein shall be borne one-half by Buyer and one-half by Seller (and not by Company).

L13188

13.3    Notices. All notices or other communications permitted or required under this Agreement shall be in writing and shall be sufficiently given if and when hand delivered to the persons set forth below or if sent by documented overnight delivery service or registered or certified mail, postage prepaid, return receipt requested, or by telecopy, receipt acknowledged, addressed as set forth below or to such other person or persons and/or at such other address or addresses as shall be furnished in writing by any party hereto to the others. Any such notice or communication shall be deemed to have been given as of the date received, in the case of personal delivery, or on the date shown on the receipt or confirmation therefor in all other cases.

To Buyer:    Mattamy (US) Acquisition Corporation
           7800 Belfort Parkway
           Suite 200
           Jacksonville, FL  32256
           Telephone: 904-219-8460
           Fax: 904-279-9556
           Attn: William R. Lanius

with a copy to:  Sack Harris & Martin, P.C.
           8270 Greensboro Drive
           Suite 810
           McLean, VA  22102
           Telephone:  703-883-0102
           Fax: 703-883-0108
           Attn:  Robert A. Harris, IV, Esq.

To Seller:    ALH II, Inc.
           4444 Lakeside Drive
           Second Floor
           Burbank, CA  91505
           Telephone: (818) 973-4253
           Fax: (818) 556-6995
           Attn: George J. Buchler

with a copy to:  Holland & Knight LLP
           633 West Fifth Street
           21st Floor
           Los Angeles, CA 90071-2040
           Telephone: 213-896-2452
           Fax: 213-896-2450
           Attn: Francis W. Costello, Esq.

13.4    Assignment and Benefit.

(a)    Buyer may assign this Agreement in whole to any one or more subsidiaries or to any person which becomes a successor in interest (by purchase of assets or stock, or by merger or otherwise) to Buyer; provided, however, that any assignment by the Buyer shall not relieve Buyer of its obligations pursuant to this Agreement.  Except for those

42

L13189

assignments to SwissRe as contemplated by the Settlement Agreement, neither Company nor Seller shall assign this Agreement or any rights hereunder, or delegate any obligations hereunder, without prior written consent of Buyer. Subject to the foregoing, this Agreement and the rights and obligations set forth herein shall inure to the benefit of, and be binding upon, the parties hereto, and each of their respective successors, heirs and assigns.

(b)    This Agreement shall not be construed as giving any person, other than the parties hereto and their permitted successors, heirs and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions herein contained, this Agreement and all provisions and conditions hereof being intended to be, and being, for the sole and exclusive benefit of such parties, and permitted successors, heirs and assigns and for the benefit of no other person or entity.

13.5    <u>Amendment, Modification and Waiver</u>. The parties may amend or modify this Agreement in any respect, and Buyer, on the one hand, and Seller, on the other hand, may: (a) extend the time for the performance of any of the obligations of the other, (b) waive any inaccuracies in representations and warranties by the other, (c) waive compliance by the other with any of the obligations contained in this Agreement, or (d) waive the fulfillment of any condition precedent to the performance under this Agreement of the waiving party. Any such amendment, modification, extension or waiver shall be in writing. The waiver by a party of any breach of any provision of this Agreement shall not constitute or operate as a waiver of any other breach of such provision or of any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.

13.6    <u>Governing Law, Venue and Attorneys' Fees and Costs</u>. This Agreement is made pursuant to, and shall be construed and enforced in accordance with, the laws of the State of North Carolina (and United States federal law, to the extent applicable), irrespective of the principal place of business, residence or domicile of the parties hereto, and without giving effect to otherwise applicable principles of conflicts of law.

In connection with any legal proceedings arising out of this Agreement, the prevailing party in such proceeding shall be entitled to receive from the non-prevailing party reimbursement for costs and expenses incurred (including reasonable attorneys' fees), including in connection with any appellate proceedings.

13.7    <u>Section Headings and Defined Terms</u>. The section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement. The terms defined herein and in any agreement executed in connection herewith include the plural as well as the singular and the singular as well as the plural, and the use of masculine pronouns shall include the feminine and neuter. Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith.

13.8    <u>Severability</u>. The invalidity or unenforceability of any particular provision, or part of any provision, of this Agreement shall not affect the other provisions or parts hereof,

43

L13190

and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions or parts were omitted.

13.9  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original; and any person may become a party hereto by executing a counterpart hereof, but all of such counterparts together shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

13.10  Entire Agreement. This Agreement, together with the agreements, exhibits, schedules and certificates referred to herein or delivered pursuant hereto, constitute the entire agreement between the parties hereto with respect to the purchase and sale of the Shares and supersede all prior agreements and understandings. Without limiting the scope of the foregoing, the parties specifically acknowledge and agree that all employment agreements, shareholder agreements, subscription agreements and any similar agreements regarding the Shares that any Seller entered into at any time prior to the Closing hereunder are hereby terminated and superseded in all respects, and the Seller hereby waives any and all rights arising under such agreements with respect to the transactions contemplated by this Agreement. The submission of a draft of this Agreement or portions or summaries thereof does not constitute an offer to purchase or sell the Shares, it being understood and agreed that neither Buyer nor Seller shall be legally obligated with respect to such a purchase or sale or to any other terms or conditions set forth in such draft or portion or summary unless and until this Agreement has been duly executed and delivered by all parties.

44

L13191

**From:**       Shalom Lamm [slamm@cannondev.com]
**Sent:**       Tuesday, December 14, 2004 6:41 AM
**To:**         Jon Zich
**Subject:**    FW: ALH Holdings Board Meeting - Updated DraftResolutions/Exhibits
**Importance:** High
**Attachments:** Blacklined Version of Proposed Resolutions.DOC; Black lined Settlement Agreement
(12_13_04).DOC; Draft Stock Purchase Agreement (12_11_04 Version).DOC

L13193

6/29/2006

DRAFT
12/6~~13~~/04

# PROPOSED RESOLUTIONS
## TO BE ADOPTED AT A MEETING
## OF THE SUPERVISORY BOARD
## OF
## ALH HOLDINGS, LLC
### (a Delaware limited liability company)

L13194

APPROVAL OF SETTLEMENT AND RELEASE AGREEMENT

WHEREAS, ALH Holding LLC's (the "Company's") wholly owned subsidiary ALH II, Inc. ("ALH II") entered into a Commitment Letter with Wachovia Bank, N.A. ("Wachovia") on January 13, 2000 (the "Commitment Letter") pursuant to which ALH II executed two Promissory Notes, each dated January 13, 2000 and amended from time to time thereafter (collectively, the "Notes") in favor of Wachovia in the principal amounts of $13,000,000 and $14,500,000;

WHEREAS, the proceeds of the loans evidenced by the Notes were used by ALH II to acquire substantially all of the assets of The Mulvaney Group, Ltd. through ALH II's wholly owned subsidiary known as Mulvaney Homes, Inc. ("Mulvaney Homes");

WHEREAS, the Notes are secured by one or more Security Instruments (collectively, the "Security Instruments"), which Security Instruments include a Bank Collateral Assignment of Deposit Agreement, dated January 13, 2000, pursuant to which ALH II pledged to Wachovia a certificate of deposit issued by Wachovia, number 10314465, as renewed from time to time (the "Certificate of Deposit");

WHEREAS, ALH II and Wachovia entered into that certain ISDA Master Agreement dated January 13, 2000 (the "Swap Agreement");

WHEREAS, the Company, ALH II and Wachovia entered into that certain Note Purchase Agreement, dated January 13, 2000, and amended from time to time thereafter (the "Note Purchase Agreement"), pursuant to which Wachovia was given the option to require the Company to purchase, for the price provided therein, the Notes, Security Instruments, Commitment Letter, Swap Agreement and any other documents held by Wachovia which evidence or secure the amounts owing under the foregoing documents (collectively, the "Loan Documents"), together with all collateral securing such amounts or arrangement under the Swap Agreement then held by Wachovia (together with the Loan Documents, the "Assets");

WHEREAS, as security for the Note Purchase Agreement, Swiss Re and Amwest Surety Insurance Company ("Amwest") jointly and severally issued Bond No. 125002282, as amended by Riders "A" and "B" thereto dated, respectively, February 4, 2002 and January 27, 2003, in the original penal sum of $13,194,000 and Bond No. 125002284, as amended by Rider "A" thereto dated January 27, 2003, in the original penal sum of $14,806,000 (collectively, the "Surety Bonds");

WHEREAS, Amwest is in the process of being liquidated and dissolved and is no longer a co-surety on the Bonds and Swiss Re is the sole surety obligated on the Surety Bonds;

WHEREAS, ALH II is in default under the Notes and the Company is or will be in default under the Note Purchase Agreement;

WHEREAS, ALH II is insolvent and has insufficient assets to repay the full amount of the outstanding principal balance of the Notes of $21,500,000, accrued and unpaid interest thereon and any other amounts now owed or which may be owed in the future by it to Wachovia under the Loan Documents (collectively, the "Indebtedness");

WHEREAS, the Company has insufficient assets to pay to Wachovia the amount of the Indebtedness which amount is or will be equal to the purchase price for the Assets due under the Note Purchase Agreement;

WHEREAS, the Company, ALH II, Swiss Re and Wachovia have entered into that certain Forbearance Agreement and Amendment, dated as of September 10, 2004 (the "Forbearance Agreement"), pursuant to which Wachovia has agreed to forbear exercising its rights in the event of a default under the Loan Documents until the earlier of December 31, 2004 or the sale by ALH II of all the stock or assets of Mulvaney Homes;

WHEREAS, on September 10, 2004, ALH II entered into a Letter of Intent with Levitt Corporation ("Levitt") to sell all of the stock of Mulvaney Homes for a purchase price of $7,000,000, which transaction was not consummated at the sole election of Levitt and Levitt has declined to make any alternative offer for the stock or assets of Mulvaney Homes;

