4.20    Labor Matters.

(a)    (i) No application or petition for certification of a collective bargaining agent is pending and none of the employees of Company are, or during the last five years have been, represented by any union or other bargaining representative; (ii) to the knowledge of Company, during the last five years, no union has attempted to organize any group of the Company's employees and no group of the Company's employees has sought to organize themselves into a union or similar organization for the purpose of collective bargaining; (iii) during the last five years there has not been and there is not currently pending any labor arbitration or proceeding in respect of the grievance of any employee, any application, charge or complaint filed by any employee or union with the National Labor Relations Board or any comparable state or local agency, any strike, slowdown, picketing or work stoppage by any employees at any facility of Company, any lockout of any such employees (iv) no agreement restricts Company from relocating, closing or terminating any of its operations or facilities or any portion thereof, and (v) to the knowledge of Company, no such agreement, action, proceeding or occurrence has been threatened in writing by any person.

(b)    The Company has not been cited for violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. sec. 651 et seq. ("OSHA"), any regulation promulgated pursuant to OSHA or any other Law establishing standards of workplace safety, or paid any fines or penalties with respect to any such citation.

(c)    Schedule 4.20(c) attached hereto contains true and correct copies of each OSHA record keeping injury/illness report, loss and summary completed and maintained by Company at its work establishments for the past three (3) years.

4.21    Directors, Officers and Employees.  Schedule 4.21 attached hereto sets forth the following information for each director, officer and employee of Company and each consultant and independent contractor regularly retained (excluding construction sub-contractors), in each case whose aggregate compensation for the calendar year ended December 31, 2003 exceed $75,000 or whose current aggregate annual rate of compensation exceeds such amount (including each such person on leave or layoff status): employer; employee name and job title; current annual rate of compensation (identifying bonuses separately) and any change in compensation since the date of the Balance Sheet; accrued vacation pay and any automobile leased or owned by Company primarily for use by any of the foregoing persons.  To the knowledge of Company, none of the Company's employees, directors or officers is a party to, or is otherwise bound by, any agreement or arrangement with any person or entity other than Company which limits or adversely affects the performance of his duties, the ability of Company to conduct its businesses, or his freedom to engage in any of the businesses conducted by Company.  Schedule 4.21 lists each employment, severance or change of control agreement to which Company is a party or is otherwise bound.

4.22    Affiliate Agreements.  Except as set forth on Schedule 4.22 attached hereto, and except for that certain loan from Seller to the Company having a balance due of $27,059,349 as of September 30, 2004 (as reflected on the Interim Balance Sheet) (the "Intercompany Loan") there are no, and since January 1, 2000 there have not been any, agreements or transactions between Company on the one hand and the Seller or any present or

17

L13231

former director, shareholder or officer of Company or any member of such person's immediate family (a "Related Party") providing for the furnishing of services (other than as an employee) by, rental of any assets from or to, or otherwise requiring payments to any Related Party.  Except as set forth on Schedule 4.22 attached hereto, no such Related Party has, or since January 1, 2000 has had, any interest in any material property (real or personal, tangible or intangible) sold to, purchased by or otherwise used in or pertaining to the business of Company, or any direct or indirect interest in any person or entity which has had business dealings or a financial interest in any transaction with Company or which is in competition with any business of Company.  Except as set forth on Schedule 4.22 attached hereto, all agreements between Company and all Related Parties are terminable by Company upon 30 days' notice or less, without payment of penalty or premium of any kind.

    4.23   Environmental Matters.  Except as disclosed on Schedule 4.23:

    (a)    The businesses and operations of the Company are and always have been operated in compliance in all material respects with all applicable Environmental Laws (as defined below).

    (b)    There are no material conditions on, about, beneath or arising from any currently Owned Real Property ("Current Real Property"), which are reasonably expected, under any applicable Environmental Laws, (A) to give rise to any liability or the imposition of any statutory lien, or (B) to require any "Response," "Removal" or "Remedial Action" (as those terms are defined below);

    (c)    At the time of disposition thereof, there were no material conditions on, about, beneath or arising from any real property which was, but is no longer, owned, used or leased to or by the Company, including without limitation real property that includes homes which were previously constructed and/or sold by Company ("Former Real Property") which resulted from action taken by the Company during its period of ownership, use or lease and are reasonably expected, under any applicable Environmental Laws, (A) to give rise to any liability or the imposition of any statutory lien, or (B) to require any "Response," "Removal" or "Remedial Action" (as defined below) pursuant to applicable Environmental Law;

    (d)    The Company has not received any notification of a "Release" or threat of a "Release of a "Hazardous Substance" (as defined below) with respect to any Current Real Property or Former Real Property);

    (e)    No Hazardous Substances have been generated, processed, treated, stored, released, discharged or disposed of by the Company or, to the knowledge of the Company, by any third party on, about or beneath any Current Real Property except in compliance with applicable Environmental Laws;

    (f)    During the Company's ownership, use or lease of the Former Real Property, no Hazardous Substances were generated, processed, treated, released, discharged or disposed of by the Company or, to the knowledge of the Company, by any third party on, about or beneath any Former Real Property except in compliance with applicable Environmental Laws;

| Deleted: ; provided that, with respect to periods prior to the acquisition or lease, or after the disposition, of any Real Property by the Company the foregoing representation and warranty is given. [Please clarify the qualification beginning with "provided that".] |

18

L13232

(g)    There are, and have been no above or underground storage tanks, asbestos containing materials, or lead-based paint, at levels which can reasonably be expected to cause adverse effects to persons or property, or transformers containing or contaminated with PCB's on, about or beneath the Current Real Property.

(h)    Except as set forth on <u>Schedule 4.23</u>, the Company has not received notice of and has no knowledge of:

(i)    any claim, demand, investigation, enforcement action, Response, Removal, Remedial Action, statutory lien or other governmental or regulatory action instituted or threatened in writing or to the knowledge of Company, threatened in any manner, against the Company or the Current, or Former Real Property pursuant to any of the Environmental Laws;

(ii)    any written or any other claim, demand, notice or suit, made or, to the knowledge of Company, threatened by any person against the Company, the Current Real Property or the Former Real Property claiming (1) damage, loss or injury resulting from, or claimed to result from, any Hazardous Substance on, about, beneath or arising from the Current or Former Real Property or (2) any alleged violation of the Environmental Laws by the Company; or

(iii)    any written or any other communication between the Company and any governmental or regulatory agency arising out of or in connection with Hazardous Substances on, about, beneath, arising from or generated at the Current Real Property or Former Real Property, including without limitation, any notice of violation, citation, complaint, order, directive, request for information or response thereto, notice letter, demand letter or compliance schedule which is likely to involve any liability or expenditure by the Company.

(i)    To the Knowledge of Company, none of the Current Real Property contains, and none of the Former Real Property contained at the time it was sold by the Company, a level of radon above action levels of the United States Environmental Protection Agency.

Deleted: N

(j)    The Company has not arranged for transportation or disposal of any Hazardous Substances at any site listed or formally proposed for listing on the National Priority List promulgated pursuant to "CERCLA" (as defined below) or to any site listed on any other publicly available and computer accessible federal or state list of sites requiring or recommended for investigation or clean-up. None of the Current Real Property or Former Real Property is listed on the National Priorities List or any other federal or state list of sites requiring or recommended for investigation or clean up.

(k)    None of the Current Real Property, or any portion thereof, is currently being used or has been used to dispose or treat wastes or for any industrial purpose whatsoever, except in a manner that does not materially violate any Environmental Laws.

(l)    None of the homes constructed by the Company on the Current Real Property, or the Former Real Property, contain or contained the presence of mold, fungus or

19

L13233

other microbial matter (hereafter "Mold") at levels, in amounts or in a manner, that could reasonably be expected to cause adverse effects to persons or property or a liability to the Company.

    (m)    As used in this Agreement:

    (i)    the term "Environmental Laws" means all applicable federal, state and local Laws relating to pollution or contamination of the environment, including but not limited to CERCLA and SARA (as defined in clause (ii) below), or otherwise relating to emissions, discharges, releases or threatened releases of Hazardous Substances or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

    (ii)    the terms "Release," "Response," "Removal" and "Remedial Action" shall have the meanings ascribed to them in Sections 101(23)-101(25) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act ("SARA"), 42 U.S.C. §§9601(23)-9601(25).

    (iii)    The term "Hazardous Substances" or "Hazardous Substance" shall mean any substance regulated under any of the Environmental Laws including, without limitation, any substance which is: (A) petroleum, asbestos or asbestos-containing material, or polychlorinated biphenyls; (B) defined, designated or listed as a "Hazardous Substance" pursuant to Sections 307 and 311 of the Clean Water Act, 33 U.S.C. ss. 1317, 1321, Section 101(14) of CERCLA, 42 U.S.C. ss. 9601; (C) listed in the United States Department of Transportation Hazardous Material Tables, 49 C.F.R. ss. 172.101; (D) defined, designated or listed as a "Hazardous Waste" under Section 1004(5) of the Resource and Conservation and Recovery Act, 42 U.S.C. 6903(5).

    4.24    <u>Absence of Certain Changes and Events</u>.

    (a)    Except as set forth on <u>Schedule 4.24</u> attached hereto, since January 1, 2004, Company has conducted its business only in the usual and ordinary course consistent with past practice and there has not been any:

    (i)    declaration or payment of any dividend or other distribution or payment in respect of the shares of capital stock of Company, or any repurchase or redemption of any such shares of capital stock or other securities;

    (ii)    payment by Company of any bonus or increase of any compensation payable to any shareholder, director or officer or, except in the ordinary course of business consistent with past practice, employee or entry into (or amendment of) any employment, severance or similar agreement with any shareholder, director, officer or employee;

    (iii)    adoption of or change in any Employee Benefit Plan or labor policy;

20

L13234

(iv)    damage, destruction or loss to any material asset or property of Company, whether or not covered by insurance;

(v)    except for this Agreement and agreements for the construction or sale of homes in the ordinary course of business, entry into any agreement involving payments in excess of $25,000;

(vi)    sale (other than sales of inventory in the ordinary course of business), assignment, conveyance, lease, or other disposition of any material asset or property of Company or mortgage, pledge or imposition of any lien, on any material asset or property of Company;

(vii)    discharge or satisfaction of any lien, claim or encumbrance, other than in the ordinary course of business consistent with past practice;

(viii)    write-down or write-off of the value of any asset except for write-downs and write-offs in the ordinary course of business consistent with past practice and at a rate no greater than that during the twelve months ended December 31, 2003, or any cancellation or waiver of any other claim or right with a value in the aggregate in excess of $25,000;

(ix)    material change in the business or operations of Company or in the manner of conducting the same or entry by Company into any transaction (other than this Agreement), other than in the ordinary course of business consistent with past practice; or

(x)    material change in the accounting methods, principles or practices followed by Company, except as required by GAAP, or any change in any of the assumptions underlying, or methods of calculating, any bad debt, contingency or other reserve;

(xi)    agreement, whether or not in writing, to do any of the foregoing by Company.

