# EXHIBIT A

031307in kp.txt

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


------------------------)
IN RE: ALH HOLDINGS LLC ) Consol. Civil Action
------------------------)   No. 04-1339-SLR


            Deposition of ISAAC M. NEUBERGER taken
pursuant to notice at the law offices of Neuberger
Quinn Gielen Rubin Gibber, P.A., One South Street,
27th Floor, Baltimore, Maryland, beginning at
9:15 a.m. on Tuesday, March 13, 2007, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.


APPEARANCES:

              ALAN J. STONE, ESQUIRE
              SAMUEL T. HIRZEL, ESQUIRE
              MORRIS NICHOLS ARSHT & TUNNELL
                 1201 North Market Street - 18th Floor
                 Wilmington, Delaware   19899
                 for the Plaintiff and Counterclaim
              Defendants

              THOMAS M. WOOD, IV, ESQUIRE
              NEUBERGER QUINN GIELEN RUBIN GIBBER, P.A.
                 One South Street - 27th Floor
                 Baltimore, Maryland 21202-3282
                 for the Defendants and Counterclaim
                 Plaintiffs



---------------------------------------------------
                 WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477

                 www.wilfet.com


⬜

2



1              ISAAC M. NEUBERGER,

2      the witness herein, having first been

                    Page 1

031307in kp.txt

8  investments that Mr. Lamm had promoted?

9    A.    I may have been based on information that Lamm

10  provided, but I don't recall.

11    Q.    Did you ever form an attorney/client

12  relationship with Mr. Lamm?

13    A.    No, other than in the limited sense that he was

14  a member of SELK and we represented SELK.  But not

15  with him, personally.

16    Q.    When SELK was formed, am I correct that NACA

17  was to have a 70 percent interest and Mr. Lamm was to

18  have a 30 percent interest?

19    A.    My recollection is that there are stated

20  percentages, but there's formulas within those

21  percentages.  And without the benefit of the document,

22  I can't be specific how that formula works.

23    Q.    Do you recall there being provisions that would

24  require Mr. Lamm to forfeit his economic interest in

☐

15

Isaac M. Neuberger

1  SELK if there was not an exit from ALH within two

2  years?

3    A.    I don't think there was ever forfeiture

4  provided for.  It's conceivable that the creeping

5  incremental interest on the NACA side would have

6  diminished just by sheer math unless the value was so

7  great so that the hurdles that were built into the

8  formula would have given NACA the benefit of its

9  bargaining and at the same time provided economic

10  benefits to Mr. Lamm.

Page 13

031307in kp.txt

17    with respect to its investment in ALH?

18      A.    SELK didn't have any money of its own.  It was

19    merely used as a vehicle.  So I assume that NACA would

20    have made those decisions because it was funding or

21    providing some form of credit enhancement which

22    allowed SELK or Lamm to borrow money.  But I don't

23    remember the specifics.

24      Q.    Was Lamm authorized to make unilateral

18

Isaac M. Neuberger

1    decisions on behalf of SELK?

2      A.    No.

3                 (Neuberger Exhibit 1 was marked for

4    identification.)

5    BY MR. STONE:

6      Q.    Mr. Neuberger, the reporter has placed before

7    you a document that's been marked as Neuberger

8    Exhibit 1.  It's an October 3rd, 2006, letter from Sam

9    Wood of your firm to Mark Hurd of my firm, and it has

10    an attachment which I want to focus on, the very last

11    page of the document.  It's a document entitled

12    "Client/Matter Master Form."  Do you recognize this

13    document?

14      A.    No.  I mean, I know it's one of our forms.

15      Q.    What's the purpose of this form at the

16    Neuberger firm?

17      A.    Opening new files.

18      Q.    Is this a Client/Matter Master Form in which

19    you opened a matter for Michel Konig?

Page 16

031307in kp.txt

20    A.    Appears to be.

21    Q.    Were you representing Mr. Konig personally?

22    A.    I have, but it was just easier -- this is

23    merely a place where I was keeping the information

24    relative to the American Landmark Homes investment.

☐                                                          19

Isaac M. Neuberger

1    But at all times it was NACA, Davidovici, and

2    Mr. Konig was acting as an advisor.

3        Q.    So this was the form by which you opened a

4    matter for the trust and NACA and its investment in

5    ALH?

6        A.    Yes.

7        Q.    It lists as adverse interest, American Landmark

8    Homes Corporation, John D. Hourihan, Lion & Lamm

9    Development, Inc.  Why were they adverse interests?

10       A.    It's merely the screen that we use to determine

11    conflicts.  I could probably list a whole bunch of

12    people in there and I didn't.

