

Isaac M. Neuberger

183

1    Q.    What's your basis for believing that they were

2    succeeding, the company was succeeding at that time?

3                MR. WOOD:   You've asked that before.

4                Go ahead.   One more time.

5    A.    It's my impression.

6    Q.    Any other ways that the B investors were harmed

7    other than the lost investment and the lost potential?

8    A.    No.

9                MR. STONE:   Okay.

10   BY MR. WOOD:

11   Q.    Mr. Neuberger, would you look at Exhibit 50,

12   please?  Do you have a recollection that there was, in

13   fact, a meeting in London on Thursday, October the

14   31st, or was there simply a conference call and the

15   meeting in London didn't happen?  Do you know one way

16   or the other?

17   A.    No.

18   Q.    Do you recall that shortly thereafter there was

19   a meeting in Mr. Jesselson's office in New York?

20   A.    I don't remember the date of Mr. Jesselson's

21   meeting.

22   Q.    If I told you the meeting was in late November

23   or early December, you wouldn't disagree with that?

24   A.    No.   I don't remember.

Isaac M. Neuberger

184

1    Q.    Now, did you provide legal advice to Mr. Lamm

2    as manager or member of SELK?

3    A.    Yes.

4    Q.    Did you provide that legal advice with respect

5    to SELK matters?

6    A.    Only with respect to the SELK matter.

7    Q.    Did you also provide that advice for matters

8    that would relate to or affect SELK?

9    A.    Yes.

10    Q.    You were asked a number of questions about when

11    you thought litigation or when this litigation was

12    anticipated.  Would you pull out Exhibit 45, please?

13            MR. STONE:  Which one is that?

14            THE WITNESS:  The July 31st, 2002.

15            MR. STONE:  Okay.

16    BY MR. WOOD:

17    Q.    No.  August 6, 2006.  Maybe it's 46.  Maybe I

18    got my numbers wrong.  Yes, that's it.  Which one is

19    that?

20    A.    This is 46.

21    Q.    All right.  Forty-six.

22    A.    Okay.

23    Q.    It's the August 6, 2002, e-mail exchange.

24            I think your testimony was that you didn't

Isaac M. Neuberger

185

1   recall the date when you began to anticipate

2   litigation or when the B's began anticipating

3   litigation; is that correct?

4      A.   I didn't recall the date.  I knew that there

5   was a time.  Certainly by the time I wrote this

6   e-mail, I was fearful that litigation would be the

7   only solution.

8      Q.   Well, my question to you is:  If you don't

9   recall a date, did you recall what the event was that

10  triggered in your mind this anticipation of

11  litigation?

12     A.   The sale of Memphis, the Walter.

13     Q.   Just looking at your e-mail dated August 6,

14  2002, that you sent to Mr. Buchler and Mr. Krieger,

15  does that refresh your recollection that it was the

16  first Memphis sale that --

17     A.   Didn't happen.

18     Q.   -- that didn't happen that triggered in your

19  mind anticipation of litigation?

20     A.   Yes.

21     Q.   If you will look at that document, do you

22  recall stating to Mr. Krieger and Mr. Buchler that if

23  the sale proceeded now, that each of the B's would

24  face a significant loss?

Isaac M. Neuberger

186

1    A.    It's the first full paragraph on page 2 of this

2    exhibit.    "We understand that in large part your

3    desire to exit this investment is driven by the

4    management demands made on you by other investments of

5    what appears to be concern that with Swiss Re-Wachovia

6    facility can NOT be extended.    Obviously the B's feel

7    that the 'control' of ALH owes them a duty to try and

8    maximize their return, not to speak of the loss that

9    the current situation portends."

10    Q.    Now, you also asked about a statement that

11    Mr. Lanius and Mr. LaGuardia purportedly made at the

12    New York meeting, and the quote was "stay the course,"

13    their recommendation was to stay the course.    Do you

14    remember that?

15    A.    Yes.

16    Q.    You were asked questions by Mr. Stone if that

17    included an infusion of capital.    Do you recall that?

18    A.    I don't know if capital -- as I said to them, I

19    don't know if capital was discussed or not.    In some

20    of these subsequent e-mails we certainly knew, but

21    that was years later.

22    Q.    That was what I was going to ask you.

23        Do you recall Mr. Lanius and Mr. LaGuardia

24    giving their opinion about staying the course in the

Isaac M. Neuberger

187

1    context of putting in more capital, or did they bring

2    it up at all?  Do you recall?

