IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ALH HOLDINGS, LLC | )<br>)<br>) | Consol. C.A. No. 04-1339 – SLR |

## **JOINT PRETRIAL ORDER**

On April 23, 2007 at 4:30 p.m. in Courtroom 6B, 6th Floor, Federal Building, 844 King Street, Wilmington, Delaware, counsel for plaintiffs and counterclaim defendants Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein") (collectively, "Plaintiffs" or "Counterclaim Defendants"), and third party defendant ALH Holdings, LLC (hereinafter "ALH") and counsel for defendants, counterclaim plaintiffs, and third party plaintiffs, Abraham "Avie" Arenson ("Arenson")[1], A. Arenson Holdings, Ltd. ("Arenson Holdings"), D. A. Gardens, Ltd. ("D. A. Gardens"), J12ALH Associates ("J12ALH"), SELK LLC ("SELK") and Laurel Equity Group, LLC ("Laurel") (collectively, "Defendants" or "Counterclaim Plaintiffs") will participate in a pretrial conference before this Court pursuant to Rule 16 of the Federal Rules of Civil Procedure, local rule 16.4 and this Court's April 10, 2007 Fifth Amended Scheduling Order. The following matters as to trial of the action commencing on May 7, 2007 at 9:30 a.m. in Courtroom 6B before The Honorable Sue L. Robinson are hereby ordered by the Court:

---

[1]     Defendant Arenson is not a party to the Counterclaims or the Third Party Complaint.

I.    NATURE OF THE ACTION

    A.    Pleadings

       1.    On September 13, 2004, Plaintiffs commenced this action against Arenson, SELK and Laurel by filing a Complaint for declaratory judgment in the Court of Chancery of the State of Delaware seeking a declaratory judgment that: (a) Plaintiffs did not breach any fiduciary duty in connection with ALH Holdings, LLC ("ALH") and specifically ALH's sale of its home building operations and its repayment of loans from certain ALH investors (Count I); (b) Plaintiffs have no liability under ALH's Operating Agreement (Count II); (c) Plaintiffs have no liability under the July 1, 2001 Consulting Agreement between ALH and SCA (the "Consulting Agreement") (Count III); (d) Plaintiffs relied in good faith on the advice of ALH's outside legal counsel and financial advisors (Count IV); (e) Plaintiffs are entitled to indemnification or advancement of expenses (Count V); (f) SELK has released claims against Plaintiffs (Count VI); (g) SELK's equity interest in ALH is reduced or eliminated to the extent of any shortfall in the capital contribution of ALH's Class E Member (Count VII); and (h) Plaintiffs have not violated Arenson's rights as Class B Representative on ALH's supervisory board (Count VIII).

       2.    On October 6, 2004, Defendants filed a Notice of Removal to Federal Court in the Court of Chancery. D.I. 1.

       3.    On October 14, 2004, SELK, Laurel and Arenson moved to dismiss this action. D.I. 3, 4.

       4.    On November 5, 2004, Plaintiffs moved to remand this action to the Court of Chancery of the State of Delaware. D.I. 15.

       5.    On March 22, 2005, the Court denied Plaintiffs' Motion to Remand. D.I. 33.

2

6.      On April 22, 2005, Plaintiffs amended their Complaint adding as defendants Arenson Holdings and D.A. Gardens (hereinafter collectively the "Arenson Entities") and J12ALH. D.I. 37.

7.      On July 2, 2005, all Defendants, except Arenson, sued Plaintiffs in Federal Court in North Carolina (the "North Carolina Action"). D.I. 41, Ex. I.

8.      On July 3, 2005, Defendants made the following motions in this action: (a) Defendants moved to dismiss or stay in favor of the North Carolina Action; (b) Arenson, the Arenson entities and J12ALH moved to dismiss for lack of personal jurisdiction (D.I. 34); (c) SELK and Laurel moved to dismiss for failure to join the Arenson entities and J12ALH as indispensable parties (D.I. 43); and (d) Arenson moved to dismiss for failure to state a claim on which relief may be granted. D.I. 46.

9.      On September 2, 2005, Plaintiffs moved to dismiss the North Carolina Action on the grounds of improper venue under Federal Rules of Civil Procedure 12(b)(3) or in the alternative, to transfer the North Carolina Action to this Court pursuant to 28 U.S.C. § 1404 and/or § 1406 on the grounds, *inter alia*, that Plaintiffs' choice of a Delaware forum was protected by the "first filed" rule. Plaintiffs also moved to dismiss the North Carolina Action in whole or in part for lack of subject matter jurisdiction and failure to state a claim on which relief may be granted.

10.      On November 22, 2005, the Federal Court in North Carolina transferred the North Carolina Action to this Court. D.I. 60.

11.      On November 29, 2005, Plaintiffs amended their November 10, 2005 answer filed in the North Carolina Action. D.I. 61.

12.    On January 20, 2006, Defendants filed an Answer to the Amended Complaint, a Third Party Complaint against ALH Holdings, LLC and a Counterclaim against Plaintiffs. D.I. 66.

13.    On January 23, 2006, Defendants filed an Amended Answer to the Amended Complaint, an Amended Third Party Complaint against ALH Holdings LLC and Amended Counterclaims against Plaintiffs (the "Counterclaims"). D.I. 67. Defendants asserted the following counterclaims against Plaintiffs and third party claims against ALH:  (a) Shamrock breached its fiduciary duties to Defendants (Counts One and Eight );[2] (b) Krieger, Buchler and Stein breached their fiduciary duties to Defendants (Counts Two and Nine); (c) Shamrock, Krieger, Buchler and Stein breached the Operating Agreement (Counts Three and Ten); (d) SCA aided and abetted Shamrock, Krieger, Buchler and Stein's breaches of fiduciary duty (Counts Four and Eleven); (e) SCA breached the Consulting Agreement (Counts Five and Twelve); (f) Shamrock, Krieger, Buchler and Stein breached their fiduciary duties through gross negligence (Counts Six and Thirteen); Shamrock, Krieger, Buchler and Stein breached their fiduciary duties through acts of self-dealing (Counts Seven and Fourteen).

