# EXHIBIT A

## EXHIBIT A

## PLAINTIFF'S STATEMENT OF ISSUES OF FACT REMAINING TO BE LITIGATED

1.      Pursuant to the March 15, 1999 Amendment to the Operating Agreement, if Lamm fails to make the full Class E Capital Contribution, SELK must make up the shortfall by performing under the SELK Guarantee and to the extent SELK fails to perform under the SELK Guarantee, its equity interest in ALH shall be reduced dollar-for-dollar by the amount that Lamm failed to contribute pursuant to Section 3.2 of the March 15, 1999 Amendment to the Operating Agreement.

2.      Lamm has not made the Class E Capital Contribution in full.

3.      SELK has not paid ALH the amount of the shortfall in the Class E Capital Contribution.

4.      Lion & Lamm Capital, LLC contributed $350,000 of the Arenson Entities' capital contributions.

5.      Lion LLC was controlled by Lamm.

6.      Lion LLC mismanaged ALH.

7.      Members of Lion LLC misappropriated funds and engaged in unauthorized related party transactions.

8.      In 2000, ALH and its subsidiaries needed funds to finance certain operations of its subsidiaries.

9.      By the end of 2000, ALH II was in default on several loans and undergoing serious financial difficulties. D.I. 94 at 6.

10.     The auditor's report of ALH II's financial statements for fiscal year 2000 stated that ALH II's defaults on certain loan covenants raised substantial doubt about the ability of ALH II and its subsidiaries to continue as a going concern.

11.     By mid-2001, the Representatives of the Class A and Class B Members on the Supervisory Board of ALH believed that Lion LLC, Lamm and certain of their associates owed ALH millions of dollars in misappropriated and/or misused funds and unauthorized expenditures.

12.     On August 10, 2001, Fried Frank sent a letter to ALH disclosing its relationship with Shamrock and seeking ALH's consent to its representation of ALH with respect to the Lion LLC Settlement.  The consent letter was executed by Buchler (on behalf of Shamrock) and Zich (on behalf of ALH).

13.     All Class Representatives approved Zich's resignation from the Supervisory Board in connection with the Lion LLC Settlement and the Class A Members appointed Stein as a Class D Representative.

14.     The change in the composition of ALH's Supervisory Board after the Lion LLC Settlement was approved by Arenson and did not preclude him, as Class B Representative, from participating in ALH's decision-making.

15.     The Consulting Agreement entered into between ALH and SCA shortly after the Lion LLC Settlement indemnified SCA and its representatives from all liability except that resulting primarily from actions or omissions done in bad faith or due to gross negligence or willful misconduct.  D.I. 94 at 7.

16.    Neither the Class B Representative on ALH's Supervisory Board nor the Class B Members have ever requested that the Consulting Agreement be terminated.

17.    Pursuant to the Consulting Agreement Krieger, Buchler and Stein devoted thousands of hours to ALH matters.

18.    After the Lion LLC Settlement, both Arenson and Lamm continued to attend Supervisory Board meetings and participate actively in the Supervisory Board's decision making process.

19.    The Class Representatives, including Arenson and Lamm, determined in 2001 that it would be in ALH's best interests to consider selling ALH.

20.    In or around December 2001, Neuberger, who then represented some or all of the Class B Members in connection with ALH, was involved in identifying a possible buyer for ALH, for which he sought a finder's fee.  The transaction was not consummated, and Neuberger did not receive this payment.

21.    On December 17, 2001, Fried Frank sent a letter to ALH disclosing its relationship with Shamrock and seeking ALH's consent to its representation of ALH with respect to the possible sale of ALH II or all or substantially all of the assets of ALH II and its subsidiaries.  The consent letter was executed by Buchler (on behalf of Shamrock) and Lamm (on behalf of ALH).

22.    On January 28, 2002, Fried Frank sent a letter to ALH disclosing its relationship with Shamrock and seeking ALH's consent to its representation of ALH with respect to certain general corporate matters as well as in connection with the possible sale of

ALH II, Inc. or all or substantially all of the assets of ALH.  The consent letter was executed by Buchler (on behalf of Shamrock) and Lamm (on behalf of ALH).

23.    By early 2002, Lamm became angered by ALH's refusal to forgive or adjust his indebtedness arising from the Lion LLC Settlement, upon which he defaulted, and together with Neuberger embarked upon a plan to hold Shamrock, as a deep pocket, and members of the Supervisory Board employed by Shamrock responsible for the future ALH business decisions required in an effort to salvage the Class A and Class B Members investments, and to meet obligations to creditors, and to enlist other Class B Members in their scheme.

24.    In or around February 2002, Neuberger proposed that the assets of BBC be transferred in an effort to shield them from the plaintiffs in an action filed by the former owners of BBC (the "Bowden Litigation").

25.    JMP is an investment banker with substantial qualifications and experience in the home building industry.

26.    ALH, with Lamm's participation, selected JMP after seriously considering and interviewing other candidates.

27.    On April 16, 2002, Fried Frank sent a letter to ALH disclosing its relationship with Shamrock and seeking ALH's consent to its representation of Shamrock with respect to the 2002 Loan.  The consent letter was executed by Buchler (on behalf of Shamrock), and Laguardia and Lanius (on behalf of ALH).

28.    The Class Representatives, including Arenson, decided in early 2002 that ALH needed additional funding.  After considering and exploring various alternatives, the Class Representatives, including Arenson, concluded that it would not be feasible to raise

4

additional equity from ALH's existing Members or obtain additional equity or loans from outside parties, and certain members loaned ALH II approximately $4.4 million in May 7, 2002 pursuant to the 2002 Loan Agreements.

29.    In July 2002, representatives of the Class B members, including Arenson, Konig and Frankel met with Neuberger and Lamm at the Heathrow airport to discuss ALH.

30.    On July 30, 2002, Arenson sent an email to Plaintiffs indicating that the Class B investors met together in London and "are prepared to explore in a very serious and expedited fashion a buy-out of Shamrock's position."

31.    At the same time, Arenson and Neuberger began objecting to the sale of less than all of ALH's operations.  ALH was in the midst of an effort to sell BBC at this time and ALH was unable to reach an agreement with the potential buyer, in part, because of the pending Bowden Litigation.

