IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ALH HOLDINGS, LLC | )<br>)<br>) | Consol. C.A. No. 04-1339 – SLR |

## PLAINTIFFS' OPENING POST-TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
302-658-9200
*Attorneys for Plaintiffs/Counterclaim Defendants*

August 11, 2008

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT |  | 1 |
| STATEMENT OF FACTS PROVED AT TRIAL |  | 4 |
| A. | Lamm Forms ALH and the Parties Negotiate the Terms of Their Investment. | 4 |
| B. | The Leveraged Expansion Of ALH and Emerging Liquidity Problems. | 7 |
| 1. | ALH's Acquisition of BBC. | 7 |
| 2. | ALH's Acquisition of MHI. | 8 |
| 3. | The First Emergency Member Loan. | 8 |
| C. | Lamm's Admitted Mismanagement of ALH. | 10 |
| D. | The Investors Agree to Sell ALH. | 13 |
| E. | Lamm Seeks to Retrade on His Obligations Under The Settlement Agreement and Operating Agreement. | 14 |
| F. | The Sale Process Moves Forward While ALH Lurches From One Financial Crisis to the Next. | 16 |
| 1. | The Retention of JMP. | 16 |
| 2. | ALH's Operating Subsidiaries Deteriorate Because Of ALH's Liquidity Problems. | 17 |
| 3. | The Second Emergency Loan To ALH. | 17 |
| 4. | JMP's Efforts to Sell ALH. | 18 |
| G. | Lamm and Neuberger Develop The Bs' "Collective Position" Against Shamrock. | 20 |
| H. | ALH's Liquidity Crises Continue. | 24 |
| I. | The Burgeoning Bowden Litigation Crisis. | 24 |
| J. | Lamm Advocates An Exit In 3 To 5 Years As ALH Continues To Suffer Capital Constraints. | 25 |

TABLE OF CONTENTS (cont.)

|  |  |  | Page |
|---|---|---|---|
| K. | April 2003 -- The Value Of ALH Continues To Plummet. | | 28 |
| L. | May 2003 -- The Supervisory Board Considers The Sale Of ABI And Settlement Of The Bowden Litigation. | | 29 |
| M. | The Bowden Settlement And The Sale Of ABI. | | 31 |
| N. | The Sale of BBC. | | 34 |
| O. | Lamm and Neuberger's "Collective Position" Develops Into A Scripted Play. | | 35 |
| P. | The Sale of MHI. | | 36 |
| Q. | Neuberger's Accusations, This Action and Plaintiffs' Demand for Indemnification. | | 39 |

ARGUMENT — 40

| I. | PLAINTIFFS DID NOT BREACH ANY CONTRACTUAL OR FIDUCIARY DUTIES. | | | 40 |
|---|---|---|---|---|
| | A. | The Operating Agreement Contractually Limits Plaintiffs' Fiduciary Duties And The Business Judgment Rule Precludes Defendants' Claims. | | 40 |
| | B. | Defendants Have Not Demonstrated That Plaintiffs Breached Any Duties – Contractual Or Otherwise. | | 41 |
| | | 1. | Shamrock Had No Duty To Throw Good Money After Bad. | 42 |
| | | 2. | There Is No Evidence That Plaintiffs Were Grossly Negligent. | 43 |
| | | 3. | Plaintiffs Did Not Act In Bad Faith. | 44 |
| | | | a. The Sale of ABI. | 44 |
| | | | b. The Sale of BBC. | 46 |
| | | | c. The Sale of MHI. | 47 |
| | C. | Defendants Would Not Have An Actionable Claim Even If A Traditional Duty of Loyalty Analysis Were Applicable. | | 48 |

<u>TABLE OF CONTENTS (cont.)</u>

<u>Page</u>

II.   DEFENDANTS HAVE NOT PROVED DAMAGES.                          52

III.   PLAINTIFFS ARE ENTITLED TO INDEMNIFICATION.                54

IV.   LAMM RELEASED SELK'S CLAIMS AND SELK'S
      INTERESTS HAVE BEEN ELIMINATED.                              55

V.   DEFENDANTS AND NEUBERGER PROSECUTED THEIR
     COUNTERCLAIMS IN BAD FAITH.                                   57

CONCLUSION                                                         60

TABLE OF AUTHORITIES

Page(s)

CASES

*Albert v. Alex Brown Mgmt. Serv., Inc.*,
    2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ........................................................43

*Arbitrium (Cayman Islands) Handels AG v. Johnston*,
    705 A.2d 225 (Del. Ch. 1997), *aff'd* .................................................................60

*Auerbach v. Earth Energy Systems, Inc.*,
    1986 WL 8930 (Del. Ch. Aug. 19, 1986) ............................................................54

*Bay Newfoundland Co. v. Wilson & Co.*,
    37 A.2d 59 (Del. 1944) ......................................................................................52

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)............................................................................................59

*Council of South Bethany v. Sandpiper Dev. Corp.*,
    1986 Del. Ch. LEXIS 508 (Del. Ch. Dec. 8, 1986) .............................................52

*Cox v. Crawford-Emery*,
    2007 WL 4327775 (Del. Ch. Nov. 30, 2007) .....................................................49

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
    1991 WL 277613 (Del. Ch. Dec. 30, 1991).......................................................50

*Dean v. Dick*,
    1999 Del. Ch. LEXIS 121 (Del. Ch. June 10, 1999) ..........................................50

*Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*,
    57 F.3d 1215 (3d Cir. 1995)..............................................................................59

*Fisk Ventures, LLC v. Segal*,
    C.A. No. 3017-CC (Del. Ch. May 7, 2008) ...........................................40, 42, 48

*Flight Options Intern., Inc. v. Flight Options, LLC*,
    2005 WL 2335353 (Del. Ch. July 11, 2005).....................................................40

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
    135 Cal. Rptr. 2d 505 (2003) .....................................................................56, 58

*Gould v. American Hawaiian S. S. Co.*,
    351 F. Supp. 853 (D. Del. 1972).......................................................................56

TABLE OF AUTHORITIES (cont.)

Page(s)

CASES

*Headlands Reserve, LLC v. Center For Natural Lands Management,*
  523 F. Supp. 2d 1113 (C.D. Cal. 2007) .................................................................55

*Hulsey v. Elsinore Parachute Center,*
  168 Cal.App.3d 333 (Cal.App.4.Dist. 1985) .........................................................56

*In re Elonex Phase II Power Management Litigation,*
  279 F. Supp. 2d 521 (D. Del. Aug. 28, 2003).......................................................59

*In re Encore Computer Corp. S'holders Litig.,*
  2000 Del. Ch. LEXIS 93 (Del. Ch. June 16, 2000) ...............................................50

*In re Hechinger Inv. Co. of Delaware,*
  327 B.R. 537 (D. Del. July 19, 2005) ....................................................................41

*In re Olsen Indus., Inc.,*
  2000 WL 376398 (D. Del. Mar. 28, 2000) ............................................................52

*In re Transkaryotic Therapies, Inc.*
  2008 WL 2699442 (Del. Ch. June 24, 2008)..........................................................51

*IT Litig. Trust v. D'Aniello,*
  2005 U.S. Dist. LEXIS 27869 (D. Del. Nov. 15, 2005) ........................................44

*Kahn v. Household Acquisition Corp.,*
  591 A.2d 166 (Del. 1991) ......................................................................................52

*Kaung v. Cole Nat'l Corp.,*
  2005 WL 1635200 (Del. July 5, 2005) ..................................................................60

*Leonard v. University of Delaware,*
  204 F. Supp. 2d 784 (D. Del. 2002).......................................................................60

*Malpiede v. Townson,*
  780 A.2d 1075 (Del. 2001) ....................................................................................41

*McGowan v. Ferro,*
  859 A.2d 1012 (Del. Ch. 2004).....................................................................43, 51-52

*Montgomery Cellular Holding Co., Inc. v. Dobler,*
  880 A.2d 206 (Del. 2005) ......................................................................................60

<u>TABLE OF AUTHORITIES</u> (cont.)

Page(s)

CASES

*Nebenzahl v. Miller,*
    1993 WL 488284 (Del. Ch. Nov. 8, 1993) ............................................................49

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,*
    930 A.2d 92 (Del. 2007) .......................................................................................50

*Oberly v. Kirby,*
    592 A.2d 445 (Del. 1991) .....................................................................................43

*Odyssey Partners, L.P., Odyssey-ABC Limited Partnership,*
    1996 WL 422377 (Del. Ch. 1996) ...................................................................42, 49

*Orman v. Cullman,*
    794 A.2d 5 (Del. Ch. 2002)...................................................................................51

*Roadway Express, Inc. v. Piper,*
    447 U.S. 752 (1980) .............................................................................................59

*Scully v. US WATS, Inc.,*
    238 F.3d 497 (3d Cir. 2001).................................................................................52

*Siegman v. Columbia Pictures Entertainment, Inc.,*
    1993 Del. Ch. LEXIS 1 (Del. Ch. Jan. 12, 1993) ................................................52

*Sinclair Oil Corp. v. Levien,*
    280 A.2d 717 (Del. 1971) .....................................................................................49

*Smith v. Van Gorkom,*
    488 A.2d 858 (Del. 1985) .....................................................................................43

*Solomon v. Pathe Communications Corp.,*
    1995 WL 250374 (Del. Ch. Apr. 21, 1995) .........................................................49

*Stanziale v. Nachtomi,*
    416 F.3d 229 (3d Cir. 2005)............................................................................41, 44

*Trounstine v. Remington Brand, Inc.,*
    194 A.95 (Del. Ch. 1937).....................................................................................52

*U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.,*
    864 A.2d 930 (Del. Ch. 2004)..............................................................................50

<u>TABLE OF AUTHORITIES</u> (cont.)

Page(s)

**CASES**

*Venhill Limited Partnership v. Hillman,*
    2008 WL 2270488 (Del. Ch. June 3, 2008)......................................................... 42-43

*Venhill Limited Partnership v. Hillman,*
    C.A. No. 1866-VCS (Del. Ch. June 3, 2008).......................................................43

*Waggoner v. Laster,*
    581 A.2d 1127 (Del. 1990) ..............................................................................52

**STATUTES**

6 *Del. C.* § 18-1101(c) ...............................................................................................40

8 *Del. C.* § 145(c)......................................................................................................55

## PRELIMINARY STATEMENT

Shalom E. Lamm, the son of a highly-respected Orthodox Jewish Rabbi and former President of Yeshiva University, has a penchant for playing with other people's money. When his initial efforts in the home-building business proved to be a dismal failure, he formed ALH Holdings LLC ("ALH" or the "Company") and persuaded "angel investors" with deep pockets – lured by the promise of a 27% preferred return and an exit in 24 months – to invest millions of dollars in the hopes of digging out of a hole that he had created for himself and his earlier investors. The biggest angel investor was Shamrock Holdings of California, Inc. ("Shamrock"), which was promised representation on the ALH Supervisory Board but was to have no role in the day to day management of ALH, which was to be supplied by Lamm and his partners, John Hourihan and Jon Zich.

From the outset, ALH failed to meet the expectations that Lamm promoted.

In 2001, an affiliate of Shamrock, Shamrock Capital Advisors ("SCA"), and its representatives on ALH's Supervisory Board reluctantly took on greater managerial responsibility after discovering that Lamm and his business partners had been enriching themselves at the Company's expense and engaging in other misconduct in connection with their management of ALH. Although Lamm acknowledged much of the wrongdoing, he came to resent Shamrock for "piling on" and being "relentless" in getting to the bottom of his misdeeds. This resentment and anger led him to conspire with attorney Isaac M. Neuberger ("Neuberger"), a family friend, fellow member of the Orthodox community and the principal for the largest ALH Class B investor, to turn against Plaintiffs their reluctantly-assumed and expanded role in dealing with the mess created by Lamm.

As ALH's liquidity and other problems mounted and additional problems from the Lamm regime were discovered, the Supervisory Board was left with very limited and

unpalatable choices.  Shamrock (and other investors) tried cauterize the wounds that it and the other ALH investors had already suffered by selling the Company, while there was still something to sell, with the assistance of qualified, outside legal and financial advisors.  Despite the able assistance of outside professionals, there was no buyer for the beleaguered Company willing to pay an amount exceeding ALH's debts.  The efforts of Neuberger, Lamm and the Class B investors likewise produced no investor who would value the Company at an amount exceeding its liabilities.  Lacking any other viable source of liquidity, including any obligation by any investor to contribute additional capital, the Supervisory Board began marketing operating subsidiaries to meet the current liabilities ALH owed to its creditors as the Company lurched from one financial crisis to the next.

Recognizing that Lamm stood to recover nothing but would be left with his obligations to ALH, and that the business would only deteriorate further without additional capital from ALH's investors, Lamm and Neuberger – nearly one year before any of the challenged transactions occurred – developed a plan of trying to buy out the As' interests on the cheap or challenging the sales (long after the fact) as a breach of duty.  They consciously played both sides – approving the payment of necessary liabilities while objecting to the sale of assets necessary to pay those same liabilities.  When the sale process was nearing its end, Neuberger reared his head again, claiming on behalf of the ALH Class B investors that Shamrock (not Lamm!) had caused their losses and demanding compensation.  To their dismay, Plaintiffs called their bluff by filing this declaratory judgment action.  Many months later, Defendants attempted to end-run this Court's jurisdiction by filing a mirror image complaint in North Carolina.  That court would not countenance such gamesmanship and transferred the action to Delaware.

3.

Forced to engage in expensive and time-consuming motion practice to overcome Defendants' bad-faith assertions of privilege over hosts of documents evidencing Neuberger's role in developing the Defendants' "collective position" against Plaintiffs, the record at trial ultimately revealed the machinations of Defendants and their counsel. No longer able to hide behind favorable pleading standards, the Class B investors cannot escape the presumptions of Delaware's business judgment rule -- much less the exculpatory provisions of ALH's Operating Agreement, which expressly limits Plaintiffs' potential liabilities to the members of ALH. Plaintiffs embarked upon an informed process, with the assistance of well-qualified financial and legal advisors, and spent massive amounts of time in connection with that process. Moreover, there was no self-dealing – all of the sales were to third parties – and Shamrock had the most to gain or lose in each transaction. Wholly apart from the machinations in pursuing their claims, the Class B investors' contentions amount to nothing more than a difference in business judgment – they believe that the investors should have poured more money in to ALH hoping, as Lamm did, that the "stars would align" and ALH would become a profitable investment. The parties are in agreement, however, that ALH's Operating Agreement specifically disavows any duty to invest additional capital in ALH. None of the investors, including Shamrock, had any obligation – contractual, legal or equitable – to throw good money after bad.

<u>STATEMENT OF FACTS PROVED AT TRIAL</u>

A.    Lamm Forms ALH and the Parties Negotiate the Terms of
      Their Investment.

Lamm, the son of the Chancellor and former President of Yeshiva University, who is generally regarded as the foremost Orthodox Jewish Rabbi in the United States, was the driving force behind the formation of ALH as a Delaware LLC in June 1998. PTO ¶ III, 27; Tr. (Arenson) at F131.[1]  As part of the formation of ALH, Lamm rolled over his investors from earlier failed investments in the Pocono Mountains and Tampa, Florida as Class C members in ALH. Tr. (Lamm) at G6 & G10.

