# TAB 1

Westlaw.

Not Reported in A.2d                                                        Page 1
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

▷Albert v. Alex. Brown Management Services, Inc.
Del.Ch.,2005.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin
Calderwood, Katherine D. Crothall, Scott W. Frazier,
FU Family Revocable Trust, Robert B. Goergen, Sr.,
Robert G. Goergen, Jr., Todd A. Goergen, Hasan
1995 Living Trust, Wai Yan Ho, Willis James
Hindman, Johnson Family Living Trust, Michael R.
Kidder Revocable Trust, Mark and Ann Kington,
Jeffrey A. Koser, Marlenko Inc., Elaine McKay
Family, LP, David Mixer, MRW Trust, James
Murray, Jim K. Omura 1996 Trust, Jennifer Owen
and Michael J. Ross, Nicholas Peay, Douglas G.
Smith, Frederick G. Smith, Jane Vei-Chun Sun, Mark
Wabschall, Karen L. Walsh, Warmenhoven 1995
Children's Trust, Yan 1996 Revocable Trust, Barbara
J. Zale, and Charles A. Ziering, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES,
INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns
Grayson; E. Robert Kent, Jr.; Truman T. Semans; DC
Investment Partners, LLC; Doctor Robert Cants, III;
and Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust,
Dr. Steven J. Berlin, Estate of Robert B. Blow,
Luther C. Boliek, Stephen E. Coit, Sara Crowder,
Gerald K. and Teresa K. Fehr, FU Family Revocable
Trust, Ralph Glasgal, Robert G. Goergen, Jr.1985
Trust, Todd A. Goergen 1985 Trust, Peter O.
Hausmann, Willis James Hindman, William F.
Kaiser, Mark and Ann Kington, Timothy K.
Krauskopf, William T. McConnell, Philip R. McKee,
David Mixer, MRW Trust, James Murray, Paul D.
and Judith F. Newman, W.L. Norton, Gregory
Packer, Howard E. Rose, Ruben Family Limited
Partnership, 5 S Trust, Saladrigas Family Ltd.
Partnership, Ricardo A. Salas, Jose M. Sanchez,
Samuel Siegel, Silverman 1996 Irrevocable Trust,
Douglas G. Smith, Frederick G. Smith, Ronald B.
Stakland, Strauch Kulhanjain Family Trust, Bruce E.
Toll, Alexander R. and Marjorie L. Vaccaro, Yanover
Family Ltd. Partnership, Michael Yokell, and Justin

A. Zivin, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES;
Deutsche Bank Securities, Inc.; Deutsche Bank, AG;
Richard Hale; E. Robert Kent, Jr.; Truman T.
Semans; DC Investment Partners, LLC; Doctor
Robert Crants, III, and Michael W. Devlin,
Defendants.
**No. Civ.A. 762-N, Civ.A. 763-N.**

Submitted July 22, 2005.
Decided Aug. 26, 2005.

Jeffrey S. Goddess, Jessica Zeldin, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; Steven E. Fineman, Hector D. Geribon,
Daniel P. Chiplock, Lieff, Cabraser, Heimann &
Bernstein, LLP, New York, New York, for the
Plaintiffs.
Michael D. Goldman, Peter J. Walsh, Jr., Melony R.
Anderson, Potter Anderson & Corroon LLP,
Wilmington, Delaware; Christopher P. Hall, Kevin
Rover, John Vassos, Marilyn B. Ampolsk, Morgan
Lewis & Bockius, LLP, New York, New York, for
the Defendants Alex. Brown Management Services,
Inc., Deutsche Bank Securities, Inc. and Deutsche
Bank A.G.
Daniel Griffith, Marshall Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Defendants DC Investment Partners, LLC, Dr. Robert
Crants, III, and Michael W. Devlin.
Richard D. Allen, Thomas W. Briggs, Jr., Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, for
Defendants Richard Hale, Gary Fearnow, Bruns
Grayson, E. Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In a recent opinion in these two related cases on
the defendants' motion to dismiss under Court of
Chancery Rule 12(b)(6), the court addressed the
defendants' statute of limitations argument and
concluded that any claims arising before November

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred.[FN1] Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.,* 2005 Del. Ch. LEXIS 100, at *43-58, 2005 WL 1594085 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred.[FN2] The Plaintiffs' Response Brief [FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the

Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> FN2. The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *78-*79, 2005 WL 1594085 (Del.Ch.).

> FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings.[FN4]Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

FN4.*O'Malley v. Boris,* 742 A.2d 845, 850 (Del.1999)

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[FN5]

FN5.*Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1983) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and

could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

**\*3** The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information. There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

> FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

### III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

### A. *Breach Of Fiduciary Duty (Count 1)*

### 1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

*4 There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports.[FN7] The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty.[FN8] Thus, this factual allegation does not state a claim for breach of fiduciary duty.

> FN7. Partnership Agreements § 11.2.

> FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

### 2. *Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds."[FN9]

> FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."[FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives.[FN11]

> FN10.*Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989).

> FN11.*Citron*, 569 A.2d at 66

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness."[FN12] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[FN13] In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."[FN14]

> FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.*, 1990 Del. Ch. LEXIS 47, at *35, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' ") (citations omitted).

> FN13.*In re Walt Disney Co. Derivative*

*Litig.*, 2005 Del. Ch. LEXIS 113, at *162, 2005 WL 2056651, 907 A.2d 693, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

> FN14.*Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 Del. Ch. LEXIS 116, at *42, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd*, 692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.*, 1988 Del. Ch. LEXIS 7, at *24-*25, 1988 WL 3587 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion,"[FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives.' " Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

> FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

*5 Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

3. *Active And Competent Management And Disclosure Allegations*

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds.[FN16] The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

> FN16. *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds.[FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

> FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a

security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *9, 2005 WL 1594085 (Del.Ch.).

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

*6 The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.[FN18]

> FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del.2003).*

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years.[FN19] As alleged in the complaints, the unitholders' right to

withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion."[FN20]

> FN19. *See* Partnership Agreements ¶¶ 6.3.

> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

*7 This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed.[FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

Page 8

that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

### C. *Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[FN23] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[FN24]

> FN22. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

> FN23. *Id.*

> FN24. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25, 1999 WL 608850 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

**\*8** For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted in Count 1 or Count 5.

### D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." [FN25] As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

> FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund I 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. *Unjust Enrichment (Count 8)*

Not Reported in A.2d                                                                                                          Page 9
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls .[FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

> FN26.*Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del.Ch. Mar.16, 1995) (applying Delaware law).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

### F. Agency Liability (Count 11)

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive."[FN27]

> FN27.*Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second

corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.[FN28]

> FN28.*Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form [FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts.[FN30]

> FN29. AB Management is a corporation, organized under the laws of Maryland.

> FN30. Fund I Compl. ¶¶ 44, 45, 247, 250, 332, 334; Fund II Compl. ¶¶ 54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears."[FN31] Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

that the corporate form should be ignored. The corporate veil may be pierced when a subsidiary is in fact a mere instrumentality or alter ego of its parent.[FN32] The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

> FN31.*Mason v. Network of Wilmington, Inc.,* 2005 Del. Ch. LEXIS 99, at *9, 2005 WL 1653954 (Del. Ch. July 1, 2005) (internal quotations omitted).

> FN32.*Mabon, Nugent & Co. v. Texas Amer. Energy Corp.,* 1990 Del. Ch. LEXIS 46, at *14-*15, 1990 WL 44267 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil,* 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee.[FN33]

> FN33. Fund I Compl. ¶¶ 153, 163, 239-240; Fund II Compl. ¶¶ 179, 253-259.

**\*10** First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control.[FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The

complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

> FN34.*Aronson,* 473 A.2d at 815;*see also In re W. Nat'l S'holders Litig.,* 2000 Del. Ch. LEXIS 82, 2000 WL 710192 (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent.[FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

> FN35.*Billops v. Magness Constr. Co.,* 391 A.2d 196, 197 (Del.1978).

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing.[FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.[FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

> FN36.*Henderson v. Chantry,* 2002 Del. Ch. LEXIS 14, at *14, 2002 WL 244692 (Del. Ch. Feb. 5, 2002).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 11
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

FN37.*Billops,* 391 A.2d at 198.

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. *Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)*

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.[FN38]While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.[FN39]However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.[FN40]

> FN38.*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n. 8 (Del.2005); *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987).

> FN39.*See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 Del. Ch. LEXIS 19, at *26, 2005 WL 583828 (Del. Ch. Feb. 28, 2005).

> FN40.*Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984), *aff'd,*575 A.2d 1131 (Del.1990).

*11 However captioned, civil conspiracy is vicarious liability.[FN41]It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty.[FN42]Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold

Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty.

> FN41.*See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1238 (Del.Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds,*817 A.2d 149 (Del.2002).

> FN42.*Gilbert,* 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity."[FN43]While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[FN44]

> FN43.*Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del.Ch.1989) (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

> FN44.*IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *12-*13, 1998 WL 914265 (Del. Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.[FN45] With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI.[FN46]This knowledge is thereby

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

imputed to DBSI.

> FN45.*J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc.,* 287 A.2d 686, 689 (Del.Super.1972), *aff'd,*303 A.2d 648 (Del.1972).

> FN46. Fund I Compl. ¶¶ 45, 47-51, 247-251; Fund II Compl. ¶¶ 55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

### H. *Accounting (Count 10)*

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.[FN47]As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

> FN47.*Jacobson v. Dryson Acceptance Corp.,* 2002 Del. Ch. LEXIS 4, at *12-*13, 2002 WL 31521109 (Del. Ch.2002).

### V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed

pursuant to Rule 23.1.[FN48]

> FN48. The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

**\*12** The demand requirement in the limited partnership context is codified in *6 Del. C.* § 17-1001. That statute states:

A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases.[FN49]Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

> FN49.*Litman v. Prudential-Bache Prop., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992).

