TAB 6

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

▷Credit Lyonnais Bank Nederland, N.V. v. Pathe
Communications Corp.
Del.Ch.,1991.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
CREDIT LYONNAIS BANK NEDERLAND, N.V., a
credit institution organized and existing under the laws of
the Netherlands, and MGM-Pathe Communications Co., a
Delaware corporation, Plaintiffs,
v.
PATHE COMMUNICATIONS CORPORATION, a
Delaware corporation, Giancarlo Parretti, Maria Cecconi
and Yoram Globus, Defendants.
**Civ. A. No. 12150.**

Submitted: Nov. 6, 1991.
Decided: Dec. 30, 1991.

**\*\*1102** <u>Samuel A. Nolen</u>, William F. Mongan, J.
Michael Christopher, and <u>Sean P. McDevitt</u>, of Richards,
Layton & Finger, Wilmington, of counsel: <u>Richard J.
Holwell</u>, of White & Case, New York City, for plaintiff
Credit Lyonnais Bank Nederland, N.V.
<u>Michael D. Goldman</u>, and <u>Stephen C. Norman</u>, of Potter
Anderson & Corroon, Wilmington, <u>Howard Weitzman</u>, of
Katten Muchin Zavis & Weitzman, Los Angeles, Cal., for
plaintiff MGM-Pathe Communications Co.
<u>Richard L. Sutton</u>, <u>Lawrence A. Hamermesh</u>, <u>Kenneth J.
Nachbar</u>, <u>Thomas C. Grimm</u>, <u>William M. Lafferty</u>, and
<u>John F. Grossbauer</u>, of Morris, **\*\*1103** Nichols, Arsht &
Tunnell, Wilmington, for Pathe Communications
Corporation, Giancarlo Parretti and Maria Cecconi.

*MEMORANDUM OPINION*

ALLEN, Chancellor.
*\*1 This is an action under Section 225 of the Delaware
General Corporation Law seeking a judicial determination
of the persons who constitute the lawfully elected board of
directors of MGM-Pathe Communications Co.
("MGM"), a Delaware corporation. The principle plaintiff
is Credit Lyonnais Bank Nederland ("CLBN" or "the
Bank"), a major lender both to MGM and to MGM's
parent Pathe Communications Corp. ("PCC").[FN1]  By

reason of claimed defaults by PCC on loans from CLBN
that were secured by PCC's controlling block of MGM
stock, CLBN now claims to be the legal (registered)
owner of that controlling stock interest, at least for
purposes of voting it.

Defendants are PCC and three individuals, Giancarlo
Parretti, Maria Cecconi and Yoram Globus, each of whom
CLBN purported to remove from the MGM board on June
16, 1991.[FN2]  Giancarlo Parretti had for several years
been the dominant factor in the ownership and
management of PCC. In November 1990, he caused PCC
to acquire MGM. Maria Cecconi is Mr. Parretti's partner
and wife. Yoram Globus, formerly controlled PCC (then
called Cannon Films, Inc.) and continued to work for the
firm after Parretti acquired control of it by 1989. Parretti
and Globus appear to have had a productive working
relationship.

As more fully explained below, the predicate for the claim
by CLBN that it had legal power to remove the individual
defendants from office is defendants' alleged breach (or a
series of alleged breaches) of an agreement referred to as
the Corporate Governance Agreement (the "CGA"). This
agreement is one of a series of agreements entered into in
mid-April 1991 which facilitated CLBN's loan to MGM
of an additional $145 million and modified in important
respects the management structure of MGM. Plaintiffs
seek, **\*\*1104** not only (1) a judicial declaration of the
validity of the Bank's action in replacing the defendant
directors, but also (2) an injunction specifically enforcing
the Corporate Governance Agreement and enjoining
future violations of it.

Following institution of this suit, PCC took the view that
the Bank's action in purporting to remove PCC's
representatives from the MGM board not only was
invalid, but also constituted a material breach or
repudiation of the Bank's obligations under the April
agreements. As a consequence, PCC asserted that it was
then free of the restrictions those agreements imposed on
its MGM stockholding and could freely exercise its rights
as MGM's controlling stockholder. Accordingly, on June
18, 1991, PCC purported to remove all of the Bank's
designees from their directorships and to appoint a new
board including Cecconi and Globus, among others. PCC
and certain of these individuals then filed a counterclaim
in this suit requesting, among other relief, a judicial

Not Reported in A.2d                                                      Page 2
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

determination that PCC's designees constituted MGM's validly elected board of directors.

This suit was originally filed on June 17, 1991. Shortly thereafter, the court entered an order governing the management of MGM pending final adjudication of the claims and counterclaims. Generally, that order left day to day control of the company in the hands of an executive committee, created by the Corporate Governance Agreement and consisting of counterclaim defendants Alan Ladd and Jay Kanter. However, the order also imposed certain restraints upon MGM designed to require a judicial hearing if certain important decisions were proposed to be taken, specifically those of a certain dollar value or affecting corporate structure or governance.

*2 While the matter in issue-as framed by the parties-is of some complexity and substantial importance to them, the parties agreed that business conditions required that the dispute be adjudicated with expedition. As a result, extensive discovery (including 29 depositions) was completed during the July-August period. Trial commenced on August 27 and continued, interrupted, over 15 trial days, concluding on September 27. Following post trial briefing, the matter was presented to the court at argument on November 6. [FN3]

**1105 This case arises from a leveraged buyout that failed to meet its sponsors' expectations.

The leveraged buyout was, of course, the prototype corporate transaction of the 1980s. In such a transaction, a management or finance entrepreneur acquires control of a public company through borrowed funds. To some extent, such a transaction replaces equity with debt on the company's balance sheet and creates incentives for the discovery and implementation of operating efficiencies and for the sale or liquidation of inefficient operating units. The aim is value realization. [FN4]   On this view, which is the conventional one among economists, stockholders are greatly benefitted by an LBO even if other corporate constituencies-especially bond holders and long-term employees-are put at risk by it.

There now seems little doubt that, when they work, LBOs can enhance efficiency and promote value creation. *See, e.g., Cede & Co. and Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., C.A. No. 7129, Allen, C., June 4, 1990, [FN5] More recent experience demonstrates, however, that when they don't work-when the debt burden that the enterprise is asked to bear is too great or when the structural or

organizational changes that the corporation experiences are injurious-LBO's can lead to bankruptcy with its accompanying realization of financial loss.

This case arises out of the leveraged buyout of MGM/UA Communication Company by a corporation controlled by Giancarlo Parretti and his wife and out of the efforts of CLBN, as principal lender in the transaction, to salvage the transaction from its almost immediate financial floundering. In several respects this LBO appears fairly typical of LBO's occurring at the tag-end of the 1980s. It was very highly leveraged (*see* pp. 10-14 below), and the price appears to have been high. In another respect, however, it was not typical: it involved a private sale to a person not associated with **1106 MGM. [FN6]   It is unusual too in the swiftness with which the financial structure of the firm became endangered. PCC closed its purchase of substantially all of the stock of MGM on November 1, 1990. Evidence shows that MGM was, in an accounting sense, out of control within weeks. Only five months after the acquisition, its trade creditors forced MGM into bankruptcy court.

The Bank's effort to finance MGM's escape from bankruptcy gave rise to the agreements that are at the center of this case. These agreements-including a Corporate Governance Agreement-purported to change MGM's governance structure; to provide for the advance of an additional $145 million by the Bank to MGM; to amend certain other agreements; and to secure repayment of amounts owed to the bank (directly or indirectly) by MGM, PCC and their affiliates.

*3 The central, but not the only, issue between the parties in this case is whether Mr. Parretti breached the Corporate Governance Agreement either by failing to make certain disclosures at the time the agreement was executed in mid-April 1991 or by material interference in MGM's management during the following two months. Judgment on that question requires a fairly detailed conclusion concerning the relevant historical facts.

Set forth below are the relevant facts as I find them to be. Much of this story is intensely contested. In reaching the conclusions set forth, I have weighed conflicting testimony and ultimately had to make determinations based upon the credibility of witnesses because in some respects the contending accounts could not be made consistent with each other. As is specified in a substantial number of instances below, I have been forced to conclude that defendants' principal witness, Giancarlo

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Parretti, did not give truthful testimony when he testified under oath in this court. *See, e.g.,* pp. 12, 18 n. 19, 28 n. 23, 47 n. 37, 49, 52-53, 69, 80-81.

For the reasons set forth below I conclude that, in his relationship with CLBN and Alan Ladd following the execution of the Corporate Governance Agreement ("CGA"), **1107 Giancarlo Parretti insistently and continually breached the foundational requirement of all contracting parties: to act with respect to the subject matter of the contract with good faith and to deal fairly. This requirement means, in general, that a contracting party is not free to deprive his promisee of the benefit of the contract or to impair that benefit materially. As set forth below, I conclude that, from the outset of the CGA, Mr. Parretti willfully breached this obligation and as a consequence CLBN was legally entitled to exercise its rights to remove him and his associates from the MGM board of directors.

I.

A. The Parties' Pre-Existing Relationship.

CLBN was introduced to Giancarlo Parretti in 1986 by its customer Yoram Globus. Mr. Globus was then negotiating with Mr. Parretti for an equity infusion into his then troubled company, Cannon Group, Inc., PCC's predecessor. After this introduction, CLBN became Parretti's principal bank.

Parretti did make a substantial investment in Cannon, and in early 1988, he became its chief executive officer. At that time Cannon was substantially indebted to CLBN and had negative net worth of $22 million. In addition, its previous management was under investigation for fraud by the Securities and Exchange Commission ("SEC"), and its auditors had refused to certify its financial statements. By 1989, under Parretti's management, Cannon had reduced its outstanding debt from $150 million to $50 million, had increased its net worth to positive $110 million, had entered into a consent decree with the SEC and had received a retroactive clean opinion for the three prior years (1986-1988) from new accountants, KPMG, Peat Marwick ("Peat Marwick"). By that time, it had also changed its name to PCC.

*4 Parretti wanted to see PCC make bigger budget motion pictures. In late 1988, as the company was coming out of its difficulties, Parretti was introduced to Alan Ladd by a mutual acquaintance, Dino DeLaurentiis. Parretti asked

Ladd, a person with substantial experience in the motion picture industry,[FN7] to help him realize his **1108 goal. Ladd agreed to make four pictures for PCC each year for four and a half years. A wholly-owned PCC subsidiary to be called Pathe Entertainment, Inc. ("PEI") was formed for this purpose. Parretti and Ladd agreed that PCC would fund PEI's film-production subject to certain budgetary constraints and that PEI would otherwise be under Ladd's complete control. Ladd later joined the board of PCC.

B. PCC Seeks to Acquire MGM.

In March 1990, Ladd learned from his contacts at MGM that MGM's owner, Kirk Kerkorian, wanted to sell MGM.[FN8] He passed this information on to Parretti who began negotiations with Kerkorian to have PCC buy MGM. Parretti simultaneously entered negotiations with Time-Warner, Inc. seeking to have Time-Warner provide about half of the $1.25 billion in cash that Kerkorian was asking. Under the arrangement Parretti discussed with Warner, MGM was to raise $650 million in cash by licensing the worldwide distribution rights to all of MGM's existing films to a Time-Warner subsidiary. Then in exchange for certain PCC assets, MGM would channel that cash to PCC for use in the purchase of MGM's shares. Supposedly, PCC would raise the remaining $600 million by issuing shares to Parretti and his European partners.

In March, Parretti signed an agreement with Kerkorian for the cash purchase in June of all of MGM's stock. Under this agreement, PCC was required to pay Kerkorian $50 million each month until closing. From March to June, PCC advanced payments totalling $150 million to Kerkorian, while it continued its discussions with Time-Warner. On June 9, however, Time-Warner terminated the negotiations, leaving PCC at the very least $650 million short of the **1109 $1.25 billion it would need for the closing. As a result, the closing date of the acquisition had to be extended, first to October 23, 1990, and then to November 1, 1990. In consideration for the extensions of the closing date, PCC agreed to pay Kerkorian an additional $1 per share, thus increasing the total cost of the acquisition to $1.33 billion.

C. The Byzantine Financing of The November Acquisition.

In a series of complex transactions, Parretti managed to replace Warner's $650 million and close the purchase of MGM on November 1, 1991. Cash provided by CLBN and its parent, Banque Credit Lyonnais ("Credit

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 4
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Lyonnais") played the central part. PCC also used cash indirectly provided by those banks to replace most of what Parretti and his European partners were to have invested.[FN9]  Instead of having MGM license the rights to distribute all of its films to Time-Warner, it was agreed that MGM would license those rights to a variety of companies, including Time-Warner (for a smaller piece) and Turner Broadcasting. These alternative licensees, however, would provide less immediate cash ($225 million) than Warner was to have provided. These licensees did, however, assume obligations to make future payments to MGM. These obligations were then factored by MGM at CLBN to reduce them to cash for use at the closing. CLBN provided about $400 million in cash pursuant to these factoring arrangements.

*5 The total $625 million in cash thus generated from licenses was immediately prior to the closing, transferred by MGM to PCC, as consideration for the acquisition by MGM of PCC's only two operating subsidiaries, Cannon Entertainment, Inc. ("CEI") and PEI, the company created to house Alan Ladd's activities. PCC then paid most of this cash to Kerkorian as part of the purchase price for MGM.[FN10]

The balance of the cash purchase price was raised from a variety of sources. CLBN provided an additional $160 million to PCC at closing as bridge financing, pending equity investments that Parretti **1110 represented would come from third parties.[FN11]  CLBN also provided $45 million in loans to PCC's controlling parent, Melia International N.V. ("Melia"), and Melia's controlling parent, Comfinance Holding Corp., the original Parretti entity.[FN12]  Finally, the parent bank, Credit Lyonnais, supported a $146 million credit to PCC by guaranteeing a loan to PCC from Sealion Corp., another Credit Lyonnais client.[FN13]  An additional $89 million apparently came from Fiorini's company, Sasea Holdings, Inc. ("Sasea"), Melia's Swiss minority owner.

Mr. Parretti testified at trial that, without the help of bank loans, companies that he and his wife controlled contributed about $500 million to the acquisition. I cannot accept this testimony. After receiving cash advances from the licensees ($225 million), the Credit Lyonnais affiliates ($751 million)[FN14] and Fiorini's company ($89 million), PCC required only an additional $268 million to close the deal. While I am unable to deduce from the record with confidence all of the sources of this $268 million, it does appear that at least $161 million in cash was advanced in two transactions *on MGM's credit* through certain Italian

financial institutions.[FN15]   Thus, in no event do I understand that Mr. Parretti or his companies could have invested more than $107 million in the $1.3 billion MGM acquisition.

Moreover, in retrospect, it might be said that CLBN, in effect, provided this amount as well. That is, prior to the acquisition, PCC had a line of credit with CLBN for working capital purposes that stood at $186 million. The cash flow projections of MGM indicated that it would need about $125 million to cover cash shortfalls during 1991. In connection with the acquisition, the Bank agreed to extend a $125 million revolving working capital line of credit to MGM **1111 following the closing, but this credit facility was conditional upon PCC reducing its debt to CLBN below $125 million.[FN16]   The Bank's proposal to make this revolving line available to MGM makes sense only on the understanding that at closing, or at all events before access to the new line of credit was necessary, PCC would pay off the existing $186 million working capital liability from the sources that were funding the acquisition. On no other assumption would the full $125 million credit ever be available.

