Tab 7

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

**H**Flight Options Intern., Inc. v. Flight Options, LLC
Del.Ch.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
FLIGHT OPTIONS INTERNATIONAL, INC., a
Delaware corporation, Plaintiff,
v.
FLIGHT OPTIONS, LLC, a Delaware limited
liability company, Kathryn Gilchrist Simpson, Louise
Francesconi, Charles E. Franklin, and William Lynn,
Defendants.
**No. Civ.A. 1459-N.**

Submitted July 7, 2005.
July 11, 2005.
Decided July 11, 2005.
Redacted Public Version Sept. 20, 2005.

Melanie K. Sharp, James P. Hughes, Jr., and Seth J.
Reidenberg, of Young Conaway Stargatt & Taylor,
LLP, Wilmington, Delaware, Robert S. Fischler, of
Ropes & Gray LLP, New York, New York, and
Justin J. Wolosz, of Ropes & Gray LLP, Beston,
Massachusetts, for Plaintiff Flight Options
International, Inc.
Jesse A. Finkelstein, Lisa A. Schmidt, Lisa M.
Zwally, Michael R. Robinson, and Harry Tashjian,
IV, of Richards, Layton & Finger, Wilmington,
Delaware, John F. Cambria, Gregory F. Hauser, and
Adam J. Biegel, of Alston & Bird LLP, New York,
New York, and David E. Brown, Jr., of Alston &
Bird LLP, Washington, DC, for Defendants Kathryn
Gilchrist Simpson, Louise Francesconi, Charles E.
Franklin, and William Lynn.
Kenneth J. Nachbar, and Megan Ward Cascio, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, for Defendant Flight Options, LLC.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.
**\*1** Plaintiff Flight Options International, Inc. ("FOI")
owns approximately 31% of Defendant Flight

Options, LLC, a Delaware limited liability company
(the "Company"). Raytheon Travel Air Company
("RTA") owns approximately 69% of the Company.
The Company has serious financial problems: debt
obligations are coming due and it has insufficient
funds to meet those obligations. RTA is prepared to
provide $50 million to the Company, but only as an
equity investment.[FN1]RTA and the Company have
agreed through the Common Units Purchase
Agreement (the "Purchase Agreement"), dated June
9, 2005, that RTA will issue 5 billion "Common
Units" of common equity in the Company at $0.01
per unit. FOI has preemptive rights allowing it to
participate on the same terms as RTA, but it has
chosen not to exercise those rights. Recognizing,
however, that consummation of the Purchase
Agreement, now scheduled for as soon as the close of
business on July 11, 2005, would dilute its equity
interest in the Company to 1%, it brought this action
to enjoin the Company from implementing the
Purchase Agreement pending arbitration of their
substantive disputes. FOI alleges that the Purchase
Agreement violates the Second Amended and
Restated Limited Liability Company Agreement of
Flight Options, LLC (the "LLC Agreement")[FN2] and
is the product of the failure of the RTA-designated
managers of the Company to discharge their fiduciary
duties in accordance with Delaware law and to meet
their obligations under the LLC Agreement. For the
reasons set forth below, the Court will enjoin the
proposed transaction for a period of 30 days to afford
FOI the opportunity to seek continued interim relief
in the arbitration forum which the parties have
chosen for dispute resolution.

> FN1. Since commencement of this action,
> RTA has formally offered to lend the
> Company another $32.4 million, but only if
> its proposed equity investment transaction
> closes.

> FN2. Verified Compl. Ex. C.

I. BACKGROUND

The Company does two things: (1) it is the world's
second largest provider of fractional and aviation
membership services; [FN3] and (2) it loses money.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

FN3. With headquarters in Cleveland, Ohio, the Company has approximately 1,300 employees and 209 aircrafts and, in 2004, had revenues of $]material redacted by court] million.

The current structure of the Company, with RTA and FOI as its two members, traces back to March 2002 when the fractional aviation interests of RTA and its affiliates and of FOI and its affiliates were combined.[FN4]Since the formation of the Company, Raytheon and its affiliates have supported the Company with more than $300 million in debt and preferred equity investments. In contrast, FOI and its principals have contributed a paltry $2 million. As of June 2003, Raytheon had provided $48 million out of the $50 million contributed by the members of the Company. At that time, the parties entered into the LLC Agreement and the Investment and Restructuring Agreement (the "Restructuring Agreement").[FN5] As a result of the restructuring, RTA purchased additional common and preferred units of the Company, increasing its equity stake from 50.1% and gaining the right to appoint a majority of the Company's Board of Managers (the "Board").[FN6]

FN4. RTA is a wholly owned subsidiary of Raytheon Aircraft Holdings, Inc. which, in turn, is a wholly owned subsidiary of Raytheon Company ("Raytheon"). For convenience, reference to "Raytheon" may include its subsidiaries.

FN5. Cambria Aff., Ex. A.

FN6. Before the restructuring, FOI had held approximately 49.9% of the equity interest in the Company. Also, before the restructuring, RTA and FOI had appointed an equal number of managers to the Board.

Under the LLC Agreement, the Company is governed by the Board which is supposed to have seven members. Four of its current members, Defendants Kathryn Gilchrist Simpson, Louise Francesconi, Charles E. Franklin, and William Lynn serve as designees of RTA and are employees or officers of Raytheon (the "RTA Managers"). Two other managers, Travis R. Metz and Robert P. Pinkas, were designated by FOI. The seventh position, reserved for the Company's chief executive officer, is vacant because there is no permanent chief executive officer.

*2 The Company's need for additional cash infusions did not abate with the restructuring. By the end of 2004, Raytheon's separate investments had reached approximately $250 million. The Board members, including Metz and Pinkas, were well aware of the Company's credit problems. For example, the October 5, 2004, Board minutes reflect the following: (1) counsel advised the Board of its duties "in a zone of insolvency context"; (2) the Company's management reported that Raytheon was resisting efforts to extend debt repayment deadlines; and (3) Raytheon was encouraging the Company to seek equity from some other source.[FN7]

FN7. Cambria Aff., Ex. C.

The Board gathered a week later to approve a forbearance agreement that had been negotiated with Raytheon to delay repayment of debt owed by the Company. The minutes of that meeting also describe the fiscal exigencies that the Company was confronting and would be confronting on an ongoing basis.[FN8]Thus, by the end of 2004, the Board knew that 2005 would present significant debt management questions for its consideration.

FN8. Cambria Aff., Ex. D.

The Board met on March 9, 2005. The Company's chief financial officer, Mark Brody, projected the need for additional cash flow of $[material redacted by court] million in April and in each of the next several months. Clearly, additional funding would be needed. Pinkas expressed his view that a third-party investment was unlikely until a permanent chief executive officer was installed and the Company's operating performance had improved. Company management was asked to "formulate a plan and process for the Board to consider regarding how the Company could obtain an equity capital infusion in the longer term, and ... outline for the Board how the Company would fund its short-term cash needs on its own."[FN9]In addition, Raytheon's proposal that the Company issue additional preferred equity units to RTA in connection with a new $[material reduced by court] million loan and certain forbearances by Raytheon was also addressed.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

FN9. The minutes of the March 9, 2005, Board meeting appear at Cambria Aff., Ex. F.

Company management had been assessing options for obtaining funding from other sources. As early as 2004, it had worked with Seabury Group LLC ("Seabury"), an investment banking, restructuring, and management consulting firm engaged in the transportation sector.

Seabury identified the Company's maintenance and aircraft dispatch availability issues as one source of its financial problems. Seabury learned that the Company had a fleet wide reliability rate of approximately [material redacted by court] percent, meaning that the Company was able to provide Company-owned aircraft to its subscribers requesting air transportation only approximately [material redacted by court] percent of the time, often due to maintenance issues. For the remaining approximately [material redacted by court] percent of requests, the Company had to charter aircraft to serve its customers. The markedly higher cost incurred by the Company for charter aircraft was one of the reasons that the Company was not profitable.[FN10]

FN10. Clauss Decl. at ¶ 13.

*3 From its review of the Company's operational and financial circumstances, Seabury drew the following conclusions which it reported to Company management in March 2005:

[U]ntil the Company's fleet wide reliability, and associated maintenance problems, were greatly improved, the Company was highly unlikely to be able to raise capital from external sources and would need to continue to rely on funding from Raytheon .... [and] the Company likely would need to fix its maintenance and reliability issues and show profitability in two consecutive calendar quarters before it would be able to attract any interest from equity investors.[FN11]

FN11. *Id.* at ¶ 14. The Defendants point to a "report" prepared by Seabury. *Id.*, Ex. A. While more in the nature of a presentation demonstrative, it does recite, at 4, that "[i]t is likely, in Seabury's opinion, that current equity shareholders will be wiped out, and

that creditors will receive pennies on the dollar under all possible [restructuring] scenarios."

At its April 4, 2005, meeting, the Board was informed of Seabury's gloomy conclusions. The Board approved, unanimously, the Company's borrowing from a Raytheon affiliate of $20 million with a maturity date of May 27, 2005 (the "Overline Loan"). Also approved was a forbearance agreement extending maturity of $[material redacted by court] million indebtedness to a Raytheon affiliate from March 2005 to May 31, 2005.

