# TAB 12

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)
**1996 WL 422377 (Del.Ch.)**

▷Odyssey Partners, L.P., Odyssey-ABC Limited
Partnership
Del.Ch.,1996.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
ODYSSEY PARTNERS, L.P., Odyssey-ABC
Limited Partnership, Prudential Securities, Inc., the
Prudential Insurance Company of America and W.R.
Huff Asset Management Co., L.L.C., Plaintiffs,
v.
FLEMING COMPANIES, INC., William M.
Lawson, Jr., Thomas W. Field, Jr., Edward G. Hill,
Jr., and R. Randolph Devening, Defendants.
**CIV. A. No. 14770.**

Submitted: June 4, 1996.
Decided: July 24, 1996.

Richard D. Allen and Katherine R. Witherspoon, of
Morris, Nichols, Arsht & Tunnell, Wilmington, for
Plaintiff.
R. Franklin Balotti, Stephen E. Herrmann, and
Matthew E. Fischer, of Richards, Layton & Finger,
Wilmington, for Fleming Companies, Inc. and the
Individual Defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.
**\*1** This suit by a group of minority shareholders of
ABCO Holdings, Inc. ("Holdings") constituting
about 28% of the outstanding stock, challenges as a
breach of fiduciary duties, actions of Fleming
Companies, Inc., the largest creditor and, allegedly,
the controlling (50.1%) shareholder of Holdings. The
only substantial asset of Holdings is it ownership of
all of the outstanding stock of ABCO Markets, Inc.,
which in turn owns approximately 71 supermarket
retail stores in the State of Arizona. While the *sine
qua non* of the complaint involves action taken by
Fleming to foreclose publicly on a security interest
(acquired in an arms-length transaction with ABCO's
primary lender) on all of the assets of ABCO Markets

and thus to acquire all of the operating assets that
give value to Holdings stock, importantly, the
complaint also entails allegations that Fleming used
its power over Holdings prior to its foreclosure to
prevent ABCO from effectively taking action that
would have prevented or remedied the default that
permitted the foreclosure sale to occur. Slightly more
specifically, plaintiffs allege that Fleming used its
influence over the ABCO board to (i) obstruct
ABCO's success, (ii) push ABCO into default of key
debt obligations, (iii) cause the Holdings board to
approve Fleming's acquisition of the bank loans
through which Fleming acquired senior creditor
status, (iv) foreclose its loans without considering
alternatives to foreclosure more beneficial to the
other shareholders, (v) structure the foreclosure sale
to deter other bids, and (vi) purchase ABCO assets at
the foreclosure auction.

On February 16, 1996, defendants filed this motion to
dismiss for failure to state a claim, arguing essentially
that Fleming acted within its rights as a creditor and
did not, in exercising these rights, breach its separate
responsibilities as a fiduciary of the corporation.

For the reasons set forth below, the pending motion
to dismiss will be denied.

I. Facts.

The following represents a summary of the
allegations of the complaint. ABCO was formed in
1984 by Odyssey Partners, L.P., a Delaware limited
partnership, and the management of 30 Arizona
based Alpha Beta supermarkets for the purpose of the
leveraged acquisition of those supermarkets. In 1988
ABCO sold notes with an aggregate principal amount
of approximately $62.5 million to acquire 38 more
stores.

After 1988, ABCO's financial condition deteriorated
as a result of a recession, its debt obligations, and a
lack of operating capital. In an effort to improve its
financial performance, ABCO developed a business
plan that included remodeling its stores in a modern
and appealing "Desert Market" format. ABCO,
however, could not obtain the necessary capital to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)
**1996 WL 422377 (Del.Ch.)**

fully effectuate this plan and by 1992, its financial position became critical.

In 1992, Holdings' trade creditors, debt holders and preferred stockholders agreed to restructure their financial interests in Holdings. Fleming was at that point a major supplier to ABCO, a significant trade creditor and a bondholder. The 1992 arrangements principally involved the exchange of debt for equity. As part of this restructuring, Chemical Bank reaffirmed its status as ABCO's senior secured creditor and entered into amendments to existing ABCO credit agreements. At the same time Fleming agreed to loan and credit agreements with ABCO and entered into a supply agreement in which ABCO agreed in substance to purchase no less than 51% of all its merchandise needs from Fleming (due to expire in 2003). Fleming also acquired shares of Holdings common and a warrant to acquire additional shares in the event that a default occurred in payment of principal or interest under the Chemical Bank loans, the Fleming loans, or the supply agreement. By exercising the rights under the warrant, Fleming could increase its interest to 50.1% of Holdings' outstanding shares. Plaintiffs allege that following the restructuring, Fleming became the controlling stockholder of Holdings and gained effective control over the Holdings board of directors.

**\*2** In connection with the 1992 restructuring, all holders of Holdings common stock entered into a stockholders agreement that (1) required a supermajority director vote (four of five directors) for the "sale of substantial assets-defined as exceeding 10% of the assets of Holdings-of any Holdings subsidiary [sic]", ¶ 26, (2) establishing that the Holdings board of directors was to consist of five directors, and (3) authorizing the formation of committees of the board of directors as needed from time to time so long as they were comprised of two non-Fleming directors and one Fleming director.

After 1992, ABCO converted several of its markets to the "Desert Market" format. The remodeled stores have among the highest gross margins and operating profits in the Arizona food retailing industry. However, even after the restructuring, ABCO remained undercapitalized and could not carry forward its strategic business plan of remodeling its other stores. ABCO's potential was contingent in large part on ABCO raising the necessary capital to convert more supermarkets to the new format.

In 1995, Holdings retained investment banking firms to help raise needed capital, but Fleming and the directors purportedly under its control refused to allow Holdings and ABCO to pursue alternatives that would dilute Fleming's interest in Holdings. ¶ 37.

In or about October 1995, Fleming itself proposed a "Rights Offering" (which would not dilute its control) to current shareholders as a possible means of raising capital. The Rights Offering required stockholders to accept the termination of the stockholders' agreement and to agree to other terms that Fleming knew few stockholders would favor. The shareholders never approved the proposed offering and it expired in or about November 1995. However, during the pendency of this Rights Offering, Fleming prohibited Holdings from seeking alternative ways to raise capital.

On or about November 20, 1995 ABCO was in default on its loan obligations. At that time Fleming exercised its rights under its warrant to become the majority shareholder of Holdings (coming at that point to own 50.1% of the common stock).

Around the same time, Fleming acquired from Chemical Bank the ABCO term and revolving notes held by the bank. These notes were in default and were secured by all of ABCO's assets. Fleming thereby became the senior secured creditor of ABCO. Fleming acquired the notes in order to foreclose on the debt and acquire ABCO assets. The Holdings board, under the control of Fleming, voted to approve of Fleming's acquisition of the debt owed to Chemical.

By notice dated in or about December 1995, Fleming announced that it would hold a public foreclosure sale of substantially all of the assets of Holdings, *viz.* all of the stock of ABCO on January 9, 1996.

Thus, in summary, plaintiffs attempt to allege that defendants engaged in a course of conduct designed to acquire ABCO assets and thereby effectuate a goal of expanding into the retail segment of the market. Plaintiffs allege that with this goal in mind, defendants acquired a controlling interest in Holdings, exacerbated ABCO's financial difficulties by preventing it from acquiring needed capital,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)
**1996 WL 422377 (Del.Ch.)**

purchased ABCO's senior debt, and thereafter acquired the ABCO assets in a foreclosure sale. The specific actions by defendants alleged to have breached fiduciary duties include blocking efforts to improve ABCO by an infusion of necessary capital, wasting time and resources in connection with an allegedly unfair Fleming-sponsored rights offering, attempting to coerce shareholders into accepting the rights offering, causing the board to approve the acquisition of the Chemical Bank notes, and structuring the foreclosure auction to favor Fleming and deter other bids.

### II. Analysis.

*3 Defendants assert that the foregoing, when read against the appropriate legal test, fails to state a claim upon which relief may be granted. In considering this motion the court must consider all well-pleaded factual allegations as true and will draw all permissible inferences from the well-pleaded facts. _Rales v. Blasband,_ 634 A.2d 927, 931 (Del.1993); _Grobow v. Perot,_ 539 A.2d 180, 187 n. 6 (Del.1988). Generally, a complaint need only give notice of the claim asserted; the pleader is entitled to have all reasonable inferences from the pleading drawn in his or her favor. _Michelson v. Duncan,_ 407 A.2d 211, 217 (Del.1979); _Delaware State Troopers Lodge, etc. v. O'Rourke,_ 403 A.2d 1109, 1110 (Del.1979). I am mindful, however, that the special characteristics of shareholder litigation require courts to try to distinguish between broadly possible inferences from specific allegations of fact, on one hand, and hollow conclusions with few specific allegations, on the other. _See Gagliardi v. TriFoods International, Inc.,_ C.A. No. 14725 (Del.Ch. July 19, 1996), Slip.Op. at 3; _Rabkin v. Philip A. Hunt Chemical Corp.,_ 498 A.2d 1099, 1105 (Del.1985); _Grobow v. Perot,_ 539 A.2d at 187 n. 6 (Del.1988).

The gist of the motion to dismiss is the assertion, which seems clearly correct insofar as it extends, that Fleming had legal rights as the owner of the Chemical Bank debt, including the right to foreclose pursuant to law. According to the argument of the moving parties, what Fleming did in acquiring all of the operating assets of ABCO at a public auction was simply the exercise of its legal rights as a creditor and as a buyer at the public sale. The allegations do not sufficiently allege that Fleming did not fully respect the _legal_ constraints imposed upon a foreclosing

creditor, it is said, and the law can impose no additional duty, under the guise of fiduciary duties, lest it take legal rights from a creditor to which it is entitled. On this view, the "coincidence" that the creditor is also a controlling shareholder [FN1] should count for nothing when a secured party exercises its creditor rights.

> FN1. Fleming warmly denies that it ever was a controlling shareholder of Holdings. It asserts that it never exercised the voting power it acquired in 1995 and never otherwise controlled the Holdings board. This dispute is essentially factual and not resolvable at this stage. Thus, I pass over that matter.

Defendants rely upon the principle that dutiful compliance with their fiduciary role does not require that they hold and exercise nonstockholder rights for the benefit of the minority shareholders, _see Solomon v. Pathe Communications Corp.,_ C.A. No. 12563 (Del.Ch., Apr. 21, 1995), Mem.Op. at 14, _aff'd_672 A.2d 35 (Del.1996). Fiduciary principles require loyalty of the holder of a power impressed with this character; the duty of loyalty requires that any power over the corporation held in a fiduciary capacity may be exercised only for the purpose of advancing collective/corporate welfare. But fiduciary obligation does not require self-sacrifice. _See, e.g., Jedwab v. MGM Grand Hotels, Inc.,_ 509 A.2d 584, 598 (Del.Ch.1986); _Getty Oil Co. v. Skelly Oil Co.,_ 267 A.2d 883, 888 (Del.1970). More particularly, it does not necessarily impress this special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary (_e.g.,_ a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights. _See Solomon v. Pathe Communications Corp., supra._

*4 But the obverse of this proposition is true as well: it may be the case that a creditor misuses a fiduciary position (by, for example, using confidential corporate information) to try to advantage himself in his creditor capacity. The advantage he seeks may involve the exercise of some independent right-the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)
**1996 WL 422377 (Del.Ch.)**

right to buy something or a creditor's right under a credit agreement, for example. In such circumstances the exercise of legal rights would not, of course, privilege the prior misuse of corporate information, which would continue to constitute a violation of fiduciary duty.

The complaint in this case survives the current motion, applying appropriate standards of review of pleadings, not because Fleming had a fiduciary duty not to exercise the legal rights it acquired by purchase from Chemical bank, and not because (absent misuse of confidential information) it did not have a privilege to buy the Chemical loan in default when the corporation itself was financially unable to cure the default. These circumstances, standing alone do not allege a violation of that loyalty that a fiduciary owes to the corporation and under some circumstances to its public shareholders. Some facts other than acquisition of the interest or exercise of the legal rights acquired by a fiduciary must be stated, in my opinion and those other facts must themselves constitute a breach of loyalty in order for these transactions to state a claim for breach of fiduciary duty. Thus a fiduciary who in good faith acquires for value legal interests from third parties is entitled to exercise fully within the law the legal rights so acquired, free of fiduciary constraints, unless in acquiring those interests the fiduciary was violating a duty of loyalty to the corporation in some respect. While that principle plainly has some relevance to this case, it is not in itself enough to defeat plaintiffs' pleading.

The complaint alleges facts, which if true are consistent with a violation of fiduciary duty not dependent upon the exercise of creditor rights. I refer to the allegations, which for these purposes I accept as true, that Fleming controlled the board and caused Holdings and ABCO to fail to explore fully available sources of additional capital because Fleming ruled out any capitalization plan that would have the effect of diluting its proportionate ownership. Instead, according to the pleading, it insisted upon a proposal that would give to each investor an option to make further investments (which is characterized as unfair, *etc.,* in the complaint, but I need not focus on the characterization; it is not an important element in the reasoning leading to my conclusion). Defendant complains that these allegations are not sufficiently specific, are conclusory, *etc.,* but in my judgment

they should be regarded as sufficient to survive a motion to dismiss here. *Cf. Gagliardi, supra,* Slip Op. at 13-18 (identifying factors, not present in this case, which make strike suits a particular risk in shareholder litigation and identifying one of the legal system's responses to that fact).

*\*5 Looked at in one way, these allegations could constitute a breach of fiduciary duty. The charter apparently gives no preemptive rights to holders of Holdings common stock. In this instance preemptive rights were, allegedly, advantageous to the party who, allegedly, controlled the board. That party exercised power over the corporation to force the corporation to abandon, or not fully explore, one option (non-preemptive capital raising) for its private reasons. As a result, no capital was raised and a default occurred or continued, ultimately leading to the public shares losing all value [FN2] and the controlling shares acquiring the assets at a good price. On this view of things, whether Fleming or Chemical Bank foreclosed on the defaulted senior loan is more or less unimportant to the loss experienced by plaintiffs (except insofar as it tends to explain why Fleming was willing to force its view of appropriate capital raising on the corporation and its minority shareholders). In all events a sale would occur and interested parties were given the opportunity to bid as the relevant law of security interests dictated.

> FN2. According to the plaintiffs, in August 1995, following an exhaustive analysis, an investment banker valued Holdings' common stock at $30/share if Fleming adopted the investment bankers' plan. Fleming's own Rights Offering valued the stock at $20/share.

Thus the elements of claim are stated in the complaint. Whether it can be proven that Fleming held and exercised power over Holdings and ABCO, and whether exercise of that power for personal reasons (prior to acquisition by Fleming of the Chemical debt) can be proven remains to be seen. But one cannot foreclose the possibility at this stage (meaning that the record to the extent it has been developed does not at this stage itself foreclose the inferences upon which this opinion rests) and thus I must conclude that the complaint states a claim for breach of fiduciary duty, of the type identified, and

Not Reported in A.2d                                                                                         Page 5
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)
**1996 WL 422377 (Del.Ch.)**


cannot be dismissed.[FN3]

> FN3. The record does not at this stage
> reflect the nonexistence of any implied
> material fact. Therefore, I skip over
> defendants' claim that this motion can be
> viewed as one for summary judgment.

The pending motion will therefore be denied. It is so
ordered.

Del.Ch.,1996.
Odyssey Partners, L.P., Odyssey-ABC Limited
Partnership
Not Reported in A.2d, 1996 WL 422377 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 13

LEXSEE 1993 DEL. CH. LEXIS 1

**JOSEPH SIEGMAN, as custodian for Gregory Siegman and Michele Siegman, Plaintiff, v. COLUMBIA PICTURES ENTERTAINMENT, INC., a Delaware corporation; SONY COLUMBIA ACQUISITION CORP., a Delaware corporation; and SONY USA INC., a New York corporation, Defendants.**

Civil Action No. 11,152

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1993 Del. Ch. LEXIS 1; Fed. Sec. L. Rep. (CCH) P97,397*

October 14, 1992, Submitted
January 12, 1993, Decided

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1] ON CROSS-MOTION FOR SUMMARY JUDGMENT: DENIED

**COUNSEL:** William Prickett, Esquire, Michael Hanrahan, Esquire, and Chandlee Johnson Kuhn, Esquire, PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, DE 19899-1328; Of Counsel: Arthur T. Susman, Esquire, and Terry R. Saunders, Esquire, SUSMAN, SAUNDERS & BUEHLER, Chicago, IL 60603, Attorneys for Plaintiff.

James F. Burnett, Esquire, and Donald J. Wolfe, Jr., Esquire, POTTER, ANDERSON & CORROON, Wilmington, DE 19899-0951; Of Counsel: Marc P. Cherno, Esquire, and Debra M. Torres, Esquire, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, NY 10004, Attorney for Defendant Columbia Pictures Entertainment, Inc.

Anthony W. Clark, Esquire, Jay W. Eisenhofer, Esquire, and Cathy J. Testa, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Wilmington, DE 19899-0636; Of Counsel: Richard L. Brusca, Esquire, and Janet L. Goetz, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Washington, DC 20005, Attorneys for Defendants Sony Columbia Acquisition Corp. and Sony USA Inc.

**JUDGES:** HARTNETT

**OPINION BY:** HARTNETT

**OPINION**

MEMORANDUM OPINION

HARTNETT, Vice Chancellor

Joseph Siegman, the named plaintiff, a former shareholder of defendant Columbia Pictures Entertainment, Inc. ("Columbia"), [*2] brought this individual and purported class action suit challenging the legality of the 1989 merger between Columbia and Sony USA Inc. ("Sony") and the alleged insufficiency of the disclosures made in connection with that merger. Defendants have moved for summary judgment alleging that there is no legal basis for Siegman's challenge to the legality of the merger and the accompanying disclosures and, alternatively, that plaintiff's claims are barred by his acquiescence in the challenged transaction. Siegman has cross-moved for summary judgment.

Because there are material issues of fact as to when Sony became an interested shareholder within the meaning of the Delaware Takeover Statute and as to whether plaintiff acquiesced in the merger, the cross-motions for summary judgment must be denied.

I

The background facts are set forth in greater detail in the previous opinion in the case, *Siegman v. Columbia Pictures Entertainment, Inc., Del. Ch., 576 A.2d 625 (1989)*. Additional facts are derived from excerpts of the discovery taken by the parties. Some of the facts are disputed and their recitation is not a finding that they are correct.

Prior to September [*3] 1989, Coca-Cola Company ("Coca-Cola") owned 49% of the shares of Columbia. In November 1988, Michael Schulhof, a director and officer of Sony approached the president and CEO of Columbia,

and expressed Sony's interest in acquiring Columbia, including the Columbia shares owned by Coca-Cola. Schulhof was referred to Herbert Allen of Allen & Co., Columbia's investment banker and Allen and Schulhof met on several occasions.

On September 22, 1989, Schulhof told Allen that Sony might be prepared to make an offer to acquire Columbia and asked Allen to convene the Columbia board. On September 25, 1989, Columbia's board met to consider a $ 27 per share offer from Sony but took no action on the offer and adjourned until September 27, 1989.

Earlier on the 25th, representatives of Sony and Coca-Cola met to negotiate an option agreement for Coca-Cola's Columbia shares. Negotiations continued throughout the 25th and the 26th and in the early morning hours of September 27th, a draft agreement was prepared but was not signed. This unexecuted draft provided for an option to purchase the Coca-Cola shares that was contingent upon approval of a merger agreement between Columbia and Sony by Columbia's [*4] board and also was contingent upon the approval of the option agreement by the boards of both Columbia and Coca-Cola. Although the draft option agreement was contingent upon approval by the Coca-Cola board, Coca-Cola's representatives apparently assured Sony on the 26th that they would "enthusiastically recommend" approval of the option agreement if Columbia's board approved the merger.

On September 27, 1989, the Columbia board met and approved the merger agreement and the Coca-Cola option. Coca-Cola's representatives signed the option agreement later that day and, on October 2, 1989, obtained the approval of Coca-Cola's board.

Sony, on October 3, 1989, publicly announced a tender offer for all of the shares of Columbia's stock to be followed by a merger that would "freeze out" any Columbia stockholders who did not tender their shares.

Siegman then brought this suit to enjoin the proposed merger alleging that it violated the Delaware Takeover Statute, 8 Del. C. § 203. That statute requires an "interested stockholder" (as defined in the statute) to postpone for three years the concluding of a proposed merger with an acquired Delaware corporation unless the transaction meets [*5] one of several statutory exceptions. The two exceptions relevant to the Sony-Columbia merger are: (1) the proposed merger receives the approval of the target corporation's board "prior to such date" that the acquiror became an interested shareholder, 8 Del. C. § 203(a)(1); or (2), the merger is approved by the board of the target and by shareholders representing two-thirds of the shares not owned by the interested shareholder. 8 Del. C. § 203(a)(3).

