IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ALH HOLDINGS LLC | ) Civ. No. 04-1339-SLR<br>) (consolidated)<br>)<br>)<br>)<br>)<br>)<br>) |

A. Gilchrist Sparks, III, Esquire, S. Mark Hurd, Esquire, and Samuel T. Hirzel, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.  Counsel for Plaintiffs and Counterclaim Defendants.

Sean J. Bellew, Esquire and David A. Felice, Esquire of Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware. Counsel for Defendants and Counterclaim Plaintiffs.  Of Counsel:  Thomas M. Wood, IV, Esquire, Nichole M. Galvin, Esquire and Brian M. Boyle, Esquire of Neuberger, Quinn, Gielen, Ruben & Gibber, P.A., Baltimore, Maryland.

**OPINION**

Dated:  December 22, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This litigation arises out of the actions taken by the directors of ALH Holdings LLC ("ALH") in selling off the subsidiaries of ALH. On September 13, 2004, Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein") (collectively, "plaintiffs") filed a declaratory judgment action in the Delaware Court of Chancery against Abraham Arenson ("Arenson"), SELK LLC ("SELK") and Laurel Equity Group ("Laurel") (collectively, "defendants"). The action was removed to this court. On April 22, 2005, plaintiffs amended the complaint and joined A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens Ltd. ("D.A. Gardens") and J12ALH Associates ("J12ALH") as defendants. Plaintiffs seek, inter alia, a declaration that no breach of fiduciary duty resulted from the piecemeal sale of ALH's subsidiary operations. (D.I. 37 at 49-50)

Meanwhile, defendants, excepting Arenson, instituted an action in a United States District Court in North Carolina. (D.I. 72 at 5) Defendants' action, based upon a factual background similar to that relied upon in plaintiffs' complaint, alleges that plaintiffs, through an abuse of majority shareholder status, breached various fiduciary duties by selling off the subsidiaries of ALH. That action was subsequently transferred to this court[1], was consolidated with plaintiffs' action, and became defendants' counterclaim against plaintiffs and third party complaint against ALH. (D.I. 67; D.I. 76) A bench trial was held between April 7, 2008 and April 17, 2008 on these issues, which

[1]Civ. No. 06-62-SLR.

were extensively briefed post-trial.  The court has jurisdiction pursuant to 28 U.S.C. §

1332.  Having considered the documentary evidence and testimony, the court makes

the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II.  FINDINGS OF FACT

### A.  The Parties

#### 1.  Plaintiffs and counterclaim defendants

Shamrock is a corporation formed under the laws of the State of California, with

a principal place of business in Burbank, California.  Shamrock is wholly-owned by the

Roy E. Disney Family and engages primarily in the business of diversified investing.

(D.I. 67  at ¶ 10)[2]  Shamrock invested $6.275 million[3] and is the majority shareholder of

ALH, holding approximately 62% of the Class A membership interest.  (Id.)

SCA is a Delaware corporation having its principal place of business in Burbank,

California.  SCA is wholly owned by, and serves as the investment adviser affiliate of,

Shamrock.  (Id. at ¶ 11)  The business of SCA includes merchant banking, investment

advisory and related activities.  (D.I. 74 at ¶ 11)

Krieger, a Class A representative on ALH's Supervisory Board, has been

employed by Shamrock since 1999 as the Vice Chairman and the Chief Operating

Officer.  (D.I. 67 at ¶ 12; D.I. 74 at ¶ 12)  Buchler, the second Class A representative on

ALH's Supervisory Board, likewise enjoys a continuing employment relationship with

---

[2]Because defendants' answer and counterclaim complaint are combined in the
same document and contain overlapping paragraph numbers, unless otherwise noted,
"D.I. 67" refers only to the counterclaim complaint.

[3]The dollar amounts noted in II. A. represent original investments, and do not
reflect any subsequent capital contributions made after the formation of ALH.

Shamrock, serving in a variety of positions since 1987.  (D.I. 67 at ¶ 13; D.I. 74 at ¶ 13)

Stein, the Director of Real Estate for Shamrock, also serves as the Class D

representative on ALH's Supervisory Board.  (D.I. 67 at ¶ 14; D.I. 74 at ¶ 14)  Krieger,

Buchler and Stein have each performed substantial services for SCA.  (D.I. 74 at ¶¶ 12-

14; D.I. 67 at ¶¶ 12-14)  All three are citizens of the State of California.  (*Id.*)

### 2. Defendants and counterclaim plaintiffs

Arenson Holdings is an Israeli Corporation, with its principal place of business in

Israel.  Arenson Holdings owns approximately 11% of the Class B membership interest

in ALH.  (D.I. 67 at ¶ 4)  D.A. Gardens is a corporation formed under the laws of the

Nation of Panama, and has its principal place of business in Panama.  D.A. Gardens is

a Class B member of ALH, holding approximately a 6% interest in the Class.  (*Id.* at ¶ 5)

Together, Arenson Holdings and D.A. Gardens invested $1.469 million in ALH.

Arenson, while not himself a party to the counterclaim, is the principal of both Arenson

Holdings and Gardens, and serves as the Class B representative on ALH's Supervisory

Board.

J12ALH is a New York general partnership, whose members are Erica

Jesselson, a citizen of New York, and Jays Twelve, LLC, a Delaware limited liability

company.  J12ALH invested $1.469 million in ALH and owns approximately 17% of the

Class B equity.  (*Id.* at ¶ 6)

SELK is a limited liability company organized under the laws of the State of

Delaware.  The membership of SELK consists of Shalom E. Lamm ("Lamm"), the

managing member, and NACA Holdings Inc. ("NACA"), a British Virgin Islands entity.

3

SELK was formed as a vehicle to invest in the ALH venture. (D.I. 178 at 142) Isaac Neuberger ("Neuberger") is the trustee of the Davidovici Trust, which owns NACA.[4] (D.I. 183 at 4) In return for an investment of $2.937 million, SELK holds approximately 33.3% of ALH's Class B equity. (D.I. 67 at ¶ 7)

Laurel is a Delaware limited liability company and a Class B member of ALH. Laurel invested $2.937 million in ALH in consideration for a 33.3% Class B membership interest. (Id. at ¶ 8)

### 3. Nominal third-party defendant

ALH is a Delaware limited liability company. While ALH acts only as a holding company and conducts no direct business,[5] it previously wholly-owned several subsidiaries involved in the home building business. (Id. at ¶ 9) Prior to its liquidation, ALH had three such subsidiaries: Atlantic Builders, Inc. ("ABI") in Jacksonville, Florida; Bowden Building Corporation ("BBC") in Memphis, Tennessee; and Mulvaney Homes, Inc. ("MHI") in Charlotte, North Carolina (collectively, "the Operating Divisions"). (D.I. 175 at 45) Within the corporate structure of ALH, ALH was the ultimate parent company, and ALH II, Inc. ("ALH II"), a wholly owned subsidiary of ALH, served as the parent company to the Operating Divisions. (Id.)

### B. Background

#### 1. The formation of ALH

---

[4]Neuberger is also the lead named partner in the law firm representing defendants in this litigation. (Id. at 40)

[5]Indirectly, ALH was engaged in the business of absorbing and/or satisfying Lamm's obligations from his previous unsuccessful ventures.

4

ALH came into existence principally through the efforts of Lamm and certain of his business partners.[6]  Lamm presented the concept of ALH to investors as an opportunity to acquire private home building companies, consolidate them and then position these holdings for a liquidity event within approximately 24 months of the initial investments. (D.I. 175 at 42-44)  The plan set forth by Lamm included the purchase of ABI with the investors' initial capital contributions; the revenue generated by ABI would then fund subsequent purchases. (Id. at 43)  As an additional incentive, Lamm and his partners promised investors a preferred high rate of return. (Id.)