WHEREAS, Mattamy Homes Corporation ("Mattamy") has offered to acquire all of the issued and outstanding stock of Mulvaney Homes in consideration of the payment to ALH II of $6,500,000 (the "Purchase Price");

WHEREAS, on October 22, 2004, ALH II entered into a Letter of Intent with Mattamy for the purchase and sale of the Mulvaney Homes stock;

WHEREAS, ALH II now proposes to enter into a definitive stock purchase agreement with Mattamy to document the terms and conditions for the purchase and sale of the Mulvaney Homes stock;

WHEREAS, the Company and ALH II propose to enter into a Settlement and Release Agreement, dated December ___, 2004 (the "Settlement Agreement") by and among Swiss Re, the Company, ALH II and Mulvaney Homes substantially in the form attached hereto as Exhibit "A", which provides, among other things, that at the Closing of the stock purchase by Mattamy, the following transactions and assignments shall be consummated, thereby effecting ~~a partial~~the satisfaction of the Indebtedness:

(i)     ALH II shall pay to Wachovia the sum of $950,000 to be applied against the Indebtedness and shall release its interest in the Certificate of Deposit which shall be assigned to Wachovia to be applied against the Indebtedness;

(ii)    Swiss Re shall pay to Wachovia the <u>sum of $14,600,000, which amount represents the</u> full amount of the Indebtedness then due and owing <u>after credit against the Indebtedness of the $950,000 payment identified in subsection (i) above and the assignment of the Purchase Price identified in the following subsection (iii)</u>;

(iii)   the Company and ALH II shall assign to Swiss Re all of their rights, title and interest in and to the full amount of the Purchase Price; provided, however, that the sum of $1 million of the Purchase Price shall be paid either to ALH II or to the Company for distribution to the Company's members;

L13196

(iv)    ALH II shall assign to Swiss Re all of its and ALH Jacksonville Builders, Inc.'s rights, title and interest in and to the escrow accounts identified below, subject to claims of third parties who have an interest in the Escrow Accounts:

(a)  Escrow Account No. 079 015-056-3 with RBC Centura Bank in the current principal amount of $1,000,000 (plus accrued interest) established pursuant to Section 2.3(b) of the Asset Purchase Agreement, dated July 9, 2003, by and among Mattamy, Atlantic Builders, Inc. and ALH Acquisition Corp. to secure performance of the indemnification agreements made by Atlantic Builders, Inc. and ALH Acquisition Corp. under the agreement; and

(b)  Escrow Account Nos. 8800196 and 8800197 with First Tennessee Bank in the current aggregate principal amount of $1,000,000 (plus accrued interest) established pursuant to Section 1.2(b) of the Stock Purchase Agreement, dated April 27, 2004, by and among Levitt Corporation, Bowden Building Corporation, ALH Tennessee Acquisition, Inc. and ALH II to secure performance of the indemnification agreements made under the agreement; and

(v)    Except as otherwise agreed to, the Company and ALH II shall assign to Swiss Re all of their remaining assets, less a cash reserve of $500,000 to pay taxes and administrative and liquidation expenses of ALH II and the Company;

WHEREAS, the Settlement Agreement further provides for mutual general releases, including a release by Swiss Re of all of its claims against the Company, ALH II, Mulvaney Homes and all of their shareholders, members, officers and directors arising out of the Loan Documents, Note Purchase Agreement, Surety Bonds and Forbearance Agreement;

WHEREAS, the Supervisory Board of the Company has determined that it is in the best interests of the Company and ALH II to resolve and settle the defaults under the Loan Documents in accordance with the terms contemplated by the Forbearance Agreement and the Settlement Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Settlement Agreement and the transactions contemplated thereby be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be and each of them hereby is authorized and empowered, for and on behalf of the Company, to negotiate the final form, terms and provisions of, and to execute and deliver, the Settlement Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications, certificates, documents, agreements or instruments required or desired to be delivered by the Company in connection with the Settlement Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements or instruments to be conclusive evidence of such due authorization by the Company.

L13197

## APPROVAL OF STOCK PURCHASE AGREEMENT

WHEREAS, ALH II desires to enter into a Stock Purchase Agreement dated December ———,17, 2004 (the "Stock Purchase Agreement") by and among Mattamy, Mulvaney and ALH II, substantially in the form attached hereto as Exhibit "B", pursuant to which ALH II will agree to sell to Mattamy, and Mattamy will agree to purchase from ALH II, 100 percent of the issued and outstanding capital stock of Mulvaney Homes, for a purchase price of approximately $6,500,000 on the terms and subject to the conditions set forth in the Stock Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined that it is in the best interests of the Company and ALH II for ALH II to enter into the Stock Purchase Agreement, on the terms and subject to the conditions to be negotiated by the officers of ALH II and set forth in the Stock Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Stock Purchase Agreement, and the transactions contemplated thereby be, and hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of ALH II be and each of them hereby is authorized and empowered, for and on behalf of ALH II, to negotiate the final form, terms and provisions of, and to execute and deliver, the Stock Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications, certificates, documents, agreements or instruments required or desired to be delivered by ALH II in connection with the Stock Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements or instruments to be conclusive evidence of such due authorization by ALH II.

## APPROVAL OF CONTRIBUTIONS TO MULVANEY HOMES' CAPITAL

WHEREAS, ALH II loaned the sum of $27,500,000 to Mulvaney Homes in June 2000 for corporate and business purposes;

WHEREAS, the sum of $27,059,349 currently remains due and owing from Mulvaney Homes to ALH II (the "Mulvaney Indebtedness"); and

WHEREAS, the Supervisory Board of the Company has determined that it is in the best interests of the Company and ALH II to have the Mulvaney Indebtedness recognized as a capital contribution by ALH II to Mulvaney Homes.

NOW, THEREFORE, BE IT RESOLVED, that ALH II's contribution of the Mulvaney Indebtedness to the capital of Mulvaney Homes is hereby ratified, confirmed and approved; and

L13198

RESOLVED, the acts of ALH II's officers in contributing the Mulvaney Indebtedness to Mulvaney Homes' capital be, and they hereby are, approved, adopted, ratified and confirmed.

GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be and each of them hereby is authorized, directed and empowered on behalf of the Company and in its name, to prepare, execute, deliver and/or file any applications, certificates, documents, agreements, or any other instruments, including noncompetition agreements and/or releases or any amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such applications, certificates, documents, agreements or any other instruments or documents, including noncompetition agreements and/or releases or any amendments or supplements thereto, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that all actions heretofore taken by any officer of the Company in connection with any of the foregoing be, and each of them hereby is, ratified, confirmed and approved.

#2445172_v1# 2445172_v2

L13199

Document comparison done by DeltaView on Monday, December 13, 2004 7:05:00 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://laxdms/Active/2445172/1 |
| Document 2 | iManageDeskSite://LAXDMS/Active/2445172/2 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |

| | |
|---|---|
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 7 |
| Deletions | 4 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 11 |

L13200

EXHIBIT "A"

## ~~DRAFT~~SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement"), is entered into as of December ___, 2004 by and amongst Swiss Reinsurance America Corporation ("Swiss Re"), a New York corporation, ALH Holdings, LLC ("ALH"), a Delaware limited liability company, ALH II, Inc., ("ALH II"), a Delaware corporation, and Mulvaney Homes, Inc. (the "Company"), a North Carolina corporation.

WHEREAS, ALH II entered into a Commitment Letter with Wachovia Bank, N.A. ("Wachovia") on January 13, 2000 (the "Commitment Letter") pursuant to which it executed two Promissory Notes, each dated January 13, 2000 and amended from time to time thereafter, (collectively, the "Notes") in favor of Wachovia in the principal amounts of $13,000,000 and $14,500,000;

WHEREAS, the proceeds of the loans evidenced by the Notes were used by ALH II to acquire assets of The Mulvaney Group, Ltd. through the Company;

WHEREAS, the Notes are secured by one or more Security Instruments (collectively, the "Security Instruments"), which Security Instruments include a Bank Collateral Assignment of Deposit Agreement, dated January 13, 2000, pursuant to which ALH II pledged to Wachovia a certificate of deposit issued by Wachovia, number 10314465, as renewed from time to time, (the "Certificate of Deposit");

WHEREAS, ALH II and Wachovia entered into that certain ISDA Master Agreement dated January 13, 2000, (the "Swap Agreement");

WHEREAS, ALH, ALH II and Wachovia entered into that certain Note Purchase Agreement, dated January 13, 2000, and amended from time to time thereafter, (the "Note Purchase Agreement") pursuant to which Wachovia was given the option to require ALH to purchase, for the price provided therein, the Notes, Security Instruments, Commitment Letter, Swap Agreement and any other documents held by Wachovia which evidence or secure the amounts owing under the foregoing documents (collectively, the "Loan Documents"), together with all collateral securing such amounts or arrangement under the Swap Agreement then held by Wachovia (together with the Loan Documents, the "Assets");

WHEREAS, as security for the Note Purchase Agreement, Swiss Re and Amwest Surety Insurance Company ("Amwest") jointly and severally issued Bond No. 125002282, as amended by Riders "A" and "B" thereto dated, respectively, February 4, 2002 and January 27, 2003, in the original penal sum of $13,194,000 and Bond No. 125002284, as amended by Rider "A" thereto dated January 27, 2003, in the original penal sum of $14,806,000 (collectively, the "Surety Bonds");

WHEREAS, Amwest is in the process of being liquidated and dissolved and is no longer a co-surety on the Bonds and Swiss Re is the sole surety obligated on the Surety Bonds;

WHEREAS, ALH II is in default under the Notes and ALH is or will be in default under the Note Purchase Agreement;

L13201

WHEREAS, ALH II, ALH, Swiss Re and Wachovia have entered into that certain Forbearance Agreement and Amendment, dated as of September 10, 2004, (the "Forbearance Agreement") pursuant to which Wachovia has agreed to forbear exercising its rights in the event of a default under the Loan Documents until the earlier of December 31, 2004 or the sale by ALH II of all the stock or assets of the Company;