(b)    Since the date of the Interim Balance Sheet, there has not been any material adverse change in the business, operations, properties, assets, or condition (financial or otherwise) of Company.

4.25    Books and Records.

(a)    The copies of the certificate or articles of incorporation of Company, as certified by the Secretary of State of its jurisdiction of incorporation, and of its bylaws (or of their other comparable organizational documents), as certified by its secretary, which have been made available to Buyer are true, complete and correct in all material respects and are in full force and effect as of the date hereof.

(b)    The stock records of Company fairly and accurately reflect the record ownership of all of its outstanding shares of capital stock. Complete and accurate copies, in all material respects, as of the date hereof, of all minute books and stock records of the Company have been made available to Buyer.

21

L13235

4.26    Brokers. No person acting on behalf of Company, any Related Party or any of their affiliates or under the authority of any of the foregoing is or will be entitled to any brokers' or finders' fee or any other commission or similar fee, directly or indirectly, from any of such parties in connection with any of the transactions contemplated by this Agreement.

4.27    Accounts Receivable. Except as set forth in Schedule 4.27, each of the accounts receivable of Company reflected on the Balance Sheet or arising thereafter constituted at the Balance Sheet date or as of the date they arose, respectively, a valid claim in the full amount thereof against the debtor charged therewith on the books of Company and was acquired in the ordinary course of Company's business. No account debtor has any valid set-off, deduction or defense with respect thereto and, to the knowledge of the Company, no account debtor has asserted any such set-off, deduction or defense.

4.28    Additional Capital Contributions. Neither the Company nor any entity in which the Company has any ownership or other equity interest, has any obligation to make any capital contributions, loans, advances or any other similar payments, to any entity.

4.29    Disclosure. All documents and other papers delivered by or on behalf of Company or Seller in connection with the transactions contemplated by this Agreement are accurate and complete in all material respects and are authentic. None of the representations and warranties of Seller made in this Section 4 or in Section 3 contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

## SECTION 5.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date of this Agreement and of the Closing Date as follows:

5.1    Organization and Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to carry on its business as presently conducted, to own and lease the assets which it owns and leases and to perform all of its obligations under each agreement and instrument by which it is bound.

5.2    Power and Authorization. Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under the other agreements and documents (the "Buyer Transaction Documents") required to be delivered by it prior to or at the Closing. The execution, delivery and performance by Buyer of this Agreement and the Buyer Transaction Documents have been duly authorized by all necessary corporate action. This Agreement has been duly and validly executed and delivered by Buyer and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the Buyer Transaction Documents shall constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, reorganization, insolvency, or similar laws affecting creditors rights generally, and principles of equity (whether considered and applied in a proceeding in equity or at law).

22

L13236

5.3     No Conflicts.

(a)     The execution, delivery and performance of this Agreement and the Buyer Transaction Documents do not and will not (with or without the passage of time or the giving of notice):

(i)     violate or conflict with Buyer's certificate of incorporation or bylaws or any Law binding upon Buyer; or

(ii)     violate or conflict with, result in a breach of, or constitute a default or otherwise cause any loss of benefit under any material agreement or other material obligation to which Buyer is a party.

(b)     Each consent or approval of, or registration, notification, filing and/or declaration with, any court, government or governmental agency or instrumentality, creditor, lessor or other person required to be given or made by Buyer in connection with the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated herein has been obtained or made or will be obtained or made prior to the Closing without payment of premium or penalty by, or loss of benefit to, Buyer.

(c)     There are no judicial, administrative or other governmental actions, proceedings or investigations pending or, to the knowledge of Buyer, threatened, that question any of the transactions contemplated by, or the validity of, this Agreement or any of the other agreements or instruments contemplated hereby or which, if adversely determined, could reasonably be expected to have a material adverse effect upon the ability of Buyer to enter into or perform its obligations under this Agreement or any of the other agreements or instruments contemplated hereby. Buyer has not received any request from any governmental agency or instrumentality for information with respect to the transactions contemplated hereby.

5.4     Funds.  Buyer will have at the Closing the funds necessary to consummate, on a timely basis, the transactions contemplated by this Agreement.

5.5     Disclosure. All documents and other papers delivered by or on behalf of Buyer in connection with the transactions contemplated by this Agreement are accurate and complete in all material respects and are authentic. None of the representations and warranties of Buyer made in this Section 5 contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

5.6     Brokers.  No person acting on behalf of Buyer or any affiliate of Buyer or under the authority of any of the foregoing is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from any such parties in connection with any of the transactions contemplated by this Agreement.

**SECTION 6.  OBLIGATIONS OF THE PARTIES**

6.1     Conduct of Business Pending Closing. Except as contemplated herein, between the date of the Interim Balance Sheet and the date hereof Seller has caused the

23

L13237

Company to, and between the date hereof and the Closing, without the prior written consent of Buyer, Seller will cause Company to:

(a)     maintain its corporate existence, to pay and discharge all debts, liabilities and obligations as they become due, operate in the ordinary course in a manner, including marketing and sales activities, consistent with past practice, and the provisions of this Agreement and in compliance with all material respects with all applicable Laws;

(b)     maintain its facilities and assets in the same state of repair, order and condition as they were on the date hereof, reasonable wear and tear excepted;

(c)     maintain its books and records in accordance with past practice, and maintain in full force and effect all Authorizations and all insurance policies and binders;

(d)     use reasonable efforts to preserve intact its present business organization and maintain its relations and goodwill with the suppliers, customers, employees and others having a business relationship with it;

(e)     promptly advise Buyer of the written threat or commencement against Company or Seller of any action, suit, proceeding, arbitration or investigation known to Seller by, against or affecting Company or any of its operations or assets, or which challenges the validity of this Agreement or any action taken or to be taken in connection with this Agreement or the ability of Company, or Seller to consummate the transactions contemplated herein or therein; and

(f)     promptly advise Buyer in the event it actually knows that any representation or warranty of Company or Seller set forth in this Agreement is untrue in a material respect.

6.2     <u>Negative Covenants</u>. Except as expressly provided herein, between the date hereof and the Closing, without the prior written consent of Buyer, Company shall not, and Seller shall not cause or permit Company to:

(a)     make any change in Company's authorized or issued capital stock; grant any stock option or warrant or other right to purchase shares of Company's capital stock or other securities; issue or make any commitment to issue any security by Company, including any security convertible into capital stock; grant any registration rights; or purchase, redeem, retire or make any other acquisition of any shares of any capital stock or other securities; declare or pay any dividend or other distribution or payment in respect of shares of capital stock of Company;

(b)     amend the certificate or articles of incorporation or bylaws (or equivalent governing documents) of Company;

(c)     fail to pay or discharge when due any liability or obligation of Company;

(d)     enter into any agreement, commitment or transaction other than in the ordinary course of business, consistent with past practice, or which is material to the

24

L13238

business, operations or financial condition of Company, whether or not in the ordinary course of business;

(e)    enter into any contract, agreement, commitment or arrangement with any party, other than contracts for the sale of homes or services and contracts for the purchase of materials, services and supplies in the ordinary and usual course of its business, and not waive any rights under, amend, modify or terminate any such contract, agreement, commitment or arrangement;

(f)    make any capital expenditure in excess of $10,000 as to any individual obligation or expenditure or any series of related expenditures or obligations, and not exceeding $100,000 in the aggregate;

(g)    increase the current compensation or rate of compensation payable to any employee of the Company or modify any payments or fringe benefits payable to such employees; or

(h)    enter into any contract, agreement, commitment or arrangement with Seller or any Related Party thereof or any officer or director of the Company.

6.3    Access to Information; Confidentiality.

(a)    Prior to the earlier of Closing or termination pursuant to Section 10.1, Company shall, and Seller shall cause Company to, upon reasonable prior notice and during ordinary business hours, give Buyer and its authorized representatives reasonable access to all of its personnel, books, records, plants, offices and other facilities and properties, and permit Buyer to make such inspections thereof as Buyer may reasonably request, and cause its officers and advisors to furnish Buyer with such financial, operating and other information regarding Company's business, agreements, commitments, liabilities, personnel and properties as Buyer may reasonably request.

(b)    Buyer agrees at all times up until the Closing to strictly observe the terms and conditions of that certain Confidentiality Agreement, dated as of October 27, 2004, by and among Seller, Company and Buyer, which is attached hereto as Exhibit 6.3(b) and is incorporated by reference herein.

(c)    Buyer agrees at all times after the Closing, (i) to keep confidential all information provided to it regarding Seller, (ii) not to use such information on its own behalf, except in connection with the transactions contemplated hereby, or on behalf of any other person, firm or entity, and (iii) not to disclose such information to any third party (other than to Buyer's lenders, employees, agents, advisors, counsel, accountants and other consultants in connection with the transactions contemplated hereby) without the advance written authorization of Seller; provided that Buyer shall have no such obligations with respect to confidential information that (A) was lawfully obtained by it not subject to restrictions of confidentiality; (B) is a matter of public knowledge; (C) has been or is hereafter publicly disclosed other than by or through Buyer or by a third party in violation of its obligation to the Company or (D) is required to be disclosed by Buyer pursuant to a subpoena or order issued by a court of competent jurisdiction, regulatory or administrative body that has power to compel the disclosure of information, or pursuant to any

25

L13239

other law, rule or regulation. In the event this Agreement is terminated, Buyer will promptly return to the Company all documents, and other materials furnished to Buyer or any of its representatives and all copies thereof, and will promptly and completely destroy all work papers made or prepared by Buyer or any of its representatives relating to the transactions contemplated hereby, whether obtained before or after the execution of this Agreement. In the event of a breach or threatened breach by Buyer of the provisions of this Section 6.3, Seller shall be entitled to an injunction restraining Buyer from disclosing, in whole or in part, the confidential information.

(d)     Seller agrees at all times, (i) to keep confidential all information provided by or on behalf of Buyer to it, (ii) not to use the confidential information on their own behalf, except in connection with the transactions contemplated hereby, or on behalf of any other person, firm or entity, and (iii) not to disclose the confidential information to any third party (other than to Seller's lenders, counsel, accountants and other consultants in connection with the transactions contemplated hereby) without the advance written authorization of the Buyer; provided that Seller shall have no such obligations with respect to confidential information that (A) was lawfully obtained by it not subject to restrictions of confidentiality; (B) is a matter of public knowledge; or (C) has been or is hereafter publicly disclosed other than by or through Seller or by a third party in violation of its obligation to Buyer. In the event this Agreement is terminated, Seller will promptly return to Buyer all documents and other materials furnished to Seller or any of its representatives and all copies thereof, and will promptly and completely destroy all work papers made or prepared by Seller or any of its representatives relating to the transactions contemplated hereby, whether obtained before or after the execution of this Agreement. In the event of a breach or threatened breach by Seller of the provisions of this Section 6.3, Buyer shall be entitled to an injunction restraining Seller from disclosing, in whole or in part, the confidential information.