13       Q.    In fact, was the trust adverse at this time to

14    ALH, Mr. Hourihan, and Lion & Lamm Development?

15       A.    Yes.

16       Q.    How was it adverse?

17       A.    It was an investor.

18       Q.    Explain that.

19       A.    It was an indirect investor through NACA.  And

20    I don't remember the timing, but this is done by a

21    secretary.  Had I had the time or the attention, I

22    could have listed a whole bunch of other people.  But

Page 17

031307in kp.txt

9     A.   What the first predicate act was, I can't

10   remember, but everything that we've complained about

11   in this complaint, whenever that first event occurred.

12     Q.   When did you first meet the other B investors?

13     A.   My recollection is that a meeting was organized

14   at the London airport and all of the investors got

15   together.  I may have met one or more of them prior to

16   that.

17     Q.   That was at Heathrow?

18     A.   Yes.  Hilton, terminal 4.

19          THE WITNESS:  I have to get on a conference

20   call right now and I'll be off in around ten minutes.

21   It's a board call to approve a 10-K.

22          Did you tell them before?

23          MR. WOOD:  No.  I forgot to tell them.

24          MR. STONE:  No problem.  We can take a

26

Isaac M. Neuberger

1    break.

2          (A recess was taken at this time.)

3    BY MR. STONE:

4     Q.   Just to go back, Mr. Neuberger, we talked

5    before about the fact that Mr. Lamm was not permitted

6    unilaterally to make decisions on behalf of SELK.

7          Who did make decisions for SELK?

8     A.   I don't think that was your question, but if it

9    was, I think Lamm was the manager of SELK.  And

10   consistent with SELK's investment in ALH, whatever was

11   appropriate, he can make those decisions.  Signing

Page 23

031307in kp.txt

12    that guarantee, in my view, was not in the interest of

13    SELK and that that was something that was not

14    authorized because it wasn't at the furtherance of

15    SELK's investment in ALH.

16        Q.    What about additional investments in ALH, who

17    made the decision to make the additional investment?

18        A.    As I answered before, NACA was the funding

19    partner and would have made the decisions because SELK

20    didn't have any funds on its own.

21        Q.    Going back to Exhibit 1, you said on this

22    Client/Matter Master Form you could have listed other

23    parties as adverse had you taken the time.   Who

24    else --

27

Isaac M. Neuberger

1        A.    Shamrock, all the investors, the A's.   If I

2    looked at the document, Mr. Krieger, Mr. Buchler.

3        Q.    At the top of this form it says "Client

4    No. 1060; Matter No. 3."

5             Did you have other matters open for

6    Mr. Konig or the trust at the time of this

7    Client/Matter Master Form being filled out?

8        A.    I might have.

9        Q.    You don't recall?

10        A.    There may have been entities that -- file

11    numbers and entities as opposed to using the shorthand

12    for Michel Konig.

13        Q.    We were talking about the meeting at the Hilton

14    in terminal 4 of Heathrow Airport among you and the

Page 24

031307in kp.txt

15  B investors.

16           Who do you recall being at that meeting?

17  A.  Michael Jesselson, Avie Arenson, Mr. Konig,

18  one -- I don't recall whether the Frankels were there

19  or not.  I suspect that they were, but I don't recall.

20  Q.  What was discussed at that meeting?

21  A.  Again, in the space of time, there was so many

22  conversations.  I can't -- the general topic was how

23  do we save our investment in ALH.

24  Q.  Were you asked at that meeting to act as an

28

Isaac M. Neuberger

1  attorney for the B's?

2  A.  Yes.

3  Q.  who asked you to do that?

4  A.  All of them, I believe.

5  Q.  Did they explicitly ask you to be the lawyer

6  for the B's?

7  A.  Yes, I believe so.  Individually they may have

8  asked me that prior to setting up the meeting.  I

9  don't recall.

10  Q.  As of the time of this meeting, was there an

11  anticipation that litigation would ensue?

12  A.  I don't think so.  I don't remember.

13  Q.  when do you recall the possibility of

14  litigation first being discussed with the B's?