3              MR. STONE:  Object to the form.

4    A.    I don't recall.  I suspect, however, that they

5    were more concerned at the time with making certain

6    that they had their bank lines.  And I think I helped

7    them secure their bank lines with Ohio Savings Bank,

8    which was the largest national lender in this segment.

9    Q.    Let me ask you again since Mr. Stone objected.

10             Do you have a recollection that the meeting

11   with Mr. Lanius and Mr. LaGuardia talking about

12   staying the course, whether or not they also raised in

13   that conversation an issue about the need for further

14   capital?

15   A.    No.

16   Q.    You have no recollection?

17   A.    I have no recollection.

18   Q.    You don't remember one way or the other?

19   A.    Correct.

20   Q.    Okay.

21             MR. WOOD:  That's all I have.

22   BY MR. STONE:

23   Q.    Just to follow up, when you wrote this e-mail

24   that we were referring to, Exhibit 46, the concept of

Isaac M. Neuberger

188

1  litigation, was that something that you were simply

2  anticipating, or is that something you discussed with

3  the B investors?

4          MR. WOOD:  You can answer that yes, no, or

5  I don't remember, but I don't want you to get into

6  what you discussed with the B members.

7    A.   Yes.

8    Q.   Was it anticipated as simply a possibility, or

9  was it anticipated as this is one of the options that

10 we are going to pursue?

11   A.   I don't understand the distinction between

12 possibility or one of the options that we might

13 pursue.

14   Q.   What I'm asking you is:  Was there an

15 anticipation in the sense that it might have to happen

16 down the road, or was it an anticipation in the sense

17 that we are going to start looking at this as a real

18 possibility?

19   A.   In my view, the threat of litigation was the

20 only motivation that Shamrock had to deal with us.

21 Otherwise, they would cast us asunder and roll us over

22 on a steamroller and not give a damn what happened to

23 us because they had this primary goal of freeing

24 themselves up of what they viewed to be a tar baby of

Isaac M. Neuberger

189

1    their own management time, not an economic operation.

2        Q.    So the threat of litigation was certainly a

3    leverage point, but my question is:  Was it something

4    that was discussed in concrete terms, or was it

5    something that was discussed as more of an esoteric

6    possibility, something that might come down the road?

7        A.    I don't understand that distinction.  It

8    certainly was discussed.

9        Q.    When did you threaten litigation against

10   Shamrock for the first time?

11       A.    I think then.  I think that e-mail is

12   self-evident.  They may have viewed it as esoteric.

13   Their arrogance could have gotten in the way of them

14   reading it carefully.

15              MR. STONE:  Nothing further.

16              MR. WOOD:  Nothing further.  Thank you.

17              THE WITNESS:  Thank you.

18              (The deposition was then concluded at

19   4:55 p.m.)

20                   - - - - -

21

22

23

24





## SELK, LLC

### OPERATING AGREEMENT

This Operating Agreement of SELK, LLC (the "Agreement") is entered into as of this *12* day of June, 1998, by and among Shalom E. Lamm and NACA Holding Inc., a British West Indies corporation ("NACA") (each, a "Member", and collectively, the "Members").

### EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the terms of, and subject to the conditions set forth in, this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

### ARTICLE I

### DEFINED TERMS

The following capitalized terms shall have the meanings specified in this Article I. Other terms may be defined in the text of this Agreement; and, throughout this Agreement those terms shall have the meanings respectively ascribed to them.

"Act" means the Delaware Limited Liability Company Act, as codified at Title 6, §18-101 et seq. of the Delaware Code, as amended from time to time.

"Additional Member" means a Member other than a Substitute Member who has acquired an Interest in the Company after the date of this Agreement in accordance with Section 7.5.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    increase such Capital Account by any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-(g)(1) and 1.704-2(i)(5) of the Regulations, as hereinafter defined; and

(b)    decrease such Capital Account by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Agreement" means this Agreement, as amended from time to time.

1

"Bankruptcy" means the filing by any Person of any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state bankruptcy, insolvency or other similar statute, law or regulation; or the seeking or consenting to or acquiescence in the judicial appointment of any trustee, fiscal agent, receiver or liquidator of such Person or of all or any substantial part of its properties or the taking of any action looking to its dissolution or liquidation; or the failure, within 60 days after the commencement of an involuntary case or action against any such Person seeking any bankruptcy, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, of such case or action to have been dismissed or of all orders in proceedings thereunder affecting the operations or the business of such Person to have been stayed, or the setting aside thereafter of the stay of any such order or proceeding; or the failure, within 60 days after the judicial appointment without the consent or acquiescence of such Person of any trustee, fiscal agent, receiver or liquidator of such Person or of all or any substantial part of its properties, to have such appointment vacated; or the making by any Person of an assignment for the benefit of creditors or the admission in writing by any Person that its assets are insufficient to pay its liabilities as they generally come due.