14.    On February 28, 2006, Plaintiffs filed a Motion for Judgment On The Pleadings and Dismissal Of The Counterclaims. D.I. 71.

15.    On March 2, 2006, Plaintiffs filed a Reply to Counterclaims and ALH filed an Answer to the Third Party Complaint. D.I. 74 & 75.

16.    On March 9, 2006, the Court issued an Order consolidating Civil Action Nos. 04-1339-SLR and 06-62-SLR. D.I. 76.

---

[2]    Defendants asserted each of their claims directly and derivatively for the benefit of ALH.

17.    On March 14, 2006, the Court issued a Memorandum Opinion and Order denying: (a) Defendants' motion to dismiss or in the alternative for a stay of proceedings (D.I. 40); (c) SELK and Laurels' motion to dismiss for failure to join the Arenson Entities and J12ALH as indispensable parties (D.I. 43); and (c) Arenson's motion to dismiss for failure to state a claim on which relief may be granted (D.I. 46).  D.I. 77 & 78.

18.    On September 29, 2006, the Court issued a Memorandum Opinion and Order granting in part and denying in part Plaintiffs' Motion for Judgment on the Pleadings and to dismiss the Counterclaims.  The Court granted Plaintiffs' Motion for Judgment on the Pleadings as to Counts II and III of the Amended Complaint and denied the motion with respect to Counts I and VIII of the Amended Complaint regarding their alleged breaches of the Operating and Consulting Agreements.  The Court further held that Counts Three, Five, Ten and Twelve of Defendants' Counterclaims and Third Party Complaint were dismissed as moot and denied the balance of Plaintiffs' Motion to Dismiss Defendants' Counterclaims and Third Party Complaint.  D.I. 94 & 95.

B.    Claims At Issue

1.    Plaintiffs seek a declaratory judgment that: (a) Plaintiffs did not breach any fiduciary duty in connection with ALH, particularly ALH's sale of its home building operations and its repayment of loans from certain ALH investors (Count I); (b) Plaintiffs relied in good faith on the advice of ALH's outside legal counsel and financial advisors (Count IV); (c) Plaintiffs are entitled to indemnification and advancement of expenses (Count V); (d) SELK has released its claims against Plaintiffs (Count VI); (e) SELK's equity interest in ALH is reduced or eliminated to the extent of any shortfall in the capital contribution of ALH's Class E Member

(Count VII); and (f) Plaintiffs have not violated Arenson's rights as Class B Representative on ALH's Supervisory Board (Count VIII).

2.      Defendants assert the following counterclaims against Plaintiffs and third party claims against ALH: (a) Shamrock, as the controlling member of ALH, breached its fiduciary duties to ALH's minority members (Count I and VIII); (b) Krieger, Buchler and Stein, as representatives on ALH's Supervisory Board and employees of Shamrock, breached their fiduciary duties to ALH's minority members (Count II and IX); (c) SCA, a consultant of ALH, aided and abetted Shamrock, Krieger, Buchler and Stein in their breaches of duty (Count IV and XI); Shamrock, Krieger, Buchler and Stein breached their fiduciary duties through gross negligence (Count VI and XIII); and (e) Shamrock, Krieger, Buchler and Stein breached their fiduciary duties through acts of self-dealing (count VII and XIV).

C.      Motions

1.      On February 1, 2007, Plaintiffs moved to compel Defendants and Counterclaim Plaintiffs to produce documents claimed as privileged or for in-camera inspection and to continue certain depositions. D.I. 116 (the "Motion to Compel"). Defendants opposed the Motion to Compel. D.I. 132. After briefing was complete on the Motion to Compel, Plaintiffs moved to supplement the record with deposition testimony taken after the close of briefing. D.I. 138. Defendants filed a response to the motion to supplement the record. D.I. 140. On April 18, 2007, the Court granted Plaintiffs' Motion to Compel to the following extent: On or before April 19, 2007, Plaintiffs shall identify a total of 36 documents listed in the Class B Parties' privilege logs. On or before 12:00 p.m. on April 23, 2007, unredacted copies of such documents shall be provided to the court by the Class B Parties for *in camera* inspection. If the

court determines from a review of this sample of documents that the claim of privilege has been inappropriately asserted, the court shall grant further relief. (D.I. 145).

II.    BASES FOR FEDERAL JURISDICTION

1.    This action was originally commenced in the Court of Chancery of the State of Delaware. The action was removed to this Court on grounds of diversity jurisdiction pursuant to 28 U.S.C. § 1332, and Plaintiffs' Motion to Remand was denied. D.I. 33.

2.    Defendants Arenson, the Arenson Entities and J12ALH challenged this Court's exercise of personal jurisdiction over them. This Court denied their motion to dismiss finding that it has personal jurisdiction over all parties. D.I. 77. Defendants maintain that they have not waived their challenge to this Court's exercise of personal jurisdiction over them.

III.    STATEMENT OF ADMITTED FACTS REQUIRING NO PROOF AT TRIAL

1.    Plaintiffs and Defendants, directly and indirectly, invested in the equity of ALH.

2.    Shamrock, a California corporation, holds approximately 62% of the total Class A membership interest in ALH. D.I. 94 at 4.

3.    Shamrock invested $9.216 million in the equity of ALH.

4.    Shamrock invested millions of dollars more in equity in ALH than did any of the Defendants.

5.    SCA is a Delaware corporation and wholly owned subsidiary of Shamrock that provided consulting services to ALH. D.I. 94 at 4. SCA is not a member of ALH.

6.    Krieger is employed by Shamrock as Vice-Chairman and Chief

Operating Officer, and is a Class A Representative on ALH's Supervisory Board. D.I. 94 at 4.

7.    Buchler is employed as President of Shamrock's Real Estate Division and Vice President and Chief Financial Officer of Shamrock, is a Managing Director of SCA and is a Class A Representative on ALH's Supervisory Board. D.I. 94 at 4.

8.    Stein is employed by Shamrock as a vice president, is a Managing Director of SCA, and is a Class D Representative on ALH's Supervisory Board. D.I. 94 at 4.

9.    Krieger, Buchler, and Stein have also performed substantial services for SCA. D.I. 94 at 4.

10.    Arenson owns, controls, and acts as agent for the Arenson Entities. The Arenson Entities are Class B members in ALH. D.I. 94 at 4 & 5.