32.    Defendants knew that an acceptable buyer for ALH could not be found, both because of JMP's unsuccessful efforts and because Defendants had failed to find a partner to join them in a buy-out offer.  At the same time, the Class B Members refused to provide any additional funding for ALH.

33.    From August – December 2002, in a series of email and other communications, Arenson and Neuberger expressed disagreement with a "piecemeal" sale of ALH and an interest in buying out Shamrock's Class A position.  Krieger and Buchler, on behalf of Shamrock, encouraged a buyout on mutually acceptable terms but indicated that ALH would move forward with the sale process absent such an agreement.

34.    Defendants initially offered $3 million for Shamrock's interest in ALH.  Shamrock countered, suggesting $12 million, and later suggested that the B's try to bridge the gap.    Messrs. Krieger and Buchler offered to buy the Class B interests at the same pro rata price offered for Shamrock's interest.

35.    In February 2003, Arenson, Neuberger, Buchler and Krieger met in Charlotte, North Carolina to discuss ALH, including a possible purchase by some or all of the Class B Members of Shamrock's interest in ALH.

36.    Defendants never made a formal written proposal to buy Shamrock's Class A membership Interest.

37.    The Class A and Class B Members never reached agreement on the Class B Members' expression of interest to purchase Shamrock's Class A membership interests. D.I. 94 at 7.

38.    After JMP began to market ABI, JMP obtained four written proposals and one verbal proposal for ABI. The most favorable proposal came from Mattamy Homes, Ltd. ("Mattamy"), which offered approximately $20 million for substantially all of the assets of ABI.

39.    At a mediation held shortly before the May 14, 2003 meeting of ALH's Supervisory Board, ALH Tennessee had offered $5 million to settle the Bowden Litigation: $1 million to be paid up front and the balance to be paid later from the proceeds of the sale of ABI.  The Bowden family had countered at $8 million, but it appeared that they might accept $5-6 million if payment was made promptly.

40.    At the May 14, 2003 meeting of ALH's Supervisory Board JMP gave an overview of the efforts to sell ALH in its entirety and the subsequent efforts to sell ABI.

JMP initially spoke to 20 builders who were potential buyers of ABI and then narrowed this list to six viable candidates. JMP advised the Board that the Mattamy proposal represented the best available transaction for the sale of ABI. John Laguardia ("Laguardia"), who was then the President and Chief Operating Officer of ALH II, presented his views of the home-building market in Jacksonville, Florida, and stated that the sale of ABI to Mattamy would be at the peak of the market. William R. Lanius ("Lanius"), who was then Executive Vice President and Chief Financial Officer of ALH II, stated that ABI faced various liquidity issues with respect to the capital needed to honor its existing land contracts. Lanius explained that ABI did not have either the cash or credit available with existing lenders to finance upcoming purchases pursuant to the existing contracts. Buchler noted that ALH as a whole had serious liquidity issues resulting from, among other things, poor results at MHI, which were causing ALHs auditors to write down a minimum of $15 million in goodwill. Lanius pointed out that ALH did not have sufficient cash on hand to finance its anticipated settlement the "Bowden Litigation". If the Bowden family were to prevail on its then-pending motion for partial summary judgment, the liability to the Bowden family would be approximately $4 million. ALH's Tennessee counsel had also advised that under Tennessee procedure, upon motion within 30 days notice, and in the trial court's discretion, a partial summary judgment could be converted into a final judgment upon which execution could be obtained. A year earlier, ALH's Tennessee counsel in the Bowden Litigation had advised ALH II's auditors that "in all likelihood," plaintiffs in the Bowden Litigation would prevail and get a judgment in the $3-4 million range. In addition, the Bowden Litigation sought millions of dollars in consequential and punitive damages on the grounds that, among other things, non-payment of the Bowden

Note had caused the failure of three new businesses started by the Bowden family after they sold BBC to ALH.

41.    Lamm consulted with Neuberger prior to the June 26, 2003 meeting of the Supervisory Board.  Neuberger advised Lamm to request additional time to review the ABI proposal and abstain from voting.

42.    At the June 26, 2003 meeting of ALH's Supervisory Board there was a full discussion of the proposed Settlement of the Bowden Litigation.  Fried Frank advised the Supervisory Board that the proposed Settlement was favorable to ALH, ALH II and other ALH subsidiaries.  Arenson, Lamm and Lanius commented that the proposed Settlement was favorable.  Arenson asked how the final payment would be addressed if the proposed sale of ABI were not consummated.  Buchler stated that, under such circumstances, it would be necessary to exercise the option to extend the final payment date and seek other purchasers for ABI.  Following this discussion, ALH's Supervisory Board, including Arenson and Lamm, unanimously approved the Settlement.  JMP gave an overview of its efforts to find purchasers for ALH's various subsidiaries and assets.  During the discussion that followed, JMP stated that it was an excellent time to sell BBC because of its strong performance in the first half of 2003.  JMP stated that a purchase price at a multiple of five times EBITDA was possible, so assuming EBITDA of $4.4 million, the price for BBC could exceed $20 million. With respect to MHI, JMP advised that it was not yet the best time to sell. JMP recommended that ALH continue its efforts to expand MHI's business before pursuing sale opportunities, and that the Supervisory Board reconsider its opportunities for selling MHI in the second half of 2003. Buchler asked JMP to give its assessment of the proposed Purchase Agreement for the sale of ABI to Mattamy.  JMP stated that based on, among other things, its review of comparable

8

transactions, the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. In light of ABI's projected EBITDA of approximately $8 million for 2003, the proposed purchase price represented an EBITDA multiple that was well above the average for previous sales of homebuilders. This price also compared favorably to comparable sale prices derived from multiples of book value or earnings. Neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of ABI. Buchler asked Laguardia and Lanius for their views on the proposed sale of ABI. Laguardia stated that ALH would be selling ABI at the peak of the Jacksonville, Florida homebuilding market. Lanius concurred in this, noting that the proceeds of the sale of ABI could be used to pay for the settlement of the Bowden Litigation, which would enhance ALH's ability to sell BBC. Lanius explained that, to continue competing in its market, ABI would need substantially better capitalization, and that ABI did not have financial resources for the land purchases it would need to make in order to compete successfully. Lanius also stated that ABI's existing contracts to purchase building lots would place considerable strain on ALH's liquidity resources. Lanius concluded that, from a financing and liquidity perspective, it was the most opportune time to sell ABI. Following a presentation by ALHs outside counsel concerning the terms of the proposed Purchase Agreement, there was a discussion among the Class Representatives. Arenson questioned whether it would be better for ALH to raise additional equity rather than sell the assets of ABI. Arenson suggested that ALH's existing Members might consider investing more capital in ABI. Buchler pointed out that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of the Bowden Litigation to be concluded, and (3) no other proposals for funding or acquiring ABI, including proposals from the Class B Members or