Lamm presented ALH to potential new investors, including Shamrock, as an opportunity for consolidation of small private home building companies in the Southeastern United States, with the stated goal of positioning ALH for a liquidity event within approximately 24 months of the investors' initial investment. Tr. (Buchler) at A42-44 & B52; Tr. (Lamm) at G7; PTO ¶ III, 30.   Lamm's concept was that ALH would purchase Atlantic Builders, Inc. ("ABI") with the investors' initial capital contribution and that cash flow from its operations would fund the purchase of additional regional homebuilders. Tr. (Buchler) at A43. ALH would operate them for a limited period, then engage in a sale or other capital event in approximately 24 months which would give both the Class A and Class B investors in ALH, *pari passu,* a 27% preferred return on their investment, plus a return of their capital. Tr. (Buchler) at A43-44 & B52-53; Tr. (Lamm) at G7. *See also* PTO ¶ III, 49. Only if that amount were recovered by the Class A and Class B members would Lamm, and certain of his investors from the prior failed

---

[1]    Citations to the record appear as follows: the Joint Pretrial Order is cited as "PTO"; trial exhibits are cited as "PX" and "DX"; and trial testimony is cited as "Tr. ([witness's last name]) at __".

5.

ventures, recover anything.  Tr. (Lamm) at G10; Tr. (Buchler) at A43 & A49; PX 3 Art. 4.1(b)(i).

The terms of ALH's members' investment were embodied in ALH's Operating Agreement.  PX 3; Tr. (Buchler) at A46-47; PTO ¶ II, 41.  The Operating Agreement anticipated a passive investment for both the Class A and B investors.

Moreover, all of the parties to the ALH Operating Agreement expressly and unambiguously agreed that no member had any obligation to make a further investment in ALH. PTO ¶ III, 54; PX 3 Art. 3.3; Tr. (Buchler) at A49; Tr. (Lamm) at G11-12; Tr. (Arenson) at F138-39 & 139.  Lamm's management company, Lion LLC (or Lion & Lamm, LLC) was to manage ALH.  PX 3 Art. 6.1(a); Tr. (Buchler) at A44, B52.  Lamm, Zich and Hourihan were the members of Lion LLC.  PTO ¶ III, 31.  Lamm was "the boss" within the Lion & Lamm organization.  Tr. (Lamm) at G8-9.  ALH also entered into a consulting agreement with Lamm personally, for a two-year term, pursuant to which he was to be paid $95,000 per quarter -- $380,000 per year -- for managing ALH's affairs.  PX 6; Tr. (Lamm) at D162-63 & G15-16; Tr. (Buchler) at A51.  ALH's Supervisory Board, with consent of the Class A Representatives, was to make "Major Decisions" concerning ALH and originally consisted of two Class A Representatives, one Class B Representative, and Lamm and Zich as the two Class D Representatives (together, the "Representatives").  PX 3 Art. 6.2(a);  PTO ¶¶ III, 6 & 7.

In connection with the formation of ALH, Lamm committed to satisfying certain preexisting obligations related to his prior, unsuccessful homebuilding ventures.  Pursuant to Article 3.2 of the Operating Agreement, Lamm, as the Class E member, was obligated to make an additional capital contribution to ALH by satisfying a $5.6 million debt to Arbor (the "Arbor Debt") and a $2 million debt to Dr. Eugene Elovic (the "Elovic Debt") by September 1, 1998.

Tr. (Lamm) at G11-13; PX 3 Art. 3.2; PX 4 § 2.1.   Lamm personally guaranteed these obligations (Tr. (Lamm) at G14-15; PX 5) and later executed a guarantee of this obligation by SELK, LLC ("SELK"), in his capacity as the managing member of SELK, pursuant to which SELK's membership interest would be reduced to the extent of any shortfall in Lamm's Class E Membership Contribution.  Tr. (Lamm) at G21-24;  PX  9, 11, 12.

Shamrock, the holder of approximately 62.75% of the total Class A membership interest in ALH, originally invested $6.275 million.[2]  PTO ¶III, 2 & 3; PX 3 at Ex. A.  The Class B Members, D.A. Gardens, Ltd., A. Arenson Holdings, Ltd. (the "Arenson Entities"), SELK, J12ALH Associates LLC, and Laurel Equities (together, the "Bs"), collectively made an initial investment of $6 million.   Lamm solicited the Bs, most of whom have strong ties to the Orthodox Jewish community, and some of whom were Lamm's family friends.  *See, e.g.,* Tr. (Neuberger) at H9; PX 3 at Ex. B.

Abraham (Avie) Arenson ("Arenson") is the principal of both of the Arenson Entities and the Class B Representative on ALH's Supervisory board.  SELK[3] was the largest Class B Member of ALH prior to dilution of its interest by failure to satisfy its obligations under the SELK Guarantee.  PX 3 at Ex. B; Tr. (Lamm) at D142.  Lamm is the managing member of SELK and personally guaranteed its investment in ALH.  PX 305; Tr. (Neuberger) at H49-51; Tr. (Lamm) at D142.  NACA holdings, a British Virgin Islands entity, is the other member of SELK.  Tr. (Neuberger) at H49.  Neuberger is the trustee of a family trust that owns NACA and SELK was formed by an attorney at his law firm.  Tr. (Neuberger) at H4, H52-53.  Neuberger

---

[2]      The other Class A members are clients of Howard Bernstein.  Tr. (Buchler) at B44.

[3]      SELK is an acronym for Shalom E. Lamm Konig (or King).  Tr. (Buchler) at B262.

and Lamm's fathers were friends. Tr. (Neuberger) at H55.  Neuberger is also the lead named partner in the law firm representing the Defendants in this litigation. Tr. (Neuberger) at 40.

>B.     The Leveraged Expansion Of ALH and Emerging Liquidity
>       Problems.

On December 9, 1998, ALH's Supervisory Board formed ALH II, Inc. ("ALH II") as a Delaware corporate subsidiary of ALH and parent company for ALH's operating subsidiaries.  ALH II was used, among other things, as a vehicle for obtaining debt financing for ALH's operations and acquisitions. PTO ¶ III, 36-37.

>1.     ALH's Acquisition of BBC.

Lamm's expectation that ABI's cash flows could fund ALH's subsequent acquisitions quickly proved incorrect[4] and ALH began the process, which continued throughout ALH's existence, of scrambling for cash to try to stay on plan. Tr. (Buchler) at B48-49.  On March 15, 1999, the ALH Members amended the Operating Agreement.  The Class A members contributed an additional $4.7 million and the Class B members contributed an additional $2.8 million[5] to acquire Bowden Building Corporation ("BBC"), a home-building company based in Memphis, Tennessee. PTO ¶ III, 51; PX 10; Tr. (Buchler) at A51-52; Tr. (Buchler) at A53.  All the Representatives approved this acquisition and the related financing, including ALH II's agreement to guarantee a $2.25 million promissory note (the "Bowden Note") for a portion of the purchase price. PTO ¶ III, 52, 58 & 59.

---

[4]    ABI's initial manager, selected by Lamm, proved to be incompetent and was promptly dismissed and ALH quickly learned that its homebuilding operations were undercapitalized. Tr. (Buchler) at B48-49.

[5]    Although Lamm had not paid his Class E Capital Contribution, he paid $350,000 of the capital contribution by the Arenson Entities because Arenson wanted to dilute his position in ALH.  PX 62; Tr. (Lamm) at G21; Tr. (Arenson) at F8-11, F132. Notwithstanding the potential conflicts it created, this fact was not disclosed to Plaintiffs until discovery in this action.

The Amendment to the Operating Agreement also defines Lamm's required Class E capital contribution to include certain amounts paid or to be paid on the Elovic Debt and the Arbor Debt on or prior to November 1, 1999 (the "Class E Capital Contribution"). PX 10. *See also* PX 12 (amendment to Subscription Agreement). The Amendment to the Operating Agreement further states that SELK unconditionally guaranteed to ALH that Lamm, as Class E Member of ALH, would fulfill his Class E Capital Contribution in the amount of the $4.7 million Arbor Debt, by paying cash or satisfying the Arbor Debt. PX 10. Lamm signed the Amendment to the Operating Agreement on behalf of SELK and a separate guarantee agreement by SELK. PX 10 & 11.

### 2.     ALH's Acquisition of MHI.

In 2000, ALH acquired Mulvaney Homes, Inc. ("MHI") based in Charlotte, North Carolina – which became its largest operating subsidiary. ALH funded this acquisition with $27.5 million of debt from Wachovia Bank ("Wachovia") which was secured by surety bonds from Amwest Surety Insurance Corporation and Swiss Reinsurance America Corporation ("Swiss Re"). Tr. (Buchler) A55-57; PX 18 & 19. ALH was effectively the guarantor of ALH II's obligations to Wachovia. Tr. (Buchler) at A57.

Lamm projected that ALH could easily cover the debt service on the Wachovia loan. Tr. (Lamm) at G25; PX 13. In fact, ALH was in default within less than a year. Tr. (Lamm) at G25-26. The leveraged acquisition of MHI through the Wachovia/Swiss Re facility became an albatross for the remainder of ALH's existence. *See, e.g.,* PX 96; 104; Tr. (Buchler) at A78-79 & A85-86; Tr. (Krieger) at C64 & C67-68.

### 3.     The First Emergency Member Loan.

Almost immediately after purchasing MHI, ALH experienced unanticipated cash flow problems due to cost overruns and lower sales and closings. Tr. (Lamm) at G26; Tr.

(Arenson) at F174. MHI, ALH's largest operating company, also suffered from the general economic downturn, national builders who provided "stiff, good competition" discovering the Charlotte market, and bad "bets" on two underperforming developments.[6] Tr. (Lamm) at D195; Tr. (Buchler) at A58-59. Within four months of acquiring MHI, ALH required an emergency member loan of $2 million to cover a working capital deficit (the "2000 Emergency Loan"), $1,633,000 of which was made by Shamrock, $166,000 by Arenson's company, and $200,000 by Lion & Lamm. PX 22; Tr. (Buchler) at A61-63. This emergency loan was "an unpleasant surprise" to the ALH investors but Lamm presented it as "a one time thing." Tr. (Lamm) at G31. The members of ALH's Supervisory Board unanimously approved the 2000 Emergency Loan to ALH II. PTO ¶ III, 66-68.

By June 2000, Lamm began to extend the exit horizon for ALH and, contrary to Lamm's earlier predictions, no capital event occurred prior to the end of 2000. Tr. (Lamm) at G32-33; PX 24. Simply put, the synergies that Lamm predicted would appeal to a buyer never developed. Tr. (Avila) at G237. Management of the operating companies was in turmoil and potential buyers were not interested in acquiring three geographically separate homebuilding companies. Tr. (Avila) at G165, G187-88 & G236. By February 2001, Lamm was internally projecting a $2 million cash flow deficit by April, and had determined that ALH would need to revise the payment plan under the 2000 Emergency Loan.[7] Tr. (Lamm) at G34-35.

---

[6]     In addition to operational issues, ALH's financial resources were further depleted by the numerous misdeeds of Lamm and his cohorts, who, among other things, diverted resources to shut down the failed Tampa operations. *See, infra*, § C.

[7]     ALH II's obligations under the 2000 Emergency Loan were initially due on December 31, 2000 and guaranteed by various ALH II subsidiaries. They were not, however, repaid at maturity because ALH had continuing cash flow problems and simply did not have the available funds. Tr. (Lamm) at G32; Tr. (Buchler) at A63.

C.    Lamm's Admitted Mismanagement of ALH.

Adding to the liquidity crisis facing ALH, in the spring of 2001 the Supervisory Board learned that Lamm and his partners had taken millions of dollars from ALH without authorization and engaged in other forms of surreptitious and unauthorized self-dealing.[8]  Tr. (Buchler) at A64-66; Tr. (Krieger) at C7-34; PX 29, PX 30, PX 31, PX 33, PX 36, PX 37 & PX 38.  Arenson was not surprised to learn about this because he was "unhappy with the general level of Shalom's accuracy."  Tr. (Arenson) at F129-30.

In July 2001, ALH reached a settlement with Lamm and his associates, which was approved by all of the Representatives.  PX 44 (the "Settlement Agreement"); PTO ¶ III, 73, 72, 75.  In connection with the Settlement Agreement, Lamm admitted that:

- Lion & Lamm caused ALH to make payments on behalf of Lamm personally to Arbor National Commercial Mortgage, LLC ("Arbor") in the amount of $660,875 in excess of what he was entitled to under his personal consulting agreement and also failed to obtain the release of ALH's obligations with respect to the debt to Arbor as required under the Operating Agreement;

- Lion & Lamm received an unauthorized financing fee of $737,000 in connection with procuring financing for the acquisition of MHI;

- Lion & Lamm caused ALH to pay $4,200,000 in connection with the close down of ALH's Tampa operations  -- $1.2 million in excess of the limits agreed to -- and in a manner that Lamm regarded as "egregious;"

- Lion & Lamm caused $489,000 of uncollectible debt to appear on ALH's balance sheet as an asset;

- Affiliates of Lion & Lamm engaged in related party financings;

---

[8]    Although Lamm claims that he was "thoroughly humiliated [and] shocked" (Tr. (Lamm) at D165 & 167), he nonetheless attempted at trial to defend one of his "alternative financing" schemes, not approved by the Supervisory Board, which gave to friends and investors unaffiliated with ALH "a good [26%!] rate of return" for acquiring properties with loans guaranteed by BBC and then selling those properties to BBC.  Tr. (Lamm) at D169-71.

- Zich received $480,000 of unauthorized payments from ALH Subsidiaries, which Lamm characterized as "unconscionable";

- Hourihan received $593,400 of unauthorized payments from ALH Subsidiaries in excess of what he was authorized to be paid by ALH;

- Lion & Lamm caused ALH to enter into Laguardia's employment agreement, which provided for a $1 million termination fee;

- Lion & Lamm failed to prepare or deliver to the Supervisory Board annual audited financial statements from 1998-2001.

PX 44 § 2; Tr. (Lamm) at G16-17, G35-42 & D173. *See also* Tr. (Krieger) at C12-13, C18-20, C29, C31, C40-43 & C45-46; Tr. (Buchler) at A68. Lamm and his partners agreed to pay approximately $2 million dollars to ALH as restitution for their wrongdoing -- on a payment schedule suggested by Lamm -- and executed a confession of judgment permitting ALH to execute on that agreement. PX 44 § 3; Tr. (Lamm) at D182-83 & G36; Tr. (Krieger) at C47. Lamm, as the managing member of SELK, also executed a Guarantee Agreement between SELK and ALH guaranteeing the payments of this restitution. PX 11; Tr. (Lamm) at G23.

The Settlement Agreement also substantially reduced the influence of Lion LLC and Lamm over ALH. Among other things it:

- gave the Class A Members the right to designate one of the two Class D Representatives on the Supervisory Board and replaced Zich with Bruce Stein, a managing director of Shamrock Capital Advisors ("SCA") with 26 years of real estate experience (Tr. (Stein) at C250-57) on the Supervisory Board;

- provided that SCA would render consulting services to ALH;

- made Buchler a member of the board of each ALH II subsidiary; and

- established an Audit Committee, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B Representative (Arenson).

PX 44.

Both Lamm and Arenson executed the Settlement Agreement and signed the Unanimous Written Consent approving the Settlement Agreement and related agreements.[9] PX 44 & 45; Tr. (Lamm) at G37-38 & G41-42; Tr. (Arenson) at F130 - F134; Tr. (Krieger) at C37; PTO ¶ III, 79, 86; PX 44 at Tab 19; PX 45. Arenson agreed with the decision to remove Zich from the Supervisory Board, had his personal attorney review the Settlement Agreement, and felt that the Settlement Agreement was justified. Tr. (Arenson) at F132-33.