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[FN50]"[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

merely at the form of words used in the complaint."[FN51]"Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[FN52]

FN50.845 A.2d 1031, 1033 (Del.2004).

FN51.*In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

FN52.*Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. *Breach Of Contract And The Non-Disclosure Allegations*

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims.[FN54]Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests.

FN53.*Tooley,* 845 A.2d at 1039.

FN54.*See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992

Del. Ch. LEXIS 6, at *10, 1992 WL 8794 (Del. Ch. Jan. 17, 1992) (same).

*13 Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy.[FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

FN55.*Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. *Gross Negligence And Failure To Provide Competent And Active Management*

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."[FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim.[FN57]The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

FN56.*Tooley,* 845 A.2d at 1039.

FN57.*See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a direct wrong to the corporation that is indirectly experienced by all shareholders.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 14
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy.[FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

FN58. *Tooley,* 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed.[FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead.[FN60]

FN59. *Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch.1983).

FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin.[FN61]

FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship.,* 1999 Del. Ch. LEXIS 161, at *12, 1999 WL 550350 (Del. Ch. July 16, 1999) (quoting *6 Del. C.* § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations.[FN62]

FN62. *See Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* 593 A.2d 535, 539 (Del.Ch.1991) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2nd Cir.1981)) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

**\*14** According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 15
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[FN63] In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?[FN64]

> FN63. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins,* 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis,* 486 A.2d 669 (Del.1984)).

> FN64. *LaNuova D & B, S.P.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986).

A. *The Long-Arm Statute*

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under 10 Del. C. § 3104, the Delaware long-arm statute. Section 3104(c) provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...." Section 3104 has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause.[FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.[FN66]

> FN65. *Id.*

> FN66. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *13, 1999 WL 550350 (Del.Ch.).

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities included in the Funds.

In *RJ Associates,* Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners.[FN67]

> FN67. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *18, 1999 WL 550350 (Del.Ch.).

*15 The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates.* First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 16
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

Funds.[FN68]Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies."[FN69]Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

> FN68.*See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

> FN69. Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

### B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice.[FN70]In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts.[FN71]The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum.[FN72]Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction.[FN73]

> FN70.*AeroGlobal,* 871 A.2d at 440 (citing

> *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

> FN71.*Id.*

> FN72.*Sternberg v. O'Neil,* 550 A.2d 1105, 1120 (Del.1988).

> FN73.*Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (U.S.1985) (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence.[FN74]

> FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 .5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement.[FN75]

> FN75.*RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *19-*20, 1999 WL 550350 (Del.Ch.).

*16 While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**2005 WL 2130607 (Del.Ch.)**

those in *RJ Associates.*DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence.[FN76]They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner.[FN77]Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77.600 A.2d 43, 52 (Del.Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware

law is especially concerned with.[FN78]

FN78.*Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.[FN79]

FN79.*See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del.Ch.2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

**\*17** For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

VII.

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Del.Ch.,2005.
Albert v. Alex. Brown Management Services, Inc.
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in A.2d                                                                      Page 1
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

HAuerbach v. Earth Energy Systems, Inc.
Del.Ch.,1986.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Mark AUERBACH and Robert Clarke, Trustees
v.
EARTH ENERGY SYSTEMS, INC., et al.
No. 8568.

Submitted: Aug. 14, 1986.
Decided: Aug. 19, 1986.

Plaintiffs, the trustees of a trust which is a minority
shareholder of Earth Energy Systems, Inc. (EESI),
commenced this action against EESI, its directors and
its controlling shareholder, Control Data Corporation,
seeking a temporary restraining order enjoining the
proposed sale of substantially all EESI's assets.
Plaintiffs contend: (1) the proposed sale violates
Del.Code Ann. tit. 8, § 271 because the shareholder
meeting at which it was approved was not called
upon twenty days notice; (2) the proposed sale will
violate EESI's obligation of good faith and fair
dealing since the plaintiffs' purchased the stock with
the reasonable expectation that the assets would not
be sold so soon after their acquisition.

The court of chancery, per Vice-Chancellor Jacobs,
denied the temporary restraining order, holding: (1)
although the shareholder meeting was not called upon
the required twenty days notice, the issue is moot
since the majority shareholder subsequently executed
a valid written consent, pursuant to Del. Code Ann.
tit. 8, § 228, authorizing the proposed sale; (2)
plaintiffs failed to produce evidence establishing that
EESI was obligated not to sell its assets within a
specified period. In the absence of a clear contractual
obligation, the propriety of such a decision is
measured under the business judgment rule and will
not be addressed in this stage of the proceeding.

**677 Michael Hanrahan, Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, Delaware.
Louis J. Finger, E. Norman Veasey, Richards, Layton

& Finger, Wilmington, Delaware.
JACK B. JACOBS, Vice-Chancellor.
*1 The plaintiffs, who are trustees of a trust that
holds 212,500 shares (approximately 13.7%) of
common stock of Earth Energy Systems, Inc., a
Delaware corporation ("EESI"), commenced this
action on August 11, 1986 against EESI, its directors,
and its 74.7% controlling stockholder, Control Data
Corporation ("Control Data"). The plaintiffs seek to
enjoin a proposed sale of assets of EESI's WINCO
Division ("the WINCO" sale), including assets held
by EESI's 100% owned subsidiary, Dyna
Technology, Inc. ("Dyna"), to Energx Corporation
("Energx"). Presently pending is the plaintiffs'
motion for a temporary restraining order prohibiting
the defendants**678 from consummating the
WINCO sale. Although that sale was scheduled to
close on Friday, August 15, 1986, at 1:00 p.m., the
defendants and Energx have agreed to postpone the
sale to Tuesday, August 19, 1986. This is the
decision of the Court on the plaintiffs' motion for a
temporary restraining order.

I.

A recital of certain background facts is useful to an
understanding of the contentions plaintiffs are
advancing. EESI is a Delaware corporation formed in
1980 under the name of "Jacobs Wind Electric
Company", as a joint venture between the Jacobs
family (no relation to the undersigned) and Control
Data to succeed to the 60-yearold Jacobs Wind
Turbine business. EESI's operations are divided into
two divisions. The WINCO Division consists of the
manufacturing of electric generators. The
"WINDPARKS" Division manages and operates
"Windparks", which generate electrical power
through the use of windmills. Most, if not all, of the
assets of the WINCO Division are held by EESI's
wholly-owned subsidiary, Dyna, which was acquired
from Keystone Camera Products Corporation
("Keystone") in 1985. Control Data owns 74.7% of
EESI's outstanding voting stock, various public
shareholders own 11.6%, and plaintiffs own
approximately 13.7%.

Critical to an understanding of this case is the history
of how Dyna came to be sold to EESI and how

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 2
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

plaintiffs came to be EESI shareholders. In 1985 Keystone, of which the plaintiff Mark Auerbach is president and chief executive officer, sold its Dyna stock to EESI. The consideration was $3.5 million, consisting of $1.75 million cash, $1.75 million in the form of 218,750 shares of EESI stock, and a Put Option Agreement dated February 6, 1985.[FN1] Under the Put Option Agreement, Keystone has the right to require EESI to repurchase for cash up to $500,000 worth of its shares from Keystone. The option is exercisable on February 6, 1987 as to $250,000 worth of EESI stock, and on February 6, 1988 as to the balance. Keystone has given notice to EESI of its intent to exercise the Put Option. The effect of that Option is to enable Keystone to realize up to **679 $500,000 in additional cash for a portion of its EESI shares, yet also to retain a substantial amount of EESI shares.

> FN1. Under the Keystone/EESI stock purchase agreement, Keystone has the right, so long as it owns at least 50,000 shares of EESI, to designate one director to sit on EESI's Board of Directors. Plaintiff Auerbach was designated as Keystone's representative on EESI's four-member Board (the remaining 3 members being Control Data designees) and now serves in that capacity.

Thereafter, pursuant to the Closing Agreement entered into by the parties in connection with the 1985 Dyna sale, Keystone assigned the proceeds of the sale (including the EESI stock and the Put Option) to the plaintiffs as trustees under a trust agreement dated December 31, 1983. Thus, the plaintiffs stand in the shoes of Keystone in its capacity as holder of both the EESI stock and the Put Option received in the 1985 sale of Dyna to EESI.

*2 The foregoing facts are significant because the plaintiffs claim that in determining to enter into the Dyna sale, Keystone relied upon two EESI documents: a September 7, 1984 EESI Private Placement Memorandum and an August 30, 1984 Five Year Business Plan. The Private Placement Memorandum is claimed to have outlined a strategy for EESI to become a leader in providing energy sources as alternatives to traditional fossil fuels. That strategy included the marketing and syndication of windfarms that would use EESI's turbines, electrical

generators, and related equipment manufactured by Dyna. The windfarms would involve configuring wind turbines so that they could serve the electrical needs of businesses and enable bulk power to be sold to electrical utilities. The Private Placement Memorandum and Five Year Business Plan projected that EESI would derive increasing multimillion dollar revenues from windfarm sales and operations.

Despite the rosy predictions contained in those documents, subsequent events conspired to jeopardize the venture almost from the beginning. Both EESI and Control Data experienced significant financial difficulties, and the economic conditions which made the windpark concept attractive in 1985 suffered reverses due to significant adverse changes in the economy. In 1984 and in early 1985 all the electrical power that EESI's Windparks Division could produce was being sold to utilities at favorable prices. Because of investment and energy tax credits, windparks were an attractive tax shelter investment. During 1985, however, oil prices plummeted and it became less expensive for utilities to produce electricity with oil and gas. As a result, the revenues paid by utilities to the windparks dropped. The high value of the United States dollar made it difficult for the WINCO Division to compete with foreign competition, and the available investment and energy tax credits were being legislatively reviewed and revised. These developments made windpark investments less favorable. Moreover, a major supplier of turbines for a project managed by EESI filed for Chapter XI Bankruptcy.