In fact, the $186 million credit line was never paid down, and, as a consequence, CLBN never had an enforceable legal obligation under the $125 million working capital facility. While CLBN later did make further substantial advances to MGM (*see, e.g.,* p. 74 *infra* ), the point I make here is that in considering the financing of the acquisition, in addition to the $751 million advanced in various ways by the Bank, one should take account of the additional $186 million of liability that the Bank was required to continue to extend to PCC, despite its contrary understanding.

*6 On November 1, 1990, the acquisition closed, and Parretti installed himself as chairman and chief executive officer of MGM. PCC then owned 98.5% of MGM, with Sealion owning the remaining 1.5%.

D. MGM's Post-Acquisition Cash-Flow and Management Crisis.

Having licensed away most of its films, factored the receivables resulting from such contracts, borrowed heavily and paid all the cash these transactions generated to Kerkorian, MGM almost immediately found itself short of cash and cash producing assets. This shortage was particularly problematic because, prior to the acquisition, the company had accumulated $20 million in unpaid trade

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

bills. Bank of America had been financing MGM's working capital needs, but required MGM to repay all amounts outstanding prior to the closing. To minimize the amount he thus would have to pay BofA at closing, Parretti had ordered MGM's finance department to slow payments to trade creditors, thereby leaving MGM with this unusually large amount of bills to pay after the closing.

MGM thus needed new financing to keep itself afloat until new cash flow could be generated by releasing films or selling assets. No **1112 such new financing was immediately forthcoming. The existence of the $186 million PCC debt to CLBN foreclosed MGM from accessing the CLBN $125 million production facility. Almost immediately the company began to have difficulty paying its bills.

Adding to the company's problems was an almost immediate loss of its internal controls. To cut expenses, Parretti had laid off personnel, particularly in the finance department. The cuts in that department, when combined with the cash crisis, caused problems there to snowball.

The internal management reports during the period vividly tell the story. The head of MGM's accounts payable department wrote the following in January 1991:

The accounts payable department is presently working on the day to day operations of the department. The department's activities are seriously behind due to inadequate staffing.

Before the lay offs, MGM Accounts Payable department consisted of 14 employees. Pathe consisted of 7 employees. MGM has been reduced to 4 full time employees and Pathe to 4 full time employees. That is a reduction of 13 people!

The department realizes th [sic] company is attempting to reduce costs, however, the Accounts Payable department is one department that requires a full staff in order to avoid serious errors and mistakes....

Processing and inputing is approximately 1 1/2 months behind.... [W]e are trying to bring everything current. It is very difficult with the present situation.

Because of the much added work load, extensive overtime (some employees, including myself are working 7 days a week), and the pressures from vendor calls (approximately 75 calls a day), almost all MGM key people have resigned and I am expecting more resignations. If I no longer have people who know the system, the department will be in serious trouble. I urge management to re-evaluate the staffing needs of the department.

*7 (DX 199 at 24222). On February 28, MGM's head of domestic marketing and distribution described the effect that the accounts payable crisis was having on MGM's ongoing projects:

**1113 "Thelma & Louise" was screened to exhibitors of the United States and Canada to very favorable responses. The original March 15th opening in theatres had been secured, and the Sales Department was diligently working on the March 29th openings. Then, the unavoidable truth surfaced: we had not paid our vendors, suppliers, couriers, labs, telephone bills, rents, etc., etc., etc. Those delinquent accounts began to strangle our ability to effectively guarantee further marketing and sales activities.

The month of February was a disaster in terms of MGM/Pathe credibility with our talent, creditors, suppliers, and exhibitors. Being short of funds or maximizing one's own resources are both understandable conditions which can be dealt with, but the continued omission of truth when dealing with problems not only exasperated and frustrated, but demoralized many able and willing professionals. It is one thing to say "the check is in the mail," or "you'll receive payment tomorrow," but it is another thing entirely that a department head is denied access to the truth....

(DX 200 at 24288). During this difficult time, Ladd lost faith in Parretti and PCC's other officers because of their frequently broken promises that bills would soon be paid.

During this chaotic, post-acquisition period (November 1990 to March 1991), CLBN advanced an additional $97 million to MGM to keep the company from going under. However, since MGM had no right to draw down under the $125 million facility, each of these advances was made at CLBN's complete discretion.[FN17]

E. The Banks March-April Efforts to Evaluate and Deal With MGM's Apparent Problems.

By mid-March, CLBN's sizable outstandings to PCC and

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

MGM had caught the attention of two senior executives of CLBN's parent, Credit Lyonnais. They were Francois Gille, deputy general director **1114 in charge of the bank's financial management and a member of Credit Lyonnais' executive committee, and Alexis Wolkenstein, deputy general director in charge of the bank's international affairs and also a member of the executive committee.

Gille and Wolkenstein met in Paris on several occasions in mid-March with Parretti and Fiorini.[FN18] The purpose of the meetings was to explore ways for the Parretti and Fiorini companies to sell assets to reduce debt. In that regard, Parretti and Fiorini signed a letter dated March 18 in which they agreed to comply with an aggressive schedule for selling assets of several companies they controlled (see pp. 87-89 infra) and repaying loans. Their companies were to repay $36 million by March 31 and an additional $624 million by the end of April.[FN19] Also in the letter, Parretti and Fiorini agreed, among other things, to allow the bank to obtain financial information directly from Peat Marwick, the auditors of PCC and MGM, provided CLBN agreed not to take judicial action against either company until November 30. The letter was not signed by any representative of the bank at that time. None of the scheduled repayments have been made.

1. *Disturbing disclosures from the MGM auditors.*

*8 As agreed in the March 18 meeting, Gille and Wolkenstein met in Los Angeles on March 27 with representatives of Peat Marwick who were responsible for the PCC/MGM audit. The bankers had earlier been surprised to learn from Fiorini that PCC had lent the $146 million proceeds of the Credit Lyonnais guaranteed loan from Sealion to PCC's parent, Melia, (see text *supra* at note **1115 13) and that Melia had turned around and invested the funds in common stock of PCC. PCC had then used these funds in the MGM closing. The bankers were concerned that this round-about transaction might constitute a related party transaction that would violate the outstanding SEC consent decree. When they brought this news up to MGM's accountants, they were distressed to learn that, its debtor, PCC should report a $146 million reduction in its equity since, under generally accepted accounting principles, PCC's loan to Melia was viewed as offsetting Melia's equity investment in PCC.

The bankers also learned that, of the $400 million in license contracts MGM had factored at CLBN, (see p. 11 *supra* ) $100 million were unenforceable because MGM had either canceled the underlying licenses prior to factoring the future payments or had breached the underlying contracts. Next, they learned for the first time of one of the two transactions involving Italian financial institutions in which MGM credit was used surreptitiously to finance part of the MGM acquisition. Specifically, they learned that PCC had borrowed under an MGM credit line from Banca Populare di Novara to finance $53 million of the acquisition. The bankers now understood that, since PCC had used MGM credit to buy MGM shares, PCC would have to report an additional $50 million reduction in its equity.

Gille and Wolkenstein also learned from the accountants that the financial management of PCC and MGM was very poor. They learned of the good people who had left or been fired and of how overworked the remaining people were. They also learned that, understaffed as it was, the finance department likely would not be able to close the 1990 accounts on time to meet reporting requirements. Finally, the bankers learned that Peat Marwick would not give the companies a clean opinion for 1990 unless the bank committed to provide still more financing.

2. *Immediate steps to deal with the visible problems.*

Before leaving Los Angeles, Gille and Wolkenstein met with Parretti, Fiorini and Bickart, the owner of Sealion. Together they agreed to solve the Sealion loan problem by having Melia repay its loan from PCC by assuming PCC's obligation to repay Sealion (*i.e.*, substituting Melia for PCC as the Sealion debtor). In private meetings with the bankers, Parretti agreed that the companies' financial management was poor, but showed the bankers cash flow forecasts and assured them that the companies would not need to borrow any more before the end of the year. Gille and Wolkenstein returned to Paris on Saturday, March 30.

*9 **1116 Although they had asked Parretti to arrange a meeting with Ladd and although Ladd had asked Parretti to arrange a meeting with the bankers, Mr. Parretti did not arrange such a meeting. Ladd was deeply frustrated and was contemplating resignation. He spoke of this to Charles Meeker an acquaintance who was a partner in the Los Angeles office of White & Case, a firm that represents Credit Lyonnais in the U.S. On hearing of Ladds' frustration, Meeker asked him not to act precipitously.

3. MGM trade creditors force the Company into a Chapter

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

7 proceeding.

Upon arriving in Paris, Gille and Wolkenstein learned to their alarm that the financial press was reporting that certain of MGM's vendors had filed a Chapter 7 proceeding against it in the United States Bankruptcy Court in Los Angeles. Parretti learned in the same way. The proceeding was particularly threatening because, if not dismissed within sixty days, *i.e.,* before May 28, MGM's $300 million in outstanding bonds would accelerate.

On April 4, Gille and Wolkenstein returned to Los Angeles where they first met with MGM's outside bankruptcy counsel who suggested a strategy for dismissing the bankruptcy proceeding but explained that the strategy would require CLBN to finance MGM's future cash flow deficit. The bankers next met with Ladd, who expressed frustration that Parretti had not fulfilled his obligations. He also stated his view that Parretti's reputation for not respecting his commitments was harming MGM by impeding Ladd's ability to contract talent and supplies for new projects. Gille told Ladd that the bank considered him to be very important and asked Ladd to hang on. Gille further explained that the bank would consider providing MGM with additional financing if MGM's management could be changed. Gille and Wolkenstein then met with Parretti who agreed to step down from his position as chairman and chief executive officer in order to solve the current problems.[FN20]

**\*\*1117 F. CLBN and Parretti Negotiate A Basis to Escape Bankruptcy.**

1. The Bank sought, first of all, competent management for MGM.

Dennis Stanfill, a former CEO of Twentieth Century Fox, was suggested as a possible replacement for Parretti. Stanfill was approached and engaged in a series of discussions with the Bank, with Parretti and with Peat Marwick. Upon receiving a draft agreement, which later evolved into the Corporate Governance Agreement, Stanfill rejected it because it would not give him control of PCC, as well as of MGM. When Gille and Wolkenstein explained to Parretti that Stanfill also wanted control of PCC, Parretti declared that he would not give up control of PCC, and the search for a new chairman and chief executive officer of MGM began anew.

After a number of other candidates were considered

briefly, Gille and Wolkenstein met with Ladd on or around April 7. They described for him a management structure that would insulate the new head of MGM from control by Parretti or PCC. They explained that extensive powers would be given to an executive committee, while the MGM board as a whole would maintain power only to make very extraordinary decisions. While Parretti would select three of five directors, the board majority would have sharply limited power. The new chairman and a new chief operating officer, to be appointed by the new chairman, would make up the remaining two members of the board and would also constitute the only members of the powerful executive committee. The board would only be able to take action with the vote of four directors. To assure Parretti's compliance with the new management structure, the voting rights of the PCC and MGM shares would be given to CLBN.

**\*10** Gille and Wolkenstein asked Ladd if he would consider taking the chairmanship under such an arrangement. Ladd said he would consider it.

On or about Wednesday, April 10, Parretti agreed with his friend Dino DeLaurentiis that Ladd would be the best candidate to take over the MGM helm. Gille and Wolkenstein then met with Parretti. They described the proposed management reorganization they had discussed with Ladd, and showed him a draft of the proposed Corporate Governance Agreement. Parretti agreed in principle to the proposed structure.[FN21]

**\*\*1118** On April 11 DeLaurentiis, who appears to have been acting as an honest intermediary as an accommodation, discussed with Ladd the terms of Ladd's appointment. They documented the points they discussed in a memo dated April 12 which they both signed, after Parretti had reviewed it. That memorandum provided in part, as follows:

The following is the verbal agreement concluded between myself and Alan Ladd, Jr.:

1) Alan Ladd Jr. becomes Chief Executive Officer of MGM/Pathe.

2) Ladd needs a top qualified person as Chief Financial Officer and wants Tom Carson; and as Chief Operating Officer, Bill Bevans. Ladd will dismiss those individuals currently employed whom in his judgment are not good.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 8
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

3) Ladd will respond to the Board of Directors and the shareholders.

4) As Chairman and CEO, Ladd will be in charge of all operations of MGM/Pathe in all its sectors, and he will have the final decision on everything.

(PX 203).

2. *Negotiating the Corporate Governance Agreement.*

On Friday, April 12, Gille met again with Parretti to discuss the draft Corporate Governance Agreement. The draft Gille and Parretti then discussed would require PCC to amend MGM's certificate of incorporation and bylaws to achieve the following: (1) the creation a five person board consisting of the new chairman, to be Ladd, a new chief operating officer, to be determined before execution of the agreement, and three directors selected by Parretti; and (2) the delegation to an executive committee, consisting of the new chairman and the new chief operating officer, of all the powers delegable under Delaware law except the powers to file for bankruptcy, issue securities or appoint or remove the chairman and chief executive officer, all of which would require the vote of four directors.

Parretti requested and received a variety of changes in the draft agreement. He first sought and received Gille's agreement that the **1119 Agreement would terminate, thereby restoring his authority, if either the bankruptcy proceeding was not dismissed before May 28 (which itself was a condition precedent for funding of the new credit line) or MGM and PCC reduced their combined outstandings to CLBN, Credit Lyonnais and Sealion below $125 million. He next sought and received agreement that the document would be changed so that he would need the vote, not of four, but of three directors to issue securities, if the purpose of such issuance was to retire debt. This point was significant. It meant that, if Parretti could find equity investors, he could use their investment to pay down debt and remove the bank from the picture, without having to involve the bank-designated directors or the executive committee comprised of the same individuals. Gille agreed to this change.

*11 A number of specific limitations on the authority of the executive committee were agreed to. It was agreed (1) to limit the number and cost of films the executive committee could authorize MGM to produce; (2) to limit the expenditures that the executive committee could

authorize for the initial release of films; (3) to require the executive committee to adhere to attached cash flow projections, unless excused by CLBN; and (4) to give the MGM board, when acting with a simple majority and the concurrence of the bank, the right to block the sale of any MGM asset the consideration for which would exceed $10 million. Finally, Gille agreed to limit Parretti's required disclosure of self-dealing and material transactions to only those about which Parretti had knowledge. The most relevant provisions of the Corporate Governance Agreement as ultimately signed are quoted in the margin.[FN22]

**1120 During the same April 12th meeting, Gille and Parretti discussed the Voting Trust Agreement, the document by which CLBN would **1121 be given the rights to vote the controlling shares of PCC and MGM. Gille explained that the agreement was designed to ensure that the Corporate Governance Agreement and related agreements would be respected. Parretti understood that giving CLBN such voting rights was "part of the rules of the game." [FN23]  (Tr. Vol. I p. 103 (F. Gille)).