Company management also presented the Board with the results of an appraisal of the Company's common equity units by Standard and Poor's ("S & P"). The purpose was to support the Company's purchase of 6.5 million common units held by its former chief executive officer for no value. The repurchase of all of the units for the nominal consideration of one dollar was supported by the Board, including Metz and Pinkas.[FN12] The S & P draft report suggested that the Company's fair market value was in the range of negative $[material redacted by court] million. The final version of the S & P report[FN13] was received by the Company in mid-May and it was updated on May 26, 2005. The report, premised primarily upon Company financials and management projections, concluded that shareholder equity, as of December 31, 2004, was a negative $]material redacted by court] million and that it would be at that level or worse through 2010. Accordingly, S & P assigned only *"de minimis"* value to the Company's equity units. S & P's report reflected: Company losses of $[material redacted by court] million in 2003 and $[material redacted by court] million in 2004; a projected loss of $[material redacted by court] million in 2005; and a projected profit first occurring in 2008.

FN12. Metz distances himself from the implications of this vote by noting that the chief executive officer had been terminated under circumstances that left him with little, if any, bargaining room. Metz Reply Aff. at ¶¶ 13-20. That, however, does not explain a similar stance with respect to the repurchase a month later of 75,000 common units for no value from an employee who departed the Company, but without any cloud.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

Page 4

FN13. Verified Compl., Ex. B.

In the middle of April 2005, Charles F. Mueller, Raytheon's director of corporate development, contacted Jeffries Quarterdeck ("Jeffries"), a firm providing services relating to mergers and acquisitions, financing, and restructuring for companies in the aerospace and defense industries. After obtaining financial information from the Company and consulting with its chief financial officer, Jeffries was "unwilling to propose any type of financing for the Company because of its financial condition."[FN14]Indeed, it noted that the Company "lost money for every hour its planes were in the air."[FN15]Jeffries drew the following conclusions: (1) "[u]ntil the Company addressed the underlying operational causes for its losses, ... there was no possibility of arranging external debt or equity financing for the Company at that time" and (2) any "external financing could be accomplished only at extraordinary interest rates or by essentially giving up equity control of the Company."[FN16]These conclusions were reported to the Board on May 13, 2005.

FN14. Richter Decl. at ¶ 6.

FN15.*Id.*

FN16.*Id.* at ¶¶ 7-8.Neither Jeffries nor S & P would provide any formal opinion to the Company regarding either the fair value of the common units or of the Purchase agreement.

*4 The Company owed Madison Capital, one of its few third-party lenders, $14 million that was due on May 27, 2005. The debt had been guaranteed by Metz and Pinkas, but they were refusing to extend their guarantees. Accordingly, at the May 13, 2005, Board meeting, in addition to reporting Jeffries' conclusions, Company management informed the Board of the guarantors' decision and the Company's need for (1) $14 million to repay Madison Capital; and (2) $23 million to meet projected cash flow needs for the balance of 2005. On May 10, 2005, RTA had submitted a term sheet for its purchase of new equity.[FN17] That term sheet, which would form the basis for the Purchase Agreement now challenged by FOI provided: (1) an increase in the Overline Loan from $20 million to $50 million ($14 million of which was to repay the Madison Capital loan); (2) a maturity date for the increased Overline Loan of June 30, 2005; (3) the issuance on June 30, 2005, of $50 million worth of common units of the Company, valued at $0.01 per unit, to RTA and to any other equity holder who chose to exercise preemptive rights in connection with the issuance; and (4) a forbearance by Raytheon until March 2006 of approximately $]material redacted by court] million of debt that would come due in 2005. The sale price for the equity units of $0.01 per unit was subject to confirmation by an independent appraiser that the fair market value was equal to or less than the specified unit price.

FN17. Cambria Aff., Ex. I.

Pinkas opposed the proposed equity financing and indicated that there were third parties interested in investing in the Company. He did not identify those third parties, except for Apollo Management, L.P., a firm that representatives of RTA had already contacted. The Board unanimously approved the additional debt financing proposals and it authorized, although over the opposition of Pinkas and Metz, Company management to negotiate with RTA over the terms of the equity financing and to retain S & P to value the common equity units.

Raytheon had been meeting the cash needs of the Company for more than two years without any assistance from FOI. With the forbearance agreements and increasing indebtedness, it was becoming more deeply involved in its apparent role as lender of last resort. Indeed, the Overline Loan was intended to be of short duration, but it was obvious that the Company would have great difficulty in repaying it when it became due on June 30. Raytheon's position evolved to a willingness to delay repayment of certain debt and to extend additional financing, but all would be conditioned upon the closing of the Purchase Agreement.[FN18]Thus, as of June 9, 2005, the Company and Raytheon executed the Purchase Agreement and another forbearance and deferral agreement. On July 1, 2005, after the filing of this action, Raytheon also submitted a term sheet offering to provide new financing in the amount of $32.4 million. [FN19]

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

FN18. The sale of the 5 billion common units to RTA would provide the Company with no new cash. Instead, it would accomplish a conversion of debt to equity.

FN19. Mueller Decl., Ex. B.

After the May 13 Board meeting, when it had become obvious that an RTA equity investment would occur, the Company's outside counsel contacted Metz and Pinkas for assistance in negotiating with RTA for a more favorable price. No response was received. On May 24, 2005, Company management wrote to representatives of RTA and FOI asking that they identify potential investors. RTA made two suggestions the next day. A week later, Pinkas identified three potential investors.

*5 In the intervening weeks, representatives of either the Company or Raytheon discussed possible investments in the Company with six different entities. Three, after receiving financial information, either did not respond or responded with a lack of interest. Three other entities engaged in more substantive discussions with Company management:

1. UIJ Aviation, a Canadian aviation venture, indicated that it valued the Company's equity at zero and that Raytheon would receive only "cents on the dollar" for its debt but that it might require more if it agreed to a deferred payment schedule. In addition, UIJ expressed an interest in receiving special concessions from Raytheon in contracts for aircraft maintenance. Raytheon was unwilling to relinquish its indebtedness rights and would not provide special terms to UIJ for its maintenance work; accordingly, UIJ has indicated that it is not interested in any transaction involving the Company.

2. Apollo Management, L.P. appears to have given serious thought to an investment in the Company. It took the position that the Company's equity was of "no value" and that its debt was worth less than face value. It submitted a written proposal, dated April 12, 2005, that any acquisition of the Company would provide no return for equity holders and only a partial return on debt. It also indicated that it desired to acquire certain other Raytheon assets which were not for sale. In light of that response, no further negotiations occurred.

3. Assets Solutions International, Inc. ("ASI") met with Company management on June 22, 2005. It is continuing to conduct due diligence following an expression of interest in purchasing and acquiring common equity if the Company's debt could be addressed as well. Although ASI's request for an exclusivity period until July 10, 2005, was denied, ASI has continued its due diligence and its discussions with representatives of RTA, FOI, and the Company.[FN20]

FN20. It is now apparent that ASI will not present a material offer before the close of business on July 11, 2005.

The Company's outside counsel, on May 31, 2005, sought to enhance the terms of the Purchase Agreement, by seeking a higher price per unit, an extension of due dates for other indebtedness, and a post-closing adjustment to the purchase price in the event any higher price was paid by a third party within a twelve month period. Raytheon rejected those efforts, but it did consent to including a "fiduciary out" in the Purchase Agreement.[FN21] Following execution of the Purchase Agreement, all eligible equity holders, including FOI, were sent a preemptive rights notice. No notice of intent to assert preemptive rights had been submitted by the June 30 deadline.

FN21. The "fiduciary out" feature is limited in scope and requires a "definitive written agreement" for a Superior Investment Proposal and a $50 million cash (or equivalent) payment by July 10, 2005. Purchase Agreement, Section 9.2. To be a Superior Investment Proposal, it must, *inter alia,* "as a whole, present[ ] a more favorable opportunity for Flight Options that the transactions contemplated by [the Purchase Agreement]." Purchase Agreement, Section 1.1.

The Company had a net loss of approximately $]material redacted by court] million through May 2005 and it was expected to lose $[material redacted by court] million in June. As of July 1, the Company had cash reserves of approximately $[material redacted by court] million but owed Raytheon Aircraft Services roughly $[material redacted by court] million for maintenance services. Although the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

Overline Loan is to be repaid by July 11, 2005, the Company does not have the ability to do so. In addition, another $[material redacted by court] million will be required during the balance of 2005 to satisfy working capital requirements and to pay a $[material redacted by court] million facility mortgage note to a third-party lender which becomes due in August 2005.[FN22]

> FN22. With respect to the additional financing proposed by the July 1, 2005, term sheet in the amount of $32.4 million, $12.5 million has already been used to pay off a third party creditor which was threatening litigation. In the absence of third-party funding or further funding by Raytheon, the Company will not be able to need its financial obligations or to continue operations. Because there is no reasonable expectation that a third-party lender or investor will appear by July 11, 2005, the Company's fate, and that of whatever interest FOI may have, rests with Raytheon and how it will, in fact, exercise its powers as the Company's, while not exclusive, most significant creditor.