Siegman, at the preliminary injunction hearing, contended that Sony became an interested shareholder on September 27, 1989 the date the Coca-Cola option agreement was signed by the officers of Coca-Cola. He argued that because approval of the merger was obtained from Columbia's board on that same day, approval was not obtained "prior to such date" and, therefore, the safe harbor for mergers with prior board approval as provided by 8 Del. C. § 203(a)(1) did not apply.

In the prior opinion, this Court agreed that Siegman had established a reasonable probability that Sony had become an interested shareholder on September 27, 1989 when the option agreement was signed by Coca-Cola's representatives notwithstanding that it was [*6] specifically subject to subsequent approval by Coca-Cola's board. Siegman v. Columbia Pictures Entertainment, Inc., Del. Ch., 576 A.2d 625, 630-32 (1989). The Court, however, also found that the words "prior to such date" as used in the statute was ambiguous. Id. at 633. Because of this ambiguity, the Court examined extrinsic materials to ascertain the intent of the General Assembly as to the meaning of the disputed words. Id. at 633-34. After examining these materials, the Court concluded that the words "prior to such date" as they appear in 8 Del. C. § 203(a)(1), mean "before the time". The plaintiff did not contend at that time that Sony had become an interested shareholder before the time Columbia's board approved the merger on September 27, 1989 and this Court denied the motion for a preliminary injunction. Siegman v. Columbia Pictures Entertainment, Inc., Del. Ch., 576 A.2d 625 (1989).

II

In now opposing defendants' motion for summary judgment and in asserting his own cross-motion for summary judgment, Siegman urges this Court to reconsider [*7] its earlier holding as to the meaning of "prior to such date" in 8 Del. C. § 203(a)(1), while defendants argue that the "law of the case" doctrine prevents plaintiff from revisiting that issue.

Under the doctrine of the law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation . . . At the trial court level, the doctrine of the law of the case is little more than a management practice to permit logical progression toward judgment. Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling. 1B MOORE'S Federal Practice P 0.404[1], at 117-18 (1992) (footnotes omitted).

The "law of the case" doctrine has greater force when a case is transferred from one judge to another.

*See, Frank G.W. v. Carol M.W., Del. Supr., 457 A.2d 715, 718-19 (1983).* "A judge should hesitate to undo his own work. Still more should he hesitate to undo the work of another judge." *Peterson v. Hopson, 306 Mass. 597, 29 N.E.2d 140, 145 (Mass. 1940).* [*8]

However, the law of the case doctrine "does not require a court to enter an erroneous judgment because the logic of an earlier erroneous ruling would require it." 1B MOORE'S *Federal Practice* P 0.404[4-1], at 126 (1992) (footnote omitted). "A Court that makes a decision has the *power* to reconsider it, so long as the case is within its jurisdiction." *Id.,* P 0.404[1], at 118 (emphasis in original) (footnote omittted). *See also, Frank G.W. v. Carol M.W., supra, 457 A.2d at 719; Topps Chewing Gum, Inc. v. Fleer Corp., Del. Ch., 1987 Del. Ch. LEXIS 470,* C.A. No. 6781-NC, Hartnett, V.C. (July 31, 1987) (application of law of the case doctrine is discretionary). Therefore, I conclude that while a court should be reluctant to revisit an issue it has already decided, the law of the case doctrine does not preclude a court from doing so, especially if new facts are present.

Siegman, however, has produced nothing that would persuade this Court that its original holding was erroneous.

The essence of the prior holding was that the words "prior to such date" as used in the statute are ambiguous necessitating a resort to extrinsic materials to determine the General Assembly's [*9] intent. *Siegman v. Columbia Pictures Entertainment, Inc., Del. Ch., 576 A.2d 625, 633-34 (1989).* Having done so, this Court found that the General Assembly intended that "the essential element to avoid a shareholder vote is the approval by the board of the about-to-be-acquired corporation before the board becomes beholden to the acquiror." *Id. at 634.*

Siegman now claims to have discovered new evidence that one of the sources relied upon by the Court in making this determination was inaccurate and incomplete. Assuming, arguendo, that Siegman is correct, (which has not been established by competent evidence), the other materials cited in the Court's opinion adequately support the Court's conclusion as to the intent of the General Assembly in enacting the statute. *See Siegman, 576 A.2d at 635.*

In short, Siegman has shown no reason for the Court to reverse its original holding as to the meaning of the words "prior to such date" as they appear in *8 Del. C. § 203(a)(1).*

III

A more substantive issue is whether there is now any material issue of fact as to whether Sony became an interested [*10] stockholder before Columbia's Board approved the merger agreement.

The Delaware Takeover statute defines an "interested stockholder":

"Interested stockholder" means any person (other than the corporation and any direct or indirect majority-owned subsidiary of the corporation) that is (i) the owner of 15% or more of the outstanding voting stock of the corporation, . . . .

*8 Del. C. § 203(c)(5).*

The Delaware Takeover statute further defines "owner":

"Owner," including the terms "own" and "owned," when used with respect to any stock, means a person that individually or with or through any of its affiliates and associates:

(i) Beneficially owns such stock, directly or indirectly; or

(ii) Has (A) the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of such person's affiliates or associates until such tendered stock is [*11] accepted for purchase or exchange; or (B) the right to vote such stock pursuant to any agreement, arrangement or understanding; provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote much stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 1 or more persons; or

(iii) Has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (B) of subparagraph (ii) of this paragraph) or disposing of such stock with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock.

*8 Del. C. § 203(c)(8).*

After additional discovery, Siegman now asserts that Sony became an interested stockholder the day before the Columbia board approved the merger. The critical issue is whether Sony became an interested stockholder by entering into an "agreement, arrangement or understanding for the purpose of acquiring, . . ." the Columbia stock held [*12] by Coca-Cola on September 26, 1989, the day before the Columbia board approved the merger. Siegman claims that because such an "agreement, ar-

rangement or understanding" came into being on September 26, 1989, the safe harbor in *8 Del. C. § 203(a)(1)* for mergers with prior board approval cannot apply. If this is so, Siegman contends that because a shareholder vote was not sought pursuant to *8 Del. C. § 203(a)(3)*, the Columbia-Sony merger was illegal. He further contends that because Sony's tender offer disclosure materials and Columbia's Schedule 14D-9 stated that *8 Del. C. § 203* had been complied with, these disclosures were both material and misleading.

From the present record, it appears that there is a material issue of fact as to whether Sony became an interested stockholder prior to the Columbia board's approval of the merger agreement.

Siegman asserts that at a luncheon meeting between Sony's and Coca-Cola's managements on September 26th, the parties effectively reached an "agreement, arrangement or understanding" as to the granting of an option. He claims that Sony's parent corporation publicly announced an agreement in principle between the managements of Sony, [*13] Columbia and Coca-Cola four hours prior to the meeting of the Columbia board on the 27th. Siegman also claims that Columbia's counsel distributed materials to the Columbia board, prior to the vote on the merger agreement and option agreement, indicating that Coca-Cola had already granted an option to Sony.

Defendants respond that the negotiation of the proposed Coca-Cola option could not, as a matter of law, have constituted an "agreement, arrangement or understanding" within the meaning of *8 Del. C. § 203 (c)(8)(iii)* before the Columbia and Coca-Cola boards approved it, because both the written draft and the later-signed option agreement expressly stated that they were conditioned on the approval of the Columbia and Coca-Cola's boards.

As this Court observed in its previous opinion in this case, the words "any agreement, arrangement or understanding" as used in the statute to define owner or interested stockholder are very broad. *Siegman, 576 A.2d at 631-32.* The Court further observed that the General Assembly intended that the statutory language would encompass "all arrangements, whether formal or informal, written or unwritten," whether or [*14] not the arrangement constituted a legally binding contract. *Id. at 632* (citations omitted). This Court rejected defendants' argument that the Coca-Cola option agreement could not, as a matter of law, have been an "agreement, arrangement or understanding" merely because it stated it was contingent on the approval of the Coca-Cola or Columbia Board. The opinion also stated that the evidence available at that time indicated that approval by the Coca-Cola Board "was a mere formality which was a

foregone conclusion". *Id.* The Court therefore found that Siegman had established a reasonable probability that the option agreement was an "agreement, arrangement or understanding" within the meaning of the Delaware Takeover statute as of September 27, 1987. *Id.* A finding of reasonable probability at the preliminary injunction stage, of course, is not a binding finding of the Court. *See, e.g., Humphreys v. Cain, Pa. Cmwlth., 83 Pa. Commw. 176, 477 A.2d 32, 35 (1984).*

The development of further facts by discovery over the past three years shows that the question of when Sony became an interested stockholder is a disputed question of fact [*15] that cannot be determined from the present record. What occurred at the September 25, 26 and 27th meetings between Sony and Coca-Cola and what was agreed is clearly disputed.

The provision in the Option Agreement stating that it was contingent upon approval of the Merger Agreement and contingent upon approval by both the Columbia and Coca-Cola boards, is strong evidence that no "agreement, arrangement or understanding" came into being until the contingencies were removed. The mere existence of this language in the draft and final agreements, however, does not, as a matter of law, preclude a court, after hearing all the evidence, from finding that this language, for example, was a sham or mere window dressing. If the General Assembly had intended that the words of a formal written contract would be the only evidence to be considered as to whether a potential acquiror was an interested stockholder within the meaning of the statute, it could have so provided. Its use of the words "agreement, arrangement or understanding", however, necessarily imposes a broader standard. The critical factual issue here therefore is whether the agreement was truly contingent.

The burden of persuasion [*16] at trial will, of course, be upon Siegman to prove the existence of a non-contingent agreement, arrangement or understanding prior to September 27, 1989. That the burden is difficult is not the test on a motion for summary judgment. Although the burden to be met to entitle a movant to summary judgment has recently been lessened, the movant, to prevail, must still demonstrate that there are no material issues of fact in dispute. *Burkhart v. Davies, Del. Supr., 602 A.2d 56 (1991).* Disputed facts exist here that preclude summary judgment.

IV

Defendants also claim they are entitled to summary judgment because Siegman cannot show that he or any members of the class suffered any damages.

Defendants correctly point out that three years have passed since the tender offer was consummated and

therefore the Delaware Takeover Statute, *8 Del. C. § 203*, no longer could prevent the merger. They also assert that because Sony paid a substantial premium for the shares it acquired there cannot be any injury and without an injury there can be no remedy.

While Siegman indeed has a formidable burden to establish any damages, the Court cannot find, at this stage [*17] of the proceedings, as a matter of law, that defendants will clearly prevail on this issue.

## V

Regardless of the question of when Sony became an interested stockholder, defendants argue that the complaint must be dismissed because Siegman acquiesced in the merger when he surrendered his shares for the merger consideration.

Siegman brought this action on his own behalf and as a purported class action on behalf of all common stockholders of Columbia except defendants, Coca-Cola, Allen & Co., and their officers, directors, affiliates and subsidiaries. After suit was filed, he tendered half of his shares pursuant to Sony's tender offer and surrendered his remaining shares after the merger had been consummated.

The doctrine of acquiescence in the context of the surrender of shares by a shareholder plaintiff was first discussed in Delaware in *Trounstine v. Remington Rand, Inc., Del. Ch., 22 Del. Ch. 122, 194 A. 95 (1937)*. In *Trounstine*, the plaintiff voted against a proposal to reclassify his preferred shares and filed a suit to enjoin the reclassification. He then voluntarily dismissed his suit and surrendered his shares in exchange for other shares authorized [*18] by the reclassification. Several months later, he filed another suit in this Court to rescind the reclassification. This Court dismissed his complaint holding that a plaintiff may not complain "against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits." *194 A. at 99*.

In another share-surrender case, *Kahn v. Household Acquisition Corp., Del. Ch., 1982 Del. Ch. LEXIS 580*, C.A. No. 6293-NC, Brown, V.C. (Jan. 19, 1982) *(Kahn I)*, this Court distinguished that case from *Trounstine* and refused to dismiss the complaint on the grounds of acquiescence. In *Kahn I*, as in the present case, a plaintiff brought suit, failed in an attempt to obtain a preliminary injunction against the proposed merger, and then surrendered her shares after the merger. *1982 Del. Ch. LEXIS 580, *5*. The Court observed that:

It does not follow that by accepting an amount that she was temporarily unable to do anything about the plaintiff thereby acquiesced in all other conduct of the defendants unrelated to the fixing of the merger price. *1982 Del. Ch. LEXIS 580, *4*.

The Court, however, held that *Trounstine* might be applicable if the plaintiff [*19] had dismissed her suit and accepted the merger price absent any claim of material misrepresentations. *1982 Del. Ch. LEXIS 580, *5*. Because plaintiff continued to prosecute her suit, however, the Court held that that "belies any thought of acquiescence." *1982 Del. Ch. LEXIS 580, *6*.

Similarly, in *Serlick v. Pennzoil Co., Del. Ch., 1984 Del. Ch. LEXIS 563*, C.A. No. 5986-NC, Walsh, V.C. (Nov. 27, 1984), this Court held that where a shareholder filed suit against a proposed merger, voted against the merger and then surrendered her shares after the merger was approved, her suit was not barred by the doctrine of acquiescence. The Court held that because the merger was not conditioned on an approval by a majority of the minority shares, "the approval process takes on an aura of inevitability," and that, under the circumstances, surrendering one's shares "does not constitute acquiescence in the conduct which preceded the merger." *1984 Del. Ch. LEXIS 563, *8*. The Court, citing *Kahn I*, distinguished the case from *Trounstine* in that the plaintiff in *Serlick* had not dismissed her suit (as in *Trounstine*) but had actively pursued the litigation against the defendants. *1984 Del. Ch. LEXIS 563, *7*.

The *Kahn I* [*20] and *Serlick* opinions have been superseded by the Delaware Supreme Court's decisions in *Bershad v. Curtiss-Wright Corp., Del. Supr., 535 A.2d 840 (1987)* and in *Kahn v. Household Acquisition Corp., Del. Supr., 591 A.2d 166 (1991) (Kahn II)*. In *Bershad*, the Court affirmed the dismissal of the claims of all shareholders who either voted in favor of a challenged cash-out merger or who accepted its benefits by tendering their shares for payment under the merger agreement. It held that "when an *informed* minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness." (emphasis added) *Bershad, 535 A.2d at 848* (citations omitted). The Court in *Kahn II* reiterated the general rule in *Bershad* although it found that equitable factors mandated the broadening of the eligible class based on the peculiar facts in the litigation. *Kahn II, 591 A.2d at 175-78*.

Although *Bershad* and *Kahn II* did not state that they were overruling *Kahn I* and [*21] *Serlick*, the holding in *Bershad* does have the effect of precluding a determination of whether a particular shareholder who surrenders his shares intended to acquiesce, as this Court made in *Kahn I* and *Serlick*.

That *Bershad* is controlling in this case, however, does not end the inquiry as to whether Siegman acquiesced in the merger when he surrendered his shares. The

prohibition against the right to continue to maintain a suit, as provided in *Bershad,* expressly applies only to an *informed* minority shareholder who voted for the merger or surrendered his shares. *Bershad, 535 A.2d at 848.* Siegman therefore argues that *Bershad* is not applicable here because he alleges defendants made a material misrepresentation that *8 Del. C. § 203* was not triggered by the merger.

Defendants counter-argue that there was no material misrepresentation as a matter of law because defendants had no duty to engage in "self-flagellation". *See, e.g., Weinberger v. United Financial Corp., Del. Ch., 1983 Del. Ch. LEXIS 443,* C.A. No. 5915-NC, Hartnett, V.C. (Oct. 13, 1983).

Defendants mischaracterize Siegman's argument. While defendants might not have had an affirmative [*22] duty to disclose a possible violation of *8 Del. C. § 203,* they affirmatively represented that the statute was not implicated in the transaction. Having done so, they had an obligation to speak truthfully. *Lock v. Schreppler, Del. Super., 426 A.2d 856, 862 (1981)* ("Although there is no general duty to speak, if a person undertakes to speak, he then has a duty to make a full and fair disclosure as to the matters about which he assumes to speak.").

Because there is a material issue of fact as to whether *8 Del. C. § 203* was violated, this Court cannot find as a matter of law that defendants' disclosures were accurate and therefore cannot find that the shareholders were fully informed and thus acquiesced in the merger if they surrendered their shares.

Defendants take their argument one step further. They argue that the discovery shows that Siegman read Sony's disclosure materials, found them misleading, decided to file suit, and *then* surrendered his shares. Defendants' argument seems to be that Siegman could not have relied on the alleged misrepresentation and, because reliance is an essential element of Siegman's cause of action for misrepresentation, [*23] he does not have standing to pursue the disclosure claim. Defendants, therefore, assert that he cannot argue that he was not an informed shareholder.

The record is unclear as to whether Siegman was fully aware of all the facts and therefore there is a material issue of fact as to whether Siegman was an "informed shareholder" at the time which he surrendered his stock. Siegman may not have been aware, when he surrendered his shares, of all that took place in the meetings between Sony and Coca-Cola on September 25-27, 1989. Defendants are therefore not entitled to summary judgment on the grounds that Siegman acquiesced in the merger when he surrendered his shares.

Having decided that defendants are not entitled to summary judgment on the issue of acquiescence, there is no need to address Siegman's argument that acquiescence is not applicable because the merger was allegedly illegal and *ultra vires.* For similar reasons, Siegman's argument that *Bershad* and *Kahn II* are applicable only to the quasi-appraisal remedy for inadequate price and not to alleged violations of *8 Del. C. § 203* need not be addressed.

Siegman's and defendants' cross-motions for summary judgment [*24] are therefore denied.

IT IS SO ORDERED.

# TAB 14

Not Reported in A.2d                                                                                                  Page 1
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

**H**Solomon v. Pathe Communications Corp.
Del.Ch.,1995.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Robert SOLOMON, Plaintiff,
v.
PATHE COMMUNICATIONS CORPORATION,
Credit Lyonnais Bank Nederland N.V., Dennis
Stanfill, Alan Ladd, Jr., Charles Meeker, Rene
Claude Jouannet, Bahman Naraghi, and Guy Etienne
Dufour, Defendants.
**CIV. A. 12563.**

Submitted: Feb. 15, 1995.
Decided: April 21, 1995.

Irving Morris, Karen L. Morris, Abraham Rappaport,
Patrick F. Morris and Seth D. Rigrodsky, of Morris
and Morris, Wilmington, for plaintiff.
Samuel A. Nolen, and Scott R. Haiber, of Richards,
Layton & Finger, Wilmington, of counsel: White &
Case, New York City, for defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.
*1 The suit grows out of the tail-end of a commercial
debacle in which Credit Lyonnais Banque Nederland
N.V. ("CLBN"), on its way to losing a huge sum,
was forced to exercise certain contractual rights and
its rights as a secured party, first to take over the
management and later the legal ownership of
MGM/UA Communications Corp. ("MGM") and,
incidentally thereto, of Pathe Communications
Corporation. This suit arises from the second of these
steps: the foreclosure by a CLBN affiliate of CLBN's
perfected security interest in substantially all of the
stock of MGM and its parent Pathe, and out of a
concurrent tender offer for the 10% of Pathe stock
that CLBN did not acquire in the foreclosure.
Plaintiff purports to represent the class of public
shareholders who owned 10% of Pathe's common
stock.

This court is well familiar with many of the
background facts alleged in the amended complaint.
*See Credit Lyonnais Bank Nederland, N.V. v. Pathe
Communications Corp.,* Del.Ch., C.A. No. 12150,
Allen, C. (Dec. 30, 1991); *Credit Lyonnais Bank
Nederland, N.V. v. Pathe Communications Corp.,*
Del.Ch., C.A. No. 12188, Allen, C. (Mar. 9 & 23,
1992).

Below I sketch that story, but here for summary
purposes, I note that in May 1992 CLBN held a
perfected security interest in 98% of MGM's stock,
which CLBN had acquired in connection with a $400
million loan to Pathe, the then owner of the MGM
stock. CLBN acquired at the same time a perfected
security interest in 89% of Pathe's stock, from Pathe's
"parent" Melia International N.V. ("Melia"). MGM
was the operating entity; it owned a film studio,
interests in Europe and other assets (e.g., the
remnants of a film library). Pathe owned operating
assets through its ownership of MGM. Am.Cplt. ¶ 13.
CLBN came, as a creditor, to control MGM and
Pathe. Thereafter, CLBN whose large loans to Pathe,
Melia and MGM were in default, elected to exercise
its rights as a secured party to foreclose on the MGM
stock. Pathe did not attempt to prevent this; plaintiff
does not allege that any ground existed for it to do so
in good faith. CLBN concurrently elected to
foreclose on the 89% of Pathe stock that secured its
loans to Melia. In connection with the foreclosure
sale of the MGM and Pathe stock, CLBN (or
affiliates) extended to the public (10%) shareholders
of Pathe an opportunity to sell their stock to CLBN at
the market price of $1.50 per share. In exchange for
an agreement to extend such an offer to Pathe's public
stockholders a special committee of the Pathe board
had agreed not to attempt to interfere with the
foreclosure on the MGM stock. Owning a 10%
minority share in a corporation (Pathe) that shortly
would own practically no assets, no doubt would
strike most of us as an unattractive option. Plaintiff
however sees the option to tender all shares to CLBN
at a market price as an equitable wrong. He brought
suit immediately (May 1992) but did not seek to
enjoin the transaction, and until March 14, 1994
when he filed an amended complaint, plaintiff did
essentially nothing to pursue the case. On April 22,
1994 defendants moved to dismiss the complaint.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

**\*2** A number of theories can be extracted from the amended complaint.

First. Most globally, it is asserted that the $1.50 cash tender offer and the agreement to take no action to interfere with the foreclosure, constituted self-interested action that was unfair in several respects, specified below.