The ALH investors negotiated the terms of the investment, which are set forth in the ALH Operating Agreement ("the Operating Agreement"). (PTX 3)  According to the Operating Agreement, the equity of ALH is broken into five classes. (Id. at 13)  The Class A members are Shamrock (62%) and clients of Howard Bernstein, a Los Angeles business agent (38%). (Id., ex. A)  The Class B members are: D.A. Gardens (6%); Arenson Holdings (11%); J12ALH (17%); Laurel (33%) and SELK (33%). (Id., ex. B)  The Class C member is Landmark Equity Investors LLC. (Id., ex. C)  The Class D member is Lion ALH Capital LLC. (Id., ex. A)  The Class E member is Lamm.  In recognition of the significant capital contributions made by the Class A and Class B members, the Operating Agreement classifies the interests held by these members as preferred; that is, Classes C, D and E are precluded from participating in any distributions unless and until Classes A and B receive the promised 27% rate of return

_____

[6]ALH was created on June 3, 1998. (D.I. 37 at ¶ 19)

5

on investment.[7]  (*Id.* at 17)

Lamm's participation in the ALH investment was further contingent upon the satisfaction of two preexisting debts related to prior homebuilding ventures. Identified as "Additional Capital Contributions," the Operating Agreement required the satisfaction of both obligations on or prior to September 1, 1998 in order to secure Lamm's Class E interest.[8]  (*Id.* at 14) Lamm guaranteed these obligations both personally and on SELK's behalf in his capacity as the managing member of SELK. (D.I. 182 at 21-22) In connection with the guarantee by SELK, an amendment to the Operating Agreement provides that, in the event that the obligations are not met, SELK's Class B interest will be reduced on a dollar-by-dollar basis.[9]  (PTX 10 at 1-2)

The Operating Agreement vested management of the day-to-day operations of ALH in Lion & Lamm LLC ("Lion").[10] A Supervisory Board was also established, whose five members were empowered to make decisions regarding the direction of ALH. (*Id.* at 23) The Supervisory Board originally included Krieger and Butler as the Class A

---

[7]The Class C members were remnants of Lamm's previously unsuccessful ventures. (D.I. 182 at 10)

[8]These obligations included a $5.6 million debt owed to Arbor ("the Arbor Debt") and a $2 million debt to Dr. Eugene Elovic ("the Elovic Debt"). (*Id.*)

[9]The amendment to the Operating Agreement explains that "[i]f SELK fails to perform under such guarantee, SELK's capital account and SELK's unrecovered Class B capital shall be reduced on a dollar-for-dollar basis by the amount that the Class E member has failed to contribute pursuant to this Section . . . ." (*Id.*)

[10]Setting aside his role as a Class D representative, Lamm initially had significant control over the daily affairs of ALH. Lamm, at his deposition, conceded that he was the "boss" of Lion. (D.I. 182 at 8-9) Pursuant to a separate consulting agreement, Lamm himself was also retained in a management capacity for two years for which he would receive $350,000 annually. (PTX 6 at 2)

6

representatives, Lamm and Jon Zich ("Zich") as the Class D representatives and Arenson as the Class B representative. According to the Operating Agreement, certain decisions required the unanimous approval of the Class A representatives.[11] (*Id.* at 23-26)

## 2. The acquisition of the Operating Divisions

The acquisition of ABI occurred in connection with the formation of ALH. (D.I. 176 at 48) Contrary to Lamm's predictions, ABI generated insufficient cash revenue to fund the subsequent purchase of BBC.[12] (D.I. 175 at 51) On December 9, 1998, the Supervisory Board formed ALH II to act as both the parent company for ALH's operating subsidiaries, and a debt financing vehicle for subsequent acquisitions made by ALH. The Supervisory Board also amended the Operating Agreement to reflect the additional capital contributions made by the Class A and Class B members[13] to acquire BBC. (*Id.* at 51-52; PTX 10) The acquisition of BBC, unanimously approved by the Supervisory Board, included ALH II's guarantee of a $2.25 million promissory note ("the Bowden Note") which secured a portion of the purchase. (PTX 10)

The acquisition of MHI[14] in early 2000 likewise required funding from sources other than the cash flow of ALH. For this purpose, ALH II received a $27.5 million line

---

[11]The Operating Agreement refers to these as "Major Decision[s]" and includes among such the "sale . . . of all or substantially all the assets . . . [of] the Company . . . ." (*Id.* at 24)

[12]Buchler testified that, after the acquisition of ABI, it was quickly apparent that ALH was undercapitalized. (*Id.* at 49)

[13]$4.7 million and $2.8 million, respectively. (PTX 10)

[14]The Supervisory Board likewise unanimously approved this acquisition.

of credit from Wachovia Bank, which was secured by surety bonds from Amwest Surety Insurance Corporation and Swiss Reinsurance America Corporation ("the Swiss Re Debt").  (D.I. 175 at 55-57; PTX 18; PTX 19)  ALH effectively guaranteed ALH II's obligations to Wachovia Bank.  (PTX 19)  Lamm projected that the revenue generated by the operations of ALH would "easily cover the debt service payments" associated with the Swiss Re Debt.  (PTX 13)

Unanticipated cash flow problems materialized soon after the acquisition of MHI, primarily associated with cost overruns and lower sales and closings.  (D.I. 182 at 26; D.I. 181 at 174)  In order to cover the working capital deficit, ALH called upon the Class A and B members to provide an emergency member loan of $2 million ("the 2000 loan") in order to "finance certain operations of ALH II."[15]  (D.I. 175 at 61-63; PTX 22)  Lamm presented this "unpleasant surprise" to the investors as a "one-time thing."  (D.I. 182 at 31)  The 2000 loan received unanimous approval from the Supervisory Board.  (D.I. 146 at III, ¶ 68)

It became evident that the original investment time line was wishful thinking when, in June 2000, Lamm began to extend the horizon of the promised capital event. (PTX 24)  Indeed, notwithstanding Lamm's prediction of 24 months, no disbursements occurred prior to the end of 2000.  (*Id.*; D.I. 182 at 33-34)  The maturity date of the 2000 loan was likewise adjusted when, in February 2001, Lamm projected a $2 million cash

---

[15]Shamrock, Arenson Holdings and Lion contributed $1,633,334, $166,666 and $200,000 respectively to the 2000 loan.  (PTX 22)

flow deficit by April.[16]  (D.I. 182 at 34-35)  Indeed, ALH failed to meet its business plan

in 2001 and 2002.  (D.I. 182 at 35)

### 3. The Settlement Agreement

A variety of admitted mismanagement conspired to further strain the financial

condition of ALH.  In the spring of 2001, the Supervisory Board learned of several

unauthorized dealings, attributable to Lamm and his affiliates, that resulted in a loss of

millions to ALH.[17]  (PTX 29; PTX 31; PTX 33; PTX 36; PTX 37; PTX 38)  These

dealings caused great concern among the investors regarding the current management

structure of ALH.[18]  After deliberations in July 2001, the Supervisory Board approved a

settlement between ALH and Lamm and his associates ("the Settlement Agreement").

(PTX 44)

The Settlement Agreement was approved through a unanimous written consent

and touched upon a variety of issues.  (Id.)  In connection with the Settlement

---

[16]The 2000 loan initially obligated ALH II to satisfy the debt by December 31, 2000.  (PTX 22)  ALH II, however, lacked the necessary funds to pay the debt at maturity.  (D.I. 182 at 34-35)  According to Buchler, "[t]he company never had the ability to repay these loans."  (D.I. 175 at 63)

[17]Lamm testified that he "was stunned" to learn of these transactions.  (D.I. 178 at 164)  While Lamm generally expressed that he was "thoroughly humiliated [and] shocked" (id. at 165, 167), he attempted at trial to defend an "alternative financing" scheme unapproved by the Supervisory Board in which investors unaffiliated with ALH received "a good [26%] rate of return" for acquiring properties with loans guaranteed by BBC, and then selling those properties to BBC.  (Id. at 169-71)

[18]Arenson, unsurprised by these events, testified that he "was unhappy with the general level of [Lamm's] accuracy."  (D.I. 180 at 129-30)

9

Agreement, Lamm admitted to several unauthorized dealings.[19]  As restitution for the

financial harms attributable to these dealings, Lamm and his partners agreed to pay

approximately $2 million.  (PTX 44 at II)  Lamm devised the restitution payment

schedule.[20]  (D.I. 178 at 182)

Most importantly for the purposes of this litigation, the Settlement Agreement

drastically altered the control scheme of ALH, both in the board room and with respect

to daily operations.  (PTX 44 at III)  The Settlement Agreement contained a new

consulting arrangement, terminating Lion and designating SCA as ALH's management

consultant.[21]  (Id.)  Buchler's appointment to the board of each Operating Division gave

the Class A members greater representation at the subsidiary level.  (Id.)  The

Settlement Agreement also gave the Class A members the right to remove Zich from

the Supervisory Board and appoint his replacement.  The Class A members exercised

this right, and designated Stein to fill the vacancy left by Zich.  (Id.)  Through the

designation of Stein to the Supervisory Board, Shamrock controlled 3 of the 5 board

---

[19]Lamm admitted, inter alia, that: Lion & Lamm caused ALH to make payments on behalf of Lamm personally with respect to the Arbor Debt in the amount of $660,875 in excess of what he was entitled to under his personal consulting agreement; Lion & Lamm received an unauthorized financing fee of $737,000 in connection with procuring financing for the acquisition of MHI; Lion & Lamm caused ALH to pay $1,200,000 in excess of the agreed upon cost to close down ALH's Tampa operations; Zich received $480,000 of unauthorized payments from ALH; and John Hourihan, another business partner of Lamm's who assisted in the promotion of ALH, received $593,400 of unauthorized payments from ALH.  (D.I. 182 at 16-17, 35-42; D.I. 178 at 173-74)

[20]Lamm and his partners also executed a confession of judgment, which would allow ALH to execute upon Lamm's proposed repayment schedule if necessary.  (Id.)