WHEREAS, ALH II has entered into a Stock Purchase Agreement, dated December , 2004 (the "Stock Purchase Agreement") with Mattamy Homes Corp. and/or its affiliate(s) ("Mattamy"), attached hereto as Exhibit "A", pursuant to which Mattamy will acquire all of the issued and outstanding stock of the Company in consideration of the payment to ALH II of $6,500,000 (the "Purchase Price");

WHEREAS, the parties hereto acknowledge that ALH II is insolvent (i.e. its liabilities exceed the fair market value of its assets) by an amount greater than the outstanding principal balance of the Notes, after the assignments against the Notes identified in Section 2 below, accrued and unpaid interest thereon, and any other amounts now owed or which may be owed in the future by it to Wachovia under the Loan Documents. (collectively, the "Indebtedness"), and the parties further acknowledge that ALH has insufficient assets to pay to Wachovia the amount of the Indebtedness which amount is or will be equal to the purchase price for the Assets due under the Note Purchase Agreement; and

WHEREAS, the parties hereto desire pursuant to this Agreement to conclusively resolve their respective rights and obligations with respect to the Indebtedness on as of the Closing Date, as defined in the Stock Purchase Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

SECTION 1.   SATISFACTION OF INDEBTEDNESS

1.1     Payment by ALH II at Closing.  At the Closing of the Stock Purchase Agreement, ALH II shall pay to Wachovia the sum of $950,000 to be applied against the Indebtedness and ALH II shall release at the Closing any and all of its interest in the Certificate of Deposit which shall be assigned in its entirety to Wachovia to be applied against the Indebtedness.

1.2     Payment by Swiss Re at Closing.  Subject to the conditions set forth herein, Swiss Re agrees to pay at the Closing to Wachovia $14,600,000 which amount represents the full amount of the Indebtedness then due and owing on the date of the Closing (the "Closing Date") after crediting to the Indebtedness the amounts set forth in Sections 1.1 and 2.1 (the "Swiss Re Payment").  Notwithstanding anything to the contrary set forth herein, Swiss Re shall not be obligated to pay to Wachovia any amount in excess of the original aggregate penal sum of the Surety Bonds.  Upon the payment by Swiss Re to Wachovia of the full amount of the Indebtedness, "Swiss Re Payment," Swiss Re, pursuant to the Surety Bonds an assignment from Wachovia, will have a right of subrogation rights against ALH II on as to the Indebtedness and a claim against ALH under the Note Purchase Agreement.  The parties agree that these obligations of ALH II and ALH will be forgiven by Swiss Re in accordance with the terms and conditions of this Agreement.

2

SECTION 2.   ASSIGNMENTS TO SWISS RE AT CLOSING

2.1     Assignment of Purchase Price.  Except as provided in Paragraph 3.1,3.1 herein, ALH II and ALH shall assign to Swiss Re at the Closing all of their rights, title and interest in and to the full amount of the Purchase Price (the "Assigned Portion").  Swiss Re shall accept the Assigned Portion subject to any hold back and other post-closing obligations of the parties under the Stock Purchase Agreement that are secured by the Purchase Price or any portion thereof. ALH II and ALH shall effectuate the assignment via wire transfer of the Assigned Portion directly to Wachovia on the Closing Date, to be applied against the Indebtedness.

2.2     Assignment of Rights to Escrowed Funds.  At the Closing, ALH II shall cause an assignment to Swiss Re of all of its and ALH/Jacksonville Builders, Inc.'s (formerly Atlantic Builders, Inc.) rights, title and interest in and to the following escrow accounts (collectively, the "Escrow Accounts"):

> a.     Escrow Account No. 079 015-056-3 with RBC Centura Bank in the current principal amount of $1,000,000 (plus accrued interest) established pursuant to Section 2.3(b) of the Asset Purchase Agreement, dated July 9, 2003, by and among Mattamy, Atlantic Builders, Inc. and ALH Acquisition Corp. (the "ABI Agreement").

> b.     Escrow Account Nos. 8800196 and 8800197 with First Tennessee Bank in the current aggregate principal amount of $1,000,000 (plus accrued interest) established pursuant to Section 1.2(b) of the Stock Purchase Agreement, dated April 27, 2004, by and among Levitt Corporation ("Levitt"), Bowden Building Corporation, ALH Tennessee Acquisition, Inc. and ALH II (the "BBC Agreement").

Such assignments shall be subject, in each case, to the respective claims of Mattamy and Levitt and such other persons or entities who have may assert an interest in the Escrow Accounts pursuant to the terms of the ABI Agreement and the BBC Agreement.  ALH, ALH II and the Company do not warrant or represent that all or any part of the current balance of the Escrow Accounts will be ultimately recoverable by Swiss Re.  Swiss ReALH, ALH II and the Company shall not be responsible, at its sole cost and expense, for the defense of any claims asserted by Mattamy, Levitt or any other person or entity against the escrowed amounts.

2.3     Assignments of Other Assets of ALH and ALH II.  At the Closing, ALH and ALH II shall assign to Swiss Re all of their rights, title and interest in and to the assets of ALH and ALH II identified in Exhibit "B" attached hereto, less a cash reserve of $500,000 to pay the taxes and administrative and liquidation expenses of ALH and ALH II.  Upon the final liquidation of ALH and ALH II, any remaining balance in said cash reserve will be assigned to Swiss Re.  Except as specifically set forth herein, no liabilities of ALH or ALH II shall be assumed by Swiss Re in connection with such assignment.

2.4     Assignments as Partial Satisfaction of Notes.  The assignments to Swiss Re set forth in this Section 2 will be made in partial satisfaction of the obligations of ALH II and ALH with respect to the Indebtedness and the Note Purchase Agreement.

L13203

3

SECTION 3.    PORTION OF PURCHASE PRICE TO ALH II

3.1    <u>Payable at Closing</u>.  At the Closing, ALH II shall cause Mattamy to pay to ALH II or its assignee(s), by wire transfer, a portion of the Purchase Price equal to the sum of $1,000,000 (the "ALH II Portion").

3.2    <u>Free of Holdback or Other Claims</u>.  The payment of the ALH II Portion shall be made without set off or deduction of any kind, or liability for same, including, but not limited to, any hold back or indemnity obligations secured by the Purchase Price pursuant to the terms of the Stock Purchase Agreement. [Subject to tax review.]

SECTION 4.    RELEASES

4.1    <u>Acknowledgment by Parties</u>.  The parties acknowledge and agree that the undertakings set forth herein constitute a settlement of disputed matters and, by entering into this Agreement, no party hereto shall be deemed to have admitted any liability to any other party hereto.

4.2    <u>Release by Swiss Re</u>.  Swiss Re on its own behalf and on behalf of its present and former assigns, predecessors, successors, owners, agents, employees, attorneys, officers, directors, shareholders and subsidiaries, hereby forever releases and discharges each of ALH, ALH II and the Company and each of their present and former assigns, predecessors, successors, owners, officers, employees, shareholders, subsidiaries, members, directors, agents and attorneys, from any and all claims, debts, liabilities, obligations, contracts, promises, agreements, losses, damages, suits, costs, expenses and causes of action of whatever kind or nature, whether known or unknown, which they may have had, may now have, or may hereafter have for or by reason of any and all obligations and liabilities under, related to or arising out of, the Loan Documents, the Note Purchase Agreement, the Surety Bonds and the Forbearance Agreement, or the transactions described therein, or any other past transactions between them.  Other than and assessments set forth in Section 2, Swiss Re will not receive any <u>monetary</u> consideration from ALH, ALH II or the Company (other than the assignments set forth in section 2) in exchange for this release.  The parties hereto each acknowledge that this release and discharge represents, among other things, a cancellation by Swiss Re of the outstanding obligations of ALH II and ALH which are or may be owed to Swiss Re with regard to the Indebtedness and the Note Purchase Agreement.

4.3    <u>Release by ALH, ALH II and the Company</u>.  ALH, ALH II and the Company on their own behalf and on behalf of their present and former assigns, predecessors, successors, owners, agents, employees, officers, directors, shareholders, members, attorneys and subsidiaries, hereby forever release and discharge Swiss Re, and its present and former assigns, predecessors, successors, owners, officers, employees, shareholders, subsidiaries, directors, agents and attorneys, from any and all claims, debts, liabilities, obligations, contracts, promises, agreements, losses, damages, suits, costs, expenses and causes of action of whatever kind or nature, whether known or unknown, which they may have had, may now have, or may hereafter have for or by reason of any and all obligations and liabilities under, related to or arising out of the Loan Documents, the Note Purchase Agreement, the Surety Bonds and the Forbearance Agreement, or the transactions described therein, or any other past transactions between them.

Except for the payment received by ALH II or its assignee from Mattamy as provided in Section 3.1 herein, ALH, ALH II and the Company will not receive any monetary consideration from Swiss Re in exchange for this release and discharge.

4.4    Acknowledgement.  The parties hereto each acknowledge that they are aware that they or their attorneys may hereafter discover facts different from or in addition to the facts which they now know or believe to be true, or may hereafter analyze any applicable law differently from the analysis undertaken prior to entering into this Agreement with respect to the claims and disputes among them.  The parties further acknowledge that, in entering into this Agreement, each party has relied only on the advice of its own attorney and not on the advice of any party or its attorney.  Notwithstanding these acknowledgements, it is the intention of the parties that the releases as provided in Sections 4.2 and 4.3 herein shall be and remain full and complete releases as to the claims released notwithstanding the discovery of any such different or additional facts or analysis of law.  In that regard, each party hereto acknowledges that it is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING A RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Notwithstanding this Section, each of the parties hereto does hereby expressly waive and relinquish all rights and benefits it has or may have under said Section 1542, as well as any similar federal or state statute or principle of law, with respect to the claims mentioned in Sections 4.2 and 4.3 herein.