6.4     _Commercially Reasonable Efforts._ Prior to the earlier of Closing or termination pursuant to Section 10.1, each party hereto shall use commercially reasonable efforts to cause to occur the transactions contemplated hereby and by the Transaction Documents, and to cause all conditions to the performance of the parties hereto that are within its control to be satisfied. No party shall take any action to cause any such covenant, agreement, transaction or condition not to occur, be satisfied or be performed, as the case may be.

6.5     _Consents._ Prior to the Closing, Company and Seller shall, and Seller (insofar as it is able) shall cause Company to, use commercially reasonable good faith efforts to obtain (and cooperate with the other parties hereto in obtaining) all consents, permits, Authorizations, approvals of, and exemptions by, any regulatory authority or third party necessary for the consummation of the transactions contemplated by this Agreement and the Seller Transaction Documents or the Company Transaction Documents.

6.6     _Financial Information._ Until the earlier of Closing or termination pursuant to Section 10.1, Company and Seller shall provide Buyer, within 20 days after the end of each month, with an unaudited consolidated balance sheet and income statement of Company as of and for the month then ended, prepared on the same basis as the interim financial statements referred to in Section 4.8, and certified as such by the chief financial officer of Company.

26

L13240

6.7    Noncompetition, Trade Secrets, Etc.

(a)    Seller hereby agrees, from and after the Closing Date hereunder, as follows:

(i)    Until the date which is five (5) years after the Closing Date, as such period may be extended as hereinafter set forth (the "Restricted Period"), (i) Seller shall not directly or indirectly engage in (as a principal, shareholder, partner, director, officer, agent, employee, consultant or otherwise) or be financially interested in any business operating within 100 miles of any county in which the Buyer operates (the "Restricted Area"), which is engaged in the construction, sale and/or leasing of single-family or multi-family homes, the acquisition or development of any property for any such purpose, or the provision of mortgage financing or title insurance/settlement services; provided, however, nothing contained in this Section 6.7 shall prevent Seller from holding for investment no more than two percent (2%) of any class of equity securities of a company whose securities are publicly traded on a national securities exchange or in a national market system; (ii) Seller shall not directly or indirectly solicit any employee, customer, independent contractor or supplier of Company to terminate employment or any other relationship with Company; and (iii) Seller shall not directly or indirectly solicit any person who is or was within the preceding year an employee of Company to establish an employment relationship with any other person or entity.

(ii)    Seller shall not disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company other than Company, any Confidential Information. For purposes of the preceding sentence, "Confidential Information" means any information regarding Company's business methods, business policies, procedures, techniques, research or development projects or results; historical or projected financial information, budgets, trade secrets or other knowledge or processes of or developed by Company; any names and addresses of customers or clients or any data on or relating to past, present or prospective Company customers or clients; or any other confidential information relating to or dealing with the business, operations or activities of Company, excepting in each case information otherwise lawfully known generally by, or readily accessible to, the trade or the general public, or as required to be disclosed by law or final, unappealable order of a court of competent jurisdiction or governmental authority. At no time shall Seller, directly or indirectly, remove or cause to be removed from the premises of Company any memorandum, note, list, record, file, document or other paper, equipment or any like item relating to the Company's business (including copies, extracts and summaries thereof); provided, however, that Buyer and Company agree to make available to Seller for inspection and copying at reasonable times during ordinary business hours any such items reasonably necessary for the liquidation of Seller's business, the completion of Seller's financial statements and tax returns or for any other purpose required by Law or by order of a court of competent jurisdiction or governmental authority.

(iii)    Seller acknowledges that the restrictions contained in this Section 6.7, in view of the nature of the business in which the Company is engaged and the purchase to be made by Buyer at Closing hereunder, are reasonable and necessary in order to protect the legitimate interests of the Company, that their enforcement will not impose a hardship on Seller, and that any violation thereof would result in irreparable injuries to the Company. Seller therefore acknowledges that, in the event of Seller's violation of any of these restrictions,

27

L13241

the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief as well as damages, including the Company's legal and other costs of enforcing Seller's compliance with these restrictions, and an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.

(iv)    If the Restricted Period or the Restricted Area specified in Section 6.7(a) above should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such amount or the area shall be reduced by the elimination of such portion or both such reductions shall be made so that such restrictions may be enforced for such time and in such area as is adjudged to be reasonable. If Seller violates any of the restrictions contained in this Section 6.7(a), the Restricted Period shall be extended by a period equal to the length of time from the commencement of any such violation until such time as such violation shall be cured by Seller to the satisfaction of the Company. The Company shall have the right and remedy to require Seller to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Seller as the result of any transactions constituting a breach of this Section 6.7, and Seller shall account for and pay over such amounts to the Company upon the Company's request therefor. Seller hereby expressly consents to the jurisdiction of any court within the Restricted Area to enforce the provisions of this Section 6.7, and agrees to accept service of process by mail relating to any such proceeding. The Company may supply a copy of Section 6.7 of this Agreement to any person to whom Seller has supplied information if the Company determines in good faith that there is a reasonable likelihood that Seller has violated or will violate this Section 6.7.

## SECTION 7.    CERTAIN CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the acquisition of the Shares is subject to the fulfillment by or at the Closing of each of the following conditions:

7.1    <u>Representations and Warranties</u>. Seller's representations and warranties contained in this Agreement shall be deemed to have been made again at and as of the Closing and shall then be true and correct in all material respects, except for representations and warranties qualified by materiality, which shall be true and correct in all respects.

7.2    <u>Performance of Covenants</u>. Company and Seller shall have performed or complied in all respects with all of the agreements in this Agreement to be performed or complied with by them prior to or at the Closing.

7.3    <u>Approvals</u>. The consents or approvals set forth in <u>Schedule 7.3</u> attached hereto shall have been obtained and no such consent or approval: (a) shall have been conditioned upon the modification, cancellation or termination of any material lease, commitment, agreement, easement, right or Authorization of Company; or (b) shall impose on the Buyer or Company any material condition, provision or requirement not presently imposed upon Seller or Company.

28

L13242

7.4    Legal Matters. The Closing shall not violate any order or decree of any court or governmental body of competent jurisdiction and no suit, action, proceeding or investigation, shall be pending or threatened which questions the validity or legality of this Agreement or the transactions contemplated hereby.

7.5    Resignation of Directors and Officers. Buyer shall have received resignations effective as of the Closing Date from such of the officers and directors of Company as it shall have requested in writing no less than five days before the Closing Date.

7.6    Opinion of Counsel. Buyer shall have received opinions reasonably satisfactory to Buyer of Holland & Knight, LLP and Horack, Talley, Pharr & Lowndes, as counsel for Seller and the Company, dated as of the Closing, with respect to the matters set forth on Exhibit B hereto.

7.7    No Material Adverse Change. The shall have been no material adverse change in the business, assets, financial condition or prospects of the Company.

7.8    Indebtedness. Seller shall deliver to Company a release for any indebtedness, obligation or claim for which Seller or a Related Party of Seller may be entitled. Seller and each Related Party of Seller shall pay to the Company all amounts due under any obligations, loans or similar instruments evidencing indebtedness of such persons to the Company.

7.9    Tax Affidavits. Seller shall deliver to the Buyer at the Closing an affidavit in a form provided by Buyer which is consistent with Section 1.1445-2(b)(2) of United States Treasury Regulations, affirming that Seller is not a "foreign person" against whose proceeds the Buyer might otherwise be required to withhold under Section 1445 of the Code.

7.10    Estoppel Letters. Seller shall deliver to Buyer the estoppel letters from each of the Company's lenders in form and substance reasonably satisfactory to Buyer.

7.11    Intercompany Loan. Seller shall cause the Intercompany Loan, and any accrued but unpaid interest thereon, to be converted to equity in the Company effective as of the Closing Date.

7.12    Insolvency Exclusion. Seller shall claim an insolvency exclusion under Section 108(a)(1)(B) of the Code to exclude debt-discharge income from gross income upon the discharge of debt contemplated by the Settlement and Release Agreement (See Section 8.4).  As a requirement for claiming this exclusion, Seller shall reduce its tax attributes, pursuant to Section 108(b) of the Code, to the extent of the amount of debt discharged and excluded from gross income.

**SECTION 8.   CERTAIN CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS**

The obligation of Seller to consummate the sale of the Shares is subject to the fulfillment by or at the Closing of each of the following conditions:

29

L13243

8.1    Representations and Warranties. Buyer's representations and warranties contained in this Agreement shall be deemed to have been made again at and as at the Closing and shall then be true and correct in all material respects, except for representations and warranties qualified by materiality, which shall be true and correct in all respects.

8.2    Performance of Covenants. Buyer shall have performed or complied in all material respects with all of the agreements in this Agreement to be performed or complied with by it prior to or at the Closing, except for agreements, covenants and conditions qualified by materiality, which shall be conformed and complied with in all respects.

8.3    Legal Matters. The Closing shall not violate any order or decree of any court or governmental body of competent jurisdiction and no suit, action, investigation, or legal or administrative proceeding shall be pending which questions the validity or legality of this Agreement or the transactions contemplated hereby.

8.4    Settlement and Release Agreement. Seller and Company shall have entered into that certain Settlement and Release Agreement (the "Settlement Agreement") with Swiss Reinsurance American Corporation ("Swiss Re") in the form attached hereto as Exhibit 8.4.

| Deleted: |

### SECTION 9.  CLOSING

9.1    Time and Place of Closing. The closing of the purchase and sale of the Shares (the "Closing") pursuant to this Agreement shall take place at the offices of Sack Harris & Martin, P.C., 8270 Greensboro Drive, Suite 810, McLean, VA 22102 commencing at 9:00 A.M., local time, on December 17, 2004 (the "Closing Date") or at such other time and place as the parties may agree in writing.

| Deleted: 6 |

9.2    Deliveries at the Closing. At the Closing, in addition to the other actions contemplated elsewhere herein:

(a)    Seller shall deliver, or shall cause to be delivered, to Buyer the following:

(i)    certificates representing all of the Shares owned by Seller, duly endorsed for transfer or with stock powers affixed thereto executed in blank in proper form for transfer;

(ii)    a certificate, dated the Closing Date and signed by Seller to the effect set forth in Sections 7.1, 7.2 and 7.3;

(iii)    the signed resignations of all officers and all directors of the Company, dated and effective as of the Closing Date;

(iv)    general releases in favor of Company executed by each shareholder and by each director and officer of the Company in form and substance satisfactory to counsel for Buyer, releasing the Company from all liability to such person;

30

L13244

(v)    an agreement, in form and substance reasonably satisfactory to Buyer, transferring to Buyer for no additional consideration all rights in any names, tradenames, domain names and any other intellectual property used in any aspect of the Company's business which are owned by Seller;

(vi)    such other documents and instruments as Buyer may be reasonably request to effectuate or evidence the transactions contemplated by this Agreement.