15  A.  A date or an event?

16  Q.  An event, a date.

17  A.  I can't give you a date.  I can tell you that

031307in kp.txt

18    when it became apparent that Shamrock was using its

19    position through its directors to exit the investment,

20    because they felt it was taking too much of their

21    management time and they weren't prepared to either

22    continue to operate ALH as a unit or to allow us, the

23    B's, to do so.  It was inevitable that litigation

24    would ensue, but I can't recall specifically when that

29

Isaac M. Neuberger

1    event occurred.

2       Q.   Well, did that occur as of the time of the

3    Heathrow meeting?

4       A.   I don't know.

5       Q.   Do you recall who first suggested that

6    litigation might be a possibility?

7       A.   No.

8       Q.   Do you recall any involvement by SELK or the

9    trust or Mr. Konig in an investment in a building in

10   Dublin, Ohio?

11      A.   Yes.

12      Q.   who was the investor in that project?

13      A.   I don't recall that.  It may have been NACA.  I

14   don't know that it was SELK.

15      Q.   What was your involvement with respect to the

16   Dublin, Ohio, investment?

17      A.   Much the same as it was in ALH.

18      Q.   Much the same as --

19      A.   I was the attorney for the investing entity on

20   behalf of the trust.

Page 26

031307in kp.txt

21    Q.    And this was another Mr. Lamm project?

22    A.    Yes.

23    Q.    When did the trust make the investment in the

24    Dublin property?

                                                                    30

                        Isaac M. Neuberger

1     A.    I know it was subsequent to ALH, but I don't

2     recall.

3     Q.    How much did the trust invest in that project?

4     A.    Again, I don't recall.

5     Q.    Did Mr. Lamm guarantee the trust's investment

6     in the Dublin, Ohio, project?

7     A.    I believe so.

8     Q.    When you agreed to represent the other B

9     investors, did you understand that they might have

10    interests that were different than Mr. Lamm's?

11    A.    Lamm, personally?

12    Q.    Yes.

13    A.    Yes.

14    Q.    Did you make the other B investors aware that

15    their interests may be adverse to Mr. Lamm's?

16    A.    Yes.

17    Q.    Did you ever ask the other B investors for a

18    conflict waiver?

19    A.    I don't think SELK's interest was adverse to

20    the other investors and I only represented SELK.  I

21    didn't represent Mr. Lamm in his personal capacity

22    because he had other counsel.  I don't think a waiver

23    was necessary.

                        Page 27

031307in_kp.txt

24    Q.   What about in any differences between the

                                                                    31

                         Isaac M. Neuberger

1    interests of the B investors themselves, did you ever

2    discuss that with the B investors?

3    A.   Did I ever discuss --

4    Q.   Did you ever discuss with the B investors that

5    among the B investors there may be varying interests

6    with respect to their investment in ALH?

7    A.   Vis-a-vis their claiming in Shamrock?

8    Q.   Vis-a-vis their investment, generally.

9    A.   Well, vis-a-vis their claiming in Shamrock, I

10   saw no conflicting interest.

11   Q.   And you were hired specifically and only for

12   the purpose of pursuing a claim against Shamrock?

13   A.   No.  I was hired to try and save their

14   investment in ALH.  As it turned out, it evolved into

15   a claim against Shamrock for what Shamrock did, but

16   initially we got together for the sole purpose of

17   trying to save our investment, to save the company and

18   not allow it to be liquidated as it was.

19   Q.   Let's go back to my original question.

20            Did you ever have a discussion with the B

21   investors about the fact that they might have varying

22   interests with respect to their respective investments

23   in ALH?

24            MR. WOOD:  Answer yes or no.

                                                                    32

031307in kp.txt

9    Q.    Did you suggest to Mr. Lamm back in 2002 when

10   you were speaking to him about his personal conflict

11   with Shamrock that Fried Frank had a conflict and that

12   that might be a pressure point?

13          MR. WOOD:  I'm going to instruct you not to

14   answer.

15          MR. STONE:  On what basis?

16          MR. WOOD:  He's having communications with

17   Mr. Lamm, Mr. Lamm has on his SELK hat, as manager of

18   SELK.  Those are privileged communications.

19          MR. STONE:  I specifically said this was

20   during the time when he was dealing with Lamm's

21   personal dispute with Shamrock.

22          MR. WOOD:  I know, but Mr. Lamm also had on

23   his SELK hat at the same time.

24          MR. STONE:  What's the basis for that?

47

Isaac M. Neuberger

1          MR. WOOD:  What do you mean what's the

2    basis?

3          MR. STONE:  How can you tell which hat he's

4    wearing?