"Capital Account" means, with respect to any Member, the account maintained for each Member on the books of account of the Company in accordance with Section 3.6 of this Agreement.

"Capital Contribution" means the total amount of money contributed to the Company by a Member.

"Capital Event" has the meaning ascribed to such term in the Operating Agreement of ALH Holdings LLC, a Delaware limited liability company, dated as of June _____, 1998.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means the limited liability company organized in accordance with this Agreement and/or any successor entity to such company.

"Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

"Initial Member" means each Person listed on Exhibit A as an initial member.

"Interest" means a Person's share of the Profit and Loss of, and the right to receive distributions from, the Company.

"Member" means each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company.

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Percentage Interests" shall mean 30% for Lamm and 70% for NACA.

"Person" means and includes an individual, corporation, company, partnership, association, limited liability company, limited liability partnership, trust, estate, or other entity.

2

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" means, for each Fiscal Year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

        (a)    All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

        (b)    Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing income or loss;

        (c)    Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

        (d)    Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for Federal income tax purposes; and

        (e)    Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulations" means the regulations, including any temporary and proposed regulations, promulgated by the U.S. Treasury Department under the Code, as such regulations may be amended from time to time (including corresponding provisions of any succeeding regulations).

"Regulatory Allocations" has the meaning ascribed to such terms in Section 5.3 (c).

"Securities Act" means the Securities Act of 1933, as amended, and all rules, rulings and regulations thereunder.

"Substitute Member" means any Person admitted to the Company pursuant to Section 7.3 hereof.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

ARTICLE II

FORMATION AND NAME; OFFICE; PURPOSE; TERM

    2.1    Organization. SELK, LLC was formed as a limited liability company pursuant to the Act by the filing with the Secretary of State of Delaware of a Certificate of Formation on June 9, 1998.

    2.2    Name of the Company. The name of the Company shall be SELK, LLC.

3

2.3     Purpose. The Company may engage in any lawful business, purpose or activity of every kind and character for which a limited liability company may be organized under the Act. The Company shall have all the powers provided for a limited liability company under the Act.

2.4     Term. The term of the Company began upon the effective date of the Certificate of Formation and shall continue in existence without interruption until December 31, 2020, unless sooner dissolved pursuant to the provisions of this Agreement or the Act.

2.5     Principal Office. The principal office of the Company shall be located at the Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801 or at such other place upon which the Members agree.

2.6     Resident Agent. The name and address of the Company's resident agent in the State of Delaware for service of process shall be the Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. Copies of process are to be sent to the principal of of the Company as provided for in Section 2.5 of this Agreement.

2.7     Members. The names and addresses of the Initial Members are listed on Exhibit A hereto.

## ARTICLE III

## MEMBERS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1     Initial Capital Contributions. The initial capital contribution of each Member shall be as set forth on Exhibit A hereto.

3.2     No Other Capital Contributions Required. No Member shall be required to contribute any additional capital to the Company, and except as set forth in the Act, no Member shall have any personal liability to the Company, to any other Member of the Company, or to any other person with respect to any obligations of the Company.

3.3     No Interest On Capital Contributions. Members shall not be paid interest on their Capital Contributions.

3.4     Return Of Capital Contributions. Except as otherwise expressly provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.

3.5     Capital Account Maintenance. The Company shall maintain for each Member a separate Capital Account in accordance with the following provisions (which Capital Account shall be adjusted as otherwise required by Section 1.704-1(b) of the Regulations):

(a)     Each Member's Capital Account shall be increased by such Member's Capital Contributions, such Member's distributive share of Profit and any items in the nature of income or gain which are specially allocated pursuant to Article V hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)     Each Member's Capital Account shall be decreased by the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Loss and any items in the nature of expenses or losses which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof and the

4

amount of any liabilities of such Member assigned by the Company or which are secured by any property contributed by such Member to the Company;

(c)    In the event any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest;

(d)    In determining the amount of any liability for purpose of paragraphs (a) and (b) hereof, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations; and

(e)    The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Account, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed Property or which are assumed by the Company or one or more of the Members), are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 8.3 of this Agreement upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purpose in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations, and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

## ARTICLE IV

## DISTRIBUTIONS

4.1    Distributions Of Cash Flow.  The cash distribution policy of the Company shall be as follows:

(a)    All distributions, other than in connection with the winding up of the Company pursuant to Section 8.3 hereof, shall be governed by this Section 4.1.