11.    The Arenson Entities invested $1.469 million in the equity of ALH.

12.    Arenson served as the Class B Representative on ALH's Supervisory Board but does not personally hold equity in ALH. D.I. 94 at 4.

13.    Since the inception of ALH in 1998, Arenson has served on ALH's Supervisory Board as the Representative of ALH's Class B Members (the "Class B Representative").

14.    SELK is a limited liability company organized under Delaware law.

15.    SELK invested $2.937 million in the equity of ALH as a Class B member.

16.    NACA Holdings LLC ("NACA") owns a 70% residual profits interest in SELK subject to the cash distribution and profit allocation priorities contained in

Articles IV and V of the SELK Operating Agreement, as amended.

17.    Shalom E. Lamm ("Lamm") is designated as the manager of SELK. Lamm holds a 30% residual profits interest in SELK subject to the cash distribution and profit allocation priorities contained in Articles IV and V of the SELK Operating Agreement, as amended.

18.    The Davidovici family trust owns NACA.

19.    Isaac M. Neuberger ("Neuberger") is the trustee for the Davidovici family trust.

20.    Lamm personally guaranteed NACA's investment in SELK.

21.    J12ALH is a general partnership organized under the laws of New York and is also a Class B Member of ALH. D.I. 94 at 4 & 5.

22.    J12ALH invested approximately $1.468 million in the equity of ALH.

23.    Laurel is a limited liability company organized under the laws of Delaware and is also a Class B Member of ALH. D.I. 94 at 4 & 5.

24.    Laurel invested $2.937 million in the equity of ALH.

25.    Laurel made a $1.75 million capital contribution to ALH by releasing a promissory note, issued by ALH Corp. and signed by Lamm, in favor of one of the members of Laurel.

26.    Together, Arenson Holdings, D.A. Gardens, SELK, Laurel and J12ALH hold 100% of the Class B Membership Interests in ALH.

27.    ALH was created on June 3, 1998. D.I. 94 at 4 & 5.

28.    ALH is a limited liability company organized under Delaware law

to engage in the home building business.

29.     The investors in ALH, including Shamrock and Defendants, negotiated the terms of their investment.

30.     In 1998, Lamm presented ALH to potential investors as an opportunity for consolidation of small private home building companies in the Southeastern United States and with the stated goal of positioning ALH for a liquidity event within approximately twenty-four months of the investors' initial investment.

31.     On or about June 12, 1998, the Class B Members funded their initial investments in ALH.  D.I. 94 at 4 & 5.

32.     As a result of the June 1998 closing of the transaction that formed and funded ALH (the "ALH Transaction"), ALH became the sole shareholder of American Landmark Homes Corporation ("ALH Corp.") and Atlantic Builders, Inc. ("ABI"), Delaware corporations with home-building operations in Florida.  D.I. 94 at 4 & 5.

33.     The stock of ALH Corp. was contributed to ALH by (a) Landmark Equity Investors LLC, a Delaware limited liability company which became the Class C Member of ALH, and (b) Lion ALH Capital LLC ("Lion LLC"), a Delaware limited liability company, which became the Class D Member of ALH.

34.     Pursuant to § 6.1(a) of ALH's Operating Agreement, Lion LLC was ALH's Initial Manager.  D.I. 94 at 6.  Lamm was a member of Lion LLC, along with Jonathan Zich ("Zich") and John Hourihan ("Hourihan").

35.     On September 3, 1998, Erica Jesselson 1994 CLAT, for which Michael G. Jesselson is the trustee, loaned $2.8 million to nine partnerships, for which Lamm served as the president, for a four month term (the "Jesselson Note").  Lamm personally

guaranteed the Jesselson Note. There is over $1.2 million owing on the Jesselson Note.

36. On or around December 9, 1998, ALH's Supervisory Board unanimously determined to form ALH II, Inc. as a subsidiary of ALH, to act as the parent company of all of ALH's operating subsidiaries. D.I. 94 at 4 & 5.

37. ALH II was created in part for tax planning purposes, *inter alia*, to capture the consolidated tax liability of ALH, while taxable income would flow directly to ALH's Members.

38. ALH II was used as the vehicle for obtaining debt financing for certain of ALH's operations and acquisitions.

39. The financial statements of ALH II were presented to lenders in connection with the initial arrangement and subsequent modifications of such loans.

40. As of June 30, 2001, ALH II was the borrower or guarantor on over $40 million in loans for the benefit of ALH and its operations.

41. ALH's Operating Agreement was initially signed by ALH's members as of June 12, 1998 (the "Operating Agreement"). D.I. 94 at 4 & 5.

42. When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by ALH's Class A Members, one designated by ALH's Class B Members and two designated by ALH's Class D Members.

43. Since 1998, Buchler has been a Class A Representative and Arenson has been the Class B Representative.

44. In or around late 1999 or early 2000, Krieger became a Class A Representative, replacing the Shamrock employee who previously held that position.

45. The Representatives of the Class D Members initially were Lamm

and Zich.

46.     ALH's Supervisory Board has always had five members.

47.     The Class B Members have never had more than one Representative on the Supervisory Board.

48.     Nothing in the Operating Agreement requires the consent of the Class B Members for actions or decisions by ALH (except that Members must unanimously consent to amendments of the Operating Agreement that modify their limited liability, alter their interest in the profits, losses or distributions of ALH, or alter the number or voting rights of the Representatives).

49.     Under ALH's Operating Agreement, the economic rights of the Class A and Class B investors are *pari pasu* and the Class A investors have no financial priority over the Class B investors.

50.     Section 6.2 of ALH's Operating Agreement provides a mechanism for making "Major Decisions" and defines "Major Decisions."

51.     In connection with the March 15, 1999 amendment to the Operating Agreement, the Members contributed additional capital to ALH.  D.I. 94 at 6.