Arenson himself, had been made.  Buchler said he would not recommend that ALH invest more money in the Jacksonville market because it had reached its peak and, due to the entry of many new and powerful builders, he anticipated that ABIs business opportunities would deteriorate in the future.  After review and discussion, a majority of ALH's Supervisory Board voted in favor of the sale of ABI.  Arenson voted against the sale and Lamm abstained.  The remaining $8.8 million would be used to repay (to the extent permitted under ALH's other credit agreements) the loans made by certain of ALH's Members under the 2000 Loan Agreement and the 2002 Loan Agreement and to provide working capital.  The Supervisory Board discussed the payment of an exit bonus to Lanius upon the consummation of the ABI sale and his anticipated resignation as an employee of ALH.  The Board agreed that Lanius should be treated fairly and generously.  The Board unanimously authorized Buchler and Krieger to negotiate an appropriate exit bonus for Lanius.  The Supervisory Board also discussed the payment of a fee to Shamrock in connection with its efforts to facilitate the ABI sale.  Krieger, Buehler and Stein declined to participate in any discussion of such a fee, because of their relationship with Shamrock.  Arenson and Lamm indicated that Shamrock was entitled to some payment.

43.    After consulting with Neuberger, Arenson and Lamm approved a $200,000 bonus to Shamrock in recognition of its services in connection with the sale of ABI.

44.    ALH's outside counsel in the Bowden Litigation were selected with reasonable care by or on behalf ALH to perform such legal services.  Krieger, Buchler and Stein reasonably believed that these services were within such counsel's professional and expert competence, and they relied in good faith on counsel's advice with respect to the Bowden Litigation and Settlement.

45.    At the March 24, 2004 meeting of ALH's Supervisory Board the Supervisory Board considered the proposed sale of 100% of the stock of BBC.  Buchler gave an overview of the economic terms of the transaction and ALH's outside counsel made a presentation regarding the terms of the proposed purchase agreement.  JMP gave an overview of its efforts to find purchasers for BBC during the preceding two years.  JMP had contacted approximately 20 prospective buyers, constituting every entity identified by JMP as a potentially active participant or potential participant in the Memphis, Tennessee homebuilding market.  Levitt Corporation ("Levitt") was the only entity that provided a serious bid for BBC.  JMP noted that the Memphis area was flat in growth and that the homebuilding market there was not robust.  In determining the merits of the BBC sale, JMP had reviewed comparable transactions in the Memphis area.  JMP was aware of only two sales in the Memphis area in the preceding two years that were comparable to the BBC sale, and in both cases, the acquired entities performed poorly post-acquisition.  JMP explained that Levitt's proposed purchase price for BBC approximated a multiple of five times BBC's 2003 EBITDA, which was well above the average EBITDA multiple for previous sales of homebuilders.  The price also compared favorably to comparable sale prices derived from a multiple of book value.  JMP stated that Levitts proposed purchase agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in comparable sales agreements.  JMP concluded that Levitts proposal represented the best potential transaction for the sale of BBC and a superior opportunity for ALH to realize value on its investment.  Neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of BBC.  The Supervisory Board then discussed the merits of the proposed BBC sale.  Buchler pointed out that Jeff Sweeney ("Sweeney"), BBCs President and Chief Executive Officer, had indicated that he

11

would not continue at BBC absent a sale to Levitt. Buchler stated his belief that Sweeney was integral to BBC's operations and was an important part of BBC's relationship with its lenders. Buchler noted that there was no successor to take over from Sweeney and that it would be difficult to identify and hire an adequate successor in a timely manner. Buchler also noted that the current absence of equity capital greatly impaired BBC's ability to significantly expand its business. Arenson stated that he opposed the sale of BBC for the same reasons he had opposed the sale of ABI. Arenson expressed a concern that the sale was not in the best interest of all of ALH's Members and that better value might be obtained by continuing to operate BBC. Lamm stated that he opposed the sale of BBC for reasons similar to Arenson's. Buchler stated his belief that the sale of BBC to Levitt was the best option available under the current circumstances. Arenson expressed a concern that there might be a possible conflict of interest on the part of Fried Frank, ALHs outside counsel, because Fried Frank also represented Shamrock. Fried Frank explained that it was representing ALH and the Supervisory Board in the transaction, and not ALH's Members separately. Fried Frank noted that ALH had consented any potential conflict of interest and that the consent was obtained prior to Fried Frank's representation of ALH. Fried Frank invited the Board Representatives to call Fried Frank or ALH's Tennessee counsel directly with any concerns or questions. Arenson did not identify any proposal from himself, from any of the Class B Members or from any other source for obtaining additional capital for BBC, for improving BBC's financial or operational condition, for realizing better value by continuing to operate BBC, or for finding a replacement for Sweeney. Arenson did not identify any way in which the services performed by outside counsel for ALH might have been affected by such counsel's representation of Shamrock, or any way in which other Members of ALH might have been

disadvantaged by such counsel's representation of Shamrock. The Supervisory Board expressly acknowledged the "extraordinary and valuable services" provided by JMP in connection with the sale of BBC, and unanimously authorized a fee of approximately $135,000 for such services.

46.    After the Supervisory Board voted to sell BBC, Arenson conceded that he had not persuaded all of the Class B Members to agree with his opposition to the sale of BBC. Arenson stated with respect to the sale of BBC: "I could have been firmer. I should have been more persuasive" and "I did not convince . . . all of the 'B's.'"

47.    On June 7, 2004, after the sale of both ABI and BBC a trust for which Michael G. Jesselson (a Class B investor through J12ALH) serves as trustee entered into a subscription agreement for a $1 million investment in Shamrock Israel Growth Fund, L.P. ("the Fund").

48.    SCA is the U.S. Advisor for the Fund and Fried Frank is United States counsel to the General Partner of the Fund.

49.    Mattamy's offer for MHI was lower than Levitt's offer, but included the same net proceeds to ALH as was contained in Levitt's offer.