Shamrock expended enormous efforts in an attempt to sort out Lion & Lamm's mismanagement and reach a resolution – in no small part because Lamm and his cohorts refused to provide straight answers regarding their wrongdoing. *See, e.g.*, PX 33; PX 36; PX 37; PX 38; Tr. (Krieger) at C22-24 & C32.    ALH entered into a consulting agreement with SCA -- unanimously approved by the Supervisory Board -- and agreed to pay a fee to SCA for those services in consideration of SCA taking a more active role in ALH to police the management activities of Lamm. PX 44 at Tab 19 (the "SCA Consulting Agreement"). ALH also agreed that SCA would have no liability to ALH or any other person in connection with the services rendered pursuant to the SCA Consulting Agreement, except to the extent that it is judicially determined that such liability results primarily from SCA's bad faith, gross negligence or willful misconduct. PX 44 at Tab 19.

Very shortly after the Settlement Agreement was executed, Shamrock learned of additional Lion & Lamm improprieties that were not disclosed in connection with the Settlement

---

[9]    The consulting agreement between ALH and Lamm, dated September 1, 1998, was terminated in favor of a new consulting agreement and Lamm was required to assume the "primary day to day managerial responsibilities" of Lion LLC with respect to ALH and its subsidiaries. PX 44.

Agreement and that Lion & Lamm had caused the forgery of an audit confirmation form to ALH's independent auditors. PX 55; Tr. (Krieger) at G43; Tr. (Lamm) at G43-44. Shamrock later learned that Lamm and his partners had also failed to include on the ALH financials a debt to Florida Island Partners and had falsely represented that certain receivables were valid and fully collectible. Tr. (Lamm) at G43-44. Issues relating to malfeasance by Lion & Lamm continued to plague ALH for the rest of its existence.[10] PX 57; PX 60; PX 69.

D.    The Investors Agree to Sell ALH.

By September 2001, all of the investors agreed that a prompt sale of ALH was desirable and the Supervisory Board unanimously determined to seek a buyer for ALH. PTO ¶ III, 87; Tr. (Lamm) at G44. *See also* Tr. (Krieger) at C232 ("How many more reasons do we need to get away from this mess"); Tr. (Buchler) at A74. Arenson felt that a sale was "a good idea" because Lamm had shepherded ALH and, in light of the wrongdoing exposed in the Settlement Agreement, would play a limited role going forward. Tr. (Arenson) at F134. Lamm continued to be useful to ALH, however, because he would be helpful in explaining the business to potential buyers during the sale process because he was its promoter. Tr. (Krieger) at C36 & C189. But because of the preferred return provision in the Operating Agreement, Lamm would receive nothing from the sale absent a spectacularly high sales price and would be left with lingering liabilities from Lion & Lamm's mismanagement of ALH. PX 3 Art. 4.1(b)(i).

In late 2001, Lamm and Neuberger presented a potential buyout transaction by MDC for which Neuberger sought a fee. Tr. (Lamm) at G44-45; Tr. (Buchler) at A76-77 & B80.

---

[10]    Lamm acknowledges that Shamrock found things at ALH that occurred during Lion & Lamm's management that were "wrong" and that Shamrock had every right to be upset. Tr. (Lamm) at G40-41; PX 41; Tr. (Krieger) at 35. Nonetheless, Lamm "resented that Shamrock decided to sic Fried Frank on [him]" and resented that "Shamrock and Fried Frank piled on and were relentless in getting to the bottom of these misdeeds." Tr. (Lamm) at G40-41. His anger continues to this day. Tr. (Lamm) at G41.

ALH and MDC were unable to reach an agreement as a result of the high levels of goodwill on ALH's books. Tr. (Lamm) at G45; Tr. (Buchler) at A77. Lamm later suggested that MDC may come back but at EBITDA multiples lower than the 5.5 to 6.0 that ALH was using in 2001. PX 70.

ALH did not meet its business plans in 2001. Tr. (Lamm) at G35. Lamm suggested that ALH move to "Plan B" to conduct a coordinated sales effort after receiving the first quarter results for 2002. Tr. (Lamm) at G45-46; PX 64; PX 66.

In January 2002, ALH's massive obligation to Swiss Re was coming due and it became clear that ALH would need to seek Swiss Re's agreement to extend. PX 70; Tr. (Buchler) at A78-79. At the same time, Buchler testified that he had little confidence that ALH would meet its business plans and "seemed to have new problems almost every day." PX 70; Tr. (Buchler) at A79. ALH was, in fact, off plan again in 2002. Tr. (Lamm) at G35.

E.    Lamm Seeks to Retrade on His Obligations Under The Settlement Agreement and Operating Agreement.

In February 2002 Lamm's $262,000 cash payment under the Settlement Agreement was coming due. Tr. (Lamm) at G50. Only seven months after signing the Settlement Agreement and recognizing that ALH was "extremely cash constrained", Lamm nonetheless began requesting relief from his Settlement obligations, and failed to pay other obligations such as the Elovic Debt. Tr. (Lamm) at G51-52; PX 77; PX 78; PX 86; PX 92; PX 94; PX 101; Tr. (Krieger) at C47-48, 51-52, 61. As the payment due date approached Lamm became "desperate" and went to Neuberger "as a friend, not as a lawyer." Tr. (Lamm) at G56-58; PX 82.[11] Although he recognized Plaintiffs were obligated to marshal monies owed to ALH,

---

[11]    Neuberger admits that any view he had as to the condition of ALH at the time was from Lamm and Zich and that he had no first-hand knowledge of how ALH was doing at the
(Continued . . .)

Lamm concluded Plaintiffs were "ruthless, mean and heartless" (one of his less colorful epithets (*see* Tr. (Lamm) at G76), and asked Neuberger to help him find a litigator who "could really cause SCA to lose lots of sleep." Tr. (Lamm) at G52-57; PX 81; PX 82. Neuberger was "happy to participate." Tr. (Lamm) at G59; PX 82. Lamm then reached out to Arenson in an effort to foster a relationship between Neuberger and the Bs. Tr. (Lamm) at G59-60; PX 83. Shortly before Lamm's payment to ALH was due,[12] Lamm told Zich and Hourihan that they needed a plan and that Neuberger told him "that he knows exactly what we (he) have to do." PX 84; Tr. (Lamm) at G61. Two hours later -- but more than one year before the first transaction Defendants challenge -- Lamm emailed Zich and said that they should probably start building an "anti-SCA file." Tr. (Lamm) at G62-63; PX 85.

Lamm and Neuberger's plan was in motion. Neuberger, with the assistance of Lamm, emailed Arenson regarding the erosion in the relationship with Shamrock and ALH management, suggesting to Arenson that "we motivate Shalom as much as possible to assist in the transaction", and that the Bs retain their own counsel. PX 456. Although Lamm did not recall "Isaac's excellent letter" at his deposition, after being refreshed with documents produced after Plaintiffs' motion to compel was granted, he admitted that he was trying to enlist the B investors in his efforts to obtain a better deal for himself than provided for in the Operating Agreement upon a sale of ALH. Tr. (Lamm) at G64 & G69-71; PX 442; PX 90; *see also* PX 456; Tr. (Lamm) at G65.

------

(. . . continued)
time of the Settlement in 2001. Tr. (Neuberger) at H73-74. It has also "never been clear" to Neuberger what Lamm, Hourihan and Zich did that resulted in the July 2001 Settlement Agreement and SCA Consulting Agreement.) Tr. (Neuberger) at H73.

[12]    Lamm arranged to borrow $100,000 from a "VERY uncomfortable source" to make a partial payment to ALH on February 28, 2002 but never made that payment. PX 89; Tr. (Lamm) at G66-68.

Arenson initially suggested that Lamm propose a schedule for future payments, which was not what Lamm wanted to hear. Lamm sent Arenson's correspondence to Neuberger, who, in turn, reached out to Arenson in late February 2002. PX 45; PX 461; Tr. (Lamm) at G72-73. Arenson told Neuberger that he was very disappointed with the business judgment and actions of Lamm and that it was time to sell ALH and move on, in as favorable a way as possible, but as quickly as possible. PX 461; Tr. (Arenson) at F135. Arenson also felt that Lamm should have made the payments that he obligated himself to make under the Settlement Agreement. Tr. (Arenson) at F130-31. But the Bs refused to take action against Lamm because "some of them had huge respect for his father, who is the foremost Orthodox rabbi in the United States" and wanted to "bend over backwards" for Lamm. Tr. (Arenson) at F131.

F.    The Sale Process Moves Forward While ALH Lurches From One Financial Crisis to the Next.

1.    The Retention of JMP.

In March 2002, the Supervisory Board unanimously determined to hire Jolson Merchant Partners ("JMP") to provide "financial advisory and investment banking services" in connection with the possible sale of ALH. Lamm participated actively in the selection of JMP and concluded that JMP was "the best choice" and that Tony Avila, the JMP representative, was "very, very impressive." Tr. (Lamm) at D188 & G46-48. On March 21, 2002, ALH entered into an engagement letter with JMP that contemplated the provision of a broad range of services, but would require payment of an additional $100,000 for a written fairness opinion. PX 100.

JMP's initial presentation to ALH's Supervisory Board employed three valuation approaches, an EBITDA approach utilizing 4 to 6 times EBITDA multiples, a multiple to book value approach and an earnings per share approach. PX 87; Tr. (Buchler) at A84. Multiples of

revenue and gross profit played no role in JMP's valuation methodologies. Tr. (Buchler) at A84. Upon being retained, JMP immediately began marketing the company. Tr. (Buchler) at B84-85.

> 2.    ALH's Operating Subsidiaries Deteriorate Because
>        Of ALH's Liquidity Problems.

Contrary to Lamm's rosy statements that ALH had "no risk on operations," ALH's financial outlook in March 2002 was dim company-wide. Tr. (Lamm) at G46; PX 96. As a result, in part, of uncertainty in receiving an extension of the Wachovia/Swiss Re debt, ALH was well behind its business plan and had started 143 fewer homes than planned in only the first two months of 2002. PX 96; Tr. (Buchler) at A85-86 & A79. In addition, ALH had failed to pay even accrued interest on the 2000 Emergency Loan. PX 96; Tr. (Buchler) at A89.

At the operating company level, ABI was facing large financial commitments to take down lot positions. PX 96; Tr. (Buchler) at A86. BBC was confronted with litigation filed by the sellers of BBC after Lion & Lamm stopped payment on the Bowden Note, which was tarnishing ALH's name in the local market, and also was late on trade payables as a result of a liquidity shortage. PX 96; Tr. (Buchler) at A87-88. MHI needed additional capital to finance its inventory and lot deposits and performed poorly in 2002. Tr. (Lamm) at G46. Construction lines were expiring in a relatively short period of time and lenders would not extend because of the pending maturity of the Swiss Re obligation. PX 113; Tr. (Krieger) at C64 & C67-68; PX 104.

> 3.    The Second Emergency Loan To ALH.

In April 2002, ALH and its subsidiaries were again in "desperate need of funding" and ALH's auditors were raising a possible going concern qualification. Tr. (Buchler) at A93; Tr. (Krieger) at C65-68; PX 112; PX 105; PX 108; PX 113; PX 119. ALH "needed this money fast… there was a pressing need." Tr. (Lamm) at D209. ALH again turned to its members for

an emergency bail out and asked all of the A and B members[13] to contribute their pro rata share

of the loan. Tr. (Buchler) at A95-96. On May 7, 2002, the Supervisory Board unanimously

approved a $4.375 million loan from Shamrock ($1,964,800.00) and 31 other A investors

($1,160,200), D.A. Gardens ($312,500), The Erica Jesselson 1994 CLAT ($312,500) and SELK

($625,000) (the "2002 Emergency Loan"). The 2002 Emergency Loan had a short term of five

months, and was made for the purpose of paying ALH's shortfalls in construction lines and to

give ALH's auditors an indication of member support. PX 126; Tr. (Buchler) at A96.

4.     JMP's Efforts to Sell ALH.

Following its retention and initial marketing efforts, JMP also prepared a

Confidential Offering Memorandum to market ALH to potential buyers and made a presentation

to ALH management. PX 124 & 125. The pitch JMP presented in the Offering Memorandum

highlighted ALH's stronger points while pointing out that ALH was unable to realize upon these

strong points – such as strong lot positions – due to its capital constraints in the same way that a

strategic buyer could. Tr. (Buchler) at A97 & B106-08. In its presentation to management, JMP

noted significant capital constraints at all three operating companies and the lingering concern

about the Swiss Re extension. PX 125; Tr. (Buchler) at A99-100. At the same time, Lamm was

highlighting the importance of mitigating the "substantial risk" presented by the Bowden

litigation in his operational reports. PX 128.

JMP actively sought a buyer for the entire company or substantially all of its

assets for about six months. PTO ¶ III, 90-96, 100. JMP marketed ALH to national

homebuilders that lacked a presence in ALH's markets and that had the resources necessary to

fully develop ALH. PX 124; Tr. (Buchler) at A100. Unfortunately, the response was "distinctly

---

[13]     Laurel refused to participate. PX 122; Tr. (Buchler) at A95; PX 139; Tr. (Lamm) at G79.

19.

lukewarm." Tr. (Buchler) at A100. ALH received expressions of interest from Walter Industries and KB Homes at $85 million and $96 million, respectively, but no transactions resulted. Tr. (Buchler) at A101. Potential purchasers expressed concern over ALH's balance sheet, including its high levels of goodwill, high debt, and lack of tangible net worth, its low margins and inability to turn revenues into profits, and lack of interest in certain divisions. Tr. (Buchler) at A101-02; Tr. (Krieger) at C72 & C82-83; Tr. (Avila) at G165; PX 130; PX 138.

Based on its marketing efforts, JMP learned that certain potential buyers were interested only in specific divisions, and JMP began seeking potential buyers for BBC and ABI. Lamm raised no objection, PX 140; Tr. (Krieger) at C81, 84, and certain of the Bs, like Laurel, wanted out of the ALH investment because it had gone on longer than Lamm had promised and presented a risk of additional "capital calls for unforeseen events." PX 139; PX 142; Tr. (Lamm) at G79 & G81-82. Konig, the beneficiary of the trust that owns SELK and a client of Neuberger, similarly "expressed frustration" with ALH and indicated that he had "no intention of adding a penny to his investment." PX 419; Tr. (Lamm) at G80. Arenson had lost confidence in ALH much earlier. Tr. (Arenson) at F132.

ALH entered into negotiations with Walter Industries for the purchase of BBC, which was suffering from capital constraints and not operating at its business plan. Tr. (Buchler) at A102-04. *See also* PX 250 (the risks of continuing to run BBC outweigh the benefits). Those negotiations were unsuccessful. PTO ¶ III, 102.

At around the same time Lamm, with the Supervisory Board's consent, was trying to broker a transaction with Landstar. Tr. (Buchler) at 105. Landstar concluded, however, that ALH was essentially bankrupt from a net worth perspective, that it had too much debt, too many retained losses, and too much goodwill. PX 156.