**680 Because of those events, EESI and its divisions experienced substantial operating losses as of December 31, 1985 and a net operating loss of over $5 million (of which $932,000 was allocable to the WINCO Division) for the six-month period ending June 30, 1986. At present, EESI is losing over $1 million per month and its projected net loss for the year could be as high as $13 million. EESI's management believes that the WINCO Division will lose $2.6 million for the year ending December 31, 1986 if it remains an asset of EESI.

Recognizing that EESI had to take steps to reduce the substantial losses that were mounting each month, the Board of Directors, at a meeting held on December 5, 1985, authorized EESI (over Auerbach's dissent) to seek a buyer for the WINCO Division (*i.e.*, the assets

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 3
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

held by Dyna). Over the next several months EESI engaged in extensive efforts to find a buyer for its WINCO Division, including approaching 21 companies in an effort to elicit offers.[FN2] Only two offers were received. One of the two offerors withdrew because of its inability to obtain adequate financing, which left only one offeror, Zaidan International ("Zaidan") in the field. On May 22, 1986, EESI and Zaidan executed a letter of intent which contemplated a sale to Zaidan of "substantially all of the assets of EESI's WINCO Division", subject to a definitive asset purchase agreement. The purchase price was to be the net book value of WINCO's assets, less certain liabilities being assumed by the purchaser (including indebtedness to Control Data) less a 25 percent discount on the net value (*i.e.*, assets less assumed liabilities). Thereafter, EESI and Zaidan negotiated a 47-page Asset Purchase Agreement, which was executed on July 31, 1986. Under that Agreement the purchaser is Energx, a Minnesota corporation apparently created by and affiliated with Zaidan for the purpose of acquiring the WINCO assets. Although it has received approval by EESI's directors and shareholders, the Asset Purchase Agreement is still being revised as to details. For example, the parties to the Agreement (EESI and Energx) have agreed that the subordinated promissory note which forms part of the consideration for the sale will be paid directly to EESI, rather than to Control Data as previously agreed.[FN3]

> FN2. The record indicates that Auerbach was involved in this process and suggested additional potential purchasers to management.

> FN3. Apparently the promissory note was to run in favor of Control Data, in connection with the Energx assumption of EESI's indebtedness to Control Data.

**\*3** On its merits the WINCO sale has been controversial from the **\*\*681** outset. At the special stockholders' meeting held on August 12, 1986, the sale was approved essentially by the 74.7% vote of EESI's majority stockholder, Control Data. Only two minority shareholders (representing 600 shares) joined Control Data in approving the WINCO sale. The remainder of the minority stockholders - including EESI's former Chairman and President -

voted against it.

The record indicates that Auerbach was kept advised of EESI's efforts to sell the WINCO assets, was informed of the May 22, 1986 letter of intent agreement with Zaidan in early June 1986, and was furnished a copy of the July 31, 1986 Asset Purchase Agreement on August 5, 1986. Auerbach and his co-plaintiff, Robert Clarke, brought this action to enjoin the sale on August 11, 1986.

II.

 To become entitled to a temporary restraining order, the moving party must establish (with due allowance for the limited opportunity to develop a record at that stage) a reasonable probability of success on the merits, a likelihood of irreparable injury if injunctive relief is not granted, and a balance of hardships that favors the moving party. *Hecco Ventures v. Sea-Land Corporation,* Del.Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 179 (1986).

The plaintiffs rest their application for temporary injunctive relief upon two distinct claims. The first is that the WINCO sale is a sale of "all or substantially all" of the assets of EESI which, under 8 *Del.C.* § 271, requires shareholder approval "at a meeting duly called upon 20 days' notice." Plaintiffs claim that § 271 was violated, because the August 12, 1986 meeting at which the WINCO sale was approved was held on 12 days' notice rather than on the 20 days' notice prescribed by the statute.

Plaintiffs' second contention is that the proposed sale of the WINCO Division will violate EESI's obligation of good faith and fair dealing under the Stock Purchase Agreement, Put Option Agreement and Closing Agreement entered into by Keystone in connection with its sale of Dyna to EESI in 1985. Plaintiffs argue that by virtue of the Private Placement Memorandum and the Five Year Plan, Keystone and plaintiffs had the reasonable expectation that the electric generator manufacturing operation would remain a part of EESI, and that the business would not be sold 18 months later, leaving plaintiffs as stockholders in a company with no viable ongoing business and whose only operations were abandoned windfarm projects and windfarms

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

that are creating large losses. Specifically, it is argued that (i) the WINCO sale violates the parties' **682 fundamental expectations of the purpose of the Dyna sale and the spirit of their bargain, (ii) the WINCO sale will render their contractual rights under the Put Option worthless by disposing of EESI's only income producing assets at the insistence and for the benefit of Control Data, and (iii) unless the WINCO sale is enjoined, the plaintiffs will suffer irreparable harm because, *inter alia,* it will leave EESI with a substantial negative net worth, with no viable business, and unable to respond to any money judgment entered in the plaintiffs' favor.

*4 For the reasons now discussed, I conclude that the plaintiffs have not established their entitlement to the temporary injunctive relief that they seek.[FN4]

> FN4. Because of the disposition of plaintiffs' § 271 and implied contract claims, it is unnecessary to deal with their additional claims of tortious interference and conspiracy, the latter being necessarily dependent for their validity upon the former.

At the time this action was filed, the plaintiffs' claim that the WINCO sale would violate 8 *Del.C.* § 271 afforded ample cause for concern. Although the defendants contended otherwise, the evidence strongly suggests that the WINCO Division represents "all or substantially all" of EESI's assets. And the stockholders' meeting to approve the sale was clearly called on less than the 20 days' notice mandated by § 271. However, shortly before oral argument, the defendants advised the Court that on August 13, 1986, Control Data, as EESI's majority stockholder, had executed a written consent under 8 *Del.C.* § 228 authorizing the transaction. The defendants contended that as a result of that written consent, the plaintiffs' contentions based upon 8 *Del.C.* § 271 had become moot.

At oral argument plaintiffs' counsel conceded that the written consent would moot their claim under 8 *Del.C.* § 271, provided that the consent were valid. Plaintiffs contend, however, that the consent is not valid because (a) it represents an inequitable and belated manipulation of the corporate machinery, (b) the consent is insufficient under § 271, because, the WINCO assets are held by Dyna, and, therefore, a separate vote by EESI as Dyna's sole stockholder and

a separate resolution by Dyna's Board of Directors approving the sale of Dyna's assets, were required, and (c) even though the directors of EESI passed a resolution approving the WINCO sale, in fact they did not and could not have approved it, because a majority of the Board never saw the definitive Asset Purchase Agreement, the exhibits showing the assets to be sold and the liabilities **683 to be assumed were not in existence, and the Agreement is still in the process of being negotiated.

Having reviewed the rather limited record in this expedited matter, I conclude, albeit with reluctance, that while the manner in which this sale is being conducted leaves something to be desired from a procedural standpoint, nonetheless the evidence relating to plaintiffs' § 271 claim is insufficient to justify the intervention of this Court at this time.

To begin with, there is no evidence that the § 228 consent represents inequitable conduct on the defendants' part. The defendants could (if they so chose) have followed the 8 *Del.C.* § 228 written consent procedure from the outset. The written consent merely confirmed the results of the stockholders' meeting which had taken place the day before, and was employed to obviate any risk that the stockholders' meeting might be invalidated on grounds of insufficient notice.

The plaintiffs's second challenge----based upon the absence of separate resolutions by EESI and by Dyna's Board of Directors approving the sale of Dyna's assets -is more perplexing. On the one hand, § 271 on its face, does call for such approvals. On the other hand, as a practical matter, the approvals would amount in this case to a formality, since, as defendants point out, EESI is Dyna's 100% stockholder and could easily direct Dyna's Board of Directors to authorize the necessary resolutions. Defendants argue that since EESI's directors and stockholders have already approved the sale, those approvals should be deemed to include Dyna as well as EESI.[FN5] Moreover, since only EESI is a stockholder of Dyna, there is a question as to the plaintiffs' standing to challenge a sale of Dyna's assets under § 271. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984). However, it is unnecessary to decide these questions. After oral argument the defendants' counsel advised the Court that before the closing of the sale, a Board of

Not Reported in A.2d                                                                                                       Page 5
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

Directors' meeting of EESI would be convened at which a new Board of Directors of Dyna would be elected, and that Board would thereafter approve the asset sale on Dyna's behalf. Counsel thereafter confirmed that those corporate actions were taken on August 18, 1986. As a result, plaintiffs' second challenge to the written consent must be considered moot.

> FN5. Since Dyna was sold to EESI in 1985, Dyna has had no independent Board of Directors; instead, EESI's directors have acted as the *de facto* directors of Dyna.

**\*5**     The defendants' last challenge to the written consent -that EESI's directors did not and could not have approved the sale -is **\*\*684** not adequately supported by the record. Mr. Auerbach's affidavit indicates that at the time of the EESI directors meeting, a majority of the directors had not even seen the July 31, 1986 Asset Purchase Agreement. Further, the defendants have admitted that certain terms of the Agreement are still being negotiated. While those facts have a certain disconcerting aspect, they must be evaluated, on this extremely expedited record, in the light of evidence that the directors of EESI have been and are being kept continually advised of the terms of the WINCO sale as those terms continue to evolve. Moreover, counsel for defendants has represented that at the August 18 meeting of EESI's directors, the directors ratified and confirmed their prior approvals of the asset sale on behalf of EESI. Accordingly, the thrust of plaintiffs' contentions is not the fact of whether the proposed asset sale has been approved by EESI's directors, but rather the degree of care with which those approvals were conferred. The question of due care is more appropriately reserved for a later stage of this proceeding.