3. *The mid-April closing and the Summary Agreement.*

Following Gille's meeting with Parretti, the bank's lawyers provided Parretti's lawyers [FN24] with the following documents in execution **1122 form: (1) a credit agreement under which CLBN agreed to lend MGM an additional $145 million upon dismissal of the bankruptcy proceeding; (2) the Corporate Governance Agreement; (3) the Voting Trust Agreement; and (4) other related documents.[FN25]

*12 Gille and Parretti agreed that the documents should be signed quickly. The documents were left in PCC's conference room throughout the weekend.[FN26]

On Monday afternoon, April 15, Parretti arrived at PCC's conference room and announced that he would sign the agreements but would keep them in escrow until the bank provided him with an acceptable, signed, two page summary of the contents of the agreements. Parretti then signed the agreements,[FN27] ordered PCC's vice chairman, Steve Silbert, to put them in escrow and awaited the two page summary that Gille was then drafting. When Parretti saw Gille's first draft of the summary agreement that evening, he consulted with Globus and Silbert and then rejected it because it provided that, in the event of any inconsistency between its terms and those of the earlier signed documents, the agreements signed earlier that day

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

would control. Gille agreed to eliminate this provision, and he **1123 and Parretti negotiated the summary throughout the course of the following day, Tuesday. At the end of that following day, when the parties reached agreement on the summary's text, Parretti had his personal secretary, Liliana Avincola, read the agreement to him in Italian. The bankers then signed it, and Parretti released the escrowed documents.[FN28]

The two page summary provides the following in relevant part:

II. *GUARANTEES*

b) In the spirit of the agreements and in the perspective of the dismissal of the current Chapter VII procedure, CLBN expresses the following intents:

Until November 30, 1991, CLBN intends not to use its voting rights provided that the ... [Corporate Governance Agreement is] not modified and continue[s] to be complied with in form and substance.

III. *MANAGEMENT*

Appointment of new senior management teams at MGM and PCC headed respectively by Messrs. Alan Ladd, Jr. and Cesare deMichelis with extensive powers in order to strengthen controls and financial management and ensure a lasting recovery.

(PX 222).

G. The Refusal to Allow the New Structure to Operate.

1. *The war of memos.*

From the first moment, Giancarlo Parretti barely masked his efforts to continue to dominate and control the management of MGM. On April 17, the day following final agreement between CLBN and himself, Parretti sent Ladd a memo in which he acknowledged Ladd's final decision-making authority but demanded, as MGM's majority **1124 owner, that Ladd inform him in advance of important decisions and provide him with copies of all memos, commitments, etc. Also in the memo, Parretti called for Ladd to meet with him weekly on Fridays.

That same day Ladd, in a first step in getting control of MGM's cash flow, drafted (but did not send at that time) a

memo to "All Officers of MGM-Pathe Communications Co." in which he describes the new corporate governance structure at MGM and PCC. The memo purports to announce resolutions Ladd adopted as the then sole member of the executive committee.

*13 Parretti, responded the next day with a memo asserting that the resolutions were invalid and calling for Ladd to rescind them. (PX 227). (*See* discussion *infra* at pp. 59-63). Although Parretti's memo did not explain why he believed the resolutions to be invalid, he told Gille it was because the executive committee could not act until its second member had been appointed. Gille disagreed.

Mr. Parretti's position was an unfavorable omen to the bank. In all events, Gille decided to appease Parretti and thereby avoid a time consuming and costly delay.[FN29] He agreed that if the board established a two-person quorum for the executive committee, the bank would not object. However, he simultaneously secured Parretti's agreement to have the MGM board establish Ladd's designate, Jay Kanter, as the second member of the executive committee.[FN30] Also at that time, Gille agreed to the appointment of Parretti's associate Liliana Avincola to the position of secretary of MGM for the purpose of apprising PCC officers of the executive committee's activities.

After canceling several board meetings that had been arranged with Ladd, Parretti finally attended a meeting on April 29 and, together with the other directors present (Ladd, Globus and Cecconi), adopted resolutions electing Kanter and Avincola to their new positions. Ladd, delayed in his efforts to get control of MGM, then sent out his April 17 memo redrafted to include Kanter as a member of the executive committee.

**1125 During the following weeks, Ladd and his management team were embroiled in disputes with Parretti repeatedly. They received memos, for example, in which PCC personnel attempted to create a record of discussions and agreements that I am satisfied had not occurred. On May 3, Ladd received a memo from Parretti purporting to confirm agreements Parretti said had been reached in a meeting that day with DeLaurentiis, Ladd, Kanter, Wolkenstein and Gille. (PX 274). Ladd is supported by DeLaurentiis in his assertion that these agreements were not reached. (PX 304). At Ladd's request, DeLaurentiis responded to Parretti's memo in detail correcting Parretti's various mistakes. Parretti wrote back contesting DeLaurentiis's corrections. (DX 69). At the end of the exchange, a number of continuing

Not Reported in A.2d                                                                                          Page 10
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

disagreements emerged. The most significant of these disagreements concerned the rehiring of employees that Parretti had fired before Ladd took over. According to Parretti, it was agreed that MGM would not rehire any former employees without Parretti's approval. DeLaurentiis reported that Ladd had merely agreed to consult Parretti before hiring such persons and that Parretti had agreed Ladd would have the last word.

On May 10, Avincola recorded in minutes of an MGM executive committee meeting that Globus and Silbert had been authorized to negotiate the sale of MGM's interest in a foreign partnership, United International Pictures ("UIP"). (PX 310). According to Ladd and Kanter, Avincola's minutes were wrong; the board had made no decision regarding the sale of such interest. Upon Ladd's request, Kanter so advised Avincola.

2. Further Upsetting News: the discovery of the Reteitalia Put.

*14 On May 12, *i.e.,* shortly after Parretti's memo and Avincola's minutes, Gille learned a shocking secret: $130 million of cash PCC had raised for the acquisition by factoring MGM license contracts was subject to a put arrangement, which if exercised might require MGM to reimburse more than $100 million dollars immediately. In the course of their audit for the delayed 1991 10K filing, Peat Marwick had received a copy of a letter to an Italian licensee, Reteitalia, S.p.A., signed by Fiorini on behalf of MGM, granting the licensee the right to put the license back to MGM. The letter was dated the same day as the original license contract, October 20, 1990.

Gille subsequently learned that Globus had negotiated the original license agreements, without the put, with Reteitalia during the months August to October 1990 but was unavailable for the signing. **1126 Fiorini thus took his place at the signing, only to learn that Reteitalia was not willing to close the deal because it did not feel it had had sufficient time to determine the value of the films it would be receiving. PCC however urgently needed the cash for the November closing. Fiorini testified that, purportedly acting for MGM, he agreed with Reteitalia's general manager, a Mr. Bernasconi, that, if Reteitalia would sign the license agreement at that time MGM would give Reteitalia's owner, a Mr. Berlusconi, the right to unwind the agreement within twelve months by putting the films rights back to MGM. According to Mr. Fiorini whose testimony on the point I accept as true, he discussed the put with Parretti before committing MGM.

Nowhere had PCC or MGM disclosed the existence of this put. In fact, Peter Halt, PCC's corporate controller, did not even know about it. Like CLBN, Credit Lyonnais and Peat Marwick, he learned about it pursuant to Peat Marwick's mid-May audit. The put was in fact later purportedly exercised by a writing dated May 28 by Reteitalia's assignee, Principal Network. MGM thus, arguably, has an obligation to pay immediately the $113 million that Principal Network is demanding.

3. *PCC attempts to control MGM.*

At about this same time, PCC sent two memos to MGM personnel further down in the organization than Ladd and Kanter. The memos issued commands to the addressees and proclaimed PCC's right to participate in decision-making by MGM officers. On May 7, PCC's chief financial officer, Aurelio Germes, sent his counterpart at MGM, Tom Carson, a memo reminding Carson of PCC's reporting responsibilities and attaching a schedule of requested information about MGM's activities. (PX 298). The schedule began: "Pathe has the right to request, and MGM-Pathe the obligation to provide, information on the following matters, *prior to their implementation.*" [FN31] Gille testified that he viewed Germes assertion as "totally against the Corporate Governance Agreement ... [T]he **1127 executive committee was in no way under the obligation to give prior notice of making any such decision." Ladd wrote Germes: "Your memo does not reflect the way I intend to operate MGM-Pathe Communications Co. If you have any comments about the way Tom Carson is functioning under my direction and authority please contact me directly." (PX 305).

*15 The second memo from PCC was addressed to Steve Shaw, MGM's director of personnel. Purportedly, it was from PCC's new chairman, deMichelis. (PX 316). It stated: "in the interest of propriety in reporting and coordination, please be informed that no hiring and firing of any employee is to be considered final until it is confirmed and agreed by my office." [FN32] (*Id.*) Ladd was upset by the memo and responded to it the same way he responded to the Germes memo. He wrote deMichelis saying that deMichelis's memo "does not reflect the way I intend to operate MGM-PATHE Communications Co., and furthermore, the procedures [regarding hiring and firing] outlined in your memo would violate the recent agreements signed with Credit Lyonnais...." (PX 370).

4. *The bankers warn Parretti.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 11
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Shortly thereafter, Ladd complained to Gille and Wolkenstein about the "constant barrage of memos ... trying to undermine my authority." Concerned that Ladd might quit and that the executive committee did not have sufficient control over MGM's foreign subsidiaries, Gille and Wolkenstein made their first concerted attempt at keeping Parretti and PCC within what they believed to be the confines of the Corporate Governance Agreement. They attempted to communicate unequivocally how important they felt the executive committee's autonomy to be. They wrote Parretti a memo on May 24 in which, among other things, they stressed the necessity of Parretti's respecting the autonomy of the executive committee and warned that memos could destabilize the management of MGM and violate the Corporate Governance Agreement. Their memo states the following in relevant part:

It is vital for MGM Pathe and its shareholder that the new rules put in place in mid-April be fully respected in their **1128 form and substance. We understand your need for a regular exchange of views with MGM Pathe on the course of business, but it is necessary, as you agreed in the various signed agreements, that the autonomy of decision of the Executive Committee of MGM Pathe in all questions of its competence be totally respected. The agreed upon purpose is that of a strengthening and a stabilization of the management of MGM Pathe in order to ensure the taking up and the development of the activities of the Company and its profitability and it would be contrary to this purpose to de-stabilize its actions by remarks, particularly written ones, from you.

(PX 363).

When he responded to the bankers in a letter dated May 28, Parretti did not take a conciliatory stance. He blamed certain of Ladd's managers for MGM's problems, and declared: "my person in its capacities of owner of the company will have control of the Board of Directors and participation in the strategies to follow." He further asserted that Ladd had violated the Corporate Governance Agreement and warned ambiguously: "I intend to exercise the control of a 'good family father'...." (PX 367).

Gille and Wolkenstein met with Parretti in Los Angeles before they received his letter. On May 27, Parretti announced to them that the time had elapsed for MGM's vendors to appeal the dismissal of their bankruptcy proceeding. He told the bankers that Ladd should now be

replaced. The bankers were surprised and frustrated by this position. They responded that the management reorganization at MGM had never been intended merely as theater for the bankruptcy judge. They affirmed that Ladd management thus would remain in place so that MGM could regain its health.

5. It is agreed that Charles Meeker will act as MGM's President.

*16 Concerned that Mr. Parretti had not gotten the message of their May 24 letter, the bankers made their second concerted attempt to keep him to his agreement. They tried to be conciliatory. They asked Parretti to meet with them and Charles Meeker that evening to discuss Meeker's filling the as-yet-unfilled position of president of MGM. The bankers told Parretti that he might find Meeker a better conduit for communications with MGM than Ladd had been. Wolkenstein, Meeker and Ladd had previously agreed that Meeker would **1129 make a good president. Not only did he have a good relationship with CLBN as its former counsel, but he had operating experience in the film industry. Moreover, Wolkenstein and Ladd felt that Ladd and his team could better focus on managing MGM if Meeker would act as a conduit for communications with PCC. That evening, Parretti told Meeker that he would be comfortable with Meeker's acting as liaison between PCC and MGM. Meeker became president of MGM on May 29.

That same day, Mr. Meeker had the first of three consecutive meetings with Parretti. In the first meeting, Parretti agreed to channel his communications with the executive committee and other MGM employees through Meeker. For his part, Meeker agreed to use his best efforts to consult with Parretti before the executive committee made a decision and to convey Parretti's comments to the executive committee in a meaningful way.

The next day, May 30, Meeker arrived at his second meeting with Parretti to learn that Parretti had invited other MGM employees to the meeting. Parretti wanted to express to William Jones, MGM's general counsel, and others that he was displeased with resolutions Jones drafted two weeks earlier for MGM's subsidiaries PEI and CEI. Parretti apparently was displeased in part because the resolutions disabled him from signing PEI and CEI checks without a cosignature.[FN33] When Meeker told Parretti that the proposed meeting-including as it did MGM personnel other than Meeker-was inconsistent with the agreement he and Parretti had worked out the previous

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

day, Parretti told Meeker that he would channel communications through Meeker only after first handling the problem of the resolutions more publicly. Parretti went ahead and publicly expressed his displeasure with Jones, and the meeting broke up.

Meeker and Parretti later met alone. Among other items, they discussed MGM's potential withdrawal from its investment in UIP. Meeker informed Parretti that the executive committee had received all the documents about the transaction and thus was prepared to consider it.[FN34]

**\*\*1130** 6. *Parretti presses his effort to control MGM.*

Following expiration of the appeal time in the bankruptcy proceeding and concomitant with and just after Parretti's agreement that PCC would channel communications through Meeker, PCC executives launched a variety of memos addressing orders to much of MGM's senior management. On May 28, Avincola addressed each of the MGM department heads instructing them to send their May management reports to PCC promptly. Her memo was brief: "To: All Department Heads ... Please be advised that the Management Report, summarizing your department's transactions and on going projects for the month of May will be due on Monday, 3rd of June." (PX 366).

**\*17** On May 29, Parretti wrote to Shaw, MGM's director of personnel, instructing him to increase the salary of a PCC employee still on the MGM payroll.

Also on May 29, Mr. Hamburger, PCC's general counsel, wrote to Jones, instructing him to keep Mr. Hamburger informed of MGM's activities and to send him *drafts of agreements,* minutes, etc. for his comments before they were finalized.

On May 30, Parretti wrote Ladd and Leonard Kroll, MGM's production manager, asking them to present him with a detailed explanation why all of MGM's films were "to some extent" over budget. (PX 375).

Finally, Ladd received a memo purportedly from deMichelis on May 31: "since MGM/PATHE Communications Co. is a subsidiary controlled by P.C.C., we hereby instruct the officers of MGM/PATHE Communications Co. to advance the necessary funds ... for the needs of Pathe Communications Corporation."

(PX 384).

Ladd, Kanter and Meeker viewed these memos as grossly inconsistent with the Corporate Governance Agreement and agreed that Meeker should respond to them. Accordingly, Meeker responded to each memo, stating MGM's position that PCC's intrusive stance was "inappropriate and invalid under applicable law." (PX 398). To Hamburger, Meeker wrote that the manner in which MGM would inform PCC of MGM's affairs would be "decided by Laddie, me and the company's executive committee, not by you." (PX 396).