## II. CONTENTIONS

### A. *From FOI's Perspective*

*6 FOI acknowledges that Raytheon and its affiliates control both the equity and the debt of the Company. The Purchase Agreement does not provide for any new funds for the Company. It simply accomplishes a conversion of Raytheon debt to Raytheon equity and whether that happens on July 11, 2005, or sometime later should make little difference to Raytheon. FOI, however, maintains that it makes a big difference to FOI because its equity interest in the Company will be eviscerated for no consideration. The decision that the Company's common equity is worthless is, according to FOI, unfair and unjustified. Because Raytheon controls "both sides" of the transaction, the actions of its representatives must be judged under the "entire fairness" standard. In addition, FOI is contractually entitled to a price set through an "arms' length" transaction. The Purchase Agreement meets neither of these standards. Thus, FOI argues, there is a reasonable probability that it would prevail on its claims before the arbitration panel. In addition, the

severe reduction of its equity interest will constitute irreparable harm and a balancing of the equities favors granting it relief because it will suffer palpable harm without interim injunctive relief, but neither the Company nor RTA will suffer any adverse consequences because Raytheon will not capriciously harm an entity into which it has made such a sizeable investment.

### B. *From the Defendants' Perspective*

The Defendants vigorously contest FOI's claims. Initially, they stress that the Company only exists because of Raytheon's long and substantial commitment to funding its operations. The Company has a negative balance sheet; it loses money; and its prospects for a turn around in the short term are bleak. Equity value simply is not there. Moreover, FOI could have protected its interests through the exercise of its preemptive rights to acquire additional equity on the same terms as RTA. The Defendants also point out that irreparable harm will not result. Raytheon's participation will likely be on a continuing basis and rescission may be an adequate remedy. Alternatively, the diminution in value can be determined and, thus, damages would also be adequate-all in what Defendants view as the unlikely event that FOI should prevail on the merits of its claims. Finally, because of the unquestioned and immediate need of the Company for additional funding, which Raytheon is now committed to accomplishing in the event the Purchase Agreement is consummated, and the history of FOI's failure to participate in meeting the Company's ongoing cash needs, the equities align against the issuance of a preliminary injunction.

## III. ANALYSIS

### A. *The Appropriate Standard*

A plaintiff seeking a preliminary injunction bears the burden of demonstrating: (1) a reasonable probability of success on the merits at trial; (2) that it will suffer imminent, irreparable harm if its application is denied; and (3) that the harm to the plaintiff, if relief is denied, outweighs the harm to the defendant if relief is granted.[FN23] The preliminary injunction, here, is sought in aid of arbitration. That requires an analysis of the likelihood of success prong at two levels: (1) the moving party's entitlement to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

arbitration; and (2) the merits of its arbitration claims.[FN24] The parties agree that the dispute among them is to be resolved by arbitration.[FN25]Moreover, "where the right to arbitrate is clear," as here, "the analysis of the merits of the underlying claims may be more limited."[FN26]This "more limited" standard has been framed as requiring the party seeking the preliminary injunction only to "establish a reasonable probability that its arbitration position is sound."[FN27]

FN23.*See, e.g., SI Management, L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995).

FN24.*Kansas City S. v. Grupo TMM, S.A.,* 2003 WL 22659332, at *2 (Del. Ch. Nov. 4, 2003).

FN25. The LLC Agreement requires arbitration of "any dispute, controversy or claim" between a member and another member, or between a member and the Company. Section 18.2. In addition, the arbitration provisions include any dispute, controversy or claim between a member and an affiliate of a member. Affiliate is defined to include the managers of the Company, in this instance, the RTA Managers. App. at B-2.

FN26.*Kansas City S.,* 2003 WL 22659332, at *2 (quoting *Price Org., Inc. v. Univ. Computers Servs., Inc.,* 1992 WL 356026, at *8 (Del. Ch. Dec. 2, 1992)).*But see Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,* 2004 U.S. Dist LEXIS 1427, at *12 (S.D.N.Y. Feb. 3, 2004) (rejecting a more relaxed standard of review for a "status quo" injunction pending further proceedings in arbitration).

FN27.*Id.* In *Kansas City Southern,* the Court did not resolve the question "as to how much the Court should limit its inquiry."*Id.* at n.10.

B. *Probability of Success on the Merits*

*7 FOI has not yet filed a demand for arbitration.

Accordingly, it is something of a challenge to determine whether a preliminary injunction should issue in aid of an arbitration where the grounds for the arbitration have not been set forth in that forum. The Court's understanding of the claims that FOI intends to present to the arbitrators includes the following: (1) that the $0.01 per unit price at which the Company will issue to RTA new common units is unfair and unwarranted; (2) the Board failed to conduct an adequate "market check" in advance of approving the Purchase Agreement on June 9, 2005; (3) the "fiduciary out" negotiated by the Company's outside counsel is illusory because of its limited scope and short duration. The parties diverge at the outset over whether the conduct of the RTA Managers is to be judged under the "entire fairness" standard or whether their obligation is to satisfy an "arms length" standard set forth in the LLC Agreement.[FN28]

FN28. The Defendants concede that the RTA Managers "stand on both sides" of the Purchase Agreement. If they are subject to the full panoply of fiduciary duties in this case, the appropriate standard for review of their conduct would be "entire fairness;" that is, they would be required to demonstrate that the Purchase Agreement was entirely fair as to price and process.

By 6 *Del. C.* § 18-1101(c), Delaware's Limited Liability Company Act (the "Act") provides:

To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

Thus, it is necessary to turn to the LLC Agreement. By Section 6.5(b), the LLC Agreement imposes the following standard: "Each Manager shall have the same fiduciary duties in managing the affairs of the Company as the directors of a Delaware corporation

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

have, under applicable law, to its shareholders and others, as applicable."[FN29]On the other hand, by Section 6.2(l), the LLC Agreement establishes the following standard to govern transactions between the Company and any affiliate of the Company:

> FN29. Pursuant to Section 6.6 of the LLC Agreement, "[e]ach Member shall have the same fiduciary duties to each other Member as the shareholders of a Delaware corporation have, under applicable law, to each other."

Unless otherwise approved by a majority of disinterested Managers, all transactions between the Company on the one hand, and any Affiliate of the Company on the other hand, will be on arms' length terms and conditions, including fair market values and prices equivalent to those that would be charged and paid between parties at arms' length at the time of the entering into of the transactions in question.

The parties who are bound by the LLC Agreement are sophisticated parties, and it is the Court's burden to discern the intention of the parties in defining, through the LLC Agreement, the obligations of RTA and the RTA Managers to the Company and to other stakeholders .[FN30]When the LLC Agreement was negotiated, it was obvious that a majority of the Board would be comprised of RTA designees. Thus, in any transaction between the Company and Raytheon, or one of its affiliates, the RTA Managers would find themselves in a position of inherent conflict where their loyalty would always be fairly subject to question. It is with this in mind that the LLC Agreement must be construed. "It is, of course, a maxim of contract interpretation that more specific contractual terms will trump those that are more general."[FN31]Section 6.2(l) specifically is targeted at transactions between the Company and its affiliates, and it is more specific with respect to assessing the conduct of the RTA managers in a related party transaction than would be the more general fiduciary duty provision of Section 6.5(b). In short, the LLC Agreement imposes general fiduciary duties upon the managers but, in the context of a transaction between the Company and its affiliates, those duties are limited to requiring that the transaction be on "arms' length terms and conditions" [FN32] and, in accordance with § 18-1110(c) of the Act, carried out in good faith and through fair dealing.[FN33]

FN30.*See Kier Constr., Ltd. v. Raytheon Co.,* 2005 WL 628498, at *5 (Del. Ch. Mar. 10.2005).

FN31.*Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 173 n.44 (Del. Ch.2003).

FN32. The notion of arms' length terms and conditions conjures up an image of real negotiations-the process of give and take. It is doubtful that any such activity occurred between the Company and Raytheon to any significant extent. The terms and conditions of the Purchase Agreement were largely set by Raytheon. The capacity of Company management to negotiate effectively with Raytheon may be questioned because the Company apparently is in the zone of insolvency and Raytheon controls the equity and is the principal creditor. Of course, as the result of negotiations, a limited "fiduciary out" clause was added. As a practical matter, the inquiry must be one of whether the price fairly reflects what would have been the outcome of an arms' length negotiation. The reliability of a determination of price cannot be fairly assessed, at least in this context, without consideration of the process.

FN33. At issue here is the scope of the fiduciary duties owed by the RTA Managers to the Company. The definition of "Affiliate" appears in Appendix B of the LLC Agreement. It means, "with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; ..." Because RTA controls the Company, whether through its ability to designate a majority of the board of managers or by its effective equity control, RTA is an "affiliate" of the Company.