Second. It is claimed that the Pathe board did not exercise informed judgment in agreeing to not oppose the MGM foreclosure.

Third. It is claimed, remarkably if obliquely, that the Pathe board failed to negotiate with all interested companies "in an attempt to obtain the best value for members of the class" in connection with a sale of the 10% public minority. ¶ 37(b)

Fourth. The board "failed to assure that no conflicts of interest existed." ¶ 37(d)

Fifth. The board failed to retain independent representatives to act solely on behalf of the members of the class for purposes of negotiating the terms of the Tender Offer. ¶ 38

Sixth. The $1.50 price was "inadequate and therefore unfair." ¶ 40

Seventh. The tender offer was designed to be coercive (¶¶ 44, 45), was "grossly unfair," and was made through a disclosure that failed "to disclose ... either the true value of the assets of MGM and Pathe or the future prospects of Pathe." ¶ 44

In evaluating the sufficiency of the amended complaint I turn first to a more complete statement of the pleading's allegations.

### I.

Given the prior adjudications in this court among CLBN, Pathe and MGM, certain of the background facts are not susceptible of dispute. CLBN is a banking institution organized and existing under the laws of the Netherlands and is a subsidiary of Banque Credit Lyonnais, a French corporation. Pathe is a Delaware corporation with its principal offices located in Culver City, California. CLBN, no doubt to its deep regret, was a primary lender to Pathe, its former Chief Executive Officer Giancarlo Parretti ("Parretti") and his affiliated companies including Comfinance SA and Melia International N.V. CLBN provided financing to Pathe for various purposes relating to the development, production and distribution of motion pictures, most notably for Pathe's acquisition of substantially all of the stock of MGM.

In March 1990 Parretti became interested in acquiring through Pathe substantially all of the stock of MGM.[FN1] On November 1, 1990 Pathe and MGM completed the private transaction in which Pathe acquired 98.5% of outstanding shares of MGM. Am.Cplt. ¶ 2. As the prior trial showed this was done for all practical purposes entirely with borrowed funds; CLBN was the principal lender.

> FN1. MGM's name was changed to MGM-Pathe Communications Co. after Pathe acquired MGM/UA Communications Co.

From the outset, things went badly for Parretti/Pathe and consequently for CLBN. Within months (March 29, 1991) a creditor's involuntary petition in bankruptcy was filed under Chapter 7 of the Bankruptcy Code against MGM. After hurried negotiations, on May 16, 1991 CLBN extended a new $145 credit facility to MGM that enabled MGM to reach an accord with the creditors and emerge from the bankruptcy proceeding.

**\*3** To induce CLBN to extend this new credit facility, Melia and its affiliated companies pledged to CLBN all of their shares in Pathe, representing approximately 89.5% of Pathe's outstanding stock. Am.Cplt. ¶ 3. In addition, Pathe itself pledged to CLBN its 98.5% ownership of MGM to secure all indebtedness owing in connection with CLBN's financing of the MGM acquisition by Pathe.

Moreover, in exchange for the new credit, CLBN acquired the right under two voting trust agreements dated April 15, 1991 (the "Voting Trust Agreements") to vote, as voting trustee, 89.5% of the outstanding voting stock of Pathe and 98.5% of the outstanding voting stock of MGM. Pathe, Parretti and Melia also entered into two separate Corporate Governance Agreements with CLBN concerning the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 3
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

management of Pathe (the "Pathe-CGA") and MGM (the "MGM-CGA"). Am.Cplt. ¶ 4.

As a result of certain actions by Parretti in violation of the MGM-CGA, CLBN exercised its voting rights under the Voting Trust Agreements and acted on June 16, 1991 to remove Parretti, his wife, Ms. Maria Cecconi, and Mr. Yorum Globus as directors of MGM. Am.Cplt. ¶ 5. Similarly, on July 8, 1991, CLBN exercised its voting rights under the Voting Trust Agreements to oust Parretti and his affiliates from Pathe's board. Am.Cplt. ¶ 7. CLBN then initiated two separate actions in this court to confirm the validity of its removal of Parretti and his affiliates from the Board of Directors of Pathe and MGM. After a lengthy trial this court affirmed the validity of actions taken by CLBN as it found that Parretti had wilfully breached his obligations set forth in the MGM-CGA.

By 1992 CLBN loans to Parretti-controlled companies (Melia, Pathe, and MGM) amounted to over $1 billion.[FN2] The number is undoubtedly higher today.

> FN2. According to the complaint, as of May 5, 1992, Pathe owed CLBN an aggregate amount of approximately $140 million. Also as of such date, MGM owed CLBN an aggregate amount of approximately $568 million. As of March 17, 1992, the aggregate principal and overdue interest owed by Melia to CLBN totalled approximately $397 million.

Pathe's stock ownership of MGM represented virtually all of Pathe's assets. Only "through MGM [did] Pathe continue to engage in financing, production and worldwide distribution of theatrical motion pictures, television series, and made-for-television features and specials, and operation of motion picture theaters in the United Kingdom, the Netherlands, and Denmark." Am.Cplt. ¶ 13.

Once Mr. Parretti and his associates were removed from Pathe's and MGM's Board of Directors, CLBN replaced them with its designees. Am.Cplt. ¶¶ 5-6. Parretti and his associates, however, continued in Italian courts to challenge CLBN's attempt to exercise control over Pathe and MGM. Am.Cplt. ¶ 27. On April 28, 1992 Mr. Parretti apparently

obtained an order of an Italian court which contradicted this court's prior decisions and placed CLBN's control of Pathe and MGM in jeopardy. *See* Notice pp. 7-8. CLBN then proceeded to foreclose on its security agreement, which reached the 89.5% of Pathe stock the legal title to which was in various Parretti associated entities (e.g., Melia) and on the 98% of MGM stock owned legally by Pathe. Am.Cplt. ¶¶ 9, 29.

In connection with the foreclosure, on April 17, 1992 CLBN sent a letter to a special committee of the Board of Directors of Pathe (the "Special Committee") consisting of Messrs. Stanfill and Meeker notifying them of its intended action. This letter stated CLBN's belief that Pathe had no basis to initiate legal proceedings to forestall the foreclosure of its MGM stock and stated that any attempt to do so would only cause harm to all parties including Pathe's bondholders and stockholders. To obtain an agreement that Pathe would not take action to attempt to forestall or delay the foreclosure, CLBN expressed willingness to provide certain benefits to holders of the public shares of Pathe's common stock and to holders of Pathe's bonds including purchasing a portion of the outstanding bonds and making a tender offer for an unspecified number of Pathe's public shares of common stock. Notice pp. 9-10. In responding to this letter, the Special Committee retained its own legal and financial advisors. Am.Cplt. ¶ 49; Notice p. 10.

*4 On May 1, 1992, Pathe and CLBN executed an agreement whereby Pathe agreed that it would not take any action to attempt to forestall or delay the foreclosure and CLBN agreed to make the tender offer of $1.50 per share for up to 5.8 million unencumbered outstanding shares and to make debt offers to purchase outstanding Pathe bonds at specified discounted prices. In addition, as part of the Agreement, CLBN agreed to provide credit support for a portion of the principal and interest on the outstanding Pathe bonds. CLBN initiated the foreclosure by announcing a public auction to take place on May 7, 1992 in Wilmington, Delaware. In preparation of the foreclosure, Credit Lyonnais, CLBN's parent company, formed MGM Holdings Corporation, ("Holdings") in the State of Delaware. Holdings is a wholly-owned subsidiary of Credit Lyonnais. CLBN assigned its security interest in MGM stock to Holdings which thereafter pursued the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

foreclosure in its name. On May 7, 1992, CLBN commenced the tender offer.

The day before the commencement of the tender offer, Mr. Solomon filed his complaint. He amended his class action complaint on March 14, 1994.[FN3]

> FN3. Mr. Solomon failed to properly serve defendant CLBN after filing the Complaint, however. He first attempted to serve CLBN by serving Pathe's registered agent in Delaware. CLBN, as a foreign corporation, does not retain a registered agent in this state. Moreover, after filing the Amended Complaint, Plaintiff served CLBN with a copy of the original Complaint rather than a copy of the Amended Complaint.

Defendants have moved to dismiss the amended complaint claiming that it fails to state a claim upon which relief can be granted. In addition, defendant CLBN has sought dismissal from this action claiming that this court lacks personal jurisdiction over it and that plaintiff's service of process upon it was ineffective.

## II.

For the reasons that follow it is my opinion that the amended complaint fails to allege facts that, if true, state a claim upon which relief may be granted. In so concluding I am mindful that on such a motion all well-pleaded factual allegations are to be treated as true and that all permissible inferences from the well-pleaded facts should be drawn in the pleader's favor. _Rales v. Blasband,_ Del.Supr., 634 A.2d 927, 931 (1993); _Grobow v. Perot,_ Del.Supr., 539 A.2d 180, 187 n. 6 (1988). I am mindful as well, however, that plaintiff's pleading obligations, especially when he purports to sue in a stockholders' class action or derivatively, cannot be satisfied by pleading conclusions such as that the transaction is "unfair" or "coercive" or that disclosure is "inadequate." _Rabkin v. Philip A. Hunt Chemical Corp.,_ Del.Supr., 498 A.2d 1099, 1105 (1985) ("a plaintiff's mere allegation of "unfair dealing, without more, cannot survive a motion to dismiss"); _Grobow,_ 539 A.2d at 187 n. 6 ("neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true.").

It is a fact evident to all of those who are familiar with shareholder litigation that surviving a motion to dismiss means, as a practical matter, that economical rational defendants (who are usually not apt to be repeat players in these kinds of cases [FN4]) will settle such claims, often for a peppercorn and a fee. This fact causes one to apply the pleading test under Rule 12 with special care in such suits. The court cannot be satisfied with mere conclusions, as it might, for example, in an auto-accident case, because in this sort of litigation the risk of strike suits means that too much turns on the mere survival of the complaint.

> FN4. One empirical study found that "shareholder suits are rare ... Litigation frequency is one shareholder suit [for each sample company] every 48 years." Roberta Romano _The Shareholder Suit: Litigation Without Foundations?_  7 Journal of Law, Econ. & Org. 55, 59 (1991).

*5 In my opinion the amended complaint weaves together a tangle of conclusions about fairness and coercion, etc., but the facts it alleges fail to state a claim.[FN5]  In so concluding I do accept for these purposes plaintiff's position that the Pathe "disinterested directors" were in fact appointed by and accountable to CLBN and their decision is not entitled to the presumption of the business judgment rule. Nevertheless I do not understand that in alleging this much, plaintiff has filed a complaint that states a claim. Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair. Plaintiff has not done so here.

> FN5. Plaintiff cites three facts to support his assertion that the transaction is unfair. None can be said to arouse as much as a fleeting doubt of the fairness of the foreclosure or the $1.50 tender offer. Plaintiff's complaint states:
>
> > "(i) in the year prior to the offer, Pathe's shares had traded as high as $3.25 per share; (ii) MGM, and therefore, Pathe, through its ownership of 98.5% of the common shares of MGM, had a substantial and valuable asset, including MGM's valuable film and television

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

libraries and profitable chain of theaters in Europe; and (iii) prior to the Tender Offer, stable, proven executive management had been installed at both Pathe and MGM."

The market price of Pathe stock a year earlier cannot provide any basis for currently valuing the stock of Pathe since all of its assets, the MGM stock, now was being foreclosed. For the same reason, plaintiff's argument that Pathe possesses valuable entertainment assets fails. Insofar as the facts alleged show, Pathe has no legitimate claim to those assets as it was in default of its obligations secured by its MGM stock. *See* pp. 14-15 *infra*.

### III.

I turn initially to clearing away some of the debris that is strewn about in the amended complaint. First, the adequacy of the price in a tender offer does not raise a triable issue unless price is connected to valid claims of breach of fiduciary duty, such as disclosure problems or actionable coercion. So long as a free choice to accept or reject a tender offer is present, courts do not attempt to protect any right to receive a "fair price" in a tender offer. *In re Ocean Drilling & Exploration Co. Shareholders Litig.,* Del.Ch., C.A. No. 11,898, Chandler, V.C. (April 30, 1991). *See also Lynch v. Vickers Energy Corp.,* Del.Ch., 351 A.2d 570, 576 (1976), *rev'd on other grounds,* Del.Supr., 383 A.2d 278 (1977); *Lewis v. Fuqua Indus., Inc.,* Del.Ch., C.A. No. 6534, slip. op. at 7, Hartnett, V.C. (Feb. 16, 1982) ("[B]ecause this is a tender offer which the individual stockholder may accept or reject as they wish and not a freeze out merger, the defendants had no duty to offer any particular sum to the stockholders as long as they complied with the requirements of full disclosure with complete candor.")

Plaintiff claims here that the $1.50 offer was "coercive" and that, as a result, CLBN had a duty to offer a fair price, which it breached.

How the tender offer was coercive is less clear. Plaintiff alleges, as I understand it, that Pathe's directors failed "to protect" the minority interest (*see* pp. 8-9 *supra* ) in breach of their fiduciary duties (by not being informed, independently advised, and

independent) and thus the tender offer became coercive.

In the present case, CLBN, as a security holder of the 98.5% of MGM stock was legally entitled to commence foreclosure proceedings upon default by Pathe. *See* UCC 8-313, 8-321, 9-503, 9-504. Even if the consequences of that foreclosure were, for example, to render the value of the minority Pathe stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity. Thus, the tender offer in this case cannot be said to be actionably coercive simply because CLBN opted to exercise a legally entitled right. "Actionable coercion does not exist, however, simply because a tender offer price is too good to pass up." *Cottle v. Standard Brand Paint Co.,* Del.Ch., C.A. No. 9342, slip op. at 8, Berger, V.C. (Mar. 22, 1990). Yet given the effect of the foreclosure, that is the core "coercive" factor present.

*6 Nevertheless, as I assume that there was a lack of independence by the members of the Special Committee, plaintiff would state a claim if he alleged that Pathe *had* valid legal grounds to oppose or forestall the foreclosure, which it did not exercise. In that event a breach of loyalty would arguably be provable. But here there is no allegation that Pathe did possess rights or claims that could have been used by Pathe legitimately to thwart the foreclosure. Failing to allege such facts, plaintiff cannot substantiate his claim that the tender offer was actionably coercive. Of course the minority shareholders may have felt financial pressure to tender their shares in light of the likelihood that their shares would have little value after the foreclosure. This type of financial pressure, however, does not render the tender offer actionably coercive. Indeed, financial downfall of a company is one of the risks assumed by the minority shareholders when they invested in the common stock of Pathe. Thus I find that plaintiff has failed to state a claim on his allegation of an actionably coercive tender offer by CLBN.

The other asserted claims are even more clearly inadequate to state a claim. That the Pathe board was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 6
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**1995 WL 250374 (Del.Ch.)**

(assumedly) under the control of CLBN does not alone constitute a wrong. The alleged failure to retain independent advisers; the alleged failure "to assure that no conflict of interest existed" are restatements of the same complaint. But I re-iterate the opinion that a plaintiff must do more than allege that a transaction is a self-interested one in order to state a claim. He or she must as well allege some facts which if true would render the transaction unfair.

In this instance plaintiff has simply alleged that the transaction was a self-dealing one and, in conclusionary fashion, that it was ill-informed, coercive, grossly unfair, etc. This is insufficient to state a claim. *See C.f. Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983) (Even where a majority shareholder orchestrates a cash-out merger, the defendant majority shareholder need not prove the entire fairness of the transaction, unless the plaintiff first demonstrates some basis for invoking the fairness obligation, beyond the fact that the majority shareholder benefitted from the transaction. Considering all of the circumstances, I conclude that this effort to leverage some additional money from the secured-creditor/new majority shareholder out of this 1992 mop-up operation fails to state a claim upon which relief may be granted.

Del.Ch.,1995.
Solomon v. Pathe Communications Corp.
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

TAB 15

Westlaw.

Not Reported in A.2d                                    Page 1
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

**C**Venhill Ltd. Partnership ex rel. Stallkamp
Del.Ch.,2008.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
VENHILL LIMITED PARTNERSHIP, by its
General Partner, William J. Stallkamp, Trust Under
Agreement of Dora B. Hillman dated August 25,
1968 f/b/ Howard B. Hillman, by its Majority
Trustees, Tatnall L. Hillman and Joseph J. Hill, and
Trust Under Agreement of Dora B. Hillman dated
August 25, 1968 f/b/o Tatnall L. Hillman, by its
Trustees Tatnall L. Hillman, Joseph J. Hill and
McBee Butcher, Plaintiffs,
v.
Howard B. HILLMAN and HMC Enterprises, LLC,
Defendants.
**C.A. No. 1866-VCS.**

Submitted: March 11, 2008.
Decided: June 3, 2008.

Steven T. Davis, Esquire, Obermayer Rebmann
Maxwell & Hippel, LLP, Wilmington, Delaware; E.
Parry Warner, Esquire, Obermayer Rebmann
Maxwell & Hippel, LLP, Philadelphia, Pennsylvania,
Attorneys for the Plaintiff Trusts.
Leslie C. Heilman, Esquire, Ballard Spahr Andrews
& Ingersoll, LLP, Wilmington, Delaware; Roger P.
Thomasch, Esquire, K. Allison White, Esquire,
Ballard Spahr Andrews & Ingersoll, LLP, Denver,
Colorado, Attorneys for Plaintiff Venhill Limited
Partnership, by its General Partner William J.
Stallkamp.
David E. Wilks, Esquire, Thad J. Bracegirdle,
Esquire, Reed Smith LLP, Wilmington, Delaware;
Mark L. Tamburri, Esquire, Reed Smith LLP,
Philadelphia, Pennsylvania, Attorneys for
Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

## I. *Introduction*

*1 This case underscores the reality that it is not only
greed that can inspire disloyal behavior by a business
fiduciary. In fact, when a business fiduciary lives a
plush and comfortable life, derived from substantial
distributions from family trusts, he can afford to
place other considerations-such as the achievement of
a personal dream, a desire to prove himself as an
entrepreneur and to call himself a CEO, or a stubborn
refusal to admit failure-ahead of the prudent pursuit
of maximum profit, having a silk-sheeted safety net
to fall back upon. In this case, that is just what
happened. Defendant Howard Hillman had many
years to make Auto-Trol Technology Corporation a
success, with the support of substantial investments
from trusts benefiting himself and his brother, and
their families. At one stage, Auto-Trol had grown its
revenues to nearly $80 million a year and was a
publicly listed company.

But its fortune declined rapidly in the early 1990's,
until such time as its stock was delisted, its revenues
fell to less than $7 million a year, it became
consistently and hugely unprofitable, and it had to go
private when its equity had turned into a speculative
penny stock. By the late 1990s, Howard Hillman's
fellow trustees of key family trusts began to object
strenuously to further investments in Auto-Trol, an
investment in which the family trusts had poured
over $48 million by 1999. As early as 1996, those
trustees told Hillman that they opposed further
investment flows into Auto-Trol.

But the trustees did not have direct control over that
issue. In 1984, the trusts had formed and funded a
limited partnership, Venhill Limited Partnership, to
make investments using funds down-streamed from
the trusts for that purpose. Howard Hillman was the
sole general partner of Venhill and had sole
discretion to make investment decisions on its behalf.
Even though the trustees told Hillman that they
opposed further investments from Venhill into Auto-
Trol, Hillman told them he would continue to fund
Auto-Trol. The cash drain of funds flowing from
Venhill to Auto-Trol was so great that, under
Hillman's control, Venhill needed substantial inflows
of capital from its limited partner trusts to meet

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

funding calls for its other private equity and venture capital investments. Despite their stance on loans to Auto-Trol, the trustees continued to fund Venhill with cash from the trusts until December of 1999, knowing full well that Howard would "invest" those funds in Auto-Trol.