[21]Lamm's consulting agreement with ALH was modified to reflect Lamm's assumption of the "primary day to day managerial responsibilities" of Lion with respect to ALH and its subsidiaries.  (Id.)

10

positions and obtained a majority position in ALH.

### 4. The investors agree to sell ALH in its entirety

By September 2001, the investors agreed that a prompt sale of ALH was desirable, and the Supervisory Board unanimously approved a decision to seek a buyer for the entire company. (D.I. 146 at III, ¶ 87) Arenson in particular believed that the sale was a good idea in light of the mismanagement and the newly minted limitations upon Lamm's involvement with ALH contained in the Settlement Agreement.[22] (D.I. 181 at 134) The first concentrated sales effort occurred in November 2001 when Neuberger approached MDC as a potential candidate for the acquisition of ALH. (D.I. 182 at 44-45) These negotiations eventually failed, in part, because of the high levels of goodwill on ALH's books. (Id. at 45) In light of this failure, Lamm proffered a "Plan B" in which he counseled ALH to conduct a coordinated sales effort after receiving the first quarter results for 2002. (Id.)

Lamm's restitution payments under the Settlement Agreement began to come due in February 2002. (Id. at 50) Prior to this date, Lamm implored the other members of the Supervisory Board to delay the required payments until the sale of ALH occurred.[23] (Id. at 51; PTX 77; PTX 78) Buchler and Krieger resisted this idea, noting that ALH was extremely cash constrained. (PTX 78) Even Arenson felt that Lamm should abide by his obligations under the Settlement Agreement, and suggested that

---

[22]In an email to Neuberger, Arenson stated that it was time to sell the company and move on as favorably and quickly as possible. (PTX 461; D.I. 181 at 135)

[23]Lamm had also failed to make payments on other obligations, such as the Elovic Debt. (PTX 101)

11

Lamm propose a schedule for future payments.[24]  (PTX 45; D.I. 181 at 130-35)  In

response, Lamm became "desperate" and sought aid from Neuberger "as a friend, not

as a lawyer."  (D.I. 182 at 56-58; PTX 82)  Because Buchler, Krieger and Stein

remained unyielding with respect to the due date of the restitution payments, Lamm

asked Neuberger to help him find a litigator who "would really cause SCA to lose lots of

sleep."  (PTX 81)  Neuberger replied that he would be "happy to participate."  (PTX 82)

In an email between Lamm, Zich and Hourihan, Lamm explained that they needed a

plan and that Neuberger told him "that he knows exactly what we (he) have to do."

(PTX 84)  A subsequent email sent by Lamm approximately two hours later instructed

Zich that they should probably start building an "anti-SCA file."[25]

### 5.  The sale process falters

In an effort to drive sales interest, the Supervisory Board tasked Lamm with the

selection of an investment banker to market ALH.  In March 2002, and upon Lamm's

suggestion, the Supervisory Board unanimously decided to retain Tony Avila ("Avila") of

Jolson Merchant Partners ("JMP") to provide "financial advisory and investment banking

services" in connection with the potential sale of ALH.  (PTX 100)  While negotiating the

---

[24]According to Arenson, the other Class B members did not share his sentiment.
Indeed, Arenson believed that the other Class B members did not intend to force Lamm
to satisfy his obligations because "some of them had huge respect for his father, who is
the foremost Orthodox rabbi in the United States" and wanted to "bend over backwards"
for Lamm.  (D.I. 181 at 130-31)

[25]This email was sent more than one year before the first transaction defendants
challenge.

engagement of JMP, Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank")[26]

recommended that the Supervisory Board retain an option to have JMP perform a

fairness opinion because it was possible that certain equity holders might receive little

or no consideration in a sale of ALH.  (DTX 237)  The engagement letter reflected this

option, which would require an additional payment of $100,000.  (PTX 100)

In April 2002, ALH again faced the need for financial support from its members.

Lenders would not extend construction lines of credit, principally because of an

uncertainty over ALH receiving an extension of the Swiss Re Debt, the maturity of which

quickly approached.  (PTX 113)  This credit shortage caused ALH's auditors to consider

issuing a possible going concern qualification.  (Id.; D.I. 175 at 93)  At the Operating

Division level, BBC was faced with an action filed by the holders of the Bowden Note

("the Bowden Litigation").[27]  (PTX 96 at 2; D.I. 175 at 87-88)  Lamm testified that, while

not completely sure what ALH needed the money for, ALH needed it "fast . . . there was

a pressing need."  (D.I. 178 at 209)

Buchler suggested that the Class A and Class B members provide pro rata

funding in the amount of $3 million to $5 million in order to support the sales effort.

(PTX 108)  As an incentive to participate, Buchler maintained that members who

---

[26]David Robbins ("Robbins") and Fried Frank, retained in connection with the sale of ALH, had represented Shamrock numerous times over a twenty year period. (D.I. 179 at 190)

[27]Buchler testified at trial that the Bowden Litigation arose after Lamm and his partners decided that they would cease paying interest on the Bowden Note.  (D.I. 175 at 87)  Under the terms of the Bowden Note, these lapses in payment resulted in an acceleration of the entire amount due.  (Id.)  In addition to this amount, the holders sought punitive and consequential damages, as well as attorney fees.  (Id.)

13

contributed their pro rata share should receive a "rich return." (*Id.*) Arenson, uncomfortable with the idea of another capital contribution, believed that the funding should be structured as a loan. (PTX 119) On May 7, 2002, the Supervisory Board unanimously approved a \$4.4 million loan to ALH II from Shamrock (\$1,964,800) and 31 other Class A members (\$1,160,200); D.A. Gardens (\$312,500); The Erica Jesselson 1994 CLAT (\$312,500); and SELK (\$625,000) ("the 2002 loan"). (D.I. 146 at § III, ¶ 97) The 2002 loan was made for the purpose of "provid[ing] working capital to [ALH II] and its subsidiaries," and included a term of five months. (PTX 126)

Meanwhile, JMP prepared a confidential offering memorandum to facilitate the sale of ALH. (PTX 124; PTX 125) This memorandum presented JMP's proposed angle, which highlighted the strengths of ALH - such as strong lot positions - that ALH, due to its capital constraints, could not benefit from in the same manner as a strategic buyer. (*Id.*) Avila identified potential acquirers and solicited proposals, but JMP failed to land a buyer for the entire company or substantially all of its assets within roughly six months of marketing.[28] (D.I. 146 at § III, ¶¶ 100-01) Potential purchasers expressed both concern over the ALH's high levels of goodwill and interest only in certain Operating Divisions. (PTX 130; PTX 138) Avila ultimately recommended that, if JMP was to sell the entire company, they "would have to wait."[29] (D.I. 182 at 204, 205)

---

[28]Walter Industries and KB Homes expressed interest in the acquisition of ALH at \$85 million and \$96 million, respectively, but a transaction never materialized. (D.I. 175 at 101; PTX 130; PTX 138)

[29]It is evident, however, that several of the Class B members did not relish the idea of waiting, and expressed frustration over their prolonged involvement with the ALH investment. (PTX 139; PTX 142) Laurel indicated that the investment had gone on longer than promised and posed a risk of "capital calls for unforeseen events." (PTX

14

### 6. The Operating Divisions are sold piecemeal

Instead of waiting, however, Avila was directed to invite offers for BBC and ABI.[30] (*Id.* at 205) While the Supervisory Board did not meet to consider abandoning the effort to sell the company as a whole, Lamm raised no objection to the piecemeal sale directive. (D.I. 176 at 146; PTX 140) With respect to the nature of the sales transition, Krieger testified that "[i]t was pretty clear at this point that we were not finding a buyer for ALH as a whole, so the notion of selling the three divisions separately was becoming a more realistic approach." (D.I. 177 at 81)

Contemporaneous with the directive to Avila, ALH entered into negotiations regarding two separate transactions, both of which ultimately proved unsuccessful. Walter Industries submitted a letter of intent to acquire BBC, but failed to make an acceptable offer. (D.I. 146 at § III, ¶ 102) Lamm, with the approval of the Supervisory Board, negotiated with Landstar in a final attempt to broker a sale of the entire company. (PTX 156) Landstar, however, identified major impediments to the acquisition; namely that ALH had "zero equity" and " . . . from a net worth perspective, [was] essentially bankrupt. ALH simply [had] too much debt, retained losses, and good will." (*Id.*)

Prior to the conclusion of the negotiations with Walter Industries, several Class B members met at London's Heathrow Airport to discuss the status of ALH ("the London

---

139)  Likewise, the beneficiary of the Davidovici Trust indicated that he had "no intention of adding a penny to his investment." (PTX 419)

[30]Avila testified that he did not remember exactly who provided these "marching orders." (*Id.*)