4.5    No Discharge.  Nothing contained in this Agreement shall operate to release or discharge any of the parties or their successors or assigns from any express undertakings of the parties in this Agreement, or from any claims, rights, or causes of action arising out of, relating to or connected with said undertakings, or from breach of any of the obligations of the parties contained in this Agreement.

SECTION 5.  MISCELLANEOUS

5.1    Successors and Assigns.  The rights and obligations created by this Agreement may not be assigned by any party hereto to any other person or entity without the prior written consent of the remaining parties hereto.  This Agreement, and the covenants and conditions contained herein, shall apply to and bind the parties, their successors, subrogees and permitted assigns.

5.2    Costs.  Except otherwise expressly provided herein, all parties agree to bear their own costs and attorney's fees in connection with this Agreement and the transactions referred to herein.

L13205

5.3    Entire Agreement.  This Agreement constitutes the entire agreement between the parties to the Agreement with respect to the subject matter of this Agreement, and supercedes all prior agreements and understandings, written or oral, between the parties hereto or any of them~~.~~ with respect to such subject matter.

5.4    Counterparts.  This Agreement may be executed in any number of ~~counter-parts~~counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute a fully executed document.

5.5    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to rules or principles respecting conflicts of laws and any action brought to enforce, or for breach of, any provision of this Agreement shall be filed in a court of competent jurisdiction in the County of Los Angeles, State of California, unless otherwise mutually agreed upon by all of the parties hereto who are parties to any such suit.

5.6    Interpretation.  This Agreement is deemed to have been prepared by the parties hereto, and any uncertainty or ambiguity contained herein shall not be interpreted against any particular party, but rather, if such uncertainty or ambiguity exists, shall be interpreted according to the application of all of the rules of interpretation of contracts~~.~~ as if all parties participated equally in the drafting.

5.7    Notices.  Unless expressly provided otherwise in this Agreement or documents executed in connection with this Agreement, all notices shall be in writing and delivered personally or sent by registered or certified mail postage prepaid or by facsimile transmission to ~~the parties~~a party at the ~~addresses~~address set forth below which may be changed at any time by such party upon notice to the other parties:

If to Swiss Re:

Michael Gillies
SWISS REINSURANCE AMERICA CORPORATION
c/o Marilyn Klinger
Peter Cofield
SEDGWICK, DETERT, MORAN & ARNOLD, LLP
801 S. Figueroa St., Suite 1800
Los Angeles, CA 90017
Fax: (213) 426-6921

If to ALH:

ALH Holdings, LLC
4444 Lakeside Drive
Second Floor
Burbank, CA  91505
Telephone: (818) 973-4253
Fax: (818) 556-6995
Attn: George J. Buchler

6

L13206

If to ALH II:

ALH II, Inc.
4444 Lakeside Drive
Second Floor
Burbank, CA  91505
Telephone: (818) 973-4253
Fax: (818) 556-6995
Attn: George J. Buchler


If to the Company:

Mulvaney Homes, Inc.
7800 Belfort Parkway
Suite 200
Jacksonville, FL 32256
Telephone: (904) 219-8460
Fax: (904) 279-9556
Attn: William R. Lanius


5.8    Additional Actions.  The parties agree to execute and deliver any additional documents which may be reasonably required or convenient to accomplish any of the purposes set forth in this Agreement.

5.9    Attorneys' Fees.  If any party hereto employs an attorney, or incurs attorneys' or paralegal fees or costs in order to enforce or defend its rights under this Agreement due to any failure by another party or parties to perform any of the duties provided in this Agreement and prevails in such enforcement or defense, the non-prevailing party or parties against whom such enforcement is sought, in addition to their other duties herein, shall pay the prevailing party's or parties' reasonable attorneys' and paralegal fees, costs, and necessary disbursements, associated with such successful enforcement with this Agreementor defense.

5.10    Severability of Provisions.  The invalidity or unenforceability of any provisions of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement.  Any such provision found to be invalid is severable from the remaining provisions of this Agreement.

5.11    Waiver and Amendments.  No breach of any provision hereof can be waived unless in writing.  Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision hereof.  No delay or omission by a Partyparty in the exercise of any of its rights or remedies constitutes a waiver of (or otherwise impairs) such right or remedy.  A consent to or approval of an act does not waive or render unnecessary the consent to or approval of any other subsequent act.  This Agreement may be amended only be a written agreement executed by the Partiesparties affected thereby at the time of the amendment.

7                    L13207

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective and duly authorized representatives as of the day and year first above written.

SWISS REINSURANCE AMERICA CORPORATION

By: _____
      Michael Gillies
      Dated:_____


ALH HOLDINGS, LLC

By: _____
      (type name)
      Dated:_____

ALH II, INC.

By: _____
      (type name)
      Dated:_____

MULVANEY HOMES, INC.

By: _____
      (type name)
      Dated:_____


APPROVED AS TO FORM AND CONTENT:

Sedgwick, Detert, Moran & Arnold, LLP


By_____
      Marilyn Klinger
      Peter M. Cofield
Attorneys for Swiss Reinsurance America Corporation
Dated: _____

L13208

Holland & Knight LLP


By_____
     Francis W. Costello
Attorneys for ALH Holdings LLC ~~and,~~
ALH II, Inc. and Mulvaney Homes, Inc.
Dated: _____


~~[Attorneys for Mulvaney]~~


~~By_____~~

~~Attorneys for MULVANEY HOMES, INC.~~
~~Dated: _____~~


~~# 2464079_v1~~


# 2464079_v1

L13209

Document comparison done by DeltaView on Monday, December 13, 2004 6:33:40 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://laxdms/Active/2438102/1 |
| Document 2 | iManageDeskSite://laxdms/Active/2460175/1 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| |

| Inserted cell | |
|---|---|
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 41 |
| Deletions | 37 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 80 |

L13210

EXHIBIT "B"
DRAFT - 12/11/04

Deleted: 08

STOCK PURCHASE AGREEMENT

AMONG

MATTAMY (US) ACQUISITION CORPORATION,

MULVANEY HOMES, INC.

AND

ALH II, INC.

Dated as of December 17, 2004

Deleted: HOMES

L13211

## TABLE OF CONTENTS

**Page**

SECTION 1. ACQUISITION OF SHARES ................................................................1

    1.1    Sale and Purchase of Shares ............................................................1

SECTION 2. PURCHASE PRICE AND PAYMENT ................................................1

    2.1    Purchase Price ........................................................................................1
    2.2    Allocation of the Purchase Price ......................................................1

SECTION 3. REPRESENTATIONS AND WARRANTIES REGARDING SELLER ................1

    3.1    Power and Authorization ....................................................................2
    3.2    No Conflicts ..............................................................................................2
    3.3    Ownership of the Shares ....................................................................3
    3.4    Brokers ......................................................................................................3
    3.5    Indebtedness ............................................................................................3

SECTION 4. REPRESENTATIONS AND WARRANTIES REGARDING COMPANY ............3

    4.1    Organization and Good Standing ......................................................3
    4.2    Power and Authorization ....................................................................3
    4.3    No Conflicts ..............................................................................................4
    4.4    Capitalization ..........................................................................................5
    4.5    Investments and Subsidiaries ............................................................5
    4.6    Compliance with Laws ........................................................................5
    4.7    Litigation ..................................................................................................5
    4.8    Financial Statements ............................................................................6
    4.9    Inventory ..................................................................................................6
    4.10   Warranties ................................................................................................6
    4.11   Real Property ..........................................................................................7
    4.12   Personal Property ..................................................................................9
    4.13   List of Properties, Contracts, Etc ....................................................9
    4.14   Contracts ................................................................................................11
    4.15   Insurance ................................................................................................11
    4.16   Previously Constructed Homes ........................................................11
    4.17   Suppliers ................................................................................................12
    4.18   Taxes ......................................................................................................12
    4.19   Employee Benefits ..............................................................................15
    4.20   Labor Matters ......................................................................................17
    4.21   Directors, Officers and Employees ................................................17
    4.22   Affiliate Agreements ..........................................................................17
    4.23   Environmental Matters ......................................................................18
    4.24   Absence of Certain Changes and Events ......................................20
    4.25   Books and Records ..............................................................................21
    4.26   Brokers ....................................................................................................22

L13212

| | | |
|---|---|---|
| 4.27 | Accounts Receivable | 22 |
| 4.28 | Additional Capital Contributions | 22 |
| 4.29 | Disclosure | 22 |

SECTION 5. REPRESENTATIONS AND WARRANTIES OF BUYER .................22

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 22 |
| 5.2 | Power and Authorization | 22 |
| 5.3 | No Conflicts | 23 |
| 5.4 | Funds | 23 |
| 5.5 | Disclosure | 23 |
| 5.6 | Brokers | 23 |

SECTION 6. OBLIGATIONS OF THE PARTIES .................23

| | | |
|---|---|---|
| 6.1 | Conduct of Business Pending Closing | 23 |
| 6.2 | Negative Covenants | 24 |
| 6.3 | Access to Information; Confidentiality | 25 |
| 6.4 | Commercially Reasonable Efforts | 26 |
| 6.5 | Consents | 26 |
| 6.6 | Financial Information | 26 |
| 6.7 | Noncompetition, Trade Secrets, Etc. | 27 |

SECTION 7. CERTAIN CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS ...........28

| | | |
|---|---|---|
| 7.1 | Representations and Warranties | 28 |
| 7.2 | Performance of Covenants | 28 |
| 7.3 | Approvals | 28 |
| 7.4 | Legal Matters | 29 |
| 7.5 | Resignation of Directors and Officers | 29 |
| 7.6 | Opinion of Counsel | 29 |
| 7.7 | No Material Adverse Change | 29 |
| 7.8 | Indebtedness | 29 |
| 7.9 | Tax Affidavits | 29 |
| 7.10 | Estoppel Letters | 29 |
| 7.11 | Intercompany Loan | 29 |
| 7.12 | Insolvency Exemption | 29 |