(b)    Seller shall cause Company to deliver to Buyer the following:

(i)    a certificate, dated the Closing Date and signed by the President or Vice President of Company, to the effect set forth in Sections 7.1, 7.2 and 7.3;

(ii)    copies of Company's certificates or articles of incorporation and bylaws, or the corresponding charter documents, and all amendments thereof to date, certified as of a recent date by the Secretary of State or corresponding certifying authority of each such entity's respective jurisdiction of organization and by the Secretary or an Assistant Secretary of Company each such entity;

(iii)    certificates of good standing of a recent date for Company and Seller, certified by the Secretaries of State or corresponding certifying authorities of each such entity's respective jurisdiction of organization and of each state in which such entities are qualified to do business;

(iv)    copies of the resolutions of the board of directors or corresponding governing body of Company and Seller authorizing the execution, delivery and performance of this Agreement and the other agreements and instruments referred to herein, certified as of the Closing Date by the Secretary or an Assistant Secretary of Company and Seller, respectively;

(v)    the original corporate seals, minute books and stock transfer and record books of Company as they exist on the Closing Date and such of their files, books and records as Buyer may request;

(vi)    the releases more fully described in Section 7.9; and

(vii)    such other documents and instruments as Buyer may reasonably request to effectuate or evidence the transactions contemplated by this Agreement.

(c)    Buyer shall deliver, or shall cause to be delivered, to Seller or Seller's assignee the items set forth below:

(i)    the Purchase Price;

(ii)    a certificate of Buyer, signed by an officer of Buyer, to the effect set forth in Sections 8.1 and 8.2;

L13245

(iii)    a copy of Buyer's certificate of incorporation and bylaws and all amendments thereof to date, certified as of a recent date by the Secretary of State of Delaware and by the Secretary or an Assistant Secretary of Buyer, and accompanied by a certificate of good standing as of a recent date for Buyer, certified by the Secretary of State of Delaware;

(iv)    a copy of the resolutions of the board of directors of Buyer authorizing the execution, delivery and performance by Buyer of this Agreement and the other agreements and instruments referred to herein, certified as of the Closing by the Secretary or an Assistant Secretary of Buyer;

(v)    such other documents and instruments as Seller may reasonably request to effectuate or evidence the transactions contemplated by this Agreement; and

9.3    Default by Seller at the Closing.  If Seller shall fail or refuse to deliver any of the Shares or to take any other action required by this Agreement to have been taken prior to or at the Closing, such failure or refusal shall not relieve Seller of its obligations under this Agreement and Buyer, at its option and without prejudice to its rights against Seller, may either (i) acquire all the Shares which the Seller has agreed to sell to Buyer hereunder, or (ii) determine to not make such acquisition and terminate all of its obligations hereunder. Seller acknowledges that the Shares are unique and agrees that in addition to any other remedies against Seller, Buyer shall have the right, without limitation, to seek and obtain all available equitable remedies to enforce delivery of the Shares hereunder, including, without limitation, an action or suit for specific performance.

9.4    Accounts Receivable From Employees of Company. With respect to any accounts or notes receivable from employees of the Company to the Company that exist at the close of business on the Closing Date and that remain unpaid and uncollected 180 days following the Closing (collectively, the "Covered Receivables"), Seller shall pay to Buyer, within five business days after receipt of a listing of all such Covered Receivables, the unpaid balance thereof. If the amount of such payment shall be in dispute, Seller shall pay the undisputed portion, if any, and the parties shall attempt in good faith to resolve the dispute.  If the parties are unable to resolve the dispute within 30 days following receipt by Seller of such listing of unpaid Covered Receivables, the dispute shall be resolved by applicable judicial proceedings.  Buyer shall cause any Covered Receivable for which Buyer has been paid under this Section to be assigned to Seller. Any proceeds received thereafter with respect to such assigned receivables shall be the property of Seller, and if received by Buyer or the Company shall be paid to Seller. Prior to such assignment, Buyer shall use reasonable efforts to collect, in accordance with their terms, all Covered Receivables and, upon prior notice, shall provide Seller or its designated representatives during normal business hours with reasonable access to Company's books and records concerning the Covered Receivables.

9.5    Remittance of Payments. From and after the Closing, Seller shall immediately remit to Company, in the form received, any payments which it or any affiliate may receive (such as payments of accounts receivable) which properly belong to Company.

32

L13246

**SECTION 10.    INTENTIONALLY OMITTED**

**SECTION 11.    INDEMNIFICATION**

11.1    <u>Indemnification by Seller</u>.  Seller shall indemnify and hold Buyer, Company and their respective officers, directors and shareholders (collectively the "Buyer Indemnitees") harmless against and in respect of any and all losses, costs, expenses, claims, damages, obligations and liabilities, including interest, penalties and reasonable attorneys fees and disbursements ("Damages"), which any of the Buyer Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any breach of any covenant, representation or warranty made by Seller in or pursuant to this Agreement.  No representation or warranty contained herein shall be deemed to have been waived, affected or impaired by any investigation made by or knowledge of Buyer.  Seller shall also indemnify and hold the Buyer Indemnitees harmless against and in respect of any and all Damages which any of the Buyer Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any breach prior to Closing of Sections 1.1, 6.1, 6.2, 6.3(a)(b) and (d), 6.4, 6.5 and 6.6.  Notwithstanding the foregoing, Seller shall not be required to pay any amount with respect to any claim pursuant to this Section 11 unless (i) the amount of damages for a single claim is at least $1,500 and (ii) the aggregate of all Damages exceeds $100,000, in which event Seller shall be liable only for the amount of such Damages which exceed $100,000; provided, however, that the $100,000 "basket" will not apply to (i) any breach of the representations and warranties contained in Section 3, (ii) the breach of any of representations and warranties of Seller or Company of which breach Seller or Company had knowledge (as defined in Section 4.3(c)) on the date on which such representation and warranty is made, (iii) any intentional breach by Seller or Company of any covenant or obligation set forth in this Agreement, or (iv) any indemnification required by Section 11.7.  Seller's liability (for indemnification or otherwise) with respect to claims under this Section 11 shall not exceed $6,500,000, provided that this limitation shall not apply with respect to Seller's obligations under Sections 4.18 or 11.4, or to claims arising from the fraudulent, willful or intentional misrepresentation or omission of Seller.

11.2    <u>Indemnification by Buyer</u>.  In the event Closing hereunder is consummated, Buyer shall indemnify and hold Seller and its respective officers, directors and shareholders (collectively the "Seller Indemnitees") harmless against and in respect of any and all Damages which any of the Seller Indemnitees may suffer, incur or become subject to arising out of, based upon or otherwise in respect of: (a) any breach of any representation or warranty of Buyer made in or pursuant to this Agreement; or (b) any breach of any covenant made by Buyer in this Agreement.

11.3    <u>Third Party Claims</u>.

(a)    Each person entitled to indemnity pursuant to this Agreement (an "Indemnified Party") shall promptly notify the person required to indemnify such Indemnified Party (an "Indemnifying Party") of the assertion in writing by any third party of any claim (each an "Indemnity Payment") with respect to which the indemnification set forth in this Section relates. The failure of the Indemnified Party to give such notice shall reduce and limit the Indemnified Party's rights under this Section 11.3(a) only to the extent failure to give prompt

33

| Deleted: 2 |
| Deleted: 4 |
| Deleted: [ |
| Deleted: ] |

L13247

notice prejudices the Indemnifying Party's ability to defend such third party claim or to mitigate the Damages arising therefrom. The Indemnifying Party shall have the right, upon notice to the Indemnified Party within ten business days after the receipt of notice from the Indemnified Party, to undertake the defense of such claim with counsel satisfactory to the Indemnified Party or, with the consent, which shall not unreasonably be withheld or delayed, of the Indemnified Party, to settle or compromise such claim. The failure of the Indemnifying Party to give such notice and to so undertake and diligently prosecute the defense of or to settle or compromise such a claim shall constitute a waiver of the Indemnifying Party's rights under this Section 11.3(a) and shall preclude the Indemnifying Party from disputing the manner in which the Indemnified Party may conduct the defense of such claim or the reasonableness of any amount paid by the Indemnified Party in satisfaction of such claim.

(b)    The election by the Indemnifying Party, pursuant to Section 11.3(a), to undertake the defense of a third-party claim shall not preclude the party against which such claim has been made also from participating or continuing to participate in such defense, so long as such party bears its own legal fees and expenses for so doing.

11.4    Tax Indemnification and Other Matters.

(a)    Seller shall be responsible for and shall indemnify and hold harmless the Buyer Indemnitees from and against any and all losses for or in respect of each of the following:

(i)    any and all Taxes (including any Taxes resulting from the inclusion of Company in a consolidated, combined or unitary tax Return) with respect to all taxable periods of Company ending on or prior to the Closing Date and, to the extent provided in Section 11.4(b) hereof, all taxable periods that include, and end after, the Closing Date (other than, in each case, Taxes for which sufficient current accruals have been made on the Balance Sheet); and

(ii)    any and all Taxes resulting from any breach of the representations and warranties contained in this Agreement.

(b)    Taxes, if any, attributable to the taxable periods of Company beginning on or before and ending after the Closing Date shall be allocated (i) to the Seller for the period up to and including the Closing Date, and (ii) to Buyer for the period subsequent to the Closing Date. For purposes of this Section 11.4(b), Taxes for the period up to and including the Closing Date and for the period subsequent to the Closing Date shall be determined on the basis of an interim closing of the books as of the Closing Date or, to the extent not susceptible to such allocation, by apportionment on the basis of elapsed days.