5          MR. WOOD:  Well, if you want to ask him did

6    he have discussions with Mr. Lamm -- if somehow you

7    can parse it out --

8          MR. STONE:  That's exactly what I tried to

9    do, I think.

10          MR. WOOD:  He's not going to answer any

11   questions about conversations he had with Mr. Lamm

Page 42

031307in kp.txt

24    Q.   What was that advice?

73

Isaac M. Neuberger

1    A.   I don't recall.

2    Q.   Was SELK being asked to do anything in

3    connection with this --

4    A.   This --

5         MR. WOOD:  What's "this"?  Define "this."

6    I object to the form of the question.

7         MR. STONE:  He didn't let me finish my

8    question.

9         MR. WOOD:  Try to let him finish, Isaac.

10   BY MR. STONE:

11   Q.   -- with this capital infusion?

12        MR. WOOD:  So what's the question?

13   Q.   The question was:  Was SELK being asked to do

14   anything in connection with this capital infusion?

15   A.   Not in this string of e-mails.

16   Q.   Mr. Lamm is seeking your advice in the e-mail

17   the second from the top.  It says: "Isaac:  What does

18   this mean as a practical matter.  Can I argue the

19   case?  Can I suggest?  Can I vote?  If I do not vote,

20   Krieger will go ballistic."

21        Do you recall having discussions with

22   Mr. Lamm about whether or not he could vote as a

23   member of the supervisory board?

24        MR. WOOD:  I instruct you not to answer

74

031307in kp.txt


Isaac M. Neuberger

1   that.

2              THE WITNESS:  What?

3              MR. WOOD:  I instruct you not to answer the

4   question.

5              MR. STONE:  All right.

6   BY MR. STONE:

7      Q.  Did you have any discussions with Mr. Lamm

8   about his question "What does this mean as a practical

9   matter"?

10             MR. WOOD:  I instruct you not to answer.

11     Q.  Did you have any discussion with Mr. Lamm about

12  whether he could argue the case?

13             MR. WOOD:  I instruct you not to answer.

14     Q.  Your e-mail to Mr. Lamm says:  "When is the

15  call?  Call me at 5:45 pm...if u can."

16             Do you recall having a call with Mr. Lamm

17  in which you discussed this potential capital infusion

18  by Shamrock?

19             MR. WOOD:  You can answer that yes or no.

20     A.  I don't have any recollection of the call.

21             (Neuberger Exhibit 16 was marked for

22  identification.)

23  BY MR. STONE:

24     Q.  Mr. Neuberger, the reporter has placed before

⬚                                                           75


Isaac M. Neuberger

1   you a document marked as Exhibit 16.  It's an e-mail
                        Page 67

# EXHIBIT B

**SUPPLEMENTAL**
**PRIVILEGE/REDACTED LOG**
**IN RE ALH HOLDINGS LLC**
**Consol. C.A. No. 04-1339-SLR**

| BATES | DATE | AUTHOR | RECIPIENT | PRIVILEGED/ REDACTED | DESCRIPTION | PRIVILEGE[1] |
|---|---|---|---|---|---|---|
| CLASSB5168 | 12/7/1998 | Neuberger | Michael Quinn | R | Inter-attorney communication forwarding communication from Konig re: documentation to reflect increase in investment | A/C |
| CLASSB5169 | 8/21/2002 | Schumann | Neuberger | P | Email re: Dictation of voicemail from Lamm soliciting legal advice re: strategy for potential B buyout | A/C |



1

# Privilege Log Key
## In re: ALH Holdings, LLC
## Consol. C.A. No. 04-1339-SLR

Class B Members
- Avie Arenson
- Michel Konig
- Michael Jesselson
- Benjamin Jesselson
- Menashe (Mark) Frankel
- Chesky Frankel
- Shalom Lamm (as managing member of SELK)

Lawyers and Employees of Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
- Isaac Neuberger
- Thomas M. Wood, IV
- Hillel Tendler
- Michael Quinn
- Debbi McMullen (Tendler's secretary)
- Andri Theo (Neuberger's secretary)
- Kathy Schumann (Neuberger's secretary)

Lamm's Lawyers
- Jon Zich
- Samuel Zylberberg
- Jay Lobell
- Clifford Brandeis
- Maureen Raimond
- Tom Letsou
- Joe Capobianco
- Michael Winger
- George Lastra
- Mitchell Haddad

Jesselson's Lawyer
- Hilah R. Iaulus