(b)    All amount available for distribution by the Company, whether upon the occurrence of a Capital Event or otherwise, shall first be used to pay and discharge the obligations of the Company to Crédit Agricole Indosuez (for principal, accrued but unpaid interest, and any other amounts) with respect to a loan to the Company in the original principal amount of $2,300,000 (the "Indosuez Loan").  Any net proceeds remaining after full payment of all obligation with respect to the Indosuez Loan shall be distributed as follows: 70% to NACA and 30% to Lamm.

4.2    Limitation Upon Distributions.  Notwithstanding anything to the contrary contained or implied in this Agreement, no distribution shall be made to Members if prohibited by Sections 18-601 through 18-607 of the Act.

5

## ARTICLE V

## ALLOCATIONS

5.1     _Profit._ Profit, if any, for any Fiscal Year shall be allocated among the Members in proportion to their Percentage Interests.

5.2     _Loss._ Loss for any Fiscal Year shall be allocated as follows:

(a)     First, Loss for any Fiscal Year, including deductions attributable to nonrecourse indebtedness of the Company, shall be allocated among the Members in proportion to their Percentage Interests. Notwithstanding the foregoing, any deductions attributable to nonrecourse indebtedness upon which a Member bears the economic risk of loss shall be specially allocated to that Member in a manner consistent with the Regulations.

(b)     Notwithstanding the foregoing Section 5.2(a), in the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Loss pursuant to Section 5.2(a), any Loss otherwise allocable to a Member which would result in such an Adjusted Capital Account Deficit shall instead be allocated to those other Members which would not have such a deficit in proportion to such other Members' Percentage Interests; _provided, however,_ that such Loss may not be so allocated to such other Members to the extent such allocation would result in any such Members having an Adjusted Capital Account Deficit at the end of any Fiscal Year in excess of the amount such Member is obligated to restore or is deemed obligated to restore under the Regulations.

(c)     Then if, after the application of the limitation in Section 5.2(b) above, there remains Loss to be allocated, such Loss shall be allocated among the Members in proportion to their Percentage Interests.

5.3     _Special Allocations._ The following special allocations shall be made in the following order:

(a)     _Minimum Gain Chargeback._ Items of income and gain shall be allocated between the Members at such time and in such amounts as necessary to satisfy the "minimum gain chargeback" requirements of the Regulations. Where such a minimum gain chargeback would cause a distortion in the economic arrangement of the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Company shall apply for a waiver of the minimum gain chargeback requirement in accordance with Section 1.70~2(f)(4) of the Regulations.

(b)     _Qualified Income Offset._ Items of Company income, gain, loss and deduction shall be allocated in an amount and manner sufficient to satisfy the "qualified income offset" provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(c)     _Curative Allocations._ Certain allocations set forth in this Article V (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other tax items of the Company pursuant to this Article V (other than the Regulatory Allocations). The Members shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each

6

Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 5.1 and 5.2 hereof.

    5.4    Tax Allocations: Code Section 704(c)

    In accordance with Code Section 704(c) and the Regulations thereunder, items of income, gain, loss, and deduction with respect to any property (other than money) contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial value using a method set forth in Treasury Regulations Section 1.70~3 as determined in good faith by the Manager.

## ARTICLE VI

    6.1    Manager. The Company shall be managed by the Manager. Shalom E. Lamm is hereby designated to serve as the Manager. In the event that Mr. Lamm shall cease to serve as Manager for any reason, a replacement Manager shall be designated by vote or written consent of a majority in Percentage Interests of the Members. The Manager shall owe only those fiduciary duties to the Company or any Member as provided under the Act and applicable law. Notwithstanding anything to the contrary set forth herein, the Manager shall not be liable, responsible or accountable in damages or otherwise to any of the Members, the Company, its receiver or trustee for any act or omission performed or omitted (i) in good faith on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of the authority granted by this Agreement and in the best interests of the Company, except for any act or omission constituting fraud, gross negligence or willful misconduct, or (ii) with the vote or written consent of a majority in Percentage Interests of the Members.

    6.2    General Powers. The Manager shall have full, exclusive and complete discretion, power and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated.