52.     The March 15, 1999 Amendment to the Operating Agreement provided that the $2,000,000 paid by the Class E Member to satisfy the Elovic Debt and the $900,000 paid prior to March 1, 1999 by the Class E Member in partial payment of the Arbor Debt together with the $2 million that was to be contributed to the Company on or prior to July 1, 1999 and the $2.7 million that was to be contributed to the Company on or prior to November 1, 1999 to be paid on the Arbor Debt constitute the Class E Capital Contribution (the "Class E Capital Contribution").  The March 15, 1999 Amendment to the Operating

Agreement states that SELK unconditionally guaranteed to ALH that Lamm, as Class E Member of ALH, would fulfill his Class E Capital Contribution in the amount of the $4.7 million Arbor Debt, by paying cash or satisfying the Arbor Debt.

53.    Section 3.3 of the Operating Agreement provides that no Member shall have any personal liability to ALH, to any other Member of ALH, or to any other person for deciding not to make a further investment in ALH.

54.    None of ALH's Members was under any obligation to invest any additional capital.

55.    Section 10.2 of the Operating Agreement provides as follows: "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

56.    Section 6.2(f) of the Operating Agreement provides as follows: "Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence."

57.    The Members of the Supervisory Board are "Representatives" pursuant to Section 6.2(a) of the Operating Agreement.

58.    The purpose of the capital contributions made by ALH's Class A and Class B Members in connection with the March 15, 1999 Amendment of the Operating

13

Agreement was to provide funds for ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a Delaware corporation and direct wholly-owned subsidiary of ALH II, to acquire Bowden Building Corporation ("BBC"), a home-building company based in Memphis, Tennessee.

59.    In 1999, ALH acquired the BBC home-building operations based in Memphis, Tennessee. All the Class Representatives approved this acquisition and the related financing, including ALH II's agreement to guarantee a $2.25 million promissory note for a portion of the purchase price.

60.    In 2000, ALH acquired Mulvaney Homes, Inc. ("MHI") based in Charlotte, North Carolina.

61.    In January 2000, ALH II borrowed from Wachovia Bank ("Wachovia") $27.5 million which was used to fund the acquisition of MHI. D.I. 94 at 5.

62.    The Wachovia loan was secured by surety bonds from Swiss Reinsurance America Corporation ("Swiss Re") and Amwest Surety Insurance Corporation ("Amwest"). Subsequently, Swiss Re assumed the Amwest surety bond.

63.    In connection with the Wachovia loan, ALH II pledged its interest in a $500,000 Certificate of Deposit and ALH pledged all of its stock in ALH II. In addition, ALH agreed that, if ALH II defaulted on the loan, Wachovia could require ALH to purchase ALH II's loan obligation to Wachovia for a price equal to ALH's obligation to Wachovia, effectively making ALH a guarantor of ALH II's obligations to Wachovia.

64.    All Class Representatives approved this acquisition and the related financing, including agreements by ALH and ALH II to guarantee and secure the Wachovia loan as set forth above.

65.    ALH's Supervisory Board unanimously approved all of the steps related to the purchase of MHI. D.I. 94 at 6.

66.    On April 6, 2000, ALH II borrowed $2 million from Shamrock, Arenson Holdings and Lion & Lamm Capital, LLC to "finance certain operations" of ALH II (the "2000 Loan Agreement"). D.I. 94 at 6. Pursuant to the 2000 Loan Agreement, Shamrock loaned $1,633,334.00; Arenson Holdings loaned $166,666.00 and Lion & Lamm Capital, LLC loaned $200,000 (the "2000 Loans").

67.    ALH II's obligations under the 2000 Loan Agreement were guaranteed by various ALH II subsidiaries.

68.    The members of ALH's Supervisory Board unanimously approved the 2000 Loans to ALH II. D.I. 94 at 6.

69.    By July 2001, the Class A and Class B Members of ALH were dissatisfied with Lion LLC's performance as Manager of ALH.

70.    In or around July 2001, ALH reached a settlement with Lion LLC, Lamm, Zich and Hourihan (the "Lion LLC Settlement").

71.    Fried Frank Harris Shriver & Jacobson ("Fried Frank") advised ALH in connection with the Lion LLC Settlement.

72.    Pursuant to the Lion LLC Settlement, Lion LLC, Lamm, Zich and Hourihan agreed to pay approximately $2 million dollars to ALH.

73.    The Lion LLC Settlement provided, among other things, that (a) the Class A Members were given the right to designate one of the two Class D Representatives on the Supervisory Board, (b) provided that SCA would render consulting services to ALH, (c) Buchler was made a member of the board of each ALH II subsidiary, (d) an Audit Committee

was established, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B Representative (Arenson), (e) the consulting agreement between ALH and Lamm dated September 1, 1998, was terminated (f) a new consulting agreement with Lion LLC was entered into, and (g) Lamm was required to assume the "primary day to day managerial responsibilities" of Lion LLC with respect to ALH and its subsidiaries.

74.    As part of the Lion LLC Settlement, the subsidiaries of ALH II that guaranteed the 2000 Loan Agreement reaffirmed their guarantees.

75.    All Class Representatives approved the Lion LLC Settlement.

76.    Pursuant to the Lion LLC Settlement, Zich, one of the two Class D Representatives resigned from ALH's Supervisory Board.

77.    The Class A Members appointed Stein as a Class D Representative.

78.    Since the Lion LLC Settlement, three of the five members of the Supervisory Board have been Shamrock employees and SCA, a wholly owned subsidiary of Shamrock, provided substantial management services to ALH.

79.    In or around July 2001, in connection with the Lion LLC Settlement, ALH entered into an agreement (the "Consulting Agreement") for SCA to consult with and provide advice to the officers and employees of ALH concerning matters generally arising out of the business affairs of the ALH. SCA was to be paid a fee of $100,000 per year.

80.    Section 6 of the Consulting Agreement provides that SCA may terminate the agreement at any time, with or without cause.

81.    Under § 6 of the Consulting Agreement, ALH could have terminated the Consulting Agreement at any time, with or without cause, after December 31, 2002.

82.    Exhibit A to the Consulting Agreement requires ALH to indemnify and hold harmless SCA, its affiliates, and the partners, officers, directors, employees and agents of the foregoing against all liabilities arising from or relating to the Consulting Agreement, except to the extent that it is finally judicially determined that such liabilities result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct.