50.    On December 14, 2004, after initially confirming that he would attend the meeting, Arenson advised that he would not attend the Supervisory Board meeting scheduled for December 15, 2005 to consider the proposed sale of MHI stating that "[b]arring some unforeseen discussion during the meeting, I would probably vote against anyway."

51.    In response to Buchler's request that he participate in the Supervisory Board meeting, Arenson stated that "any further participation would be a waste of my time."

13

52.    At the December 15, 2004 Supervisory Board meeting, there was a discussion of the circumstances leading to the proposed MHI transaction, including the fact that ALH II was currently insolvent and in default with respect to an outstanding principal balance of $21.5 million, plus accrued interest, owed to Wachovia. Outside counsel discussed key aspects of the proposed transaction. In summary terms, the effect of the transaction would be that (a) Swiss Re would fully satisfy all indebtedness to Wachovia, (ii) ALH would have no liability to Swiss Re and (iii) as was true with respect to the withdrawn offer by Levitt, ALH II would receive $1 million in net proceeds from the sale of the MHI stock.

53.    On December 15, 2004, the majority of ALH's Supervisory Board voted to sell the last of ALH's home-building operations, MHI. D.I. 94 at 8. Krieger, Buchler, Stein and Lamm voted in favor of the sale of MHI. Despite Buchler's request, Arenson chose not to attend the Supervisory Board Meeting.

54.    Arenson and the other Defendants were not willing to make additional capital contributions to solve ALH's liquidity and capital issues if Shamrock did not participate, and Shamrock had no obligation to do so.

55.    Defendants never made a formal written proposal to acquire the Class A Interests of ALH. Instead, Neuberger proposed a possible price for the entire Class A Membership Interest and outstanding loans owed by ALH to all of the Class A Members that would have yielded Shamrock less than the outstanding amount of its loans to ALH, thus valuing Shamrock's equity at a negative number.

56.    Shamrock consistently solicited and considered Arenson's thoughts on a broad range of matters relating to the management of ALH.

57.    Krieger, Buchler and Stein relied in good faith on JMP's advice.

14

58.    Shamrock sought to maximize value for all investors.

59.    Defendants have not been damaged by any actions of Plaintiffs.

803425

# EXHIBIT B

## EXHIBIT B

## Defendants' Statement of Issues of Fact Remaining to be Litigated

To the extent that the issues of law in Defendants' Statement of Issues of Law (Exhibit D) are issues of fact, this Statement of Issues of Fact incorporates those issues by reference.

1.    Whether Plaintiffs were adequately informed and acted reasonably in approving the liquidation of ALH through the sales of the operating units.

2.    Whether Plaintiffs relied in good faith on SCA, Jolson Merchant Partners, Fried, Frank, Harris, Shriver & Jacobson, LLP, Baker & Hostetler LLP and Holland & Knight LLP in deciding to liquidate ALH by selling the operating units.

3.    Whether Plaintiffs acted in good faith and with reasonable care in hiring Fried, Frank, Harris, Shriver & Jacobson, LLP, as ALH's outside counsel.

4.    Whether the simultaneous representation of ALH and Shamrock by Fried, Frank, Harris, Shriver & Jacobson, LLP presented a conflict of interest and whether Fried Frank obtained valid waiver letters from ALH.

5.    Whether JMP's services in connection with the sale of ALH were based on its independent assessment of the merits of the sale and attaining value for ALH and its members or whether JMP was carrying out the directions of Plaintiffs and seeking the best option under the conditions imposed by Plaintiffs.

6.    Whether Plaintiffs disregarded the advice of JMP to stop pursuing a sale of ALH for 12-18 months.

7.    Whether Plaintiffs' actions amounted to bad faith, willful

misconduct and/or gross negligence.

8.    Whether SCA is entitled to indemnification since the claims against it arise from bad faith, gross negligence and willful misconduct.

9.    Whether SELK is a party to the Settlement Agreement and Mutual Release dated December 17, 2004, and if it is not, whether SELK expressly or implicitly adopted the agreement.

10.    Whether in connection with the March 15, 1999 Amendment to the Operating Agreement, the guaranty given to ALH by Lamm on behalf of SELK that Lamm, as Class E Member of ALH, would fulfill his Class E Capital Contribution in the amount of the $4.7 million Arbor Debt, by paying cash or satisfying the Arbor Debt, was within Lamm's authority as a member of SELK and whether ALH took reasonable steps to ascertain whether Lamm had authority to execute the guaranty.

11.    Whether Lamm satisfied his obligation to fulfill his Class E Capital Contribution.

12.    Whether the Class B membership interest in ALH is held by the following entities: the Arenson Entities (17%); J12ALH (17%); SELK (33%); and Laurel (33%).

13.    Whether Shamrock exercised control over ALH and the Supervisory Board through (1) its majority ownership of the Class A membership interest thereby giving it the power to appoint two of the Class A representatives and through those representatives to control all major decisions; (2) its control of SCA, ALH's management consultant, and (3) its control of three of the five representatives on the Supervisory Board.

14. Whether Shamrock used its control of ALH and the Supervisory Board to force the unwarranted liquidation of ALH without regard for whether the liquidation would maximize value for ALH for the benefit of all its members.

15. Whether Shamrock used its control of ALH and the Supervisory Board to force the unwarranted liquidation of ALH by selling the operating units for the primary purpose of furthering its own self-interest—namely to secure repayment of approximately $3,598,000 in outstanding loans to ALH, to ensure that its loan repayments were not treated as preferences and to exit its investment in ALH and eliminate its costly, time-consuming management responsibilities.

16. Whether Krieger, Buchler and Stein, as representatives on the Supervisory Board, lacked independence from Shamrock in promoting and approving the unwarranted liquidation of ALH.

17. Whether Krieger, Buchler and Stein approved the unwarranted liquidation of ALH by selling the operating units for the primary purpose of furthering Shamrock's interest without regard for whether the sales would maximize value for ALH or its members.