G.    Lamm and Neuberger Develop The Bs' "Collective
Position" Against Shamrock.

Throughout the spring and summer of 2002, certain of ALH's Representatives continued to press Lamm to pay his obligations to ALH. PX 132 &133; Tr. (Krieger) at C75-78. Lamm became non-responsive while at the same time strategizing a counter-offensive with Neuberger.[14] As the prospects for a sale that would free Lamm from his financial obligations waned, Lamm and his personal attorney assisted Neuberger in drafting a letter to Shamrock challenging its desire to sell as a result of the deterioration in the relationship with Lamm and pressing Shamrock to "resolve the issues with Lamm in a fair and appropriate manner." PX 462; Tr. (Lamm) at G78.

By July 2002, Lamm recognized that his "growth for sale" business plan had failed, in part because ALH had an over-abundance of debt since its inception. Tr. (Lamm) at G87-88; PX 341. Lamm felt that ALH's land inventory was too high and that it would take three to four years to prepare ALH for sale. Tr. (Lamm) at G87-88; PX 341. Neuberger, whose involvement with ALH was limited to once driving by one of its housing developments, felt that the investors should hold onto ALH in the hopes of selling the company as one unit at a later date and proposed a potential buy out of Shamrock's interests by the Bs. Tr. (Neuberger) at H68; Tr. (Lamm) at G82-84; PX 139. Lamm, who (because of his subordination under the Operating Agreement to the 27% preferred return provision) only stood to benefit from a sale if ALH hit a home-run and anticipated that he would receive better treatment in connection with

---

[14]    On July 17, 2002, Neuberger forwarded Lamm a 72-page email attaching emails from as far back as February 12, 2002 (around the time that Lamm's obligations to ALH were coming due) concerning his disputes with Shamrock. PX 428. This "anti-SCA file," PX 85, was one of the many withheld based upon a completely unfounded assertion of privilege.

his debt to ALH if Shamrock was out of the picture, reached out to Arenson and suggested that the Bs use Neuberger as their attorney in putting together a deal to buy out Shamrock. PX 143; Tr. (Lamm) at G82-83 & G92.

On July 31, 2002, Lamm, Neuberger, Arenson, Jesselson, Frankel and Konig met at London's Heathrow Airport to discuss ALH. PX 148; Tr. (Lamm) at G95. Lamm made a presentation about ALH's operations before Neuberger took over. Tr. (Lamm) at G140; Tr. (Neuberger) at H12. At the end of the meeting, the Bs decided on a two-pronged plan: (1) try to convince Shamrock to invest additional money in ALH, and (2) if they were not willing to do so, to try to buy them out. Tr. (Arenson) at F138. The Bs were not, however, willing to invest additional money into ALH unless Shamrock also invested. Tr. (Arenson) at F70-71 & F139. In addition, the Bs recognized that Shamrock had no obligation to invest, did not intend to put additional money into ALH, and that there were no outside sources that would invest in ALH. Tr. (Arenson) at F138-39.

At the July 2002 meeting, it became the Bs' "collective position "that Shamrock, in its desire to exit," 'was using its' control position to 'dismantle the company' pay back its loans and to ignore the future prospects of the Company and all of its investors just to get 'out.'" PX 243; Tr. (Arenson) at F120-21; Tr. (Lamm) at E78-79 & G95-96. Neuberger acknowledged that the concept of litigation arose at this meeting – *many months before the sale of any of the operating companies* – because litigation was the only incentive Shamrock had to deal with him. Tr. (Neuberger) at H78-79. They also devised a strategy of protesting the sale of ALH's operations, without trying to stop them, so that ALH would have the benefits of those necessary transactions without the Bs ratifying them. *See* PX 412 ("now, it is best NOT to react, not to

ratify whatever it is that they are doing and simply to keep pressing for the best offer"); PX 426 ("Avie wants to give them enough rope to swing").

After the Heathrow meeting, Arenson, through an email ghost-written by Neuberger (Tr. (Neuberger) at H18), communicated to Shamrock that (1) the Bs were interested in buying out the As, (2) time was of the essence, and (3) the buy out could conclude in a matter of weeks. DX 40; PX 141. At the same time, Arenson, on behalf of the Bs, began posturing that a sale of BBC was not advisable. PX 141 & 146; Tr. (Krieger) at C84-86. Shortly thereafter, Neuberger appeared for the first time asking for a meeting regarding a potential B buy out and objecting to the possible sale of BBC. PX 148.

Shamrock expressed willingness to meet but requested "a clear indication of the proposed arrangement" in advance. PX 148. A week later, having received no response, Shamrock followed up with Arenson and asked for a timetable with respect to the proposed buy out. PX 150; Tr. (Krieger) at C88. Arenson did not respond. Tr. (Arenson) F141. Two weeks later Shamrock again followed up with Arenson. PX 152; Tr. (Krieger) at C89. On September 3, 2002, Arenson finally responded, indicating that the Bs did not have a buyer or an offer, and also lamenting that Lamm "is taking advantage of his personal relationship in an unconscionable fashion." PX 154. Krieger asked what Arenson meant by his statement and whether Arenson thought Lamm's "role in helping facilitate a buy out is being used as a shield (or delaying tactic) from facing the issues he has with ALH" but never received a response. PX 154; Tr. (Krieger) at C91.

On September 8, 2002, Lamm sent an email to Buchler and Krieger updating them on the B buy out efforts and stating that the conclusion of potential homebuilding partners that they had met with was that ALH was "essentially bankrupt. ALH simply has too much debt,

retained losses and good will.  Notwithstanding healthy operations and land positions, they are insufficient to make up for [these] problems…  Their view is that the equity in the company is zero…."  PX 155 & 156.  Lamm agreed that ALH faced a "very uncertain future" and was using a 4.5 EBITDA multiple in his own valuations.  PX 446; Tr. (Lamm) at G89-91.

ALH's desperate need for liquidity necessitated the sale of an asset to provide liquidity.  PX 159; Tr. (Krieger) at C95-97 & C109.  Walter's initial proposal for BBC, however, was "so far off the mark, that it raised significant issues about their credibility and seriousness."  PX 162; PX 164; Tr. (Krieger) at 98.  To make matters worse, ALH's nine months financials were "a major disaster", reflecting a downturn at BBC that caused Walter to walk away, as well as performance problems in ALH's other divisions.  PX 171; Tr. (Krieger) at C162-63.

Arenson recognized that, absent a B buy out, a piecemeal sale was the "only" option available and told Krieger on September 13, 2002 that the Bs would make their decision within the next few days.  PX 159; Tr. (Arenson) at F142-43; Tr. (Krieger) at C96-97.  Despite repeated indications that Shamrock was receptive to a buy out proposal, however, the Bs never made a specific, credible proposal or indicated when they would do so.  Tr. (Arenson) at F143; PX 159; PX 164; PX 174; PX 179; PX 420; Tr. (Krieger) at C96-98 & C167-68.

Lamm was concerned about the lack of movement in the B buy out efforts because it was bad for him personally.  Tr. (Lamm) at G92.  Lamm believed that if the Bs took control of ALH they would "rip up" what he referred to as the "disastrous" Settlement Agreement.  PX 162; Tr. (Lamm) at G92.  In an effort to facilitate a personally beneficial buy out, in October 2002, Lamm drafted a letter for Arenson to send to the Bs encouraging them to buy out Shamrock, and noting that if the Bs were not going to structure a transaction they "need

to give Shamrock the green light to move forward with the Bowden sale." PX 168; Tr. (Lamm) at G93-94. The Bs never came to an agreement with Shamrock. Tr. (Lamm) at G94.

### H.    ALH's Liquidity Crises Continue.

In December 2002, ALH again needed to seek an extension of the Swiss Re credit facility. PX 164; Tr. (Buchler) at A107. Without an extension from Swiss Re, there would have been no Company to buy or sell. Tr. (Arenson) at F66. In connection with a meeting with Swiss Re representatives, Lanius prepared a "Financial Position" paper showing that ALH had a negative equity value at EBITDA multiples of 4.5 to 5.5 (PX 322), and was underwater by $14 million to $17 million. Tr. (Buchler) at A107-08; Tr. (Lanius) at F217.

ALH ultimately obtained an extension. Tr. (Buchler) at A109. After receiving the extension, Shamrock again encouraged the Bs to make a concrete and realistic buy out offer.[15] PX 190; PX 191; Tr. (Krieger) at C102-04. By this time, however, Arenson (like Lanius) believed that ALH had "no equity" value. Tr. (Arenson) at F144.

### I.    The Burgeoning Bowden Litigation Crisis.

At around the same time, another looming obligation and legacy of Lion & Lamm's mismanagement continued to fester. Tr. (Lamm) at G99, G102 & G107-08; Tr. (Buchler) at A87. Lion & Lamm had thought that they could put pressure on the Bowden family to accept a lower pay off on the Bowden Note by stopping payment at a time when the Bowden family needed money. Tr. (Krieger) at C49-50. This ill-conceived plan instead put the debt in default and accelerated all of the payments due under the Bowden Note. Tr. (Krieger) at C50. The Bowden family sued, seeking (1) principal and accrued interest of $2.85 million, (2)

---

[15]    Arenson acknowledged that the Bs were trying to use the Swiss Re situation as leverage to buy ALH cheaply. Tr. (Arenson) at F146.

recovery under an earn-out provision with an estimated value of approximately $675,000, (3) an award of attorneys' fees (estimated to be in the range of $200,000 to $600,000), and (4) consequential and punitive damages on the grounds that, among other things, non-payment of the Bowden Note had caused the failure of three new businesses started by the Bowden family after they sold BBC to ALH (hereafter the "Bowden Litigation"). Tr. (Buchler) at A87. By 2002, the Bowden family had become outspoken about their case and competitors were using it to their advantage in the local Memphis market. Tr. (Lamm) at G106; Tr. (Buchler) at A87.

Counsel had advised ALH, and Lamm agreed, that ALH would lose the litigation, and that it presented a serious risk that needed to be mitigated. Tr. (Buchler) at A110 & A127; PX 137; PX 128; PX 129; Tr. (Lamm) at G109-10; Tr. (Krieger) at C71 & C79. ALH II was a named defendant in the Bowden Litigation and was a guarantor of the Bowden Note. PTO ¶ III, 110. ALH did not have the ability to pay the expected judgment in the Bowden Litigation. Tr. (Buchler) at A110. The only question was how soon the Bowden plaintiffs would be able to execute on ALH's assets. ALH's outside litigation counsel advised that if the plaintiffs were successful on their motion for partial summary judgment, the court had the discretion to make the partial summary judgment a final judgment, which would permit plaintiffs to execute. DX 67; Tr. (Buchler) at A110.

J.     Lamm Advocates An Exit In 3 To 5 Years As ALH
        Continues To Suffer Capital Constraints.

On February 7, 2003, Lamm wrote a long email to the Bs in an effort to persuade them to buy out Shamrock. Tr. (Lamm) at E6. Lamm stated that MHI was "well into its turnaround" and "can expect stronger performance throughout the year" and highlighted that "the company is maintaining virtually no stale inventory." PX 466. Lamm acknowledged, however, that ALH remained "severely challenged" from a balance sheet perspective, that the Bowden

Litigation was a "major issue for the whole company" and that ALH did not have adequate financing to pay for its inventory. DX 155; Tr. (Lamm) at E12-13. Already years beyond the promised exit from ALH, Lamm concluded his letter by outlining an additional *three to five year* plan for turning ALH around. DX 155; Tr. (Lamm) at G102-03. Even that recovery, however, would require additional capital from the investors. Tr. (Lamm) at E10, E12-13 & G103.

Plaintiffs did not share Lamm's rosy outlook for ALH. PX 197; Tr. (Stein) at D3-18. ALH did not have the capital to take down lots at ABI (Tr. (Lamm) at E47), lots that Lamm viewed as "the best we had ever had" (Tr. (Lamm) at E11), and not taking them down would forfeit ABI's future and its value in a later sale. PX 197; Tr. (Krieger) at 177-78; Tr. (Stein) at D10-11 & D82. MHI could not be turned around in the short term. PX 197. MHI owned too many lots, it had a weak product, its sales were in the doldrums, it had liquidity problems, and word on the street was that it was in a tail spin. PX 197; Tr. (Stein) at D7-8 & D12-13. BBC was suffering from unhappy management and the overhang of the Bowden Litigation, it couldn't qualify buyers to purchase its homes, and it was becoming more costly to do business. PX 197; Tr. (Stein) at D14-17. Moreover, ALH had a long history of failing to meet its projections and lenders were tightening its credit lines because they were concerned that the Wachovia/Swiss Re loan would force ALH into bankruptcy. Tr. (Krieger) at C93-94; Tr. (Stein) at D18.

On February 18, 2003, the night before a scheduled meeting of the Supervisory Board, Buchler and Krieger met for dinner with Arenson and Neuberger to discuss the proposed B buy out of the As. Tr. (Buchler) at A114-15; PX 196. Neuberger offered $3 million (less than Shamrock's debt) for the entire Class A interest, including the debt owed to Shamrock. Tr. (Neuberger) at H28; Tr. (Buchler) at A116-17. Buchler proposed $12 million and offered to buy

out the Bs (who held a smaller position) for the same *pro rata* amount offered by Neuberger.  Tr. (Buchler) at A118.

Neuberger also suggested that as an alternative approach to dealing with obligations to the Bowden plaintiffs, ALH could create a shell company and move Bowden's assets to that shell in exchange for a note so that the Bowden family would be unable to execute on any judgment.  Tr. (Neuberger) at H69-73[16]; PX 194; Tr. (Buchler) at A116; Tr. (Lamm) at G111.  When Krieger questioned the ethics of his idea, Neuberger concluded that Krieger was "getting on his high horse."  Tr. (Neuberger) at H73.

The next day, the Supervisory Board met and, among other things, discussed that ABI would need approximately $3.8 million of additional equity to take down key lot positions and there was substantial doubt that ALH had the ability to borrow those funds.  PX 206; Tr. (Buchler) at A112-13.  The Supervisory Board also discussed a variety of potential sources of financing for the lot acquisitions, which Lanius attempted to pursue without success.  PX 206; Tr. (Lanius) at F247-48.  In addition to a lack of equity for the major lot purchases ABI was required to take down in 2003, ALH also had a substantial shortfall in the bank financing required for those impending lot take-downs.  Tr. (Lanius) at F247-48, F277-79, F285, F290 F300-01.

In March 2003, with the unanimous approval of all Representatives, the Supervisory Board extended JMP's Engagement Letter.  PTO ¶ III, 101-103; PX 209.  Although Lamm approved the extension of the JMP Engagement Letter, and admits that he agreed with the

---

[16]    Despite his extreme confidence in his scheme, Neuberger was not certain that his plan would work and, at trial, conceded that he was unaware that ALH II had guaranteed the Bowden Note at the time he suggested "denuding" BBC of its assets.  PX 364; Tr. (Neuberger) at H70-73.

strategies outlined by JMP in its December 12, 2002 letter (DX 55; Tr. (Lamm) at G98), he drafted a letter expressing his views as to why ALH should not be broken up, which he concluded by outlining a *four year* plan for turning ALH around, which would require cash infusions for litigation settlements, land purchases and operations at MHI. DX 155; PX 448; Tr. (Lamm) at G98-101; Tr. (Krieger) at C94. Lamm, who realized he would receive nothing from a sale of ALH due to the 27% preferred return provision in the Operating Agreement, was hoping "to get all the stars to align."[17]  Tr. (Lamm) at D201.