Plaintiffs' second claim, based upon the defendants' alleged breach of their implied contractual duty to deal fairly and act in good faith, is likewise insufficient to support a grant of temporary injunctive relief. To begin with, the record does not support it. What plaintiffs are arguing is that Keystone's bargain, in essence, was that Dyna's assets would not be sold so soon after their acquisition by EESI, and/or would not be sold under circumstances that would leave EESI incapable of fulfilling its obligations under the Put Option. However, nothing in the contract

documents explicitly obligates EESI to hold, and not to sell, the WINCO assets for any specific period of time. Moreover, it is not disputed that EESI's directors are empowered to propose a sale of corporate assets if, in their honest, good faith business judgment, such a sale is necessary to extricate the corporation from a perilous financial crisis such as that EESI faces here. Absent a clear contractual provision prohibiting EESI's directors from doing what they would otherwise be legally empowered to do, to imply such a prohibition judicially would require much more convincing evidence than has been developed on this record so far. On the present record, and recognizing fully the possibility that on a more expanded record a different conclusion might be reached, [FN6] there is no sufficient basis for implying a contractual condition, the effect of which would be to prohibit EESI from selling **\*\*685** its assets under circumstances where such a step would otherwise be justified in the directors' honest, good faith business judgment.

> FN6. With respect to this particular claim, it must be observed that the plaintiffs were not without opportunity to develop a fuller record. Since early June, 1986 the plaintiffs have known (as a result of the EESI/Zaidan letter of intent) of EESI's plans to sell the WINCO assets, yet they chose not to bring this action until August 11, 1986. Any procedural disadvantages this delay has caused have been inflicted by the plaintiffs upon themselves.  *See Hecco Ventures v. Sea-Land Corporation, supra,* at p. 12; *Bacine v. Scharffenberger,* Del.Ch., C.A. No. 7862, Brown, C. (December 10, 1984), at pp. 9-10.

Finally, even if the WINCO sale is assumed to be a violation of defendants' duty of fair dealing, plaintiffs have not established the likelihood that they will be irreparably harmed by the sale. The present record does not indicate that the WINCO sale is other than an arm's-length transaction that will result in EESI obtaining fair value for the assets being sold. If that is the case, then plaintiffs are no worse off economically than they were before the sale, as far as their status as EESI stockholder and Put Option holder is concerned. To the extent plaintiffs claim irreparable harm because the sale will leave ESSI with a negative net worth, in that respect the sale

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675
**1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675**

would have no adverse impact, because EESI already has a negative net worth. Moreover, if fair value for the assets is not received and if that is shown to be caused by the defendants' wrongful conduct, the plaintiffs will have an adequate remedy in damages.[FN7]

> FN7. The most recent Form 10Q filed by Control Data with the Securities and Exchange Commission shows that Control Data has stockholder equity totalling over $1.1 billion. The maximum damage claim under the Put Option is $500,000.

**\*6** For the foregoing reasons, plaintiffs' application for a temporary restraining order is denied. IT IS SO ORDERED.

Del.Ch.,1986.
Auerbach v. Earth Energy Systems, Inc.
Not Reported in A.2d, 1986 WL 8930 (Del.Ch.), 12 Del. J. Corp. L. 675

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

LEXSEE 1986 DEL CH LEXIS 508

**Council of South Bethany a municipal corporation of the State of Delaware, and the Planning and Zoning Commission of the Town of South Bethany, Plaintiffs, v. Sandpiper Development Corporation, Inc., a Delaware corporation, and John Doe I, et al., Defendants**

**Civil Action No. 935**

**Court of Chancery of Delaware, Sussex**

*1986 Del. Ch. LEXIS 508*

**Submitted November 18, 1986
December 8, 1986, Decided**

**COUNSEL:** [*1] Robert L. Halbrook, Esquire of WILSON, HALBROOK & BAYARD, and James B. Tyler, III, Esquire; for Plaintiffs.

John A. Sergovic, Jr., Esquire, of TUNNELL & RAYSOR; for Defendant Sandpiper Development Corporation.

**JUDGES:** JACOBS, Vice Chancellor

**OPINION BY:** JACOBS

**OPINION**

JACOBS, Vice Chancellor

In its Opinion dated September 4, 1986, the Court denied the motion for summary judgment of defendant Sandpiper Development Corporation, Inc., et al. ("Sandpiper") on its counterclaim challenging the validity of South Bethany Ordinance No. 4-73 ("the Zoning Ordinance") and Article V, Section 504 thereof ("Section 504"). The Court also granted Sandpiper's motion for summary judgment insofar as it challenged the validity of South Bethany Ordinance No. 11-81.

Sandpiper has moved for reargument of that portion of the Opinion denying Sandpiper summary judgment on its counterclaim challenging the validity of the Zoning Ordinance and Section 504. Because one of the grounds for the Court's rulings had been raised *sua sponte*, reargument was granted to afford the parties a full opportunity to be heard. Supplemental briefs addressed to the issues of the statute of limitations and equitable estoppel were filed [*2] on November 14 and 18, 1986. This is the decision of the Court on reargument of Sandpiper's challenge to the validity of the Zoning Ordinance and Section 504.

I.

In the September 4, 1986 Opinion, South Bethany's summary judgment motion was denied insofar as it was addressed to the Zoning Ordinance and Section 504, on the ground that Sandpiper's claim was barred by the applicable statute of limitations (*10 Del. C. § 8126(a)*), and also on the basis of estoppel. By its terms that statute bars any challenge to the legality of a zoning ordinance adopted by a county or municipality unless the challenge is made within 60 days of the date of publication of the adoption of the ordinance in a newspaper of general circulation in the county or municipality where the adoption occurred. It is undisputed that Sandpiper's challenge to the Zoning Ordinance was not brought until over 8 years after the ordinance was adopted.

On reargument Sandpiper proffers four grounds in support of its contention that the 60 day statute of limitations was improperly applied to it. Three of those grounds are palpably without merit. [1] Only the fourth need be addressed.

[1] Sandpiper's first argument -- that the Town waived the limitations defense by failing to raise it in its pleadings -- became moot by reason of the Court's September 18, 1986 letter to counsel granting both reargument and leave to amend the pleadings to reflect the parties' present positions. Pursuant to such leave, the Town amended its pleadings to raise the defenses of the statute of limitations and estoppel. Sandpiper's second argument -- that the Town contracted in its May 19, 1983 partial settlement agreement with Sandpiper and the Taylors, to limit the issues to be litigated to those issues presented by the pleadings as they existed in May, 1983 -- goes beyond the scope of

reargument. That (Footnote continued on p. 3) contention was not raised in Sandpiper's motion for reargument, which was granted only as to those arguments that were raised. Finally, Sandpiper argues that the applicable statute of limitations is not *10 Del. C., § 8126* but *10 Del. C. § 7901*, the 20 year statute of limitations governing claims for compensation for an unconstitutional taking of property. The short answer is that Sandpiper does not seek compensation for an alleged unconstitutional taking of its property. Rather, it seeks injunctive relief and a declaratory judgment that the Zoning Ordinance (and Section 504) are invalid -- relief that brings Sandpiper's claim clearly within the ambit of *§ 8126*.

[*3] Sandpiper argues that *§ 8126* was improperly applied to it, because the 60 day limitations period -- which runs from the date that notice of the adoption of the ordinance is published in a newspaper of general circulation -- has never commenced. Sandpiper so contends on the ground the Town has failed to show that such notice was ever published. Sandpiper goes on to urge that the Town's failure to comply with the legislatively mandated publication requirement invalidates the Zoning Ordinance on that basis alone.

The law clearly requires there be at least 15 days' notice before the holding of a public hearing on the adoption of a proposed zoning ordinance, and that such notice must be published in a local newspaper before the ordinance can take effect. *22 Del. C. § 304*; *Hartman v. Buckson, Del. Ch., 467 A.2d 694, 698 (1983)*. This requirement must be strictly complied with, the Town not being free to disregard statutorily mandated procedures. *Carl M. Freeman Associates, Inc., v. Green, Del. Supr., 447 A.2d 1179 (1982)*; *Hartman v. Buckson, supra, 467 A.2d at 699*.

The Town contends that it gave the required notice and that the notice was published in a local newspaper [*4] of general circulation. The Town supports that contention with an affidavit of counsel to which were attached two sets of news articles that were published in the *Wilmington Morning News* and the *Evening Journal* shortly before and shortly after the Zoning Ordinance was adopted in October, 1973. [2] However, those articles do not purport to be official notice, that is, notice promulgated by the Town Council or other appropriate authority. Rather, the articles are simply news stories by a reporter about the Zoning Ordinance and certain of its provisions. Sandpiper argues that such articles do not constitute the type of notice that is contemplated either by *22 Del. C. § 304* or by *10 Del. C. § 8126*. I agree. *See Gendron v. Borough of Naugatuck, Conn. Comm. Pl., 144 A.2d 818, 823 (1958)*. Since the burden of establishing the limitations defense rests upon its proponent (here, the

Town), and since the Town has not established that the 60 day limitations period has started to run (and, consequently, that the period has expired), the statute of limitations cannot be held to bar Sandpiper from challenging the Zoning Ordinance, including Section 504. To the extent the Opinion [*5] of September 4, 1986 holds otherwise, it is hereby modified.

> 2 Those newspaper articles had not been placed of record, nor had any issue been raised, as to the sufficiency of the published notice of the public hearing at the time of the summary judgment proceedings that led to the Court's Opinion of September 4, 1986.

Before leaving this subject, it is prudent to address one contention made by Sandpiper that has potential significance in both the limitations as well as the estoppel context. In its reargument brief Sandpiper raises, for the first time, the argument that the Zoning Ordinance, having been adopted without compliance with the statutorily mandated publication requirements, is void *ab initio* and that, therefore, no challenge thereto can be barred by the statute of limitations. Although not articulated in these precise terms, Sandpiper's position appears to be that whenever a claim is advanced that a zoning ordinance is invalid by reason of having been enacted in violation of statutory procedural requirements, that claim falls outside the scope of any statute of limitations. No authority is cited for that proposition, and in my view, both authority and logic compel [*6] the precise opposite conclusion.