Meeker and Parretti met in Paris on Thursday, June 6. Parretti was angry about the memos Meeker had sent PCC. He told Meeker that they had embarrassed him and Avincola. Meeker responded that he would not need to send such memos if PCC did not send memos like the ones it sent. According to Mr. Meeker, Mr. Parretti then threatened Meeker as follows:

**\*\*1131** You have to understand. I am crazy.... I want you to understand, Meeker, that I am crazy. I want you to understand that I am really crazy.... I want you to understand that I am really dangerous. I am very dangerous. Do you understand, Meeker? I'm dangerous. I am very dangerous, Meeker. Do you understand that, Meeker? I'm very dangerous.

(Tr. Vol. VI p. 1226 (C. Meeker)).

I accept this testimony as truthful, if not necessarily an exact quotation. After this meeting, Parretti and Meeker met with Gille and Wolkenstein. Gille and Wolkenstein reaffirmed their support for the executive committee, again stressed Parretti's need to comply with the Corporate Governance Agreement and repeated their earlier request that Parretti cooperate with the executive committee's efforts to get control of the foreign subsidiaries.

Later that week, Gille and Wolkenstein dined with Parretti in Paris. Gille testified that by this point he and Wolkenstein had observed "that Mr. Parretti was obsessed with contesting the executive committee's authority...." (Tr. Vol. II p. 146 (I. Gille)). They were also concerned about reports they had from DeLaurentiis that Parretti had been pressuring Ladd to resign. When during their dinner Parretti complained about the memos PCC had received from Meeker, the bankers made their third concerted effort to induce Parretti to comply with the Corporate

Not Reported in A.2d                                                                                          Page 13
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Governance Agreement. This time they resorted to a warning. First, they stated their view that the memos Meeker wrote were proper responses to inappropriate action by PCC. They then told Parretti: "Mr. Parretti, be very careful. We want to make sure that the corporate governance agreement is enforced, and the corporate governance agreement will be enforced....if you do not fully cooperate with the full enforcement of the Corporate Governance Agreement, we have given the agreement ways to make sure and see that this agreement is enforced." (*Id.*) Parretti appears to have understood the gravity of that meeting, for he testified that he "didn't like that conversation at all because Mr. Gille's tone had changed." (Tr. Vol. X p. 2205 (G. Parretti)).

H. The June 14 Board Meeting and Its Aftermath.

*\*18* Far from backing down in response to the bankers' warning, Parretti and PCC's other officers instead attempted a more direct attack on the Corporate Governance Agreement.

*\*\*1132* 1. A legal theory to brace-up Parretti's effort to control MGM.

In Los Angeles, sometime prior to June 10, Germes discussed with Hamburger, and Theodore Cohen, PCC's corporate counsel, the question whether the Corporate Governance Agreement might be considered invalid. (Cohen Dep. at 88, 92; Germes Dep. at 120-21). Mr. Cohen prepared one memo on the subject for Germes on June 11 or 12 and another on June 13 or 14. (Cohen Dep. at 88-89; Germes Dep. at 119-22). Although both memos were privileged from discovery, Germes in a memo to Parretti that is in evidence, summarized the contents of Cohen's second memo:

The [Corporate Governance] Agreement effectively divests Pathe of the power to perform its legal duty to maintain a system of internal accounting controls for the activities of MGM. This legal requirement is applicable to all public companies and is imposed by Section 13(b)(2) of the Securities Exchange Act of 1934. These obligations are independently imposed on Pathe and its subsidiaries under the 1987 SEC Consent Decree....

Accordingly, the [Corporate Governance Agreement] should be deemed void as having a result that is (i) illegal and (ii) against the public policy of requiring public companies to maintain control over their financial affairs, including those of their subsidiaries.

(PX 424 at 008424). Germes understood that Parretti would use this memo in a meeting with Gille and Wolkenstein to be held on Saturday in Paris.[FN35] (Germes Dep. at 138).

2. *Ms. Avincola gives notice of an MGM board meeting.*

Following Germes' first discussions with Hamburger and Cohen, Avincola on Wednesday, June 12, notified MGM's directors of a special board meeting to be held on Friday, June 14, *i.e.,* the day before Parretti's next scheduled meeting with the bank. Ladd, Kanter, Meeker and Gille (by phone from Paris) discussed whether Ladd *\*\*1133* and Kanter should attend the meeting. The directors had been given no agenda,[FN36] and this purportedly concerned them. They feared that, if minutes of the meeting were leaked to the press, the meeting could be used as a highly visible forum in which to challenge Ladd management, with harmful effects on the already low morale of MGM employees. Kanter called Avincola to tell her that he would agree to have a meeting but did not want it to be an official board meeting. On Thursday evening, Ladd and Kanter decided not to attend the meeting and asked Meeker to relay their decision to Parretti. Meeker left word with Avincola because Parretti was not available.

On Thursday, Parretti sent an invitation to Meeker, Germes and Hamburger to attend the meeting, but Meeker did not receive it until after the meeting.[FN37] Gille called Parretti on Friday morning to confirm their meeting set for Saturday in Paris and to inquire about the board meeting.

3. *The June 14 meeting.*

*\*19* The meeting was held on June 14 at PCC's offices in Los Angeles. Directors Parretti, Globus and Cecconi attended together with Ms. Avincola, Messrs. Hamburger, Germes, Cohen and others. Neither Ladd, Kanter nor Meeker attended the meeting. Thus, under the CGA and implementing bylaws, there was no quorum.

Minutes of the meeting were prepared, and they have played a catalytic role in this litigation. It appears to have been the early uncovering of these minutes by MGM general counsel Jones, as well as the June 15 meeting in Paris, that finally induced the bank to purport to exercise its voting power to remove defendants from the MGM

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 14
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

board.

These minutes were prepared by Edmund Hamburger, general counsel to PCC and an experienced corporate lawyer. (Hamburger Dep. at 172-73). They went through various drafts. (PX 424-A, -E, -F). Although they are not signed, they are written in a formal **1134 style typical of board minutes. They recite, purportedly *in hoc verba,* 14 resolutions, each of which is reported to have been "adopted by the unanimous vote of all Directors present""on motion duly made and seconded."

Among the resolutions reportedly adopted were:

1. a resolution proclaiming "that the acts of this meeting of the Board of Directors of this Corporation are hereby confirmed and deemed to be efficacious."

2. a resolution confirming "the priority of the Consent Decree and the [1934] Act over any Bylaw, resolution or practices which would disenable the carrying out of duties under the Consent Decree and the Act by the management of PCC...."

3. a resolution that "the Board of Directors disapproves the contracts proposed to be entered with Messrs. Meeker, Carson, Meyer and Jones and that Edmund A. Hamburger ... is hereby authorized and directed to negotiate appropriate contracts, subject to review and approval by the management and Board of Directors of PCC."

4. a resolution "that Giancarlo Parretti be, and he hereby is, authorized to sign all agreements in order to put into proper form the existing commitments with respect to the 6420 Wilshire Boulevard property...."[FN38]

5. a resolution that [a certain management information system] "shall be used to the exclusion of all other systems."

6. a series of resolutions which purported to deal with various proposed transactions relating to possible sales of MGM's European subsidiaries and interests (including UIP).

(PX 424-E).

The nature and content of the board meeting is the subject of warm dispute. To plaintiffs, the June 14 meeting was an explicit, if futile, attempt to seize corporate power in

violation of the Corporate Governance Agreement. To defendants, the meeting went ahead in the absence of a quorum only as a working session designed to permit a bare majority of the board to clarify issues and to document positions. Thus, Mr. Parretti **1135 testified that he realized no binding corporate action could be taken. (Tr. Vol. X p. 2209 (G. Parretti)).

*20 Without reaching the question whether defendants actually intended to take effective corporate action and then to document such action in the minutes, I conclude that Mr. Parretti and his associates intended the meeting and the minutes at least to give that impression. Put another way, I conclude that defendants intended to use the meeting and the minutes-in conjunction with the argument that Cohen had developed in support of the invalidity of the Corporate Governance Agreement-as pressure points to extract from the bank its agreement to allow Parretti and PCC to exercise more power than the Corporate Governance Agreement had left them. *See also* n. 57 *infra.*

I cannot accept Parretti's view that the formal nature of the minutes was a secretarial mistake, nor can I accept his contention that it was not intended that the meeting and the minutes give the impression of valid corporate action. The minutes were prepared in multiple drafts by Hamburger, a seasoned corporate lawyer and PCC's general counsel. They bear all the hallmarks of formal minutes. They contain little boiler plate language, instead containing long passages of specially drafted language such as "this Board of Directors disapproves the contracts to be entered into with Messrs. Meeker, Carson, Meyer and Jones...." Finally, the minutes were reviewed in three drafts by Avincola, Germes and Globus, all of whom were present at the meeting. They were even translated into Italian by PCC's secretary, Avincola, at Cecconi's request. (Tr. Vol. IX p. 1993-95 (L. Avincola)).

The events following the meeting leave little doubt as to the intentionally provocative character of the meeting and the minutes. After the meeting, Parretti met with Meeker as the two had previously arranged.[FN39] Meeker complained that Parretti still was not using him to coordinate communications with MGM. Parretti responded that he intended to coordinate through Meeker only his communications with Ladd, but that he reserved the right to deal with other MGM employees directly. Parretti also informed Meeker that the board had taken action with respect to MGM's divestment of UIP, that he intended to give a copy of all the board's actions to the

Not Reported in A.2d                                                                 Page 15
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

bank on Saturday and that he would not disclose to Meeker what actions had been taken until after he met with the bank. The meeting ended **1136 when Parretti told Meeker that he had signed the April agreements with a gun to his head.[FN40]

On Saturday Meeker, Ladd and Kanter received copies of the minutes from a secretary who had worked on them. Friday, in the middle of the night Paris time, Gille's lawyers read him a copy of the minutes and faxed to him a memo Meeker made summarizing the discussion he had had with Parretti following the board meeting. Meeker spoke with Gille by telephone. He asked Gille if the bank still supported the executive committee. Gille replied that it did and indicated that, if necessary, the bank might even use its voting rights in that regard.[FN41]

4. Parretti and the bankers meet in Paris immediately following the June 14 meeting.

*21 Parretti had traveled to Paris immediately after the board meeting to meet with Gille and Wolkenstein. Although he and the bankers briefly discussed preliminary negotiations that Parretti had had with potential investors in MGM, their meeting focused on the MGM board meeting and the validity of MGM's corporate governance arrangement. Gille asked Parretti whether there had been a quorum present at the board meeting. Parretti answered "no" but went on to explain that a quorum was not necessary because the concept of a quorum is a joke in the U.S. since creating one there is so easy.

At the meeting, Parretti discussed the inconsistency he claimed existed between PCC's consent decree and the Corporate Governance Agreement. He stated his view that the delegation of authority to the executive committee was inconsistent with the consent decree's requirement that PCC devise and maintain a system of internal accounting controls. He gave the bankers a copy of the consent decree and told Gille that the bank must accept that, because of the stupidity of its lawyers, the Corporate Governance Agreement was invalid.[FN42] In Parretti's view, MGM could not engage in transactions**1137 without first securing PCC's consent. Also in his meeting with Gille, Parretti explained that Ladd and Kanter would be removed from their directorships if they missed another board meeting.[FN43] Parretti did not give Gille, in that meeting, a copy of the minutes of the board meeting. However, he agreed to send Gille a copy on Monday. Gille testified that his meeting that day with Parretti had

been very "tense" and that, as Parretti left the meeting, he told Gille: "If I take action against you, I will warn you of it ahead of time." (Tr. Vol. II p. 160 (F. Gille).

On Monday, June 17, after conferring with Mr. Haberer, the chairman of Credit Lyonnais, and Mr. Wolkenstein, Gille concluded that Parretti had failed to comply with the CGA in form and substance. He then authorized CLBN to exercise its rights under the Voting Trust Agreement. CLBN then broke the escrow in which it held its rights to vote PCC's MGM stock. It registered the Voting Trust Agreement with MGM, had the MGM shares transferred into its name and executed a shareholders' consent purporting to remove Parretti, Globus and Cecconi from the MGM board and replacing them with Meeker, Meyer and Jones.

II.

The foregoing narrative does not exhaust the facts or alleged facts that are relevant to one aspect or another of the parties' dispute. Large and involved aspects of the dispute have not been touched upon. But the foregoing does provide the basic context for identifying and resolving the material issues presented by the pleadings in this case.

**1138 For the reasons set forth below I conclude that Giancarlo Parretti was guilty of material breaches of the Corporate Governance Agreement. I conclude as a consequence that the action of CLBN in purporting to exercise its rights under the Voting Rights Agreement and the Voting Trust Agreement was valid and effective corporate action. Moreover, I conclude that CLBN did not itself breach its agreements with Mr. Parretti or his affiliates or behave towards him in an inequitable or unfair way. *See* pp. 75-89 *infra.* Thus I will dismiss the defendants' counterclaims with prejudice.

*22 Putting aside, for the moment, all questions of moral blame or legal liability, it appears from the credible evidence entirely clear that the management structure contemplated by the Corporate Governance Agreement in April had by June proven entirely unworkable. Following the June 14 "board" meeting and the discussions between Messrs. Parretti and Gille in Paris shortly thereafter, the commercial reality of the situation effectively forced the Bank to choose between two options. The situation could not go on with the same personalities and the same legal structure in place if there was to be any hope to salvage MGM. The bank could accede to Mr. Parretti's implicit

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Page 16

demand to remove Mr. Ladd from office and return the Company to the operating control of Parretti and his designees or it could exercise its power under the April Voting Trust and remove Mr. Parretti, Ms. Cecconi and Mr. Globus from the MGM board. In either event the too-delicate balance thought to be workable under the Corporate Governance Agreement would be radically reformulated.

I believe that, in the circumstances, the bank's election to remove the defendants from office was a reasonable one, even if one assumes that Mr. Parretti was at all times operating with subjective good faith under the Corporate Governance Agreement. However, upon consideration of the evidence, I am required to conclude that Giancarlo Parretti did not act with that degree of good faith that contracting parties are entitled to expect and demand.

More specifically, I conclude that he breached the foundational obligation implicit in every contract, to refrain from acting with respect to the subject matter of his contract so as to deny or materially impair the value bargained for by his promisee. From the outset Mr. Parretti adopted a course of conduct that insistently and continually breached the obligation to act with respect to the subject matter of the contract in good faith and to deal fairly, so that the bargain for which the other gave value should not, by his action, **1139 be defeated or materially impaired. California law, which governs the performance of the Corporate Governance Agreement, recognizes this obligation, *see, e.g., Seaman's Direct Buying Service v. Standard Oil Co.,* 36 Cal.3d 752, 686 P.2d 1158 (Cal.1984); *Berkeley Lawn Bowling Club v. City of Berkeley,* 42 Cal App 3d 280, 286-7 (1974), as does our own law. *Wilgus v. Salt Pond Investment Co.,* Del.Ch., 498 A.2d 151 (1985); *Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d 873 (1986). *See generally* Restatement 2d Contracts § 205 (1981); *see* pp. 57-59 *infra.*

Moreover, I conclude that Mr. Parretti failed to disclose to CLBN material information (*i.e.,* Reteitalia Put) concerning the financial condition of MGM at the time of the April agreements and during the following weeks, as the bank extended millions of dollars of additional credit to MGM. This failure violated the covenant contained in paragraph 7 of the CGA. *See* pp. 67-75 *infra.* I find it unnecessary to determine whether the non-disclosure of the Reteitalia Put agreement constituted common law fraud. *See Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 224 (1979); *Anderson v. Handley,* 149 Cal.App.2d

184, 308 P.2d 368, 369 (1957) (elements of fraud).