It should be noted that the arbitrators might take a different view. The LLC Agreement broadly imposed fiduciary duties on the RTA Managers. A limitation on those important duties should have been, it could be determined, more

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

precisely delineated and, if resort to a contract construction principle of the specific provision controlling the general provision is needed, then Section 6.2(1) was not adequate to achieve the results sought by the Defendants.

**\*8** In accordance with the LLC Agreement, the RTA Managers must justify their approval of the interested party transaction as one on "arms' length terms and conditions." [FN34]FOI does not question the terms and conditions of the Purchase Agreement other than the price and, perhaps, the provisions of the "fiduciary out" clause. Through Metz's affidavit, FOI sets up its claim relating to the price of the common units and S & P's supporting valuation.[FN35]Metz, who does not claim to be an independent valuation professional in this matter,[FN36] expresses the view that each common unit is worth $1.44.[FN37]

> FN34. The burden of demonstrating that the Purchase Agreement is based on an arms' length price is properly imposed upon the RTA Managers because that is the standard prescribed in the LLC Agreement for them to justify their conduct, instead of the more onerous "entire fairness" standard, a burden which, if applicable, clearly would be theirs.

> FN35. Metz notes that S & P used only a discounted cash flow analysis, eschewing other potential methodologies to determine value.

> FN36. Metz does have experience in valuing businesses as part of his duties as a managing director of a private equity investment firm that manages more than $1.5 billion. FOI did not submit an independent cash flow analysis. The reasons for that tactical choice are not clear although one is tempted to wonder about the conclusions that might have been drawn.

> FN37. Metz Aff. at ¶ 12. A detailed review of Metz's attack on the S & P discounted cash flow analysis, Metz Aff. at ¶¶ 5-12, would serve little purpose in the context of a preliminary injunction motion. It is sufficient to note that his concerns are fairly addressed in the Deetz Decl. at ¶ 7-10.

If the common units are worth $1.44 each, one wonders why the preemptive rights were not exercised. FOI chose not to do so (perhaps because it did not have the resources), but that does not explain why FOI could not have induced others to participate (or assist it in participating) if, in fact, the units were worth 144 times the purchase price. While there is no duty to exercise preemptive rights, these sophisticated parties included no dilution protection feature in the LLC Agreement, except for the preemptive rights provision that allows each member to amass equity units on the same basis as the other member.

FOI also attacks the independence of S & P because Raytheon is s an "S & P client." Verified Compl. at ¶ 33. FOI offers nothing more and what it has alleged has no suggestion of materiality and, thus, fails to cast any doubt on S & P's independence. *See, e.g., NBC Universal, Inc. v. Paxson Communications Corp., 2005 WL 1038997, at \*7-8 (Del. Ch. Apr. 29, 2005).*

FOI also argues that the process adopted by the RTA Managers was so flawed as to cast doubt upon the value established through that process for the new common units. First, it points out that the Company never retained an investment adviser and it did not receive a formal opinion from either Seabury or Jeffries. Second, FOI contends, quite plausibly, that the Company has favorable future prospects.[FN38]The impact of potential future prosperity on current value was not, according to FOI, given appropriate weight. Third, Apollo Management's position reflected the first response to a solicitation that was then cut off by the Raytheon interests. As such, it was only the opening salvo in a negotiation that never went further. Accordingly, it is an unreliable reference.

> FN38. That, of course, is premised on an assumption that the Company survives until the "future" arrives. To be sure, the Company does have serious difficulties that extend beyond its current liquidity crisis. For example, the Company's churn rate (a

Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

function of customers lost measured against customers gained) is above the industry average. *See* Deetz Decl. at ¶ 11(iv).

Thus, it is against this backdrop that the Court must determine whether FOI has "establish[ed] a reasonable probability that its arbitration position is sound."[FN39] That question is not whether the Court, in the absence of an agreement by the parties to submit the merits of their dispute to an arbitration panel, would enjoin the issuance of new common units to RTA. Instead, it requires an assessment, however imprecise, as to how FOI's claims would likely be received in the arbitration forum. It is not simply a question of whether the claims to be submitted to the arbitrators are colorable; nor does it require certainty that a favorable result will be obtained. Instead, FOI must persuade the Court that the arbitration panel could find in its favor and that there is a reasonable possibility of such a result. It is important for the Court not to impress its views of this matter on the venue chosen by the parties for the resolution of their dispute. Thus, the Court must be careful in predicting the outcome in the arbitration forum. Ultimately, it is a question of whether FOI has come forward with a showing that its claim is sufficient to accommodate these considerations.

FN39. *Kansas City S.*, 2003 WL 22659332, at *2.

The evidence that the price of the new Common Units is a fair reflection of what would have been reached in an arms' length transaction consists of: (1) the S & P valuation; (2) the "opinions" from Seabury and Jeffries; and (3) a limited marketing or "market check" effort. Each has its shortcomings. The S & P valuation is not unreasonable, but it relies exclusively on the discounted cash flow method. While the discounted cash flow approach may have been the single best tool, other methodologies were not employed as a check.[FN40] In addition, the Company's relatively short history and the difficulty of projecting its cash flows into the future all counsel for caution. Moreover, S & P did not explore in depth the nature of the industry and its prospects. With respect to Seabury and Jeffries, the intensity of their efforts cannot readily be discerned from the affidavits presenting their conclusions.[FN41] In addition, Jeffries' involvement was solicited by Raytheon's director of corporate development, *i.e.,* not by anyone directly

associated with the Company. Neither Jeffries nor Seabury offered a formal opinion. Again, while ultimately none of this may matter, there is room for doubt. The effort to obtain proposals-an effort to secure an accurate read of market perception-was done in a haphazard manner. The results may accurately reflect the market, but the lack of coordination and process, again, tends to undermine the results. Finally, the "fiduciary out" provision which requires a "definitive written offer" and the delivery of $50 million within approximately one month of approval of the Purchase Agreement, does not support the reliability of the established price because the short period offers only limited opportunity for any potential investor to pursue necessary due diligence and to arrange for the required funding.

FN40. S & P acknowledges the usefulness of other methodologies-the Guideline Company Method and the Comparable Company Method. It states that the necessary information to employ other methodologies was not available, but it is not clear why that is the case. Verified Compl., Ex. B, at ¶ 6.3.

FN41. Because of the compressed schedule for considering the preliminary injunction application, admittedly due largely to FOI's delay in filing this action, no depositions were taken.

*9 The question, of course, is not how the Court views the valuation information as a whole; it is how the arbitrators would view it. The Court is satisfied, however, that there is a likelihood that the arbitrators would find FOI's challenge to be sound: that they would conclude that the fate of a company with revenues in excess of $[material redacted by court] million annually and the fate of an almost one-third interest in the Company should not be based on a price established by such a process. Raytheon controlled the setting of the price; while it may eventually be sufficient for it to argue that the balance sheet and the cash demands demonstrate an absence of value in the equity, the process chosen was so informal as to undermine substantially the ability of the RTA Managers to show that the price is the equivalent of an arms' length transaction's result, at least within the projected views of an arbitration

Not Reported in A.2d                                                                    Page 11
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

panel.[FN42] Accordingly, under the in aid of arbitration standard, FOI has met its merits-based burden.

> FN42. Although the Act provides that drafters of limited liability company agreements may relieve managers of some of the burdens of fiduciary duties, the duty of good faith must remain. FOI alleges that the RTA Managers failed to meet their duty of good faith. The Court is satisfied, at least on the present record, that FOI has not demonstrated any basis for finding a breach of the duty of good faith, even under the in aid of arbitration standard. There is no reason to doubt that the RTA Managers reasonably and in good faith believed that the Common Units were of no (or *de minimis* ) value and that the proposed financing was in the Company's best interest. The balance sheet is negative, cash needs cannot be met, and the debt is substantial. In addition, they had the benefit of the S & P valuation. Their views may be wrong (or they may be right), but for these purposes, their conduct cannot be viewed as resulting from a lack of good faith.

C. *Irreparable Harm*

Without irreparable harm, there is no need for the Court to grant interim relief and the parties can fairly wait until final decision on the merits. Winning sooner, instead of later, is, of course, preferable. When a court enters a preliminary injunction, it does so frequently without a full understanding of the facts and without the parties' having had the opportunity to develop fully their advocacy positions. Thus, courts must be careful in awarding such relief; indeed, it is said that a "preliminary injunction is an extraordinary remedy,"[FN43] and it is crucial for the successful plaintiff to demonstrate that it will suffer irreparable harm in the absence of judicial intervention.

> FN43. *Lawson v. Meconi,* 2005 WL 1323123, at *2 (Del. Ch. May 27, 2005).

FOI starts with the argument that it need not make a showing of irreparable harm. It relies upon Section 21.13 of the LLC Agreement, which provides in pertinent part:

Specific Performance. The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party ... from a failure of a party to perform any of the obligations under this Agreement. Therefore, if any party ... enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party ... has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

While this language perhaps could be read as requiring the court to be more flexible in assessing whether FOI has made the necessary showing, it is not dispositive.[FN44] First, it only addresses the question of an adequate remedy at law-a necessary predicate to the exercise of equitable jurisdiction without regard to whether the plaintiff seeks interim or permanent equitable relief. It does not specifically address the more precise aspect of irreparable harm. In short, there are instances where there may not be an adequate remedy at law but there, at the same time, may not be the potential for irreparable harm. Second, the parties may not confer equitable subject matter jurisdiction upon this Court by agreement.[FN45] Thus, further consideration is required.