Thus, from 1999 to July of 2005, Hillman put another $37 million into Auto-Trol. He did so on terms that were set entirely by himself and that were far more favorable than Auto-Trol could have ever received in arms-length transactions. That is not surprising as Auto-Trol was insolvent and its shrunken revenues did not cover its substantial expenses. To make Auto-Trol appear solvent, Hillman re-characterized debt Auto-Trol owed to Venhill as equity. He also rolled $31.5 million in various short-term notes that would come due within three years into a single note maturing in 2020 that would only require interest payments "from time to time." That note reflected his regular practice since 2002 of loaning Venhill funds to Auto-Trol that earned interest at the Applicable Federal Rate, a floating rate set by the federal government available only to the highest quality borrowers. Auto-Trol was a borrower who, by Hillman's own admission, could not obtain debt or equity financing on *any* terms in the market. In total, Hillman made some 186 loans from Venhill to Auto-Trol. Venhill received very little in return, and had invested $85.4 million at a substantial loss by July of 2005.

**\*2** At the end of their tolerance, the other trustees of the family trust-Hillman's brother and cousin-finally took action to use the trusts' voting power of Venhill's equity to remove Hillman as general partner. Sensing that his removal was coming, one of Hillman's last acts as general partner was to transfer the majority equity interest of Auto-Trol from Venhill to an entity that Hillman personally controlled for no consideration. Hillman also funneled another $2 million from Venhill into Auto-Trol as he went out the door.

The inevitable litigation ensued. In this case, the issues have been narrowed. Until shortly after trial, Hillman clung to the untenable position that his actions in transferring control over Auto-Trol from Venhill to himself for nothing was proper. After trial, he abandoned that position and unwound that transaction. Similarly, going into trial, the plaintiffs-

the trustees of the various trusts and the new general partner of Venhill on its behalf-sought monetary damages for actions taken by Hillman going back as early as 1993, even though Hillman's intention to continue putting funds into Auto-Trol was understood by all the trustees of the family trusts. On the first day of trial, the plaintiffs finally agreed to limit their request for relief to those actions taken by Hillman within three years of the filing of their complaint on December 30, 2005, abandoning their claims as to prior periods as time-barred.

At trial, the following became clear. From the beginning of the applicable time period in 2002 (and indeed much sooner) until Howard was removed as Venhill's general partner, Auto-Trol had no plan of business that, to the mind of a rational investor contemplating entrusting equity or debt capital to it, would have provided any rational prospect of success. Given the lack of any realistic plan for future success, and Auto-Trol's past record of business failure, rational private equity investors and lenders would likely not have invested in Auto-Trol on any terms. Absolutely certain is that such rational third-parties would not have lent money to Auto-Trol on terms that corporate borrowers with a AAA credit rating could not obtain. Even more than absolutely certain is that such rational third-parties would not have continued to pour money into Auto-Trol when the prior infusions had done nothing to help the corporation increase its chances for success.

The reason for Venhill's provision of financing to Auto-Trol was singular: Howard Hillman's personal sense of identity was bound up in Auto-Trol. He had served as its CEO since 1985, found its mission interesting, and fervently desired to make it a success, proving to himself and the world that he was capable of generating wealth as an entrepreneur and executive, and not simply by directing family funds into investments identified by another branch of his family, with which he had strained relations.

But Howard Hillman was not pursuing his Auto-Trol dream with his own funds. Instead, he was funding it with Venhill funds that did not belong to him. He was a fiduciary and expected to exercise a rational business judgment about how to invest Venhill's funds. He was expected to make investments that would maximize the returns to Venhill, not that would maximize the personal value he placed on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

remaining as CEO of Auto-Trol and seeking to make it a success. Likewise, Howard Hillman could not place his pride above his duty to Venhill. In that respect, it is clear that Hillman was loath to admit to his fellow trustees-his brother and cousin-that Auto-Trol was failing and should be responsibly wound-up unless another financing source could be found.

*3 Instead of exercising his authority as Venhill's general partner for the best interests of Venhill, Hillman irrationally pursued his own agenda by imprudently investing tens of millions of dollars in an insolvent company with no rational plan for future success. He made those investments on terms that were grossly unfair to Venhill, and without any attempt to compare what Venhill would likely receive from investing in Auto-Trol to what it could receive for making other market investments. In fact, it is indisputable that no rational third-party would have invested in Auto-Trol on the terms Hillman caused Venhill to invest. At most, a rational third party might have purchased Auto-Trol's assets for a sum certain, and took what could be salvaged going forward, leaving Auto-Trol's previous investors to enjoy only the modest dent the sales price would make in their huge losses. Put bluntly, Hillman knew he was imprudently investing Venhill's funds by pouring them into a sinking hole, when there were much safer investments available that promised a higher rate of return. Not only that, Hillman knew that he was imprudently concentrating Venhill's investments in Auto-Trol, increasing investments in Auto-Trol to a staggering 63% of Venhill's investments by 2005.

After careful consideration of his testimony and the relevant evidence, I am confident that Hillman knew that what he was doing was imprudent. But he believed that because of the overall wealth of the trusts and the work he had put in at Venhill that he had an entitlement to pursue his Auto-Trol dream with the funds of his family members. The more they raised concerns, the more stubborn and stuck-in he got regardless of the worsening situation at Auto-Trol, eventually engaging in an outrageous attempt to transfer control of Auto-Trol from Venhill to himself personally when it became clear that his ouster was imminent. In the course of doing that, Hillman caused Venhill to make one last large infusion of funds into Auto-Trol.

Having knowingly pursued his personal objectives over the best interests of Venhill, Hillman acted disloyally and is liable to Venhill for the harm he caused it. At the very least, his conduct was grossly negligent which also suffices to expose him to liability under the terms of Venhill's Limited Partnership Agreement. Finding that all the investments he caused Venhill to make into Auto-Trol from December 30, 2002 to July 26, 2005 were on terms he knew were imprudent and unfair to Venhill, I will require Hillman to repay the principal amount plus a rate of interest approximate to what Venhill would have earned had it used the funds for alternate investments.

## II. *Factual Background*

A certain amount of Hillman family history is essential to a proper understanding of this case. Henry Hillman founded the successful investment firm known as The Hillman Company, which is now a private equity investor in many high technology companies.

Defendant Howard Hillman and his brother Tatnall Hillman joined Henry Hillman's family when Henry married their mother, Dora. Henry became their stepfather and they took his surname. Henry Hillman had at least one child from his first marriage. The importance of that will become clear soon.

*4 Howard Hillman is now seventy-three years old. He graduated from Princeton University, spent some time in the Navy, and went on to get an M.B.A. from Harvard Business School in 1960. In the early part of his career, he spent nine years as a commercial loan officer at Chemical Bank.

Howard's brother, Tatnall, graduated from Princeton with a biology major, then spent four years as an active duty Naval officer. After that, he taught high school classes for several years in Princeton, New Jersey, and briefly worked as a computer programmer. Therefore, by the mid-1960s Howard was focused on a career in business, and Tatnall was trying to figure out to what career, if any, he should dedicate his time.

By that time, their stepfather Henry Hillman had died. Henry's son, Henry Hillman, Jr., had taken over leadership of The Hillman Company after his father's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

death and shares of The Hillman Company had been distributed to Hillman family members. In 1965, Henry, Jr., sought to consolidate ownership of The Hillman Company, and approached his relatives with offers to buy out their shares of The Hillman Company.

Howard thought the offer from his step-brother Henry was too low and declined to sell the shares to his step-brother. His mother, Dora, and brother, Tatnall, followed suit and also declined to sell their shares. Howard, Tatnall and Dora eventually reached an arrangement with Henry Hillman, Jr., and remained as owners of stock in The Hillman Company.

The joint action by Howard, Tatnall, and their mother Dora was not coincidental. As of that time, Howard and Tatnall had a deep brotherly bond, having been very close as children. Consistent with this relationship, on August 25, 1968, Howard and Tatnall's mother, Dora Hillman, created an interlocking system of trusts primarily for the benefit of her sons Howard and Tatnall Hillman and their families.[FN1] The trusts were funded by stock in The Hillman Company.

FN1. DX 1 ("Trust Agreement").

Dora created the "A-1 Trust" for the benefit of Howard Hillman and his issue, and the "B-1 Trust" for the benefit of Tatnall Hillman and his issue. The "Trust Agreement" provided that the trusts would be administered by the same three "Trustees," two of whom would be Howard and Tatnall Hillman. The Trust Agreement provided the Trustees the power to establish accumulation trusts for the benefit of any beneficiary of the main days of the Trust Agreement. Three days after Dora executed the Trust Agreement for the A-1 and B-1 Trusts, Howard and Tatnall created two additional series of trusts for the benefit of their respective children, the C-series of trusts for the benefit of Howard's children and the D-series of trusts for Tatnall's children. Additional accumulation trusts under the A, B, C, and D-series have been established over the years for the benefit of various beneficiaries.[FN2] The value of the A-1 Trust's assets are now conservatively estimated in the neighborhood of $120 million, and the value of the B-1 Trust is slightly less because of more conservative investing.[FN3]

FN2. In all, there are 18 such trusts: four in the A-series; six in the B-series; three in the C-series; and five in the D-series. Tr. at 816.

FN3. Tr. at 647-48. These figures are approximate. It is unclear whether these estimates incorporate the value of Venhill.

**\*5** A good deal of the value of the A-1 and B-1 Trusts results from the refusal of Howard, Tatnall, and Dora to go along with Henry, Jr.'s desire to buy them out of The Hillman Company stock. The A-1 and B-1 Trust now each contain around 13% of the stock of The Hillman Company, or around 26% of that Company's stock collectively. Howard considers his leadership in the decision not to sell in 1965 to be the primary reason the Trusts are so well funded, and this likely contributes to his sense that his brother Tatnall should leave the investing decisions to him.[FN4]

FN4. *See, e.g.,* DX 8 (Henry: "[T]he presumption that I am working to deny any beneficiary long term benefit is contradicted by history. I was the one who 'blew the whistle' on HLH in 1965 (in essence funding this debate)....").

A. *A Fast-Forwarded View Of The 1970s And 1980s*

Howard and Tatnall reacted to their wealth and economic security differently. After experimenting with teaching and computer programming, Tatnall decided to eschew the pursuit of a paying career. Since 1970, Tatnall has occupied his time with avocations. A devoted skier who now lives in Aspen, Tatnall has volunteered his time patrolling ski mountains in Colorado and as an instructor for disabled and blind skiers. He also continued to serve for several years in the Naval Reserves, and used his wealth to engage in philanthropic activities and non-profit board service.

Howard took a very different tack. After spending nine years at Chemical Bank, Howard decided to concentrate on making his mark as an investor and entrepreneur. One way in which he did so was to act as the key Trustee for the Family Trusts. In particular, that role involved Howard in interacting

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

with The Hillman Company. Under the helm of Henry, Jr., The Hillman Company had become an active investor in venture capital and private equity firms as well as high-technology companies.[FN5] Apparently, relations with step-brother Henry, Jr. had evolved to the point where the Family Trusts were offered the opportunity to co-invest with The Hillman Company in new deals. Howard would scrutinize these opportunities and select those that he believed had the most promise. Tatnall appears to have played little or no role in this effort, deferring to his brother's greater interest and expertise in business matters.

> FN5. The Hillman Company was an early investor in Kleiner Perkins Caufield & Byers, the Silicon Valley powerhouse venture capital firm and Kohlberg Kravis Roberts & Co., a firm critical to the emergence of the private equity industry.

But that role was not satisfying for Howard. Although wealthy because of the success of The Hillman Company, Howard chafed under the secondary role of his branch of the family. Howard did not want to be dependent on Henry, Jr. Rather, he wanted to use the wealth in the Family Trusts to invest in other opportunities, and thereby reduce their dependence on The Hillman Company.

That desire manifested itself in two key ways. One is non-controversial. That involved Howard developing a relationship with Hambrecht & Quist, a West Coast investment bank that invested in technology start-ups. Eventually, Howard joined the board of that firm, which gave the Family Trusts access to deal flow from a source other than The Hillman Company. The Hambrecht & Quist relationship positioned the Family Trusts to benefit from the exponential growth in the high technology field, as that bank backed many successful technology IPOs, including Apple Computer, Genentech, Adobe Systems, and later Netscape and Amazon.com. But merely selecting deals from two quality investment shops did not satisfy Howard. He wanted to demonstrate more autonomy than that.

*6 And that is where Auto-Trol comes into the story. In 1973, Howard Hillman used cash from the A-1 Trust to buy Auto-Trol from a venture capitalist for $50,000 and an earn-out. Candidly, the parties did not

do a clear job of portraying the evolution of Auto-Trol's business over the quarter-century relevant to this litigation. The most one can confidently say is that Auto-Trol has been engaged in some form of the computer software business for the last several decades, with somewhat of a focus on providing solutions for businesses to manage their operations more efficiently.[FN6]

> FN6. In the 1960s, Auto-Trol manufactured oven sensors and in the 1970s was an early entrant in the field of computer aided design.

It appears that Howard took a hands-on role at Auto-Trol from the get-go, and served as its chairman from 1973 on. His concept for Auto-Trol was grandiose. Although Auto-Trol was a small concern, Howard's vision for it was one he explained by reference to an initiative of a much bigger firm, Xerox. Xerox had created Xerox PARC as a Silicon-Valley based research center. At that center, a number of important technology products were invented, including laser printing, Ethernet, the graphical user interface, and the mouse. Like Xerox's idea, Howard's concept was that Auto-Trol could become a "magnet investment." If Auto-Trol could establish its success with a few products, it could use those products to entice promising technological inventors to come work for it and develop even more products. These inventive ideas and minds would cross-pollinate, resulting in a sustainably profitable harvest of technology products. As one might imagine, the chronological time at which this vision came to the fore is hard to discern, but that is the basic concept Howard had.

Howard and the Auto-Trol managers appear to have convinced a number of investors that Auto-Trol had a future, including members of the Hillman family. In 1979, Auto-Trol went public. At that time, the A-1 Trust controlled a majority of the shares, but the corporation had raised capital from a number of investors with no relationship to the Hillman Family.

In 1985, Howard Hillman assumed the top managerial positions at Auto-Trol directly, becoming CEO and president. In exchange, he received an annual salary of approximately $100,000 that remained essentially unchanged until he left Auto-Trol at the end of last year. Howard's ascendancy to CEO of Auto-Trol in early 1985 roughly coincided with another development critical to this case, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

formation of Venhill Limited Partnership.

B. *The Family Trusts' Form Venhill Near The End Of President Reagan's First Term*

By 1984, the Family Trusts were predominantly invested in The Hillman Company as well as investments directed to the Trusts by that Company and Hambrecht & Quist. The A-1 Trust also controlled Auto-Trol, but had only invested a small minority of its overall portfolio.

The Family Trusts, however, did not allow for the nimble action often demanded when investment opportunities arose. The Hillman Company would contact Howard with a new opportunity, ask him to make an investing decision within 24 to 48 hours, and he would have to get consent from Tatnall and the third Trustee, who was then James Farinholt. This was inefficient, especially because Tatnall was not interested in making investment decisions, and risked the loss of valuable opportunities if Howard could not gain the necessary consents in a timely manner.

*7 To address this problem, the Trustees of the Family Trusts formed Venhill Limited Partnership on October 22, 1984. Venhill's stated purpose was "the acquisition, ownership, investment in, and disposition of personal and/or real property of all kinds, including but not limited to providing capital to corporations, partnerships, and joint ventures...."[FN7] The A-1 and B-1 Trusts each took positions as limited partners and contributed 49.5% each of the starting capital. Howard personally contributed 1% of the initial capital and was appointed general partner, charged with "the management and control of the Partnership and its business and affairs."[FN8]Venhill's creation allowed Howard a freer hand to evaluate and invest in the deal flow from The Hillman Company and improve Howard's own efforts to generate a useful private equity deal flow for the trusts as Venhill's limited partners. Like the Trustee positions in the 1968 Trusts, the Venhill general partner was uncompensated. At one point in the mid-1990s, the value of Venhill's portfolio was worth over $150 million.[FN9]

FN7. JX 1 ("Venhill LP Agreement") Art. IV.

FN8.*Id.* § 9.1.

FN9. Tr. at 644-45. Complications stemming from the lack of a ready market for limited partnership interests and a change in the accounting treatment of some assets from cost to fair-market value make this more of an estimate than a value Venhill could have immediately realized in the market. *Id.* at 795-96.

Although Howard had a strong hand at Venhill, it is important to understand that he was not insulated from removal. Under the terms of the Venhill Limited Partnership Agreement, the limited partners could remove Howard as general partner without cause with the only consequence being the obligation to pay him the value of his 1% general partnership interest.[FN10]Because the limited partners were the A-1 and B-1 Trusts and those Trusts could act through a majority of their Trustees, a vote of 2/3 of the Trustees of those Trusts was sufficient to cause the Trusts to act together to remove Howard.

FN10. Venhill LP Agreement § 15.2; *Hillman v. Hillman,* 910 A.2d 262 (Del. Ch.2006).

C. *Cousin Joe Steps In To Lend A Hand*

In 1987, another Hillman family member enters this story. That year, Joe Hill, the cousin of Howard and Tatnall, replaced James Farinholt as the third Trustee on the A-1 and B-1 Trusts. Hill was a stockbroker in Philadelphia until he retired shortly before trial and he had invested in Auto-Trol shares at Howard's instance. When he took on the role of Trustee of the Trusts, Hill had a good relationship with both his cousins.

D. *The Last Decade Of The Twentieth Century: Auto-Trol Tanks And Howard Uses Venhill To Prop It Up*

One could say that Auto-Trol was out front in the tech boom of the 1990s, in the sense that it went bust ahead of many other firms in that boom. By 1990, Auto-Trol's annual revenue peaked at $79.4 million. But its fortunes declined rapidly after that time. By 1994, Auto-Trol's auditors began requiring Howard to provide a letter to Auto-Trol "document[ing][his] commitment of ongoing financial support to Auto-

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

Trol ... which support will be sufficient to continue operating as a going concern."[FN11] From 1994 until it "went dark" in 1997, Auto-Trol's various SEC filings contained this disclaimer:

FN11. PX 29.

[T]he Company [is] economically dependent on affiliates of the Company's President, Chairman of the Board, and majority shareholder ... [and] will continue to be economically dependent upon financial support from the majority shareholder until it achieves profitable operations. The shareholder has indicated his intent to continue such financial support.[FN12]

FN12. DX 137; *see, e.g.,* PX 93 at 8.

*8 Indeed, Auto-Trol's auditor required Howard to annually provide a letter documenting his commitment of ongoing financial support "to enable [Auto-Trol] to continue as a going concern through" the end of the year, which he did annually beginning in 1994 for a period ultimately lasting until December 31, 2007.[FN13]

FN13. PX 29; *see* DX 137; PX 34; *see also* PX 31; PX 32; PX 33.

That Auto-Trol's strategy of acting as a "magnet" for a variety of technological development efforts failed was not surprising. Other, much better funded efforts along those lines had failed. At trial, Venhill and the plaintiff Trusts proffered the testimony of a respected academic with expertise in the area of venture capital and private equity, Professor Andrew Metrick, then of the Wharton School at the University of Pennsylvania, now of the Yale School of Management. Professor Metrick explained that: "by 1993, many large corporations ... had given up on [the magnet concept] as being far too expensive and not getting back its returns. But those were large companies with a lot of resources. The notion that a small company ... would be able to do that is just very, very ambitious."[FN14]

FN14. Tr. at 447.

When Auto-Trol began to evidence strong signs of failure, Howard reacted by deepening Venhill's investment in the firm. From 1990 to 1993, Auto-Trol's revenues fell and it was deeply unprofitable. But Howard expressed confidence-as he would continually for the next decade and a half or so-that success was just around the bend for Auto-Trol. Lacking the capacity to obtain outside financing, Auto-Trol, under Howard's dominion, began to look to Venhill as a regular provider of the cash flow it needed to keep from falling into bankruptcy.

Lacking financing, Howard began to fund Auto-Trol through loans from Venhill with a $500,000 loan on June 11, 1993 at 10% interest.[FN15] This was followed by another for $400,000 on June 28, 1993 with similar terms, and yet a third on July 26, 1993 for $750,000.[FN16] Howard believed at first that the loans would be temporary. But this pattern of frequent financial support for Auto-Trol would ultimately continue in this fashion, and grow to involve the provision of 186 loans over 12 years.

FN15. JX-52 at 1.

FN16. *Id.*

By the beginning of 1994, Venhill had loaned $4,650,000 to Auto-Trol, and was continuing to lend it a steady stream of capital. On February 24, 1994, Howard caused $4 million of the loans from Venhill to Auto-Trol to be converted to shares of Auto-Trol common stock at $0.75 per share. Without elimination of a substantial amount of debt, Auto-Trol's financial statements would have shown negative shareholder equity. The health of Auto-Trol's balance sheet was important because its better-financed competitors pointed customers to Auto-Trol's weak financial statements as a reason not to purchase its software. Throughout 1994, Venhill made an additional $4.6 million in loans to Auto-Trol, receiving a repayment of only $200,000, and converted another $6,413,986 of loans into equity in February and December.[FN17]

FN17. JX 52.