15

Meeting"). (PTX 148; D.I. 182 at 95) Lamm presented a quick overview of ALH's operations, and then Neuberger took over. (D.I. 182 at 140; D.I. 183 at 12) The Class B members, now concerned with the loss of equity resulting from anything less than the sale of the entire company, decided that they must either convince the Class A members to invest additional money into ALH, or buy them out.[31] (D.I. 181 at 138) Thereafter, Arenson, through an email ghostwritten by Neuberger and addressed to Buchler and Krieger, declared that, while it was desirable for Shamrock to continue in the ALH operation, the Class B members preferred to buy out Shamrock's Class A interest rather than proceed with a piecemeal sale. (PTX 141; D.I. 183 at 18) Arenson's email concluded that the time frame for the buy-out should be "one of weeks and not months." (PTX 141)

Shamrock expressed an interest in the buy-out, but requested "a clear indication of the proposed arrangement in advance." (PTX 148) Shamrock did not receive a response from Arenson with respect to the buy-out for several weeks. (PTX 150; PTX 152) In the interim, both Arenson and Neuberger strongly advocated against the individual sales of the Operating Divisions, claiming that such would essentially destroy the equity of ALH. (PTX 143; PTX 148) On September 13, 2002, Arenson emailed Krieger regarding the buy-out, and noted that "the option of a B buy-out is the only one available, other than a piecemeal sale, and a decision in principle should be made in

---

[31]Neuberger later reminded the Class B members, in an email dated one year after the London Meeting, that "[i]t has been our collective position that Shamrock, in its desire to exit, has used its control position to dismantle the company, pay back its loans, and to ignore the future prospects of the company and all of its investors just to get out." (PTX 243; D.I. 181 at 120-21) Lamm confirmed that the Class B members established this position at the London Meeting. (D.I. 182 at 95-96)

the next few days." (PTX 159)  In order to motivate the buy-out, Lamm drafted a letter

for Arenson to distribute among the Class B members, noting that if they were not going

to submit an offer to Shamrock, they "need to give Shamrock the green light to move

forward with the Bowden sale." (PTX 168)

In December 2002, ALH again required an extension of the Swiss Re Debt.

(PTX 164)  In preparation for the Swiss Re meeting, Avila prepared a "Financial

Position" paper, later edited by Krieger and Butler, which indicated that an immediate

sale of ALH might yield insufficient proceeds to pay off all creditors. (PTX 322; D.I. 181

at 217)  Swiss Re ultimately granted ALH an extension on the bond until December 31,

2004 and the Wachovia loan until June 30, 2004. (DTX 220; DTX 70)

Adding to ALH's financial concerns, the Bowden Litigation began to gain

momentum.  Counsel advised ALH that it would likely lose the litigation and that, if

plaintiffs in that action succeeded on the pending motion for partial summary judgment,

the court had the discretion to enter a final judgment upon which the plaintiffs could

quickly execute. (PTX 128; PTX 129; PTX 137)  According to Buchler, ALH did not

have the ability to pay the estimated judgment. (D.I. 175 at 110)

The negotiations between the Class B members and Shamrock continued to stall

with the Class B members offering $3 million and Shamrock asking for $12 million or, in

the alternative, the option to purchase the Class B interest (smaller than Shamrock's

interest) at the same pro rata amount offered by the Class B members.[32] (PTX 191;

PTX 374)  In an email dated February 7, 2003, Lamm again attempted to persuade the

---

[32]Krieger called Neuberger's $3 million offer, which represented a sum less than
Shamrock's debt in ALH, "woefully inadequate." (PTX 191)

Class B members to buy out Shamrock's interest, advocating a three to five year plan

for turning ALH around that required an additional influx of capital.  (DTX 155; D.I. 180

at 10, 12-13)  On February 18, 2003, Buchler, Krieger, Arenson and Neuberger met for

dinner in an effort to structure the buy-out, but the parties remained unyielding in their

positions.  (PTX 196)  While Avila actively marketed ABI, the Supervisory Board

unanimously approved the extension of JMP's Engagement Letter in March 2003.  (D.I.

182 at 205-06; D.I. 146 at III, ¶ 103)[33]

        After eight months of unsuccessful negotiations, Arenson confirmed that the

Class B members were unwilling to raise their offer for the Class A interest, and

indicated that the Supervisory Board should proceed with the sale of ABI.  (D.I. 180 at

159-60; PTX 213)  Arenson, on Neuberger's recommendation, later went on the record

in an email to Buchler stating that "I think that it is not in the best interests of ALH II to

sell itself piecemeal."  (D.I. 180 at 160; PTX 370)  In response, Buchler explained that,

barring any alternative solution that Arenson or the other Class B members could

devise, the sale of ABI was necessary to pull ALH out of a severe liquidity crisis.  (D.I.

---

[33]In addition to his vote in favor of the extension, Lamm drafted a letter
espousing resistance to the piecemeal sale directive, advocating instead a four year
plan for turning ALH around that would require cash contributions for litigation
settlements, land purchases and operations at MHI.  (DTX 155; D.I. 182 at 98-101)
Lamm further noted that, from "a balance sheet perspective, ALH remains severely
challenged."  (D.I. 182 at 98-101)
        Arenson testified that his vote in favor of the extension rested upon Avila's
"mandate to sell the whole company and nothing less than the whole company. And
what he was doing in the meantime was, I had not agreed to and I wasn't agreeing to
by extending his original mandate." (D.I. 180 at 79)

175 at 121; PTX 371)[34]  Neither Arenson nor the other Class B members proposed an alternative solution, and ALH entered into a letter of intent with Mattamy Homes ("Mattamy") for the sale of ABI on April 11, 2003.

The Supervisory Board met for an "informational meeting" on May 14, 2003 to address the sale of ABI. (D.I. 176 at 165)  In light of the liquidity issues, Buchler, Krieger and Stein concluded that the best interest of ALH lie in the sale of ABI.  Each believed that this sale would make available the funds needed to settle the Bowden Litigation, while simultaneously providing working capital for lot commitments and the improvement of ALH's balance sheet. (PTX 224; D.I. 175 at 125-27; D.I. 177 at 108-09; D.I. 178 at 56)  The recommendation to sell ABI went unopposed.  Buchler further proposed, likwise without opposition, that the proceeds of the sale go towards the satisfaction of the 2000 loan, the 2002 loan and the Swiss Re Debt. (PTX 224)

A telephonic meeting occurred on June 26, 2003, in which the Supervisory Board considered the terms of a proposed settlement of the Bowden Litigation, as well as the sale of ABI.[35]  (PTX 233; PTX 232; PTX 234; PTX 255)  Fried Frank presented the proposed settlement, under which ALH would pay $5 million plus $210,000 in attorney fees ("the Bowden settlement"). (PTX 233; PTX 230)  The Supervisory Board unanimously approved the Bowden settlement. (PTX 233)  Avila then presented an overview of the efforts to sell ALH in its entirety, followed by the subsequent efforts to

---

[34]Buchler explained that this liquidity crisis resulted from ALH's inability to finance either the settlement of the Bowden Litigation or the takedown of all of the lots under contract at ABI. (PTX 221; PTX 224)

[35]Buchler, Krieger and Stein, with Robbins present, conducted the meeting from a conference room, while Arenson, Lamm and Avila participated by telephone.

19

sell ABI.[36]  (D.I. 182 at 217)  Avila indicated that the Mattamy bid was the best potential transaction for the sale of ABI, and further noted that the proposed transaction was well within the range of EBITDA[37] multiples suggested by JMP.  While ALH did not pay to have JMP render the optional fairness opinion in connection with this transaction, no member of the Supervisory Board challenged the fairness of the price.[38]

As an alternative to selling ABI, Arenson proposed that the shareholders of ALH increase the company's capital through membership contributions.  (PTX 233; D.I. 181 at 103-04)  Shamrock, however, did not intend to invest any more capital in ALH.  Buchler indicated that no viable alternatives to the sale of ABI had been presented and, barring this sale, ALH had no way to deal with the pressing liquidity concerns it faced.  (PTX 233)  Buchler, Krieger and Stein voted in favor of the transaction, Arenson voted against it, and Lamm abstained after requesting additional time to "read intelligently" the proposal.  (Id.; D.I. 182 at 122-25)  Lamm, however, did execute the unanimous written consent by ALH II approving the transaction.  (PTX 321)  The minutes of this meeting also reflect that the Supervisory Board agreed to use the proceeds to satisfy the 2000

---

[36]Avila noted that, after the unsuccessful attempt to locate a purchaser for ALH or substantially all of its assets, the efforts to sell ABI involved interactions with approximately twenty building companies.  The Supervisory Board and JMP eventually narrowed this list of twenty down to six viable buyer candidates, among whom the Mattamy bid materialized.  (Id.)

[37]EBITDA is a metric that measures the earnings of an entity "before interest, taxes, depreciation and amortization."