SECTION 8. CERTAIN CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS ...........29

| | | |
|---|---|---|
| 8.1 | Representations and Warranties | 30 |
| 8.2 | Performance of Covenants | 30 |
| 8.3 | Legal Matters | 30 |
| 8.4 | Settlement and Release Agreement | 30 |

SECTION 9. CLOSING .................30

| | | |
|---|---|---|
| 9.1 | Time and Place of Closing | 30 |
| 9.2 | Deliveries at the Closing | 30 |
| 9.3 | Default by Seller at the Closing | 32 |

ii

L13213

9.4    Accounts Receivable From Employees of Company ........................................32
9.5    Remittance of Payments ..............................................................................32

SECTION 10. INTENTIONALLY OMITTED ..........................................................33

SECTION 11. INDEMNIFICATION............................................................................33
11.1   Indemnification by Seller ............................................................................33
11.2   Indemnification by Buyer ............................................................................33
11.3   Third Party Claims ......................................................................................33
11.4   Tax Indemnification and Other Matters .......................................................34
11.5   Tax Treatment of Indemnity Payments.........................................................37
11.6   Interest.........................................................................................................37
11.7   Warranty Indemnity.....................................................................................37
11.8   Right of Set-Off ...........................................................................................37
11.9   Sole Remedy; Exclusion of Certain Damages; Mitigation............................37
11.10  Time Limitations..........................................................................................38

SECTION 12. DEFINITIONS .....................................................................................38

SECTION 13. MISCELLANEOUS ..............................................................................41
13.1   Further Assurances .......................................................................................41
13.2   Costs and Expenses ......................................................................................41
13.3   Notices ........................................................................................................42
13.4   Assignment and Benefit................................................................................42
13.5   Amendment, Modification and Waiver .........................................................43
13.6   Governing Law, Venue and Attorneys' Fees and Costs .................................43
13.7   Section Headings and Defined Terms............................................................43
13.8   Severability..................................................................................................43
13.9   Counterparts.................................................................................................44
13.10  Entire Agreement .........................................................................................44

| Deleted: 36 |
|---|

| Deleted: 41 |
|---|

| Deleted: 43 |
|---|

iii

L13214

### STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is entered into as of December 17, 2004 by and among Mattamy (US) Acquisition Corporation, a Delaware corporation ("Buyer"), Mulvaney Homes, Inc., a North Carolina corporation ("Company"), and ALH II, Inc., a Delaware corporation ("Seller").

Deleted: Homes

    A.    Buyer desires to acquire Company.

    B.    Seller owns all of the issued and outstanding shares of common stock of the Company.

    C.    The Seller desires to sell, and Buyer desires to purchase, all of the issued and outstanding shares of common stock of the Company at the price and upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

### SECTION 1.  ACQUISITION OF SHARES

    1.1    <u>Sale and Purchase of Shares</u>. Subject to the terms and conditions of this Agreement, at the Closing (as herein defined), Seller shall sell, transfer and deliver to Buyer 1,000 shares of the common stock of the Company, constituting all of the outstanding shares of the capital stock of Company (collectively, the "Shares"), and Buyer shall purchase the Shares for the consideration set forth in Section 2.

### SECTION 2.  PURCHASE PRICE AND PAYMENT

    2.1    <u>Purchase Price</u>. The aggregate purchase price for the Shares shall be Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Purchase Price"). The Purchase Price shall be paid to Seller or Seller's assignee on the Closing Date by wire transfer of immediately available funds pursuant to instructions previously given by Seller to Buyer for that purpose.

    2.2    <u>Allocation of the Purchase Price</u>. An allocation of the Purchase Price is attached hereto as <u>Schedule 2.2</u>. The parties hereto shall make consistent use of the allocation for all Tax (as defined in Section 4.18) purposes and in all filings, declarations and reports filed with the Internal Revenue Service in respect thereof.

### SECTION 3.  REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller hereby represents and warrants to Buyer as of the date of this Agreement and as of the Closing Date as follows:

3.1    <u>Power and Authorization</u>.  Seller has full capacity, legal right, power and authority to enter into and perform its obligations under this Agreement and under the other documents required to be delivered by Seller prior to or at the Closing (the "Seller Transaction Documents"). This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, laws restricting the enforceability of noncompete and nonsolicitation provisions and other specific restraints of trade and principles of equity (whether considered and applied in a proceeding in equity or at law). When executed and delivered as contemplated herein, each of the Seller Transaction Documents shall constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

3.2    <u>No Conflicts</u>.

(a)    The execution, delivery and performance of this Agreement and the Seller Transaction Documents by Seller do not and will not (with or without the passage of time or the giving of notice):

(i)    violate or conflict with the certificate or articles of incorporation or bylaws (or other organizational documents) of Seller;

(ii)    violate or conflict with any law (including, without limitation, principles of common law), statute, regulation, permit, license, certificate, judgment, order, award or other decision or requirement of any arbitrator, court, government or governmental agency or instrumentality (domestic or foreign) (collectively, "Laws") which are binding upon the Seller and which, in the event of such violation or conflict, would have a material adverse effect on Seller, the Company or the performance by them of this Agreement; or

| Deleted: , |
| --- |

(iii)    result in, require or permit the creation or imposition of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any nature upon or with respect to the Shares.

(b)    Each consent or approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person required to be given or made by Seller in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein has been obtained or made or will be obtained or made prior to the Closing without payment of premium or penalty by, or loss of benefit to, Company.

(c)    There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Seller, threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby which, if adversely determined, could reasonably be expected to have a material adverse effect upon the ability of Seller to enter into or

| Deleted: or |
| --- |

2

perform its obligations under this Agreement or any such other agreements or instruments. Seller has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.

3.3    <u>Ownership of the Shares</u>. Seller owns the Shares beneficially and of record, free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any kind, and there has been no event or action taken (or failure to take action) by or against Seller which might result in the creation of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance of any kind on any Shares. There are no shareholder or other agreements affecting the right of Seller to convey the Shares to Buyer or any other right of Seller with respect to the Shares, all of which agreements shall be terminated prior to Closing, and Seller has the absolute right, authority, power and capacity to sell, assign and transfer the Shares free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance. Upon delivery to Buyer of the certificates for the Shares at the Closing, Buyer will acquire good, valid and marketable title to the Shares, free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance.

3.4    <u>Brokers</u>. No person acting on behalf of Seller or any affiliate of Seller or under the authority of any of the foregoing is or will be entitled to any brokers' or finders' fee or any other commission or similar fee, directly or indirectly, from any of such parties in connection with any of the transactions contemplated by this Agreement.

3.5    <u>Indebtedness</u>. Except as set forth in Schedule 3.5, there are no notes, advances or other unpaid indebtedness or obligations, whether written or oral, of the Company in favor of Seller or a Related Party (as defined in Section 4.22) of Seller.

**SECTION 4.    REPRESENTATIONS AND WARRANTIES REGARDING COMPANY**

Seller and Company hereby represent and warrant to Buyer as of the date of this Agreement and as of the Closing Date as follows:

4.1    <u>Organization and Good Standing</u>. Company is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina and has all necessary corporate power and authority to carry on its business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it is bound. Except as set forth in <u>Schedule 4.1</u>, the Company is not required to be qualified to do business as a foreign corporation in any State.

4.2    <u>Power and Authorization</u>. Company has full legal right, power and authority to enter into and perform its obligations under this Agreement and under the other agreements and documents (the "Company Transaction Documents") required to be delivered by it prior to or at the Closing. The execution, delivery and performance by Company of this Agreement and the Company Transaction Documents have been duly authorized by all necessary corporate action by the Company. This Agreement has been duly and validly executed and delivered by Company and constitutes its legal, valid and binding obligation, enforceable against

3

L13217

it in accordance with its terms. When executed and delivered as contemplated herein, each of the Company Transaction Documents shall constitute the legal, valid and binding obligation of Company, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors' rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

4.3     No Conflicts.

(a)     The execution, delivery and performance by the Company of this Agreement and the Company Transaction Documents do not and will not (with or without the passage of time or the giving of notice):

(i)     violate or conflict with the certificate or articles of incorporation or bylaws (or other organizational documents) of Company or any Law which is binding upon Company and which, in the event of such violation or conflict, would have a material adverse effect on Seller, the Company or the performance by them of this Agreement;

(ii)     violate or conflict with, result in a breach of, or constitute a default or otherwise cause any loss of benefit under any agreement or other obligation to which Company is a party or by which it or its assets are bound, or give to others any rights (including rights of termination, foreclosure, cancellation or acceleration), in or with respect to Company or any of their assets; or

(iii)     result in, require or permit the creation or imposition of any restriction, mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance upon or with respect to the Shares, Company or any of its assets.

| Deleted: their |
| --- |

(b)     Except as set forth on Schedule 4.3, no approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person is required to be given or made by Company in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein.  No such consents, approvals, registrations, notifications, filings or declarations are required to be obtained or made or will be required to be obtained or made involving payment of premium or penalty by, or loss of benefit to, Company. Upon consummation of the transactions contemplated by this Agreement, Company will be entitled to continue to use all of the assets and properties now used by it immediately prior to such consummation.

(c)     There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Company (as hereinafter defined), threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby or which, if adversely determined, could reasonably be expected to have a material adverse effect upon Company's ability to enter into or perform its obligations under this Agreement or any of the other agreements or instruments contemplated hereby.  Company has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.  The phrase "to the knowledge of Company" as used in this Agreement

4

shall mean that Gary Shamp, Julie Walker, James Eastridge, George Buchler or Bruce Stein is actually aware of a particular fact or matter or, after reasonable inquiry, would reasonably be expected to have discovered or otherwise become aware of a particular fact or matter.