(c)    Buyer shall be responsible for, and shall pay or cause to be paid, and shall indemnify and hold harmless the Seller from and against any and all losses for or in respect of each of the following:

(i)    any and all Taxes (including any Taxes resulting from the inclusion of Company in a consolidated, combined or unitary Tax Return) with respect to all taxable periods of Company beginning after the Closing Date and, to the extent provided in

34

L13248

Section 11.4(b) hereof, all taxable periods that include, and end after, the Closing Date (other than, in each case, Taxes for which Seller is responsible pursuant to Section 11.4(a)(ii) hereof); and

        (ii)    Taxes for which sufficient current accruals have been made on the Balance Sheet and are specifically shown therein as accruals for unpaid taxes; and

        (iii)    any and all adverse tax consequences resulting from the Election (i.e., taxes incurred by Seller or the Company that would not have been incurred if the Election had not been made, including but not limited to taxes paid with respect to any reimbursement pursuant to this Section 11.4(c)(iii)).

        (d)    (a)    Seller shall be responsible for preparing all Tax Returns required to be filed by or on behalf of Company and all of its operations and assets on or before the Closing Date (taking into account applicable extensions of time) and shall pay or cause to be paid any Taxes shown to be due thereon. All such Tax Returns shall be prepared in a manner consistent with past practices and copies of such Tax Returns shall be delivered to Buyer for Buyer's review, comment and approval at least fifteen (15) business days prior to filing; provided, however that such approval shall be limited to confirming that such Tax Returns accurately reflect the transactions contemplated by this Agreement and such approval shall not be unreasonably withheld, conditioned or delayed. The appropriate officers of Company and, if applicable, Seller and Buyer shall sign and file such Tax Returns. Buyer shall be responsible for filing or causing to be filed all Tax Returns required to be filed by or on behalf of Company and any of its operations and/or assets after the Closing Date (taking into account applicable extensions of time).

        (i)    With respect to any Tax Return required to be filed by Buyer for a taxable period of Company beginning on or before and ending on or after the Closing Date, Buyer shall provide Seller with a statement setting forth the amount of Tax shown on such Return for which Seller is responsible pursuant to Section 11.4(a) hereof or that is allocable to Seller pursuant to Section 11.4(b) hereof (as the case may be) (the "Statement") at least thirty (30) days prior to the due date for filing of such Tax Return (including extensions). Seller shall have the right to review such Tax Return and the Statement prior to the filing of such Tax Return. Seller and Buyer agree to consult and resolve in good faith any issues arising as a result of the review of such Tax Return and such Statement and to mutually consent to the filing as promptly as possible of such Tax Return. If the parties are unable to resolve any disagreement within fifteen business days following Seller's receipt of such Tax Return and Statement, the parties shall jointly request KPMG LLP to resolve any issue in dispute as promptly as possible and shall cooperate with KPMG LLP to resolve such disagreement. If KPMG LLP is unable to make a determination with respect to any disputed issue prior to the due date (including extensions) for the filing of the Tax Return in question, then Buyer may file such Tax Return on the due date (including extensions) therefor without such determination having been made. Notwithstanding the filing of such Tax Return, KPMG LLP shall make a determination with respect to any disputed issue, and the amount of Taxes that are allocated to Seller pursuant to this Section 11.4(d)(ii) shall be as determined by KPMG LLP. The fees and expenses of KPMG LLP shall be paid one-half by Buyer and one-half by Seller. Not later than five (5) business days before the due date (including extensions) for payment of Taxes with respect to such Tax Return

L13249

| | |
|---|---|
| Deleted: and | |

or in the case of a dispute, not later than five (5) business days after notice to Seller of resolution thereof, Seller shall pay to Company an amount equal to the Taxes shown on the Statement or as shown in such notice, as the case may be, as being the responsibility of Seller pursuant to Section 11.4(a) hereof or allocable to Seller pursuant to Section 11.4(b) hereof (as the case may be). No payment pursuant to this Section 11.4(d)(ii) shall excuse Seller from its indemnification obligations pursuant to Section 11.4(a) hereof should the amount of Taxes as ultimately determined (on audit or otherwise), for the periods covered by such Tax Returns and which are the responsibility of Seller, exceed the amount of Seller's payment under this Section 11.4(d)(ii).

(ii)     Seller may not file any amended Tax Returns or refund claims in respect of any taxable period of Company ending on or prior to the Closing Date without the prior written consent of Buyer.

(iii)     Seller shall cooperate fully with Buyer and make available to Buyer in a timely fashion such Tax data and other information as may be reasonably required for the preparation by Buyer of any Tax Returns required to be prepared and filed by Buyer hereunder. Seller and Buyer shall make available to the other, as reasonably requested, all information, records or documents in their possession relating to Tax liabilities of Company for all taxable periods of Company ending on, prior to or including the Closing Date and shall preserve all such information, records and documents until the expiration of any applicable Tax statute of limitations or extensions thereof; provided, however, that if a proceeding has been instituted for which the information, records or documents is required prior to the expiration of the applicable statue of limitations, such information, records or documents shall be retained until there is a final determination with respect to such proceeding.

(e)     Buyer shall promptly notify Seller in writing upon receipt by Buyer or Company of notice of any Tax audits of or proposed assessments against Company for taxable periods of Company ending on or prior to the Closing Date; provided, however, that the failure of Buyer to give Seller prompt notice as required herein shall not relieve Seller of any of its obligations under this Section 11.4, except to the extent that Seller is actually and materially prejudiced thereby. Buyer shall represent Company's interests in any such Tax audit or administrative or court proceeding and shall employ counsel of its choice. Seller agrees that it will cooperate fully with Buyer and its counsel in the defense against or compromise of any claim in any such audit or proceeding.

(f)     Except as provided in Section 11.4(d)(a)(i), any dispute as to any matter covered hereby shall be resolved by an independent accounting firm chosen by Buyer. The fees and expenses of such accounting firm shall be borne equally by Seller, on one hand, and Buyer on the other.

(g)     The parties hereto agree to furnish or cause to be furnished to each other, at their own expense, such information, access to books and records, and assistance, including making employees available during regular business hours on a mutually convenient basis, as may reasonably be necessary for the preparation and filing of any Tax Return contemplated by this Section 11.4.

36

L13250

11.5 . Tax Treatment of Indemnity Payments. Seller and Buyer agree to treat . any indemnity payment made pursuant to this Section 11 as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes.

11.6 Interest. In the event any party fails to make full payment with respect to an Indemnity Payment within 30 days after a request for such Indemnity Payment is made by an Indemnified Party, such unpaid Indemnity Payment shall bear interest until paid at a rate of 10% per annum or, if less, the highest rate permitted by applicable law.

11.7 Warranty Indemnity. If the amount of the out of pocket costs incurred by Company during the two (2) year period following the Closing Date for repairs and replacements (including 30 day punchlist items) on homes for which closing of the sale thereof has occurred prior to Closing (which repairs and replacements are required by the Company's warranty on such homes) exceeds in the aggregate the amount of the warranty reserve reflected on the Company's balance sheet as of the Closing Date, Buyer shall be entitled to indemnification for any and all such amounts.

11.8 Right of Set-Off. In the event that Buyer determines in good faith that it is entitled to any Damages or reimbursement from Seller pursuant to this Agreement, Buyer, Buyer's affiliates and Company shall, prior to exercising any other remedy against Seller, set-off the amount of such Damages or reimbursement against the funds being held for the benefit of Mattamy (Jacksonville) Partnership pursuant to that certain Escrow Agreement dated July 10, 2003 by and among Mattamy (Jacksonville) Partnership, Atlantic Builders, Inc. and RBC Centura Bank (the "Escrow Agreement"), as determined by Buyer in good faith (the "Set-Off Amount"), subject to the following provisions of this Section.  Prior to the Closing Date, the Escrow Agreement shall be amended to reflect the provisions of this Section 11.8, and the Termination Date (as defined in the Escrow Agreement) shall be extended to a date that is two years after the Closing Date. Upon a final determination of the actual amount of such Damages or reimbursement (the "Actual Amount"), if the Set-Off Amount is in excess of the Actual Amount (upon determination thereof), such excess shall be paid to Seller in accordance with Section 2.2(c) with payment of such amounts to be due within twenty (20) business days of the date on which the Actual Amount is determined.

11.9 Sole Remedy; Exclusion of Certain Damages; Mitigation. The parties understand and agree that, except as otherwise set forth in this Agreement:

(a)     The indemnification obligations provided for in Section 11 shall constitute the sole and exclusive remedy of the parties with respect to any matters or claims arising under this Agreement and the documents, instruments and agreements entered into in connection herewith, and the parties hereby waive, and unconditionally release each other from, any rights and remedies that they may otherwise have against each other.  No party shall have any liability (whether for indemnification or otherwise) for any Damages that are punitive, exemplary or special damages of any nature and for indirect or consequential damages, including damages for lost business opportunity or damage to business reputation or lost profits.

(b)     Buyer, on the one hand, and Seller, on the other hand, shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to use commercially

37

L13251

reasonable efforts to mitigate any Damages for which it may be entitled to seek indemnification pursuant to this Agreement. Buyer, on the one hand, and Seller, on the other hand, shall, and shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to use commercially reasonable efforts to obtain all insurance proceeds or other payments from third parties that may be available with respect to any Damages to which it may be entitled to indemnification under this Agreement. If any of the Buyer Indemnitees, on the one hand, or Seller Indemnitees, on the other hand, is indemnified by Seller, or by Buyer, as applicable, for any Damages pursuant to this Agreement with respect to any third party claim, then Seller, on the one hand, and Buyer, on the other hand, shall be subrogated to all rights and remedies of such Buyer Indemnitee or Seller Indemnitee, as applicable, against such third party, and Buyer, on the one hand, and Seller, on the other hand, shall cause each of the Buyer Indemnitees or Seller Indemnitees, as applicable, to reasonably cooperate with and assist Seller, on the one hand, and Buyer, on the other hand, as applicable, in asserting all such rights and remedies against such third party. If any of the Buyer Indemnitees, on the one hand, or Seller Indemnitees, on the other hand, after receiving any indemnification payment pursuant to this Agreement with respect to any Damages, subsequently receives any insurance proceeds or other payment with respect to such Damages, Buyer or Seller, as applicable, shall promptly refund and pay to Seller or Buyer, as applicable, an amount equal to such insurance proceeds or payment.

11.10  <u>Time Limitations</u>.

(a)    If the Closing occurs, Seller will have liability for indemnification pursuant to this Section 11 with respect to any breach of (i) a covenant or obligation to be performed with or complied with prior to the Closing Date or (ii) a representation, warranty, or obligation to be performed after the Closing Date (other than those in Sections 3.4, 4.12, 4.18, 4.19, 4.23, 6.7 and 11.4, as to which a claim may be made within the five (5) year anniversary of the Closing Date), in each case, at any time on or before the two (2) year anniversary of the Closing Date upon notice by Buyer or Seller of a validly asserted claim with respect hereto (and specifying the factual basis of the claim in reasonable detail to the extent then known by Buyer).