    6.3    Limitation On Authority Of Member.

    (a)    No Member is an agent of the Company solely by virtue of being a Member, and no Member, other than the Manager acting as authorized pursuant to this Agreement, has any right, power or authority to bind or otherwise act for the Company.

    (b)    Any Member who takes any action or binds the Company in violation of this Article VI shall be solely responsible for any loss and expense incurred by the Company or any other Member as a result of the unauthorized action and shall indemnify and hold the Company and any such other Member harmless with respect to the loss or expense including any reasonable attorney's fees.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS
## AND WITHDRAWALS OF MEMBERS

    7.1    Transfers. No Member may Transfer all or any portion of such Member's Interest except with the prior written consent of all the other Members, which consent may be given or

withheld in the sole discretion of each Member. The Transfer of any Interest in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom an Interest is attempted to be transferred in violation of this Section 7.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions (liquidating or otherwise) from the Company, or have any other rights in or with respect to the Interest.

7.2     Assignment by Member.

(a)     Subject to Section 7.1, a Member may assign all or part of his/her Interest by an executed and acknowledged written instrument only if all of the following conditions are satisfied:

(i)     The requisite consent of all the other Members has been obtained in writing and delivered to the Company;

(ii)     All reasonable costs of transfer have been paid to the Company; and

(iii)     Such assignment or transfer does not cause the Company to be in violation of any applicable law, rule or regulation (including, without limitation, the Securities Act).

(b)     Any such assignment shall be recognized by the Company as effective only on the first day of the calendar month following satisfaction of the requirements set forth in this Section 7.2.

(c)     If an assignee of a Member does not become a Substitute Member pursuant to Section 7.3, the Company shall not recognize the assignment, and such assignee shall not have any rights to acquire any information on account of the Company's business or inspect the Company's books or vote on Company matters and shall not otherwise have any rights as a Member.

7.3     Substitute Member.     An assignee of any Interest in the Company pursuant to Section 7.2 shall have the right to become a Substitute Member in place of its assignor only if all of the following conditions are satisfied:

(a)     The fully executed and acknowledged written instrument of assignment filed with the Company sets forth a statement of the intention of the assignor that the assignee become a Substitute Member in its place;

(b)     The assignee executes, adopts and acknowledges this Agreement;

(c)     All reasonable costs of transfer have been paid to the Company;

(d)     The assignee meets general investment criteria established for investment in the Company, which shall relate to the sophistication, investment experience and net worth of the assignee and which may also include any other factors customarily considered in connection with the private placement of securities under Regulation D of the Securities Act or any applicable state "blue sky" or securities laws; and

(e)     The assignee provides such opinions of counsel as the Company may reasonably require that such assignment of such Interest in the Company does not violate any

8

registration or similar provision of any federal or state securities or comparable law (including, without limitation, the Securities Act).

Upon the admission of a Substitute Member, the Manager shall amend Exhibit A hereto to reflect the admission of such Substitute Member and his/her Percentage Interest.

    7.4    <u>Involuntary Withdrawal by Members.</u>

        (a)    Upon the Bankruptcy, dissolution, liquidation, death or other cessation of existence of a Member, the authorized representative of such Member shall have all the rights of such Member for the purpose of effecting the orderly winding up and disposition of the business of such Member and such power as such Member possessed to designate a successor as an assignee of its Interest and to join with such assignee in making an application to substitute such assignee as a Substitute Member.

        (b)    The Bankruptcy, dissolution, liquidation, death or other cessation of existence of a Member shall not dissolve or terminate the Company.

    7.5    <u>Issuance of Additional Interests; Admission of Additional Members.</u> The Members may authorize, by vote or written consent of all the Members, the issuance of additional Interests in and the admission of Additional Members to the Company. Each Additional Member shall be required to execute, adopt and acknowledge this Agreement as a condition of admission. Upon the admission of an Additional Member in accordance with the provisions hereof, the Manager shall amend Exhibit A hereto to reflect the admission of such Additional Member and his/her Percentage Interest.

## ARTICLE VIII

## DISSOLUTION

    8.1    <u>Dissolution.</u> The Company shall be dissolved and its affairs wound up in the event that:

        (a)    The term of the Company, as provided in this Agreement, expires; or

        (b)    All the Members agree, by vote or written consent, to dissolve the Company.

    8.2    <u>Winding Up.</u> Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall proceed to wind up the affairs of the Company as soon as is practicable.