83.    Exhibit A to the Consulting Agreement further provides that SCA shall have no liability to the Company or any other person in connection with the services which they render pursuant to the Letter Agreement, except for SCA's bad faith, gross negligence or willful misconduct judicially determined as aforesaid.

84.    Exhibit A to the Consulting Agreement requires ALH to assume SCA's defense of such action including payment of fees and disbursements of counsel insofar as such action shall relate to any alleged liability in respect of which indemnity may be sought against ALH. The Consulting Agreement further provides that ALH agrees to reimburse the indemnified persons for legal fees and other expenses "as they are incurred."

85.    The Consulting Agreement provides that (1) SCA shall devote such time as it deems necessary to perform the services to be rendered by it under the Consulting Agreement, and (2) SCA is not required to devote any minimum amount of time to the performance of such services.

86.    All Class Representatives approved the Consulting Agreement.

87.    In 2001, the Supervisory Board unanimously approved a decision to seek a buyer for the entire company.

88.    In or around November 2001, Neuberger was involved in identifying a possible buyer for ALH.

89.    Fried Frank advised ALH regarding the possible sale of ALH II or all or substantially all of the assets of ALH II and its subsidiaries.

90.    In March 2002, ALH's Supervisory Board unanimously determined to hire Jolson Merchant Partners ("JMP") to provide "financial advisory and investment banking services" in connection with the possible sale of ALH. D.I. 94 at 7.

91.    Lamm participated actively in the selection of JMP, and all Supervisory Board Members approved the selection, retention and compensation of JMP.

92.    JMP was selected with reasonable care by or on behalf ALH to perform the services contemplated by the JMP engagement letter.

93.    On March 21, 2002, ALH and ALH II ("the Company") entered into an engagement letter with JMP (the "JMP Engagement Letter") to engage JMP to advise the Company concerning a sale of the Company including any transaction or related series of transactions whereby, directly or indirectly, control of the Company or of all or substantially all of the assets of the Company is acquired by a third party. The JMP Engagement Letter contemplated JMP's provision of a broad range of services, including: investigation and analysis with respect to the business and operations of the Company and of the industry and markets it serves; analysis of the various strategic alternatives available to the Company; development, updating and ongoing review of a list of parties that might have a specific interest in acquiring the Company; marketing the Company to potential buyers; advising on the financial

aspects of proposed transactions; participating in meetings of the Supervisory Board to consider potential transactions; structuring a sale transaction process, including developing and administering a confidential bidding process; counseling the Company with respect to strategy and tactics for negotiation of a transaction; and participating with the Company and its counsel in the negotiation of a transaction.

94.    The JMP Engagement Letter further provides that upon request by the Company, JMP would render an opinion in writing as to the fairness, from a financial point of view, to the Company's equity holders of the consideration to be received by such equity holders or of the exchange ratio, as the case may be, in any potential Transaction or advise the board of directors of the Company that it is unable to render such an opinion. The JMP Engagement Letter further provides that if the Company had requested JMP to render a written fairness opinion to the Company, the Company would have become obligated to pay JMP a one-time fairness opinion fee of $100,000. ALH's Supervisory Board never discussed or approved payment of a fairness opinion fee to JMP.

95.    Shamrock, Krieger, Buchler and Stein reasonably believed, based on JMP's substantial experience in the industry, that such services were within JMP's professional and expert competence.

96.    ALH paid JMP a non-refundable retainer of $150,000.

97.    On May 7, 2002, with the Supervisory Board's unanimous approval, ALH II borrowed approximately $4.4 million from Shamrock, D.A. Gardens, The Erica Jesselson 1994 CLAT and SELK (the "2002 Loan Agreement"). D.I. 94 at 7. Pursuant to the 2002 Loan Agreement, Shamrock loaned $1,964,800.00; D.A. Gardens loaned $312,500.00,

The Erica Jesselson 1994 CLAT loaned $312,500 and SELK loaned $625,000 (the "2002 Loans").

98.    A purpose of the 2002 Loans was to provide working capital to ALH II and its subsidiaries.

99.    Fried Frank advised Shamrock in connection with the 2002 Loans.

100.    Pursuant to the March 20, 2002 JMP Engagement Letter, JMP actively sought a buyer for the entire Company or substantially all of its assets.

101.    After these efforts to sell ALH in its entirety proved unsuccessful, in or around July 2002, JMP began seeking potential buyers of BBC (the Memphis, Tennessee operation) and ABI (the Jacksonville, Florida operation).

102.    In the summer of 2002, ALH entered into negotiations with Walter Industries, Inc. for the purchase of BBC but those negotiations were unsuccessful.

103.    In March 2003, with the approval of all Class Representatives, the JMP Engagement Letter was extended.

104.    In April 2003, ALH entered into a letter of intent with Mattamy Homes ("Mattamy") for the sale of ABI.

105.    Fried Frank represented ALH in connection with the sale of ABI.

106.    On May 5, 2003, Neuberger, on behalf of the Class B Members, sent an email letter to Plaintiffs expressing opposition to the sale of ABI.

107.    On May 14, 2003, the Supervisory Board met to discuss the sale of ABI and the Bowden Litigation.

108.    In the Bowden Litigation, the Bowden family sought payment under a promissory note (the "Bowden Note") issued by ALH Tennessee in connection with

the purchase of BBC. The principal amount of the Bowden Note was $2.25 million and the accrued interest was approximately $600,000. In addition, the plaintiffs sought to recover under an earn-out provision with an estimated value of approximately $675,000, and an award of attorneys' fees in an estimated range of $200,000 to $600,000. Plaintiffs also sought consequential and punitive damages on the grounds that, among other things, non-payment of the Bowden Note had caused the failure of three new businesses started by the Bowden family after they sold BBC to ALH.

109.    In late May, 2003, the Bowden Litigation was rescheduled for trial in February 2004. Lamm was advised at that time of the rescheduling.

110.    The Bowden Note was guaranteed by ALH II, and ALH II was a named defendant in the Bowden Litigation.

111.    At a June 26, 2003 meeting of the Supervisory Board, Krieger, Buchler and Stein voted to sell ABI. Arenson voted against the sale of ABI. Lamm requested additional time to review the ABI proposal and abstained from voting. D.I. 94 at 7.