18. Whether Shamrock, Krieger, Buchler and Stein were grossly negligent and failed to exercise due care and inform themselves fully concerning all material information regarding the unwarranted liquidation of ALH by, *inter alia*, failing to obtain legal advice from disinterested and neutral professionals; failing to seek and adhere to advice by JMP; rushing to market the operating units only three months after JMP was retained to sell the entire company; failing to consider strategic alternatives when a sale of the entire company did not occur; failing to consider or advise

the Board on the impact the sales would have on the overall business of ALH or the equity of the members; failing to obtain fairness opinions; and rushing a vote on the sale of ABI.

19.    Whether Defendants, in response to Plaintiffs' efforts to sell BBC in July 2002, expressed interest in acquiring Shamrock's Class A Membership Interest to prevent Plaintiffs from liquidating ALH and destroying their Class B equity interest.

20.    Whether Defendants through Arenson, their Class B representative, and Neuberger, their counsel, repeatedly expressed concern to Plaintiffs that the liquidation of ALH through the piecemeal sale of the operating units and the timing and manner of such sales was imprudent and served only Shamrock's interest to the detriment of ALH and Defendants.

21.    Whether Plaintiffs rushed to liquidate ALH giving JMP only a few months to market the company as a whole before they directed JMP to begin marketing the individual operating units.

22.    Whether Plaintiffs used the threat of a sale of ABI as leverage in their discussions with Defendants regarding a buyout of Shamrock's Class A membership interest in ALH.

23.    Whether Plaintiffs considered any strategic alternatives for ALH other than liquidation.

24.    Whether the "liquidity crisis" that Plaintiffs represented to the Supervisory Board existed and was sufficiently dire to warrant the sale of ABI.

25.    If there was a liquidity crisis, whether Plaintiffs sought

alternative strategies or directed the officers of ALH and ALH II to consider alternatives other than a sale of ABI.

26.    Whether Plaintiffs rushed to call a Supervisory Board meeting for June 26, 2003, giving Arenson and Lamm less than twenty-four hours to review the information relating to the sale of ABI and then denied Lamm's request for additional time to review the documents to better understand the terms and conditions of the sale thereby causing Lamm to abstain from voting on the sale of ABI.

27.    Whether, after the sale of ABI, Plaintiffs proceeded with the liquidation of ALH by marketing and selling BBC to protect repayment of its loans during the preference period.

28.    Whether the sales of BBC and MHI were marketed to insiders namely John Laguardia, the former chief executive officer of ALH II and now an officer of Levitt and Bill Lanius a current officer of both Mattamy and ALH II.

29.    Whether the minutes from the Supervisory Board meetings on May 14, 2003, June 26, 2003, March 24, 2004 and December 14, 2004 fairly and accurately represent the proceedings of those meetings.

30.    Whether a written or oral fairness opinion was given in connection with the sales of ABI, BBC and MHI and whether Plaintiffs discussed obtaining such an opinion with the Board.

31.    Whether Plaintiffs knew, in July 2003, that the sale of ABI would destroy ALH as a going concern.

32.    Whether Krieger, Buchler and Stein's actions on behalf of SCA constitute knowing participation in their own breaches of fiduciary duty as

representatives on ALH's Supervisory Board and in Shamrock's breaches of fiduciary duty.

33.     Whether Plaintiffs' unwarranted liquidation of ALH by the sales of the operating units and SCA's knowing participation in the violation, caused damage to ALH's value and Defendants' equity.  Specifically, whether at the time of the sale of ABI, ALH had an enterprise value of $30,922,000, and the value of the Class B members' equity was $11,502,984.  Further, whether the enterprise value of ALH on June 30, 2005 would have been $45,477,000, if Plaintiffs had not proceeded with the unwarranted liquidation of ALH.

# EXHIBIT C

**EXHIBIT C: PLAINTIFF'S STATEMENT OF ISSUES OF LAW**

A.    Plaintiffs did not breach any fiduciary duties in connection with the sale of ALH's operations and its repayment of loans from certain investors (Amended Complaint Count I & Counterclaims Counts One, Two, Six, Seven, Eight, Nine, Thirteen and Fourteen).

1.    The Operating Agreement Bars the Counterclaims

6 *Del. C.* § 18-1101(c) provides: "[t]o the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided that a limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing." The Delaware Limited Liability Company Act provides latitude to parties to limit and define fiduciary duties contractually in a limited liability company agreement. *See Flight Options Int'l v. Flight Options LLC*, 2005 WL 2335353 (Del. Ch. July 11, 2005).

6 *Del. C.* § 18-1101(e) provides: "A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided that a limited liability company agreement may not limit or eliminate liability for any act or omission that

constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."[1]

Section 6.2(f) of the Operating Agreement provides: "Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence."

2.     The Business Judgment Rule Bars the Counterclaims

a.     The Presumptions of the Business Judgment Rule

The business judgment rule constitutes "a presumption that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Stanziale* v. *Nachtomi,* 416 F.3d 229, 238 (3d Cir. 2005). "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del. 1971)).

---

[1]     6 *Del. C.* § 18-1101(d) further provides: "Unless otherwise provided in a limited liability company agreement, a member or manager or other person shall not be liable to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement for breach of fiduciary duty for the member's or manager's or other person's good faith reliance on the provisions of the limited liability company agreement."

"The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. *In re IT Group Inc.*, 2005 WL 3050611, at *8 n.10 (D. Del. 2005) (Jordan, J.) (quoting *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch.1996)). "[A]fter the fact evidence" is "irrelevant, because it invites the use of 20-20 hindsight to review the director defendants' decision." *McGowan v. Ferro*, 859 A.2d 1012, 1023 (Del. Ch. 2004), *aff'd* 873 A.2d 1099 (Del. 2005). *IT Litig. Trust. v. D'Aniello*, 2005 WL 3050611, at *12 (D. Del. Nov 15, 2005) ("Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule."). *See also Continuing Creditors' Comm. of Star Telecomms. Inc.* v. *Edgecomb*, 385 F. Supp. 2d 449 (D. Del. 2004).