K.     April 2003 -- The Value Of ALH Continues To Plummet.

In April 2003 -- just two months after its February business plan -- ALH amended its business plan to reflect substantially reduced EBITDA and closings. PX 212; Tr. (Krieger) at C106-08; Tr. (Stein) at D22-23.  MHI was not turning around – it was in a tail-spin.  Between MHI and BBC's downward revisions, ALH was projecting a decrease in EBITDA of $4 million, which at a 5 times EBITDA multiple equates to a $20 million reduction in enterprise value for ALH in a period of just two months!  PX 214; Tr. (Stein) at D25-26.

Shamrock kept Arenson apprised of ALH's efforts to sell ABI and attempted to give the Bs an opportunity to complete a buy out on mutually agreeable terms.  PX 111; PX 211; Tr. (Buchler) at A120-21.  In a phone call to Buchler after eight months of discussions about a potential B buy out in which no agreement was reached, Arenson stated that the B's were not

---

17     In an email to Jesselson, Lamm acknowledged that "Charlotte [MHI] remains in the doldrums" and that the "promised turn around is slow in coming." PX 448; Tr. (Lamm) at G102-03.  Lamm also noted that "[i]n Memphis [BBC] we have a looming $5MM liability on Bowden law suit." PX 448; Tr. (Lamm) at G102.  Lamm concluded by recommending "some new capital" and that the investors "think in terms of 3-5 year time line." PX 448; Tr. (Lamm) at G103.

willing to raise their offer for the A interests and that the Supervisory Board should proceed with the sale of ABI.[18]  Tr. (Arenson) at F159-60; DX 293; PX 213; Tr. (Buchler) at A122-23.

Arenson was aware and had advised the Bs that ALH would need cash, which it could not generate internally, to settle the Bowden Litigation and for a large take-down of lots at ABI.  Tr. (Arenson) at F158; DX 293.  Notwithstanding these acknowledged facts, and after consulting with Neuberger (DX 293), Arenson reversed course on his statement to Mr. Buchler to proceed with a sale and wrote that "I think that it is not in the best interests of ALH II to sell itself piecemeal."  PX 370; PX 213; Tr. (Arenson) at F160.  Buchler responded by saying that ALH had a severe liquidity crisis and that ABI was being sold to provide necessary liquidity and asked Arenson or other B investors to propose an alternative solution.  PX 371; Tr. (Buchler) at A121.  Arenson did not respond with an alternative solution.  On April 11, 2003, ALH entered into a letter of intent with Mattamy Homes ("Mattamy") for the sale of ABI.  PX 223.

L.     May 2003 -- The Supervisory Board Considers The Sale Of ABI And Settlement Of The Bowden Litigation.

On May 14, 2003, the Supervisory Board met to discuss the proposed sale of ABI and the settlement of the Bowden Litigation.  PX 224; Tr. (Buchler) A124; PX 221 & PX 222. JMP made a presentation describing the three bids that it had received for ABI, and indicated that the Jacksonville market was at its peak and that it was a good time to sell.  PX 224; PX 221; Tr. (Stein) at D38; Tr. (Buchler) at A124-25.  Management described the liquidity issues at ABI and indicated that ALH did not have the liquidity to take down key lot positions or the credit available with existing lenders to finance those purchases.  PX 224; PX 221; Tr. (Stein) at D39-

---

[18]     The email confirming Arenson's statement to Buchler to proceed with a sale of ABI was one of the many documents the Defendants attempted to hide from discovery through a wrongful assertion of privilege.

40; Tr. (Buchler) at A124-26. Lamm agreed with those concerns. Tr. (Lamm) at G104-05.

Lamm also agreed that it would take $5 million to settle the Bowden Litigation, that ALH would

have only $2.4 million in cash flow in the next six months, that MHI was near its credit limits,

and that ALH did not have sufficient cash on hand to finance the settlement of the Bowden

Litigation. Tr. (Lamm) at G105; PX 221; Tr. (Stein) at D41-42.

Buchler, Krieger and Stein concluded that it was in the best interests of ALH to

sell ABI because ALH needed funds to settle the Bowden Litigation, provide working capital for

lot commitments at the other divisions and improve ALH's balance sheet. PX 224; Tr. (Buchler)

at A125-27; Tr. (Krieger) at C108-09; Tr. (Stein) at D56. Buchler proposed that the 2000

Emergency Loan and 2002 Emergency Loan be paid from the proceeds of the sale of ABI. PX

233; Tr. (Krieger) at C113. No one at the meeting spoke in opposition to the proposal to repay

the member loans from these proceeds, PX 224; Tr. (Buchler) at A126; Tr. (Krieger) at C108-09,

and nobody spoke in opposition to the concept of selling ABI at this meeting. Tr. (Lamm) at

104.

In late May, 2003, the Bowden Litigation was rescheduled for trial in February

2004. PX 226. Lamm was advised at that time of the rescheduling. Tr. (Lamm) at 114; PX 226.

Although the trial had been postponed, ALH's Tennessee trial counsel had advised ALH that

there was still risk that a partial final judgment could be entered, that the judge had scheduled a

hearing on various motions, including the Bowden plaintiffs' motion for partial summary

judgment for June 19, 2003, and that if the plaintiffs won that motion they could seek to have

that partial judgment entered as a final judgment and execute on it. DX 67; PX 226; PX 228; Tr.

(Krieger) at C110; Tr. (Buchler) at A130. ALH did not, absent the sale of ABI, have the cash to

pay a settlement or a judgment. Tr. (Krieger) at C111.

M.     The Bowden Settlement And The Sale Of ABI.

On June 25, 2003, ALH's outside counsel circulated proposed terms for the settlement of the Bowden Litigation and Buchler summarized the agenda for the meeting.  PX 229; PX 230.  Lamm, Neuberger and Arenson coordinated their actions prior to the meeting.  DX 273; PX 229.

The Supervisory Board met the next day.  PX 233; PX 232; PX 234; PX 255.  As reflected in the minutes,[19] Fried Frank described a proposed settlement of the Bowden Litigation under which ALH would pay the Bowden family $5 million plus $210,000 in attorneys' fees (the "Bowden Settlement").  PX 233; PX 230; Tr. (Stein) at D45-46; Tr. (Buchler) at A132.  The first $1 million would be due immediately upon execution of the settlement agreement and the balance would be payable on the earlier of August 31, 2003 or the consummation of the sale of ABI.  PX 233.  The proposed Bowden Settlement included an option to extend the final payment date for an additional 90 days, for a fee of $250,000.  PX 233.  Lamm and Arenson both commented favorably on the proposed terms of the Bowden Settlement.  Tr. (Arenson) at F106; Tr. (Buchler) at A132.  The Supervisory Board unanimously approved the terms of the Bowden Settlement, which Arenson and Lamm testified was an "excellent" outcome and a "good settlement."  PX 233; Tr. (Arenson) at F148; PX 367; Tr. (Lamm) at E65.

After approving the Bowden Settlement, the Board then discussed the sale of ABI.  PX 233.  Mr. Avila of JMP indicated that the Mattamy bid was the best potential transaction for the sale of ABI, was "market" and that the 5.0 EBITDA multiple for the purchase price was above the average for previous sales in the industry.  PX 233.  Lanius and Laguardia

---

[19]     Lamm approved the minutes of the June 26, 2003 board meeting, after his comments were incorporated.  PX 253; PX 257; Tr. (Lamm) at G114-19; Tr. (Stein) at D59.

indicated that ABI was at the peak of the market and was facing large lot take-down capital requirements. PX 233; PX 221; Tr. (Stein) at D41; Tr. (Buchler) at A133. The transaction was well within the range of multiples suggested by JMP and had been tested in the market. Tr. (Buchler) at A133; Tr. (Krieger) at C113. "If anything, it was probably generous." Tr. (Krieger) at C112. Neither Lamm nor Arenson challenged the fairness of the price obtained in the ABI sale.[20]

Arenson suggested that rather than sell ABI, all the Members could contribute additional equity and keep ABI. Tr. (Arenson) at F104; PX 233. Buchler reiterated the liquidity concerns facing ALH, that Shamrock was not willing to make additional investments in ALH, and that Arenson had not presented any viable proposals to alleviate those liquidity concerns. Tr. (Buchler) at A133-34; PX 233. The Supervisory Board discussed the use of the proceeds from the sale of ABI and indicated that they would use part of those proceeds to satisfy the 2000 Emergency Loan and the 2002 Emergency Loan, which at that point had been outstanding well beyond the initial contractual maturity dates. PX 233; Tr. (Krieger) at C113.

Krieger, Buchler and Stein voted to sell ABI. PX 233. Arenson voted against the sale of ABI. PX 233; Tr. (Buchler) at A134. "After a great deal of discussion with Mr. Lamm about what the resolution said and what their intent was" Lamm nonetheless requested additional time so that he would have the opportunity to "read intelligently" the ABI proposal and abstained

---

[20]    Buchler, Krieger and Stein recall that Avila stated that the transaction was "fair" and each personally concluded that the price was fair. Tr. (Buchler) at A133 & B177; Tr. (Krieger) at C112; Tr. (Stein) at D52, 56, 117 & 122. ALH did not, however, pay the extra $100,000 required for a formal fairness opinion from JMP, and therefore did not receive a formal fairness opinion. In all events, defendants have not challenged the fairness of the financial terms of the ABI sale in this litigation. Tr. (Stein) at 52-53.

from voting.[21]  PX 233; Tr. (Buchler) at A134; Tr. (Lamm) at G122-25.  Lamm did, however, execute the unanimous written consent by ALH II approving the sale.  PX 321.[22]

In addition, Arenson and Lamm were appointed as the sole members of a special committee to consider whether Shamrock should be paid a fee in connection with the sale of ABI to Mattamy.  PX 233.  After discussing it with Neuberger, Arenson and Lamm approved a $200,000 fee to Shamrock and Arenson expressed his "personal congratulations" to Shamrock for their efforts in the sale of ABI.  PTO ¶ III, 104, 107-116; Tr. (Lamm) at E63; PX 240; Tr. (Krieger) at C116-117.

The 2000 Emergency Loan and 2002 Emergency Loan were repaid in full from the proceeds of the sale of ABI.  DX 101.  Arenson expressed pleasure and thanks after the meeting that his portion of the loans would be repaid.  Tr. (Buchler) at A136.  Lamm "viewed it as inappropriate to argue that the loans should not be repaid."  Tr. (Lamm) at G120 & G126. Because these loans were repaid to insiders, in the event that ALH were to file for bankruptcy within one year, all of the member loans (including those repaid to the Bs) would be recoverable as preferences.  PX 254; Tr. (Buchler) at A146.  Bankruptcy was always a distinct possibility given that ALH was lurching forward on short extensions of the Wachovia/Swiss Re loan.  Tr. (Buchler) at A146-47; Tr. (Lanius) at F273-74; Tr. (Neuberger) at H15 & H22.

---

[21]  Lamm's excuse for not voting is belied by his uniform practice of not reading documents. *See, e.g.,* Tr. (Lamm) at E106, E109, G13, G15, G19, G21, G23, G24, G38.  Instead, his refusal to vote is but one more example of the Neuberger strategy of avoiding ratification of actions taken by the Supervisory Board while accepting their benefits.  PX 427; Tr. (Arenson) at 122; Tr. (Neuberger) at 34-35; Tr. (Lamm) at 78.

[22]  Lamm later asked Lanius whether he thought that ALH should have sold ABI.  Lanius indicated that he hoped that the Bs would buy out the As and grow ALH, but "as that did not happen, he thought selling ABI had a native logic to it."  Tr. (Lamm) at G128-29.

The day after the meeting, Buchler sent a letter to Arenson expressing dismay over Arenson's decision to vote against the sale of ABI after voting in favor of the Bowden Settlement that ALH could not, absent a sale of ABI, fund. PX 235; Tr. (Buchler) at A137-38; *see also* Tr. (Stein) at 56-57. Arenson responded, bemoaning his inability to persuade all of the Bs to contribute additional capital to ALH, and indicating that his no vote on the sale of ABI was just a difference of opinion on a business matter and that it did not change his high regard for Krieger and Buchler. Tr. (Buchler) at 139-40; PX 238.

N.     The Sale of BBC.

After closing on the sale of ABI, JMP marketed BBC to several potential buyers. Buchler continued to keep Arenson informed of the process and stressed that if the Bs wanted to buy out the As, they would need to do so promptly. PX 242; Tr. (Buchler) at A142-44. Buchler and Stein discussed BBC at length and concluded that the risks of operating BBC into the future outweighed the potential additional benefits because of BBC's financial constraints and management turmoil. PX 250; Tr. (Stein) at D60-61.

At the same time, ALH continued its efforts to obtain a further extension of the Swiss Re credit facility. PX 261. Krieger concluded that by selling BBC, ALH would be able pay down part of the Wachovia/Swiss Re obligation and buy time to improve MHI, ALH's largest operating subsidiary. PX 250; Tr. (Krieger) at C116-17. In anticipation of a meeting with Swiss Re, Lanius prepared a valuation showing that ALH was underwater by $14 million using a 4.75 EBITDA multiple. PX 256; Tr. (Lanius) at F324-25. In November 2003, Lanius, Krieger and Buchler met with Swiss Re and obtained a two year extension. Arenson congratulated Shamrock on this result. Tr. (Buchler) at A147-48; PX 261.

On March 24, 2004, the Supervisory Board met to consider the proposed sale of the stock of BBC to Levitt for $7.25 million -- $4 million of which would be used to pay down

the Swiss Re credit facility. PX 270;[23] DX 129; PX 265. JMP explained that it had engaged in a

two year exhaustive search and had engaged in discussion with 20 potential buyers, but that the

Levitt purchase was the only real option for ALH. PX 270; Tr. (Buchler) at A150-51. JMP

indicated that the transaction was "market" and that it was within the range of comparable

transactions and EBITDA multiples that could be expected. PX 270; Tr. (Buchler) at A151; Tr.

(Stein) at D64. The Supervisory Board discussed that Jeff Sweeney had indicated that he would

not renew his contract, and that he was irreplaceable and without him BBC's value would only

diminish. PX 270; Tr. (Buchler) at A151-52; Tr. (Arenson) at F151-52. Krieger, Buchler and

Stein voted in favor of the proposed sale of BBC and concluded that it was a fair price because it

was the best deal available and at a multiple well within the range of multiples that ALH had

seen in connection with the sale process. PX 270; Tr. (Buchler) at A152-54; Tr. (Krieger) at

C117; Tr. (Stein) at D64-66. Arenson and Lamm voted against the sale.[24] PX 270.

> O.    Lamm and Neuberger's "Collective Position" Develops
>        Into A Scripted Play.

By January 11, 2004, the Bs "collective position" developed into a decision to sue

Shamrock and hire "a super-powerful lawyer in DC by the name of Dale Kooter… [who] is a

paid assassin." PX 264. Then, on March 5, 2004, Lamm sent an email to Neuberger stating:

> Forgive a crazy thought. As an alternative to a fight with
> Shamrock in which the B investors try to get their funds back from
> SCA, what if the negotiations were made easier by telling SCA
> that an alternative solution is for all of the A investors to walk

---

[23]    Arenson agreed that the minutes (PX 270) were accurate. Tr. (Arenson) at F150-51.

[24]    A special committee of Arenson and Lamm was formed to consider whether Shamrock should be paid a fee for its time spent in connection with the sale of BBC. PX 270. Although they had approved a fee in connection with the sale of ABI, Arenson and Lamm determined not to pay Shamrock a fee with respect to the sale of BBC. PTO ¶ III, 118-24.

from the investment leaving the companies and operations to the B investors? The first order of business would be assembling a management team, assessing what potential exists and what investment would be required to realize it, and then to aggressively work on a severe cram down with respect to Swiss Re.