Sandpiper's proposition is refuted by the statute of limitations itself (*10 Del. C. § 8126(a)*), which does not carve out any exception for claims based upon alleged statutory invalidity. Moreover, it is highly significant that the statute creates an extraordinarily short (60 day) period during which zoning regulations must be challenged. Such a short period evidences a legislative judgment that while there is a strong public policy favoring strict compliance with statutes establishing procedural requirements for enacting local zoning regulations (*see Carl M. Freeman Associates, Inc. v. Green, 447 A.2d at 1181-82*; *Hartman v. Buckson, 467 A.2d at 698-99*), those policies are not absolute. Of considerable importance as well is the policy of repose which underlies the statute of limitations. In this case, that policy translates directly to the interest of local communities in stable land use regulatory arrangements and in freedom from the uncertainty and disruption that would result if such arrangements were permitted to remain legally vulnerable for long periods. The strength of that policy is underscored by the extraordinarily brief period [*7] allowed by the General Assembly for mounting legal challenges to zoning ordinances.

In this particular case the statute of limitations was found not to apply only because one of its predicates (the publication of notice) was not established, but not by reason of any notion that the particular type of claim asserted by Sandpiper is exempt from the statute's coverage. But the policy of repose which underlies the statute continues to apply, even if for technical reasons the statute itself does not. Because of that policy, this Court is empowered, in a proper case, to reach the identical result under analogous equitable principles, namely, the doctrines of laches and estoppel.

For reasons more fully explained in Part II, *infra*, Sandpiper is estopped from challenging the Zoning Ordinance by virtue of Mr. Taylor's role as chairman of the Planning and Zoning Commission. But Sandpiper is also precluded for reasons of much broader application, namely, constructive notice to the public of the enactment of the Zoning Ordinance, and a long period of acceptance and reliance by the public of the regulatory scheme which the Ordinance embodies.

In *Hartman v. Buckson, 467 A.2d at 698*, this [*8] Court recognized the principle that a zoning ordinance cannot be challenged as defective where it is shown that the Ordinance has been accepted and relied upon by the public for many years. The Court in *Hartman* refused to apply that principle under the totality of circumstances in that particular case. The instant case, however, involves quite different circumstances. In *Hartman*, there was a 5 year delay between the enactment and the challenge to the zoning ordinance, a period found there to be insufficient to erect a conclusive presumption as to the measure's validity. Here, in contrast, there was an almost 9 year delay when Sandpiper mounted its original challenge to the Zoning Ordinance (based upon the composition of the Zoning Commission and the Town's alleged lack of power to enact a mandatory dedication requirement) and there had been a 13 year delay by the time Sandpiper launched its present challenge to the Ordinance on grounds of statutory invalidity. Thus, the reliance interest of the public in this case is far stronger than it was in *Hartman*. Moreover, in *Hartman* the plaintiff was unaware of the defects in the manner in which the Zoning Ordinance was enacted; [*9] here, Mr. Taylor was aware of the alleged defects. Accordingly, on this basis Sandpiper is equitably barred from challenging the Zoning Ordinance (including Section 504), despite the technical inapplicability of the statute of limitations.

II.

As previously ruled, Sandpiper is also estopped from challenging the Zoning Ordinance by reason of the role played by its president and controlling stockholder, Mr. Taylor, as Chairman of the Zoning and Planning Commission that developed, and recommended the adoption, of the Zoning Ordinance. In its reargument brief Sandpiper advances several reasons why, in its view, the estoppel doctrine has no application. [3] None of those contentions withstands scrutiny.

3    As with the limitations defense, Sandpiper also argues that the Town has waived the estoppel defense (by virtue of not raising it in its original pleadings), and that the Town is contractually barred from raising the estoppel defense by virtue of the May, 1983 settlement agreement. For the reasons previously set forth on pp. 2-3, fn 1, *supra*, those contentions are rejected.

In its September 4, 1986 Opinion, the Court found that Sandpiper was equitably estopped on the following [*10] basis: Mr. Taylor would be estopped if he had challenged the Zoning Ordinance individually, on the ground that one cannot be heard to complain of an act or transaction in which he has participated or acquiesced. *Gottlieb v. McKee, Del. Ch., 107 A.2d 240, 244-45 (1954)*. Mr. Taylor was Chairman of the Zoning and Planning Commission and its predecessors, which developed and recommended the Zoning Ordinance that the Town Council ultimately adopted. The Court concluded that to permit the Taylors to level those same challenges indirectly through Sandpiper, a corporation they own and control, would create an inequitable result. Accordingly, Taylor's estoppel was imputed to Sandpiper, on the authority of *Courtland Manor, Inc. v. Leeds, Del. Ch. 347 A.2d 144, 147-49 (1975)* and *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co., 417 U.S. 703, 713 (1974)*.

Sandpiper challenges this reasoning on three separate grounds. First, it contends that for Mr. Taylor's (or Sandpiper's) conduct to rise to the level of an estoppel, it must have involved a misrepresentation or concealment of a material fact known to them, plus detrimental reliance and prejudice to the Town circumstances [*11] not present here. Second, Sandpiper argues that Mr. Taylor's role as Chairman of the Zoning and Planning Commission did not constitute "acquiesence" or "participation" in the adoption of the Zoning Ordinance, because the Commission was only an advisory body and lacked the power to enact the Ordinance. Third, Sandpiper contends that in no event was it correct to impute to it any estoppel against Mr. Taylor, since there was no showing of fraud or that Sandpiper was an *alter ego* of the Taylors. For the reasons that follow, these arguments must also be rejected.

Sandpiper's contention that for an estoppel to arise a party's conduct must *always* involve a misrepresentation or concealment of a material fact, an intent to induce reliance, and detrimental reliance, is simply not correct. To be sure, such conduct does exemplify estoppel in one

of its classic forms, 3 *Pomeroy's Equity Jurisprudence,* § 805 (Fifth Ed. 1941), but it does not constitute the only set of circumstances that trigger the doctrine's application. Acquiescence by a party in another party's conduct or in a certain state of affairs may also give rise to an estoppel, even if there is no deception or intent to [*12] mislead. 3 *Pomeroy's, supra,* §§ 818-820; *28 Am Jur. 2d Estoppel and Waiver § 57.* Thus, in Delaware as elsewhere, the rule has developed that one who participates or acquiesces in another's conduct has no standing in equity to complain against it. *Trounstine v. Remington Rand, Inc., Del. Ch. 194 A. 95 (1937)*; *Gottlieb v. McKee, 107 A.2d at 244-45*; *Papaioanu v. Commissioners of Rehoboth, Del. Ch., 186 A.2d 745 (1962).* Defendants' effort to rewrite this principle so as to invariably require existence of conduct akin to fraud, is not legally well founded.

Nor, likewise, is the defendant's attempt to evade the application of the estoppel principle to Mr. Taylor. While it is true the Zoning and Planning Commission did not enact the Ordinance now under attack, the Commission did develop and recommend its passage to the Town Council. Thus as Chairman of the Commission, Mr. Taylor induced the Town Council in 1973 to adopt the very land use regulation scheme which he and his wife then proceeded to attack directly in 1981 in their federal court action, and which they attack indirectly (through Sandpiper) in this Chancery action. Given those circumstances, Sandpiper's [*13] argument that Mr. Taylor's conduct does not constitute "participation" or "acquiescence", strikes the Court as an exercise in reality-avoidance. Mr. Taylor led the Town Council to adopt the Zoning Ordinance in 1973. The Town and its citizenry relied on Taylor's acts in the sense that they bought, sold, and devoted their land to its various uses for over 8 years in reliance on the validity of that zoning scheme. If Taylor believed that the Zoning Ordinance was invalid because the Planning Commission was improperly constituted or because the publication of the required notice was defective, or because the Town lacked the power to require a landowner to dedicate portions of their land for public use, then he was under a duty to assert those positions in a timely fashion so that any defects could be timely cured and before there was substantial community reliance

upon the validity of this particular scheme of land use. To permit Mr. Taylor to lay back and withhold his "invalidity" contentions for 8 years until it became economically advantageous for him to assert them, would be antithetical to any sound concept of equity or common sense. See *O. P. Corp. v. North Palm Beach, Fla. Supr.,* [*14] *278 So.2d 593 (1973).*

For those same reasons Taylor cannot be permitted to assert those claims indirectly through Sandpiper. Defendants argue that this Court cannot estop Sandpiper from asserting Taylor's claims except where there has been a showing of fraud or that Sandpiper was a mere *alter ego* of the Taylors. But those are not the only circumstances that will justify disregarding Sandpiper's separate corporate entity. As a general rule that may be done "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation, require it." *Pauley Petroleum Inc. v. Continental Oil Co., Del. Supr., 239 A.2d 629, 633 (1968).* To allow Taylor to circumvent his individual estoppel by asserting his invalidity contentions through a controlled corporate vehicle, would be, in this instance, to sanction a public wrong and would not serve the interests of justice.

In *Courtland Manor, Inc. v. Leeds,* 847 A.2d at 147-49, this Court held that in cases where equity would preclude individual shareholders from bringing an action in their own right for wrongs done to the corporation before [*15] they acquired their stock, the corporate form may be disregarded if it is necessary to prevent the after-acquiring shareholders from circumventing that rule by bringing the same action in the name of the corporation. That principle should operate here to preclude Mr. Taylor from using his corporation to mount the same challenge to the Zoning Ordinance that he is equitably prohibited from bringing individually.

For the foregoing reasons the Court adheres to its earlier ruling denying Sandpiper's Motion for Summary Judgment, insofar as it is addressed to the Zoning Ordinance, including Section 504 thereof.

IT IS SO ORDERED.

# TAB 4

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)
2007 WL 4327775 (Del.Ch.)