A. Giancarlo Parretti Failed to Comply "In Form and Substance" with the Corporate Governance Agreement.

1. *Mr. Parretti's rights and obligations under the CGA.*

**23** In a simple single transaction contract the obligations of the parties are usually discreet and easily identified: to render a single performance or to pay a stated price, for example. When a contract contemplates not a single performance or set an identified performance but contemplates an on-going relationship of some sort, difficulties in defining contractual obligations at the outset will increase. As the scope or time-frame of the contractual relation is extended, the express allocation of risks of future contingencies becomes more difficult. In only a moderately complex or extend contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible.[FN44] In such contracts some things must be left to the good faith of the parties.

The Corporate Governance Agreement is a contract that established a new tripartite relationship among Mr. Parretti and PCC; Mr. Ladd; and CLBN with **1140 respect to the governance of MGM. While that agreement was certainly specific in much that it contemplated, it contemplated a relationship that, perhaps necessarily, entailed some ambiguity as well. Surely, Mr. Ladd and the executive committee under his control would have exclusive authority, with stated limits, to exercise the powers of the MGM board that were delegatable, but the parties intended as well that Mr. Parretti would designate three directors and would manage PCC's "currently existing assets and liabilities" (PX 222 p. 2). What was the content of Parretti's rights as an MGM director or as a representative of its 98.5% shareholder? The parties could not, or at all events did not, attempt in their agreement to be highly specific in defining that role. This does not mean that their contract fails, but rather that the question whether subsequent action by either party violates the obligations assumed in the contract entails a contextual construction of the obligations assumed. *See* 3 *Corbin on Contracts* § 534, at 11-12 (1960).

Generally speaking, contracting parties are, to a large extent, entitled to act selfishly to promote their own interests under the contract. While in a relational contract it may be short-sighted and bad business to do so, they

Not Reported in A.2d                                                      Page 17
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

generally are entitled to push their claims of entitlement under a contract in an attempt to maximize their self-interest. But while contracting parties are not fiduciaries for each other, there are outer limits to the self-seeking actions they may take under a contract. Where one party's actions are such as to deprive the other of a material aspect of the bargain for which he contracted, the first party will be found to have violated that elemental obligation of all contracting parties to deal with each other in good faith and to deal fairly with each other with respect to the subject matter of the contract. That is the case here.

2. Mr. Parretti Breached An Obligation to Act in Good Faith and Deal Fairly with MGM and CLBN.[FN45]

*24 From the outset of the new regime contemplated by the Corporate Governance Agreement, Mr. Parretti took very aggressive positions vis-a-vis Mr. Ladd and CLBN. His first memo to Ladd, the day after the signing of the **1141 CGA, constituted dramatic evidence of an intent not to accede to Mr. Ladd's management of MGM, but to confront and challenge it. I will expand a bit upon this incident, which is touched upon above (p. 34) because, coming immediately at the outset, it is illuminating and it had the effect of delaying for two weeks Mr. Ladd's full management of MGM.

Among the piles of papers, which present at the signing of the CGA and which Mr. Parretti himself probably never read, were draft resolutions modifying the MGM bylaws as contemplated by the CGA. Most importantly, those resolutions created the two member executive committee contemplated by the CGA and defined its broad powers. Recall that the CGA itself had provided that the board of directors "shall consist of Mr. Alan Ladd, the Chief Operating Officer of MGM who is to be hired by Mr. Ladd and three persons named by Mr. Giancarlo Parretti."[FN46] The CGA also stated that "if the Chief Operating Officer ceases to serve for any reason, a successor shall be selected by Mr. Ladd or his successor." Finally, of course, the CGA provided that "An Executive Committee, consisting of Mr. Alan Ladd and the new Chief Operating Officer will be authorized and created ... pursuant to which all corporate power and duties permitted by law ... to be delegated ... shall be delegated exclusively to the Executive Committee."

The draft implementing resolutions present at the signing provided, in part; as follows:

There shall be an Executive Committee ... consisting of the Chairman of the Board and the Chief Operating Officer of the corporation. Both members ... shall constitute a quorum ... provided that if there is a vacancy on the Executive Committee, the remaining member shall constitute a quorum.

PX 221 Tab 24, Exh. A. I am satisfied that this resolution was adopted by the MGM board at its meeting held on April 16th or 17th 1991 in conjunction with the closing. See Hamburger Dep. at 330-31.

As indicated above, on April 17, Mr. Ladd drafted a memorandum addressed to all officers of MGM. Among other things, that memo announced the "new management structure" and attached copies of resolutions that it said had been adopted by the new executive committee. Among other things those resolutions: (1) **1142 changed the signatory power on the companies bank accounts (requiring Mr. Parretti or any persons affiliated with him to get a cosignature from Ladd or a person appointed by him); (2) suspended the power of any officer to expend or authorize an obligation in excess of $5,000 in the ordinary course of business; and (3) suspended the closing, execution or taking of other action with respect to any pending transaction, except with the approval of Mr. Ladd or designated persons.

*25 All of these steps plainly were within the legal power of the executive committee under the CGA and the implementing resolutions. But Giancarlo Parretti's reaction to them was immediate and hostile. On April 18, he wrote to Ladd, in part, as follows:

I have received a copy of the resolutions you purportedly adopted on April 17, 1991. As the owner of the Company, and on behalf of a majority of the boards of both PCC and MGM-Pathe, I wish to inform you that these resolutions are invalid, since, among other things, they do not conform to Exhibit 4 [the CGA] or other requirements.

Since these resolutions are invalid, I trust that you will immediately advise everyone of that fact. As to the banking resolutions, I am certainly not opposed to changes in our authorized signatories, but I think we should discuss the particulars in person.

Mr. Parretti's position, it later developed, was that the executive committee could not function at all until the entire board met and designated the contemplated second member. This position was totally inconsistent with the

Not Reported in A.2d                                                                         Page 18
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

language of the board resolution that, I find, had been adopted. Moreover, even if Mr. Parretti's position had been technically sound, it was formal and did not involve a question of substantive rights. Ladd plainly had the right to appoint the chief operating officer under the CGA; Parretti and PCC had the obligation to designate that individual for a board set and to cause him to be appointed to the executive committee. There was, legally, no room for further deliberation (or negotiation) on this point. It is not clear what purpose Parretti's challenge to Ladd served other than to challenge Ladd and to improperly delay the implementation of Ladd's control of MGM. Thus, while I interpret Mr. Parretti's April 18 letter to be legally incorrect, more importantly, I conclude that it evidences an intent at the very outset of the new relationship to be adversarial and combative.

**\*\*1143** I do not conclude lightly or easily that the covenant of good faith and fair dealing was violated here. The entire course of conduct of defendant up to and including the June 15 Paris meeting does, however, force me to that conclusion. That is, I conclude that no reasonable negotiator who consented to the mid-April agreements (including the CGA) could have concluded, if all of the actions of Mr. Parretti and his agents up to June 15 were considered, that such action would constitute compliance "in form and substance" with the CGA. *See Katz v. Oak Industries,* 508 A.2d at 880 (statement of legal test).

Among the acts done by Mr. Parretti, or those who were associated with him and under his direction, that reflect the failure to comply with the substance of CGA are the following: (1) Parretti's May 3rd attempt to get a right of prior approval on any rehiring of former employees (*see* p. 34 *supra* ); (2) Mr. Germes' May 7 memo to Tom Carson (MGM's CFO) demanding that prior to the implementation of transactions, information of various kinds be provided to him (*see* text at note 31); (3) the May 13, 1991 memo to Mr. Shaw directing that "no hiring or firing of any employee is to be considered final until it is confirmed and agreed by [Mr. deMichelis]" (p. 37 *supra* ); (4) the May 28 Avincola memo to MGM department heads instructing them to make reports to PCC (p. 42); (5) the May 29 Parretti memo to Shaw telling him to increase the salary of a person on the MGM payroll (p. 42); (6) the May 29 memo of PCC general counsel Hamburger to MGM lawyers telling them that before any transactions were finalized he should be sent drafts of all agreements, etc. (p. 42); (7) Mr. Parretti's June 6 threat to Mr. Meeker in Paris (p. 43); (8) the dispute about the form of internal

MGM reports (*see* p. 51 n. 40); (9) Parretti's refusal to refrain from direct communication with MGM subordinate personnel (p. 51); (10) Parretti's elaborate maneuvering (including the June 14 board meeting, and the statement at the June 15 Paris meeting that the CGA was invalid) designed to force CLBN to abandon its right to have Ladd manage MGM.

**\*26** These acts were plainly materially disruptive and fall beyond the scope of action that might lie in the broad border of ambiguity that the parties left in defining Mr. Parretti's rights and obligations under the CGA. They evince a committed effort to wrest back much, if not all, of that which Mr. Parretti purportedly granted in consideration of the various forms of consideration extended by CLBN **\*\*1144** and by Ladd [FN47] since April. I reject completely defendants' characterization of these actions as simple requests for information and actions without substantial impact upon MGM. Plainly, the efforts to achieve pre-authorization review of transactions such as Mr. Germes and, later, Mr. Hamburger sought constitute attempts to interfere with the on-going management of the Company by the Ladd management team. These efforts by Mr. Parretti and other PCC personnel had an effect upon the functioning of MGM. One would be amazed if they did not. But that the Ladd management was resolute in dealing with Mr. Parretti's demands does not make his conduct, which was inconsistent with the most basic provisions of the CGA, harmless. Far from that, it appears to me that the well-being of the enterprise could not much longer sustain the sort of open warfare that by mid-June had become too obvious to ignore.

The culmination of these acts illuminates the problem as clearly as the early, April 18 memo illuminates Mr. Parretti's basic approach. Mr. Parretti wanted Mr. Ladd to be gone. (Tr. Vol. II p. 141 (F. Gille)). If he could not force him out, he wanted to have acknowledged dominance over him and Charles Meeker. This explains the "resolution" at Parretti's rump board meeting of June 14 to the effect that a director would be automatically removed if he missed two consecutive meetings. At the June 15 Paris meeting with Gille and Griffault of CLBN, Parretti expressed the view that Ladd would be removed if he did not attend the next board meeting. There was no legal foundation for this claim but, as I see Mr. Parretti, he was interested not in legalisms but in dominance.

The Cohen legal memos and the assertion by Parretti that the CGA was invalid most pointedly demonstrate the final

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 19
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

bankruptcy of the governance structure that the CGA had contemplated. With these charges and with the assertion of the right to throw Ladd off the board, Mr. Parretti deliberately pushed matters to a crisis. The Bank might have responded by a partial or total capitulation (*i.e.,* consent to Ladd's removal) or by removing Mr. Parretti. Mr. Parretti no doubt fostered the hope of the former outcome. He had some ground for that hope. The Bank's relationship with Ladd was not of long standing and was not financially involved as was its relationship with Mr. Parretti. One imagines that Mr. Parretti understood**1145 that he was pushing the CGA to a crisis but that he misunderstood in what direction CLBN would jump, if it were pushed to do so.

One need not psychoanalyze Mr. Parretti, however, to conclude that his actions sought to deprive Mr. Ladd of the power for which he and CLBN had contracted and did so to a material extent. To conclude that the covenant of good faith and fair dealing has been breached, we need not conclude that the breaching party actually intended to violate a contract right. "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *Restatement (Second) of Contracts* § 205 (Comment d) (1981). The question is not whether Mr. Parretti believed that his pushing, his threats and his lack of candor constituted evasions of his contractual obligations under the CGA, the question is whether they objectively were. For the reason set forth above, I conclude that they were.

B. Mr. Parretti Breached the Warranties Contained in Paragraph 7 of the CGA.

*27 In paragraph 7 of the Corporate Governance Agreement, Parretti committed to disclose all material transactions engaged in by MGM and all related party transactions:

Giancarlo Parretti hereby represents and warrants to the best of his knowledge that (a) all material agreements or understandings or other material liabilities of MGM as of the date hereof are fully reflected in the financial statements of MGM to the extent required; and (b) all agreements between senior management and MGM have been disclosed.

FX 221, Tab 5 at p. 6. Plaintiffs complain that this undertaking was breached at the time of the signing of the CGA (and its release from escrow) in a number of material respects. I need not extend this lengthy opinion

by an evaluation of each of these claims because, below, I conclude that the existence of the so-called Reteitalia Put did constitute a highly material agreement or understanding of MGM's that was not disclosed prior to May 1991 and that such prior non-disclosure constituted a violation of paragraph 7(a) of the CGA.

1. *The Reteitalia Put Agreement.*

As part of Parretti's effort to raise cash to pay Kerkorian, he caused MGM on or about October 20, 1990 to license to Reteitalia, **1146 an Italian entity controlled by Mr. Berlusconi, certain motion picture rights for use in television broadcasts in Spain, Italy and Italian speaking countries, for eight years in exchange for a promise to pay $168 million.[FN48] PX 65; Tr. at 918. Immediate cash was made available to MGM by means of a factoring arrangement with a "sister" company of Reteitalia called Mediolanum Factor. Mediolanum provided $108 million against Reteitalia's future performance of three payment streams under the license. Tr. at 1710-11, 1840; PX 98. CLBN factored a fourth payment stream, providing $22 million, apparently under a guarantee of Banco Popolare di Milano.[FN49] This cash was then used at closing, in part, to pay PCC for the transfer of its PEI and CEI subsidiaries and in turn, by PCC, to pay Kerkorian. According to Mr. Fiorini, the Put agreement was entered into in great haste "because we need[ed] the money for the 31st of October ... in order to close the acquisition of MGM." Fiorini Dep. at 181.

Under an undisclosed letter agreement also dated October 20, 1990, however, MGM and Reteitalia had agreed that Reteitalia, at its option, could require MGM to buy back the license rights for Italy, for the purchase price $113 million, [FN50] plus interest on sums Reteitalia had paid to MGM (the "Put"). PX 64; Tr. at 920, 1331; Fiorini Dep. at 179-80.

Mr. Parretti claims he was unaware of the existence of the Put. I do not accept this testimony as truthful. I conclude that he was well aware of the Put from the date of the Agreement, October 20, 1990. Fiorini Dep. at 179-80. According to Fiorini, the Berlusconi group did not have adequate time to evaluate the worth of the films that were being licensed to Reteitalia, but as the often-deferred closing date was soon to occur, Reteitalia's cash was urgently needed by Parretti to help finance the acquisition. The Put agreement was the solution devised by Fiorini and Parretti:

Not Reported in A.2d                                                                                          Page 20
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

**\*28  \*\*1147** So we started to have the discussions what we can give you, what we can give you a guarantee for delivery of the goods, a guarantee that the goods are there and are good at this price. Finally, the decision was, well, if you are not glad with the goods, we buy back the goods and resell to others. So fundamentally the agreement was that they had a right to reput the goods back to MGM. *Now I discussed this with Parretti.*  I was unable to find Globus because he was in Japan, I believe.  *And finally we decide that we had to give this right to reput the goods back to us....*

Fiorini Dep. at 179-80 (emphasis added).