> FN44. The Defendants argue that Section 21.13 can have no application here because it bears the heading "Specific Performance" and this is not an action for specific performance. They are right: Section 21.13 of the LLC Agreement bears the heading "Specific Performance" and this is not an action for specific performance; however, by Section 21.7 of the LLC Agreement, "Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof." The text of Section 21.13 cannot be fairly read as limited to specific performance actions only.

> FN45. As to the capacity of contracting parties under circumstances, not present here, to confer subject matter jurisdiction by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

contract, see 10 _Del. C._ § 346.

**\*10** Consummation of the Purchase Agreement will dilute FOI's equity interest in the Company from 31% to 1%. A severe dilution has been found to constitute irreparable harm because, at least in part, of the difficulties in restoring the injured party to its proper status through a grant of final relief.[FN46]However, there is no general rule that applies to all circumstances. Instead, a case-by-case analysis, considering the various potential consequences of the dilutive conduct is necessary.[FN47]

> FN46._See, e.g., Suchodolski Assocs. v. Cardell Fin. Corp.,_ 2004 U.S. Dist. LEXIS 1427 (S.D.N.Y. Feb. 3, 2004). The parties all cite _Solar Cells, Inc. v. True N. Partners, LLC,_ 2002 WL 749163 (Del. Ch. Apr. 25, 2002), which, while instructive, involves a more "injunction-friendly" set of facts. More than equity dilution (_e .g.,_ dilution of role in corporate governance) was at stake there. Also, the challenged dilution was accomplished in what the Court considered an underhanded manner. Here, Metz and Pinkas were aware of the substance of the Purchase Agreement well in advance of the June 9 meeting and, for another month, have had, although on a limited basis, the opportunity to pursue other options. There is one aspect about _Solar Cells_ which may be viewed as putting FOI's claims in a better light. The fiscal difficulties experienced in _Solar Cells_ resulted from claims of third-party creditors; here, the creditor of consequence-Raytheon-is also the party which is acquiring the enhanced equity position as the result of dilution of FOI's interest.

> FN47._See Rovner v. Health-Chem Corp.,_ 1996 WL 377027, at \*13 (Del. Ch. July 3, 1996) (considering the impact of voting power dilution).

The Defendants have cogent arguments as to why a finding of irreparable harm may not be appropriate. First, the benefits of dilution will accrue to Raytheon; Raytheon will likely, but with no guarantee, continue holding that equity; under the LLC Agreement, Raytheon will be required to give notice to FOI of any proposed transfer of its equity interest; and, thus, the arbitration panel would likely be confronted with a factual setting in which, if applicable, rescission could be accomplished. Second, the value of FOI's interest in the Company before and after the issuance of the new equity can be determined-even if imprecisely-and, thus, damages could be fairly measured. If damages are available, the Defendants point out, the harm cannot be said to be irreparable. Finally, the dilution of FOI's equity interest will not impair its right to designate two members of the Board. As the Defendants argue, but with little comfort for FOI, FOI's role in corporate governance through the Board will not be diminished.

In response, FOI notes that the LLC Agreement exculpates the RTA Managers from personal liability for money damages to the extent that "their act[s] or omission[s] [were] taken or omitted in good faith and in a manner that the Covered Person [Manager] reasonably believed to be in or not opposed to the best interests of the Company or permitted by the [LLC Agreement]."[FN48] On the other hand, the exculpatory provision does not extend to RTA. Nevertheless, FOI's ability to collect damages from the RTA Managers, in the event that it should prevail on the merits of its claims, is, at best, problematic.

> FN48. LLC Agreement, Section 7.3(a).

Although rescission may be more likely in this matter to be a viable remedy than it frequently is, there remain a number of substantial impediments. These range from the possibility, even if not the likelihood, that Raytheon will sell its interests in the Company to the likelihood that further changes will be made in the Company's capital structure thereby making rescission less facile. Moreover, the process of calculating the diminishment in value (of course, assuming that there would be any) may be a daunting task.

In sum, reducing FOI's equity interest in the Company from 31% to 1% may fairly be characterized as irreparable harm.

D. _Balancing of the Equities_

If the Purchase Agreement is implemented, FOI's significant equity position will be reduced to approximately 1% of the Company and, if that is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

done improperly, restoring to FOI its former position or fairly compensating it for its loss will be problematic. As for the Company, this is not a dispute where some third-party investor or creditor may do substantial harm to it in the absence of the proposed transaction. Raytheon, of course, will act as it chooses as creditor. If it chooses to force the issue, it can cause the parade of horribles posited by the Company-loss of jobs, closing of facilities, defaults on contracts. That harm, however, will be caused to an entity in which Raytheon holds approximately 69% of the equity. In short, in balancing the equities between the Company and FOI, the balance tips slightly in favor of FOI. The interests of the RTA Managers, as such, would not be adversely affected by the entry of a preliminary injunction.

### E. *Propriety of a Preliminary Injunction*

*11 FOI has succeeded, although by the barest of margins, under the relaxed standard associated with preliminary injunctions in aid of arbitration in demonstrating a likelihood of success, the occurrence of irreparable harm in the absence of interim relief, and a favorable balancing of the equities.[FN49] Thus, a preliminary injunction, as described below, will issue to maintain the status quo pending commencement of the arbitration proceeding between the parties and the arbitration forum's opportunity to review the need for continuing interim relief.

> FN49. The Defendants argue that equitable relief should be denied to FOI because of its delay in pursuing this action. It took from June 9, 2005, when the Purchase Agreement was applied (and those terms had been known for perhaps as long as a month before then) until June 27, 2005, to file this action. The defense of laches "operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment."*Scureman v. Judge, 626 A.2d 5, 13 (Del. Ch.1992)*. It appears that efforts to avoid litigation were pursued during the interim; it appears that the Defendants did not change their position during the interim; under the circumstances, it is difficult to say that the delay was unreasonable. Thus, laches is not available as a defense to FOI's

motion for a oreliminary injunction.

### IV. CONCLUSION

The Company's future depends upon what Raytheon plans to do with, or to, it. This Court's actions in the context of a motion for a preliminary injunction in aid of arbitration are likely to be of little, if any, long-term consequence for the Company. Raytheon controls the Company's Board of Managers, it controls the Company's equity, and its credit position is overwhelming. Although obviously dependent upon the course chosen by Raytheon, FOI's interest in the Company is likely limited in terms of both value and duration. The parties agree that their disputes should be resolved through arbitration; without a preliminary injunction, the ability of the arbitrators to protect the interests of FOI, as limited as they may be as a practical matter, would be impaired. In light of the relaxed standard for a preliminary injunction in aid of arbitration, it is appropriate for the Court to exercise its discretion to maintain the status quo.

FOI's application for interim injunctive relief is not without its unappealing aspects. It negotiated the Restructuring Agreement and the LLC Agreement which diluted its interest without securing any future protection from dilution except through the preemptive rights provision. It now has elected not to exercise those rights. Since the formation of the Company, as now constituted, FOI and its affiliates have contributed a pittance to slake the Company's thirst for cash, but it willingly allowed Raytheon to fund, and to fund, and to fund those needs. The arbitrators may well finally conclude that FOI is not entitled to relief. Moreover, they may conclude that FOI is not entitled to relief pending their final resolution of the parties' dispute. The LLC Agreement specifically authorized the pursuit of interim relief in the arbitration forum under the American Arbitration Association's Optional Rules for Emergency Measures of Protection.[FN50]That established the proper process for determining whether the status quo should be maintained for the duration of the arbitration proceeding and its respects the parties' agreement to submit this dispute to arbitration.

> FN50. LLC Agreement, Section 18.2(a).

Accordingly, the Court will issue a preliminary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)
**2005 WL 2335353 (Del.Ch.)**

injunction prohibiting consummation of the Purchase Agreement. That injunction, however, will expire, in the absence of further order, in thirty days. During this period, FOI may take its claims to the arbitration forum and seek interim relief here.

**\*12** An order will be entered to implement this Memorandum Opinion.

Del.Ch.,2005.
Flight Options Intern., Inc. v. Flight Options, LLC
Not Reported in A.2d, 2005 WL 2335353 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

TAB 8

LEXSEE 2000 DEL CH LEXIS 93

**IN RE ENCORE COMPUTER CORPORATION SHAREHOLDERS LITIGATION**

**CONSOLIDATED C.A. No. 16044**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2000 Del. Ch. LEXIS 93*

**February 22, 1999, Submitted**
**June 16, 2000, Decided**

**SUBSEQUENT HISTORY:**    [*1]  As Amended June 16, 2000. Released for Publication by the Court July 3, 2000.

**DISPOSITION:**    Motion to dismiss the amended complaint is granted.

**COUNSEL:** Norman M. Monhait and Carmella P. Keener, Esquires, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; and Norman Berman and Michael G. Lange, Esquires, of BERMAN, DEVALERIO & PEASE, LLP, Boston, Massachusetts; and Robert I. Harwood and Jeffrey M. Haber, Esquires, of WECHSLER HARWOOD HALE-BIAN & FEFFER LLP, New York, New York; and Marian Rosner and Patricia Avery, Esquires, of WOLF POPPER LLP, New York, New York; and Curtis V. Trinko and Timothy J. McFall, Esquires, of LAW OF-FICES OF CURTIS V. TRINKO, LLP, New York, New York; Attorneys for Plaintiffs.