*9 Although they knew that Auto-Trol was Howard's passion and that the transactions between Auto-Trol and Venhill involved Howard acting on both sides of the transactions, Tatnall and Joe Hill did not initially object to these infusions of support. As of that time, Howard had been successful as Venhill's general

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

partner in managing its investments and Auto-Trol had been unprofitable for only three years. But by 1994, Tatnall and Hill began to express concern over Howard's deepening support of Auto-Trol with Venhill funds.

In 1994, Joe travelled to Colorado to visit Auto-Trol and surveyed the company "to find out what was going on and find out if there's any collateral backing this sizable amount of investment."[FN18]Howard welcomed the visit, and gave Joe access to Auto-Troll's management and facility.[FN19]Joe concluded after that brief visit that he was "somewhat satisfied, but a little skeptical."[FN20]

> FN18. Tr. at 585.

> FN19.*Id.* at 317-19;*id.* at 585 (Hill: "So I came back at that point somewhat satisfied, but a little skeptical, hoping that things would turn quickly.").

> FN20.*Id.* at 585.

Around the same time, Howard began to express a desire to separate his family's interests from those of Tatnall's family, by having a separate set of Trustees for each side of the family. To that end, Howard proposed that he resign from his Trustee positions in the Tatnall Hillman trusts-the B-series and the D-series-and that Tatnall and Joe resign from their Trusteeship of trusts benefiting him-the A-series and the C-series.

Joe refused to resign, citing that he had "a responsibility to be sure that someone with a knowledge of fiduciary duties follow me so that all is in good hands."[FN21]Tatnall similarly refused. Their principal concern was that if they resigned from the A and C-series and Howard remained, Howard would squander the funds held in trust for his children.[FN22]They also feared legal exposure to the other beneficiaries of the Trusts.

> FN21. DX 4.

> FN22.*See* DX 8 (letter from Howard Hillman to Tatnall Hillman, dated Sept. 10, 1995) ("From what I comprehend, your refusal to resign unless I resign from my

own trusts is prompted by the belief that my children need 'protection.' What in your opinion is needed and when is there enough?"); *see also* DX 11 at 2.

1995 came and went without any satisfactory resolution of the simmering disagreements among the Trustees. By year-end, Venhill had invested almost $20 million in total in Auto-Trol, and Auto-Trol now comprised almost 20% of Venhill's portfolio.[FN23]For its part, Auto-Trol's performance continued to be poor, as the company experienced declining revenues and persistent losses.

> FN23. PX 114 ("Baines Report") at Ex. 3.

Howard proceeded without hesitation to pour Venhill funds into Auto-Trol. Joe Hill and Tatnall knew he was doing it and expressed discontent. But they did not remove him as general partner of Venhill. Joe Hill began emphasizing the conflict situation that Howard was in and at one point threatened to have the Auto-Trol shares owned by the C1 Trust voted against Howard's re-election at the Auto-Trol annual meeting in 1996.

But Joe did not act on that threat when Howard furiously objected to such a public vote of no confidence in him and Auto-Trol. At that meeting, Auto-Trol actually engaged in a ten to one reverse stock split that enabled it to convert additional Venhill debt to equity. Again, the purpose of that conversion was simple: without doing so, Auto-Trol's balance sheet would have demonstrated that it was insolvent. In the wake of that incident, Howard tried to hasten the disentanglement of the interlocking trusts by resigning from the D-1 series of trusts on February 9, 1996.[FN24]Tatnall and Hill did not follow suit, and they along with Howard remained the three Trustees for the A, B, and D-series of trusts.

> FN24. JX 8.

**\*10** Inspired mostly by a desire to preserve a fragile family relationship, Tatnall and Joe continued to tolerate further investments in Auto-Trol but in an increasingly questioning and begrudging manner. By 1996, a "heavy deal flow and large expenditures" had "virtually eliminated" Venhill's liquidity, and Howard requested additional funds from the Trustees from the A-1 and B-1 Trusts as well as suggested

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

loans from other trusts.[FN25] The enormous outflow of cash to Auto-Trol without any reasonable rate of return was the major contributor to this problem. Instead of funding Venhill from contributed capital as they had before, the Trusts began to use loans to Venhill as the method of financing. The A-1 and B-1 Trusts each made their last capital contribution to Venhill on April 12, 1995. In May and November of 1996, the A-1 and B-1 Trusts began to make a series of loans to Venhill.[FN26] On October 18, 1996, the Trustees met in Denver and decided to fund Venhill with loan financing through December of 1997, with $42 million in capital split between the A-1 and B-1 Trusts.[FN27]

> FN25. DX 13.

> FN26. DX 64 at 204, 219; DX 65 at 269, 274; Tr. at 771, 772.

> FN27. DX 14; *see also* DX 19.

Auto-Trol showed some fleeting signs of profitability in its fourth fiscal quarter of 1997, with a profit of $117,000, which Howard made sure to convey to Tatnall. He cautioned that, "[w]hile [Auto-Trol] broke the pattern, [he did] not expect to be consistently in the black (unfortunately) from [then] on...."[FN28] That was a bit of an understatement.

> FN28. JX 16.

1997 was the last year that Auto-Trol's shares were listed on a public exchange, as the NASDAQ pulled its listing because of Auto-Trol's poor financial condition. And, despite its profitable last quarter of 1997, by the next year, Auto-Trol had rapidly oriented itself back to its favorite red trail and showed no prospect of changing course.

By the end of the Clinton years, the relationship between Howard, on the one hand, and Tatnall and Joe, on the other, had deteriorated. The parties lawyered up, and Howard's communications with Joe were contemptuous and confrontational.

Howard continued to express a putative desire for separation of his affairs from those of his brother. Howard asked the other Trustees if the B-1 Trust wished to withdraw from Venhill. But, of course,

Howard was not proposing any plan to make the B-1 Trust whole for the losses it and Venhill had suffered because of the huge infusions into Venhill. Because Venhill had not had a liquidity event from its non-Auto-Trol investments for some time and because Venhill's portfolio had become dominated by the losing Auto-Trol investment, it did not have the funds to pay off the loans from the B-1 Trust, much less to fully buy out its stake in Venhill.[FN29]

> FN29. DX 17.

Although Joe and Tatnall continued to procrastinate on removing Howard as Venhill's general partner, they began to restrict his discretion in other ways. On September 4, 1998, the Trustees instituted several limitations on Howard at the trust level, by tightening the previously loose style of trust administration:

> **\*11** You have put A-1 cash into Venhill as a loan recently ... without either one of your fellow Trustees being informed. We realize that this is a style that has had our approval in the past but the time has come due to the visible shortage of cash to clarify the Venhill funding and investment commitments policies.[FN30]

> FN30. DX 19.

Tatnall and Joe expressed their desire for the Trustees to obtain a 2/3 vote in favor of any new investments by Venhill requiring additional trust investment, "ideally" the approval of 2/3 of the Trustees for any A or B-series Trust expenditure in excess of $50,000 and an absolute prohibition on Howard investing C or D-series funds.[FN31] They also commented on Auto-Trol: "We were told that Auto-Trol would be cash break-even by the end of 1997. Since then Auto-Trol has cancelled its major research project and cut back in a major way. The remaining products do not support the expense and *the end of the cash drain does not seem in sight.*" [FN32] Tatnall echoed this sentiment in an email written to Howard on September 7, 1998: "If a loan is made to Venhill, will it disappear into the black hole of Auto-Trol?"[FN33] By that date, Venhill had already invested $39,475,000 in Auto-Trol.

> FN31. *Id.*

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

FN32. *Id.*

FN33. DX 20.

At trial, Tatnall testified that he believed in September of 1998 that Howard was breaching his fiduciary duties to the A-1 and B-1 Trusts by loaning Venhill funds to Auto-Trol.[FN34] Nevertheless, Tatnall and Joe agreed to live up to their previous commitment to provide "Auto-Trol support ... through December 31, 1998."[FN35]

FN34. Tr. at 692.

FN35. DX 20.

On October 30, 1998, Joe and Tatnall went to Denver to convince Howard to discontinue Venhill's support of Auto-Trol. During those two days of meetings, Joe Hill demanded that Howard stop funding Auto-Trol and initially told him the Trustees would not support Venhill past December of 1998.[FN36] Howard asked for more money for Venhill from the A-1 and B-1 Trusts that could be used to support Auto-Trol.[FN37] At the end of the meeting, Joe and Tatnall were again worn down by Howard's adamancy and influenced by their own desire to avoid an open family conflagration. They therefore reluctantly agreed to fund Venhill from the A-1 and B-1 Trusts so that Venhill could find Auto-Trol for another year even though Howard himself had admitted not knowing when the loans would be repaid to the Trusts.[FN38]

FN36. Tr. at 696.

FN37. *Id.* at 696-97.

FN38. *Id.*

### E. A New Century Begins, But The Hillman Family's Commitment To Inertial Behavior Persists

By the Millennium, brotherly love was almost entirely depleted, and Howard and Joe were openly disdainful of each other. But time marched on with little change. Although Tatnall and Joe prevented the A-1 and B-1 Trusts from making further loans to Venhill, Howard continued to use his discretion as Venhill's general partner to fund Auto-Trol using its remaining capital. While the parties dickered at a slow pace over a global resolution of their differences, Auto-Trol continued to founder, losing money and needing Venhill's support to pay its bills. In July 2002, Auto-Trol went private but not in a happy premium-paying deal sponsored by KKR or Blackstone. Rather, its non-Hillman stockholders were cashed out for a pittance of twenty cents per share.[FN39]

FN39. JX 47 at 5.

**\*12** Between 1994 and the 2002 going private transaction, Howard had caused Venhill to convert over $50 million of Auto-Trol debt into equity. This had resulted in Venhill owning over 95% of Auto-Trol and Hillman affiliates owning 99.7% of Auto-Trol before the going private transaction, and 100% after.[FN40] As a private company, Howard no longer needed to convert debt to equity, and the last such conversion had taken place in April of 2001. By June 24, 2002, Venhill had invested $63,800,000 in Auto-Trol, but the bulk of which Howard had converted into equity. On January 1, 2003, Howard caused Auto-Trol to reissue a note consolidating the remaining $15,950,000 of debt into a single note.[FN41]

FN40. *Id.*

FN41. Although neither party has described the terms of that note, consistent with Howard's practice throughout that period, it was likely at the short-term AFR rate and matured in less than three years. *See* PX 116 Ex. 4. Howard began making loans at the AFR rate, instead of the previously used rate of 10% in July of 2002.

During 2003, things came to a bit of a head when accounts for 13 Hillman trusts were filed in the latter part of 2003 in the Orphans' Court of Westmoreland County, Pennsylvania. In connection with the accounting litigation, Hempstead & Co. prepared an appraisal of Auto-Trol (the "Hempstead Valuation") that valued Auto-Trol's equity at $359,000 as of October 10, 2003, and rounded that figure to approximately $600,000 based on the value of operating loss carry-forwards for tax purposes, $0.01 per share.[FN42] Howard, of all people, disputed this valuation and contended that it *overstated* the value of Auto-Trol. He offered Tatnall and Joe a dollar-yes, one picture of George Washington-for the equity of

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

Auto-Trol.

FN42. PX 12 at 29; Tr. at 146-47.

Despite Howard's own position that Auto-Trol was essentially worthless, he kept using Venhill funds to prop it up. Even worse, Howard caused Venhill to transfer funds to Auto-Trol, which he then used to make payments to himself. Thus, on March 8, 2004, Howard had $700,000 transferred from Venhill to Auto-Trol. Howard used these funds to repay the principal and interest of a $200,000 loan to himself and a $450,000 loan made to Auto-Trol by a trust that he had formed for he and his children, called the Vineyard Trust. During 2003 and 2004, Howard caused Venhill to make a total of $12,950,000 million in loans to Auto-Trol at the short-term Applicable Federal Rate ("AFR"). This interest rate was well below any rate that could be found in commercial lending and during the relevant time period it reached as low as 1.21 %. Indeed, if the interest rate had been any lower, Venhill would have been required to pay taxes on interest income, even if the loans were never repaid.

*F. Suspecting That Tatnall Would Finally Remove Howard As General Partner Of Venhill, Howard Secretly Places Auto-Trol Out Of Venhill's Reach*

On January 22, 2005, the Westmoreland County Court convened a conciliation conference in the accounting litigation on January 22, 2005. After the conciliation conference, Howard suspected that he might be removed as Venhill's general partner and began to make preparations for that contingency.

On January 28, 2005, Howard engaged in a series of transactions designed to protect Auto-Trol in the event that he was replaced. For one, he loaned Auto-Trol another $2 million from Venhill to build in a cushion for the year's operating expenses. Simultaneously, he reissued a note for the balance of all the outstanding loans due to Venhill from Auto-Trol, which had maximum maturity dates of three years, into a single note for the principal amount of loans that Venhill had made to Auto-Trol since 2000—some $31,520,000. The note would not come due until January 28, 2020 and would only require payment of interest at the then-long-term annual AFR rate of 4.76% "from time to time." FN43

FN43. PX 85.

*13 Howard also executed a strategy that would prevent a subsequent general partner from gaining control of Auto-Trol through Venhill's ownership of Auto-Trol stock. Howard created HMC Enterprises, LLC with Howard as the sole manager and Venhill as the sole member, and transferred all of Venhill's Auto-Trol stock to HMC.FN44 The HMC Operating Agreement provided that Venhill "shall not have any right or power to take part in the management or control of the LLC or its business or affairs."FN45The Operating Agreement also provided that Howard would remain in office until death, resignation or removal by Venhill, provided there was an "issuance of a non-appealable judicial determination by a court of competent jurisdiction expressly stating that the Manager acted with gross negligence or willful misconduct in performance of his duties as [HMC's] Manager."FN46Additionally, Venhill could not assign or pledge any part of its membership interest without prior written consent from Howard, which he could deny in his sole discretion.FN47Howard did not inform Tatnall and Joe of the HMC transaction and they would not discover it until ten months later.FN48

FN44. PX 4; PX 87.

FN45. PX 87 § 9(a).

FN46.*Id.* On Howard's death, his estate would spring into the Manager Position until resignation or an identical judicial determination.*Id.*

FN47. PX 87 § 11.

FN48. Tr. at 169, 554-55.

*G. Tatnall And Joe Finally Remove Howard As General Partner of Venhill*

An hour before a telephonic Trustee meeting on July 26, 2005, Howard received an email attaching a consent form for the removal of the Venhill general partner and also attaching William Stallkamp's curriculum vitae.FN49Believing that his removal was imminent, Howard absented himself from the meeting and began taking actions at Venhill before he received formal notice of his removal.FN50He

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

caused Venhill to loan yet another $2 million for Auto-Trol's future needs, paid his personal lawyers $56,254 for legal services in connection with the Westmoreland County litigation, and reimbursed himself for $300,816 in out-of-pocket expenses and legal fees he had personally paid his lawyers in connection with that litigation.[FN51] Joe and Tatnall continued the meeting, removed Howard as Venhill's general partner, and installed William Stallkamp in his place.

> FN49. *See* JX 53; PX 90.

> FN50. Tr. at 177; JX 79 at 2.

> FN51. Pre-Trial Order; Tr. at 177, 178, 818-20.

### H. *The Family Squabble Results In Litigation In This Court*

On August 9, 2005, Howard attempted to convert his 1% interest in Venhill into a limited partnership interest, and was denied, leading to a previous lawsuit in this court.[FN52] On December 30, 2005, plaintiffs Venhill, the A-1 Trust, and the B-1 Trust filed this action, in which they sued Howard Hillman and HMC for an accounting, for alleged breaches of his fiduciary duties of care and loyalty to Venhill, and for conversion of Venhill's Auto-Trol stock.[FN53]

> FN52. *See Hillman v. Hillman*, 910 A.2d at 262 (holding that Venhill's Limited Partnership agreement did not allow Howard to convert his interest, but that he was entitled to the fair value of his partnership interest).

> FN53. After that suit concluded and before trial in this case, the parties agreed that Venhill would offset Howard's 1% economic interest in Venhill by the amount of personal legal fees that Howard reimbursed himself. Venhill Opening Post-Trial Brief at 2.

### I. *Howard Continues To Support Auto-Trol*

After Howard was removed as Venhill's general partner, Auto-Trol continued to need inflows of

capital to pay its mounting debts. The HMC transaction insulated Auto-Trol from Venhill's collection of outstanding debt or exercise of its voting rights, but it did not allow Howard to continue funding Auto-Trol with Venhill money. Howard attempted to secure commercial financing for Auto-Trol, but unsurprisingly could not find a third-party willing to provide it.

**\*14** Howard therefore turned to other trusts that he controlled to pay Auto-Trol's bills. By May of 2006, the C-1 Trust for the benefit of Howard's children had replaced Tatnall and Hill as Trustees with Elise Hillman Green, Howard's daughter, and Irene Riebe, Howard's long-time personal assistant.[FN54] Howard's personal friend, Theodore Rupert, remained as the third Trustee.

> FN54. Tr. at 183-84. Neither party has explained when Elise Hillman Green and Irene Riebe replaced Tatnall and Hill as trustees for the C-1 Trust. Based on certain correspondence in the record, Tatnall and Hill occupied roles as trustees of C-1 as late as the autumn of 2003.

Over 2006 and 2007, with Tatnall and Hill no longer administering the C-1 Trust, the C-1 Trust loaned Auto-Trol $2.91 million over 2006 and 2007 at interest rates of 8.25% to 8.75%, not the AFR he used when putting Venhill's funds at stake. These loans were personally guaranteed by Howard.[FN55] The Vineyard Trust of which Howard was the sole Trustee and, along with his children, the sole beneficiary, loaned $815,000 to Auto-Trol over the same period at interest rates of 7.5% and 7.75%.[FN56]

> FN55. PX 155; PX 197; Tr. at 184; *e.g.*, PX 99.

> FN56. PX 197; Tr. at 184; *e.g.*, PX 98. Howard purchased these loans personally on April 4, 2007. PX 135; Tr. at 185.

When these sources of financing were nearly exhausted, Howard sought Auto-Trol board approval to request a $6 million loan from Venhill in late February 2007 that he projected would keep Auto-Trol operating for the next year.[FN57] Without additional financing, Auto-Trol could not make payroll.[FN58] Auto-Trol's two outside directors did not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

approve Howard's request for a unanimous board consent that would enable Howard to request a further loan from Venhill. Instead, they resigned, citing concerns about the commercial reasonableness of the loan, and what they perceived as a growing detachment from Auto-Trol's operations and Howard.[FN59] The next day, Howard emailed a term sheet to Stallkamp requesting a $6 million loan.[FN60] Stallkamp refused.

> FN57. PX 107; *see also* PX 106.

> FN58. PX 106.

> FN59. PX 107.

> FN60. PX 106; Tr. at 556.

Faced with no other means of supporting Auto-Trol, Howard sought to force Venhill to provide it. On April 27, 2007, Howard solicited Stallkamp's participation in a Subscription Offering for additional Auto-Trol shares offered to current stockholders at a 50 to 1 ratio.[FN61] Venhill's portion of the offering was to be around $2.5 million and a failure on its part to participate would severely dilute Venhill's ownership. On May 4, 2007, Venhill filed a motion for a temporary restraining order in this court to enjoin the Subscription Offering. That motion was ultimately resolved by a stipulation between the parties on May 11 in which Howard agreed not to conduct the Subscription Offering in return for allowing him to personally loan funds to Auto-Trol secured by Auto-Trol's real estate at commercially reasonable rates.[FN62] The parties agreed that "[a]ll preferences or priorities created or implied by the Security Interest, [its] validity and enforceability ... and Howard B. Hillman's entitlement to repayment for any consideration he provides to Auto-Trol after May 11, 2007 shall be subject to the final resolution of [this lawsuit]."[FN63]

> FN61. PX 132; Tr. at 556-57.

> FN62. PX 138 ¶¶ 2, 3(a) (Stipulation and Order dated May 11, 2007).

> FN63. PX 138 ¶ 3(b).

A four-day trial in this case was held over October 29

to November 2, 2007. Throughout trial, Howard took the position that his transfer of Venhill's Auto-Trol stock to HMC was proper and defended himself against the claim that the transfer was a breach of duty. A month after trial, Howard reversed course and transferred all the Auto-Trol stock owned by HMC back to Venhill and dissolved HMC.[FN64] He also resigned from all employment and board positions at Auto-Trol effective on December 31, 2007.[FN65]

> FN64. Letter from David E. Wilks to Vice Chancellor Leo E. Strine, Jr., Dec. 4, 2007.

> FN65. *Id.*

III. *The Major Claims In This Case*

*\*15* The essence of this case is simple to grasp. The plaintiffs are Venhill, which was authorized to bring this action by Howard's successor, Stallkamp, and the A-1 and B-1 Trusts. They argue that Howard breached his fiduciary duties of loyalty and care to them by causing Venhill to engage in a series of imprudent, unfair, and irrational investments into and transactions involving Auto-Trol.