[38]The minutes drafted by Stein reflect, and Buchler, Krieger and Stein each recall, that Avila characterized the transaction as fair from a financial perspective.  (PTX 233)  Avila, however, said that his characterization of such was unlikely because "fair is a dangerous term in [the investment banking] industry."  (D.I. 182 at 209)

loan and the 2002 loan, the maturity dates of both loans having since passed.[39] (PTX 233)

After the distribution of the net proceeds from the sale of ABI, ALH retained approximately $1.6 million to improve upon operations at BBC and MHI.[40] (PTX 247; D.I. 176 at 180) Fried Frank, however, cautioned the members of ALH that if ALH went into bankruptcy within a year of this distribution, the repayment of the 2000 and 2002 loans would be recoverable as preferences. (PTX 254) The members considered this advice especially salient, as many had acknowledged that ALH maintained its financial stability only so long as the Swiss Re Debt continued to receive extensions. (D.I. 175 at 146-47; D.I. 181 at 273-74; D.I. 183 at 15, 22)

Arenson conveyed his "personal congratulations" to Shamrock in closing the deal with Mattamy (D.I. 146 at III, ¶¶ 104, 107-116; PTX 240) and, according to Buchler, Arenson likewise expressed gratitude that his portions of the 2000 and 2002 loans would be repaid. (D.I. 175 at 136) Arenson further noted that his vote against the sale represented a difference of opinion, and that he continued to hold Krieger and Buchler in the highest regard. (PTX 238)

---

[39]According to the minutes, Arenson suggested this disbursement of the proceeds. (*Id.*) Arenson testified that he offered no such statement. (D.I. 181 at 103)

[40]The sale of ABI generated approximately $12.5 million. (PTX 247) ALH paid out $4.2 million in connection with the Bowden Settlement. (*Id.*) Both the 2000 and 2002 loans were repaid in full. With respect to the parties involved in the sale process, Fried Frank received approximately $400,000 and JMP received $200,000. In addition to repayment of the 2000 and 2002 loans, Shamrock received $200,000 in outstanding consulting fees and $66,000 in outstanding expenses. (*Id.*) Shamrock also received a $200,000 bonus granted by a special committee, comprised solely of Arenson and Lamm, formed to consider whether Shamrock should be paid a fee for its role in the sale of ABI to Mattamy. (PTX 240)

Soon after the sale of ABI, JMP began marketing BBC to several potential buyers.[41] (PTX 242)  Buchler and Stein believed that BBC had a very uncertain future in light of its financial constraints and management turmoil. (PTX 250)  Around the same time, ALH began contemplating yet another extension of the Swiss Re Debt. (PTX 261)  Krieger hoped that the sale of BBC would generate funds that ALH could use to reduce the Swiss Re Debt sufficiently to warrant a further extension of the maturity date. (PTX 250; D.I. 177 at 116-17)  In November 2003, Krieger and Buchler convinced Swiss Re to grant ALH a two year extension. (D.I. 175 at 147-48)  Pursuant to the terms of the extension, Krieger and Buchler earmarked $4 million of the proceeds from the proposed sale of BBC for repayment of the Swiss Re Debt. (PTX 261)

JMP solicited offers for BBC from a pool of roughly 20 potential buyer candidates. (PTX 270)  On March 24, 2004, the Supervisory Board met to consider a $7.25 million offer from Levitt,[42] which JMP considered to be the "only serious bid" for BBC. (*Id.*)  JMP also indicated that the offer fell within the range of comparable transactions and EBITDA multiples that could be expected. (*Id.*)  In light of JMP's

---

[41]Buchler continued to represent to Arenson that Shamrock was open to the concept of a Class B member buy out. (*Id.*)

[42]A conflict arose, at least temporarily, in the negotiations between Levitt and ALH management.  John Laguardia ("Laguardia"), ALH II's president and COO, allegedly assisted Levitt with the potential acquisition of BBC.  Laguardia was also a director in a company in which Levitt had significant ownership interests. (D.I. 182 at 223, 225)  Also assisting in these negotiations was Jeffrey Sweeney ("Sweeney"), the president of BBC, who would be leaving ALH to work for BBC's buyer. (*Id.*)  Avila identified these potential conflicts and revealed them to the Supervisory Board. (*Id.*)  Upon the advice of Fried Frank, Laguardia drafted a letter to the Supervisory Board revealing both his and Sweeney's relationship to Levitt, and seeking approval for their continued participation in the negotiations. (DTX 106)  The Supervisory Board granted this request.

assessment of the transaction, Krieger, Buchler and Stein voted in favor of the
accepting Levitt's offer. (PTX 270; D.I. 175 at 152-54) Both Arenson and Lamm voted
against the sale. (PTX 270) From the proceeds of this sale, ALH applied the promised
$4 million to the Swiss Re Debt, leaving ALH with net proceeds of $1.65 million.[43] (PTX
269)

The Supervisory Board's hopes to salvage MHI began to wan almost
immediately after the sale of BBC. Construction lenders, wary of the looming Swiss Re
Debt, refused to provide any lines of credit unless ALH could somehow receive another
extension.[44] (PTX 272) Buchler and Stein concluded that, after accounting for MHI's
secured debt and the Swiss Re Debt, no equity remained in MHI. (PTX 279; D.I. 176 at
5; D.I. 178 at 70) Holding the belief that MHI was "under water" and could no longer
sustain its operations, ALH entered into negotiations with Levitt for the potential sale of
MHI. Swiss Re approved the proposal submitted by Levitt; however, Levitt withdrew its
interest in MHI after performing due diligence in October 2004. (PTX 283)

After negotiations with Levitt proved unsuccessful, a bid from Mattamy
materialized, offering to buy MHI for $6.5 million.[45] (PTX 283) Swiss Re again
approved of the transaction with the understanding that ALH would retain $1 million

---

[43]Laguardia received a $1 million bonus according to his employment contract,
Sweeney received $300,000, and both went to work for Levitt. (PTX 266)

[44]Indeed, Buchler and Stein met with Wachovia and Ohio Bank several times to
avoid "hav[ing] the situation deteriorate any further." (PTX 279)

[45]Bill Lanius ("Lanius") submitted Mattamy's bid to ALH. At the time ALH
received Mattamy's bid, Lanius served as both an officer of ALH and the president of
Mattamy. (D.I. 181 at 299-300)

23

from this transaction, and that Swiss Re would pay a $12.5 million shortfall to Wachovia. (*Id.*) In connection with its sale proposal, Mattamy sought a standard release from the directors of MHI.[46] (DTX 136) Lamm, however, refused to execute the release unless he likewise received a release from ALH with respect to his obligations under the Settlement Agreement. (*Id.*; D.I. 182 at 130) ALH granted Lamm's request. (DTX 136; D.I. 182 at 130-31)

The Supervisory Board, minus Arenson,[47] met on December 15, 2004 to consider the proposed terms of the Mattamy bid. (PTX 287; PTX 292) The quorum unanimously approved Mattamy's offer.[48] (PTX 295) Most of the proceeds went directly towards the Swiss Re Debt, ALH keeping only the previously agreed upon $1 million. (D.I. 177 at 121) In consideration of this payment, Swiss Re, taking a $12.5 million loss on its bond in the process, released ALH from further obligations. (D.I. 146 at III, ¶ 128) The $1 million net proceeds remains in the treasury of ALH. (D.I. 176 at 34) The sale of MHI commenced the winding down process for ALH.

Throughout the sale process of the Operating Divisions, Neuberger repeatedly characterized plaintiffs' actions as breaches of fiduciary duties. (DTX 85; DTX 264; PTX 369) In response, plaintiffs filed this declaratory action seeking a determination

---

[46]The directors of MHI were Arenson, Krieger and Lamm. (*Id.*)

[47]Arenson initially confirmed that he would attend the meeting, but advised that he was unable to attend on the day before the meeting. (PTX 287; PTX 292)

[48]While the other members of the Supervisory Board testified to various merits of the Mattamy bid including, inter alia, the fairness of the price, Lamm indicated that his vote here was largely influenced by the release he would obtain in connection with the sale. (D.I. 177 at 121; D.I. 180 at 95)

that they did not breach any fiduciary duties with respect to the sale of the Operating Divisions.

## III. CONCLUSIONS OF LAW

### A. Fiduciary Duty Claims

Delaware law explicitly defines the separation of (and relationship between) an entity's management and its ownership. *See, e.g.,* 8 Del.C. § 141 ("(a) The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ."). Pursuant to this separation, shareholders, the passive owners, must depend upon the integrity and deliberate consideration of the directors who manage the corporation. To insulate this relationship of trust between shareholder and director, the director's managerial authority is constrained by the traditional fiduciary duties of loyalty and care. *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993).

The Delaware General Assembly has applied similar maxims to the alternative entity context. In recognition of the sophisticated parties involved in such ventures, the Delaware Limited Liability Act provides great flexibility with respect to the "scope, structure and personality of limited liability companies." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *1 (Del. Ch. May 7, 2008); *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1063 (Del. Ch. 2006). Indeed, the members of a LLC may contract to expand, restrict or even eliminate certain fiduciary duties. *See* 6 Del. C. § 18-1101(c).