     4.4    Capitalization.  The Company's authorized, issued and outstanding capital stock or other securities are fully and accurately set forth in Schedule 4.4 attached hereto.  No person has any preemptive or other similar rights with respect to any such equity interests or other securities and there are no offers, options, warrants, rights, agreements or commitments of any kind (contingent or otherwise) relating to the issuance, conversion, registration, voting, sale or transfer of any equity interests or other securities of Company (including, without limitation, the Shares) or obligating Company or any other person to purchase or redeem any such equity interests or other securities. The Shares constitute all of the issued and outstanding shares of capital stock of Company, have been duly authorized and are validly issued and outstanding, fully paid and non-assessable, and such issuance was not in violation of applicable securities laws.

     4.5    Investments and Subsidiaries.  Except as disclosed in Schedule 4.5, the Company's business is and has been conducted solely by and through the Company and no other person, and Company does not directly or indirectly own, control or have any investment or other interest in any corporation, partnership, joint venture, business trust or other entity and Company has not agreed, contingently or otherwise, to share any profits, losses, costs or liabilities, or to indemnify any person or entity or to guaranty the obligations of any person or entity.

     4.6    Compliance with Laws.

        (a)    The Company is in compliance in all material respects with all Laws applicable to the Company the violation of which would have a material adverse effect on the Company and the Company has not received any written notice from a governmental authority of an alleged or actual violation of or failure to comply with any Law.  Company has complied with all material provisions of applicable building codes for all homes constructed by the Company the violation of which would have a material adverse effect on the Company.

        (b)    To the knowledge of Company, all federal, foreign, state, local and other governmental consents, licenses, permits, franchises, grants and authorizations (collectively, "Authorizations") required for the operation of the business of Company as currently conducted and as conducted during the last five years are in full force and effect, and, to the knowledge of Company, the Company has not received any written notice of any claim or charge that Company is in violation of or in default under any such Authorization. No proceeding is pending or, to the knowledge of Company, threatened by any person to revoke or deny the renewal of any Authorization of Company.

     4.7    Litigation.  Except as disclosed on Schedule 4.7, there are no pending actions, suits, proceedings (arbitration or otherwise) or, to the knowledge of Company, investigations to which Company, or its directors, officers or shareholders in their capacities as such, is a party before or by any court or governmental agency or instrumentality, or before an arbitrator of any kind. To the knowledge of Company, no such action, suit, proceeding or

| Formatted: Underline |
| Deleted: T |

L13219

investigation is presently threatened.  There are no unsatisfied judgments, penalties or awards against Company.

    4.8    Financial Statements.

        (a)    Exhibit 4.8 attached hereto includes the balance sheet of Company as of December 31, 2003 (including the notes thereto, the "Balance Sheet"), and the related statements of income and stockholders' equity for such period, together with the audit report thereon from Ernst & Young, LLP, independent accountants (the "Audited Financial Statements"), including all notes thereto and other financial information schedules detailing the balance sheet and operating statement of the Company.  Such financial statements accurately and fairly present, in all material respects, the financial condition and results of operations of Company as at December 31, 2003 and for the periods therein referred to, all in accordance with GAAP consistently applied (except as described in the notes).

        (b)    Exhibit 4.8 attached hereto includes the interim balance sheet of the Company as of September 30, 2004 and for the nine month period then ended (the "Interim Balance Sheet") and the related statements of income and stockholders' equity for such period.  Such financial statements accurately and fairly present, in all material respects, the financial condition and results of operations of the Company as at September 30, 2004 and for the periods therein referred to, all in accordance with past practices of the Company consistently applied.  The Interim Balance Sheet reflects, in all material respects, all liabilities of Company, whether absolute, accrued or contingent, as of the date thereof.  Company does not have any material liabilities that are not reflected in the Interim Balance Sheet (or the notes thereto).

    4.9    Inventory.

        (a)    Except as disclosed on Schedule 4.9(a), all inventory of Company is valued on Company's consolidated books and records at the lower of cost or fair market value thereof, and is usable or saleable in the ordinary course of business consistent with past practice.  A true and complete listing of all inventory of Company as of a recent date has been delivered to Buyer.

Deleted: ,

        (b)    There are no present material design, construction, manufacturing or other defects with respect to homes currently in inventory or, to the knowledge of Company, defects presently existing with respect to such homes as a result of soil conditions. No homes have been sold by Company under an understanding that such homes would be returnable.

    4.10    Warranties. Except for the standard warranty and the warranty issued by Bonded Builders Home Warranty Association (the "Warranty Company"), copies of which have been provided to Buyer, (a) Company has not made any express warranties to third parties with respect to any homes manufactured, constructed or sold by Company; and (b) there are no express warranties outstanding with respect to any such homes.  The Company has not modified or expanded its warranty obligations beyond those set forth in the standard warranty.

Deleted: or services

6

4.11    Real Property.

(a)    Except as set forth in Schedule 4.11(a), the Owned Real Property (as defined below), and, to the knowledge of Company, the Land Contract Real Property (as defined below) and the Option Real Property (as defined below) (collectively, the "Real Property"): (i) have (or will have as a matter of right by contract or otherwise) all necessary access to and from public highways, streets, and roads, and no pending or, to the knowledge of Company, threatened proceeding exists that would reasonably be expected to limit or result in the termination of such access; (ii) to the knowledge of Company, are (or may as a matter of right be) connected to and serviced by public electric, public gas, public sewage, septic tanks (if applicable), permitted wells (if applicable), public storm drains, public telephone and public water facilities, subject to such installation and connection charges with respect thereto which, in the ordinary course of business are payable upon issuance of building permits or certificates of occupancy, as applicable, which have not yet been procured; and (iii) to the knowledge of Company, meet the conditions for the issuance of a building permit for the construction and sale of residential dwellings as proposed by Company in Exhibit 4.11(a). The Real Property constitutes all of the Real Property that Company owns or has a right to acquire.

(b)    Schedule 4.11(b) attached hereto lists all of the real property that Company owns, and Company is the sole owner of good, valid, marketable and insurable (at standard rates) fee simple title to all such real property, including, without limitation, all buildings, structures, fixtures and improvements thereon (the "Owned Real Property"), in each case free and clear of any restriction, mortgage, deed of trust, pledge, lien, security interest, or other lien or encumbrance, except Permitted Encumbrances set forth on Exhibit 4.11(b) or as disclosed in title reports and surveys made available to Buyer and listed on Exhibit 4.11(b). "Permitted Encumbrances" means (i) liens for current state and local property taxes or assessments not yet due or delinquent or which are being contested in good faith; (ii) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Company; (iii) exceptions shown on the surveys or other title records made available to Buyer on or before the date hereof and which do not materially affect the Company's proposed use of such Real Property as disclosed in Exhibit 4.11(a); (iv) mortgages on the landlord's interest in property leased to the Company; (v) liens and encumbrances reflected in the Balance Sheet (or notes thereto or the Interim Balance Sheet); (vii) such other Liens, imperfections in title, charges, rights of way, land use ordinances and zoning plans which do not materially interfere with Company's proposed use of such Real Property as disclosed in Exhibit 4.11(a).

(c)    Schedule 4.11(c) attached hereto describes each lease pursuant to which Company is the lessee with respect to any real property (the "Leased Real Property"). Company has all right, title and interest in all material leasehold estates and other material rights purported to be granted to it by the agreements, arrangements, contracts, commitments and leases listed and set forth in Schedule 4.11(c).

(d)    Schedule 4.11(d) attached hereto lists all written and oral agreements, arrangements, contracts and commitments to which Company is a party pursuant to which Company is obligated to purchase any developed or undeveloped real property, whether or not subject to conditions precedent (the "Land Contract Real Property") or possesses an option or

7

other rights to acquire any developed or undeveloped real property, whether or not subject to conditions precedent (the "Option Real Property").

      (e)     Except as set forth in Schedule 4.11(e), with respect to any agreements, arrangements, contracts, covenants, conditions, deeds of trust, rights-of-way, easements, mortgages, restrictions, surveys, title insurance policies, and other documents granting Company title to or an interest in or a right or an option to acquire real property, no breach or event has occurred that, with or without the giving of notice or the passage of time, would constitute a breach or event of default, by Company, or, to the knowledge of Company, any other party thereto.

      (f)     No Owned Real Property and, to the knowledge of Company, no Land Contract Real Property or Option Real Property is the subject of any condemnation, eminent domain, or similar proceedings and, to the knowledge of Company, no condemnation, eminent domain, or similar proceeding is threatened with respect to the Real Property.

      (g)     The buildings and other improvements on the Owned Real Property, and, to the knowledge of Company, the Land Contract Real Property and the Option Real Property, do not violate in any material respect (i) any applicable Law, including without limitation, any building, set-back, or zoning Law, or (ii) any restrictive covenant affecting any such real property and conform in all material respect to the appropriate governmental authority's subdivision standards, except to the extent that any violation of, or nonconformance with an applicable Law would not inhibit Company's ability to construct and sell residential homes.

      (h)     To the knowledge of Company, there are no parties in possession of any portion of the Owned Real Property, the Land Contract Real Property or the Option Real Property, as lessees, tenants at sufferance, or trespassers.

      (i)     Except as set forth in Schedule 4.11(i), there are no unpaid charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use, or operation of the Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property. Except as set forth in Exhibit 4.11(i), no Owned Real Property or, to the knowledge of Company, no Land Contract Real Property and no Option Real Property is subject to any condition or obligation to any governmental entity or other person requiring Company or any transferee thereof to donate land, money or other property or to make on-site or off-site public improvements.

      (j)     The Company has no obligation, without rights of recourse against a developer or other third party, to pay any developer related charges or any charges or assessments for public improvements made to Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property, including without limitation, any charges or assessments for construction of sewer lines, water lines, storm drainage systems, electric lines, natural gas lines, roads and curbs. The Company has no obligation, without rights of recourse against a developer or other third party, to pay any developer related charges or any charges or assessments for public improvements made to previously sold homes, including without limitation, any charges or assessments for construction

8

of sewer lines, water lines, storm drainage systems, electric lines, natural gas lines, roads and curbs, except as reflected or reserved for on the Balance Sheet.