(b)    If the Closing occurs, Buyer will have liability for indemnification pursuant to this Section 11 with respect to any breach of (i) a covenant or obligation, to be performed or complied with prior to the Closing Date or (ii) a representation, warranty or obligation to be performed after the Closing Date (other than that set forth in Section 6.7(a)(ii) and 11.4, as to which a claim may be made within the five (5) year anniversary of the Closing Date), at any time on or before the two (2) year anniversary of the Closing Date upon notice by, Seller or Shareholder to Buyer of a validly asserted claim with respect hereto (and specifying the factual basis of the claim in reasonable detail to the extent then known by Seller.

## SECTION 12.  DEFINITIONS

"Actual Amount" shall have the meaning set forth in Section 11.8.

"Audited Financial Statements shall have the meaning set forth in Section 4.8(a).

"Authorizations" shall have the meaning set forth in Section 4.6(b).

"Balance Sheet" shall have the meaning set forth in Section 4.8(a).

38

L13252

"Buyer Transaction Documents" shall have the meaning set forth in Section 5.2.

"CERCLA" shall have the meaning set forth in Section 4.23(m)(ii).

"Closing" shall have the meaning set forth in Section 9.1.

"Closing Date" shall have the meaning set forth in Section 9.1.

"COBRA" shall have the meaning set forth in Section 4.19(b).

"Code" shall have the meaning set forth in Section 4.18(e).

"Company Transaction Documents" shall have the meaning set forth in Section 4.2.

"Confidential Information" shall have the meaning set forth in Section 6.7(a)(ii).

"Consolidated Group" shall have the meaning set forth in Section 4.18(a).

"Constructed" shall have the meaning set forth in Section 4.16(a).

"Covered Receivables" shall have the meaning set forth in Section 9.4.

"Current Real Property" shall have the meaning set forth in Section 4.23(b).

"Damages" shall have the meaning set forth in Section 11.1.

"DOL" shall have the meaning set forth in Section 4.19(d).

"Election" shall have the meaning set forth in Section 4.18(l)(i).

"Election Forms" shall have the meaning set forth in Section 4.18(l)(ii).

"Employee Benefit Plans" shall have the meaning set forth in Section 4.19(a).

"Employee Pension Benefit Plan" shall have the meaning set forth in Section 4.19(b).

"Environmental Laws" shall have the meaning set forth in Section 4.23(m)(i).

"ERISA" shall have the meaning set forth in Section 4.19(a).

"ERISA Affiliate" shall have the meaning set forth in Section 4.19(a).

"Escrow Agreement" shall have the meaning set forth in Section 11.8.

"Former Real Property" shall have the meaning set forth in Section 4.23(c).

"Hazardous Substances" shall have the meaning set forth in Section 4.23(m)(iii).

"Hazardous Waste" shall have the meaning set forth in Section 4.23(m)(iii).

39

L13253

"Indemnified Party" shall have the meaning set forth in Section 11.3(a).

"Indemnifying Party" shall have the meaning set forth in Section 11.3(a).

"Indemnity Payment" shall have the meaning set forth in Section 11.3(a).

"Intellectual Property" shall have the meaning set forth in Section 4.13(c).

"Inter Company Loan" shall have the meaning set forth in Section 4.22.

"Interim Balance Sheet" shall have the meaning set forth in Section 4.8(a).

"IRS" shall have the meaning set forth in Section 4.18(c).

"Land Contract Real Property" shall have the meaning set forth in Section 4.11(d).

"Laws" shall have the meaning set forth in Section 3.2(a)(ii).

"Leased Real Property" shall have the meaning set forth in Section 4.11(c).

"Material Contract" shall have the meaning set forth in Section 4.13(e).

"Minimum Value" shall have the meaning set forth in Section 7.5.

"Mold" shall have the meaning set forth in Section 4.23(l).

"Multiemployer Plan" shall have the meaning set forth in Section 4.19(c).

"OSHA" shall have the meaning set forth in Section 4.20(b).

"Option Real Property" shall have the meaning set forth in Section 4.11(d).

"Owned Real Property" shall have the meaning set forth in Section 4.11(b).

"PBCG" shall have the meaning set forth in Section 4.19(b).

"Permitted Encumbrances" shall have the meaning set forth in Section 4.11(b).

"Purchase Price" shall have the meaning set forth in Section 2.1.

"Real Property" shall have the meaning set forth in Section 4.11(a).

"Related Party" shall have the meaning set forth in Section 4.22.

"Release" shall have the meaning set forth in Section 4.23(m)(ii).

"Remedial Action" shall have the meaning set forth in Section 4.23(m)(ii).

"Removal" shall have the meaning set forth in Section 4.23(m)(ii).

L13254

"Response" shall have the meaning set forth in Section 4.23(m)(ii).

"Restricted Area" shall have the meaning set forth in Section 6.7(a)(i).

"Restricted Period" shall have the meaning set forth in Section 6.7(a)(i).

"Return" shall have the meaning set forth in Section 4.18(a).

"SARA" shall have the meaning set forth in Section 4.23(m)(ii).

"Seller Indemnitees" shall have the meaning set forth in Section 11.2.

"Seller Transaction Documents" shall have the meaning set forth in Section 3.1.

"Set-Off Amount" shall have the meaning set forth in Section 11.8.

"Shares" shall have the meaning set forth in Section 1.1.

"Statement" shall have the meaning set forth in Section 11.4(d)(a)(i).

"Taxes" shall have the meaning set forth in Section 4.18(a).

"Warranty Company" shall have the meaning set forth in Section 4.10.

## SECTION 13.   MISCELLANEOUS

13.1    <u>Further Assurances</u>. Each party hereto shall use commercially reasonable good faith efforts to comply with all requirements imposed hereby on such party and to cause the transactions contemplated hereby to be consummated as contemplated hereby and shall, from time to time and without further consideration, either before or after the Closing, execute such further instruments and take such other actions as any other party hereto shall reasonably request in order to fulfill its obligations under this Agreement and to effectuate the purposes of this Agreement and to provide for the orderly and efficient transition of the ownership of Company to Buyer. Seller shall, for five years after the Closing, retain its various books and records relating to Company and shall, upon prior notice, provide Buyer and its authorized representatives reasonable access thereto. Each party shall promptly notify the other parties of any event or circumstance known to such party that could prevent or delay the consummation of the transactions contemplated hereby or which would indicate a breach or non-compliance with any of the terms, conditions, representations, warranties or agreements of any of the parties to this Agreement.

13.2    <u>Costs and Expenses</u>. Except as otherwise expressly provided herein, each party shall bear its own expenses in connection herewith. Any and all transfer, sales, use, documentary and similar taxes and recording and filing fees incurred in connection with the transactions contemplated herein shall be borne one-half by Buyer and one-half by Seller (and not by Company).

41

L13255

13.3   Notices. All notices or other communications permitted or required under this Agreement shall be in writing and shall be sufficiently given if and when hand delivered to the persons set forth below or if sent by documented overnight delivery service or registered or certified mail, postage prepaid, return receipt requested, or by telecopy, receipt acknowledged, addressed as set forth below or to such other person or persons and/or at such other address or addresses as shall be furnished in writing by any party hereto to the others. Any such notice or communication shall be deemed to have been given as of the date received, in the case of personal delivery, or on the date shown on the receipt or confirmation therefor in all other cases.

| To Buyer: | Mattamy (US) Acquisition Corporation |
|  | 7800 Belfort Parkway |
|  | Suite 200 |
|  | Jacksonville, FL  32256 |
|  | Telephone: 904-219-8460 |
|  | Fax: 904-279-9556 |
|  | Attn: William R. Lanius |

┌─────────────────────┐
│ Deleted: Homes      │
└─────────────────────┘

| with a copy to: | Sack Harris & Martin, P.C. |
|  | 8270 Greensboro Drive |
|  | Suite 810 |
|  | McLean, VA  22102 |
|  | Telephone:  703-883-0102 |
|  | Fax: 703-883-0108 |
|  | Attn:  Robert A. Harris, IV, Esq. |

| To Seller: | ALH II, Inc. |
|  | 4444 Lakeside Drive |
|  | Second Floor |
|  | Burbank, CA  91505 |
|  | Telephone: (818) 973-4253 |
|  | Fax: (818) 556-6995 |
|  | Attn: George J. Buchler |

| with a copy to: | Holland & Knight LLP |
|  | 633 West Fifth Street |
|  | 21st Floor |
|  | Los Angeles, CA 90071-2040 |
|  | Telephone: 213-896-2452 |
|  | Fax: 213-896-2450 |
|  | Attn: Francis W. Costello, Esq. |

13.4   Assignment and Benefit.

(a)    Buyer may assign this Agreement in whole to any one or more subsidiaries or to any person which becomes a successor in interest (by purchase of assets or stock, or by merger or otherwise) to Buyer; provided, however, that any assignment by the Buyer shall not relieve Buyer of its obligations pursuant to this Agreement.  Except for those

42

L13256

assignments to SwissRe as contemplated by the Settlement Agreement, neither Company nor Seller shall assign this Agreement or any rights hereunder, or delegate any obligations hereunder, without prior written consent of Buyer. Subject to the foregoing, this Agreement and the rights and obligations set forth herein shall inure to the benefit of, and be binding upon, the parties hereto, and each of their respective successors, heirs and assigns.

(b)    This Agreement shall not be construed as giving any person, other than the parties hereto and their permitted successors, heirs and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions herein contained, this Agreement and all provisions and conditions hereof being intended to be, and being, for the sole and exclusive benefit of such parties, and permitted successors, heirs and assigns and for the benefit of no other person or entity.

13.5    Amendment, Modification and Waiver. The parties may amend or modify this Agreement in any respect, and Buyer, on the one hand, and Seller, on the other hand, may: (a) extend the time for the performance of any of the obligations of the other, (b) waive any inaccuracies in representations and warranties by the other, (c) waive compliance by the other with any of the obligations contained in this Agreement, or (d) waive the fulfillment of any condition precedent to the performance under this Agreement of the waiving party. Any such amendment, modification, extension or waiver shall be in writing. The waiver by a party of any breach of any provision of this Agreement shall not constitute or operate as a waiver of any other breach of such provision or of any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.

13.6    Governing Law, Venue and Attorneys' Fees and Costs. This Agreement is made pursuant to, and shall be construed and enforced in accordance with, the laws of the State of North Carolina (and United States federal law, to the extent applicable), irrespective of the principal place of business, residence or domicile of the parties hereto, and without giving effect to otherwise applicable principles of conflicts of law.

In connection with any legal proceedings arising out of this Agreement, the prevailing party in such proceeding shall be entitled to receive from the non-prevailing party reimbursement for costs and expenses incurred (including reasonable attorneys' fees), including in connection with any appellate proceedings.