    8.3    <u>Distribution.</u>

        (a)    The proceeds of any dissolution of the Company shall be distributed in accordance with the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

            (i)    First, to the payment of the debts and liabilities of the Company and

the expenses of dissolution and liquidation;

(ii)     Second, to the establishment of any reserves which the Manager shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Manager, and such reserves shall be held by a bank or trust company selected by the Manager, as escrow holder, to be disbursed as directed by the Manager in payment of any of the specified debts and liabilities or, at the expiration of such period as the Manager may deem advisable, to be distributed in the manner hereinafter provided; and

(iii)     Thereafter, to the Members in accordance with their Positive Capital Account balances (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all Fiscal Years, including the Fiscal Year during which such liquidation occurs); and

(b)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to Article V hereof to reflect such deemed sale prior to the distribution of the assets in liquidation.

8.4     No Obligation To Restore Negative Capital Accounts.  If any Member has a Negative Capital Account (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the year during which dissolution of the Company occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such Negative Capital Account, and the negative balance of any Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purposes whatsoever.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

9.1     Bank Accounts.  All funds of the Company shall be deposited in a bank account opened in the Company's name. The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.2     Books and Records.  The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be available at the Company's principal office for examination by a Member or a Member's duly authorized representative at any and all reasonable times during normal business hours.

9.3     Annual Accounting Period.  The annual accounting period of the Company shall be its Fiscal Year.

9.4     Tax Returns.

(a)     The Members intend that the Company shall be treated as a 'partnership" for Federal, state, local and foreign income and franchise tax purposes and agree to take all action,

10

including the amendment of this Agreement and the execution of other documents, as may be required to qualify for and receive such treatment as a "partnership" for Federal income tax purposes.

(b)     Federal, state, local, and foreign income tax returns of the Company shall be prepared at the direction of the Manager. Copies of all tax returns of the Company shall be furnished for review by each Member, if requested, as early as possible prior to the statutory date for filing such returns, including any extensions thereof. The Manager shall duly consider all suggestions of the Members regarding positions taken and disclosures made on any such returns. In the case of disagreements, the Members shall attempt to resolve any differences in good faith.

(c)     Company income and expenses shall be reported under the accrual method of accounting. The annual accounting period for the Company for tax purposes shall be the same as its Fiscal Year.

9.5     Tax Matters Partner.  Shalom E. Lamm shall be the tax matters partner pursuant to Code Section 6231(a)(7) and shall serve in a similar capacity under any applicable state, local or foreign law, and is authorized to take all necessary action to qualify as such. The tax matters partner shall represent the Company on behalf of the Members in connection with all administrative and judicial proceedings with respect to Company affairs involving or resulting from examinations by any and all federal, state, local or foreign tax authorities (including, but not limited to, examinations by the Internal Revenue Service), and may expend Company funds for reasonable professional services and costs in connection therewith as he/she deems advisable and necessary; provided, that except as otherwise provided in this Agreement or by law, the tax matters partner does not assume any obligations or responsibilities with respect to the foregoing. The Company will reimburse the tax matters partner for all reasonable expenses he/she incurs in fulfilling his/her duties as such.

9.6     Miscellaneous.

(a)     All elections by the Company for federal, state, local and foreign income and franchise tax purposes shall be determined by the Manager.

(b)     Prompt notice shall be given to each Member upon receipt of advice that the Internal Revenue Service or any other government agency intends to examine any Company tax returns or any other notice. In the event of an audit of the tax returns of the Company by the Internal Revenue Service or any other government agency, the tax matters partner shall supervise, participate in and retain professionals to participate in such audit and shall contest, to the extent it, in its sole discretion, determines appropriate or advantageous, any assertions by such agency that may be adverse to the Members or the Company.

## ARTICLE X

## GENERAL PROVISIONS

10.1     Assurances.  Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2     Applicable Law.  All questions concerning the construction, validity, and

11

interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

10.3    Headings. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

10.4    Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective successors and permitted assigns.

10.5    Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

10.6    Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

10.7    Waiver. No consent or waiver, express or implied, by any Member to or of any breach or default by the other Member in the performance by such other Member of its obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligation of such Member hereunder. Failure on the part of a Member to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

10.8    Additional Remedies. The rights and remedies of any Member hereunder shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SHALOM E. LAMM

NACA HOLDING INC.

By: _____

12

## EXHIBIT A

### INITIAL CAPITAL CONTRIBUTION

| | |
|---|---|
| Shalom E. Lamm | $30.00 |
| NACA Holding Inc. | $70.00 |

13