112.    At the June 26, 2003 meeting of ALH's Supervisory Board, Stephen Alexander of Fried Frank described a proposed settlement of the Bowden Litigation under which the Bowden family would be paid $5 million plus $210,000 in attorneys' fees (the "Settlement"). The first $1 million would be due immediately upon execution of the settlement agreement and the balance would be payable on the earlier of August 31, 2003 or the consummation of the sale of ABI. The proposed Settlement included an option to extend the final payment date for an additional 90 days, for a fee of $250,000. The Supervisory Board unanimously approved the terms of the Bowden Settlement.

113. The loans under the 2000 Loan Agreement and the 2002 Loan Agreement were repaid in full from the proceeds of the sale of ABI.

114. Under the JMP Engagement Letter, JMP was only entitled to a fee upon the sale of the whole Company. The Supervisory Board unanimously authorized Buchler and Krieger to negotiate a fee with JMP for the sale of ABI up to a total of $300,000 (the prorated portion of the fee that would have been payable to JMP upon a sale of the whole Company).

115. At the June 26, 2003 meeting, Arenson and Lamm were appointed as the sole members of a special committee to consider whether Shamrock should be paid a fee in connection with the sale of ABI to Mattamy.

116. Arenson and Lamm approved a $200,000 fee to Shamrock.

117. After the sale of ABI to Mattamy, Bill Lanius ("Lanius"), CFO of ALH II, became an employee and officer of Mattamy but he remained an officer of ALH II and continued to provide consulting services to ALH.

118. After closing on the sale of ABI, JMP also marketed BBC to several potential buyers including discussions with John LaGuardia ("LaGuardia"), the president and chief operating officer of ALH II, and Jeff Sweeney ("Sweeney"), the president of BBC regarding several possible transactions.

119. On July 29, 2003, Buchler sent Arenson and Lamm an email concerning (a) Laguardia's request to the members of ALH's Supervisory Board for permission for Laguardia and Sweeney to assist Levitt Corporation, including its affiliates ("Levitt"), in evaluating BBC; and (b) a draft response to Laguardia that had been prepared with the assistance

of ALH's counsel, Fried Frank, containing certain conditions for such permission; and (c) Buchler's request that the Board approve the draft letter.

120.    On March 24, 2004, Plaintiffs called a Supervisory Board meeting to consider the proposed sale of 100% of the stock of BBC to Levitt.

121.    Fried Frank represented ALH in connection with the sale of BBC.

122.    Krieger, Buchler and Stein voted in favor of the proposed sale of BBC to Levitt. Arenson and Lamm both voted against the sale.

123.    In connection with the sale of BBC, ALH paid JMP a fee of approximately $135,000.

124.    A special committee of Arenson and Lamm was formed to consider whether Shamrock should be paid a fee for its time spent in connection with the sale of BBC. Arenson and Lamm determined that ALH should not pay Shamrock a fee.

125.    In the late summer and early fall of 2004, ALH was in the process of negotiating a possible sale of MHI to Levitt, which had purchased BBC.

126.    Holland & Knight represented ALH in connection with the sale of MHI.

127.    LaGuardia, the former president of ALH II was the president of Levitt.

128.    Lanius negotiated with ALH's lenders to obtain approval for the sale of MHI. Swiss Re's approval was required because Swiss Re would pay to Wachovia a shortfall of more than $12 million with respect to the Wachovia loan. Swiss Re approved the Levitt proposal and Lanius obtained Swiss Re's agreement that the ALH Members would receive a $1 million payment after the Levitt transaction closed.

129.    In early October 2004, Levitt elected not to proceed with the acquisition of MHI.

130.    Mattamy made an offer for MHI.

131.    Swiss Re approved Mattamy's offer.

132.    In late October, Buchler distributed Mattamy's proposed letter of intent to all Class Representatives and sought their comments on the transaction.

133.    In November and December 2004, drafts of the proposed MHI transaction documents and resolutions were circulated for comment to all Class Representatives.

134.    The Supervisory Board meeting to consider the proposed MHI transaction was scheduled for December 15, 2004.

135.    Although initially confirming that he would attend the meeting, on December 14, 2004 Arenson advised that he would not attend.

136.    On December 15, 2004, a meeting of the Supervisory Board was held. With four Class Representatives in attendance, there was a quorum and the meeting proceeded.

137.    JMP did not participate in the sale of MHI. No oral or written fairness opinion was given in connection with the sale of MHI.

138.    Pursuant to a Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR"), Lamm, on behalf of himself and for , *inter alia,* his affiliates (including Lion ALH Capital LLC and Lion & Lamm Capital LLC) (collectively the "Lamm Affiliates"), released ALH, ALH II, MHI and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors and assigns (collectively the "ALH Affiliates"), from "any and all claims, demands, debts, duties,

bonds, damages, liabilities, actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises" (collectively "Claims") of Lamm or the Lamm Affiliates that "relate[] to or aris[e] out of [any] past transactions between or amongst them."

139.    ALH has no remaining operations.

140.    Section 7.4 of the By-Laws of ALH II provides for indemnification of directors and officers to the fullest extent allowed by law, subject to the board of directors' discretion regarding the advancement of legal fees and other expenses and determination that indemnification is proper.

141.    Defendants have opposed any advancement to or indemnification of Plaintiffs unless ordered by a court.

IV.    STATEMENT OF ISSUES OF FACT REMAINING TO BE LITIGATED

1.      Plaintiffs' statement of issues of fact remaining to be litigated is attached hereto as Exhibit A.

2.      Defendants' statement of issues of fact remaining to be litigated is attached hereto as Exhibit B.

V.     STATEMENT OF ISSUES OF LAW REMAINING TO BE LITIGATED

1.      Plaintiffs' statement of issues of law that remain to be litigated is attached as Exhibit C.

2.      Defendants' statement of issues of law that remain to be litigated is attached as Exhibit D.

VI.    EXHIBITS

1.      Plaintiffs' list of exhibits that it intends to offer at trial is attached hereto as Exhibit E.

2.      Defendants' list of exhibits that it intends to offer at trial is attached hereto as Exhibit F.

3.      The parties agree to provide each other with objections to exhibits prior to the pretrial conference and will update Exhibit E and Exhibit F accordingly.