To rebut the presumptions of the business judgment rule, the complaining party must demonstrate a violation of the duty of loyalty or care. "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task. Delaware courts have said that it may be accomplished by showing either irrationality or inattention. A plaintiff may overcome the presumption that directors and officers acted in *good faith* by establishing that a decision was so egregious as to constitute corporate waste. The burden here is to show irrationality: a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith. Put positively, the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Stanziale* v. *Nachtomi*, 416 F.3d 229, 238 (3d Cir. 2005)(internal citations omitted). *See also In re Encore Computer Corp. Shareholders Litigation*, 2000 WL 823373, at *8 (Del. Ch. 2000).

b.    The Duty of Loyalty

The fiduciary duty of loyalty requires that directors act with the undivided purpose of advancing the best interests of the corporation. *See, e.g., Cede & Co. v. Technicolor,*

3

*Inc.*, 634 A.2d 345, 361 (Del. 1993) ("*Cede II*"), *modified on other grounds*, 636 A.2d 956 (Del. 1994); *IT*, 2005 WL 3050611, at *7; *Star Telecommunications*, 385 F.Supp.2d at 460; *Dean v. Dick*, 1999 WL 413400, at *4 (Del. Ch. June 10, 1999); *In re Walt Disney Co. Derivative Litigation*, 2004 WL 2050138, at *5 n. 49 (Del. Ch. Sept. 10, 2004), 907 A.2d 693, 751 (Del. Ch. 2005); *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998).

"Delaware law is clear that substantial stockholdings in a company by directors create powerful incentives to get the best deal in the sale of that company." *McGowan v. Ferro*, 859 A.2d 1012, 1030 (Del. Ch. 2004) (citing *In re Mobile Communications Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991); *Orman*, 794 A.2d at 27 n. 56; *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 356 (Del. Ch. 1998), *aff'd in part, rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *In re IXC Communications Inc. v. Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6-7 (Del. Ch. Oct. 27, 1999)).

The duty of loyalty does not "require self-sacrifice." *Odyssey Partners, L.P., Odyssey-ABC Limited Partnership*, 1996 WL 422377, *3 (Del. Ch. July 24, 1996) (citing *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) & *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883, 888 (Del. 1970)). "More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary (*e.g.*, a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights." *Id.* (citing *Solomon v. Pathe Communications Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd* 672 A.2d 35 (Del.1996)). "A controlling shareholder is not required to give up legal rights that it clearly

possesses; this is certainly so when those legal rights arise in a non-stockholder capacity."
*Solomon v. Pathe Communications Corp.*, 1995 WL 250374, at *5 (Del. Ch.1995).    Nor is a
majority shareholder under a duty to sell his shares even if a sale would benefit minority.
*Bershad v. Curtiss-Wright Corp.,* 535 A.2d. 840, 845 (Del. 1987).

"In order to rebut the presumption of director disinterestedness and independence,
a stockholder must show that the directors' self-interest materially affected their independence.
In other words '[t]o be disqualifying, the nature of the director interest must be substantial,' not
merely 'incidental.'   A '*de minimus* departure' from the requirement that all stockholders be
treated equally does not 'amount to an actionable breach of fiduciary duty.'" *McGowan*, 859
A.2d at 1029 (quoting *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del.1993) (citing
*Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d 584, 595 n. 7 (Del. Ch. 1986); *In re Budget Rent
A Car Corp. S'holder Litig.,* 1991 WL 36472, at *4 (Del. Ch. Mar. 15, 1991); *Cinerama, Inc. v.
Technicolor, Inc.,* 663 A.2d 1156, 1169 (Del.1995)). "[I]t is not enough to establish the interest
of a director by alleging that he received any benefit not equally shared by the stockholders.
Such benefit must be alleged to be *material* to that director.   Materiality means that the alleged
benefit was significant enough '*in the context of the director's economic circumstances,* as to
have made it improbable that the director could perform [his] ... duties....'" *President & Fellows
of Harvard Coll. v. Glancy,* 2003 WL 21026784, at *21 (Del. Ch. Mar. 21, 2003).

c.    The Duty of Care

In making a business decision, directors "have a duty to inform themselves, prior
to making a business decision, of all material information reasonably available to them."
*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Cede II*, 634 A.2d at 367.   Once informed,
directors "must then act with requisite care in the discharge of their duties." *Id.*   The fiduciary
duty of due care requires that directors "use that amount of care which ordinarily careful and

5

prudent men would use in similar circumstances," and "consider all material information reasonably available" in making business decisions. *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. Ch. 1963).

The standard by which the directors' process will be reviewed is gross negligence. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) ("*Disney* II"); *Official Comm. Of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, 2004 Del. Ch. LEXIS 122, (Del. Ch. Aug. 24, 2004); *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 Del. Ch. LEXIS 5, (Del. Ch. Jan. 10, 2003). "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Disney*, 907 A.2d at 750 & 750 n.429, *aff'd sub nom., Brehm v. Eisner*, 906 A.2d 27 (Del. 2006); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990). "Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one 'which involves a devil-may-care attitude or indifference to duty amounting to recklessness.' 'In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.' In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'" *Albert v. Alex. Brown,* 2005 2005 WL 2030607, at *4 (Del. Ch. Aug. 26, 2005). *See also, Stanziale,* 416 F.3d. at 241.

d.    Fiduciary Duties to Creditors

Delaware law recognizes that fiduciary duties extend to creditors when the entity is in the vicinity or zone of insolvency. As has been observed, "'the fact of insolvency does not change the primary object of the directors' duties, which is the firm itself,' 'the business

judgment rule remains important and provides directors with the ability to make a range of good

faith, prudent judgments about the risks they should undertake on behalf of troubled firms.'"

*Hechinger*, 327 B.R. at 549 (citing *Prod. Res. Group, Production Resources Group, L.L.C. v.*

*NCT Group, Inc.*, 863 A.2d 772, 788 & n.53 (Del. Ch. 2004). "When a firm has reached the

point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe

fiduciary duties to the company's creditors." *Production Resources*, 863 A.2d at 787-88; *Geyer*

*v. Ingersoll Publications Co.*, 621 A.2d 784, 778-78 (Del. Ch. 1992).

> B.    Plaintiffs relied in good faith on the advice of ALH's
>       outside legal and financial advisors (Amended Complaint
>       Count IV).

6 Del.C. § 18-406 provides that:

> A member, manager or liquidating trustee of a limited liability
> company shall be fully protected in relying in good faith upon the
> records of the limited liability company and upon information,
> opinions, reports or statements presented by another manager,
> member or liquidating trustee, an officer or employee of the
> limited liability company, or committees of the limited liability
> company, members or managers, or by any other person as to
> matters the member, manager or liquidating trustees reasonably
> believes are within such other person's professional or expert
> competence, including information, opinions, reports or statements
> as to the value and amount of the assets, liabilities, profits or losses
> of the limited liability company, or the value and amount of assets
> or reserves or contracts, agreements or other undertakings that
> would be sufficient to pay claims and obligations of the limited
> liability company or to make reasonable provision to pay such
> claims and obligations, or any other facts pertinent to the existence
> and amount of assets from which distributions to members or
> creditors might properly be paid.