Neuberger responded, "How, in your view, would we get this presented?" Lamm answered:

.... As part of a negotiation. The first part being a meeting between Michael & Avie (and you?) in which, for various reasons, demands be made that SCA buy-out the B's at par. Sword Rattling to commence. As part of a follow up "compromise" – the offer for them to "walk" becomes the solution with all parties agreeing to stop pursuing each other. Then on to Swiss Re for a showdown. This is a scripted play.

PX 417. Lamm acknowledged that he was referring to "litigation similar to this one" and was aware of discussions among the Bs about suing Shamrock. Tr. (Lamm) at E85-86.

In May 2004, Buchler informed Arenson that ALH intended to begin steps to collect on Lamm's confession of judgment. PX 410; Tr. (Arenson) at F152. Incredibly, Arenson tipped Buchler's email to Neuberger because of the "personal considerations" that Neuberger and the Bs had with regard to Lamm. Tr. (Arenson) at F152.

P.    The Sale of MHI.

MHI continued to suffer from the Wachovia/Swiss Re loan overhang. Construction lenders were unwilling to provide MHI with additional construction financing unless Wachovia and Swiss Re extended their loan and Wachovia indicated that it would not keep its loan in place indefinitely. PX 272; Tr. (Stein) at D66-68; Tr. (Krieger) at C119.

By June 2004, Plaintiffs had determined that, after accounting for MHI's secured debt and the Swiss Re credit facility, there was no equity left in MHI. PX 279; Tr. (Buchler) at B5; Tr. (Stein) at D70. MHI did not have the ability to sustain its construction lines of credit and if it could not obtain extensions would be forced to shut down its operations. PX 280; Tr. (Krieger) at C118-19. Moreover, MHI did not have enough lots in its pipeline, and therefore

would continue to decline in value. PX 279; Tr. (Buchler) at B5. Shamrock tried to "make the best of what was a very bad situation" and "extract the highest value for the ALH investors" as it could. Tr. (Buchler) at B6.

In the late summer and early fall of 2004, ALH was in the process of negotiating a possible sale of MHI to Levitt, which had purchased BBC. PX 280; Tr. (Buchler) at B7-9. Buchler reached out to Arenson to see if the Bs still wanted to buy out the As, but Arenson did not respond. PX 280; Tr. (Buchler) at B7 & B9.

Buchler negotiated with ALH's lenders to obtain approval for the sale of MHI to Levitt, which was required because Swiss Re would have to pay Wachovia a shortfall of more than $12 million with respect to the Wachovia loan. Tr. (Buchler) at B10. Swiss Re approved the Levitt proposal and ALH obtained Swiss Re's agreement that ALH would retain $1 million after the Levitt transaction closed. PX 282; Tr. (Buchler) at B9-10.

In early October 2004, after performing due diligence, Levitt elected not to proceed with the acquisition of MHI. PX 283; Tr. (Buchler) at B8. Mattamy, however, surfaced as a potential buyer. PX 283. ALH obtained Swiss Re's approval of Mattamy's offer, again with ALH retaining $1 million after the transaction closed and Swiss Re paying a $12.5 million shortfall to Wachovia. PX 283. In late October, Buchler distributed Mattamy's proposed letter of intent to all Representatives and sought their comments on the transaction. In November and December 2004, drafts of the proposed MHI transaction documents and resolutions were circulated for comment to all Representatives.

Mattamy requested a standard release from the directors of MHI and its subsidiaries. DX 136; DX 183; Tr. (Buchler) at B12-13. Lamm and his lawyer, Capobianco,

determined to seek a release of Lamm's $3,550,807 obligation to ALH in exchange.[25]     Tr. (Lamm) at G130.   Lamm's self-interested demand put the deal in peril, and ultimately, ALH agreed to a Settlement and Mutual Release Agreement with Lamm (PX 298, the "SAMR") in which it ceded to Lamm's demand in order to facilitate the transaction.   Tr. (Lamm) at G130-31; DX 136 & 183; Tr. (Buchler) at B13 & B15-16.

On December 15, 2004, the Supervisory Board met to consider the sale of MHI to Mattamy, related release documents for Swiss Re necessitated by the fact that Swiss Re took a loss of almost half of their original $27.5 million surety bond, and the SAMR.   DX 146; Tr. (Buchler) at B15.   Although initially confirming that he would attend the meeting, Arenson advised on the day before the meeting that he would not attend.   Tr. (Arenson) at F153; PX 287; PX 292; Tr. (Buchler) at B13-14.

With four Representatives in attendance, there was a quorum and the meeting proceeded.   The Supervisory Board (including Lamm) unanimously approved the sale of MHI for $6.5 million, with $1 million to be kept by ALH and the balance to be used to pay down a portion of the Swiss Re facility.   PX 295; PX 301; DX 142; Tr. (Krieger) at C120-21; Tr. (Lamm) at G129-30; Tr. (Stein) at D70-71; Tr. (Buchler) at B15-16.   Krieger testified that this permitted ALH to make a substantial payment to its largest creditor (Swiss Re), obtain a release, and keep $1 million for its efforts and that under the circumstances, this was a great result.   Tr. (Krieger) at C121; Tr. (Stein) at D70.   Lamm, on the other hand, voted in favor of the sale of

---

[25]     Lamm's counsel negotiated the SAMR with ALH's counsel.   Capobianco requested changes to the definition of "Lamm Affiliate" in paragraph 2 of the SAMR, which were then incorporated into the final document.   Tr. (Capobianco) at E124-26.   The final executed version of the SAMR includes a release of Plaintiffs by Lamm's "affiliates." DX 194.   Neither Capobianco nor ALH's counsel discussed whether Lamm, the managing member of SELK, intended to release SELK's potential claims against ALH. Tr. (Capobianco) at E131-32.

MHI purely for personal reasons: "to be quite frank here, I was going to get a release... and that release was – had real value to me." Tr. (Lamm) at E95.

Q.     Neuberger's Accusations, This Action and Plaintiffs' Demand for Indemnification.

After the sale of MHI, ALH had no remaining operations and a pool of $1 million to wind down ALH.  PTO ¶ III, 139.  With Lamm's personal risk from his wrongdoing eliminated through the SAMR, Neuberger saw an opportunity to extort a settlement from Plaintiffs by setting up roadblocks to the ALH wind-down.  Neuberger continued to send Shamrock threatening emails suggesting that Plaintiffs had breached their fiduciary duties and that the Bs intended to pursue litigation.  PX 369.  In light of Neuberger's accusations, Plaintiffs filed this action seeking a declaratory judgment that they did not breach any fiduciary duties in connection with the sale of ALH's operations.  Shortly thereafter, on January 14, 2005, Plaintiffs' counsel notified ALH, the Supervisory Board and Neuberger that Plaintiffs intended to seek indemnification for their fees and expenses in this action.  PX 302; Tr. (Arenson) at F153-55.  Defendants opposed any advancement to or indemnification of Plaintiffs, unless ordered by a court.  PTO ¶¶ III, 140-41; PX 369.  The approximately $1 million proceeds from the MHI transaction remains in the treasury of ALH.  Tr. (Buchler) at 34.

<u>ARGUMENT</u>

I.    PLAINTIFFS DID NOT BREACH ANY CONTRACTUAL OR
      FIDUCIARY DUTIES.

    A.    The Operating Agreement Contractually Limits Plaintiffs'
        Fiduciary Duties And The Business Judgment Rule
        Precludes Defendants' Claims.

The Delaware Limited Liability Act provides:

> To the extent that, at law or in equity, a member or manager or
> other person has duties (including fiduciary duties) to a limited
> liability company or to another member or manager or to another
> person that is a party to or is otherwise bound by a limited liability
> company agreement, the member's or manager's or other person's
> duties may be expanded or restricted or eliminated by provisions in
> the limited liability company agreement; provided, that the limited
> liability company agreement may not eliminate the implied
> contractual covenant of good faith and fair dealing.

6 *Del. C.* § 18-1101(c). *See also Flight Options Intern., Inc. v. Flight Options, LLC*, 2005 WL

2335353, at *7 (Del. Ch. July 11, 2005). "Contractual language defines the scope, structure and

personality of limited liability companies." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at

*1 (Del. Ch. May 7, 2008).

ALH's Operating Agreement expressly limits the liability of the Representatives

on ALH's Supervisory Board,[26] providing:

> Neither the Manager nor any Representative [] shall be liable,
> responsible, or accountable in damages or otherwise to the

---

[26]    There is no occasion to consider the possible liability of Shamrock in this action as it was
never required to and did not vote upon any of the transactions challenged in this
proceeding.  Shamrock was never the Manager of ALH, which under the Operating
Agreement, managed the overall business, operations and affairs of ALH.  PX 3
Art. 6.1(a).   Moreover, the Operating Agreement vested responsibility for "Major
Decisions" in the Supervisory Board, not in the members. *Id.* Art. 6.2.  Indeed, the
Operating Agreement expressly provides that "No Member is an agent of the Company
solely by virtue of being a Member, and no Member has authority to act for the Company
solely by virtue of being a Member." *Id.* Art. 6.6.

> Company or any of the Members for any failure to take any action
> or the taking of any action within the scope of authority conferred
> on it, him or her by this Agreement made in good faith, except that
> the Manager [and] Representatives [] shall be liable, responsible
> and accountable for their own fraud, criminal action, bad faith or
> gross negligence.

PX 3 Art. 6.2(f).  Defendants do not contend that Plaintiffs acted fraudulently or criminally.

Thus, in order to prevail, Defendants can no longer rely upon the allegations of their pleading but

must prove that Plaintiffs acted in "bad faith" or with "gross negligence" in connection with the

sale of ALH's operating companies.

In addition to the contractual limitations on Plaintiffs' fiduciary duties, "[t]he

business judgment rule 'posits a powerful presumption in favor of actions taken by the directors

in that a decision made by a loyal and informed board will not be overturned by the courts unless

it cannot be 'attributed to any rational business purpose.'"  Therefore, a party challenging a board

decision 'has the burden at the outset to rebut the rule's presumption.'"  *In re Hechinger Inv. Co.*

*of Delaware*, 327 B.R. 537, 549 (D. Del. July 19, 2005).  Overcoming the business judgment rule

is "a near-Herculean task."  *Stanziale v. Nachtomi*, 416 F.3d 229, 238 (3d Cir. 2005).

      B.      **Defendants Have Not Demonstrated That Plaintiffs
              Breached Any Duties – Contractual Or Otherwise.**

With the benefit of a fully-developed factual record, it is clear that Defendants

have not demonstrated a breach of contractual or fiduciary duties.[27]

---

[27]    The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) the
existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing
participation in the breach by a defendant who is not a fiduciary; and (iv) damages.  *See,
e.g., Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  Because Defendants have
not shown a breach of fiduciary duty by the Representatives (or damages), their aiding
and abetting claims must necessarily fail.

1.      Shamrock Had No Duty To Throw Good Money
        After Bad.

One undisputed fact largely disposes of Defendants' claims -- **the Operating Agreement expressly provides that no Member of ALH had any obligation to contribute additional capital.**[28] PTO ¶ III, 54; PX 3 Art. 3.3. The lynchpin of Defendants' claims – that the investors should have contributed additional money to ALH to attempt to improve it before a sale (Tr. (Arenson) at 178-79 (responding to the Court's questions)) – is flatly inconsistent with the Operating Agreement, the Stipulated Facts in the Pre-Trial Order, and the understanding of all of the parties. *See, e.g.*, PX 2, Art. 3.3; PTO ¶ III, 54; Tr. (Lamm) at G11-12; Tr. (Arenson) at F138-39; Tr. (Buchler) at A49. "The mere exercise of one's contractual rights, without more, cannot constitute such a breach." *Fisk Ventures*, 2008 WL 1961156, at *11.

As Lamm acknowledged, ALH faced a debt burden that it was "impossible to extricate one's self from." PX 417. The June 2003 decision to sell ABI occurred at a time when ALH was facing substantial liabilities that were coming due without any viable source for paying them. *See* Tr. (Lamm) at E90. As Vice Chancellor Strine recently explained:

> the coming of the due date of a large series of debt is the sort of
> inflection point that causes a rational investor to think deeply about
> winding up the business if the business cannot meet its repayment

---

[28]     Even absent the express contract provision such as the one found in ALH's Operating Agreement, Delaware law is clear that fiduciaries, whether controlling stockholders or directors, have no fiduciary obligation to invest additional capital. *See, e.g., Odyssey*, 735 A.2d at 406 & 415 (holding that the majority shareholder and largest creditor of the corporation permissibly foreclosed on the loans owed to it by that corporation even though the foreclosure resulted in the 50.01 percent shareholder owning 100 percent of the corporation's assets because the controlling shareholder's fiduciary duties do not require "self-sacrifice"); *Venhill Limited Partnership v. Hillman*, 2008 WL 2270488, at *27 (Del. Ch. June 3, 2008) (criticizing the controlling shareholder for continuing to financially support the insolvent corporation even though it failed to provide a "business plan that showed how in some commercially reasonable timeframe it would, through the sale of services and products, attain profitability on a durable basis, sufficient to enable it to repay" its debts to the controlling shareholder).

obligations.  It is not a time for the inertial deepening of a financial sinkhole.

*Venhill*, 2008 WL 2270488, at *27.  Defendants here suggest that Plaintiffs were duty-bound to "throw good money after bad" and play "a high stakes game of chicken with [others'] money," *id.* at 29, precisely the type of conduct that led the court to conclude there was a breach of duty in *Venhill*.  Instead of breaching duties, Plaintiffs made the difficult, but reasonable, decision to limit the losses of all of ALH's members by selling ALH at the best prices that they could obtain before new surprises arose and while ALH still had an ongoing business to sell.

> 2.     There Is No Evidence That Plaintiffs Were Grossly Negligent.

Under Delaware law, which governs the Operating Agreement, gross negligence has a "stringent meaning"

> 'which involves a devil-may-care attitude or indifference to duty amounting to recklessness....  In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'

*Albert v. Alex Brown Mgmt. Serv., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005).  Seeking formal (and often expensive) fairness opinions is not required.  *See, e.g., Oberly v. Kirby*, 592 A.2d 445, 472 (Del. 1991) (noting that a fairness opinion is not required); *Smith v. Van Gorkom*, 488 A.2d 858, 874 (Del. 1985) (same); *McGowan v. Ferro*, 859 A.2d 1012, 1033-34 (Del. Ch. 2004) (finding that canvassing the market and obtaining informal advice from an investment bank were sufficient to satisfy duty of care).

It is undisputed that the process of considering and approving the sales of ABI, BBC and MHI transpired over many months, in a difficult business environment, when ALH faced substantial business uncertainty.  The sales process had the support of a qualified financial advisor approved by both Lamm and the Class B Representative, outside legal counsel and ALH

management.  Defendants have not proved negligence, let alone showed that Plaintiffs acted with a "devil-may-care" attitude or that they made decisions "outside the bounds of reason." Accordingly, they have failed to prove gross negligence.

### 3.     Plaintiffs Did Not Act In Bad Faith.

The Third Circuit has held that:

> A plaintiff may overcome the presumption that directors and officers acted in *good* faith by establishing that a decision was so egregious as to constitute corporate waste.  The burden here is to show irrationality:  a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith. Put positively, the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.