Page 1

**C**Cox v. Crawford-Emery
Del.Ch.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
NOT DESIGNATED FOR PUBLICATION
Court of Chancery of Delaware.
Re: COX
v.
CRAWFORD-EMERY, et al.
**C.A. No. 3202-VCN.**

Submitted: Oct. 18, 2007.
Nov. 30, 2007.

James G. McMillan, III, Esquire, Montgomery,
McCracken, Walker & Rhoads, LLP, Wilmington,
DE.
JOHN W. NOBLE, Vice Chancellor.
*1 Dear Mr. McMillan:

Plaintiff Allen Victor Cox brought this action to
obtain certain declaratory and injunctive relief and
the appointment of a custodian pursuant to 8 Del. C.
§ 226 for Nominal Defendant Horse Power Ltd., a
Delaware corporation (the "*Company* " or "Horse
Power").

The present controversy stems from Horse Power's
ownership of the *Shangri-La,* its primary asset, an
82-foot charter yacht moored on the southern coast of
Turkey.[FN1]Cox and Defendants David Crawford-
Emery and Diane Phillips are Horse Power's only
shareholders and directors. Cox resides aboard the
vessel in Mugla, Turkey and has a 50% equity
interest in the Company; Crawford-Emery and
Phillips reside in Ryton, England and together own
the other 50% of the Company.[FN2]To date, the
Defendants have not appeared in this action.[FN3]

> FN1. For current purposes, the Court
> assumes that the *Shangri-La* is owned by
> Horse Power, despite some apparent
> disagreement among the parties concerning
> its registration. *See* PL's Am. Compl. Ex. F
> (hereinafter "Dutton Letter, March 20,

2007"); *see infra* text accompanying note
15.

> FN2. Crawford-Emery owns 49% of the
> Company, with Phillips owning the
> remaining 1%. PL's Am. Compl. ¶¶ 2, 6-7;
> Pl.'s Am. Compl. Ex. C, at Schedule 1
> (hereinafter "Shareholders' Agreement").
> For convenience, Crawford-Emery and
> Phillips are collectively referred to as the
> "Defendants."

> FN3. Presumably, the Defendants doubt that
> this Court has personal jurisdiction.

Before the Court is the Plaintiff's Motion for
Preliminary Injunction by which Cox seeks to
preclude the Defendants from causing the Company
to enter into administration or liquidation, from
taking any action varying the terms of his service as a
director or employee of the Company, and from
taking any steps to diminish his equity interest in the
Company.

* * *

According to the Complaint, Horse Power was
formed in April of 2003 as a joint venture between
Cox and Tayfun Asyali, a resident of Turkey. The
Company's certificate of incorporation authorizes
1500 shares of stock;[FN4] initially, Cox and Asyali
each received 750 shares. In the fall of 2005, Asyali
sold his shares in Horse Power to the Defendants. As
a result of that transfer, on October 11, 2005, Cox
and the Defendants entered into a series of
agreements which were drafted in England and
executed by Cox in Turkey.[FN5]

> FN4. Pl.'s Am. Compl. Ex. B (the
> certificate).

> FN5. Pl.'s Am. Compl. ¶ 15.

One of the agreements the parties executed was the
Shareholders' Agreement, which provides for the
Defendants' registration as shareholders and allocates
750 shares to Cox, 735 to Crawford-Emery, and 15 to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)
**2007 WL 4327775 (Del.Ch.)**

Phillips.[FN6]It also names the three as the Company's directors.[FN7]The agreement establishes, among other things, that Cox is captain of the vessel and responsible for its routine business; that Crawford-Emery and Phillips are responsible for marketing; that the shareholders are to exercise their rights so that the Company will not make any material change to the nature of its business or dispose of any capital assets without unanimous shareholder consent; and that the agreement is to be governed by English law, with the parties submitting to the non-exclusive jurisdiction of English courts.[FN8]

> FN6. Shareholders' Agreement §§ 1.1, 3.1, Schedule 1.

> FN7.*Id.* 3.1.

> FN8. Shareholders' Agreement §§ 4.2-4.3, 7.1, 17.9.

Cox and Crawford-Emery also executed an option agreement (the "Option Agreement") [FN9] and a vessel option agreement (the "Vessel Option").[FN10] In the Option Agreement, Cox granted Crawford-Emery the right to purchase his equity interest in the Company at a price to be determined by a surveyor.[FN11]This option is exercisable beginning November 1, 2011[FN12] In the Vessel Option, Cox granted Crawford-Emery the right to acquire 32 shares in the *Shangri-La,* an interest identified as representing a 50% equity stake in the vessel, again at price to be determined by a surveyor's valuation.[FN13]The Vessel Option vested November 1, 2006 and expires October 31, 2016.[FN14]

> FN9. Pl.'s Am. Compl. Ex. D.

> FN10.*Id.* Ex.E.

> FN11. Option Agreement §§ 1-2.

> FN12.*Id.* § 1.1.

> FN13. Vessel Option §§ 1-2. Although beyond the Court's decision today, Cox contests the validity of the Vessel Option.

> FN14.*Id.* § 1.1.

*2 The Defendants' United Kingdom counsel, Paul Dutton, sent Cox a letter regarding the state of affairs within Horse Power on March 20, 2007.[FN15]In the letter, Dutton described an "untenable," "irrevocable breakdown" in the working relationship between Cox and the Defendants. Dutton expressed his clients' concern that the *Shangri-La,* after having been registered in Horse Power's name in Delaware, also remained on the registry in Jersey, a British Crown dependency. Additionally, Dutton advised Cox that there were two potential options for resolving the parties' deadlock: either (1) Crawford-Emery would exercise the "Option Agreements" or (2) the Defendants would seek liquidation or administration of the Company in England by virtue of the fact that they were substantial creditors of the Company. In closing, Dutton asked Cox to elect either the first or second option within 10 days.

> FN15. Dutton Letter, March 20, 2007.

Writing to Cox again on May 3, 2007, Dutton indicated that the Defendants, not having received a response from Cox, had elected to proceed with both courses of action, pursuing the appointment of administrators in accordance with option 2, as well as exercising the "option to purchase both [Cox's] shares in the Company and the Vessel pursuant to the Option Agreement dated 11 October 2005" as outlined in option 1.[FN16] An unsigned "Notice of appointment of an administrator by company or director(s)" form was enclosed.[FN17]Dutton sent Cox an identical letter on May 9, 2007.[FN18]

> FN16. Pl.'s Am. Compl. Ex. G, at May 3, 2007 Letter. Because the Option Agreement is not exercisable until late 2011, and Cox argues that the Vessel Option is not valid, Cox contends that their "purported" exercise would be improper. These questions are not currently before the Court.

> FN17.*Id.* Ex. G, at Notice of appointment of an administrator by company or director(s) Form (hereinafter "Administration Form"). Because the Administration Form can be executed by a director, a parry's execution and filing of this form could have important personal jurisdiction ramifications. *See infra* note 26.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)
**2007 WL 4327775 (Del.Ch.)**

FN18.*Id.* Ex. G, at May 9, 2007 Letter.

Although discussions ensued between Cox's counsel and the Defendants' counsel in England, no agreement was reached. Dutton apparently sent emails in May, June, and July to Cox's counsel. Cox's counsel sent Dutton an email on August 3, 2007; Dutton did not reply.

Cox filed the original Complaint on September 4, 2007, and his counsel sent a copy to Dutton by email. On September 14, 2007, Cox's counsel advised Dutton by email that Cox would seek expedited proceedings in Delaware and asked the Defendants to identify their Delaware counsel. There was no response. On September 17, 2007, Cox filed a Motion for Preliminary Injunction and Motion for Expedited Proceedings, again providing Dutton with copies via email. This time Dutton responded, acknowledging receipt of the prior emails and indicating that he was awaiting instructions from his clients. On September 21, 2007, Dutton replied that he had been instructed not to accept service or appear in the matter. The Court heard oral argument on the Plaintiffs Motion for Preliminary Injunction on October 18, 2007. The Defendants did not appear.

\* \* \*

Cox contends that the Defendants have threatened to seize control of the Company improperly through the Option Agreement and the Vessel Option and to use the English courts, through their status as creditors, to force the sale of the *Shangri-La* and the Company's liquidation. Cox urges that these actions warrant a preliminary injunction.

\* \* \*

**\*3** A parry seeking interim injunctive relief must satisfy a familiar, exacting standard, namely, "the moving party must demonstrate a reasonable probability of success on the merits, that absent injunctive relief irreparable harm will occur, and that the harm the moving party will suffer if the requested relief is denied outweighs the harm the opponents will suffer if relief is granted."[FN19]A motion seeking interim injunctive relief asks a court to take a step that is properly labeled "extraordinary." [FN20]A preliminary injunction order requires a court to make a preliminary determination of a case's merits prior to

a final adjudication. The reason for departing from the usual rule that a decision on the merits must occur only in a rigorous merits-based procedural setting is that necessity mandates such a departure.[FN21]Necessity in this context refers to the prevention of irreparable harm. Without necessity, without the risk of irreparable harm, "a preliminary adjudication would have the characteristics of an advisory opinion."[FN22]Where there is no threat of imminent, irreparable harm, preliminary adjudication of the merits would prove an "unnecessary academic exercise." [FN23]

FN19.*Hollinger Inc. v. Hottinger Int'l, Inc.,* 858 A.2d 342, 371 (Del. Ch.2004) (citation and quotation omitted).

FN20.*See Frazer v. Worldwide Energy Corp.,* 1987 WL 8739, at \*5 (Del. Ch. Feb. 19, 1987).