It is inconceivable that Mr. Parretti was unaware of this critical aspect of one of the last large pieces of financing pulled together to achieve the MGM acquisition. In fact, during this period of time Parretti and Fiorini spoke to each other almost every day. Tr. at 2715.

On December 28, 1990 Reteitalia assigned its rights and obligations under the licensing agreement with MGM to Principal Network LTD., Tortola ("Principal Network"). *See* PX 251. Principal Network is a subsidiary of Finivest, a Berlusconi affiliate.

The Put was not disclosed to present MGM management and to CLBN until May, 1991 when Principal Network and Reteitalia revealed it in response to Peat Marwick's annual audit inquiry. Later that month, a communication purporting to exercise the Put was received.

Gille first became aware of the possibility of partial cancellation of the Reteitalia contract when he reviewed PCC's mid-May draft of its 10K. PX 476 (dated May 12, 1991); DX 80 (dated May 17, 1991); Tr. at 168-70. These drafts suggested that the Reteitalia license and factoring agreements had not been completely firmed up.  *See, e.g.,* PX 476. A few days earlier, CLBN's Brutschi had learned from Berlusconi of the existence of the Put. When told of the exercise of the Put on May 28, the Bank's representatives were "extremely upset" and "very angry" over what they believed to be "nonrevelation of ... a very substantial commitment." Tr. at 170-74; 3027-29 (F Gille).

2. *The Materiality of the Put Agreement.*

Defendants contend that disclosure of the Put was not required given the unclassified nature of MGM's balance

sheet. That means that MGM's balance sheet does not break out liabilities between **\*\*1148** short-term liabilities and long-term liabilities. The cash received by MGM just prior to the closing from the Reteitalia licenses was booked as a debit to "cash" and a credit to a liability account denominated "advances." The liability credit reflected the fact that the license would require MGM to provide future consideration to Reteitalia (over an eight year period). The Put, on the other hand, reflects a contingent liability of very short maturity. In my opinion, whether a $113 million liability represented a non-cash call upon the long-term assets of the Company through licensing rights or, on the other hand, represented an immediate, or potentially immediate, call on the Company for $113 million in cash, is a very material distinction.

**\*29** Defendants urge otherwise, suggesting that where a balance sheet is unclassified it cannot itself reflect that distinction and there is no need to do so in the financial notes to the balance sheet. In rejecting this view I rely in part upon the general test of disclosure materiality as set out in the Statement of Financial Accounting Concepts No. 2 at ¶ 132; PX 612 ("FAC 2"); Tr. at 1721-31 and Financial Accounting Standards Board ("FASB") Nos. 78 and 5, and the opinion of Mr. Gagnon.[FN51]

Michael Gagnon, a partner at Price Waterhouse, testified in rebuttal as an expert witness. Tr. at 3034-38. Gagnon testified that FASB No. 78, "Classification of Obligations that Are Callable By the Creditor", requires obligations that by their terms are due on demand, to be classified as current liabilities. PX 665. Furthermore, in those instances where an unclassified balance sheet is presented, the terms of these callable obligations should be disclosed in the Financial Statements. Tr. at 3044-47. In addition, the Reteitalia Put should have been disclosed in the Financial Statements under FASB No. 5, paragraph 12, as a transaction substantially similar to a guarantee to repurchase receivables. Tr. at 3047-48. In rendering his opinion, Gagnon also relied on the obvious liquidity problems at MGM, and its relative lack of cash that eventually led to the **\*\*1149** "going concern" reservation taken by Peat Marwick in issuing its auditor's opinion. Tr. at 3048-49. Based upon his review of the transaction and the foregoing factors, it was Gagnon's opinion that the existence of the Reteitalia Put should have been disclosed, under GAAP, in the footnotes to the 1990 MGM Financial Statements, prepared as of April, 1991. Tr. at 3040-41.

The question whether paragraph 7 of the CGA was

Not Reported in A.2d                                                                                          Page 21
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

breached is, of course, governed by California law. I believe, that the tests of materiality employed by the accounting procession, and the SEC (*see* n. 51) are essentially the same as the test that California law provides for the materiality of disclosure. *See Warner Construction Corp. v. City of Los Angeles,* 2 Cal.3d 285, 466 P.2d 996, 1000, 85 Cal.Rptr. 444 (Cal.1970); *Rattray v. Sudder,* 28 Cal.2d 214, 224, 169 P.2d 371, 377 (Cal.1946); *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 159 P.2d 958, 968-69 (Cal.1945); *Cf.*Cal.Corp. Code §§ 25400, *et seq.* & 25500, *et seq.* (1979).

I concur in Mr. Gagnon's opinion. The existence of a potential immediate call of $113 million in cash was, for this Company at that time, a highly material fact, even given the disclosure of the "advances" that exercise of the Put would relate to. One cannot know whether the Bank would have acted differently in the negotiations leading to the CGA, had the Put been disclosed in mid-April, but I do conclude that its various judgments would have been influenced by disclosure of this potentially immediate cash liability of large size.

3. *Enforceability of the Breach of Paragraph 7(a).*

**\*30** Defendants contend that plaintiffs knew about the existence and even the exercise of the Reteitalia Put before CLBN came under a legal obligation to fund the $145 million credit facility that it agreed on April 16 to extend to MGM. Therefore, they assert that in later funding those amounts, CLBN waived its rights to rely upon the Reteitalia Put as constituting a failure to comply with the obligations of the CGA "in form and substance." Two factors lead me to reject this waiver argument. First, by the time the Put was uncovered in May it is quite likely that CLBN had already extended very substantial additional credit to MGM and was not therefore in the same position it had been on April 16 when the disclosure should have been made. The record does not appear to specify what credit was extended between April 15 and the date in early May when the Put first came to light, but it does establish that some $78 million of **\*\*1150** new credit was extended between April 24 and May 28. Tr. 2910. I infer that a portion of the substantial amount was made available prior to the uncovering of the existence of the Put.

Equally important, Mr. Parretti is himself estopped by his conduct from claiming that CLBN may not assert the existence of his non-disclosure. After the exercise of the Put occurred Parretti attempted to placate the bank by telling Mr. Gille that he, Parretti, would resolve the problem promptly. This was on or about May 28. It was not until much later that the Bank learned that this had not been done.

Thus, I conclude that the existence of the Reteitalia Put was a material fact that was required to be disclosed by Mr. Parretti on or about April 16.

III. The Claim that CLBN and Ladd Violated Mr. Parretti's Rights and the Issue of Credibility.

The account that Mr. Parretti gives of the relations between himself and the companies that he and Ms. Cecconi control on the one hand and CLBN and Mr. Ladd on the other is of course strikingly different from the story of Parretti's mismanagement, disingenuousness and bad faith that CLBN presents.

Parretti portrays himself as trusting and sees the bank as having manipulated him and MGM into a vulnerable situation in late March, in order to seize control of his company. Several strands in this argument are most important. First, he claims that CLBN had an obligation to fund $125 million of MGM's working capital needs following the acquisition. He asserts in his counterclaim that the Bank's failure fully to meet this obligation exposed the Company to the bankruptcy proceeding which itself was the occasion to force him to relinquish control over MGM. The second element of Mr. Parretti's account entails an understanding of what the parties intended by the CGA. Parretti contends that they intended that that agreement would govern the control of MGM itself, but not of its foreign subsidiaries. These were intended to remain under his control. This was important he says because the parties plainly did contemplate that if he could reduce MGM's outstanding obligations to CLBN to $125 million by November 30, 1991, he would regain control of the management of MGM. He could reduce this debt only by locating new equity investors or by selling assets. In March (before the emergence of the bankruptcy problem) Gille and Wolkenstein had discussed a program of debt reduction that contemplated the possible **\*\*1151** sale of assets held by MGM's foreign subsidiaries. *See* DX 23 and pp. 87-89 *infra*. According to Parretti the CGA was not intended to amend, modify or rescind this March 18 plan. Indeed according to him, his agreement to the CGA was expressly conditioned upon the bank supplying him with an executed copy of the agreement contemplating such sales. Tr. Vol. XII p. 2446 (G. Parretti).

Not Reported in A.2d                                                                    Page 22
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

*31 The third strand in Mr. Parretti's version of the case involves the claim that Ladd and his team were anxious to see him fail at his effort to pay down the MGM-PCC bank debt because his success would in all likelihood mean their removal from office. It is the case that some of the testimony of Ladd and others reflects a belief that Parretti's regaining of day to day control of MGM would be harmful to the company. (*See, e.g.,* Tr. Vol. IV p. 719 (A. Ladd)). In order to thwart his regaining control, Mr. Parretti asserts, Ladd interfered with his management of MGM's European subsidiaries and, specifically, delayed considering his proposal to sell MGM's interest in UIP, the film distribution consortium and delayed acting on other beneficial corporate transactions. Thus, he says, that Ladd and CLBN acted in bad faith, interfered with his contract rights and breached the CGA. He concludes not only that the Bank's purported exercise of its voting power was illicit but that he was justified by the breach in removing Ladd and Kanter from the MGM board, which he purported to do on June 18, 1991.

A. There is no evidence that CLBN breached any duty to MGM or PCC in connection with the extension of additional credit to MGM following closing of the MGM acquisition.

Mr. Parretti asserts that CLBN agreed to extend an additional $125 million revolving credit facility to MGM following closing in order to meet working capital needs. He asserts that the Bank's failure to make all of these funds available led to the financial problems that ended in the late March bankruptcy court filing. There is, however, no written agreement or notation that supports the assertion of the existence of any unconditional right to such a credit facility. Such evidentiary record as exists supports the Bank's version of events. In this version, the Bank would agree to provide a revolving line of credit that would be available to the extent that the working capital borrowings of PCC and MGM combined did not exceed $125 million. The term sheet forwarded by Mr. Bastin of CLBN to Mr. Parretti, under a cover letter dated June 7, 1990 specifically included this provision. (PX 39). I accept the testimony that PCC's working capital line was never reduced below $125 million (*see* p. 13 *supra* ) and thus I conclude that CLBN had no legal obligation to **1152 extend further credit following the closing. As it happens, the Bank did extend almost $100 million of additional credit following the closing and prior to the bankruptcy filing.

Nor do I find a breach of duty by Ladd or by CLBN in the negotiation of the May 15 Credit Agreement that formalized the extension of the $145 million contemplated by the April agreements. That that agreement did not contemplate further payments by MGM to PCC does not, in my opinion, constitute a wrong. CLBN had no obligation to PCC to fund it and restrictions on payments to shareholders is a conventional restriction imposed in commercial loans to troubled companies. Even more clearly, MGM at that point had no leverage that would permit it to force CLBN to finance PCC through MGM. In no event could the May 15 credit agreement support the conclusion that it represented a violation by Ladd or by CLBN of any right of PCC.

B. The March 18th negotiations did not result in a contract and even if it had, PCC breached its obligations under any such agreement.

*32 A key element of Mr. Parretti's vision of his dispute with CLBN is the assertion that the mid-April agreements (including the CGA) were wholly consistent with an agreement reached on March 18 that contemplated his selling assets and reducing debt to the Bank on a schedule. The continuing vitality of such a March agreement is important to his view of the case because he also asserts that Ladd and the Bank thereafter conspired to prevent him from meeting the schedule of asset sales and debt repayments.[FN52]

CLBN urged at trial that the writing reflecting the terms of the March 18th proposals had never been signed by CLBN and delivered to Mr. Parretti and thus had never reached the dignity of an enforceable contract. The Bank admitted that it caused the letter agreement to be signed in mid-April and faxed to Alexis Wolkenstein **1153 who was in Los Angeles, but it asserted that Messrs. Gille and Wolkenstein never delivered the letter to Parretti because they concluded that the March 18th discussions had been mooted by events, including the then newly negotiated CGA.

It was thus some surprise to plaintiffs when at trial defendants produced for the first time a copy of the fully executed March 18 letter agreement indicating the fax identification line of PCC and recording the April 16, 1991 receipt of the agreement by PCC. Mr. Parretti testified that receipt of that letter agreement was critical to his agreement to enter the CGA. Referring to the summary agreement that was negotiated on April 16th, plaintiffs' counsel asked Mr. Parretti:

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Q. And in fact this is the document that you-you signed the other agreements and gave them to your lawyer and said "I'm not going to give them to the bank until we sign this two-page summary?"

A. *Not until* we signed this and *we received the executed agreement of March 18th.*

Q. And then you signed this document on April 16th?

The Interpreter: Did you say April 16th?

The Witness: (through interpreter) Yes, *because I also received the agreement on the letter of March the 18th.*

Tr. Vol. XII p. 2446-47 (G. Parretti). *See also* Tr. Vol. X p. 2146-47 (G. Parretti).

Thus, at trial, Mr. Parretti testified that he agreed to the corporate governance agreement because he received a fully executed copy of the March 18th letter agreement with CLBN. The copy bearing the PCC fax identification was identified by Mr. Parretti, marked as DX 38A and admitted into evidence (Tr. Vol. X p. 2161).

Following the close of the evidence plaintiffs moved for a reopening of the evidence in an effort to show that DX 38A was a fake. This motion was granted and on December 18 testimony was heard relating to the authenticity of DX 38A.[FN53] The evidence adduced at that hearing establishes conclusively that DX 38A is not what is **1154 purports to be, but is in fact a document manufactured from a copy of DX 38 after that document was produced to defendants in this litigation. The evidence does not establish whether it was Mr. Parretti's hand that crafted the fraud or whether another was the active agency of deceit. It does, however, establish to my satisfaction that when Mr. Parretti testified that he signed the April 16th document "because I ... received the agreement on the letter of March the 18th" he was not truthful.

*33 I do accept the testimony of Francois Gille that the signed letter of March 18 was never delivered and conclude that no legal commitment of the kind reflected in the March 18th letter was made by the Bank to Parretti. By the time Messrs. Gille and Wolkenstein contemplated delivery of an executed copy of the March 18th letter, PCC had already failed to perform the acts it had

contemplated it would have performed by the end of March. (*See* p. 87 *supra* ).

C. The weight of the credible evidence establishes that neither the Ladd management team nor CLBN breached a fiduciary duty or a duty of good faith and fair dealing owed to Mr. Parretti and PCC.

Defendants complain that the members of the Ladd management group were committed to preventing Parretti from regaining control of MGM because they realized that Mr. Parretti would promptly remove them from office. Parretti says they did two things that breached their fiduciary duty to PCC as the 98.5% shareholder of MGM. First they entered into certain severance agreements with certain members of the Ladd team, which were triggered by Parretti's regaining control.[FN54] Defendants assert that these payments represented a tax upon the shareholders' exercise of their right to elect the board and thus constituted a breach of duty. Second, Parretti claims that the executive committee-with whom the Bank chose to share its contractual power to veto asset sales-delayed and impeded the sale of MGM's interest in UIP, a foreign movie distribution consortium, as well as other transactions.

The first point need not delay one for long. I find no evidence of bad faith in Mr. Ladd's decision to cause MGM to enter these employment contracts. It is an oddity of these facts that the change **1155 in control that the contracts contemplated is one that would return control back to an existing controlling shareholder, but I don't see that circumstance as necessarily material. In these odd circumstances, the risks of instability or insecurity, which no doubt might affect the corporation's functioning, came from the controlling stockholders. That risk was real. The response to it was reasonable. I do not interpret the granting of these termination rights (*see* n. 54) as intended to have, or in fact as having, a substantial impact upon the exercise of the stockholders' franchise right (or in this case as affecting the stockholders ability otherwise to regain corporate control).