R. Franklin Balotti, Lisa A. Schmidt and Peter B. Ladig, Esquires, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; and Richard A. Cirillo, Debora S. Burstein and Ann M. Driscoll, Esquires, of KING & SPALDING, New York, New York; Attorneys for Defendants Gould Electronics, Inc., Robert J. Fedor, C. David Ferguson, Thomas N. Rich and Michael C. Veysey.

Stephen J. Balick, Esquire, of ASHBY & GEDDES, Wilmington, Delaware; and Mark D. Cahill, Esquire, of CHOATE, HALL & STEWART, Boston, Massachusetts; [*2] Attorneys for Defendants Kenneth G. Fisher and Rowland H. Thomas, Jr.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINION BY:** JACOBS

**OPINION**

*MEMORANDUM OPINION*

**JACOBS, VICE CHANCELLOR.**

This consolidated class action is brought by former shareholders of Encore Computer Corporation, a Delaware corporation ("Encore" or "the Company"), against Encore's former directors and its largest stockholder, Gould Electronics, Inc. ("Gould"). The plaintiffs' claim is that the defendants breached their duties of loyalty and disclosure by approving two separate sales of Encore's assets to third parties, which amounted to a de facto liquidation of Encore. The plaintiffs contend that the two asset sales served Gould's interests to the exclusion of the Encore common shareholders.

The defendants have moved to dismiss the amended complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The basis for the dismissal motion is that (i) the complaint does not allege any cognizable breach of duty of loyalty claims, and (ii) the nondisclosure allegations fail to plead facts legally sufficient to warrant relief.

For the reasons next discussed, I find that these [*3] arguments have merit, and thus will grant the motion to dismiss.

**I. BACKGROUND**

The pertinent facts are derived from the amended complaint and extrinsic documents properly incorporated therein by reference. [1]

> 1    The documents incorporated by reference include the Sun Asset Purchase Agreement, the Gould Agreement, the Retention Agreements, the Sun Proxy Statement, the third quarter 1998

Form 10-Q, and the Gores Group Proxy Statement.

Encore (which was not joined as a party) is a Delaware corporation with its principal place of business in Plantation, Florida. Before 1997, the Company had three lines of business: (1) it designed, manufactured, and distributed data storage, data retrieval and sharing technologies for mixed platform processing environments (the "Storage Products Business"); (2) it also developed clustering software (the "Clustering Software Business"); and (3) it designed, manufactured, distributed and supported scalable real-time computer systems software used for computer simulations (the [*4] "Real-Time Business").

Until November 24, 1997, Encore had a four member Board of Directors that consisted of defendants Kenneth G. Fisher ("Fisher"), Rowland H. Thomas ("Thomas"), Robert J. Fedor ("Fedor"), and C. David Ferguson ("Ferguson"). After November 24, 1997, the Board was expanded to include two additional directors, defendants Thomas N. Rich ("Rich") and Michael C. Veysey ("Veysey").

Also named as a defendant is Encore's 48.5% stockholder, Gould, which (in turn) is a wholly owned subsidiary of Japanese Energy Group ("JEC"), a Japanese corporation. Fedor, Ferguson, Rich and Veysey are Gould's representatives on Encore's Board of Directors.

In 1989, Gould sold its computer systems business to Encore. Unable to generate enough revenue to sustain itself, Encore came to rely primarily on Gould to fund its operations. From 1989 through November 1997, Gould loaned Encore approximately $ 496 million. That loan was secured by a first priority security interest in Encore's assets, including its Storage Products business. As additional security for those loans, in 1991 Encore licensed to Gould substantially all of its intellectual property, including that relating to Encore's Storage [*5] Products business.

During this period Gould also agreed to accept convertible preferred stock in satisfaction of approximately $ 420 million of secured debt that Encore owed to Gould. The preferred stock gave Gould a liquidation preference totaling approximately $ 420 million. Despite that debt reduction, Encore found itself unable to pay cash dividends on the preferred stock, and as a result, it issued to Gould additional preferred shares with a liquidation preference of about $ 41 million. By 1997, Encore had unpaid dividends arrearages to Gould that totaled $ 29.5 million.

In January 1997, Encore's independent auditors expressed substantial doubt about the Company's ability to continue as a going concern. At that point, Gould decided to stop providing funding to Encore. Having had

no source of capital other than Gould, Encore faced bankruptcy and liquidation. An analysis prepared by Price Waterhouse showed that in a liquidation, Encore's liquidation value would be only $ 24.4 million. On that basis Encore's common shareholders would receive no liquidating distribution, since $ 24.4 million would not be nearly enough to pay off Encore's debts to Gould and to Encore's other creditors.

### [*6] A. The Sun Transaction

On July 17, 1997, the Encore Board entered into an Asset Purchase Agreement with Sun Microsystems, Inc. ("Sun"), in which Sun agreed to purchase Encore's Storage Products business for $ 185 million (the "Sun Transaction"). Sun would pay the purchase price in two installments: $ 150 million at closing and the remaining $ 35 million in July 1998.

As part of the Sun Transaction, Encore entered into an agreement with Gould on July 16, 1997 (the "Gould Agreement"), in which Gould agreed to release its security interest in the Storage Products business and to transfer its intellectual property license in that business to Sun. Gould also agreed: (i) to convert a portion of its Encore preferred stock into Encore common stock (thereby increasing Gould's holdings to 48.5% of Encore's outstanding shares), and (ii) until November 24, 1999, to forego its right to participate in the first $ 30 million of any liquidating distribution by Encore to its common shareholders. Moreover, Gould agreed to (iii) guarantee Encore's contractual representations and warranties to Sun, (iv) guarantee to Sun that Encore would remain solvent for at least one year after the Sun [*7] Transaction closing, and (v) to indemnify Sun against damages if Encore became insolvent after that first year.

In return for these undertakings by Gould--without which the Sun Transaction could not take place--Encore agreed that it would devote a portion of the proceeds from the Sun transaction: (i) to pay the principal amount and accrued interest owed on Encore's secured indebtedness to Gould (estimated at $ 93 million); and (ii) to redeem the Encore preferred stock held by Gould--which had a liquidation preference of over $ 400 million--for $ 60 million.

At the time the Gould Agreement was being considered, the Encore Board consisted of four directors, two of whom (Ferguson and Fedor) were officers of Gould. Ferguson and Fedor did not vote on the Gould Agreement. The remaining two directors, Fisher and Thomas, were not affiliated with Gould, and did vote to approve the Gould Agreement.

### B. The Retention Agreements

To retain Encore's employees through the closing of the Sun Transaction, Encore, at the recommendation of an outside consultant, entered into Retention Agreements in May 1997 with 49 of its key employees. The outside consultant recommended this approach to [*8] give Encore's employees an incentive to remain and assist the Company in its efforts, "to seek a sale or merger of the Company, a joint venture which a strategic partner or substantial new investment in the Company." Under the Retention Agreements, Fisher and Thomas received payments of $ 566,525 and $ 398,750, respectively. Thomas also received a $ 50,000 bonus in November 1997. All these payments were disclosed to Encore shareholders in the Sun Proxy Statement, which is next described.

## C. The Sun Proxy Statement

In November 1997, Encore distributed a proxy statement (the "Sun Proxy Statement") for the upcoming shareholders meeting at which the Sun Transaction would be voted upon. The Sun Proxy Statement disclosed the terms of the Sun Transaction and the Gould Agreement. To approve the Sun Transaction, the affirmative vote of the holders of 75% of the Encore common stock being voted (as well as a majority of all Encore's outstanding common stock) was required.

The Sun Proxy Statement disclosed that Gould had discontinued funding Encore, and that if the Sun Transaction did not close, Encore would become insolvent. The Sun Proxy Statement included Price Waterhouse's liquidation [*9] analysis, which had estimated Encore's liquidation value at $ 24.4 million. The Sun Proxy Statement also disclosed that if the Sun Transaction was approved, the Encore Board of Directors would consider future operations, such as (1) continuing the Real-Time business, (2) developing software to enable standard computer hardware units to be operated so as to create larger computer versions of the computer hardware, or (3) selling the Real-Time business. Finally, the Sun Proxy Statement disclosed the prospects for the Real-Time business, and that it was a declining business for Encore.