As a remedy, they seek to hold Howard liable for the losses suffered by Venhill, not only for the loss of the principal invested by Venhill, but also for the loss of profits that would have been made had the funds been prudently invested along the lines of Venhill's other investing activity.

On the eve of trial, the plaintiffs finally made an important concession. Originally, they sought to hold Howard responsible for all the investment decisions involving Auto-Trol regardless of when they occurred. Thus, they sought damages for decisions made by Howard dating back to the early months of the Clinton Administration.

Recognizing that Howard's proclivity to invest Venhill funds in Auto-Trol was rather well known to Tatnall and Joe, the plaintiffs belatedly limited their request for relief to those transactions entered into by Howard on or after December 30, 2002, the period within three years of the filing of their claims. By this means, the plaintiffs ensured that they only sought damages for claims that were not time-barred.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

This concession was helpful in narrowing the issues, but did not obviate the need for the court to consider the 35-year history of the Trusts' involvement with Auto-Trol. Lest the big picture be lost in the minutia, a basic summary of the overall effect on Venhill of the Auto-Trol investment decisions made by Howard usefully precedes a consideration of the legal issues that I must decide.

For the sake of clarity, I frame this summary in terms of the periods for which any claims would be stale and the period after which claims remain viable.

### A. *Venhill's Investments Into Auto-Trol From 1993 To Late 2002*

During the period from June 11, 1993 until December 30, 2002, Venhill loaned approximately $68 million to Auto-Trol. These loans were first issued at an interest rate of 10% until after June 28, 2002, when Howard caused new loans to be issued at the short-term AFR. Interest payments were made every year except 1995 totaling $3,520,425. Over $50 million of those loans were re-characterized from debt to equity in 21 transactions from 1994 to 2001. In the second half of 2000, Venhill directly invested $2.5 million in Auto-Trol equity. By these transactions and the going private merger in 2002, Venhill came to own more than 95% of the shares outstanding in Auto-Trol. Howard Hillman or entities affiliated with him own the balance.

At the end of Howard's first year of investing Venhill funds in Auto-Trol, Auto-Trol investments constituted slightly less than 10% of Venhill's portfolio of assets. That concentration rose steadily, passing 20% in 1996, and 30% in 1998. By the end of 2002, nearly 45% of Venhill's portfolio was tied up in Auto-Trol. In comparison, no other asset held by Venhill ever exceeded 20% of its portfolio, and in most years no other asset exceeded 10% of its portfolio.

**\*16** During this same period, Auto-Trol's fortunes rose and rapidly sank. From its listing on the NASDAQ in 1979 and revenue height of nearly $80 million in 1990, in 2002 Auto-Trol was delisted, insolvent (or nearly so), and had annual revenues that were less than a tenth of the 1990 high. It had been on life-support with infusions of capital from Venhill

averaging more that once a month for nearly a decade with only one profitable quarter in thirty-eight. The A-1 Trust's $50,000 investment in Auto-Trol, which had grown to a market value of roughly $100 million at one time, would shortly be valued by Howard himself as less valuable than the cost of a Happy Meal.

### B. *The Remaining Remedies Sought Against Howard Hillman*

Venhill and the plaintiff Trusts now ask this court for several remedies for Howard's alleged breaches of fiduciary duty from December 30, 2002 until the Trusts removed Howard on July 26, 2005. They seek rescission of the January 28, 2005 promissory note for $31,520,000 that, among other things, consolidated the debt at that time into a single note that is not due until 2020. Provided the court unwinds that note, they seek damages for 52 new loans Venhill made to Auto-Trol in the aggregate principal amount of $17,870,000. The plaintiffs also believe that Venhill is entitled to damages for Venhill's reissuance of a $15,950,000 note on January 1, 2003 that refinanced debt that Auto-Trol incurred to Venhill over the entire time-frame dating back to 1993, including the principal. In accordance with the terms of the May 11, 2007 stipulation that allowed Howard to directly invest up to $6 million in Auto-Trol,[FN66] the plaintiffs want any security interest created in Auto-Trol's real estate to be cancelled. In addition, the plaintiffs argue that they are entitled to attorney's fees for prosecuting this action in light of what they style as bad faith on Howard's part in the underlying conduct. Finally, the plaintiffs seek an award of post-judgment interest.

FN66. PX 138 ¶ 3(b).

### IV. *Legal Analysis*

### A. *The Lack Of A Coherent Strategic Plan For Auto-Trol And The Related Battle Of Experts*

Before deciding the legal claims of the parties, it is useful to address the state of the record regarding Auto-Trol and the expert testimony regarding the propriety of Howard's decisions to keep investing in Auto-Trol. These are related subjects, as will soon become clear.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

The first issue can be disposed of briefly. At trial and in his briefs, Howard has entirely failed to articulate a coherent business strategy for Auto-Trol that would result in it becoming a healthy, solvent company, capable of paying off its creditors and going forward on a profitable basis. From the record, one can conclude that Auto-Trol has developed some useful software, which allows businesses to track production and service delivery processes, and produce technical illustrations of complex designs. It has some big name customers, but decidedly small change revenues.

**\*17** As important, there is no evidence that Auto-Trol ever engaged in a rational business planning process during the last 15 years. That is, there is no reason to believe that Auto-Trol has ever prepared strategic plans that articulated financial goals, product developments, and sales benchmarks in relationship to some rational time horizon. When did Auto-Trol intend to turn the red ink into black ink? How?

The record is devoid of any indication of planning of this type. As a result, the kind of showing that private equity and venture capital investors would have expected from a company seeking funding is not one that Auto-Trol ever made, and there is no basis for me to believe could have made. Howard poured funds into Auto-Trol without asking himself and his management team to do the sort of disciplined work that a third-party investor would have demanded as a pre-condition to considering the provision of funding.

This issue relates to the expert testimony presented. At trial, each side presented an expert about the soundness of Howard's decision to keep putting funds into Auto-Trol. Howard attacks the admissibility of the testimony of the plaintiffs' expert, Professor Andrew Metrick, then of the Wharton School, now of the Yale School of Management. Professor Metrick provided testimony about the prudence of Howard's investment decisions and whether they comported with the approach taken by private equity and venture capital investors.

Howard complains that Professor Metrick's testimony is unreliable and should be excluded. In particular, he complains that Professor Metrick did not examine the particular circumstances of Venhill and Auto-Trol, but considered general market circumstances that

typically involved transactions far larger than those between Venhill and Auto-Trol. I reject this attack.

Professor Metrick is the author of a textbook entitled *Venture Capital and the Finance of Innovation,* and has published and taught in areas directly relevant to the issues in dispute in this case. He is well qualified to give testimony about the standards used by investors in making the types of equity investments and high-risk loans Venhill was making into Auto-Trol. That Howard undertook to have Venhill, which was a vehicle for investing his family's wealth, make investments that were different in size, scope, and character from those a disinterested investor might make does not make Professor Metrick's testimony irrelevant. Rather, that reality is itself a factor bearing on the prudence of Howard's decision-making process.

I will therefore admit Professor Metrick's testimony. That testimony was persuasive and can be summarized as follows:

• As of the year 1995, Auto-Trol was well past being considered an attractive or even suitable investment for a prudent private equity investor. Being virtually insolvent, having already converted over $50 million in loans from Venhill into equity to avoid bankruptcy, and having no growth prospects, in 2003, Auto-Trol was not a company to which a rational investor would have entrusted further funds;

**\*18** • The terms on which Auto-Trol loaned money to Venhill were grossly disparate from those that Auto-Trol would have gotten in the market. As to that, Metrick believed no third party would have funded Auto-Trol at all. If one had, it would have demanded terms far different than Howard extracted. Instead of a loan on terms better than a AAA borrower could have gotten, Auto-Trol would only have had funds at extremely high interest rates, with an equity option for the lender, and corporate governance provisions that enabled it to take control;

• The sheer number of loans Venhill made to Auto-Trol reflected a lack of discipline uncharacteristic of private equity and venture capital investors. These investors would typically never make more than four or five carefully thought out rounds of

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

financing over the life of a company. By contrast, Howard made 14 loans a year or so to Auto-Trol;

• Private equity and venture capital investors always seek to know when they will achieve liquidity. Auto-Trol presented no reasonable prospect for exit by Venhill, as it had no plans for growth to a level where it could go public again or be in shape to be sold to another industry player;

• Howard's "magnet investing strategy" is one that rational investors would eschew. According to Metrick, private equity and venture capital investors achieve success by making a number of risky bets, with a minority (20-30%) paying off in a public IPO exit and a still smaller number hitting it really big. If Venhill had really wanted to attract additional investments, it should have followed that strategy and made a number of investments. Instead, by concentrating so much of its capital into Auto-Trol, Venhill minimized its chances for success;

• Relatedly, Howard imprudently concentrated Venhill's portfolio in Auto-Trol. By 1995, Auto-Trol represented 19% of Venhill's portfolio. Since 2003, it has exceeded 50%. According to Metrick, this type of concentration is unheard of in the private equity industry, where most funds limit any one investment to no more than 20% of the fund's portfolio.

On all these points, I found Metrick's testimony reasonable and understated. Howard's investment decisions were grossly disparate from any that a rational investor would have made, and Metrick calmly pointed out why by reference to common industry practices.

Moreover, Howard's complaint that Metrick did not examine Auto-Trol closely does not affect my view. If Auto-Trol had a persuasive business plan, no doubt Metrick would have considered it. But then so would I.

The reality is that no coherent articulation of Auto-Trol's strategy during the relevant period exists. One cannot fault Metrick for that. Rather, the absence of any blue-print for turning Auto-Trol from an insolvent company with flagging revenues into a profitable concern that could pay off its debtors and

make a return to its equity holders provides support for Metrick's fundamental position, which is that no rational investor would have entrusted further capital to Auto-Trol in this century.

**\*19** To support his contrary view, Howard presented the testimony of Steven Kursh, who had spent years in the software field and is now essentially a clinical professor (a so-called Executive Professor) at Northeastern University. Kursh weakly defended Howard's investments into Auto-Trol, mainly by pointing out that the software industry was risky, but that many such firms had been sold for a profit. Because Auto-Trol had some big name customers-albeit ones whose cumulative payments resulted in total revenues for Auto-Trol of only $6,463,000 in 2002-Kursh opined that a "private equity investor during the relevant period from 1993 to the time of my research could have considered Auto-Trol as a potentially viable company that could provide positive financial returns to investors."[FN67] That said, Kursh admitted:

> FN67. PX 135 ("Kursh Report") at 10.

> One of the cardinal rules in investment management (and business financial management in general) is never to make decisions on sunk costs. While the Venhill investments in Auto-trol are relatively large when considered in totality, my research found that the investments made by Mr. Howard Hillman in Auto-trol, particularly investments made beginning in the late 1990s, were made at times when Auto-trol could have provided positive financial returns (on those specific investments) going forward.[FN68]

> FN68. Kursh Report at 10.

The key for Kursh is that despite Auto-Trol's high debt and mounting red ink, someone could have come along and decided to buy off the debtors and pay the equity holders money for their stock to get at Auto-Trol's technology and customers. But his testimony was not rooted in any financial or business reality.

From 1993 to 2005 is 12 years! During that time, Auto-Trol was insolvent. Its revenues had plummeted and stagnated. Contrary to what any rational controller would have done, Venhill did not push for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

a liquidity event because Howard wanted to keep running Auto-Trol. Thus, the very premise that Kursh relied upon-that it might have made sense to invest in Auto-Trol to dress it up for sale-was not one that Howard was even pursuing.

As important, Kursh's testimony was entirely abstract. He had no opinion that Auto-Trol had or was developing software of such potential utility as to generate a potential for its emergence from the ashes. Nor did he consider what its lengthy record of failure suggested about its future prospects.

And Kursh could not even stomach giving Howard a complete endorsement. He explicitly refused to opine that several transactions engaged in by Howard were entirely fair, including conversions of debt owed to Venhill into Auto-Trol equity. Even more than that, Kursh's opinion that the loans Howard was causing Venhill to make to Auto-Trol from December 30, 2002 onward were on fair terms is without any logical basis. For one thing, he attributed the interest rate to Venhill's accountant, rather than Howard.[FN69] But it was Howard's job to make investments and the idea that Howard's personally chosen accountant, rather than Howard, set the terms provides no evidence of fairness. Howard's own trial testimony contradicts Kursh's interpretation and clarifies that the true purpose of his accountant's suggestion that the interest rate be changed from 10% to the AFR was entirely unrelated to the merits of the investment. Instead, that rate was the absolute lowest Venhill could have earned without creating tax liabilities for imputed interest income it would never earn.[FN70] This would have left fewer dollars to invest in Auto-Trol. Moreover, Kursh's report in regard to the loan terms is premised on his assumption that the plaintiffs "understood that Auto-Trol had little or no value based on the findings of the Hempstead valuation dated October 10, 2003 if not sooner."[FN71]

FN69. Kursh Report at 42; Tr. at 902.

FN70. Tr. at 89-90.

FN71. Kursh Report at 42.

**\*20** But, if it was true that Auto-Trol had no value as of December 30, 2002, and Kursh has provided no basis to doubt that, then Kursh's testimony is entirely nonsensical. If there was no plausible basis to believe

that further infusions into Auto-Trol would provide a commercially reasonable chance that Auto-Trol could attain a level of success sufficient to pay off its existing indebtedness to Venhill, and Kursh's own report suggests there was none, then by his own logic about the irrelevance of sunk costs, it was utterly irrational for Venhill to act as a lender by providing an insolvent borrower with rates of interest better than could be achieved by a borrower with a AAA credit rating.[FN72] Indeed, at trial, Kursh admitted that "based on the specific terms that were there, [he] would not have made those loans"[FN73] and "[i]n [his] opinion, [Auto-Trol] could not have received financing from a completely independent third party at the terms [it did]."[FN74] In other words, a disinterested fiduciary, acting solely in the interests of Venhill would not have made loans on those terms.

FN72. Metrick testified without rebuttal from Kursh that even if Auto-Trol could have somehow obtained a loan, it would have paid high-yield rates that were, at times, 20% higher than the interest rate it was paying Venhill. *See* PX 181; PX 116 Exs. 3, 4; Tr. at 428-29.

FN73. Tr. at 952.

FN74. Tr. at 941.

In summary, in this battle of the experts, one side came out decisively on top. Professor Metrick gave balanced testimony, well grounded in common practices among relevant investment communities, that identified a multitude of reasons why Howard's investments into Auto-Trol during the relevant period were imprudent, unfair to Venhill, and inconsistent with the behavior of a rational investor.

B. *The Standard Of Review Relevant To The Determination Of Whether Howard Is Liable For Damages To Venhill And Its Limited Partners*

The plaintiffs and Howard manage to both disagree and agree about the procedural standard that applies to evaluate the plaintiffs' claim that Howard breached his fiduciary duties by investing Venhill funds in Auto-Trol. The point of agreement is that both accept the idea that the investment decisions regarding Auto-Trol that were made by Howard are subject to

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

the entire fairness standard. The reason for that is obvious: Howard was on both sides of the transaction, acting as Venhill's general partner and as Auto-Trol's chairman, CEO, and president.[FN75]

> FN75.*E.g., In re Boston Celtics Limited P'ship S'holders Litig.,* 1999 WL 641902, *4 (Del. Ch. Aug. 6, 1999) (stating that when a general partner appears on both sides of a transaction with the partnership that transaction is reviewed under the entire fairness standard); *see also Emerald Partners v. Berlin,* 726 A.2d 1215, 1221 (Del.1999).

From there, things get murky. Howard complicates the analysis with two arguments, which I will address now in turn. First, Howard contends that because his fellow Trustees Joe and Tatnall had been aware that he was going to continue pouring funds into Auto-Trol from 1995 onward, their failure to take action as Trustees to remove him had the effect of ratifying or acquiescing in his decisions, regardless of whether he informed them in advance of the specific terms on which those investments were made.

As I understand this argument, it is premised on the assumption that if stockholders with voting power object to a particular business strategy of a fiduciary and fail to use that voting power to remove the fiduciary, those stockholders are deemed, by their failure to exercise their power of removal, to have assented to the strategy and are barred from contending that the strategy's implementation was a breach of fiduciary duty. Stated summarily, this rule would impose on stockholders a duty to remove a fiduciary who was bent on pursuing what the stockholders believed to be an imprudent strategy because if they do not do that, the fiduciary's actions will be immunized from the ordinary scrutiny of equity.

*21 This rule is not one grounded in our existing common law,[FN76] and I am not persuaded that it would be a productive innovation. Here, it is plain that Howard made clear his intention to continue to support Auto-Trol with Venhill funds. By the time period that matters, December 30, 2002 forward, it was also clear that Joe and Tatnall opposed that course of action. It is also clear that they, for reasons of family harmony and a reluctance to take action

that would inevitably result in expensive and time-consuming litigation, delayed removing Howard, leaving him as general partner of Venhill, with the broad discretion Venhill's Limited Partnership Agreement vested in him.

> FN76. For example, in *In re Wheelabrator Technologies, Inc. Shareholders Litigation,* then-Vice Chancellor Jacobs described three factual circumstances that are commonly lumped into the term "shareholder ratification," all of which required approval in a vote of shareholders. 663 A.2d 1194, 1201 n. 4 (Del. Ch.1995).

But it is some distance from failing to remove a general partner over a policy dispute, to the point of giving him the unreviewable discretion to do whatever he wishes as to that policy dispute. And that is what Howard contends for here, that the fact that Joe and Tatnall left him as general partner of Venhill means that they ratified all of the decisions he made regarding Auto-Trol as Venhill's general partner. Accepting that contention would convert a stockholders' typically multi-dimensional decision to vote for (or fail to remove) a sitting fiduciary into a powerful and crudely overbroad immunity from liability.

Using the traditional principles governing their use, the doctrines of acquiescence and ratification do not aid Howard. Rather than acquiesce in Howard's Auto-Trol strategy, by the beginning of this century it was clear that Joe and Tatnall emphatically opposed it. Nothing they did gave Howard any reason to believe that they approved his desire to continue funding Auto-Trol.[FN77] Likewise, the doctrine of ratification does not avail Howard as Joe and Tatnall never gave assent to any of the particular investments Howard caused Venhill to make in Auto-Trol on or after December 30, 2002. To the contrary, they openly opposed all such investments and never were asked to approve any particular investment decision.[FN78]

> FN77. The doctrine of acquiescence requires that the party who is alleged to have acquiesced to conduct "lead[ ] the other party to believe the act has been approved," something Joe and Tatnall clearly did not do.*Julin v. Julin,* 787 A.2d 82, 84

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

(Del.2001); *see also* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 13-3 (2008) (stating that "[a]cquiescence arises when a party complaining of an act (1) has full knowledge of his rights and all material facts and (2) remains inactive for a considerable time, or freely gives recognition to the act or conducts himself in a manner inconsistent with any subsequent repudiation of the act, *thereby leading the other party to believe that the act has been approved")* (emphasis added).

FN78. Under these circumstances, no assumption of consent on Howard's part would have been reasonable. *See* RESTATEMENT (THIRD) OF AGENCY § 4.04 (2006) ("A person ratifies an act by manifesting assent that the act shall affect the person's legal relations, or conduct that *justifies a reasonable assumption that the person so consents ....")* (emphasis added) (internal subsections omitted); *Lewis v. Vogelstein,* 699 A.2d 327, 334 (Del. Ch.1997) (stating that "[r]atification is a concept deriving from the law of agency") (citing RESTATEMENT (SECOND) OF AGENCY § 82 (1958)).

In this regard, it is also important to note that Howard was not forthcoming with information about his activities as Venhill's general partner. Although it was clear he was continuing to pour money into Auto-Trol, Howard engaged in several transactions without any advance notice to Joe and Tatnall. He simply did as he pleased, and concealed from the Trustees instances of self-dealing payments to himself. This factual scenario is therefore far different than that to which the doctrines of acquiescence or ratification typically apply, which is when a stockholder is informed of all the material facts regarding a transaction and then, by act or deed, either acquiesces in the transaction or gives it affirmative approval.[FN79] Here, Howard cannot point to one decision he made from 2002 to 2005 where he gave Joe or Tatnall prior notice of the material facts and received any hint of approval from them. That is because he never sought their assent, knowing that he would not get it.