In addition to any contractual limitations upon fiduciary duties that the members

25

of an LLC might agree upon, the business judgment rule protects directors from spurious claims against their exercise of discretion in an effort to "promote the full and free exercise of the managerial power granted to Delaware directors." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985). The business judgment rule is a corollary that flows from the authority and responsibility inherent in the director's role. *See id.* Pursuant to this maxim, a court will not disturb the business decisions of loyal and informed directors "if they can be attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *see also Cede*, 634 A.2d at 361. Functionally, the business judgment rule acts as a rule of evidence which creates a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The challenger may rebut this presumption by "providing evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty - good faith, loyalty or due care."[49] *Cede*, 634 A.2d at 361. It is a "near-Herculean task" for a challenger to meet this burden. *Stanziale v. Nachtomi*, 416 F.3d 229, 238 (3d Cir. 2005).

### 1. Contractual fiduciary duties

Addressing first the nature of the fiduciary duties as contemplated by the members of ALH, the Operating Agreement provides, in relevant part:

---

[49]The Delaware Supreme Court has explained that the duty of good faith falls squarely within the duty of loyalty. *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

26

Neither the Manager nor any Representative [] shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager [and] Representatives [] shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence.

(PTX 3 at 27)  On its face, this provision indicates that the sophisticated parties who

negotiated the Operating Agreement expressly eliminated fiduciary duties to the extent

that an act or failure to act does not involve "fraud, criminal action, bad faith or gross

negligence."[50] (*Id.*)  Furthermore, in accordance with Delaware law, the Operating

Agreement's sweeping elimination of fiduciary duties retains the minimum implied

covenant of good faith and fair dealing.  6 Del. C. § 18-1101(c).  Insofar as defendants

do not contend that plaintiffs acted fraudulently or criminally, the court will confine its

analysis to whether plaintiffs' actions comport with the contractual prohibitions of bad

faith and gross negligence.

### a. Bad faith

The Third Circuit has explained that a showing of bad faith occurs when the

challenger

establish[es] that a decision was so egregious as to constitute corporate waste. The burden here is to show irrationality: a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith. Put positively, the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.

*Stanziale*, 416 F.3d at 238.  The Delaware Supreme Court further clarified the scope of

---

[50]In essence, the Operating Agreement imposes the traditional duty of care, but retains only a subset of the duty of loyalty in its prohibition against actions made in bad faith.

bad faith violations, noting that

> [a] failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).  Thus, while decisions based in irrationality may bespeak a failure to discharge the duty of good faith, the same is true of decisions made "for any personal advantage or out of improper motive or intentional disregard of shareholder interests." *See Stanziale*, 416 F.3d at 238; *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 604 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974).

      The court notes at the outset that, within the context of ALH's tenuous financial stability, the decision to sell the Operating Divisions belies any notion of irrationality.[51] While defendants attempt to brush aside the obstacles faced by ALH as a "manufactured liquidity crisis," the contemporaneous record before the court reads as a near litany of financial calamities that illuminate ALH's dire need for an influx of capital. Beginning at its inception, the Operating Agreement saddled ALH with the substantial obligations in the form of the Elovic Debt and the Arbor Debt.  (PTX 3 at 14)  ALH's obligations snow-balled under Lamm's mismanagement, the debt-leveraging associated with the acquisition of each Operating Division and the consistent failure of ALH to meet

---

    [51]The court agrees with plaintiffs that defendants have placed into issue only the decision to sell the Operating Divisions, and not the price received for any such transaction.

its business plans.

It is also evident that, after a certain point, neither the Class A nor the Class B members would continue to contribute capital to the black hole of equity which ALH had become.  After the 2000 and 2002 loans, Shamrock declared that it would not extend ALH any more funds, in the form of a loan or otherwise, a declaration that was echoed by several frustrated Class B members.  Even the Class B members who continued to advocate for an influx of capital expressed reluctance at the idea of a capital contribution in which Shamrock did not provide its pro rata share.

With respect to the sale of ABI, Krieger's conclusions that the Bowden Litigation posed a serious threat of sufficient immediacy, and that ALH lacked the liquidity to satisfy the damages that would almost certainly flow from this suit, were well grounded in relevant business considerations.  (D.I. 177 at 111-12)  Importantly, at the June 26, 2003 meeting, the Supervisory Board unanimously approved the Bowden Settlement immediately before they moved on to consider the sale of ABI.  Aside from Arenson's chimerical suggestion to contribute more capital, the Supervisory Board failed to identify any viable alternatives that would account for satisfaction of the approximately $5 million Bowden Settlement.  It follows that the Supervisory Board considered (and ultimately approved) the sale of ABI to provide the necessary liquidity for the Bowden Settlement.

Plaintiff members of the Supervisory Board made the decision to sell BBC after the consideration of different, but equally alarming, concerns.  By this point, the Swiss Re Debt had already received several extensions, and the Supervisory Board had begun preparations to seek yet another.  Both Buchler and Krieger reasonably

29

concluded that Swiss Re would require more than ALH's renewed promise to eventually satisfy the Swiss Re Debt. Their commitment of the BBC sale proceeds to Swiss Re represented the logical recognition that ALH, again, had no other way to satisfy its obligations and prolong its existence other than through a sale of its assets.

While the decision to sell BBC was partially based upon the hope that the proceeds could resuscitate MHI's ailing operations, plaintiff members of the Supervisory Board quickly realized that MHI was in "dire straights" and "literally had a few days or, at most, a few weeks left where it could operate with its present capital constraints[.]" (D.I. 176 at 16) Indeed, soon after the sale of BBC, it became apparent that the sale of MHI would be necessary to assist in the winding down of ALH. At this point, plaintiff members of the Supervisory Board rightfully focused upon negotiating a release from the Swiss Re Debt - a release that likely would not have occurred but for the $6.5 million in proceeds from the sale of MHI. On these grounds, the decision to sell MHI and avoid insolvency was both rational, and made in the best interests of ALH.

The court turns next to the issue of whether the sale of the Operating Divisions could give rise to a claim of bad faith. Defendants allege that plaintiff members of the Supervisory Board acted contrary to the best interests of ALH by forcing a liquidation to obtain an exclusive benefit to the detriment of ALH and its members. In making this argument, defendants conjure a financial landscape in which ALH was free of capital constraints, met its business plans and could easily satisfy its obligations as they became due.

As an initial matter, these allegations are inconsistent with the factual record before the court. Defendants brush aside several looming threats to the continued

30

existence of ALH, the most notable of which were the Bowden Litigation and the
numerous extensions of the Swiss Re Debt.  Defendants also ignore the effects of
Lamm's mismanagement upon ALH.  Likewise, little attention is paid to the fact that the
Supervisory Board had unanimously determined that the ALH investment had
continued well beyond Lamm's promised exit date and that it was time to move on as
quickly and as favorably as possible.

The most glaring deficiency in defendants' argument, however, is the failure to
explain why plaintiff members of the Supervisory Board elected to liquidate ALH and, in
the process, sacrifice Shamrock's $9 million equity position for $4.2 million in loan
repayments.  Contrary to defendants' allegations, Shamrock, as the holder of the
largest share of equity, had the greatest apparent motivation to explore all potential
avenues to salvage the equity of ALH.  Clearly, Shamrock would have preferred to
locate a buyer for the entire company and capitalize upon the substantial investment in
ALH.  JMP's meticulous search for such, however, revealed feeble interest in an
acquisition of the entire company, with several buyers expressing a preference for less
than all of the Operating Divisions.  JMP's ultimate recommendation to remove ALH
from the market for approximately 18 months required the Supervisory Board to decide
between following JMP's advice (during which time ALH would likely deteriorate further
and require more capital which its members had already refused to contribute) or
pursuing a sale of less than the entire company in order to salvage as much value as
possible.  Faced with these equally unpalatable choices, the court cannot say that
plaintiff members of the Supervisory Board harbored an improper motive in the decision
to sell the Operating Divisions.

31

For the reasons discussed above, the court concludes that defendants have failed to prove that plaintiff members of the Supervisory Board made the decision to sell the Operating Divisions in bad faith.

### b. Gross negligence

The Operating Agreement likewise provides for liability with respect to an action or failure to act tainted by gross negligence. The Delaware Supreme Court has used gross negligence as the benchmark "for determining whether a business judgment reached by a board of directors was an informed one." *Van Gorkom*, 488 A.2d at 873.[52] The process of making an informed decision (and thus avoiding gross negligence) requires a board of directors to consider "prior to making a business decision, [] all material information reasonably available to them." *Id.* at 872 (quoting *Aronson*, 473 A.2d at 812.). Accordingly, a finding of gross negligence is appropriate where the board of directors has made "an unintelligent or unadvised judgment" or has acted "without the bounds of reason and recklessly[.]" *Id.* at 873 (citing *Mitchell v. Highland-Western Glass Co.*, 167 A. 831, 833 (Del. Ch. 1933) and *Gimbel v. Signal Cos.*, 316 A.2d 599, 615 (Del. Ch. 1974)).