        (k)      There is no published moratorium applicable to any of the Owned Real Property or, to the knowledge of Company, the Land Contract Real Property or the Option Real Property on (i) the issuances of building permits for the construction of houses or certificates of occupancy therefor, or (ii) the purchase of sewer or water taps.

        (l)      To the knowledge of Company, the Owned Real Property, and, to the knowledge of Company, the Land Contract Real Property and the Option Real Property (i) are not located within a "critical," "preservation," "conservation" or similarly designated area and (ii) the buildable area of the property does not contain wetlands.

        (m)      To the knowledge of Company, none of the Owned Real Property, the Former Real Property, the Land Contract Real Property or the Option Real Property is reclaimed marsh or swampland or has been used as a grave site, land fill or for any industrial purpose whatsoever.

        4.12    <u>Personal Property</u>.  Company owns all of the personal property reflected in the Interim Balance Sheet as owned by it and all personal property acquired after the end of the period covered by the Interim Balance Sheet, except personal property which has been sold or disposed of in the ordinary course of business since such date, free and clear of any mortgage, deed of trust, pledge, lien, security interest or other charge, claim or encumbrance.

        4.13    <u>List of Properties, Contracts, Etc</u>.  <u>Schedule 4.13</u> attached hereto lists or describes the following:

        (a)      Each vehicle, item of machinery, equipment and other tangible asset (other than real property) carried as an asset on the records of or leased by Company with cost or tax basis in excess of $25,000 in respect of any item;

        (b)      Each material Authorization;

        (c)      Each (i) fictitious business name, domain name registration, tradename, registered and unregistered trademark, service mark, patents, copyrights and related application (together with the name Mulvaney Homes, the "Intellectual Property"), and (ii) license and permit issued or granted by any person relating to any of the foregoing; in each case owned, leased, used or held by, granted to or licensed by Company as either licensor or licensee, together with all other interests therein granted by Company to any other person, all agreements with respect to any of the foregoing to which Company is a party and any lien, encumbrance, adverse claim, opposition or claim of infringement with respect to any of the foregoing;

        (d)      Each outstanding loan or advance (excluding certain advances to employees for ordinary and necessary business expenses made in the ordinary course of business) by Company to any person (including Seller and any officer, director of employee of Company);

9

   (e) Each contract, agreement, lease, purchase order or other commitment, withdrawal, involving the performance of services or delivery of goods or materials by or to Company (excluding contracts for the sale of homes, but including listing agreements) involving payments of more than $25,000 over its remaining term and which is not terminable by Company on 90 days' notice, without premium or penalty (each, a "Material Contract");

   (f) Each capital project currently undertaken or which has been approved by Company involving an estimated expenditure of more than $25,000 and all agreements, contracts, purchase orders or commitments with respect thereto;

   (g) Each contract, agreement, lease or commitment, withdrawal, to which Company is a party or is otherwise bound providing for payments (contingent or otherwise) to or by any person or entity based on sales, purchases or profits, other than direct payments for goods and salesperson's commission and override arrangements set forth in the Schedule 4.13;

   (h) Each form of contract, agreement, lease or commitment currently used by Company as a standard form in the ordinary course of business;

   (i) Each policy and binder of insurance (including without limitation, property, casualty, liability, life, health, accident, workers' compensation and disability insurance and bonding arrangements) owned by, or maintained for the benefit of, or respecting which any premiums are paid directly or indirectly by Company;

   (j) Each outstanding power-of-attorney or similar power granted by Company for any purpose whatsoever;

   (k) Each evidence of indebtedness, note, advance, guaranty or letter of credit entered into, issued or to be issued by Company, and all loan and other agreements relating thereto;

   (l) Each evidence of indebtedness, note, advance, guaranty or letter of credit entered into, issued or to be issued to the Company, and all loan and other agreements relating thereto;

   (m) Each deed of trust, pledge, lien, security interest or other charge, claim and encumbrance of any nature relating to the Owned Real Property or material personal property of Company; and

   (n) Each bank or other financial institution in which Company has a deposit account, line of credit or safe deposit box, the relevant account or other identifying number, and the names of all persons authorized to act or deal in connection therewith.

  Seller has caused Company to make available to Buyer true and complete copies of each agreement or other document required to be disclosed on Exhibit 4.13.

10

L13224

4.14    <u>Contracts</u>. Each Material Contract to which Company is a party was made in the ordinary course of business, is in full force and effect and is valid, binding and enforceable in all material respects against the parties thereto in accordance with its terms. The Company has not received any written notice of cancellation of, or any written notice of a material dispute under, any Material Contract.  To the knowledge of Company, no other party is in default in any material respect under any Material Contract, and there has not occurred any event which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute such a default.  Except as set forth on <u>Schedule 4.14</u>, Company has performed in all material respects all obligations required to be performed by it under each such contract, agreement and commitment, and to the knowledge of Company, no condition exists or event has occurred which with notice or lapse of time would constitute a material default or a basis for delay or non-performance by Company, or by any other party thereto.

4.15    <u>Insurance</u>.

(a)     Except as set forth on <u>Schedule 4.15</u>, the insurance policies listed in <u>Schedule 4.13</u> are valid and enforceable policies, no claims have been made against any of such insurance policies, and such insurance policies will not be affected by, terminate or lapse by reason of the transactions contemplated by this Agreement.

(b)     Company has not received any written notice of cancellation or modification of any policy or binder of insurance identified in <u>Schedule 4.13</u>.  Company has not, within the last five years, been refused any insurance nor has its coverage been limited.

4.16    <u>Previously Constructed Homes</u>.

(a)     All of the homes previously Constructed by Company were of a quality salable in the ordinary course of business, consistent with the practices and standards of the home building industry and in substantial compliance with all Laws the violation of which would have a materially adverse effect on Company, including without limitation, any building, setback, subdivision or zoning Law, consistent with the practices followed in homebuilding industry in the markets in which the Company operates. As used in this Agreement "Constructed" means homes for which construction has been completed and a certificate of occupancy has been issued.

(b)     <u>Schedule 4.16</u> attached hereto lists all repairs made after sale of Constructed homes by or on behalf of Company during the 36 month period ended October 31, 2004, which involved (i) an aggregate repair cost in excess of $5,000 per home or (ii) a material recurring problem (the same material problem occurring in more than five (5) homes).

(c)     <u>Schedule 4.16</u> sets forth (i) the total dollar amount of all warranty claims paid by the Warranty Company or on behalf of Company in each of the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, (ii) the total dollar amount of all deductibles paid by Company in each of the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, and (iii) the total dollar amount and a brief description of all pending warranty claims, other than claims for punchlist and similar items involving in any case less than $5,000 in the aggregate per home.  All homes previously Constructed by Company and

14

L13225

sold during the two twelve (12) month periods ended December 31, 2002, and December 31, 2003, were enrolled in the Warranty Company's warranty program upon closing of the sale to the homeowner and are currently enrolled in such program.

(d)    To the knowledge of Company, there are no material design, construction, manufacturing or, to the knowledge of Company, other material defects with respect to homes previously Constructed by Company.

4.17    Suppliers.  Schedule 4.17 attached hereto lists the names of the ten suppliers from whom Company made the most purchases during 2003 and during the nine month period ended November 30, 2004 and the aggregate expenditures attributable to each in each such year.  No supplier that accounted for more than $50,000 of the purchases of Company during the twelve month period ended September 30, 2004, has terminated or materially reduced, or has given notice that it intends to terminate or materially reduce, the amount of business done with Company.

4.18    Taxes.

(a)    All federal, state, local and foreign Returns (as defined herein) relating to Taxes (as defined herein), or extensions relating thereto, required to be filed on or before the Closing Date by or with respect to Company (including, without limitation, all federal and state consolidated and combined tax returns and reports for any consolidated group of which Company has been a member (the "Consolidated Group")) have been or will be timely filed and are or will be true and complete in all material respects.  For purposes of this Agreement, "Return" and/or "Returns" shall mean all reports, estimates, information statements and returns of any nature, including amended versions of any of the foregoing, relating to or required to be filed in connection with any Taxes pursuant to the statutes or regulations of any federal, state, local or foreign government taxing authority.  "Tax" or "Taxes" shall mean all federal, state (which includes for this purpose the District of Columbia), local and foreign (which includes for this purpose possessions, territories and protectorates of the United States of America) income, profits, capital, franchise, sales, use, payroll, premium, occupancy, real or personal property, ad valorem, severance, excise, withholding, customs, unemployment, transfer and other taxes, or other kind of tax, assessment, levy, imputation or other governmental change in the nature of a tax (no matter how denominated), including interest, additions to tax and penalties.

(b)    All Taxes imposed upon the Company due with respect to taxable periods ending on or prior to Closing Date have been fully and timely paid to the appropriate governmental authority or properly deposited as required by law, or, in the case of Taxes not yet due, fully provided for on the books of account of Company; and there are no levies, liens, or other encumbrances relating to Taxes existing, threatened or pending with respect to any asset of Company.

(c)    No claim of deficiency has been asserted or, to the knowledge of Company, threatened by the Internal Revenue Service ("IRS") or any other taxing authority (or is currently pending), no taxing authority has begun or, to the knowledge of Company, threatened to begin any audit or investigation of any Returns filed by Company referred to above, or requested information with regard thereto or any other Taxes that may be owed by Company and

12

L13226

no waivers of statutes of limitations have been given with respect to any Returns previously filed by Company. In the event Company or Seller become aware of any such asserted or threatened deficiency or assessment, or any investigation or audit, after the date hereof, it will immediately notify Buyer and will diligently defend any such action.