13.7    Section Headings and Defined Terms. The section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement. The terms defined herein and in any agreement executed in connection herewith include the plural as well as the singular and the singular as well as the plural, and the use of masculine pronouns shall include the feminine and neuter. Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith.

13.8    Severability. The invalidity or unenforceability of any particular provision, or part of any provision, of this Agreement shall not affect the other provisions or parts hereof,

43

L13257

and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions or parts were omitted.

13.9    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original; and any person may become a party hereto by executing a counterpart hereof, but all of such counterparts together shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

13.10    Entire Agreement. This Agreement, together with the agreements, exhibits, schedules and certificates referred to herein or delivered pursuant hereto, constitute the entire agreement between the parties hereto with respect to the purchase and sale of the Shares and supersede all prior agreements and understandings. Without limiting the scope of the foregoing, the parties specifically acknowledge and agree that all employment agreements, shareholder agreements, subscription agreements and any similar agreements regarding the Shares that any Seller entered into at any time prior to the Closing hereunder are hereby terminated and superseded in all respects, and the Seller hereby waives any and all rights arising under such agreements with respect to the transactions contemplated by this Agreement. The submission of a draft of this Agreement or portions or summaries thereof does not constitute an offer to purchase or sell the Shares, it being understood and agreed that neither Buyer nor Seller shall be legally obligated with respect to such a purchase or sale or to any other terms or conditions set forth in such draft or portion or summary unless and until this Agreement has been duly executed and delivered by all parties.

44

L13258

| | |
|---|---|
| **From:** | Shalom Lamm [slamm@lionlamm.com] |
| **Sent:** | Friday, December 06, 2002 12:45 PM |
| **To:** | Arenson Avie; Isaac M. Neuberger |
| **Subject:** | Bowden Litigation |

**Attachments:**    021205 Mediation Notes.pdf



021205 Mediation
Notes.pdf (11...

                Avie & Isaac, good afternoon:

Bill Lanius attended mediation in Memphis regarding the Bowden litigation.
Attached is the report I asked him to forward to me following my conversation with him
last evening.

Kind regards,

-Shalom

PS:  A meeting is set with Swiss Re for December 12th at their offices in Stamford,
Connecticut.  In attendance will be Jon Zich, Bill Lanius and George Buchler.

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

L13349

- DRAFT -

# ALH II, Inc.

## (Privileged and Confidential)

| | |
|---|---|
| **DATE:** | December 6, 2002 |
| **TO:** | File |
| **FROM:** | Bill Lanius |
| **RE:** | Bowden Family Litigation - Mediation Notes |

Mediation Date: 12/5/02

1. The Bowden family members ("Plaintiffs") are passionate about their legal proceeding against ALH II, ALH Tenn and BBC ("Defendants").

2. In addition to amounts owed pursuant to our stock purchase agreement and related documents (approx. $3.6 million), Plaintiffs believe that they are owed substantial amounts for consequential and punitive damages.

3. Plaintiffs believe that they have been defrauded because ALH II did not maintain the required minimum net worth of $25 million and, in fact, did not have the required net worth in 3/99 when the purchase/sale of BBC occurred. The net worth deficiency was allegedly concealed from Plaintiffs because Defendants did not submit required quarterly financial information.

4. Plaintiffs allege that amounts owed to them were earmarked for newly created businesses that ultimately failed because they were not paid on a timely basis by Defendants.

5. Plaintiffs allege that Defendants were aware of Plaintiffs's cash needs and tried to take advantage by offering to pay/settle all outstanding balances with a substantial (and egregious) discount. When Plaintiffs refused, Defendants stopped payments altogether further exacerbating Plaintiffs financial position.

6. As a result of Defendant's actions, Plaintiffs claim they lost millions of dollars (minimum of $6.3 million) and were forced to sell their personal residences and airplane and to liquidate life insurance policies. In addition, Plaintiffs currently owe banks and other creditors an aggregate amount in excess of $3.5 million.

L13350

I explained the following points to Plaintiffs during the course of the mediation:

1. Earlier this year, ALH II's investors decided to sell the company and engaged an investment banking firm with considerable expertise in the homebuilding industry. We subsequently compiled a confidential offering memorandum that was provided to prospective acquirers on a targeted basis. These efforts have not resulted in any meaningful offers for ALH II in its entirety primarily because of operational issues that surfaced at MHI/Charlotte during the year.

2. The Walter/BBC transaction represents the only viable means of paying the Bowdens and, in that regard, our interests are mutually aligned. Defendants offer to pay all amounts owed to Plaintiffs pursuant to the stock purchase agreement, promissory note and related documents (approx. $3.6 million) contingent upon closing of the Walter/BBC transaction. Defendants do not recognize liability for consequential and punitive damages and do not have resources to pay such amounts anyway. ALH II would stand to incur a significant loss on the sale of BBC to Walter Industries.

3. Without support from the Bowdens, the Walter transaction will probably not materialize.

4. Despite operational improvements at ABI and BBC, ALH II continues to face significant financial challenges, particularly the $14.5 million Wachovia/SwissRe obligation due in 1/03. Etc.

5. The surety extension provided by SwissRe earlier this year was based on our expectation of selling ALH II and generating sufficient funds to repay the $27.5 million loan in its entirety during year 2002.

6. ALH II's balance sheet includes a goodwill balance of $35 million which creates a negative tangible net worth of $17 million at 9/30/02. The capital structure of ALH II creates a significant challenge in securing adequate and continuous construction financing for operations.

7. ALH II's investors will not commit any additional capital to ALH II. In effect, ALH II must "sink or swim" and, if necessary, is prepared to implement future protective actions including a Chapter 11 filing or other means of reorganization.

8. I offered to facilitate a meeting/conference call with members of the ALH II Board of Directors to validate or clarify any concerns or points of discussion. The Plaintiffs declined.

L13351

Plaintiffs were under the mistaken impressions that:

1. BBC's accumulated losses of approx. $2.6 million thru 9/30/02 were a result of post-acquisition plundering/mismanagement and had nothing to do with the conditions of the company on or before the acquisition date.

2. Walter Industries is actually interested in acquiring all three of ALH II's homebuilding operations, not just BBC.

3. ALH II's investors have guaranteed all loans and are willing to provide the necessary indemnifications to consummate the Walter/BBC transaction.

4. ALH II's investors will provide whatever future capital is necessary to keep the company solvent.

I refuted each of the foregoing points in detail directly with the Plaintiffs.

To settle this case in full, the Plaintiffs made these following sequential offers:

1. $30 million immediate cash.

2. $18 million immediate cash.

3. $15 million cash over an 18 month period with $5.5 million payable at closing of the Walter/BBC transaction (but no later than 1/31/03) and the balance payable upon sale of the other two homebuilding operations (but $4.5 million no later than 10/31/03 and the remaining $5.0 million no later than 7/31/04).

<u>Conclusion</u> - The Bowden family members are emotionally charged and have unrealistic expectations concerning the amounts to which they are entitled and could actually receive by continuing to pursue their litigation against ALH II, et al. Despite improved rapport and greater understanding of each party's position, no resolution was reached during the course of this mediation.

L13352

| From: | Shalom Lamm [slamm@lionlamm.com] |
|---|---|
| Sent: | Friday, July 26, 2002 8:54 AM |
| To: | Isaac M. Neuberger |
| Subject: | $105MM Sale |

Attachments:    B Group Worksheet.xls



B Group
Worksheet.xls (9 KB)

Isaac:

Welcome back.  Attached please find an Excel worksheet that has my best guess of the results of a $105MM sale.

The fact that you have brought this process as far as you have -- whether it ultimately proves successful or not -- dayainu.  Kol Hakavod.

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

L13353

**From:**       Shalom Lamm [slamm@lionlamm.com]
**Sent:**       Friday, July 26, 2002 8:49 AM
**To:**         jzich@burakorganization.com
**Subject:**    Re: London Preparation


that's a guess?  Thanks.

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

> From: "jon zich" <jzich@burakorganization.com>
> Organization: The Burak Organization
> Reply-To: <jzich@burakorganization.com>
> Date: Fri, 26 Jul 2002 08:44:23 -0400
> To: "'Shalom Lamm'" <slamm@lionlamm.com>
> Subject: RE: London Preparation
>
>
>
> My best guess
>
> Capital Contributions of the Class B Members of ALH Holdings, LLC
>
>
> A. Arenson Holdings, LTD.
> $1,168,750
>
> D.A. Gardens, Ltd.
> $   300,000
>
> J12ALH Associates LLC
> $1,468,750
>
> SELK LLC
> $2,937,500
>
> Laurel Equity Group
> $2,937,500
>
> Capital Contributions of the Class A Members of ALH Holdings, LLC
>
> $14,687,500
>
>
> -----Original Message-----
> From: Shalom Lamm [mailto:slamm@lionlamm.com]
> Sent: Friday, July 26, 2002 8:30 AM
> To: Jon Zich
> Subject: London Preparation
> Importance: High
>
> JZ:  I am preparing for the trip to London  on Sunday night.  I need
> (ASAP) the amount invested by the A's & B's (excluding the latest loan).
> I went to Steinbeck and believe the answer is their -- but I am having
> trouble deciphering it.
>
> Can you tell me what your impression is.  I need two simple numbers:
>
> A's invested X
> B's invested Y

L14046

```
>
> Thanks.
>
> -Shalom
>
> --
> Shalom Lamm
> Phone: 516-565-0868
> fax: 516-565-1819
> cell: 917-282-7375
>
>
>
```

L14047

REDACTED



REDACTED

> -----Original Message-----
> From: Shalom Lamm [mailto:slamm@lionlamm.com]
> Sent: Tuesday, August 06, 2002 10:19 PM
> To: Arenson Avie; Isaac Neuberger
> Cc: Lobell, J. Jay; Jon Zich
> Subject: George's Response to my Note
>
>
> I thought you might be interested in George's response to me.  His
> phone call to me preceding my note to him was laced with irritation.
> He made it clear that "Mr. Neuberger's letter lacked only three
> things; price, terms, and timing."  He reiterated that he would like
> to bought out by the B's.  He also made it clear in no uncertain terms
> that I am directed to sign the Bowden LOI as per the governing docs.
> -Shalom
>
> George's note to me in full:
>
>
> "I am likewise disappointed -- on two counts.
>
> You and I just finished agreeing on the phone within the past two
> hours that you would sign and fax the agreements within "twenty
> minutes" when you reached a fax machine.  Now you feel that you must
> delay for another day.
> While I always like to be courteous as well, we have already been
> courteous in keeping Avie apprised of what we're doing and allowing
> him his input.
> The LLC agreement allows us to act on issues such as this with or
> without his consent -- in this case, which is the first instance of
> there being such a disagreement, we have instructed you to move
> forward.  You have been advised by your counsel to do so, you have
> received written authority from the "A" investors and yet we have
> another delay.  This isn't how you sell a company, and from your
> standpoint, this is not how you satisfy your Board and your largest
> shareholder.