4.      The parties agree that the identification of the Rule of Evidence on which the proponent of an exhibit will rely to support its admissibility in response to any remaining objection will be provided to the objecting party at least 24 hours prior to offering it into evidence of trial.

5.      The parties will offer as exhibits at trial one or more of the exhibits set forth in their respective lists. These lists include the exhibit number to be used at trial and a description sufficient to identify the exhibit, e.g. by production number, deposition exhibit

number or otherwise.  The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the document.

6.    The parties reserve the right to seek to offer an exhibit designated by the other party, even if not introduced by the designating party.  All objections to such documents are preserved.

7.    The parties shall exchange demonstrative exhibits they intend to use at trial in their respective case in chief and in their respective opening statements by no later than 5:00 p.m. on the day prior to their use.  The notice provisions of this paragraph shall not apply to demonstrative exhibits created in the Courtroom during testimony at trial or the enlargement, highlighting, ballooning, etc. of trial exhibits or of testimony.  The parties shall meet and confer to resolve any objections to demonstrative exhibits.  Any objections that can not be resolved shall be raised with the Court before the demonstrative exhibit is used for the witness.

8.    Any document offered into evidence at trial that was produced during discovery and which on its face appears to have been authored by a party, or an employee, officer, representative or affiliate of a party shall be deemed *prima facie* authentic, subject to the right of the party against whom such document is offered to offer evidence to the contrary.

9.    The parties will exchange copies of and identify by bates range copies of any trial exhibits not previously introduced at a deposition no later than May 1, 2007.

10.    The listing of a trial exhibit does not constitute an admission as to the admissibility of the trial exhibit (i.e., a waiver of any applicable objection).

11.    Due to scheduling difficulties and difficulties obtaining documents from non-parties, a limited number of documents have just recently been produced and the parties have agreed to postpone the deposition of Arbor Commercial Mortgage, LLC ("Arbor") until after this pre-trial order is due to the Court.  Accordingly, the parties have agreed to permit one another to supplement their exhibit lists with those late produced documents and exhibits used at the Arbor deposition prior to trial.

VII.    WITNESSES  TO  BE  CALLED  IN  PERSON  OR  BY DEPOSITION

1.    Plaintiffs' list of witnesses it may call at trial is attached hereto as Exhibit G.

2.    Defendants' list of witnesses it may call at trial is attached hereto as Exhibit H.

3.    The parties agree that they shall provide the other side by 5:00 p.m. two days before witnesses are called live at trial for a party's case in chief (i.e., Monday evening for a witness to be called on Wednesday) with the name of each witness they expect to call, the order in which they expect to call the witnesses, and identification of the trial exhibits they expect to use under direct examination of the witness.  The other parties shall identify any objections to the admissibility of the exhibits sought to be used with a witness within 24 hours of receiving notice of the exhibits.  For rebuttal witnesses, the parties agree that they shall provide the other side with notice of witnesses and exhibits by 5:00 p.m. the day before any such witness is called live at trial and the other party shall identify any objections to exhibits sought to be used by 8:30 a.m. the next day.  The parties shall meet and confer in an attempt to resolve any objections to exhibits.  Any objections that are not be resolved shall be raised with the Court before the exhibit is used with a witness.

4.    The parties shall exchange designations on or before April 27, 2007 at 5 p.m. and counter-designations of deposition testimony expected to be used at trial, along with objections to any designations on or before May 2, 2007 and objections to any counter-designations on or before May 4, 2007. The parties shall meet and confer to resolve any objections to such deposition testimony. If the objections to disputed testimony are not resolved by the parties meet and confer, they will be presented to the Court the day the presenting party proposes to present testimony by deposition. The specific portions of the deposition shall be read in page order or, if directed by the Court, submitted to the Court. If a party designates deposition testimony, and the other party counter-designated, both the designation and the counter-designation shall be read in page order.

5.    Prior to commencement of the trial, the parties will have designated all deposition testimony for their respective cases in chief. The parties will have also made a good faith effort to designate rebuttal deposition testimony and have counter-designated deposition testimony. To the extent rebuttal testimony can not be reasonably anticipated, the parties reserve the right to designate additional testimony and will give each other reasonable notice to provide counter-designations and objections.

6.    The parties agree that any deposition testimony to be used at trial may be used whether or not transcripts of such depositions have been signed and filed pursuant to Federal Rule of Civil Procedure 30(b).

7.    The listing of a deposition designation or discovery response does not constitute an admission as to the admissibility of the testimony or discovery response (i.e., a waiver of any applicable objection).

VIII.    BRIEF STATEMENT OF INTENDED PROOFS

A.     Plaintiffs' Statement of Intended Proofs

1.     In support of their claims, in addition to the facts not in dispute, Plaintiffs expect to offer the proofs set forth below:

a.     Plaintiffs did not breach any fiduciary duty in connection with ALH, particularly ALH's sale of its home building operations and its repayment of loans from certain ALH investors;

b.     Defendants' Counterclaims are barred by the business judgment rule;

c.     Plaintiffs relied in good faith on the advice of ALH's outside legal counsel and financial advisors;

d.     Plaintiffs are entitled to indemnification and advancement of expenses;

e.     SELK released its claims against Plaintiffs;

f.     There has been a shortfall in the capital contribution of ALH's Class E Member and SELK's equity interest in ALH has been reduced or eliminated by reason of and to the extent of such shortfall;

g.     Plaintiffs have not violated Arenson's rights as Class B Representative on ALH's Supervisory Board;

h.     Defendants' Counterclaims are barred, in whole or in part, by waiver, estoppel, ratification and unclean hands;

           i.       Defendants have not suffered any damages as a result of Plaintiffs' actions.