"[R]easonable reliance upon expert counsel is a pertinent factor in evaluating

whether corporate directors have met a standard of fairness in their dealings with respect to

corporate powers." *Cinerama, Inc. v. Technicolor, Inc.* 663 A.2d 1134, 1142 (Del. Ch. 1994).

An otherwise independent board of director's reliance on an expert selected in good faith bolsters

a finding of due care and justifies maintaining the presumptions of the business judgment rule absent some other showing of gross negligence. *See Disney IV*, 907 A.2d at 770. *See also Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 510-12 (Del. Ch. 1990). Directors are not required, however, to follow an expert's advice. *See, Disney IV*, 907 A.2d at 770 n.550. "The role of experts [] is to assist the board's decisionmaking-not supplant it." *Id.*

> C.    SCA did not aid and abet Shamrock, Krieger, Buchler and Stein's alleged breaches of fiduciary duty (Counterclaim Counts Four and Eleven).

The elements for a claim for aiding and abetting a breach of fiduciary duty are: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in the breach by a defendant who is not a fiduciary; and (iv) damages. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995); *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 734 (Del. Ch. 1999). "[A] court can infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently wrongful manner." *Nebenzahl v. Miller*, 1996 WL 414913, at *7 (Del. Ch. Aug. 26, 1996); *Katell v. Morgan Stanley Group, Inc.*, 1993 WL 10871, at *8 (Del. Ch. Jan. 14, 1993).

> D.    Plaintiffs are entitled to indemnification and advancement of expenses (Amended Complaint Count V).

The July 1, 2001 Consulting Agreement between ALH and SCA provides:

> As part of the consideration for the agreement of [SCA], to furnish its services, [ALH], agrees to indemnify and hold harmless SCA and its affiliates and the respective partners, offices, directors, employees and agents of, and persons controlling, SCA or any of its affiliates . . . and each of their respective successors and assigns (collectively, the indemnified persons") from and against all claims, liabilities, expenses, losses or damages (or any actions in respect thereof) related to or arising out of actions taken (or omitted to be taken) by SCA pursuant to the terms of the letter

agreement, dated July 1, 2001, between SCA and [ALH] (the "Letter Agreement", or SCA's role in connection therewith; provided, however, that [ALH] shall not be responsible for any claims, liabilities, expenses, losses and damages to the extent that it is finally judicially determined that they result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct. . . . In addition, the Company agrees to reimburse SCA and each other indemnified person for all expenses (including reasonable fees and disbursements of counsel if the Company does not assume the defense of such action) as they are incurred by SCA, or any indemnified person in connection with investigating, preparing or defending any such action or claim.

Section 7.4 of the By-Laws of ALH II provides: "[t]he corporation shall indemnify its directors, officers and employees to the fullest extent allowed by law, provided, however, that it shall be within the discretion of the Board of Directors whether to advance any funds in advance of disposition of any action, suit or proceeding. . . ."

6 *Del. C.* § 18-108 provides that "a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demand whatsoever."

E.    SELK released its claims against Plaintiffs (Amended Complaint Count VI).

The Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR") provides:

Lamm, for himself and his heirs, successors, and assigns, and each of them, (collectively, the "Lamm on Affiliates"), does hereby, in perpetuity, release, remise and discharge ALH, ALH II and Mulvaney, and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members successors, assigns, and each of the (collectively, the "ALH Affiliates") from any and all claims, demands, debts, duties, bonds, damages, liabilities, actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises (collectively "Claims"), in law or in equity, which Lamm or the Lamm Affiliates now have, have had or at any time

9

may have against ALH, ALH II, Mulvaney, and /or the ALH Affiliates, whether or not they have been subject to dispute and whether or not known or unknown or suspected or unsuspected or liquidated or unliquidated, by reason of any matter, cause or thing whatsoever related to or arising out of the Note Obligation or any other past transactions between or amongst them.

"In general, a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." *Skrbina v. Fleming Companies*, 45 Cal. App. 4th 1353, 1366. (1996); *Johnston v. Clark*, 2004 WL 1088938, *7 (Cal. App. 5 Dist 2004). "Release, indemnity and similar exculpatory provisions are binding on the signatories and enforceable so long as they are clear, explicit and comprehensible in each of their essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement." *Skirbina*, 45 Cal. App. 4th at 1368.

> F.     SELK's equity interest in ALH is reduced or eliminated to the extent of the shortfall in the capital contribution of ALH's Class E Member (Amended Complaint Count VII).

Section 3.2 of the Operating Agreement, as amended on March 15, 1999 provides:

> Prior to March 1, 1999, the Class E Member has . . . repaid $900,000 in partial payment of that portion of the American Debt owed to Arbor National Commercial Mortgage (the "Arbor Debt"). Pursuant to the Subscription Agreement, on or prior to July 1, 1999, the Class E Member shall contribute to the Company in one or more installments (either in cash for the satisfaction of the Arbor Debt or by direct satisfaction of the Arbor Debt on behalf of ALH) an amount of $2,000,000, in partial payment of the Arbor Debt. Pursuant to the Subscription Agreement, on or prior to November 1, 1999, the Class E Member shall contribute to the Company an amount of $2,700,000 in payment of the remainder of the Arbor Debt plus that portion of the Discount Amount relating to the Arbor Debt, if any, plus that portion of the Interest Amount relating to the Arbor Debt, if any, in exchange for an aggregate 100% Class E Membership Interest.    The Class E Capital

Contributions will not be deemed paid in full until the Class E Member makes all of the contributions described above, which contributions shall be unconditionally guaranteed by SELK, LLC ("SELK"), a Class B member.  In addition to any other remedies the Company may have as a result of the failure of the Class E Member to make the contributions described above, if SELK fails to perform under such guaranty, SELK's Capital Account and SELK's Unrecovered Class B Capital shall be reduced on a dollar-for-dollar basis by the amount that the Class E Member has failed to contribute pursuant to Section 3.2.  Once SELK's Capital Account is reduced to zero, SELK's Membership Interest will be terminated.