*Stanziale*, 416 F.3d at 238.  A claim for bad faith fails when there is "an ostensibly legitimate business purpose for an allegedly egregious decision." *Id.* at 239.  In *IT Litig. Trust v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869 (D. Del. Nov. 15, 2005), for example, plaintiffs alleged that the company's controlling investor caused the company to pursue an unwise acquisition strategy and take other actions that "caused or deepened" the company's insolvency and "sealed [its] financial doom." *Id.* at *11.  In rejecting those claims, the Court explained that the fact the "strategy was implemented to achieve benefits for the Company" precluded the claims, even if "the strategy was unwise in retrospect." *Id.* at *43-45.  Plaintiffs had legitimate business reasons for their decisions.  Thus, even if the Bs did not agree with those decisions, they were not made in bad faith.

### a.     The Sale of ABI.

As Buchler explained, based on JMP's qualifications and "exhaustive search for buyers", three bids, and the fact that JMP's analyses showed that the "multiples being paid were in line with [] multiples for other similar transactions" he concluded ALH received "a very fair price" for ABI.  Tr. (Buchler) at A136.  Krieger similarly concluded that ALH did not have the

financial resources or borrowing capacity to pay the Bowden Settlement without the sale of ABI, and that the transaction multiple was "reasonable... if anything... probably generous."  Tr. (Krieger) at C111-12.  Stein reasoned that the sale of ABI was necessary to end the Bowden Litigation and made sense because the Jacksonville market was becoming more competitive and ABI did not have the financing to take down lots.  Tr. (Stein) at D56 & D38-40.  In addition, Stein concluded that the sale of ABI was at a fair price based on the advice of ALH's financial advisor, the extensive efforts to shop the Company and the five times EBITDA multiple that ALH received for ABI.  Tr. (Stein) at D51-52.

Indeed, with the benefit of a full trial record it is now clear that the contrarian theories and allegations of Defendants' pleading lack business merit because they failed to identify any viable alternative to the sale of ABI to pay the Bowden Settlement – which was unanimously approved before the decision to sell ABI and was a *fact*, not a possibility, at the time that the Supervisory Board made its decision to sell ABI.  Nor was the option of not taking down lots at ABI, or taking down only some of those lots, an appropriate course of action.  Apart from specific performance concerns, the forfeiture of substantial deposits, and the loss of the right to purchase additional lots under the contract, Tr. (Stein) at C261-263, D82, it was undisputed that ABI's strength was in its lot positions.  *See, e.g.*, Tr. (Lamm) at D191 & 204.[29] To not take down these lots would be to forfeit the future of ABI and reduce the price of ABI to a future purchaser.  Tr. (Dunbar) at K80-81; Tr. (Lanius) at C312 (it was essential that we take

---

[29]    Lamm viewed the Bartram Springs and Oakleaf Plantations lots as so critical that ALH should have borrowed money at a "high rate of return" from Evander Holyfield (the boxer) to complete the purchase.  Tr. (Lamm) at E56.  If the 26% that he offered his friends and business partners in connection with his "alternative financing"schemes was merely a "good" rate of return in Mr. Lamm's view (Tr. (Lamm) at D169-71), one wonders how much this "high" rate of return to Mr. Holyfield would have been.

down these lots"); Tr. (Buchler) at B114 (noting that if you didn't acquire additional lot positions, you would be out of business); Tr. (Krieger) at C177-78.

The best that the Bs could come up with -- the "solution" offered by Arenson -- was that the members could have contributed additional equity. Tr. (Arenson) at F178-79; Tr. (Buchler) at B118. If money grew on trees this would be an easy solution. But money does not grow on trees and, as explained above, there is no dispute that the Operating Agreement expressly provides that no member had a duty to contribute additional capital to ALH (*see, e.g.,* Tr. (Arenson) at F178-79 (testifying candidly that "[i]t's true there's no obligation for a shareholder to put in more money" and that Shamrock "didn't have the legal responsibility to put in more money"), and that the Bs were steadfast in their position that they would not invest unless Shamrock did too. Tr. (Arenson) at F70-71.

Lacking any viable alternative to the sale of ABI, the Bs' claims ring of bad faith litigation – not bad faith decision-making by Plaintiffs. Indeed, in an email entirely inconsistent with the claims asserted in this litigation, Arenson told Buchler that he appreciated his efforts in connection with the sale of ABI and held him and Krieger in the "highest regard." Tr. (Arenson) at F166; Tr. (Buchler) at A139-40; PX 238; PX 237. These glimpses of candor belie Defendants' allegations of bad faith.

b.    The Sale of BBC.

The sale of BBC, in Buchler's opinion, was in the best interest of ALH because he was "very concerned" about the effect of Sweeney's departure on BBC and its operations and because BBC did not have sufficient capital resources to maintain even its current levels of production. Tr. (Buchler) at A152-53. In addition, Buchler observed that ALH had committed to Swiss Re that it would sell BBC to pay off a portion of ALH's debt to Wachovia. Tr.

(Buchler) at A153.  Based on JMP's analysis and its long search for potential buyers, Buchler concluded that it was a fair transaction.  Tr. (Buchler) at A154.

Krieger similarly concluded that ALH needed to sell BBC as quickly as possible to give ALH the resources to make a partial payment to Swiss Re in order to entice them to extend the maturity on their bond and give MHI, ALH's largest operating company, the opportunity to improve its financial position.  Tr. (Krieger) at C116-17.  Krieger viewed the price that ALH obtained for BBC as "a good price", especially in an unattractive market.  Tr. (Krieger) at C117-18.  Stein also concluded that in light of BBC's liquidity problems and issues with Sweeney, BBC was worth more to a buyer than it was to ALH and was satisfied that ALH received a fair price based on the extensive shopping and the five times EBITDA multiple that ALH received.  Tr. (Stein) at D61-62 & D64-66.

c.    The Sale of MHI.

Buchler concluded that because MHI was in "dire straits", and "literally had a few days or, at most, a few weeks left where it could operate with its present capital constraints," "obtaining a six and a half million dollar purchase price… was very fair to the company."  Tr. (Buchler) at B16.

Krieger similarly concluded that the sale of MHI was at a fair price and in the best interest of ALH and all of its constituents – including creditors.  Tr. (Krieger) at C121.  Stein reasoned that

> to be able to get six-and-a-half million dollars over construction lines was a great price.  I had thought that the company was worth less than what its debt was…. We were able to put a million dollars out of the – and put it into ALH, which I thought was great, that Swiss Re was allowing us to do that…. we were still facing a tremendous liquidity crisis, and without a massive infusion of capital into Mulvaney, it was just a matter of time that Mulvaney would – operations would suffer further.

Tr. (Stein) at D70.

       The Court of Chancery recently disposed of claims very similar to those asserted by Defendants in this action. In *Fisk Ventures*, the Class A and B members of a Delaware LLC had different views as to the Company's capital needs and how to finance those needs. The Court noted that:

> It may very well be that [the LLC] would be a thriving company today if only the Class B members had seen things Segal's way. However, it may very well be that [the LLC] would also be a thriving company today if only Dr. Segal had gone along with what the Class B members wanted. Indeed, the LLC Agreement endows both the Class A and Class B members with certain rights and protections. In no way does it obligate one class to acquiesce to the wishes of the other simply because the other believes its approach is superior or in the best interests of the Company. To find otherwise – that is, to find that the Court must decide whose business judgment was more in keeping with the LLC's best interests—would cripple the policy underlying the LLC Act promoting freedom of contract.

*Fisk Ventures*, 2008 WL 1961156, at *9. As in *Fisk Ventures*, "at most the facts demonstrate that [Plaintiffs] vigorously championed their own proposals and did not support [the Bs'] plans." *Id.* at *10. This difference in business judgment does not give rise to any liability to the Bs.

          C.    Defendants Would Not Have An Actionable Claim Even If
               <u>A Traditional Duty of Loyalty Analysis Were Applicable.</u>

       The Operating Agreement permits the Manager and Supervisory Board Representatives to act in their own self interests provided that they do so in good faith. Even if the traditional duty of loyalty were applicable, however, Defendants would have no such claim under both settled Delaware law and the facts of this case.

       First, "[a] breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director 'derived any personal financial benefit from it in the sense of **self-dealing**, as opposed to a benefit which

devolves on the corporation or all stockholders generally." *Nebenzahl v. Miller*, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) (emphasis in original). Here, neither Shamrock nor Krieger, Buchler or Stein stood on both sides of any of the sales of ALH's operations. All of the sales were to third parties unaffiliated with Plaintiffs.

Second, the business judgment rule bars a claim for relief when all stockholders are treated equally in connection with a corporate action, even if the stockholders are situated differently. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971). Even when "great sums of money" are transferred to the corporate decision-makers, there is no self-dealing when, "a proportionate share of this money was received by the minority shareholders" and the decision-makers "received nothing from [the subsidiary] to the exclusion of its minority stockholders." *Id.* at 721-22. Thus, there is no breach of the duty of loyalty when Defendants received the same benefits from the sale of ABI (including the repayment of the emergency member loans), BBC and MHI, as Plaintiffs received.

Third, stockholders, even controlling stockholders, have a right to enforce contractual duties owed to them, such as debt obligations. *See, e.g., Cox v. Crawford-Emery*, 2007 WL 4327775, at *4 n.26 (Del. Ch. Nov. 30, 2007) (holding that "a creditor does not lose his rights as a creditor solely because he is also a shareholder, even a controlling shareholder, or a director."); *Odyssey*, 1996 WL 422377, at *3 (holding that the majority shareholder and largest creditor of the corporation permissibly foreclosed on the loans owed to it by that corporation and stating that fiduciary duties do not require "self-sacrifice" such that "one who may be both a creditor and a fiduciary (e.g., a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights."); *Solomon v. Pathe Communications Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995)

("Even if the consequences of that foreclosure were, for example, to render the value of the minority Pathe stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity."). Indeed, even when the controlling shareholder receives all of the proceeds of the sale of the company's assets to third parties on the basis of pre-existing debt, the business judgment rule is applicable. *In re Encore Computer Corp. S'holders Litig.*, 2000 Del. Ch. LEXIS 93 (Del. Ch. June 16, 2000) (dismissing claim that the sale of the company's assets served the interest of the controlling stockholder to the exclusion of others by discharging debt to controlling stockholder). Accordingly, even if Shamrock were the *only* party to benefit from the repayment of the member loans – which it was not – repayment of those loans from the proceeds of ABI (and the well-overdue management fees owed to SCA) would not give Defendants a viable cause of action.

Fourth, the evidence at trial demonstrated that ALH was in the zone of insolvency at the time of the sale of ALH's operations, a fact ignored by Defendants. When a corporation is insolvent or in the zone of insolvency, directors have a duty to maximize the recovery for the all corporate constituencies, *including creditors*. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 WL 277613 (Del. Ch. Dec. 30, 1991); *U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.*, 864 A.2d 930 (Del. Ch. 2004). "[N]othing in our law requires a party to shirk its legal responsibilities where possible to avoid paying what it owes." *Dean v. Dick*, 1999 Del. Ch. LEXIS 121, at *15 (Del. Ch. June 10, 1999). Plaintiffs were not obligated to shirk ALH's legal responsibilities to

creditors (including member-creditors and Wachovia/Swiss Re) for the benefit of some of its equity holders, the Bs.

Finally, as the evidence at trial established, Shamrock's interests were consistent with those of the Bs with respect to the sale of ALH's operations. As the largest equity holder in ALH, Shamrock had the most to gain or lose in the sale of ALH's operations. Shamrock's $9.2 million investment in ALH gave it a powerful incentive to maximize the value of its investment, as well as that of all of the other A and B investors, who were treated *pari passu*. *See, e.g.*, Tr. (Buchler) at B19-20. It is well established that "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders." *See, e.g., In re Transkaryotic Therapies, Inc.* 2008 WL 2699442, at *13 (Del. Ch. June 24, 2008). *See also Orman v. Cullman,* 794 A.2d 5, 26 n.56 (Del. Ch. 2002) (same); *McGowan v. Ferro,* 859 A.2d 1012, 1035 (Del. Ch. 2004) ("[the plaintiff's] argument would require the Court to accept his theory that the director defendants were willing to leave a substantial sum of money on the table in favor of a new and untested business endeavor simply to rid themselves of [plaintiff]. Absent a strong factual showing favoring such an inference, the Court cannot reasonably infer that directors with very substantial stock holdings would fail to seek the highest value reasonably available in the sale of a company's flagship assets."). Buchler, Krieger and Stein spent significant time (and resources) seeking to maximize value for Shamrock and all of ALH's investors. *See, e.g.*, Tr. (Buchler) at

B19-20. Unfortunately for all of ALH's investors, especially Shamrock, this required making

the best of the bad situation that Plaintiffs inherited from Lamm.[30]

## II.      DEFENDANTS HAVE NOT PROVED DAMAGES.

Wholly apart from the absence of liability, Defendants have failed to satisfy their

burden of proving any damages with reasonable certainty. *In re Olsen Indus., Inc.*, 2000 WL

376398, at *12 (D. Del. Mar. 28, 2000); *Scully v. US WATS, Inc.*, 238 F.3d 497, 515 (3d Cir.

2001).

Throughout the life of ALH, all of the business people valued ALH using

multiples of 4 to 6 times of EBITDA (cashflow).[31] Using objective numbers from public data

sources (Tr. (Dunbar) at I127 & K41-42), and the multiples of EBITDA of 4.5 to 5 used by the

---

[30]     Defendants' acquiescence also bars their claims. It is undisputed that Arenson, the Class B Representative on ALH's Supervisory Board, voted to approve the extension of JMP's engagement to sell the separate components of ALH, the settlement of the Bowden Litigation, and accepted the repayment of loans from the proceeds of the sale of ABI. The others who loaned money to ALH also were repaid from the proceeds of ABI without dispute. Lamm voted in favor of the sale of MHI and, therefore, neither he nor SELK can challenge that transaction. By acquiescing to these actions, Defendants waived the challenges that they now assert. *See, e.g., Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991); *Bay Newfoundland Co. v. Wilson & Co.*, 37 A.2d 59, 63 (Del. 1944); *McGowan*, 859 A.2d at 1032; *Trounstine v. Remington Brand, Inc.*, 194 A.95, 99 (Del. Ch. 1937); *Siegman v. Columbia Pictures Entertainment, Inc.*, 1993 Del. Ch. LEXIS 1 (Del. Ch. January 12, 1993); *Council of South Bethany v. Sandpiper Dev. Corp.*, 1986 Del. Ch. LEXIS 508 (Del. Ch. December 8, 1986); *Waggoner v. Laster*, 581 A.2d 1127, 1136-1137 (Del. 1990).

[31]     *See, e.g.,* Tr. (Arenson) at F173 (responding to judge's question "[homebuilding companies] are sold on the basis of multiples of earnings"); Tr. (Neuberger) at H43-44 (homebuilding companies are sold on the basis of cashflow – "all that we were attempting to do was sell a money machine, a going concern money machine") & H45-46 (reluctantly, when pressed, Stern agreed to a five times EBITDA multiple); Tr. (Lamm) at G91 (Lamm using a 4.5 times EBITDA multiple); Tr. (Avila) at G155 (JMP using a 4.5 to 5.5 times EBITDA multiple), G168 (JMP using average of 5.7 times EBITDA multiple), G185 (JMP focused on "the earnings power of the business"); Tr. (Lanius) at F212-15 & PX 172 (employing 5.0 to 6.0 times EBITDA multiples); PX 322 (Lanius presentation to Swiss re using 4.5 to 5.5 times EBITDA multiples and showing enterprise value less than debt); PX 37 (Hourihan using a 5.5 time EBITDA multiple); Tr. (Krieger) at 27.

parties and JMP through out the life of ALH,[32] Dr. Dunbar concluded that the value of ALH's

equity as of April 2003 was less than its debt by $22.9 million. Tr. (Dunbar) at I14-15 & I32-34;

PX 307 ¶ 37. Dr. Dunbar's valuation is consistent with the contemporaneous market evidence

obtained during the sale process in which potential purchasers were valuing ALH at less than its

debt, and management's valuations showing negative equity values. Tr. (Dunbar) at I14-15.