FN21.*Id.*

FN22.*Id.*

FN23.*Id.*

Assuming the facts to be as pled in the Complaint and drawing reasonable inferences in the Plaintiffs favor, the Court concludes that Cox has failed to show the requisite threat of irreparable harm. Although the Court acknowledges that a reasonable person in Cox's position might be uneasy or anxious, that is not the standard supporting the extraordinary relief accomplished by a preliminary injunction. Indeed, "[r]elief will not be granted merely to allay the fears or apprehension of the plaintiff where there is no showing or reasonable ground for believing that the defendant is about to commit the wrongs complained of or where it appears that he is without the opportunity or intention of so doing."[FN24]As noted above, a preliminary injunction will be ordered only where the Court is persuaded that equity demands relief to avoid a serious injury that will likely occur before a final disposition on the merits can be made.[FN25]

FN24.*State v. Del State Educ, Ass'n,* 326 A.2d 868, 876 (Del 1974).

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)
**2007 WL 4327775 (Del.Ch.)**

FN25.*See id.*

In this case, Cox has not presented facts warranting interim injunctive relief. Dutton's letters from March and May, advising Cox of the Defendants' intentions to place the Company into administration and to exercise the "Option Agreements," do not constitute sufficient threats of irreparable harm. Indeed, Dutton's actions are fairly viewed simply as lawyer posturing. If acted upon, the Defendants' stated plan to place the Company into administration in England by filing a "Notice of appointment of an administrator by company or director(s)" form would likely not create the specter of irremediable harm because Cox could challenge the appointment of an administrator in the English courts. Moreover, to date, no evidence has been adduced suggesting that the Defendants have actually filed for administration: the forms appended as exhibits to the Amended Complaint are concededly unsigned. As to the option agreements, there is no reason to think that Cox could not challenge their allegedly improper exercise if and when that potentiality can be shown to be likely to occur.

\* \* \*

\*4 Because the Plaintiff has failed to demonstrate a sufficient threat of irreparable harm, his Motion for Preliminary Injunction is denied.[FN26]

> FN26. The Court also has some doubt about its personal jurisdiction over the Defendants based on the allegations of the Complaint The Defendants reside in the United Kingdom. There is no evidence even suggesting that they have ever visited this venue. The Shareholders' Agreement, the Option Agreement, and the Vessel Agreement were all drafted in the United Kingdom where the Defendants presumably executed them. Further, the Shareholders' Agreement is to be governed by English law according to the parties' agreement Given these facts, it appears Delaware's Long-Arm Statute, *10 Del C.* § 3104, is not implicated. Moreover, Delaware's Director Consent Statute, *10 Del. C.* § 3114, does not confer jurisdiction on this Court due to a party's mere status as a director; rather, Section 3114 provides for implied consent to

personal jurisdiction in controversies alleging 'Violation of a duty in [the directorial] capacity."Cox's concern that Crawford-Emery will improperly purport to exercise the Option Agreement and the Vessel Option does not implicate Crawford-Emery's duties as a director since those agreements memorialize understandings between two of the Company's shareholders-Cox and Crawford-Emery-as shareholders, not as directors. As to Cox's allegation that the Defendants intend to press their claims as creditors against the Company, a creditor does not lose his rights as a creditor solely because he is also a shareholder, even a controlling shareholder, or a director. *See Odyssey P'ners, LP. v. Fleming Cos.,* 1996 WL 422377, at *3-*4 (Del. Ch. July 24, 1996). Of course, Delaware law does not countenance a director's misuse of his fiduciary position for his benefit as a creditor. *See id.* at *4. Fiduciary duties, including the duty of loyalty, attach, of course, to directors who are creditors. *See id.* at *3-*4.Loyalty demands "that any power over the corporation held in a fiduciary capacity may be exercised only for the purpose of advancing collective/corporate welfare."*Id.* The duty of loyalty, however, does not require self-sacrifice:

> More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary ... does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.

*Id.* In Odyssey Partners, the Court recognized that some facts must exist apart from the fiduciary's exercise of his rights as a creditor, and those facts must constitute a breach of fiduciary duty. *Id.* at *4. Although Cox has submitted evidence that Crawford-Emery has identified as a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 5
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)
**2007 WL 4327775 (Del.Ch.)**

tactical option his ability to cause the Company to enter into administration by using his capacity as a director to file the Administration Form in order to press his claims as a creditor, a potentially self-interested action, to date he has not done so. It should also be noted that, between the first mention of this option and the hearing on the instant motion, almost seven months elapsed with no reported implementation of Defendants* proposed course of conduct.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

Del.Ch.,2007.
Cox v. Crawford-Emery
Not Reported in A.2d, 2007 WL 4327775 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

LEXSEE 1999 DEL. CH. LEXIS 121

**J. SIMPSON DEAN, JR., Plaintiff, v. ROBERT DICK, III, and GAIL D. KELLER, ADMINISTRATORS OF THE ESTATE OF ROBERT G. DICK, II, ROBERT MEYER, and KENNETH BECKER, Defendants.**

Civil Action No. 16566

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1999 Del. Ch. LEXIS 121*

April 30, 1999, Date Submitted
June 10, 1999, Date Decided

**SUBSEQUENT HISTORY:**    [*1] Released for Publication by the Court June 25, 1999.

**DISPOSITION:**    Each of Becker's counterclaims dismissed.

**COUNSEL:** R. Bruce McNew, of TAYLOR, GRUVER & McNEW, Greenville, Delaware, Attorney for Plaintiff J. Simpson Dean, Jr.

Robert K. Beste, Jr., of BIGGS AND BATTAGLIA, Wilmington, Delaware, Attorney for Defendants Robert Dick, III, and Gail D. Keller.

Michael W. Teichman, of DUANE, MORRIS & HECKSCHER, LLP, Wilmington, Delaware, Attorney for Defendant Kenneth Becker.

**JUDGES:** CHANDLER, Chancellor.

**OPINION BY:** CHANDLER

**OPINION**

MEMORANDUM OPINION

CHANDLER, Chancellor

This case involves a motion to dismiss counterclaims filed by a defendant who is being sued for contribution on a bank note. The plaintiff in the original suit is the sole owner of the general partner of a limited partnership of which the defendant is one of the limited partners. Although the entity is a limited partnership, the issues are largely the same as those implicated in a corporate matter, specifically fiduciary duties, demand requirement, and the business judgment rule.

I. FACTS

I will limit discussion of the facts to those at issue in the pending motion to dismiss. J. Simpson Dean, Jr. ("Dean" or "Plaintiff") has [*2] sued the Estate of Robert G. Dick II ("Dick"), Robert Meyer ("Meyer"), and Kenneth Becker ("Becker," and with Dick and Meyer, collectively, "Defendants") in an attempt to recover as a co-maker or guarantor on two notes on which all four parties were allegedly signatories. Dean has settled his suit as to Dick and Meyer, but Becker has answered Dean's complaint with a counterclaim. Dean has moved to dismiss that counterclaim.

In 1986, Dean, Becker, and others became limited partners in the Mt. Airy-Regency Limited Partnership (the "Partnership"). The Partnership fell on hard times, and in 1991 the general partner was fired and replaced by MDD Realty, Inc. ("MDD"), an entity owned 100% by Dean (the "1991 Transaction"). MDD, in its role as general partner, sold the real property that was the sole or primary asset of the Partnership and a shortfall resulted such that the Partnership could not satisfy its debt on the property. In the underlying suit here, Dean sued Defendants seeking contribution from Defendants toward that shortfall.

II. COUNTERCLAIM

Becker's counterclaim, filed derivatively, [1] seeks damages from Dean for the following acts:

> * Dean, acting as the alter ego of [*3] MDD, breached his fiduciary duties to the limited partners Dick, Meyer, and Becker.

> * Dean failed to respond to reasonable demands for information relating to the partnership, including one request by Becker to meet to discuss the manage-

ment of the Partnership, and the result was that Becker was unable to make informed decisions about his investment.

* Although the Partnership was operating at a break-even level, Dean sold the sole asset of the partnership, its apartment building, at such a low amount that it resulted in insufficient funds to repay the notes the partnership owed. Furthermore, Dean forgave a purchase money mortgage on the property.

* In 1997, Dean refinanced a $100,000 note (the "Bard Note") that was intended as a financing vehicle for a capital contribution to be made by Bard Investments Company ("Bard"), a limited partner in the Partnership. By refinancing the Bard Note, Bard, which was owned in part by Dean, received an early distribution of its capital contribution. Also, Dean did not seek to recover from Bard the amounts the Partnership paid to service the note since the Partnership's inception, despite his attempts to recover distributions made [*4] to Becker.

* When MDD became general partner in 1991, it (and by extension Dean) received additional ownership interest in the Partnership without making an additional capital contribution by characterizing any amounts owed as a loan, thus insuring preferred treatment over the other limited partners.

* Dean was grossly negligent in failing to maintain the value of the property and keep vacancy levels down.

* Dean failed to make any effort to settle a real estate tax liability at a discount, paying the full amount owed at settlement.

* Dean was grossly negligent in failing to account for $25,000 in security deposits.

* Dean was grossly negligent in selling the property at a time when it was neither necessary nor in the Partnership's best interest.

* Dean was grossly negligent in selling the property for a price below its market value.

* Dean refused to act on financing secured by Becker in 1991 that would have resulted in better terms for the Partnership, instead securing refinancing late on two separate occasions, resulting in the payment of late fees and extension fees. Furthermore, Dean did not properly apply the proceeds of a note, whose [*5] purpose was to pay off real estate taxes, toward those taxes.

1   There is some question as to whether Becker has properly filed this suit as a derivative action, as Dean argues and Becker admits, that certain of the claims are for personal injuries and not for injuries to the Partnership. Furthermore, Dean argues, Becker has failed to name the Partnership as a plaintiff in his counterclaim. I will assume for purposes of this motion to dismiss that Becker's claims are properly filed as derivative claims.

Becker argues that demand on the Partnership would have been futile based on the fact that Dean was the alter ego of MDD, the general partner, and he would not have instituted a lawsuit against himself based on his misconduct. As a result, claims Becker, demand was excused and he may continue in his prosecution of this suit derivatively.