I turn then to the second aspect of the argument that Mr. Ladd was disloyal to PCC in its capacity as MGM's stockholder by failing to facilitate sale transactions that Parretti sought in order to help him regain control. (In fact those proposed transactions were too little, too late in any event).

It is true that a conflict emerged between Mr. Parretti and

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099

**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Page 24

Mr. Ladd. If this conflict was not inevitable under the CGA, it was at all events quite likely. I pass over the question whether the existence of this conflict affects the availability of the business judgment form of judicial review of controversial executive committee decisions. Under any approach, I find that the executive committee decisions were valid and did not represent a breach of duty. Mr. Meekers' testimony presents persuasive evidence that the Ladd management group acted prudently with respect to these transactions from the point of view of MGM.

*34 In these circumstances where the company was in bankruptcy until May 28 and even thereafter the directors labored in the shadow of that prospect, Mr. Ladd and his associates were appropriately mindful of the potential differing interests between the corporation and its 98% shareholder. At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise.[FN55]

**1156 The Ladd management was not disloyal in not immediately facilitating whatever asset sales were in the financial best interest of the controlling stockholder. In managing the business affairs of MGM, Mr. Ladd, and those he appointed owed their supervening loyalty to MGM, the corporate entity.[FN56] It was not disloyal for them to consider carefully the corporation's interest in the UIP transaction, in the UK cinemas sale and in other proposed transactions. This I conclude they did. Mr. Parretti had gotten himself into a corner. He needed to liquidate assets to raise capital. Ladd and his team **1157 could reasonably suspect that he might be inclined to accept fire-sale prices. But the MGM board or its executive committee had an obligation to the community of interest that sustained the corporation, to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.

D. The failure to attend the June 14 "Board meeting" did not constitute a breach of the CGA in the circumstances.

The record fully discloses that by mid-June Giancarlo Parretti and his associates were not only not cooperating in the realization of the purpose of the CGA, but were actively engaged in an effort to overturn that agreement. The June 14 meeting was, I conclude, a step in that effort. The so-called minutes of that meeting fully and completely document that fact. They are summarized, in part, above. Defendants seek to characterize the refusal of

Mr. Ladd and Mr. Kanter to attend that meeting as a breach of the CGA. But to accept this view of things would turn the matter completely on its head. That Ladd and Kanter did not attend that meeting was attributable to a well founded suspicion. Had they done so, Mr. Parretti would have been in a position to make additional legalistic arguments to Mr. Gille in Paris the following day.[FN57] By the time of the June 14th meeting Mr. Parretti had demonstrated his antagonism and bad faith sufficiently to justify plaintiffs in deferring attendance at a board meeting.

E. The dispute over the question whether the CGA extended to control of MGM's European subsidiaries does not impact upon my judgment.

The parties introduce a further complex area of disagreement with respect to the question whether control of the European subsidiaries was intended to be covered by the CGA. Mr. Parretti relies upon assurances that he would be left in his offices in those subsidiaries, as well as alleged explicit statements that the CGA would not affect their operations and his understanding of technical legal questions of corporate law, to support his contention that Mr. Ladd breached the CGA in taking certain actions with respect to the management of those entities. Plaintiffs admit that Mr. Parretti was assured that he would keep his offices in those companies, but add **1158 that it was discussed and agreed that those entities would also be under the ultimate control of the executive committee. Thus, they assert that Ladd did not violate the letter or the spirit of the CGA or the Summary Agreement in attempting to exercise managerial power over those companies.

*35 The real importance of the European subsidiaries from defendants' point of view is that they held assets (e.g., theatres in England, distribution rights in France and other countries, and some other real estate) that might be sold to pay down MGM indebtedness. The assets held in the European subsidiary of MGM, however, represented but a part of the assets that Parretti and Fiorini undertook to liquidate pursuant to the March 18 debt reduction plan (DX 23). They were as well to see stock of Renta Imobilaria SA; to sell hotels in Spain; to sell Imperial Hotels in the US and the "PCC buildings in Los Angeles." DX 23. This proposed effort never got off the ground. The repayment schedule for March 31 (only US $36mm) was not met nor was the much greater April 30 payment (US $624mm) ever made, even though the CGA had had no effect at all in Europe or in the US on those

Not Reported in A.2d                                                                 Page 25
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

dates.

Thus, the core of the story that Mr. Parretti seeks to tell-that Ladd materially and wrongfully interfered with his feasible plan to regain control of MGM by exerting power over the European subsidiaries-is itself empty, even if one assumes that the parties did not intend the CGA and Ladd's authority under it to extend to the European subsidiaries. Ladd's efforts to gain supervisory control over the European subsidiaries was without effect upon Mr. Parretti's totally failed effort to raise new capital or to sell enough assets on good terms to permit him to pay down the huge debt that his companies had undertaken.

I have not predicated my judgment in this case on a finding that Mr. Parretti's activities with regard to the European subsidiaries constituted a material breach of the CGA. I simply do not see those entities and their day-to-day management as of critical importance to the CGA (or indeed to Mr. Parretti's failure to pay down the debt of PCC, Melia, Comfinance, etc.). The U.S. companies were the principal source of the problems that came to light in March and it is those entities that really matter to a recovery. If forced to decide the issue of the intended scope of the CGA, however I would accept the testimony of Mr. Wolkenstein that the subsidiaries were discussed on April 16 and it was agreed that, while Mr. Parretti would stay in his offices in those subsidiaries, it was understood that he would do so subject to the supervising power of the executive **1159 committee of MGM. In part I rest this conclusion upon Wolkenstein's credible testimony, in part upon the notation on an earlier draft of the CGA which indicates that Parretti wanted an exception for the foreign subsidiaries but that such an exception was not later included in the signed document, and in part upon the belief that experienced business people understand that, as a practical matter, absent an express agreement that provides otherwise (e.g., CGA itself) a 100% owned subsidiary is controlled in all it does by its parent, to the extent the parent chooses to exercise that control. But more fundamentally, I confess that I see this issue, in context, as marginal and relatively unimportant, in real terms.

*36 Therefore, having heard the lengthy testimony in this case, I conclude that Giancarlo Parretti and PCC had by June 16, 1991 failed to comply with the CGA "in form and substance," as the Summary Agreement required and that, as a result, the bank was legally entitled at that time to exercise its rights under the Voting Trust Agreement. The action it purported to take in removing Messrs.

Parretti and Globus and Ms. Cecconi was valid and effective action. Moreover, I conclude that the allegations of the defendants' counterclaim have not been proven and that pleading will be dismissed with prejudice.

Plaintiffs may submit a form of implementing order on notice.

FN1. MGM itself is a signatory to some of the agreements involved in this action. It has also been named as plaintiff in this case.

FN2. During trial, Mr. Globus was dismissed from the lawsuit pursuant to an agreement of the parties after he disclaimed any further interest in serving on MGM's board of directors.

FN3. A subsequent evidentiary hearing was held on December 18, 1991 following the granting of plaintiffs' motion under Ch. C. Rule 60(b) to open the record to receive additional evidence relevant to the authenticity of defendants' exhibit 38A. See pp. 78-81 infra.

FN4. To some extent the increased value of stock that typically accompanies an LBO may represent value creation, and to some extent it may represent a transfer from other corporate "stakeholders." See, e.g., Metropolitan Life Insurance Co. v. RJR Nabisco, Inc., 716 F.Supp. 1504 (S.D.N.Y.1989); Coffee, The Uncertain Case For Takeover Reform, 1988 Wis.L.Rev. 435; Shleifer & Summers, Breach of Trust in Hostile Takeovers, in "Corporate Takeovers: Causes and Consequences" 33, 34-37 (Auerbach, ed.1988).

FN5. That case dealt with the acquisition by Ronald Perelman of Technicolor in 1982 for about $105 million (plus assumption of debt)-about twice its then-market capitalization. Practically all of the purchase price was borrowed. After selling many assets to pay down debt, Mr. Perelman sold the company five years later for more than $750 million.

FN6. There is no legal significance in this case to the fact that the sale was a private sale. That fact may have economic significance, however, because financial economists have posited that a

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

source of the value creation in LBO transactions is the elimination of costs that arise from the separation of ownership from control in a public corporation. To the extent one buys a private firm, such as MGM was at the time of the sale, it is less likely that additional value can easily be wrung-out of the corporation by a reduction of agency costs thought necessarily to arise from public ownership. *See* Michael C. Jensen, *Eclipse of the Public Corporation,* Harv.Bus.Rev. (Sept.-Oct. 1989) at 61-74.

FN7. Ladd began his career in the entertainment industry as an agent for such motion picture stars as Paul Newman, Robert Redford, Judy Garland, Albert Finney, Julie Christie and Rex Harrison. He then produced films on his own in London and Los Angeles before joining Twentieth Century Fox where he ultimately became president. In 1979 he left Twentieth Century Fox to establish his own production company, the Ladd Company. There he produced films for Warner Brothers with an annual budget from Warner Brothers of $150 million. In 1985 he became chairman and chief executive officer of United Artists, then a subsidiary of MGM/UA Communications Company. Following consolidation of MGM and United Artists, Ladd became chairman and chief executive officer of the combined entertainment company. He left MGM/UA to join PCC in late 1988.

FN8. Mr. Kerkorian controlled MGM/UA through his ownership of Tracinda Corp., a personal holding company. The record in this case does not disclose the details of MGM/UA's capital structure as of mid to late 1990, as it does not appear to be relevant to this litigation in any way. In this narrative I will refer to Mr. Kerkorian rather than Tracinda as MGM's "owner."

FN9. In the effort to replace the Warner funding, Mr. Parretti was assisted by Mr. Florio Fiorini, the principal behind Sasea Holding, Inc., a Swiss company that is a major investor, indirectly, in PCC. *See* n. 12.

FN10. It appears that $100 million of this amount was used by PCC to repay existing debt and to fund working capital needs.

FN11. Only $50 million of the equity investments ultimately came through. Thus, of the $160 million in total bridge financings that CLBN provided, $110 million remains outstanding.

FN12. PCC was owned 90% by Melia, and Melia was owned 51% by Comfinance and 49% by Sasea Holdings, Inc.

FN13. As it turned out (but unknown at the time) PCC lent these funds to its parent, Melia, who then turned around and contributed them to PCC as equity.

FN14. $751 million = $400 million in factoring + $160 million in bridge financing + $45 million in loans to PCC's parent and grandparent + $146 million in guaranteed loans from Sealion.

FN15. Two separate transactions are referred to. First, it appears that Banco Populare di Novara advanced $53 million to PCC to cover one of PCC's deposit payments, but that MGM's credit was used to support that advance. Second, some $108 million of cash was made available through factoring of obligations of an Italian licensee of MGM's films. *See* pp. 67-70 *infra* ("Reteitalia Put").

FN16. That is the Bank would make credit available to MGM on a revolving basis but only to the extent that the outstanding balance of PCC's line was below $125 million. *See* PX 39.

FN17. These advances remained undocumented until March, when CLBN, MGM and other MGM companies signed an agreement which set forth conditions, not only for the $97 million in undocumented advances then outstanding, but also for up to $153 million in any future discretionary advances made by CLBN. Since under the terms of the agreement, all future advances were to be made only at CLBN's direction, MGM could not draw down funds as a matter of right. (PX 170).

FN18. Jean Jacques Brutschi, president of CLBN's executive committee and Jacques

Not Reported in A.2d                                                                                          Page 27
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Griffault, CLBN's general manager and a member of its executive committee, also attended.

FN19. Mr. Parretti refused to admit upon cross-examination that the March 18 letter required repayment of $624 million by April 30. (Tr. Vol. XII P. 2459-61 (G. Parretti)). With the following provision before him in English, French and translated to Italian, he maintained, upon repeated questioning, that the provision required repayment of just $120 million by April 30:

The companies will coordinate their reimbursements in such a manner that the total of these reimbursements reaches ... for the period April 1 to April 30, 1991, USD 504 million minimum to which will be added USD 30 millions from the loan Sealion and USD 90 million from the loan Deepbridge....

(DX 23). This testimony represents a curiosity that neither Mr. Parretti in his testimony nor his counsel in their briefs were able to explain.

FN20. In setting down my conclusions of background facts, I use the term "agreed" or "agreement" to mean a meeting of minds. I do not intend it to mean that a legal obligation was created. In other words I do not here use "agreement" as a synonym for "contract." *See Leeds v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095 (1986).

FN21. Within a day or two of this meeting Wolkenstein proposed to Parretti that he also step down from the chairmanship of PCC. Parretti agreed, the two concurred upon Cesare deMichelis, an Italian professor and brother of Italy's foreign minister as a successor. DeMichelis accepted the post.

FN22. 1. The by-laws and the certificate of incorporation of MGM shall be amended to provide for a board of directors consisting of five persons. The by-laws shall also be amended to provide that no action of the directors shall be taken without a quorum present which shall consist of no fewer than four directors. No meeting shall be called on less than 48 hours notice.

2. The current Chairman and Chief Executive Officer of MGM shall resign. The board of directors shall consist of Mr. Alan Ladd, the Chief Operating Officer of MGM who is to be hired by Mr. Ladd, and three persons named by Mr. Giancarlo Parretti. Mr. Alan Ladd shall be the Chairman of the Board and the Chief Executive Officer. If Mr. Ladd resigns from MGM or ceases to be able to serve on the Executive Committee by reason of death or disability, a successor shall be selected by the Board of Directors subject to the approval of MGM's principal lender (Credit Lyonnais Bank Nederland N.V.). If the Chief Operating Officer ceases to serve for any reason, a successor shall be selected by Mr. Ladd or his successor.

3. An Executive Committee, consisting of Mr. Alan Ladd and the new Chief Operating Officer, will be authorized and created by an amendment to both the certificate of incorporation and the by-laws, pursuant to which all corporate powers and duties permitted by the law of the State of Delaware to be delegated to a committee shall be delegated exclusively to the Executive Committee. The powers and duties delegated to the Executive Committee shall include, without limitation, the sole and exclusive power to hire and fire the executive officers of MGM and to enter into any other material transaction whether in or out of the ordinary course of business, provided that (a) the power of the Executive Committee in relation to the production of films shall be limited to the approval of a maximum of ten films for the first year, for a total production budget of not more than $125,000,000; (b) the power of the Executive Committee in relation to initial release expenditures for Prints and Advertising shall be limited to the approval of approximately $67,000,000 to $70,000,000 in the aggregate for the twelve pictures discussed in the agreement of March 12, 1991, with the condition that the Executive Committee shall be entitled to approve additional expenditure for those films that upon their release prove to be successful in the reasonable opinion of the Executive Committee, and with the further

Not Reported in A.2d                                                                                      Page 28
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

condition that similar provisions shall apply with respect to Print and Advertising expenditures for future films subsequent to the specified twelve films; (c) the Executive Committee shall adhere within reasonable limits to projections of "net cash flow before credit line requirements" referred to in Exhibit 1, except to the extent otherwise approved by MGM's principal lender; and (d) with respect to any disposition of MGM assets other than in the ordinary course of business which involves fair market value consideration to MGM of greater than $10,000,000, approval by the Executive Committee may be overruled within five days after written notice thereof to the Board of Directors by both the specific written disapproval of such disposition by the Board of Directors and by MGM's principal lender, acting jointly.