Importantly, the Sun Proxy Statement advised shareholders of the specific "risk factors" relating to Encore's business after the Sun Transaction as follows:

(i) the Company will be left with only the real-time business (unless and until it determines to enter the clustering software market), resulting in a change in the Company's primary business activities from the Storage Products Business to the real-time business; (ii) there is no assurance that the real-time business will operate profitably; (iii) there can be no assurance that Encore will be able to retain employees that would be critical [*10] to a clustering software initiative; (iv) there can be no assurance that any clustering software initiative would have access to sufficient amounts of funds; (v) there can be no assurance that any clustering software initiative would be successful; and (vi) none of the alternatives available to the Company. . . is without substantial risk.

On November 24, 1997, the Encore shareholders voted to approve the Sun Transaction, which closed shortly thereafter.

## D. The Gores Transaction

Meanwhile, Encore's Real-Time business had continued to decline, and in December 1997, Encore retained McDonald & Company Securities, Inc. ("McDonald"), an investment banker, to solicit potential acquirors for that business. McDonald conducted a diligent search and contacted eight potential acquirors. After this process was completed, Encore and the Gores Technology Group (the "Gores Group") executed a letter of intent for the Gores Group to purchase Encore's Real-Time business for $ 5.5 million. After the Gores Group later became unwilling to pay that amount, [2] Encore entered into an agreement to sell the Real-Time business to the Gores Group for $ 3 million (the "Gores Transaction"). To enable [*11] that transaction to proceed, Gould agreed to become jointly and severally liable with Encore for Encore's indemnification obligations under the Gores Asset Purchase Agreement.

2    The record does not explain why the Gores Group was unwilling to pay $ 5.5 million for the Real-Time business.

## E. The Gores Proxy Statement

In August 1998, Encore disseminated a Proxy Statement (the "Gores Proxy Statement") for the upcoming shareholder meeting to vote on the Gores Transaction. As with the earlier asset sale to Sun, the affirmative vote of the holders of 75% of the voting shares (plus a majority of Encore's outstanding shares) were required to approve the Gores Transaction. The Gores Proxy Statement disclosed, among other things, that the Encore directors had unanimously approved the Gores Transaction, and that if the Gores Transaction did not go forward, Encore would become insolvent and have to be

liquidated. The Gores Transaction received shareholder approval and closed on December 31, 1998.

As of July 15, 1999, the [*12] date of the amended complaint, the defendants were planning to dissolve the Company at some future time, subject to shareholder approval. According to the complaint, Encore's common shareholders will receive nothing when the defendants dissolve the Company, because Gould's liquidation preference will exhaust any liquidation proceeds.

## II. THE CONTENTIONS

The plaintiffs allege four separate breach of fiduciary duty claims arising out of the Sun and the Gores Transactions which, the plaintiffs allege, amounted to a de facto liquidation of Encore. Two claims are for breach of the defendants' duty of loyalty; the remaining two claims are for breaches of their duty of disclosure.

The duty of loyalty claims challenge the Encore Board's decisions: (i) to allocate to Gould, Encore's largest creditor and stockholder, $ 60 million of the $ 185 million proceeds from the sale of Encore's Storage Technology business to Sun, and (ii) to sell the Real-Time business to the Gores Group, the claim being that there was no justification for selling the Real-Time business, which (plaintiffs contend) Encore should have continued to own and operate.

The duty of disclosure claims attack the proxy [*13] statements that were disseminated (respectively) to Encore shareholders in connection with the Sun and the Gores Transactions. The disclosure claims are that: (i) the directors of Encore concealed their plan to liquidate Encore in its entirety, and (ii) the proxy statements falsely and misleadingly held out the hope that if both transactions were approved, Encore's common stockholders would receive some of the proceeds.

In support of their motion to dismiss, the defendants argue that the Sun and Gores Transactions did not violate the Encore directors' duty of loyalty, because only disinterested board members voted on these deals. Second, the defendants contend that there was a legitimate business justification for both the Sun and Gores Transactions.

The defendants also urge the dismissal of the disclosure claims as legally unsupported. Responding to the claim that the Encore Board had a "secret" plan to liquidate, the defendants argue that the amended complaint pleads no facts supporting the conclusory allegation of a "secret" plan. Regarding the second disclosure claim-- that the Sun Proxy Statement falsely promised that shareholders would receive distributions from the Sun Transaction [*14] proceeds--the defendants argue that the proxy statement made no such "promise," but, rather

disclosed that a shareholder distribution was one of several possible ways in which the Sun Transaction proceeds might be used.

## III. ANALYSIS

The standard governing a Rule 12(b)(6) motion to dismiss is well-established. The motion will be granted where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proven to support the claim. [3] All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are not supported by specific factual allegations will not be accepted as true. [4]

> 3  *In re Tri-Star Pictures, Inc. Litig., Del. Supr., 634 A.2d 319, 326 (1993)*; see also Loudon v. *Archer-Daniels-Midland Co., Del. Supr., 700 A.2d 135, 140 (1997).*
> 4  *Weinberger v. UOP, Inc., Del. Ch., 409 A.2d 1262, 1264 (1979).*

### A. The Duty of [*15]  Loyalty Claims

It is well-established Delaware law that the business judgement rule creates a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" [5] To rebut that presumption, the plaintiffs may allege facts sufficient to plead a cognizable claim for a breach of duty of loyalty, more specifically, that the defendants were materially interested in the transaction or failed to act independently on behalf of the corporation. [6]

> 5  *Cede & Co. v. Technicolor, Inc., Del. Supr., 634 A.2d 345, 361 (1993)* (citing *Sinclair Oil Corp. v. Levien, Del. Supr., 280 A.2d 717, 720 (1971))*, see also Mills Acquisition Co. v. Mac-Millan, Inc., Del. Supr., 559 A.2d 1261, 1279 (1989).
> 6  *Grobow v. Perot, Del. Supr., 539 A.2d 180, 188 (1988).*

I conclude that the plaintiffs have failed to allege [*16] facts sufficient to establish that the Encore directors either had a material self-interest in, or failed to act independently with respect to, the challenged transactions. I find also that the complaint in fact alleges that the Sun and the Gores Transactions served legitimate business purposes. My reasons follow.

### 1. The Sun Transaction

As earlier stated, the Sun Transaction involved the sale of Encore's Storage Technology business to Sun for

$ 185 million. The sale proceeds were used to pay all of Gould's secured indebtedness (approximately $ 95 million), and to redeem the Encore preferred stock held by Gould (approximately $ 60 million). The balance of the purchase price (about $ 30 million) was paid to Encore.

The plaintiffs' claim that the board breached its duty of loyalty by agreeing to redeem, for $ 60 million, Encore preferred stock that had a liquidation value of over $ 400 million. Plaintiffs contend that the claim must be decided under the entire fairness standard of review, because the non-Gould directors who voted to approve the sale were conflicted, their vote having been induced by the Retention Agreements. Alternatively, plaintiffs argue, even if the business [*17] judgment standard does apply, they have stated a cognizable claim because the amended complaint alleges that the redemption of the preferred was irrational and lacked any business justification.

These arguments are now addressed.

The plaintiffs challenge the disinterest and independence of the Encore Board on the basis that the Gould-appointed directors were in a position to approve the Sun Transaction unilaterally. The infirmity in that argument is that the amended complaint makes no allegations which support that claim. Only the two directors who had no connection to Gould--Messrs. Fisher and Thomas--actually voted; the other two directors--Fedor and Ferguson--recused themselves. Moreover, the Sun Transaction could not be approved without the affirmative vote of the holders of at least 75% of the shares of the common stock present and voting at the meeting. Accordingly, there is no factual or legal basis to claim that the Gould-appointed directors were in a position unilaterally to approve the Sun Transaction.

The plaintiffs next claim that the two directors who did vote on the transaction, Messrs. Fisher and Thomas, had a disabling financial interest by reason of the Retention [*18] Agreements. This claim also finds no support in the amended complaint. That pleading alleges that Fisher and Thomas received $ 566,525 and $ 398,750 respectively under the Retention Agreements, and that Thomas received a $ 50,000 incentive bonus. But those payments alone, and without more, do not suffice legally to negate those directors' independence. According to the amended complaint, payments of a similar character were made to 49 other Encore employees, after being recommended by an independent consultant, to ensure their continued service through the closing of the Sun Transaction. The Retention Agreements did not contractually obligate Thomas or Fisher to vote as directors in any particular way. Accordingly, the Retention Agreement payments that had been independently recommended, shared by others, and made for legitimate business reasons, do not constitute a disabling financial self-interest that would taint the directors who voted in favor of the Sun Transaction. [7]

> 7  See Grobow, 539 A.2d at 188 (where only alleged financial interest on the part of the directors is payment paid for services as directors, no cognizable financial interest exists); see also Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946 (1985).

[*19]  The Retention Agreement payments did not constitute a disabling financial interest for other reasons. Those payments were made months before the Board voted on the Sun Transaction and over a year before the vote on the Gores Transaction. Mr. Thomas' bonus received Board approval four months after the Sun deal was approved. Thus, any connection between these events is far too remote to support the inference that those payments disabled Fisher and Thomas from impartially determining whether or not the Sun Transaction served the best interest of Encore and its common stockholders. Any such inference would be especially problematic in the case of Mr. Fisher, who, after Gould, was Encore's largest single stockholder. Mr. Fisher owned 4 million shares of Encore, and had a significant self-interest in maximizing the value of that investment. If any inference is to be drawn, it is that Fisher's and the shareholders' financial interests were aligned.