FN79. *See, e.g., In re Wheelabrator Tech., Inc. S'holders Litig.,* 663 A.2d at 1201 n. 4 (describing the typical scenarios for stockholder ratification). For this same reason, I refuse to accept Howard's novel argument that the failure of Joe and Tatnall to remove him earlier constituted a failure by the Trusts to mitigate their damages. *See Brzoska v. Olson,* 668 A.2d 1355, 1368 (Del.1995) ("A party has a general duty to mitigate damages if it is feasible to do so."). Each investment decision made by Howard was a new breach, and mitigation only applies to damages occurring after a breach. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 918 (1977) ("[O]ne injured by the tort of another is not entitled to recover for any harm that he could have avoided by the use of reasonable effort or expenditure *after* the commission of a tort.") (emphasis added); *cf. Lynch v. Vickers Energy Corp.,* 429 A.2d 497, 504 (Del.1981) (holding stockholders were not barred from recovering damages merely because open market purchases of corporate stock might have been made in mitigation of out-of-pocket damages for breach of fiduciary duty), *overruled on other grounds by Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983). More important, for the same reasons I do not believe that an equity holder's failure to remove a fiduciary who has embarked on a course of action the equity holder believes imprudent constitutes an acquiescence in the fiduciary's decisions, I do not believe that such a failure bars the equity holder from recovering if she proves that the fiduciary's further actions involved breaches of fiduciary duty. Certainly, that the fiduciary was forthright about his intentions is a useful fact to him in defending the breach of duty claim, but such forthrightness does not thereby give the fiduciary the chance to put the equity holder to a stark decision to either remove him or give him a blank check to engage in activity free from the restraints of equitable review. Equity holders have a variety of tools of self-protection at their disposal, and the failure to use the power of removal does not

Not Reported in A.2d                                                              Page 20
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

thereby deprive them of their independent right to sue.

**\*22** Howard's second argument has more force. The Venhill Limited Partnership Agreement contains the following provision:

> Section 14.1. *Exoneration.* The General Partner shall not be liable to the Partnership or the Limited Partners for any act or omission based upon errors in judgment or other fault in connection with the business or affairs of the Partnership so long as the General Partner *acts in good faith and is not found to be guilty of gross negligence or willful or wanton misconduct with respect thereto.* It shall be conclusively presumed and established that the General Partner has acted in good faith with respect to any action taken or omitted by him on the advice of independent legal counsel or independent outside consultants.[FN80]

> FN80. Venhill LP Agreement § 14.1.

The parties engage in a terse and not particularly helpful duel regarding whether § 14.1 was intended to reach claims implicating the general partner's duty of loyalty under traditional default principles of fiduciary responsibility and what, if any, effect § 14.1 has on the court's use of the entire fairness standard. For his part, Howard says that § 14.1 is clear and immunizes him from liability to Venhill or its limited partners unless it is shown that he: 1) engaged in bad faith acts; 2) made grossly negligent decisions; or 3) committed acts of willful and wanton misconduct. For their part, the plaintiffs say that any modification of default rules of fiduciary duty must be made plain and that § 14.1 is, at most, directed at due care claims.

On this score, Howard has the better of the argument. An important reality influences that conclusion, a reality that neither party focuses upon. The entire fairness test is, at its core, an inquiry designed to assess whether a self-dealing transaction should be respected or set aside in equity. It has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction. In the typical corporate context for example, one can imagine a transaction in which one of a five-member board of directors, who owns the largest bloc of shares in the company, has a self-

dealing interest. Further suppose that one of the board members is the CEO, two of the other board members are the brother-in-law and first cousin of the self-dealing director respectively, and that the other board member is by status independent of both. An exculpatory charter provision is in place, in accordance with § 102(b)(7) of the DGCL. No procedural protections are used to approve the transaction which cannot now be practicably unwound, the court uses the entire fairness standard to evaluate the transaction in a derivative suit, and finds that the transaction was unfair. As I understand it, only the self-dealing director would be subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind.[FN81] Why? Because under the traditional operation of the entire fairness standard, the self-dealing director would have breached his duty of loyalty if the transaction was unfair, regardless of whether he acted in subjective good faith. After all, that is the central insight of the entire fairness test, which is that when a fiduciary self-deals he might unfairly advantage himself even if he is subjectively attempting to avoid doing so.[FN82]

> FN81.*E.g., In re Emerging Commc'n, Inc., S'holders Litig.,* 2004 WL 1305745, at \*38 (Del. Ch.2004) (engaging in a director by director monetary liability analysis for the approval of a self-interested going-private transaction that was held not to be entirely fair to the corporation "because the nature of [the directors'] breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director"); *see also* William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1301-02 (2001) ("In cases where the transaction cannot be undone, the court must conduct a director-by-director inquiry into which specific directors actually engaged in a breach of fiduciary duty sufficient to justify monetary liability. The fact that a transaction is found to be 'unfair' does not necessarily mean that all the directors have the same exposure to liability. Where the corporation has a charter provision that exculpates directors from monetary liability for breaching their duty of care, *the plaintiff must establish that a director who had no conflicting self-interest*

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

*in the transaction nonetheless acted in bad faith.*If a director did not benefit from the unfair transaction, the plaintiff who seeks to subject that director to money damages liability should have the burden to prove that the director *consciously* breached his duties to the corporation.") (emphasis added).

FN82.*In re PNB Holding Co. S'holders Litig.,* 2006 WL 2403999, at * 12 (Del. Ch.2006) (observing that "the core insight of the entire fairness standard ... [is that] even when acting in subjective good faith, a person who stands on one side of a transaction may not act fairly towards the person on the other side"); *see Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del. Ch.2003) ("There might be situations when a director acts in subjective good faith and is yet not loyal, if the director is interested in a transaction subject to the entire fairness standard and cannot prove financial fairness), but there is no case in which a director can act in subjective bad faith towards the corporation and act loyally.").

**\*23** But as to the other directors, even the ones who might be deemed non-independent by status, the presence of the exculpatory charter provision would require an examination of their state of mind, in order to determine whether they breached their duty of loyalty by approving the transaction in bad faith to benefit their relative, rather than in a good faith effort to benefit the corporation.[FN83]If those directors acted in the good faith belief that they were pursuing the corporation's best interests-that is, with a loyal state of mind-their failure to procure a fair result does not expose them to liability, because the charter provision immunized them from liability for mere violations of the duty of care.[FN84]In other words, their status as a relative of the self-dealing director is only a fact relevant to the ultimate determination whether they complied with their fiduciary duties, it is not a status crime making them a guarantor of the fairness of the transaction.

FN83.*See In re Emerging Commc'n, Inc., S'holders Litig.,* 2004 WL 1305745, at *38 (engaging in such an analysis).

FN84.*Emerald Partners v. Berlin,* 787 A.2d 85, 98 (Del.2001).

As applied to this case, the difference between using the entire fairness test to consider whether to unwind a transaction and the analysis necessary to determine whether a fiduciary is personally liable for damages resulting from a transaction is an arguably important one. Noticeably absent from this case is Auto-Trol itself. That may be because Auto-Trol's equity is entirely owned by Venhill, the Trusts, and other members of the Hillman family, and that Venhill controlled Auto-Trol (at least until Howard placed Auto-Trol under the control of HMC). The plaintiffs may have thought that having Venhill, Howard, HMC, and the Trusts before the court was enough.

But in this lawsuit, the plaintiffs primarily seek to hold Howard, as general partner, "liable to the Partnership [i.e., Venhill]" and "the Limited Partners [i.e., the Trusts]" for "act[s] based upon errors in judgment or other fault in connection with the business or affairs of the Partnership."[FN85]By its plain terms, § 14.1 prevents them from recovering from Howard unless he acted in bad faith, with gross negligence, or engaged in willful and wanton misconduct.

FN85. Venhill LP Agreement § 14.1.

Although the relationship that § 14.1 has to the traditional entire fairness standard is a bit unusual, it does not suffer from any linguistic lack of clarity. I say unusual because § 14.1 is unlike a traditional exculpatory provision in the corporate context which usually insulates directors from liability for gross negligence.[FN86]Section 14.1 does not do that, and expressly subjects Howard to liability for grossly negligent acts.

FN86.*Malpiede v. Townson,* 780 A.2d 1075, 1094-95 (Del.2001) (stating that "even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section 102(b)(7) charter provision that bars such claims").

But unlike a traditional exculpatory provision in the corporate context, § 14.1 appears to immunize Howard from personal liability for engaging in self-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

dealing transactions that, while subjectively well-motivated in the sense that they were undertaken in the good faith belief that they would benefit Venhill, were substantively unfair. That is, in a circumstance when the court found that Howard acted in good faith and without gross negligence, but simply failed to meet the fairness mark by human error, § 14.1 seems to insulate him for an award of damages. Read in this way, the Venhill Limited Partnership Agreement would preserve the ability of Venhill limited partners to enjoin an unfair, self-dealing transaction in advance of its consummation, but they could only recover damages from the general partner after such a transaction is consummated if his conduct in connection with the transaction was in bad faith or grossly negligent.

**\*24** In clashing over this issue, the parties have not burdened me with any consideration of the status of the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") as of 1984, when the Venhill Limited Partnership Agreement was executed. Although the DRULPA became effective in 1983, it was not until 1990 that Delaware's General Assembly amended the DRULPA to explicitly allow modification of a partner's fiduciary duties to the limited partnership. But, one respected commentator has written that the addition of § 17-1101(d) of the DRULPA merely clarified prior decisional law that allowed partners to modify fiduciary duties through the partnership agreement.[FN87] In that same vein, Venhill's Limited Partnership Agreement expresses an intent to be governed by the terms of the DRULPA as they exist in the present day .[FN88]

> FN87. Larry E. Ribstein, _Unlimited Contracting in the Delaware Limited Partnership and Its Implications for Corporate Law,_ 16 J. CORP. L. 299, 301 (1991) ("The new Delaware provision [that explicitly allows modification of a partner's fiduciary duties in a limited partnership agreement] is more a clarification of prior partnership law than a change. The Uniform Partnership Act, which is applicable to limited partnerships [to the extent there are no contrary provisions in the limited partnership statute], provides that a partner is accountable only for those benefits that are 'derived ... without the consent of the other partners.' Consistent with this

provision, some courts have enforced partnership agreement provisions that permit partners to engage in conduct that would otherwise breach the partners' fiduciary duties.") (citations removed, omission in original) (quoting UNIFORM PARTNERSHIP ACT § 21 (1969)).

> FN88. _See_ Venhill LP Agreement §§ 1. 1, 2.1 (Venhill is to be governed by "the Delaware Uniform Limited Partnership Act, _as amended")_ (emphasis added).

Thus, on balance, it seems likely that the Venhill Limited Partnership Agreement insulates Howard from liability if his dealings with Auto-Trol were unfair to Venhill but well-motivated and undertaken without gross negligence. That is an entirely hypothetical issue, given the factual record before the court. As I next discuss, even if Howard's reading of § 14.1 is correct, he is liable to the plaintiffs for damages because he acted in bad faith and with gross negligence, and engaged in willful misconduct.

_C. The Transactions Howard Caused Venhill To Enter With Auto-Trol From December 30, 2002 To July 26, 2005 Were Unfair-And Howard Knew It_

1. _Howard Flunks The Entire Fairness Test_

In coming to the conclusion that Howard acted in bad faith and with gross negligence and engaged in willful misconduct, it is useful to apply the entire fairness standard initially to examine the transactions he caused Venhill to enter into with Auto-Trol from December 30, 2002 forward. That examination surfaces Howard's disregard for the best interests of Venhill and its investors. As is well known, the entire fairness test requires the court to consider the process used to implement a transaction, and the substantive terms of the transaction, all in aid of coming to a singular conclusion about the fairness of the transaction.[FN89]

> FN89. _Weinberger v. UOP, Inc.,_ 457 A.2d 701, 711 (Del.1983).

I therefore begin my analysis with a consideration of the process used by Howard in determining to loan money to Auto-Trol during the period between

Not Reported in A.2d                                                                          Page 23
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

December 30, 2002 and July 26, 2005.[FN90] It is impossible to detail all the ways in which the process fell short of fair. I will stick to the key points.

> FN90. An inquiry into fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the [decision-maker], and how the approvals ... were obtained."*Id.*

First, Howard never attempted any kind of market check. There were at least two market checks that were advisable each time Howard caused Venhill to put additional funds at risk in Auto-Trol. The initial one was to consider whether Venhill would likely profit more from investing more in Auto-Trol or other investments available in the marketplace. These investments could have been other private equity investments, publicly traded securities, or other instruments. In fact, that sort of consideration should also have involved whether Venhill should return cash to the Trusts, if it had no uses for the cash that were attractive, when the prospects for returns and potential risks were considered. Howard never engaged in any calculus of this kind. He simply put money into Auto-Trol whenever he felt it needed cash, never considering whether that money could earn a higher return, at lower risk, by being deployed elsewhere.

**\*25** The other market check Howard never did was to consider what terms Venhill should be receiving given Auto-Trol's essential insolvency and inability to procure financing from third-parties. Howard has conceded that during this period, Auto-Trol had no prospect of receiving funding from third-parties. Howard unilaterally exercised dominion over Auto-Trol and could have undertaken a test of its market worth. He did not do so. Yet, he caused Venhill to lend funds to Auto-Trol at the AFR rate, a rate that is "nearly always lower than AAA yields, the interest rate paid on corporate bonds issued by the most creditworthy U.S. companies ."[FN91] Moreover, he required Auto-Trol only to make payments annually and pushed the principal due date out until January 28, 2020. Any bare consideration of the distressed debt and equity markets would have revealed to Howard that the terms he was setting were far less advantageous to Venhill than market. Howard, of course, knew that.

> FN91.*See* PX 115 ("Metrick Report") at 8 & Ex. 4.

Howard recognized that if he retained an investment banker for Auto-Trol to find outside investors, the overwhelming likelihood was that outside investors would only invest through a transaction that had the effect of wiping out the substantial debt and equity overhang that Howard had racked up. If-and this is a big if-Auto-Trol had some technology and personnel of value, an outside investor might have given Venhill and Auto-Trol's other creditors a goodbye payment, but that was the limit and would have left Venhill having lost the vast majority of its investment. In such an examination, a disinterested private equity investor in Howard's position would have found that investors putting funds into companies much stronger than Auto-Trol would have required interest rates, repayment terms, debt covenants, and control rights far in excess of what he was extracting for Venhill.[FN92]

> FN92.*See, e.g.,* Tr. at 940-42.

Howard is a bright man. He knew what a market test of Auto-Trol's worth would have revealed. Being obstinately committed to pursuing his vision for Auto-Trol, Howard purposely blinded himself to market realities.

Second, and relatedly, Howard failed to seek the advice of competent professionals who could provide objective advice on Auto-Trol's prospects and the terms, if any, on which Venhill could prudently entrust more capital to it. At trial, Howard claimed that he was capable of objectively considering the best interests of Venhill, and determining how to price transactions between it and Auto-Trol in a manner that was fair to Venhill. But Howard was Auto-Trol's chairman and CEO and Auto-Trol was his personal passion. It is precisely in these sorts of circumstances when it is most useful to get outside advice. In most complex matters, it is wise for fallible humans to consult with others; doing so minimizes, but does not eliminate, the risk of missing a key consideration or failing to identify and then grapple with relevant information. In situations where the key decision-maker is on both sides of the transaction, outside advisors also help check the potential that the conflicted party's personal motivations will cause the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

consummation of a transaction that should have been avoided or, at the very least, been priced much differently. Howard eschewed any outside advice and, in fact, reacted to any questioning of the wisdom of continuing to fund Auto-Trol angrily and not rationally, choosing to seclude himself from any outside thinking that might differ from his own.

**\*26** Third, Howard's analytical process was, well, non-existent. From a rational perspective, the fact that Venhill had invested $67,850,000 in Auto-Trol as of December 30, 2002 was largely irrelevant to its future investment decisions. Howard's own trial expert agrees that the funds Venhill had already invested in Auto-Trol at any particular point should not have factored into Howard's decision to invest more money in the company.[FN93] I agree with Dr. Kursh that the question of whether "specific investments ... could have provided positive financial returns ... going forward" is an important focus for my analysis.[FN94]

> FN93. Kursh Report at 10; Tr. at 1001.

> FN94. Kursh Report at 10.

In choosing between two new potential investments of roughly the same size as an average loan to Auto-Trol, say $200,000, a disinterested general partner at Venhill should have evaluated which investment would have returned more capital to Venhill. That rational, disinterested (and hypothetical) general partner would be indifferent between a non-Auto-Trol investment yielding $300,000, and a loan to Auto-Trol that led to Auto-Trol retiring $300,000 of the vast sum of money it owed Venhill. The key question is which investment was, considering the relevant risks, likely to provide the highest return. For precisely that reason, venture capitalists and private equity investors carefully analyze each additional investment they make into a portfolio company.

In that process, it is common for them to demand that the company seeking capital present detailed plans regarding their proposed use of funds, their business plan, and the cycle on which they expect the company to reach profitability. Future funding (or even tranches of a single funding commitment) is often conditioned on the attainment of certain benchmarks. In fact, the failure to attain a certain

level of success may subject the managers of the company to removal at the instance of the investing entity. Investors putting capital at substantial risk recognize that they will often make losing bets even when an entrepreneur has a well-thought out strategy. But that is exactly why they go through the rigor of requiring the entrepreneur to make her case, by presenting a specific business plan with real benchmarks, and testing the entrepreneur's plan against their own industry knowledge and experience.

Howard did not engage in any thinking of this kind. To be candid, I left the trial concluding that Auto-Trol has been entirely improvisational and has had a shifting and unfocused business plan. This is not a minor problem in a corporation that is generations, not months old. Auto-Trol is not a start-up. Indeed, Auto-Trol's consistent record of failure would have caused any outside investor considering the company to demand that Auto-Trol's management be even more specific and clear about the company's business plans and when management thought it would become profitable.

Howard never developed such a plan for Auto-Trol, much less used the achievement of benchmarks in the plan as a pre-condition to further infusions of capital from Venhill. Rather, he simply made ad hoc loans to Auto-Trol from Venhill whenever Auto-Trol needed cash, never examining whether Auto-Trol was on a course toward sustained profitability. As a result, he never made any rational attempt to exercise the type of disciplined thinking that most durably successful private equity and venture capital investors employ.

**\*27** For all these reasons, the process used by Howard to make investment decisions for Venhill regarding Auto-Trol was grossly deficient. And, not surprisingly, the absence of a fair process relates to my consideration of the substantive fairness of the transactions.

Let us begin with the nature of the transactions. These were loans made during the period December 30, 2002 to July 26, 2005 at a very low rate of interest and with weak repayment terms. Thus, the upside of these loans was low. The only way they could be conceived of as making any sense was if by making them, Venhill was facilitating a turnaround at Auto-Trol that would make it able to repay the $15,950,000 Auto-Trol already owed to Venhill as of

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

December 30, 2002 and would receive a high rate of return in that sense.[FN95]

> FN95. In other words, because a large proportion of Auto-Trol's debt to Venhill by this time period was unrecoverable, any additional recovery of that debt resulting from a new loan from Venhill could be considered as part of the return on investment for that new loan.

For that to be a rational basis for an investing decision by Venhill, Auto-Trol had to have a business plan that showed how in some commercially reasonable timeframe it would, through the sale of services and products, attain profitability on a durable basis, sufficient to enable it to repay Venhill for principal and interest, and to meet its future cash needs on its own. Howard and his management team at Auto-Trol never prepared such a plan, and even under the pressure of litigation, never formulated a sensible, comprehensible business strategy.

It may well be that Auto-Trol has developed some useful products over the years. But that does not mean that it was or is a sound business. By 2003, Auto-Trol had been insolvent for a decade, only remaining afloat because of infusions of nearly cost-free capital from Venhill. No rational person would have put good money after bad without some rational business plan for a turn-around at Auto-Trol. Howard lacked one.

Given that, it was obviously imprudent for Venhill to provide low-interest, payment deferred loans to Auto-Trol of another $17,870,000 between December 30, 2002 and July 26, 2005. If Venhill-which had been formed to make risky investments yielding high returns-was going to make loans, it could have easily found more creditworthy borrowers willing to pay a higher interest rate and make more regular payments. That is, it could have easily achieved a higher expected rate of return at much lower risk. Instead of doing so, Howard caused Venhill to provide Auto-Trol with loans at rates and on terms no rational lender would have tolerated. Indeed, Howard himself admits that no rational third-party would have financed Auto-Trol on the terms he did. That is unsurprising because even AAA-rated borrowers could not get such a sweet deal from a lender.

As or more egregious was Howard's decision on January 28, 2005 to roll all of the nearly $31,520,000 in debt Auto-Trol owed Venhill into a single note, not payable until January 28, 2020.[FN96] Howard's only defense to this is that Venhill already essentially owned all of Auto-Trol's debt and equity, so what was the harm to pushing out the debt to itself another 15 years? But again, the coming of the due date on a large series of debt is the sort of inflection point that causes a rational investor to think deeply about winding up the business if the business cannot meet its repayment obligations. It is not a time for the inertial deepening of a financial sinkhole.

> FN96. PX 85.