As described above, the process through which the Supervisory Board considered and approved the sales of the Operating Divisions occurred over the course of several months and in a difficult business environment. During this process, the

---

[52]Since *Aronson*, 473 A.2d 805, the Delaware Supreme Court has consistently held that "under the business judgment rule director liability is predicated upon concepts of gross negligence." *Van Gorkom*, 488 A.2d at 873; *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 53. Thus, the gross negligence standard in the Operating Agreement equates to the requirement that the Supervisory Board observe the traditional duty of care. *See Van Gorkom*, 488 A.2d at 873.

32

Supervisory Board was advised by ALH's management and JMP, the financial advisor

selected by Lamm and engaged unanimously by the Supervisory Board. The

Supervisory Board also had the benefit of outside legal counsel.[53]

Furthermore, it is evident that the Supervisory Board informed itself by

deliberating each contemplated sale. The minutes of the meetings in which the

Supervisory Board considered selling the Operating Divisions are replete with

statements by plaintiff members of the Supervisory Board as to why the sale was

necessary, as well as defendants' objections to each respective sale. Irrespective of

defendants' allegations of the "scripted" nature of these meetings, the court finds that

the ramifications of these proposed transactions were extensively explored. Indeed, the

deliberation of these transactions began (and continued) outside of the board room. A

continuing dialogue in which the Class A members and the Class B members

considered alternative outcomes is evident in the emails sent by Neuberger reminding

plaintiffs of fiduciary duty, as well as the unsuccessful Class B buy-out negotiations.

Likewise, Shamrock's significant equity stake in ALH objectively signifies a

motivation[54] to seek the best deal available. This situation invokes the "natural

---

[53]The court remains unconvinced that the use of Fried Frank in connection with
the sale process created a conflict that would bring into question the objectivity of any
advice provided by the firm and received by the Supervisory Board. While Shamrock
had used Fried Frank several times in the past, concerns of objectivity in this matter are
minimized by the firm's recommendation that the Supervisory Board obtain a fairness
opinion, noted in defendants' brief, which would ultimately assess the fairness of the
proposed transaction to all members of ALH. Thus, the evidence of record suggests,
rather than refutes, that Fried Frank appropriately counseled the Supervisory Board
with respect to its fiduciary duties.

[54]Assuming, arguendo, defendants' allegations that Shamrock controlled the
actions of Krieger, Buchler and Stein.

33

inference" that a heavily invested party would seek "the highest value reasonably available . . . ." *McGowan v. Ferro*, 859 A.2d 1012, 1035 (Del. Ch. 2004); *see also In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at \*10 n.47 (Del. Ch. 2006) (citing *R. Franklin Balotti, Equity Ownership and the Duty of Care: Convergence, Revolution, or Evolution?*, 55 BUS. LAW. 661, 692 (2000) ("The intuitive and experiential foundations for these principles now find additional support in empirical research that shows that substantial equity holdings in fact promote superior board monitoring and effective corporate decision making.")).

Finally, the failure to obtain a fairness opinion does not evince gross negligence, let alone the conscious and intentional disregard of plaintiffs' responsibilities that defendants contend. Delaware courts have consistently held that a fairness opinion is not a condition precedent to satisfying the duty of care. *See Oberly v. Kirby,* 592 A.2d 445, 472 (Del. 1991) (citing *Van Gorkam*, 488 A.2d at 874).

The reliance on legal and financial counselors and adequate deliberations, as well as Shamrock's incentive to seek a high price, do not support the finding that plaintiff members of the Supervisory Board made an uninformed decision to sell the Operating Divisions. Consequently, the court concludes that defendants have not proven that said decision resulted from gross negligence.

### 2. Duty of loyalty

Alternatively, the court examines the record for compliance with the unmodified duty of loyalty. By default, the directors of an LLC owe a fiduciary duty of loyalty to the LLC and its members. *VGS, Inc. v. Castiel*, 2000 WL 1277372, at \*5 (Del. Ch. 2000),

*aff'd*, 781 A.2d 696 (Del. 2001). "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede*, 634 A.2d at 361. Essentially any corporate decision which directly or indirectly confers a benefit upon a participating director can implicate the broadly construed duty of loyalty. *See Aronson*, 473 A.2d 805 (Del. 1984); *Cede*, 634 A.2d 345 (Del. 1993).

Aside from interested transactions which confer a direct or indirect financial benefit to the director, the duty of loyalty also arises in the corporate setting where a relationship with an interested party may affect the independent judgment of the director. *Orman v. Cullman*, 794 A.2d 5, 25-26, n.50 (Del. Ch. 2002). Specifically, a court should inquire into whether this relationship rises to a level where the interested party controls the director. The Delaware Chancery Court has explained that a controlled director

> is dominated by [the interested] party, whether through close personal or familial relationship or through force of will. A director can also be controlled by another if the challenged director is beholden to the allegedly controlling entity. A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.[55]

---

[55]The Delaware Supreme Court adopted this language in *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).

35

*Id.* A finding of independence must result from a subjective inquiry into the allegiance

of each director on a case by case basis. *Id.* at 31. Of course, it remains the

challenger's burden to rebut the presumption of the business judgment rule by alleging

such facts as to put the participating director's independence into question.

Defendants' allegations raise both types of duty of loyalty violations, and the

court addresses each in turn.

### a. Interested transactions

Defendants advance two separate theories that classify the sale of the Operating

Divisions as an interested transaction. First, defendants assert that Shamrock, in

violation of its fiduciary duty of loyalty,[56] used its control over the Supervisory Board to

force the liquidation of ALH. To establish Shamrock's abuse of control, defendants

point to evidence of record which demonstrates that Sharnrock intended to "exit its

investment" and obtain repayment of its loans. Defendants cite to *Sinclair* for the

proposition that self-dealing (an interested transaction) results in causing the dominated

entity to act in such a way that the majority shareholder receives a benefit not received

by the minority shareholders. 280 A.2d at 720.

In *Sinclair*, the minority shareholders of Sinclair Venezuelan Oil Company

("Sinven") sued the directors of Sinclair Oil Corporation ("Sinclair"), the parent company

---

[56]As previously mentioned, Shamrock appointed three of its employees to the
Supervisory Board. Through its power to appoint 3 of the 5 members of the
Supervisory Board, Shamrock controlled (at least indirectly) more than half of the voting
power of ALH. *Weinstein Enters. v. Orloff*, 870 A.2d 499, 507 (Del. 2005). Shamrock,
as the controlling shareholder of ALH, owed the fiduciary duty of loyalty to ALH and its
members. *Id.*

36

of Sinven. Sinclair nominated all of the board members of Sinven and, through this control, caused Sinven to pay out excessive dividends to the point that Sinven retained insufficient capital to pursue certain business opportunities. *Id.* The Delaware Supreme Court found no evidence of self-dealing on Sinclair's behalf and applied the business judgment standard, noting that the declaration of dividends resulted in the distribution of benefits proportionate to each shareholder's respective stake in the company. *Id.* at 721. Sinclair stands for the proposition that no self-dealing is present in a corporate action which treats all stockholders similarly.

In accordance with avoiding self-dealing under *Sinclair*, the sale of the Operating Division likewise resulted in similarly situated ALH members receiving proportionate benefits. First, these transactions eliminated the equity of ALH, a financial harm that resounded across ALH and affected members proportionately. Second, each member (including several among defendants) who **chose to participate** in the 2000 and 2002 loans received a proportionate benefit in the satisfaction of these loans through the sale proceeds. Significantly, the Supervisory Board unanimously voted to apply sales proceeds to the satisfaction of these loans.

Finally, it is noteworthy to mention again at this juncture that Shamrock held a substantially greater equity stake than any other member in ALH, and suffered the greatest harm in the eradication of this equity. Shamrock's interests were aligned with the Class B members with respect to the sale of ALH, and it would strain credulity to posit that either desired anything other than the greatest return on equity possible. *McGowan*, 859 A.2d 1012. For the foregoing reasons, the court finds that defendants

37

have failed to demonstrate that Shamrock breached its fiduciary duties as the controlling shareholder.

Defendants also allege that Buchler, Krieger and Stein acted to sell the Operating Divisions pursuant to their own self interests. Defendants assert that the time these directors spent with respect to keeping ALH afloat detracted from their ability to pursue other investment opportunities for Shamrock. While defendants credibly support that plaintiffs were unhappy with the current trajectory of ALH's timeline, defendants fail to point to any evidence that this dissatisfaction rose to a level where Shamrock considered the time of its employees to be more material than its $9 million investment. Indeed, the Delaware Court of Chancery rejected a similar argument that a heavily invested fiduciary would "leave a substantial sum of money on the table in favor of a new and untested business endeavor." *Id.* at 1035.

In sum, the court has failed to identify any conduct on the part of plaintiffs that can be properly called self-dealing or interested behavior.