(d)     Buyer has been furnished complete copies of all Returns filed by Company for the three year period ending on the date of this Agreement. No deficiencies have been asserted in writing or, with respect to deficiencies as to which the Company has received written notice, are currently under examination by the IRS or by other taxing authorities with respect to all federal, state, local and foreign income, franchise and sales and use tax Returns of or with respect to Company. All deficiencies asserted or assessments made as a result of such examinations have been fully paid, and there are no other unpaid deficiencies asserted or assessments made by any taxing authority against Company.

(e)     Except as set forth in Schedule 4.18(e) attached hereto, Company: has not filed any consent under section 341(f)(1) of the Code or agreed to have the provisions of Code section 341(f)(2) apply to any dispositions of "subsection (f) assets" as such term is defined in Code section 341(f)(4); has not agreed to or is required to make any adjustments under Code section 481(a) by reason of a change in accounting method or otherwise; does not employ the LIFO method of accounting for inventories for federal income tax purposes; has not made a transfer of intangible property on which Code section 367(d) or 482 will require the recognition of additional income for any period after the date hereof; and does not own stock in a "passive foreign investment company" within the meaning of Code section 1297(a). "Code" for purposes of this Agreement shall mean the Internal Revenue Code of 1986, as amended.

(f)     Company is a member of a consolidated group for federal income tax purposes.

(g)     Company is a "C" corporation and has analogous status for applicable state income tax purposes.

(h)     Company is not required to file a foreign Return.

(i)     Company has not made, and will not become obligated to make, any payments that will be nondeductible under Section 280G of the Code (or any corresponding provision of federal, state, provincial, local or foreign income Tax law). Seller is a United States person as defined in Code §7701(a)(3). Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662. Company is not a party to or bound to any Tax allocation, sharing or similar agreement and has no contractual obligation to indemnify any other Person with respect to Taxes and Company has no liability for Taxes arising as a result of Company at any time being a member of an affiliated group for federal income tax purposes.

(j)     Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (1) change in method of accounting for a taxable period ending on or prior to the Closing Date; (2) "closing agreement" as described in Code

13

L13227

§7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; (3) intercompany transactions occurring at or prior to the Closing (including, but not limited to, conversion of the Intercompany Loan from debt to equity) or any excess loss account in existence at Closing described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or foreign income Tax law); (4) installment sale or open transaction disposition made on or prior to the Closing Date; or (5) prepaid amount received on or prior to the Closing Date.

(k)    As of the first day of its most recently completed taxable year, Company had adjusted inventories as required by Section 263A of the Code. Exhibit 4.18 sets forth the amount of each adjustment required under said Section 263A and the regulations thereunder.

(l)    Possible Section 338(h)(10) Election.

(i)    At the election of Buyer, Seller and Company shall file an election under Section 338(h)(10) of the Code and under any comparable provisions of state, local or foreign law with respect to the purchase of the Shares (the "Election"). No later than one hundred fifty (150) days following the Closing, Buyer shall notify Seller whether Buyer will make the Election. If such election is to be made, Buyer shall also supply to Seller within such one hundred fifty (150) day period Form 8883 prepared by Buyer's regularly employed accountants which shall be attached to Company's federal income tax return (and the forms if any to be attached to Company's state income tax return). Seller and Company shall take no action which is inconsistent with the Election or its validity under the Code and the applicable Treasury Regulations.

(ii)    On the Closing Date, Seller shall execute and deliver to Buyer five copies of Internal Revenue Service Form 8023-A provided by Buyer and the equivalent forms for state income tax purposes, and shall thereafter provide any additional or similar forms under applicable federal, state, local or foreign law (the "Election Forms") to Buyer as Buyer may reasonably request.

(iii)    Buyer shall be responsible for the preparation and filing of all forms and documents required in connection with the Election. Buyer shall provide Seller with copies of (a) any necessary corrections, amendment, or supplements to Form 8023(a), (b) all attachments required to be filed therewith pursuant to applicable Treasury Regulations, and (c) any comparable forms and attachments with respect to any applicable state, foreign, or local elections included as part of the Election. Seller shall execute and deliver to Buyer within five (5) days of receipt by Seller such documents or forms as are required properly to complete the Election.

(iv)    Seller and Company shall cooperate fully with Buyer and make available to Buyer such Tax data and other information as may be reasonably required by Buyer or Company in order for Buyer to timely file the Election and any other required statements or schedules (or any amendments or supplements thereto) and shall, if requested by Buyer, attach to the federal income tax Return filed for the Company for the period ending with the Closing Form 8883 as referred to in Section 4.18(l)(i).

14

L13228

4.19    Employee Benefits.

(a)    Schedule 4.19 attached hereto contains a complete and correct list of all benefit plans, arrangements, commitments and payroll practices (whether or not employee benefit plans ("Employee Benefit Plans") as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), including, without limitation, sick leave, vacation pay, severance pay, salary continuation for disability, consulting or other compensation arrangements, retirement, deferred compensation, bonus, incentive compensation, stock purchase, stock option, health including hospitalization, medical and dental, life insurance and scholarship programs maintained for the benefit of any present or former employees of Company or any ERISA Affiliate (as defined below) or to which Company or any ERISA Affiliate has contributed or is or was within the last three years obligated to make payments. Company has made available to Buyer, with respect to all such plans, arrangements, commitments and practices, true, complete and correct copies of the following: all plan documents, handbooks, manuals, collective bargaining agreements and similar documents governing employment policies, practices and procedures; the most recent summary plan descriptions and any subsequent summaries of material modifications for each Title I plan; Forms series 5500 as filed with the IRS for the three most recent plan years; the most recent report of the enrolled actuary for all defined benefit plans, funded welfare plans or other plans requiring actuarial valuation; all trust agreements with respect to employee benefit plans; plan contracts with service providers or with insurers providing benefits for participants or liability insurance for fiduciaries and other parties in interest or bonding; most recent annual audit and accounting of plan assets for all funded plans; and most recent IRS determination letter for all plans intended to be qualified under Code section 401(a). As used herein, "ERISA Affiliate" shall refer to any trade or business, whether or not incorporated, under common control with the Company within the meaning of Section 414(b), (c), (m) or (o) of the Code.

(b)    With respect to each Employee Benefit Plan required to be listed on Schedule 4.19: (i) each Employee Benefit Plan has been administered in substantial compliance with its terms, and is in compliance in all material respects with the applicable provisions of ERISA, the Code and all other applicable Laws (including, without limitation, funding, filing, termination, reporting and disclosure and continuation coverage obligations pursuant to Title V of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA")); (ii) the Company has made or provided for all contributions required under the terms of such Plans; (iii) no "Employee Pension Benefit Plan" (as defined in Section 3(2) of ERISA) has been the subject of a "reportable event" (as defined in Section 4043 of ERISA) and there have been no "prohibited transactions" (as set forth in Section 4975 of the Code or in Part 4 of Subtitle B of Title I of ERISA) with respect to any Employee Benefit Plan; (iv) there are and during the past three years there have been no inquiries, proceedings, claims or suits pending or threatened by any governmental agency or authority or by any participant or beneficiary against any of the Employee Benefit Plans, the assets of any of the trusts under such Plans or the Plan sponsor or the Plan administrator, or against any fiduciary of any of such Employee Benefit Plans with respect to the design or operation of the Employee Benefit Plans; (v) the actuarial present value of accumulated benefits (both vested and unvested) of each of the Employee Pension Benefit Plans which are defined benefit plans, are fully funded in accordance with the actuarial assumptions used by the Pension Benefit Guaranty Corporation ("PBGC") to determine the level of funding required in the event of the termination of such Plan; (vi) each

15

L13229

Employee Pension Benefit Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code is and has from its inception been so qualified, and any trust created pursuant to any such Employee Pension Benefit Plan is exempt from federal income tax under Section 401(a) of the Code and the IRS has issued each such Plan a favorable determination letter which is currently applicable; and (vii) neither Company nor any ERISA Affiliate is aware of any circumstance or event which would jeopardize the tax-qualified status of any such Employee Pension Benefit Plan or the tax-exempt status of any related trust, or which would cause the imposition of any liability, penalty or tax under ERISA or the Code with respect to any Employee Benefit Plan.

(c)     Neither Company nor any ERISA Affiliate maintains or has ever maintained or been obligated to contribute to a "Multiemployer Plan" (as such term is defined by Section 4001(a)(3) of ERISA).

(d)     With respect to each Employee Benefit Plan maintained by Company or any ERISA Affiliate: (i) no unsatisfied liabilities to participants, the IRS, the United States Department of Labor ("DOL"), the PBGC or to any other person or entity have been incurred as a result of the termination of any Employee Benefit Plan; (ii) no Employee Pension Benefit Plan, which is subject to the minimum funding requirements of Part 3 of subtitle B of Title I of ERISA or subject to Section 412 of the Code, has incurred any "accumulated funding deficiency" within the meaning of Section 302 of ERISA or Section 412 of the Code and there has been no waived funding deficiency within the meaning of Section 303 of ERISA or Section 412 of the Code; (iii) there has been no event with respect to an Employee Pension Benefit Plan which would require disclosure under Sections 4062(c), 4063(a) or 4041(e) of ERISA.

(e)     All reports and information required to be filed with the DOL, IRS and PBGC with respect to each Employee Benefit Plan have been filed and all annual reports (including Form 5500 series) of such Plans were certified without qualification by each Plan's accountants and actuaries.

(f)     Any bonding required under ERISA with respect to any Employee Benefit Plan has been obtained and is in full force and effect and no funds held by or under the control of Company are plan assets.

(g)     Neither Company nor any ERISA Affiliate maintains any retired life and/or retired health insurance plans which provide for continuing benefits or coverage for any employee or any beneficiary of an employee after such employee's termination of employment.

(h)     The consummation of the transactions contemplated by this Agreement will not, alone or together with any other event, (i) entitle any person to severance pay, unemployment compensation or any other payment, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee, or (iii) result in any liability under Title IV of ERISA or otherwise.

16

L13230