> As far as the Avie phone call goes, I am willing to make some
> allowance for Avie having been on a cell phone far away.  We had a
> long chat with Avie - probably about 45 minutes.  We NEVER agreed to
> making this subject to Avie's approval of a letter from Tony, which in
> no way will govern the ultimate financial outcome of this deal.  We of
> course agreed to send Avie the letter as soon as it was prepared,
> which of course we will honor.  I believe Avie's judgment here is
> being colored by his desire to buy us out -- but on that issue, we
> have absolutely nothing tangible - price, terms, deposit, etc. - which
> would lead us to believe that a deal is truly forthcoming, even though
> more than a week has transpired since the London meeting.
>
> For a change, let's move forward."
>
>

L14053

**From:**        Shalom Lamm [slamm@lionlamm.com]
**Sent:**        Friday, October 04, 2002 7:19 AM
**To:**        Isaac M. Neuberger
**Subject:**     Re: From Tony Avila

Sorry Isaac - just saw your message this morning.  I would have been happy to speak with you last night.  I'm driving my family to Cleveland today (family Bas Mitzvah in Cleveland).  Driving back Sunday.

I will try to touch base with you -- do you have time Sunday night-ish in the 9PM area?

-Shalom

--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

> From: "Isaac M. Neuberger" <IMN@NQGRG.com>
> Date: Thu, 3 Oct 2002 17:01:31 -0400
> To: "Shalom Lamm" <slamm@lionlamm.com>
> Subject: RE: From Tony Avila
>
> call me anytime before midnight
>
> -----Original Message-----
> From: Shalom Lamm [mailto:slamm@lionlamm.com]
> Sent: Thursday, October 03, 2002 3:25 AM
> To: Isaac M. Neuberger
> Subject: Re: From Tony Avila
>
>
> Agreed  - I have the kernel of an "out of the box" idea I'd like to
> discuss with you before a call.
>
> Zich and I had a good meeting today with the bank on Dublin.  I'll
> give you details tomorrow.
>
> It's 3:30AM.  I think it's time to go to bed -- thank goodness I don't
> go to a k'vasikin minyan!
>
> -Shalom
>
> --
> Shalom Lamm
> Phone: 516-565-0868
> fax: 516-565-1819
> cell: 917-282-7375
>
>> From: "Isaac M. Neuberger" <IMN@NQGRG.com>
>> Date: Wed, 2 Oct 2002 11:07:44 -0400
>> To: "Shalom Lamm" <slamm@lionlamm.com>, "Arenson Avie"
>> <avie@arenson.co.il>, "Menashe Frankel" <mfrankel@iaac.com>, "Michael Jesselson"
>> <mgj@attglobal.net>, "Michel Konig" <konig@skynet.be>, "Hesky Frankel"
>> <starjewelers@aol.com>
>> Subject: RE: From Tony Avila
>>
>> it seems to me that once Avie hears back from Shamrock, that we
>> should convene another conference call
>>
>> -----Original Message-----
>> From: Shalom Lamm [mailto:slamm@lionlamm.com]
>> Sent: Tuesday, October 01, 2002 10:29 PM

L14054

```
>> To: Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig;
>> Isaac M. Neuberger; Hesky Frankel
>> Subject: From Tony Avila
>>
>>
>> Gentlemen:
>>
>> I (and George Buchler & Gene Krieger) recieved the following from
>> Tony Avila.  FYI.
>>
>> "Gentlemen, As I feared, when we forced Walter to get into the
>> details, the gap is even wider. They are proposing net proceeds of
>> $4mm and I proposed net proceeds of nearly $8mm. See their marked up
>> spreadsheet below. I will find out exactly how high they will go on
>> net proceeds. This is still their typical lowball style. My guess is
>> I could get them to net proceeds of $6mm based upon where they are
>> today. Give me a call to discuss when you have a moment. Best regards, Tony"
>>
>> --
>> Shalom Lamm
>> Phone: 516-565-0868
>> fax: 516-565-1819
>> cell: 917-282-7375
>>
>> *********************************
>> CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn,
>> Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for
>> the use ONLY of the intended recipient and may constitute a
>> communication protected by the attorney-client privilege.  If you are
>> not the intended recipient or a person responsible for delivering it
>> to the intended recipient, you are hereby notified that any use,
>> distribution, or copying of this communication or its contents is
>> strictly prohibited.  If you have received this communication in
>> error, please notify us immediately by telephone at (410) 332-8550.
>> *********************************
>
> *********************************
> CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn,
> Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the
> use ONLY of the intended recipient and may constitute a communication
> protected by the attorney-client privilege.  If you are not the
> intended recipient or a person responsible for delivering it to the
> intended recipient, you are hereby notified that any use,
> distribution, or copying of this communication or its contents is
> strictly prohibited.  If you have received this communication in error, please notify us
immediately by telephone at (410) 332-8550.
> *********************************
```

From:       Shalom Lamm [slamm@lionlamm.com]
Sent:       Sunday, March 16, 2003 6:30 AM
To:         Jon Zich
Subject:    FW: ist installment


Very, very strange. -Shalom


--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

----------
From: "Isaac M. Neuberger" <IMN@NQGRG.com>
Date: Sun, 16 Mar 2003 06:05:29 -0500
To: <avie@arenson.co.il>, "Michel Konig \(E-mail\) \(E-mail\)"
<konig@skynet.be>
Subject: FW: ist installment

very strange...indeed

-----Original Message-----
From: M.G. Jesselson [mailto:mgj@jesselson.com]
Sent: Friday, March 14, 2003 5:18 PM
To: Isaac M. Neuberger
Subject: Re: ist installment


[Message body truncated by Infowave, see end of message]

met with stanley
didnt speak at all about alh
just about his israeli fund..

on the way out i brought it up in passing no tachlis just that we'll stay partners...

shabat shalom
mgj

At 10:27 PM 3/12/2003 -0500, you wrote:
>   <<Performance review>>  <<Please call Shalom Lamm (917)
> 282-7375>>  <<Re: Thoughts>>  <<ALH Status - now & the
> future>>  <<ALH>>  <<final draft with changes..I would show open
> future>> copies
> to the Bs, when sent>>
>********************************
>CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn,
>Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the
>use ONLY of the intended recipient and may constitute a communication
>protected by the attorney-client privilege.  If you are not the
>intended recipient or a person responsible for delivering it to the
>intended recipient, you are hereby notified that any use, distribution,
>or copying of this communication or its contents is strictly
>prohibited.  If you have received this communication in error, please
>notify us immediately by telephone at (410) 332-8550.
>********************************
>Received:  from darius.concentric.net ([207.155.198.79]) by
>senaca.nqgrg.com with Microsoft SMTPSVC(5.0.2195.5329); Thu, 6 Mar 2003
>08:30:34 -0500
>MIME-Version: 1.0
>Content-Type: text/plain;
>          charset="iso-8859-1"
>Received:  from mcfeely.concentric.net (mcfeely.concentric.net

L14133

From:        Shalom Lamm [slamm@lionlamm.com]
Sent:        Sunday, March 16, 2003 6:30 AM
To:          Jon Zich
Subject:     FW: ist installment


Very, very strange. -Shalom


--
Shalom Lamm
Phone: 516-565-0868
fax: 516-565-1819
cell: 917-282-7375

----------
From: "Isaac M. Neuberger" <IMN@NQGRG.com>
Date: Sun, 16 Mar 2003 06:05:29 -0500
To: <avie@arenson.co.il>, "Michel Konig \(E-mail\) \(E-mail\)"
<konig@skynet.be>
Subject: FW: ist installment

very strange...indeed

-----Original Message-----
From: M.G. Jesselson [mailto:mgj@jesselson.com]
Sent: Friday, March 14, 2003 5:18 PM
To: Isaac M. Neuberger
Subject: Re: ist installment


[Message body truncated by Infowave, see end of message]

met with stanley
didnt speak at all about alh
just about his israeli fund..

on the way out i brought it up in passing no tachlis just that we'll stay partners...

shabat shalom
mgj

At 10:27 PM 3/12/2003 -0500, you wrote:
>  <<Performance review>>  <<Please call Shalom Lamm (917)
> 282-7375>>  <<Re: Thoughts>>  <<ALH Status - now & the
> future>>  <<ALH>>  <<final draft with changes..I would show open
> future>> copies
> to the Bs, when sent>>
>**********************************
>CONFIDENTIALITY NOTICE:  This e-mail message from Neuberger, Quinn,
>Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the
>use ONLY of the intended recipient and may constitute a communication
>protected by the attorney-client privilege.  If you are not the
>intended recipient or a person responsible for delivering it to the
>intended recipient, you are hereby notified that any use, distribution,
>or copying of this communication or its contents is strictly
>prohibited.  If you have received this communication in error, please
>notify us immediately by telephone at (410) 332-8550.
>**********************************
>Received:  from darius.concentric.net ([207.155.198.79]) by
>senaca.nqgrg.com with Microsoft SMTPSVC(5.0.2195.5329); Thu, 6 Mar 2003
>08:30:34 -0500
>MIME-Version: 1.0
>Content-Type: text/plain;
>        charset="iso-8859-1"
>Received:  from mcfeely.concentric.net (mcfeely.concentric.net

L14133

**From:**      Shalom Lamm [slamm@cannondev.com]
**Sent:**      Friday, April 16, 2004 2:20 AM
**To:**        Arenson Avie; Menashe Frankel; Michael Jesselson; Michel Konig; Isaac Neuberger; Hesky
**Subject:**   Conversation with Lanius

Gentlemen:

I had a conversation with Bill Lanius  today that yielded some important
issues:

1.  Wachovia -- the prime construction lender at Mulvaney -- does not want to renew the
construction line when it is matures at end of year.  This is the largest line and not
replaceable.  This would be devastating to Mulvaney.

2.  Ohio Savings Bank (which has been informed of 1 above by Bill), and is very deeply
concerned about this.

3.  Swiss Re has been informed of #1 as well.  Understandably super-concerned (that could
work strategically well if all else can be solved).

4.  The sale of Bowden has been put off by a week, but will still close.

5.  Bill has been completely overwhelmed by his current responsibilities.
He would like to work on the plans we have discussed, but will not be bale to get to it in
earnest until the week of April 25th.

-Shalom

--
Shalom E. Lamm
Phone & Fax: 877-869-6465
cell: 917-282-7375

L14148