      B.      Defendants' Statement of Intended Proofs

           1.      Brief Statement of What Defendants Intend to Prove as a Defense:

              a.      Defendants will, to the extent necessary, rebut any evidence by Plaintiffs that they are entitled to a declaratory judgment that they did not breach their fiduciary duties to ALH and Defendants by proving self-interest, lack of independence and failure to exercise due care.

              b.      Defendants will, to the extent necessary, rebut any evidence by Plaintiffs that the liquidation of ALH was entirely fair to Defendants by showing that it was not the product of fair dealing and did not attain the highest value reasonably available.

              c.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that Shamrock, Krieger, Buchler and Stein are entitled to a declaratory judgment that they relied in good faith on SCA, Jolson Merchant Partners, Fried, Frank, Harris, Shriver & Jacobson, LLP, Baker & Hostetler LLP and Holland & Knight LLP.

              d.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that Shamrock, Krieger, Buchler and Stein are entitled to a declaratory judgment that they are entitled to indemnification, including advancement of legal fees and other expenses.

              e.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that SCA is entitled to a declaratory judgment that under the Consulting

Agreement, they are entitled to indemnification, including advancement of legal fees and other expenses by proving that SCA's action were in bad faith, grossly negligent and willful misconduct.

        f.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that they are entitled to a declaratory judgment that SELK's claims against them have been released by the Settlement Agreement and Mutual Release dated December 17, 2004 by proving that SELK is not a party to the agreement and did not expressly or implicitly adopt the agreement.

        g.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that they are entitled to a declaratory judgment that SELK's equity interest in ALH is reduced or eliminated to the extent of any shortfall in the Class E Capital Contribution by proving that Lamm fulfilled his obligation to contribute the Class E Capital Contribution or SELK is not obligated to reduce or eliminate the Class E Capital Contribution shortfall.

        h.      Defendants will, to the extent necessary, rebut any evidence submitted by Plaintiffs that SELK guaranteed Lamm's obligation to contribute the Class E Capital Contribution by proving that the purported guaranty is not valid.

        2.      Brief Statement of What Counterclaim Plaintiffs and Third Party Plaintiffs Intend to Provide in Support of Their Claims:

        a.      Counterclaim Plaintiffs and Third Party Plaintiffs (hereinafter collectively "Counterclaim Plaintiffs") will prove that Shamrock owed a fiduciary duty to them by its control of ALH and the Board.  Counterclaim Plaintiffs will further prove that

Shamrock breached its fiduciary duties by using that control to force the unwarranted liquidation of ALH by the sales of the operating units for the primary purpose of furthering its own self-interest—namely to secure repayment of its outstanding loans to ALH, to ensure that its loan repayments were not treated as preferences and to exit its investment in ALH thereby eliminating its costly, time-consuming management responsibilities.

b.    Counterclaim Plaintiffs will prove that Krieger, Buchler and Stein comprised a majority of the Board and because their primary loyalty was to Shamrock, they lacked independence and approved the unwarranted liquidation of ALH for the primary purpose of furthering Shamrock's interests thereby breaching their fiduciary duties of loyalty and good faith.

c.    Counterclaim Plaintiffs will prove that Plaintiffs breached their fiduciary duty of due care by failing to inform themselves fully concerning all material information reasonably available prior to approving the unwarranted liquidation of ALH by the sales of the operating units.

d.    Counterclaim Plaintiffs will prove that SCA knowingly assisted Shamrock, Krieger, Buchler and Stein in breaching their fiduciary duties to ALH and its members through the unwarranted liquidation of ALH and is therefore liable for aiding and abetting.

e.    Counterclaim Plaintiffs will prove that Plaintiffs had a fiduciary duty to maximize value for the members because the sale of ABI made the break up of ALH inevitable.

f.      Counterclaim Plaintiffs will, to the extent necessary, rebut each of Plaintiffs' affirmative defenses.

g.      Counterclaim Plaintiffs will prove that Plaintiffs' unwarranted liquidation of ALH by the sales of the operating units violated their fiduciary duties and SCA's knowing participation in the violation, caused damage to ALH's value and Counterclaim Plaintiffs' equity. Specifically, Counterclaim Plaintiffs will prove that at the time of the sale of ABI, ALH had an enterprise value of $30,922,000, and the value of the Class B members' equity was $11,502,984. Counterclaim Plaintiffs will also prove that if ALH had not proceeded with the unwarranted liquidation of ALH, the enterprise value of ALH on June 30, 2005, would have been $45,477,000, and the value of the Class B members' equity would have been $20,265,444. Counterclaim Plaintiffs' damages analysis is set forth in detail in the reports of William Bavis.

IX.    CERTIFICATE    OF    ATTEMPTED    RESOLUTION    OF
       CONTROVERSY

1.      The parties certify that two-way communication has occurred between persons having authority in good faith to explore a resolution of the controversy by settlement. No agreement has been reached.

X.    MISCELLANEOUS ISSUES TO BE ADDRESSED AT THE
       PRETRIAL CONFERENCE

1.    Whether Defendants may call Joseph Capobianco and Samuel Zylberberg at trial?

2.    Whether Defendants' witness list includes only those witnesses that they intend to call at trial pursuant to Local Rule 16.4?

3.    Whether Defendants must specify in their witness list whether they intend to call witnesses live or by designation pursuant to Local Rule 16.4?

4.    Whether Plaintiffs are entitled to continue certain depositions on the basis of documents produced by Defendants after the depositions?

XI.    EXPECTED DURATION OF TRIAL

1.    The parties believe that the issues of liability and damages, if any, can be tried to the court with 60 hours equally divided among the parties with post-trial briefing.

XII.    ORDER TO CONTROL COURSE OF ACTION

1.    This Order shall control the subsequent course of this action unless modified by the Court to prevent manifest injustice.

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

*/s/ Samuel T. Hirzel*
_____
A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200
*Attorneys for Plaintiffs/Counterclaim Defendants*

COZEN O'CONNOR

*/s/ Sean J. Bellew*
_____
Sean J. Bellew (#4072)
David A. Felice (#4090)
1201 N. Market Street
Wilmington, DE 19899
(302) 295-2000
*Attorneys for Defendants/Counterclaim Plaintiffs*

OF COUNSEL:

Neuberger, Quinn, Gielen, Rubin &
  Gibber, P.A.
Thomas M. Wood, IV
Nichole M. Galvin
One South Street, 27th Floor
Baltimore, MD 21202
(410) 332-8550

April 19, 2007

783916.8

SO ORDERED this _____ day of April, 2007.

_____
Chief Judge Sue L. Robinson