"[T]he policy of the [Delaware Limited Liability Company] Act is to give the maximum effect to the principle of freedom of contract and to the enforceability of LLC agreements." *Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999).  "LLC Agreements are contracts to be construed like any other contract.  Contract interpretation must begin, of course, with the language of the contract." *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681, at *3 (Del. Ch. 2002).

> G.  Plaintiffs did not violate any of Arenson's rights as Class B Representative on ALH's Supervisory Board (Amended Complaint Count VIII).

Section 6.2(b)(ii) of the Operating Agreement provides that "the Class B Members shall be entitled and required (acting by a Class B Vote) to designate one Representative to serve on the Supervisory Board."

Section 6.2(d) of the Operating Agreement provides that "[m]eetings of the Supervisory Board shall be held at the Company's principal place of business or such other place as the Supervisory Board may agreed and at such regular times not less frequently than once each calendar month as may be specified by the Manager and, in addition, special meetings may be called by any Member by giving at least five (5) Business Days prior notice thereof to each of

the Representatives. Notice of each meeting shall be in writing and shall state the date, time, and

place at which such meeting is to be held and the purposes for which such meeting is called."

Section 6.2(e) of the Operating Agreement provides that "[t]he attendance of a

Representative (or his or her Deputy Representative) at a meeting shall constitute a waiver of

notice of such meeting. Subject to Section 6.2(c), the presence at a meeting of at least four

Representatives (or Deputy Representatives) shall constitute a quorum for the transaction of all

business of the Supervisory Board.... Each Representative (or his or her Deputy Representative)

may vote either in person or by proxy signed by the Representative (or his or her Deputy

Representative) or by his or her duly authorized attorney-in-fact. Each Representative (or his or

her Deputy Representative) shall have one vote on all matters presented to the Supervisory Board

for approval, and except with respect to a Major Decision, the vote of a majority of the

Representatives at a meeting which is properly called and at which a quorum is present shall be

binding on the Supervisory Board. Any action taken by the Representative (or his or her Deputy

Representative) pursuant to this Agreement shall be binding on such Member."

H.    The Counterclaims are barred by the doctrines of laches,
      waiver, estoppel, acquiescence and/or ratification.

"The issues on which a court must focus in a laches analysis are: 1) whether the

alleged delayer had knowledge of the alleged claim; 2) whether the delay was unreasonable

under the circumstances, and 3) whether the delay had a detrimental effect on another party."

*Wacht v. Continental Hosts, Ltd.*, 1993 WL 315461, *2 (Del. Ch. 1993); *Federal United Corp. v.

Havender*, 11 A.2d 331, 343 (Del. 1940); *Skouras v. Admiralty Enterprises, Inc.,* 386 A.2d 674,

682 (Del. Ch. 1978).

"'Waiver is the voluntary and intentional relinquishment of a known right.' It

implies knowledge of all material facts and an intent to waive, together with a willingness to

12

refrain from enforcing those contractual rights." *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A.2d 428, 444 (Del. 2005); *Mazik v. Decision Making, Inc.*, 449 A.2d 202, 205 (Del. 1982).

"'The doctrine of equitable estoppel is invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.' The party claiming estoppel must demonstrate that: (i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance. *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005). A "shareholder cannot assume a pose of approval in the voting process and then seek to litigate under a contrary position [in Court]." *Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991).

"Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000); *Nevins v. Bryan*, 885 A.2d at 246. *See also McGowan*, 859 A.2d at 1032 (challenge by plaintiff to original merger "would be barred by his acquiescence since [he] voted in favor of the original Merger Agreement."); *Kahn* v. *Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (tendering shares and accepting benefits of transaction constitute acquiescence that may bar relief); *Bay Newfoundland Co. v. Wilson & Co.*, 37 A.2d 59, 63 (Del. 1944) (in light of shareholder's knowledge of recapitalization, failure to vote against it was acquiescence);

13

*Trounstine* v. *Remington Brand, Inc.* 194 A. 95, 99 (Del. Ch. 1937) (shareholder barred by acquiescence from complaining about conversion of shares after accepting benefits of conversion).

"'Ratification results if the party [challenging the transaction] accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it.'" *Cianci v. JEM Enterprise, Inc.*, 2000 WL 1234647, at *12 (Del. Ch. 2000) (internal citation omitted).

"Courts have wide discretion in refusing to aid unclean parties, and are not bound by any formula which would limit that discretion. The United States Supreme Court, however, has provided a guiding principle that '[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim.' In other words, relief will be denied a party 'who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.'" *Haft v. Dart Group Corp.* 841 F.Supp. 549, 577 (D. Del. 1993) (quoting *Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 815 (1945). "The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals. . . . The purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, *regardless of their merit.* Thus, the doctrine should not be seen as a means to

14

aid a party who faces an unscrupulous opponent; 'rather it is a rule of public policy.'" *Nakahara v. NS 1991 American Trust*, 718 A.2d 518, 522 (Del. Ch. 1998).

        I.      Defendants' damages, if any, were not proximately caused by any conduct of Plaintiffs.

       "Our law does not permit a recovery of damages which are merely speculative or conjectural." *Lasher v. Inter-Continental Biologics, Inc.*, 1984 WL 137716, at *15 (Del. Ch. 1984); *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 699 (Del. Ch. 1996)( "The law "does not ... promote speculative damages at the [defendant's] expense"). "Damages cannot be speculative or uncertain, but must be at least based on a 'reasonable estimate.'" *Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Service of Cincinnati, Inc.*, 1996 WL 506906, at 20 (Del. Ch. 1996). "[A] party must prove claimed damages, and they may not be speculative or conjectural. *Atwell v. RHIS, Inc.*, 2007 WL 625277, at*1 (Del. Super. 2007).

        J.      Miscellaneous issues of law remaining to be litigated

       Defendants are bound by the admissions in their Answer to the Amended Complaint. *See, e.g., Morse/Diesel, Inc. v. Fed. & Deposit Co.*, 763 F. Supp. 28, 32 (S.D.N.Y. 1991), modified in part on other grounds, 768 F. Supp. 115 (S.D.N.Y. 1991).

       Defendants are bound by the prior rulings of this Court in its September 29, 2006 Memorandum Opinion (D.I. 94).

789311