       The evidence at trial also demonstrated that ALH did not have enough cash and

cash flow to meet its debts as they were coming due at the time of the Supervisory Board's

decision to sell ABI and that ALH's debt covenants and the Swiss Re debt overhang made it

difficult for ALH to obtain outside financing (Tr. (Dunbar) at I15 & I34-38; Tr. (Arenson) at

F140; Tr. (Lanius) at F100) – the only option where there was no obligation (or willingness) on

behalf of the Members to contribute additional capital. ALH was in default on its contractual

obligations to SCA, and was unable to repay the emergency loans from its members. It also

lacked the ability to fulfill contractual obligations to take down lot positions. Moreover, before

authorizing the sale of ABI, the Supervisory Board had approved the Bowden Settlement and

had a contractual obligation to the Bowden plaintiffs that it could not, absent a sale, satisfy.

       In short, at the time the Supervisory Board made its business decision to sell ABI,

ALH had no other viable alternative in order to continue as a going concern. Lamm's view that

ALH *might* turn around in 4-5 years was pure speculation, which is belied in any event by his

own concessions that additional (unavailable) equity investments would be required to satisfy the

---

[32]    This provided valuation estimates that, if anything, were on the high side because Dr.
Dunbar also testified that private transactions were generally at lower EBITDA multiples
of 3.0 to 4.6. Tr. (Dunbar) at I75. *See also* Tr. (Dunbar) at K65 (average multiple of
public companies is three points higher than the average multiple of private targets). This
is consistent with Lamm's original arbitrage play in by which ALH could obtain a higher
EBTIDA multiple by buying small regional homebuilders at low EBTIDA multiples, and
consolidating them to sell as a larger public company. Tr. (Buchler) at A43-44 & B52-
53; Tr. (Lamm) at G7.

Bowden Settlement and other obligations. Finally, there was no positive equity value in ALH at the time of the ABI sale such that Defendants lost nothing and hence were not damaged as a result of that or the later sales of BBC and MHI. *Auerbach v. Earth Energy Systems, Inc.*, 1986 WL 8930, at *5 (Del. Ch. Aug. 19, 1986) (denying relief on claims that sale would leave the company with "negative net worth" when it would "have no adverse impact, because [the company] already has a negative net worth").

III.    PLAINTIFFS ARE ENTITLED TO INDEMNIFICATION.

On January 14, 2005 Shamrock, SCA, Krieger, Buchler and Stein asserted indemnification rights in connection with the claims threatened or asserted by the Class B members of ALH pursuant to, among other things, the SCA Consulting Agreement and applicable statutory law. PX 368. Defendants opposed any indemnification of Plaintiffs unless ordered by a court. PTO ¶ III, 140-41. Exhibit A to the Consulting Agreement obligates ALH to indemnify and hold harmless SCA, its affiliates, and the partners, officers, directors, employees and agents of the foregoing against all liabilities arising from or relating to the Consulting Agreement, except to the extent that it is finally judicially determined that such liabilities result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct and to assume SCA's defense of such action including payment of fees and disbursements of counsel insofar as such action shall relate to any alleged liability in respect of which indemnity may be sought against ALH. PTO ¶ III, 82 & 84. Here, because it was demonstrated at trial that Plaintiffs are not liable to Defendants, much less for "liabilities that result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct," under the SCA Consulting Agreement ALH must "indemnify and hold harmless SCA, its affiliates, and the partners, officers, directors, employees and agents of the foregoing against all liabilities arising from or relating to the

Consulting Agreement." In addition, because Buchler and Krieger were directors of ALH II, a Delaware corporation, they are also entitled to indemnification pursuant to 8 *Del. C.* § 145(c) (Indemnification is mandatory when "a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding..."). Accordingly, Plaintiffs are as a matter of law entitled to indemnification from ALH for their fees and costs incurred in this action.

IV.    LAMM    RELEASED    SELK'S    CLAIMS    AND    SELK'S
       INTERESTS HAVE BEEN ELIMINATED.

Lamm, who was represented by counsel, demanded a release in connection with the sale of MHI before he would execute customary documents necessary to complete the transaction. His counsel testified that he personally requested the release language be added to the SAMR. Tr. (Capobianco) at E125-26. The SAMR (PX 298) states:

> Shalom E. Lamm ("Lamm"), on behalf of himself and his ... affiliates ... (collectively the "Lamm Affiliates"), has released ALH Holdings, LLC, ALH II, Inc., and Mulvaney Homes, Inc. and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors and assigns (collectively the "ALH Affiliates"), from any and all claims, demands, debts, duties, bonds, damages, liabilities, actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises (collectively "Claims") of Lamm or the Lamm Affiliates that relate[] to or aris[e] out of [any] past transactions between or amongst them."

Lamm is the managing member of SELK and has a 30% residual equity interest in SELK. Consequently, SELK is a Lamm Affiliate and released any claims SELK may have against the Plaintiffs. Lamm and his counsel's uncommunicated, after-the-fact statements that they did not *subjectively* intend to include SELK in the release when they demanded it be modified are irrelevant. The SAMR is governed by California law which applies the *objective* theory of contracts. *Headlands Reserve, LLC v. Center For Natural Lands Management*, 523 F. Supp. 2d

1113, 1128 (C.D. Cal. 2007) ("California has adopted the objective theory of contracts. Under this theory, '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.' One party's subjective and undisclosed intent is simply irrelevant to contract interpretation.")(internal citations omitted); *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 135 Cal. Rptr. 2d 505, 514 (Cal. Ct. App. 2003) ("California recognizes the objective theory of contracts."). As Lamm's lawyer acknowledged, the SAMR includes a merger clause and "whatever language is in the document speaks for itself." Tr. (Capobianco) at E132-35.

       Even if Lamm is found not to have released SELK's claims, however, Lamm's failure to pay his obligations to ALH have eliminated SELK's interest in ALH. Lamm, as SELK's managing member, had authority to act on SELK's behalf, and Shamrock and ALH had no reason to doubt that SELK's managing member and 30% interest holder had such authority. Tr. (Krieger) at C192; Tr. (Lamm) at G21. Lamm signed the amendment to the Operating Agreement on behalf of SELK (PX 10) and a separate guarantee agreement by SELK (PX 11) pursuant to which SELK unconditionally guaranteed to ALH that Lamm would fulfill his Class E Capital Contribution in the amount of the $4.7 million Arbor Debt, by paying cash or satisfying the Arbor Debt.[33] Under the Operating Agreement, if Lamm failed to satisfy that obligation by November 1, 1999, SELK's interest in ALH would be reduced by the amount of his shortfall. PX 10 ¶ 3.2(a). On November 12, 1999 Arbor still showed the Arbor Debt as a $3,165,508.98

---

[33]    Lamm's purported failure to read the document is no excuse. *Gould v. American Hawaiian S. S. Co.,* 351 F. Supp. 853, 868 (D. Del. 1972) (rejecting failure to read defense as "almost too disingenuous to believe"); *Hulsey v. Elsinore Parachute Center,* 168 Cal. App. 3d 333, 339 (Cal. Ct. App. 1985) ("It is well established. . . that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it.").

57.

obligation of ALH.   Tr. (Zizzo) at E172; PX 350.[34]   This is in excess of SELK's $2,937,750 capital account.   PX 2; PX 10.   As a result, SELK's equity interest in ALH was eliminated pursuant to the terms of the Operating Agreement.   PX 10.

### V.    DEFENDANTS AND NEUBERGER PROSECUTED THEIR COUNTERCLAIMS IN BAD FAITH.

After Plaintiffs' motion to compel the production of scores of documents that were clearly not privileged was granted, the true impetus for this litigation became clear – Neuberger's efforts to help the son of a prominent Orthodox Jewish rabbi and family friend with his personal obligations to ALH under the Settlement Agreement.   The Bs' claims are driven not by rational legal analysis or, for that matter business judgment, but by Lamm's hatred for Shamrock and the Bs' personal considerations with respect to Lamm and his father.   *See* Tr. (Arenson) at F152.

In February 2002, Lamm, who was resentful of Shamrock's efforts to collect monies due to ALH pursuant to the July 2001 Settlement Agreement, approached Neuberger "as a friend, not a lawyer" seeking help in obtaining relief from his financial obligations to cash strapped ALH.   Tr. (Lamm) at G56-58; PX 82.   Neuberger, after receiving comments from Lamm, then approached Arenson in an effort to aid Lamm with his personal issues.   PX 456. Ultimately, Neuberger persuaded Arenson.

In July 2002, at the urging of Lamm and Neuberger, the Bs met at Heathrow Airport.   PX 148.   Neuberger led this meeting and Lamm made a presentation on ALH's operations.   Shortly after this meeting, Neuberger circulated a position paper to the Bs.   PX 243.

---

[34]   Indeed, ALH <u>never</u> received a release from its obligations to Arbor and Arbor's records showed the Arbor Debt as an obligation of ALH as recently as March 15, <u>2007</u>.   Tr. (Zizzo) at E172.

At the time of this August 2002 position paper, Neuberger had litigation in mind as a way to pressure Shamrock into negotiating a low-ball buy out by the Bs. Tr. (Neuberger) at H78-79; Tr. Neuberger testified that litigation was the only incentive for Shamrock to pay attention to him.[35] *Id*. This was *nine months before* the sale of the first operating unit that is challenged in the Bs' counterclaims. When Neuberger was not ghost-writing Arenson's communications, there were glimpses of candor like Arenson's congratulations to Plaintiffs on the sale of ABI and acknowledgment that he has the "highest" regards for Buchler and Krieger. PX 237 & PX 238.

Similarly, the Bs remained on the sidelines when Shamrock sold BBC and MHI – seeking to accept the benefits, but not the consequences, of those sales. Tr. (Neuberger) at H79-80. When it was over, however, Neuberger reared his head with threatening letters in an effort to extort a settlement. Plaintiffs, however, called his bluff by filing this declaratory judgment action. Rather than admit defeat, however, Defendants filed meritless counterclaims and continued to demand that Shamrock mitigate their losses. This is all consistent with Mr. Lamm's "Crazy Thought" email in which he proposes that:

> As an alternative to a fight with Shamrock in which the B investors try to get their funds back from SCA, what if the negotiations were made easier by telling SCA that an alternative solution is for all of the A investors to walk from the investment leaving the companies and operations to the B investors? The first order of business would be assembling a management team, assessing what potential exists and what investment would be required to realize it, and then to aggressively work on a severe cram down with respect to Swiss Re.
>
> This would be presented:

---

[35]     In May 2003, ALH was in desperate need of financing and sold ABI to pay valid debts and the settlement of the Bowden Litigation. Although the Bs now challenge this decision as "bad faith," they never sought an injunction against this sale. Tr. (Neuberger) at H79-80. Instead, Neuberger reminded Arenson of the Bs' collective position and Arenson attempted to give Plaintiffs "rope to swing." PX 427; PX 283.

> .... As part of a negotiation.   The first part being a meeting
> between Michael & Avie (and you?) in which, for various reasons,
> demands be made that SCA buy-out the B's at par.  Sword Rattling
> to commence.  As part of a follow up "compromise" – the offer for
> them to "walk" becomes the solution with all parties agreeing to
> stop pursuing each other.  Then on to Swiss Re for a showdown.
> This is a scripted play.

PX 417.  Lamm and Neuberger's scripted play to extort a settlement from Shamrock failed.  In

the process, however, Shamrock was forced to spend millions of dollars to defend claims brought

in bad faith by the B investors as part of their cynical and preconceived scheme to let Shamrock

go forward with the necessary and thankless task of winding down the failed business the

investors inherited as a result of Lamm's egregious mismanagement, accept the benefits of what

Shamrock was able to salvage, and then turn around and sue Shamrock as the deep pocket to

recoup the balance of their investment.   *See* Tr. (Arenson) at F165-66.   Defendants then

attempted to hide behind egregious false claims of privilege to hide their scheme, as well as

highly probative documents cited extensively herein that belied their bad-faith claims.

Defendants and Neuberger[36] should be responsible for reimbursing these monies to Plaintiffs

under the bad faith exception to the American Rule.  *See, e.g., Chambers v. NASCO, Inc.,* 501

U.S. 32, 57 (1991) (applying bad faith exception to the American rule where the defendant

deliberately misused the judicial process); *Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980)

(finding bad faith where a party knowingly asserted frivolous claims); *Fellheimer, Eichen &*

*Braverman, P.C. v. Charter Techs., Inc.,* 57 F.3d 1215, 1228 (3d Cir. 1995) (affirming award of

fees after finding that action was frivolous and filed in bad faith for the purpose of protecting the

---

[36]  *Fellheimer,* 57 F.3d at 1228 (requiring attorney to pay fee award for meritless claims
brought to protect his "real client"); *In re Elonex Phase II Power Management Litigation,*
279 F. Supp. 2d 521, 525 (D. Del. Aug. 28, 2003) (holding attorney and client jointly and
severally liable for meritless and vexatious motion).

60.

attorney's "real client" from legitimate actions of a creditors' committee – much like Neuberger and the Bs have tried to bend over backwards to protect Lamm); *Leonard v. University of Delaware*, 204 F. Supp. 2d 784, 789-90 (D. Del. 2002) (awarding attorneys fees where defendant attempted to disregard obligations under a settlement agreement – much like SELK has done here with respect to the SAMR).[37]

CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Plaintiffs and Defendants should be required to reimburse Plaintiffs for their fees and expenses incurred in this action.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel (#4415)
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Plaintiffs/Counterclaim Defendants*

August 11, 2008

2297055

---

[37] *See also Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225 (Del. Ch. 1997) (holding that bad faith opposition to declaratory judgment action and bad faith conduct during litigation warranted award of reasonable attorney and expert witness fees), *aff'd.*, 720 A.2d 542 (Del. 1998); *Kaung v. Cole Nat'l Corp.*, 2005 WL 1635200 (Del. July 5, 2005) (affirming application of the bad faith exception to the American Rule where the plaintiff had an improper motive for filing the action and ignored discovery obligations); *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 228 (Del. 2005) (finding bad-faith exception to the American rule applicable where respondent forced petitioner to engage in unnecessary litigation, interfered with the Court's performance of its fact finding duties, and unnecessarily prolonged and increased the costs of the litigation).

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 11, 2008, he caused the

foregoing Plaintiffs' Post-Trial Brief to be electronically filed with the Clerk of the Court using

CM/ECF, which will send notification of such filing(s) to the following:

> Sean J. Bellew, Esquire
> David A. Felice, Esquire

I also certify that copies were caused to be served on August 11, 2008, upon the

following in the manner indicated:

BY HAND

> Sean J. Bellew, Esquire
> David A. Felice, Esquire
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE  19801

_____

Samuel T. Hirzel (#4415)
*shirzel@mnat.com*