III. ANALYSIS

A. Motion to Dismiss Standard

On a motion to dismiss, the Court will accept all well-pled allegations as true; furthermore, all inferences reasonably [*6] drawn from the pleadings must be construed in the light most favorable to the plaintiffs. [2] The Court, however, will not accept as true conclusory allegations not supported by specific references to fact. [3]

2   See Kahn v. Icahn, 1998 Del. Ch. LEXIS 223, *6, Del. Ch., C.A. No. 15916, Chandler, C. (Nov. 12, 1998).
3   See In re Fuqua Indus. Shareholder Litig., 1997 Del. Ch. LEXIS 72, *9, Del. Ch., C.A. No. 11974, Chandler, V.C. (May 13, 1997).

B. Demand Requirement

Before I reach any decisions on the merits of Becker's claims, I must first decide if demand on the Partnership was required or excused. Title 6, Section 17-1003 of the Delaware Code is the limited partnership parallel to the General Corporation Law's demand re-

quirement. It requires that a limited partner suing derivatively "set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making that effort." Derivative suits involving limited partnerships have been [*7] few and far between in this Court, [4] but fortunately the rule regarding demand futility in the corporate context is nearly the same as that in the limited partnership context. [5] Therefore, I believe corporate case law concerning demand futility is applicable in the limited partner setting. Here I believe that demand was excused.

> 4   See, e.g., Seaford Funding Ltd. Partnership v. M & M Assocs. II, L.P., Del. Ch., 672 A.2d 66 (1995); Litman v. Prudential-Bache Properties, Inc., Del. Ch., 611 A.2d 12 (1992).
> 5   Compare Ct. Ch. R. 23.1 (addressing derivative actions in the context of a corporation or an unincorporated association: "In a derivative action . . . the complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.") with 6 Del. C. § 17-1003 (addressing limited partnership derivative suits: "In a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making that effort.").

[*8] To reach that conclusion, I need not address the question of whether MDD is the alter ego of Dean. [6] Instead, I look to the first prong of the Aronson test-- whether "a reasonable doubt is created that . . . the directors are disinterested and independent." [7]

> 6   In fact, for purposes of this motion to dismiss Becker's counterclaims only, I treat MDD and Dean as interchangeable without reaching the question of whether MDD was the alter ego of Dean.
> 7   Aronson v. Lewis, Del. Supr., 473 A.2d 805 (1984).

It is not sufficient to excuse demand (in a corporate context) to simply allege a director would be required to bring suit against himself. [8] I do, however, find it very persuasive that where the general partner is 100% owned by one person, and the general partner would be required to bring suit against that person, there is at least some doubt as to the disinterest of that person. When demand is made in a corporate setting, the board of directors has some pressure to at least consider [*9] the suit, as some directors may feel they are not as liable as others, or at

least some directors may take their responsibilities seriously, or all directors may be protected by directors and officers insurance, or several of the defendants may be non-director officers of the company and so the potential liability may fall more squarely on those defendants. Additionally, when a majority of the board of directors is beholden to the person from whom the damages (or return of funds) will be sought, demand is excused. [9] But here, where the only party against whom relief is sought is the 100% owner of the party that would be requested to prosecute the lawsuit--what could be closer to beholdenness? MDD is beholden to Dean because MDD is 100% owned by Dean. And so, demand is excused.

> 8   See Spiegel v. Buntrock, Del. Supr., 571 A.2d 767, 774 n.14 (1990); Pogostin v. Rice, Del. Supr., 480 A.2d 619, 625 (1984); Aronson, 473 A.2d at 814-15.
> 9   Cf.  In re The Walt Disney Co. Derivative Litig., 731 A.2d 342, 1998 Del. Ch. LEXIS 186, *16 (1999).

[*10] I do not need to reach the question whether the second prong of Aronson is met, namely that "the challenged transactions were otherwise the product of a valid, exercise of business judgment." My analysis of the challenged transactions below, however, would indicate that Aronson's second prong would not be met.

C. Alleged Breaches of Fiduciary Duty

Merely because demand was excused, however, does not mean that Becker's underlying claims are valid. I will look at each of the claims to determine whether they (a) receive business judgment rule protection, and (b) survive scrutiny under that standard.

1. Failing to respond to demands for information by Becker

Becker alleges that Dean failed to respond to Becker's demands for information relating to the partnership and refused to meet with Becker to discuss the management of the Partnership. Becker believes the result was that he was unable to make informed decisions about his investment, and so Dean breached his fiduciary duties toward Becker.

It is clear, however, that nothing in our partnership law requires a general partner to meet with limited partners at their every request. The rights of a limited partner to [*11]  see information about the limited partnership are limited by either the partnership agreement or, in the absence of anything in that agreement, by the fiduciary duty owed by the general partner to the limited partner. [10] Here, Becker has made no showing of either requirement. Furthermore, although Becker claims he needed the information "to make informed decisions about his

investment," [11] he has made no showing of what harm he suffered by not being able to evaluate his investment. Accordingly, I dismiss this counterclaim.

> 10  See Sonet v. Timber Co., L.P., Del. Ch., 722 A.2d 319, 322 (1998), ("Unless limited by the partnership agreement, the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners." (emphasis in original)); Boxer v. Husky Oil Co., Del. Ch., 429 A.2d 995, 997 (1981).
>
> 11  Countercl. at 14, P3.

### 2. Dean's sale of the property for a low amount

Becker alleges [*12]  that Dean's sale of the apartment building was at such a low level as to be grossly negligent. As proof, Becker cites the fact that the Partnership "was operating on a 'break-even' basis" [12] when he sold it for below the amount owed on the property.

> 12  1999 Del. Ch. LEXIS 121, *3.

Merely because the partnership was operating at a break-even level does not mean the time to sell was not optimal. Perhaps Dean thought the property value would drop, or perhaps he had been trying to sell it for years to no avail. Furthermore, any shortfall would be owed by Dean in the same proportion as his partners. In any case, that decision was well within Dean's business judgment as general partner, and I do not find it so egregious as to warrant second-guessing his judgment in contravention of the business judgment rule.

### 3. Refinance of the Bard Note

Becker alleges that the 1997 refinance of the Bard Note benefited Dean disproportionately, since he was a partner in Bard. Becker, however, does not allege whether any benefit received [*13] by Dean in his role as a Bard partner was even material to him. Further, Becker's allegations are vague on this count: Becker alleges that "the Partnership should have sought the return of partnership assets improperly expended to service the Bard note since the partnership's inception in 1987," [13] but he fails to allege in a nonconclusory fashion why these funds were improperly expended. No partner seems to have complained about these "improper" expenditures during the ten years that they were being paid, so I have serious doubts as to whether they actually were improper. In any event, the refinancing of the Bard Note seems to me to be a matter properly left to the business judgment of Dean, and Dean is not alleged to have been interested in the refinancing.

> 13  1999 Del. Ch. LEXIS 121, *4.

### 4. MDD's additional ownership interest

Becker alleges that when MDD became general partner in 1991, it received additional ownership interest in the Partnership without making an additional capital contribution through the [*14] technicality of characterizing any amounts owed as a loan rather than a capital contribution. As above, I do not see how this situation can be complained about today, eight years after the fact, when Becker presumably approved of it at the time.

### 5. Dean's failure to maintain the value of the property

Becker alleges Dean was grossly negligent in failing to maintain the value of the property and keep vacancy levels down. This seems to me to be a classic case for the protections of the business judgment rule--why should this Court (or any court) second-guess Dean's actions here, when Dean gained nothing by keeping vacancy levels up and in fact was harmed by it to the same degree as Becker?

### 6. Dean's failure to negotiate down real estate taxes owed

Becker alleges that Dean's failure to make any effort to negotiate downward a real estate tax liability constitutes gross negligence. While a savvy businessman may have attempted to do so, nothing suggests it is grossly negligent not to have done so. The Partnership had a legal obligation to pay these taxes, and nothing in our law requires a party to shirk its legal responsibilities where possible to avoid paying what it owes.

[*15] 7. Failure to account for $ 25,000 in security deposits

Becker alleges that Dean was grossly negligent in failing to account for $ 25,000 in security deposits. Becker, however, does not adequately allege why Dean was responsible for this amount and does not respond to the statement in Dean's answering brief that (a) these amounts have been accounted for, and (b) the shortfall occurred before MDD became general partner. Most importantly, I cannot see how this misplacement, even if true, constitutes gross negligence when it was under two percent of the selling price of the property.

### 8. Timing of the sale

Becker's next allegation is that Dean was grossly negligent in selling the property at a time when it was neither necessary nor in the Partnership's best interest. Becker does not allege, however, that Dean failed to obtain the necessary consents to sell the property nor why the timing was bad. I cannot understand why this act by Dean is not protected by the business judgment rule, being a classic example of a business decision made by a disinterested party. [14]

1999 Del. Ch. LEXIS 121, *

14  Although Dean may have been interested in the matter of whether to bring suit against himself, he was not interested in the fundamental business decision regarding when to sell the property.

[*16] 9. Sale of the property for a price below market value

This complaint is addressed, and dismissed, in paragraph two above.

10. Refusal to act on Becker's financing

Becker alleges that Dean refused to act on favorable financing Becker secured in 1991, instead paying late fees and extension fees. But Becker's allegation fails to consider why these terms were favorable, so I find this allegation to be improperly vague and I dismiss it under the requirements of the business judgment rule.

11. Failure to apply proceeds of a loan to pay off taxes

Becker alleges that the proceeds of a note whose purpose was to pay off real estate taxes were used for another purpose. Becker does not allege, however, that this purpose was improper, and he does not explain why he was harmed by this business decision of Dean. Most of all, he does not allege why this action was grossly negligent or how Becker benefited from this more than his proportional share. As a result, I dismiss this counterclaim under the requirements of the business judgment rule.

IV. CONCLUSION

I hereby dismiss each of Becker's counterclaims because they fail to state a claim upon which relief can be granted under [*17]  Rule 12(b)(6) of the Court of Chancery Rules.

IT IS SO ORDERED.