4. The Articles of Incorporation and by-laws shall be amended to provide that no action (a) relating to the filing of any petition under bankruptcy, reorganization or similar laws, or a petition for a receiver for the affairs of MGM, or (b) relating to the authorization of the issuance of any stock or other security except as provided above and except for issuances the proceeds of which are used to retire indebtedness, or (c) relating to the appointment or removal of the Chairman and Chief Executive Officer, or (d) inconsistent with any Executive Committee action authorized under paragraph 3, or (e) involving any limitation or reduction of the Executive Committee and its powers and duties under paragraph 3, shall be valid unless it is approved by an affirmative vote of no less than four of the directors.

7. Mr. Giancarlo Parretti hereby represents and warrants to the best of his knowledge that (a) all material agreements or understandings or other material liabilities or MGM as of the date hereof are fully reflected in the financial statements of MGM to the extent required; and (b) all agreements between senior management and MGM have been disclosed.

8. The terms and conditions of this document and the agreements, resolutions, by-laws, charter amendments and other documentation (the "related matters") contemplated hereby will be binding immediately but shall terminate (a) if sufficient financial support to MGM by Credit Lyonnais Bank Nederland N.V., its affiliated banks and Sealion Corp., is not provided so that all bankruptcy actions against MGM are dismissed before May 28, 1991, or (b) when MGM's and PCC's aggregate indebtedness to Credit Lyonnais Bank Nederland N.V., its affiliated banks and Sealion Corp., is less than $125,000,000.00.

(PX 221, Tab 5).

FN23. At trial Parretti testified that, when he reviewed the Corporate Governance Agreement, he told Gille and Wolkenstein that he wanted the March 18 letter (*see* pp. 17-18 *supra* ) to remain in effect. His testimony however does not square with the facts as they stood at that time. The March 18 letter was not in effect even then because no representative of the bank had yet signed it. In addition, Gille testified that, in any event, the letter was obsolete by that time because the Parretti and Fiorini companies had missed the $36 million, March 31 payment due under the terms of the letter. Finally, I note that the April agreements obviously were intended to supplant at least some aspects of the March 18 letter. I therefore accept Gille's version and find that, during the negotiation of the April agreements, the bankers did not discuss with Parretti any continued effectiveness of the March 18 letter or, if they did discuss the letter, they indicated to Parretti that it was to be replaced by the new arrangements provided for in the April agreements. *See* pp. 87-89 *infra*.

FN24. Although Parretti implied at trial and asserted in the counterclaim that he was not assisted by counsel in negotiating the April agreements, I find this not to be the case. Meeker testified that, on behalf of the bank, he conferred with four of Parretti's lawyers himself. They were Mr. Hamburger, PCC's and MGM's general counsel, Mr. Silbert, PCC's vice chairman, Mr. Jacobs, PCC's outside counsel, and Mr. Markizon, another of PCC's lawyers. I accept Meeker's testimony. Consistent with Meeker's story, Hamburger testified at deposition that he

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 29
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

did confer with Meeker regarding the Corporate Governance Agreement. More specifically, Hamburger testified that, on Wednesday the 10th or Friday the 12th, he received drafts of the voting trust agreement, a related voting rights agreement and the proposed PCC and MGM board resolutions. (Hamburger Dep. at 242, 251-59). He apparently already had the Corporate Governance Agreement. He testified that he reviewed each of the documents, checked on certain matters with Delaware counsel and commented on the agreements to Silbert, Meeker and Johnson, another of the bank's lawyers. Finally, although Parretti testified that Silbert refused to review the documents, the record contains a fax dated April 12 from Silbert to Gary Jacobs, PCC's outside counsel, which consists solely of a marked up draft or the Corporate Governance Agreement. (PX 212 at M104781-90).

FN25. These other documents included a Voting Rights Agreement that (a) provided that the Voting Trust Agreement would be held in escrow "until such time as CLBN, acting in its sole discretion, breaks such escrow in respect of ... such Voting Trust Agreement, at which time such Voting Trust Agreement shall be effective" and (b) granted CLBN, as trustee, an irrevocable power of attorney ... to endorse any shares ... as security." Also included with these documents was the Assignment, Assumption and Release Agreement by which Melia would assume PCC's obligation to pay Sealion the $146 million mentioned above (*see* p. 20 *supra* ) and draft PCC and MGM board resolutions designed to implement the management structure to be agreed upon in the Corporate Governance Agreement.

FN26. The testimony of Gille and Wolkenstein and Parretti differs substantially regarding the negotiation of the Corporate Governance Agreement and the other documents signed on April 15. For example, Parretti says that he did not negotiate the Corporate Governance Agreement until Sunday, the day before the signing. He also says that he requested different limitations on the executive committee's authority than the changes attributed to him by the bankers, that the other agreements were still being drafted over the weekend and that he signed all the agreements without their having been reviewed by his counsel. I reject Parretti's testimony and instead accept that of Gille and Wolkenstein and thus provide their version of events in the text because, as discussed in prior footnotes, (*see, e.g.,* nn. 23-24), certain of Parretti's assertions regarding the negotiations in question are particularly implausible and because I find Gille and Wolkenstein generally to be more credible witnesses.

FN27. Parretti testified that, when he was signing the agreements, he told Wolkenstein that he was only signing them because the bankers had "put a machine gun to my head." Wolkenstein denies that Parretti ever uttered such words. I find that Mr. Parretti made no such statement at that time.

FN28. The PCC and MGM boards did not, until the following day, adopt the resolutions that had been drafted to amend the bylaws and certificates of incorporation for the purpose of implementing the Corporate Governance Agreement. Thus, these documents were never escrowed.

FN29. MGM then had an operating cash flow deficit of about $1 million per day.

FN30. In exchange for the two-person quorum requirement, Parretti agreed to recommend that the MGM board elect an alternative person who would become a full member of the board and/or the executive committee if an existing member of either body were to become unable to serve. His agreement to provide for this "springing" member was documented in a letter from him to CLBN dated April 22, 1991. However, when the board passed resolutions on April 29, the provision failed to appear, much to Gille's annoyance.

FN31. The information demanded in the schedule includes: (1) policies and procedures as far as they affect internal controls or deviations from existing policies; (2) information on financial statements; (3) cash flows, budgets and forecasts; (4) transactions involving financing, partnerships and joint ventures, acquisitions and disposals and employees; (5) commitments (and

Not Reported in A.2d                                                                      Page 30
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

how they develop); (6) personnel; and (7) subsidiaries (incorporation, name changes, officers).

FN32. Parretti testified that he was not responsible for the memo and that he did not know what "had happened to Mr. deMichelis." I do not accept Mr. Parretti's testimony. The memo came from PCC's office in Los Angeles. DeMichelis was not in this country when the memo was sent, and he denies having sent or heard about it until much later.

FN33. Parretti also objected to the resolutions because, in appointing new officers to MGM's subsidiaries, they did not state explicitly that Parretti remained in his positions in the subsidiaries. Meeker agreed that Parretti's status in the subsidiaries would be made clear in subsequent resolutions.

FN34. Parretti testified that he and Meeker had no such conversation regarding UIP.

FN35. On June 13 or 14, Ladd met with Ms. Cecconi and Ms. Avincola at Cecconi's request. Ladd invited Meeker. Ms. Cecconi informed Ladd that Comfinance was canceling its guarantee of Ladd's employment contract with MGM because, in Comfinance's view, Ladd was in breach of the contract.

FN36. Parretti later provided them with an agenda on Friday morning just before the meeting.

FN37. Parretti apparently also wrote a memo to the file dated June 13 in which he documents that in April when the agreements were being signed he told various persons at the signing that CLBN was putting a machine gun to his head. Parretti testified that he did not write this memo but asked Hamburger to write it sometime in May. His testimony does not explain why the memo is dated June 13, nor does it explain why Hamburger expressly denied having ever seen or heard of such a memo.

FN38. This was a property owned by a Parretti entity that PCC wanted to sell to MGM. Ladd

and Meeker both testified that it was a bad deal from MGM's point of view and the executive committee refused to authorize it, much to Mr. Parretti's annoyance.

FN39. Meeker documented his meeting in a memo to Ladd and Kanter dated June 14.

FN40. Also during their meeting, Meeker and Parretti argued over whether MGM department heads had to prepare management reports in a form that had been used before Meeker became president. Parretti ordered Avincola to tell Cecconi to visit MGM's department heads on Monday and demand the old reports.

FN41. Gille also spoke that day with Wolkenstein and Haberer, Credit Lyonnais chairman, to whom he expressed his opinion that the bank no longer could rely on Parretti's good faith.

FN42. Parretti acknowledges that he told Gille that the Corporate Governance Agreement conflicted with the consent decree. He denies that he told Gille it was invalid. I decline to accept Mr. Parretti's version and instead accept that of Gille. Parretti's version is undermined, not only by Gille's testimony, but also by events leading up to Parretti's meeting with Gille which I summarize as follows: PCC executives including Parretti wrote memos asserting, contrary to the language of the Corporate Governance Agreement, that MGM cannot make certain decisions without input from PCC and, in some cases, PCC's consent. Germes then asked Hamburger and Cohen whether the Corporate Governance Agreement was valid. Upon receiving Cohen's conclusion, Germes wrote a memo, intended for Parretti's use in the meeting with Gille, saying that the Corporate Governance Agreement is void. And finally, the day before Parretti's meeting with Gille, Parretti, Globus and Cecconi adopted a board resolution stating that PCC's consent decree takes priority over MGM's bylaws which, among other things, incorporate the governance arrangements agreed to in the Corporate Governance Agreement.

FN43. Parretti testified that, if Kanter and Ladd did not attend board meetings, the board could

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

not take action with respect to the sale of assets. MGM thus would not sell the assets necessary for it to repay debt, and he could not get back into power. It is incorrect however to assert that the executive committee did not give timely consideration to proposed sales.

FN44.*See* Goetz and Scott, *Principles of Relational Contracts,*67 Va.L.Rev. 1089, text at n. 4 (1981).

FN45. CLBN was not a signatory to the Corporate Governance Agreement but plainly did give consideration in exchange for its execution by Mr. Parretti, and had an intense financial interest in its performance. While in its capacity as Voting Trustees it is not, in terms, enforcing the CGA, it might nevertheless do so, as an intended third party beneficiary of that contract.

FN46. Emphasis added throughout unless otherwise noted.

FN47. I focus primarily upon the bank's forbearance and its advance of credit, but Ladd too relied importantly upon the CGA in agreeing to assume the obligations of CEO.

FN48. Once PCC acquired MGM the validity of this and similar agreements were ratified by the new MGM board.

FN49. Although the record is replete with testimony that CLBN factored this payment stream, *see, e.g.,* Tr. Vol. VIII p. 1710-12, 1720-22, 1740 (P. Halt). There may be no evidence in the record that the transaction was guaranteed by Banco Popolare di Milano. Plaintiffs assert the existence of this guarantee in their brief, but cite to sections of the record which make no mention of the guarantee.

FN50. The portion allocated to the license covering Italy was $113 million. The precise origin of this figure is uncertain. Tr. at 921.

FN51. Mr. Halt testified that the standard for materiality for SEC filings is whether "the judgment of a person relying on the 10-K would

have been changed or influenced by the inclusion or exclusion of the matter." Tr. at 1830. This is the same definition employed by FAC No. 2 which provides:

> The essence of the materiality concept is clear. The omission or misstatement of an item in a financial report is material if in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

FN52. In fact, the record discloses that CLBN and Credit Lyonnais were extremely accommodating in trying to assist Mr. Parretti in locating new equity investors. I need not document here the evidence of the many meetings the Bank attended to this end, but I might mention one because it captures a flavor of the events. After it filed this lawsuit, the Bank was informed by Parretti that Cardinal O'Connor of the Roman Catholic Archdiocese of New York was interested in making a $50 million equity investment in PCC and serving on its board of directors. Tr. Vol XV p. 2922 (Gille). At Parretti's request Mr. Wolkenstein flew from Paris to New York for the purpose of discussing this prospect, only to find on arrival that the Cardinal would not attend any such meeting. *Id.* at 2923.

FN53. The parties were accorded about ten days to take any necessary discovery. CLBN noticed Mr. Parretti's deposition but his counsel informed plaintiffs that Mr. Parretti refused to appear for a deposition.

FN54. The payments would have gone to Messrs. Carson, Meyer and Jones and would have totaled $2.3 million. Ladd justifies these contracts on the conventional ground of affording financial stability to important employees in an environment of risk.

FN55. The possibility of insolvency can do curious things to incentives, exposing creditors to risks of opportunistic behavior and creating complexities for directors. Consider, for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**

Page 32

example, a solvent corporation having a single asset, a judgment for $51 million against a solvent debtor. The judgment is on appeal and thus subject to modification or reversal. Assume that the only liabilities of the company are to bondholders in the amount of $12 million. Assume that the array of probable outcomes of the appeal is as follows:

|  |  |  | Expected Value |
|---|---|---|---|
| 25% | chance of affirmance | ($51mm) | $12.75 |
| 70% | chance of modification | ($4mm) | 2.8 |
| 5% | chance of reversal | ($0) | 0 |

Expected Value of Judgment on Appeal    $15.55

Thus, the best evaluation is that the current value of the equity is $3.55 million. ($15.55 million expected value of judgment on appeal-$12 million liability to bondholders). Now assume an offer to settle at $12.5 million (also consider one at $17.5 million). By what standard do the directors of the company evaluate the fairness of these offers? The creditors of this solvent company would be in favor of accepting either a $12.5 million offer or a $17.5 million offer. In either event they will avoid the 75% risk of insolvency and default. The stockholders, however, will plainly be opposed to acceptance of a $12.5 million settlement (under which they get practically nothing). More importantly, they very well may be opposed to acceptance of the $17.5 million offer under which the residual value of the corporation would increase from $3.5 to $5.5 million. This is so because the litigation alternative, with its 25% probability of a $39 million outcome to them ($51 millon - $12 million = $39 million) has an expected value to the residual risk bearer of $9.75 million ($39 million x 25% chance of affirmance), substantially greater than the $5.5 million available to them in the settlement. While in fact the stockholders' preference would reflect their appetite for risk, it is possible (and with diversified shareholders likely) that shareholders would prefer rejection of both settlement offers.

But if we consider the community of interests that the corporation represents it seems apparent that one should in this hypothetical accept the best settlement offer available providing it is greater than $15.55 million, and one below that amount should be rejected. But that result will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.

FN56. *But cf. Blasius Industries Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988) (board action intended to impede stockholder exercise of statutory franchise right is suspect even if taken in good faith effort to promote corporate welfare).

FN57. We now understand that defendants, incorrectly, assert that under MGM amended bylaws the whole board *acting through a simple majority* could act in any matter on which the executive committee has not already acted-which would cover a number of the resolutions "adopted" on June 14. (*See* Defendants' Post Trial Brief p. 76).

Del.Ch.,1991.
Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 33
Not Reported in A.2d, 1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099
**1991 WL 277613 (Del.Ch.), 17 Del. J. Corp. L. 1099**


END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.