Because the plaintiffs have not sufficiently pleaded facts demonstrating that Thomas or Fisher were subject to a disabling interest, the Encore Board's decision to approve the Sun Transaction is entitled to review under the business judgment [*20] rule.

The plaintiffs next argue, in the alternative, that even under the business judgment standard they have stated a claim, because the complaint sufficiently alleges that the Sun Transaction lacked any valid business justification. I disagree. Without the Sun Transaction the Encore stockholders would have received nothing. That transaction enabled Encore to discharge significant amounts of debt, while still retaining $ 30 million for operating purposes. For that to occur, however, it was necessary for Gould to surrender several valuable assets to Sun, including Gould's security interest in the Storage Products Business assets and the Gould License that covered the intellectual property for the Storage Products Business. The consideration for Gould's cooperation was Encore's agreement for Gould to receive $ 60 million of the Sun Transaction proceeds, which would be used to redeem the preferred stock. Even in that connection, Gould agreed that in any liquidation it would not participate in the first $ 30 million of distributable assets--a significant concession because the net proceeds available after paying Gould would be $ 30 million.

Thus, the complaint fairly alleges that the [*21] agreed-to allocation of the Sun Transaction proceeds netted Encore $ 30 million that Encore would not have otherwise received. As a consequence, the decision to approve the Sun Transaction was a rational business judgment that must be respected.

## 2. The Gores Transaction

The Gores transaction involved the sale of the Real-Time business to the Gores Group for $ 3 million. The plaintiffs challenge only the directors' decision to sell that business, claiming that the sale did not serve the Company's interests because the Real-Time business was profitable and the transaction costs exceeded the sale proceeds. Essentially, what the plaintiffs claim is that the sale of the Real-Time business benefitted only Encore's majority stockholder, Gould.

But the pleaded facts show otherwise. The amended complaint does allege that the transaction costs of the Gores Transaction exceeded the amount received from the sale of the Real-Time business, thereby leaving the Encore shareholders with nothing when the Company was dissolved. But this allegation is based upon the plaintiffs' erroneous inclusion of the estimated costs of an Encore liquidation in calculating the "transaction costs" of the Gores [*22] Transaction. Plaintiffs allege that "Encore estimated the cost for completing the Gores Transaction and dissolving the Company at approximately $ 10.6 million," but that misrepresents what Encore actually stated in its third quarter 1998 Form 10-Q. [8] That document disclosed that the amount of any possible distribution to shareholders would be the sum of (i) the Company's assets, (ii) the second payment from the Sun Transaction, and (iii) the net loss or gain from the Gores transaction, *minus* the cost of liquidating Encore. The plaintiffs' effort to treat the cost of liquidating Encore as a cost of the Gores Transaction finds no support in the Form 10Q. Nor have plaintiffs shown, as a matter of pleaded fact or logic, how it makes any sense to argue that the cost of the liquidating Encore was a cost of the Gores Transaction. Indeed, the amended complaint alleges that the Gores Transaction was completed in December 1998, before Encore was liquidated.

8  Because the third quarter 1998 Form 10-Q is included in and is integral to the Amended Complaint, its content may be considered on this motion to dismiss. That document stated:

If the sale of the real-time business is consummated, the assets of the Company available for distribution to shareholders on liquidation would be: (i) the Company's

assets at September 27, 1998 plus any additional amounts received with regard to the second Payment [from the Sun Transaction], less its liabilities at September 27, 1998 including the $ 9,692,000 payable to Gould, plus or minus; . . . (iii) the gain or loss from the sale of the Company's real-time computer systems business; minus (iv) costs of the liquidation and reserves for any contingent liabilities, including any pending litigation, estimated by the Company to be approximately $ 10,624,000, which has not been recorded on the books of the Company as of September 27, 1998.

[*23] The plaintiffs also attack the Gores Transaction on the ground that the Real-Time business was profitable at the time it was sold, but the plaintiffs' own pleading undermines that claim. The amended complaint alleges that the 1997 sales of the Real-Time business were approximately $ 25 million. By 1998, that figure had dropped to $ 20 million, [9] reflecting a further decline of the Real-Time business. [10] Finally, the amended complaint contains no fact-specific allegations from which one could infer that the Real-Time business was profitable. All that it contains is the conclusory averment that business was "profitable," which by any pleading standard is inadequate and also contrary to the specifically pleaded facts.

9  Compl. P106.
10  Defendant's Opening Brief, Ex. B. at 5. (1998 Real-Time sales of products and services were down from $ 41 million in 1996, and were substantially below the peak rate in 1990 when sales of Real-Time systems totaled $ 133 million dn sales of services totaled $ 82 million).

[*24] For these reasons the Board's decision to approve the Gores Transaction must be upheld under the business judgment rule. According to the complaint, the Encore Board determined that the sale of the Real-Time business would be the best way for the Encore shareholders to realize any return on their investment. Because the Gores Transaction therefore had a rational business purpose, this claim must also be dismissed.

## B. The Disclosure Claims

The plaintiffs next claim that the proxy statement disclosures were materially misleading in two separate

respects: (1) they failed to disclose the directors' "strategy to liquidate all of Encore's assets," and (2) they made a false promise to distribute the proceeds to Encore's shareholders. Neither of these allegations states a claim upon which relief can be granted.

Directors of Delaware corporations are required, fully and fairly, to disclose all material information within the board's control when the corporation seeks shareholder action. [11] A fact is material only if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. [12] There must be a substantial likelihood that [*25] the disclosure of the omitted fact would have significantly altered the total mix of information made available. [13] The disclosure claims are evaluated in light of this standard.

> 11  *Stroud v. Grace, Del. Supr., 606 A.2d 75, 84 (1992).*
> 12  *Loudon, 700 A.2d at 143.*
> 13  *Zirn v. VLI Corp., Del. Supr., 681 A.2d 1050, 1056 (1996); see also TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).*

### 1. The Undisclosed Alleged Plan to Liquidate

The plaintiffs first claim that the defendants failed to disclose their plan to liquidate Encore in the proxy statements for the Sun and Gore Transactions. That is essentially a "fraud by hindsight" claim, based solely on the fact that after the Sun Transaction closed, Encore hired an investment banker to explore the possibility of selling the Real-Time business, and that thereafter, the Board decided to sell that business. But it does not follow from those [*26] facts that the board had always intended to liquidate the entire Company. The alleged facts are fully consistent with a much more benign scenario--that liquidation was one of several possibilities, that after the Sun Transaction the Board decided to explore that possibility, and that as a result of that exploration, the Board later decided upon that course of action. That latter scenario was disclosed in the Sun Proxy Statement:

> As discussed below, [Encore's] Board of Directors will be considering whether Encore should (i) continue, and attempt to expand, its real-time business, (ii) attempt to develop and market clustering software for various types of computer hardware, or (iii) attempt to sell its real-time business and distribute the proceeds of sale, together with the remaining proceeds of

the Sun Transaction, to its stockholders as a liquidating distribution.

Moreover, the proxy statement for the Gores Transaction disclosed that one of the items the shareholders would vote on at the meeting called to approve the Gores Transaction was:

> To approve the proposed Plan of Dissolution and Liquidation (the "Plan"), pursuant to which [Encore] would be dissolved [*27] and liquidated following the consummation of the Gores Transaction.

That is, in the Gores Transaction Proxy Statement the Board was explicitly proposing a plan of liquidation and asking the shareholders to approve it. The shareholders were clearly told that liquidation was a real possibility, and they voted to authorize the directors to take that course if they so chose. Because no material fact was misdisclosed or concealed, these disclosures are not actionable.

### 2. The Alleged Misdisclosure that Funds Would Be Available for Distribution

Finally the plaintiffs claim that the Encore shareholders were lulled into a false sense of security, and were induced to vote for the Sun Transaction, by being led to believe (incorrectly) that Encore's remaining business would be operated profitably and provide them a return. That claim is unsupported by the proxy statements, which disclose no such promise. All those documents disclosed was the *possibility* of a future return. [14] The complaint also lacks any specific factual allegation to support the implicit assumption upon which this claim rests, namely, that there was *no* possibility that the shareholders would ever receive [*28] a distribution of the proceeds. For these reasons this disclosure claim must also be dismissed.

> 14  The Sun Proxy Statement disclosed that the Board would consider "whether Encore should (i) continue, and attempt to expand, its Real-Time business, (ii) attempt to develop and market clustering software for various types of computer hardware, or (iii) attempt to sell its Real-Time business and distribute the proceeds of that sale, together with the remaining proceeds of the Sun Transaction, to its stockholders as a liquidating distribution." Defendant's Opening Brief, Ex. A at 15.

2000 Del. Ch. LEXIS 93, *

**IV. CONCLUSION**

The motion to dismiss the amended complaint is granted. IT IS SO ORDERED.