**\*28** Howard's own admission of Auto-Trol's value further demonstrates that these transactions were unfair. If Howard truly believed that Auto-Trol had real equity value, in the sense that it could pay off its debts and have a surplus for its stockholders, he would have been anxious to try to buy Auto-Trol for a fraction of its debt obligations (say $15 million) and see if its creditors would accept that, and to take the upside for himself. By his conduct in arguing that Auto-Trol's equity was worth only $1 and his unwillingness to pay off any of the substantial debt Auto-Trol owed, Howard essentially admitted that there was little or no prospect that Auto-Trol would ever succeed to the point where it could pay off the $21 million in debt that it owed to Venhill at that time, let alone pay back the massive $73 million in investment capital that Venhill had invested in Auto-Trol before the debt re-characterizations. Given this admission, his decision to keep pouring money in on submarket terms was obviously unfair to Venhill.

Even considered in narrower terms, the loans from Venhill to Auto-Trol from December 30, 2002 forward were grossly unfair to Venhill. Auto-Trol was insolvent, with financial metrics worse than a median company with credit ratings considered to be "predominately speculative, substantial risk, or in default."[FN97] Despite that, Howard demanded it only pay the AFR rates, rates that were lower than the yields on AAA bonds, "the interest rate paid on corporate bonds by the most creditworthy U.S. companies ."[FN98] Given the huge risk of default that existed because Auto-Trol was already incapable of servicing its existing debt to Venhill, it is impossible to imagine a rational fiduciary putting principle at

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

risk for an AFR return, from a company that had only once in the last 9 years repaid the principal of a loan.

> FN97. Metrick Report at 8 (citation omitted).

> FN98. *Id.*

Likewise, the other terms of the loans were unfair to Venhill. At this stage of failure by Auto-Trol, it was likely that any other rational private equity sponsor would have shut down the firm, salvaged what it could through an asset sale, and moved on. At the very least, any additional investments would have been on terms that involved a very high rate of interest, the potential for an upside through warrants or a conversion feature, and triggers that allowed the investor to exercise direct control over Auto-Trol if its management continued to fail to achieve success.[FN99] Howard extracted none of these protections for Venhill.

> FN99. Howard's own expert admitted as much at trial. Tr. at 941-942; *see also id.* at 952-53.

Finally, no rational investor would have allowed Venhill to imbalance its portfolio so strongly toward Auto-Trol. Given Auto-Trol's record of failure and lack of reasonable growth prospects, it was unlikely to have been any investor's choice as an investment at all. But what is clear is that if an investor was going to take a big bet by putting over 50% of his portfolio in one investment, it would not have been on Auto-Trol. For Howard to have tilted Venhill's portfolio so heavily toward Auto-Trol was obviously imprudent, and something that no rational investor would have done. Even high-risk venture capital and private equity investors do not typically bet more than 20% of their portfolio on one company. To put over 50% of a portfolio into a company that has been essentially insolvent for a decade or more would be unthinkable to a rational high-risk investor.[FN100]

> FN100. Metrick Report at 9-10 ("In general, PE funds would rarely allocate more than 20 percent of their portfolio to a single company, and I have never heard of an allocation reaching 50 percent .").

*29 For all reasons, I conclude that all of the investments and transactions Howard caused Venhill to make into or with Auto-Trol from December 30, 2002 to the present were unfair to Venhill.

### 2. *Howard Knew He Was Acting Imprudently*

Howard's lawyers have tried to convince me that Howard was a true believer, who subjectively believed all along the way that Auto-Trol would turn out to be a financial success. I do not believe that to be the case.

At least by this century, Howard himself had no subjective belief that Auto-Trol would be successful in the sense relevant to a for-profit business. By that, I mean that Howard did not believe that Auto-Trol would develop and sell sufficient products and services to pay off its debt-holders and make a decent return to its equity holders. In fact, I am convinced Howard knew that Auto-Trol had essentially no prospect of paying off Venhill and its other debt-holders.

If Howard had a genuine belief in the value of Auto-Trol, he could have put his money where his mouth was. He could have offered to buy Auto-Trol in a transaction paying off all, half, or even a quarter of Auto-Trol's debts. He could have convinced his children to help him fund his dream, using funds from their family Trusts, without drawing on funds from Trusts for Tatnall and his children. When the Hempstead Valuation came out in 2003, Howard was presented with a great opportunity to deal. But his actions were consistent with what I find was his true belief, which is that Auto-Trol was insolvent, could not pay off its debts, and could only be kept alive by ongoing infusions of cash by a source that did not demand timely repayment.

This does not mean that Howard was not devoted to Auto-Trol. Indeed, that is the problem. It is clear that Howard derived much of his personal identity and satisfaction from being the CEO of Auto-Trol. Auto-Trol was the vehicle by which he was going to prove himself.

By this century, though, Howard knew that Auto-Trol was not going to be successful as a business. But he was dug in.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

Howard believed his brother Tatnall was a lazy and ungrateful dilettante, who had spent his adult life having fun while Howard did the hard work for the family. Howard resented that Tatnall and their cousin Joe (who Howard viewed as an interloping intermeddler) would not recognize all Howard had done for the family and let him pursue his dreams at Auto-Trol. And, most of all, Howard was not going to confess error or defeat by admitting that it was time to pack it in, sell Auto-Trol, and cut the family's losses.

Instead, he played a high-stakes game of chicken with his family's money, challenging and goading Joe and Tatnall into a confrontation. Howard's personal pride would not let him back down, and the plush circumstances afforded to him by the Trusts allowed him to play a game of brinksmanship without personal consequence.

Howard is a smart man. He knew that Venhill could get a better return at lower risk by putting its funds elsewhere than in Auto-Trol. He knew that he was lending Venhill funds in Auto-Trol on terms unfair to Venhill, and that there was little or no chance Venhill would be repaid. He knew that Auto-Trol had no business strategy that would enable it to pay back the huge debt it already owed to Venhill.

**\*30** But Howard did not care because he found the continued operation of Auto-Trol personally satisfying, as he enjoyed being a CEO, thinking about the company's products and research, and interacting with the employees. Howard seems to have harbored the belief that Tatnall owed it to him to allow him to pursue his passion with Venhill's money, as an act of grace in exchange for Howard's work on behalf of the Trusts over the years and Howard's savvy that led to their wealth in the first place. Professor Metrick accurately described Auto-Trol as Howard's "hobby," [FN101] but it was a hobby he funded with other people's money.

FN101. Tr. at 426, 446.

Regrettably, this was also a situation that only became worse with time. The more objectively bleak the situation was, the more stuck in Howard got. He did not approach this issue with a cool head, considering whether it was time to wind up Auto-

Trol, cut Venhill's losses and move on to more profitable ventures. Instead, the more that Joe and Tatnall questioned him, the more Howard blinded himself to objective reality and simply forged ahead.

That Howard's actions were not selfless is also demonstrated by his willingness to treat himself and his children differently than Venhill. Even though Auto-Trol was cash-strapped, Howard had it funnel money back to him and to the Vineyard Trust that benefited his family.

This is a clear case of fiduciary disloyalty. Although Howard's motives were not financial enrichment, they were personal.[FN102] He preferred the continuation of his hobby and let a stubborn sense of pride and an unwillingness to admit error come ahead of his duties to Venhill. Howard knew he was injuring Venhill to benefit his personal interest in continuing Auto-Trol as a hobby. That is, Howard did not act in the good faith pursuit of Venhill's best interests, as he was bound to do. Instead, he acted in bad faith by impoverishing Venhill in order to keep Auto-Trol afloat for personal reasons unrelated to Venhill's own best interests. Given that he knew that he was investing Venhill's funds in an imprudent and irrational manner, Howard also engaged in willful misconduct. Therefore, § 14.1, the exoneration clause of the Venhill Limited Partnership Agreement, does not insulate him from liability for his breaches of duty.

> FN102. *See In re RJR Nabisco, Inc. S'holders Litig.,* 1989 WL 7036, at \* 15 (Del. Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.... In such a case, is it not apparent that such a director would be required to demonstrate that the corporation had not been injured and to remedy any injury that appears to have been occasioned by such transaction?").

Section 14.1 does not aid Howard for another reason, which is that it is obvious that he acted in a grossly negligent manner. His decisions did not involve any

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

rational consideration of relevant factors. He did not make any genuine effort to comply with the expected duty of care. No rational investor would have made the decisions Howard did, or in the manner he did.

### V. *What Is The Appropriate Remedy For Howard's Breaches Of Duty?*

This court has broad discretion in determining an appropriate remedy for Howard's breaches of fiduciary duties.[FN103] In cases of this kind, it is rare for the record to permit the court to enter a remedial order that derives arithmetically from the application of a financial formula to undisputed facts. Rather, the court's task is to fashion a sensible, rational remedy grounded in the record and relevant principles of finance and economics, bearing in mind the policy in favor of generous awards to remedy breaches of the fiduciary duty of loyalty.[FN104]

> FN103. *See* *Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437, 440 (Del.2000)* ("In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages.") (internal citations omitted); *see also* *Weinberger,* 457 A.2d at 714 (similar).

> FN104. *Thorpe v. CERBCO, Inc.,* 676 A.2d 436, 445 (Del.1996)* ( "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."); *In re Primedia Inc. Derivative Litig.,* 910 A.2d 248, 262 (Del. Ch.2006)* ("As the Delaware Supreme Court long ago noted, the duty of loyalty 'does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for purposes of removing all temptation, extinguishes all possibility of profit flowing from the breach of confidence imposed by the fiduciary relation.'") (quoting *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del .1939)).

**\*31** Here, the primary dispute among the parties about the shape of any remedy is how to calculate the damages suffered by Venhill as a result of the loans

Howard caused it to make to Auto-Trol from December 30, 2002 to July 26, 2005. The parties agreed that these totaled some $17,870,000.

They also agree that analytically the difficult question to be answered is what lost profits Venhill suffered on top of the loss of principal as a result of Howard's decision to loan those funds to Auto-Trol rather than to invest them in other opportunities. A great deal of trial time and briefing and expert report space was taken up with a debate over what measure to use in calculating Venhill's lost investment profits. This issue was complicated by the fact that Venhill (under Howard's managerial control) did not maintain books and records that make it easy to determine how its non-Auto-Trol investments have performed over time, and that the parties did not submit any credible or clear showing of the rate of return Venhill achieved during the time period relevant to this remedy determination.

What is clear, however, is that Venhill was formed by the Trusts to seek a return higher than could be achieved simply by investing in common stocks. Howard admits as much,[FN105] and believed that Venhill's other investments generated a rate of return higher than the Standard & Poor's 500 Index (the "S & P 500").[FN106] Indeed, it would have been irrational to form Venhill simply to achieve a return that the Trusts could have attained at lower cost and at much lower risk simply by investing in an index fund. Venhill was embarked on the mission of seeking better than market returns, a mission that necessarily involved taking some greater risks in several senses, including having less ability to diversify away risk. In fact, one reason why Howard's loans to Auto-Trol were so obviously improper is that they involved the pursuit of a below-market return (a negligible interest rate return with weak repayment terms) at a huge risk (an insolvent borrower already in deep default to Venhill).

> FN105. Tr. at 273, 287-88.

> FN106. *Id.* at 21.

For this reason, even Howard's expert did not point to the S & P 500 as the appropriate benchmark for measuring Venhill's lost profits. Instead, Kursh argued that because Auto-Trol was a software company, the right measure was what Venhill would

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

have made if it had invested in other computer companies.

I reject that notion, because there is no basis to believe that Venhill was formed to concentrate on computer industry investments. Howard's obsession with Auto-Trol did not turn Venhill into a specialized computer industry investment fund. Nothing in the record supports that inference, or the inference that Venhill's other investments did not involve a diverse array of industries.

Rather, what is clear is that the measure that is most consistent with Venhill's objective is one that measures what Venhill would likely have received by making high-risk venture capital and private equity investments. The plaintiffs' expert, Professor Metrick, persuasively testified that the database called VentureXpert provides a sound estimate for average annual returns achieved by investors in these sectors. Using VentureXpert, and data available from Venhill, the plaintiffs' damages expert Arthur Baines of PricewaterhouseCoopers calculated the return Venhill would have made if instead of loaning nearly $18 million to Auto-Trol from December 30, 2002 until July 26, 2005, it had invested in venture capital and private equity investments. In coming up with the calculation, Baines gave Howard credit for the fact that, based on the books and records available, Venhill had invested in some marketable securities and had kept some cash on hand. He therefore applied the VentureXpert rate only to the portion of Venhill's portfolio devoted to non-marketable securities and partnerships and LLCs. That was a sensible proxy for the portion of Venhill's portfolio it would have invested in investments of the type captured by VentureXpert.

**\*32** At trial, Kursh raised several questions regarding the VentureXpert database. Only one was substantial, which is whether VentureXpert accounted for the failure of firms sufficiently by incorporating losses due to portfolio firm failure into its return calculation. Professor Metrick admitted that this is an unsettled issue, especially for a lag period that is present in recent data. He was, however, convinced that VentureXpert seemed to have addressed it better than other databases and that data from VentureXpert that is over 24 months old does not reflect this concern. All three experts agreed that it would be inappropriate to use VentureXpert for the most recent

two years, and as a result the plaintiffs' expert used the S & P 500 as a conservative benchmark in lieu of VentureXpert for that time period.

Because of these issues and because there is no guarantee that Venhill would have been as successful as the average venture capital investor, I am going to premise my award on two rates of return. I will first apply the VentureXpert rate of return, minus one percent per year, to all damages until two years before the date of this opinion. After that, the interest rate on the S & P 500 index will replace VentureXpert in the calculation of damages. By using these rates, I remain true to Venhill's purpose and what I know about Venhill's rate of return on non-Venhill investments, which is that Venhill obtained a return in excess of the S & P 500, but apply a tempering measure of conservatism to address the concerns over survivor bias and other uncertainties with the VentureXpert data. The plaintiffs shall recalculate their damages request-which, using VentureXpert returns, was $28,386,824 for the period beginning December 30, 2002-in accordance with this decision, share their calculations with Howard, and present an agreed upon figure to the court. Interest on the award will run from the period of this calculation at the legal rate, and continue to run at that rate until the judgment is satisfied.

The other remedial issues are relatively simple. As to Howard's January 1, 2003 decision to roll all of Auto-Trol's debt to Venhill into a single note, I reject the plaintiffs' request that I pretend that Auto-Trol could have paid that debt in 2003 and invested the funds elsewhere. As to that issue, the appropriate remedy is rescission, allowing Venhill to collect on the debts based on the obligations owed to it by Auto-Trol before Howard converted that debt into a single note. This obvious remedy is complicated by the absence of Auto-Trol as a party. Therefore, I shall enter an order prohibiting Howard or any party acting in concert with him from contesting any decision by Venhill, as the controlling stockholder of Auto-Trol, from unwinding that decision.

Lastly, Howard's attempt to grant himself priority as a creditor over Venhill as a result of his unilateral decision to invest funds of himself and his children in Auto-Trol in May of 2007 will be set aside. Notably, Howard took steps to obtain a security interest in Auto-Trol's real estate for himself and his family

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

when putting their funds at risk. This was something he had never bothered to do for Venhill, despite having made 186 loans and investments totaling over $85 million into Auto-Trol on its behalf. Auto-Trol's obligation to Howard should be subordinated to the entirety of its debt obligation to Venhill.

**\*33** In this regard, I reject Howard's argument that there should be any reduction in the damages award because Venhill has been able to use certain Auto-Trol losses to offset some capital gains liability. The fact that Venhill was able to salve some of the wound from its equity investments in Auto-Trol (the last of which occurred in 2001 through the last of Howard's improper conversions of Auto-Trol debt into equity) does nothing to offset the harm suffered by Venhill as a result of the imprudent loans Howard caused it to make to Auto-Trol from December 30, 2002 forward.[FN107]

> FN107. Furthermore, the mere fact that Venhill has not shuttered the doors at Auto-Trol since Howard left at the end of 2007 does not mean that my award poses a danger that Venhill will enjoy a windfall at Howard's expense. There is no basis to believe that Auto-Trol is worth anything near the $85.4 million Venhill invested into it. If, in the unlikely event that Stallkamp and the turnaround specialist he retained can dress up Auto-Trol and sell it for an amount that exceeds what Venhill was due considering its lost opportunities and the time value of money, Howard will benefit as the primary beneficiary of the A-1 Trust, one of Venhill's two limited partners.

### VI. *Should Howard Pay The Plaintiffs' Attorneys Fees?*

The plaintiffs contend that Howard's actions are of such an egregious nature that he should bear their fees under the bad faith exception to the American Rule. That rule can create some cognitive dissonance in a case like this when I have concluded that Howard breached his duty of loyalty by undertaking action on behalf of Venhill for the bad faith reason that it advanced his personal interests and knowing that the action was unfair to Venhill. Our law, however, has not been that every case of intentional fiduciary wrongdoing justifies fee-shifting.[FN108] If it

did, there would not be much left of the American Rule.[FN109]

> FN108. *HMG/Courtland Properties, Inc. v. Gray,* 749 A.2d 94, 124-25 (Del. Ch.1999) ("The mere fact that a corporate director has breached his duty of loyalty to the corporation does not justify an award of attorneys' fees and expenses.... This exception to the American rule is 'narrow' and should be applied 'in only the most egregious instances of fraud or overreaching.'") (quoting *Boyer v. Wilmington Materials, Inc.,* 1999 WL 342326, \*5 (Del. Ch. May 17, 1999)) (internal citations omitted).

> FN109. *Ryan v. Tad's Enters., Inc.,* 709 A.2d 682, 706 (Del. Ch.1996) (stating that "[o]therwise, every adjudicated breach of fiduciary duty would automatically result in a fee award."); *see also HMG/Courtland Properties, Inc., 749 A.2d at 125* (quoting *Ryan,* 709 A.2d at 706).

Rather, the bad faith exception applies only in cases, to use Chancellor Allen's vivid phrase, of "unusually deplorable behavior"-pre-litigation behavior, so egregious that the defendant's proffer of a litigation defense is seen as in itself an act of bad faith, because the plaintiff's right to relief is so obvious and the defendant has unjustifiably caused the plaintiff to expend resources in the form of money and time in securing a clear right.[FN110] Here, there is only one area of the case where Howard's behavior justifies fee shifting.

> FN110. *Barrows v. Bowen,* 1994 WL 514868, at \*2 (Del. Ch. Sept. 7, 1994) ("While this court can imagine situations which may be so egregious as to warrant an award of attorney's fees on the basis of fraud, the American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees. Even more harmful would be to extend this narrow exception to situations involving less than unusually deplorable behavior.").

His decision to usurp control of Auto-Trol from

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)
**2008 WL 2270488 (Del.Ch.)**

Venhill when he feared removal and to cause Venhill to make another $2.3 million in payments to Auto-Trol and to his own attorneys was obviously improper. Yet, it was not until after trial that Howard returned control of Auto-Trol to Venhill. Even then, he did not concede that the departing payments were improper.

Howard had no good faith defense to these actions and put the plaintiffs and the court to needless burden in addressing these issues. Thus, the plaintiffs' fees and expenses attributable to those decisions shall be paid by Howard.[FN111] The plaintiffs shall make a conservative and well-supported showing of what those fees and expenses are, and meet and confer with Howard's counsel in an effort to agree on that amount.

> FN111. This includes the costs of the TRO application and settlement agreement entered to prevent the Spring 2007 Subscription Offering, which would have benefited Auto-Trol at the expense of Venhill by either compelling Venhill to infuse Auto-Trol with $2.5 million in equity capital or severely diluting Venhill's equity holdings. Venhill, although it owned over 95% of Auto-Trol, was unable to prevent the transaction because its voting rights were held by Howard as the unremovable manager of HMC, thereby preventing Howard's removal. The attempted Subscription Offering, both evidences Howard's bad faith of its own accord also resulted directly to his decision to usurp control of Auto-Trol from Venhill.

But the plaintiffs' request for all of their remaining fees and expenses is denied. This is a case where the plaintiffs knew for over a decade before they brought suit of Howard's inclination to keep investing in Auto-Trol. Yet, they brought a case demanding damages for actions going back to 1993. Given that the plaintiffs themselves complicated this action by bringing obviously time-barred claims, they are in a poor position to ask Howard to cover all of their fees and expenses for this action. Had they brought a suit focused on the appropriate time period, this case would have been far less unwieldy for all concerned. And even if they had, I cannot conclude that fee shifting under the American Rule is in order simply

because Howard defended the fiduciary propriety of the investments he caused Venhill to make into Auto-Trol from 2002-2005, with the exception of the parting gifts made in connection with his transfer of Auto-Trol to HMC.

## VII. *Conclusion*

*34 For all these reasons, judgment will be entered for Venhill and against Howard Hillman. Within twenty days, the plaintiffs shall prepare a conforming final judgment providing for the payment of damages and interest to Venhill, addressing all other issues, and submit it, upon agreement as to form from Howard Hillman. The court recognizes that meeting this deadline will require the parties to devote immediate and substantial attention to this matter, but the deadline is achievable if the parties work cooperatively toward the required end.

Del.Ch.,2008.
Venhill Ltd. Partnership ex rel. Stallkamp
Not Reported in A.2d, 2008 WL 2270488 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.