### b. Director independence

Defendants also argue that Krieger, Buchler and Stein lacked the independence necessary to discharge their duty of loyalty as directors of ALH due to concurrent roles as high ranking Shamrock employees. The court finds it noteworthy that the issue of independence usually arises within the context of demand futility in corporate derivative actions. *See Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Aronson*, 473 A.2d 805. With respect to demand futility, a finding that a director lacked independence results in the legal conclusion that the director lacked the capacity to consider the demand disinterestedly, a conclusion that has no ultimate bearing upon the applicability of the

38

business judgment rule to the challenged corporate action. *Aronson*, 473 A.2d at 809.

Moreover, as noted above, the parties involved in the formation of an LLC warrant a presumption of sophistication over those present in a corporate setting. *See Fisk Ventures*, 2008 WL 1961156, at *1; *ABRY Partners V*, 891 A.2d 1032. The unanimously approved Operating Agreement and Settlement Agreement resulted from arms-length negotiations between the respective classes of equity investors, many of whom had extensive investment experience. While the Settlement Agreement changed the composition of the Supervisory Board by giving Shamrock the right to designate a third seat, this was a result properly attributable to Lamm's mismanagement, not a power play by Shamrock to increase its control over ALH. Shamrock, holding the largest equity position in ALH, had every reason to demand increased oversight in order to prevent the recurrence of the numerous transgressions perpetrated by Lamm and his associates that permeated ALH and its subsidiaries.

Accordingly, having previously found that plaintiffs faithfully discharged the fiduciary duties of care and loyalty, the court concludes that Shamrock's employment of a majority of the Supervisory Board does not, in of itself, overcome the presumption of the business judgment rule.

## B. Indemnification

Having found no breach of fiduciary duty, the court turns to whether ALH must indemnify plaintiffs for the fees and expenses incurred in this declaratory judgment action. The Delaware Limited Liability Act permits the members of an LLC to contract

39

to indemnify its members and managers.  6 Del. C. § 18-108.[57]  These statutes grant

the contracting parties broad authority to determine the nature and extent of

indemnification, if any.  Morgan v. Grace, 2003 WL 22461916, at *2 (Del. Ch. Oct. 29,

2003).

The Operating Agreement contains no provision regarding indemnification.

Plaintiffs, however, seek a declaration confirming ALH's authority to indemnify Buchler,

Krieger and Stein in their roles as members of the Supervisory Board.  This declaration

would presumably allow Buchler, Krieger and Stein to use their majority position on the

Supervisory Board to indemnify themselves for their declaratory action.  Irrespective of

the broad authority granted to the Supervisory Board to indemnify by statute, absent a

pre-existing provision in the Operating Agreement that expressly provides for

indemnification, the court will not sanction an interested transaction of this nature.

Alternatively, plaintiffs contend that ALH II must indemnify Buchler and Krieger

pursuant to their roles as directors of this corporation.[58]  This argument lacks merit.

The challenged transactions resulted from decisions made by the Supervisory Board,

---

[57]"Subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever."

[58]Plaintiffs rely upon 8 Del. C. § 145(c), which provides:

(c) To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

40

not from any actions taken by a director of ALH's subsidiary companies. While ALH II,
as the direct parent of the Operating Divisions, had to eventually approve each
challenged transaction, it does not change the fact that the ultimate authority to sell
each Operating Division originated with the Supervisory Board of ALH.

Accordingly, the court will not order ALH to indemnify plaintiffs for the costs
associated with this action.[59]

## C. Bad Faith Claim

The court also finds against plaintiffs' bad faith claim. Pursuant to the American
Rule, parties must each bear their own litigation expenses, absent "narrowly defined
circumstances." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (U.S. 1991). Bad faith,
one of the four limited exceptions to the American Rule, includes "the circumstances
where [an] action is brought in bad faith, or where the defendants' bad faith forces the

---

[59]The court recognizes that the SCA Consulting Agreement obligates ALH to
indemnify and hold harmless SCA against all liabilities arising from or relating to the
consulting arrangement, except "to the extent that it is finally judicially determined that
they result primarily from actions taken or omitted by SCA in bad faith or due to SCA's
gross negligence or willful misconduct." (PTX 44 at 24324)

While the question of SCA's liability is (marginally) before the court in
defendants' allegations that SCA aided and abetted breaches of fiduciary duty, the
court likewise finds against SCA's claim for indemnity. First, the sparse facts regarding
SCA highlighted by the parties' otherwise rich and extensive briefing, along with the 2
paragraphs that plaintiffs dedicate (out of approximately 140 pages) to refuting the
allegations of aiding and abetting, belie anything greater than a nominal cost associated
with SCA's participation in this action. In a related concern, the court questions the
practicality of determining the costs associated with defending against this claim when
most of the leg work occurred in the context of defending against breaches of fiduciary
duties, a common element among plaintiffs. Indeed, because identifying a breach of
fiduciary duty is a condition precedent to liability for aiding and abetting, the court does
even not reach this issue. Perhaps most importantly, SCA chose to involve itself in
instituting this action, and thus played an implicit role in creating this liability. For all of
these reasons, the court denies SCA's request for indemnity.

filing of the action." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d

225, 231 (Del. Ch. 1997). In assessing a claim of bad faith, a court must determine that

the challenged party acted in subjective bad faith. *Id.* at 232. A party alleging bad faith

must prove such through "a higher or more stringent standard of proof, i.e., 'clear

evidence'." *Id.* (citing *Chambers*, 501 U.S. at 44; *Sierra Club v. U.S. Army Corp of

*Engineers*, 776 F.2d 383, 390 (2d Cir. 1985) (bad faith exception requires "clear

evidence" that party's claims were without color and brought for improper purposes)).

Plaintiffs allege that defendants and Neuberger prosecuted the counterclaims in

bad faith. Specifically, plaintiffs submit that in 2002, Lamm and Neuberger concocted a

scheme to present Shamrock with a choice to face litigation over the challenged

transactions, or "compromise" with the Class B members and simply walk away from

the investment (thus absolving Lamm of his liability under the Settlement Agreement).[60]

---

[60]Plaintiffs point to correspondence between Lamm and Neuberger to
substantiate this claim. In an email, Lamm proposed to Neuberger that,

[a]s an alternative to a fight with Shamrock in which the B investors try to get
their funds back from SCA, what if the negotiations were made easier by telling
SCA that an alternative solution is for all of the A investors to walk from the
investment leaving the companies and operations to the B investors? The first
order of business would be assembling a management team, assessing what
potential exists and what investment would be required to realize it, and then to
aggressively work on a severe cram down with respect to Swiss Re.

In response to Neuberger's email asking how Lamm believed they could accomplish
this, Lamm replied:

As part of a negotiation. The first part being a meeting [where] demands be
made that SCA buy out the [Class B members] at par. Sword rattling to
commence. As part of a follow up "compromise" - the offer for [the Class A
members] to "walk" becomes the solution with all parties agreeing to stop
pursuing each other.

42

Plaintiffs corroborate this scheme through Neuberger's 2003 position email indicating that it was the Class B members' "collective position" that Shamrock desired to exit the ALH investment at the cost of the other investors, as well as Neuberger's alleged "anti-SCA file."

Plaintiffs' allegations of bad faith fail for several reasons. Neuberger, as trustee of the Davodici Trust, had an interest in preserving the equity of ALH and believed that the sale of the Operating Divisions threatened this equity. These concerns motivated Neuberger to (repeatedly) emphasize to plaintiff members of the Supervisory Board the fiduciary duties implicated by this proposed transaction. Furthermore, Neuberger's cooperation with Lamm regarding the burgeoning malcontent between Lamm and Shamrock does not clearly evince a nefarious strategy and is plausibly explained by Neuberger's realization that Lamm was critical to the sale process. Likewise, while not required to obtain a fairness opinion with respect to the sale of the Operating Divisions, plaintiffs can not credibly contend that the counterclaims are "meritless" without the benefit of such. Indeed, a fairness opinion may well have obviated the need for this litigation altogether. Finally, defendants' counterclaims largely mirror plaintiffs' declaratory judgment. While Shamrock may have spent millions of dollars in the declaratory action that it brought, defendants' counterclaims likely account for a nominal portion of this figure.

While the record reveals that the relationships between the members of ALH deteriorated dramatically (most notably, between Lamm and Shamrock), plaintiffs have

---

(PTX 417)  Neuberger, in discussing Lamm's email with other Class B members, noted that "[Lamm] is an optimist."  (DTX 292)

failed to demonstrate by clear evidence the subjective bad faith of defendants and Neuberger in pursuing the counterclaims. Accordingly, each party will bear its own costs.

## IV. CONCLUSION

For the reasons stated, the court concludes that plaintiffs breached no fiduciary duties with respect to the sale of ALH's Operating Divisions. Because the court finds against plaintiffs with respect to the indemnification and bad faith claims, the parties will bear their own costs. An appropriate order shall issue.